AES:LHE/JAM/GSM
F. #2018R01064

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

DAVID GENTILE,
JEFFRY SCHNEIDER and
JEFFREY LASH,

                   Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

**I N D I C T M E N T**

Cr. No. **1:21-cr-00054(DG)(PK)**

(T. 15, U.S.C., §§ 78j(b) and 78ff; T. 18,
U.S.C., §§ 371, 981(a)(1)(C), 1349,
1343, 2 and 3551 et seq.; T. 21, U.S.C.,
§ 853(p); T. 28, U.S.C., § 2461(c))

## INTRODUCTION

At all times relevant to this Indictment, unless otherwise indicated:

I.    <u>GPB Capital and Related Entities</u>

       1.    GPB Capital Holdings LLC ("GPB Capital") was an investment adviser

registered with the United States Securities and Exchange Commission, with its principal place

of business at 535 West 24th Street, Floor 4, New York, New York.  GPB Capital was founded

in or around 2013 and served as the general partner of several investment funds, including GPB

Holdings, LP ("Holdings I"), GPB Holdings II, LP ("Holdings II"), GPB Automotive Portfolio,

LP ("Automotive Portfolio"), GPB Waste Management, LP ("Waste Management") and GPB

Cold Storage, LP ("Cold Storage") (collectively, the "GPB Funds").  The business of GPB

Capital was to manage the GPB Funds, which raised and invested capital in a portfolio of private

equity investments.  Since inception, the GPB Funds have collectively raised over approximately

$1.8 billion in capital from investors.  In its most recent Form ADV, filed on December 10,

2020, GPB Capital claimed to manage assets totaling approximately $239 million.

2.      Holdings I was formed in or around March 2013.  As of approximately December 2019, Holdings I had raised approximately $193 million from investors.  Holdings I's primary strategy was to acquire and operate existing, profitable businesses, including and in particular car dealerships, though it also invested in life sciences companies and information technology ("IT") service businesses.  Several dozen investors in Holdings I were residents of the Eastern District of New York, including a number residing in Brooklyn, Queens and Staten Island.

3.      Automotive Portfolio was formed in or around July 2013.  As of approximately December 2019, Automotive Portfolio had raised approximately $675 million from investors.  Automotive Portfolio's primary strategy was to acquire and operate car dealerships.  Over one hundred investors in Automotive Portfolio were residents of the Eastern District of New York, with several dozen residing in Brooklyn, Queens and Staten Island.

4.      Holdings II was formed in or around April 2015.  As of approximately December 2019, Holdings II had raised approximately $680 million from investors.  Holdings II's primary strategy was to acquire and operate existing, profitable businesses, including car dealerships and IT service companies.  Over one hundred investors in Holdings II were residents of the Eastern District of New York, with several dozen residing in Brooklyn, Queens and Staten Island.

5.      Cold Storage was formed in or around July 2015.  As of approximately December 2019, Cold Storage had raised approximately $57 million from investors.  Cold Storage's primary strategy was to acquire cold storage facilities.  Several investors in Cold Storage were residents of the Eastern District of New York.

6.      Ascendant Capital LLC ("Ascendant"), based in Austin, Texas, served as the placement agent and marketing firm for the GPB Funds.  As the placement agent, Ascendant helped raise capital for the GPB Funds.

II.    The Defendants

7.      The defendant DAVID GENTILE was a resident of Manhasset, New York and the founder, owner and Chief Executive Officer ("CEO") of GPB Capital.  Prior to forming GPB Capital, GENTILE, a licensed certified public accountant, worked for an accounting firm. Since GPB Capital's inception, GENTILE had primary responsibility for decision-making at the GPB Funds.

8.      The defendant JEFFRY SCHNEIDER was a resident of Austin, Texas and the owner and CEO of Ascendant.  SCHNEIDER held Series 7, 24, 63 and 65 licenses from the Financial Industry Regulatory Authority.

9.      The defendant JEFFREY LASH was a resident of Naples, Florida and a managing partner of GPB Capital from 2013 through early 2018.  LASH's primary responsibility was overseeing the GPB Funds' investments in car dealerships.  Prior to his employment with GPB Capital, LASH owned and operated several car dealerships.

III.    Relevant Regulatory Principles and Definitions

10.      A "security" was, among other things, any note, stock, bond, debenture, evidence of indebtedness, investment contract or participation in any profit-sharing agreement.

11.      A "private placement memorandum" ("PPM"), also known as a private offering document and confidential offering memorandum, was a securities disclosure document used in a private offering of securities by a company or investment fund.

12.      A "distribution" was a disbursement of assets from a fund to an investor.

13.     A "management fee" was a periodic payment based on a fund's assets under management, which was paid by a fund to the fund's investment adviser for advisory and administrative services.

14.     A "performance guarantee" was an agreement pursuant to which one party agreed to personally guarantee that a specific asset would generate a specific amount of revenue over a defined period of time.  In the event the revenue generated by that asset fell short of the amount agreed upon, the party issuing the guarantee would be personally liable for the shortfall.

IV.     The Fraudulent Scheme

15.     In or about and between August 2015 and December 2018, the defendants DAVID GENTILE, JEFFRY SCHNEIDER and JEFFREY LASH, together with others, engaged in a scheme to defraud investors and prospective investors in the GPB Funds through material misrepresentations and omissions relating to, among other things: (a) the source of funds used to pay monthly distribution payments to investors in several of the GPB Funds, including Holdings I, Automotive Portfolio and Holdings II, and (b) the revenue generated by Holdings I in 2014 and Automotive Portfolio in 2015.  In furtherance of this fraudulent scheme, as set forth below, GENTILE, SCHNEIDER, LASH and others made and caused to be made material misrepresentations and omissions to investors and prospective investors in the GPB Funds.

16.     These material misrepresentations and omissions induced investors to invest their capital in Holdings I, Automotive Portfolio and Holdings II based upon their understanding that the investment strategy of those funds had been, and would continue to be, to use investor funds to purchase mature, profitable companies (the "portfolio companies") that were already generating cash flow sufficient to pay the investors' monthly distributions.  The investors were led to believe that they would receive monthly liquidity in the form of distribution

payments, but that the payment of these distributions would not diminish the value of their

invested capital, which would remain invested in the portfolio companies and potentially

generate a substantial return in the event of a liquidity event, such as a sale or initial public

offering.  In reality, from in or about and between August 2015 and December 2018, the

portfolio companies frequently underperformed expectations, the monthly distribution payments

were substantially derived from investor capital and, in December 2018, the monthly distribution

payments were suspended.  The vast majority of investors in the GPB Funds have been unable to

obtain any liquidity from their investments since that time.

17.     From their inception through the present, the GPB Funds primarily raised

capital through the marketing efforts of Ascendant, whose employees contacted registered

brokers ("brokers") and registered investment advisers ("RIAs") by email, by phone and at in-

person meetings.  Ascendant employees pitched those brokers and RIAs on the GPB Funds to

encourage them to advise their individual investor clients to invest money into the GPB Funds.

Ascendant also organized due diligence seminars at which brokers and RIAs could get

information about the GPB Funds and meet with the defendant DAVID GENTILE and other

representatives of the GPB Funds.  The GPB Funds were pitched to brokers and investment

advisers as offering a rare opportunity for individuals to invest in private equity—a category of

investment that is typically only available to institutional investors.

18.     The GPB Funds and Ascendant maintained a close operational

relationship, and were considered by executives at each entity to function essentially as one

company.  At the heart of that relationship was the partnership between the defendants DAVID

GENTILE and JEFFRY SCHNEIDER, who worked together on the founding, development,

operation and marketing of the GPB Funds.  For nearly all of the relevant period, the GPB Funds
were the only investments marketed by Ascendant.

19.     The defendants JEFFRY SCHNEIDER and DAVID GENTILE were
closely involved in drafting and reviewing marketing materials and communications used by
Ascendant employees to sell investments in the GPB Funds.  SCHNEIDER and GENTILE also
personally met with investors at individual meetings and due diligence seminars.

20.     According to information disclosed in offering materials for the GPB
Funds, approximately 14 percent of investments in the GPB Funds went to pay fees, including 11
percent in combined selling fees (commissions, wholesale fees and placement fees), a 2 percent
management fee, a 1.25 percent organizational expense fee and an acquisition fee between 1.75
percent and 2.85 percent.  In total, between approximately August 2013 and March 2019, GPB
Capital received approximately $79 million in management fees and the GPB Funds paid GPB
Capital approximately $599,000 in acquisition fees.  Ascendant and its affiliated broker dealers
generated approximately $187 million in selling fees and approximately $26 million in
acquisition fees during the same period.

A.     Material Misrepresentations and Omissions about Distribution Payments

21.     From the GPB Funds' inception in 2013 until approximately 2017, the
defendants DAVID GENTILE and JEFFRY SCHNEIDER, both individually and through
employees at Ascendant, represented to investors and prospective investors in Holdings I and
Automotive Portfolio that those funds would pay to investors a monthly distribution, targeted to
equal an annualized 8 percent of invested capital, and that this monthly distribution would be
"fully covered" by "funds from operations."  In other words, GENTILE, SCHNEIDER and
Ascendant employees acting at their direction represented that the source of funds used to pay

distributions would be cash flow generated by the companies the funds owned, and not capital raised from investors. These representations were made in the funds' governing documents, in written correspondence and marketing materials and during in-person meetings and presentations. GENTILE and SCHNEIDER, together and through Ascendant employees, made similar representations to investors and prospective investors in Holdings II from 2015 through late 2018.

22.    In written correspondence and marketing materials, including in due diligence questionnaires disseminated to brokers and RIAs, the GPB Funds and Ascendant, at the direction of the defendants DAVID GENTILE and JEFFRY SCHNEIDER, further represented to investors that, from time to time, when cash flow from the portfolio companies allowed, the GPB Funds would pay special distributions, above and beyond the monthly distribution payments, ranging from 0.5 percent to 1.5 percent of invested capital.

23.    In reality, contrary to the representations made to investors, as of approximately August 2015 for Automotive Portfolio, September 2015 for Holdings I and April 2017 for Holdings II, and continuing through December 2018, investor capital was used to pay a material portion of the distributions made to investors in each of these funds, including several special distribution payments.

24.    On or about December 20, 2018, the defendant DAVID GENTILE sent a letter to investors in Automotive Portfolio, which announced to Automotive Portfolio investors, for the first time, that "[A]ll of the Company's distributions made to date have been a return of capital contributions made to the Company by investors. The source of these return of capital distributions [paid to date] have included, and may in the future continue to include, cash flow

from operations and investor contributions."  Similar letters were not sent to investors in
Holdings I or Holdings II.

i.    Representations and Omissions in Fund PPMs

25.    Prior to December 2016, the PPMs for Holdings I and Automotive
Portfolio stated, in sum and substance and in part, that the funds would make a distribution in
cash to investors three months after their subscriptions at annual return rates targeted to be 8
percent of investor capital, though the distributions could be more, less or none at all, depending
on the funds' cash flow.  The PPMs prior to December 2016 further stated that if the funds had
excess cash to distribute, they may make special distributions.

26.    In approximately December 2016, the PPMs for Holdings I and
Automotive Portfolio were amended to add a disclaimer stating, in sum and substance and in
part, that while the funds "have no present plans to do so," they could include the investors'
invested capital in amounts distributed back to investors, which may reduce the amount of
capital available to acquire fund assets.  Likewise, the PPM for Holdings II issued in April 2016
stated, in sum and substance and in part, that the fund "reserve[d] the right to return Capital
Contributions to [investors] as part of our distributions, though we do not presently have plans to
do so."

27.    The investors in Automotive Portfolio, Holdings I and Holdings II were
never notified of any change to the funds' "present plans" regarding the source of funds for
distribution payments.

ii.    Representations and Omissions in Marketing Communications

28.    The bulk of marketing communications made to RIAs and brokers
promoting the GPB Funds were made by Ascendant employees.  The information those pitches

contained was communicated to Ascendant salespeople by senior employees at the GPB Funds and Ascendant and approved by the defendants DAVID GENTILE and JEFFRY SCHNEIDER. In particular, at least through early 2017, GENTILE and SCHNEIDER knew and intended for Ascendant salespeople to sell the GPB Funds as providing a monthly distribution that was fully covered by funds from operations. Ascendant salespeople sent thousands of emails pitching the GPB Funds that made variations on that claim.

29.    For example, on or about October 18, 2016, an Ascendant Employee ("Ascendant Employee #1"), an individual whose identity is known to the Grand Jury, sent an email to a target RIA regarding Automotive Portfolio, touting that it pays an "8% target annual distribution, paid monthly, which has been fully covered with funds from operations since inception." This email attached a marketing presentation that made similar claims, and in a footnote, explained that the targeted distribution could be "more less or none at all depending on the cash flow of the portfolio," again reaffirming that the amount of the distribution payment would depend on the cash flow of the portfolio companies.

30.    Likewise, on or about February 2, 2017, an Ascendant employee ("Ascendant Employee #2"), an individual whose identity is known to the Grand Jury, sent a nearly identical email to a target investor regarding Automotive Portfolio. The email stated that GPB Capital "has a focus on acquiring income-producing, middle market companies that meet our key investment criteria: high yield from operations, recession resilient, high barriers to entry and proven management teams. The goal of the offering is to provide investors access to a [private equity] investment vehicle that provides growth potential as well as a meaningful distribution (8%)." Then, in a section of the email with the heading "Investment Highlights," the

first bullet point stated "8% target annual distribution, paid monthly, which has been fully covered with funds from operations since inception."

31.  On or about November 21, 2017, an Ascendant employee ("Ascendant Employee #3"), an individual whose identity is known to the Grand Jury, sent an email to a target investor claiming that Automotive Portfolio paid an "8% target annual distribution, paid monthly, which has been fully covered with funds from operations since inception." This email also attached a marketing presentation that described distributions as "[b]ased off cash flow from portfolio companies targeted at 8%" and claimed that Automotive Portfolio had provided a historical distribution of 10 percent in 2015 and 11.5 percent in 2014.

32.  In reality, Automotive Portfolio began running shortfalls in or around October 2015, and used investor funds to pay monthly distribution payments in an amount equivalent to an annualized 8 percent. To make the payments, GPB Capital employees would transfer funds from an "investment account" that held incoming, received investor capital to the "distribution account" to pay out the distributions.

33.  This practice was known to the defendants. For example, on or about October 7, 2015, a former employee in the GPB Funds' finance department ("Former GPB Employee #1"), an individual whose identity is known to the Grand Jury, sent an email to the defendant DAVID GENTILE and another former employee in the GPB Funds' finance department ("Former GPB Employee #2"), an individual whose identity is also known to the Grand Jury, in which he or she proposed transfers from investment accounts held by Holdings I and Automotive Portfolio in order to cover approximately $1.7 million and $1.1 million shortfalls, respectively.

34.     The defendants DAVID GENTILE and JEFFRY SCHNEIDER were also made aware of these shortfalls through regularly disseminated "management dashboard" emails that attached charts depicting the financial state of the funds.  Former GPB Employee #2 regularly disseminated the management dashboard emails to a number of senior employees at the GPB Funds and Ascendant, including GENTILE and SCHNEIDER.

35.     For example, on or about November 27, 2015, Former GPB Employee #2 sent an email attaching a management dashboard to, among others, the defendants DAVID GENTILE and JEFFRY SCHNEIDER.  The dashboard showed that for October 2015, Automotive Portfolio received $80,876 in revenue, but paid out $317,164 in distributions.

36.     The GPB Funds' financial situation did not improve after November 2015. For example, on or about May 12, 2016, Former GPB Employee #2 sent an email to, among others, the defendants DAVID GENTILE and JEFFRY SCHNEIDER, attaching an updated management dashboard showing that Automotive Portfolio had earned less than it distributed for October 2015, November 2015, January 2016, February 2016, March 2016 and April 2016, paying out approximately $3.48 million more in revenue than it earned in income over the prior six months.  These figures are consistent with Automotive Portfolio's audited financial statement for 2016, which was finalized on May 1, 2017, and showed that for audit year 2016 Automotive Portfolio had a negative net income of approximately $7.29 million, yet it paid approximately $14.34 million in distributions.

37.     Internal communications between the defendants DAVID GENTILE, JEFFRY SCHNEIDER and JEFFREY LASH, reveal the extent to which they were aware of cash flow shortfalls at the GPB Funds.  For example, on or about March 17, 2016, GENTILE sent a text message to SCHNEIDER and LASH in which he stated, "Guys to get the coverage

ratio to 60% on [Automotive Portfolio] we need cash back to the company of approx[imately]

600k." SCHNEIDER replied, "We have to man up and write checks which is simply giving

back dollars we already received." "Coverage ratio" was a term used by GPB Capital employees

that referred to the ratio of portfolio company cash flow to distribution payments, i.e., the extent

to which the distributions were paid from cash flow.

38.    Even after the audited financial statements were published, employees at

the GPB Funds and Ascendant continued to promote the GPB Funds' payment of distributions,

and continued to pay those distributions, equivalent to an annualized 8 percent per month, by

using investor capital.  Per the GPB Funds' governing documents, they were entitled to reduce or

stop paying distributions, but the defendants DAVID GENTILE and JEFFRY SCHNEIDER

insisted on continuing to pay them, at the touted rate, even though the distributions now largely

comprised a return of capital rather than a payment of a dividend from the GPB Funds' cash

flow.

39.    This pattern continued with respect to other GPB Funds, including

Holdings II.  In connection with promoting this fund, Ascendant salespeople touted the fund as

having "fully covered" distributions since its inception.  For example, on September 15, 2017,

Ascendant Employee #3 sent an email to a target RIA telling him to consider directing clients to

Holdings II, because it provides "[h]igh sustainable cash flow," and that its 8 percent target

annual distribution "has been fully covered with funds from operations since inception."

40.    Ascendant salespeople also misled investor representatives who asked

questions about the apparent weakness of the performance of Holdings II.  For example, in an

April 2018 email exchange, an RIA representative asked a senior Ascendant employee

("Ascendant Employee #5"), an individual whose identity is known to the Grand Jury, about

12

losses in his client's K-1 statements, explaining that he was "expecting some taxable profits."  In

response, Ascendant Employee #5 wrote that there was "[n]othing to be concerned about . . .

[t]he gains/losses from a tax perspective do not equal the gains/losses from the fund level."

41.    These representations contradicted facts well known to the leadership of

GPB Capital and Ascendant, including the defendants DAVID GENTILE and JEFFRY

SCHNEIDER.  For example, on or about April 30, 2017, a former GPB Capital employee in the

finance department ("Former GPB Employee #3"), an individual whose identity is known to the

Grand Jury, sent an email to GENTILE, SCHNEIDER and other senior GPB Capital employees,

in which he or she stated that, for the first quarter of 2017, the coverage ratio was at 11 percent

for Holdings I, 40 percent for Automotive Portfolio and 27 percent for Holdings II, and that none

of the funds were expected to achieve full coverage for the full year of 2017.

42.    Monthly account statements distributed to investors in the GPB Funds

reaffirmed the false depiction created by the defendants DAVID GENTILE, JEFFRY

SCHNEIDER and JEFFREY LASH, that distribution payments were fully covered by cash flow

from operations.  Specifically, the investors' account statements depicted an investor's capital

contribution for each month, which remained consistently equal to the amount invested in the

fund, and identified the investor's monthly distribution payment, which was consistently equal to

the annualized 8 percent payment they received.  The capital contribution balance was never

reduced to reflect the extent to which distribution payments were a return of investor capital.  As

a consequence, investors were falsely led to believe that the distribution payments did not

diminish the value of their invested capital.

B.     Fraudulent Performance Guarantees

43.     In furtherance of the fraudulent scheme to deceive investors about the extent to which their monthly distribution payments were paid via cash flow from the portfolio companies, in approximately 2015 and 2016, the defendants DAVID GENTILE, JEFFRY SCHNEIDER and JEFFREY LASH fraudulently inflated the income that the GPB Funds received from certain of their assets through the use of backdated performance guarantees.

44.     For example, for audit year 2014, Holdings I recorded guarantees signed by the defendant JEFFREY LASH as contributing total revenue of $1.13 million.  The guarantees were signed for a total of $600,000 of guaranteed profits; however, due to substantial net losses incurred by the car dealerships, the guarantees ultimately contributed $1.13 million to the revenue of Holdings I.  Despite these guarantees being recorded by the fund, LASH never paid any money due under the guarantees.  Email correspondence between employees of the GPB Funds and Ascendant exchanged in or around July 2015 acknowledge the non-payment of the guarantees and their expectation that the defendant DAVID GENTILE and LASH would "work something out."

45.     For audit year 2015, the defendants DAVID GENTILE, JEFFRY SCHNEIDER and JEFFREY LASH pursued a similar course to artificially inflate the revenue of Automotive Portfolio, but this time they also falsified receipt of cash in order to bolster the legitimacy of the performance guarantee and maintain the ability to count the income on the books of Automotive Portfolio.

46.     On or about March 23, 2016, Former GPB Employee #2 sent an email to the defendants DAVID GENTILE, JEFFRY SCHNEIDER and JEFFREY LASH, along with others, which stated that the final income numbers for audit year 2015 showed that Automotive

Portfolio would have a coverage ratio of 70.4 percent, inclusive of a management fee rebate paid by GENTILE. On or about April 5, 2016, an auditor employed by the firm auditing Automotive Portfolio, an individual whose identity is known to the Grand Jury, wrote to Former GPB Employee #2 and asked about an entry reducing the management fee expense attributable to Automotive Portfolio by $1,050,000. Former GPB Employee #2 responded and wrote that "David [GENTILE] has elected to rebate that amount of management fees."

47.    At some point after that exchange, Former GPB Employee #2 learned from the defendant DAVID GENTILE that Automotive Portfolio would instead record $1,050,000 in revenue from a performance guarantee to be signed by the defendant JEFFREY LASH. That performance guarantee (the "Sham Guarantee") would be for $2,015,000 in revenue for audit year 2015 on the part of Country Motors II, a car dealership owned by Automotive Portfolio. On or about April 29, 2016, Former GPB Employee #2 sent an unsigned version of the Sham Guarantee to Automotive Portfolio's auditors. The unsigned Sham Guarantee purported to be dated as of January 1, 2015. LASH did not execute the Sham Guarantee until on or around May 2, 2016, on which date Former GPB Employee #2 forwarded the executed Sham Guarantee to Automotive Portfolio's auditors by email.

48.    To make the Sham Guarantee appear to have been legitimate and paid by the defendant JEFFREY LASH, the defendant DAVID GENTILE and LASH engineered a series of financial transactions, as follows:

(a)    On or about April 22, 2016, GENTILE transferred approximately $335,643 from the investment account of Cold Storage into an account held by GPB Realty Capital at Signature Bank (the "Signature Bank GPB Realty Capital Account") that was maintained at a Signature Bank location in Forest Hills, New York. GPB Realty Capital was an

15

entity controlled by GENTILE and the defendant JEFFRY SCHNEIDER, and the Signature

Bank Realty Capital Account was used to hold funds contributed by GENTILE and

SCHNEIDER.

      (b)     Also on or about April 22, 2016, GENTILE transferred

approximately $509,643 from the Signature Bank Realty Capital Account to an account held by

GPB Realty Capital at JP Morgan Chase (the "Chase GPB Realty Capital Account").

      (c)     On or about April 28, 2016, GENTILE transferred approximately

$200,000 from his personal savings account to the Chase GBP Realty Capital Account.

      (d)     Also on or about April 28, 2016, GENTILE transferred

approximately $700,000 from the Chase GBP Realty Capital Account to an account held by

LASH at JP Morgan Chase (the "LASH Chase Account").  Prior to this transfer, the LASH

Chase Account had a balance of approximately $300,000.

      (e)     Finally, on or about April 28, 2016, GENTILE and LASH, at a JP

Morgan Chase location in Great Neck, New York, originated a transfer of approximately

$1,050,000 from the LASH Chase Account to an account held by Automotive Portfolio at JP

Morgan Chase (the "Automotive Portfolio Chase Account").

      49.     By routing funds in this way, the defendants DAVID GENTILE and

JEFFREY LASH made it appear as though the payment made from LASH to Automotive

Portfolio on or about April 28, 2016 was made pursuant to the Sham Guarantee, which was

backdated.  In reality, however, GENTILE primarily used his own money, money he and the

defendant JEFFRY SCHNEIDER had contributed to GPB Realty Capital and money taken from

investors in Cold Storage to manufacture revenue in Automotive Portfolio.  By using the Sham

Performance Guarantee, the defendants overstated Automotive Portfolio's income for 2015 by approximately 28 percent.

COUNT ONE
(Conspiracy to Commit Securities Fraud)

50.    The allegations contained in paragraphs one through 49 are realleged and incorporated as if fully set forth in this paragraph.

51.    In or about and between August 2015 and December 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants DAVID GENTILE, JEFFRY SCHNEIDER and JEFFREY LASH, together with others, did knowingly and willfully conspire to use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by (i) employing one or more devices, schemes and artifices to defraud; (ii) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon investors and prospective investors in Holdings I, Automotive Portfolio and Holdings II, in connection with the purchase and sale of investments in Holdings I, Automotive Portfolio and Holdings II, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails, contrary to Title 15, United States Code, Sections 78j(b) and 78ff.

52.    In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants DAVID GENTILE, JEFFRY

17

SCHNEIDER and JEFFREY LASH, together with others, did commit and cause the commission of, among others, the following:

OVERT ACTS

        (a)     On or about April 28, 2016, GENTILE sent, via wire transfer, $200,000 to the Chase GBP Realty Capital Account.

        (b)     On or about April 28, 2016, GENTILE sent, via wire transfer, $700,000 from the Chase GPB Realty Account to the LASH Chase Account.

        (c)     On or about May 2, 2016, LASH executed the Sham Guarantee, which guaranteed revenues at Country Motors II in the amount of $2,015,000 for audit year 2015.

        (d)     On or about September 22, 2016, SCHNEIDER sent an email to an investment adviser that stated, "I believe GPB is distinct from any other [private equity] strategy currently in the market.  GPB has been able to provide meaningful income (8.7% fully covered distributions)."

(Title 18, United States Code, Sections 371 and 3551 et seq.)

COUNT TWO<br>(Conspiracy to Commit Wire Fraud)

        53.     The allegations contained in paragraphs one through 49 are realleged and incorporated as if fully set forth in this paragraph.

        54.     In or about and between August 2015 and December 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants DAVID GENTILE, JEFFRY SCHNEIDER and JEFFREY LASH, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud

18

investors and prospective investors in Holdings I, Automotive Portfolio and Holdings II, and to obtain money and property from them by means of one or more materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT THREE
(Securities Fraud)

55.    The allegations contained in paragraphs one through 49 are realleged and incorporated as though fully set forth in this paragraph.

56.    In or about and between August 2015 through December 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants DAVID GENTILE, JEFFRY SCHNEIDER and JEFFREY LASH, together with others, did knowingly and willfully use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon one or more investors and prospective investors in Holdings I, Automotive Portfolio and Holdings II, in connection with the purchase

and sale of investments in Holdings I, Automotive Portfolio and Holdings II, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

## COUNT FOUR
(Wire Fraud)

57.     The allegations contained in paragraphs one through 49 are realleged and incorporated as if fully set forth in this paragraph.

58.     On or about April 22, 2016, within the Eastern District of New York, the defendants DAVID GENTILE and JEFFREY LASH, together with others, did knowingly and intentionally devise a scheme and artifice to defraud investors and prospective investors in Automotive Portfolio, and to obtain money and property from those investors and prospective investors, by means of one or more materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, GENTILE and LASH transmitted and caused to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, to wit: a wire transfer in the amount of approximately $509,643 from the Signature Bank GPB Realty Account maintained in the Eastern District of New York to the Chase GPB Realty Account.

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

## COUNT FIVE
(Wire Fraud)

59.     The allegations contained in paragraphs one through 49 are realleged and incorporated as if fully set forth in this paragraph.

60.     On or about April 28, 2016, within the Eastern District of New York, the defendants DAVID GENTILE and JEFFREY LASH, together with others, did knowingly and intentionally devise a scheme and artifice to defraud investors and prospective investors in Automotive Portfolio, and to obtain money and property from those investors and prospective investors, by means of one or more materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, GENTILE and LASH transmitted and caused to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, to wit: a wire transfer in the amount of approximately $1,050,000 from the LASH Chase Account to the Automotive Portfolio Chase Account.

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNTS ONE THROUGH FIVE

61.     The United States hereby gives notice to the defendants that, upon their conviction of any of the offenses charged in Counts One through Five, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, constituting or derived from proceeds obtained directly or indirectly as a result of such offenses.

62.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)    has been placed beyond the jurisdiction of the court;

(d)    has been substantially diminished in value; or

(e)    has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) to

seek forfeiture of any other property of the defendants up to the value of the forfeitable property

described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code,

Section 853(p); Title 28, United States Code, Section 2461(c))

A TRUE BILL

_____
FOREPERSON

_____
SETH D. DuCHARME
ACTING UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK