```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
UNITED STATES OF AMERICA

                v.                              MEMORANDUM AND ORDER
                                                21-CR-54 (RPK) (PK)
DAVID GENTILE
and JEFFRY SCHNEIDER,

                Defendants.
---------------------------------------------------------------x
```

RACHEL P. KOVNER, United States District Judge:

The government moves *in limine* "to introduce testimony from cooperating witness Jeffrey Lash regarding a series of incidents involving the defendants and another [alleged] co-conspirator, James Prestiano." Gov't's Mot. in Limine 1 (Dkt. #394). Defendants oppose the admission of the testimony, arguing that it contains communications that are privileged and otherwise inadmissible. For the reasons explained below, defendants have not established that the communications are privileged.

## BACKGROUND

I assume the parties' familiarity with the underlying facts, summarized here only as necessary to decide this motion.

The government seeks to prove at trial that defendants David Gentile and Jeffry Schneider, together with Jeffrey Lash, "created fraudulent performance guarantees for three car dealerships to artificially inflate the income of the GPB Holdings, LP fund ('Holdings I') in 2014 and the GPB Automotive Portfolio, LP fund ('Automotive Portfolio') in 2015." Gov't's Mot. in Limine 1. The government plans to call Lash as a witness and expects that Lash will testify about the alleged creation of fraudulent performance guarantees. *Ibid*. The government expects Lash to testify that

1

James Prestiano, GPB Capital's former counsel, "was intimately involved in the scheme, drafted the fraudulent guarantees, and served as an interlocutor between Gentile and Lash." *Id.* at 2.

On May 13, 2024, the prosecution team learned that Lash may have had conversations with Prestiano that implicated attorney-client privilege and referred the matter to the government's filter team. Defs.' Br. in Opp'n 2 (Dkt. #396). The filter team met with Lash regarding those communications and consulted with GPB's counsel. *Ibid.* The filter team identified several potentially privileged communications between Lash and Prestiano. *See* First Sealed Ltr. from Filter Team (Dkt. #353) ("First Filter Team Ltr."). While GPB initially asserted attorney-client privilege over some of those communications, *see id.* at 3–4, it subsequently reached a limited privilege waiver agreement with the filter team, Third Sealed Ltr. from Filter Team (Dkt. #382) ("Third Filter Team Ltr."). The filter team then provided the parties with copies of its interviews with Lash, along with a copy of the waiver agreement with GPB. Third Filter Team Ltr.

The government now seeks to elicit testimony from Lash regarding five incidents involving Prestiano:

(1) Shortly after the 2015 Performance Guarantee was executed, Prestiano alluded to the fraudulent nature of the guarantee, and told Lash he should not have signed it and that it would cause problems down the road because too many people were aware of the circumstances of the 2015 Performance Guarantee's creation [(hereinafter "Communication 1")].

(2) In April 2018, after the SEC began an examination of GPB, Prestiano and Gentile contacted Lash and offered to renegotiate his severance package as a part of an apparent effort to ensure Lash would remain loyal to the defendants [(hereinafter "Communication 2")].

(3) In 2019, Lash met with Gentile and, on several occasions, Prestiano, before Lash was interviewed by the government and attorneys for GPB, in order to go over what Lash would tell investigators. Lash recalls that Schneider was present or on the phone for at least one of these meetings. Lash was told to 'stick to the story' that the performance guarantees were legitimate and remain on 'Team GPB.' The defendants informed Lash that they would stop paying his severance if he did not stick to the agreed-upon story. Prestiano then escorted Lash to the interview with

>    GPB's attorneys to ensure he followed that script [(hereinafter "Communication 3")].
>
> (4) Shortly after the government executed a search warrant at GPB's premises on February 28, 2019, Prestiano contacted Lash in a panic, stated that they were bad actors (or the government believed they were bad actors) and asked for Lash's help. Lash understood Prestiano to be concerned the government would learn of the details of the performance guarantees [(hereinafter "Communication 4")].
>
> (5) At some point after the search warrant was executed at GPB's premises, Lash visited GPB's offices. Lash heard Gentile discussing the government's investigation with Prestiano and several other individuals, some of whom may have been other attorneys. Gentile asked Prestiano how much jail time Gentile might get and told the participants that he could handle a custodial sentence of a few years [(hereinafter "Communication 5")].

Gov't's Mot. in Limine 2–3. Defendants oppose the admission of each of these communications, arguing that they are privileged and otherwise inadmissible. *See generally* Defs.' Br. in Opp'n; Defs.' Surreply (Dkt. #399); Defs.' Resp. to Gov't's Surreply (Dkt. #407).

## LEGAL STANDARD

"[Q]uestions about privilege in federal question cases are resolved by the federal common law." *Woodward Governor Co. v. Curtiss Wright Flight Sys., Inc.*, 164 F.3d 123, 126 (2d Cir. 1999). "The attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011). The Second Circuit "'appl[ies the privilege] only where necessary to achieve its purpose' and 'construe[s] the privilege narrowly because it renders relevant information undiscoverable.'" *Ibid.* (quoting *In re County of Erie*, 473 F.3d 413, 418 (2d Cir. 2007)) (internal quotation marks omitted). "The part[y] asserting the privilege . . . bear[s] the burden of establishing its essential elements." *United States v. Krug*, 868 F.3d 82, 86 (2d Cir. 2017) (quoting *Mejia*, 655 F.3d at 132).

3

# DISCUSSION

Gentile has not established that he is entitled to assert a privilege over the communications involving attorney Prestiano that the government seeks to offer through Lash. Gentile cannot assert a privilege over the first four conversations involving Prestiano because he has not established that Prestiano was acting as his attorney—rather than simply GPB's attorney—during those conversations. And while Gentile has a colorable claim that he was seeking individual legal advice from Prestiano in the fifth conversation, any privilege is destroyed by the presence of Lash, a third party, because Gentile has not set forth facts establishing that the communications in that conversation were made in the course of an ongoing common enterprise and intended to further that enterprise.

## I.  Gentile Has Not Established an Attorney-Client Relationship Between Gentile and Prestiano Covering Communications 1–4.

Gentile's claim of privilege over conversations involving Prestiano in Communications 1–4 fails because Gentile has not established that Prestiano was his attorney during the conversations in question.

### A. A personal attorney-client relationship requires that the client manifest an intent to seek legal advice from the attorney on personal matters.

As a general matter, an attorney-client relationship does not arise unless "a person manifests to a lawyer the person's intent that the lawyer provide legal services for the person." Restatement (Third) of the Law Governing Lawyers § 14 (2000) (hereinafter "Restatement"); *see, e.g.*, *United States v. Demauro*, 581 F.2d 50, 55 (2d Cir. 1978) ("At the very least [the party claiming the privilege] was required to show, with respect to the communication at issue, that it occurred in the course of an effort to obtain legal advice from a professional legal adviser acting in his capacity as such."); *United States v. Pizzonia*, 415 F. Supp. 2d 168, 179 (E.D.N.Y. 2006) (applying the Restatement test).

Under most circumstances, when an attorney is employed or retained as a *company's* lawyer, "any privilege that attaches to communications on corporate matters between corporate employees and corporate counsel belongs to the corporation, not to the individual employee." *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 119 F.3d 210, 215 (2d Cir. 1997). As a result, "employees generally may not prevent a corporation from waiving the attorney-client privilege arising from such communications." *Ibid.*

An exception to this general rule exists when the individual speaking to counsel "make[s] it clear to corporate counsel that he seeks legal advice on personal matters," and the company attorney provides such advice. *Id.* at 215–16 (holding that employee could not assert privilege over communications with corporate counsel when he "neither sought nor received legal advice from [that attorney] on personal matters"). While *Teamsters* did not define "personal matters," courts since have understood this term to at least require "a showing that communications implicated her interests alone and were segregable from those involving [the company's] interests." *United States v. Stein*, 463 F. Supp. 2d 459, 465 (S.D.N.Y. 2006); *see also United States v. Daugerdas*, 757 F. Supp. 2d 364, 370–73 (S.D.N.Y. 2010).

The *Teamsters* framework aligns with broader principles concerning the creation of attorney-client relationships. After all, an individual's seeking a company lawyer's advice on a wholly personal topic—segregable from his role as a company official or employee—can be understood as manifesting to the lawyer a request that the lawyer represent him personally. *See* Restatement § 14. In contrast, an individual does not implicitly signal that he is seeking personal representation simply by communicating with company counsel about company business.

This framework limiting individual privilege claims over communications with company lawyers applies even when the individual seeking to assert privilege is a high-level company

5

officer or other stakeholder, rather than simply an employee. While *Teamsters* itself involved an "employee," *Teamsters*, 119 F.3d at 215, the Second Circuit applied the same principle to a corporate officer, in a decision that *Teamsters* cited in explaining the applicable rule. *See United States v. Piccini*, 412 F.2d 591, 593 (2d Cir. 1969) (holding that "officer of [a] corporation" could not claim privilege over his statements to company's attorney); *Teamsters*, 119 F.3d at 215 (citing *Piccini*). *Teamsters* also cited approvingly another circuit's statement that "corporate officer[s]" cannot assert privilege over communications with corporate counsel, and the Supreme Court's statement that "[n]ew managers . . . may waive the attorney-client privilege with respect to communications made by former officers and director." *Teamsters*, 119 F.3d at 215 (quoting *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d 120, 124 (3d Cir. 1986); *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 349 (1985)). Accordingly, courts in this circuit routinely apply the *Teamsters* framework to corporate officers and company owners. *See, e.g.*, *Daugerdas*, 757 F. Supp. 2d at 370–71 (applying *Teamsters* framework to member of partnership); *MacKenzie-Childs LLC v. MacKenzie-Childs*, 262 F.R.D. 241, 253–55 (W.D.N.Y. 2009) (rejecting privilege claim raised by individuals who had been the "sole shareholders and ultimate decisionmakers of a closely-held corporation"); *SEC v. Credit Bancorp, Ltd.*, 96 F. Supp. 2d 357, 358, 359–60 (S.D.N.Y. 2000) (rejecting privilege claim of company's "sole shareholder, president, and chief executive officer").

In arguing that the *Teamsters* framework does not apply to him as GPB's "founder, owner, and CEO," Defs.' Surreply 4, Gentile places too much weight on an unpublished summary order involving former corporate officers who sought access to privileged documents. In *Sampedro v. Silver Point Cap., L.P.*, 818 F. App'x 14 (2d Cir. 2020), the court of appeals stated that it "recogniz[ed] that district courts within [the Second] Circuit have acknowledged" a "general

6

'doctrine that treats a director and a corporation as 'joint clients' of the company's attorney for purposes of privilege claims.'" *Id.* at 18 (quoting *Newmarkets Partners, LLC v. Sal. Oppenheim Jr. & Cie. S.C.A.*, 258 F.R.D. 95, 104 (S.D.N.Y. 2009)). But the court held that the plaintiffs in *Sampedro* were not entitled to the documents they sought even accepting the approach of those courts. *Ibid.*

The approach *Sampedro* described does not now predominate in lower courts, even in the context that it addressed—disputes over whether "a corporation can[] assert the privilege to deny a director access to legal advice furnished to the board during a director's tenure." *Ibid.* (citation omitted); *see, e.g.*, *United States v. Rankin*, No. 3:18-CR-272 (JAM), 2020 WL 3036015, at *2–3 & n.3 (D. Conn. June 5, 2020) (holding that board directors were not entitled to access such documents); *Fitzpatrick v. Am. Intern. Grp., Inc.*, 272 F.R.D. 100, 109 (S.D.N.Y. 2010) (same); *Las Vegas Sands v. Eighth Jud. Dist. Ct.*, 331 P.3d 905, 913 (Nev. 2014) (stating that "[i]t appears that the modern trend in caselaw" denies directors access to such documents); *Nunan v. Midwest, Inc.*, No. 2004/00280, 2006 WL 344550, at *7 (N.Y. Sup. Ct. Jan. 10, 2006) (describing "most of the more recent cases" as concluding privilege pertaining to such documents belongs to the company alone).

In any event, *Sampedro* does not set out the Second Circuit's approach to individual assertions of privilege over conversations with company counsel. To the extent that the district court cases involving document access that *Sampedro* discussed imply a view on that subject, *Sampedro* "had no occasion to approve of [those district courts'] rule" because "it found that the rule by its terms did not apply." *Rankin*, 2020 WL 3036015, at *3 n.3. Further, "as an unpublished summary order," *Sampedro* "cannot detract from the published precedential rulings of the Second Circuit." *Ibid.* As explained above, those precedential rulings hold that individuals cannot claim

7

privilege over communications with corporate counsel, subject to the exception set out in *Teamsters*—drawing no distinction based on the individual's status within the organization or ownership stake.

### B. Gentile has not asserted facts showing an attorney-client relationship between himself and Prestiano.

Gentile has not set out facts showing an attorney-client relationship between himself and Prestiano under these principles.

First, Gentile has not set forth facts regarding Communications 1–4 that would satisfy the *Teamsters* exception allowing an individual to exercise privilege over communications to company counsel. During the period in which these communications occurred, Prestiano was either GPB's company counsel or retained outside counsel for GPB. Gentile has not alleged that he made clear to Prestiano that he was seeking Prestiano's advice on "personal matters" during these conversations. And the conversations did not relate to Gentile's "interests alone" or to interests that "were segregable from those involving [GPB's] interests." *Stein*, 463 F. Supp. 2d at 465. On the contrary, they concerned topics of obvious importance to GPB, such as the authenticity of performance guarantees that Lash issued to GPB, as well as the details of Lash's severance package.* Gentile has therefore not set forth facts indicating that he made it known that he was seeking Prestiano's legal advice on personal matters. *See Teamsters*, 119 F.3d at 215–16.

Second, Gentile has not set forth facts establishing that he was represented by Prestiano during these conversations on any other theory. Notwithstanding Gentile's assertion that Prestiano "was his attorney," Decl. of David Gentile ¶ 3 (Dkt. #396-1), he does not set out facts supporting

---

* Communication 2 is independently not privileged on the ground that the conversation is not "for the purpose of obtaining or providing legal advice." *Mejia*, 655 F.3d at 132. Communication 4 similarly did not involve communications "for the purpose of obtaining or providing legal advice," *ibid.*, because Prestiano contacted Lash "in a panic" and "asked for Lash's help."

8

that legal conclusion. For instance, he does not allege that he paid fees to Prestiano for his advice on these matters. *See, e.g.*, Paul R. Rice et al., *Attorney-Client Privilege in the United States* § 4:1 (2023) (noting that "the payment of the attorney's fees . . . is circumstantial evidence that can assist in proving that an attorney-client relationship existed"). Nor does he allege that he had a retainer agreement or other contract with Prestiano covering the time period and subjects at issue in these conversations. Instead, Gentile apparently retained *other* counsel to represent him in connection with the government's investigation of GPB, *see* Gov't's Reply 3 (Dkt. #398), while signing an agreement *on GPB's behalf* retaining Prestiano as counsel for the company, Agreement Between James Prestiano and GPB Capital (Dkt. #403-1); Retainer Agreement (Dkt. #403-2). And while a retainer agreement and payment of fees are not indispensable to an attorney-client relationship, Gentile has not alleged other facts supporting an inference that such a relationship existed. He has not, for instance, described conversations in which he manifested to Prestiano an intent to be represented by Prestiano in his individual capacity in connection with the government's investigation of GPB. Restatement § 14.

Gentile's statement that Prestiano previously represented him in "various matters," Decl. of David Gentile ¶ 3, does not by itself establish a representation in connection with the government's investigation of GPB. *See, e.g., Stein*, 463 F. Supp. 2d at 466 (individual could not assert privilege over communications with corporate attorney though the attorney had represented him in certain prior matters); *Daugerdas*, 757 F. Supp. 2d at 371–73 (individual could assert privilege over communications with law firm pertaining to compensation agreement, because he "formally and individually retained [the law firm]" in connection with that agreement, but could not assert privilege over communications with same firm relating to other topics on which the firm served as counsel for the company).

9

Gentile argues that even if Prestiano did not represent him, he can assert a privilege over Communications 1–4 because he reasonably perceived Prestiano to be his personal lawyer. But the Second Circuit has expressly "decline[d] . . . to adopt a 'reasonable belief' standard" for representation in this context. *Teamsters*, 119 F.3d at 217. In any event, Gentile has not established that he reasonably believed Prestiano was his lawyer during Communications 1–4. Courts that allow assertions of privilege based on a reasonable belief of this type require an individual to demonstrate the reasonableness of their belief, which "usually requires some affirmative act by the individual communicating this belief to the corporation's attorney and by the attorney who accepts this responsibility regardless of the conflict of interest that the representation may create." Paul R. Rice et al., *Attorney-Client Privilege in the United States* § 4:32 (2023); *see, e.g.*, *United States v. Keplinger*, 776 F.2d 678, 701 (7th Cir. 1985). As explained above, Gentile has presented no evidence that he took affirmative steps to communicate to Prestiano his belief that Prestiano was representing him individually in these conversations.

## II. Communication 5 Is Not Protected Because of Lash's Presence.

Gentile also cannot assert an attorney-client privilege with respect to Communication 5. Gentile's statements in that conversation allegedly seeking Prestiano's view on whether he faced jail time may qualify as statements that impliedly conveyed a request for personal legal advice. *See Stein*, 463 F. Supp. 2d at 464 (citing as an "example" of when a communication might concern segregable interests of an employee "when the conversation specifically concerns the officer's personal liability for jail time based on conduct interrelated with corporate affairs" (citation omitted)).

But Gentile cannot assert privilege as to those claims because they were made in the presence of Lash, a third party. "A party that shares otherwise privileged communications with an

10

outsider is deemed to waive the privilege by disabling itself from claiming that the communications were intended to be confidential." *Schaeffler v. United States*, 806 F.3d 34, 40 (2d Cir. 2015).

Gentile has not established that the statements in Communication 5 fall within the exception to this general rule for statements made in the context of a joint-defense privilege or common-interest agreement. The joint-defense or "common interest rule" permits a party to maintain attorney-client privilege over communications by the client in the presence of another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel. *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989). But only communications made pursuant to a common legal enterprise "and intended to further the enterprise are protected." *Ibid*. Consequently, assertions of a common-interest privilege require the existence of an explicit or implied common-interest agreement that reflects a joint legal strategy. *See Schaeffler*, 806 F.3d at 40–43 (finding the common-interest privilege implicated by a confidentiality agreement between a company and its majority owner and a consortium of lenders whereby the lenders agreed to extend additional credit in exchange for "control over [the owner's] legal decisions to settle, pay, or sue" in response to an IRS audit); *Schwimmer*, 892 F.2d at 243–45 (holding that co-defendants' attorney "had agreed to cooperate in all matters of mutual concern" and therefore a common-interest privilege existed and was not waived by the defendant's disclosure of information to an accountant hired by co-defendant's attorney); *HSH Nordbank AG N.Y. Branch v. Swerdlow*, 259 F.R.D. 64, 72 (S.D.N.Y. 2009) (applying the common-interest privilege to communications by counsel for a corporate lender to the corporation's co-lenders under a loan agreement that "contemplates that [the corporation]'s counsel will effectively represent the interests of the various lenders"). The burden is on the party asserting the privilege

11

to show that an explicit or implied common-interest agreement existed at the time the relevant communication was made. *United States v. Weissman*, 195 F.3d 96, 99 (2d Cir. 1999) (per curiam); *see also United States v. Adelman*, 68 F.3d 1495, 1500 (2d Cir. 1995) ("The party claiming the benefit of the attorney-client privilege has the burden of establishing all the essential elements." (citing *von Bulow v. von Bulow*, 811 F.2d 136, 144 (2d Cir. 1987))).

Gentile has not shown that Communication 5 satisfies these requirements. Even if Gentile's statements to Prestiano can be construed as an implicit request for personal legal advice on criminal exposure, Gentile has still failed to show that he had a common-interest agreement with Lash or GPB that could bring conversations in Lash's presence within the ambit of attorney-client privilege. *See Weissman*, 195 F.3d at 100 ("Some form of joint strategy is necessary to establish a [joint defense agreement], rather than merely the impression of one side."); *see also United States v. Ghavami*, 882 F. Supp. 2d 532, 538 (S.D.N.Y. 2012) (noting that the common-interest privilege requires that "a joint strategy among the individuals is apparent" (citation omitted)). In arguing that such an agreement existed, Gentile relies on his overlapping "legal interest" with Lash and GPB. Defs.' Surreply 5. But more than overlapping interests and unstructured cooperation is required to infer a common-interest agreement where, as here, no explicit agreement is alleged. *See Weissman*, 195 F.3d at 99–100 (rejecting defendant's argument that an implied common-interest agreement existed due to "cooperation" between the defendant's personal attorney and company counsel regarding a government investigation of the company). And even if a common-interest agreement did exist, Gentile has not established that his solicitation of advice regarding his potential criminal exposure was intended to further that joint-defense or common-interest agreement. *See Schwimmer*, 892 F.2d at 243.

### III. Gentile Cannot Assert GPB's Privilege.

Gentile cannot prevent the production of Lash's testimony on the theory that GPB has not waived its privilege over these communications. Defs.' Surreply 6–7. The government represents that GPB "does not intend to assert a privilege claim with respect to those incidents to the extent they entail any potentially privileged communications." Gov't's Mot. in Limine 3. And even if the government's account were incorrect, only GPB—not Gentile—can assert the company's privilege. *See Application of Sarrio*, S.A., 119 F.3d 143, 147–48 (2d Cir. 1997) (holding that, because "[t]he attorney-client privilege in question . . . belongs solely to [the corporation]" and the corporation had refrained from invoking the privilege, "a party against whom the evidence is offered has no right to insist that the privilege nevertheless be observed"); *see also Weintraub*, 471 U.S. at 348–49; *United States v. Plache*, 913 F.2d 1375, 1381 (9th Cir. 1990) ("Because the privilege was held by the corporation, . . . . [the privilege] was not [the defendant]'s to assert.").

### CONCLUSION

For the reasons explained above, the Court declines to preclude testimony regarding the conversations with James Prestiano discussed in the government's motion *in limine* based on attorney-client privilege.

SO ORDERED.

                                                */s/ Rachel Kovner*
                                                RACHEL P. KOVNER
                                                United States District Judge

Dated: July 8, 2024
       Brooklyn, New York