853

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - -X
 UNITED STATES OF AMERICA,    : 21-CR-0054(RPK)
                              :
                              :
                              :
                              :
                              : United States Courthouse
     -against-                : Brooklyn, New York
                              :
                              :
                              :
                              : Friday, June 21, 2024
 DAVID GENTILE and            : 9:30 a.m.
 JEFFRY SCHNEIDER,            :
                              :
         Defendants.          :
- - - - - - - - - - - - - - -X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE RACHEL P. KOVNER
UNITED STATES DISTRICT JUDGE, AND A JURY

A P P E A R A N C E S:

For the Government:    UNITED STATES ATTORNEY'S OFFICE
                       Eastern District of New York
                           271 Cadman Plaza East
                           Brooklyn, New York 11201
                       BY: ARTIE MCCONNELL, ESQ.
                           JESSICA WEIGEL, ESQ.
                           NICHOLAS AXELROD, ESQ.
                           KATE MATHEWS, ESQ.
                           Assistant United States Attorneys

For the Defendant:     KOBRE & KIM, LLP
                       Attorneys for the Defendant -
                       David Gentile
                           800 Third Avenue
                           New York, New York 10022
                       BY: SEAN S. BUCKLEY, ESQ.
                           MATTHEW MENCHEL, ESQ.
                           ADRIANA RIVIERE-BADELL, ESQ.
                           JONATHAN D. COGAN, ESQ.

854

              A P P E A R A N C E S: (Continued.)


                    ARENT FOX SCHIFF, LLP
                    Attorneys for the Defendant -
                    Jeffry Schneider
                          1301 Avenue of the Americas
                          42nd Floor
                          New York, New York 10019
                    BY: GLENN C. COLTON, ESQ.
                        APEKSHA VORA, ESQ.

                    ARENT FOX SCHIFF, LLP
                    Attorneys for the Defendant -
                    Jeffry Schneider
                          1717 K Street, NW
                          Washington, DC 20006
                    BY: MICHAEL DEARINGTON, ESQ.
                        LAURA ZELL, ESQ.

                    LAW OFFICE OF STEPHEN JAMES BINHAK, PLLC
                    Attorney for the Defendant -
                    Jeffry Schneider
                          1 SE 3rd Avenue
                          Suite 2600
                          Miami, Florida 33131
                    BY:  STEPHEN J. BINHAK, ESQ.

Court Reporter:  Anthony D. Frisolone, FAPR, RDR, CRR, CRI
                 Official Court Reporter
                 Telephone: (718) 613-2487
                 Facsimile: (718) 613-2694
                 E-mail: Anthony_Frisolone@nyed.uscourts.gov


Proceedings recorded by computerized stenography.
Transcript produced by Computer-aided Transcription.

*Proceedings*                                                    855

1          (In open court.)

2          COURTROOM DEPUTY:  United States of America versus

3    David Gentile and Jeffry Schneider.

4          Counsel, state your names for the error.

5          MR. MCCONNELL:  Artie McConnell, Jessica Weigel,

6    Nicholas Axelrod, and Kate Mathews for the United States.

7    We are joined at counsel table by Paralegal Specialist

8    Madison Bates.

9          Good morning.

10         MR. MENCHEL:  Good morning, your Honor.  Matthew

11   Menchel, John Cogan, Sean Buckley on behalf of David Gentile

12   who is us in court today.

13         MR. COLTON:  Good morning, your Honor.  Glenn

14   Colton, Apeksha Vora, Laura Zell and Michael Dearington on

15   behalf of Jeffry Schneider who is at counsel table.

16         THE COURT:  Good morning.

17         All right.  So we don't have the all the jurors

18   yet but I understand there are some matters you want to take

19   up.

20         MR. MCCONNELL:  Your Honor, we met and conferred

21   briefly this morning about some issues relating to the

22   current witness' direct examination which I plan to conclude

23   this morning.

24         The first issue is an evidentiary one.  I would

25   like to elicit from the witness a prior consistent statement

*Proceedings*                                                              856

1    from Jeffrey Lash who will be testifying later in the case.

2          The chronology of the statement is in relation to

3    the 2015 performance guaranty which we're coming to which is

4    the charged guaranty.  The audits are issued, the

5    performance guaranty is booked in the audited financials.

6    Later on, there is a deal involving a car dealership where

7    there is a large fee that is supposed to be provided to

8    Mr. Lash.  Mr. Jacoby, as the chief financial officer,

9    notices this and asks Mr. Lash, hey, what is this for and is

10   basically told in sum and substance by Mr. Lash that this is

11   part of the deal about the performance guaranties that were

12   fake.

13         I believe -- and as a result he then confronts

14   Mr. Gentile about the nature and payment of the performance

15   guaranties.  I believe it's admissible at this time even

16   though Mr. Lash has not testified, under the amendment to

17   §801(d)(1)(B) with the double I that amended the rule so you

18   don't have to wait until the fabrication has been alleged.

19   The statement can be elicited by someone other the declarant

20   and there is Second Circuit case law correctly on point to

21   this.

22         So I'm not going to go into detail about the sum

23   and substance but I think it's fair game under that rule and

24   it's also necessary to complete the narrative for why he

25   then had subsequent discussions with the defendant Gentile

*Proceedings*                                                    857

1   about this.

2          MR. COLTON:  So we disagree with that and I don't

3   know the case law that Mr. McConnell is talking about since

4   we only learned about this a few minutes ago in the meet and

5   confer.  But amendment to the Rule 801(d) said, as before

6   prior consistent statements under the amendment may be

7   brought before the fact-finder only if they properly

8   rehabilitate a witness whose credibility has been attacked.

9          That that has not happened yet and I have no idea

10  what Mr. Lash is going to say in large part because, as what

11  will come out in the trial, his story has changed multiple

12  times.  So I don't know what the final story is going to be.

13         So, at this point, I don't know that his

14  credibility is going to be attacked and I understand the

15  point that it may be inefficient to have to bring Mr. Jacoby

16  back, but his -- Mr. Lash's credibility has not been

17  attacked yet and that's what the amendment notes say.

18         THE COURT:  Do you want to give me -- you said you

19  had a case dealing with this question of the witness'

20  credibility.

21         MR. MCCONNELL:  United States v. Purcell, 967 F.3d

22  159 at 197.  That's a Second Circuit case from 2020.

23  There's another case, I don't have the full cite, but it's

24  United States v. Flores, 925 F.3d at 706.  And, again, I

25  think the amendment to the rule speaks to this situation.

*Proceedings*                                                        858

1        MR. COLTON:  Do you have a jump cite on Purcell?

2        MR. MCCONNELL:  197.  967 F.3d 197 is what I have.

3        THE COURT:  So, obviously, this is totally new to

4   me and I'm looking at this as we're sitting here a moment

5   before the witness takes the stand.  So if you give it to me

6   a little earlier, it will be better.  But I'm looking at

7   Purcell that's a great point for me to start.  It looks like

8   Purcell involved this issue.  It seems like the Second

9   Circuit is saying, and it's talking about how defense

10  counsel cross-examined Wood, and then the statements are

11  introduced to rehabilitate it or it indicates no recent

12  fabrication.

13        So just tell me what -- read me something from

14  Purcell.

15        MR. MCCONNELL:  I think Flores is the better cite,

16  I'm sorry.

17        MR. COLTON:  If you can give us the cite.

18        MR. MCCONNELL:  It's 945 F.3d 687 at 706.

19        MR. COLTON:  He changed the cite.  Can you give

20  that us to again.

21        MR. MCCONNELL:  945 F.3d 687 at 706.

22        (A brief pause in the proceedings was held.)

23        THE COURT:  This is a case where there was a

24  challenge to the witness' credibility in the opening.

25        MR. MCCONNELL:  I think it's clear from even the

*Proceedings*                                                          859

1  colloquy we've had that the witness is going to be

2  challenged if your Honor is saying we need to recall the

3  witness for this purpose, then we'll do that.

4         THE COURT:  You probably do.

5         MR. MCCONNELL:  Okay.

6         The other issue I raised with defense counsel is I

7  would like the Court's permission to lead the witness when

8  asking him about filing a whistleblower complaint.  I don't

9  want him to sort of say in his own words because I don't

10  know if he's going to say anything that's inflammatory.  So

11  I would like permission to just lead him, did he file a

12  notice of whistle blower complaint?  Do you understand that

13  to be something where you believe to be alleged

14  improprieties or misconduct and then sort of ask questions

15  about what he understands the potential reward to be for

16  that.

17         THE COURT:  Any objection to that?

18         MR. MENCHEL:  I have no objection.  And I

19  appreciate Mr. McConnell's desire to do that.

20         THE COURT:  Yes.

21         MR. COLTON:  I agree.  I'm hopeful that the

22  witness has been instructed accordingly.

23         MR. MCCONNELL:  I can go instruct him if that's

24  what we're going to do.

25         THE COURT:  Okay.

*Proceedings*                                                              860

1              MR. MCCONNELL:  I think that was it.

2              We did look at some of the e-mails I intend to

3    introduce.  There is probably going to be objections on

4    some, but we tried to confer and work out some of the

5    issues.

6              THE COURT:  Great.

7              MR. COLTON:  I don't know if the jury is already

8    here.  If the jury is here, we can get started.  But if not,

9    I would use the time.

10             THE COURT:  Just so you know, I have two juror

11   notes about scheduling.  One juror indicates that she is not

12   able to come in on the following Fridays:  June 28th,

13   July 12th.  So June 28th will be next week.  July 12th.  So

14   those are basically the two next Fridays we would possibly

15   be sitting.  The next juror says basically also about

16   Fridays, doesn't want to sit Fridays.  So I don't know we

17   can talk about whether we should be -- we're in such dire

18   scheduling straits that we need to push back on that.

19             MR. AXELROD:  Your Honor, I think, speaking for

20   the Government we should let it lie for now and revisit this

21   if it truly becomes, as you say, dire.

22             THE COURT:  That sounds good.  I will let the jury

23   know.  Sounds like we're good to go 9:30 to 5:00 or no notes

24   yet.

25             MR. MCCONNELL:  Just to revisit the statement.

*Proceedings*                                                    861

1   What I'll plan to do it in light the Court's ruling is to

2   say without getting into what was said, did you have a

3   conversation with Mr. Lash about the performance guaranties?

4   And as a result of that, did you have a conversation with

5   Mr. Gentile, what was that?

6               So is that acceptable?

7               THE COURT:  Yes.

8               MR. COLTON:  I would ask that you instruct the

9   witness not to blurt out what Mr. Lash said.

10              MR. MCCONNELL:  You have to give me a chance.

11              THE COURT:  Let's check on the jury.

12              COURTROOM DEPUTY:  Sure, Judge.

13              MR. COLTON:  Your Honor, very briefly.

14              With respect to a bunch of the e-mails not

15  involving Mr. Schneider that go to auditors.  Not from

16  Mr. Schneider but to Mr. Schneider, I will be registering

17  objections just to give notice it's coming.

18              THE COURT:  Sure.

19              (A brief pause in the proceedings was held.)

20              MR. MCCONNELL:  Your Honor, do you want the

21  witness on the stand?

22              THE COURT:  Actually, let's wait because I don't

23  know if the jury is here.

24              MR. MCCONNELL:  Okay.  Sorry.

25              (A brief pause in the proceedings was held.)

*Proceedings*                                                    862

1          COURTROOM DEPUTY:  Jurors entering.

2          (Jury enters courtroom at 10:12 a.m.)

3          THE COURT:  Good morning.  Everybody can be

4    seated.

5          I got two notes about the scheduling issue that I

6    raised with you all yesterday.  The notes are both about

7    sitting Fridays and indicating that would be disruptive.  So

8    I think our thought is we're not going to sit Friday next

9    week and we're going to hope the lawyers will be able to

10   pick up the pace a little bit and catch us back up.  And if

11   we get into a dire situation, we will revisit the Friday

12   situation with you.  But we're not sitting Friday next week.

13   I think we're ready for continued examination with

14   Mr. Jacoby.

15         (Witness takes the witness stand.)

16   **WILLIAM JACOBY**, called as a witness, having been previously

17   duly sworn, was examined and testified as follows:

18

19         COURTROOM DEPUTY:  Mr. Jacoby, you are still under

20   oath.

21         MR. MCCONNELL:  May I inquire, your Honor.

22         THE COURT:  Go ahead.

23         MR. MCCONNELL:  Thank you.

24   DIRECT EXAMINATION

25   BY MR. MCCONNELL: (Continuing.)

*W. Jacoby - Direct/Mr. McConnell*                863

1  Q    Good morning, Mr. Jacoby.

2  A    Good morning.

3  Q    When we broke yesterday, we were going through some of

4  the management dashboards that you had sent to the

5  defendants.

6       If I can just pull up on the screen what's in evidence

7  as Government Exhibit 7682, please.  If you scroll down,

8  Ms. Bates, to the Automotive Portfolio page.  Thank you.

9       So, Mr. Jacoby, just looking at that last --

10      And, Ms. Bates, if you want to zoom in on the last

11 portion that says "coverage shortfall," make that as big as

12 we can.

13      So, Mr. Jacoby, this was the year of 2015 for the

14 Automotive Portfolio, correct?

15 A    At that point in time, yes.

16 Q    And this is from a February 19, 2016, e-mail, correct?

17 A    Yes.

18 Q    Now, every time you see a parenthesis, what does that

19 indicate?

20 A    Those were the months that we paid out more in

21 dividends than we made in profits in that fund.

22 Q    Now, yesterday, you testified about special

23 distributions.  Did Automotive pay any special distributions

24 in 2015?

25 A    I have to refresh my memory but I believe in December

1   they did and I think also in April.  But I'm -- off the top

2   of my head, I'm not positive unless I see better.

3   Q    Now, besides GPB's internal financial reports, did you

4   also review, or were you familiar, with the account

5   statements that were sent to investors?

6   A    Yes.

7   Q    Specifically, were you familiar with the format of

8   those account statements?

9   A    Yes, I was.

10  Q    Can you tell us how you became familiar with the format

11  of those account statements?

12  A    I reviewed them.  We were provided them.  If we wanted

13  to see them, we could see them from the fund administrator.

14  Q    I would like to show you what's in evidence as

15  Government Exhibit 1391, please.

16       Mr. Jacoby, does this look like the format of the

17  account statements as they existed when you were the chief

18  financial officer?

19  A    Yes.  This is after I was gone but it's the same

20  format.

21  Q    This exhibit is after you were gone but while you were

22  there was this format the same?

23  A    Yes.

24  Q    Did you have any conversations with Mr. Schneider about

25  these account statements and how they were formatted?

*W. Jacoby - Direct/Mr. McConnell*                    865

1    A    Yeah, I did.

2    Q    Can you tell the members of the jury about those

3    conversations --

4         Well, first, approximately when did you have these

5    conversations with Mr. Schneider?

6    A    Early on, when I started working there.

7    Q    And tell the members of the jury about those

8    conversations, please?

9    A    I think the account statements misleading and

10   inaccurate.

11   Q    Why did you think that the account statement was

12   misleading and inaccurate?

13   A    Because it doesn't tell the investor the value of their

14   account.

15   Q    What do you mean?

16   A    It just says, misleadingly, total capital invested

17   which is the amount that they deposited.  So, in this case,

18   this person deposited $150,000 and it misleadingly tells

19   them that that's still the value of their account or leads

20   them to believe that by looking at this.

21   Q    And when you expressed this to Mr. Schneider, what did

22   he say?

23   A    He didn't he said want to see the fees that have been

24   paid to get complaints.

25   Q    What else?

*W. Jacoby - Direct/Mr. McConnell*          866

1  A    He said it's not a lie because it says total capital

2  invested.

3  Q    Can you just explain that?

4  A    So, it's misleading, but if you take it verbatim, total

5  capital invested is the amount that they deposited.

6  Q    Did you have any involvement in preparing the quarterly

7  financial statements that GPB sent out to investors?

8  A    Yes.

9  Q    Did you have any -- what was your involvement in that

10 process?

11 A    So we prepared them and then we sent them to our

12 contact at Ascendant who was a man named Trent Schneiter,

13 spelled differently with a T.  He was in charge of

14 collecting that information and working with the Ascendant

15 team to distribute communications once they were ready to

16 go.

17 Q    How often didn't those reports go out?

18 A    The quarterlies?

19 Q    Yes.

20 A    Every three months.

21 Q    And how were they provided to investors, if you know?

22 A    They went from Ascendant out to the brokers and

23 investment advisors.

24 Q    Did you have any role in preparing audited financial

25 statements?

*W. Jacoby - Direct/Mr. McConnell*                    867

1   A    Yes.

2   Q    What are audited financial statements?

3   A    Those are financial statements for the fund and you use

4   the books and records to create them, and then you get them

5   audited by an independent accounting firm.

6   Q    And why are you audited financial statements different

7   than financial statements that are prepared internally at

8   GPB?

9   A    Because they're reviewed by an accounting firm that

10  reviews all of the evidence and all of the support for the

11  entries in the statement to get comfort that they're

12  accurate.

13  Q    And why does a company produce audited financial

14  reports in your experience in investing and finance?

15  A    Well, if you give people audited financial statements,

16  it gives them some comfort that an independent accounting

17  firm has reviewed it.  And there's also regulations that

18  require that you do that.

19  Q    As the chief financial officer at GPB, can you just

20  explain to the members of the jury, generally, what your

21  role was in helping produce these audited financial

22  statements with the outside auditor?

23  A    Myself and my team would create the statements and then

24  we would have a list of tasks to perform with the audit team

25  that we would have to provide to them to give them comfort

1    that they were accurate statements and they would review

2    that and then they come back to us.

3         So it's a back-and-forth process.  We create a list of

4    items that they want, we respond, and then they come back.

5    So it's a back-and-forth process, it takes a little while.

6    Q    When say "a little while," how long does that typically

7    take?

8    A    We have until the end of April is the deadline.

9    Q    Is that --

10   A    For year-end financials, you have to get them out by

11   end of April.

12   Q    So, for 2015, the year-end financials would be due

13   when?

14   A    April 30th.

15   Q    Of what year?

16   A    '16.  So, wait, 2015, yeah, they're due April '16.

17   Q    And as a chief financial officer, was it important to

18   you that the audited financials be completed in a timely

19   fashion?

20   A    Yeah.

21   Q    Why?

22   A    Well, you know, not the least of which there's a

23   regulation that says you have to get them out by then.  If

24   you don't, then it raises concerns that there's some problem

25   with the financials because if you're not getting them out

*W. Jacoby - Direct/Mr. McConnell*                    869

1    it indicates that there's some problem or mistake or other

2    confusion that would raise a red flag, should raise a red

3    flag.

4    Q    Were you familiar with something called performance

5    guaranties when you were working at GPB?

6    A    Yes.  And before, yeah.

7    Q    Can you just tell the members of the jury generally

8    what are performance guaranties and how they were used at

9    GPB?

10   A    Well, the two different ways I've seen it is, prior to

11   GPB, I saw a performance guaranty would be a metric.  So you

12   would agree to make a purchase.  So, in this case, it's a

13   company, right, we're purchasing a car dealership that we've

14   been talking about.  You would say, agree a price, but maybe

15   you would pay it in increments, provided certain metrics are

16   hit.  So you would say, I'll pay you $10 million for your

17   car dealership, but I'll give you eight now and I'll give

18   you another million and then another million in the

19   following two years provided you hit certain metrics.

20        At GPB, it was a little bit different where we had some

21   performance guaranties where we purchased a company and the

22   company was required to hit a certain minimum level of

23   profits, otherwise, the seller would have to pay the profits

24   back to GPB.

25   Q    So these performance guaranties, I want to direct your

*W. Jacoby - Direct/Mr. McConnell*                    870

1  attention to the audit for the fiscal year 2014 for the

2  Holdings 1 fund.

3       Do you remember that?

4  A    Yes.  Yes, I do.

5  Q    Did you participate in preparing the audited financials

6  for that fiscal year with that fund?

7  A    I didn't prepare it.  I had come in after they had been

8  prepared and I with, Mr. Marshall and Mr. Frangioni, I

9  helped them finish it up.

10 Q    So when did that process take place?

11 A    March and April.

12 Q    Of?

13 A    The '14 financials were due in March and April of 2015.

14 Q    Just remind us when you started?

15 A    March of '15, yeah.

16 Q    So, as part of finishing, as you said, to finish things

17 up with your colleagues, what were you trying to do?

18 A    We were trying to help them knock off the list of "to

19 dos" that we were being requested from the auditors.

20 Q    And, specifically, do you recall any issue with

21 performance guaranties involving DJD and DJD 2?

22 A    Yes.

23 Q    Remind us what DJD and DJD 2 are?

24 A    Those were two car dealerships, first two car

25 dealerships in the fund.

*W. Jacoby - Direct/Mr. McConnell*                871

1  Q    Can you tell the members of the jury what the issue was

2  with the performance guaranties for Holdings 1 during that

3  audit process?

4  A    Yeah.  The issue was that Mr. Gentile told me that

5  Mr. Lash had paid 1.1 million in total performance

6  guaranties for that year, but we had no contracts to support

7  that.

8  Q    So Mr. Gentile told you that Mr. Lash?

9  A    Paid the performance guaranties to those dealerships,

10  yeah.

11  Q    And the total amount under those performance guaranties

12  was how much money?

13  A    1.1 million.

14  Q    And you said that at the time, did you have actual

15  documents that reflected this?

16  A    No.  That was what was missing from the audit, we

17  didn't have the documents.

18          MR. MCCONNELL:  I would like to show the witness

19  what's marked for identification as Government Exhibit 7962.

20  Q    Do you see that on the screen, Mr. Jacoby?

21  A    Yes, sir.

22  Q    What do you recognize this to be?

23  A    This is an e-mail from Mr. Marshall sending the

24  deficiency notice which was a notice letting Mr. Lash know

25  that he owed this performance guaranty.

*W. Jacoby - Direct/Mr. McConnell*                         872

1    Q    And is Mr. Gentile copied on this e-mail?

2    A    Yes.

3             MR. MCCONNELL:  Your Honor, I offer -- well, let

4    me show the two attachments, please.

5    Q    Were the deficiency notices attached to this e-mail?

6    A    Yes.

7    Q    If we can pull up 7962-A and then B for the witness,

8    please.  Just let us know when you're finished reviewing the

9    exhibits, sir, 7962-A?

10   A    Okay.

11   Q    7962-B, please.  I see you shaking your head.  Are you

12   finished reading?

13   A    Yes.

14   Q    What is 7962-A and B which were the two documents you

15   were looking amounts?

16   A    They were the calculated amounts that the dealerships

17   fell short in their promise.

18   Q    What are the documents?

19   A    These are the deficiency notices.

20            MR. MCCONNELL:  Your Honor, at this time, I offer

21   7962, which is the cover e-mail, and the two deficient

22   notice attachments into evidence.

23            MR. MENCHEL:  No objection.

24            THE COURT:  Admitted.

25            (Government's Exhibits 7962 and 7962-A and B were

*W. Jacoby - Direct/Mr. McConnell*          873

1   marked in evidence.)

2          MR. MCCONNELL:  Let's go back to the cover e-mail,

3   Ms. Bates.

4   Q    So Mr. Jacoby, this e-mail was sent on March 18th of

5   2015 and the subject is DJD and DJD 2 deficiency notices.

6          Do you see that?

7   A    Yes.

8   Q    Now, as of that -- and these are sending the deficiency

9   notices to Jeff Lash?

10  A    Yes.

11  Q    What are deficiency notices, generally?

12  A    It's telling them how much money he owes.

13  Q    So a bill he has to pay?

14  A    Yes.

15         MR. MCCONNELL:  If we can just show the members of

16  the jury the two attachments, please, A and B.

17         (Exhibit published.)

18         MR. MCCONNELL:  If we can zoom in on one at a

19  time.

20  A    Are these not the same?  Right?

21  Q    No.  Well, you....

22  A    Okay.

23  Q    So this is the deficiency notice for which of the

24  dealerships?

25  A    DJD Holdings 2.

*W. Jacoby - Direct/Mr. McConnell*                    874

1    Q    And if we can go to the next one.  The amount is

2    $725,739?

3    A    Correct.

4    Q    If we can go to the next one, please.

5    A    Right this is just DJD.

6    Q    So these are the two dealerships, right?

7    A    Correct.

8    Q    And this one is for $810,462?

9    A    Correct.

10   Q    Mr. Jacoby, as the chief financial officer, were you

11   aware of the significance of the two numbers in these

12   deficiency notices?

13   A    Yes.

14   Q    What was the significance of it?

15   A    That was the amount that we've been discussing that he

16   owed to pay up to get to the minimum level of performance.

17   Q    The date on the cover e-mail and the date on the

18   deficiency notice is March 18, 2015?

19   A    Yes.

20   Q    Did you have signed copies of these performance

21   guaranties when these deficient notices were sent out?

22   A    No, that was what was missing.

23        MR. MCCONNELL:  If I can show the witness

24   Government Exhibit 8020, please.  If we can just start at

25   the --

*W. Jacoby - Direct/Mr. McConnell*                875

1  Q    Well, Mr. Jacoby, I'd like you to review Government

2  Exhibit 8020 and let us know when you're finished and if you

3  recognize it.

4  A    Can you make it -- hold on, let me see.  Okay, yes.

5  Q    Do you recognize this series of e-mails, sir?

6  A    Right, yes.  Yes.

7  Q    What do you recognize this to be?

8  A    This is a chain of e-mails trying to get the

9  documentation for those performance guaranties.

10 Q    What's the date on it?

11 A    March 23rd.  Yeah, March 23, 2015.

12 Q    And who is party to this e-mail chain, generally?

13 A    The accountants that were working on it.

14 Q    Within GPB?

15 A    Yes.

16       MR. MCCONNELL:  Your Honor, I offer Government

17 Exhibit 8020 into evidence.

18       MR. MENCHEL:  No objection.

19       THE COURT:  Admitted.

20       (Government's Exhibit 8020 was marked in

21 evidence.)

22       MR. MCCONNELL:  So if we can just start at the

23 bottom of the exhibit, Ms. Bates, and we'll go

24 chronologically up from there.

25 Q    So the first e-mail, and these are all from March 23rd.

*W. Jacoby - Direct/Mr. McConnell*                      876

1   It says, "Brian, do you have the actual agreement that

2   details the guaranties?  I will need these for the audit.

3   Signed, Steve Frangioni."

4        Who is Brian?

5   A    Mr. Marshall.  He was the accountant working on

6   Auto Portfolio.

7   Q    Did he work under you?

8   A    Yes.

9   Q    And Mr. Frangioni, again, was another accountant who

10  worked under you?

11  A    Yes.

12  Q    Okay.  If we can go to the next e-mail, please,

13  Ms. Bates.

14       So, again, it's from Mr. Frangioni saying "Brian,

15  Dustin."

16       Who is Dustin?

17  A    He's another person that was working on the audit.

18  Q    Mr. Frangioni is, again, asking for these purchase

19  agreements, guaranty agreements, et cetera for all the

20  dealerships.

21       Do you see that?

22  A    Yes.

23  Q    Can you just read the second paragraph there, "these

24  agreements," please?

25  A    "These agreements are critical item for us to finalize

1    the audits for the funds.  Please keep in mind that they

2    will need be fully executed docs.  And we need to make sure

3    that any guaranty agreements to tie back to the actual

4    income recorded at the funds.  Please advise."

5    Q    And you're copied on this e-mail.  What did you

6    understand this to e-mail to be saying?

7    A    It was telling them that Steve still hadn't received

8    all of the contracts that he needed to provide to the

9    auditors.

10              MR. MCCONNELL:  Can we go up to the next e-mail,

11    please, Ms. Bates.

12    Q    So this is the response.  It says, "Steve, this was

13    completed some time ago.  There were certain outstanding

14    agreements that did not exist that required all of the

15    accounting to be resolved as the first step so the

16    agreements would reflect that.  Let me know what

17    specifically you need likely this is what Jim is working on

18    finalizing."

19         So I want to break this down.  It says, "there were

20    certain outstanding agreements that did not exist."

21         What did you understand that to mean, you're copied on

22    this e-mail.

23    A    Those are the performance guaranties that you were

24    asking about from Mr. Lash.

25    Q    This is after the deficiency notices were already sent

1    out?

2    A    Yes.

3    Q    But you didn't have the actual agreements?

4    A    We didn't have the contracts, no.

5    Q    When Mr. Moscato write that "all of the accounting

6    needed to be resolved as the first step so the agreements

7    would reflect that."

8         What did you understand that to mean?

9    A    I think he was saying that he wanted to make sure he

10   had the final numbers which should be those numbers in the

11   deficiency notices so that he made sure that the performance

12   guaranties that were being drafted were consistent with

13   that?

14   Q    And the last sentence is, "Likely, Jim is working on

15   finalizing that."

16        Who is Jim?

17   A    He was the in-house counsel that was working on it.

18   Q    What's his last name?

19   A    Prestiano.

20        MR. MCCONNELL:  If we can go to the in next

21   e-mail, please.

22   Q    So Steve responds that he's going to send the agreement

23   that the auditors are requesting.

24        MR. MCCONNELL:  And if we can go to the last

25   e-mail in the chain, please, Ms. Bates.

*W. Jacoby - Direct/Mr. McConnell*                                   879

1   Q    Mr. Moscato what was Mr. Moscato's role at the company?

2   A    At this time, he was working on the Auto Fund.

3   Q    Okay.

4   A    Yeah.

5   Q    But this was for Holdings 1?

6   A    Yes.  This is Holdings 1.  Working on the auto

7   businesses.  This is Holdings 1, yes.

8   Q    And Mr. Moscato says, "Okay, I do know that everything

9   that existed at the time was provided.  So what should be

10  outstanding are agreements that don't currently exist.  I

11  will schedule a call with Jim.  I don't know if he's working

12  on them."

13       Did this concern you that the deficient notices had

14  gone out but you had never seen an actual paper agreement?

15  A    Yeah.  It's pretty sloppy, yes.

16  Q    Did there come a time when you actually saw signed

17  performance guaranties?

18  A    Yes.

19       MR. MCCONNELL:  I'd like to show the witness

20  Government Exhibit 6038 and 6039.

21       We can do that one at a time, Ms. Bates, so we

22  don't have to strain our eyes.

23  Q    First, 6038.  Do you recognize this document, Mr. Lash?

24  Do you want scroll zoom in on the top, please.

25       Sorry, Mr. Jacoby.  Sorry.

*W. Jacoby - Direct/Mr. McConnell*                    880

1    A     Yes.

2    Q     What's this?

3    A     This is the performance guaranty you were asking about.

4    This is the contract that we needed.

5    Q     For which one, which company?

6    A     This one is for DJD.

7    Q     Okay.  And if we can just show the witness 6039,

8    please.

9          What's this?

10   A     This is for the second one, DJD 2.

11   Q     Okay.  And were these signed?

12   A     I believe so, yeah.  If you can scroll down and check.

13   Q     Let's scroll down and check.

14   A     Yes.  There you go.  So that's the signed one.

15   Q     And can we go back to 6038 just to confirm that that's

16   the signed one as well.

17         Is this a signed one, Mr. Jacoby?

18   A     Yes.

19         MR. MCCONNELL:  I'm going to offer 6038 and 0639,

20   your Honor.

21         MR. MENCHEL:  No objection.

22         THE COURT:  Admitted.

23         (Government's Exhibits 6038 and 6039 were marked

24   in evidence.)

25         MR. MCCONNELL:  If we can publish.  Let's start

*W. Jacoby - Direct/Mr. McConnell*          881

1    with 6038.

2          (Exhibit published.)

3    Q    So Mr. Jacoby, this is the actual signed performance

4    guaranty for DJD Holdings.

5          Do you see that?

6    A    Yes.

7    Q    If we can zoom in on the top portion.

8          You see it says, "This performance guaranty dated

9    February 20, 2014."

10         Was that the date this was signed?

11   A    No.

12   Q    Is there anything in this document that indicates when

13   it was actually signed?

14   A    I don't think -- you would have to check up next to see

15   the signature but there should be a date but I don't think

16   there is.  No, no date.  So that's incorrect.

17              MR. MCCONNELL:  And if we can look at 6039,

18   please.  Just the top paragraph.

19   Q    Again this says, "This performance guaranty dated as of

20   February 20, 2014.

21         Was this signed on that date, Mr. Jacoby, to your

22   knowledge?

23   A    No, I think it's the same.

24   Q    Is there anything in this document that indicates when

25   it was actually signed?

1  A    I didn't see any place that indicates that, no.

2  Q    And when you added these two amounts together, you got

3  approximately the $1.1 million; is that correct?

4  A    I think it's exactly.

5  Q    Was there anything in these documents to indicate that

6  they were actually signed in 2015 during the audit?

7  A    No.

8  Q    I'd like to show you what's marked for identification

9  as Government Exhibit 8021, please.

10      So, Mr. Jacoby, if you can just take a look at this.

11  Let's go to the top so we can identify it.

12  A    Okay.

13  Q    What do you recognize this to be?

14  A    Can you just scroll down a bit.  In the middle there,

15  yeah.  Okay so, yeah, this is Mr. Frangioni cc'ing me asking

16  for the money to actually be paid and he's trying to chase

17  it down.

18  Q    And why was the actual money being paid significant?

19  Why isn't it enough to just have the -- you got the

20  performance guaranty, why isn't that enough?

21  A    It's like an outstanding receivable.  So it's just like

22  if you bill a customer, in this case it's Mr. Lash, right?

23  He said you owe me $1.1 million, that's a receivable.  So it

24  goes 30 days, 60 days, 90 days, now it's 120 days.  You have

25  to decide at some point you're not going to get paid, right.

*W. Jacoby - Direct/Mr. McConnell*                883

1   So that's why the auditors want to see the payments.

2   Q    They want to see the money actually hit?

3   A    They want to see the money actually hit, yeah.

4         MR. MCCONNELL:  I'm going to offer 8021 in

5   evidence, your Honor.

6         MR. MENCHEL:  No objection.

7         THE COURT:  Admitted.

8         (Government's Exhibit 8021 was marked in

9   evidence.)

10  Q    If we can zoom in on the middle portion.  It says,

11  "Brian, we have an ETA as to when we can expect the monies

12  from the deficiency notices to GPB HA."

13       What does this mean as you understood it when you

14  received it?

15  A    That's those two amounts that you had showed me

16  earlier.  Steve is looking for the payments.

17  Q    And this is dated March 23, 2015.  That was the same

18  date as those e-mails we saw where it said the agreement did

19  not exist?

20  A    Yes.

21        MR. MCCONNELL:  And if we can just scroll up,

22  please.

23  Q    Mr. Marshall responded, "Not yet.  Lash was supposed to

24  be discussing with Dave on Thursday or Friday but I have not

25  heard back."

*W. Jacoby - Direct/Mr. McConnell*                    884

1        Who did you understand Dave to be a reference to when

2    you read this?

3    A    That's Mr. Gentile.

4    Q    Now, were audited financials issued for Holdings 1?

5    A    Yeah, they were.

6    Q    Let's look at Government Exhibit 2008.

7              MR. MCCONNELL:  I don't believe this is in

8    evidence.

9    Q    Mr. Jacoby --

10             MR. MENCHEL:  I have no objection.

11             MR. MCCONNELL:  Okay.  So with that no objection,

12   we're going to offer Government Exhibit 2008.

13             THE COURT:  Admitted.

14             (Government's Exhibit 2008 was marked in

15   evidence.)

16             MR. MCCONNELL:  If we can publish that to the

17   jury.

18   Q    Mr. Jacoby, what's this?

19   A    It looks like it's the audited financial statements for

20   2014.

21             (Continued on the next page.)

22

23

24

25

1    BY MR. McCONNELL (continuing):

2    Q    That's -- this is the final product?

3    A    Yes.

4    Q    What we were just talking about?

5    A    It should be.  If you flip a page in, you will see the

6    auditors signing off.

7    Q    And who were the auditors, by the way?

8    A    It was an accounting firm MWE.

9    Q    Now, in these audited financials, did it show the

10   performance guaranties that we were just talking about?

11   A    Yes.

12        MR. McCONNELL:  We can scroll down to, I think

13   it's page 8.  I think page 8, at the bottom.  The next one.

14   Nope, that's not right.  I'm sorry.

15   Q    Mr. Jacoby, where is the performance guaranty, the

16   numbers?

17   A    You are looking at for the income statement?

18   Q    Yes.  Oh, there it is.

19   A    That's it right there, yeah.

20        MR. McCONNELL:  So if we can just zoom in on this.

21   And what page are we on page -- what page are we on,

22   Ms. Bates?  The record's a mess because of me.

23        MS. BATES:  Five.

24        MR. McCONNELL:  Five, okay.

25   Q    We are on page 5.  What part of the audited financials

1   are we looking at, Mr. Jack?

2   A    It's part of the 4,632,314.

3   Q    Before we get to that, what part of the financial

4   statement are we looking at?

5   A    This is the income statement.

6   Q    And what's depicted on the income statement?

7   A    It's revenues, less expenses, net profits.

8   Q    And why don't you just tell us what the big categories

9   are of bold text, what each of those is and what they mean?

10  A    So the total investment income, that's the revenue that

11  they -- that the fund took in from all the portfolio

12  companies, so that's the 4,642,314.  That includes those

13  deficiency amounts.  Okay?  So it includes the 1.1 million

14  in that 4.6 million number, right?  Then you have your

15  expenses and it lists them down, the various different

16  expenses.  And the total expenses were 2,143,456 for the

17  fund that year.  So your net investment income is the

18  2,498,858.

19  Q    And so net investment income is the total investment

20  income minus all the expenses?

21  A    Yes.

22  Q    Okay.  What's below net investment income?

23  A    That's an unrealized estimate.

24  Q    And can you just --

25  A    So unrealized is not cash.  So when you buy a stock or

*Jacoby - direct - Mr. McConnell*                    887

1    a bond, if you buy it at a hundred, and it goes up ten

2    points, you can see the price on the New York Stock

3    Exchange, says it's now worth 110.  But if you haven't sold

4    a stock, that's not cash gains, that's not cash profits,

5    it's just unrealized profits of ten.  This is an estimate on

6    that because the companies here do not trade on an exchange,

7    so we have to get an accounting firm to estimate the value

8    of the companies.  And you get an estimated mark-to-market

9    number, broken out separately.

10   Q    Just very briefly, what do you mean by

11   "mark-to-market"?

12   A    It's not cash.

13   Q    Okay.

14   A    Right?  It's either up or done in value, but it's not

15   cash.

16   Q    And then the last number at the bottom, there's net

17   income.

18          What's that?

19   A    That's the net investment income plus whatever that

20   noncash unrealized amount is.

21   Q    So you said that the performance guaranty money, the

22   $1.1 million, where is that accounted for here?

23   A    It's in the investment income at the top.

24   Q    Okay.  And what percentage, approximately, was that

25   $1.1 million of the net investment income?

*Jacoby - direct - Mr. McConnell*                        888

1   A    I'm going to approximate.  40 percent.

2           MR. McCONNELL:  If we can go down to page 15, I

3   think.  No, go up one, sorry, Ms. Bates.  If you can just

4   scroll in on the second-to-last paragraph here.  So if we're

5   looking at the document pagination, it's page 13.

6   Q    What are we looking at here, Mr. Jacoby?

7   A    So this is the notes to the financial statement.  So

8   you read them after you look at the statements and it helps

9   explain some things for the reader of the financial

10  statements, which there aren't many, but in some cases,

11  here, it's saying that there were performance guaranties and

12  it's explaining that and it's explaining the 1.1 million,

13  which is included in revenue.

14  Q    It says:  The partnership has agreements in place with

15  the operating partner and Patrick Dibre.

16           I thought these were agreements with Jeff Lash?

17  A    Jeff Lash is the operating partner there and Patrick

18  Dibre was a dealer that he was working with, who was

19  partnering with him.

20  Q    And it says:  To guarantee it a certain amount of

21  income at the dealership level for a specified amount of

22  time.

23           These are the performance guaranties you have been

24  talking about?

25  A    Yes.

*Jacoby - direct - Mr. McConnell*                    889

1   Q    And then it says:  For the year ended December 31,

2   2014, approximately 1.1 million was paid by them into the

3   dealerships.

4          It says:  Distributions and interest received by

5   the partnership resulting from these guarantees are included

6   in the interest income from investments on the consolidated

7   statement of operations.

8          Can you just translate that last sentence into

9   English, please?

10  A    As we were looking at before, it means the $1.1 million

11  is in the revenue of the financial statement.

12  Q    And you would have to scroll down to this page in order

13  to get that information, right?

14  A    Yes, yes, you would.

15  Q    Just looking at the statement of operations that we had

16  up before, you don't know that 40 percent of this income is

17  from this performance guaranties?

18  A    True.  You need to read it, yup.

19  Q    At the time these financials, audited financials were

20  issued, did you believe that that money had actually been

21  collected as is indicated here?

22  A    Yes.

23  Q    And as the Chief Financial Officer, did you review

24  books and records regarding payment or nonpayment of those

25  guarantees?

*Jacoby - direct - Mr. McConnell*                890

1   A    Yes.

2   Q    And what did your understanding become about whether or

3   not that money had actually been paid?

4   A    We -- it turns out it was not paid, yeah.

5   Q    I want to direct your attention to the audit for the

6   Automotive Portfolio the follow year.

7   A    Okay.

8   Q    All right?  So Automotive Portfolio for the year 2015,

9   when did that audit process take place?

10  A    So that process would take place in the first quarter,

11  and then to the end of April of 2016.

12  Q    Now, did you have a similar situation with performance

13  guaranties that year, as well?

14  A    Well, not until the end.

15  Q    Okay, well, let's get to the end.

16       First, how was the state of the

17  Automotive Portfolio in terms of the ability to pay

18  distributions at that point.

19  A    Well, you had started off, when you started off this

20  morning, we were looking at it, right?  It was the -- the

21  net income was one-third of -- the net investment income was

22  one-third of the distributions paid.

23       MR. McCONNELL:  Actually, it we can just pull that

24  back up, Government Exhibit 682 in evidence.

25       I'm sorry Ms. Bates, just if you can go down to

1    the Automotive Portfolio one, I think it's the second one.

2              THE WITNESS:  There we go, right.

3              MR. McCONNELL:  Just scroll in on the bottom, the

4    coverage shortfall portion.

5              THE WITNESS:  Actually, can you highlight the net

6    income and distribution, as well?  Both.  Yeah, that's

7    great.  Yeah.

8    Q    So Mr. Jacoby, at the end of 2015 and when you are

9    gearing up for the audit, this was the condition of the

10   Automotive Portfolio?

11   A    Yes.

12   Q    And you shared this in management dashboards with the

13   defendants and other members of GPB and Ascendant Capital?

14   A    I sent this one out because, you know, I -- we had

15   to -- I think, if you recall from yesterday, we had talked

16   about a couple of deals that broke.  I had to remove that

17   revenue because those deals did not happen.  This was the

18   situation.  I had sent out the management update to

19   everybody on the list including Mr. Schneider and

20   Mr. Gentile.  Mr. Anscher was at the airport with

21   Mr. Schneider when they got this one.  And Mr. Gentile got a

22   bit upset by this and called me and said, you know, we have

23   to fix this, this is a big problem.

24   Q    What do you remember about that phone call that you

25   received from Mr. Gentile?

1  A    He was upset with the results and he said we needed to
2  talk about it and see what we could do to fix it when he got
3  back.
4  Q    And did you have a conversation with him when he
5  returned to New York?
6  A    Yes.
7  Q    And tell us about that conversation.
8  A    Well, I explained to him that he had directed us to
9  accrue for $2 million worth of income for the two
10 dealerships, the one in Maryland, from Mr. Rogers and the
11 Planet Honda in New Jersey, that was accounted for
12 $2 million of revenue that had to come off.  And I said now,
13 you know, we're stuck with this situation where we have to
14 now get the books audited and we have to face reality.
15 Q    And what was his response?
16 A    He told me I needed to create my own reality.
17 Q    And what did you understand that to mean?
18 A    I understand it that he was telling me to try to find a
19 way to make the numbers look better.
20 Q    After sending out this management dashboard and in
21 getting ready to do the audit, did you also have a
22 conversation or conversations with Mr. Schneider about the
23 situation in the Automotive Portfolio?
24 A    Yes, I did.
25 Q    And tell us, was that in person or on the phone?

*Jacoby - direct - Mr. McConnell*                    893

1  A    In person.

2  Q    What do you remember about that conversation?

3  A    He said one-third net investment income to

4  distributions was unacceptable because it would essentially

5  stop new deposits from coming into the funds.

6  Q    What do you mean "it would stop new deposits" --

7  A    Meaning that people would stop putting new investments

8  into the funds.

9  Q    What did you --

10          What else do you remember about that conversation?

11  A    Well, he said -- he said, you know -- I told him -- he

12  said, you know, we can't have this.  And I said, well, you

13  know, I need to report accurate numbers for the audit.  He

14  told me, you know, you're giving me problems, not solutions.

15  I need solutions.  I told him that's like, you know --

16  that's like blaming the weatherman for bad weather.

17  Q    And what did he say in response?

18  A    He said, well, if I gave -- if I offered you a million

19  dollar bonus, could you make the financials look better.

20  Q    And what did you say?

21  A    I said no, of course not, but I said what we would do

22  is we'd have the accountants review all of the financial

23  numbers, from all the portfolio companies, and I would take

24  a look at everything and see if there's any opportunity to

25  improve the net investment income.

1  Q    Did you ever take a million dollars bonus --

2  A    No.

3  Q    -- that year?

4  A    No, no, no.  He was trying to incentivize me.

5  Q    Did you come up with a potential solution?

6  A    Yes.

7  Q    And did you tell the defendants what your proposed

8  solution to this issue was?

9  A    Yes.

10 Q    Can you tell us about the conversations you had with

11 the defendants about that?

12 A    So we did the best we could to get final numbers from

13 all the portfolio companies.  And after that, the only other

14 solution that I could come up with was to reduce expenses

15 and we had the ability to give fees back that we had charged

16 the investors since we didn't get their money invested.  So

17 I suggested that in this year, you were looking at the

18 financial statements, there was 1.4 million in management

19 fees that we charged on this one.  So if we refunded the

20 1.4 million, as you can see here, we could get from

21 one-and-a-half -- we could get to about 80 percent of the

22 dividends that we paid if we gave -- if we refunded that fee

23 back to the investors.

24 Q    And just to be clear, where you are when you are

25 talking about 30 percent coverage ratio, that means

*Jacoby - direct - Mr. McConnell*                    895

1    70 percent of these monthly distributions being paid to

2    investors is coming from where?

3    A    Investors' deposits.  Their own cash.

4    Q    So you proposed giving back fees; is that basically

5    what you proposed?

6    A    Refunding the management fee.

7    Q    And why would that help the situation?

8    A    Well, it would -- it would reduce the expense.  So by

9    subtracting your expense -- by reducing your expense, you're

10   increasing your profit.

11   Q    What was the reaction from Mr. Gentile and

12   Mr. Schneider when you proposed giving back, you know,

13   $1.4 million?

14             MR. COLTON:  Objection.  Compound.

15             THE COURT:  You want to make it not compound?

16             MR. McCONNELL:  Sure.

17   Q    Did you have a conversation with Mr. Gentile --

18             Well, what was Mr. Gentile's reaction when you

19   suggested giving back 1.4 million in fees?

20   A    So -- well, I spoke to them both about it and said this

21   is a proposed solution, that's the best I could come up

22   with.  They took that information away and -- under

23   advisement -- and came back to us, all of us in the

24   accounting group a little later with a decision.

25   Q    And what was the decision that they came back to you

1  with?

2          MR. COLTON:  Again, objection, compound.  I don't

3  know who the speaker is.

4  Q    Well, was Mr. Gentile and Mr. Schneider present for

5  these conversations?

6  A    Yes.  This was both of them.  And then Mr. Gentile came

7  back to the accounting team and communicated their decision.

8  Q    Okay.  What did Mr. Gentile say?

9  A    He said that they had decided to refund 1,050,000 of

10  management fees, so not all of them.  Because it would get

11  the net coverage to exactly 70 percent and that was a number

12  that Mr. Schneider felt comfortable with as far as not

13  hurting the capital rates efforts too much.

14  Q    When you say --

15          MR. COLTON:  Move to strike.  That's out-of-court

16  statement of Mr. Gentile about what supposedly was said by

17  somebody else.

18          THE WITNESS:  No, Mr. Schneider said it, too.

19  Mr. Schneider said that to me, too.  70 percent.

20          MR. COLTON:  Your Honor, I would ask that the

21  witness not be commenting without a question pending.

22          THE WITNESS:  I'm sorry.

23          THE COURT:  All right.  So as to the portion where

24  he was recounting what Mr. Gentile said Mr. Schneider said,

25  is there a hearsay exception or this is being offered for a

*Jacoby - direct - Mr. McConnell*                          897

1   non-hearsay purpose?

2              MR. McCONNELL:  It's being offered for a

3   non-hearsay purpose, but there also is an exception, if we

4   can approach?

5              THE COURT:  Yes.

6              (Sidebar.)

7              (Continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Sidebar Conference*                                              898

1          (Sidebar conference held on the record out of the
2    hearing of the jury.)
3          MR. McCONNELL:  Again, apologies for the sidebar,
4    your Honor, I don't want to say co-conspirator in front of
5    the jury.  This clearly falls into the co-conspirator
6    category.  Mr. Gentile is also giving direction to members
7    of the accounting team in order to provide contextual
8    information for the statement.  So I think for what the
9    course of action is going to be, so I think it's admissible
10   for either of those purposes.  And the witness has indicated
11   he's going to testify to similar statements that
12   Mr. Schneider made to him directly, so.
13         MR. COLTON:  But what he may or may not say that
14   Mr. Schneider said to him directly we'll find out, but the
15   alleged statement that Mr. Gentile said Mr. Schneider said
16   that 70 percent is good enough, the alleged fraud is to
17   misstate coverage, not to accurately state coverage, so this
18   is not in furtherance of any conspiracy.
19         THE COURT:  It's not obvious to me how it's in
20   furtherance.  I will say if he's about to say "and
21   Mr. Schneider told me exactly the same thing," I guess I --
22         MR. COLTON:  I don't know.
23         MR. MENCHEL:  Well, he blurted it out.
24         THE COURT:  I guess I'm inclined to strike that
25   portion of it.  And if you want to talk more about it, we

1   can talk about how it's in furtherance.

2          MR. McCONNELL:  I don't really know what else

3   to -- go ahead.

4          THE COURT:  Maybe it would be easier if you tell

5   me how it would be in furtherance.  To say to this witness

6   the reason I want to refund this amount of money is to get

7   to this coverage issue, it doesn't sound to me like it's in

8   furtherance.

9          MS. WEIGEL:  I'm happy to handle it.  So your

10  Honor, there will be testimony that some investors and RIA

11  started asking questions about the coverage ratio and there

12  were limited disclosures with respect to that and as we

13  heard earlier from some of the investors, there were

14  temporary periods, it was explained as temporary blips in

15  coverage.

16         So this 70 percent ratio is easier to explain for

17  the marketing team to the extent they get questions.  It's

18  our position that this information was not voluntarily

19  disclosed.  In the scheme of this fraud, they had to answer

20  questions and they had to provide explanations to some of

21  the RIAs and investors.  So this made it easier to cover up.

22         MR. AXELROD:  And with respect to the in

23  furtherance co-conspirator requirement generally, it's not

24  merely directions from one conspirator to another.  The

25  discussions that lead to the fraud that are then

1    coordinating their stories, that build the relationship that

2    provide background, all of these things are well within the

3    Second Circuit description of the in furtherance

4    requirement.  So we think we are in the charged conspiracy

5    if already started using investor funds to pay

6    distributions, we think we are well within that here.

7              MR. MENCHEL:  Can I be heard?

8              THE COURT:  Yes.

9              MR. MENCHEL:  I am confused about what the fraud

10   is in this case.  I thought up until this moment the fraud

11   was that investors were being lied to and being paid back

12   capital without their knowledge and being told that the fund

13   was fully funded from operations.  Now we are hearing a

14   whole new theory of fraud that if they got to 70 percent,

15   we're good.  Those two things can't coexist.  Either the

16   fraud is that the investors did not know that their funds

17   were not fully covered or not.  Now we're hearing a whole

18   different theory that, well, if the investors believe

19   70 percent, that seems to completely undercut the main

20   theory of fraud in this case.

21             THE COURT:  I'm going to strike this portion of

22   the answer.

23             MR. COLTON:  Your Honor, if I could just ask that

24   the questions try as best as you can to avoid "they" so we

25   don't it be to run into this problem, because there are two

*Sidebar Conference*                                                901

1    different people.

2              MR. McCONNELL:  I understand.  And when he's

3    saying that to me it's clear that he's speaking with both of

4    them, but I will make it clear.

5              THE COURT:  That would be great.

6              (Sidebar conference ends.)

7              (Continued on following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (In open court.)

2        THE COURT:  So please disregard the portion of the

3   witness's answer where the witness was describing what

4   Mr. Gentile said Mr. Schneider had said.

5        Go ahead, Counsel.

6   BY MR. McCONNELL:

7   Q    So I just want to break the question down, Mr. Jacoby.

8   A    Yes, sir.

9   Q    Mr. Gentile came back to you and other members of the

10  accounting team and said they would refund 1,050,000 in

11  management fees?

12  A    Correct.

13  Q    And was that all of the fees?

14  A    No.

15  Q    What portion of the fees was it, approximately?

16  A    Well, the whole amount was 1.4 million.  They decided

17  to refund only 1,050,000 of it or most of it.

18  Q    Did you have conversations with Mr. Schneider as well

19  about the $1,050,000 amount?

20  A    Yes.

21  Q    And could you tell us about those conversations?

22  A    That was an amount that they calculated given the

23  numbers that we had provided to them, I had provided.  That

24  would get the net investment income to cover 70 percent of

25  the distributions paid for the year.

1   Q    And did Mr. Schneider tell you or did you have a

2   conversation with Mr. Schneider about why 70 percent was the

3   number?

4   A    Yes.

5   Q    What did he say?

6   A    He said that that was a lot better than 30 and he could

7   explain away when he got phone calls from the brokers and

8   their investment advisors, he could explain more easily that

9   we had broken deals, and that was the reason for the

10  shortfall, and that GPB anticipated catching up the

11  following year.  And if it was 70 percent, it was a more

12  realistic amount.

13  Q    So during the course of the audit process, did you

14  communicate with the auditors that this management fee

15  rebate of $1,050,000 was something to be included in the

16  audit?

17  A    Yes.

18  Q    Can you tell us about that process?

19  A    Yes.  So I communicated to the auditors that we were

20  putting this entry in, refunding $1,050,000 of the

21  management fees due to the fact that we failed to get the

22  money invested efficiently.

23  Q    And what was the response?

24  A    They asked why.  They wanted a business reason.  They

25  wanted, you know, an explanation, which I gave them.  And

1  then I explained to them what it was, like I just did,

2  the -- the failure to get money invested.  And then I worked

3  with them to get the right description into the notes of the

4  financial statement explaining the reason for the rebate.

5  Q    Did the auditors ask to see proof that the management

6  fee rebate had actually been made, that the money had

7  actually been repaid?

8  A    Yes.

9  Q    And tell us about that.

10 A    So we produced the financial statements.  Everything

11 was ready to go.  We knocked off all of the other open items

12 except for that last one.

13 Q    Which one?

14 A    Which was the management fee rebate.  We had collected

15 all the other outstanding receivables.  That was the last

16 one to be collected.

17        The auditor working on the audit called me and she

18 said, you know, Margolin is not signing off -- Margolin, the

19 auditing firm, we're not signing off on the financials until

20 we see that you guys actually paid that management fee back

21 to the investors.

22 Q    And did you have a conversation with Mr. Gentile at

23 that point?

24 A    Well, I told Ms. Gage I would relay that information to

25 Mr. Gentile and she said to me that she would follow up

1    independently as well.  And so --

2    Q    Who is Ms. Gage?

3    A    She's the auditor.

4    Q    And did you --

5         Well, what happened next?

6    A    We -- I followed up with Mr. Gentile and told him that

7    they were not going to sign off until we paid the money into

8    the investors.  And then I think it was two days before the

9    deadline, Mr. Gentile had a phone call with myself and

10   Mr. Frangioni, and he said he had decided not to refund the

11   management fees but instead he had changed his mind and that

12   Mr. Lash was going to pay a performance guaranty on the --

13   on the Bob's Buick GMC store.

14   Q    And what was the amount of the performance guaranty?

15   A    Identical, $1,050,000.

16   Q    And did he say why --

17   A    And when I say that, yeah, he said he didn't want to

18   pay the management fee rebate.

19   Q    Now, prior to this phone call with Mr. Gentile, had you

20   ever heard of a performance guaranty on that dealership?

21   A    No.

22   Q    Did you ask Mr. Gentile if this was a real thing, this

23   performance guaranty?

24   A    Yes.

25   Q    What did you say to him?

1   A    We said, you know, this is a last-minute change, it's

2   going to be a problem.  Is Lash going to actually pay it?

3   And he said -- he confirmed to us that Mr. Lash had agreed

4   to pay it.

5   Q    Did you ask him why this was coming up at the last

6   minute?

7   A    He just instructed us to do it this way.  I mean, it

8   wasn't debatable at that point, with two days to go.

9   Q    Why did you go along with it?

10          Well, did you go along with it?

11  A    We did, yes, and I did.

12  Q    Why?

13  A    Because he told me I had to do it.  He told us to do it

14  this way.  We eventually got a contract and we got the

15  contract signed and Mr. Lash wired us the money in.  So I

16  got a contract and I got the money and he was telling me I

17  had to do it.

18  Q    I want to look at some of the --

19          Well, and was that performance guaranty included

20  in the 2015 financials, audited financials for the

21  Automotive Portfolio?

22  A    Well, yeah, but we had to -- we obviously had to make

23  changes with two days to go, so I knew the financials were

24  going to be late.  I had to alert Mr. Schneiter, as I told

25  you, the one in Austin, with a T.  His name is Trent.  I

1    alerted him that we were going to be late so that he could,

2    you know, manage the problem because he would be having a

3    lot of people asking for them.

4    Q    Well, let me just break that down.

5            Again, who is Trent Schneiter with a T?

6    A    He was my contact in Austin who worked for Ascendant

7    and he -- he would take the financial statements that I

8    would send him and then he would release them to the -- to

9    the Ascendant team to get out to the brokers and investment

10   advisors.

11   Q    So why do you have to tell him that these audited

12   financials are going to be late?

13   A    Because he's receiving incoming queries from his team

14   and from brokers.

15           MR. COLTON:  Objection.  Move to strike the

16   hearsay, your Honor.

17   Q    What was your --

18           MR. McCONNELL:  Sorry.

19           THE COURT:  Feel free to rephrase it.

20   Q    What was your understanding of why he wanted or why he

21   needed to know this information?

22   A    Because he told me he was getting phone calls --

23           MR. COLTON:  Same objection.

24           THE COURT:  I mean, it does seem like it's

25   hearsay, right?

1          MR. McCONNELL:  It's just to explain the

2    narrative, Judge, not offering it for --

3          THE COURT:  Let's move on to the next question,

4    then.

5          Strike that answer.

6    Q    So Mr. Jacoby, I would like to look at some of the

7    e-mails that you were a party to --

8    A    Okay.

9    Q    -- when this audit was being prepared.

10         MR. McCONNELL:  If I can show the witness

11   Government Exhibit 7544.

12   Q    Do you recognize this e-mail, sir?

13   A    Yes.  So this is earlier on in the work.  This is me

14   interacting with the auditor as she's starting to collect

15   some of the documentation that she needs to do the audit.

16   Q    And what's the date on this e-mail?

17   A    That one is February 22, 2016.

18   Q    And when are the audited financial statements supposed

19   to be done?

20   A    April 30th that year.

21         MR. McCONNELL:  So I'm going to offer 7544, your

22   Honor.

23         MR. COLTON:  No objection.

24         THE COURT:  Admitted.

25         MR. McCONNELL:  Any objection to the attachment?

1          MR. MENCHEL:  No.

2          MR. McCONNELL:  I will offer the attachment to the

3     Excel spreadsheet as well.

4          (Government Exhibit 7544 received in evidence.)

5          MR. McCONNELL:  Can we publish this to the jury?

6          MR. COLTON:  Sorry, I apologize.  You asked

7     whether there was an objection to an attachment and I don't

8     see it and I doubt I have an objection, but I don't see it.

9          MR. McCONNELL:  We will show the witness the

10    attachment.

11         MR. MENCHEL:  Can you just show Counsel, please,

12    first?

13         MR. McCONNELL:  We will do it for the witness and

14    Counsel.

15         THE WITNESS:  Okay.

16    Q    Mr. Jacoby, what's in the attachment here?

17    A    This is a portion of what was feeding into the

18    management dashboard.

19    Q    And you sent this to the auditor?

20    A    Yeah.

21    Q    Why?

22    A    Because she's going to use it to help check against the

23    bank accounts and do her audit work.

24    Q    And this Excel sheet has tabs for holdings in the

25    Automotive Portfolio?

*Jacoby - direct - Mr. McConnell*                910

1    A    Yes.

2    Q    Does it show some of the coverage shortfalls that you

3    talked about before?

4    A    I think it does.  You have to just scroll to the right

5    and go down.  Yeah.  If you -- this is holdings, you're

6    looking at.  So we were talking about Auto Portfolio.

7         MR. McCONNELL:  If we can click on the other tab,

8    Ms. Bates.

9         THE WITNESS:  Yes, yup.

10        MR. McCONNELL:  So I will offer the attachment as

11   well as the coverage e-mail at this time.

12        MR. COLTON:  Assuming there is no data to the

13   right, I don't see it -- okay, no objection.

14        MR. McCONNELL:  Thank you.

15        We can just show the jury quickly.  Actually, we

16   don't have to do that.

17   Q    That Excel spreadsheet is basically the same thing that

18   makes up your management dashboards?

19   A    And the financial statement that you are looking at as

20   well.

21   Q    I want to show you Government Exhibit 7852, please.

22        MR. McCONNELL:  If we can just pull up the e-mail

23   portion.

24   Q    Do you recognize this e-mail, sir?

25   A    So this is March 23rd.

1    Q    Of 2016?

2    A    Yeah.

3    Q    And what's in this e-mail, generally?

4    A    So this is an update from Mr. Marshall to me and

5    everybody else on that -- on that e-mail, so it's

6    Mr. Gentile, Mr. Lash, Mr. Sijan, Mr. Schneider, Mr. Naugle

7    Mr. Prestiano and Kyle Brengel who was working on the taxes

8    and Frangioni and Jacoby.

9              And he's giving us an update on the final number.

10   So I had just described how we had that conversation and the

11   team's going to go out and get the final numbers from all

12   the portfolio companies.  This is the end of that.

13   Q    Okay.

14             MR. McCONNELL:  I am a going to offer

15   Government Exhibit 7852 into evidence.

16             MR. COLTON:  No objection.

17             THE COURT:  Admitted.

18             (Government Exhibit 7852 received in evidence.)

19             MR. McCONNELL:  If we can publish that for the

20   jury with the Court's permission?

21             (Exhibit published.)

22   Q    So I want to look at this e-mail.  Again, it's from

23   Brian Marshall to Kyle Brengel, you and Steven Frangioni.

24             Just who was Kyle Brengel?

25   A    He was the partner at the accounting firm doing the

1    taxes for the fund.

2    Q    That's the accounting firm that Mr. Gentile used to

3    work at?

4    A    Was a partner at, yes.

5    Q    So it says:  Hi, all.  Here are the final income

6    numbers for 2015 per my phone call with David Gentile.  I

7    included the sources of the income by store and type.  In

8    GPB Auto Portfolio, the additional income from RCG, there's

9    a difference between statement income for December and the

10    distribution we took in January.

11          In this sentence, Mr. Jacoby, the distribution is

12    the money that the dealership is kicking back to the fund?

13    A    Yeah.  He's not talking about the dividends to the

14    investors.  He's talking about the payments of profits from

15    the dealerships to the fund.

16    Q    And the next paragraph, it says:  In addition there

17    will be a capital contribution coming in from David Gentile

18    to GPB Capital Holdings for $1,050,000, which will be used

19    to refund that portion of management fees/fund expenses.

20          Is that what you were talking about before?

21    A    Exactly.

22    Q    And then it says:  Per my calculations, the attached

23    should get us to 100.3 percent coverage in Holdings,

24    70.4 percent coverage in GPB Auto Portfolio.

25          Is that referencing the conversations you had with

1   Mr. Gentile and Mr. Schneider about how this fee rebate

2   would impact the fund?

3   A    Exactly.

4          MR. McCONNELL:  I'd like to show the witness

5   Government Exhibit 7475.

6          If we can just blow this up so the witness can

7   read it and identify it.

8   Q    I know this is hard to read, Mr. Jacoby.

9   A    Can I see the earlier parts?  Yeah.  Okay, I see.  Hold

10  on.  Yeah.  I remember this exchange.

11  Q    And what is this exchange?

12  A    This is a discussion between myself and the auditor,

13  Ms. Gage, at MWE.  I'm telling her that -- she noticed as

14  she was doing the audit that we made the entry reducing the

15  expenses.

16  Q    Mm-hm.

17  A    And as she was doing her audit work, she asked me, hey,

18  why did you guys make that entry?

19         MR. McCONNELL:  I am going to offer 7475 into

20  evidence, please.

21         MR. MENCHEL:  No objection.

22         THE COURT:  It's admitted.

23         (Government Exhibit 7475 received in evidence.)

24         MR. McCONNELL:  If we can publish that to the

25  members of the jury.

*Jacoby - direct - Mr. McConnell*                              914

1              (Exhibit published.)

2    Q    So just here at the bottom e-mail on April 5, it says:

3    Why did you make an entry reducing the management fee

4    expense paid by Automotive to Capital Holdings by over

5    $1 million?

6              And you responded:  David has elected to rebate

7    that amount of management fees for 2015.

8    A    Right.

9    Q    And when you refer to David, that's Mr. Gentile?

10   A    Yes.

11   Q    And then the response from the auditor to just you is:

12   Based on what?  Why?

13   A    Yeah.

14   Q    When you received that e-mail, why did you understand

15   that she wanted to know that information?

16   A    She wanted a business reason.

17   Q    Well, what difference does it make if there's money

18   going back into the fund?

19   A    Well, she's -- she's auditing the integrity of the

20   financials.

21   Q    I would like to show you Government Exhibit 7476.

22              MR. McCONNELL:  We can just go to the top,

23   Ms. Bates.  The first three.  There we go.  That's fine.

24              I'm sorry, if we could go down one more.  I

25   apologize.

*Jacoby - direct - Mr. McConnell*                    915

1    Q    So what's depicted in this exhibit, Mr. Jacoby?

2    A    Ms. Gage and I spoke on the phone and then I -- we had

3    some more e-mails following up.

4              And so here I am telling her, yes, I'm very clear

5    that we need to disclose the business reason in the

6    footnotes, that's the explanations in the financial

7    statements.  We'll be working on that wording.  And I asked

8    her if she had any examples from other funds that did a

9    similar thing that might help us craft the wording that we

10   would use.

11             MR. McCONNELL:  I would offer 7476 into evidence.

12             MR. MENCHEL:  No objection.

13             THE COURT:  Admitted.

14             (Government Exhibit 7476 received in evidence.)

15   Q    So just looking at this, Mr. Jacoby.

16             MR. McCONNELL:  If we could have this published,

17   please.

18             (Exhibit published.)

19   Q    Again, this is just you and Ms. Gage going back and

20   forth.

21             You say:  Yes, we're very clear, we need to

22   disclose the business reason in the footnotes.  We'll work

23   on that wording.  Do you have any examples for reference or

24   guidance?

25             She tells you she'll find something.  What about

*Jacoby - direct - Mr. McConnell*                    916

1    the other two questions?  Much more important.

2              And then at the top, she asks:  Has the cash been

3    actually refunded yet?

4              And in parenthesis:  I hope so.

5              What did you understand that to mean?

6    A    That was the point that we had discussed earlier that

7    we had to actually pay the money back to the investors,

8    right.

9    Q    And when it says:  I'll prepare a confirm for David to

10   sign.

11             What do you understand that to mean?

12   A    That means the accounting firm is going to prepare like

13   a letter saying please confirm that you acknowledge that

14   this is accurate.

15   Q    Did you also speak to Kyle Brengel at the accounting

16   firm about this issue?

17   A    Yes.

18             MR. McCONNELL:  If I can show the witness

19   Government Exhibit 7478, please.

20   Q    What do you recognize this to be, sir?

21   A    This is just a followup between him -- he and I.

22   Q    Who?

23   A    Mr. Brengel and myself.

24   Q    Just explain generally why it was necessary to

25   communicate with Mr. Brengel at the accounting firm about

*Jacoby - direct - Mr. McConnell*                    917

1    this issue.

2    A    Because he was producing the -- the tax documents that

3    would go out to all the investors in the fund.  So just like

4    you get a W-2, you're going to get, in this case, a K-1 form

5    to do your taxes with.  So he was producing those.

6    Q    What does that have to do with the audited financials?

7    A    Well, he's using the financial statements of the fund

8    and then the partnership allocation from the fund

9    administrator to produce those K-1s.  So it's an involved

10   process.  It's not at all straightforward.  He needed to be

11   included on any changes, obviously, because he's working to

12   get -- get these out by -- he's trying to get them out as

13   soon as possible in this scenario.

14           MR. McCONNELL:  I will offer 7478, your Honor.

15           MR. COLTON:  Your Honor, a minute with

16   Mr. McConnell, I think I will probably be able to resolve

17   this small issue?

18           Let me just check with them.  Give me a second.

19           Your Honor, just doing a small redaction, it's

20   agreed, and then there will be no objection.

21           THE COURT:  Okay.  So it's admitted with the

22   redaction.

23           (Government Exhibit 7478 received in evidence.)

24           MR. McCONNELL:  Ms. Bates, if you have got that

25   redacted, you can just publish that to the jury.

*Jacoby - direct - Mr. McConnell*                          918

1                (Exhibit published.)

2    Q    So you wrote on April 5th:  FYI, Margolin is chasing

3    down to see that all our outstanding receivables has settled

4    up.  And one of them is the management fee rebate.

5    A    Yeah.

6    Q    So what do you mean there?

7              Again, who is marrying?

8    A    That's -- that's the MWE, that's the accounting firm.

9    Q    And when you say "chasing down to see that all our

10   outstanding receivables," what do you mean?

11   A    They want to make sure that all the open account

12   receivables that are on the books and records at year end

13   are actually collected.

14   Q    And the response from Mr. Brengel was:  Spoke to Dave.

15             Who is Dave?

16   A    Mr. Gentile.

17   Q    And he asks you:  What do you need from Dave for fee

18   reduction receivable?

19             Do you see that?

20   A    Yes.

21   Q    I would like to show you Government Exhibit 7480,

22   please.

23             Do you recognize this e-mail with Ms. Gage?

24   A    Is this the same one?  No.

25             Yeah, oh, yeah, so she -- this was a continuation

1    of the one you were showing me before.

2            MR. McCONNELL:  I'd offer Government Exhibit 7480,

3    your Honor.

4            MR. MENCHEL:  One second, please.

5            I have no objection.

6            THE COURT:  Admitted.

7            (Government Exhibit 7480 received in evidence.)

8            MR. McCONNELL:  If we can publish that to the

9    jury.

10           (Exhibit published.)

11   Q    So this is all a continuation of the same e-mail chain

12   or different branches of it, Mr. Jacoby?

13   A    Yes.

14   Q    What are we looking at in Government Exhibit 7480?

15   A    She came back to me with, you know, a suggested

16   paragraph that we could include in the notes of the

17   financial statement for --

18   Q    So you're getting down to how this is actually going to

19   be described in the financial statements?

20   A    Correct, yeah.

21   Q    How the management fee rebate's going to be described?

22   A    Yes.

23   Q    I would like to show you what's marked as 7496.

24           So Mr. Jacoby, the e-mails that we looked at so

25   far are all April 5th to April 6th.

1              Do you recognize this e-mail, 7496?

2              MR. McCONNELL:  Ms. Bates, can we pull it down a

3    little bit, just so we can get the -- let's do the last

4    e-mail first.  Thank you.

5    Q    And Mr. Jacoby, if you need to look at the whole e-mail

6    in order to identify it, let us know what you want to see.

7    A    Okay.

8    Q    Do you need to go look at the top part?

9    A    Yes.

10   Q    Okay.  What's this e-mail exchange about?

11   A    Okay.  So that was Ms. Gage following up with

12   Mr. Gentile about the management fee rebate.  And then I'm

13   also following up with Mr. Brengel.

14             MR. McCONNELL:  I will offer 7496, your Honor.

15             THE COURT:  Admitted.

16             MR. MENCHEL:  One second, please.

17             Can we have a brief sidebar?

18             (Sidebar.)

19             (Continued on the following page.)

20

21

22

23

24

25

*Sidebar Conference*                                            921

1          (Sidebar conference held on the record out of the

2     hearing of the jury.)

3          MR. MENCHEL:  Your Honor, I haven't raised a lot

4     of objections, even though Mr. Gentile's not on these

5     e-mails, to allow Mr. McConnell to complete the background,

6     but I think this has been going on a bit long now and I

7     would start to object.

8          MR. McCONNELL:  This is the last one.

9          THE COURT:  Okay.

10         MR. McCONNELL:  Well, just to be clear, it's the

11    last one until we flip to the performance guaranty parts,

12    until the next one.  So this is the last e-mail with the

13    management fee rebate and then the next couple are --

14         MR. MENCHEL:  All right.  We will take them as we

15    go.

16         THE COURT:  Just so I am understanding if we are

17    going to have objections, this is just to explain what the

18    witness is doing, that he's getting requests for

19    information, then he's providing information?

20         MR. McCONNELL:  Yes.  And then the timing, yes.

21         (Sidebar conference ends.)

22         (Continued on following page.)

23

24

25

Jacoby - direct - McConnell                        922

1    BY MR. McCONNELL:   (Continuing.)

2            MR. McCONNELL:   Your Honor, I offer 7496.

3            (Government Exhibit 749 received in evidence.)

4            MR. McCONNELL:   And if we can just go to the bottom,

5    Ms. Bates?

6            (Exhibit published.)

7            MR. McCONNELL:   If you can get the whole second page

8    too.

9    Q    This is an e-mail from Ms. Gage to Mr. Gentile and

10   copying you and Mr. Frangioni.  What's relayed in the body of

11   the e-mail?

12   A    She's trying to confirm with him the existence of this

13   rebate, that he's aware of it and that he has to pay it.

14   Q    And is this the proposed language in the -- for the

15   audit?

16   A    No.  No, she's asking him to confirm to her that he

17   recognizes the fee and that he's going to pay it.

18   Q    I see, okay.  And if -- what's the date on this e-mail?

19   A    April 27th.

20   Q    Now, up to this point we haven't heard anything about a

21   performance guaranty; correct?

22   A    That's right.

23   Q    I'd like to show you Government Exhibit 7516.

24        (Exhibit published to witness, Counsel and Court only.)

25   Q    Do you recognize this e-mail?

Jacoby - direct - McConnell                923

1    A    Yes.

2    Q    What do you recognize this e-mail to be?

3    A    This is me alerting -- this is to Mr. Schneiter in

4    Ascendant in Austin about the conversation that I had --

5    myself and Mr. Gentile and Mr. Frangioni had about making the

6    change from a refunded management fee to a performance

7    guaranty.  So I'm alerting him that the financials are going

8    to be late.

9            MR. McCONNELL:  If we can offer Government Exhibit

10   7516.

11           THE COURT:  Admitted.

12           (Government Exhibit 7516 received in evidence.)

13           MR. McCONNELL:  And if we can publish that to the

14   jury.

15           (Exhibit published.)

16   BY MR. McCONNELL:

17   Q    So, Mr. Jacoby, the date on this is April 29th; correct?

18   A    Yes.

19   Q    So that's two days after the last e-mail we saw when we

20   were talking about a management fee rebate?

21   A    Yes.

22   Q    And now we're talking about a performance guaranty?

23   A    That's right.

24   Q    In between those two days, what happened?

25   A    So, we had that phone call in the morning where

Jacoby - direct - McConnell                924

1    Mr. Gentile told Mr. Frangioni and myself that he decided not

2    to pay the management fees and Mr. Lash is going to instead

3    pay a performance guaranty in that amount.

4    Q    Had you ever heard of a performance guaranty on that

5    dealership prior to that date?

6    A    No.

7    Q    Is that something as the chief financial officer you

8    would have been aware of?

9    A    That's right.

10   Q    I'd like to show you Government Exhibit 7512, please.

11        (Exhibit published to witness, Counsel and Court only.)

12   Q    What's 7512, sir?

13   A    So, now we have drafted up a contract for audit purposes

14   for Mr. Lash to sign.

15   Q    Who is "we"?  Did you do that?

16   A    No.  It's in-house counsel that did that.

17   Q    Who is that?

18   A    Mr. Prestiano.

19   Q    And how do you know he did that?

20   A    He worked with me directly.

21   Q    So you're sending this --

22        MR. McCONNELL:  Well, I'm going to offer 7512 into

23   evidence, your Honor?

24        MR. MENCHEL:  No objection.

25        THE COURT:  Admitted.

Jacoby - direct - McConnell                925

1              (Government Exhibit 7512 received in evidence.)

2              (Exhibit published.)

3    BY MR. McCONNELL:

4    Q    So, Mr. Jacoby, what are you sending to the auditors

5    here?

6    A    I'm sending them the contract.  It's not signed yet by

7    Mr. Lash, but I'm alerting them that here is the contract that

8    we're going to submit to them and I'm going to make the

9    entries into the financial statements according to this

10   contract.

11   Q    Why are you sending them a blank, unsigned performance

12   guaranty?

13   A    Because I'm anxious to get the financials finished and I

14   want them to be prepared with all of the information that I

15   had available at April 29th since they're due at the end of

16   April.

17   Q    I'd like to show you Government Exhibit 7524, please.

18              (Exhibit published to witness, Counsel and Court only.)

19   A    This is a continuation of that e-mail chain.

20              MR. McCONNELL:  I'd offer 7524 --

21   Q    With the auditors?

22   A    Yes.

23              MR. COLTON:  No objection.

24   A    But this is -- another auditor is working on it.  Another

25   partner is now involved.

Jacoby - direct - McConnell                          926

1    Q    But they're all from the same --

2    A    Yeah.  So, Mr. Matarazzo is working on this with

3    Ms. Gage.

4              MR. MENCHEL:  No objection.

5              THE COURT:  Admitted.

6              (Government Exhibit 7524 received in evidence.)

7              MR. McCONNELL:  And if we can publish it to the

8    jury, please.

9              (Exhibit published.)

10   BY MR. McCONNELL:

11   Q    So, Mr. Matarazzo is also another one of the auditors at

12   MWE?

13   A    Yes.

14   Q    And he's asking you, "Is a signed copy coming Monday

15   morning," and you say "Lash is coming to the office, so 100

16   percent chance."

17   A    Yeah.  So I had spoken to Lash and he confirmed he would

18   be in.

19   Q    Is that one of reasons you were willing to go along with

20   this?

21   A    Yes.

22   Q    Tell the members of the jury what happened when Lash

23   actually did sign the document.  How did that come about?

24   A    Well, Mr. Frangioni was in the Garden City office.  I was

25   in the New York office, so we had all offices covered.  We

Jacoby - direct - McConnell                     927

1    knew he was coming to New York.  We just weren't sure which

2    office and, so, we both had a copy of the contract for him to

3    sign.  And he had confirmed to us that as soon as he came in,

4    he would sign it and we would get it over to the auditors as

5    quickly as possible.

6    Q    So I'd like to show you Government Exhibit 7526, please.

7         (Exhibit published to witness, Counsel and Court only.)

8    Q    Do you recognize this?

9    A    Yes.

10   Q    What's this?

11   A    Yeah, this is the culmination of what we were just

12   discussing which is Mr. Frangioni tells me he thinks Mr. Lash

13   is going to be in Garden City and I told Mr. Frangioni,

14   Mr. Lash told me he was come coming to Manhattan.  So we had

15   him covered.

16              MR. McCONNELL:  I'd offer 7526.

17              MR. MENCHEL:  No objection.

18              THE COURT:  It is admitted.

19              (Government Exhibit 7526 received in evidence.)

20              MR. McCONNELL:  If we can show the witness 7528,

21   please.

22        (Exhibit published to witness, Counsel and Court only.)

23   BY MR. McCONNELL:

24   Q    Do you recognize this e-mail, sir?

25   A    Yes.

Jacoby - direct - McConnell                928

1  Q    What's this e-mail?

2  A    This is, again, myself and Mr. Frangioni discussing

3  chasing down this contract.  I was hearing -- it says -- me to

4  Steve, "Now hearing that David Gentile and Roger Anscher are

5  going to be in Garden City today, if Lash does there get him

6  to sign it."

7          So I'm giving Steve a copy of the contract.  I have

8  a copy of the contract so whoever sees him first, get him to

9  sign.

10          MR. McCONNELL:  I'd offer Government Exhibit 7528

11 please.

12          MR. MENCHEL:  No objection.

13          THE COURT:  Admitted.

14          (Government Exhibit 7528 received in evidence.)

15          MR. McCONNELL:  7530 for the witness.

16      (Exhibit published to witness, Counsel and Court only.)

17 Q    What's this?

18 A    Yes, so this is me confirming to the auditors and to

19 Mr. Frangioni that I saw Lash and I got him to sign it in the

20 New York office.

21          MR. McCONNELL:  I'd offer 7530, please.

22          MR. MENCHEL:  No objection.

23          THE COURT:  Admitted.

24          (Government Exhibit 7530 received in evidence.)

25 Q    And there's an attachment to this document.

Jacoby - direct - McConnell                    929

1          MR. McCONNELL:  If we can publish this to the jury,

2     Ms. Bates.

3          (Exhibit published.)

4     Q    This is dated May 2, 2016.  So you're already a couple of

5     days late?

6     A    We're late, yeah.

7     Q    Is the signed performance guaranty attached to this

8     e-mail?

9     A    I think so.

10         MR. McCONNELL:  If we can show the witness 7531-A,

11    please.

12         (Exhibit published to witness, Counsel and Court only.)

13    A    Yeah, that looks like it.

14         MR. McCONNELL:  I'd offer 7531-A.

15         MR. MENCHEL:  No objection.

16         THE COURT:  It's admitted.

17         (Government Exhibit 7531-A received in evidence.)

18         MR. McCONNELL:  If we can show that to the jury,

19    please.

20         (Exhibit published.)

21    A    Can I just explain something?

22    Q    Sure.

23         MR. MENCHEL:  Objection.  There's no question

24    pending.

25         THE COURT:  I think probably you need to ask a

1   question.

2          MR. McCONNELL:  Okay.

3   BY MR. McCONNELL:

4   Q    Let me ask you this, Mr. Jacoby, what are we looking at

5   here?

6   A    This is the performance guaranty for Mr. Lash on that

7   dealership.  It articulates an amount that's exactly

8   $1,050,000 larger than the amount the dealership actually

9   made.  So, the difference is the amount he owes which is the

10  1,050,000.

11  Q    I was getting there.  I need to get the document into

12  evidence.

13         So, is this the document that was signed by

14  Mr. Lash?

15  A    Yeah, yeah.

16         MR. McCONNELL:  Can we scroll to the bottom to make

17  sure this is the right one?

18  A    Yes.

19         MR. McCONNELL:  I'd offer 7531-A into evidence.

20         THE COURT:  It is admitted.

21         (Government Exhibit 7531-A received in evidence.)

22         (Exhibit published.)

23  BY MR. McCONNELL:

24  Q    So just starting at the top, the first paragraph says,

25  "The performance guaranty dated January 1 of 2015."

Jacoby - direct - McConnell                    931

1          Mr. Jacoby, when was the first time that you ever
2     heard of a performance guaranty for this dealership for this
3     year?
4     A    I think from a minute ago, I think it was April 28th.
5              MR. McCONNELL:  And if we can just scroll to the
6     bottom where Mr. Lash signed.
7     Q    Is there anything in this document that indicates that it
8     was signed in May of 2016?
9     A    No.
10    Q    What is the amount of the performance guaranty?
11    Mr. Jacoby, tell me where to stop?
12    A    It says "the guaranty," number one.  So the guaranty of
13    2,015,000.
14    Q    And what's the significance of that number?
15    A    So that's exactly 1,050,000 larger than the amount that
16    that Buick GMC store made for that year.
17    Q    And, so, what does that require Mr. Lash ostensibly to
18    pay pursuant to this agreement?
19    A    So, he has to pay the 1,050,000 to make up the difference
20    to get to the 2 million.
21             MR. McCONNELL:  I'd like to show you
22    Government Exhibit 7534, please.
23         (Exhibit published to witness, Counsel and Court only.)
24    Q    While that's being pulled up, was the language in the
25    audited financial statements changed to reflect this

Jacoby - direct - McConnell                              932

1  performance guaranty?

2  A    Yes.

3  Q    And do you see Government Exhibits 7534 on your screen,

4  sir?

5  A    Yes.

6  Q    And what's in this exhibit?

7  A    So, this is me talking to Mr. Matarazzo, updating the

8  notes to the financial statements to reflect the change.

9          MR. McCONNELL:  I'd offer this exhibit.

10         MR. MENCHEL:  No objection.

11         THE COURT:  It is admitted.

12         (Government Exhibit 7534 received in evidence.)

13         MR. McCONNELL:  If we can publish that to the jury,

14  please.

15         (Exhibit published.)

16 BY MR. McCONNELL:

17 Q    Mr. Jacoby just directing your attention to the middle

18 portion of the e-mail, it's changed that for the year ended

19 December 31, 2015.  It used to say, "no amounts were paid" to

20 "$1,050,000 was paid by the operating partners into the fund,"

21 correct?

22 A    That's right.

23 Q    That's reflecting the performance guaranty payment?

24 A    Yes.

25 Q    And had you confirmed that to your knowledge Mr. Lash had

Jacoby - direct - McConnell                    933

1   actually made a payment in that amount?

2   A    He did.  Yes.  We confirmed it and we also had to provide

3   that wire information to the auditor to show that it was

4   there.

5   Q    Now, audited financials were eventually issued?

6   A    Yes.

7   Q    I would like to show you what's in evidence as

8   Government Exhibit 2125, please.

9          (Exhibit published.)

10  Q    These are a copy of the audited financial statements.

11  A    It looks like it.

12         MR. McCONNELL:  If we can scroll down to the date of

13  the letter for when it issued.

14  Q    This is dated May 5, 2016?

15  A    Correct.

16  Q    How late is that?

17  A    It's a week.

18  Q    Is that a big deal, a week late?

19  A    I mean -- you know, it's always a big deal to

20  accountants.

21  Q    I want to go to the statement of operations like the one

22  we looked at for the 2014 Holdings 1.

23         MR. McCONNELL:  If we can scroll down.  I think it's

24  page seven, but I'll tell you when to stop.  There you go.  If

25  we can just blow that up.  It's actually page five, according

Jacoby - direct - McConnell                    934

1    to the document's pagination.

2    Q    Mr. Jacoby, where is the $1,050,000 from this performance

3    guaranty --

4    A    Shown?

5    Q    Yeah, shown.

6    A    It's in the total investment income, $6,586,110.

7    Q    What percentage of net investment income is from that

8    performance guaranty?  So, the net investment income is that

9    $3.3 million figure a few rows down after you take out

10   expenses?

11   A    Right, right.

12   Q    What percentage of the net investment income is from that

13   performance guaranty payment?

14   A    About a third.

15   Q    And if this had been booked in the audited financials as

16   a management fee rebate, where would that have been accounted

17   for?

18   A    So, in the expenses the second line down says managerial

19   assistance fee that's the 1, 427, 419.

20   Q    And how would -- if this money had been coming in as a

21   management fee rebate as originally planned, how would that

22   number have changed?

23   A    It would have reduced that 1,427,000 by the 1,050,000.

24   Q    So it would have been booked as a reduction of that fee

25   and not as income?

Jacoby - direct - McConnell                935

1   A    Not as revenue, yes.

2         MR. McCONNELL:  If we can just scroll down to page

3   15, please, where the notes are.

4   Q    Mr. Jacoby, if you can see where the note is regarding

5   the performance guaranty, let us know.

6   A    So, if you can highlight the paragraph that says "In some

7   cases the partnership."

8   Q    So, Mr. Jacoby, this is on page 13.

9   A    Right.

10  Q    Is there anything prior to page 13 that indicates a third

11  of the net investment income was from this performance

12  guaranty?

13  A    No.  This is where it is -- this is where it is

14  explained.

15  Q    And just looking at this it says, "For the year ended

16  December 31, 2015, 1,050,000 was earned by the partnership and

17  is included in income receivable from investments on the

18  balance sheet, 1 million 50 was collected in April 2016."

19        Is there anything in this that indicates that the

20  actual document was signed in April -- I'm sorry, May of 2016?

21  A    No.

22  Q    Do you recall a subsequent deal involving a dealership,

23  the Ron Carter dealership?

24  A    Yes.

25  Q    Can you just generally explain to the members of the jury

1   what that deal entailed?

2   A    That was a group of car dealerships in Texas owned by a

3   gentleman named Ron Carter.  So, it was a number of different

4   brands.  So, it was a large group.  So, it was a large

5   purchase by the fund of dealerships all in one fell swoop.

6   Q    And when did that take place?

7   A    I think that was in July.  So a couple of months later

8   than this.

9   Q    In 2016?

10  A    In 2016, yeah.

11         MR. McCONNELL:  Your Honor, pursuant to our

12  discussion I would like permission to lead the witness?

13         THE COURT:  Sure.

14  BY MR. McCONNELL:

15  Q    Mr. Jacoby, do you remember reviewing the financials for

16  that deal, that purchase?

17  A    Yes.

18  Q    And in doing so, did you notice a fee that was supposed

19  to be paid to Mr. Lash as part of that purchase agreement?

20  A    Yes.

21  Q    And without getting into what you discussed, did you have

22  a discussion with Mr. Lash about why he was being paid that

23  fee?

24  A    Yes.

25  Q    How much was the fee approximately?

Jacoby - direct - McConnell                    937

1   A     $825,000.

2   Q     And did Mr. Lash have anything to do with that deal?

3   A     No.

4   Q     So, again, without saying what was said, you had a

5   conversation with Mr. Lash about why he was being given

6   800,000-plus fee for this dealership?

7   A     That's right.

8   Q     And without saying what you said, did you subsequently

9   have a conversation with Mr. Gentile about the audited

10  financial statements for the Automotive Portfolio for 2015?

11  A     With Mr. Gentile and Mr. Anscher.

12  Q     And can you tell us, again, what -- well, did you inform

13  Mr. Gentile and Mr. Anscher that you believed that the audited

14  financials needed to be restated?

15  A     For both 2014 and '15.

16        MR. McCONNELL:  Your Honor, I just want to be sure

17  that I'm being consistent with what we discussed.  Can we just

18  approach before I continue?

19        THE COURT:  Sure.

20        MR. McCONNELL:  Thank you

21        (sidebar held outside of the hearing of the jury.)

22        (Continued on next page.)

23

24

25

Sophie Nolan, RCR, RPR - Official Court Reporter

```
                        Sidebar                      938

1              (The following sidebar took place outside the
2       hearing of the jury. )
3              MR. McCONNELL:  So, now we're in a conversation with
4       Mr. Gentile.  So I am planning on eliciting from the witness
5       why did you tell Mr. Gentile that the audited financial
6       statements needed to be redone in your opinion and he's going
7       to answer.
8              THE COURT:  Yeah.
9              MR. McCONNELL:  Okay.
10             MR. COLTON:  He's --
11             MR. McCONNELL:  He's going did say that the
12      performance guarantys were fraudulent.
13             MR. COLTON:  Your Honor, he can't have a conclusion
14      like fraud.
15             MR. McCONNELL:  I'll lead him.  What do you want me
16      to say?
17             MR. COLTON:  He shouldn't be giving conclusions like
18      that.  If he had a belief that they were improper or whatever
19      that's one thing, but not fraud.
20             MR. McCONNELL:  But just as a point -- I understand
21      that it's a loaded word, but if that's what he's telling
22      Mr. Gentile, I think that's significant.
23             THE COURT:  It is what he told Mr. Gentile, right?
24             MR. COLTON:  It may be --
25             MR. McCONNELL:  I don't know that he's going to say,
```

                              Sidebar                          939

1   but it may be something to that effect.

2              MR. COLTON:  If it is agreeable, as far as I'm

3   concerned lead him to say, you thought this was not proper or

4   something like that -- "fraud" is a loaded word and it's not

5   his place to make that determination.

6              THE COURT:  It does seem like it's just what he said

7   to Mr. Gentile.

8              MR. MENCHEL:  Can I ask a housekeeping matter?

9              THE COURT:  Yes.

10             MR. MENCHEL:  I assume you're going to finish soon?

11             MR. McCONNELL:  I've got to do him leaving the

12  company.

13             MR. MENCHEL:  So it's going to take me some time to

14  set up.

15             THE COURT:  So you want to break for lunch when he's

16  done?

17             MR. AXELROD:  Do you want to take a midmorning

18  break?

19             THE COURT:  Let's just get through and then go to

20  lunch.

21             MR. McCONNELL:  Great.

22             (Sidebar ends.)

23             (Continued on next page.)

24

25

Jacoby - direct - McConnell                    940

1    (Continuing.)

2         THE COURT:  I know we haven't taken a break.  Our

3    hope is that we don't have that much more with this witness so

4    that we can get through this witness and then break for lunch,

5    but if anyone needs a break raise your hand.

6         Okay.  You may continue.

7         MR. McCONNELL:  Thank you.

8    BY MR. McCONNELL:

9    Q    So, Mr. Jacoby, what did you tell Mr. Gentile about why

10   in your opinion the financials for those two years had to be

11   restated?

12   A    The performance guaranty needed to be taken out of the

13   financial statement.

14   Q    And why did you tell him that?

15   A    Because we were using investor money on a fee to change

16   the financial statement from a -- from the previous year.

17   Q    And why was that a problem?

18   A    Because you're using -- you're charging investors a

19   fee to create revenue in the previous year.  So, it's not

20   revenue.

21   Q    So, in other words, in your opinion the statements were

22   not accurate?

23   A    Not accurate.

24   Q    And what did Mr. Gentile say?

25   A    He disagreed with my opinion.

Jacoby - direct - McConnell                    941

1    Q    And what did he tell you to do?

2    A    He said that -- that we weren't going to change --

3    restate the financial statements, but that I needed to prepare

4    for the company to do an initial public offering in the

5    following year.

6    Q    And what was your -- what did you understand that to

7    mean?

8    A    So, an initial public offering is when a company decides

9    that they're going to sell their stock on the New York Stock

10   Exchange and so that's -- and then you become a publicly

11   traded company like Nike or Disney.

12   Q    And what was your response when Mr. Gentile told you he

13   wanted to become a publicly traded company on the New York

14   Stock Exchange?

15   A    I said that's not going to be likely possible given the

16   condition of our financials.

17   Q    Did there come a time when you were fired?

18   A    Shortly thereafter.

19   Q    And who did they hire to replace you?

20   A    Macrina Kgil was hired to replace me on September 1.

21   Q    I'm sorry, September 1?

22   A    Yes.

23   Q    Of 2016?

24   A    Yes.

25   Q    And at that point what was your role with GPB?

Jacoby - direct - McConnell                    942

1   A    I stayed on for a transition period because it's a very
2   complicated, fast-growing business to help transition her into
3   the role, to about the middle of December and then I was
4   available from home on a consulting basis through the end of
5   the audit if she needed me.
6   Q    And did you inform Ms. Kgil about the fact that investor
7   dollars had been used to pay monthly distributions?
8   A    Of course, yes.
9           MR. MENCHEL:  Objection.  Move to strike the
10  question and answer, please.
11          THE COURT:  They question and answer are stricken.
12  BY MR. McCONNELL:
13  Q    When you left --
14          Well, first, did you have conversations with either
15  of the defendants about why you were getting fired?
16  A    Yes.
17  Q    What did Mr. Gentile say?
18  A    They needed someone who could take the company public.
19  Q    And why couldn't you do that?
20  A    He didn't feel that I was able to do it.
21  Q    And did you have conversations with Mr. Schneider about
22  why you were being let go?
23  A    It was the same conversation.
24  Q    And why did you think that the company could not be taken
25  public?

Jacoby - direct - McConnell                      943

1   A    Because in order to go public you need to register with

2   the SEC and apply and then there's an extensive amount of

3   accounting work and regulatory work that goes in before they

4   approve you to do that.

5   Q    So when you were fired from GPB, did you have another job

6   lined up?

7   A    No.

8   Q    What's Grand Central Automotive?

9   A    That was a brand that I and Mr. Dibre came up with to try

10  to borrow some money to buy some dealerships for him.

11  Q    And Patrick Dibre was another person who owned car

12  dealerships?

13  A    Yes.  He also left GPB.

14  Q    And was that the same thing that GPB was doing?

15  A    No.

16  Q    Why was it different?  It's car dealerships.

17  A    He owned car dealerships and he wanted to buy some more

18  car dealerships.

19  Q    So, what was the plan for Grand Central Automotive?

20  A    To borrow private money in a more traditional way that we

21  had previously discussed; from institutional investors you can

22  borrow money through private equity or private lending.  These

23  were discussions that we ended up having with -- through the

24  introduction of some capital raises or through a private

25  lending facility.

Jacoby - direct - McConnell                    944

1            So it's similar to asking for a loan from a bank.

2    We asked, you know, can I have a credit line to go and

3    purchase some car dealerships.

4    Q    And did that business ever get off the ground?

5    A    No, it did not.

6    Q    Did Mr. Gentile sue you for trying to set up that

7    business?

8    A    Yes.

9    Q    And what did he sue you for?

10   A    He said I stole his proprietary information.

11   Q    Did you?

12   A    No.

13   Q    Was there any proprietary information to

14   ^ exactly ^ steal?

15   A    Sure.

16   Q    What was the result of that lawsuit?

17   A    We ended -- it ended up getting dropped.

18   Q    When you say it ended up getting dropped, what do you

19   mean?

20   A    It was withdrawn.

21   Q    Now, did there come a time when you decided to report

22   what you had observed transpired at GPB and Ascendant Capital

23   to the Securities and Exchange Commission?

24   A    Yes.

25   Q    That's commonly known as the SEC?

Jacoby - direct - McConnell                    945

1    A    Yes.

2    Q    Can you tell the jury what the SEC is?

3    A    The Securities and Exchange Commission is a regulatory

4    body that is charged with regulating the securities industry.

5    Q    Like, private equity firms like GPB?

6    A    Private equity firms and public and stocks and bonds; you

7    know, with the role of protecting investors.

8    Q    And did you -- did you make what's called a whistleblower

9    complaint to the SEC?

10   A    I did.

11   Q    And is it your understanding that a whistleblower

12   complaint is a mechanism where someone can report what they

13   believe to be misconduct or impropriety?

14   A    Correct.

15   Q    And when did you do that?

16   A    I filed it in May of 18, 2018.

17   Q    Why didn't you go earlier?

18   A    Because in my separation and transition agreement there

19   was language that said I was not permitted to do so.

20   Q    That's what you understood it to say?

21   A    That's the way I understood it, yes.

22   Q    Now, having filed one of those whistleblower complaints

23   are you eligible to recover any kind of financial reward?

24   A    Potentially.

25   Q    And what is your understanding of how that might come

Jacoby - direct - McConnell                946

1   about?

2   A    The SEC would make a decision at some point.

3   Q    And do you know, sitting here today, whether or not you

4   will?

5   A    No.

6   Q    Do you know how that award is decided or calculated or

7   who makes that decision?

8   A    I do not.

9   Q    Does it depend in any way on your testimony in this case?

10  A    It does not.

11  Q    Does it depend in any way on the outcome of this criminal

12  trial?

13  A    It does not.

14  Q    I want to just show you a few more things.

15       MR. McCONNELL:  If I can show the witness

16  Government Exhibit 1438 which is in evidence, please.

17       (Exhibit published.)

18  BY MR. McCONNELL:

19  Q    So, Mr. Jacoby, this exhibit is titled "Fund Level Track

20  Record."  Do you see that?

21  A    Yes.

22  Q    And it's got Holdings, Automotive and Holdings II, the

23  first three funds that are listed.  Do you see that?

24  A    Yes.

25  Q    And generally what is depicted in this chart?

Jacoby - direct - McConnell                947

1    A    It -- it's representing fund performance.

2    Q    And is it representing fund performance?

3    A    Not accurately.

4    Q    Why not?

5    A    Because it's not the actual performance.

6    Q    How so?

7    A    The numbers are -- are wrong.

8    Q    Well, these -- these numbers show the percentage of

9    distributions that are paid; correct?

10   A    Yeah, but just paying a distribution is not performance,

11   right?  So, for example, if I give you $100, right, and you

12   hand me $10 back you have 90 I have 10, I didn't make $10.

13   That's what this is.

14   Q    And the -- it says on the right-hand side "Fund to date

15   analyzed return."  Just generally speaking what is a return?

16   A    Return is performance or yield.

17   Q    And is -- are those numbers accurate?

18   A    Definitely not.

19   Q    Was the Automotive Portfolio turning out 10.95 percent?

20   A    Nope.

21   Q    What about Holdings?

22   A    Neither one.

23         MR. McCONNELL:  I would like to show the witness

24   Government Exhibit 7901-A, please, just for the witness and

25   counsel.

Jacoby - direct - McConnell                    948

1        (Exhibit published to witness, Counsel and Court only.)

2   Q    Do you recognize this document, sir?

3   A    Yes.

4   Q    What is this?

5   A    This is a due diligence questionnaire that was put

6   together by the Ascendant team.

7   Q    Did you review this while you were at GPB or did you see

8   it later on?

9   A    This particular one I saw later on.

10           MR. McCONNELL:  I am going to offer it subject to

11  connection, your Honor, with a future witness, but I would

12  like to ask the witness some things about it if we can publish

13  it.

14           MR. COLTON:  I have no objection to it, but asking

15  the witness to opine on something he saw after he left the

16  company --

17           THE COURT:  All right.  The exhibit is admitted

18  subject to connection.

19           (Government Exhibit 7901-A received in evidence.)

20           MR. McCONNELL:  If we can publish the exhibit.

21           (Exhibit published.)

22  BY MR. McCONNELL:

23  Q    Down at the bottom of page three --

24           MR. McCONNELL:  If we can zoom in.

25  Q    So, Mr. Jacoby.

Jacoby - direct - McConnell                    949

1          MR. McCONNELL:  -- and go to the next page to get

2     the rest of the -- there you go.

3     BY MR. McCONNELL:

4     Q    So, Mr. Jacoby, this was dated January, 2017, were you

5     still with the company at that point?

6     A    No.

7     Q    You were serving in a consulting capacity?

8     A    Correct.

9     Q    But you're still listed in here as the managing director,

10    director of financial reporting?

11    A    Yes.

12    Q    Is that accurate?

13    A    No.

14          MR. McCONNELL:  If we can go to page 10, please.

15    And just zoom in on the number 16 there.

16    Q    Mr. Jacoby, in your time at GPB, did the annualized

17    distribution rate ever change?

18    A    No.

19    Q    And where was the distribution that was made on a monthly

20    basis to the investors supposed to come from?

21    A    Profits.

22    Q    Did it?

23    A    Nope.

24          MR. McCONNELL:  If we can go to the next page,

25    please, number 17, special distributions.

Jacoby - direct - McConnell                950

1    Q    Mr. Jacoby, the exhibit says, "As excess cash flow from

2    operations is generated, GPB will pay additional distributions

3    known as special distributions to investors in the fund.

4    Historically, the funds are paid special distributions as

5    follows."

6              So I just want to look at the special distributions

7    that you had issued while you were at the company, okay?

8    A    Sure.

9    Q    Holdings in April of 2015, did Holdings have, quote,

10   excess cash flow from operations to pay a 1.5 percent special

11   distribution?

12   A    Nope.

13   Q    And for the Automotive Portfolio, in April 2015 was there

14   excess cash flow from operations to pay a 1.5 percent special

15   distribution?

16   A    No.

17   Q    To pay a .5 percent special distribution in December of

18   2015?

19   A    No.

20             MR. McCONNELL:  If I can go to page 19, please.  If

21   we can look at the bottom 38.

22   Q    It says, "What is the life-to-date performance for all

23   funds offered."  And it says, "The total cash-on-cash returns

24   for investors in the GPB family of funds from inception

25   through January 15, 2017 are as follows."

Jacoby - direct - McConnell                    951

1              Are these numbers accurate, sir?

2    A    Absolutely not.

3    Q    Why not?

4    A    That is not performance.

5    Q    What do you mean it's not performance?

6    A    It's just reflecting cash payments back to people.  It's

7    not performance.

8    Q    And where --

9    A    Performance is an investment that produces profits and

10   that is -- that is not depicted here.

11   Q    Where is the money being -- coming from to pay these

12   analyzed total cash-on-cash returns?

13   A    A significant portion is coming from paying people their

14   own money back.

15             MR. McCONNELL:  If we can just look at the next

16   page, please.

17   Q    Number 39 says, "Provide the monthly net performance

18   since inception."

19             The same question, is this accurate?

20   A    Can you just highlight maybe the top two or three so I

21   can see -- yeah, this is the same completely false

22   performance.

23   Q    I want to just show you one more thing, Mr. Jacoby,

24   Government Exhibit 8258-B, that's the automotive PPM that's in

25   evidence.

Jacoby - direct - McConnell                    952

1               (Exhibit published.)

2    Q    And if we can go to page 26, please.  And if we can

3    highlight the paragraph that says "No Assurance of

4    Distributions."

5    A    What was the date on this one?

6    Q    Let's look at the date.  I believe it's June 2016 -- June

7    30, 2016.

8    A    Okay, okay.

9    Q    Just if you can read this to yourself, Mr. Jacoby.

10   A    (Reviewing.)

11             Okay.

12   Q    I had shown you a PPM yesterday that the language was

13   different; correct?

14   A    Correct.

15   Q    Do you see the sentence that says, "Furthermore, while we

16   have no present plans to do so, we could include LP's invested

17   capital"?

18   A    Yes.

19   Q    Are you aware of how that language got into this PPM?

20   A    Yes, I am.

21   Q    Can you tell the members of the jury?

22   A    We were having -- we at the company were having

23   discussions -- so myself, Mr. Anscher, Mr. Gentile,

24   Mr. Schneider and some others on amending the offering

25   memorandums to correctly reflect that investor money had been

Jacoby - direct - McConnell                953

1    used to pay distributions or dividends.  It was proposed that

2    it say, we may include investor money in the distributions.

3    Mr. Schneider and Mr. Gentile refused to accept that language

4    and they made us change it to, we have no present plans to do

5    so but we could do it if we wanted to.

6    Q    And you had -- how many times were you part of these

7    conversations?

8    A    That particular one, probably twice.

9    Q    Did Mr. Gentile tell you why he would not just say, we

10   may include distributions and why this present plan's language

11   was what he wanted?

12   A    Because when you make an amendment, you have to send the

13   amendment out to all of your brokers and investors and you

14   have to tell them what you changed, and they felt --

15   Mr. Gentile and Mr. Schneider, felt that making it more clear

16   that we were paying investor money back to them would be

17   alarming.

18   Q    To whom?

19   A    To the investors.

20   Q    And did you have conversations with both Mr. Gentile and

21   Mr. Schneider about this?

22   A    Yes.

23   Q    And what did Mr. Schneider specifically say about this

24   language and your proposed change?

25   A    I only recall him saying that he wanted it this way

Jacoby - direct - McConnell                954

1   because he felt that that was acceptable and it could be used

2   as an excuse for having made it.

3   Q    So this language says, "While we have no present plans to

4   do so, we could include LP's invested capital amounts we

5   distribute to the LPs."

6          Was that true as of the date of this PPM?

7   A    It was not true.

8   Q    Why not?

9   A    We had done it since I arrived at GPB.

10  Q    Doing what?

11  A    Including investor cash in the dividends paid to them.

12  Q    That's is the monthly dividend?

13  A    Yes.

14          MR. McCONNELL:  I have nothing further.

15          THE COURT:  Okay.  Let's take a break for lunch.

16  It's 12:12.  Let's come back at 1:15.

17          Please remember, don't do any research and don't

18  talk to each other about the case.

19          (Jury exits.)

20          THE COURT:  You can step down.

21          (Witness steps down.)

22          MR. MENCHEL:  Your Honor, now that the witness has

23  been tendered for cross, we ask that the Government have no

24  conversation with him or his counsel, who is present in court.

25          THE COURT:  Okay, no conversations.

Jacoby - direct - McConnell                    955

1              MR. COLTON:  To be clear, Mr. McConnell is not to

2    have conversations with Mr. Jacoby's counsel too.

3              THE COURT:  Right.  No conversation with

4    Mr. Jacoby's counsel.

5              Anything else for us to take up?  I'll see you all

6    at 1:15.

7              THE COURTROOM DEPUTY:  All rise.

8              (Judge exits.)

9              (Luncheon recess.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*W. Jacoby - Cross/Mr. Menchel*                         956

1                         AFTERNOON SESSION

2

3              (In open court.)

4              (Parties present.)

5              THE COURT:  We're ready for the jurors.  Okay.

6              MR. MENCHEL:  Get the witness back on?

7              THE COURT:  That would be great.

8              (Witness takes the witness stand.)

9              COURTROOM DEPUTY:  Jurors entering.

10             (Jury enters courtroom at 1:17 p.m.)

11             THE COURT:  Everybody can be seated.  Go ahead,

12     Counsel.

13             MR. MENCHEL:  Thank you, your Honor.

14     CROSS-EXAMINATION

15     BY MR. MENCHEL:

16     Q    Good afternoon, Mr. Jacoby.

17     A    Good afternoon.

18     Q    My name is Matt Menchel, I represented David Gentile.

19          We've never met other than the questions I asked you

20     yesterday, correct?

21     A    Correct.

22     Q    I want to put up the last document that I think you

23     looked at before the break, Government Exhibit 8258-B.  This

24     was the PPM for GPB Automotive from June of 2016.

25          Do you recall being asked questions about this?

W. Jacoby - Cross/Mr. Menchel                957

1   A    Yes.

2           MR. MENCHEL:  Andy, if you go to the section,

3   please.  Blow it out, please.  It's in evidence, you can

4   publish it.  Go back to the title page.  I recognize the

5   jury couldn't see it.  Apologies.

6   Q    This is what you were shown before the break, yes?

7   A    Yes, looks like it.

8   Q    You were asked questions about this document?

9   A    Yes.

10          MR. MENCHEL:  Can we go to the particular section,

11  Andy.

12  Q    And, specifically, you were asked about this language,

13  correct?

14  A    No, this is a different spot.

15  Q    But it's the same language, right?

16  A    It's similar.

17  Q    "We do not presently have plans to do so"?

18  A    Yes.

19  Q    Okay.  And it's your sworn testimony before this jury

20  that that language, "No present plans," was inserted by

21  Mr. Gentile and Mr. Schneider into this PPM?

22  A    They agreed to that compromise.

23  Q    That's not my question.  Who came up with the language

24  "No present plans"?

25          MR. MCCONNELL:  Objection.

*W. Jacoby - Cross/Mr. Menchel*                          958

1   A    I don't recall.

2   Q    But if was during discussion of this PPM when it first

3   came up?

4            THE COURT:  The objection is overruled.

5            I don't know if you want to go back to your

6   question or ask another question.

7            Go ahead.

8   Q    It's your testimony before this jury that the "No

9   present plans" language came up in the context of discussing

10  this particular PPM, yes?

11  A    That's my recollection.

12  Q    2016?

13  A    Correct.

14  Q    Okay.  When you say "your recollection," you understand

15  you're in a criminal court in federal court; right?

16  A    Yes.

17  Q    And that precision and accuracy matters; yes?

18  A    Yes.

19  Q    By the way, you're an accountant; right?

20  A    Yes.

21  Q    You deal with numbers?

22  A    Yes.

23  Q    And it's important to be very precise, right, with

24  numbers?

25  A    Yes.

*W. Jacoby - Cross/Mr. Menchel*                959

1  Q    I'm going to ask you to apply that same precision

2  today.

3       Is it your sworn testimony before this jury that in

4  2016, you had a discussion with Mr. Gentile and

5  Mr. Schneider where the "No present plans" language was

6  discussed and that's how it got inserted into this PPM?

7  A    That is my recollection, yes.

8  Q    Okay.  Now, you've also testified repeatedly both today

9  and yesterday that you had many meetings with Mr. Gentile,

10 yes?

11 A    Yes.

12 Q    Mr. Schneider?

13 A    Yes.

14 Q    Mr. Gentile and Mr. Schneider together, right?

15 A    Correct.

16 Q    Where you expressed a lot of concerns, yes?

17 A    Yes.

18 Q    Concerns that the marketing materials and what

19 investors were being told was not accurate?

20 A    True.

21 Q    Concerns about money moving from the investment account

22 to the distributions and operating accounts?

23 A    Yes.

24 Q    You expressed those concerns?

25 A    Yes, I did.

W. Jacoby - Cross/Mr. Menchel                    960

1   Q    Concerns that the funds were under-covered?

2   A    Absolutely.

3   Q    Concerns that the fees and expenses were draining too

4   much cash from the portfolio companies?

5   A    Yes.

6   Q    You already mentioned that you had concerns about the

7   "No present plans" language that you expressed?

8   A    Yes.

9   Q    And you also told this jury that you expressed concerns

10  about the performance guaranties and the way those were

11  booked, right?

12  A    Yes.  Yes, I did.

13  Q    How many meetings did you have in all total?  You

14  testified to a lot of meetings, how many were there?

15  A    I went to work five days a week.

16  Q    Are we talking dozens?

17  A    I went to work five days a week for a year and a half.

18  Q    How many meetings would you estimate where you

19  expressed these concerns?

20  A    I'm sorry, I can't do that.

21  Q    Is it dozens?

22  A    I'm sorry, I can't do that.  It was part of the course

23  of business working there all the time.  I was in the office

24  all the time.

25  Q    Other than your testimony, do you have any written

*W. Jacoby - Cross/Mr. Menchel*                961

1   memorandums recorded that you expressed these concerns to

2   these two men?

3   A    I might.  I have to look.

4   Q    You don't know?

5   A    I think I might.  I have to look.

6   Q    You've never disclosed them to the Government, have

7   you?

8   A    I disclosed everything to the Government.

9   Q    So if you had meetings about -- you had memorandum

10  about that, they would have it already?

11  A    Yes.

12  Q    Okay.  And I just want to make sure I understand.  In

13  all those meetings, did you ever once raise a concern that

14  you thought GPB was violating the law?

15  A    Yes, on record.

16  Q    Violating the criminal law?

17  A    Yes, on record.

18  Q    You say on what?

19  A    Yes.  On my exit interview, I said this is illegal.

20  Q    On your exit interview?

21  A    Yes.

22  Q    Prior to your exit interview, in all those meetings

23  where you expressing concerns about money moving from the

24  investment account to the distributions and operations

25  account, did you express you thought that you were violating

W. Jacoby - Cross/Mr. Menchel                    962

1   the law?

2   A    Yes.

3   Q    Did you express that you thought they were violating

4   the law about the marketing materials?

5   A    Yes.

6   Q    Did you express that they were violating the law about

7   being under-covered?

8   A    About what being what?

9   Q    Under-covered?

10  A    Oh, on the distributions?

11  Q    Yes.

12  A    Yes.

13  Q    Did you express your concerns that the "no present

14  plans" language was a violation of law?

15  A    I don't think I had an opinion about that.

16  Q    On the performance guaranties?

17  A    What about the performance guaranties?

18  Q    That the way they were booked was violating the law?

19  A    Yes.

20  Q    Okay.  And yet, there's not a single e-mail that you

21  can send us to show us, right, in real-time that you sent to

22  either of these men that said I'm concerned we're violating

23  the law?

24  A    I'm not sure about that.

25  Q    Well, were you shown one yet?

W. Jacoby - Cross/Mr. Menchel                963

1    A    No.

2    Q    Okay.  How about a memo?  Did you draft a memo either

3    to yourself or to somebody else in GPB or to Ascendant

4    saying I'm concerned we're violating the law?

5    A    No.

6    Q    How about a diary entry to yourself?

7    A    I'm not sure about that.

8    Q    Okay.  By the way, not just to Mr. Schneider or to

9    Mr. Gentile, did you send any e-mails to Mr. Anscher who

10   later became your boss, Mr. Anscher, I think we're violating

11   the law?

12   A    I don't think I used those words.

13   Q    What words did you use.

14        MR. MENCHEL:  Withdrawn.  I withdraw the question.

15   Q    Ms. Kgil, she took over as chief financial officer

16   after you were demoted, yes?

17   A    Yes.

18   Q    Did you ever send her an e-mail?  You were onboarding

19   her you said, right?

20   A    Yes.

21   Q    When you were onboarding her, did you say, Macrina,

22   that's her first name, Macrina, right?

23   A    I spoke with her.

24   Q    Did you ever in writing, sir, say I think this company

25   is violating the law and you should get out, don't even

W. Jacoby - Cross/Mr. Menchel                964

1    come?

2    A    I did not write that down.

3    Q    By the way, you were there for two years, right?

4    A    No.

5    Q    How long were you there for?

6    A    March 1, 2015, and then she replaced me on

7    September 1st.

8    Q    How long were you at the company, sir?

9    A    So I was there from March 1st, she replaced me

10   September 15th.  I stayed on to the end of that year.  And

11   then I was available on a consulting basis from home through

12   the end of the audit if she needed me.

13   Q    So, all tolled, how many months is that?

14   A    So I think that makes a year and a half.

15   Q    Even though your official start date was in March, we

16   saw an e-mail yesterday when that you were on from early

17   February, right?

18   A    Yes.  I started to work as soon as I agreed to come on.

19   Starting in March, I started to work ahead of time.

20   Q    You started working ahead of your official start date?

21   A    That's right.

22   Q    In fact, you started in January?

23   A    I may have done some work in January.

24   Q    Right.  So, from January of 2015, was that when you

25   started?

*W. Jacoby - Cross/Mr. Menchel*                          965

1   A     Yes.

2   Q     So when your consultancy period end?

3   A     December of '16.

4   Q     That's about two years, right?

5   A     About, yeah.

6   Q     And in all that time when you thought you were breaking

7   the law, GPB was, and you were just going along with it, you

8   didn't say, I have got the heck out of this company, I can

9   get in trouble?

10  A     Excuse me?

11  Q     In all the time that you were at GPB, where you were

12  supposedly expressing concerns repeatedly, about repeated

13  violations of law, you stayed on?

14  A     So, you know, the day I walked in the door, that's not

15  how I felt.

16  Q     Sir, you said pretty early on you figured out that the

17  funds were under-covered, right?

18  A     Yes, sir.

19  Q     And investors were being misled?

20  A     Information came out over time, yeah.

21  Q     And according to you, you didn't quit, you were fired?

22  A     Correct.

23  Q     So you would have never left if you hadn't been fired

24  as far as we know, right?

25  A     Well, I can tell you, it's up to you if you want to

W. Jacoby - Cross/Mr. Menchel                966

1   know or not.

2   Q     Well, sir, did you quit?

3   A     No.

4   Q     So you were there for almost two-years-plus in various

5   capacities:  Chief financial officer, director of fund

6   management, consultant, and you never said, I should get out

7   of this company, these guys are breaking the law.

8         That never happened, right?

9   A     Oh, it did.  It happened over the course of time, yeah.

10  Q     Sir, were you fired or did you quit?

11  A     I was fired.

12  Q     Okay.  So you didn't quit on your own accord despite

13  the fact that you were in a company that you said was

14  basically rampant with fraud, right?

15  A     Yes.

16  Q     By the way, has the Government ever told you that you

17  should be charged with a crime?

18  A     No.

19  Q     And yet, all these things that you testified to the

20  jury, you apparently knew at the time were wrong; right?

21  A     I felt some things were wrong, yes.

22  Q     By the way, in addition to never reporting in writing

23  to anybody in the company that you believe the company was

24  violating the law, you met with outside auditors in

25  connection with your job as chief financial officer, right?

W. Jacoby - Cross/Mr. Menchel                967

1    A    Correct.

2    Q    There was audits for 2015?

3    A    Yes.

4    Q    Audits for 2016?

5    A    I did not finish with 2016, no.

6    Q    Were you involved in the audits for audit year 2016?

7    A    No.

8    Q    No?

9    A    Because all I did was help Macrina start to prepare

10   them.

11   Q    We'll take a look at some documents later.

12   A    Okay.  I may have helped, but I didn't --

13   Q    Sir, we talked about precision.  Were you involved in

14   the 2016 audit or not?

15   A    Involved in the way that I, yes, I helped the

16   accounting department up through the end of 2016 and I was

17   available for questions through the end of the audit.

18   Q    And you never expressed to any auditor at any time in

19   the two-plus years you were at GPB, I think fraud is afoot

20   at GPB, did you?

21   A    I did express that, not in writing.

22   Q    Again, not in writing?

23   A    Yes.

24   Q    So you quietly total auditors that you thought fraud

25   was occurring and they ignored that?

W. Jacoby - Cross/Mr. Menchel                968

1   A    I said I had concerns, yes.

2   Q    You had concerns or you thought there was fraud?

3   A    I said I had concerns.

4   Q    And the auditors just ignored that?

5   A    No, some of them did not.

6   Q    Okay.  Is there anything you can point to this jury

7   where you put in writing to an auditor, I think fraud is

8   afoot at GPB?

9   A    Not offhand.

10  Q    Okay.  You also met with what are called third-party

11  due diligence firms, right?

12  A    Sometimes, yeah.

13  Q    And one of the jobs of these due diligence firms is to

14  see whether or not there's any risk of fraud, right?

15  A    Yeah.

16  Q    That's part of the job of the due diligence company,

17  right?

18  A    Right.

19  Q    And they interviewed you.  You were interviewed by a

20  number of due diligence firms, didn't you?

21  A    Yeah, early on.  Mostly not later, though.  It it's

22  mostly only early on that I can recall.

23  Q    Did you ever in the time that you interviewed with due

24  diligence firms tell them you had concerns about fraud at

25  GPB?

W. Jacoby - Cross/Mr. Menchel                    969

1   A    Certainly, at the time -- the times I remember speaking

2   to a couple of due diligence firms, it was early enough on

3   that I did not deal the way you're describing.

4   Q    Okay.  Let's talk about the 2014 performance guaranties

5   that you were testifying to before the break.

6   A    Right.

7   Q    Now, the 2014 performance guaranties get booked in

8   2015, correct?

9   A    Yes.

10  Q    That's the way it works.  For the end of the year, you

11  go back and you do the audited financials; right?

12  A    Right.

13  Q    Okay.  And you had just started in your role as CFO,

14  chief financial officer; right?

15  A    Right.

16  Q    And in your first few months at GPB, you became aware

17  that Jeff Lash had certain performance guaranties, right?

18  A    Correct.

19  Q    You were not involved in the drafting of those

20  agreements?

21  A    I was not.

22  Q    You were not involved in the papering of them in any

23  way, right?

24  A    No.

25  Q    You're getting Lash to sign them?

W. Jacoby - Cross/Mr. Menchel                    970

1    A    No.

2    Q    That wasn't you, right?

3    A    No, not that time.

4    Q    Yet, you testified that those performance guaranties

5    hit the revenue line of Holdings 1's audited financial

6    statements.

7         Wasn't that your testimony earlier today?

8    A    Yes.

9    Q    Let's take a look at that.

10   A    Okay.

11        MR. MENCHEL:  Tab 20, please.  Andy, Page 5,

12   please.  This is Government Exhibit 2008, I believe.

13   Q    You looked at this with Mr. McConnell?

14   A    Yes.

15        MR. MENCHEL:  Page 7, Andy.  Please publish it,

16   Mr. Chan.  This is in evidence.  Can you please publish it,

17   please.  Go back to the title page I'm sorry.  Title page,

18   please.

19        (Exhibit published.)

20   Q    This is what you looked at with Mr. McConnell, correct?

21   A    It looks like it, I think.

22   Q    Well, it's the consolidated financial statements for

23   GPB Holdings, right?

24   A    Yes.

25   Q    That's also commonly known as Holdings 1, right?

W. Jacoby - Cross/Mr. Menchel                971

1   A    Yes.

2           MR. MENCHEL:  Andy, if we go to Bates Page 007,

3   please.

4           Can you highlight that top number where it says "3

5   million."

6   A    Right.

7           MR. MENCHEL:  I'm sorry, the total investment

8   line, Andy, I apologize.

9   Q    That's the number where you said it's the 4,000,642?

10  A    Yeah.

11  Q    That Mr. Lash's performance guaranties hit this book,

12  right, hit these financials?

13  A    Yes.

14  Q    You are a hundred percent sure about that?

15  A    I believe so.

16  Q    Sir, these men are on trial for criminal crimes?

17  A    Yes, that's where it is, yes, it's in the investment

18  income.

19  Q    And let's go to Page 15, please, Bates Page 15.  And

20  note that says "in some cases."

21          This was the language you also went over with

22  Mr. McConnell, yes?

23  A    Yes.

24  Q    And this is where they're disclosing that performance

25  guaranties were paid?

W. Jacoby - Cross/Mr. Menchel                    972

1    A    Yes.

2    Q    In some cases, the partnership has agreements in place

3    with the operating partner.

4         Who would that be?

5    A    That's Mr. Lash.

6    Q    And Patrick Dibre?

7    A    Yes.

8    Q    Who was he?

9    A    He was Mr. Lash's partner.

10   Q    He was another car dealership owner, was he not?

11   A    Yes.

12   Q    He owned a number of car dealerships, yes?

13   A    Yes.

14   Q    Okay.  "To guarantee a certain amount of income at the

15   dealership level for a specified amount of time for the year

16   ended December 31, 2014, approximately, $1,100,000 was paid

17   by them into the dealerships."

18        Do you see that?

19   A    Yes.

20   Q    Okay.  Did you ever actually --

21        MR. MENCHEL:  Withdraw that question.

22   Q    So you're certain that 1,100,000 relates to Mr. Lash's

23   performance guaranty?

24   A    The 1,100,000, yeah, it ties out to these other two

25   documents that we were looking at, yeah.

W. Jacoby - Cross/Mr. Menchel                973

1    Q    Do you how much did Mr. Dibre pay?

2    A    I'd have to go back and review that.

3    Q    Well, if Mr. Dibre and Mr. Lash both paid something,

4    and the 1,100,000 was only Mr. Lash, we'd expect a bigger

5    number, right?

6    A    This is only referring to the 1,100,000 that was in

7    those two performance guaranties that I'm talking about.

8    Q    Sir, it says in --

9    A    So, in this case, I don't think Mr. Dibre has a

10   performance guaranty that he paid in this one.

11   Q    What's your basis for saying that to this jury?

12   A    That's my recollection of this.

13   Q    Your recollection again, huh?

14   A    Yes.

15   Q    Okay.

16   A    So now if you go back it says right here, "included in

17   interest income from investments on the consolidated

18   statement."

19        So go back to the consolidated statements because you

20   were saying that it wasn't there and it was.  It's included

21   in the interest income from investments.

22   Q    I haven't said any such thing, sir.  Sir, I'm asking

23   questions bear with me.

24        I want to show you, this is Tab 162.

25             MR. MENCHEL:  I don't know if this is in evidence

W. Jacoby - Cross/Mr. Menchel                974

1   yet.  Is this in evidence?  I don't believe it is.

2            Mr. McConnell, any objection to the admission of

3   this document?

4            MR. MCCONNELL:  No.

5            MR. MENCHEL:  Your Honor, I off Government's

6   Exhibit 7392, please.

7            THE COURT:  Without objection, it's admitted.

8            (Government's Exhibit 7392 was marked in

9   evidence.)

10  Q    Sir, I want to show you the top of that.  Just blow up

11  the top of that e-mail so he can see he's on it.

12       This is a mill from Mr. Brian Marshall?

13  A    Right.

14  Q    Who is he?

15  A    He worked in the accounting department.

16  Q    He worked for you?

17  A    Yes.

18  Q    Okay.  And then it's to Trent Schneiter, Dustin

19  Moscato.

20       Who is that?

21  A    He also work at the GPB.

22  Q    Steve Frangioni.  Who is that?

23  A    He worked in the accounting department.

24  Q    Okay.  And whose cc'd?

25  A    Myself and Jovan Sijan.

*W. Jacoby - Cross/Mr. Menchel*                    975

1    Q    I'm going to take you to the very beginning of this

2    e-mail chain and I'm going to walk you through it.

3    A    Okay.

4    Q    Okay.

5              MR. MENCHEL:  Let's start at the very bottom.  And

6    if you can go to which is Page 005 in the document.

7              Blow up the bottom where it says -- yes, perfect.

8    Q    This is from Trent Schneiter.  Remind the jury again,

9    who is he?

10   A    He worked at Ascendant and he interfaced with the

11   accounting team at GPB.

12   Q    Okay.  And this is to somebody named David Hock --

13             MR. MENCHEL:  If you can highlight these, please,

14   as I go, Andy.

15   Q    -- and Todd Doorenbos.  It says at aretewealth.com.

16        Do you see that?

17   A    Yes.

18   Q    Who were they?

19   A    I don't know.

20   Q    They were brokers, though, right?

21   A    It looks like it.

22   Q    Okay.  It says, "Hello, Dave and Todd.  Appreciate your

23   time for the call with Dave and Jeff.  Here are the

24   questions I have to follow up."

25        And the last bullet point on the bottom, second-to-last

W. Jacoby - Cross/Mr. Menchel                976

1    bullet point -- I'm sorry, Andy -- it says, breakdown and
2    explanation of 1.1 million guaranteed payments in the 2014
3    GPB Holdings, LP audited financials.
4         Do you see that?
5    A    Yes.
6    Q    That's the same 1.1 we were just looking on those
7    audited financial statements, is it not?
8    A    Yes.  I think that's what they were referring to.
9    Q    And it is asking for an -- a breakdown, an explanation
10   of that?
11   A    Yes, I believe that -- yeah, yes.
12   Q    And if you go through, go back to the top e-mail,
13   Marshall is giving Trent Schneiter the information that he
14   can then refer back to those broker-dealers, do you see
15   that?
16        Just want to clarify in the last bullet point.
17              MR. MENCHEL:  Andy, get first page, top of the
18   e-mail.  This is the first page, I can't tell if -- this has
19   a Government sticker on it, Page 1.  First page.
20   Q    Now, you're on this e-mail at this point, right?
21   A    Yes.
22   Q    It says, "Hi, Trent.  I just wanted to clarify in that
23   last bullet point, the 1.1 million guaranteed payment in the
24   2014 audited financial statements were actually cash paid
25   from Lash/to Gray during the year or accrued during the year

W. Jacoby - Cross/Mr. Menchel          977

1    and paid shortly thereafter in Q1 2015, okay?

2        You see that?

3    A    Yes.

4    Q    "We have to be very careful about how we communicate

5    about this and it's documented in the audit as a personal

6    guaranty from No. Dibre/Lash?

7    A    Right.

8    Q    Now, at the very, very bottom it says, "Jacoby and

9    Frangioni have the exact details on the amounts and timing

10   of these payments if you need them."

11       Do you see that?

12   A    Yes.

13   Q    Do you have a recollection of providing that detail?

14   A    Not offhand.  You have to show me with some more stuff.

15   Q    I'm going to show you.

16           MR. MENCHEL:  Tab 34, Andy.

17           This is Defense Exhibit FFFFY-001.  Any objection

18   to the admission of this document?

19           MR. MCCONNELL:  This wasn't on the list that was

20   provided so I don't know what it is.

21           MR. MENCHEL:  Take a moment.

22           MR. MCCONNELL:  Can you zoom in?

23           MR. MENCHEL:  If you want, Mr. McConnell, I can

24   explain it to you.

25           MR. MCCONNELL:  Can I have a paper copy?

*W. Jacoby - Cross/Mr. Menchel*                    978

1            MR. MENCHEL:  Yes.

2            (A brief pause in the proceedings was held.)

3            MR. MENCHEL:  Andy, if you blow up the top portion

4    that has Mr. Jacoby's name on it in the chart below.

5    Q    Mr. Jacoby, this is an e-mail from you to Trent

6    Schneiter.

7        Do you see that?

8    A    Yes.

9            MR. MENCHEL:  I offer it.

10           THE COURT:  Is there an objection to this exhibit?

11           MR. MCCONNELL:  I don't know if the witness can

12   authenticate it.

13           MR. MENCHEL:  If the witness can what?

14           MR. MCCONNELL:  No, I'm sorry.  I wasn't sure if

15   the witness said -- you asked if the witness recognized the

16   document and he said yes.

17           THE WITNESS:  I don't recognize the document but

18   I'm looking at it and I can see I sent it to Trent.

19           MR. MCCONNELL:  Then no, no objection.

20           THE COURT:  Admitted.

21           (Defendant's Exhibit FFFFY-001 was  marked in

22   evidence.)

23           MR. MENCHEL:  So blow up the bottom portion where

24   it says, "Hi Trent."

25   Q    This is same e-mail we just look at a moment ago, is it

*W. Jacoby - Cross/Mr. Menchel*                    979

1    not?

2    A    Yes.

3    Q    It has same thing here, "Jacoby and Frangioni have the

4    exact details."

5    A    Of the payments.  So can I just read this for one

6    second.

7    Q    Of course you can.

8    A    Right.  So that comment down below --

9    Q    There is no question.  Do you recognize this document?

10   A    Yes.

11   Q    Okay.

12          MR. MENCHEL:  Andy, if you would, please, blow up

13   the top portion that has the chart.  For some reason it's

14   not on my screen.  I have to use your method, okay.  That

15   works.

16   Q    You attached this spreadsheet, did you not?

17   A    Yes.

18   Q    In response to the question below, that you have the

19   exact details on the amounts and timing of these payments.

20          These payments being the 1.1 million, right?

21   A    No.

22   Q    No?

23   A    No, that's not correct.

24   Q    What is this?

25   A    This is responding to the discussion about the Dibre

W. Jacoby - Cross/Mr. Menchel                    980

1   dealerships.

2   Q    What Dibre paid?

3   A    He didn't -- he wasn't involved in the 1.1.  These are

4   separate from the 1.1.

5   Q    Sir.

6   A    Yeah.

7   Q    Let's read it together, okay?

8   A    Yeah.

9   Q    Starting at the bottom, again.

10           MR. MENCHEL:  Take this off.  Highlight that last

11   set highlighted yellow and just blow it out.

12   Q    "Jacoby and Frangioni have the exact details on the

13   amounts and timing of these payments."

14       These payments are referring to the 1.1 Lash/Dibre

15   guaranties?

16   A    No, that's not correct.

17   Q    So why are you attaching it, sir?

18   A    It's not referring to the 1.1, it's referring to the

19   other stuff discussed in the paragraph.

20   Q    What other stuff is it discussed in the paragraph?

21   A    So it says, "GPB is currently investigating setting up

22   other similar companies that would be owed by the funds

23   and/or switching over to the non-reinsured products that

24   would generate similar returns to the fund.

25       Because of those details are not finalized during the

*W. Jacoby - Cross/Mr. Menchel*                    981

1    year, we received payments in the form of personal

2    guaranties from Dibre, not the 1.1.  However we do not

3    expect that to be a material change in the abdominal to

4    collect the money in the future when the term of the

5    guarantees has expired."

6         Because the guy was concerned that if there was

7    guaranties and they expired, what happens then if they still

8    continue to miss their numbers, okay?

9         Because of that, by that point we had either our own

10   reinsurance business to replace the one that's there, or

11   we'll have an alternative agreement set up with an -- in

12   place with a third-party insurance company that will

13   generate similar profits.

14        So what I'm responding to Trent up above there, I'm

15   responding about the Dibre stores, not the 1.1 performance

16   guaranty.

17   Q    Sir, the only thing you were asked to provide detail

18   on --

19   A    I spoke with him on the phone.

20   Q    Sir, the only thing you were asked to provide detail on

21   the bottom of this e-mail was the timing of the payments

22   regarding the 1.1, true or false?

23   A    False.

24   Q    Okay.  The jury will decide, they can read English.

25   A    Yeah, I just read it.

*W. Jacoby - Cross/Mr. Menchel*                          982

1          THE COURT:  Gentlemen.

2          MR. MENCHEL:  Okay.

3    Q    Let's go to the top of the document.

4          Do you know where you got this from?

5    A    I don't recognize it offhand, no.

6    Q    All of these dealerships, North Plainfield Nissan;

7    Nissan of Richmond; Nissan of Huntington; Nissan of Garden

8    City; Nissan of Duarte, those are all Patrick Dibre

9    dealerships.

10   A    That's right.

11   Q    The only one, by the way, that is a Lash dealership

12   Country Motors 2 at the bottom?

13   A    Correct.

14   Q    By the way we see two columns here on right in yellow.

15        Do you see that?

16   A    Yes.

17   Q    Okay.  And I'm going to show you something?

18        MR. MENCHEL:  What's the next document?  If you

19   will go to Tab 18, please.  What is the exhibit number on

20   this?

21        One second, please, your Honor.  I'm marking this

22   as Defense Exhibit MF-9-008.

23   Q    Sir, did you see this e-mail?

24   A    Yes.

25   Q    It's from you to Mr. Frangioni dated April 23, 2015,

*W. Jacoby - Cross/Mr. Menchel*                    983

1   right?

2   A    Correct.

3           MR. MENCHEL:  Andy, if you can go to Attachment A.

4   Are you able to find it?  Okay, I remember.  Do we have copy

5   of this?

6           I'm sorry, your Honor.  Okay.

7           We're having a technical issue I don't think we

8   can find it.

9           THE COURT:  You can keep going if you solve the

10  technical issue.

11          MR. MENCHEL:  Going back to the prior exhibit.

12  Publish it, please, it's in evidence.

13          So the whole half of it all the way to the bottom

14  where it says.  Andy, just the top half to the bottom of the

15  text.  Yes.

16  Q    So it's your sworn testimony, sir, and we'll get back

17  to this later, that even though it says, "Jacoby and

18  Frangioni have the exact details on the the announcement and

19  timing of these payments, what you attached was not the

20  timing and payments of the performance guaranties.  That's

21  your testimony?

22  A    You're talking about two different things, okay?  I

23  know it's complicated, but --

24  Q    Sir, I just want you to answer my question.

25          You were asked to provide detail about the 1.1 million

W. Jacoby - Cross/Mr. Menchel                    984

1   and it's your testimony that what is attached is not related

2   to that?

3   A    It's not related to the 1.1 million.  That was the two

4   Lash performance guaranties from DJD 1 and DJD 2.

5   Q    And you'll see, by the way, that for Country Motors 2,

6   which is the only Lash dealership in the column, that the

7   numbers are highlighted in yellow to the right, it's blank,

8   right?

9   A    Yes.

10  Q    You know what happens when you add up the numbers of

11  those two yellow columns on the right, what they add up to?

12  A    They add up to 1.1 million.

13  Q    Approximately?

14  A    Yeah, that's not the performance guaranty.

15  Q    That's just a coincidence?

16  A    Yes, correct.

17  Q    Okay, got it.

18  A    That's all the part of the problem.

19  Q    We'll get back to it, sir, when I get the document

20  later.

21       I want to show you a document, and I want to show you

22  what Mr. Schneiter represented to those folks at Ariti

23  afterwards.  I show you Defense Exhibit TQ for the witness

24  only, please.

25       Read this to yourself.  Specifically, I'm going to

W. Jacoby - Cross/Mr. Menchel                    985

1   refer you to a section in the e-mail breakdown 1.1 million

2   guaranteed payment?

3   A    So he's wrong here.  He's talking about the Dibre

4   stores.

5   Q    I just asked you to read this to yourself.

6   A    Okay.

7   Q    Let me know when you're done.

8   A    I'm done.

9   Q    Are you aware, now that I've shown you this, that after

10  you provided that spreadsheet to Mr. Schneiter, he got back

11  to Mr. Doorenbos at Arete Wealth and told them that the

12  1.1 million guarantee payment --

13            THE COURT:  I can see counsel standing up.  Have

14  you offered this exhibit or are you just --

15            MR. MENCHEL:  I would like to offer it subject to

16  connection.

17            MR. MCCONNELL:  Objection.

18            THE COURT:  So.

19            MR. MENCHEL:  Can we have sidebar?

20            THE COURT:  Yes.

21            (Continued on the next page.)

22

23

24

25

*Sidebar*                                                              986

1              (Sidebar held outside the presence of the jury.)

2              THE COURT:  So he's on it, right?  So you can't

3      offer it through them.

4              MR. MENCHEL:  It goes to the effect of the

5      listener that he just testified that this has nothing to do

6      with the performance guaranty.

7              THE COURT:  You're going to show him the e-mail

8      and then ask him were you aware basically now that you read

9      this e-mail of what's in the e-mail?

10             MR. MENCHEL:  Are you aware that Mr. Schneiter

11     interpreted what you did as providing him --

12             THE COURT:  What you're doing is you're giving him

13     the e-mail and that's a document that you just handed him is

14     going to be basis for his saying that, no, we're not going

15     to do that.

16             MR. MENCHEL:  Okay.

17             (Sidebar discussion concludes.)

18             (Continued on the next page.)

19

20

21

22

23

24

25

W. Jacoby - Cross/Mr. Menchel                    987

1          (In open court.)

2    EXAMINATION BY

3    MR. MENCHEL:

4    (Continuing.)

5    Q    Are you aware how Mr. Schneiter represented the graph

6    that you provided to him to the folks at Arete's?

7              MR. MCCONNELL:  Objection.

8              THE COURT:  I guess you can answer yes or no.  Are

9    you aware of that?

10             THE WITNESS:  I'm not.

11   Q    Okay.  In fact, sir, the performance guaranties that

12   Mr. Dibre had were to Holdings 1, were they not?

13   A    I don't believe he actually had performance guaranties

14   I think he had -- I didn't see one, a contract that said

15   "performance guaranties."

16   Q    Let me show you.

17   A    I think they were -- what were they called -- they were

18   a different contract, I this.

19   Q    Sir, didn't we just see a note where in the audited

20   financials it said that Mr. Dibre also had performance

21   guaranties?

22   A    I didn't see them for that year, though.  I think it

23   was only applying to Lash.  I didn't see any contracts.

24   Q    Do you know whether or not Mr. Dibre had performance

25   guaranties with Holdings 1?

W. Jacoby - Cross/Mr. Menchel                988

1   A    I don't remember him having a performance guaranty.  I

2   think he had something different, a different contract, for

3   his stores.

4   Q    Okay.  Mr. Lash had performance guaranties but they

5   weren't to Holdings 1, correct?

6   A    No, they were.

7   Q    They were?

8   A    Yeah, we went through this earlier.

9   Q    Okay.  Let me pull up Tab 2, please.

10       Do you recognize this document?

11  A    I think this is the performance guaranty that we were

12  looking at earlier this morning.

13  Q    Okay.  This is Government Exhibit 6038.  Is it already

14  in evidence?

15            MR. MCCONNELL:  Yes.

16            MR. MENCHEL:  I would publish it.

17  Q    So the performance guaranty is actually between who and

18  who, Jeffrey Lash and DJD Holdings?

19  A    DJD, yeah.

20  Q    Correct?

21  A    Yes.

22  Q    That's also true for the other one, right?

23       Let me show you.

24  A    Yes.

25            MR. MENCHEL:  What tab is that?  Tab 3, please?

W. Jacoby - Cross/Mr. Menchel                    989

1    A    Yes.

2          MR. MENCHEL:  Would you publish that, please,

3    Mr. Chan.  It's in evidence.  It's in evidence,

4    Government Exhibit 6038?

5          THE WITNESS:  Right, DJD 2.

6    Q    So both of the Lash performance guaranties were not

7    actually guaranties to the Holdings 1, they were guaranties

8    to DJD 1 and DJD 2, correct?

9    A    The dealerships owned, yeah, that's right.

10   Q    You see that?

11   A    Yes.  Those two dealerships were in Holdings.

12   Q    I understand that?

13   A    Okay.

14   Q    Other than your testimony, sir, do you have a chart or

15   Excel spreadsheet that you can show those performance

16   guaranties got on to the financials of the 2014 Holdings 1?

17   A    I think so but I can't do that for you right now.

18   Q    And you weren't shown that during your direct

19   examination, were you?

20   A    The 1.1 million guaranty?

21   Q    That there was an audit trail shows those numbers

22   actually hit Holdings 1 financials.

23   A    Yeah, I think there is, but --

24   Q    You don't have it?

25   A    Of course not.

*W. Jacoby - Cross/Mr. Menchel*                990

1   Q    Now, let's talk about these performance guaranties as

2   well.

3        There were actual real efforts to collect from Mr. Lash

4   on the 2014 performance guaranties, were there not?

5   A    I believe there was.

6              MR. MENCHEL:  Let's take a look at Tab 14, please.

7              I believe this is already in evidence as a

8   Government Exhibit but I'm going to offer it as a Defense

9   Exhibit but just that's the sticker on that's IID.

10             MR. MCCONNELL:  No objection.

11             THE COURT:  Admitted.

12             (Defendant's Exhibit IID was marked in evidence.)

13  Q    And you're on this exchange, right?

14  A    Yes.

15  Q    And this is sending a deficiency notice to Mr. Lash

16  because you wanted to get paid on this, right?

17  A    That's right.

18  Q    This was a real effort to collect, was it not?

19  A    Yes.

20  Q    Okay.  Let's just talk for a moment on what a

21  performance guaranty is, Mr. Jacoby.

22       It's an agreement between, in this case, the operating

23  partner, a dealership, and somebody else or the entity that

24  if the dealership doesn't perform up to a certain level, the

25  person who is providing the guaranty has to make up the

W. Jacoby - Cross/Mr. Menchel                    991

1    difference, right?

2    A    That's the way these ones were written, yes.

3    Q    These weren't into unusual, there were a number of

4    performance guaranties at GPB, were there not?

5    A    They weren't unusual for GPB.

6    Q    That's my question.

7    A    Yes.

8    Q    In fact, Mr. Gentile was a big believer in performance

9    guaranties as a way of helping protect investors, yes?

10   A    I wouldn't agree with that.

11   Q    Well, were they touted and marketed as something that

12   would be valuable to investors?

13   A    Yeah, I think they were touted and marketed that way.

14   But by the way they were written, the investors unknowingly

15   taking personal credit risk of the person whom the guaranty

16   is expecting the payment from without knowing the person's

17   credit history.

18   Q    That's your testimony, right, sir?

19   A    That's correct.

20   Q    Okay.  We'll see.

21        MR. MENCHEL:  Tab 57, please.

22   Q    I want to show you what's been marked as

23   Government Exhibit 5026-A.  I don't think this is in

24   evidence yet.

25        Do you recognize this?

W. Jacoby - Cross/Mr. Menchel                    992

1           MR. MCCONNELL:  No objection.

2           THE COURT:  Admitted.

3           THE WITNESS:  It looks one of the slide shows.

4           MR. MENCHEL:  I offer it.

5           MR. MCCONNELL:  No objection.

6           THE COURT:  Admitted.

7           (Government's Exhibit 5026-A was marked in

8     evidence.)

9           MR. MENCHEL:  Andy, if you would go to Page 13,

10    please.

11    Q    And one of the things that was marketed during these

12    slide decks was personal performance guaranties, right?

13    A    Yes.

14    Q    This was something that was marketed from the very

15    beginning as far as you know, yes?

16    A    As far as I know.

17    Q    So these weren't just made up for this case, these

18    actually were something that GPB was marketing as something

19    that was important to investors to know about with respect

20    to the car dealerships?

21    A    Yes, with all of their investments, not just the car

22    dealerships.

23    Q    Well, it was mostly car dealerships that had them,

24    right?

25    A    I think they were on quite a few other things, too.

*W. Jacoby - Cross/Mr. Menchel*                    993

1   Q    Now, you testified you never heard of Mr. Lash having a

2   performance guaranty; is that correct?

3   A    In 2015, there was not a performance guaranty on the

4   Bob's GMC Store in Milford, Connecticut.

5   Q    That was the one you hadn't heard about it?

6   A    That was the one, the 2015 one.

7   Q    Let me show you something.

8          MR. MENCHEL:  This is Tab 13, please.  I think

9   this is in evidence.

10         MR. MCCONNELL:  I think so.

11         MR. MENCHEL:  This is a Government Exhibit 4100.

12  This was one the PPMs, Mr. Chan, if you can publish.

13  Q    This was one of the PPMs that you testified to with

14  Mr. McConnell, correct?

15  A    Yes.

16  Q    Okay.  If we can go to Page 17.

17         And this was from, just to be clear -- I'm sorry, go

18  back to the first page.

19         This was March 6, 2015, do you see that?

20  A    Right.

21  Q    So this was before the 2015 performance guaranty had

22  been executed, according to your testimony?

23  A    That's right.

24  Q    Okay.

25         MR. MENCHEL:  If we'll go to Page 17, please, and

W. Jacoby - Cross/Mr. Menchel                  994

1  highlight the section that says, "High quality operating

2  partners."

3          And you were working for the company at this time

4  shall as the CFO, yes.

5  A    Yeah.

6  Q    Okay.  It says -- and you would have read this PPM as

7  part of your job responsibilities, yes?

8  A    Yes.

9  Q    Okay.

10         (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jacoby - cross - Menchel                                  995

1   BY MR. MENCHEL:   (Continuing.)

2   Q    It says, "High quality operating partners.  GPB intends

3   to structure our dealership network around two to five veteran

4   operating partners including Mr. Dibre."  Do you see that?

5   A    Yes.

6   Q    "That are experienced owning and operating dealerships,

7   are well-known in automobile circles and are considered world

8   class by manufacturers," and they're defined as the operating

9   partners.  Do you see that?

10  A    Yes.

11  Q    And that also included Mr. Lash, did it not; he was one

12  of the operating partners?

13  A    Yes.

14  Q    And then it says in the second paragraph, "We will seek

15  to acquire 75 to 80 percent of a typical dealership and the

16  operating partner will keep 20 to 25 percent of the

17  dealership.  We anticipate maintaining the existing operating

18  structure and the operating partner will have the obligation

19  to manage the dealership.  Additionally, GPB intends to have

20  the operating partner provide a 24-month personal

21  collateralized guarantee on performance with at least 50

22  percent cash-on-cash yield."  Do you see that?

23  A    Yes.

24  Q    So even before Mr. Lash signed the performance guarantys,

25  these PPMs were already touting that the operating partners

Jacoby - cross - Menchel                                    996

1  would have performance guarantys?

2  A    Well, the PPM is saying that they intend to do it, but it

3  wasn't contracted necessarily.

4  Q    I'm just asking whether or not it was already

5  anticipated that there would be a performance guaranty in this

6  PPM?

7  A    The PPM is advertising it.

8  Q    Correct.

9  A    Yeah.

10 Q    Okay.  Let's talk about the 2015 performance guaranty.

11 You were not involved in the conversations that Mr. Lash and

12 Mr. Gentile had about how it came to be that Mr. Lash would

13 sign a performance guaranty, were you?

14 A    I did not talk to the two of them about that, no.

15 Q    And you don't know what conversations those two men had?

16 A    Well, when you say that, you're asking me if I ever spoke

17 to Mr. Lash about it or --

18 Q    No.  At the time when those two men were talking about

19 it, you were not in the room or on the phone call when they

20 were discussing this performance guaranty; correct?

21 A    I'm not following what your question.

22 Q    My question is that to the extent that Mr. Gentile and

23 Mr. Lash had discussions about the 2015 performance guaranty,

24 if there were discussions between those two men, you were no

25 on them or in them?

Jacoby - cross - Menchel                    997

1    A    That's correct.

2    Q    Okay.

3    A    Yeah.

4    Q    And am I right -- you spent a lot of time with the jury

5    walking through how this was going to be a management fee

6    return?

7    A    Yes.

8    Q    And then it got switched over to a performance guaranty;

9    right?

10   A    Yes.

11   Q    And am I right present that from a financial aspect, it's

12   a wash whether or not the million 50 was booked as a

13   performance guaranty or whether or not it was booked as a

14   return of management fee?

15   A    Provided that money being used to pay it is from either

16   Mr. Lash or from Mr. Gentile.

17   Q    Yeah.  My only question is whether it's labeled a

18   management fee return or a performance guaranty, from a

19   financial standpoint it made no difference?

20   A    For the income statement it would not have changed the

21   income statement.

22   Q    It's a wash?

23   A    Yeah.

24   Q    Okay.  And it was your testimony, I believe, that

25   Mr. Gentile was well aware whether it was return of a

Jacoby - cross - Menchel                    998

1    management fee or a performance guaranty that the fund was

2    only going to get to 70 percent coverage even with the

3    inclusion of it; correct?

4    A    Correct.

5    Q    And, so, the investors were not going to be fully covered

6    whether it was a payment of a management fee or a performance

7    guaranty, right?

8    A    That's right.

9    Q    And that was going to be disclosed on the financial

10   statements to the investors?

11   A    One way or the other, yes.

12   Q    One way or the other the investors were going to see that

13   even with the inclusion of the million 50, their investment

14   was not fully covered according to the metric net investment

15   income; correct?

16   A    If they read the financial statement, yeah.

17   Q    Well, let's talk about those people for a second.

18        You referred to them, I think, as -- this was

19   private equity for the masses?

20   A    Yes.

21   Q    Sir, you had to be a millionaire in order to invest in

22   this business; correct?

23   A    No.

24   Q    Or you had to have an income of 200 to $300,000 a year?

25   A    That's correct.

Jacoby - cross - Menchel                                     999

1    Q    You consider that masses?

2    A    About 25 percent of the country.

3    Q    And so 75 percent of the country is locked out of this

4    investment; right?

5    A    Yes, and 25 percent -- what is it 400 million in the

6    country?  It's a lot.

7    Q    It's not every day folks who can just buy into this; they

8    have to be an accredited investor?

9    A    No, but the distinction you're making and why is it a

10   distinct difference is because in a typical private equity or

11   private investment vehicles, hedge funds, private equities and

12   private lending, the investors are far, far greater and far,

13   far fewer than this.

14   Q    I understand.  By the way, since the time this fund has

15   been created, do you know how many other private equity

16   companies have started offering private equity to people in

17   this price range?

18              MR. McCONNELL:  Objection.

19              THE COURT:  Sustained.

20   BY MR. MENCHEL:

21   Q    You said this was something different.  Do you know

22   whether or not it's commonplace today?

23              MR. McCONNELL:  Objection.

24              THE COURT:  Sustained.

25   BY MR. MENCHEL:

Jacoby - cross - Menchel                    1000

1   Q    Now, I want to talk to you about this backdating.  You

2   were fully aware that the 2015 performance guaranty was back

3   dated; right?

4   A    The 2015 -- yes.

5   Q    You were helping get it signed?

6   A    Yes.

7   Q    You didn't have any problem with that?

8   A    I did.

9   Q    You did?

10  A    Yeah.

11  Q    Okay.  In any of the e-mails that you walked through with

12  Mr. McConnell, did you once say that I'm uncomfortable with

13  this?

14  A    No.

15  Q    The auditors didn't have a problem with it, did they?

16  A    They did.

17  Q    Okay.  Let's take a look at some of the e-mails.

18          MR. MENCHEL:  Tab 59, please.  Matter of fact, hold

19  on one second.

20  BY MR. MENCHEL:

21  Q    You met with the prosecutors in this case many, many

22  times, did you not?

23  A    Yes.

24  Q    Starting in 2018 you've been having meetings with the

25  folks over at that table; right?

Jacoby - cross - Menchel                           1001

1   A    Them and others, yeah.

2   Q    Dozens of meetings?

3   A    Yeah.

4   Q    Over 25 meetings?

5   A    It's been a lot of years.

6   Q    You've lost track?

7   A    Yes.

8   Q    Is that a yes?

9   A    Yes.

10  Q    And do you recall in December of 2019 you told them that

11  MWE, the auditors, never questioned the mismatched date or

12  said anything about the document being backdated?

13  A    Yes.

14  Q    You did say that to the Government?

15  A    They said -- just repeat that again?

16  Q    Yes.  Sir, you just testified before this jury that the

17  auditors had a problem with this being backdated.  That was

18  your testimony, right?

19  A    Yeah.  Can I explain what I'm referring to.

20  Q    Just answer my question.  Was that your testimony before

21  this jury?

22  A    Yes.

23  Q    And in December of 2019 when you met with the folks over

24  here, you said MWE never questioned the mismatched date or

25  said anything about the document being backdated; that's what

Jacoby - cross - Menchel                    1002

1    you told them back then; right?

2    A    So those are two different questions.

3    Q    Let's take a look at what they actually expressed about.

4              MR. MENCHEL:  59, please.  I believe this is already

5    in evidence, Government Exhibit 7513.

6              I ask that it be published, Mr. Chan.

7              (Exhibit published.)

8    Q    Mr. Jacoby, this is from you to Al Matarazzo.  He was one

9    of the auditors; right?

10   A    Yes.

11   Q    And Sarah Kowalski?

12   A    Yes.

13   Q    She was the other auditor?

14   A    Yes.

15   Q    And it says in April 29, 2016, performance guaranty is

16   the subject; right?

17   A    Yes.

18   Q    And it u says, 'Lash performance guaranty," this is the

19   attachment, January 2015 draft dock.

20   A    Yes.

21   Q    And if you'll turn to the attachment, please, which is

22   Tab A.  This is -- this is what the auditors were shown;

23   right?

24   A    Yes, that looks like it.

25   Q    Let's go to the last page, please.  It's completely

Sophie Nolan, RCR, RPR - Official Court Reporter

Jacoby - cross - Menchel                    1003

1    unsigned and it was labeled a draft.

2    A    That's right.

3    Q    So the auditors were told in April of 2016 that an

4    unsigned performance guaranty from 2015 was being submitted

5    for their review; correct?

6    A    No.  I'm saying this is the document -- this is the

7    contract that I was anticipating getting Mr. Lash to sign.

8    Q    Right.  They were fully aware --

9    A    Yes.

10   Q    -- it was an unsigned draft document at this point?

11   A    Right.

12   Q    And they don't write back to you and go, this is

13   absolutely nuts, we cannot accept this, do they?

14   A    No, they gave us a management warning letter instead.

15   Q    Sir, can you just answer my questions?

16   A    I thought --

17   Q    I know you have a lot of money on the line here.  Can you

18   answer my questions?

19            MR. McCONNELL:  Objection.

20            THE COURT:  Counsel, let's not argue with the

21   witness.  Do you have a question for the witness?

22            MR. MENCHEL:  Yes.

23   BY MR. MENCHEL:

24   Q    Did they respond to this e-mail?

25   A    They expressed concern, yes.  They did.

Sophie Nolan, RCR, RPR - Official Court Reporter

Jacoby - cross - Menchel                    1004

1   Q    Did they say there was anything improper about this?

2   A    Yes, they expressed concern.

3   Q    Okay.  Isn't it common in audits -- this apparently is a

4   different document.  It's 7513?

5            MR. McCONNELL:  I'm sorry --

6            MR. MENCHEL:  I think 7512 is in evidence, but this

7   is 7513.

8            MR. McCONNELL:  That's fine.

9            MR. MENCHEL:  I'd offer that, your Honor.

10           THE COURT:  Admitted.

11           (Defendant's Exhibit 7513 received in evidence.)

12  BY MR. MENCHEL:

13  Q    Sir, it is common when an audit is done that auditors ask

14  for memorialization of agreements that may not be reduced to

15  writing, true?

16  A    Yes.

17  Q    Okay.  That happens during an audit people, are told

18  there's an agreement in place, there's no paper for it and the

19  auditors say I need you to paper up the agreement, that

20  happens during an audit?

21  A    That would be like a confirm like I did with the other

22  ones, yeah.

23           MR. MENCHEL:  Let's go to the next one.  Thank you.

24  Q    This is 7513.

25           (Exhibit published.)

Jacoby - cross - Menchel                    1005

1         I'm going to offer this as a -- I'm sorry,

2    Defendant's Exhibit OOD.

3              MR. McCONNELL:  That's fine, no objection.

4              THE COURT:  It is admitted.

5              (Defendant's Exhibit OOD received in evidence.)

6    BY MR. MENCHEL:

7    Q    The bod bottom of this e-mail chain is the exact same

8    part we saw in the prior exhibit; right?

9    A    Right.

10   Q    You attached the support for the million 50?

11   A    Right.

12   Q    And then Mr. Matarazzo from the auditing company says,

13   "Is a signed copy coming Monday morning?

14   A    Right.

15   Q    Okay.  So it was no surprise to the auditors that

16   Mr. Jacoby was signing a document which was dated from a year

17   before; correct?

18             MR. McCONNELL:  Objection.

19             THE COURT:  Sustained.

20   Q    Did they express any concern in this e-mail that

21   Mr. Jacoby was coming in to sign a document that was a year

22   old?

23   A    Not in the e-mail.

24   Q    In fact, they're actually asking you is the signed copy

25   coming Monday morning; right?

Jacoby - cross - Menchel                          1006

1   A    That's correct.

2   Q    Okay.  And then I think you already went through this

3   with the Government, so I'm not going to repeat it.  Mr. Lash

4   did show up, yes?

5   A    Yes.

6   Q    You got him to sign it?

7   A    I did.

8   Q    And the -- and you didn't have a problem with it?

9   A    I went through with it.

10  Q    You went through with it, but you secretly thought it was

11  a problem?

12  A    I thought it was a problem, yes.

13  Q    But you went through it anyway?

14  A    I did.

15  Q    And the auditors were sent that copy?

16  A    Yes.

17  Q    Knowing it had just been signed?

18  A    Correct.

19  Q    Okay.  And they passed the audit?

20  A    They ultimately decided to give us a clean audit instead

21  of an unclean audit but with a warning letter.

22  Q    Okay.  Because it wasn't the best process?

23  A    Yeah.

24  Q    But they were aware it was a backdated document and they

25  accepted it?

Jacoby - cross - Menchel          1007

1        MR. McCONNELL:  Objection.

2        THE COURT:  Sustained as to what they were aware of.

3   BY MR. MENCHEL:

4        MR. MENCHEL:  Tab 48, please.  This is

5   Government Exhibit 2009.  I think it's already in.  I ask that

6   it be published.

7        (Exhibit published.)

8        MR. MENCHEL:  I'd ask that you go to page four,

9   please.  If you can blow up opinion.

10  Q    And this was the opinion of the auditors after they

11  received a backdated personal guaranty from Mr. Lash aware

12  that it had been backdated, right?

13       MR. McCONNELL:  Objection.

14  Q    Well, the e-mail showed that you were sending them an

15  unsigned document and then you had it signed, yes?

16  A    Yes.

17  Q    Is there any doubt in your mind that the auditors didn't

18  know this document was signed in 2016?

19  A    I don't think so.

20  Q    Okay.  "In our opinion the financial statements referred

21  to above present fairly in all material respects the financial

22  position of GPB Automotive Portfolio, LP as of December 31,

23  2015.  And the results of its operations and its cash flows

24  for the year then ending in accordance with accounting

25  principles generally accepted in United States of America."

Jacoby - cross - Menchel                           1008

1   A    That's a clean opinion.

2   Q    That's a clean opinion?

3   A    Yeah.

4   Q    By the way, did I hear you testify on direct examination

5   that the Lash guarantee was double what the automotive company

6   had done for that year that was guaranteed?

7   A    You'd have to show me what you mean.

8   Q    This was a performance guaranty on a dealership called

9   Bob's Buick; right?

10  A    I believe that's correct.

11  Q    Also known as Country Motors II?

12  A    Yes.

13  Q    So if we see things that say CM II knew or Bob's Buick

14  same dealership?

15  A    Correct, yeah.

16  Q    Okay.  Have you ever looked at the financial reports for

17  Bob's Buick?

18  A    The dealership?

19  Q    Yeah.

20  A    No.

21  Q    Do you know what the dealership had done in the prior

22  year, in 2014?

23  A    No.

24  Q    Would it surprise you to know that it did $1.9 million?

25          MR. McCONNELL:  Objection.

Jacoby - cross - Menchel                          1009

1        THE COURT:  Overruled.  I think he said he didn't

2   know.

3        MR. MENCHEL:  Actually, I'd like to -- just for the

4   witness only please, Defendant's Exhibit KKL.

5        (Exhibit published to witness, Counsel and Court only.)

6   Q    Do you see that document?

7   A    Yes.

8   Q    Okay.  And I'm going to show you the second page of it.

9            You testified earlier, sir, that you looked at the

10  financials of the underlying portfolio companies from time to

11  time, right?

12  A    Not frequently, no.

13  Q    Didn't you say on direct examination that you did?

14  A    I never looked -- we didn't have visibility into all the

15  portfolios.

16  Q    You testified on direct examination that you did look at

17  some of the financial statements for the underlying portfolio

18  companies?

19  A    We got to look at them sometimes, yes.

20  Q    And you did testify that you thought that the amount of

21  money that Mr. Lash paid was a million dollars more than what

22  Bob's Buick had done that year, correct?

23  A    No, what Bob's Buick had paid into the fund.

24  Q    Okay, had paid into the fund.

25  A    Yeah.

Jacoby - cross - Menchel                    1010

1   Q    I want to show you --

2          MR. MENCHEL:  Can you go to the second page, Andy?

3   If you can't pull it up, I'll go to the ELMO.

4          THE COURT:  Are you objecting?

5          MR. McCONNELL:  Yes.

6          THE COURT:  He is not going to be able to get in

7   this exhibit, right?

8          MR. MENCHEL:  I'd like to offer it.  I think it's

9   self-admitting.  It's a business record of the dealership.

10         THE COURT:  No.  You've got to lay a business

11  records foundation for that.

12         MR. MENCHEL:  Okay.

13         Can we pull up JJ-11?

14         (Exhibit published.)

15  Q    Do you recognize this document, sir?

16  A    Not offhand.

17  Q    Well, if you see where it says at the top, Schedule

18  obtained from Bill Jacoby?

19  A    Okay.

20  Q    These are audit work papers that you provided to the

21  auditors, yes?

22  A    I don't recognize it offhand, so you have to give me a

23  little bit more to go with here.

24  Q    Well, I don't know what else to give you.  If you read it

25  it says this schedule was obtained by you -- from you.

Jacoby - cross - Menchel                          1011

1          MR. McCONNELL:  Objection.

2          THE COURT:  Sustained.

3    BY MR. MENCHEL:

4    Q    You see to the left --

5          MR. MENCHEL:  If you could, Andy, blow up where it

6    says PPC --

7    Q    Let me ask it this way; Mr. Jacoby what was your basis

8    for saying -- let me ask you this:  Mr. Jacoby, you don't need

9    to look at the screen.  It's okay.

10         Do you know how much Bob's Buick had done in profit

11   in the year 2014?

12   A    No, I only know what I was communicated and paid up from

13   the fund for that year.

14   Q    For 2014?

15   A    Yeah.

16   Q    And wouldn't that have been $1,987,000?

17   A    I would have to look at it.  I don't have that memorized,

18   sorry.

19   Q    Okay.  Do you know how much Bob's Buick made in the year

20   2015?

21   A    We'd have to look.

22         MR. McCONNELL:  Objection.

23   Q    I was trying to show you that, but you apparently don't

24   recognize it?

25         THE COURT:  He can ask if he knows.

Jacoby - cross - Menchel                        1012

1   Q     Do you know how much Bob's Buick made in 2015?

2   A     Can we look at the stuff?  Can we look at it?

3   Q     Sure.

4               MR. McCONNELL:  Now I will object.

5               THE COURT:  Let's talk at sidebar

6               (sidebar held outside of the hearing of the jury.)

7               (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar                                                    1013

1          (The following sidebar took place outside the

2     hearing of the jury. )

3          THE COURT:  So, if he's not able to authenticate

4     that exhibit -- if he can't read off of that exhibit --

5          MR. MENCHEL:  I hear you.  Let me see if I can

6     refresh his recollection with it.

7          THE COURT:  Okay.

8          (Sidebar ends.)

9          (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jacoby - cross - Menchel                          1014

1    BY MR. MENCHEL:  (Continuing.)

2    Q    Sir, I'm just going to ask you to look at this document,

3    don't comment on it, and see if this refreshes your

4    recollection as to what Bob's Buick made in the year 2015.

5    A    I need to see more.

6    Q    So, it doesn't --

7    A    It's not giving me enough information for me to make a

8    comment.

9    Q    If you can't comment, you can't comment?

10   A    I wish I could help you, but you're not giving me enough

11   to go on here.

12   Q    Let me hand you up the whole spreadsheet.

13            MR. MENCHEL:  With the Court's permission if this

14   will help you.

15            (Counsel approaches.)

16   Q    It's a little small, sir.

17   A    (Reviewing.)  Okay.

18   Q    Having looked at that, does that refresh your

19   recollection for what Bob's Buick did in terms of profits for

20   that year?

21            MR. McCONNELL:  Same objection your Honor?

22            THE COURT:  Why can't he ask if it refreshes his

23   recollection?

24            MR. McCONNELL:  Okay.

25   A    I can't tell what stage of the audit this is in at this

Jacoby - cross - Menchel                    1015

1   point.  It looks like at that point we had --

2           THE COURT:  Okay.  So I think we're not in

3   refreshing recollection territory.

4   Q    I got it.  If you don't know, you don't know.

5           So, what was your basis when you testified on direct

6   examination for saying how much the guaranty was in relation

7   to how well Bob's Buick had done that year?

8   A    It was how much the guaranty was.  We backed into the

9   amount for the guaranty by saying the amount that we had in

10  the financial statement from Bob's Buick GMC, we added

11  1,050,000 to it and backed into that number to put in the

12  guaranty for Mr. Lash --

13  Q    Let me ask you this, if Bob's Buick, asking

14  hypothetically, had done $2 million in 2014 and only done

15  approximately $1 million in 2015, then the performance

16  guaranty of approximately $1 million would have been

17  reasonable, yes?

18          MR. McCONNELL:  Objection.

19          THE COURT:  I don't understand the question.  Can

20  you ask it a different way?

21          MR. MENCHEL:  Sure.

22  BY MR. MENCHEL:

23  Q    A performance guaranty is just that; it's supposed to

24  guarantee a certain measure of performance, yes?

25  A    Yes.

Jacoby - cross - Menchel                          1016

1    Q    And one of the ways you would determine the performance

2    guaranty is by looking at past performance?

3    A    Certainly.

4    Q    So if a dealership had done $2 million in one year and it

5    was projected it was going to do roughly the same the next

6    year but it only does half as well; let's say it only does $1

7    million in revenue then the performance guaranty would kick in

8    and make up the difference, right?

9    A    That's the way it's supposed to work.

10   Q    Okay.  And if, in fact, and I know you do no but if, in

11   fact, Bob's Buick had done over $2 million in revenue in 2014,

12   but less than $1 million of revenue in 2015 then the

13   performance guaranty of $1 million would have been reasonable?

14            MR. McCONNELL:  Objection.

15            THE COURT:  Sustained.

16   BY MR. MENCHEL:

17   Q    All right.  I want to start by -- I want to now change

18   subjects and talk about what you did when you started your

19   testimony with Mr. McConnell yesterday.

20            He showed you another deck, a marketing deck, from

21   2015 for Auto.  This is tab number 154, please.

22            (Exhibit published.)

23            MR. MENCHEL:  This is Government Exhibit 7781-3.  I

24   ask that it be published.

25            MR. McCONNELL:  It's in, so we have no objection.

Jacoby - cross - Menchel                    1017

1          (Exhibit published.)

2   Q    Do you remember that you were shown this deck at the

3   beginning of your testimony yesterday -- around the beginning?

4   A    Yes, it looks familiar.

5   Q    And Mr. McConnell referred you to --

6          MR. MENCHEL:  Go to page seven, please, Andy.  Will

7   you blow that up, please?

8   Q    Do you recall Mr. McConnell asking you questions about

9   the figures that were being expressed on this page?

10  A    Yes.

11  Q    And he directed you to the --

12  A    Which fund is this one again?

13  Q    This is Auto, I believe.  This is Auto.

14  A    For which year?  Okay, I see, 2014 auto fund.

15  Q    It's a 2015 deck and it's discussing the distribution for

16  2015 here.  Do you see that?

17  A    Right.

18  Q    And do you recall Mr. McConnell asked you about this

19  fully covered funds from operations?

20  A    Yes.

21  Q    You testified that that was not true?

22  A    I don't believe that's true.

23  Q    Okay.  And then on the bottom he directed you to this

24  footnote one?

25          MR. MENCHEL:  If you could blow it up, Andy.  Just

Jacoby - cross - Menchel                               1018

1   footnote -- the one that says 3 percent.

2   Q    Do you see that?

3   A    Yes.

4   Q    You were specifically asked about the special

5   distributions.  Do you recall that?

6   A    Yes.

7   Q    And you were asked if they were true?

8   A    Yeah, they were -- we used investor capital to pay those.

9   Q    And you testified that it was false?

10  A    Yes.

11  Q    Okay.

12         MR. MENCHEL:  Tab 13, please.  This is the PPM for

13  Automotive.

14  Q    Do you see that?

15  A    Yes.

16         MR. MENCHEL:  I believe this is in evidence as

17  Government Exhibit 4100.  Please publish it.

18         (Exhibit published.)

19  BY MR. MENCHEL:

20  Q    And at the very back of this, if you go to page 133 --

21         MR. MENCHEL:  Please, Andy.

22  Q    -- it has the financials attached to this PPM, does it

23  not?

24  A    Right.  And this is which fund again?

25  Q    Automotive.

Jacoby - cross - Menchel                          1019

1   A    Okay.

2   Q    And you see where it says "Net investment income,

3   1,014,452?

4   A    And that's included in the 1.1 million?

5   Q    I'm just asking you, sir, if that's correct?

6   A    It looks like it's correct.  I haven't looked at it in a

7   bit, yeah.

8   Q    Okay.  Now, if we go to the next page that has the

9   distributions --

10  A    Yeah.

11  Q    792?

12  A    Yeah.

13  Q    So at least according to the financial statements, the

14  net investment income exceeded distributions; correct?

15  A    It looks like it.  Can you flip the page for me.

16       MR. MENCHEL:  Dean can you side-by-side.

17  A    No, I want to see the statement of cash flows.

18  Q    What page is that?

19  A    Go back to the income statement, first.

20       MR. MENCHEL:  The previous page, Andy.

21  A    Go to the -- can I see the statement of cash flows,

22  please?

23  Q    I'm not sure what page that's on.

24  A    Just go forward.  Keep going.  Okay.  Now, down -- it's

25  down further ahead.  All right.  You don't have it.

Jacoby - cross - Menchel                    1020

1   Q    Okay.  But at least according to the financial

2   statements, a net investment income exceeded distributions,

3   yes?

4   A    Yes.

5   Q    Okay.  I want to talk about your actual position at GPB.

6            You testified yesterday that you reviewed the PPMs

7   initially to educate yourself about the funds.  Do you recall

8   that testimony?

9   A    That's true.

10  Q    But it wasn't just something that you had to do to

11  educate yourself about the funds.  It was part of your job,

12  was it not, to review and make sure that the financials that

13  were being distributed to investors were accurate?

14  A    Yes.  You have to try to follow them as best you can,

15  yeah.

16  Q    Okay.  Now, yesterday Mr. McConnell was asking you a lot

17  of questions and he kept saying, in your capacity as chief

18  financial officer.  Do you remember he would often ask a

19  question and Mr. McConnell would say in your capacity as chief

20  financial officer?

21  A    No, I don't remember that.

22  Q    Okay.  But you weren't just the chief financial officer

23  of GPB when you started there; correct?

24  A    No, that's not true.

25  Q    You were the chief compliance officer as well, were you

Jacoby - cross - Menchel                    1021

1   not?

2   A    I was forced to do that because we didn't have one and it

3   was not in my employment agreement.

4   Q    I want to understand you.  You were forced to be the

5   chief compliance officer?

6   A    I was because I was hired as the chief financial officer.

7   We did not have a chief compliance officer so before we hired

8   one, I had to do it.

9   Q    Sir, you had been a chief compliance officer in Arlington

10  for five years prior to this job, right?

11  A    Yes.

12  Q    So you were familiar with how to be a chief compliance

13  officer; this was not new to you, was it?

14  A    It was not my capacity, no.

15  Q    You accepted a job as chief compliance officer, but you

16  it's your testimony you were not qualified for the job?

17  A    I accepted a job as chief financial officer which is what

18  my employment contract said and I filed as the chief

19  compliance officer temporarily until we hired one.

20  Q    Temporarily was a year, right?

21  A    I think we hired one before that.

22  Q    So I'm not understanding.  Did you not understand that

23  when you were brought on, your responsibilities in addition to

24  being chief financial officer was also compliance work?

25  A    That's correct.

Jacoby - cross - Menchel                    1022

1    Q    You did understand it or did not?

2    A    Did not.  It was told to me after I started.

3    Q    Okay.

4              MR. MENCHEL:  Tab 9, please.

5    Q    This is Defendant's Exhibit BB-S for the witness only.

6         (Exhibit published to witness, Counsel and Court only.)

7    Q    Do you recognize this document?

8    A    I can't read it.

9              MR. MENCHEL:  Can you blow it up for him, please.

10   And if you would turn to the next couple of pages so the

11   witness can see, Andy.

12   Q    Mr. Jacoby, are you able to see this document?

13   A    Yes.

14   Q    This was your employment agreement, was it not?

15   A    It's an offer letter.

16   Q    And you accepted?

17   A    Yes.

18   Q    And it had in there the duties and responsibilities that

19   you would be taking on when you joined the company; right?

20   A    Yes.

21             MR. MENCHEL:  I would offer this document.

22             MR. McCONNELL:  No objection.

23             THE COURT:  It is admitted.

24             (Defendant's Exhibit BB-S received in evidence.)

25             (Exhibit published.)

Sophie Nolan, RCR, RPR - Official Court Reporter

Jacoby - cross - Menchel                              1023

1           MR. MENCHEL:  If you would scroll down to the bullet

2    point that says "strong financial reporting capabilities," and

3    blow that up?

4    Q    Part of your responsibilities was strong financial

5    reporting capabilities; right?

6    A    Yes.

7    Q    "Build a team with realtime reporting across all assets,

8    timely and regimented monthly close process, efficient, timely

9    and accurate investor reporting to include the following:

10   Timeliness of financial statements to investors," and so on

11   and so forth; right?

12   A    Right.

13   Q    "Plan and implement internal control procedures for the

14   sponsor and the funds."

15   A    Right.

16   Q    Turn to the next page, please, where it says "Operational

17   fund competence."  Under operational fund competence it

18   says, "Develop companywide compliance practices."  Do you see

19   that?

20   A    Yup.

21   Q    So part of your offer was to run compliance while the

22   time you were there until you could get a replacement?

23   A    That's different from chief compliance officer.

24   Q    You're saying that you were not held out as the chief

25   compliance officer?

Jacoby - cross - Menchel                          1024

1   A    No, I'm saying I temporarily had to do it.  I spoke with

2   David Gentile and we agreed that we would hire a chief

3   compliance officer as soon as we could.

4   Q    And until that person was hired you were it?

5   A    I had to do it.

6   Q    Did you feel that you were competent to do it or not,

7   sir?

8   A    I did the best I could for the size of the firm that we

9   were.

10  Q    Okay.  And a chief compliance officer, that person's job

11  much like what it sounds like is to make sure that the company

12  is complying with the company's rules?

13  A    No, it's the regulations that you focus on.  So, the

14  company's rules as well, but the regulations is the main

15  focus.

16  Q    But also the internal policies of the company, yes?

17  A    Yes.

18  Q    Whatever regulations may be at issue -- for example, you

19  mentioned the Securities and Exchange Commission, make sure

20  you're complying with that; right?

21  A    That's primary, yes.

22  Q    As well as any criminal laws, right?

23  A    Yes.

24  Q    And if the compliance officer is aware that the company

25  is not following regulations or laws, it's supposed to take

Jacoby - cross - Menchel                    1025

1   appropriate steps and actions?

2   A    That's right.

3   Q    Including reporting to law enforcement if need be?

4   A    That's right.

5   Q    And you didn't do that during your time when you were the

6   compliance officer, did you?

7   A    That's right.

8   Q    Or at any time while you were working at GPB?

9   A    Did I do what?

10  Q    Report anything to the SEC or to law enforcement at the

11  time that you were there.

12  A    No, not while I was there.  I was busy trying to

13  implement the things that you just highlighted.

14  Q    Too busy to go to law enforcement?

15  A    I was busy trying to get it up and running.  It was a new

16  company.

17  Q    You were too busy to go to law enforcement, is that your

18  testimony?

19            MR. McCONNELL:  Objection.

20            THE COURT:  Overruled.

21  A    I was trying to get the company into compliance.

22  Q    Is it your testimony that you were too busy to go to law

23  enforcement and that's why you didn't?

24  A    No, that's not what I said.

25  Q    Okay.  You were also what's called a control person at

Jacoby - cross - Menchel                              1026

1    GPB; right?

2    A    I -- it sounds -- I believe you.  I don't know.

3    Q    You're not familiar with that concept?

4    A    You mean a control person in what -- in what capacity, at

5    the SEC?

6    Q    I'll show you.

7    A    Okay.

8    Q    There's something called a form ADD, is there not?

9    A    Yes.

10   Q    Are you familiar with it?

11   A    Yes.

12   Q    What is it?

13   A    It's a form that you file with the Securities and

14   Exchange Commission.

15   Q    Okay.  And it's filed by companies like GPB when they're

16   registered investment advisors and when they manage more than

17   a certain amount of money in assets, right?

18   A    Yeah.  There's certain points where you have to make

19   different filings depending on how large you get.

20            MR. MENCHEL:  If you'll show for the witness just

21   the witness only tab 160.

22       (Exhibit published to witness, Counsel and Court only.)

23   Q    Do you recognize that document?

24   A    I don't recognize it, but it looks like the form ADD from

25   April of 2015.

Jacoby - cross - Menchel                    1027

1           MR. MENCHEL:  I would offer it.

2           MR. McCONNELL:  I don't have any objection.

3           (Defendant's Exhibit MMMMU received in evidence.)

4           MR. MENCHEL:  This is Defendant's Exhibit MMMMU.

5    BY MR. MENCHEL:

6    Q    Sir, I want to direct your attention to page 20 of this

7    document.

8    A    Yup.

9    Q    Your name is listed in the middle?

10   A    Yup.

11          MR. MENCHEL:  Please publish it.  I thought it was

12   already published.

13          (Exhibit published.)

14   Q    You're listed here as the chief financial officer and

15   CCO, chief compliance officer, right?

16   A    Yup.

17          MR. MENCHEL:  If you go up a little bit, Andy.  Do

18   you see where it says 7-A in the control person column, blow

19   that up for the gentleman.

20   Q    It says in the "Control Person column enter yes if the

21   person has controlled -- has control as defined in the

22   glossary of terms to form ADD."  Do you see that?

23   A    Yes.

24   Q    You're one of the three control people that's listed in

25   this document; right?

Jacoby - cross - Menchel                          1028

1    A    Yes, that's right.

2    Q    And a control person is someone who holds key leadership

3    positions and can otherwise influence the policies or

4    management of the company, right?

5    A    Right.

6    Q    So you had the power to influence the policies of GPB as

7    a control person?

8    A    Yes.

9

10                (Continued on the following page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jacoby - cross - Mr. Menchel                     1029

1    BY MR. MENCHEL:  (Continuing.)

2    Q    By the way, there's also something that the company had

3    called the code of ethics, correct?

4    A    Yes.

5    Q    And as the Chief Compliance Officer when you came on,

6    you were in charge of those code of ethics?

7    A    Yeah, I recall.  They changed a lot over the months

8    that I was there.

9    Q    Okay.  And did you make those changes?

10   A    No.  No.  The new people that we hired to do compliance

11   did.

12   Q    Now, did I hear you correctly saying that you were cut

13   out of reviewing the marketing materials and at a certain

14   point only Ascendant Capital reviewed them?  Was that your

15   testimony yesterday?

16   A    Mr. Schneider controlled the marketing materials, yes.

17   Q    So you are saying nobody from GPB was reviewing

18   marketing materials before they were going out?

19            MR. McCONNELL:  Objection.

20            THE COURT:  Overruled.

21   A    I didn't say nobody was reviewing it.  You asked three

22   different questions there.

23            MR. MENCHEL:  Okay.  Hold on a second.

24            Can I have the transcript?

25            One second, please, your Honor.

```
1        I want you to blow up lines 18 to 25, please.
2   Q    This is what you testified to yesterday.
3        MR. MENCHEL:  If this can be published, please.
4   Q    Mr. Jacoby, do you recall being asked me questions
5   yesterday?
6        MR. McCONNELL:  Object to the form.  I don't think
7   transcripts are supposed to be published in this way, your
8   Honor.
9        THE COURT:  Sorry, are you publishing the
10  transcript?
11       MR. MENCHEL:  Absolutely wanted to publish the
12  transcript.  I want to read this to him and ask him if this
13  is his testimony.
14       MR. McCONNELL:  The --
15       THE COURT:  Why don't you just ask him the
16  question:  Do you recall being asked this question and
17  giving this answer?
18  Q    Mr. Jacoby, were you asked these questions and gave
19  these answers yesterday when Mr. McConnell was asking you
20  questions:
21       Question:  Mr. Jacoby, after you had these
22  conversations with the Defendant about the marketing
23  materials, did you continue to review marketing materials
24  later in your tenure as Chief Financial Officer?
25       Answer:  No.  I was cut out of that process going
```

*Jacoby - cross - Mr. Menchel*                          1031

1    forward.

2            Question:  What do you mean you were cut out of

3    that process?

4            Answer:  It was just controlled by Mr. Schneider

5    and the Ascendant team.

6            Were you asked those questions and did you give

7    that answer?

8    A    Yes.  You want me to clarify that?

9    Q    No.  I want you to answer my questions.

10   A    Yeah.

11   Q    Was that your testimony?

12   A    Yes.

13   Q    You didn't clarify anything yesterday when you gave

14   that testimony, right, you just gave that testimony?

15   A    You seem to misunderstand.

16   Q    In fact, the review of the marketing materials was not

17   just controlled by Mr. Schneider and the Ascendant team,

18   true?

19   A    He had the final say.

20   Q    He had the final say?

21   A    Yes.  Hundred percent.

22   Q    Okay.  In fact, after you were replaced, one of the

23   very first things -- you were replaced by Macrina Kgil,

24   correct?

25   A    Macrina Kgil, yeah.

*Jacoby - cross - Mr. Menchel*                    1032

1    Q    You were demoted, yes?

2    A    Yeah, yeah.

3    Q    And she took over as Chief Financial Officer?

4    A    She did.

5    Q    And one of the first things she started to do was

6    review the marketing materials that you claim you were cut

7    out of, right?

8              MR. McCONNELL:  Objection.  If he knows.

9              THE COURT:  Sustained.

10   Q    Do you know?

11   A    I don't know that, yeah.

12             MR. MENCHEL:  I would like to show the witness for

13   the witness only tab 76.

14   Q    I'm showing you what's been marked as

15   Government Exhibit 8162.  I don't believe this is in

16   evidence.  If you take a moment and read it to yourself.

17   A    Okay.

18   Q    Are you on this e-mail?

19   A    Yes.

20             MR. MENCHEL:  I offer it.

21             MR. McCONNELL:  Objection.

22             THE COURT:  Let's talk about it at sidebar.  This

23   might be a good time.  I think we haven't taken an afternoon

24   break, so we might as well give the jury ten minutes.  Let's

25   do that.

*Proceedings*                                                    1033

1          (Jury exits.)

2          (Witness steps down.)

3          THE COURT:  So I guess we can give the witness a

4    chance to leave.

5          So I don't have the e-mail in front of me anymore.

6    He is on the e-mail, so I guess he can authenticate it as an

7    e-mail, but I take it the objection is that it's an

8    out-of-court statement of this person for the truth or what

9    is it.

10         MR. McCONNELL:  Yes, the witness has already

11   testified that he doesn't know about Macrina Kgil's review

12   of marketing materials.  It appears to be an attempt to

13   knowledge him up in that respect.  I don't see a non-hearsay

14   purpose for the document.  And when Ms. Kgil testifies, she

15   can be asked all of these questions.

16         MR. MENCHEL:  This is classic impeachment.  He is

17   on an e-mail where she is reviewing a document saying I

18   would like to review them even if the numbers were tied out

19   prior to issue.  This is me being mindful of what goes out

20   to investors.

21         Also he just testified that Mr. Schneider had the

22   final say.  He is not even on this e-mail.

23         This is direct impeachment to what he just

24   testified to in front of the jury.  He is on the e-mail

25   being shown that she is reviewing the materials that he

*Proceedings*                                                    1034

1   claims she wasn't allowed to review.

2          MR. McCONNELL:  She said she would like to review

3   them.  The witness said he don't know whether she reviewed

4   them or not.

5          THE COURT:  The question is:  One of the first

6   things she is started to do was reviewed the marketing

7   materials that you claim you were cut out of?

8          And he says:  I don't know that.

9          MR. MENCHEL:  And this shows that he does.  This

10  is her coming onboard.

11         MR. McCONNELL:  Your Honor, the attachment appears

12  to be "Report of Partnership."

13         MR. MENCHEL:  It's not being offered for the

14  truth.  It's being offered to show that at least she's

15  saying she's going to review this stuff.

16         MR. McCONNELL:  That's the hearsay purpose.

17         THE COURT:  I guess the issue is the prior

18  question was really eliciting hearsay, right, it was really

19  eliciting what Ms. Kgil said to the witness.  And so

20  probably that question was eliciting hearsay, too.  Now you

21  are impeaching, also offering this, I think, as evidence of

22  what Ms. Kgil --

23         MR. MENCHEL:  This is what she is purporting to

24  do.  Whether she actually did it, okay, that's for the jury

25  to decide.  I am not offering it for the truth.  But he is

*Proceedings*                                                    1035

1    on an e-mail where she is saying she wants to -- this is why

2    he was demoted and I want to show that.  She is doing work

3    he didn't do.

4              THE COURT:  But that she's doing it is hearsay,

5    right?  The e-mail is a hearsay -- it's an out-of-court

6    statement of her being offered for the truth of what it

7    says.

8              MR. MENCHEL:  If you turn to the prior page, your

9    Honor, she's asking how these got approved and it says:

10   Kelly, going forward please ensure Macrina is looped in and

11   has the opportunity to approve any marketing materials.

12             That is a command, not a statement.

13             THE COURT:  Is that what you are offering and who

14   is that from?

15             MR. MENCHEL:  That is from Mr. Schultz and

16   Mr. Jacoby is on that part of the chain, as well.  If you

17   want me to just stick with that, that's fine.

18             THE COURT:  Any objection to this?

19             MR. McCONNELL:  I think it's the same objection.

20   I don't see how this is tied to the witness's testimony.  I

21   mean, the witness has been asked does he know if Macrina

22   reviewed marketing materials.  He said he didn't know.  She

23   will testify and she can testify to this personally, based

24   on personal knowledge.  I don't have a particular problem

25   with this e-mail except with this witness and in the manner

*Proceedings*                                                        1036

1   it's seeking to be introduced.

2            MR. MENCHEL:  It also undermines that he says he

3   was cut out of a process.  He is on an e-mail discussing

4   reviewing of marketing materials that he says he was cut out

5   of.

6            THE COURT:  It does seem like this is hearsay and

7   it shouldn't come in.  I don't see how this goes to the

8   witness being looped in on materials.  If you are telling me

9   this witness -- this e-mail shows that the witness was, in

10  fact, receiving these marketing materials, I am open to that

11  theory, but I am not really seeing that.

12           Kelly, going forward please make sure that Macrina

13  is looped in, has an opportunity -- so I am not seeing that

14  one.

15           MR. MENCHEL:  That's not a hearsay statement.

16  That's a command.  There's no truth being asserted.

17           MR. McCONNELL:  Your Honor, the issue is the

18  original question, which calls for the hearsay response and

19  that's what --

20           MR. MENCHEL:  I will reframe the question.

21           THE COURT:  I guess I am not -- it does seem like

22  this is just being offered to show that this portion of the

23  e-mail is just being offered to show that Jeff said to

24  Kelly, please ensure that Macrina is looped in.  And he's on

25  the e-mail.  So I guess it seems like that's okay.

*Proceedings*                                                    1037

1           MR. McCONNELL:  Okay.  For what purpose, though,

2    your Honor?

3           THE COURT:  To show that Jeff said to Kelly --

4           MR. McCONNELL:  I have to say, Judge, that's --

5    we've -- we've offered several documents that could be

6    characterized in the same way where the only relevant

7    purpose would be to show that a particular statement was

8    made.

9           THE COURT:  Right.

10          MR. McCONNELL:  I don't see any -- number one, I

11   think that this is objectionable on the same basis that your

12   Honor sustained several objections to the Government

13   attempting to introduce similar e-mails of this character,

14   but, again, I think the witness has made a statement that he

15   does not know if she was reviewing e-mails.  I understand

16   that he's on this e-mail, but it's clearly being offered for

17   its truth and I think it's improper.

18          THE COURT:  I am not seeing it as being offered

19   for -- what is the truth that is being asserted here?

20          MR. McCONNELL:  That Macrina is reviewing

21   marketing materials which the witness says he does not

22   have --

23          THE COURT:  I don't think it's being offered for

24   that.  I will allow you to put in this e-mail that he is on.

25          MR. McCONNELL:  And then I would like to redact

*Proceedings*                                                    1038

1    the bottom portion where it says Senior Counsel.  This is

2    the live issue that we've continued --

3              THE COURT:  Any issue with that?

4              MR. MENCHEL:  I don't know why we have to pretend

5    like there weren't any lawyers in the company.  I'm not

6    highlighting that point.

7              THE COURT:  I am not going to require you to

8    redact his position at GPB.  If you all want to take a

9    moment?

10             MR. MENCHEL:  I wouldn't mind taking a break.

11   Thanks.

12             THE COURT:  Yes.

13             (Recess taken.)

14             (In open court; jury not present.)

15             MR. McCONNELL:  There is a bottom portion to this

16   e-mail, Judge, where Ms. Kgil is saying:  I don't remember

17   being asked to review a draft of this, was this before I

18   joined?

19             And I think we would make the same objection here.

20   I understand it somewhat contextualizes the part that your

21   Honor has ruled admissible, but at the same time this adds

22   to the hearsay problem.

23             MR. MENCHEL:  She is asking a question.  The

24   questions are not hearsay either.

25             THE COURT:  I will allow this exhibit.

*Jacoby - cross - Mr. Menchel*                    1039

1        MR. MENCHEL:  Up to the portion that you said,

2   correct?

3        THE COURT:  Yes.

4        (Recess.)

5        (Jury enters.)

6        (Witness resumes the stand.)

7        THE COURT:  All right.  Everybody can be seated.

8        MR. MENCHEL:  May I, your Honor?

9        THE COURT:  Yes.

10  BY MR. MENCHEL:

11  Q    I believe this is now in evidence.

12  Government Exhibit 8162.  I would like to show you the

13  bottom portion of this e-mail.

14       MR. MENCHEL:  Can we publish it, please, Mr. Chan?

15       THE COURTROOM DEPUTY:  Will do.  Thank you.

16       (Exhibit published.)

17  Q    Do you see this e-mail sir?

18  A    Yes.

19  Q    And this is October 5, 2016, at that point what is your

20  position in the company?

21  A    I'm transitioning out.

22  Q    But you still have a title of director of funds, fund

23  accounting?

24  A    I don't know what the title was.  I was ex-CFO at that

25  point.

Jacoby - cross - Mr. Menchel                    1040

1   Q    Okay.  But you are on the e-mail nonetheless, are you

2   not, Mr. Jacoby?

3   A    Yes.

4   Q    And the subject is about a Report of Partnership for

5   GPB Holdings.

6           Do you see that?

7   A    Yes.

8   Q    And Ms. Kgil e-mails you and Mr. Schultz.

9           Who is Mr. Schultz?

10  A    He was an in-house counsel.

11  Q    Was he in charge of compliance?

12  A    I believe he was.

13  Q    Okay.  And so he took over after you stepped down?

14  A    I think he was the second one.  I think Mr. Anscher was

15  before that.

16  Q    Okay.  So just so I have the chronology right for the

17  benefit of the jury, you were Chief Compliance Officer for a

18  while, then Mr. Anscher took over, and then you got a

19  dedicated compliance person in Mr. Schultz; is that correct?

20  A    I believe that's order it went in.

21  Q    Okay.  And Ms. Kgil says:  I don't remember being asked

22  to review a draft of this.  Was this before I joined?

23  Thanks.

24           Do you see that?

25  A    Yeah.

Jacoby - cross - Mr. Menchel                    1041

1   Q    And this is the process that you said that you were cut

2   out of, right, reviewing documents?

3   A    No, I didn't say I was cut out of reviewing documents.

4   I said I was not part of the marketing documents.

5   Q    Is the Report of Partnership considered part of the

6   marketing?

7   A    No, I don't think it is.

8   Q    So this is something you still were involved in?

9   A    I don't know.  And can you show me it and I can try to

10  help?

11  Q    Okay.  Well, it's not really relevant and I don't have

12  the attachment to the document.  I just want to -- well,

13  actually, I can show it to you.  No, I can't, sorry.

14          MR. MENCHEL:  Go to the top of it, please.  I need

15  more of the body of the e-mail, of who is responding to it.

16  It's on the next page.  I'll show you.

17          And could you now include the body of the

18  response?

19  Q    So Mr. Schultz responds:  I approved this on

20  September 30th.

21          Do you see that?

22  A    Yes.

23  Q    And then it says:  Kelly, going forward please ensure

24  Macrina is looped in and has the opportunity to approve any

25  marketing materials that contain any performance metrics or

Jacoby - cross - Mr. Menchel                    1042

1    other statements of the funds or the portfolio companies.

2    Thanks, Jeff.

3            Do you see that?

4    A    I do.

5    Q    And you were on this e-mail?

6    A    They CCd me on this one, yes.

7    Q    So I am going to ask you again:  Were you aware of

8    whether or not Ms. Kgil when she took over was --

9            THE COURT:  Sustained.

10   Q    By the way, the company also worked with outside

11   advisors, as well, correct, in terms of the compliance

12   function?

13           MR. McCONNELL:  Objection.

14           THE COURT:  Overruled.

15           MR. MENCHEL:  Actually, can we go sidebar.  I want

16   to make sure I'm not going to run afoul of anything.

17           (Sidebar.)

18           (Continued on the following page.)

19

20

21

22

23

24

25

*Sidebar Conference*                                            1043

1        (Sidebar conference held on the record out of the

2   hearing of the jury.)

3        MR. MENCHEL:  I do want to bring out that they've

4   worked with law firms as part of the compliance function,

5   they got advice from them.

6        MR. McCONNELL:  I think this is the same issue.  I

7   don't see the relevance.  I think, your Honor, we're still

8   sort of in a grey area with some of this stuff.

9        THE COURT:  I think what I kind of teed up, that I

10  am going to need some more facts to understand how the

11  involvement of counsel is being invoked in order to have you

12  do that.  So I guess my suggestion is let's move on.  If you

13  want to give me a proffer about it later and come back to

14  it.

15       MR. MENCHEL:  There is something else that is

16  going to come up, and I think it's within the scope of the

17  letter.  The witness testified, I started my examination

18  with him that the "no present plans" language was put in

19  2016 at the behest of the defendants.  As I think your Honor

20  knows from our pleading, in fact, it was inserted by a

21  lawyer in 2015, the very first document that we could ever

22  find, sent to Mr. Jacoby.  It includes that language.  It's

23  in a red line.  He doesn't say anything.

24       THE COURT:  So you want to show him a red line

25  and?

*Sidebar Conference*                                              1044

1          MR. MENCHEL:  I want to show him a document and

2    show that he was sent that document and that in that

3    document, in 2015, it says "no present plans."

4          And then I want to walk through and show how, over

5    time, it just kept getting copied over, copied over, and

6    copied over.  It was not as he described it, that the

7    defendants inserted -- they are not even on these e-mails,

8    any of them.

9          THE COURT:  It does seem like he's pretty clearly

10   put who created that language at issue.  If they want to

11   show it came from somebody other than who he's asserted,

12   it's relevant.

13         MR. AXELROD:  Are you trying to introduce an

14   inconsistent statement?

15         MR. MENCHEL:  No.  I want to show that the lawyer

16   reviewed it, the lawyer added this language, it was sent to

17   Jacoby.

18         MR. AXELROD:  The problem with that is just

19   because it was included in a red line that you get from a

20   lawyer, it doesn't mean that the lawyer included that nobody

21   else had anything else to do with it, it's not the

22   product --

23         THE COURT:  It's certainly not dispositive as to

24   came up with the words.  There's some evidence relevant to

25   that.

*Sidebar Conference*                                                    1045

1          MR. AXELROD:  Yes, but without calling those to

2     the jury and showing the jury what happened and without the

3     ability to inquire what the lawyers actually knew and what

4     they told, it leaves the misleading impression, it's really

5     a 403 issue, that we can't deal with the misleading

6     impression.

7          THE COURT:  I am hearing this is being offered not

8     for the fact that the lawyers were the authors, but as to

9     that it was not Mr. Gentile and Mr. Schneider.  So if you

10    want to elicit that, it's fine.  If you start getting into,

11    and it was lawyers, then I am likely to sustain the

12    objection.  Unless you are going to tell me more.  I mean,

13    your papers gave me no basis to say this is a permissible

14    indication of the involvement of counsel.

15         MR. MENCHEL:  I am not suggesting it is.

16         THE COURT:  So let's not go there, but if you want

17    to get into --

18         MR. MENCHEL:  But the e-mail is from the lawyer.

19    I don't know how I can avoid it.  It has his e-mail on it.

20    Wilson Nellie is the firm.  I will just say it was inserted

21    by somebody else.  I don't really care.  It's not my point.

22         MS. WEIGEL:  Without the document --

23         THE COURT:  Are you going to offer it?

24         MR. MENCHEL:  No, I am going to offer it.

25         MS. WEIGEL:  That's exactly the problem.

*Sidebar Conference*                                              1046

1           MR. DEARINGTON:  Your Honor, if I may, your Honor

2      already ruled on this in a motion in limine, so they seem to

3      be relitigating the same point.  They charged this language

4      in the indictment.  They are attributing it to the

5      defendants.  The truth is it came from other people and your

6      Honor said we can do it.

7           THE COURT:  I don't think I said that it was a

8      lawyer that was the author of the statement, which is what I

9      think is what we are arguing over.  You think I did?

10          MR. DEARINGTON:  I thought you did.  Maybe I am

11     mistaken.

12          MR. MENCHEL:  It just happens that that is the

13     case.  I don't know what I am supposed to do about it.  If

14     it had come from John Smith, I would introduce it from John

15     Smith.

16          THE COURT:  I haven't seen the exhibits.  I guess

17     there is some question about whether it should be redacted

18     in some way.  You could certainly ask the witness the

19     question of is it some outside the firm.

20          MR. MENCHEL:  I will ask that.  I don't care.  I

21     really don't care.  I'm not trying to bring out the lawyer

22     part.

23          THE COURT:  Okay.

24          (Sidebar conference ends.)

25          (Continued on following page.)

*Jacoby - cross - Mr. Menchel*                                    1047

1          (In open court.)

2          MR. MENCHEL:  May I?

3          THE COURT:  Go ahead.

4   CONTINUED CROSS-EXAMINATION

5   BY MR. MENCHEL:

6   Q    Now, Mr. Jacoby, I think you mentioned a few moments

7   ago that Mr. Anscher was also hired by GPB to be the Chief

8   Compliance Officer for a period of time as well; is that

9   right?

10  A    Correct.

11  Q    And that was in January of 2016?

12  A    Sounds about right.

13  Q    Were you the one that hired him?

14  A    No.  Mr. Gentile did.

15  Q    Did you have anything to do with the process of hiring

16  him?

17  A    I don't recall.

18  Q    And you understood that he had -- he was a Certified

19  Public Accountant?

20  A    He wasn't practicing as a public accountant.

21  Q    But he was a Certified Public Accountant?

22  A    I think he may have had that degree.  That license but

23  I don't recall.

24  Q    He was also an attorney?

25  A    He was an attorney.

Jacoby - cross - Mr. Menchel                    1048

1   Q    And he had prior experience as a Chief Operating

2   Officer?

3   A    Yes.

4   Q    And he had prior experience as a Chief Compliance

5   Officer; did he not?

6   A    I believe that's true.

7   Q    Are you aware that he was the General Counsel and Chief

8   Compliance Officer of Equinox Partners?

9   A    That sounds correct.

10  Q    In your view, was he a highly qualified person to act

11  as the Chief Compliance Officer and the Chief Operating

12  Officer of GPB?

13  A    Yes, I think he was qualified.

14  Q    Let's talk about your testimony about you being fired.

15       It's your testimony that you were fired because of

16  blowing the whistle on people or because the company wanted

17  to go public and you were not in agreement?  I wasn't quite

18  clear.

19  A    They expressed the desire to take the company public.

20  And I wanted to restate the financial statements.

21  Q    Okay.  And they fired you because of that?

22  A    They fired me because they wanted a Chief Financial

23  Officer that would take the company public.

24  Q    And Ms. Kgil had a public finance background; did she

25  not?

1   A    I believe so.

2   Q    You did not?

3   A    That's correct.

4   Q    Ms. Kgil, she was also a Certified Public Accountant;

5   was she not?

6   A    I don't know.

7   Q    Do you recall that she worked at PricewaterhouseCoopers

8   for seven years?

9   A    I don't know that.  I can't speak --

10  Q    Okay, if you don't know, you don't know.

11          Do you recall her working at a private equity

12  investment firm called Fortress?

13  A    She may have.  I don't recall.

14  Q    When she came in, she made a number of changes; did she

15  not?

16  A    For -- I only overlapped with her for a brief period of

17  time and of course when she came in, she started to make

18  changes and try to do things, yes.

19  Q    She brought in another accounting firm called KPMG?

20  A    Correct.

21  Q    That's considered a big four accounting firm; is that

22  correct?

23  A    Yes.

24  Q    And a big four accounting firm is one of the four

25  biggest accounting firms in the world?

Jacoby - cross - Mr. Menchel                    1050

1    A    Yes.

2    Q    Now, you testified that one of the things you expressed

3    concerns about was private jet travel.

4            Do you remember that?

5    A    Yes.

6    Q    When was it that you expressed concern to Mr. Gentile

7    and Mr. Schneider about the use of a private jet?

8    A    I don't recall exactly.

9    Q    Well, was it in 2015?

10   A    I think it was in 2016, but I can't recall exactly.

11   Q    2016?

12   A    I believe so.

13   Q    Because you were already gone by 2017, correct?

14   A    Correct.

15   Q    Sir, are you aware that they didn't start using a

16   private jet until January of 2017?

17   A    No.

18   Q    Well, if they had started using a jet in 2017, you

19   couldn't have been speaking to them about it in 2016; fair

20   to say?

21           MR. McCONNELL:  Objection.

22   A    I don't think that's accurate.  I think that they were

23   using it --

24           THE COURT:  Sorry.  If there is an objection, give

25   me a second to read back the question and then rule on the

Jacoby - cross - Mr. Menchel                    1051

1    objection.

2              THE WITNESS:  Oh, sorry.

3              THE COURT:  Sustained.

4    Q    When did they start using a private plane?

5    A    My understanding and my memory, my memory of it was

6    2016.

7    Q    When?

8    A    I can't give you an exact time.

9    Q    Beginning, middle, end?

10   A    No.  I can't give you an exact time.

11   Q    You had you went to them and complained about the

12   expenses that was incurred?

13   A    Yes.

14   Q    Was it millions of dollars?

15   A    Anything was in addition to the fees already charged to

16   the investors and that was being charged on top of the fees.

17   So yes, anything, amount -- any amount in addition to that

18   was a concern.

19   Q    Can you answer my question?

20              You said you spoke to these men about the fact

21   that these fees were draining the funds, right?

22   A    The extra expenses.

23   Q    The extra expenses?

24   A    Yes.

25   Q    How much was it?

*Jacoby - cross - Mr. Menchel*                              1052

1   A    I don't have the numbers for you.

2   Q    Did you ever look at the numbers?

3   A    For sure.  Yes.

4   Q    What document did you look at that those private air

5   travel that you are relying upon that you are telling this

6   jury you spoke to these men about?

7   A    I don't have it handy.

8   Q    Sir, let me show you a document.

9           MR. MENCHEL:  For the witness only, please, put

10  up -- hold on one second.

11  Q    Do you know how the air travel was actually booked?

12  A    No, I don't know what you are talking about.

13  Q    So you testified to this jury that you spoke to these

14  men about a jet, right?

15  A    Mr. Gentile, Mr. Schneider and Mr. Anscher, yes.

16  Q    And you don't remember when it was?

17  A    It was in 2016.

18  Q    And you don't know when the plane was being used?

19  A    I don't recall the details at this point.

20  Q    And are you on any e-mails that you are aware of, sir,

21  involving the air travel for this jet?  Any 1-E-mail you can

22  point to in this case?

23  A    I probably am.

24  Q    Well, have you looked at any in preparation for your

25  testimony here?

*Jacoby - cross - Mr. Menchel*                                    1053

1    A    No, I have not.

2    Q    Okay.  Sir, are you aware of the fact that the way it

3    worked was when the jet was used, the only thing the funds

4    were charged were commercial rates?

5              MR. McCONNELL:  Objection.

6              THE COURT:  Sustained.

7              MR. MENCHEL:  I'm asking if he is aware.

8              THE COURT:  I think he already indicated he was

9    not aware of how this was booked.

10   Q    Let me ask you this:  If somebody uses a private jet

11   and just bills the price of a coach ticket, it doesn't make

12   a difference whether they used the jet or a regular

13   airplane, right?

14             MR. McCONNELL:  Objection.

15             THE COURT:  Overruled.

16   A    I don't know what you're --

17   Q    I will give you an example.

18             Let's say a ticket cost $550.

19   A    Yup.

20   Q    And I am using a jet.

21   A    Yup.

22   Q    And all I bill the fund is the cost of a coach ticket

23   for $550, it doesn't matter whether the person used the jet

24   or they used JetBlue, right?

25   A    In that hypothetical scenario that you're describing,

*Jacoby - cross - Mr. Menchel*                    1054

1    that would be accurate.

2    Q    And do you know if that's what these men did?

3    A    I do not know for a fact.

4    Q    So you have no idea, despite what you told this jury

5    yesterday, about how those fees were being billed to the

6    funds at all; do you?

7    A    They were being billed to the fund.

8    Q    How much?

9    A    These were expenses in addition to fees.

10   Q    Wait a second.

11        If they're traveling for business --

12   A    If it's for business.

13   Q    -- they can bill the fund, yes?

14   A    It depends.

15   Q    If it's a business expense, they can bill the fund,

16   yes?

17   A    I don't actually think that's clear in the documents.

18   Q    What documents did you look at?

19   A    The PPMs.

20   Q    What documents did you look at in connection with this

21   plane that you testified so vividly about yesterday?

22   A    I didn't realize it was vivid.

23   Q    Well, is it vivid?

24   A    It's an additional expense.

25   Q    No, no.  Your recollection of this supposed

Jacoby - cross - Mr. Menchel                    1055

1   conversation, do you have a vivid recollection of actually

2   talking to these men about an airplane?

3   A    Additional expenses and one of them was that, yes.

4   Q    The Ferrari.  You also have a vivid memory of talking

5   to Mr. Gentile about that?

6   A    Yes.

7   Q    When was that?

8   A    I can't remember the year.

9   Q    And what documents, if any, did you look at in

10  connection with the Ferrari?

11  A    None.

12  Q    Do you know who wound up paying for the Ferrari?

13  A    My memory is that the Buick dealership sold it.

14  Q    Sold it at a profit or a loss?

15  A    I think it was a loss.

16  Q    Do you know if anybody made up the difference?

17  A    I don't know.

18  Q    Did Mr. Lash ever tell you that he was, in fact,

19  required to make up the difference?

20          MR. McCONNELL:  Objection.

21          THE COURT:  Sustained.

22  Q    When was it that you first became concerned about the

23  issues that you testified to in front of this jury that you

24  raised concerns with the defendants in this case?

25  A    Throughout my time at GPB.

*Jacoby - cross - Mr. Menchel*                    1056

1  Q    But when did you first start having that problem, that

2  concern?

3  A    I don't -- can you give me more information?

4  Q    We established that although your start date was

5  March 1st --

6  A    Yup.

7  Q    -- you actually began working in January, right?

8  You've already testified to that?

9  A    Right.

10 Q    So from the time of January, 2015; is that correct?

11 A    Yes.

12 Q    When did you first start to have concerns?

13 A    About what?

14 Q    About anything that you now have testified to in front

15 of this jury about.

16 A    You need to -- you need to give me a little bit better

17 question.  I don't understand what you are talking about.

18 Q    Sir, you have testified you were concerned about

19 coverage?

20 A    Yes.

21 Q    Misrepresentations to the investors, the performance

22 guaranties, we listed all these things in the beginning of

23 your testimony, right?

24 A    Right.

25 Q    When was the first time any of those things became a

*Jacoby - cross - Mr. Menchel*                                1057

1   concern to you?

2   A    So I would point to an example as the April special

3   distribution.

4   Q    April?

5   A    Yeah.

6   Q    April of 2015?

7   A    Yes, yes.  It was -- I don't know it was put into

8   testimony, but I know there was evidence with e-mails with

9   me saying we can't make the special distribution, we don't

10  have the money, this is crazy.  So yes, that's all there,

11  and I know that that was in the evidence.

12  Q    And then in May, one of the due diligence firms called

13  FactRight interviewed you, right?

14  A    Possibly.

15  Q    Let me show you.

16        MR. MENCHEL:  Can I have 23, please?

17  Q    Do you recognize this document?

18  A    No.

19        MR. MENCHEL:  Can you go to page 8, please?

20        MR. McCONNELL:  Your Honor, I'm going to object.

21        THE COURT:  If it's a refresh your recollection

22  question, I am going to allow it.

23        Is that what it's going to be?

24        MR. MENCHEL:  Yes, I want to see that he remembers

25  this document.

*Jacoby - cross - Mr. Menchel*                    1058

1       THE COURT:  Okay.

2   Q    Do you recall meeting with folks from FactRight in May

3   of 2017?

4       MR. McCONNELL:  Objection.

5       THE COURT:  If you want to ask a refresh your

6   recollection question, you've got to ask that question.

7       MR. MENCHEL:  Okay.

8   Q    So take a look at page 7 -- page 08, I guess, of the

9   document.

10      MR. MENCHEL:  And if you could highlight for the

11  gentleman where it says "compliance is led by."

12  Q    If you could read that to yourself.

13  A    Yeah.

14  Q    Also, I want to show you --

15  A    I didn't -- I didn't write this.

16  Q    I understand.  I'm asking you if it refreshes

17  something.  Hold on.

18      MR. MENCHEL:  Page 43, if you will show the

19  witness paragraph that reads FactRight compiled, in the

20  bottom, it's 44 of the Bates number.

21  Q    Please read that to yourself, and when you are done,

22  let me know.

23  A    Okay.

24  Q    Does this refresh your recollection that in May of

25  2015, you were interviewed by the due diligence firm called

Jacoby - cross - Mr. Menchel                                1059

1    FactRight?

2    A    No.

3    Q    Do you have any memory being interviewed by FactRight?

4    A    Vague.

5    Q    What's the memory?

6    A    I think there were people in the office.

7    Q    Do you remember being interviewed by them?

8    A    No.

9    Q    If you had been interviewed by them, would you have

10   reported any concerns?

11              MR. McCONNELL:  Objection.

12              THE COURT:  Sustained.

13   Q    What about other firms like Mercer?  Do you remember

14   being interviewed by them?

15   A    I think Mercer came through, I remember them.

16   Q    MC Law?

17   A    MC, I didn't talk to.

18   Q    How many different due diligence firms did you

19   communicate with during your tenure at GPB?

20   A    Maybe just those two that you mentioned, but I don't

21   recall.

22   Q    Okay.  Did you ever raise any concerns with the due

23   diligence firms that you thought something was amiss at GPB?

24   A    My job was not to raise concerns with the due diligence

25   firms.

*Jacoby - cross - Mr. Menchel*                    1060

1   Q    You didn't see your job as the Chief Compliance Officer

2   and Chief Financial Officer to raise concerns with a company

3   that is doing diligence on the company?

4   A    I was working for the company, trying to improve

5   everything, and I was answering the questions that I was

6   asked when I got due diligence questions.  And I would have

7   answered them honestly.

8   Q    So it was that they didn't ask the right questions; is

9   that the testimony?

10  A    I don't know what questions you're talking about.

11  Q    Okay.  Do you recall that when you were working with

12  Margolin you had to fill out a fraud survey report?

13  A    Yes.

14  Q    And that is a very specific survey that asks questions

15  about fraud, right?

16  A    Right.

17  Q    Okay.  I want to show that to you.

18          MR. MENCHEL:  Just show, just for the witness

19  only, Defense Exhibit MMMM-Y.

20          If you can go to the tab that puts them together,

21  Andy, I think it will be easier for him to see.

22  Q    Mr. Jacoby, is this the fraud survey that you filled

23  out?

24          MR. MENCHEL:  Actually, can you show the top of

25  it, Andy, where it has his name?

Jacoby - cross - Mr. Menchel                          1061

1    A    Right.

2              MR. MENCHEL:  I offer it.

3              MR. McCONNELL:  No objection.

4              THE COURT:  Admitted.

5              (Defense Exhibit MMMM-Y received in evidence.)

6              MR. MENCHEL:  Mr. Chan, please publish it.

7              (Exhibit published.)

8    Q    So this is a survey that you filled out in January of

9    2016, right?

10   A    Right.

11   Q    You had been at the company almost a year at this

12   point?

13   A    Yes.

14   Q    Okay.  And the first question that you are asked was

15   whether management has knowledge of any fraud or suspected

16   fraud affecting the entity.  And you answered no.

17   A    Right.

18             MR. MENCHEL:  Okay, next question, please.

19   Q    Whether management is aware of allegations of fraud or

20   suspected fraud affecting the entity, for example, receiving

21   communications from employees, former employees, analysts,

22   regulators, short sellers or others.

23             And you answered no.

24   A    Correct.

25             MR. MENCHEL:  Okay, next question, please.

1   Q    Management's assessment of the risk that the financial

2   statements may be materially misstated due to fraud

3   including the nature, extent and frequency of such

4   assessments.

5            And you wrote:  Gets harder as the company gets

6   bigger and more spread out.  There can be concerns about

7   issues at investee's, for example, inventory, right.

8   A    Okay.

9   Q    That's all you wrote, right?

10  A    Yeah, in January of '16.

11  Q    Well, by then you were certainly concerned, this is a

12  year, right, a year into your tenure?

13  A    Concern is different than what you're saying there, but

14  yeah.

15  Q    Sir, you answered no to every question about fraud,

16  right?

17  A    Yes.

18           MR. MENCHEL:  Next question, please.

19  Q    By the way, by this time you had already seen all the

20  transfers you were talking about, the performance

21  guaranties, everything that you told this jury about, you

22  had seen, right?

23  A    Yes.

24  Q    Okay.  Management's process for identifying, responding

25  to, and monitoring the risks of fraud in the entity,

including any specific risks of fraud that management has identified or that had been brought to its attention or classes of transactions, account balances or disclosures for which risk of fraud is likely to exist, including programs and controls, the entity has established, to mitigate specific fraud risks.

And all you wrote was: GPB hired Citrin for a special project to review the policies of the dealership and to make suggestions. They're the auditors and GPB told them they wanted no surprises at year end.

That's all you wrote, right?

A For this, yeah.

Q Now, Mr. McConnell also asked you whether or not you filed something called a whistleblower complaint, right?

A Yes.

Q And I want to be clear. You left GPB in April of 2017, yes? That was when you -- you were already part time, you already had been coming into work by then, right?

A It was December of 2016.

Q December of 2016?

A Yeah.

Q You had a separation agreement that allowed to you stay on as a consultant for a little while, right?

A I was available to Macrina Kgil up until the end of the audit, which goes to the end of April.

*Jacoby - cross - Mr. Menchel*                    1064

1    Q    So --

2    A    At home.

3    Q    At home.  But you didn't --

4    A    I maybe got like one or 2-E-mails, maybe one phone

5    call.

6    Q    So effectively, you were done --

7    A    December.

8    Q    -- December, okay, fine.

9         And so that's -- you didn't file the complaint

10   until May 1st of 2018, this whistleblower complaint, right?

11   A    That's right.

12   Q    And, in fact, you only filed it after you had been

13   sued, true?

14   A    That is true.

15   Q    And you had been sued for theft of trade secrets,

16   right?

17   A    Yeah, I think that was it.  Something like that.

18   Q    They basically were accusing you of setting up a

19   copycat-type of private equity fund, right?

20   A    Right.

21   Q    You disagreed with that?

22   A    Yes.

23   Q    So it was a couple of weeks after that lawsuit had been

24   filed against you, that's when you filed the whistleblower

25   complaint?

Jacoby - cross - Mr. Menchel                    1065

1   A    Yeah, I guess that's true, yes.

2   Q    Okay.

3   A    I don't know the exact time period.  It sounds about

4   right.

5   Q    Okay.  But you had believed that a crime had been

6   committed for over a year and you sat on it and did nothing?

7   A    Yes.

8   Q    And it's your testimony that you did that because you

9   felt that you couldn't say anything because of the

10  separation agreement?

11  A    Yes -- no.  There's two agreements.  It's a separation

12  and a transition agreement.

13          MR. MENCHEL:  Okay.  Let's take a look at that

14  transition or separation agreement.

15          This is for the witness only please.

16  Q    I am showing you what's been marked Defense

17  Exhibit BBT.

18          Do you recognize this document?

19  A    Yes.

20  Q    Is this the transition agreement that you entered into

21  with the company?

22  A    I think so.

23  Q    Do you want to look at more pages?

24  A    Yeah.  I might need some help on this, but --

25  Q    Sure.

*Jacoby - cross - Mr. Menchel*                          1066

1     MR. MENCHEL:  Andy, if you could scroll through

2  and give Mr. Jacoby some time to look at it and then direct

3  him to the page 8, which has his signature.

4  Q    Let me know when you are finished.

5  A    I'm not able to read it as fast as you, but there's a

6  number of spots in there where I'm limited.

7     MR. MENCHEL:  I will hand you up my copy, with the

8  Court's permission.

9     THE COURT:  Sure.

10     MR. MENCHEL:  I am just going to need it back.

11  A    What's your question?

12  Q    I want to know if this is the transition agreement that

13  you entered into with the company.

14  A    Yes, I believe this is it.

15     MR. MENCHEL:  I offer it.

16     MR. McCONNELL:  No objection.

17     THE COURT:  Admitted.

18     (Defense Exhibit BBT received in evidence.)

19     MR. MENCHEL:  May I take it back, your Honor?

20     THE COURT:  Sure.

21  Q    Would you consider this to be a fair and generous

22  agreement that you were given by GPB?

23  A    I hadn't formed an opinion about that.

24  Q    You never thought about it?

25  A    I thought about it a lot.

*Jacoby - cross - Mr. Menchel*                    1067

1          MR. MENCHEL:  Okay, well, let's go to the first

2    paragraph, 1-B.

3          THE COURTROOM DEPUTY:  Excuse me, Mr. Menchel,

4    publish it?

5          MR. MENCHEL:  Publish, please.

6          THE COURTROOM DEPUTY:  Thank you.

7          MR. MENCHEL:  Thank you, sir.

8          (Exhibit published.)

9          MR. MENCHEL:  If you would go, please, to 2-B.

10   Q    First of all, while you were transitioning out, they

11   agreed to keep your current base salary of $263,137 per

12   year, right?

13   A    Yes.

14   Q    Okay.

15         MR. MENCHEL:  If you go to C, please, Andy.

16   Q    They also told you that you would be eligible for a

17   2016 year-end bonus payment which is currently anticipated

18   to be $60,000?

19   A    Right.

20   Q    Did they pay these?

21   A    Yes.

22         MR. MENCHEL:  Let's go to the next page, please,

23   under separation benefits, 4-A, please.

24   Q    Severance pay in the amount of $65,785.

25         You got that, as well, right?

Jacoby - cross - Mr. Menchel                    1068

1    A    Yes.

2    Q    And then B, a supplemental payment in the gross amount

3    of $60,000.

4            The supplemental payment, right, you got that, as

5    well?

6    A    That's the one they were talking about before, right.

7    Q    So you got all that money?

8    A    Yes.

9    Q    Now, I want to direct your attention to paragraph --

10   this is on page 4, paragraph 8C.

11           This is what's referred to as a non-disparagement

12   clause.

13           You are familiar with these; are you not?

14   A    I'm aware of them.

15   Q    And what it basically says is that both the company and

16   you are agreeing they're not going to disparage or speak

17   badly of each other, it's going to be an amicable split,

18   right?

19   A    Right.

20   Q    Okay.  And notwithstanding that, at the very bottom, it

21   says:  Nothing in this paragraph, 8 --

22           MR. MENCHEL:  If you could blow that up, please,

23   Andy, or highlight it?

24   Q    -- precludes the company or the company persons --

25           You are the company persons, right?

Jacoby - cross - Mr. Menchel                                  1069

1    A    Yes.

2    Q    -- and entities from making truthful statement to a

3    governmental or self-regulatory entity in the course an

4    investigation being conducted by such entity by required or

5    permitted by applicable law.

6              Is that correct?

7    A    That's what it says.

8    Q    Well, that's what it says?

9    A    Yeah.  And that's illegal.

10   Q    It says you can make a statement to a governmental or

11   self-regulatory entity; does it not?

12   A    Only -- only in the course of an investigation.

13   Q    Okay.  So you read that to be that I couldn't speak out

14   because, as far as you knew, there was no investigation?

15   A    Absolutely.

16   Q    And you didn't want to violate this -- this -- this

17   agreement?

18   A    Yeah.  There's other -- there's other places in here,

19   too, but that's -- yes, that's -- that's correct.

20   Q    I'm just asking you:  You didn't want to violate this

21   agreement?

22   A    It says that I cannot speak, and I did not want to take

23   the chance that I would get sued.

24   Q    So you didn't want to violate the agreement?

25   A    Yeah.

1   Q    And that's your reason for why you didn't come forward

2   sooner?

3   A    Correct.

4   Q    Now, there's another provision here.

5         MR. MENCHEL:  Andy, if you will go to page 5.

6   Actually, go to 11, please.

7   Q    There is a provision here about confidential

8   information, right?  Do you see that?

9   A    Yup.

10  Q    And one of the things it says at the bottom is:  ^ Your

11  Honor ^ You shall not, without the prior written consent of

12  company, or as required by law, use or disclose or enable

13  anyone else to use or disclose any confidential information

14  of the company, persons and entities.

15        Do you see that?

16  A    Yeah.

17        MR. MENCHEL:  And then if we go to "Return of

18  Property," 12, please, Andy.

19  Q    You agree that as of the separation date, you will have

20  returned to the company all property belonging to the

21  company and/or the company persons and entities, other than

22  your contact information, including, but not limited to, all

23  proprietary and/or confidential information and documents in

24  any form belonging to the company.

25        Do you see that?

1    A    Yes.

2    Q    In fact, you stole an entire thumb drive worth of

3    documents; did you not, sir?

4    A    I took a thumb drive worth of documents, yes.

5    Q    In violation of this provision?

6    A    Because my understanding --

7    Q    If you would just answer my question, sir.

8         Did you know you were violating this provision?

9    A    I know that this provision does not cover the reason I

10   took the thumb drive.

11   Q    You can ^ exactly ^ steal it if it's for a good reason?

12   A    You can -- you can take the information if you believe

13   a crime has been committed.

14   Q    You testified just a moment ago, you didn't want to

15   report to law enforcement because you didn't want to violate

16   this agreement, right?

17   A    That's right.

18   Q    You violated the agreement the day you left the

19   company, true?

20   A    I took information to defend myself.

21   Q    You violated the agreement the day you left the

22   company --

23   A    Yeah.

24   Q    -- true?

25   A    That's right.

*Jacoby - cross - Mr. Menchel*                              1072

1  Q    So violating the agreement wasn't something you were

2  concerned about when it came to the documents, right?

3  A    Getting sued was.

4  Q    Can you answer my question?

5         Violating the agreement wasn't something you were

6  concerned about when it came to the documents, right?

7  A    Right.

8  Q    Now, you've got a lawyer representing you, yes?

9  A    Sure, yes.

10 Q    He's here in court?

11 A    Yes.

12 Q    Mr. Crimmins, I believe, is his name?

13 A    Yes.

14 Q    The gentleman in the back?

15 A    Yup.

16 Q    You filled out a form when you filed this whistleblower

17 complaint, right?

18 A    Yes.

19 Q    Let me show it to you.

20        MR. MENCHEL:  For the witness only, please, Andy,

21 Defense Exhibit QQQ- -- let me start again, there's a lot of

22 Qs here.  QQQQ-H.

23 Q    Do you recognize document, Mr. Jacoby?

24 A    Can you flip the page?

25        MR. MENCHEL:  Flip the page, please, Andy.

*Jacoby - cross - Mr. Menchel*                    1073

1    A    Yeah.  This looks like it.

2    Q    This is the form that you filled out when you filed

3    your whistleblower complaint?

4    A    I think so.

5              MR. MENCHEL:  I offer it.

6              MR. McCONNELL:  Are you offering the whole

7    document?

8              MR. MENCHEL:  No.  Just the form.

9              MR. McCONNELL:  Can I see the rest of the

10   document?

11             MR. MENCHEL:  I will give it to you.

12             May I, your Honor?

13             THE COURT:  Sure.

14             MR. COLTON:  I would like to see it, as well.

15             MR. MENCHEL:  I withdraw that, your Honor.

16             THE COURT:  Sure.

17   Q    This form asked you a bunch of questions, correct?

18   A    Yes.

19   Q    And one -- and it required you to sign it under the

20   pain and penalty of perjury, right?

21   A    Okay.

22   Q    Is that a yes?

23   A    I think so.

24   Q    Let me just to refresh your recollection show you the

25   last page --

Jacoby - cross - Mr. Menchel                1074

1      MR. McCONNELL:  Your Honor, the witness needs to
2  be asked a question and indicate he needs to be refreshed.
3      MR. MENCHEL:  He said "I think so."  I was going
4  to show it to him.
5      THE COURT:  I will allow it.
6      MR. MENCHEL:  Page 6.
7  Q    Take a look at that and see if that refreshes your
8  memory whether or not you had to fill this out under the
9  penalty of perjury.
10 A    Yes.
11 Q    And you did that, right, you filled this out under the
12 penalty of perjury and it was as truthful and accurate as
13 you could make it, right?
14 A    Yes, yes.
15 Q    Okay.  And one of the questions that it asked you --
16     MR. McCONNELL:  Objection.
17 Q    -- was --
18     THE COURT:  I need to know the question first.
19     Do we need to talk about it at sidebar?
20     MR. McCONNELL:  The document's not in evidence and
21 he's reading from the document.
22     MR. MENCHEL:  I am going to ask him if that
23 refreshes his recollection and I will refresh his
24 recollection.
25 Q    Do you recall the document asking you whether or not

*Jacoby - cross - Mr. Menchel*                    1075

1  the complaint you were making related to an entity in which

2  you were an officer or a director?

3  A    No, I don't.

4  Q    Let me show it to you and see if it refreshes your

5  memory.

6            MR. MENCHEL:  If you would, Andy, go to page 3,

7  question 5-A.

8  A    Yes.  Okay.

9  Q    Does that refresh your memory that one of the questions

10 that you were asked under the penalty of perjury was whether

11 the complaint you were making related to an entity in which

12 you were an officer or director?

13 A    Okay.

14 Q    Yes?

15 A    It looks correct, yes.

16 Q    And you said yes, right, because you were?

17 A    Yeah.

18            MR. McCONNELL:  Your Honor, I am going to object.

19 If we are going to offer the whole document in with all the

20 attachments, we have no objection --

21            MR. MENCHEL:  Can we have a sidebar, please?

22            THE COURT:  Yes.

23            (Sidebar.)

24            (Continued on the following page.)

25

*Sidebar Conference*                                            1076

1          (Sidebar conference held on the record out of the

2    hearing of the jury.)

3          THE COURT:  Go ahead.

4          MR. MENCHEL:  You are the boss.  Whatever you say

5    I do.

6          THE COURT:  It sounds like you could offer the

7    document.  It sounds like we are really just having the

8    witness read from the document, but not offering it and

9    that's --

10         MR. MENCHEL:  He -- I believe I'm entitled to

11   offer this form without offering the affidavit of the

12   allegations for the purposes of impeachment.  In this form,

13   he was asked a very specific question whether or not he ever

14   reported this violation basically to anybody at the company

15   ever.  And he wrote no.  This is classic impeachment.

16         MR. McCONNELL:  But he hasn't said a statement

17   that's inconsistent with that to impeach him with that.  All

18   we're doing is trying to put the document into evidence

19   through the witness's testimony.  I have no problem with the

20   whole thing going in, but I think the witness needs to make

21   a statement that's inconsistent with that first before the

22   document can be used to impeach him.

23         THE COURT:  I guess the theory is that if the

24   witness has previously testified that he did not report this

25   violation -- did report this violation to --

*Sidebar Conference* 1077

1          MR. MENCHEL:  He has previously testified

2     repeatedly that he raised these concerns to Mr. Gentile, and

3     here he's saying he didn't.

4          THE COURT:  Why can't he impeach with questioning?

5          MR. McCONNELL:  I think the attachment says that

6     he did raise it with them.

7          MR. MENCHEL:  No, it doesn't.

8          THE COURT:  I will let him ask the question.  If

9     you want to rehabilitate him with attachments, that's fine.

10          (Sidebar conference ends.)

11          (Continued on following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Jacoby - cross - Mr. Menchel*                            1078

1           (In open court.)

2    CONTINUED CROSS-EXAMINATION

3    BY MR. MENCHEL:

4    Q    Sir, you testified here that you repeatedly raised your

5    concerns about the illegality of things that you observed at

6    the company to Mr. Gentile and Mr. Schneider and others,

7    right?

8    A    Yes.  My concerns, yes.

9    Q    Okay.

10          And yet, when you filled out your whistleblower

11   complaint, you were specifically asked whether you ever

12   raised or reported a violation to anybody at the company,

13   your supervisor, or anybody at the company, and you answered

14   no, correct?

15   A    That would be incorrect if I answered it that way.

16   Q    Well, let me show it to you, and see if that's how you

17   answered it.

18   A    I think I'm -- I think I'm answering that question

19   differently than the way you're phrasing it, so I have to

20   see it.

21          MR. MENCHEL:  Let's put it up on the screen for

22   him, please, see if it refreshes his memory, Andy.

23          Witness only.  It's question 5-B on page 3.

24   A    So the way I read this question, I think I answered it

25   correctly.

Jacoby - cross - Mr. Menchel                    1079

1    Q    The question --

2    A    So this comes down to maybe I'm reading it differently

3    than you.  So I think it's correct and I still -- it's

4    consistent with the contradiction you're trying to raise.

5              (Continued on the following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

W. Jacoby - Cross/Mr. Menchel          1080

1          MR. MENCHEL:  Your Honor, I'd like to offer just

2     this portion of the exhibit into evidence so I can read it

3     to the jury.

4          MR. MCCONNELL:  We would object the whole document

5     can come in.  We have no problem with that.

6          THE COURT:  I'll allow it.  Admit this portion of

7     the exhibit.

8          (Defendant's Exhibits QQQQ-H was marked in

9     evidence.)

10         MR. MENCHEL:  Mr. Chan, publish it please.

11    Q    Let's start with 5-A, the related questions.

12         5-A asks, "Does this complaint relate to an entity of

13    which the complainant."

14         You're the complainant, right?

15    A    Yes.

16    Q    "Is or was an officer, director, Counsel, employee,

17    consultant, or contractor," and you answered yes?

18    A    Yes.

19    Q    Okay.  Then 5-B, Andy, please, says "If the answer to

20    question 5-A is yes, has the complainant reported this

21    violation to his or her supervisor, compliance officer,

22    whistleblower hotline, ombudsman, or any other available

23    mechanism at the entity for reporting violations," and you

24    answered no; right?

25    A    So I think the way that's written that's accurate.

*W. Jacoby - Cross/Mr. Menchel*                    1081

1   Q    Okay.  Mr. Gentile was your supervisor?

2   A    Yeah, but I'm taking reported to mean a different

3   meaning than you are.

4   Q    You are taking it to mean something other than saying,

5   Mr. Gentile, I think you and Mr. Schneider are committing

6   fraud that wasn't reported?

7   A    Yeah, I am.

8   Q    Okay.  Now, you testified on direct examination that as

9   a whistleblower you stand to potentially make money if a

10  judgment is made against anybody in connection with your

11  complaint, correct?

12  A    That's possible, yes.

13  Q    And you're hoping for it, aren't you?

14  A    That would be great, but yes.

15  Q    And are you aware that you could make up to one-third

16  of the money that the SEC recovers that would go to you

17  potentially?

18  A    I don't know how that's calculated.  It's a complicated

19  law, so I don't understand how the --

20  Q    Did you ever take or make any attempt to educate

21  yourself on what you could potentially earn if the SEC

22  renders a judgment against anybody in connection with your

23  complaint?

24       You're not interested?

25  A    I spoke with my counsel.

W. Jacoby - Cross/Mr. Menchel                    1082

1  Q    Don't tell me what your counsel said because that's

2  privileged --

3  A    Yeah, I know.

4  Q    -- so let's stay away from that.

5       But are you aware that you can make anywhere between 10

6  and 30 percent of a money judgment, if there is one,

7  recovered by the SEC?

8  A    Yes, some, about the I don't know what defines a money

9  judgment.

10 Q    Okay.  Now --

11 A    It's zero to 30, it's not 10 to 30.  It's zero 30.

12 Q    You can make nothing?

13 A    Yes.

14 Q    Okay.  So if there is a $10 million judgment, you could

15 hit the jackpot and make 30 percent of that potentially,

16 right?

17 A    Or zero.

18 Q    Or zero?

19 A    Yeah.

20 Q    But you got nothing to lose, right, by filing it;

21 right?

22 A    What do you mean?

23 Q    You're hoping to make money in connection with this

24 complaint, are you not, sir?

25 A    It's not the motivation for filing.

W. Jacoby - Cross/Mr. Menchel                    1083

1   Q    I see.

2        Now, you testified that if there was a conviction in

3   this case that would have no impact on whether or not the

4   SEC makes a finding or a violation or enters a judgment.

5        Is that your testimony?

6              MR. MCCONNELL:  Objection.

7              THE COURT:  I'm sorry, give me one moment.

8              MR. MENCHEL:  That's what he testified to on

9   direct.

10             THE COURT:  Give me a minute.  Okay, I'll allow

11  it.

12  Q    Do you understand the question?

13  A    Say it again.

14  Q    I'll ask it a different way.

15       Did you testify on direct examination that the outcome

16  here would not affect an SEC judgment?

17  A    That is my understanding that they're separate.

18  Q    They may be separate, sir, but do you understand that a

19  conviction in this case could have a huge, potentially huge,

20  impact on the SEC?

21             MR. MCCONNELL:  Objection.

22             THE COURT:  Overruled.

23  A    My understanding to answer the question is they're two

24  separate cases and there's many other cases.

25  Q    You're not a lawyer right, sir?

W. Jacoby - Cross/Mr. Menchel                    1084

1    A    Correct.

2    Q    So you really don't know if a guilty verdict in this

3    case could have a positive impact for you with the SEC, do

4    you?

5    A    The SEC is a separate case, that's what I do know.

6    Q    I know it's a separate case.

7         I'm asking you whether or not if you a guilty verdict

8    in this case can be used in that case?

9    A    I don't know.

10   Q    You don't know?

11   A    I don't know how the legality of everything works.

12   Q    So you testified earlier with assurance that an outcome

13   here would not affect the SEC.

14        You really then the know that, do you?

15   A    That's my belief, that's my understanding.

16   Q    That's your belief?

17   A    That was my understanding, yes.

18             MR. MENCHEL:  Tab 22, please.

19             One second, please, your Honor.

20             (A brief pause in the proceedings was held.)

21   EXAMINATION BY

22   MR. MENCHEL:

23   (Continuing.)

24   Q    Now, you testified earlier when you were talking about

25   these interaccount transfers between the investment account

W. Jacoby - Cross/Mr. Menchel                 1085

1    and the distribution and operations account.

2        You recall that testimony?

3    A    I do.

4    Q    And I believe you testified that you had no ability to

5    approve any of those transfers, they always had to come from

6    Mr. Gentile; is that correct?

7    A    I could approve it but Mr. Gentile was always a

8    final -- always included in approval by Mr. Frangioni.

9    Q    He was always included?

10   A    And so, if he wasn't available, he may do it with me

11   and then follow-up with him and put the text in the

12   QuickBooks entry.

13   Q    I'm a little bit confused now because you said before

14   you couldn't approve it.

15       So could you approve it without Mr. Gentile or not?

16   A    No, Mr. Gentile had to approve all of them.  So if

17   there was a case where he wasn't available, we would follow

18   up with him if we had to make a transfer and then follow up

19   and add that support later.

20   Q    Now, you testified that these three accounts that were

21   set up:  The investment account, the distribution account,

22   and the operations account was something you had never seen

23   before, right?

24   A    This structure?  Yes.

25   Q    Yes.

*W. Jacoby - Cross/Mr. Menchel*                    1086

1    A    Yes.

2    Q    You referred to as ingenious?

3    A    Yeah, I thought it was smart.

4    Q    Well, did you use the word "ingenious" yesterday?

5    A    Maybe I did.

6    Q    And, in fact, there's no requirement in a company that

7    they have to have three separate bank accounts for the cash

8    coming into a company, correct?

9    A    That's correct.

10   Q    These were not called "escrowed accounts."

11        Do you know what I mean by escrowed accounts?

12   A    Tell me what you mean.

13   Q    So an escrow account can only be used for a specific

14   purpose, you can't just use it for anything you want.  These

15   accounts were not escrowed?

16   A    No, this is for organizational purposes.

17   Q    Right.

18   A    Yeah.

19   Q    And part of the job of being the director of -- I'm

20   sorry, being the chief financial officer is to manage cash

21   flow, right?

22   A    Yes.

23   Q    And it's not impermissible or uncommon when you have a

24   cash shortage in one account to bring in cash to another

25   account, correct?

*W. Jacoby - Cross/Mr. Menchel*                    1087

1   A     You have to give me more detail.

2   Q     Okay.  Let's go through it.  I want to show you,

3   actually, one other thing I want to talk to you about.

4         There's different types of accounting.  There's

5   something called cash-based accounting, correct?  Cash

6   basis?

7   A     Okay.

8   Q     Are you familiar with that term?

9   A     Sure.

10  Q     And there's what's calls the accrual-based accounting,

11  right?

12  A     Yes.

13  Q     Most companies in the United States are accrual-based,

14  right?

15  A     Yes.

16  Q     All right.  So let's just, and I'm not an accountant,

17  but I think I can with your help explain to the jury what

18  the difference is.

19        Just to make a simple example:  I make hats, baseball

20  caps, okay?

21  A     Yes.

22  Q     And you I'm a wholesaler, you're a retailer.  You buy

23  500 hats from me, I ship you the hats but you haven't paid

24  me yet.

25  A     That's right.

W. Jacoby - Cross/Mr. Menchel                    1088

1    Q    Okay.  Under a cash type of accounting, I can only book

2    the $500 once I get payment from you?

3    A    That's right.

4    Q    That's cash-based accounting?

5    A    Correct.

6    Q    On accrual-based accounting, I can ship you the 500

7    hats, and if I have a reasonable basis to believe you're

8    going to pay me, I can account for the $500 as though I've

9    already earned it, right?

10   A    Yes.

11   Q    That's accrual-based account?

12   A    That's right.

13   Q    And that's the type of accounting that was happening at

14   GPB?

15   A    Yes.

16   Q    And that's perfectly permissible?

17   A    Yes.

18   Q    In fact, it's considered a more efficient way of

19   accounting for large corporations than cash basis, right?

20   A    Yeah, well, GAAP is that cash is for tax, yeah,

21   generally.

22   Q    Okay.  Now, let's go to Defense Exhibit -- this is

23   Tab 33 -- PPPPZ for the witness only.

24        Can you blow it up for the witness?  Do you recognize

25   this document, sir?

W. Jacoby - Cross/Mr. Menchel                    1089

1   A    Can I read it.

2   Q    Absolutely.

3   A    Is it at the bottom, too, or is that the whole thing?

4   Q    What's on the screen for you now is the whole thing.

5   A    Okay.  Right, yes.

6   Q    This is an e-mail chain that you're on with

7   Mr. Frangioni and others regarding these account transfers,

8   right?

9   A    That's right.

10              MR. MENCHEL:  I'd offer it.

11              MR. MCCONNELL:  No objection.

12              THE COURT:  Admitted.

13              (Defendant's Exhibit PPPPZ was marked in

14   evidence.)

15              MR. MENCHEL:  Mr. Chan, if you can publish it,

16   please.

17              COURTROOM DEPUTY:  Okay.

18              (Exhibit published.)

19   Q    Now, the bottom of it is from Mr. Frangioni to you?

20   A    Yes.

21   Q    And the subject is about investment account transfers

22   for GPB Auto Portfolio for September of 2015; is that right?

23   A    Yes.

24   Q    It says, "Bill, per our discussion earlier today,

25   please confirm that GPB Auto Portfolio will be transferring

*W. Jacoby - Cross/Mr. Menchel*                    1090

1    monies from the investment account into the operating and

2    distribution accounts of GPB Auto Portfolio in order to

3    cover fund-level expenses i.e., management fees owed as of

4    8/31, approximately 327K and other fund overhead AP,

5    approximately, 100K.  Also, we need to cover any potential

6    timing shortfalls from investment distributions."

7         Do you see that?

8    A    Yes.

9    Q    And then you responded?

10   A    Yes.

11             MR. MENCHEL:  And you can blow that up, Andy.

12   Q    Yes, agreed and approved.  Correct?

13   A    Yes.

14   Q    Mr. Gentile is not on this e-mail?

15   A    He was never doing this on e-mail, we always did it

16   with text.  Steve would follow up with him on a text, take

17   his text and attach it to the entry.

18   Q    It's your testimony that Mr. Gentile had to approve

19   this?

20   A    Yes, definitely.

21   Q    We have your word to take for that, I guess; is that

22   right?

23   A    No, I think if you go into QuickBooks what he does,

24   Steven Frangioni.  And that when he says, "As per our

25   discussion," that's what we were talking about, he takes

W. Jacoby - Cross/Mr. Menchel                    1091

1    text and he says, "David, I'm moving this money from the

2    investment account to there, do you approve?"  When he gets

3    the text back, he takes a picture of it into his iPhone and

4    attaches it to the QuickBooks entry.

5    Q    You're saying that happened every single time?

6    A    To my knowledge, yes.

7    Q    Okay.  And if we go back to the bottom of this e-mail.

8         One of the -- it says, "We also may need to recover any

9    potential timing shortfalls," do you see that, "from

10   investment distributions."

11   A    Right.

12   Q    Okay.  Now, this word distributions gets a little bit

13   confusing.

14   A    It does, yeah.

15   Q    So let's make sure we're clear for the benefit of the

16   jury.

17        When the money was coming from the portfolio companies

18   to the fund that was also called a distribution, right?

19   A    Yeah, the accounting team was inconsistent about how we

20   used the term "distribution" and "dividend."  So the

21   payments to the investors, really, we should have been more

22   consistent and said dividends.  But since a lot of the

23   documents say "distributions," it gets confusing.

24   Q    Right.  So in this context, what's being discussed is

25   money coming up, the distributions coming up from the

1   portfolio companies into the fund.

2        This is not about the investors, right?

3   A    I believe that's what he referring to there, yes.

4   Q    And what he's saying is, we need this because we may

5   have potential timing shortfalls, correct?

6   A    Yes.

7   Q    One of the things that was happening, excuse me, at the

8   company was that these car dealerships sometimes they were

9   slow, even though they earned the money to put the cash up

10  into the fund, isn't that correct?

11  A    Yes.

12  Q    So you knew the money was coming, you just didn't have

13  it yet?

14  A    Right.  And sometimes you wouldn't know how much was

15  coming.  It was a process.

16  Q    It was a process.

17  A    Yes.

18  Q    As we discussed earlier, as long as you had a

19  reasonable basis to believe the money was coming, you could

20  accrue for it?

21  A    And that's what we did to the financials.

22  Q    And that's why you had no problem with this, correct?

23  A    Yeah.

24  Q    So on this e-mail, I just want to be clear, you don't

25  think you're doing anything wrong here; right?

Case 1:21-cr-00054-RPK-PK   Document 424-2   Filed 07/12/24   Page 241 of 294
PageID #: 14305

W. Jacoby - Cross/Mr. Menchel                    1093

1   A    That's right.

2   Q    Because as long as there's money that you had a

3   reasonable belief that's coming up from the portfolio

4   companies, you can take money out of the investor account as

5   long as you know later on there's going to be enough money

6   to cover it?

7   A    That's the key part, yeah.

8   Q    Okay.

9         MR. MENCHEL:  Let me show you, Mr. McConnell, is

10  this in evidence, this is Government Exhibit 7010.

11        MR. MCCONNELL:  Just give me one second.

12        MR. MENCHEL:  Just take a look at it.  Or it might

13  be a duplicate.

14        MR. MCCONNELL:  I think you objected to this when

15  I tried to put it in but I have no objection if you're

16  putting it in.

17        MR. MENCHEL:  I don't think I did.

18        MR. COLTON:  One moment, your Honor, I'm looking

19  to find it.

20        MR. MENCHEL:  May I have one moment, your Honor.

21        THE COURT:  Sure.

22        (A brief pause in the proceedings was held.)

23        THE COURT:  Are we trying to determine whether

24  it's in or not?

25        MR. MENCHEL:  I think there's a duplicate and I

Anthony D. Frisolone, FAPR, RDR, CRR, CRI, CSR
Official Court Reporter

W. Jacoby - Cross/Mr. Menchel                1094

1    think I have a different number.

2              MR. COLTON:  We're trying to figure it out.

3              THE COURT:  If everybody agrees it should be in,

4    I'm not sure we need to do the recordkeeping now.

5              MR. MCCONNELL:  Yes, it's fine with us.

6              THE COURT:  Okay.  So let's go ahead.

7              MR. MENCHEL:  So I'm admitting this document.

8    It's Government Exhibit 7010.  It maybe a duplicate, I'm not

9    sure.

10             THE COURT:  Admitted.

11             MR. MENCHEL:  Okay.

12             (Government's Exhibit 7010 was marked in

13   evidence.)

14   Q    Let's start at the bottom.

15        This is from Mr. Frangioni to you, correct?

16   A    Yes.

17   Q    It says, "Bill, as discussed, attached is the

18   reconciliation for all transfers made from the investment

19   accounts to the various other accounts to cover numerous

20   cash outflows:  Monthly distributions, fund overhead, et

21   cetera.  Note that month-to-date, we only received a partial

22   dividend/distribution from CM2.

23        That's Country Motors 2?

24   A    Yes.

25   Q    That's what we've also been referring to as Bob's

1    Buick, Mr. Lash's dealership?

2    A    Well, yeah.  Bob's Buick, yes.

3    Q    He ran this dealership, did he not?

4    A    I think he was managing it at the time.

5    Q    Okay.  It says, "$50,539 we have not received any

6    distributions from the other dealerships.  Although GPB

7    Auto Portfolio is not able to cover its monthly

8    distributions from the assets investments it currently

9    holds.  Please confirm that this has been communicated to

10   Jovan, Jeff Schneider, and DG," which is David Gentile;

11   correct?

12   A    Yes.

13   Q    So, in this, Mr. Frangioni is telling you we had to

14   take money out of the investment account to cover shortfalls

15   because we hadn't gotten money from the auto dealerships

16   yet, right?

17   A    Yes.

18   Q    Okay.  And he's actually saying, please make sure this

19   is communicated to Mr. Schneider and Mr. Gentile?

20   A    That's right, yeah.

21   Q    Yet you testified Mr. Gentile would have already known

22   about this, correct?

23   A    Correct.  Yeah, he did.

24   Q    So for whatever reason, Mr. Frangioni seems to think it

25   still had to be recommunicated to Mr. Gentile, correct?

*W. Jacoby - Cross/Mr. Menchel*                    1096

1    A    I know the reason.

2    Q    Okay.

3              MR. MENCHEL:  Can we go to the top, please.

4    Q    "Hi, Jovan, as we discussed previously, we've been

5    forced to use some cash in the fund's investment account due

6    to not receiving some pending accounts receivables in the

7    Automotive Portfolio Fund.  Specifically, it is due in the

8    to getting enough cash on the invested amounts."

9         So this is a perfect example of what we're discussing,

10   right, you know there's money coming.

11        That's an account receivable, yes?

12   A    We believe there's money coming, yeah.

13   Q    It just hit yet?

14   A    That's correct.

15              (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

Jacoby - cross - Menchel                              1097

1   BY MR. MENCHEL:   (Continuing.)

2   Q    But under accrual based accounting that's perfectly

3   appropriate to do this?

4   A    Right.

5   Q    Okay.  And, by the way with car dealerships the business

6   can be cyclical; correct?  Do you know what I mean by that?

7   A    Sure.

8   Q    In other words, certain times of the year cars are sold

9   more frequently than other times of the year; right?

10  A    Yeah.

11  Q    So there may be times when you know you're going to be

12  getting money from the dealerships but this is a particularly

13  dry month or dry season and then there will be more cash

14  coming in the subsequent month or the subsequent season;

15  correct?

16  A    Okay.

17  Q    Is that true?

18  A    It sounds like a reasonable thesis.

19  Q    And as long as you have a reasonable basis to believe

20  that that revenue is coming in, you can accrue for it on your

21  paperwork?

22  A    Say it again.

23  Q    As long as you have a reasonable basis to believe the

24  money is coming in, you can accrue for it as though it's been

25  earned?

Jacoby - cross - Menchel                    1098

1   A    You should, yes.

2   Q    Okay.  So I just want to be clear, this is not an example

3   where you thought moving money from one account to another

4   account was in any way illegal?

5   A    This is not illegal, no.

6   Q    Okay.

7           MR. MENCHEL:  I'm going to pull up DX 6171-C.

8   Hopefully we can pull it up.

9           Can I as the Government to pull up this exhibit?

10  6171-C?  I apologize, your Honor, the technology is a little

11  complicated.

12          THE COURT:  No problem.

13          MR. MENCHEL:  I'll move on and fix this tomorrow.

14          THE COURT:  Sure.

15  Q    I want to show you -- this is tab 93.

16          MR. MENCHEL:  Witness only, please, Andy.

17       (Exhibit published to witness, Counsel and Court only.)

18          MR. MENCHEL:  Blow up the top portion so he can read

19  it and then show him the bottom portion.

20  Q    Mr. Jacoby, let me know when you're done reading the

21  bottom and then I'll show you the top.

22  A    (Reviewing.)

23          Okay.

24  Q    Do you recognize this document?

25  A    I -- I mean it -- I don't recognize it.

Sophie Nolan, RPR - Official Court Reporter

Jacoby - cross - Menchel                    1099

1   Q    You don't remember it, but you recognize it as an e-mail

2   chain that you're on?

3   A    Yeah.

4          MR. MENCHEL:  I'd offer it.  This is Defendant's

5   Exhibit RRRG.

6          MR. McCONNELL:  Can I take a look at it?  I have no

7   objection.

8          THE COURT:  Admitted.

9          (Defendant's Exhibit Defendant's Exhibit RRRG

10  received in evidence.)

11         MR. MENCHEL:  Mr. Chan, if you would please publish.

12         (Exhibit published.)

13  Q    It's a little --

14         MR. MENCHEL:  Go to the bottom of the e-mail first,

15  Andy.

16  Q    It's a little odd, Mr. Jacoby, because it doesn't say who

17  you're sending it to.  I don't know why.

18  A    Me neither.

19  Q    It's from you to, I guess, whomever; correct?

20  A    It's probably -- I'd have to guess.

21  Q    We'll be able to figure it out as we go up the chain.

22  It's a from line not a to line.

23  A    Okay.

24  Q    This is the way it was produced to us.  I'll represent

25  that to you.  It says, "Have a great weekend all.  Holdings II

Sophie Nolan, RPR - Official Court Reporter

Jacoby - cross - Menchel                      1100

1    730k from investment account to cover distributions.

2    Auto Portfolio, 3 million from investment account to cover

3    distributions and management fees."  And then it says, "Note,

4    Holdings I, 1.3 million in cash.  Arkatera (ph) expected to

5    come back in February, timing could be critical to make

6    February distributions.  Actively collecting account

7    receivables"; correct?

8    A    Yes.

9    Q    And if you go up to the top, it looks like you forwarded

10   it to Ms. Kgil, do you see that?

11   A    Yes, I would expect that because the timing of it all

12   she's working on it.

13   Q    She's now in charge?

14   A    Yeah.

15   Q    Is that correct?

16   A    I was helping her out, yeah.

17   Q    So, she's been made aware by this e-mail that the

18   investment accounts are being used to cover distributions in

19   both Holdings II and Auto Portfolio, right?

20   A    Absolutely.

21   Q    Substantial amounts of money?

22   A    Substantial, yes.

23   Q    And she writes, "So we can meet February distributions

24   for holdings, can you please send me all expected payroll

25   allocation for Holdings I?  We can pay out of CH."

Jacoby - cross - Menchel                    1101

1       Do you know what CH is?

2  A    I think it's capital holdings is my guess.

3  Q    "And wait for Arkatera to come back and then reimburse.

4  Let's look at this one by one but wanted to give you a heads

5  up on payroll just for Holdings I.  Thanks."  Do you see that?

6  A    Yes.

7  Q    So neither you nor she is expressing concern once again

8  with the covering of these distributions from the investment

9  account; correct?

10 A    Correct.

11        MR. MENCHEL:  I know this is early, but this may be

12 a good place to break.

13        THE COURT:  Let's break for the weekend.  Next week

14 we're sitting 9:30 to 5 instead of starting at 10.  But we

15 won't sit on Friday because that's a conflict for a lot of

16 you.  So we'll see you on Monday.  Don't talk to anybody about

17 the case.  Don't make up your mind and don't do any research.

18 Thank you.

19        (Jury exits.)

20        (Witness steps down.)

21        MR. MENCHEL:  Your Honor, I would ask you to remind

22 the witness not to speak to --

23        THE COURT:  The Government is not going to speak to

24 the witness or.  Don't speak to the Government's attorney.

25        So, give me a sense of where we are.

Jacoby - cross - Menchel                    1102

1       MR. McCONNELL:  So, next week we've told defense

2   counsel after this witness who I think -- I don't know how

3   much counsel has left, but obviously we have another cross so

4   I imagine we're going to eat into a fair amount of Monday.  We

5   will have another witness available.  We've identified the

6   next two witnesses.

7       Honestly, your Honor, we're running into scheduling

8   problems given the open issues regarding Mr. Lash.

9       THE COURT:  How can I help you all resolve that?  I

10  don't intend to be holding you up.

11      MR. AXELROD:  So, your Honor, the issue from our

12  perspective is we intend to elicit in Mr. Lash's direct the

13  details of what we would call the cover up, but not knowing

14  the contours of that and some of them involve attorneys so we

15  wanted to get clarity on that so we've been holding him.

16      THE COURT:  You are all responding to that by

17  Monday?

18      MR. MENCHEL:  We got the letter last night.  We

19  expect to respond by Monday.

20      MR. AXELROD:  This could be complicated, I don't

21  know, but we may need to give your Honor an additional letter

22  which we'll do as quickly as we can.

23      THE COURT:  All right.

24      MR. McCONNELL:  But assuming that Mr. Lash is off

25  the table, we would likely have some time to fill with a

Jacoby - cross - Menchel                          1103

1   publication witness and we're working out sort of what

2   Wednesday and Thursday would look like and we'll let counsel

3   know as we get some additional clarity on that.

4        I have for their planning purposes let them know of

5   witnesses who are significant who we don't intend to call next

6   week so they can streamline their efforts.  I would just ask

7   that -- because there seems to be a bit of a disagreement.

8   When we do our simultaneous exchange of exhibits it's supposed

9   to be simultaneous.

10       So, my understanding is we're not supposed to be

11  getting defense exhibits that are going to be used on

12  cross-examination 48 hours from when the cross-examination is

13  going to start.  Both sides are to exchange 48 hours before

14  the witness is called.

15       THE COURT:  This is what I asked you all to figure

16  out.

17       MR. McCONNELL:  It doesn't seem --

18       THE COURT:  It just gives you a lot more time with

19  their exhibits than vice versa.

20       MR. McCONNELL:  We're not going to share them with

21  the witness.  It's purely so we can have time to digest them

22  for purposes of raising issues with the Court.  We're not

23  using them in preparation with the witnesses.  We agreed to

24  that.  We're not going to do it.

25       I know with this witness we were in the my middle of

Jacoby - cross - Menchel                    1104

1   reaching some agreement about so we haven't received

2   Mr. Colton's exhibits for this witness and that's fine, but

3   going forward the whole point, as I understood it, of the 48

4   hours was we give each other everything.  We're not going to

5   use it to our tactical advantage, but we want enough time to

6   look through it to prepare substantive issues with the Court.

7            THE COURT:  What is the issue here?

8            MR. COLTON:  The issue is twofold.  There's a matter

9   of practicality.  A, we don't know what the Government is

10   going to bring out with the witness.  We know some of what the

11   Government is going to bring out.  For example, with this

12   witness, given all the 3500 we got, it could have been four

13   weeks' worth of testimony.  He's been interviewed twenty

14   some-odd times.  And, secondly, there's two sets of

15   defendants.  When you're going second you don't know what's

16   covered or doors may be opened up.

17            I'm not looking to prevent the Government from

18   getting the same benefit that we are which is timing it out 48

19   hours before.  Not saying you get 48 and we get 48 and you get

20   12, but we alerted the Court that this witness was more

21   complicated, but it is --

22            THE COURT:  Look, I'll give you 48 hours before you

23   are going to begin your cross.  I don't know how you're going

24   to know that.  It may be with a short witness that's not going

25   to be a material difference but I'll give you 48 hours before

Sophie Nolan, RPR - Official Court Reporter

Jacoby - cross - Menchel                    1105

1    beginning your cross.

2         MR. COLTON:  They're not going to share the exhibits

3    with witnesses.  I don't think so, but I want to be sure.

4         MR. McCONNELL:  Yes, we're not going to do that.

5         MR. COLTON:  With respect to Mr. Lash there's two

6    pending legal issues.

7         MR. AXELROD:  I have an answer.

8         THE COURT:  Yes.

9         MR. AXELROD:  To the extent I am able to give you an

10   answer.

11        That letter, your Honor, was a reference to the

12   Schneider search warrant materials.  I'm not able to inquire

13   into the details of this because it's privileged.

14        THE COURT:  Got it.  I am taking there hasn't been

15   any misrepresentation -- with that in mind I'll try to get

16   something out on this issue.

17        MR. AXELROD:  Your Honor, on that point, I am

18   authorized such as it is to tell you that if you wanted to

19   hear from his counsel, he is willing to do that.  I just can't

20   invade the privilege between them, if that makes sense.

21        THE COURT:  Sure.  I mean, his counsel put in a

22   letter saying -- saying what he -- his client had seen or not

23   seen.

24        MR. AXELROD:  Right.

25        THE COURT:  You don't want to make further inquiry

Jacoby - cross - Menchel                         1106

1    about what the client has seen.

2         MR. AXELROD:  It wasn't intended to be a

3    representation to the Court about 502(d) documents.  To the

4    extent that your Honor wanted that, I can tell you on his

5    behalf that counsel is willing to engage with your Honor.  It

6    might need to be in camera but that's --

7         THE COURT:  Can we talk about this just attorney

8    issue for a moment maybe now that we have a moment we can

9    figure out where we're going with that.  Are you offering --

10   where are you going -- are you going to inquire of this

11   witness about the involvement of attorneys and --

12        MR. MENCHEL:  I was going to show him -- if you give

13   me a second, I'll try to find the e-mail.  There's a lot of

14   paper back here, I apologize.

15        MR. DEARINGTON:  Your Honor, I have Your Honor's

16   ruling.

17        THE COURT:  I've got it in front of me so I was

18   thinking we can talk about it with that in mind.  There was

19   less clarity.  I guess what -- in the operative part I say you

20   can offer this evidence, but I'll limit defendant's ability to

21   focus on -- participation of lawyers -- so I'm just trying to

22   figure out if we're going to highlight the involvement of

23   lawyers or not.

24        MR. MENCHEL:  I'll show you the document.

25        Could you pull up Andy, tab 15.  The exhibit is UUF.

Jacoby - cross - Menchel                     1107

1          THE COURT:  I guess the point is that Paulson L.A.

2    is a law firm, is that your issue?

3          MS. WEIGEL:  Yes, your Honor.

4          THE COURT:  I do not -- there's not a lot of lost

5    lawyer references in here.  I'll consider giving a limiting

6    instruction if you want it.  I'm not sure it's going to be

7    ^ wanted ^ warranted here.

8          MS. WEIGEL:  Your Honor, can we see the entire

9    document?

10          MR. MENCHEL:  Sure it's pretty much what you saw.

11          MS. WEIGEL:  It looks, your Honor, like the bottom

12    has the logo of the law firm and really when you have a

13    signature block like this, it really is signaling that a law

14    firm potentially signed off on the disclosure at issue and for

15    the reasons we've explained, we think it's potentially highly

16    prejudicial because there is no assertion of the advice of

17    counsel.

18          THE COURT:  Do you want me to give instruction about

19    this issue?

20          MS. WEIGEL:  Yes.

21          (Continued on the following page.)

22

23

24

25

Sophie Nolan, RPR - Official Court Reporter

*Proceedings*                                                        1108

1   (Continuing.)

2          MR. COLTON:  Mr. Jacoby testified, we believe,

3   quite falsely, that --

4          THE COURT:  I am going to give you the opportunity

5   to speak.  It might be helpful just to know whether they

6   want a limited instruction and then you can respond.

7          MR. COLTON:  I think the question of whether a

8   limiting instruction is appropriate --

9          THE COURT:  But it's going to moot it if they

10  don't want it.

11         MS. MATHEWS:  Your Honor, I think we may request a

12  limiting instruction depending on the testimony that comes

13  in with respect to the document.

14         MR. COLTON:  So Mr. Jacoby testified that

15  Mr. Schneider wrote the PPMs.  That's just false.  And we

16  intend to prove it.  And the way we are going to prove it is

17  that the lawyers and Mr. Jacoby had a substantial role in

18  drafting the PMMs.  And we can't be limited in bringing that

19  out and the fact that Mr. Peterson or whoever else is a

20  lawyer, the impression given from the stand is that

21  Schneider was a renegade, he was writing documents on his

22  own, we wasn't listening to anybody.

23         The fact of the matter is there were lawyers

24  involved and that's to counteract a charge made by a

25  Government witness.  And that's different than saying we are

*Proceedings*                                                    1109

1    putting imprimatur, like blessing the alleged actions in the

2    case.  We have to be able to demonstrate that lawyers and

3    other professionals were involved in the drafting of the PPM

4    and it wasn't as the witness said, Mr. Schneider.

5           MR. McCONNELL:  Just as a factual matter, your

6    Honor, and then I will turn it back over to co-counsel --

7           MR. COLTON:  It's not this document, per se.  It's

8    a lot of documents.

9           MR. McCONNELL:  The PPM that the witness testified

10   Mr. Schneider quote/unquote wrote was prior to the sending

11   of this e-mail.

12          MR. COLTON:  I have e-mails that predate the PPM.

13          THE COURT:  Well, happy to hear from you, but as a

14   starting point, I think it's fine to offer evidence that

15   somebody other than the defendants wrote this language.  So

16   I think all we're arguing about is whether it's permissible

17   to, I think, make this argument that you are making or put

18   forward evidence to make the argument that you want to make,

19   which is that the fact that there were lawyers involved is

20   probative of something in the case.

21          So the fact not just that it wasn't us who did it,

22   but the fact that the people who wrote this were lawyers is

23   evidence of, what?  Because it does feel like it's an advice

24   of counsel kind of theory.

25          MR. COLTON:  On this particular point, I am just

*Proceedings*                                                    1110

1   alerting the Court what I think will happen Monday, is there

2   is a lawyer involved.  And I think, I'm not going to say,

3   and therefore this was, you know, legally blessed, I am not

4   going to make that argument.

5          I am simply going to say:  You said that

6   Mr. Schneider wrote it, here is the evidence to say it's not

7   so, and here are the e-mails that show it isn't so.

8          THE COURT:  That's fine.  Because that didn't go

9   through a, and that question was a lawyer and so this must

10  have been --

11         Go ahead, Counsel.

12         MR. COGAN:  I think this is broader issue that is

13  going to play out as the case unfolds.  And if that resolves

14  it for this document, we can probably leave it there for

15  purposes of today, but particularly later in the case in the

16  event that the Government calls, particularly, Mr. Anscher,

17  I expect that there is going to be cross-examination --

18         Let me take a step back.

19         The defense's theory, as we explained in our

20  letter, is that responsibility for preparing and drafting

21  the PPM was delegated by Mr. Gentile and GPB to Mr. Anscher

22  and then, in turn, outside counsel.  Okay.  Meaning, in

23  other words, the language that they're now claiming

24  Mr. Gentile committed fraud through, the "no present plans"

25  language, was language that he was not responsible for

*Proceedings*                                                    1111

1    preparing because it had been delegated to other people.

2              In that context, it's relevant who those other

3    people are.  Imagine those people were just people that were

4    just completely unqualified to draft PPMs, right?  The jury

5    might say, wait, you really expect me to believe that

6    Mr. Gentile would have delegated to someone who has to

7    qualification for drafting the legal documents?  Because

8    it's sophisticated counsel and compliance officers that have

9    experience with this, that increases the probability that

10   what we're saying is true, which is that Mr. Gentile

11   delegated this responsibility.

12             And I will tell you this one document, I think, is

13   the tip of the iceberg.  There is overwhelming evidence that

14   other people -- not Mr. Gentile, not Mr. Schneider -- were

15   responsible for preparing this document.  That has nothing

16   to do with good faith; that just has to do with who's

17   responsible for preparing it.

18             THE COURT:  So the theory is you want to show the

19   actual drafters of the allegedly misleading statements were

20   not Mr. Schneider and Mr. Gentile.  And the fact that the

21   alternative authors you are offering are lawyers makes it

22   plausible that his account is true and that he would have

23   actually delegated to those people as opposed to -- that's

24   the theory?

25             MR. AXELROD:  So your Honor, we can look at the

*Proceedings*                                                    1112

1   e-mails and I think we should do it when we get there in the

2   case, but either it's in the documents or not.  I don't

3   think the identity of the person is really going to be the

4   difference maker on whether it's plausible.

5          I would just say that while that was a clever

6   argument, it was incredibly clear that what they really want

7   to do is show that he delegated it to lawyers to establish

8   his good faith.  I think that they're telling you that they

9   want to do advice of counsel light and they have found a way

10  to pitch it, but that's really what they want to do.

11         And the reason we are waiting on the limiting

12  instruction is because we want to see how the questions come

13  in and whether they run afoul of that.  As your Honor knows,

14  we continue to have the position that the reliance questions

15  are not actually directed at materiality.  They're asking

16  reliance questions and that's why I know Your Honor's

17  overruling this, but that's why we keep objecting on that

18  point.  And I think this is a very similar experience and so

19  we want to see how they ask the questions and we will decide

20  if we want a limiting instruction at that point.  But I

21  think he's telling you what he's going to do and it's advice

22  of counsel.

23         THE COURT:  I take your theory, which doesn't go

24  through the advice of counsel defense box.  My concern is

25  kind of limited probative value on that theory for the

*Proceedings*                                                    1113

1   purpose that you are putting it to and there is a risk of

2   prejudice.

3           So if I were to allow that testimony, I would be

4   inclined to give a limiting instruction which says this is

5   what it's being offered for and you are not to consider it

6   for this other purpose.  Because it doesn't sound like you

7   are laying the foundation of, we told the counsel all of the

8   relevance facts, which is what would need to be the case for

9   you to have that.

10          So it sounds like we don't have anything

11  definitive to do now because you want to hear what the

12  questions are.  I'm not sure with respect to this.  I guess

13  I've previewed that if the only issue is Polsinelli is the

14  e-mail suffix there, I'm not inclined to exclude the

15  document.  If you decide you want a limiting instruction,

16  maybe you all can start thinking about what you would want

17  that instruction to be.  I am just trying to avoid us having

18  a whole long discussion of this when the jury is here on

19  Monday.

20          MR. COLTON:  So there's one more tentacle tool.

21          Mr. Jacoby, I think, again, falsely and proven

22  falsely testified that Mr. Schneider was the final word on

23  all marking material.  That was his testimony.  And there

24  was substantial evidence that marketing material was

25  submitted to people like Mr. Schultz and Mr. Anscher who

*Proceedings*                                                      1114

1    were both chief compliance officers and happen to have the

2    title of lawyer and it can't be, at least in my view, that

3    we are now precluded from demonstrating that these materials

4    were run through GPB's Chief Compliance Officer solely

5    because they happen to hold another legal or educational

6    certificate.

7              MR. AXELROD:  I guess two things, your Honor.

8              I think your Honor has teased a distinction

9    between compliance and lawyers and I think I stood up and

10   said we understood that distinction and we're not changing

11   our position on that now.

12             The second thing is sounds like they want to put

13   on a case and they should put on a case in that situation if

14   they want to do that.  I don't think it's proper because it

15   sounds like Mr. Colton might want to do this, to show

16   Mr. Jacoby a bunch of e-mails he's not on from inside

17   Ascendant with other people doing other things that he's not

18   familiar with.  If he wants to put on a witness to discuss

19   that, and establish it and then argue in summation that

20   Mr. Jacoby was wrong because you heard from "x" person, then

21   he should do that.

22             MR. COLTON:  My main intent with Mr. Jacoby is to

23   show him things that we would know.  It's certainly possible

24   I might once or twice try to refresh recollection not by

25   reading documents that are not in evidence, but the general

*Proceedings*                                               1115

1   plan would be to show him things that I honestly believe he

2   has firsthand knowledge of.

3               THE COURT:  Got it.  And your point, you want to

4   put on evidence that these materials were shown to people in

5   GPB's compliance department?

6               MR. COLTON:  Including him.

7               THE COURT:  Including the witness?

8               MR. COLTON:  Yes.

9               THE COURT:  Any issue with that?

10              MR. AXELROD:  I think we just did that.

11              THE COURT:  Right.

12              MR. AXELROD:  I was concerned about e-mails that

13  he's not on.

14              THE COURT:  And I agree with the way you are

15  proposing, that if you are only offering an e-mail that he

16  is not on when he says I don't remember something and you

17  ask him does this refresh your recollection of "x," that's

18  fine.

19              Okay.  Other --

20              MR. AXELROD:  You said he is not on it.

21              THE COURT:  Yes, e-mails he's not on.  He can

22  refresh his recollection with whatever he wants.  If it

23  refreshes his recollection, great; if it doesn't, then we

24  are going to move on.

25              MR. AXELROD:  Got it.

*Proceedings*                                                    1116

1            THE COURT:  Other stuff?  Anything else?

2            So we are on for Monday.  We'll start at 9:30.

3    And in the event that I get letters from you all that tell

4    me there's something to talk about before then, maybe I'll

5    ask you to come in a little bit earlier.

6            MR. McCONNELL:  So we are going to start with the

7    jury at 9:30?

8            THE COURT:  Start with the 9:30.

9            Have a good weekend.

10        (Matter adjourned to Monday, June 24, 2024, 9:30 a.m.)

11              *         *         *         *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1117

1                                  <u>INDEX</u>

2

3

4    <u>WITNESS</u>:                                    <u>PAGE</u>:

5    WILLIAM JACOBY

6          DIRECT EXAMINATION

7          BY MR. MCCONNELL.........................   862

8          CROSS-EXAMINATION

9          BY MR. MENCHEL...........................   956

10

11                            * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1118

1

2                    <u>INDEX OF EXHIBITS</u>

3

4                                                <u>PAGE:</u>

5    Government's Exhibits 7962 and 7962-A and B were

6    marked in evidence................................    872

7    Government's Exhibit 8020 was marked in evidence....    875

8    Government's Exhibits 6038 and 6039 were marked in

9    evidence..........................................    880

10   Government's Exhibit 8021 was marked in evidence....    883

11   Government's Exhibit 2008 was marked in evidence....    884

12   Government Exhibit 7544 was marked in evidence .....    909

13   Government Exhibit 7852 was marked in evidence .....    911

14   Government Exhibit 7475 was marked in evidence .....    913

15   Government Exhibit 7476 was marked in evidence .....    915

16   Government Exhibit 7478 was marked in evidence .....    917

17   Government Exhibit 7480 was marked in evidence .....    919

18   Government Exhibit 749 was marked in evidence ......    922

19   Government Exhibit 7516 was marked in evidence .....    923

20   Government Exhibit 7512 was marked in evidence .....    925

21   Government Exhibit 7524 was marked in evidence .....    926

22   Government Exhibit 7526 was marked in evidence .....    927

23   Government Exhibit 7528 was marked in evidence .....    928

24   Government Exhibit 7530 was marked in evidence .....    928

25   Government Exhibit 7531-A was marked in evidence ...    929

1119

1    Government Exhibit 7531-A was marked in evidence ...    930

2    Government Exhibit 7534 was marked in evidence .....    932

3    Government Exhibit 7901-A was marked in evidence ...    948

4    Government's Exhibit 7392 was marked in evidence....    974

5    Defendant's Exhibit FFFFY-001 was  marked in

6    evidence........................................    978

7    Defendant's Exhibit IID was marked in evidence......    990

8    Government's Exhibit 5026-A was marked in evidence..    992

9    Defendant's Exhibit 7513 was marked in evidence ....    1004

10   Defendant's Exhibit OOD was marked in evidence .....    1005

11   Defendant's Exhibit BB-S was marked in evidence ....    1022

12   Defendant's Exhibit MMMMU was marked in evidence ...    1027

13   Defense Exhibit MMMM-Y was marked in evidence ......    1061

14   Defense Exhibit BBT was marked in evidence .........    1066

15   Defendant's Exhibits QQQQ-H was marked in evidence..    1080

16   Defendant's Exhibit PPPPZ was marked in evidence....    1089

17   Government's Exhibit 7010 was marked in evidence....    1094

18   Defendant's Exhibit Defendant's Exhibit RRRG........    1099

19

20

21                              * * * * *

22

23

24

25

## $

**$1,050,000** [8] - 902:19, 903:15, 903:20, 905:15, 912:18, 930:8, 932:20, 934:2
**$1,100,000** [1] - 972:16
**$1,987,000** [1] - 1011:16
**$10** [4] - 869:16, 947:12, 1082:14
**$100** [1] - 947:11
**$150,000** [1] - 865:18
**$263,137** [1] - 1067:11
**$300,000** [1] - 998:24
**$50,539** [1] - 1095:5
**$500** [2] - 1088:2, 1088:8
**$550** [2] - 1053:18, 1053:23
**$6,586,110** [1] - 934:6
**$60,000** [2] - 1067:18, 1068:3
**$65,785** [1] - 1067:24
**$725,739** [1] - 874:2
**$810,462** [1] - 874:8
**$825,000** [1] - 937:1

## '

**'14** [1] - 870:13
**'15** [2] - 870:15, 937:15
**'16** [4] - 868:16, 965:3, 1062:10
**'Lash** [1] - 1002:18

## 0

**005** [1] - 975:6
**007** [1] - 971:2
**0639** [1] - 880:19
**08** [1] - 1058:8

## 1

**1** [16] - 854:12, 914:5, 930:25, 934:19, 935:18, 941:20, 941:21, 964:6, 976:19, 984:4, 989:8, 1015:15, 1015:16, 1016:6, 1016:12, 1016:13
**1's** [1] - 970:5
**1,014,452** [1] - 1019:3
**1,050,000** [9] - 896:9, 902:10, 902:17, 930:10, 931:15, 931:19, 934:23, 935:16, 1015:11
**1,100,000** [4] - 972:22, 972:24, 973:4, 973:6
**1,427,000** [1] - 934:23
**1-B** [1] - 1067:2
**1-E-mail** [1] - 1052:21
**1.1** [28] - 871:5, 871:13, 882:3, 882:23, 886:13, 887:22, 887:25, 888:12, 889:2, 889:10, 976:2, 976:6, 976:23, 979:20, 980:3, 980:4, 980:14, 980:18, 981:2, 981:15, 981:22, 983:25, 984:3, 984:12, 985:1, 985:12, 989:20, 1019:4
**1.3** [1] - 1100:4
**1.4** [5] - 894:18, 894:20, 895:13, 895:19, 902:16
**1.5** [2] - 950:10, 950:14
**1.9** [1] - 1008:24
**10** [5] - 947:12, 949:14, 1082:5, 1082:11,

1101:14
**10.95** [1] - 947:19
**100** [1] - 926:15
**100.3** [1] - 912:23
**10019** [1] - 854:5
**10022** [1] - 853:21
**1004** [1] - 1119:9
**1005** [1] - 1119:10
**100K** [1] - 1090:5
**1022** [1] - 1119:11
**1027** [1] - 1119:12
**1061** [1] - 1119:13
**1066** [1] - 1119:14
**1080** [1] - 1119:15
**1089** [1] - 1119:16
**1094** [1] - 1119:17
**1099** [1] - 1119:18
**10:12** [1] - 862:2
**11** [1] - 1070:6
**110** [1] - 887:3
**11201** [1] - 853:15
**12** [2] - 1070:18, 1104:20
**120** [1] - 882:24
**12:12** [1] - 954:16
**12th** [2] - 860:13
**13** [6] - 888:5, 935:8, 935:10, 992:9, 993:8, 1018:12
**1301** [1] - 854:4
**133** [1] - 1018:20
**1391** [1] - 864:15
**14** [1] - 990:6
**1438** [1] - 946:16
**15** [6] - 888:2, 935:3, 950:25, 971:19, 1106:25
**154** [1] - 1016:21
**159** [1] - 857:22
**15th** [1] - 964:10
**16** [1] - 949:15
**160** [1] - 1026:21
**162** [1] - 973:24
**17** [3] - 949:25, 993:16, 993:25
**1717** [1] - 854:8
**18** [4] - 874:18, 945:16, 982:19, 1030:1
**18th** [1] - 873:4
**19** [2] - 863:16, 950:20
**197** [3] - 857:22, 858:2
**1:15** [2] - 954:16, 955:6
**1:17** [1] - 956:10
**1st** [4] - 964:7, 964:9, 1056:5, 1064:10

## 2

**2** [12] - 873:25, 892:9, 892:12, 929:4, 931:20, 982:12, 984:5, 988:9, 1015:14, 1016:4, 1016:11, 1094:23
**2,015,000** [1] - 931:13
**2,143,456** [1] - 886:16
**2,498,858** [1] - 886:18
**2-B** [1] - 1067:9
**2-E-mails** [1] - 1064:4
**20** [5] - 881:9, 881:20, 970:11, 995:16, 1027:6
**200** [1] - 998:24
**20006** [1] - 854:9
**2008** [5] - 884:6, 884:12, 884:14, 970:12,

1118:11
**2009** [1] - 1007:5
**2014** [20] - 870:1, 881:9, 881:20, 884:20, 889:2, 933:22, 937:15, 969:4, 969:7, 972:16, 976:2, 976:24, 989:16, 990:4, 1008:22, 1011:11, 1011:14, 1015:14, 1016:11, 1017:14
**2015** [56] - 856:3, 863:13, 863:24, 868:12, 868:16, 870:13, 873:5, 874:18, 875:11, 882:6, 883:17, 890:8, 891:8, 906:20, 912:6, 914:7, 930:25, 932:19, 935:16, 937:10, 950:9, 950:13, 950:18, 964:6, 964:24, 967:2, 969:8, 977:1, 982:25, 993:3, 993:6, 993:19, 993:21, 996:10, 996:23, 1000:2, 1000:4, 1002:19, 1003:4, 1007:23, 1011:20, 1012:1, 1014:4, 1015:15, 1016:12, 1016:21, 1017:15, 1017:16, 1026:25, 1043:21, 1044:3, 1050:9, 1056:10, 1057:6, 1058:25, 1089:22
**2016** [37] - 863:16, 890:11, 908:17, 911:1, 929:4, 931:8, 933:14, 935:18, 935:20, 936:9, 936:10, 941:23, 952:6, 952:7, 956:24, 958:12, 959:4, 967:4, 967:5, 967:6, 967:14, 967:16, 1002:15, 1003:3, 1007:18, 1039:19, 1043:19, 1047:11, 1050:10, 1050:11, 1050:19, 1051:6, 1052:17, 1061:9, 1063:19, 1063:20, 1067:17
**2017** [7] - 949:4, 950:25, 1050:13, 1050:16, 1050:18, 1058:3, 1063:16
**2018** [3] - 945:16, 1000:24, 1064:10
**2019** [2] - 1001:10, 1001:23
**2020** [1] - 857:22
**2024** [2] - 853:7, 1116:10
**21** [1] - 853:7
**21-CR-0054(RPK** [1] - 853:3
**2125** [1] - 933:8
**22** [2] - 908:17, 1084:18
**23** [4] - 875:11, 883:17, 982:25, 1057:16
**23rd** [2] - 875:11, 875:25, 910:25
**24** [1] - 1116:10
**24-month** [1] - 995:20
**25** [5] - 995:16, 999:2, 999:5, 1001:4, 1030:1
**26** [1] - 952:2
**2600** [1] - 854:13
**271** [1] - 853:15
**27th** [1] - 922:19
**28th** [3] - 860:12, 860:13, 931:4
**29** [1] - 1002:15
**29th** [2] - 923:17, 925:15

## 3

**3** [6] - 971:4, 988:25, 1018:1, 1075:6, 1078:23, 1100:2
**3.3** [1] - 934:9
**30** [9] - 882:24, 894:25, 903:6, 952:7, 1082:6, 1082:11, 1082:15
**30th** [3] - 868:14, 908:20, 1041:20
**31** [5] - 889:1, 932:19, 935:16, 972:16, 1007:22
**327K** [1] - 1090:4
**33** [1] - 1088:23

**33131** [1] - 854:13
**34** [1] - 977:16
**3500** [1] - 1104:12
**38** [1] - 950:21
**39** [1] - 951:17
**3rd** [1] - 854:12

---

## 4

**4** [1] - 1068:10
**4,000,642** [1] - 971:9
**4,632,314** [1] - 886:2
**4,642,314** [1] - 886:12
**4-A** [1] - 1067:23
**4.6** [1] - 886:14
**40** [2] - 888:1, 889:16
**400** [1] - 999:5
**403** [1] - 1045:5
**4100** [2] - 993:11, 1018:17
**419** [1] - 934:19
**427** [1] - 934:19
**42nd** [1] - 854:4
**43** [1] - 1058:18
**44** [1] - 1058:20
**48** [9] - 1007:4, 1103:12, 1103:13, 1104:3, 1104:18, 1104:19, 1104:22, 1104:25

---

## 5

**5** [8] - 885:25, 914:2, 933:14, 950:17, 970:11, 1039:19, 1070:5, 1101:14
**5-A** [4] - 1075:7, 1080:11, 1080:12, 1080:20
**5-B** [2] - 1078:23, 1080:19
**50** [5] - 935:18, 995:21, 997:12, 998:13, 1005:10
**500** [2] - 1087:23, 1088:6
**502(d** [1] - 1106:3
**5026-A** [3] - 991:23, 992:7, 1119:8
**57** [1] - 991:21
**59** [2] - 1000:18, 1002:4
**5:00** [1] - 860:23
**5th** [2] - 918:2, 919:25

---

## 6

**6** [2] - 993:19, 1074:6
**60** [1] - 882:24
**6038** [9] - 879:20, 879:23, 880:15, 880:19, 880:23, 881:1, 988:13, 989:4, 1118:8
**6039** [5] - 879:20, 880:7, 880:23, 881:17, 1118:8
**6171-C** [2] - 1098:7, 1098:10
**682** [1] - 890:24
**687** [2] - 858:18, 858:21
**6th** [1] - 919:25

---

## 7

**7** [2] - 970:15, 1058:8
**7-A** [1] - 1027:18

**70** [11] - 895:1, 896:11, 896:19, 898:16, 899:16, 900:14, 900:19, 902:24, 903:2, 903:11, 998:2
**70.4** [1] - 912:24
**7010** [4] - 1093:10, 1094:8, 1094:12, 1119:17
**706** [3] - 857:24, 858:18, 858:21
**730k** [1] - 1100:1
**7392** [3] - 974:6, 974:8, 1119:4
**7475** [4] - 913:5, 913:19, 913:23, 1118:14
**7476** [4] - 914:21, 915:11, 915:14, 1118:15
**7478** [4] - 916:19, 917:14, 917:23, 1118:16
**7480** [5] - 918:21, 919:2, 919:7, 919:14, 1118:17
**749** [2] - 922:3, 1118:18
**7496** [4] - 919:23, 920:1, 920:14, 922:2
**75** [2] - 995:15, 999:3
**7512** [6] - 924:10, 924:12, 924:22, 925:1, 1004:6, 1118:20
**7513** [6] - 1002:5, 1004:4, 1004:7, 1004:11, 1004:24, 1119:9
**7516** [4] - 922:23, 923:10, 923:12, 1118:19
**7524** [4] - 925:17, 925:20, 926:6, 1118:21
**7526** [4] - 927:6, 927:16, 927:19, 1118:22
**7528** [4] - 927:20, 928:10, 928:14, 1118:23
**7530** [4] - 928:15, 928:21, 928:24, 1118:24
**7531-A** [7] - 929:10, 929:14, 929:17, 930:19, 930:21, 1118:25, 1119:1
**7534** [4] - 931:22, 932:3, 932:12, 1119:2
**7544** [4] - 908:11, 908:21, 909:4, 1118:12
**76** [1] - 1032:13
**7682** [1] - 863:7
**7781-3** [1] - 1016:23
**7852** [4] - 910:21, 911:15, 911:18, 1118:13
**7901-A** [3] - 947:24, 948:19, 1119:3
**792** [1] - 1019:11
**7962** [4] - 871:19, 872:21, 872:25, 1118:5
**7962-A** [5] - 872:7, 872:9, 872:14, 872:25, 1118:5
**7962-B** [1] - 872:11

---

## 8

**8** [5] - 885:13, 1057:19, 1066:3, 1068:21
**8/31** [1] - 1090:4
**80** [2] - 894:21, 995:15
**800** [1] - 853:20
**800,000-plus** [1] - 937:6
**801(d** [1] - 857:5
**8020** [5] - 874:24, 875:2, 875:17, 875:20, 1118:7
**8021** [4] - 882:9, 883:4, 883:8, 1118:10
**8162** [2] - 1032:15, 1039:12
**8258-B** [1] - 951:24, 956:23

**862** [1] - 1117:7
**872** [1] - 1118:6
**875** [1] - 1118:7
**880** [1] - 1118:9
**883** [1] - 1118:10
**884** [1] - 1118:11
**8C** [1] - 1068:10

---

## 9

**9** [1] - 1022:4
**90** [2] - 882:24, 947:12
**909** [1] - 1118:12
**911** [1] - 1118:13
**913** [1] - 1118:14
**915** [1] - 1118:15
**917** [1] - 1118:16
**919** [1] - 1118:17
**922** [1] - 1118:18
**923** [1] - 1118:19
**925** [2] - 857:24, 1118:20
**926** [1] - 1118:21
**927** [1] - 1118:22
**928** [2] - 1118:23, 1118:24
**929** [1] - 1118:25
**93** [1] - 1098:15
**930** [1] - 1119:1
**932** [1] - 1119:2
**945** [2] - 858:18, 858:21
**948** [1] - 1119:3
**956** [1] - 1117:9
**967** [2] - 857:21, 858:2
**974** [1] - 1119:4
**978** [1] - 1119:6
**990** [1] - 1119:7
**992** [1] - 1119:8
**9:30** [7] - 853:8, 860:23, 1101:14, 1116:2, 1116:7, 1116:8, 1116:10

---

## A

**a.m** [3] - 853:8, 862:2, 1116:10
**abdominal** [1] - 981:3
**ability** [5] - 890:17, 894:15, 1045:3, 1085:4, 1106:20
**able** [14] - 860:12, 862:9, 917:16, 942:20, 983:4, 1010:6, 1013:3, 1022:12, 1066:5, 1095:7, 1099:21, 1105:9, 1105:12, 1109:2
**absolutely** [7] - 951:2, 960:2, 1003:13, 1030:11, 1069:15, 1089:2, 1100:20
**accept** [2] - 953:3, 1003:13
**acceptable** [2] - 861:6, 954:1
**accepted** [5] - 1006:25, 1007:25, 1021:15, 1021:17, 1022:16
**accord** [1] - 966:12
**accordance** [1] - 1007:24
**according** [7] - 925:9, 933:25, 965:21, 993:22, 998:14, 1019:13, 1020:1
**accordingly** [1] - 859:22
**account** [39] - 864:4, 864:8, 864:11, 864:17, 864:25, 865:9, 865:11, 865:14, 865:19, 918:11, 959:21, 961:24, 961:25, 1063:3, 1084:25, 1085:1, 1085:21,

1085:22, 1086:13, 1086:24, 1086:25, 1088:8, 1088:11, 1089:7, 1089:21, 1090:1, 1091:2, 1093:4, 1095:14, 1096:5, 1096:11, 1098:3, 1098:4, 1100:1, 1100:2, 1100:6, 1101:9, 1111:22

**Accountant** [3] - 1047:19, 1047:21, 1049:4

**accountant** [5] - 876:5, 876:9, 958:19, 1047:20, 1087:16

**accountants** [3] - 875:13, 893:22, 933:20

**accounted** [1] - 887:22, 892:11, 934:16

**accounting** [38] - 867:5, 867:9, 867:16, 877:15, 878:5, 885:8, 887:7, 895:24, 896:7, 898:7, 902:10, 911:25, 912:2, 916:12, 916:15, 916:25, 918:8, 943:3, 967:16, 974:15, 974:23, 975:11, 1007:24, 1039:23, 1049:19, 1049:21, 1049:24, 1049:25, 1087:4, 1087:5, 1087:10, 1088:1, 1088:4, 1088:6, 1088:13, 1088:19, 1091:19, 1097:2

**accounts** [12] - 909:23, 959:22, 1085:20, 1086:7, 1086:10, 1086:11, 1086:15, 1090:2, 1094:19, 1096:6, 1100:18

**accredited** [1] - 999:8

**accrual** [5] - 1087:10, 1087:13, 1088:6, 1088:11, 1097:2

**accrual-based** [4] - 1087:10, 1087:13, 1088:6, 1088:11

**accrue** [4] - 892:9, 1092:20, 1097:24

**accrued** [1] - 976:25

**accuracy** [1] - 958:17

**accurate** [17] - 867:12, 868:1, 893:13, 916:14, 940:22, 940:23, 947:17, 949:12, 951:1, 951:19, 959:19, 1020:13, 1023:9, 1050:22, 1054:1, 1074:12, 1080:25

**accurately** [2] - 898:17, 947:3

**accusing** [1] - 1064:18

**acknowledge** [1] - 916:13

**acquire** [1] - 995:15

**act** [1] - 1048:10

**action** [1] - 898:9

**actions** [2] - 1025:1, 1109:1

**actively** [1] - 1100:6

**actual** [12] - 871:14, 876:1, 877:3, 878:3, 879:14, 881:3, 882:18, 935:20, 947:5, 990:3, 1020:5, 1111:19

**ADD** [3] - 1026:8, 1026:24, 1027:22

**add** [4] - 984:10, 984:11, 984:12, 1085:19

**added** [3] - 882:2, 1015:10, 1044:16

**addition** [6] - 912:16, 966:22, 1021:23, 1051:15, 1051:17, 1054:9

**additional** [6] - 912:8, 950:2, 1054:24, 1055:3, 1102:21, 1103:3

**additionally** [1] - 995:19

**adds** [1] - 1038:21

**adjourned** [1] - 1116:10

**administrator** [2] - 864:13, 917:9

**admissible** [3] - 856:15, 898:9, 1038:21

**admission** [2] - 974:2, 977:18

**admit** [1] - 1080:6

**admitted** [35] - 872:24, 875:19, 880:22, 883:7, 884:13, 908:24, 911:17, 913:22,

915:13, 917:21, 919:6, 920:15, 923:11, 924:25, 926:5, 927:18, 928:13, 928:23, 929:16, 930:20, 932:11, 948:17, 974:7, 978:20, 990:11, 992:2, 992:6, 1004:10, 1005:4, 1022:23, 1061:4, 1066:17, 1089:12, 1094:10, 1099:8

**admitting** [2] - 1010:9, 1094:7

**ADRIANA** [1] - 853:22

**advantage** [1] - 1104:5

**advertising** [1] - 996:7

**advice** [6] - 1043:5, 1107:16, 1109:23, 1112:9, 1112:21, 1112:24

**advise** [1] - 877:4

**advisement** [1] - 895:23

**advisors** [5] - 866:23, 903:8, 907:10, 1026:16, 1042:11

**affect** [2] - 1083:16, 1084:13

**affecting** [2] - 1061:16, 1061:20

**affidavit** [1] - 1076:11

**afoot** [2] - 967:19, 968:8

**afoul** [2] - 1042:16, 1112:13

**afternoon** [4] - 956:1, 956:16, 956:17, 1032:23

**afterwards** [1] - 984:23

**ago** [6] - 857:4, 877:13, 931:4, 978:25, 1047:7, 1071:14

**agree** [6] - 859:21, 869:12, 869:14, 991:10, 1070:19, 1115:14

**agreeable** [1] - 939:2

**agreed** [8] - 906:3, 917:20, 957:22, 964:18, 1024:2, 1067:11, 1090:12, 1103:23

**agreeing** [1] - 1068:16

**agreement** [30] - 876:1, 878:22, 879:14, 883:18, 931:18, 936:19, 945:18, 981:11, 990:22, 1004:18, 1004:19, 1021:3, 1022:14, 1048:17, 1063:22, 1065:10, 1065:12, 1065:14, 1065:20, 1066:12, 1066:22, 1069:17, 1069:21, 1069:24, 1071:16, 1071:18, 1071:21, 1072:1, 1072:5, 1104:1

**agreements** [17] - 876:19, 876:24, 876:25, 877:3, 877:14, 877:16, 877:20, 878:3, 878:6, 879:10, 888:14, 888:16, 969:20, 972:2, 1004:14, 1065:11

**agrees** [1] - 1094:3

**ahead** [10] - 862:22, 899:3, 902:5, 956:11, 958:7, 964:19, 964:20, 1019:25, 1047:3, 1076:3, 1094:6, 1110:11

**aided** [1] - 854:18

**air** [3] - 1052:4, 1052:11, 1052:21

**airplane** [2] - 1053:13, 1055:2

**airport** [1] - 891:20

**AI** [1] - 1002:8

**alarming** [1] - 953:17

**alert** [1] - 906:24

**alerted** [2] - 907:1, 1104:20

**alerting** [4] - 923:3, 923:7, 925:7, 1110:1

**allegations** [2] - 1061:19, 1076:12

**alleged** [5] - 856:18, 859:13, 898:15, 898:16, 1109:1

**allegedly** [1] - 1111:19

**allocation** [2] - 917:8, 1100:25

**allow** [8] - 921:5, 1037:24, 1038:25, 1057:22, 1074:5, 1080:6, 1083:10, 1113:3

**allowed** [2] - 1034:1, 1063:22

**almost** [2] - 966:4, 1061:11

**alternative** [2] - 981:11, 1111:21

**amended** [1] - 856:17

**amending** [1] - 952:24

**amendment** [7] - 856:16, 857:5, 857:6, 857:17, 857:25, 953:12, 953:13

**AMERICA** [1] - 853:3

**America** [2] - 855:2, 1007:25

**Americas** [1] - 854:4

**amicable** [1] - 1068:17

**amiss** [1] - 1059:23

**amount** [34] - 865:17, 866:5, 871:11, 874:1, 874:15, 887:20, 888:20, 888:21, 899:6, 902:16, 902:19, 902:22, 903:12, 905:14, 914:7, 924:3, 930:7, 930:8, 930:9, 931:10, 931:15, 933:1, 943:2, 972:14, 972:15, 1009:20, 1015:9, 1026:17, 1051:17, 1067:24, 1068:2, 1102:4

**amounts** [12] - 872:15, 872:16, 882:2, 883:15, 886:13, 932:19, 954:4, 977:9, 979:19, 980:13, 1096:8, 1100:21

**analysts** [1] - 1061:21

**analyzed** [2] - 947:15, 951:12

**AND** [1] - 853:12

**Andy** [39] - 957:2, 957:11, 970:11, 970:15, 971:2, 971:8, 975:14, 976:1, 976:17, 977:16, 978:3, 979:12, 983:3, 983:14, 992:9, 1010:2, 1011:5, 1017:6, 1017:25, 1018:21, 1019:20, 1022:11, 1027:17, 1060:21, 1060:25, 1066:1, 1067:15, 1068:23, 1070:5, 1070:18, 1072:20, 1072:25, 1075:6, 1078:22, 1080:19, 1090:11, 1098:16, 1099:15, 1106:25

**announcement** [1] - 983:18

**annualized** [1] - 949:16

**Anscher** [14] - 891:20, 928:4, 937:11, 937:13, 952:23, 963:9, 963:10, 1040:14, 1040:18, 1047:7, 1052:15, 1110:16, 1110:21, 1113:25

**answer** [22] - 899:19, 900:22, 902:3, 908:5, 938:7, 942:10, 942:11, 983:24, 987:8, 1001:20, 1003:15, 1003:18, 1030:17, 1031:7, 1031:9, 1051:19, 1071:7, 1072:4, 1080:19, 1083:23, 1105:7, 1105:10

**Answer** [2] - 1030:25, 1031:4

**answered** [10] - 1060:7, 1061:16, 1061:23, 1062:15, 1078:13, 1078:15, 1078:17, 1078:24, 1080:17, 1080:24

**answering** [2] - 1060:5, 1078:18

**answers** [1] - 1030:19

**anticipate** [1] - 995:17

**anticipated** [3] - 903:10, 996:5, 1067:17

**anticipating** [1] - 1003:7

**anxious** [1] - 925:13

**anyway** [1] - 1006:13

**AP** [1] - 1090:4

**Apeksha** [1] - 855:14

**APEKSHA** [1] - 854:6

**apologies** [2] - 898:3, 957:5

**apologize** [5] - 909:6, 914:25, 971:8, 1098:10, 1106:14

**applicable** [1] - 1069:5

(apply    believer)

**apply** [2] - 943:2, 959:1
**applying** [1] - 987:23
**appreciate** [2] - 859:19, 975:22
**approach** [2] - 897:4, 937:18
**approaches** [1] - 1014:15
**appropriate** [3] - 1025:1, 1097:3, 1108:8
**approval** [1] - 1085:8
**approve** [10] - 943:4, 1035:11, 1041:24, 1085:5, 1085:7, 1085:14, 1085:15, 1085:16, 1090:18, 1091:2
**approved** [3] - 1035:9, 1041:19, 1090:12
**approximate** [1] - 888:1
**April** [31] - 864:1, 868:8, 868:11, 868:14, 868:16, 870:11, 870:13, 890:11, 908:20, 914:2, 918:2, 919:25, 922:19, 923:17, 925:15, 925:16, 931:4, 935:18, 935:20, 950:9, 950:13, 982:25, 1002:15, 1003:3, 1026:25, 1057:2, 1057:4, 1057:6, 1063:16, 1063:25
**area** [1] - 1043:8
**ARENT** [2] - 854:2, 854:7
**Arete** [1] - 985:11
**Arete's** [1] - 987:6
**aretewealth.com** [1] - 975:15
**argue** [2] - 1003:20, 1114:19
**arguing** [2] - 1046:9, 1109:16
**argument** [4] - 1109:17, 1109:18, 1110:4, 1112:6
**Ariti** [1] - 984:22
**arkatera** [1] - 1100:4
**Arkatera** [1] - 1101:3
**Arlington** [1] - 1021:9
**arrived** [1] - 954:9
**articulates** [1] - 930:7
**ARTIE** [1] - 853:16
**Artie** [1] - 855:5
**Ascendant** [15] - 866:12, 866:14, 866:22, 891:13, 907:6, 907:9, 923:4, 944:22, 948:6, 963:3, 975:10, 1029:14, 1031:5, 1031:17, 1114:17
**aspect** [1] - 997:11
**asserted** [3] - 1036:16, 1037:19, 1044:11
**assertion** [1] - 1107:16
**assessment** [1] - 1062:1
**assessments** [1] - 1062:4
**assets** [3] - 1023:7, 1026:17, 1095:8
**assistance** [1] - 934:19
**Assistant** [1] - 853:18
**assume** [1] - 939:10
**assuming** [2] - 910:12, 1102:24
**Assurance** [1] - 952:3
**assurance** [1] - 1084:12
**attach** [1] - 1090:17
**attached** [9] - 872:5, 912:22, 929:7, 979:16, 983:19, 984:1, 1005:10, 1018:22, 1094:17
**attaches** [1] - 1091:4
**attaching** [1] - 980:17
**attachment** [12] - 908:25, 909:2, 909:7, 909:10, 909:16, 910:10, 928:25, 1002:19, 1002:21, 1034:11, 1041:12, 1077:5
**Attachment** [1] - 983:3
**attachments** [5] - 872:4, 872:22, 873:16, 1075:20, 1077:9

**attacked** [3] - 857:8, 857:14, 857:17
**attempt** [1] - 1033:12, 1081:20
**attempting** [1] - 1037:13
**attention** [6] - 870:1, 890:5, 932:17, 1027:6, 1063:2, 1068:9
**attorney** [4] - 1047:24, 1047:25, 1101:24, 1106:7
**Attorney** [1] - 854:11
**ATTORNEY'S** [1] - 853:14
**Attorneys** [2] - 853:18, 854:7
**attorneys** [4] - 853:19, 854:3, 1102:14, 1106:11
**attributing** [1] - 1046:4
**audit** [38] - 867:24, 870:1, 871:3, 871:16, 876:2, 876:17, 882:6, 890:5, 890:9, 891:9, 892:21, 893:13, 903:13, 903:16, 904:17, 908:9, 908:15, 909:23, 913:14, 913:17, 922:15, 924:13, 942:5, 964:12, 967:6, 967:14, 967:17, 977:5, 989:21, 1004:13, 1004:17, 1004:20, 1006:19, 1006:20, 1006:21, 1010:20, 1014:25, 1063:25
**audited** [33] - 856:5, 866:24, 867:2, 867:5, 867:6, 867:13, 867:15, 867:21, 868:18, 870:5, 884:4, 884:19, 885:9, 885:25, 889:19, 892:14, 906:20, 907:11, 908:18, 917:6, 931:25, 933:5, 933:10, 934:15, 937:9, 937:13, 938:5, 969:11, 970:5, 976:3, 976:7, 976:24, 987:19
**auditing** [3] - 904:19, 914:19, 1005:12
**auditor** [12] - 867:22, 904:17, 905:3, 908:14, 909:19, 913:12, 914:11, 925:24, 933:3, 967:18, 968:7, 1002:13
**auditors** [32] - 861:15, 870:19, 877:9, 878:23, 883:1, 885:6, 885:7, 903:14, 903:19, 904:5, 925:4, 925:21, 926:11, 927:4, 928:18, 966:24, 967:24, 968:4, 1000:15, 1001:11, 1001:17, 1002:9, 1002:22, 1003:3, 1004:13, 1004:19, 1005:15, 1006:15, 1007:10, 1007:17, 1010:21, 1063:9
**audits** [6] - 856:4, 877:1, 967:2, 967:4, 967:6, 1004:3
**Austin** [3] - 906:25, 907:6, 923:4
**authenticate** [3] - 978:12, 1013:3, 1033:6
**author** [1] - 1046:8
**authorized** [1] - 1105:18
**authors** [2] - 1045:8, 1111:21
**Auto** [13] - 876:6, 910:6, 912:8, 912:24, 1016:21, 1017:13, 1089:22, 1089:25, 1090:2, 1095:7, 1100:2, 1100:19
**auto** [2] - 879:6, 1095:15
**Auto fund** [2] - 879:2, 1017:14
**automobile** [1] - 995:7
**Automotive** [22] - 863:8, 863:14, 863:23, 890:6, 890:8, 890:17, 891:1, 891:10, 892:23, 906:21, 909:25, 914:4, 937:10, 943:8, 943:19, 946:22, 947:19, 950:13, 956:24, 1007:22, 1018:13, 1096:7
**automotive** [3] - 951:24, 1008:5, 1018:25
**available** [9] - 925:15, 942:4, 964:11, 967:17, 1063:24, 1080:22, 1085:10, 1085:17, 1102:5

**Avenue** [3] - 854:4, 854:12
**avoid** [3] - 900:24, 1045:19, 1113:17
**award** [1] - 946:6
**aware** [29] - 874:11, 922:13, 924:8, 952:19, 969:16, 985:9, 986:8, 986:10, 987:5, 987:9, 997:25, 1000:2, 1003:8, 1006:24, 1007:2, 1007:11, 1024:24, 1042:7, 1048:7, 1050:15, 1052:20, 1053:2, 1053:7, 1053:9, 1061:19, 1068:14, 1081:15, 1082:5, 1100:17
**aXELROD** [1] - 1105:9
**AXELROD** [19] - 853:17, 860:19, 899:22, 939:17, 1044:13, 1044:18, 1045:1, 1102:11, 1102:20, 1105:7, 1105:17, 1105:24, 1106:2, 1111:25, 1114:7, 1115:10, 1115:12, 1115:20, 1115:25
**Axelrod** [1] - 855:6

## B

**back-and-forth** [2] - 868:3, 868:5
**backdated** [6] - 1001:12, 1001:17, 1001:25, 1006:24, 1007:11, 1007:12
**backdating** [1] - 1000:1
**backed** [2] - 1015:8, 1015:11
**background** [3] - 900:2, 921:5, 1048:24
**bad** [1] - 893:16
**BADELL** [1] - 853:22
**badly** [1] - 1068:17
**balance** [1] - 935:18
**balances** [2] - 909:23, 944:1, 1086:7
**bank** [3] - 909:23, 944:1, 1086:7
**base** [1] - 1067:11
**baseball** [1] - 1087:19
**based** [9] - 914:12, 1035:23, 1087:5, 1087:10, 1087:13, 1088:4, 1088:6, 1088:11, 1097:2
**basis** [15] - 942:4, 949:20, 964:11, 973:11, 986:14, 1011:7, 1015:5, 1037:11, 1045:13, 1087:6, 1088:7, 1088:19, 1092:19, 1097:19, 1097:23
**Bates** [20] - 855:8, 863:8, 863:10, 873:3, 875:23, 876:13, 877:11, 878:25, 879:21, 885:22, 888:3, 910:8, 914:23, 917:24, 920:2, 922:5, 929:2, 971:2, 971:19, 1058:20
**bates** [1] - 890:25
**BATES** [1] - 885:23
**BB** [3] - 1022:5, 1022:24, 1119:11
**BB-S** [3] - 1022:5, 1022:24, 1119:11
**BBT** [3] - 1065:17, 1066:18, 1119:14
**bear** [1] - 973:23
**became** [5] - 864:10, 963:10, 969:16, 1055:22, 1056:25
**become** [3] - 890:2, 941:10, 941:13
**becomes** [1] - 860:21
**began** [1] - 1056:7
**begin** [1] - 1104:23
**beginning** [6] - 975:1, 992:15, 1017:3, 1051:9, 1056:22, 1105:1
**behalf** [3] - 855:11, 855:15, 1106:5
**behest** [1] - 1043:19
**belief** [4] - 938:18, 1084:15, 1084:16, 1093:3
**believer** [1] - 991:8

**belonging** [2] - 1070:20, 1070:24
**below** [4] - 886:22, 978:4, 979:8, 979:18
**benefit** [3] - 1040:17, 1091:15, 1104:18
**benefits** [1] - 1067:23
**best** [6] - 894:12, 895:21, 900:24, 1006:22, 1020:14, 1024:8
**better** [7] - 858:6, 858:15, 864:2, 892:19, 893:19, 903:6, 1056:16
**between** [11] - 912:9, 913:12, 916:21, 923:24, 988:17, 990:22, 996:24, 1082:5, 1084:25, 1105:20, 1114:9
**big** [8] - 863:11, 886:8, 891:23, 933:18, 933:19, 991:8, 1049:21, 1049:24
**bigger** [2] - 973:4, 1062:6
**biggest** [1] - 1049:25
**bill** [5] - 873:13, 882:22, 1053:22, 1054:13, 1054:15
**Bill** [3] - 1010:18, 1089:24, 1094:17
**billed** [2] - 1054:5, 1054:7
**bills** [1] - 1053:11
**BINHAK** [2] - 854:11, 854:14
**bit** [14] - 862:10, 869:20, 882:14, 891:22, 920:3, 921:6, 1010:23, 1019:7, 1027:17, 1056:16, 1085:13, 1091:12, 1103:7, 1116:5
**blaming** [1] - 893:16
**blank** [2] - 925:11, 984:7
**blessed** [1] - 1110:3
**blessing** [1] - 1109:1
**blips** [1] - 899:14
**block** [1] - 1107:13
**blow** [22] - 913:6, 933:25, 957:3, 974:10, 975:7, 978:3, 978:23, 979:12, 980:11, 1007:9, 1011:5, 1017:7, 1017:25, 1022:9, 1023:3, 1027:18, 1030:1, 1068:22, 1088:24, 1090:11, 1098:18
**blower** [1] - 859:12
**blowing** [1] - 1048:16
**blurt** [1] - 861:9
**blurted** [1] - 898:23
**Bob's** [1] - 993:4
**Bob's Buick** [17] - 905:13, 1008:9, 1008:13, 1008:17, 1009:22, 1009:23, 1011:10, 1011:19, 1012:1, 1014:4, 1014:19, 1015:7, 1015:10, 1015:13, 1016:11, 1094:25, 1095:2
**bod** [1] - 1005:7
**body** [4] - 922:10, 945:4, 1041:15, 1041:17
**bold** [1] - 886:9
**bond** [1] - 887:1
**bonds** [1] - 945:6
**bonus** [3] - 893:19, 894:1, 1067:17
**book** [2] - 971:11, 1088:1
**booked** [10] - 856:5, 934:15, 934:24, 960:11, 962:18, 969:7, 997:12, 997:13, 1052:11, 1053:9
**books** [4] - 867:4, 889:24, 892:14, 918:12
**borrow** [3] - 943:10, 943:20, 943:22
**boss** [2] - 963:10, 1076:4
**bottom** [36] - 875:23, 885:13, 887:16, 891:3, 914:2, 922:4, 930:16, 931:6, 948:23, 950:21, 975:5, 975:7, 975:25, 977:8, 978:23, 980:9, 981:21, 982:12, 983:13, 983:14, 1005:7, 1017:23, 1038:1,
1038:15, 1039:13, 1058:20, 1068:20, 1070:10, 1089:3, 1089:19, 1091:7, 1094:14, 1098:19, 1098:21, 1099:14, 1107:11
**box** [1] - 1112:24
**branches** [1] - 919:12
**brand** [1] - 943:9
**brands** [1] - 936:4
**break** [16] - 877:19, 902:7, 907:4, 939:15, 939:18, 940:2, 940:4, 940:5, 954:15, 956:23, 957:6, 969:5, 1032:24, 1038:10, 1101:12, 1101:13
**breakdown** [1] - 976:1, 976:9, 985:1
**breaking** [2] - 965:6, 966:7
**Brengel** [8] - 911:7, 911:23, 911:24, 916:15, 916:23, 916:25, 918:14, 920:13
**Brian** [6] - 876:1, 876:4, 876:14, 883:11, 911:23, 974:12
**brief** [8] - 858:22, 861:19, 861:25, 920:17, 978:2, 1049:16, 1084:20, 1093:22
**briefly** [3] - 855:21, 861:13, 887:10
**bring** [6] - 857:15, 1043:3, 1046:21, 1086:24, 1104:10, 1104:11
**bringing** [1] - 1108:18
**broader** [1] - 1110:12
**broke** [2] - 863:3, 891:16
**broken** [2] - 887:9, 903:9
**broker** [1] - 976:14
**broker-dealers** [1] - 976:14
**brokers** [6] - 866:22, 903:7, 907:9, 907:14, 953:13, 975:20
**Brooklyn** [2] - 853:5, 853:15
**brought** [4] - 857:7, 1021:23, 1049:19, 1063:2
**BUCKLEY** [1] - 853:21
**Buckley** [1] - 855:11
**Buick** [2] - 931:16, 1055:13
**build** [2] - 900:1, 1023:7
**bullet** [5] - 975:25, 976:1, 976:16, 976:23, 1023:1
**bunch** [3] - 861:14, 1073:17, 1114:16
**business** [16] - 903:24, 914:16, 915:5, 915:22, 942:2, 944:4, 944:7, 960:23, 981:10, 998:22, 1010:9, 1010:10, 1054:11, 1054:12, 1054:15, 1097:5
**businesses** [1] - 879:7
**busy** [5] - 1025:12, 1025:14, 1025:15, 1025:17, 1025:22
**buy** [6] - 886:25, 887:1, 943:10, 943:17, 999:7, 1087:22

# C

**Cadman** [1] - 853:15
**calculated** [4] - 872:16, 902:22, 946:6, 1081:18
**calculations** [1] - 912:22
**camera** [1] - 1106:6
**cannot** [2] - 1003:13, 1069:22
**capabilities** [2] - 1023:2, 1023:5
**capacities** [1] - 966:5
**capacity** [5] - 949:7, 1020:17, 1020:19, 1021:14, 1026:4
**capital** [11] - 865:16, 866:1, 866:5,
896:13, 900:12, 912:17, 943:24, 952:17, 954:4, 1018:8, 1101:2
**Capital** [5] - 891:13, 912:18, 914:4, 944:22, 1029:14
**caps** [1] - 1087:20
**car** [18] - 856:6, 869:13, 869:17, 870:24, 936:2, 943:11, 943:16, 943:17, 943:18, 944:3, 972:10, 972:12, 992:20, 992:21, 992:23, 1092:8, 1097:5
**care** [3] - 1045:21, 1046:20, 1046:21
**careful** [1] - 977:4
**cars** [1] - 1097:8
**Carter** [2] - 935:23, 936:3
**case** [39] - 856:1, 856:20, 857:3, 857:19, 857:22, 857:23, 858:23, 865:17, 869:12, 882:22, 900:10, 900:20, 917:4, 946:9, 954:18, 973:9, 990:22, 992:17, 1000:21, 1046:13, 1052:22, 1055:24, 1083:3, 1083:19, 1084:3, 1084:5, 1084:6, 1084:8, 1085:17, 1101:17, 1109:2, 1109:20, 1110:13, 1110:15, 1112:2, 1113:8, 1114:13
**cases** [4] - 888:10, 935:7, 971:20, 972:2, 1083:24
**cash** [39] - 886:25, 887:4, 887:12, 887:15, 895:3, 916:2, 950:1, 950:10, 950:14, 950:23, 951:6, 951:12, 954:11, 960:4, 976:24, 995:22, 1007:23, 1019:17, 1019:21, 1086:7, 1086:20, 1086:24, 1087:5, 1088:1, 1088:4, 1088:19, 1088:20, 1092:9, 1094:20, 1096:5, 1096:8, 1097:13, 1100:4
**cash-based** [2] - 1087:5, 1088:4
**cash-on-cash** [3] - 950:23, 951:12, 995:22
**catch** [1] - 862:10
**catching** [1] - 903:10
**categories** [1] - 886:8
**category** [1] - 898:6
**cc'd** [1] - 974:24
**cc'ing** [1] - 882:15
**CCd** [1] - 1042:6
**CCO** [1] - 1027:15
**Central** [2] - 943:8, 943:19
**certain** [15] - 869:15, 869:19, 869:22, 877:13, 877:20, 888:20, 969:17, 972:14, 972:22, 990:24, 1015:24, 1026:17, 1026:18, 1029:13, 1097:8
**certainly** [6] - 969:1, 1016:3, 1044:23, 1046:18, 1062:11, 1114:23
**certificate** [1] - 1114:6
**Certified** [3] - 1047:18, 1047:21, 1049:4
**cetera** [2] - 876:19, 1094:21
**CFO** [3] - 969:13, 994:4, 1039:24
**CH** [2] - 1100:25, 1101:1
**chain** [11] - 875:8, 875:12, 878:25, 919:11, 925:19, 975:2, 1005:7, 1035:16, 1089:6, 1099:2, 1099:21
**challenge** [1] - 858:24
**challenged** [1] - 859:2
**Chan** [9] - 970:16, 989:3, 993:12, 1002:6, 1039:14, 1061:6, 1080:10, 1089:15, 1099:11
**chance** [4] - 861:10, 926:16, 1033:4, 1069:23
**change** [10] - 906:1, 923:6, 932:8,

940:15, 941:2, 949:17, 953:4, 953:24, 981:3, 1016:17

**changed** [9] - 857:11, 858:19, 905:11, 931:25, 932:18, 934:22, 953:14, 997:20, 1029:7

**changes** [5] - 906:23, 917:11, 1029:9, 1049:14, 1049:18

**changing** [1] - 1114:10

**character** [1] - 1037:13

**characterized** [1] - 1037:6

**charge** [5] - 866:13, 1029:6, 1040:11, 1100:13, 1108:24

**charged** [10] - 856:4, 894:15, 894:19, 900:4, 945:4, 966:17, 1046:3, 1051:15, 1051:16, 1053:4

**charging** [1] - 940:18

**chart** [4] - 946:25, 978:4, 979:13, 989:14

**chase** [1] - 882:16

**chasing** [3] - 918:2, 918:9, 928:3

**check** [6] - 861:11, 880:12, 880:13, 881:14, 909:22, 917:18

**Chief** [15] - 889:23, 1029:5, 1030:24, 1032:3, 1040:17, 1047:7, 1048:1, 1048:4, 1048:7, 1048:11, 1048:22, 1060:1, 1060:2, 1114:4

**chief** [31] - 856:8, 864:17, 867:19, 868:17, 874:10, 924:7, 963:15, 966:5, 966:25, 969:14, 1020:17, 1020:19, 1020:22, 1020:25, 1021:5, 1021:6, 1021:7, 1021:9, 1021:12, 1021:15, 1021:17, 1021:18, 1021:24, 1023:23, 1023:24, 1024:2, 1024:10, 1027:14, 1027:15, 1086:20, 1114:1

**chronologically** [1] - 875:24

**chronology** [2] - 856:2, 1040:16

**circles** [1] - 995:7

**cite** [5] - 857:23, 858:1, 858:15, 858:17, 858:19

**Citrin** [1] - 1063:7

**City** [4] - 926:24, 927:13, 928:5, 982:8

**claim** [2] - 1032:6, 1034:7

**claiming** [1] - 1110:23

**claims** [1] - 1034:1

**clarify** [4] - 976:16, 976:22, 1031:8, 1031:13

**clarity** [3] - 1102:15, 1103:3, 1106:19

**class** [1] - 995:8

**classes** [1] - 1063:3

**classic** [2] - 1033:16, 1076:15

**clause** [1] - 1068:12

**clean** [3] - 1006:20, 1008:1, 1008:2

**clear** [17] - 858:25, 894:24, 901:3, 901:4, 915:4, 915:21, 921:10, 953:15, 955:1, 993:17, 1048:18, 1054:17, 1063:16, 1091:15, 1092:24, 1098:2, 1112:6

**clearly** [3] - 898:5, 1037:16, 1044:9

**clever** [1] - 1112:5

**click** [1] - 910:7

**client** [2] - 1105:22, 1106:1

**close** [1] - 1023:8

**CM** [1] - 1008:13

**CM2** [1] - 1094:22

**co** [4] - 898:4, 898:5, 899:23, 1109:6

**co-conspirator** [3] - 898:4, 898:5, 899:23

**co-counsel** [1] - 1109:6

**coach** [2] - 1053:11, 1053:22

**code** [2] - 1029:3, 1029:6

**coexist** [1] - 900:15

**Cogan** [1] - 855:11

**COGAN** [2] - 853:23, 1110:12

**coincidence** [1] - 984:15

**collateralized** [1] - 995:21

**colleagues** [1] - 870:17

**collect** [4] - 908:14, 981:4, 990:3, 990:18

**collected** [5] - 889:21, 904:14, 904:16, 918:13, 935:18

**collecting** [2] - 866:14, 1100:6

**colloquy** [1] - 859:1

**COLTON** [48] - 854:5, 855:13, 857:2, 858:1, 858:17, 858:19, 859:21, 860:7, 861:8, 861:13, 895:14, 896:2, 896:15, 896:20, 898:13, 898:22, 900:23, 907:15, 907:23, 908:23, 909:6, 910:12, 911:16, 917:15, 925:23, 938:10, 938:13, 938:17, 938:24, 939:2, 948:14, 955:1, 1073:14, 1093:18, 1094:2, 1104:8, 1105:2, 1105:5, 1108:2, 1108:7, 1108:14, 1109:7, 1109:12, 1109:25, 1113:20, 1114:22, 1115:6, 1115:8

**Colton** [2] - 855:14, 1114:15

**colton's** [1] - 1104:2

**column** [3] - 984:6, 1027:18, 1027:20

**columns** [2] - 982:14, 984:11

**comfort** [3] - 867:11, 867:16, 867:25

**comfortable** [1] - 896:12

**coming** [31] - 856:3, 861:17, 893:5, 895:2, 906:5, 912:17, 926:14, 926:15, 927:1, 927:14, 934:20, 951:11, 951:13, 1005:13, 1005:21, 1005:25, 1034:10, 1063:18, 1086:8, 1091:17, 1091:25, 1092:12, 1092:15, 1092:19, 1093:3, 1096:10, 1096:12, 1097:14, 1097:20, 1097:24

**command** [2] - 1035:12, 1036:16

**comment** [5] - 979:8, 1014:3, 1014:8, 1014:9

**commenting** [1] - 896:21

**commercial** [1] - 1053:4

**Commission** [4] - 944:23, 945:3, 1024:19, 1026:14

**committed** [1] - 1065:6, 1071:13, 1110:24

**committing** [1] - 1081:5

**common** [2] - 1004:3, 1004:13

**commonly** [2] - 944:25, 970:25

**commonplace** [1] - 999:22

**communicate** [4] - 903:14, 916:25, 977:4, 1059:19

**communicated** [5] - 896:7, 903:19, 1011:12, 1095:9, 1095:19

**communications** [2] - 866:15, 1061:21

**companies** [1] - 886:12, 887:6, 887:8, 893:23, 894:13, 911:12, 960:4, 980:22, 999:16, 1009:10, 1009:18, 1026:15, 1042:1, 1087:13, 1091:17, 1092:1, 1093:4

**company** [99] - 867:13, 869:13, 869:21, 869:22, 879:1, 880:5, 939:12, 941:4, 941:8, 941:11, 941:13, 942:18, 942:24, 948:16, 949:5, 950:7, 952:22, 962:24,

964:8, 965:8, 966:7, 966:13, 966:23, 968:16, 981:12, 994:3, 1005:12, 1008:5, 1022:19, 1024:11, 1024:16, 1024:24, 1025:16, 1025:21, 1028:4, 1029:2, 1038:5, 1039:20, 1042:10, 1048:16, 1048:19, 1048:23, 1060:2, 1060:3, 1060:4, 1061:11, 1062:5, 1065:21, 1066:13, 1068:15, 1068:24, 1068:25, 1070:12, 1070:14, 1070:20, 1070:21, 1070:24, 1071:19, 1071:22, 1076:14, 1078:6, 1078:12, 1078:13, 1086:6, 1086:8, 1092:8

**company's** [2] - 1024:12, 1024:14

**companywide** [1] - 1023:18

**competence** [2] - 1023:17

**competent** [1] - 1024:6

**compiled** [1] - 1058:19

**complainant** [3] - 1080:13, 1080:14, 1080:20

**complained** [1] - 1051:11

**complaint** [17] - 859:8, 859:12, 945:9, 945:12, 1063:14, 1064:9, 1064:10, 1064:25, 1072:17, 1073:3, 1075:1, 1075:11, 1078:11, 1080:12, 1081:11, 1081:23, 1082:24

**complaints** [2] - 865:24, 945:22

**complete** [2] - 856:24, 921:5

**completed** [2] - 868:18, 877:13

**completely** [4] - 900:19, 951:21, 1002:25, 1111:4

**compliance** [29] - 1020:25, 1021:5, 1021:7, 1021:9, 1021:12, 1021:15, 1021:19, 1021:24, 1023:18, 1023:21, 1023:23, 1023:25, 1024:3, 1024:10, 1024:24, 1025:6, 1025:21, 1027:15, 1029:10, 1040:11, 1040:19, 1042:11, 1043:4, 1058:11, 1080:21, 1111:8, 1114:1, 1114:9, 1115:5

**Compliance** [8] - 1029:5, 1040:17, 1047:8, 1048:4, 1048:8, 1048:11, 1060:1, 1114:4

**complicated** [6] - 942:2, 983:23, 1081:18, 1098:11, 1102:20, 1104:21

**complying** [1] - 1024:12, 1024:20

**compound** [3] - 895:14, 895:15, 896:2

**compromise** [1] - 957:22

**Computer** [1] - 854:18

**Computer-aided** [1] - 854:18

**computerized** [1] - 1026:3

**concept** [1] - 1026:3

**concern** [12] - 879:13, 961:13, 1003:25, 1004:2, 1005:20, 1050:6, 1051:18, 1056:2, 1057:1, 1062:13, 1101:7, 1112:24

**concerned** [10] - 939:3, 962:22, 963:4, 981:6, 1055:22, 1056:18, 1062:11, 1072:2, 1072:6, 1115:12

**concerns** [29] - 868:24, 959:16, 959:18, 959:21, 959:24, 960:1, 960:3, 960:6, 960:9, 960:19, 961:1, 961:23, 962:13, 965:12, 968:1, 968:2, 968:3, 968:24, 1050:3, 1055:24, 1056:12, 1059:10, 1059:22, 1059:24, 1060:2, 1062:6, 1077:2, 1078:5, 1078:8

**conclude** [1] - 855:22

**concludes** [1] - 986:17

**conclusion** [1] - 938:13

**conclusions** [1] - 938:17

**condition** [2] - 891:9, 941:16

**conducted** [1] - 1069:4

**confer** [2] - 857:5, 860:4

**conference** [8] - 898:1, 901:6, 921:1, 921:21, 1043:1, 1046:24, 1076:1, 1077:10

**conferred** [1] - 855:20

**confidential** [3] - 1070:7, 1070:13, 1070:23

**confirm** [8] - 880:15, 916:9, 916:13, 922:12, 922:16, 1004:21, 1089:25, 1095:9

**confirmed** [5] - 906:3, 926:17, 927:3, 932:25, 933:2

**confirming** [1] - 928:18

**conflict** [1] - 1101:15

**confronts** [1] - 856:13

**confused** [2] - 900:9, 1085:13

**confusing** [2] - 1091:13, 1091:23

**confusion** [1] - 869:2

**Connecticut** [1] - 993:4

**connection** [9] - 948:11, 948:18, 966:25, 985:16, 1054:20, 1055:10, 1081:10, 1081:22, 1082:23

**consent** [1] - 1070:11

**consider** [4] - 999:1, 1066:21, 1107:5, 1113:5

**considered** [4] - 995:7, 1041:5, 1049:21, 1088:18

**consistent** [6] - 855:25, 857:6, 878:12, 937:17, 1079:4, 1091:22

**consolidated** [4] - 889:6, 970:22, 973:17, 973:19

**conspiracy** [2] - 898:18, 900:4

**conspirator** [4] - 898:4, 898:5, 899:23, 899:24

**consultancy** [1] - 965:2

**consultant** [3] - 966:6, 1063:23, 1080:17

**consulting** [3] - 942:4, 949:7, 964:11

**contact** [3] - 866:12, 907:6, 1070:22

**contain** [1] - 1041:25

**context** [3] - 958:9, 1091:24, 1111:2

**contextual** [1] - 898:7

**contextualizes** [1] - 1038:20

**continuation** [3] - 918:25, 919:11, 925:19

**continue** [5] - 937:18, 940:6, 981:8, 1030:23, 1112:14

**continued** [4] - 862:13, 985:21, 1038:2, 1107:21

**CONTINUED** [2] - 1047:4, 1078:2

**Continued** [19] - 854:1, 884:21, 897:7, 901:7, 920:19, 921:22, 937:22, 939:23, 986:18, 994:10, 1012:7, 1013:9, 1028:10, 1042:18, 1046:25, 1075:24, 1077:11, 1079:5, 1096:15

**continuing** [5] - 885:1, 922:1, 1014:1, 1029:1, 1097:1

**Continuing** [6] - 862:25, 940:1, 987:4, 995:1, 1084:23, 1108:1

**contours** [1] - 1102:14

**contract** [17] - 880:4, 906:14, 906:15, 906:16, 924:13, 925:6, 925:7, 925:10,

927:2, 928:3, 928:7, 928:8, 987:14, 987:18, 988:2, 1003:7, 1021:18

**contracted** [1] - 996:3

**contractor** [1] - 1080:17

**contracts** [4] - 871:6, 877:8, 878:4, 987:23

**contradiction** [1] - 1079:4

**contribution** [1] - 912:17

**control** [8] - 1023:13, 1025:25, 1026:4, 1027:18, 1027:21, 1027:24, 1028:2, 1028:7

**Control** [1] - 1027:20

**controlled** [4] - 1027:21, 1029:16, 1031:4, 1031:17

**controls** [1] - 1063:5

**conversation** [19] - 861:3, 861:4, 892:4, 892:7, 892:22, 893:2, 893:10, 895:17, 903:2, 904:22, 911:10, 923:4, 937:5, 937:9, 938:3, 942:23, 954:24, 955:3, 1055:1

**conversations** [19] - 864:24, 865:3, 865:5, 865:8, 892:22, 894:10, 896:5, 902:18, 902:21, 912:25, 942:14, 942:21, 953:7, 953:20, 954:25, 955:2, 996:11, 996:15, 1030:22

**conviction** [2] - 1083:2, 1083:19

**coordinating** [1] - 900:1

**copied** [6] - 872:1, 877:5, 877:21, 1044:5, 1044:6

**copies** [1] - 874:20

**copy** [11] - 926:14, 927:2, 928:7, 928:8, 933:10, 977:25, 983:4, 1005:13, 1005:24, 1006:15, 1066:7

**copycat** [1] - 1064:19

**copycat-type** [1] - 1064:19

**copying** [1] - 922:10

**corporations** [1] - 1088:19

**correct** [104] - 863:14, 863:16, 874:3, 874:7, 874:9, 882:3, 902:12, 919:20, 922:21, 923:17, 932:21, 933:15, 945:14, 947:9, 949:8, 952:13, 952:14, 956:20, 956:21, 957:13, 958:13, 959:15, 965:22, 967:1, 969:8, 969:18, 970:20, 979:23, 980:16, 982:13, 983:2, 984:16, 988:5, 988:20, 989:8, 991:19, 993:2, 993:14, 996:8, 996:20, 997:1, 998:3, 998:4, 998:15, 998:22, 998:25, 1003:5, 1005:17, 1006:1, 1006:18, 1008:10, 1008:15, 1009:22, 1019:5, 1019:6, 1019:14, 1020:23, 1021:25, 1029:3, 1031:24, 1039:2, 1040:19, 1042:11, 1047:10, 1048:9, 1049:3, 1049:20, 1049:22, 1050:13, 1050:14, 1056:10, 1061:24, 1069:6, 1069:19, 1070:3, 1073:17, 1075:15, 1078:14, 1079:3, 1081:11, 1084:1, 1085:6, 1086:8, 1086:9, 1086:25, 1087:5, 1088:5, 1090:12, 1092:5, 1092:10, 1092:22, 1094:15, 1095:11, 1095:22, 1095:23, 1095:25, 1096:14, 1097:6, 1097:15, 1099:19, 1100:7, 1100:15, 1101:9, 1101:10

**correctly** [4] - 856:20, 952:25, 1029:12, 1078:25

**cost** [2] - 1053:18, 1053:22

**counsel** [33] - 855:4, 855:7, 855:15, 858:10, 859:6, 878:17, 924:16, 947:25,

954:24, 955:2, 955:4, 985:13, 1003:20, 1040:10, 1043:11, 1045:14, 1081:25, 1082:1, 1102:2, 1102:3, 1103:2, 1105:19, 1105:21, 1106:5, 1107:17, 1109:6, 1109:24, 1110:22, 1111:8, 1112:9, 1112:22, 1112:24, 1113:7

**Counsel** [22] - 902:5, 909:11, 909:14, 922:24, 924:11, 925:18, 927:7, 927:22, 928:16, 929:12, 931:23, 948:1, 956:12, 1009:5, 1014:15, 1022:6, 1026:22, 1038:1, 1048:7, 1080:16, 1098:17, 1110:11

**counteract** [1] - 1108:24

**Country** [4] - 982:12, 984:5, 1008:11, 1094:23

**country** [3] - 999:2, 999:3, 999:6

**couple** [7] - 891:16, 921:13, 929:4, 936:7, 969:2, 1022:10, 1064:23

**course** [11] - 893:21, 898:9, 903:13, 942:8, 960:22, 966:9, 979:7, 989:25, 1049:17, 1069:3, 1069:12

**Court** [20] - 854:15, 854:15, 922:24, 924:11, 925:18, 927:7, 927:22, 928:16, 929:12, 931:23, 948:1, 1009:5, 1022:6, 1026:22, 1098:17, 1103:22, 1104:6, 1104:20, 1106:3, 1110:1

**court** [15] - 855:1, 855:12, 896:15, 902:1, 954:24, 956:3, 958:15, 987:1, 1033:8, 1035:5, 1038:14, 1047:1, 1072:10, 1078:1

**Court's** [5] - 859:7, 861:1, 911:20, 1014:13, 1066:8

**Courthouse** [1] - 853:5

**courtroom** [2] - 862:2, 956:10

**cover** [16] - 872:21, 873:2, 874:17, 899:21, 902:24, 1071:9, 1090:3, 1090:5, 1093:6, 1094:19, 1095:7, 1095:14, 1100:1, 1100:2, 1100:18, 1102:13

**coverage** [15] - 863:11, 891:4, 894:25, 896:11, 898:17, 899:7, 899:11, 899:15, 910:2, 910:11, 912:23, 912:24, 998:2, 1056:19

**covered** [11] - 900:17, 926:25, 927:15, 960:1, 962:7, 962:9, 965:17, 998:5, 998:14, 1017:19, 1104:16

**covering** [1] - 1101:8

**craft** [1] - 915:9

**crazy** [1] - 1057:10

**create** [5] - 867:4, 867:23, 868:3, 892:16, 940:19

**created** [2] - 999:15, 1044:10

**credibility** [5] - 857:8, 857:14, 857:16, 857:20, 858:24

**credit** [1] - 944:2, 991:15, 991:17

**crime** [3] - 966:17, 1065:5, 1071:13

**crimes** [1] - 971:16

**criminal** [5] - 946:11, 958:15, 961:16, 971:16, 1024:22

**Crimmins** [1] - 1072:12

**critical** [2] - 876:25, 1100:5

**CROSS** [3] - 956:14, 1047:4, 1078:2, 1117:8

**cross** [6] - 858:10, 954:23, 1102:3, 1103:12, 1104:23, 1105:1, 1110:17

**cross-examination** [3] - 1103:12, 1110:17

**CROSS-EXAMINATION** [4] - 956:14, 1047:4, 1078:2, 1117:8
**cross-examined** [1] - 858:10
**culmination** [1] - 927:11
**current** [2] - 855:22, 1067:11
**customer** [1] - 882:22
**cut** [9] - 1029:12, 1030:25, 1031:2, 1032:6, 1034:7, 1036:3, 1036:4, 1041:1, 1041:3
**cyclical** [1] - 1097:6

## D

**dashboard** [2] - 892:20, 909:18
**dashboards** [3] - 863:4, 891:12, 910:18
**data** [1] - 910:12
**date** [25] - 874:17, 875:10, 881:10, 881:15, 881:16, 881:21, 883:18, 908:16, 922:18, 923:17, 924:5, 933:12, 947:14, 950:22, 952:5, 952:6, 954:6, 964:15, 964:20, 1001:11, 1001:24, 1056:4, 1070:19, 1094:21
**dated** [10] - 881:8, 881:19, 883:17, 929:4, 930:25, 933:14, 949:4, 982:25, 1000:3, 1005:16
**Dave** [7] - 883:24, 884:1, 918:14, 918:15, 918:17, 975:22, 975:23
**DAVID** [1] - 853:8
**David** [14] - 853:20, 855:3, 855:11, 912:6, 912:17, 914:6, 914:9, 916:9, 928:4, 956:18, 975:12, 1024:2, 1091:1, 1095:10
**days** [12] - 882:24, 905:8, 906:8, 906:23, 923:19, 923:24, 929:5, 960:15, 960:17
**DC** [1] - 854:9
**deadline** [2] - 868:8, 905:9
**deal** [11] - 856:6, 856:11, 933:18, 933:19, 935:22, 936:1, 936:16, 937:2, 958:21, 969:3, 1045:5
**dealer** [1] - 888:18
**dealers** [1] - 976:14
**dealership** [33] - 856:6, 869:13, 869:17, 888:21, 905:20, 912:12, 924:5, 930:7, 930:8, 931:2, 935:22, 935:23, 937:6, 972:10, 972:15, 982:11, 984:6, 990:23, 990:24, 995:3, 995:15, 995:17, 995:19, 1008:8, 1008:14, 1008:18, 1008:21, 1010:9, 1016:4, 1055:13, 1063:8, 1095:1, 1095:3
**dealerships** [34] - 870:24, 870:25, 871:9, 872:16, 873:24, 874:6, 876:20, 889:3, 892:10, 912:15, 936:2, 936:5, 943:10, 943:12, 943:16, 943:17, 943:18, 944:3, 972:12, 972:17, 980:1, 982:6, 982:9, 989:9, 989:11, 992:20, 992:22, 992:23, 995:6, 1092:8, 1095:6, 1095:15, 1097:5, 1097:12
**dealing** [1] - 857:19
**deals** [3] - 891:16, 891:17, 903:9
**Dean** [1] - 1019:16
**Dearington** [1] - 855:14
**DEARINGTON** [4] - 854:9, 1046:1, 1046:10, 1106:15
**debatable** [1] - 906:8
**December** [16] - 863:25, 889:1, 912:9,

932:19, 935:16, 942:3, 950:17, 965:3, 972:16, 1001:10, 1001:23, 1007:22, 1063:19, 1063:20, 1064:7, 1064:8
**decide** [5] - 882:25, 981:24, 1034:25, 1112:19, 1113:15
**decided** [7] - 896:9, 902:16, 905:10, 924:1, 944:21, 946:6, 1006:20
**decides** [1] - 941:8
**decision** [5] - 895:24, 895:25, 896:7, 946:2, 946:7
**deck** [4] - 1016:20, 1017:2, 1017:15
**decks** [1] - 992:12
**declarant** [1] - 856:19
**dedicated** [1] - 1040:19
**defend** [1] - 1071:20
**defendant's** [1] - 1106:20
**Defendant's Exhibit** [23] - 978:21, 990:12, 1004:11, 1005:2, 1005:5, 1009:4, 1022:5, 1022:24, 1027:3, 1027:4, 1089:13, 1099:4, 1099:9, 1119:5, 1119:7, 1119:9, 1119:10, 1119:11, 1119:12, 1119:16, 1119:18
**Defendant's Exhibits** [2] - 1080:8, 1119:15
**defendants** [12] - 853:9, 863:5, 891:13, 894:7, 894:11, 942:15, 1043:19, 1044:7, 1046:5, 1055:24, 1104:15, 1109:15
**defense** [5] - 858:9, 859:6, 1102:1, 1103:11, 1112:24
**Defense** [12] - 977:17, 982:22, 984:23, 990:8, 1060:19, 1061:5, 1065:16, 1066:18, 1072:21, 1088:22, 1119:13, 1119:14
**defense's** [1] - 1110:19
**deficiency** [14] - 871:24, 872:5, 872:19, 873:5, 873:8, 873:11, 873:23, 874:12, 874:18, 877:25, 878:11, 883:12, 886:13, 990:15
**deficient** [3] - 872:21, 874:21, 879:13
**defined** [2] - 995:8, 1027:21
**defines** [1] - 1082:8
**definitely** [2] - 947:18, 1090:20
**definitive** [1] - 1113:11
**degree** [1] - 1047:22
**delegated** [6] - 1110:21, 1111:1, 1111:6, 1111:11, 1111:23, 1112:7
**demonstrate** [1] - 1109:2
**demonstrating** [1] - 1114:3
**demoted** [3] - 963:16, 1032:1, 1035:2
**department** [4] - 967:16, 974:15, 974:23, 1115:5
**depicted** [4] - 886:6, 915:1, 946:25, 951:10
**deposited** [3] - 865:17, 865:18, 866:5
**deposits** [3] - 893:5, 893:6, 895:3
**DEPUTY** [10] - 855:2, 861:12, 862:1, 862:19, 955:7, 956:9, 1039:15, 1067:3, 1067:6, 1089:17
**described** [4] - 911:10, 919:19, 919:21, 1044:6
**describing** [3] - 902:3, 969:3, 1053:25
**description** [2] - 900:3, 904:3
**desire** [2] - 859:19, 1048:19
**despite** [2] - 966:12, 1054:4
**detail** [6] - 856:22, 977:13, 981:17, 981:20, 983:25, 1087:1

**details** [10] - 876:2, 977:9, 979:4, 979:19, 980:12, 980:25, 983:18, 1052:19, 1102:13, 1105:13
**determination** [1] - 939:5
**determine** [2] - 1016:1, 1093:23
**Develop** [1] - 1023:18
**DG** [1] - 1095:10
**diary** [1] - 963:6
**Dibre** [18] - 888:15, 888:18, 943:9, 943:11, 972:6, 973:1, 973:3, 973:9, 979:25, 980:2, 981:2, 981:15, 982:8, 985:3, 987:12, 987:20, 987:24, 995:4
**Dibre/Lash** [1] - 977:6
**difference** [14] - 912:9, 914:17, 930:9, 931:19, 991:1, 997:19, 999:10, 1016:8, 1053:12, 1055:16, 1055:19, 1087:18, 1104:25, 1112:4
**different** [29] - 867:6, 869:10, 869:20, 886:15, 900:18, 901:1, 919:12, 936:3, 943:16, 952:13, 957:14, 983:22, 987:18, 988:2, 999:21, 1002:2, 1004:4, 1015:20, 1023:23, 1026:19, 1029:22, 1059:18, 1062:13, 1081:2, 1083:14, 1087:4, 1094:1, 1108:25
**differently** [3] - 866:13, 1078:19, 1079:2
**digest** [1] - 1103:21
**diligence** [14] - 948:5, 968:11, 968:13, 968:16, 968:20, 968:24, 969:2, 1057:12, 1058:25, 1059:18, 1059:23, 1059:24, 1060:3, 1060:6
**dire** [3] - 860:17, 860:21, 862:11
**DIRECT** [2] - 862:24, 1117:6
**direct** [16] - 855:22, 869:25, 890:5, 989:18, 1008:4, 1009:13, 1009:16, 1015:5, 1027:6, 1033:23, 1066:2, 1068:9, 1081:8, 1083:9, 1083:15, 1102:12
**directed** [2] - 892:8, 1017:11, 1017:23, 1112:15
**directing** [1] - 932:17
**direction** [1] - 898:6
**directions** [1] - 899:24
**directly** [3] - 898:12, 898:14, 924:20
**director** [8] - 949:9, 949:10, 966:5, 1039:22, 1075:2, 1075:12, 1080:16, 1086:19
**disagree** [1] - 857:2
**disagreed** [2] - 940:25, 1064:21
**disagreement** [1] - 1103:7
**disclose** [4] - 915:5, 915:22, 1070:12, 1070:13
**disclosed** [4] - 899:19, 961:6, 961:8, 998:9
**disclosing** [1] - 971:24
**disclosure** [1] - 1107:14
**disclosures** [2] - 899:12, 1063:3
**discuss** [1] - 1114:18
**discussed** [11] - 916:6, 936:21, 937:17, 943:21, 959:6, 980:19, 980:20, 1091:24, 1092:18, 1094:17, 1096:4
**discussing** [9] - 874:15, 883:24, 927:12, 928:2, 958:9, 996:20, 1017:15, 1036:3, 1096:9
**discussion** [10] - 913:12, 936:12, 936:22, 958:2, 959:4, 979:25, 986:17, 1089:24, 1090:25, 1113:18
**discussions** [6] - 856:25, 899:25,

943:23, 952:23, 996:23, 996:24
**Disney** [1] - 941:11
**disparage** [1] - 1068:16
**disparagement** [1] - 1068:11
**dispositive** [1] - 1044:23
**disregard** [1] - 902:2
**disruptive** [1] - 862:7
**distinct** [1] - 999:10
**distinction** [3] - 999:9, 1114:8, 1114:10
**distribute** [2] - 866:15, 954:5
**distributed** [1] - 1020:13
**distribution** [17] - 891:6, 912:10, 912:11, 947:10, 949:17, 949:19, 950:11, 950:15, 950:17, 1017:15, 1057:3, 1057:9, 1085:1, 1085:21, 1090:2, 1091:18, 1091:20
**Distributions** [1] - 952:4
**distributions** [40] - 863:23, 889:4, 890:18, 890:22, 893:4, 895:1, 900:6, 902:25, 942:7, 947:9, 949:25, 950:2, 950:3, 950:4, 950:6, 953:1, 953:2, 953:10, 959:22, 961:24, 962:10, 1018:5, 1019:9, 1019:14, 1020:2, 1090:6, 1091:10, 1091:12, 1091:23, 1091:25, 1094:20, 1095:6, 1095:8, 1100:1, 1100:3, 1100:6, 1100:18, 1100:23, 1101:8
**District** [1] - 853:14
**dividend** [2] - 954:12, 1091:20
**dividend/distribution** [1] - 1094:22
**dividends** [6] - 863:21, 894:22, 912:13, 953:1, 954:11, 1091:22
**DJD** [11] - 870:21, 870:23, 873:5, 873:25, 874:5, 880:6, 881:4, 984:4, 988:18, 988:19, 989:8
**DJD 2** [7] - 870:21, 870:23, 873:5, 880:10, 984:4, 989:5, 989:8
**dock** [1] - 1002:19
**docs** [1] - 877:2
**document** [80] - 879:23, 881:12, 881:24, 888:5, 926:23, 928:25, 930:11, 930:13, 931:7, 935:20, 948:2, 956:22, 957:8, 974:3, 975:6, 977:18, 978:16, 978:17, 979:9, 982:3, 982:18, 984:19, 984:21, 986:13, 988:10, 1001:12, 1001:25, 1003:6, 1003:10, 1004:4, 1005:16, 1005:21, 1006:24, 1007:15, 1007:18, 1009:6, 1010:15, 1014:2, 1022:7, 1022:12, 1022:21, 1026:23, 1027:7, 1027:25, 1033:14, 1033:17, 1041:12, 1043:21, 1044:1, 1044:2, 1044:3, 1045:22, 1052:4, 1052:8, 1057:17, 1057:25, 1058:9, 1065:18, 1072:23, 1073:7, 1073:10, 1074:21, 1074:25, 1075:19, 1076:7, 1076:8, 1076:18, 1076:22, 1080:4, 1088:25, 1094:7, 1098:24, 1106:24, 1107:9, 1108:13, 1109:7, 1110:14, 1111:12, 1111:15, 1113:15
**document's** [2] - 934:1, 1074:20
**documentation** [2] - 875:9, 908:15
**documented** [1] - 977:5
**documents** [28] - 871:15, 871:17, 872:14, 872:18, 882:5, 917:2, 967:11, 972:25, 1037:5, 1041:2, 1041:3, 1041:4, 1054:17, 1054:18, 1054:20, 1055:9, 1070:23, 1071:3, 1071:4, 1072:2, 1072:6,

1091:23, 1106:3, 1108:21, 1109:8, 1111:7, 1112:2, 1114:25
**dollar** [1] - 893:19
**dollars** [4] - 894:1, 942:7, 1009:21, 1051:14
**done** [20] - 887:14, 908:19, 939:16, 954:9, 964:23, 985:7, 985:8, 1004:13, 1008:6, 1008:21, 1009:22, 1011:10, 1015:7, 1015:14, 1016:4, 1016:11, 1058:21, 1064:6, 1098:20
**door** [1] - 965:14
**Doorenbos** [2] - 975:15, 985:11
**doors** [1] - 1104:16
**dos** [1] - 870:19
**double** [2] - 856:17, 1008:5
**doubt** [2] - 909:8, 1007:17
**down** [37] - 863:7, 877:19, 880:12, 880:13, 882:14, 882:17, 885:12, 886:15, 888:2, 889:12, 890:25, 902:7, 907:4, 910:5, 914:24, 918:3, 918:9, 919:18, 920:2, 928:3, 933:12, 933:23, 934:9, 934:18, 935:2, 948:23, 954:20, 954:21, 964:2, 979:8, 1019:24, 1019:25, 1023:1, 1033:2, 1040:13, 1079:2, 1101:20
**dozens** [3] - 960:16, 960:21, 1001:2
**draft** [7] - 963:2, 1002:19, 1003:1, 1003:10, 1038:17, 1040:22, 1111:4
**drafted** [2] - 878:12, 924:13
**drafters** [1] - 1111:19
**drafting** [5] - 969:19, 1108:18, 1109:3, 1110:20, 1111:7
**draining** [2] - 960:3, 1051:21
**drive** [3] - 1071:2, 1071:4, 1071:10
**dropped** [2] - 944:17, 944:18
**dry** [2] - 1097:13
**Duarte** [1] - 982:8
**due** [21] - 868:12, 868:16, 870:13, 903:21, 925:15, 948:5, 968:11, 968:13, 968:16, 968:20, 968:23, 969:2, 1057:12, 1058:25, 1059:18, 1059:22, 1059:24, 1060:6, 1062:2, 1096:5, 1096:7
**duly** [1] - 862:17
**duplicate** [3] - 1093:13, 1093:25, 1094:8
**during** [13] - 871:2, 882:6, 903:13, 958:2, 976:25, 980:25, 989:18, 992:11, 1004:17, 1004:20, 1025:5, 1059:19
**Dustin** [3] - 876:15, 876:16, 974:18
**duties** [1] - 1022:18
**DX** [1] - 1098:7

## E

**E-mail** [1] - 854:17
**e-mail** [103] - 863:16, 871:23, 872:1, 872:5, 872:21, 873:2, 873:4, 874:17, 875:12, 875:25, 876:12, 877:5, 877:6, 877:10, 877:22, 878:21, 878:25, 908:12, 908:16, 910:11, 910:22, 910:24, 911:3, 911:5, 911:22, 914:2, 914:14, 918:23, 919:11, 920:1, 920:4, 920:5, 920:10, 921:12, 922:9, 922:11, 922:18, 922:25, 923:2, 923:19, 925:19, 927:24, 928:1, 929:8, 932:18, 962:20, 963:18, 964:16, 974:11, 975:2, 976:12, 976:18, 976:20, 978:5, 978:25, 981:21, 982:23, 985:1,

986:7, 986:9, 986:13, 1003:24, 1005:7, 1005:20, 1005:23, 1007:14, 1032:18, 1033:5, 1033:6, 1033:7, 1033:17, 1033:22, 1033:24, 1035:1, 1035:5, 1035:25, 1036:3, 1036:9, 1036:23, 1036:25, 1037:16, 1037:24, 1038:16, 1039:13, 1039:17, 1040:1, 1041:15, 1042:5, 1045:18, 1045:19, 1089:6, 1090:14, 1090:15, 1091:7, 1092:24, 1099:1, 1099:14, 1100:17, 1106:13, 1109:11, 1113:14, 1115:15
**e-mails** [24] - 860:2, 861:14, 875:5, 875:8, 883:18, 908:7, 915:3, 919:24, 921:5, 963:9, 1000:11, 1000:17, 1037:13, 1037:15, 1040:8, 1044:7, 1052:20, 1057:8, 1109:12, 1110:7, 1112:1, 1114:16, 1115:12, 1115:21
**early** [7] - 865:6, 964:16, 965:16, 968:21, 968:22, 969:2, 1101:11
**earn** [1] - 1081:21
**earned** [4] - 935:16, 1088:9, 1092:9, 1097:25
**easier** [4] - 899:4, 899:16, 899:21, 1060:21
**easily** [1] - 903:8
**East** [1] - 853:15
**Eastern** [1] - 853:14
**eat** [1] - 1102:4
**educate** [3] - 1020:7, 1020:11, 1081:20
**educational** [1] - 1114:5
**effect** [2] - 939:1, 986:4
**effectively** [1] - 1064:6
**efficient** [2] - 1023:8, 1088:18
**efficiently** [1] - 903:22
**effort** [1] - 990:18
**efforts** [3] - 896:13, 990:3, 1103:6
**eight** [1] - 869:17
**either** [10] - 887:14, 898:10, 900:15, 942:14, 962:22, 963:2, 981:9, 997:15, 1038:24, 1112:2
**elected** [1] - 914:6
**elicit** [3] - 855:25, 1045:10, 1102:12
**elicited** [1] - 856:19
**eliciting** [4] - 938:4, 1034:18, 1034:19, 1034:20
**eligible** [2] - 945:23, 1067:16
**ELMO** [1] - 1010:3
**employee** [1] - 1080:16
**employees** [2] - 1061:21
**employment** [3] - 1021:3, 1021:18, 1022:14
**enable** [1] - 1070:12
**end** [23] - 868:8, 868:10, 868:11, 868:12, 890:11, 890:14, 890:15, 891:8, 911:12, 918:12, 925:15, 942:4, 964:10, 964:12, 965:2, 967:16, 967:17, 969:10, 1051:9, 1063:10, 1063:24, 1063:25, 1067:17
**ended** [8] - 889:1, 932:18, 935:15, 943:23, 944:17, 944:18, 972:16
**ending** [1] - 1007:24
**ends** [6] - 901:6, 921:21, 939:22, 1013:8, 1046:24, 1077:10
**enforcement** [6] - 1025:3, 1025:10, 1025:14, 1025:17, 1025:23, 1071:15
**engage** [1] - 1106:5
**English** [2] - 889:9, 981:24

**ensure** [3] - 1035:10, 1036:24, 1041:23
**entailed** [1] - 936:1
**enter** [1] - 1027:20
**entered** [2] - 1065:20, 1066:13
**entering** [2] - 862:1, 956:9
**enters** [4] - 862:2, 956:10, 1039:5, 1083:4
**entire** [2] - 1071:2, 1107:8
**entities** [3] - 1069:2, 1070:14, 1070:21
**entitled** [1] - 1076:10
**entity** [12] - 990:23, 1061:16, 1061:20, 1062:25, 1063:5, 1069:3, 1069:4, 1069:11, 1075:1, 1075:11, 1080:12, 1080:23
**entries** [2] - 867:11, 925:9
**entry** [8] - 903:20, 913:14, 913:18, 914:3, 963:6, 1085:12, 1090:17, 1091:4
**Equinox** [1] - 1048:8
**equities** [1] - 999:11
**equity** [9] - 943:22, 945:5, 945:6, 998:19, 999:10, 999:15, 999:16, 1049:11, 1064:19
**error** [1] - 855:4
**escrow** [1] - 1086:13
**escrowed** [3] - 1086:10, 1086:11, 1086:15
**ESQ** [13] - 853:16, 853:16, 853:17, 853:17, 853:21, 853:22, 853:22, 853:23, 854:5, 854:6, 854:9, 854:10, 854:14
**essentially** [1] - 893:4
**establish** [2] - 1112:7, 1114:19
**established** [2] - 1056:4, 1063:5
**estimate** [4] - 886:23, 887:5, 887:7, 960:18
**estimated** [1] - 887:8
**et** [2] - 876:19, 1094:20
**ETA** [1] - 883:11
**ethics** [1] - 1029:3, 1029:6
**event** [2] - 1110:16, 1116:3
**eventually** [2] - 906:14, 933:5
**evidence** [111] - 863:6, 864:14, 867:10, 872:22, 873:1, 875:17, 875:21, 880:24, 883:5, 883:9, 884:8, 884:15, 890:24, 909:4, 911:15, 911:18, 913:20, 913:23, 915:11, 915:14, 917:23, 919:7, 922:3, 923:12, 924:23, 925:1, 926:6, 927:19, 928:14, 928:24, 929:17, 930:12, 930:19, 930:21, 932:12, 933:7, 946:16, 948:19, 951:25, 957:3, 970:16, 973:25, 974:1, 974:9, 978:22, 983:12, 988:14, 989:3, 990:7, 990:12, 991:24, 992:8, 993:9, 1002:5, 1004:6, 1004:11, 1005:5, 1018:16, 1022:24, 1027:3, 1032:16, 1034:21, 1039:11, 1044:24, 1057:8, 1057:11, 1061:5, 1066:18, 1074:20, 1076:18, 1080:2, 1080:9, 1089:14, 1093:10, 1094:13, 1099:10, 1106:20, 1109:14, 1109:18, 1109:23, 1110:6, 1111:13, 1113:24, 1114:25, 1115:4, 1118:12, 1118:13, 1118:14, 1118:15, 1118:16, 1118:17, 1118:18, 1118:19, 1118:20, 1118:21, 1118:22, 1118:23, 1118:24, 1118:25, 1119:1, 1119:2, 1119:3, 1119:8, 1119:9, 1119:10, 1119:11, 1119:12, 1119:13, 1119:14, 1119:15

**evidence..** [6] - 1118:7, 1118:10, 1118:11, 1119:4, 1119:16, 1119:17
**evidence....** [1] - 1119:7
**evidence............................** [1] - 1118:6
**evidence................................** [2] - 1118:9, 1119:6
**evidentiary** [1] - 855:24
**ex** [1] - 1039:24
**ex-CFO** [1] - 1039:24
**exact** [9] - 977:9, 979:4, 979:19, 980:12, 983:18, 1005:7, 1051:8, 1051:10, 1065:3
**exactly** [12] - 882:4, 896:11, 898:21, 912:21, 913:3, 930:7, 931:15, 944:14, 1045:25, 1050:8, 1050:10, 1071:11
**examination** [3] - 855:22, 862:13, 989:19, 1008:4, 1009:13, 1009:16, 1015:6, 1043:17, 1081:8, 1083:15, 1103:12, 1110:17
**EXAMINATION** [8] - 862:24, 956:14, 987:2, 1047:4, 1078:2, 1084:21, 1117:6, 1117:8
**examined** [2] - 858:10, 862:17
**example** [10] - 947:11, 1024:18, 1053:17, 1057:2, 1061:20, 1062:7, 1087:19, 1096:9, 1098:2, 1104:11
**examples** [2] - 915:8, 915:23
**exceeded** [2] - 1019:14, 1020:2
**Excel** [4] - 909:3, 909:24, 910:17, 989:15
**except** [2] - 904:12, 1035:25
**exception** [2] - 896:25, 897:3
**excess** [3] - 950:1, 950:10, 950:14
**Exchange** [7] - 887:3, 941:10, 941:14, 944:23, 945:3, 1024:19, 1026:14
**exchange** [7] - 887:6, 913:10, 913:11, 920:10, 990:13, 1103:8, 1103:13
**exclude** [1] - 1113:14
**excuse** [4] - 954:2, 965:10, 1067:3, 1092:7
**executed** [2] - 877:2, 993:22
**Exhibit** [152] - 863:7, 864:15, 871:19, 873:17, 874:24, 875:2, 875:17, 875:20, 879:20, 881:2, 882:9, 883:8, 884:6, 884:12, 884:14, 890:24, 908:11, 909:4, 910:21, 911:15, 911:18, 911:21, 913:5, 913:23, 914:1, 914:21, 915:14, 915:18, 916:19, 917:23, 918:1, 918:21, 919:2, 919:7, 919:10, 919:14, 922:3, 922:6, 922:23, 922:24, 923:9, 923:12, 923:15, 924:10, 924:11, 925:1, 925:2, 925:17, 925:18, 926:6, 926:9, 927:6, 927:7, 927:19, 927:22, 928:10, 928:14, 928:16, 928:24, 929:3, 929:12, 929:17, 929:20, 930:21, 930:22, 931:22, 931:23, 932:12, 932:15, 933:8, 933:9, 946:16, 946:17, 947:24, 948:1, 948:19, 948:21, 951:24, 952:1, 956:23, 970:12, 970:19, 974:6, 974:8, 977:17, 982:22, 984:23, 988:13, 989:4, 990:8, 990:9, 991:23, 992:7, 993:11, 1002:5, 1002:7, 1004:25, 1007:5, 1007:7, 1009:5, 1010:14, 1016:22, 1016:23, 1017:1, 1018:17, 1018:18, 1022:6, 1022:25, 1026:22, 1027:13, 1032:15, 1039:12, 1039:16, 1060:19, 1061:5, 1061:7, 1065:17, 1066:18,

1067:8, 1072:21, 1088:22, 1089:18, 1093:10, 1094:8, 1094:12, 1098:17, 1099:12, 1118:7, 1118:10, 1118:11, 1118:12, 1118:13, 1118:14, 1118:15, 1118:16, 1118:17, 1118:18, 1118:19, 1118:20, 1118:21, 1118:22, 1118:23, 1118:24, 1118:25, 1119:1, 1119:2, 1119:3, 1119:4, 1119:8, 1119:13, 1119:14, 1119:17
**exhibit** [22] - 864:21, 875:23, 915:1, 932:6, 932:9, 946:19, 948:17, 948:20, 950:1, 978:10, 982:19, 983:11, 985:14, 1005:8, 1010:7, 1013:4, 1038:25, 1080:2, 1080:7, 1098:9, 1106:25
**EXHIBITS** [1] - 1118:2
**exhibits** [7] - 872:9, 1046:16, 1103:8, 1103:11, 1103:19, 1104:2, 1105:2
**Exhibits** [5] - 872:25, 880:23, 932:3, 1118:5, 1118:8
**exist** [5] - 877:14, 877:20, 879:10, 883:19, 1063:4
**existed** [2] - 864:17, 879:9
**existence** [1] - 922:12
**existing** [1] - 995:17
**exit** [3] - 961:19, 961:20, 961:22
**exits** [4] - 954:19, 955:8, 1033:1, 1101:19
**expect** [7] - 883:11, 973:4, 981:3, 1100:11, 1102:19, 1110:17, 1111:5
**expected** [2] - 1100:4, 1100:24
**expecting** [1] - 991:16
**expense** [6] - 895:8, 895:9, 914:4, 1054:15, 1054:24
**expenses** [17] - 886:7, 886:15, 886:16, 886:20, 894:14, 912:19, 913:15, 934:10, 934:18, 960:3, 1051:12, 1051:22, 1051:23, 1054:9, 1055:3, 1090:3
**experience** [5] - 867:14, 1048:1, 1048:4, 1111:9, 1112:18
**experienced** [1] - 995:6
**expired** [2] - 981:5, 981:7
**explain** [14] - 866:3, 867:20, 888:9, 899:16, 903:7, 903:8, 908:1, 916:24, 921:17, 929:21, 935:25, 977:24, 1001:19, 1087:17
**explained** [6] - 892:8, 899:14, 904:1, 935:14, 1107:15, 1110:19
**explaining** [3] - 888:12, 904:4
**explanation** [3] - 903:25, 976:2, 976:9
**explanations** [2] - 899:20, 915:6
**express** [6] - 961:25, 962:3, 962:6, 962:13, 967:21, 1005:20
**expressed** [15] - 865:21, 959:16, 959:24, 960:7, 960:9, 960:19, 961:1, 967:18, 1002:3, 1003:25, 1004:2, 1017:9, 1048:19, 1050:2, 1050:6
**expressing** [3] - 961:23, 965:12, 1101:7
**extensive** [1] - 943:2
**extent** [5] - 899:17, 996:22, 1062:3, 1105:9, 1106:4
**extra** [2] - 1051:22, 1051:23
**eyes** [1] - 879:22

# F

**F.3d** [5] - 857:21, 857:24, 858:2, 858:18, 858:21
**fabrication** [2] - 856:18, 858:12
**face** [1] - 892:14
**facility** [1] - 943:25
**Facsimile** [1] - 854:16
**fact** [30] - 857:7, 903:21, 942:6, 964:22, 966:13, 987:11, 991:8, 1000:18, 1005:24, 1016:10, 1016:11, 1031:16, 1031:22, 1036:10, 1043:20, 1045:8, 1051:20, 1053:2, 1054:3, 1055:18, 1064:12, 1071:2, 1086:6, 1088:18, 1108:19, 1108:23, 1109:19, 1109:21, 1109:22, 1111:20
**fact-finder** [1] - 857:7
**FactRight** [5] - 1057:13, 1058:2, 1058:19, 1059:1, 1059:3
**facts** [2] - 1043:10, 1113:8
**factual** [1] - 1109:5
**failed** [1] - 903:21
**failure** [1] - 904:2
**fair** [4] - 856:23, 1050:19, 1066:21, 1102:4
**fairly** [1] - 1007:21
**faith** [2] - 1111:16, 1112:8
**fake** [1] - 856:12
**falls** [1] - 898:5
**false** [5] - 951:21, 981:22, 981:23, 1018:9, 1108:15
**falsely** [3] - 1108:3, 1113:21, 1113:22
**familiar** [11] - 864:4, 864:7, 864:10, 869:4, 1017:4, 1021:12, 1026:3, 1026:10, 1068:13, 1087:8, 1114:18
**family** [1] - 950:24
**far** [11] - 896:12, 919:25, 939:2, 965:24, 992:15, 992:16, 999:12, 999:13, 1069:14
**fashion** [1] - 868:19
**fast** [2] - 942:2, 1066:5
**fast-growing** [1] - 942:2
**February** [8] - 863:16, 881:9, 881:20, 908:17, 964:17, 1100:5, 1100:6, 1100:23
**federal** [1] - 958:15
**fee** [33] - 856:7, 894:22, 895:6, 903:14, 904:6, 904:14, 904:20, 905:18, 913:1, 914:3, 918:4, 918:17, 919:21, 920:12, 921:13, 922:17, 923:6, 923:20, 934:16, 934:19, 934:21, 934:24, 936:18, 936:23, 936:25, 937:6, 940:15, 940:19, 997:5, 997:14, 997:18, 998:1, 998:6
**feeding** [1] - 909:17
**fees** [21] - 865:23, 894:15, 894:19, 895:4, 895:19, 896:10, 902:11, 902:13, 902:15, 903:21, 905:11, 914:7, 924:2, 960:3, 1051:15, 1051:16, 1051:21, 1054:5, 1054:9, 1090:3, 1100:3
**fees/fund** [1] - 912:19
**fell** [2] - 872:17, 936:5
**felt** [7] - 896:12, 953:14, 953:15, 954:1, 965:15, 966:21, 1065:9
**Ferrari** [3] - 1055:4, 1055:10, 1055:12
**few** [6] - 857:4, 934:9, 946:14, 969:16, 992:25, 1047:6
**fewer** [1] - 999:13

**FFFFY-001** [3] - 977:17, 978:21, 1119:5
**figure** [6] - 934:9, 1094:2, 1099:21, 1103:15, 1106:9, 1106:22
**figured** [1] - 965:16
**figures** [1] - 1017:9
**file** [3] - 859:11, 1026:13, 1064:9
**filed** [10] - 945:16, 945:22, 1021:18, 1026:15, 1063:14, 1064:12, 1064:24, 1072:16, 1073:2
**filing** [3] - 859:8, 1082:20, 1082:25
**filings** [1] - 1026:19
**fill** [3] - 1060:12, 1074:8, 1102:25
**filled** [6] - 1060:22, 1061:8, 1072:16, 1073:2, 1074:11, 1078:10
**final** [12] - 857:12, 878:10, 885:2, 894:12, 911:9, 911:11, 912:5, 1031:19, 1031:20, 1033:22, 1085:8, 1113:22
**finalize** [1] - 876:25
**finalized** [1] - 980:25
**finalizing** [2] - 877:18, 878:15
**finance** [2] - 867:14, 1048:24
**financial** [75] - 856:8, 864:3, 864:18, 866:7, 866:24, 867:2, 867:3, 867:6, 867:7, 867:13, 867:15, 867:19, 867:21, 868:17, 874:10, 884:19, 886:3, 888:7, 888:9, 889:11, 893:22, 894:18, 904:4, 904:10, 907:7, 908:18, 910:19, 915:6, 917:7, 919:17, 919:19, 924:7, 925:9, 931:25, 932:8, 933:10, 937:10, 938:5, 940:13, 940:16, 941:3, 945:23, 949:10, 963:15, 966:5, 966:25, 969:14, 970:5, 970:22, 976:7, 976:24, 997:11, 997:19, 998:9, 998:16, 1007:20, 1007:21, 1008:16, 1009:17, 1015:10, 1019:13, 1020:1, 1020:18, 1020:20, 1020:22, 1021:6, 1021:17, 1021:24, 1023:2, 1023:4, 1023:10, 1027:14, 1048:20, 1062:1, 1086:20
**Financial** [1] - 889:23, 1030:24, 1032:3, 1048:22, 1060:2
**financials** [38] - 856:5, 868:10, 868:12, 868:18, 868:25, 870:5, 870:13, 884:4, 885:9, 885:25, 889:19, 893:19, 904:19, 906:20, 906:23, 907:12, 914:20, 917:6, 923:7, 925:13, 933:5, 934:15, 936:15, 937:14, 940:10, 941:16, 969:11, 971:12, 976:3, 987:20, 989:16, 989:22, 1009:10, 1018:22, 1020:12, 1092:21
**finder** [1] - 857:7
**fine** [12] - 914:23, 1004:8, 1005:3, 1035:17, 1045:10, 1064:8, 1077:9, 1094:5, 1104:2, 1109:14, 1110:8, 1115:18
**finish** [4] - 870:9, 870:16, 939:10, 967:5
**finished** [5] - 872:8, 872:12, 875:2, 925:13, 1066:4
**finishing** [1] - 870:16
**fired** [11] - 941:17, 942:15, 943:5, 965:21, 965:23, 966:10, 966:11, 1048:14, 1048:15, 1048:21, 1048:22
**firm** [23] - 867:5, 867:9, 867:17, 885:8, 887:7, 904:19, 911:25, 912:2, 916:12, 916:16, 916:25, 918:8, 1024:8, 1045:20, 1046:19, 1049:12, 1049:19, 1049:21, 1049:24, 1058:25, 1107:2, 1107:12, 1107:14

**firms** [14] - 945:5, 945:6, 968:11, 968:13, 968:20, 968:24, 969:2, 1043:4, 1049:25, 1057:12, 1059:13, 1059:18, 1059:23, 1059:25
**first** [39] - 855:24, 865:4, 870:24, 875:25, 877:15, 878:6, 879:23, 890:10, 890:16, 909:12, 914:23, 920:4, 928:8, 930:24, 931:1, 942:14, 946:23, 958:2, 963:22, 969:16, 976:17, 976:18, 976:19, 993:18, 1019:19, 1031:23, 1032:5, 1034:5, 1043:21, 1055:22, 1056:1, 1056:12, 1056:25, 1061:14, 1067:1, 1067:10, 1074:18, 1076:21, 1099:14
**firsthand** [1] - 1115:2
**fiscal** [2] - 870:1, 870:6
**five** [7] - 885:23, 885:24, 933:25, 960:15, 960:17, 995:3, 1021:10
**fix** [3] - 891:23, 892:2, 1098:13
**flag** [2] - 869:2, 869:3
**flip** [5] - 885:5, 921:11, 1019:15, 1072:24, 1072:25
**Floor** [1] - 854:4
**Flores** [2] - 857:24, 858:15
**Florida** [1] - 854:13
**flow** [4] - 950:1, 950:10, 950:14, 1086:21
**flows** [3] - 1007:23, 1019:17, 1019:21
**focus** [3] - 1024:13, 1024:15, 1106:21
**folks** [6] - 984:22, 987:6, 999:7, 1000:25, 1001:23, 1058:2
**follow** [8] - 890:6, 904:25, 975:24, 1020:14, 1085:11, 1085:17, 1085:18, 1090:16
**follow-up** [1] - 1085:11
**followed** [1] - 905:6
**following** [23] - 860:12, 869:19, 897:7, 901:7, 903:11, 915:3, 920:11, 920:13, 920:19, 921:22, 938:1, 941:5, 996:21, 1013:1, 1023:9, 1024:25, 1028:10, 1042:18, 1046:25, 1075:24, 1077:11, 1079:5, 1107:21
**follows** [3] - 862:17, 950:5, 950:25
**followup** [1] - 916:21
**footnote** [2] - 1017:24, 1018:1
**footnotes** [2] - 915:6, 915:22
**forced** [3] - 1021:2, 1021:4, 1096:5
**form** [14] - 917:4, 981:1, 1026:8, 1026:13, 1026:24, 1027:22, 1030:6, 1070:24, 1072:16, 1073:2, 1073:8, 1073:17, 1076:11, 1076:12
**format** [5] - 864:7, 864:10, 864:16, 864:20, 864:22
**formatted** [1] - 864:25
**formed** [1] - 1066:23
**former** [1] - 1061:21
**forth** [4] - 868:3, 868:5, 915:20, 1023:11
**Fortress** [1] - 1049:12
**forward** [8] - 1019:24, 1031:1, 1035:10, 1036:12, 1041:23, 1070:1, 1104:3, 1109:18
**forwarded** [1] - 1100:9
**foundation** [2] - 1010:11, 1113:7
**four** [5] - 1007:8, 1049:21, 1049:24, 1104:12
**FOX** [2] - 854:2, 854:7
**Frangioni** [30] - 870:8, 876:3, 876:9,

Case 1:21-cr-00054-RPK-PK    Document 424-2    Filed 07/12/24    Page 279 of 294
PageID #: 14343
(fraud - guaranty)                                                    Page 12

876:14, 876:18, 882:15, 905:10, 911:8,
911:23, 922:10, 923:5, 924:1, 926:24,
927:12, 927:13, 928:2, 928:19, 974:22,
977:9, 979:3, 980:12, 982:25, 983:18,
1085:8, 1089:7, 1089:19, 1090:24,
1094:15, 1095:13, 1095:24

**fraud** [33] - 898:16, 899:19, 899:25,
900:9, 900:10, 900:14, 900:16, 900:20,
938:14, 938:19, 939:4, 966:14, 967:19,
967:24, 968:2, 968:7, 968:14, 968:24,
1060:12, 1060:15, 1060:22, 1061:15,
1061:16, 1061:19, 1061:20, 1062:2,
1062:15, 1062:25, 1063:1, 1063:4,
1063:6, 1081:6, 1110:24

**fraudulent** [1] - 938:12

**free** [1] - 907:19

**frequency** [1] - 1062:3

**frequently** [2] - 1009:12, 1097:9

**Friday** [6] - 853:7, 862:8, 862:11,
862:12, 883:24, 1101:15

**Fridays** [5] - 860:12, 860:14, 860:16,
862:7

**front** [6] - 898:4, 1033:5, 1033:24,
1055:23, 1056:14, 1106:17

**full** [1] - 857:23

**fully** [8] - 877:2, 900:13, 900:17, 998:5,
998:14, 1000:2, 1003:8, 1017:19

**function** [2] - 1042:12, 1043:4

**fund** [45] - 863:21, 864:13, 867:3, 870:2,
870:6, 870:25, 886:11, 886:17, 900:12,
912:1, 912:12, 912:15, 913:2, 914:18,
917:3, 917:7, 917:8, 932:20, 936:5,
947:1, 947:2, 950:3, 966:5, 980:24,
998:1, 999:14, 1009:23, 1009:24,
1011:13, 1017:12, 1018:24, 1023:17,
1039:22, 1053:22, 1054:7, 1054:13,
1054:15, 1064:19, 1090:3, 1090:4,
1091:18, 1092:1, 1092:10, 1094:20

**Fund** [2] - 946:19, 947:14, 1096:7

**fund's** [1] - 1096:5

**fund-level** [1] - 1090:3

**funded** [1] - 900:13

**funds** [24] - 877:1, 877:4, 893:5, 893:8,
900:5, 900:16, 915:8, 946:23, 950:4,
950:23, 950:24, 960:1, 965:17, 980:22,
999:11, 1017:19, 1020:7, 1020:11,
1023:14, 1039:22, 1042:1, 1051:21,
1053:3, 1054:6

**furtherance** [7] - 898:18, 898:20, 899:1,
899:5, 899:8, 899:23, 900:3

**Furthermore** [1] - 952:15

**future** [2] - 948:11, 981:4

**FYI** [1] - 918:2

## G

**GAAP** [1] - 1088:20

**Gage** [9] - 904:24, 905:2, 913:13, 915:2,
915:19, 918:23, 920:11, 922:9, 926:3

**gains** [1] - 887:4

**game** [1] - 856:23

**Garden** [4] - 926:24, 927:13, 928:5,
982:7

**gearing** [1] - 891:9

**General** [1] - 1048:7

**general** [1] - 1114:25

**generally** [12] - 867:20, 869:7, 873:11,
875:12, 899:23, 911:3, 916:24, 935:25,
946:25, 947:15, 1007:25, 1088:21

**generate** [2] - 980:24, 981:13

**generated** [1] - 950:2

**generous** [1] - 1066:21

**GENTILE** [1] - 853:8

**Gentile** [97] - 853:20, 855:3, 855:11,
856:14, 856:25, 861:5, 871:4, 871:8,
872:1, 884:3, 891:20, 891:21, 891:25,
895:11, 895:17, 896:4, 896:6, 896:8,
896:16, 896:24, 898:6, 898:15, 902:4,
902:9, 904:22, 904:25, 905:6, 905:9,
905:19, 905:22, 911:6, 912:2, 912:6,
912:17, 913:1, 914:9, 918:16, 920:12,
922:9, 923:5, 924:1, 928:4, 937:9,
937:11, 937:13, 938:4, 938:5, 938:22,
938:23, 939:7, 940:9, 940:24, 941:12,
942:17, 944:6, 952:23, 953:3, 953:9,
953:15, 953:20, 956:18, 957:21, 959:4,
959:9, 959:14, 963:9, 991:8, 996:12,
996:22, 997:16, 997:25, 1024:2, 1045:9,
1047:14, 1050:6, 1052:15, 1055:5,
1077:2, 1078:6, 1081:1, 1081:5, 1085:6,
1085:7, 1085:15, 1085:16, 1090:14,
1090:18, 1095:10, 1095:19, 1095:21,
1095:25, 1110:21, 1110:24, 1111:6,
1111:10, 1111:14, 1111:20

**Gentile's** [2] - 895:18, 921:4

**gentleman** [4] - 936:3, 1027:19,
1058:11, 1072:14

**gentlemen** [1] - 982:1

**given** [7] - 902:22, 937:5, 941:15,
1066:22, 1102:8, 1104:12, 1108:20

**GLENN** [1] - 854:5

**Glenn** [1] - 855:13

**glossary** [1] - 1027:22

**GMC** [4] - 905:13, 931:16, 993:4,
1015:10

**Government** [98] - 853:14, 860:20,
863:7, 864:15, 871:19, 874:24, 875:1,
875:16, 879:20, 882:9, 884:6, 884:12,
890:24, 908:11, 909:4, 910:21, 911:15,
911:18, 913:5, 913:23, 914:21, 915:14,
916:19, 917:23, 918:21, 919:2, 919:7,
919:14, 922:3, 922:23, 923:9, 923:12,
924:10, 925:1, 925:17, 926:6, 927:6,
927:19, 928:10, 928:14, 928:24, 929:17,
930:21, 931:22, 932:3, 932:12, 933:8,
946:16, 947:24, 948:19, 951:24, 954:23,
956:23, 961:6, 961:8, 966:16, 970:12,
976:19, 988:13, 989:4, 990:8, 991:23,
993:11, 1001:14, 1002:5, 1006:3, 1007:5,
1016:23, 1018:17, 1032:15, 1037:12,
1039:12, 1093:10, 1094:8, 1098:9,
1101:23, 1104:9, 1104:11, 1104:17,
1108:25, 1110:16, 1118:12, 1118:13,
1118:14, 1118:15, 1118:16, 1118:17,
1118:18, 1118:19, 1118:20, 1118:21,
1118:22, 1118:23, 1118:24, 1118:25,
1119:1, 1119:2, 1119:3

**Government's** [18] - 872:25, 875:20,
880:23, 883:8, 884:14, 974:5, 974:8,
992:7, 1094:12, 1101:24, 1118:5, 1118:7,
1118:8, 1118:10, 1118:11, 1119:4,
1119:8, 1119:17

**governmental** [2] - 1069:3, 1069:10

**GPB** [71] - 866:7, 867:8, 867:19, 869:5,
869:9, 869:11, 869:20, 869:24, 875:14,
883:12, 891:13, 903:10, 912:8, 912:18,
912:24, 941:25, 943:5, 943:13, 943:14,
944:22, 945:5, 948:7, 949:16, 950:2,
950:24, 954:9, 956:24, 961:14, 963:3,
965:7, 965:11, 967:19, 967:20, 968:8,
968:25, 969:16, 970:23, 974:21, 975:11,
976:3, 980:21, 991:4, 991:5, 992:18,
995:2, 995:19, 1007:22, 1020:5, 1020:23,
1025:8, 1026:1, 1026:15, 1028:6,
1029:17, 1038:8, 1040:5, 1047:7,
1048:12, 1055:25, 1059:19, 1059:23,
1063:7, 1063:9, 1063:16, 1066:22,
1088:14, 1089:22, 1089:25, 1090:2,
1095:6, 1110:21

**GPB's** [3] - 864:3, 1114:4, 1115:5

**Grand** [2] - 943:8, 943:19

**graph** [1] - 987:5

**Gray** [1] - 976:25

**great** [9] - 858:7, 860:6, 891:7, 901:5,
939:21, 956:7, 1081:14, 1099:25,
1115:23

**greater** [1] - 999:12

**grey** [1] - 1043:8

**gross** [1] - 1068:2

**ground** [1] - 944:4

**group** [3] - 895:24, 936:2, 936:4

**growing** [1] - 942:2

**guarantee** [6] - 888:20, 972:14, 985:12,
995:21, 1008:5, 1015:24

**guaranteed** [4] - 976:2, 976:23, 985:2,
1008:6

**guarantees** [3] - 889:5, 889:25, 981:5

**guaranties** [55] - 856:11, 856:15, 861:3,
869:5, 869:8, 869:21, 869:25, 870:21,
871:2, 871:6, 871:9, 871:11, 874:21,
875:9, 876:2, 877:23, 878:12, 879:17,
885:10, 888:11, 888:23, 889:17, 890:13,
960:10, 962:16, 962:17, 969:4, 969:7,
969:17, 970:4, 971:11, 971:25, 973:7,
980:15, 981:2, 981:7, 983:20, 984:4,
987:11, 987:13, 987:15, 987:21, 987:25,
988:4, 989:6, 989:7, 989:16, 990:1,
990:4, 991:4, 991:9, 992:12, 1056:22,
1062:21

**guaranty** [82] - 856:3, 856:4, 856:5,
869:11, 871:25, 876:19, 877:3, 880:3,
881:4, 881:8, 881:19, 882:20, 885:15,
887:21, 905:12, 905:14, 905:20, 905:23,
906:19, 921:11, 922:21, 923:7, 923:22,
924:3, 924:4, 925:12, 929:7, 930:6,
930:25, 931:2, 931:10, 931:12, 932:1,
932:23, 934:3, 934:8, 934:13, 935:5,
935:12, 940:12, 972:23, 973:10, 977:6,
981:16, 984:14, 986:6, 988:1, 988:11,
988:17, 989:20, 990:21, 990:25, 991:15,
993:2, 993:3, 993:21, 996:5, 996:10,
996:13, 996:20, 996:23, 997:8, 997:13,
997:18, 998:1, 998:7, 1000:2, 1002:15,
1002:18, 1003:4, 1007:11, 1008:8,
1015:6, 1015:8, 1015:9, 1015:12,
1015:16, 1015:23, 1016:2, 1016:7,
1016:13

(guarantys    incoming)

**guarantys** [3] - 938:12, 995:24, 996:1
**guess** [21] - 898:21, 898:24, 987:8, 1033:3, 1033:6, 1034:17, 1036:21, 1036:25, 1043:12, 1046:16, 1058:8, 1065:1, 1076:23, 1090:21, 1099:19, 1099:20, 1101:2, 1106:19, 1107:1, 1113:12, 1114:7
**guidance** [1] - 915:24
**guilty** [2] - 1084:2, 1084:7
**guy** [1] - 981:6
**guys** [3] - 904:20, 913:18, 966:7

## H

**HA** [1] - 883:12
**half** [6] - 894:21, 960:17, 964:14, 983:13, 983:14, 1016:6
**hand** [5] - 940:5, 947:12, 947:14, 1014:12, 1066:7
**handed** [1] - 986:13
**handle** [1] - 899:9
**handy** [1] - 1052:7
**happy** [2] - 899:9, 1109:13
**hard** [1] - 913:8
**harder** [1] - 1062:5
**hats** [4] - 1087:19, 1087:23, 1088:7
**head** [2] - 864:2, 872:11
**heads** [1] - 1101:4
**hear** [6] - 1008:4, 1013:5, 1029:12, 1105:19, 1109:13, 1113:11
**heard** [10] - 883:25, 899:13, 900:7, 905:20, 922:20, 924:4, 931:2, 993:1, 993:5, 1114:20
**hearing** [13] - 898:2, 900:13, 900:17, 921:2, 928:3, 928:4, 937:21, 938:2, 1012:6, 1013:2, 1043:2, 1045:7, 1076:2
**hearsay** [16] - 896:25, 897:1, 897:3, 907:16, 907:25, 1033:13, 1034:16, 1034:18, 1034:20, 1035:4, 1035:5, 1036:6, 1036:15, 1036:18, 1038:22, 1038:24
**heck** [1] - 965:8
**hedge** [1] - 999:11
**held** [14] - 858:22, 861:19, 861:25, 898:1, 921:1, 937:21, 978:2, 986:1, 1012:6, 1023:24, 1043:1, 1076:1, 1084:20, 1093:22
**Hello** [1] - 975:22
**help** [12] - 870:18, 895:7, 909:22, 915:9, 942:2, 967:9, 1014:10, 1014:14, 1041:10, 1065:24, 1087:17, 1102:9
**helped** [3] - 870:9, 967:12, 967:15
**helpful** [1] - 1108:5
**helping** [4] - 867:21, 991:9, 1000:5, 1100:16
**helps** [1] - 888:8
**Hi** [2] - 976:22, 978:24
**hi** [2] - 912:5, 1096:4
**High** [2] - 994:1, 995:2
**highlight** [11] - 891:5, 935:6, 951:20, 952:3, 971:4, 975:13, 980:10, 994:1, 1058:10, 1068:23, 1106:22
**highlighted** [3] - 980:11, 984:7, 1025:13
**highlighting** [1] - 1038:6
**highly** [2] - 1048:10, 1107:15

**hire** [2] - 941:19, 1024:2
**hired** [10] - 941:20, 1021:6, 1021:7, 1021:19, 1021:21, 1024:4, 1029:10, 1047:7, 1047:13, 1063:7
**hiring** [1] - 1047:15
**historically** [1] - 950:4
**history** [1] - 991:17
**hit** [11] - 869:16, 869:19, 869:22, 883:2, 883:3, 970:5, 971:11, 971:12, 989:22, 1082:15, 1096:13
**hm** [1] - 913:16
**Hock** [1] - 975:12
**hold** [7] - 875:4, 913:9, 1000:18, 1029:23, 1052:10, 1058:17, 1114:5
**holding** [2] - 1102:10, 1102:15
**holdings** [6] - 909:24, 910:5, 950:9, 1099:25, 1100:24, 1101:2
**Holdings** [19] - 873:25, 881:4, 912:18, 912:23, 914:4, 946:22, 947:21, 950:9, 970:5, 970:23, 976:3, 988:18, 989:11, 1040:5, 1100:4, 1100:19, 1100:25, 1101:5
**Holdings 1** [14] - 870:2, 871:2, 879:5, 879:6, 879:7, 884:4, 933:22, 970:25, 987:12, 987:25, 988:5, 989:7, 989:16, 989:22
**holds** [2] - 1028:2, 1095:9
**home** [4] - 942:4, 964:11, 1064:2, 1064:3
**Honda** [1] - 892:11
**honestly** [3] - 1060:7, 1102:7, 1115:1
**Honor** [82] - 855:10, 855:13, 855:20, 859:2, 860:19, 861:13, 861:20, 862:21, 872:3, 872:20, 875:16, 880:20, 883:5, 896:20, 898:4, 899:10, 900:23, 907:16, 908:22, 917:14, 917:15, 917:19, 919:3, 920:14, 921:3, 922:2, 924:23, 936:11, 937:16, 938:13, 948:11, 954:22, 956:13, 974:5, 982:21, 983:6, 1004:9, 1014:21, 1029:25, 1030:8, 1034:11, 1035:9, 1036:17, 1037:2, 1037:12, 1038:21, 1039:8, 1043:7, 1043:19, 1046:1, 1046:6, 1057:20, 1066:19, 1070:11, 1073:12, 1073:15, 1074:1, 1075:18, 1080:1, 1084:19, 1093:18, 1093:20, 1098:10, 1101:21, 1102:7, 1102:11, 1102:21, 1105:11, 1105:17, 1106:4, 1106:5, 1106:15, 1107:3, 1107:8, 1107:11, 1108:11, 1109:6, 1111:25, 1112:13, 1114:7, 1114:8
**Honor's** [2] - 1106:15, 1112:16
**HONORABLE** [1] - 853:11
**hope** [3] - 862:9, 916:4, 940:3
**hopeful** [1] - 859:21
**hopefully** [1] - 1098:8
**hoping** [2] - 1081:13, 1082:23
**hotline** [1] - 1080:22
**hours** [6] - 1103:12, 1103:13, 1104:4, 1104:19, 1104:22, 1104:25
**house** [3] - 878:17, 924:16, 1040:10
**housekeeping** [1] - 939:8
**huge** [2] - 1083:19
**hundred** [2] - 887:1, 971:14, 1031:21
**Huntington** [1] - 982:7
**hurting** [1] - 896:13
**hypothetical** [1] - 1053:25

**hypothetically** [1] - 1015:14

## I

**i.e** [1] - 1090:3
**iceberg** [1] - 1111:13
**idea** [2] - 857:9, 1054:4
**identical** [1] - 905:15
**identification** [2] - 871:19, 882:8
**identified** [2] - 1063:2, 1102:5
**identify** [3] - 882:11, 913:7, 920:6
**identifying** [1] - 1062:24
**identity** [1] - 1112:3
**ignored** [2] - 967:25, 968:4
**II** [5] - 946:22, 1008:11, 1008:13, 1099:25, 1100:19
**IID** [3] - 990:9, 990:12, 1119:7
**illegal** [4] - 961:19, 1069:9, 1098:4, 1098:5
**illegality** [1] - 1078:5
**imagine** [2] - 1102:4, 1111:3
**impact** [4] - 913:2, 1083:3, 1083:20, 1084:3
**impeach** [3] - 1076:17, 1076:22, 1077:4
**impeaching** [1] - 1034:21
**impeachment** [4] - 1033:16, 1033:23, 1076:12, 1076:15
**impermissible** [1] - 1086:23
**implement** [2] - 1023:13, 1025:13
**important** [4] - 868:17, 916:1, 958:23, 992:19
**impression** [3] - 1045:4, 1045:6, 1108:20
**imprimatur** [1] - 1109:1
**improper** [2] - 938:18, 1004:1, 1037:17
**improprieties** [1] - 859:14
**impropriety** [1] - 945:13
**improve** [2] - 893:25, 1060:4
**in-house** [3] - 878:17, 924:16, 1040:10
**inaccurate** [2] - 865:10, 865:12
**incentivize** [1] - 894:4
**inception** [2] - 950:24, 951:18
**inclined** [3] - 898:24, 1113:4, 1113:14
**include** [7] - 919:16, 952:16, 953:2, 953:10, 954:4, 1023:9, 1041:17
**included** [15] - 888:13, 889:5, 903:15, 906:19, 912:7, 917:11, 935:17, 973:16, 973:20, 995:11, 1019:4, 1044:19, 1044:20, 1085:8, 1085:9
**includes** [3] - 886:12, 886:13, 1043:22
**including** [10] - 891:19, 954:11, 995:4, 1025:3, 1062:3, 1063:1, 1063:4, 1070:22, 1115:6, 1115:7
**inclusion** [2] - 998:3, 998:13
**income** [46] - 877:4, 885:17, 886:5, 886:6, 886:10, 886:17, 886:19, 886:20, 886:22, 887:17, 887:19, 887:23, 887:25, 888:21, 889:6, 889:16, 890:21, 891:6, 892:9, 893:3, 893:25, 902:24, 912:5, 912:7, 912:8, 912:9, 934:6, 934:7, 934:8, 934:12, 934:25, 935:11, 935:17, 971:18, 972:14, 973:17, 973:21, 997:20, 997:21, 998:15, 998:24, 1019:2, 1019:14, 1019:19, 1020:2
**incoming** [1] - 907:13

**inconsistent** [4] - 1044:14, 1076:17, 1076:21, 1091:19
**incorrect** [2] - 881:16, 1078:15
**increases** [1] - 1111:9
**increasing** [1] - 895:10
**incredibly** [1] - 1112:6
**increments** [1] - 869:15
**incurred** [1] - 1051:12
**independent** [2] - 867:5, 867:16
**independently** [1] - 905:1
**INDEX** [1] - 1117:1
**iNDEX** [1] - 1118:2
**indicate** [3] - 863:19, 882:5, 1074:2
**indicated** [3] - 889:21, 898:10, 1053:8
**indicates** [9] - 858:11, 860:11, 869:1, 881:12, 881:24, 882:1, 931:7, 935:10, 935:19
**indicating** [1] - 862:7
**indication** [1] - 1045:14
**indictment** [1] - 1046:4
**industry** [1] - 945:4
**inefficient** [1] - 857:15
**inflammatory** [1] - 859:10
**influence** [2] - 1028:3, 1028:6
**inform** [2] - 937:12, 942:6
**information** [24] - 866:14, 889:13, 895:22, 898:8, 899:18, 904:24, 907:21, 914:15, 921:19, 925:14, 933:3, 944:10, 944:13, 965:20, 976:13, 1014:7, 1056:3, 1070:8, 1070:13, 1070:22, 1070:23, 1071:12, 1071:20
**ingenious** [2] - 1086:2, 1086:4
**initial** [2] - 941:4, 941:8
**inquire** [4] - 862:21, 1045:3, 1105:12, 1106:10
**inquiry** [1] - 1105:25
**inserted** [5] - 957:20, 959:6, 1043:20, 1044:7, 1045:20
**inside** [1] - 1114:16
**instead** [5] - 905:11, 924:2, 1003:14, 1006:20, 1101:14
**institutional** [1] - 943:21
**instruct** [2] - 859:23, 861:8
**instructed** [2] - 859:22, 906:7
**instruction** [10] - 1107:6, 1107:18, 1108:6, 1108:8, 1108:12, 1112:12, 1112:20, 1113:4, 1113:15, 1113:17
**insurance** [1] - 981:12
**integrity** [1] - 914:19
**intend** [6] - 860:2, 996:2, 1102:10, 1102:12, 1103:5, 1108:16
**intended** [1] - 1106:2
**intends** [2] - 995:2, 995:19
**intent** [1] - 1114:22
**interaccount** [1] - 1084:25
**interacting** [1] - 968:13
**interest** [4] - 889:4, 889:6, 973:17, 973:21
**interested** [1] - 1081:24
**interfaced** [1] - 975:10
**internal** [3] - 864:3, 1023:13, 1024:16
**internally** [1] - 867:7
**interpreted** [1] - 986:11
**interview** [3] - 961:19, 961:20, 961:22
**interviewed** [1] - 968:19, 968:23,

**inconsistent** [1] - 1057:13, 1058:25, 1059:3, 1059:7, 1059:9, 1059:14, 1104:13
**introduce** [4] - 860:3, 1037:13, 1044:13, 1046:14
**introduced** [2] - 858:11, 1036:1
**introduction** [1] - 943:24
**invade** [1] - 1105:20
**inventory** [1] - 1062:7
**invest** [1] - 998:21
**invested** [9] - 865:16, 866:2, 866:5, 894:16, 903:22, 904:2, 952:16, 954:4, 1096:8
**investee's** [1] - 1062:7
**investigating** [1] - 980:21
**investigation** [3] - 1069:4, 1069:12, 1069:14
**investing** [1] - 867:14
**investment** [48] - 866:23, 886:10, 886:17, 886:19, 886:22, 887:19, 887:23, 887:25, 890:21, 893:3, 893:25, 902:24, 903:8, 907:9, 934:6, 934:7, 934:8, 934:12, 935:11, 951:9, 959:21, 961:24, 971:7, 971:17, 998:13, 998:14, 999:4, 999:11, 1019:2, 1019:14, 1020:2, 1026:16, 1049:12, 1084:25, 1085:21, 1089:21, 1090:1, 1090:6, 1091:2, 1091:10, 1094:18, 1095:14, 1096:5, 1100:1, 1100:2, 1100:18, 1101:8
**investments** [7] - 889:6, 893:7, 935:17, 973:17, 973:21, 992:21, 1095:8
**investor** [12] - 865:13, 900:5, 940:15, 942:6, 952:25, 953:2, 953:16, 954:11, 999:8, 1018:8, 1023:9, 1093:4
**investors** [42] - 864:5, 866:7, 866:21, 894:16, 894:23, 895:2, 899:10, 899:13, 899:21, 900:11, 900:16, 900:18, 904:21, 905:8, 912:14, 916:7, 917:3, 940:18, 943:21, 945:7, 949:20, 950:3, 950:24, 953:13, 953:19, 959:19, 965:19, 991:9, 991:12, 991:14, 992:19, 998:5, 998:10, 998:12, 999:12, 1020:13, 1023:10, 1033:20, 1051:16, 1056:21, 1091:21, 1092:2
**investors'** [1] - 895:3
**invoked** [1] - 1043:11
**involve** [1] - 1102:14
**involved** [15] - 858:8, 917:9, 925:25, 967:6, 967:13, 967:15, 969:19, 969:22, 980:3, 996:11, 1041:8, 1108:24, 1109:3, 1109:19, 1110:2
**involvement** [6] - 866:6, 866:9, 1043:11, 1045:14, 1106:11, 1106:22
**involving** [5] - 856:6, 861:15, 870:21, 935:22, 1052:21
**iPhone** [1] - 1091:3
**issue** [34] - 855:24, 858:8, 859:6, 862:5, 870:20, 871:1, 871:4, 894:8, 899:7, 916:16, 917:1, 917:17, 983:7, 983:10, 1024:18, 1033:19, 1034:17, 1036:17, 1038:2, 1038:3, 1043:6, 1044:10, 1045:5, 1102:11, 1104:7, 1104:8, 1105:16, 1106:8, 1107:2, 1107:14, 1107:19, 1110:12, 1113:13, 1115:9
**issued** [6] - 856:4, 884:4, 889:20, 933:5, 933:13, 950:7
**issues** [8] - 855:21, 860:5, 1055:23,

1062:7, 1102:8, 1103:22, 1104:6, 1105:6
**item** [1] - 876:25
**items** [2] - 868:4, 904:11

## J

**Jack** [1] - 886:1
**jackpot** [1] - 1082:15
**JACOBY** [2] - 862:16, 1117:5
**Jacoby** [85] - 856:8, 857:15, 862:14, 862:19, 863:1, 863:9, 863:13, 864:16, 871:20, 873:4, 874:10, 875:1, 879:25, 880:17, 881:3, 881:21, 882:10, 884:9, 884:18, 885:15, 888:6, 891:8, 902:7, 908:6, 909:16, 911:8, 912:11, 913:8, 915:1, 915:15, 919:12, 919:24, 920:5, 923:17, 925:4, 930:4, 931:1, 931:11, 932:17, 934:2, 935:4, 935:8, 936:15, 940:9, 946:19, 948:25, 949:4, 949:16, 950:1, 951:23, 952:9, 956:16, 977:8, 978:5, 979:3, 980:12, 983:17, 990:21, 1002:8, 1005:16, 1005:21, 1010:18, 1011:7, 1011:8, 1022:12, 1030:4, 1030:18, 1030:21, 1035:16, 1040:2, 1043:22, 1044:17, 1047:6, 1060:22, 1066:2, 1072:23, 1098:20, 1099:16, 1108:2, 1108:14, 1108:17, 1113:21, 1114:16, 1114:20, 1114:22
**Jacoby's** [3] - 955:2, 955:4, 978:4
**JAMES** [1] - 854:11
**January** [14] - 912:10, 930:25, 949:4, 950:25, 964:22, 964:23, 964:24, 1002:19, 1047:11, 1050:16, 1056:7, 1056:10, 1061:8, 1062:10
**Jeff** [9] - 873:9, 888:16, 888:17, 969:17, 975:23, 1036:23, 1037:3, 1042:2, 1095:10
**Jeffrey** [2] - 856:1, 988:18
**JEFFRY** [1] - 853:8
**Jeffry** [5] - 854:3, 854:8, 854:12, 855:3, 855:15
**Jersey** [1] - 892:11
**Jessica** [1] - 855:5
**JESSICA** [1] - 853:16
**jet** [11] - 1050:3, 1050:7, 1050:16, 1050:18, 1052:14, 1052:21, 1053:3, 1053:10, 1053:12, 1053:20, 1053:23
**JetBlue** [1] - 1053:24
**Jim** [4] - 877:17, 878:14, 878:16, 879:11
**JJ-11** [1] - 1010:13
**job** [13] - 943:5, 966:25, 968:16, 994:7, 1020:11, 1021:10, 1021:15, 1021:16, 1021:17, 1024:10, 1059:24, 1060:1, 1086:19
**jobs** [1] - 968:13
**John** [3] - 855:11, 1046:14
**joined** [4] - 855:7, 1022:19, 1038:18, 1040:22
**JONATHAN** [1] - 853:23
**Jovan** [3] - 974:25, 1095:10, 1096:4
**Judge** [4] - 861:12, 908:2, 1037:4, 1038:16
**judge** [1] - 955:8
**judgment** [7] - 1081:10, 1081:22, 1082:6, 1082:9, 1082:14, 1083:4,

1083:16

**July** [3] - 860:13, 936:7

**jump** [1] - 858:1

**June** [7] - 853:7, 860:12, 860:13, 952:6, 956:24, 1116:10

**juror** [2] - 860:10, 860:11, 860:15

**jurors** [4] - 855:17, 862:1, 956:5, 956:9

**jury** [69] - 860:7, 860:8, 860:22, 861:11, 861:23, 865:2, 865:7, 867:20, 869:7, 871:1, 873:16, 884:17, 898:2, 898:5, 909:5, 910:15, 911:20, 913:25, 917:25, 919:9, 921:2, 923:14, 926:8, 926:22, 929:1, 929:18, 932:13, 935:25, 937:21, 938:2, 945:2, 952:21, 957:5, 957:19, 958:8, 959:3, 960:9, 966:20, 968:6, 973:11, 975:8, 981:24, 986:1, 997:4, 1001:16, 1001:21, 1012:6, 1013:2, 1032:24, 1033:24, 1034:24, 1038:14, 1040:17, 1043:2, 1045:2, 1052:6, 1052:13, 1054:4, 1055:23, 1056:15, 1062:21, 1076:2, 1080:3, 1087:17, 1091:16, 1111:4, 1113:18, 1116:7

**Jury** [6] - 862:2, 954:19, 956:10, 1033:1, 1039:5, 1101:19

# K

**K-1** [1] - 917:4

**K-1s** [1] - 917:9

**KATE** [1] - 853:17

**Kate** [1] - 855:6

**keep** [6] - 877:1, 983:9, 995:16, 1019:24, 1067:11, 1112:17

**Kelly** [5] - 1035:10, 1036:12, 1036:24, 1037:3, 1041:23

**kept** [2] - 1020:17, 1044:5

**key** [2] - 1028:2, 1093:7

**kgil** [1] - 1100:10

**Kgil** [15] - 941:20, 942:6, 963:15, 1031:23, 1031:25, 1033:14, 1034:19, 1034:22, 1038:16, 1040:8, 1040:21, 1042:8, 1048:24, 1049:4, 1063:24

**Kgil's** [1] - 1033:11

**kick** [1] - 1016:7

**kicking** [1] - 912:12

**KIM** [1] - 853:19

**kind** [4] - 945:23, 1043:9, 1109:24, 1112:25

**KKL** [1] - 1009:4

**knock** [1] - 870:18

**knocked** [1] - 904:11

**knowing** [3] - 991:16, 1006:17, 1102:13

**knowledge** [8] - 881:22, 900:12, 932:25, 1033:13, 1035:24, 1061:15, 1091:6, 1115:2

**known** [6] - 944:25, 950:3, 970:25, 995:7, 1008:11, 1095:21

**knows** [4] - 1011:25, 1032:8, 1043:20, 1112:13

**KOBRE** [1] - 853:19

**KOVNER** [1] - 853:11

**Kowalski** [1] - 1002:11

**KPMG** [1] - 1049:19

**Kyle** [4] - 911:7, 911:23, 911:24, 916:15

# L

**L.A** [1] - 1107:1

**labeled** [2] - 997:17, 1003:1

**language** [27] - 922:14, 931:24, 945:19, 952:12, 952:19, 953:3, 953:10, 953:24, 954:3, 957:12, 957:15, 957:20, 957:23, 958:9, 959:5, 960:7, 962:14, 971:21, 1043:18, 1043:22, 1044:10, 1044:16, 1046:3, 1109:15, 1110:23, 1110:25

**large** [6] - 856:7, 857:10, 936:4, 1026:19, 1088:19

**larger** [2] - 930:8, 931:15

**Lash** [60] - 856:1, 873:9, 888:16, 888:17, 905:12, 906:2, 906:3, 906:15, 911:6, 924:2, 924:14, 925:7, 926:15, 926:17, 926:22, 927:12, 927:14, 928:5, 928:19, 930:6, 930:14, 931:6, 931:17, 932:25, 936:19, 936:22, 937:2, 937:5, 969:17, 969:25, 972:5, 973:3, 973:4, 982:11, 984:4, 984:6, 987:23, 988:4, 988:18, 989:6, 990:3, 990:15, 993:1, 995:11, 995:24, 996:11, 996:12, 996:17, 996:23, 997:16, 1003:7, 1006:3, 1007:11, 1008:5, 1009:21, 1015:12, 1055:18, 1102:8, 1102:24, 1105:5

**lash** [14] - 856:8, 856:9, 856:10, 856:16, 857:10, 861:3, 861:9, 871:5, 871:8, 871:24, 877:24, 879:23, 882:22, 883:23

**Lash's** [6] - 857:16, 971:11, 972:9, 972:22, 1095:1, 1102:12

**Lash/Dibre** [1] - 980:14

**Lash/to** [1] - 976:25

**last** [26] - 863:9, 863:10, 878:14, 878:18, 878:24, 887:16, 888:4, 889:8, 904:12, 904:15, 906:1, 906:5, 920:3, 921:8, 921:11, 921:12, 923:19, 956:22, 975:25, 976:16, 976:23, 980:10, 1002:25, 1073:25, 1102:18

**last-minute** [1] - 906:1

**late** [8] - 906:24, 907:1, 907:12, 923:8, 929:5, 929:6, 933:16, 933:18

**Laura** [1] - 855:14

**LAURA** [1] - 854:10

**law** [30] - 856:20, 857:3, 961:14, 961:16, 962:1, 962:4, 962:6, 962:14, 962:18, 962:23, 963:4, 963:11, 963:25, 965:7, 965:13, 966:7, 966:24, 1025:3, 1025:10, 1025:14, 1025:17, 1025:22, 1043:4, 1069:5, 1070:12, 1071:15, 1081:19, 1102:12, 1107:12, 1107:13

**Law** [1] - 1059:16

**LAW** [1] - 854:11

**laws** [2] - 1024:22, 1024:25

**lawsuit** [2] - 944:16, 1064:23

**lawyer** [15] - 1043:21, 1044:15, 1044:16, 1044:20, 1045:18, 1046:8, 1046:21, 1072:8, 1083:25, 1107:5, 1108:20, 1110:2, 1110:9, 1114:2

**lawyers** [15] - 862:9, 1038:5, 1045:3, 1045:8, 1045:11, 1106:21, 1106:23, 1108:17, 1108:23, 1109:2, 1109:19, 1109:22, 1111:21, 1112:7, 1114:9

**lay** [1] - 1010:10

**laying** [1] - 1113:7

**lead** [6] - 859:7, 859:11, 899:25, 936:12, 938:15, 939:3

**leadership** [1] - 1028:2

**leads** [1] - 865:19

**learned** [1] - 857:4

**least** [6] - 868:22, 995:21, 1019:13, 1020:1, 1034:14, 1114:2

**leave** [2] - 1033:4, 1110:14

**leaves** [1] - 1045:4

**leaving** [1] - 939:11

**led** [1] - 1058:11

**left** [9] - 942:13, 943:13, 948:15, 965:23, 1011:4, 1063:16, 1071:18, 1071:21, 1102:3

**legal** [3] - 1105:6, 1111:7, 1114:5

**legality** [1] - 1084:11

**legally** [1] - 1110:3

**lending** [3] - 943:22, 943:25, 999:12

**less** [3] - 886:7, 1016:12, 1106:19

**letter** [11] - 916:13, 933:13, 1003:14, 1006:21, 1022:15, 1043:17, 1102:18, 1102:21, 1105:11, 1105:22, 1110:20

**letters** [1] - 1116:3

**letting** [1] - 871:24

**Level** [1] - 946:19

**level** [6] - 869:22, 874:16, 888:21, 972:15, 990:24, 1090:3

**license** [1] - 1047:22

**lie** [2] - 860:20, 866:1

**lied** [1] - 900:11

**life** [1] - 950:22

**life-to-date** [1] - 950:22

**light** [2] - 861:1, 1112:9

**likely** [5] - 877:17, 941:15, 1045:11, 1063:4, 1102:25

**Likely** [1] - 878:14

**limine** [1] - 1046:2

**limit** [1] - 1106:20

**limited** [6] - 899:12, 1066:6, 1070:22, 1108:6, 1108:18, 1112:25

**limiting** [7] - 1107:5, 1108:8, 1108:12, 1112:11, 1112:20, 1113:4, 1113:15

**line** [10] - 934:18, 944:2, 970:5, 971:8, 1003:17, 1043:23, 1043:24, 1044:19, 1099:22

**lined** [1] - 943:6

**lines** [1] - 1030:1

**list** [5] - 867:24, 868:3, 870:18, 891:19, 977:19

**listed** [6] - 946:23, 949:9, 1027:9, 1027:14, 1027:24, 1056:22

**listener** [1] - 986:5

**listening** [1] - 1108:22

**lists** [1] - 886:15

**live** [1] - 1038:2

**LLP** [3] - 853:19, 854:2, 854:7

**loaded** [2] - 938:21, 939:4

**loan** [1] - 944:1

**locked** [1] - 999:3

**logo** [1] - 1107:12

**look** [51] - 860:2, 864:16, 881:17, 882:10, 884:6, 888:8, 892:19, 893:19, 893:24, 906:18, 908:6, 911:22, 920:5, 920:8, 950:6, 950:21, 951:15, 952:6, 961:3, 961:5, 967:11, 970:9, 978:25, 990:6, 1000:17, 1002:3, 1009:16,

1009:19, 1011:9, 1011:17, 1011:21,
1012:2, 1014:2, 1052:2, 1052:4, 1054:18,
1054:20, 1055:9, 1058:8, 1065:13,
1065:23, 1066:2, 1074:7, 1093:12,
1099:6, 1101:4, 1103:2, 1104:6, 1104:22,
1111:25

**looked** [11] - 919:24, 933:22, 956:23,
970:13, 970:20, 1008:16, 1009:9,
1009:14, 1014:18, 1019:6, 1052:24

**looking** [28] - 858:4, 858:6, 863:9,
865:20, 872:15, 883:16, 885:17, 886:1,
886:4, 888:5, 888:6, 889:10, 889:15,
890:20, 894:17, 910:6, 910:19, 915:15,
919:14, 930:4, 935:15, 972:25, 976:6,
978:18, 988:12, 1016:2, 1093:18,
1104:17

**looks** [18] - 858:7, 884:19, 929:13,
933:11, 957:7, 970:21, 975:21, 992:3,
1002:24, 1015:1, 1017:4, 1019:6,
1019:15, 1026:24, 1073:1, 1075:15,
1100:9, 1107:11

**looped** [5] - 1035:10, 1036:8, 1036:13,
1036:24, 1041:24

**lose** [1] - 1082:20

**loss** [2] - 1055:14, 1055:15

**lost** [2] - 1001:6, 1107:4

**LP** [2] - 976:3, 1007:22

**LP's** [2] - 952:16, 954:4

**LPs** [1] - 954:5

**lunch** [4] - 939:15, 939:20, 940:4,
954:15

**Luncheon** [1] - 955:9

## M

**Macrina** [13] - 941:20, 963:21, 963:22,
967:9, 1031:23, 1033:11, 1035:10,
1035:21, 1036:12, 1036:24, 1037:20,
1041:24, 1063:24

**macrina** [1] - 1031:25

**Madison** [1] - 855:8

**mail** [104] - 854:17, 863:16, 871:23,
872:1, 872:5, 872:21, 873:2, 873:4,
874:17, 875:12, 875:25, 876:12, 877:5,
877:6, 877:10, 877:22, 878:21, 878:25,
908:12, 908:16, 910:11, 910:22, 910:24,
911:3, 911:5, 911:22, 914:2, 914:14,
918:23, 919:11, 920:1, 920:4, 920:5,
920:10, 921:12, 922:9, 922:11, 922:18,
922:25, 923:2, 923:19, 925:19, 927:24,
928:1, 929:8, 932:18, 962:20, 963:18,
964:16, 974:11, 975:2, 976:12, 976:18,
976:20, 978:5, 978:25, 981:21, 982:23,
985:1, 986:7, 986:9, 986:13, 1003:24,
1005:7, 1005:20, 1005:23, 1007:14,
1032:18, 1033:5, 1033:6, 1033:7,
1033:17, 1033:22, 1033:24, 1035:1,
1035:5, 1035:25, 1036:3, 1036:9,
1036:23, 1036:25, 1037:16, 1037:24,
1038:16, 1039:13, 1039:17, 1040:1,
1041:15, 1042:5, 1045:18, 1045:19,
1089:6, 1090:14, 1090:15, 1091:7,
1092:24, 1099:1, 1099:14, 1100:17,
1106:13, 1109:11, 1113:14, 1115:15

**mails** [24] - 860:2, 861:14, 875:5, 875:8,
883:18, 908:7, 915:3, 919:24, 921:5,

963:9, 1000:11, 1000:17, 1037:13,
1037:15, 1040:8, 1044:7, 1052:20,
1057:8, 1109:12, 1110:7, 1112:1,
1114:16, 1115:12, 1115:21

**main** [3] - 900:19, 1024:14, 1114:22

**maintaining** [1] - 995:17

**maker** [1] - 1112:4

**man** [1] - 866:12

**manage** [4] - 907:2, 995:19, 1026:16,
1086:20

**management** [42] - 863:4, 891:12,
891:18, 892:20, 894:18, 895:6, 896:10,
902:11, 903:14, 903:21, 904:5, 904:14,
904:20, 905:11, 905:18, 909:18, 910:18,
912:19, 914:3, 914:7, 918:4, 919:21,
920:12, 921:13, 923:6, 923:20, 924:2,
934:16, 934:21, 966:6, 997:5, 997:14,
997:18, 998:1, 998:6, 1003:14, 1028:4,
1061:15, 1061:19, 1063:1, 1090:3,
1100:3

**management's** [2] - 1062:1, 1062:24

**managerial** [1] - 934:18

**managing** [2] - 949:9, 1095:4

**Manhattan** [1] - 927:14

**manner** [1] - 1035:25

**manufacturers** [1] - 995:8

**March** [16] - 870:11, 870:13, 870:15,
873:4, 874:18, 875:11, 875:25, 883:17,
910:25, 964:6, 964:9, 964:15, 964:19,
993:19, 1056:5

**Margolin** [4] - 904:18, 918:2, 1060:12

**mark** [2] - 887:8, 887:11

**mark-to-market** [2] - 887:8, 887:11

**marked** [53] - 871:19, 873:1, 875:20,
880:23, 882:8, 883:8, 884:14, 919:23,
974:8, 978:21, 990:12, 991:22, 992:7,
1032:14, 1065:16, 1080:8, 1089:13,
1094:12, 1118:6, 1118:7, 1118:8,
1118:10, 1118:11, 1118:12, 1118:13,
1118:14, 1118:15, 1118:16, 1118:17,
1118:18, 1118:19, 1118:20, 1118:21,
1118:22, 1118:23, 1118:24, 1118:25,
1119:1, 1119:2, 1119:3, 1119:4, 1119:5,
1119:7, 1119:8, 1119:9, 1119:10,
1119:11, 1119:12, 1119:13, 1119:14,
1119:15, 1119:16, 1119:17

**market** [2] - 887:8, 887:11

**marketed** [4] - 991:11, 991:13, 992:11,
992:14

**marketing** [23] - 899:17, 959:18, 962:4,
992:18, 1016:20, 1029:13, 1029:16,
1029:18, 1030:22, 1030:23, 1031:16,
1032:6, 1033:12, 1034:6, 1035:11,
1035:22, 1036:4, 1036:10, 1037:21,
1041:4, 1041:6, 1041:25, 1113:24

**marking** [1] - 982:21, 1113:23

**marrying** [1] - 918:7

**Marshall** [8] - 870:8, 871:23, 876:5,
883:23, 911:4, 911:23, 974:12, 976:13

**Maryland** [1] - 892:10

**masses** [2] - 998:19, 999:1

**Matarazzo** [5] - 926:2, 926:11, 932:7,
1002:8, 1005:12

**material** [5] - 981:3, 1007:21, 1104:25,
1113:23, 1113:24

**materiality** [1] - 1112:15

**materially** [1] - 1062:2

**materials** [22] - 959:18, 962:4, 1029:13,
1029:16, 1029:18, 1030:23, 1031:16,
1032:6, 1033:12, 1033:25, 1034:7,
1035:11, 1035:22, 1036:4, 1036:8,
1036:10, 1037:21, 1041:25, 1105:12,
1114:3, 1115:4

**MATHEWS** [2] - 853:17, 1108:11

**Mathews** [1] - 855:6

**Matt** [1] - 956:18

**matter** [7] - 939:8, 1000:18, 1053:23,
1104:8, 1108:23, 1109:5, 1116:10

**matters** [2] - 855:18, 958:17

**MATTHEW** [1] - 853:22

**Matthew** [1] - 855:10

**MC** [2] - 1059:16, 1059:17

**MCCONNELL** [62] - 853:16, 855:5,
855:20, 857:21, 858:2, 858:15, 858:18,
858:21, 858:25, 859:5, 859:23, 860:1,
860:25, 861:10, 861:20, 861:24, 862:21,
862:23, 862:25, 871:18, 872:3, 872:20,
873:2, 873:15, 873:18, 874:23, 875:16,
875:22, 877:10, 878:20, 878:24, 879:19,
880:19, 880:25, 881:17, 883:4, 883:21,
884:7, 884:11, 884:16, 957:25, 974:4,
977:19, 977:22, 977:25, 978:11, 978:14,
978:19, 985:17, 987:7, 988:15, 990:10,
992:1, 992:5, 993:10, 1080:4, 1083:6,
1083:21, 1089:11, 1093:11, 1093:14,
1094:5

**McConnell** [196] - 855:5, 857:3, 885:1,
885:12, 885:20, 885:24, 888:2, 890:23,
891:3, 895:16, 897:2, 899:8, 899:2,
901:2, 902:6, 907:18, 908:1, 908:10,
908:21, 908:25, 909:2, 909:5, 909:9,
909:13, 910:7, 910:10, 910:14, 910:22,
911:14, 911:19, 913:4, 913:19, 913:24,
914:22, 915:11, 915:16, 916:18, 917:14,
917:16, 917:24, 919:2, 919:8, 920:2,
920:14, 921:5, 921:8, 921:10, 921:20,
922:1, 922:2, 922:4, 922:7, 923:9,
923:13, 923:16, 924:22, 925:3, 925:20,
926:7, 926:10, 927:16, 927:20, 927:23,
928:10, 928:15, 928:21, 929:1, 929:10,
929:14, 929:18, 930:2, 930:3, 930:16,
930:19, 930:23, 931:5, 931:21, 932:9,
932:13, 932:16, 933:12, 933:23, 935:2,
936:11, 936:14, 937:16, 937:20, 938:3,
938:9, 938:11, 938:15, 938:20, 938:25,
939:11, 939:21, 940:7, 940:8, 942:12,
946:15, 946:18, 947:23, 948:10, 948:20,
948:22, 948:24, 949:1, 949:3, 949:14,
949:24, 950:20, 951:15, 954:14, 955:1,
970:13, 970:20, 971:22, 974:2, 977:23,
993:14, 999:18, 999:23, 1000:12,
1003:19, 1004:5, 1004:8, 1005:3,
1005:18, 1007:1, 1007:13, 1008:25,
1010:5, 1011:1, 1011:22, 1012:4,
1014:21, 1014:24, 1015:18, 1016:14,
1016:19, 1016:25, 1017:5, 1017:8,
1017:18, 1020:16, 1020:19, 1022:22,
1025:19, 1027:2, 1029:19, 1030:6,
1030:14, 1030:19, 1032:8, 1032:21,
1033:10, 1034:2, 1034:11, 1034:16,
1035:19, 1036:17, 1037:1, 1037:4,
1037:10, 1037:20, 1037:25, 1038:15,
1042:13, 1043:6, 1050:21, 1053:5,

1053:14, 1055:20, 1057:20, 1058:4, 1059:11, 1061:3, 1063:13, 1066:16, 1073:6, 1073:9, 1074:1, 1074:16, 1074:20, 1075:18, 1076:16, 1077:5, 1093:9, 1099:6, 1102:1, 1102:24, 1103:17, 1103:20, 1105:4, 1109:5, 1109:9, 1116:6

**McConnell's** [1] - 859:19

**MCCONNELL**......................... [1] - 1117:7

**mean** [32] - 865:15, 877:21, 878:8, 883:13, 886:9, 887:10, 892:17, 893:6, 906:7, 907:24, 916:5, 916:11, 918:6, 918:10, 933:19, 941:7, 944:19, 951:5, 1008:7, 1026:4, 1031:2, 1035:21, 1044:20, 1045:12, 1081:2, 1081:4, 1082:22, 1086:11, 1086:12, 1097:6, 1098:25, 1105:21

**meaning** [3] - 893:7, 1081:3, 1110:22

**means** [3] - 889:10, 894:25, 916:12

**measure** [1] - 1015:24

**mechanism** [2] - 945:12, 1080:23

**meet** [2] - 857:4, 1100:23

**meeting** [1] - 1058:2

**meetings** [10] - 959:9, 960:13, 960:14, 960:18, 961:9, 961:13, 961:22, 1000:24, 1001:2, 1001:4

**members** [13] - 865:2, 865:7, 867:20, 869:7, 871:1, 873:15, 891:13, 898:6, 902:9, 913:25, 926:22, 935:25, 952:21

**memo** [2] - 963:2

**memorandum** [1] - 961:9

**memorandums** [2] - 952:25, 961:1

**memorialization** [1] - 1004:14

**memorized** [1] - 1011:17

**memory** [11] - 863:25, 1051:5, 1055:4, 1055:13, 1059:3, 1059:5, 1074:8, 1075:5, 1075:9, 1078:22

**men** [11] - 961:2, 962:22, 971:16, 996:15, 996:18, 996:24, 1051:20, 1052:6, 1052:14, 1054:2, 1055:2

**Menchel** [3] - 855:11, 956:18, 1067:3

**MENCHEL** [237] - 853:22, 855:10, 859:18, 872:23, 875:18, 880:21, 883:6, 884:10, 898:23, 900:7, 900:9, 909:1, 909:11, 913:21, 915:12, 919:4, 920:16, 921:3, 921:14, 924:24, 926:4, 927:17, 928:12, 928:22, 929:15, 929:23, 932:10, 939:8, 939:10, 939:13, 942:9, 954:22, 956:6, 956:13, 956:15, 957:2, 957:10, 963:14, 970:11, 970:15, 971:2, 971:7, 972:21, 973:25, 974:5, 975:5, 975:13, 976:17, 977:16, 977:21, 977:23, 978:1, 978:3, 978:9, 978:13, 978:23, 979:12, 980:10, 982:2, 982:18, 983:3, 983:11, 985:15, 985:19, 986:4, 986:10, 986:16, 987:3, 988:16, 988:25, 989:2, 990:6, 991:21, 992:4, 992:9, 993:8, 993:11, 993:25, 995:1, 999:20, 999:25, 1000:18, 1000:20, 1002:4, 1003:22, 1003:23, 1004:6, 1004:9, 1004:12, 1004:23, 1005:6, 1007:3, 1007:4, 1007:8, 1009:3, 1010:2, 1010:8, 1010:12, 1011:3, 1011:5, 1013:5, 1014:1, 1014:13, 1015:21, 1015:22, 1016:16, 1016:23, 1017:6, 1017:25, 1018:12, 1018:16, 1018:19,

1018:21, 1019:16, 1019:20, 1022:4, 1022:9, 1022:21, 1023:1, 1026:20, 1027:1, 1027:4, 1027:5, 1027:11, 1027:17, 1029:1, 1029:23, 1030:3, 1030:11, 1032:12, 1032:20, 1033:16, 1034:9, 1034:13, 1034:23, 1035:8, 1035:15, 1036:2, 1036:15, 1036:20, 1038:4, 1038:10, 1038:23, 1039:1, 1039:8, 1039:10, 1039:14, 1041:14, 1042:15, 1043:3, 1043:15, 1044:1, 1044:15, 1045:15, 1045:18, 1045:24, 1046:12, 1046:20, 1047:2, 1047:5, 1052:9, 1053:7, 1057:16, 1057:19, 1057:24, 1058:7, 1058:10, 1058:18, 1060:18, 1060:24, 1061:2, 1061:6, 1061:18, 1061:25, 1062:18, 1065:13, 1066:1, 1066:7, 1066:10, 1066:15, 1066:19, 1067:1, 1067:5, 1067:7, 1067:9, 1067:15, 1067:22, 1068:22, 1070:5, 1070:17, 1072:20, 1072:25, 1073:5, 1073:8, 1073:11, 1073:15, 1074:3, 1074:6, 1074:22, 1075:6, 1075:21, 1076:4, 1076:10, 1077:1, 1077:7, 1078:3, 1078:21, 1080:1, 1080:10, 1083:8, 1084:18, 1084:22, 1089:10, 1089:15, 1090:11, 1093:9, 1093:12, 1093:17, 1093:20, 1093:25, 1094:7, 1094:11, 1096:3, 1097:1, 1098:7, 1098:13, 1098:16, 1098:18, 1099:4, 1099:11, 1099:14, 1101:11, 1101:21, 1102:18, 1106:12, 1106:24, 1107:10

**MENCHEL**......................... [1] - 1117:9

**mentioned** [4] - 960:6, 1024:19, 1047:6, 1059:20

**Mercer** [2] - 1059:13, 1059:15

**merely** [1] - 899:24

**mess** [1] - 885:22

**met** [6] - 855:20, 956:19, 966:24, 968:10, 1000:21, 1001:23

**method** [1] - 979:14

**metric** [2] - 869:11, 998:14

**metrics** [3] - 869:15, 869:19, 1041:25

**MF-9-008** [1] - 982:22

**Miami** [1] - 854:13

**Michael** [1] - 855:14

**MICHAEL** [1] - 854:9

**middle** [10] - 882:14, 883:10, 932:17, 942:3, 1027:9, 1051:9, 1103:25

**midmorning** [1] - 939:17

**might** [13] - 915:9, 945:25, 961:3, 961:5, 1032:23, 1032:24, 1065:24, 1093:12, 1106:6, 1108:5, 1111:5, 1114:15, 1114:24

**Milford** [1] - 993:4

**mill** [1] - 974:12

**million** [55] - 869:16, 869:18, 871:5, 871:13, 882:3, 882:23, 886:13, 886:14, 887:22, 887:25, 888:12, 889:2, 889:10, 892:9, 892:12, 893:18, 894:1, 894:18, 894:20, 895:13, 895:19, 902:16, 914:5, 931:20, 934:9, 935:18, 971:5, 976:2, 976:23, 979:20, 983:25, 984:3, 984:12, 985:1, 985:12, 989:20, 997:12, 998:13, 999:5, 1005:10, 1008:24, 1009:21, 1015:14, 1015:15, 1015:16, 1016:4, 1016:7, 1016:11, 1016:12, 1016:24, 1016:7, 1016:11, 1016:12, 1016:24, 1017:4

1019:4, 1082:14, 1100:2, 1100:4

**millionaire** [1] - 998:21

**millions** [1] - 1051:14

**mind** [7] - 877:1, 905:11, 1007:17, 1038:10, 1101:17, 1105:15, 1106:18

**mindful** [1] - 1033:19

**minimum** [2] - 869:22, 874:16

**minus** [1] - 886:20

**minute** [5] - 906:1, 906:6, 917:15, 931:4, 1083:10

**minutes** [2] - 857:4, 1032:24

**misconduct** [2] - 859:14, 945:13

**misleading** [6] - 865:9, 865:12, 866:4, 1045:4, 1045:5, 1111:19

**misleadingly** [2] - 865:16, 865:18

**misled** [1] - 965:19

**mismatched** [2] - 1001:11, 1001:24

**misrepresentation** [1] - 1105:15

**misrepresentations** [1] - 1056:21

**miss** [1] - 981:8

**missing** [2] - 871:16, 874:22

**misstate** [1] - 898:17

**misstated** [1] - 1062:2

**mistake** [1] - 869:1

**mistaken** [1] - 1046:11

**misunderstand** [1] - 1031:15

**mitigate** [1] - 1063:5

**mm-hm** [1] - 913:16

**MMMM** [3] - 1060:19, 1061:5, 1119:13

**MMMM-Y** [3] - 1060:19, 1061:5, 1119:13

**MMMMU** [3] - 1027:3, 1027:4, 1119:12

**moment** [13] - 858:4, 900:10, 977:21, 978:25, 990:20, 1032:16, 1038:9, 1071:14, 1083:7, 1093:18, 1093:20, 1106:8

**moments** [1] - 1047:6

**Monday** [11] - 926:14, 1005:13, 1005:25, 1101:16, 1102:4, 1102:17, 1102:19, 1110:1, 1113:19, 1116:2, 1116:10

**money** [61] - 871:12, 873:12, 882:16, 882:18, 883:2, 883:3, 887:21, 889:20, 890:3, 894:16, 899:6, 903:22, 904:2, 904:6, 905:7, 906:15, 906:16, 912:12, 914:17, 916:7, 934:20, 940:15, 943:10, 943:20, 943:22, 951:11, 951:14, 952:25, 953:2, 953:16, 959:21, 961:23, 981:4, 997:15, 1003:17, 1009:21, 1026:17, 1057:10, 1068:7, 1081:9, 1081:16, 1082:6, 1082:8, 1082:23, 1091:1, 1091:17, 1091:25, 1092:9, 1092:12, 1092:19, 1093:2, 1093:4, 1093:5, 1095:14, 1095:15, 1096:10, 1096:12, 1097:12, 1097:24, 1098:3, 1100:21

**monies** [2] - 883:11, 1090:1

**monitoring** [1] - 1062:25

**month** [3] - 1094:21, 1097:13, 1097:14

**month-to-date** [1] - 1094:21

**monthly** [8] - 895:1, 942:7, 949:19, 951:17, 954:12, 1023:8, 1094:20, 1095:7

**months** [6] - 863:20, 866:20, 936:7, 964:13, 969:16, 1029:7

**moot** [1] - 1108:9

**morning** [15] - 855:9, 855:10, 855:13, 855:16, 855:21, 855:23, 862:3, 863:1, 863:2, 890:20, 923:25, 926:15, 988:12, 1005:13, 1005:25

**Moscato** [4] - 878:5, 879:1, 879:8, 974:19

**Moscato's** [1] - 879:1

**most** [2] - 902:17, 1087:13

**mostly** [3] - 968:21, 968:22, 992:23

**motion** [1] - 1046:2

**motivation** [1] - 1082:25

**Motors** [4] - 982:12, 984:5, 1008:11, 1094:23

**move** [7] - 896:15, 907:15, 908:3, 942:9, 1043:12, 1098:13, 1115:24

**moving** [4] - 959:21, 961:23, 1091:1, 1098:3

**Mr. Schneider** [49] - 861:15, 861:16, 864:24, 865:5, 891:19, 891:21, 892:22, 895:12, 896:4, 896:12, 896:18, 896:19, 896:24, 898:12, 898:14, 898:15, 898:21, 902:4, 902:18, 903:1, 903:2, 911:6, 913:1, 942:21, 952:24, 953:3, 953:15, 953:21, 953:23, 957:21, 959:5, 959:12, 959:14, 1029:16, 1031:4, 1031:17, 1033:21, 1045:9, 1050:7, 1052:15, 1078:6, 1081:5, 1108:15, 1109:4, 1109:10, 1110:6, 1111:14, 1111:20, 1113:22

**MS** [9] - 885:23, 899:9, 1045:22, 1045:25, 1107:3, 1107:8, 1107:11, 1107:20, 1108:11

**multiple** [1] - 857:11

**MWE** [6] - 885:8, 913:13, 918:8, 926:12, 1001:11, 1001:24

## N

**name** [8] - 878:18, 906:25, 956:18, 963:22, 978:4, 1027:9, 1060:25, 1072:12

**named** [3] - 866:12, 936:3, 975:12

**names** [1] - 855:4

**narrative** [2] - 856:24, 908:2

**nature** [2] - 856:14, 1062:3

**Naugle** [1] - 911:6

**necessarily** [1] - 996:3

**necessary** [2] - 856:24, 916:24

**need** [37] - 859:2, 860:18, 876:2, 877:2, 877:17, 889:18, 893:13, 893:15, 915:5, 915:21, 918:17, 920:5, 920:8, 929:25, 930:11, 943:1, 977:10, 1004:19, 1011:8, 1014:5, 1025:3, 1041:14, 1043:10, 1056:16, 1065:24, 1066:10, 1074:18, 1074:19, 1090:5, 1091:8, 1092:4, 1094:4, 1102:21, 1106:6, 1113:8

**needed** [14] - 877:8, 878:6, 880:4, 892:1, 892:16, 907:21, 917:10, 937:14, 938:6, 940:12, 941:3, 942:5, 942:18, 964:12

**needs** [5] - 908:15, 940:5, 1074:1, 1074:2, 1076:20

**Nellie** [1] - 1045:20

**Net** [1] - 1019:2

**net** [22] - 886:7, 886:17, 886:19, 886:22, 887:16, 887:19, 887:25, 890:21, 891:5, 893:3, 893:25, 896:11, 902:24, 934:7, 934:8, 934:12, 935:11, 951:17, 998:14, 1019:14, 1020:2

**network** [1] - 995:3

**never** [15] - 879:14, 956:19, 961:6, 965:23, 966:6, 966:8, 966:22, 967:18, 993:1, 1001:11, 1001:24, 1009:14, 1066:24, 1085:22, 1090:15

**New** [13] - 853:5, 853:14, 853:15, 853:21, 854:5, 887:2, 892:5, 892:11, 927:1, 941:9, 941:13

**new** [8] - 858:3, 893:5, 893:6, 893:7, 900:14, 1021:13, 1025:15, 1029:10

**next** [44] - 860:13, 860:14, 860:15, 862:8, 862:12, 874:1, 874:4, 876:12, 877:10, 878:20, 881:14, 884:21, 885:13, 905:5, 908:3, 912:16, 921:12, 921:13, 937:22, 939:23, 949:1, 949:24, 951:15, 982:18, 985:21, 986:18, 994:10, 1004:23, 1012:7, 1013:9, 1016:5, 1019:8, 1022:10, 1023:16, 1041:16, 1061:18, 1061:25, 1062:18, 1067:22, 1096:15, 1101:13, 1102:1, 1102:6, 1103:5

**NICHOLAS** [1] - 853:17

**Nicholas** [1] - 855:6

**night** [1] - 1102:18

**Nike** [1] - 941:11

**Nissan** [3] - 982:6, 982:7, 982:8

**nobody** [3] - 1029:17, 1029:21, 1044:20

**non** [6] - 897:1, 897:3, 980:23, 1033:13, 1068:11

**non-disparagement** [1] - 1068:11

**non-hearsay** [3] - 897:1, 897:3, 1033:13

**non-reinsured** [1] - 980:23

**noncash** [1] - 887:20

**none** [1] - 1055:11

**nonetheless** [1] - 1040:1

**nonpayment** [1] - 889:24

**North** [1] - 982:6

**note** [4] - 935:4, 971:20, 987:19, 1094:21

**Note** [1] - 1100:3

**notes** [10] - 857:17, 860:11, 860:23, 862:5, 862:6, 888:7, 904:3, 919:16, 932:8, 935:3

**nothing** [7] - 954:14, 986:5, 1065:6, 1068:21, 1082:12, 1082:20, 1111:15

**notice** [9] - 859:12, 861:17, 871:24, 872:22, 873:23, 874:18, 936:18, 990:15

**noticed** [1] - 913:13

**notices** [12] - 856:9, 872:5, 872:19, 873:5, 873:9, 873:11, 874:12, 874:21, 877:25, 878:11, 879:13, 883:12

**notwithstanding** [1] - 1068:20

**number** [27] - 886:14, 887:9, 887:16, 896:11, 903:3, 911:9, 931:12, 931:14, 934:22, 936:3, 949:15, 949:25, 951:17, 968:20, 971:4, 971:9, 972:12, 973:5, 982:19, 991:3, 1015:11, 1016:21, 1037:10, 1049:14, 1058:20, 1066:6, 1094:1

**numbers** [24] - 874:11, 878:10, 885:16, 892:19, 893:13, 893:23, 894:12, 902:23, 911:11, 912:6, 947:7, 947:8, 947:17, 951:1, 958:21, 958:24, 981:8, 984:7, 984:10, 989:21, 1033:18, 1052:1, 1052:2

**numerous** [1] - 1094:19

**nuts** [1] - 1003:13

**NW** [1] - 854:8

## O

**oath** [1] - 862:20

**object** [6] - 921:7, 1012:4, 1030:6, 1057:20, 1075:18, 1080:4

**objected** [1] - 1093:14

**objecting** [2] - 1010:4, 1112:17

**objection** [88] - 859:17, 859:18, 872:23, 875:18, 880:21, 883:6, 884:10, 884:11, 895:14, 896:2, 907:15, 907:23, 908:23, 908:25, 909:7, 909:8, 910:13, 911:16, 913:21, 915:12, 917:20, 919:5, 924:24, 925:23, 926:4, 927:17, 928:12, 928:22, 929:15, 929:23, 932:10, 942:9, 948:14, 957:25, 958:4, 974:2, 974:7, 977:17, 978:10, 978:19, 985:17, 987:7, 990:10, 992:1, 992:5, 999:18, 999:23, 1003:19, 1005:3, 1005:18, 1007:1, 1007:13, 1008:25, 1011:1, 1011:22, 1014:21, 1015:18, 1016:14, 1016:25, 1022:22, 1025:19, 1027:2, 1029:19, 1032:8, 1032:21, 1033:7, 1035:18, 1035:19, 1038:19, 1042:13, 1045:12, 1050:21, 1050:24, 1051:1, 1053:5, 1053:14, 1055:20, 1058:4, 1059:11, 1061:3, 1066:16, 1074:16, 1075:20, 1083:6, 1083:21, 1089:11, 1093:15, 1099:7

**objectionable** [1] - 1037:11

**objections** [5] - 860:3, 861:17, 921:4, 921:17, 1037:12

**obligation** [1] - 995:18

**observed** [2] - 944:22, 1078:5

**obtained** [2] - 1010:18, 1010:25

**obvious** [1] - 898:19

**obviously** [4] - 858:3, 906:22, 917:11, 1102:3

**occurring** [1] - 967:25

**October** [1] - 1039:19

**odd** [2] - 1099:16, 1104:14

**offer** [52] - 872:3, 872:20, 875:16, 880:19, 883:4, 884:12, 908:21, 909:2, 910:10, 911:14, 913:19, 915:11, 917:14, 919:2, 920:14, 922:2, 923:9, 924:22, 925:20, 927:16, 928:10, 928:21, 929:14, 930:19, 932:9, 948:10, 978:9, 985:15, 986:3, 990:8, 992:4, 1004:9, 1005:1, 1010:8, 1022:15, 1022:21, 1023:21, 1027:1, 1032:20, 1045:23, 1045:24, 1061:2, 1066:15, 1073:5, 1075:9, 1076:6, 1076:11, 1080:1, 1089:10, 1099:4, 1106:20, 1109:14

**offered** [16] - 893:18, 896:25, 897:2, 950:23, 985:14, 1034:13, 1034:14, 1035:6, 1036:22, 1036:23, 1037:5, 1037:16, 1037:18, 1037:23, 1045:7, 1113:5

**offering** [14] - 908:2, 941:4, 941:8, 952:24, 999:16, 1034:21, 1034:25, 1035:13, 1073:6, 1076:8, 1076:11, 1106:9, 1111:21, 1115:15

**offhand** [6] - 968:9, 977:14, 982:5, 1010:16, 1010:22

**office** [5] - 926:15, 926:24, 927:2, 960:23, 1059:6

**OFFICE** [2] - 853:14, 854:11

Case 1:21-cr-00054-RPK-PK   Document 424-2   Filed 07/12/24   Page 286 of 294
PageID #: 14350
(officer - pay)                                                    Page 19

officer [36] - 856:8, 864:18, 867:19, 868:17, 874:10, 924:7, 963:15, 966:5, 966:25, 969:14, 1020:18, 1020:20, 1020:22, 1020:25, 1021:5, 1021:6, 1021:7, 1021:9, 1021:13, 1021:15, 1021:17, 1021:19, 1021:24, 1023:23, 1023:25, 1024:3, 1024:10, 1024:24, 1025:6, 1027:14, 1027:15, 1075:2, 1075:12, 1080:16, 1080:21, 1086:20

**Officer** [14] - 889:23, 1029:5, 1030:24, 1032:3, 1040:17, 1047:8, 1048:2, 1048:5, 1048:8, 1048:11, 1048:12, 1048:23, 1060:1, 1114:4

**Officer to** [1] - 1060:2

**officers** [2] - 1111:8, 1114:1

**offices** [1] - 926:25

**Official** [1] - 854:15

**official** [2] - 964:15, 964:20

**often** [2] - 866:17, 1020:18

**old** [1] - 1005:22

**ombudsman** [1] - 1080:22

**onboard** [1] - 1034:10

**onboarding** [2] - 963:18, 963:21

**once** [6] - 866:15, 961:13, 1000:12, 1088:2, 1101:7, 1114:24

**one** [122] - 855:24, 860:11, 873:18, 874:1, 874:4, 874:8, 879:21, 880:5, 880:6, 880:10, 880:14, 880:16, 880:17, 885:13, 888:3, 890:21, 890:22, 891:1, 891:14, 891:21, 892:10, 893:3, 894:19, 894:21, 899:24, 904:12, 904:13, 904:16, 906:25, 908:17, 914:24, 918:4, 918:24, 919:1, 919:4, 920:16, 921:8, 921:11, 921:12, 926:11, 926:19, 930:17, 931:12, 933:21, 936:5, 938:19, 945:22, 947:22, 948:9, 951:23, 952:5, 953:8, 962:25, 968:13, 973:10, 979:5, 981:10, 982:11, 982:21, 987:14, 988:22, 992:3, 992:11, 993:5, 993:6, 993:12, 993:13, 995:11, 998:11, 998:12, 1000:19, 1002:8, 1004:23, 1016:1, 1016:4, 1017:12, 1017:24, 1018:1, 1021:2, 1021:8, 1021:19, 1021:21, 1027:24, 1029:25, 1031:22, 1032:5, 1034:5, 1036:14, 1037:10, 1040:14, 1042:6, 1047:13, 1049:24, 1050:2, 1052:10, 1055:3, 1057:12, 1064:4, 1068:6, 1070:10, 1073:19, 1074:15, 1075:9, 1081:15, 1082:6, 1083:7, 1084:19, 1086:24, 1087:3, 1091:8, 1092:7, 1093:11, 1093:18, 1093:20, 1098:3, 1101:4, 1111:12, 1113:20

**one-and-a-half** [1] - 894:21

**one-third** [4] - 890:21, 890:22, 893:3, 1081:15

**ones** [2] - 991:2, 1004:22

**OOD** [3] - 1005:2, 1005:5, 1119:10

**open** [11] - 855:1, 902:1, 904:11, 918:11, 956:3, 987:1, 1036:10, 1038:14, 1047:1, 1078:1, 1102:8

**opened** [1] - 1104:16

**opening** [1] - 858:24

**operating** [18] - 888:15, 888:17, 932:20, 959:22, 972:3, 990:22, 994:1, 995:2, 995:4, 995:6, 995:8, 995:12, 995:16, 995:17, 995:18, 995:20, 995:25, 1090:1

**Operating** [2] - 1048:1, 1048:11

**Operational** [1] - 1023:16

**operational** [1] - 1023:17

**operations** [12] - 889:7, 889:15, 900:13, 933:21, 950:2, 950:10, 950:14, 961:24, 1007:23, 1017:19, 1085:1, 1085:22

**operative** [1] - 1106:19

**opine** [1] - 948:15

**opinion** [11] - 938:6, 940:10, 940:21, 940:25, 962:15, 1007:9, 1007:10, 1007:20, 1008:1, 1008:2, 1066:23

**opportunity** [5] - 893:24, 1035:11, 1036:13, 1041:24, 1108:4

**opposed** [1] - 1111:23

**order** [8] - 889:12, 898:7, 920:6, 943:1, 998:21, 1040:20, 1043:11, 1090:2

**organizational** [1] - 1086:16

**original** [1] - 1036:18

**originally** [1] - 934:21

**ostensibly** [1] - 931:17

**otherwise** [2] - 869:23, 1028:3

**out-of-court** [3] - 896:15, 1033:8, 1035:5

**outcome** [3] - 946:11, 1083:15, 1084:12

**outflows** [1] - 1094:20

**outside** [7] - 867:22, 937:21, 938:1, 966:24, 986:1, 1012:6, 1013:1, 1042:10, 1046:19, 1110:22

**outstanding** [7] - 877:13, 877:20, 879:10, 882:21, 904:15, 918:3, 918:10

**overhead** [2] - 1090:4, 1094:20

**overlapped** [1] - 1049:16

**Overruled** [1] - 1083:22

**overruled** [6] - 958:4, 1009:1, 1025:20, 1029:20, 1042:14, 1053:15

**overruling** [1] - 1112:17

**overwhelming** [1] - 1111:13

**owe** [1] - 882:23

**owed** [4] - 871:25, 874:16, 980:22, 1090:3

**owes** [2] - 873:12, 930:9

**own** [7] - 859:9, 892:16, 895:3, 951:14, 966:12, 981:9, 1108:22

**owned** [5] - 936:2, 943:11, 943:17, 972:12, 989:9

**owner** [1] - 972:10

**owning** [1] - 995:6

# P

**p.m** [1] - 956:10

**pace** [1] - 862:10

**PAGE** [2] - 1117:4, 1118:4

**page** [81] - 863:8, 884:21, 885:5, 885:13, 885:21, 885:25, 888:2, 888:5, 889:12, 897:7, 901:7, 920:19, 921:22, 922:7, 933:24, 933:25, 935:2, 935:8, 935:10, 937:22, 939:23, 948:23, 949:1, 949:14, 949:24, 950:20, 951:16, 952:2, 957:4, 970:17, 976:17, 976:18, 976:19, 985:21, 986:18, 993:18, 994:10, 1002:25, 1007:8, 1009:8, 1010:2, 1012:7, 1013:9, 1017:6, 1017:9, 1018:20, 1019:8, 1019:15, 1019:18, 1019:20, 1019:23, 1023:16, 1027:6, 1028:10, 1035:8, 1041:16,

1042:18, 1046:25, 1057:19, 1058:8, 1058:18, 1066:3, 1067:22, 1068:10, 1070:5, 1072:24, 1072:25, 1073:25, 1074:6, 1075:6, 1075:24, 1077:11, 1078:23, 1079:5, 1096:15, 1107:21

**Page** [10] - 970:11, 970:15, 971:2, 971:19, 975:6, 976:19, 992:9, 993:16, 993:25

**pages** [2] - 1022:10, 1065:23

**pagination** [2] - 888:5, 934:1

**paid** [38] - 863:20, 865:24, 871:5, 871:9, 882:16, 882:18, 882:25, 889:2, 890:3, 890:4, 890:22, 894:22, 895:1, 900:11, 902:25, 904:20, 905:7, 914:4, 932:19, 932:20, 936:19, 936:22, 947:9, 950:4, 954:11, 971:25, 972:16, 973:3, 973:10, 976:24, 977:1, 980:2, 990:16, 1009:21, 1009:23, 1009:24, 1011:12, 1087:23

**pain** [1] - 1073:20

**paper** [5] - 879:14, 977:25, 1004:18, 1004:19, 1106:14

**papering** [1] - 969:22

**papers** [2] - 1010:20, 1045:13

**paperwork** [1] - 1097:21

**paragraph** [16] - 876:23, 881:18, 888:4, 912:16, 919:16, 930:24, 935:6, 952:3, 980:19, 980:20, 995:14, 1058:19, 1067:2, 1068:9, 1068:10, 1068:21

**Paralegal** [1] - 855:7

**parenthesis** [2] - 863:18, 916:4

**part** [27] - 856:11, 857:10, 870:16, 885:25, 886:2, 886:3, 920:8, 936:19, 953:6, 960:22, 968:16, 984:18, 994:7, 1005:8, 1020:11, 1023:4, 1023:21, 1035:16, 1038:20, 1041:4, 1041:5, 1043:4, 1046:22, 1063:17, 1086:19, 1093:7, 1106:19

**partial** [1] - 1094:21

**participate** [1] - 870:5

**participation** [1] - 1106:21

**particular** [7] - 948:9, 953:8, 957:10, 958:10, 1035:24, 1037:7, 1109:25

**particularly** [3] - 1097:12, 1110:15, 1110:16

**parties** [1] - 956:4

**partner** [11] - 888:15, 888:17, 911:25, 912:4, 925:25, 972:3, 972:9, 990:23, 995:16, 995:18, 995:20

**partnering** [1] - 888:19

**Partners** [1] - 1048:8

**partners** [7] - 932:20, 994:2, 995:2, 995:4, 995:9, 995:12, 995:25

**Partnership** [3] - 1034:12, 1040:4, 1041:5

**partnership** [8] - 888:14, 889:5, 917:8, 935:7, 935:16, 972:2

**parts** [2] - 913:9, 921:11

**party** [4] - 875:12, 908:7, 968:10, 981:12

**passed** [1] - 1006:19

**past** [1] - 1016:2

**Patrick** [5] - 888:15, 888:17, 943:11, 972:6, 982:8

**Paulson** [1] - 1107:1

**pause** [6] - 858:22, 861:19, 861:25, 978:2, 1084:20, 1093:22

**pay** [33] - 863:23, 869:15, 869:16,

869:23, 873:13, 874:16, 890:17, 900:5, 905:12, 905:18, 906:2, 906:4, 916:7, 922:13, 922:17, 924:2, 924:3, 931:18, 931:19, 942:7, 950:2, 950:10, 950:14, 950:17, 951:11, 953:1, 973:1, 997:15, 1018:8, 1067:20, 1067:24, 1088:8, 1100:25

**paying** [4] - 947:10, 951:13, 953:16, 1055:12

**payment** [14] - 856:14, 889:24, 932:23, 933:1, 934:13, 976:23, 985:2, 985:12, 991:16, 998:6, 1067:17, 1068:2, 1068:4, 1088:2

**payments** [16] - 883:1, 883:16, 912:14, 951:6, 976:2, 977:10, 979:5, 979:19, 979:20, 980:13, 980:14, 981:1, 981:21, 983:19, 983:20, 1091:21

**payroll** [2] - 1100:24, 1101:5

**penalty** [4] - 1073:20, 1074:9, 1074:12, 1075:10

**pending** [4] - 896:21, 929:24, 1096:6, 1105:6

**people** [24] - 867:15, 893:7, 901:1, 907:3, 951:6, 951:13, 998:17, 999:16, 1004:17, 1027:24, 1029:10, 1046:5, 1048:16, 1059:6, 1109:22, 1111:1, 1111:3, 1111:14, 1111:23, 1113:25, 1114:17, 1115:4

**per** [6] - 912:6, 912:22, 1067:11, 1089:24, 1090:24, 1109:7

**percent** [33] - 888:1, 889:16, 894:21, 894:25, 895:1, 896:11, 896:19, 898:16, 899:16, 900:14, 900:19, 902:24, 903:2, 903:11, 912:23, 912:24, 926:16, 947:19, 950:10, 950:14, 950:17, 971:14, 995:15, 995:16, 995:22, 998:2, 999:2, 999:3, 999:5, 1018:1, 1031:21, 1082:6, 1082:15

**percentage** [4] - 887:24, 934:7, 934:12, 947:8

**perfect** [2] - 975:7, 1096:9

**perfectly** [2] - 1088:16, 1097:2

**perform** [2] - 867:24, 990:24

**performance** [137] - 856:3, 856:5, 856:11, 856:14, 861:3, 869:4, 869:8, 869:11, 869:21, 869:25, 870:21, 871:2, 871:5, 871:9, 871:11, 871:25, 874:16, 874:20, 875:9, 877:23, 878:11, 879:17, 880:3, 881:3, 881:8, 881:19, 882:20, 885:10, 885:15, 887:21, 888:11, 888:23, 889:17, 890:12, 905:12, 905:14, 905:20, 905:23, 906:19, 921:11, 922:21, 923:6, 923:22, 924:3, 924:4, 925:11, 929:7, 930:6, 930:25, 931:2, 931:10, 932:1, 932:23, 934:2, 934:8, 934:13, 935:5, 935:11, 938:12, 940:12, 947:1, 947:2, 947:5, 947:10, 947:16, 950:22, 951:4, 951:5, 951:7, 951:9, 951:17, 951:22, 960:10, 962:16, 962:17, 969:4, 969:7, 969:17, 970:4, 971:11, 971:24, 972:23, 973:7, 973:10, 981:15, 983:20, 984:4, 984:14, 986:6, 987:11, 987:13, 987:15, 987:20, 987:24, 988:1, 988:4, 988:11, 988:17, 989:6, 989:15, 990:1, 990:4, 990:21, 991:4, 991:8, 992:12, 993:2, 993:3, 993:21, 995:21, 995:24, 996:1, 996:5, 996:10, 996:19, 996:20, 996:23,

997:8, 997:13, 997:18, 998:1, 998:6, 1000:2, 1002:15, 1002:18, 1003:4, 1008:8, 1015:15, 1015:23, 1015:24, 1016:1, 1016:2, 1016:7, 1016:13, 1041:25, 1056:21, 1062:20

**period** [5] - 942:1, 965:2, 1047:8, 1049:16, 1065:3

**periods** [1] - 899:14

**perjury** [4] - 1073:20, 1074:9, 1074:12, 1075:10

**permissible** [3] - 1045:13, 1088:16, 1109:16

**permission** [6] - 859:7, 859:11, 911:20, 936:12, 1014:13, 1066:8

**permitted** [2] - 945:19, 1069:5

**Person** [1] - 1027:20

**person** [20] - 865:18, 876:17, 892:25, 893:1, 943:11, 990:25, 991:15, 1024:4, 1025:25, 1026:4, 1027:18, 1027:21, 1028:2, 1028:7, 1033:8, 1040:19, 1048:10, 1053:23, 1112:3, 1114:20

**person's** [2] - 991:16, 1024:10

**personal** [7] - 977:5, 981:1, 991:15, 992:12, 995:20, 1007:11, 1035:24

**personally** [1] - 1035:23

**persons** [4] - 1068:24, 1068:25, 1070:14, 1070:21

**perspective** [1] - 1102:12

**Peterson** [1] - 1108:19

**ph** [1] - 1100:4

**phone** [12] - 891:24, 892:25, 903:7, 905:9, 905:19, 907:22, 912:6, 915:2, 923:25, 981:19, 996:19, 1064:4

**phrasing** [1] - 1078:19

**pick** [1] - 862:10

**picture** [1] - 1091:3

**pitch** [1] - 1112:10

**place** [13] - 870:10, 882:1, 888:14, 890:9, 890:10, 936:6, 938:1, 939:5, 972:2, 981:12, 1004:18, 1013:1, 1101:12

**places** [1] - 1069:18

**Plainfield** [1] - 982:6

**plan** [5] - 855:22, 861:1, 943:19, 1023:13, 1115:1

**plan's** [1] - 953:10

**plane** [3] - 1051:4, 1052:18, 1054:21

**Planet** [1] - 892:11

**planned** [1] - 934:21

**planning** [2] - 938:4, 1103:4

**plans** [13] - 952:16, 953:4, 954:3, 957:17, 957:20, 957:24, 958:9, 959:5, 960:7, 962:14, 1043:18, 1044:3, 1110:24

**plausible** [1] - 1111:22, 1112:4

**play** [1] - 1110:13

**Plaza** [1] - 853:15

**pleading** [1] - 1043:20

**PLLC** [1] - 854:11

**plus** [3] - 887:19, 966:4, 967:19

**PMMs** [1] - 1108:18

**point** [44] - 856:20, 857:13, 857:15, 858:7, 863:15, 882:25, 890:18, 904:23, 906:8, 916:6, 922:20, 938:20, 941:25, 946:2, 949:5, 968:6, 975:25, 976:1, 976:16, 976:20, 976:23, 981:9, 1003:10, 1015:1, 1023:2, 1029:14, 1038:6, 1039:19, 1039:25, 1045:21, 1046:3,

1052:19, 1052:22, 1057:2, 1061:12, 1104:3, 1105:17, 1107:1, 1109:14, 1109:25, 1112:18, 1112:20, 1115:3

**points** [2] - 887:2, 1026:18

**policies** [4] - 1024:16, 1028:3, 1028:6, 1063:8

**Polsinelli** [1] - 1113:13

**Portfolio** [25] - 863:8, 863:14, 876:6, 890:6, 890:8, 890:17, 891:1, 891:10, 892:23, 906:21, 909:25, 910:6, 912:8, 912:24, 937:10, 947:19, 950:13, 1007:22, 1089:22, 1089:25, 1090:2, 1095:7, 1096:7, 1100:2, 1100:19

**portfolio** [11] - 886:11, 893:23, 894:13, 911:12, 960:4, 1009:10, 1009:17, 1042:1, 1091:17, 1092:1, 1093:3

**portfolios** [1] - 1009:15

**portion** [26] - 863:11, 881:7, 883:10, 891:4, 896:23, 898:25, 900:21, 902:2, 902:15, 909:17, 910:23, 912:19, 932:18, 951:13, 978:3, 978:23, 979:13, 1036:22, 1038:1, 1038:15, 1039:1, 1039:13, 1080:2, 1080:6, 1098:18, 1098:19

**position** [7] - 899:18, 1007:22, 1020:5, 1038:8, 1039:20, 1112:14, 1114:11

**positions** [1] - 1028:3

**positive** [2] - 864:2, 1084:3

**possible** [5] - 917:13, 927:5, 941:15, 1081:12, 1114:23

**possibly** [2] - 860:14, 1057:14

**potential** [5] - 859:15, 894:5, 1090:5, 1091:9, 1092:5

**potentially** [8] - 945:24, 1081:9, 1081:17, 1081:21, 1082:15, 1083:19, 1107:14, 1107:15

**power** [1] - 1028:6

**PPC** [1] - 1011:6

**PPM** [19] - 951:24, 952:12, 952:19, 954:6, 956:24, 957:21, 958:2, 958:10, 959:6, 994:6, 996:2, 996:6, 996:7, 1018:12, 1018:22, 1109:3, 1109:9, 1109:12, 1110:21

**PPMs** [7] - 993:12, 993:13, 995:25, 1020:6, 1054:19, 1108:15, 1111:4

**PPPPZ** [3] - 1088:23, 1089:13, 1119:16

**practicality** [1] - 1104:9

**practices** [1] - 1023:18

**practicing** [1] - 1047:20

**precise** [1] - 958:23

**precision** [3] - 958:17, 959:1, 967:13

**precluded** [1] - 1114:3

**precludes** [1] - 1068:24

**predate** [1] - 1109:12

**prejudice** [1] - 1113:2

**prejudicial** [1] - 1107:16

**preparation** [2] - 1052:24, 1103:23

**prepare** [6] - 870:7, 916:9, 916:12, 941:3, 967:9, 1104:6

**prepared** [5] - 866:11, 867:7, 870:8, 908:9, 925:14

**preparing** [7] - 866:6, 866:24, 870:5, 1110:20, 1111:1, 1111:15, 1111:17

**presence** [1] - 986:1

**present** [19] - 896:4, 952:16, 953:4, 953:10, 954:3, 954:24, 956:4, 957:20, 957:24, 958:9, 959:5, 960:7, 962:13,

Case 1:21-cr-00054-RPK-PK    Document 424-2    Filed 07/12/24    Page 288 of 294
PageID #: 14352
(presently - read)                                          Page 21

997:11, 1007:21, 1038:14, 1043:18,
1044:3, 1110:24

**presently** [1] - 957:17
**Prestiano** [3] - 878:19, 911:7, 924:18
**pretend** [1] - 1038:4
**pretty** [4] - 879:15, 965:16, 1044:9,
1107:10
**prevent** [1] - 1104:17
**previewed** [1] - 1113:13
**previous** [3] - 940:16, 940:19, 1019:20
**previously** [5] - 862:16, 943:21,
1076:24, 1077:1, 1096:4
**price** [4] - 869:14, 887:2, 999:17,
1053:11
**PricewaterhouseCoopers** [1] - 1049:7
**primary** [1] - 1024:21
**principles** [1] - 1007:25
**private** [21] - 943:20, 943:22, 943:24,
945:5, 945:6, 998:19, 999:10, 999:11,
999:12, 999:15, 999:16, 1049:11, 1050:3,
1050:7, 1050:16, 1051:4, 1052:4,
1053:10, 1064:19
**privilege** [1] - 1105:20
**privileged** [2] - 1082:2, 1105:13
**probability** [1] - 1111:9
**probative** [2] - 1109:20, 1112:25
**problem** [23] - 868:24, 869:1, 891:23,
900:25, 906:2, 907:2, 940:17, 984:18,
1000:7, 1000:15, 1001:17, 1006:8,
1006:11, 1006:12, 1035:24, 1038:22,
1044:18, 1045:25, 1056:1, 1076:19,
1080:5, 1092:22, 1098:12
**problems** [2] - 893:14, 1102:8
**procedures** [1] - 1023:13
**Proceedings** [1] - 854:18
**proceedings** [6] - 858:22, 861:19,
861:25, 978:2, 1084:20, 1093:22
**process** [20] - 866:10, 868:3, 868:5,
870:10, 871:3, 890:9, 890:10, 903:13,
903:18, 917:10, 1006:22, 1023:8,
1030:25, 1031:3, 1036:3, 1041:1,
1047:15, 1062:24, 1092:15, 1092:16
**produce** [3] - 867:13, 867:21, 917:9
**produced** [3] - 854:18, 904:10, 1099:24
**produces** [1] - 951:9
**producing** [2] - 917:2, 917:5
**product** [2] - 885:2, 1044:22
**products** [1] - 980:23
**professionals** [1] - 1109:3
**proffer** [1] - 1043:13
**profit** [3] - 895:10, 1011:10, 1055:14
**profits** [11] - 863:21, 869:23, 886:7,
887:4, 887:5, 912:14, 949:21, 951:9,
981:13, 1014:19
**programs** [1] - 1063:4
**project** [1] - 1063:8
**projected** [1] - 1016:5
**promise** [1] - 872:17
**proof** [1] - 904:5
**proper** [2] - 939:3, 1114:14
**properly** [1] - 857:7
**Property** [1] - 1070:18
**property** [1] - 1070:20
**proposed** [8] - 894:7, 895:4, 895:5,
895:12, 895:21, 922:14, 953:1, 953:24
**proposing** [1] - 1115:15

**proprietary** [3] - 944:10, 944:13,
1070:23
**prosecutors** [1] - 1000:21
**protect** [1] - 991:9
**protecting** [1] - 945:7
**prove** [2] - 1108:16
**proven** [1] - 1113:21
**Provide** [1] - 951:17
**provide** [10] - 867:25, 877:8, 898:7,
899:20, 900:2, 933:2, 981:17, 981:20,
983:25, 995:20
**provided** [13] - 856:7, 864:12, 866:21,
869:15, 869:19, 879:9, 902:23, 977:20,
985:10, 987:6, 997:15, 1010:20
**providing** [4] - 921:19, 977:13, 986:11,
990:25
**provision** [5] - 1070:4, 1070:7, 1071:5,
1071:8, 1071:9
**public** [11] - 941:4, 941:8, 942:18,
942:25, 943:1, 945:6, 1047:20, 1048:17,
1048:19, 1048:23, 1048:24
**Public** [3] - 1047:19, 1047:21, 1049:4
**publication** [1] - 1103:1
**publicly** [2] - 941:10, 941:13
**publish** [30] - 880:25, 884:16, 909:5,
911:19, 913:24, 917:25, 919:8, 923:13,
926:7, 929:1, 932:13, 948:12, 948:20,
957:4, 970:15, 970:16, 983:12, 988:16,
989:2, 993:12, 1018:17, 1027:11,
1030:11, 1039:14, 1061:6, 1067:4,
1067:5, 1080:10, 1089:15, 1099:11
**published** [54] - 873:17, 881:2, 911:21,
914:1, 915:16, 915:18, 918:1, 919:10,
922:6, 922:24, 923:15, 924:11, 925:2,
925:18, 926:9, 927:7, 927:22, 928:16,
929:3, 929:12, 929:20, 930:22, 931:23,
932:15, 933:9, 946:17, 948:1, 948:21,
952:1, 970:19, 1002:6, 1002:7, 1004:25,
1007:6, 1007:7, 1009:5, 1010:14,
1016:22, 1016:24, 1017:1, 1018:18,
1022:6, 1022:25, 1026:22, 1027:12,
1027:13, 1030:3, 1030:7, 1039:16,
1061:7, 1067:8, 1089:18, 1098:17,
1099:12
**publishing** [1] - 1030:9
**pull** [12] - 863:6, 872:7, 890:23, 910:22,
920:2, 988:9, 1010:3, 1010:13, 1098:7,
1098:8, 1098:9, 1106:25
**pulled** [1] - 931:24
**Purcell** [5] - 857:21, 858:1, 858:7, 858:8,
858:14
**purchase** [6] - 869:12, 876:18, 936:5,
936:16, 936:19, 944:3
**purchased** [1] - 869:21
**purchasing** [1] - 869:13
**purely** [1] - 1103:21
**purporting** [1] - 1034:23
**purpose** [10] - 859:3, 897:1, 897:3,
1033:14, 1034:16, 1037:1, 1037:7,
1086:14, 1113:1, 1113:6
**purposes** [7] - 898:10, 924:13, 1076:12,
1086:16, 1103:4, 1103:22, 1110:15
**pursuant** [2] - 931:18, 936:11
**push** [1] - 860:18
**put** [20] - 948:5, 956:22, 968:7, 1015:11,
1037:24, 1043:18, 1044:10, 1052:9,

1057:7, 1076:18, 1078:21, 1085:11,
1092:9, 1093:15, 1105:21, 1109:17,
1114:12, 1114:13, 1114:18, 1115:4
**puts** [1] - 1060:20
**putting** [5] - 893:7, 903:20, 1093:16,
1109:1, 1113:1

## Q

**Q1** [1] - 977:1
**QQQ** [1] - 1072:21
**QQQQ** [3] - 1072:22, 1080:8, 1119:15
**QQQQ-H** [3] - 1072:22, 1080:8, 1119:15
**Qs** [1] - 1072:22
**qualification** [1] - 1111:7
**qualified** [3] - 1021:16, 1048:10,
1048:13
**quality** [2] - 994:1, 995:2
**quarter** [1] - 890:10
**quarterlies** [1] - 866:18
**quarterly** [1] - 866:6
**queries** [1] - 907:13
**questioned** [2] - 1001:11, 1001:24
**questioning** [1] - 1077:4
**questionnaire** [1] - 948:5
**questions** [39] - 859:14, 899:11, 899:17,
899:20, 900:24, 916:1, 956:19, 956:25,
957:8, 967:17, 973:23, 975:24, 1002:2,
1003:15, 1003:18, 1017:8, 1020:17,
1029:22, 1030:4, 1030:18, 1030:20,
1031:6, 1031:9, 1033:15, 1038:24,
1060:5, 1060:6, 1060:8, 1060:10,
1060:14, 1073:17, 1074:15, 1075:9,
1080:11, 1112:12, 1112:14, 1112:16,
1112:19, 1113:12
**QuickBooks** [3] - 1085:12, 1090:23,
1091:4
**quickly** [3] - 910:15, 927:5, 1102:22
**quietly** [1] - 967:24
**quit** [4] - 965:21, 966:2, 966:10, 966:12
**quite** [3] - 992:25, 1048:17, 1108:3
**quote** [1] - 950:9
**quote/unquote** [1] - 1109:10

## R

**RACHEL** [1] - 853:11
**raise** [9] - 869:2, 940:5, 961:13,
1059:22, 1059:24, 1060:2, 1077:6,
1079:4
**raised** [7] - 859:6, 862:6, 921:3,
1055:24, 1077:2, 1078:4, 1078:12
**raises** [2] - 868:24, 943:24
**raising** [1] - 1103:22
**rampant** [1] - 966:14
**ran** [1] - 1095:3
**range** [1] - 999:17
**rate** [1] - 949:17
**rates** [2] - 896:13, 1053:4
**ratio** [3] - 894:25, 899:11, 899:16
**RCG** [1] - 912:8
**reaching** [1] - 1104:1
**reaction** [2] - 895:11, 895:18
**read** [32] - 858:13, 876:23, 884:2, 888:8,

Case 1:21-cr-00054-RPK-PK    Document 424-2    Filed 07/12/24    Page 289 of 294
PageID #: 14353
(reader - requests)                                          Page 22

889:18, 913:7, 913:8, 952:9, 979:5,
980:7, 981:24, 981:25, 984:25, 985:5,
986:8, 994:6, 998:16, 1010:24, 1013:4,
1022:8, 1030:12, 1032:16, 1050:25,
1058:12, 1058:21, 1066:5, 1069:13,
1076:8, 1078:24, 1080:2, 1089:1,
1098:18
   **reader** [1] - 888:9
   **reading** [5] - 872:12, 1074:21, 1079:2,
1098:20, 1114:25
   **reads** [1] - 1058:19
   **ready** [5] - 862:13, 866:15, 892:21,
904:11, 956:5
   **real** [4] - 905:22, 962:21, 990:3, 990:18
   **real-time** [1] - 962:21
   **realistic** [1] - 903:12
   **reality** [2] - 892:14, 892:16
   **realize** [1] - 1054:22
   **really** [18] - 899:2, 1034:18, 1036:11,
1041:11, 1045:4, 1045:21, 1046:21,
1076:7, 1084:2, 1084:14, 1091:21,
1107:12, 1107:13, 1111:5, 1112:3,
1112:6, 1112:10
   **realtime** [1] - 1023:7
   **reason** [14] - 899:6, 903:9, 903:24,
904:4, 914:16, 915:5, 915:22, 979:13,
1070:1, 1071:9, 1071:11, 1095:24,
1096:1, 1112:11
   **reasonable** [8] - 1015:17, 1016:13,
1088:7, 1092:19, 1093:3, 1097:18,
1097:19, 1097:23
   **reasons** [2] - 926:19, 1107:15
   **rebate** [14] - 903:15, 904:4, 904:6,
904:14, 905:18, 913:1, 914:6, 918:4,
920:12, 921:13, 922:13, 923:20, 934:16,
934:21
   **rebate's** [1] - 919:21
   **receivable** [5] - 882:21, 882:23, 918:18,
935:17, 1096:11
   **receivables** [6] - 904:15, 918:3, 918:10,
918:12, 1096:6, 1100:7
   **received** [34] - 877:7, 883:14, 889:4,
891:25, 909:4, 911:18, 913:23, 914:14,
915:14, 917:23, 919:7, 922:3, 923:12,
925:1, 926:6, 927:19, 928:14, 928:24,
929:17, 930:21, 932:12, 948:19, 981:1,
1004:11, 1005:5, 1007:11, 1022:24,
1027:3, 1061:5, 1066:18, 1094:21,
1095:5, 1099:10, 1104:1
   **receiving** [4] - 907:13, 1036:10,
1061:20, 1096:6
   **recent** [1] - 858:11
   **Recess** [1] - 1038:13
   **recess** [2] - 955:9, 1039:4
   **recognize** [35] - 871:22, 875:3, 875:5,
875:7, 879:23, 882:13, 908:12, 910:24,
916:20, 918:23, 920:1, 922:25, 923:2,
927:8, 927:24, 948:2, 957:4, 978:17,
979:9, 982:5, 988:10, 991:25, 1010:15,
1010:22, 1011:24, 1022:7, 1026:23,
1026:24, 1057:17, 1065:18, 1072:23,
1088:24, 1098:24, 1098:25, 1099:1
   **recognized** [1] - 978:15
   **recognizes** [1] - 922:17
   **recollection** [23] - 958:11, 958:14,
959:7, 973:12, 973:13, 977:13, 1013:6,

1014:4, 1014:19, 1014:23, 1015:3,
1054:25, 1055:1, 1057:21, 1058:6,
1058:24, 1073:24, 1074:23, 1074:24,
1114:24, 1115:17, 1115:22, 1115:23
   **recommunicated** [1] - 1095:25
   **reconciliation** [1] - 1094:18
   **record** [7] - 898:1, 921:1, 961:15,
961:17, 1010:9, 1043:1, 1076:1
   **Record** [1] - 946:20
   **record's** [1] - 885:22
   **recorded** [3] - 854:18, 877:4, 961:1
   **recordkeeping** [1] - 1094:4
   **records** [4] - 867:4, 889:24, 918:12,
1010:11
   **recounting** [1] - 896:24
   **recover** [2] - 945:23, 1091:8
   **recovered** [1] - 1082:7
   **recovers** [1] - 1081:16
   **red** [5] - 869:2, 1043:23, 1043:24,
1044:19
   **redact** [2] - 1037:25, 1038:8
   **redacted** [2] - 917:25, 1046:17
   **redaction** [2] - 917:19, 917:22
   **redone** [1] - 938:6
   **reduce** [2] - 894:14, 895:8
   **reduced** [2] - 934:23, 1004:14
   **reducing** [3] - 895:9, 913:14, 914:3
   **reduction** [2] - 918:18, 934:24
   **refer** [3] - 914:9, 976:14, 985:1
   **reference** [3] - 884:1, 915:23, 1105:11
   **references** [1] - 1107:5
   **referencing** [1] - 912:25
   **referred** [5] - 998:18, 1007:20, 1017:5,
1068:11, 1086:2
   **referring** [8] - 973:6, 976:8, 980:14,
980:18, 1001:19, 1092:3, 1094:25
   **reflect** [5] - 877:16, 878:7, 931:25,
932:8, 952:25
   **reflected** [1] - 871:15
   **reflecting** [2] - 932:23, 951:6
   **reframe** [1] - 1036:20
   **refresh** [12] - 863:25, 1013:6, 1014:18,
1057:21, 1058:5, 1058:24, 1073:24,
1074:23, 1075:9, 1114:24, 1115:17,
1115:22
   **refreshed** [1] - 1074:2
   **refreshes** [8] - 1014:3, 1014:22,
1058:16, 1074:7, 1074:23, 1075:4,
1078:22, 1115:23
   **refreshing** [1] - 1015:3
   **refund** [6] - 896:9, 899:6, 902:10,
902:17, 905:10, 912:19
   **refunded** [4] - 894:19, 894:22, 916:3,
923:6
   **refunding** [2] - 895:6, 903:20
   **refused** [1] - 953:3
   **regarding** [5] - 889:24, 935:4, 981:22,
1089:7, 1102:8
   **regimented** [1] - 1023:8
   **register** [1] - 943:1
   **registered** [1] - 1026:16
   **registering** [1] - 861:16
   **regular** [1] - 1053:12
   **regulating** [1] - 945:4
   **regulation** [1] - 868:23
   **regulations** [5] - 867:17, 1024:13,

1024:14, 1024:18, 1024:25
   **regulators** [1] - 1061:22
   **regulatory** [4] - 943:3, 945:3, 1069:3,
1069:11
   **rehabilitate** [3] - 857:8, 858:11, 1077:9
   **reimburse** [1] - 1101:3
   **reinsurance** [1] - 981:10
   **reinsured** [1] - 980:23
   **relate** [1] - 1080:12
   **related** [5] - 984:1, 984:3, 1075:1,
1075:11, 1080:11
   **relates** [1] - 972:22
   **relating** [1] - 855:21
   **relation** [2] - 856:2, 1015:6
   **relationship** [1] - 900:1
   **relay** [1] - 904:24
   **relayed** [1] - 922:10
   **release** [1] - 907:8
   **relevance** [2] - 1043:7, 1113:8
   **relevant** [5] - 1037:6, 1041:11, 1044:12,
1044:24, 1111:2
   **reliance** [2] - 1112:14, 1112:16
   **relitigating** [1] - 1046:3
   **relying** [1] - 1052:5
   **remember** [23] - 870:3, 891:24, 893:2,
893:10, 913:10, 936:15, 954:17, 969:1,
983:4, 988:1, 1017:2, 1020:18, 1020:21,
1038:16, 1040:21, 1050:4, 1052:16,
1055:8, 1059:7, 1059:13, 1059:15,
1099:1, 1115:16
   **remembers** [1] - 1057:24
   **remind** [4] - 870:14, 870:23, 975:8,
1101:21
   **remove** [1] - 891:16
   **renders** [1] - 1081:22
   **renegade** [1] - 1108:21
   **repaid** [1] - 904:7
   **repeat** [2] - 1001:15, 1006:3
   **repeated** [1] - 965:12
   **repeatedly** [4] - 959:8, 965:12, 1077:2,
1078:4
   **rephrase** [1] - 907:19
   **replace** [3] - 941:19, 941:20, 981:10
   **replaced** [4] - 964:6, 964:9, 1031:22,
1031:23
   **replacement** [1] - 1023:22
   **Report** [3] - 1034:12, 1040:4, 1041:5
   **report** [8] - 893:13, 944:21, 945:12,
1025:10, 1060:12, 1071:15, 1076:24,
1076:25
   **reported** [5] - 1059:10, 1076:14,
1078:12, 1080:20, 1081:2, 1081:6
   **Reporter** [2] - 854:15, 854:15
   **reporting** [8] - 949:10, 966:22, 1023:2,
1023:5, 1023:7, 1023:9, 1025:3, 1080:23
   **reports** [4] - 864:3, 866:17, 867:14,
1008:16
   **represent** [1] - 1099:24
   **representation** [1] - 1106:3
   **represented** [3] - 956:18, 984:22, 987:5
   **representing** [3] - 947:1, 947:2, 1072:8
   **request** [1] - 1108:11
   **requested** [1] - 870:19
   **requesting** [1] - 878:23
   **requests** [1] - 921:18

Case 1:21-cr-00054-RPK-PK    Document 424-2    Filed 07/12/24    Page 290 of 294
PageID #: 14354
(require - sent)                                                      Page 23

**require** [3] - 867:18, 931:17, 1038:7
**required** [6] - 869:22, 877:14, 1055:19, 1069:4, 1070:12, 1073:19
**requirement** [3] - 899:23, 900:4, 1086:6
**research** [2] - 954:17, 1101:17
**resolve** [2] - 917:16, 1102:9
**resolved** [2] - 877:15, 878:6
**resolves** [1] - 1110:13
**respect** [8] - 861:14, 899:12, 899:22, 992:19, 1033:13, 1105:5, 1108:13, 1113:12
**respects** [1] - 1007:21
**respond** [4] - 868:4, 1003:24, 1102:19, 1108:6
**responded** [2] - 883:23, 914:6, 1090:9
**responding** [6] - 979:25, 981:14, 981:15, 1041:15, 1062:24, 1102:16
**responds** [2] - 878:22, 1041:19
**response** [10] - 877:12, 892:15, 893:17, 903:23, 914:11, 918:14, 941:12, 979:18, 1036:18, 1041:18
**responsibilities** [4] - 994:7, 1021:23, 1022:18, 1023:4
**responsibility** [2] - 1110:20, 1111:11
**responsible** [3] - 1110:25, 1111:15, 1111:17
**rest** [2] - 949:2, 1073:9
**restate** [2] - 941:3, 1048:20
**restated** [2] - 937:14, 940:11
**result** [3] - 856:13, 861:4, 944:16
**resulting** [1] - 889:5
**results** [2] - 892:1, 1007:23
**resumes** [1] - 1039:6
**retailer** [1] - 1087:22
**return** [7] - 947:15, 947:16, 997:6, 997:14, 997:18, 997:25
**Return** [1] - 1070:17
**returned** [2] - 892:5, 1070:20
**returns** [3] - 950:23, 951:12, 980:24
**revenue** [13] - 886:10, 888:13, 889:11, 891:17, 892:12, 935:1, 940:19, 940:20, 970:5, 1016:7, 1016:11, 1016:12, 1097:20
**revenues** [1] - 886:7
**review** [20] - 864:4, 868:1, 875:1, 889:23, 893:22, 948:7, 973:2, 1003:5, 1020:12, 1030:23, 1031:16, 1032:6, 1033:11, 1033:18, 1034:1, 1034:2, 1034:15, 1038:17, 1040:22, 1063:8
**reviewed** [9] - 864:12, 867:9, 867:17, 1020:6, 1029:14, 1034:3, 1034:6, 1035:22, 1044:16
**reviewing** [12] - 872:8, 936:15, 1029:13, 1029:17, 1029:21, 1033:17, 1033:25, 1036:4, 1037:15, 1037:20, 1041:2, 1041:3
**Reviewing** [3] - 952:10, 1014:17, 1098:22
**reviews** [1] - 867:10
**revisit** [3] - 860:20, 860:25, 862:11
**reward** [2] - 859:15, 945:23
**RIA** [1] - 899:10
**RIAs** [1] - 899:21
**Richmond** [1] - 982:7
**right-hand** [1] - 947:14
**rise** [1] - 955:7

**risk** [5] - 968:14, 991:15, 1062:1, 1063:4, 1113:1
**risks** [3] - 1062:25, 1063:1, 1063:6
**RIVIERE** [1] - 853:22
**RIVIERE-BADELL** [1] - 853:22
**Roger** [1] - 928:4
**Rogers** [1] - 892:10
**role** [8] - 866:24, 867:21, 879:1, 941:25, 942:3, 945:7, 969:13, 1108:17
**Ron** [2] - 935:23, 936:3
**room** [1] - 996:19
**roughly** [1] - 1016:5
**rows** [1] - 934:9
**RRRG** [2] - 1099:5, 1099:9
**RRRG......** [1] - 1119:18
**Rule** [1] - 857:5
**rule** [4] - 856:17, 856:23, 857:25, 1050:25
**ruled** [2] - 1038:21, 1046:2
**rules** [2] - 1024:12, 1024:14
**ruling** [2] - 1110:16, 1116:16
**run** [5] - 900:25, 1023:21, 1042:16, 1112:13, 1114:4
**running** [2] - 1025:15, 1102:7

# S 

**salary** [1] - 1067:11
**Sarah** [1] - 1002:11
**sat** [1] - 1065:6
**saw** [10] - 869:11, 879:16, 883:18, 923:19, 928:19, 948:9, 948:15, 964:16, 1005:8, 1107:10
**scenario** [2] - 917:13, 1053:25
**schedule** [2] - 879:11, 1010:25
**Schedule** [1] - 1010:17
**scheduling** [4] - 860:11, 860:18, 862:5, 1102:7
**scheme** [1] - 899:19
**SCHIFF** [2] - 854:2, 854:7
**SCHNEIDER** [1] - 853:8
**Schneider** [12] - 854:3, 854:8, 854:12, 855:3, 855:15, 861:16, 865:21, 963:8, 1095:10, 1095:19, 1105:12, 1108:21
**Schneiter** [12] - 866:12, 906:24, 907:5, 923:3, 974:18, 975:8, 976:13, 978:6, 984:22, 985:10, 986:10, 987:5
**Schultz** [6] - 1035:15, 1040:8, 1040:9, 1040:19, 1041:19, 1113:25
**scope** [1] - 1043:16
**screen** [7] - 863:6, 871:20, 932:3, 979:14, 1011:9, 1078:21, 1089:4
**scroll** [18] - 863:7, 879:24, 880:12, 880:13, 882:14, 883:21, 885:12, 888:4, 889:12, 891:3, 910:4, 930:16, 931:5, 933:12, 933:23, 935:2, 1023:1, 1066:1
**SE** [1] - 854:12
**se** [1] - 1109:7
**SEAN** [1] - 853:21
**Sean** [1] - 855:11
**search** [1] - 1105:12
**season** [2] - 1097:13, 1097:14
**seated** [3] - 862:4, 956:11, 1039:7
**SEC** [16] - 943:2, 944:25, 945:2, 945:9, 946:2, 1025:10, 1026:5, 1081:16,

1081:21, 1082:7, 1083:4, 1083:16, 1083:20, 1084:3, 1084:5, 1084:13
**second** [26] - 876:23, 880:10, 888:4, 891:1, 917:18, 919:4, 920:16, 922:7, 934:18, 975:25, 979:6, 982:21, 995:14, 998:17, 1000:19, 1009:8, 1010:2, 1029:23, 1029:25, 1040:14, 1050:25, 1052:10, 1054:10, 1084:19, 1093:11, 1104:15, 1106:13, 1114:12
**Second Circuit** [4] - 856:20, 857:22, 858:8, 900:3
**second-to-last** [2] - 888:4, 975:25
**secondly** [1] - 1104:14
**secretly** [1] - 1006:10
**secrets** [1] - 1064:15
**section** [4] - 957:2, 957:10, 985:1, 994:1
**Securities** [4] - 944:23, 945:3, 1024:19, 1026:13
**securities** [1] - 945:4
**see** [120] - 863:18, 864:2, 864:13, 865:23, 871:20, 872:11, 873:6, 875:4, 876:21, 881:5, 881:8, 881:14, 882:1, 883:1, 883:2, 883:3, 885:5, 887:2, 892:2, 893:24, 894:20, 904:5, 904:20, 909:8, 910:13, 913:9, 918:3, 918:9, 918:19, 920:6, 922:18, 932:3, 935:4, 946:20, 946:23, 948:7, 951:21, 952:15, 955:5, 957:5, 968:14, 972:18, 974:11, 975:16, 976:4, 976:14, 977:2, 977:11, 978:7, 978:18, 982:14, 982:15, 982:23, 984:5, 985:13, 987:14, 987:19, 987:22, 987:23, 989:10, 991:20, 993:19, 995:4, 995:9, 995:22, 998:12, 1008:13, 1009:6, 1010:17, 1011:4, 1013:5, 1014:3, 1014:5, 1017:14, 1017:16, 1018:2, 1018:14, 1019:2, 1019:17, 1019:21, 1022:11, 1022:12, 1023:18, 1027:18, 1027:22, 1033:13, 1035:20, 1036:7, 1037:10, 1039:17, 1040:6, 1040:24, 1041:21, 1042:3, 1043:7, 1057:24, 1060:1, 1060:21, 1070:8, 1070:15, 1070:25, 1073:9, 1073:14, 1074:7, 1075:4, 1078:16, 1078:20, 1078:22, 1083:1, 1090:7, 1091:9, 1100:10, 1101:5, 1101:16, 1107:8, 1112:12, 1112:19
**seeing** [3] - 1036:11, 1036:13, 1037:18
**seek** [1] - 995:14
**seeking** [1] - 1036:1
**seem** [8] - 907:24, 939:6, 1031:15, 1036:6, 1036:21, 1044:9, 1046:2, 1103:17
**sees** [1] - 928:8
**self** [2] - 1010:9, 1069:3, 1069:11
**self-admitting** [1] - 1010:9
**self-regulatory** [2] - 1069:3, 1069:11
**sell** [1] - 941:9
**seller** [1] - 869:23
**sellers** [1] - 1061:22
**send** [7] - 878:22, 907:8, 953:12, 962:21, 963:9, 963:18, 1100:24
**sending** [11] - 871:23, 873:8, 892:20, 924:21, 925:4, 925:6, 925:11, 990:15, 1007:14, 1099:17, 1109:10
**Senior** [1] - 1038:1
**sense** [2] - 1101:25, 1105:20
**sent** [16] - 863:4, 864:5, 866:7, 866:11,

Case 1:21-cr-00054-RPK-PK    Document 424-2    Filed 07/12/24    Page 291 of 294
PageID #: 14355
(sentence - statement)                                                     Page 24

873:4, 874:21, 877:25, 891:14, 891:18,
909:19, 962:21, 978:18, 1006:15,
1043:22, 1044:2, 1044:16

**sentence** [4] - 878:14, 889:8, 912:11,
952:15

**separate** [2] - 980:4, 1083:17, 1083:18,
1083:24, 1084:5, 1084:6, 1086:7

**separately** [1] - 887:9

**separation** [7] - 945:18, 1063:22,
1065:10, 1065:11, 1065:14, 1067:23,
1070:19

**September** [6] - 941:20, 941:21, 964:7,
964:10, 1041:20, 1089:22

**series** [1] - 875:5

**serving** [1] - 949:7

**SESSION** [1] - 956:1

**set** [5] - 939:14, 944:6, 980:11, 981:11,
1085:21

**sets** [1] - 1104:14

**setting** [2] - 980:21, 1064:18

**settled** [1] - 918:3

**seven** [3] - 933:24, 1017:6, 1049:8

**several** [2] - 1037:5, 1037:12

**severance** [1] - 1067:24

**shaking** [1] - 872:11

**shall** [2] - 994:4, 1070:11

**share** [1] - 1103:20, 1105:2

**shared** [1] - 891:12

**sheet** [2] - 909:24, 935:18

**ship** [2] - 1087:23, 1088:6

**short** [3] - 872:17, 1061:22, 1104:24

**shortage** [1] - 1086:24

**shortfall** [3] - 863:11, 891:4, 903:10

**shortfalls** [5] - 910:2, 1090:6, 1091:9,
1092:5, 1095:14

**shortly** [2] - 941:18, 977:1

**show** [99] - 864:14, 871:18, 872:4,
873:15, 874:23, 879:19, 880:7, 882:8,
885:9, 908:10, 909:9, 909:11, 910:2,
910:15, 910:21, 913:4, 914:21, 916:18,
918:21, 919:23, 922:23, 924:10, 925:17,
927:6, 927:20, 929:10, 929:18, 931:21,
933:3, 933:7, 946:14, 946:15, 947:8,
947:23, 951:23, 962:21, 973:24, 974:10,
977:14, 977:15, 982:17, 984:21, 984:23,
986:7, 987:16, 988:23, 989:15, 991:22,
993:7, 1006:4, 1008:7, 1009:8, 1010:1,
1011:23, 1026:6, 1026:20, 1032:12,
1034:14, 1035:2, 1036:22, 1036:23,
1037:3, 1037:7, 1039:12, 1041:9,
1041:13, 1041:16, 1043:24, 1044:1,
1044:2, 1044:4, 1044:11, 1044:15,
1052:8, 1057:15, 1058:14, 1058:18,
1060:17, 1060:18, 1060:24, 1072:19,
1073:24, 1074:4, 1075:4, 1078:16,
1087:2, 1093:9, 1098:15, 1098:19,
1098:21, 1106:12, 1106:24, 1110:7,
1111:18, 1112:7, 1114:15, 1114:23,
1115:1

**showed** [3] - 883:15, 1007:14, 1016:20

**showing** [4] - 919:1, 1032:14, 1045:2,
1065:16

**shown** [11] - 934:4, 934:5, 952:12,
957:6, 962:25, 985:9, 989:18, 1002:22,
1017:2, 1033:25, 1115:4

**shows** [4] - 989:21, 992:3, 1034:9,

1036:9

**side** [3] - 947:14, 1019:16

**side-by-side** [1] - 1019:16

**sidebar** [28] - 897:6, 898:1, 898:3,
901:6, 920:17, 920:18, 921:1, 921:21,
937:21, 938:1, 939:22, 985:19, 986:1,
986:17, 1012:5, 1012:6, 1013:1, 1013:8,
1032:22, 1042:15, 1042:17, 1043:1,
1046:24, 1074:19, 1075:21, 1075:23,
1076:1, 1077:10

**sides** [1] - 1103:13

**sign** [15] - 905:7, 916:10, 924:14,
926:23, 927:3, 927:4, 928:6, 928:9,
928:19, 969:25, 996:13, 1003:7, 1005:21,
1006:6, 1073:19

**signaling** [1] - 1107:13

**signature** [3] - 881:15, 1066:3, 1107:13

**signed** [29] - 874:20, 876:3, 879:16,
880:11, 880:14, 880:16, 880:17, 881:3,
881:10, 881:13, 881:21, 881:25, 882:6,
906:15, 925:6, 926:14, 929:7, 930:13,
931:6, 931:8, 935:20, 995:24, 1000:5,
1005:13, 1005:24, 1006:17, 1007:15,
1007:18, 1107:14

**significance** [3] - 874:11, 874:14,
931:14

**significant** [4] - 882:18, 938:22, 951:13,
1103:5

**signing** [4] - 885:6, 904:18, 904:19,
1005:16

**Sijan** [2] - 911:6, 974:25

**similar** [10] - 890:12, 898:11, 915:9,
944:1, 957:16, 980:22, 980:24, 981:13,
1037:13, 1112:18

**simple** [1] - 1087:19

**simply** [1] - 1110:5

**simultaneous** [2] - 1103:8, 1103:9

**single** [2] - 962:20, 1091:5

**sit** [3] - 860:16, 862:8, 1101:15

**sitting** [6] - 858:4, 860:15, 862:7,
862:12, 946:3, 1101:14

**situation** [9] - 857:25, 862:11, 862:12,
890:12, 891:18, 892:13, 892:23, 895:7,
1114:13

**size** [1] - 1024:8

**slide** [2] - 992:3, 992:12

**sloppy** [1] - 879:15

**slow** [1] - 1092:9

**small** [3] - 917:17, 917:19, 1014:16

**smart** [1] - 1086:3

**Smith** [2] - 1046:14, 1046:15

**sold** [4] - 887:3, 1055:13, 1055:14,
1097:8

**solely** [1] - 1114:4

**solution** [4] - 894:5, 894:8, 894:14,
895:21

**solutions** [2] - 893:14, 893:15

**solve** [1] - 983:9

**some-odd** [1] - 1104:14

**someone** [5] - 856:19, 942:18, 945:12,
1028:2, 1111:6

**sometimes** [4] - 968:12, 1009:19,
1092:8, 1092:14

**somewhat** [1] - 1038:20

**soon** [5] - 917:13, 927:3, 939:10,
964:18, 1024:3

**sooner** [1] - 1070:2

**sophisticated** [1] - 1111:8

**sorry** [30] - 858:16, 861:24, 879:25,
885:14, 888:3, 890:25, 896:22, 907:18,
909:6, 914:24, 935:20, 941:21, 960:20,
960:22, 970:17, 971:7, 976:1, 978:14,
983:6, 993:17, 1004:5, 1005:1, 1011:18,
1030:9, 1041:13, 1050:24, 1051:2,
1083:7, 1086:20

**sort** [4] - 859:9, 859:14, 1043:8, 1103:1

**sound** [2] - 899:7, 1113:6

**sounds** [13] - 860:22, 860:23, 1024:11,
1026:2, 1047:12, 1048:9, 1065:3, 1076:6,
1076:7, 1097:18, 1113:10, 1114:12,
1114:15

**sources** [1] - 912:7

**speaker** [1] - 896:3

**speaking** [5] - 860:19, 901:3, 947:15,
969:1, 1050:19

**speaks** [1] - 857:25

**special** [13] - 863:22, 863:23, 949:25,
950:3, 950:4, 950:6, 950:10, 950:14,
950:17, 1018:4, 1057:2, 1057:9, 1063:8

**Specialist** [1] - 855:7

**specific** [5] - 1060:14, 1063:1, 1063:6,
1076:13, 1086:13

**specifically** [9] - 864:7, 870:20, 877:17,
953:23, 957:12, 984:25, 1018:4, 1078:11,
1096:7

**specified** [2] - 888:21, 972:15

**spelled** [1] - 866:13

**spent** [1] - 997:4

**split** [1] - 1068:17

**spoken** [1] - 926:17

**sponsor** [1] - 1023:14

**spot** [1] - 957:14

**spots** [1] - 1066:6

**spread** [1] - 1014:9

**spreadsheet** [6] - 909:3, 910:17,
979:16, 985:10, 989:15, 1014:12

**stage** [1] - 1014:25

**stand** [7] - 858:5, 861:21, 862:15, 956:8,
1039:6, 1081:9, 1108:20

**standing** [1] - 985:13

**standpoint** [1] - 997:19

**start** [24] - 858:7, 874:24, 875:22,
880:25, 921:7, 964:15, 964:20, 967:9,
975:5, 1016:17, 1045:10, 1050:15,
1051:4, 1056:1, 1056:4, 1056:12,
1072:21, 1080:11, 1094:14, 1103:13,
1113:16, 1116:2, 1116:6, 1116:8

**started** [22] - 860:8, 865:6, 870:14,
890:19, 899:11, 900:5, 964:18, 964:19,
964:20, 964:22, 964:25, 969:13, 999:16,
1016:18, 1020:23, 1022:2, 1032:5,
1034:6, 1043:17, 1049:17, 1050:18

**starting** [7] - 908:14, 930:24, 964:19,
980:9, 1000:24, 1101:14, 1109:14

**state** [3] - 855:4, 890:16, 898:17

**statement** [44] - 855:25, 856:2, 856:19,
860:25, 865:11, 867:11, 885:17, 886:4,
886:5, 886:6, 888:7, 889:7, 889:11,
889:15, 896:16, 898:8, 898:15, 904:4,
910:19, 912:9, 919:17, 933:21, 940:13,
940:16, 973:18, 997:20, 997:21, 998:16,
1015:10, 1019:17, 1019:19, 1019:21,

1033:8, 1035:6, 1035:12, 1036:15, 1037:7, 1037:14, 1044:14, 1046:8, 1069:2, 1069:10, 1076:16, 1076:21

**statements** [52] - 857:6, 858:10, 864:5, 864:8, 864:11, 864:17, 864:25, 865:9, 866:7, 866:25, 867:2, 867:3, 867:6, 867:7, 867:15, 867:22, 867:23, 868:1, 884:19, 888:8, 888:10, 894:18, 898:11, 904:10, 907:7, 908:18, 915:7, 917:7, 919:19, 925:9, 931:25, 932:8, 933:10, 937:10, 938:6, 940:21, 941:3, 970:6, 970:22, 973:19, 976:7, 976:24, 998:10, 1007:20, 1009:17, 1019:13, 1020:2, 1023:10, 1042:1, 1048:20, 1062:2, 1111:19

**stay** [2] - 1063:22, 1082:4

**stayed** [3] - 942:1, 964:10, 965:13

**steal** [2] - 944:14, 1071:11

**stenography** [1] - 854:18

**step** [4] - 877:15, 878:6, 954:20, 1110:18

**STEPHEN** [2] - 854:11, 854:14

**stepped** [1] - 1040:13

**steps** [4] - 954:21, 1025:1, 1033:2, 1101:20

**Steve** [9] - 876:3, 877:7, 877:12, 878:22, 883:16, 928:4, 928:7, 974:22, 1090:16

**Steven** [2] - 911:23, 1090:24

**stick** [1] - 1035:17

**sticker** [2] - 976:19, 990:9

**still** [11] - 862:19, 865:19, 877:7, 949:5, 949:9, 981:7, 1039:22, 1041:8, 1043:7, 1079:3, 1095:25

**stock** [3] - 886:25, 887:4, 941:9

**Stock** [3] - 887:2, 941:9, 941:14

**stocks** [1] - 945:6

**stole** [2] - 944:10, 1071:2

**stood** [1] - 1114:9

**stop** [5] - 893:5, 893:6, 893:7, 931:11, 933:24

**store** [3] - 905:13, 912:7, 931:16

**Store** [1] - 993:4

**stores** [3] - 981:15, 985:4, 988:3

**stories** [1] - 900:1

**story** [2] - 857:11, 857:12

**straightforward** [1] - 917:10

**strain** [1] - 879:22

**straits** [1] - 860:18

**streamline** [1] - 1103:6

**Street** [1] - 854:8

**stricken** [1] - 942:11

**strike** [6] - 896:15, 898:24, 900:21, 907:15, 908:5, 942:9

**strong** [2] - 1023:2, 1023:4

**structure** [3] - 995:3, 995:18, 1085:24

**stuck** [1] - 892:13

**stuff** [7] - 977:14, 980:19, 980:20, 1012:2, 1034:15, 1043:8, 1116:1

**subject** [7] - 873:5, 948:10, 948:18, 985:15, 1002:16, 1040:4, 1089:21

**subjects** [1] - 1016:18

**submit** [1] - 925:8

**submitted** [4] - 1003:4, 1113:25

**subsequent** [4] - 856:25, 935:22, 1097:14

**subsequently** [1] - 937:8

**substance** [2] - 856:10, 856:23

**substantial** [4] - 1100:21, 1100:22, 1108:17, 1113:24

**substantive** [1] - 1104:6

**subtracting** [1] - 895:9

**sue** [2] - 944:6, 944:9

**sued** [4] - 1064:13, 1064:15, 1069:23, 1072:3

**suffix** [1] - 1113:14

**suggested** [3] - 894:17, 895:19, 919:15

**suggesting** [1] - 1045:15

**suggestion** [1] - 1043:12

**suggestions** [1] - 1063:9

**Suite** [1] - 854:13

**sum** [2] - 856:10, 856:22

**summation** [1] - 1114:19

**supervisor** [3] - 1078:13, 1080:21, 1081:1

**supplemental** [2] - 1068:2, 1068:4

**support** [4] - 867:10, 871:6, 1005:10, 1085:19

**supposed** [13] - 856:7, 883:23, 908:18, 936:18, 949:20, 1015:23, 1016:9, 1024:25, 1030:7, 1046:13, 1054:25, 1103:8, 1103:10

**supposedly** [2] - 896:16, 965:12

**surprise** [2] - 1005:15, 1008:24

**surprises** [1] - 1063:10

**survey** [4] - 1060:12, 1060:14, 1060:22, 1061:8

**suspected** [2] - 1061:15, 1061:20

**sustain** [1] - 1045:11

**sustained** [13] - 999:19, 999:24, 1005:19, 1007:2, 1011:2, 1016:15, 1032:9, 1037:12, 1042:9, 1051:3, 1053:6, 1055:21, 1059:12

**switched** [1] - 997:8

**switching** [1] - 980:23

**swoop** [1] - 936:5

**sworn** [4] - 862:17, 957:19, 959:3, 983:16

## T

**tab** [12] - 910:7, 988:25, 1000:18, 1007:4, 1016:21, 1018:12, 1022:4, 1026:21, 1032:13, 1060:20, 1098:15, 1106:25

**Tab** [12] - 970:11, 973:24, 977:16, 982:19, 988:9, 988:25, 990:6, 991:21, 993:8, 1002:22, 1084:18, 1088:23

**table** [4] - 855:7, 855:15, 1000:25, 1102:25

**tabs** [1] - 909:24

**tactical** [1] - 1104:5

**tasks** [1] - 867:24

**tax** [2] - 917:2, 1088:20

**taxes** [3] - 911:7, 912:1, 917:5

**team** [15] - 866:15, 867:23, 867:24, 896:7, 898:7, 899:17, 902:10, 907:9, 907:13, 948:6, 975:11, 1023:7, 1031:5, 1031:17, 1091:19

**team's** [1] - 911:11

**teased** [1] - 1114:8

**technical** [2] - 983:7, 983:10

**technology** [1] - 1098:10

**teed** [1] - 1043:9

**Telephone** [1] - 854:16

**temporarily** [3] - 1021:19, 1021:20, 1024:1

**temporary** [2] - 899:14

**ten** [3] - 887:1, 887:5, 1032:24

**tendered** [1] - 954:23

**tentacle** [1] - 1113:20

**tenure** [3] - 1030:24, 1059:19, 1062:12

**term** [3] - 981:4, 1087:8, 1091:20

**terms** [4] - 890:17, 1014:19, 1027:22, 1042:11

**territory** [1] - 1015:3

**testified** [45] - 856:16, 862:17, 863:22, 959:8, 960:14, 966:19, 970:4, 986:5, 993:1, 993:13, 1001:16, 1009:9, 1009:16, 1015:5, 1017:21, 1018:9, 1020:6, 1030:2, 1033:11, 1033:21, 1033:24, 1043:17, 1050:2, 1052:13, 1054:21, 1055:23, 1056:8, 1056:14, 1056:18, 1071:14, 1076:24, 1077:1, 1078:4, 1081:8, 1083:2, 1083:8, 1084:12, 1084:24, 1085:4, 1085:20, 1095:21, 1108:2, 1108:14, 1109:9, 1113:22

**testifies** [1] - 1033:14

**testify** [6] - 898:11, 1008:4, 1009:20, 1035:23, 1083:15

**testifying** [2] - 856:1, 969:5

**testimony** [43] - 899:10, 946:9, 957:19, 958:8, 959:3, 960:25, 970:7, 983:16, 983:21, 984:1, 989:14, 991:18, 993:22, 997:24, 1001:18, 1001:20, 1016:19, 1017:3, 1020:8, 1021:16, 1025:18, 1025:22, 1029:15, 1030:13, 1031:11, 1031:14, 1035:20, 1048:14, 1048:15, 1052:25, 1056:23, 1057:8, 1060:9, 1065:8, 1076:19, 1083:5, 1085:2, 1090:18, 1104:13, 1108:12, 1113:3, 1113:23

**Texas** [1] - 936:2

**text** [8] - 886:9, 983:15, 1085:11, 1090:16, 1090:17, 1091:1, 1091:3

**the defendant** [7] - 853:19, 853:19, 854:3, 854:7, 854:11, 856:25, 1030:22

**the New York office** [2] - 926:25, 928:19

**the times** [1] - 969:1

**theft** [1] - 1064:15

**theory** [11] - 900:14, 900:18, 900:20, 1036:11, 1076:23, 1109:24, 1110:19, 1111:18, 1111:24, 1112:23, 1112:25

**thereafter** [2] - 941:18, 977:1

**therefore** [1] - 1110:3

**thesis** [1] - 1097:18

**they've** [1] - 1043:3

**thinking** [2] - 1106:18, 1113:16

**thinks** [1] - 927:12

**third** [8] - 890:21, 890:22, 893:3, 934:14, 935:10, 968:10, 981:12, 1081:15

**Third Avenue** [1] - 853:20

**third-party** [2] - 968:10, 981:12

**three** [9] - 866:20, 914:23, 946:23, 948:23, 951:20, 1027:24, 1029:21, 1085:20, 1086:7

**throughout** [1] - 1055:25

*(thumb - versus)*                                                                      *Page 26*

thumb [3] - 1071:2, 1071:4, 1071:10
Thursday [2] - 883:24, 1103:2
ticket [3] - 1053:11, 1053:18, 1053:22
tie [1] - 877:3
tied [2] - 1033:18, 1035:20
ties [1] - 972:24
timeliness [1] - 1023:10
timely [1] - 868:18, 1023:8
timing [13] - 921:20, 977:9, 979:19, 980:13, 981:21, 983:19, 983:20, 1090:6, 1091:9, 1092:5, 1100:5, 1100:11, 1104:18
tip [1] - 1111:13
title [6] - 957:4, 970:17, 1039:22, 1039:24, 1114:2
titled [1] - 946:19
today [9] - 855:12, 928:5, 946:3, 959:2, 959:8, 970:7, 999:22, 1089:24, 1110:15
Todd [2] - 975:15, 975:22
together [5] - 882:2, 948:6, 959:14, 980:7, 1060:20
tolled [1] - 964:13
tomorrow [1] - 1098:13
took [13] - 886:11, 895:22, 912:10, 938:1, 963:15, 1013:1, 1032:3, 1040:13, 1040:18, 1042:8, 1071:4, 1071:10, 1071:20
tool [1] - 1113:20
top [28] - 864:1, 879:24, 881:7, 881:18, 882:11, 887:23, 914:22, 916:2, 920:8, 930:24, 951:20, 971:4, 974:10, 974:11, 976:12, 976:17, 978:3, 979:13, 982:3, 983:14, 1010:17, 1041:14, 1051:16, 1060:24, 1096:3, 1098:18, 1098:21, 1100:9
total [14] - 865:16, 866:1, 866:4, 871:5, 871:11, 886:10, 886:16, 886:19, 934:6, 950:23, 951:12, 960:13, 967:24, 971:7
totally [1] - 858:3
touted [2] - 991:11, 991:13
touting [1] - 995:25
TQ [1] - 984:23
Track [1] - 946:19
track [1] - 1001:6
trade [2] - 887:6, 1064:15
traded [2] - 941:11, 941:13
traditional [1] - 943:20
trail [1] - 989:21
transactions [1] - 1063:3
TRANSCRIPT [1] - 853:11
transcript [3] - 1029:24, 1030:10, 1030:12
Transcript [1] - 854:18
Transcription [1] - 854:18
transcripts [1] - 1030:7
transfer [1] - 1085:18
transferring [1] - 1089:25
transfers [6] - 1062:20, 1084:25, 1085:5, 1089:7, 1089:21, 1094:18
transition [7] - 942:1, 942:2, 945:18, 1065:12, 1065:14, 1065:20, 1066:12
transitioning [2] - 1039:21, 1067:10
translate [1] - 889:8
transpired [1] - 944:22
travel [4] - 1050:3, 1052:5, 1052:11, 1052:21

traveling [1] - 1054:11
Trent [11] - 866:12, 906:25, 907:5, 974:18, 975:8, 976:13, 976:22, 978:5, 978:18, 978:24, 981:14
trial [3] - 857:11, 946:12, 971:16
tried [2] - 860:4, 1093:15
trouble [1] - 965:9
true [22] - 889:18, 954:6, 954:7, 959:20, 981:22, 988:22, 1004:15, 1017:21, 1017:22, 1018:7, 1020:9, 1020:24, 1031:18, 1048:6, 1064:13, 1064:14, 1065:1, 1071:19, 1071:24, 1097:17, 1111:10, 1111:22
truly [1] - 860:21
truth [8] - 1033:8, 1034:14, 1034:25, 1035:6, 1036:16, 1037:17, 1037:19, 1046:5
truthful [2] - 1069:2, 1074:12
try [9] - 892:18, 900:24, 943:9, 1020:14, 1041:9, 1049:18, 1105:15, 1106:13, 1114:24
trying [2] - 870:17, 870:18, 875:8, 882:16, 894:4, 917:12, 922:12, 944:6, 1011:23, 1025:12, 1025:15, 1025:21, 1044:13, 1046:21, 1060:4, 1076:18, 1079:4, 1093:23, 1094:2, 1106:21, 1113:17
turn [6] - 1002:21, 1022:10, 1023:16, 1035:8, 1109:6, 1110:22
turning [1] - 947:19
turns [1] - 890:4
twenty [1] - 1104:13
twice [2] - 953:8, 1114:24
two [51] - 860:10, 860:14, 862:5, 869:10, 869:19, 870:24, 872:4, 872:14, 872:21, 873:16, 874:6, 874:11, 882:2, 883:15, 892:9, 900:15, 900:25, 905:8, 906:8, 906:23, 916:1, 923:19, 923:24, 940:10, 951:20, 961:2, 964:3, 965:4, 966:4, 967:19, 972:24, 973:7, 982:14, 983:22, 984:3, 984:11, 989:11, 995:3, 996:14, 996:15, 996:18, 996:24, 1002:2, 1059:20, 1065:11, 1083:23, 1102:6, 1104:14, 1105:5, 1114:7
two-plus [1] - 967:19
two-years-plus [1] - 966:4
twofold [1] - 1104:8
type [4] - 912:7, 1064:19, 1088:1, 1088:13
types [1] - 1087:4
typical [2] - 995:15, 999:10
typically [1] - 868:6

---

## U

ultimately [1] - 1006:20
unacceptable [1] - 893:4
unclean [1] - 1006:21
uncomfortable [1] - 1000:12
uncommon [1] - 1086:23
under [20] - 856:16, 856:23, 857:6, 862:19, 871:11, 876:7, 876:10, 895:22, 960:1, 962:7, 962:9, 965:17, 1023:17, 1067:23, 1073:19, 1074:8, 1074:11, 1075:10, 1088:1, 1097:8

under-covered [4] - 960:1, 962:7, 962:9, 965:17
undercut [1] - 900:19
underlying [2] - 1009:10, 1009:17
undermines [1] - 1036:2
understood [6] - 883:13, 945:20, 945:21, 1047:18, 1104:3, 1114:10
unfolds [1] - 1110:13
United States [12] - 853:1, 853:3, 853:5, 853:12, 853:14, 853:18, 855:2, 855:6, 857:21, 857:24, 1007:25, 1087:13
unknowingly [1] - 991:14
unless [2] - 864:2, 1045:12
unqualified [1] - 1111:4
unrealized [4] - 886:23, 886:25, 887:5, 887:20
unsigned [5] - 925:11, 1003:1, 1003:4, 1003:10, 1007:15
unusual [2] - 991:3, 991:5
up [126] - 855:19, 862:10, 863:6, 870:9, 870:17, 872:7, 874:16, 875:24, 877:10, 881:14, 883:21, 887:1, 887:14, 888:3, 889:16, 890:24, 891:9, 894:5, 894:14, 895:21, 899:21, 900:10, 903:10, 904:25, 905:6, 906:5, 910:18, 910:22, 913:6, 915:3, 918:4, 920:11, 920:13, 922:20, 924:13, 931:19, 931:24, 933:25, 939:14, 943:6, 943:9, 943:23, 944:6, 944:17, 944:18, 955:5, 956:22, 957:23, 958:3, 958:9, 965:25, 967:16, 974:10, 975:7, 975:24, 978:3, 978:23, 979:12, 980:21, 981:11, 981:14, 984:10, 984:11, 984:12, 985:13, 988:9, 990:24, 990:25, 992:17, 1004:19, 1006:4, 1007:9, 1010:3, 1010:13, 1011:5, 1011:12, 1014:12, 1016:8, 1017:7, 1017:25, 1022:9, 1023:3, 1025:15, 1027:17, 1027:19, 1030:1, 1033:13, 1039:1, 1043:9, 1043:16, 1044:24, 1052:10, 1055:12, 1055:16, 1055:19, 1063:24, 1064:18, 1066:7, 1068:22, 1078:21, 1081:15, 1085:11, 1085:18, 1085:21, 1088:24, 1090:11, 1090:16, 1091:25, 1092:9, 1093:3, 1098:7, 1098:8, 1098:9, 1098:18, 1099:21, 1100:9, 1101:5, 1101:17, 1102:10, 1102:13, 1104:16, 1106:25, 1114:9
update [3] - 891:18, 911:4, 911:9
updating [1] - 932:7
upset [2] - 891:22, 892:1
uses [1] - 1053:10
UUF [1] - 1106:25

---

## V

vague [1] - 1059:4
valuable [1] - 991:12
value [5] - 865:13, 865:19, 887:7, 887:14, 1112:25
various [3] - 886:15, 966:4, 1094:19
vehicles [1] - 999:11
verbatim [1] - 866:4
verdict [2] - 1084:2, 1084:7
versa [1] - 1103:19
versus [1] - 855:2

Case 1:21-cr-00054-RPK-RK    Document 424-2    Filed 07/12/24    Page 294 of 294
PageID #: 14358

**veteran** [1] - 995:3
**vice** [1] - 1103:19
**view** [2] - 1048:10, 1114:2
**violate** [4] - 1069:16, 1069:20, 1069:24, 1071:15
**violated** [2] - 1071:18, 1071:21
**violating** [14] - 961:14, 961:16, 961:25, 962:3, 962:6, 962:18, 962:22, 963:4, 963:10, 963:25, 966:24, 1071:8, 1072:1, 1072:5
**violation** [8] - 962:14, 1071:5, 1076:14, 1076:25, 1078:12, 1080:21, 1083:4
**violations** [2] - 965:13, 1080:23
**visibility** [1] - 1009:14
**vivid** [4] - 1054:22, 1054:23, 1055:1, 1055:4
**vividly** [1] - 1054:21
**voluntarily** [1] - 899:18
**VORA** [1] - 854:6
**Vora** [1] - 855:14

## W

**W-2** [1] - 917:4
**wait** [6] - 856:18, 861:22, 868:16, 1054:10, 1101:3, 1111:5
**waiting** [1] - 1112:11
**walk** [2] - 975:2, 1044:4
**walked** [2] - 965:14, 1000:11
**walking** [1] - 997:5
**wants** [3] - 1035:1, 1114:18, 1115:22
**warning** [2] - 1003:14, 1006:21
**warrant** [1] - 1105:12
**warranted** [1] - 1107:7
**wash** [2] - 997:12, 997:22
**Washington** [1] - 854:9
**ways** [2] - 869:10, 1016:1
**Wealth** [1] - 985:11
**weather** [1] - 893:16
**weatherman** [1] - 893:16
**Wednesday** [1] - 1103:2
**week** [10] - 860:13, 862:9, 862:12, 933:17, 933:18, 960:15, 960:17, 1101:13, 1102:1, 1103:6
**weekend** [3] - 1099:25, 1101:13, 1116:9
**weeks** [1] - 1064:23
**weeks'** [1] - 1104:13
**Weigel** [1] - 855:5
**WEIGEL** [8] - 853:16, 899:9, 1045:22, 1045:25, 1107:3, 1107:8, 1107:11, 1107:20
**well-known** [1] - 995:7
**whistle** [2] - 859:12, 1048:16
**whistleblower** [12] - 859:8, 945:8, 945:11, 945:22, 1063:14, 1064:10, 1064:24, 1072:16, 1073:3, 1078:10, 1080:22, 1081:9
**whole** [15] - 900:14, 900:17, 902:16, 920:5, 922:7, 983:13, 1014:12, 1073:6, 1075:19, 1076:20, 1080:4, 1089:3, 1089:4, 1104:3, 1113:18
**wholesaler** [1] - 1087:22
**WILLIAM** [2] - 862:16, 1117:5
**willing** [3] - 926:19, 1105:19, 1106:5
**Wilson** [1] - 1045:20

**wire** [1] - 933:3
**wired** [1] - 906:15
**wish** [1] - 1014:10
**withdraw** [3] - 963:14, 972:21, 1073:15
**withdrawn** [2] - 944:20, 963:14
**witness** [118] - 855:25, 857:8, 858:5, 859:1, 859:3, 859:7, 859:22, 861:9, 861:21, 862:15, 862:16, 871:18, 872:7, 874:23, 879:19, 880:7, 896:21, 898:10, 899:5, 902:3, 908:10, 909:9, 909:13, 913:4, 913:6, 916:18, 921:18, 922:24, 924:11, 925:18, 927:7, 927:20, 927:22, 928:15, 928:16, 929:10, 929:12, 931:23, 936:12, 938:4, 940:3, 940:4, 946:15, 947:23, 947:24, 948:1, 948:11, 948:12, 948:15, 954:22, 956:6, 956:8, 978:11, 978:13, 978:15, 984:23, 1003:21, 1009:4, 1009:5, 1022:5, 1022:6, 1022:11, 1026:20, 1026:21, 1026:22, 1032:12, 1032:13, 1033:2, 1033:3, 1033:10, 1034:3, 1034:19, 1035:21, 1035:25, 1036:8, 1036:9, 1037:14, 1037:21, 1039:6, 1043:17, 1046:18, 1052:9, 1058:19, 1060:18, 1065:15, 1072:20, 1074:1, 1076:8, 1076:20, 1076:24, 1078:23, 1088:23, 1088:24, 1098:16, 1098:17, 1101:20, 1101:22, 1101:24, 1102:2, 1102:5, 1103:1, 1103:14, 1103:21, 1103:25, 1104:2, 1104:10, 1104:12, 1104:20, 1104:24, 1106:11, 1108:25, 1109:4, 1109:9, 1114:18, 1115:7
**Witness** [3] - 862:15, 954:21, 956:8
**witness'** [3] - 855:22, 857:19, 858:24
**witness's** [3] - 902:3, 1035:20, 1076:19
**witnesses** [4] - 1102:6, 1103:5, 1103:23, 1105:3
**Wood** [1] - 858:10
**word** [6] - 938:21, 939:4, 1086:4, 1090:21, 1091:12, 1113:22
**wording** [3] - 915:7, 915:9, 915:23
**words** [7] - 859:9, 940:21, 963:12, 963:13, 1044:24, 1097:8, 1110:23
**works** [3] - 969:10, 979:15, 1084:11
**world** [2] - 995:7, 1049:25
**worth** [5] - 887:3, 892:9, 1071:2, 1071:4, 1104:13
**wound** [1] - 1055:12
**write** [4] - 878:5, 964:2, 1003:12, 1058:15
**writes** [1] - 1100:23
**writing** [7] - 963:24, 966:22, 967:21, 967:22, 968:7, 1004:15, 1108:21
**written** [5] - 960:25, 991:2, 991:14, 1070:11, 1080:25
**wrote** [9] - 918:2, 1062:5, 1062:9, 1063:7, 1063:11, 1076:15, 1108:15, 1109:10, 1109:15, 1109:22, 1110:6

## Y

**year** [62] - 863:13, 868:10, 868:12, 868:15, 870:1, 870:6, 871:6, 886:17, 889:1, 890:6, 890:8, 890:13, 894:3, 894:17, 902:25, 903:11, 908:20, 918:12, 931:3, 931:16, 932:18, 935:15, 940:16,

940:19, 941:5, 960:17, 964:10, 964:14, 967:6, 969:10, 972:15, 976:25, 981:1, 987:22, 998:24, 1005:16, 1005:21, 1007:24, 1008:6, 1008:22, 1009:22, 1011:11, 1011:13, 1011:19, 1014:4, 1014:20, 1015:7, 1016:4, 1016:6, 1017:14, 1021:20, 1055:8, 1061:11, 1062:12, 1063:10, 1065:6, 1067:12, 1067:17, 1097:8, 1097:9
**year-end** [3] - 868:10, 868:12, 1067:17
**years** [9] - 869:19, 940:10, 964:3, 965:4, 966:4, 967:19, 1001:5, 1021:10, 1049:8
**yellow** [1] - 980:11, 982:14, 984:7, 984:11
**yesterday** [20] - 862:6, 863:3, 863:22, 891:15, 952:12, 956:20, 959:9, 964:16, 1016:19, 1017:3, 1020:6, 1020:16, 1029:15, 1030:2, 1030:5, 1030:19, 1031:13, 1054:5, 1054:21, 1086:4
**yield** [2] - 947:16, 995:22
**York** [12] - 853:5, 853:14, 853:15, 853:21, 854:5, 887:2, 892:5, 927:1, 941:9, 941:13
**you...** [1] - 873:21
**yourself** [11] - 952:9, 963:3, 963:6, 984:25, 985:5, 1020:7, 1020:11, 1032:16, 1058:12, 1058:21, 1081:21
**yup** [11] - 889:18, 910:9, 1023:20, 1027:8, 1027:10, 1027:16, 1053:19, 1053:21, 1056:6, 1070:9, 1072:15

## Z

**ZELL** [1] - 854:10
**Zell** [1] - 855:14
**zero** [4] - 1082:11, 1082:17, 1082:18
**zoom** [9] - 863:10, 873:18, 879:24, 881:7, 883:10, 885:20, 948:24, 949:15, 977:22

## §

**§801(d)(1)(B** [1] - 856:17