1120

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,    : 21-CR-0054(RPK)
                             :
                             :
                             :
                             :
                             : United States Courthouse
     -against-               : Brooklyn, New York
                             :
                             :
                             :
                             : Monday, June 24, 2024
DAVID GENTILE and            : 9:30 a.m.
JEFFRY SCHNEIDER,            :
                             :
       Defendants.           :
- - - - - - - - - - - - - - -X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE RACHEL P. KOVNER
UNITED STATES DISTRICT JUDGE, AND A JURY

A P P E A R A N C E S:

For the Government:    UNITED STATES ATTORNEY'S OFFICE
                       Eastern District of New York
                          271 Cadman Plaza East
                          Brooklyn, New York 11201
                       BY: ARTIE MCCONNELL, ESQ.
                           JESSICA WEIGEL, ESQ.
                           NICHOLAS AXELROD, ESQ.
                           KATE MATHEWS, ESQ.
                           Assistant United States Attorneys

For the Defendant:     KOBRE & KIM, LLP
                       Attorneys for the Defendant -
                       David Gentile
                          800 Third Avenue
                          New York, New York 10022
                       BY: SEAN S. BUCKLEY, ESQ.
                           MATTHEW MENCHEL, ESQ.
                           ADRIANA RIVIERE-BADELL, ESQ.
                           JONATHAN D. COGAN, ESQ.
                           ALEXANDRIA E. SWETTE, ESQ.

1121

A P P E A R A N C E S: (Continued.)


                    ARENT FOX SCHIFF, LLP
                    Attorneys for the Defendant -
                    Jeffry Schneider
                         1301 Avenue of the Americas
                         42nd Floor
                         New York, New York 10019
                    BY: GLENN C. COLTON, ESQ.
                        APEKSHA VORA, ESQ.

                    ARENT FOX SCHIFF, LLP
                    Attorneys for the Defendant -
                    Jeffry Schneider
                         1717 K Street, NW
                         Washington, DC 20006
                    BY: MICHAEL DEARINGTON, ESQ.
                        LAURA ZELL, ESQ.

                    LAW OFFICE OF STEPHEN JAMES BINHAK, PLLC
                    Attorney for the Defendant -
                    Jeffry Schneider
                         1 SE 3rd Avenue
                         Suite 2600
                         Miami, Florida 33131
                    BY:  STEPHEN J. BINHAK, ESQ.

Court Reporter:  Anthony D. Frisolone, FAPR, RDR, CRR, CRI
                 Official Court Reporter
                 Telephone: (718) 613-2487
                 Facsimile: (718) 613-2694
                 E-mail: Anthony_Frisolone@nyed.uscourts.gov


Proceedings recorded by computerized stenography.
Transcript produced by Computer-aided Transcription.

*Proceedings*                                                              1122

1          (In open court.)

2          THE COURTROOM DEPUTY:  All rise.

3          THE COURT:  You can all be seated.

4          MR. MENCHEL:  Your Honor, I didn't understand why I

5  couldn't publish the transcript of the witness' in-court

6  testimony.  I've never not been allowed to do that before.  I

7  don't know of any rule that prohibits anything showing his

8  in-court testimony.

9          THE COURT:  I'm not sure I remember what we're --

10         MR. MENCHEL:  In other words, I want to bring him

11 back to testimony he said on direct and I was reading back his

12 testimony.

13         THE COURT:  Isn't it generally done, weren't you

14 asked the following question and did you give the following

15 answer?

16         MR. MENCHEL:  Yes, and I usually do it while I have

17 it on the screen so the jurors can follow along.

18         THE COURT:  It's an out of court --

19         MR. MENCHEL:  It's in court.

20         THE COURT:  I think that's fair.  Any reason why he

21 can't do that?  It's not generally how I see it done.

22         MR. MCCONNELL:  I've never seen it done that way.  I

23 mean, we generally just ask, didn't you testify to that and I

24 don't know why we need the transcript.

25         MR. MENCHEL:  It's evidence in the case.  I don't

*Proceedings*                                                    1123

1    see why I can't use it.

2              THE COURT:  That's a fair point.

3              (Jury present.)

4              THE COURT:  I think we're ready for your cross.

5              MR. MENCHEL:  Thank you, your Honor.

6              (Witness takes the stand.)

7              (Continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  **WILLIAM JACOBY**,

2       called as a witness by the Government, having been

3       previously duly sworn/affirmed by the Courtroom Deputy,

4       was examined and testified as follows:

5  CROSS-EXAMINATION

6  BY MR. MENCHEL:

7  Q    Good morning, Mr. Jacoby.

8  A    Good morning.

9  Q    Mr. Jacoby, I want to go back to something we were

10  talking about on Friday regarding the marketing dec for the

11  Automotive Portfolio.

12       This is Government Exhibit 7781-C, Andy.  It's in

13  evidence, if you would just publish it.

14       THE COURTROOM DEPUTY:  This is coming from defense

15  table?

16       MR. MENCHEL:  Yes.

17  Q    Do you recall we looked at this dec, this was the dec,

18  also, that Mr. McConnell showed you I believe on Thursday?

19  A    Okay.

20  Q    I want to direct you back again to the page, page 7 of

21  the marketing dec for Automotive Portfolio?

22  A    Yes.

23  Q    We looked at this and I asked you -- you testified when

24  Mr. McConnell was questioning you about whether or not

25  targeted annual distributions 8 percent paid, 100 percent

1   funds from operations --

2   A    Yes.

3   Q    -- in 2014 were fully covered.  And you testified that

4   they were not.  Do you recall that testimony when Mr.

5   McConnell was asking you questions?

6   A    I don't know if he said specifically fully covered, but

7   we were saying that they used investigators' money to pay

8   them.

9   Q    That's the same thing, right?

10  A    No, it's not.

11  Q    What's the difference?

12  A    Remember how you were very interested in the concept of

13  accrual accounting?

14  Q    Yes.

15  A    Half of the money that's in the net investment income is

16  accrued for, but all the marketing materials, everything they

17  said, all the distribution, the due diligence packages, and

18  the slideshows and performance, the PPMs, all say that special

19  distributions will be distributed once the profits from the

20  operations are collected and accumulated at the fund.  That is

21  not what happened.  So call up the 2014 Automotive Portfolio

22  audited financials and I'll show you.

23  Q    We'll get there in a second.  Before I do, the special

24  distributions are also mentioned here below, as well, right?

25  Do you see that 3 percent?

1           MR. MENCHEL:  If you could pull that up, Andy.

2           (Pause.)

3           THE COURT:  We're getting tech up.  My suggestions

4    are talk really loudly in the meantime or we can take a short

5    break.  I don't want to make the jurors sit here.

6           MR. MENCHEL:  My voice isn't the best, but I'm fine

7    doing that.  I think the reporter is having an issue.

8           THE COURT:  As long as you talk loudly.  She can

9    hear you now.

10   BY MR. MENCHEL:

11   Q    So you see what's on the screen, the 3 percent special

12   distributions?

13   A    Yes.

14   Q    You testified on direct examination that there was not

15   sufficient coverage at the time that those distributions were

16   paid, is that your testimony?

17   A    Not enough cash, yeah, and they used another -- let me

18   finish.  They also used a performance guaranty in that year,

19   as well.  So it wasn't funds through operations.  They had

20   cash to pay half of it of the distributions that were paid

21   that year, and one of the dealerships was never purchased.

22   That happened after the fact.  But yeah, so the special

23   distribution is fraudulent, yes.

24   Q    What performance guaranty are you referring to, sir?

25   A    That one was the 2014 one.  We haven't had that one in

evidence.

Q    There's been no testimony at all about a performance

guaranty in the year 2014, correct?

A    Well, you asked.

Q    Are you suggesting that performance guaranty was

fraudulent also?

A    Yes.

Q    So for the first time in this case you're now telling the

prosecution that there was a 2014 performance guaranty for

Auto that was not real?

A    Yes.

Q    Whose performance guaranty was that?

A    That was also Lash.

Q    Okay.  Let's take a look at the audited financials.  By

the way, you sign off on these financials, right?

A    At the time I thought it was accurate.

Q    Okay.  Let's take at the audited financial statements?

A    For '14 Automotive Portfolio?

Q    This is GX-2005.  Because before I get there, you asked

about the 1.1 last week when I was questioning you about these

financials.  Do you remember that?

A    No.  The 1.1 is the 2015.

Q    That's right.  And when I showed you this, you said it's

the 1.1 in there.  Do you recall asking me that question on

Friday?

1  A    I must have been confused.  The 1.1 is the 2015

2  performance guarantees.

3  Q    Let's go to these audited financial statements.

4         MR. MENCHEL:  Andy, if you would, please, go to

5  page 7.  Highlight net investment income, please, Andy.  No,

6  net investment income.  It's on the bottom.

7  Q    Do you recognize that number?

8  A    Yes.

9  Q    And that's the number that was being used to determine

10  whether there was sufficient coverage for distributions,

11  correct?

12  A    In the marketing materials that's what people spoke

13  about, yes.

14  Q    Isn't this the metric you were using to determine whether

15  or not it was fully covered?

16  A    Right.  But it's not all cash.  So if the special

17  distributions as all the marketing material say are going to

18  be distributed once we collect enough cash, half of that

19  number is not cash.

20  Q    Are you suggesting that the cash has to be collected

21  before you can pay a distribution?

22  A    That's what the marketing materials said.  The marketing

23  materials say that they'll pay the special distribution once

24  the cash is collected and accumulated and it becomes

25  available.

1   Q    We'll look at the marketing materials.

2   A    Let's.

3   Q    We talked about cash accounting versus accrual accounting

4   on Friday, did we not?

5   A    Yes.  And that's separate --

6   Q    If you answer my questions, this will go a lot faster.

7   We talked about cash accounting versus accrual accounting on

8   Friday, did we not?

9   A    Yes.

10  Q    And it's perfectly appropriate and, in fact, it's what's

11  normally used in the United States to use accrual based

12  accounting when determining whether you have income, yes?

13  A    Sure.

14  Q    And so according to the audited financials that you

15  signed off on, the net investment income was over $1 million

16  that year, right?

17  A    That's right.

18         MR. MENCHEL:  Let's look at the distribution on the

19  next page, please, Andy.

20  Q    The distribution was $792,000, right?

21  A    That's right.

22  Q    So according to the audited financial statements there

23  was more than sufficient amount of net investment income to

24  cover all the distributions for that year, true?

25  A    But not enough cash.

1  Q    So now you have this theory that they actually have to
2  physically have the cash before they can make a special
3  distribution?
4  A    No.  The marketing materials, the PPM, the due diligence
5  documents, and the slideshows all say, including what came out
6  of their mouths, all say that they would make special
7  distributions once the cash was collected and it was
8  available.  That doesn't say that you can't do accrual
9  accounting because you can, but that's what they said.
10 Q    We'll look at the marketing materials later.  Right now
11 you would agree with me that there was more than sufficient
12 income to cover the distributions for the Automotive Portfolio
13 in the year 2014?
14 A    Sure.
15 Q    And not only the 8 percent distributions, but all the
16 special distributions that were in the footnote that I just
17 showed you?
18 A    Yes, yes.
19 Q    I'm only yelling because I'm trying to keep my voice up
20 for the benefit of the reporter.  I'm not yelling at you.
21 Please don't take it that way.  When the mic comes back on,
22 I'll simmer down.
23 A    To be clear, $300,000 of that distribution was the
24 investors' own deposits and cash.
25 Q    Says you.

1   A    I can show you.  Please go to the --

2   Q    Mr. Jacoby, you said you never testified before, right?

3   A    That's correct.

4   Q    The way this works is I ask questions, you give answers.

5   Do you understand that?

6   A    I'm trying to explain it to you.

7   Q    That's not your job.  The way this works is I ask

8   questions, you give answers, and Mr. McConnell, if he wants to

9   ask you other questions, he's entitled to do that.  That's the

10  rules of the Court.

11             Do you understand that?

12  A    Sure.

13  Q    Now, I also asked you about whether or not Mr. -- I'm

14  going to talk about the 2014 performance guarantees.

15             MR. MENCHEL:  Andy, if you could go to

16  Government Exhibit 2008, tab 27, page 15 on the Bates, please,

17  Andy.  And can you blow these up, Andy.  Yes, thank you.

18  Q    We looked at this on Friday, as well, right?

19  A    Yes.

20  Q    And this is, to be clear for the benefit of the jury,

21  this is now Holdings 12014 financial statements, yes?

22  A    Right.

23  Q    And there's a note here and it says, In some cases the

24  partnership has agreements in place with the operating

25  partner; that would be Mr. Lash, correct?

*Jacoby - Cross - Menchel* 1132

1  A    Right.

2  Q    And Patrick Dibre to guarantee a certain amount of income

3  at the dealership level for a specified amount of time.

4  A    Sure.

5  Q    For the year ended December 31, 2014, approximately

6  1,100,000 was paid by them into the dealerships.  Do you see

7  that?

8  A    Yes.

9  Q    I asked you whether or not Mr. Dibre had performance

10 guarantees and you said you didn't think so.  Do you recall

11 that?

12 A    Yes.  He had convertible notes.

13 Q    Let me show you.  This is Defense Exhibit CF for the

14 witness only, I believe.  This is not in evidence.

15       Do you recognize what's on the screen as Defense

16 Exhibit CF?

17 A    I hadn't seen this.

18 Q    My question is, do you know what it is?

19 A    It's a performance guaranty.

20 Q    Of who?

21 A    This is one is for Dibre, dated March of 2014.

22       MR. MENCHEL:  I offer.

23       MR. MCCONNELL:  Objection.

24       THE COURT:  Yes.  No, not based on that testimony.

25 He indicated he hadn't seen it before and you showed it to him

1    and he read what it is.  I'm not letting you offer it to that

2    witness.

3                MR. MENCHEL:  Could we have a sidebar, please?

4                THE COURT:  Yes.

5                (Sidebar; continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Sidebar*                                                                      1134

1          (Sidebar conference held on the record in the

2    presence of the Court and counsel, out of the hearing of the

3    jury.)

4          MR. MENCHEL:  Your Honor, these documents were

5    provided to us by the Government.  Are they going to seriously

6    contend these are not real?

7          THE COURT:  I don't know, but you definitely haven't

8    covered foundation for the admission of this exhibit.

9          MR. MENCHEL:  You're not willing to agree to the

10   admission of this document by stipulation?

11         MR. MCCONNELL:  I don't know what this document is.

12   It doesn't have our Bates on it and this wasn't on your

13   exhibit list that you provided.

14         MR. MENCHEL:  Yes, it is.

15         MR. MCCONNELL:  CF?  I don't think so.

16         MR. MENCHEL:  It has the Bates number from you guys

17   to us.

18         MR. MCCONNELL:  No, it doesn't.

19         THE COURT:  Let's go.

20         (Sidebar concluded; continued on next page.)

21

22

23

24

25

1   BY MR. MENCHEL:

2   Q    So it's your testimony, sir, that you were not aware that

3   Mr. Dibre had performance guarantees in 2014?

4   A    I believe that what you're referring to is --

5   Q    Can you just answer my question, please?  Is it your

6   testimony you were not aware that Mr. Dibre had performance

7   guarantees for Volkswagen of Huntington LLC in 2014?

8   A    Yes.  I believe that that was part of his convertible

9   note.  That's what I thought.

10  Q    Let's me show you another document, Defense Exhibit KN,

11  just for the witness only.  Do you recognize this performance

12  guaranty?

13  A    Yes.  I think this is all part of his convertible notes.

14  Q    You said part of his convertible notes.  It does say

15  performance guaranty on it, does it not?

16       THE COURT:  Sustained.

17  Q    So you were not aware that he also had a performance

18  guaranty for Duarte Nissan Motor Group in 2014?

19       MR. MCCONNELL:  Same objection.

20       THE COURT:  Overruled.

21  Q    You were not aware of that?

22  A    No.  I think it's all part of these convertible notes.

23  If you want to go back to the financial statement, I'll show

24  you what I mean.

25       THE COURT:  We have a tech person here who is going

*Jacoby - Cross - Menchel*                                                1136

1    to look at your mic.

2             MR. MENCHEL:  By the way, for the benefit of the

3    Government the Bates on that was DOJ-EDNY-0570763.

4    Q    I want to go back to the document I showed you on Friday,

5    as well, Government Exhibit 7392.  This is in evidence.

6             MR. MENCHEL:  Andy, if you would turn to page 5 of

7    the email chain.  I'm sorry, page 4, the bottom.

8    Q    Do you see where it says Trent Schneiter?

9    A    Yes.

10   Q    Go to the next page, please, page 5.  It says, Have some

11   follow up.  Hello, gentlemen.  Have some follow-up items.

12   And, again, the very last bullet is, break down an explanation

13   of the 1.1 million guaranteed payment in the 2014 GPB Holdings

14   LP audited financials.  See that?

15   A    Yes.

16   Q    And I showed you, go to the top of the chain please,

17   first page.  First page, please.  You're now on the top of the

18   chain, correct?

19   A    Yes.

20   Q    And Mr. Marshall is talking to Mr. Trent Schneiter?

21   A    Yes.

22   Q    At the bottom it says Jacoby and Frangioni have the exact

23   details on the amounts and timing of these payments, if you

24   need them, right?

25   A    Yes.

1  Q    It begins with, Just wanted to clarify on the last bullet
2  point.  The 1.1 million guaranteed payment in the 2014 audited
3  financials were actually cash paid from Lash Dibre during the
4  year.  Do you see that?
5  A    Yes.
6  Q    It's still your testimony that Dibre didn't pay anything?
7  A    Yes.
8  Q    Okay.
9  A    I'll show you.
10 Q    Okay.  Let's go to Defense Exhibit FFFFY.  I showed you
11 this as well, correct?  Do you remember that?
12 A    Yes.
13 Q    And you included in response to Mr. Marshall's email this
14 chart?
15 A    Yes.
16 Q    Okay.  I want to show you --
17          MR. COGAN:  Do you want this published?
18          MR. MENCHEL:  Yes, please.  I thought it was
19 published.  It's in evidence.  Thank you.  My fault.
20 Q    Just to recap, you included this chart, right?
21 A    Yes.
22 Q    And it's now your testimony that even though there was a
23 question about the 1.1, you didn't respond to that question?
24 A    Yes.  In this discussion we're talking about Mr. Dibre's
25 contracts, which were these convertible notes, which included

1   some level of guaranty which he never paid.

2   Q    He never paid these?

3   A    I'll show you on the financial statements.

4   Q    Okay.  Now, that chart, do you remember where you got

5   that chart from?

6   A    A spreadsheet.

7   Q    You got it from a spreadsheet?

8   A    I think so.

9   Q    Let me show you another document not in evidence yet,

10  Defense Exhibit CCCCCT.  And if you would show Mr. Jacoby both

11  pages of it.  Second page, as well, which is dash one.

12        Do you recognize this?

13  A    Not yet.  It looks familiar but I don't recognize it.

14  Q    Let's go back to the first page.  Mr. Jacoby, this is an

15  email from you to Mr. Frangioni, right?

16  A    Yes.

17  Q    So you attached this document and sent it to Mr.

18  Frangioni on April 2015, yes?

19  A    Right.

20        MR. MENCHEL:  I offer it.

21        MR. MCCONNELL:  No objection.

22        THE COURT:  Admitted.

23        (Defense Exhibit CCCCCT was received in evidence.)

24  Q    Let's go to the first page.  This was back in April of

25  2015.  You sent this to Mr. Frangioni, and the subject is copy

1   of dealerships, 2014 income, right?

2   A    Right.

3   Q    An you included it in an Excel spreadsheet?

4   A    Right.

5   Q    Go to the next page, please, Andy.  And this chart is

6   pretty much the same chart you saw attached to the email that

7   we just looked at a moment ago, right?

8   A    Right.

9   Q    It has two columns here.  Let me make sure we're going

10  through each of these.  North Plainfield of Nissan at the top,

11  that is a Patrick Dibre dealership, is it not?

12  A    Yes.

13  Q    Nissan of Richmond, also Dibre?

14  A    Yes.

15  Q    Nissan of Huntington, also Dibre?

16  A    Right.

17  Q    Nissan Garden City, also Dibre?

18  A    Right.

19  Q    Volkswagen of Huntington, also Dibre?

20  A    Right.

21  Q    Nissan of Duarte, also Dibre?

22  A    Yes.

23  Q    Country Motors II, that one is Mr. Lash?

24  A    That's right, yes.

25            MR. MENCHEL:  If you could blow it back out again,

*Jacoby - Cross - Menchel*                                                1140

1    Andy.  If you could blow up the columns that say true up.

2    Q    These were payments made by Mr. Dibre to true up the

3    amount of income for those dealerships, true or false?

4    A    I believe that's true.

5    Q    And if you look, and if you blow it back out, the Country

6    Motors II one is empty, so there were no true ups for Country

7    Motors II, right?

8    A    That's right.  He didn't pay that one.

9    Q    We talked about this the other day, but if you add up

10   those numbers it's approximately $1.1 million, right?

11   A    That's right.

12   Q    Now, I want to go back and show you a new document now,

13   not in evidence yet.  Defense Exhibit DDDDDR.  Witness only,

14   please.

15           Do you see, Mr. Jacoby, you're on the top of this

16   email chain?

17   A    Yes.

18   Q    I want to show you, and turn back to page 3, Andy.  This

19   is part of the same email thread.  Do you see where it says

20   break down of 1.1 million?

21   A    Yes.

22   Q    That we just looked at, right?

23   A    Right.

24           MR. MENCHEL:  I offer it.

25   A    This is on the notes in interest.

1        MR. MCCONNELL:  Object to this.

2        THE COURT:  I'm sorry.  My realtime isn't working.

3    I might need you to scroll.

4        MR. MENCHEL:  Mr. Jacoby is on this email chain.

5        THE COURT:  What is the objection?

6        MR. MCCONNELL:  Hearsay.

7        MR. MENCHEL:  I'm not offering it for the truth.  I

8    can explain at sidebar, if I need to.

9        THE COURT:  It's not being offered for the truth.

10   This is being offered to show that the witness received this

11   document and acted on it.  Go ahead.

12       MR. MENCHEL:  Correct.

13       THE COURT:  It's admitted.

14       (Defense Exhibit DDDDDR was received in evidence.)

15   Q    So now, please publish.  Highlight the top portion.  So

16   this is from Mr. Weisenberger.

17       He is an employee at Ascendant, was he not?

18   A    Yes.

19   Q    Do you recall his position?

20   A    No.

21   Q    And the only person he's sending this to is you at this

22   point, right?

23   A    Yes.

24   Q    If you turn back to page 3, to the email that starts with

25   Mr. Schneiter.  This is the exact same part of the email chain

1   that we looked at in the prior exhibit, is it not?

2   A    Okay.

3   Q    Was that a yes?

4   A    Yes.

5   Q    And, again, it has the breakdown 1.1 million guaranty

6   payment, so on and so forth we talked about, right?

7   A    That's right.

8   Q    And then, if we could go to the next page -- hold on a

9   second.  Page 3, at the top for Mr. Schneiter to Mr.

10  Doorenbos, please, Andy.

11        This is Mr. Schneiter reporting to Mr. Doorenbos

12  after you had sent him that spreadsheet, correct?

13  A    Right.

14  Q    And it says -- hold on a second, please.  It says on the

15  second paragraph, Break down 1.1 million guaranty payment in

16  2014 GPB Holdings LP audited financials is attached.  The

17  amounts are a result of Patrick.

18        Do you see that?

19  A    Yes.

20  Q    And that would be referring to Patrick Dibre, yes?

21  A    Yes.

22  Q    Paying the distributions out of pocket, rather than

23  directly from the dealerships, correct?

24  A    That's right.

25  Q    So at least Mr. Schneiter was representing to these

1   broker dealers --

2           THE COURT:  Sustained as to how you're using this

3   email, which is for the truth.  Let's move on.

4           MR. MENCHEL:  It's not for the truth.  I want to

5   explain the actions he took in response to this, if any.

6           THE COURT:  All right.  Ladies and gentlemen, this

7   is being offered not for the truth of its contents, but just

8   to explain what the witness subsequently did.  Go ahead.

9   BY MR. MENCHEL:

10  Q    You were copied on this email chain?

11  A    Right.

12  Q    Specifically by Mr. Weisenberger to you, right?

13  A    Okay.

14  Q    Okay.  And in your view this is an incorrect assertion,

15  right?

16  A    There was 1.1 million attached to Patrick's dealerships.

17  I could show you the financial statements, if you want to look

18  at them.

19  Q    He's talking about the 1.1 million performance guarantees

20  as the explanation, yes?

21  A    Talking about Dibre's guarantees as they're related to

22  his convertible notes, which I can show you in the financial

23  statements.

24  Q    My question, sir, is did you agree with this answer or

25  not?  Because on Friday you said he was wrong about something,

1    so I'm asking you.

2    A    It's not the 1.1 million of the two performance

3    guarantees that we were talking about with Lash that you

4    showed me.

5    Q    So in your opinion he's giving the wrong explanation for

6    the 1.1 performance --

7    A    I think you're getting it confused because they're

8    similar and they're two different guarantees.

9    Q    Okay.  In any event, sir, to the extent Mr. Schneiter had

10   represented to Mr. Doorenbos that the 1.1 million performance

11   guaranty was paid by Patrick, you didn't do anything to

12   correct that misimpression, right?

13   A    I -- from looking at this I think that's what I thought

14   they were referring to at the time.

15   Q    So you didn't feel the need to correct anything?

16   A    I think that's what they were talking about at the time,

17   yes.

18   Q    You think or you know?

19   A    From looking at what you're showing me here, I think that

20   the exchange was speaking about Mr. Dibre's guarantees, not

21   Mr. Lash's.  You showed me Mr. Lash's before.  That's what I

22   thought you were talking to me about prior.  So they both

23   happened.

24   Q    I see.  I'm a little confused because I thought you said

25   earlier Mr. Dibre didn't have performance guarantees.  Now

1   you're saying he does?

2   A    They're in his convertible notes, which I can show you in

3   the financial statements.

4   Q    I want to move on and talk about --

5              MR. MENCHEL:  You can take that down Andy.  Thank

6   you.

7   Q    Last week I asked you if you were familiar with the

8   financial statements of Bob's Buick.  Do you recall that?

9   A    Yes.

10  Q    Your testimony was you were not?

11  A    Yes, that's true, I'm not.

12  Q    I tried to show you a document.  You said you had never

13  seen it before.  Do you recall that?

14  A    Yes, I think so.

15  Q    Let me show you, sir.

16             MR. MENCHEL:  Tab 19.  Andy, this is for the witness

17  only.  This is Defense Exhibit DDDQ.  Sorry, DDDDDQ.  If you

18  would Andy, show the witness also the attachment.  This is an

19  email from Mr. Moscato to you, is that correct, and others?

20  A    Yes, it was.  I don't remember it.

21             MR. MENCHEL:  I offer it.

22             MR. MCCONNELL:  Objection.

23             THE COURT:  What's the objection?

24             MR. MCCONNELL:  The witness doesn't remember it.

25             THE COURT:  I think he said it's an email to him.

1    I'll allow it.

2            MR. MCCONNELL:  I don't know what the purpose is

3    going to be in order to admit this.  The witness says he

4    hasn't seen it before.  I'll withdraw the objection.  It's

5    fine.

6            MR. MENCHEL:  I offer it into evidence.

7            MR. MCCONNELL:  No objection.

8            (Defense Exhibit DDDDDQ was received in evidence.)

9    BY MR. MENCHEL:

10   Q    Turning to the first page, please, Andy.  This is from a

11   gentleman named Dustin Moscato?

12   A    Right, yes.

13   Q    Do you know who he is?

14   A    Yes.

15   Q    Who was he?

16   A    He worked at GPB.

17   Q    Your job, I you said this on Friday, was to look at the

18   underlying financial statements for a number of the

19   dealerships, yes?

20   A    We had spotty visibility.  So we didn't have full

21   visibility.  Once in a while we would get some statements, but

22   I didn't have full visibility.

23   Q    But this was one that was sent to you.  It says

24   manufacturer of financial statements is the subject?

25   A    Yes.

1  Q    Let's turn to the next page, please.  This is what was

2  attached, correct?

3  A    Yes.

4  Q    This was a document when I showed you on Friday you said

5  you had never seen before, right?

6  A    I didn't recognize it, no.

7  Q    But now it turns out you had gotten a copy of it, yes?

8  A    That's true.

9  Q    If you scroll down to the very bottom.  You see the top

10  right it says dealership, Bob's Buick?

11  A    Yes, that's right.

12  Q    That's Mr. Lash's Buick?

13  A    Yes.

14  Q    And the statement is from December of 2014?

15  A    Right.

16  Q    Okay.  If you go to the very, very bottom, the profit and

17  loss summary.

18  A    Right.

19  Q    There's a number there that's 1,987,132?

20  A    Yes.

21  Q    That's the profits for that year?

22  A    Yes.  That's what it's saying, yes.

23  Q    You remember what the profits were for 2015, the year

24  that Mr. Lash signed the performance guaranty?

25  A    The 2015 financials or you're talking about --

1    Q    I'm talking about this is 2014.

2    A    Right.

3    Q    And I'm asking you if you know how Bob's Buick did for

4    the year 2015?

5    A    You would have to refresh my memory.

6    Q    Let me show you something.  I'm showing you, for the

7    witness only, Defense Exhibit OOS.  Do you recognize this

8    document?

9    A    I don't, but it looks like -- let me look at it for a

10   second.

11   Q    Blow it back out for the gentleman.

12   A    This looks like we're talking about the 2015 performance

13   guaranty for Lash.

14   Q    Correct.  I want to turn you to the last page on the

15   attachment.  Blow up where it says GPB Auto Portfolio, that

16   row.  Do you see that?

17            MR. MCCONNELL:  Your Honor --

18            THE COURT:  Are you offering it?

19            MR. MENCHEL:  I'm familiarizing him with it.  I'm

20   laying a foundation.

21   Q    This is what you attached and gave to the auditors,

22   correct?

23   A    Can I look at this?  Can I see the part to the right

24   there?

25   Q    To the right?

1   A    Yes.  Keep going.  Please, keep going to the right.

2   Okay.  I recognize that, yes.

3           MR. MENCHEL:  I offer it.

4           MR. MCCONNELL:  He recognizes it as what?

5   Q    Isn't this --

6           MR. MCCONNELL:  Can I voir dire the witness on the

7   exhibit, please?

8           THE COURT:  Okay.

9   VOIR DIRE EXAMINATION

10  BY MR. MCCONNELL:

11  Q    Mr. Jacoby, you've been shown a number of documents on

12  cross-examination.  Have you reviewed them prior to today?

13  A    No.

14  Q    When you say you recognize them, do you know how the

15  numbers got in there?

16  A    I'd have to do a little more work.

17  Q    Do you know whether the numbers are accurate, sir?

18  A    I would have to do a little more work to familiarize

19  myself with it, yes.

20          MR. MCCONNELL:  No further questions.

21          MR. MENCHEL:  I offer it.

22          MR. MCCONNELL:  No objection.

23          THE COURT:  Admitted.

24          (Defense Exhibit OOS was received in evidence.)

25

1   CROSS-EXAMINATION

2   BY MR. MENCHEL:

3   Q    Go to the first page, please.  Blow up the top.  Mr.

4   Jacoby, that's an email from you to Sarah Kowalski, correct?

5   A    Yes.

6   Q    Al Matarazzo and --

7   A    Yes.

8   Q    Who are those folks?

9   A    The auditors.

10  Q    And you provided this Excel spreadsheet to them for them

11  to do their work, right?

12  A    For support of the Lash 1,000,050 performance guaranty.

13  Q    I assume you would have been careful to what you were

14  attaching to make sure it was accurate when you sent it,

15  right, sir?

16  A    Yes.

17  Q    There is no doubt in your mind about that, is there?

18  A    I don't think so.

19  Q    Let's go back to where I was.  If you could blow up that

20  line.  This is part of what you said to the auditors, correct?

21  A    Yes.

22  Q    And blow up a little more to the left so I can show him

23  what we're talking about.  See Buick GMC of Milford?

24  A    Yes.

25  Q    That's also Bob's Buick, right?

*Jacoby - Cross - Menchel*                                   1151

1   A    That's where the 1,000,050 was booked.

2   Q    If you go to the right.  There's a table there that says

3   year to date 963,000 and $3, right?

4   A    Yes.

5   Q    That's what he earned?

6   A    Yes.

7   Q    No question about it?

8   A    Well --

9   Q    You attached this, did you not?

10  A    Yes, that's what the spreadsheet has.

11  Q    And in --

12         MR. MENCHEL:  Andy, if we could do a side by side,

13  please, of the 2014 Bob's Buick income profit.  Blow out just

14  the 1,000,987 and do a side by side with what we just showed

15  Mr. Jacoby.

16  A    Yes.  So according to that --

17  Q    I haven't asked you a question, sir.

18         So the difference between the two dealerships,

19  between the dealership performing in 2014 versus '15 was well

20  over a million dollars, right?

21  A    Yes.

22  Q    It underperformed in 2015?

23  A    Yes.

24  Q    We can take that off.  Now, when you had an audited

25  financial statement you sign off on something called a

1   management representation letter, correct?

2   A    That's right, yes.

3   Q    That is a letter you give to the auditors that makes

4   certain statements that you're saying that these materials

5   that they've been provided are true and accurate, right?

6   A    Yes.

7   Q    And that's a very important document?

8   A    I agree.

9   Q    I want to show it to you.  This is Defense Exhibit

10  DDDDDV.  If you'll direct the witness to page 24 of the

11  document.  If you will turn to the last page for Mr. Jacoby so

12  he can see that he signed it.

13          Do you recognize this document?

14  A    Yes.  So this is -- yes, uh-huh.

15  Q    This is the management representation letter in

16  connection with the audited financial statements of GPB

17  Automotive for the year ending in 2015, right?

18  A    That's right.

19          MR. MENCHEL:  I offer it.

20          MR. MCCONNELL:  No objection.

21          THE COURT:  Admitted.

22          (Defense Exhibit DDDDDV was received in evidence.)

23  Q    If we could start at the top, the first page.  Blow out

24  the first page of the letter, 24.  This is to Margolin, Winer

25  & Evens.  This was the auditors that were doing the work for

1    the Automotive Portfolio for year 2015, right?

2    A    That's right.

3    Q    It says, This representation letter is provided in

4    connection with your audit of the financial statements of GPB

5    Automotive Portfolio.  It goes on to say, And the related

6    notes the financial statements for the purpose of expressing

7    an opinion on whether the financial statements are presented

8    fairly in all material respects in accordance with accounting

9    principals generally accepted in United States US GAAP, right?

10   A    Right.

11   Q    If you could go to the last page.  And if you could blow

12   up the -- you, as the chief financial officer, along with Mr.

13   Gentile as the managing member, signed this document, right?

14   A    That's right, yes.

15   Q    You reviewed it carefully before you signed it?

16   A    Yep.

17   Q    Wanted to make sure it was accurate?

18   A    That's right.

19   Q    I want to walk through some of the paragraphs.

20   A    To be clear, I would take it back now.  I wouldn't sign

21   it now.

22   Q    I understand that, sir.  Anything else you want to

23   volunteer?

24   A    You were asking me.

25   Q    I'm asking you questions and asking you to answer the

1    questions I'm asking.  Okay?

2    A    Okay.

3    Q    Paragraph 1 on the first page, please, Andy, under

4    financial statements.  It says "we", and you're part of that

5    "we", right?

6    A    Yes.

7    Q    We have fulfilled our responsibilities as set out in the

8    terms of the audit engagement letter for the preparation and

9    fair presentation of the financial statements in accordance

10   with US GAAP?

11   A    That's right.

12   Q    Number four, please, on this page.  We acknowledge our

13   responsibility for the design, implementation, and maintenance

14   of internal control to prevent and detect fraud.

15   A    Right.

16   Q    And once again, you're the "we" in that?

17   A    That's right, yep.

18   Q    If we could go to page 26 of this document, number three,

19   please.  We have disclosed to you the results of our

20   assessment of the risk that the financial statements may be

21   material misstated as a result of fraud, right?

22   A    Yes.

23   Q    Okay.  Next, four.  We have no knowledge of any fraud or

24   suspected fraud that affects the entity and involves

25   management.  Employees have significant roles in internal

1   control, or others when the fraud could have had a material

2   affect on the financial statements, right?

3   A    At the time of signing it, yes.

4   Q    Number five, please.  We have no knowledge of any

5   allegations of fraud or suspected fraud affecting the entity's

6   financial statements communicated by employees, former

7   employees, analysts, regulators, or others, right?

8   A    Yes, at the time signing it.

9   Q    You signed this.

10             MR. MENCHEL:  Go to the top of the page, Andy.  Show

11   him the date, please, Andy, at the top.

12   Q    You signed this on May of 2016, right?

13   A    Right.

14   Q    You told me you had concerns as early as April of 2015?

15   A    Concerns, yes.

16   Q    You testified at length that from April on you were

17   concerned that things that GPB were fraudulent, right?

18   A    It was over the period of time more and more information

19   comes to light that you learn.

20   Q    Sir, this is well into your tenure as CFO, right, a year

21   has passed plus, right?

22   A    Correct, yes.

23   Q    Your testimony now is that as of May of 2016 you didn't

24   know anything was wrong?

25   A    I said I signed it because I thought the financial

1    statements were accurate.

2    Q    When did this light bulb go off that suddenly everything

3    was a fraud, after May of 2016?

4    A    Yes, when the Ryan Carter fee was paid to Lash to repay

5    David and Jeff.

6    Q    That's what triggered it?

7    A    Yes.

8    Q    You earlier testified that as early as April of 2015 is

9    when you had serious concerns, right?

10   A    Yes, serious concerns.  And over time as more and more

11   things happened, as more and more things come out that you

12   were lied to about, yes.

13   Q    I'm curious, did you ever send a letter to the auditors

14   to withdraw this?

15   A    I spoke to them.

16   Q    That's not my question.  Did you ever send them a letter

17   withdrawing your attestations in this management

18   representation letter?

19   A    No, I did not.

20   Q    Number six, please, on page 26.  We've disclosed to you

21   all known instances of noncompliance or suspected

22   noncompliance with laws and regulations and contractual

23   statements -- I'm sorry -- contractual agreements whose

24   affects should be considered when preparing financial

25   statements.  Right?

1   A    Yes.

2   Q    You attested to that as well?

3   A    Yes, I did, yes.

4   Q    Let's talk about the thumb drive of materials that you

5   stole when you left GPB.  Do you remember we were talking

6   about that on Friday?

7   A    Yes.

8   Q    And you said you stole those to protect yourself, right?

9   A    That's right.

10  Q    And you put all that information on the thumb drive,

11  right?

12  A    Yes.

13  Q    And you gave it to your attorney?

14  A    Yes.

15  Q    And your attorney gave it to the Government?

16  A    The SEC.

17  Q    To the prosecutors as well, yes?

18  A    I don't know.  I gave it to my attorney and he gave it to

19  the SEC, as far as I understand.

20  Q    In preparation for your testimony you met with the

21  prosecutors multiple times, did you not?

22  A    Yes.

23  Q    And they showed you things off the very thumb drives you

24  provided them, did they not?

25  A    I think it was provided to the SEC.  I think that's how

1   it got there.

2   Q    But they had a copy of the same information?

3   A    They had a copy of whatever information I provided.

4   Q    I didn't hear the answer.  I'm sorry.

5   A    They had a copy -- to my understanding they had a copy of

6   all the information I provided.

7   Q    And it was showing you things that you had taken with

8   that thumb drive, right, when they were preparing for your

9   testimony?

10  A    Yes.

11  Q    Okay.  Mr. Jacoby, I want to show you what's been marked,

12  for the witness only, DDDDDK-001.  Do you recognize this

13  document?

14  A    Nope.

15  Q    Does it have your name in the middle of it?

16  A    Yes.

17  Q    You still don't recognize it?

18  A    No.

19  Q    Never saw it before?

20  A    I think I probably have.

21  Q    Well, sir, you started a fund called Grand Central

22  Automotive Partners, right?

23  A    No.

24  Q    You weren't involved in that?

25  A    There was no fund called Grand Central Automotive

1   Partners.

2   Q    What was it called?

3   A    There was no fund.

4   Q    You tried to start one, yes?

5   A    No.  We actually tried to take out a private loan.

6   Q    Did you begin to put together marketing materials for a

7   fund?

8   A    No.  We switched it to a loan because nobody wanted to do

9   a fund, so we did a loan instead.

10  Q    So you don't recognize this document?

11  A    It looks familiar.

12  Q    What does -- how does it look familiar to you?  Your name

13  is on it.

14  A    Yes.  You're talking about some of the stuff that the

15  marketing guy put together, yeah.

16  Q    And you saw it?

17  A    I'm sure I did.

18          MR. MENCHEL:  I offer it.

19          MR. MCCONNELL:  Objection.

20          THE COURT:  I don't think there is a foundation for

21  this.

22  Q    Let's go to the next one.

23          (Continued on next page.)

24

25

1       MR. MENCHEL:  What is the exhibit number on this?

2  Q    I want to show you what's been marked as DDDD-DS.

3       I'll represent to you, sir, that this was part of the

4  materials that were in the thumb drive that you provided the

5  Government.

6       Do you recognize this?

7  A    It looks like marketing decks.  You have to give me a

8  little more to gone.

9  Q    Do you want me to turn the page?

10 A    Yes, I would like to see more, yes.  Can you keep

11 going?

12 Q    Yes.

13 A    Keep going.  Is there a date on that?  Okay, I see it.

14 Okay.  Keep going.  Please keep going.  Keep going.  Can you

15 back one page, please.  Okay.  I think I know this.

16 Q    Okay.  I'm representing to you that this was in the

17 thumb drive that you provided to the Government?

18 A    Okay.

19       MR. MENCHEL:  I offer it.

20       MR. MCCONNELL:  No objection.

21       THE COURT:  Admitted.

22       (Defendant's Exhibit DDDD-DS was marked in

23 evidence.)

24       MR. MENCHEL:  Publish it, please.

25       (Exhibit published.)

W. Jacoby - Cross/Mr. Menchel                1161

1   Q    So this was part of the materials that you stole when

2   you left GPB; do you recall that?

3   A    Yeah, it's fraudulent.

4   Q    Okay.  That's what you used it for, to protect

5   yourself?

6   A    Yeah.

7   Q    Okay.  Let's look at the first page, there's a

8   disclaimer.

9        Next page, please, Andy.

10       Do you see that?

11  A    Yeah.

12  Q    Okay.  Go to the next page, please.

13       Continuing part of the disclaimer, is it not?

14  A    Yeah.

15  Q    Go to Page 9, please, Andy.

16       This page has the investment highlights, right?

17  A    Right.

18  Q    We've seen things like this before already?

19  A    Yeah.

20  Q    Okay.  And then if you go to Page 48, please, it has a

21  risk summary.

22       Do you see that?

23  A    Yeah.

24  Q    Okay.  Now, I want to show you what else was included

25  in the thumb drive that you provided to the Government.

1   A    Okay.

2            MR. MENCHEL:  This is for the witness only.

3   Q    Defense Exhibit EEEE-EF.

4            MR. MENCHEL:  And scroll through for the witness,

5   please.

6   A    Don't recognize it, but...

7            MR. MCCONNELL:  Your Honor, I'll object to the

8   prior question.

9            THE COURT:  Yes.  So I don't think you should be

10  asking the question that way.

11           MR. MENCHEL:  Okay.  Fair enough.

12  Q    Now, do you recognize this?

13  A    No.

14  Q    Never saw it before?

15  A    I may have.

16  Q    Sir, is it your sworn testimony before this jury that

17  you were not involved in crafting marketing materials for a

18  company called Grand Central Automotive Partners?

19  A    Yeah, I didn't do the marketing materials.

20  Q    You didn't have anything to do with that?

21  A    That's right.

22  Q    I want to show you what's been marked as Exhibit

23  DDDD-DL.

24       Do you recognize this?

25  A    No.

*W. Jacoby - Cross/Mr. Menchel*                    1163

1          MR. MENCHEL:  Can we go to sidebar, please.  I

2    want to ask the Government a question, I don't want to do it

3    in open court.

4               (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Sidebar*                                                    1164

1          (Sidebar held outside the presence of the jury.)

2          MR. MENCHEL:  Your Honor, this is in Mr. Jacoby's

3    thumb drive that he provided to the Government.

4          THE COURT:  They want to stipulate?

5          MR. MENCHEL:  They want to stipulate to it and if

6    they don't --

7          THE COURT:  Do you want stipulate?

8          MR. MENCHEL:  I will subpoena Mr. Cremins and I

9    will subpoena the FBI and we'll recall them on my case to

10   prove that this came out of the materials that he gave them.

11         MR. MCCONNELL:  I don't know that it's on the

12   thumb drive.  I don't not believe you but I honestly don't

13   know.

14         MS. WEIGEL:  I never saw it.

15         MR. MCCONNELL:  I never saw it until yesterday and

16   I've never shown it to the witness.  I'm not saying you're

17   wrong but it's hard for me to be on the spot at sidebar.

18         MR. MENCHEL:  I'm offering it subject to

19   connection.  Because I will tell you, I will represent to

20   you as an officer of the Court, this came out of a thumb

21   drive copy they provided to us yesterday.  They provided it

22   to us, we pulled it.  It was his marketing materials --

23         THE COURT:  Do you want to take a break to talk

24   about this issue?

25         MR. MCCONNELL:  I don't know that we're going to

*Sidebar*                                                            1165

1    resolve it.

2              MR. MENCHEL:  I will recall them.

3              MR. MCCONNELL:  That's okay.  I think we probably

4    object to him being recalled for I think it's extrinsic

5    evidence on a collateral matter.  I think if they want to

6    impeach on this, they can.  He's already said he had no role

7    in the marketing materials.  They've shown him the

8    documents.  He said he doesn't remember them, so I don't

9    know what to do.  If they want to try and recall it as a

10   substantive part of their case, then they can do that.  But

11   I don't know that showing me that this is in the thumb drive

12   is going to somehow going to really change the issue.

13             THE COURT:  I'm going to let the jury take a

14   break.

15             MR. MCCONNELL:  Okay.

16             (Sidebar discussion concludes.)

17             (Continued on the next page.)

18

19

20

21

22

23

24

25

*Proceedings*                                                   1166

1           (In open court.)

2           THE COURT:  Let's take a five-minute break.

3           (Jury exits courtroom at 10:32 a.m.)

4           MR. MENCHEL:  Your Honor, we ask that Mr. Cremins

5     be removed from the courtroom as well.

6           THE COURT:  All right.  So this is marketing

7     materials that were on thumb drive for Grand Central Auto,

8     is that what we have here?

9           MR. MCCONNELL:  There's a lot of stuff on the

10    thumb drive that I'm not going to claim perfect recall about

11    it.  I can tell you that I don't remember seeing this

12    document until the defense brought it to our attention when

13    they disclosed their exhibits.  It may be on the thumb

14    drive, I can look, but I don't know that I've ever seen it

15    before.

16          So I'm not saying Mr. Menchel is wrong, I don't

17    know that that really changes things either because the

18    witness has said he doesn't remember; he doesn't have it.

19          If it happens to be on the thumb drive, we will

20    stipulate that it was on the thumb drive that he provided to

21    the Government.  We'll do a written stipulation.  I don't

22    think it's proper to subpoena anyone or to recall people.  I

23    think it's extrinsic evidence of a collateral matter.  If

24    the witness is wrong because he's not telling the truth or

25    because he's misremembering, we'll stipulate that that

*Proceedings* 1167

1  document was on the thumb drive and we'll offer that it be

2  admitted at that time but right now it's not admissible.

3           MR. MENCHEL:  This is not extrinsic.  This witness

4  testified that he stole documents to protect himself.  He

5  stole documents to creat a copycat fund.  If I'm allowed to

6  get that document in, I'm going to show you that the

7  disclaimer language and the other language that I just went

8  through is word for word copied onto these marketing

9  materials which were created while he was working there as

10  the CFO.  And, by the way, that show that he is the actual

11  creator of the document.

12           THE COURT:  Just to make sure I understand what

13  we're fighting about here.  You are not sure as we stand

14  here today whether it is on the thumb drive, you had any

15  chance to look.  If it is on the thumb drive, you're willing

16  to stipulate that to that's it's on the thumb drive and that

17  it's admissible?

18           MR. MCCONNELL:  Yes, we'll do that.  One second,

19  hold on.

20           I think the problem is, look, we would stipulate

21  that it's on the thumb drive.  If it's on the thumb drive,

22  it's on the thumb drive.

23           THE COURT:  So the theory you just heard

24  Mr. Menchel say is it's relevant because they want to show

25  that the actual reason he took these documents was to create

*Proceedings*                                                  1168

1   a copycat fund.

2          MR. MCCONNELL:  The other thing that's on the

3   document is that the name Patrick Dibre is on there who was

4   also intimately involved with GPB.  So I don't know whether

5   or not he's the one who produced these marketing materials

6   or not.  The witness has said he had nothing to do with the

7   market materials and doesn't recognize this document.  So I

8   don't know that it says what defense counsel wants it to

9   say.

10         MR. MENCHEL:  I just said he created it.  I'm

11  going to show that.

12         THE COURT:  So I'm inclined to think the exhibit

13  is relevant if it's admissible if he can get it in.  I don't

14  know how you all want to approach the issue.

15         MR. MCCONNELL:  I guess we'll have to look and see

16  on the thumb drive.

17         Can you show me where it is?

18         MR. MENCHEL:  Sure.  We can do that.  I can move

19  forward and we can do it at the next break.

20         MR. COLTON:  It shouldn't take that long.

21         MR. MENCHEL:  Let's do it.

22         MR. COLTON:  We have a letter from the Government

23  saying these are the contents of the thumb drive.  They

24  produced it to us as 3500-WJ-22.

25         THE COURT:  So if you can talk amongst yourselves

*Proceedings*                                                1169

1    and resolve this now.

2              MR. COLTON:  It should take five minutes.

3              THE COURT:  Okay.  Are there going to be, like,

4    five exhibits like this?  We should talk about them all

5    right now?  Other stuff on the thumb drive that he's likely

6    to say.

7              MR. MENCHEL:  I think so.

8              THE COURT:  Okay.  Let me just double check.

9              (A brief pause in the proceedings was held.)

10             THE COURT:  Are we good to go?

11             MR. MCCONNELL:  Before the jury comes in, can you

12   show me the two that you want to show him just so I know.

13             MR. MENCHEL:  Absolutely.

14             THE COURT:  Okay.

15             (A brief pause in the proceedings was held.)

16             MS. WEIGEL:  Your Honor, you want the witness

17   back.

18             THE COURT:  Yes, so we can get the jurors.

19             (Witness takes the witness stand.)

20             MR. MENCHEL:  So I understand there's no

21   objection?

22             MR. MCCONNELL:  I think I might want to -- well, I

23   want to hear -- we've had a little bit of confusion about

24   which is which if you can just start over.

25             MR. MENCHEL:  Yes, I'll start over.

*W. Jacoby - Cross/Mr. Menchel*                    1170

1       THE COURT:  Just so I'm clear.  So we don't have

2   an objection and then go back to sidebar.

3       So you've resolved the question of whether some

4   documents were on the thumb drive.  The documents you intend

5   to show the witness are documents we agree were on the thumb

6   drive.

7       MR. MCCONNELL:  No.  So one was from the GPB

8   server which we clarified.  The second one was from the

9   thumb drive.  We may have an objection to the thumb drive

10  document because I don't believe that it's consistent with

11  what -- actually, you know what, we will not have an

12  objection.

13      MR. MENCHEL:  Okay.

14      (Jury enters courtroom at 10:47 a.m.)

15      THE COURT:  Thanks for bearing with us.  Everybody

16  can be seated.

17      Go ahead, Counsel.

18      MR. MENCHEL:  Thank you.

19  EXAMINATION BY

20  MR. MENCHEL:

21  (Continuing.)

22  Q    Mr. Jacoby, before the break, I was showing you a

23  document it's for the witness only so far.  Defense Exhibit

24  EEEE-EF and I represented that this was on the thumb drive,

25  I misspoke.  This was part of what was on GPB's servers that

*W. Jacoby - Voir Dire/Mr. McConnell*          1171

1   were produced to the Government.

2       If you would scroll through and show this to the

3   witness, please.

4       Do you recognize this document?

5   A    I do not.

6           MR. MENCHEL:  I'd offer it anyway, your Honor.

7           MR. MCCONNELL:  I would like to briefly voir dire

8   the witness on the document.

9   VOIR DIRE EXAMINATION

10  BY MR. MCCONNELL:

11  Q    So, Mr. Jacoby, you've never seen this before?

12  A    I don't remember seeing this, no, ever.

13  Q    You don't remember contributing to putting this

14  together with somebody else?

15  A    No.

16  Q    Okay.  You don't know who put it together.

17  A    I could take some guesses, but...

18  Q    We don't want some guesses?

19          MR. MCCONNELL:  With that, we have no objection.

20          THE COURT:  Admitted.

21          (Defendant's Exhibit EEEE-EF was marked in

22  evidence.)

23  CROSS-EXAMINATION

24  BY MR. MENCHEL: (Continuing.)

25  Q    You have any idea how this document wound up on GPB's

W. Jacoby - Cross/Mr. Menchel                    1172

1    servers?

2    A    I do not.

3    Q    You had nothing to do with it?

4    A    I don't believe so.

5    Q    You know your name is on this document?

6    A    I haven't seen it yet.

7    Q    Let me show it to you.  If you'll go to Page 18,

8    please.  Blow up "Management Team."

9         That's you, right?

10   A    Yeah.

11   Q    Now, I showed you earlier a GPB deck.  You recall that

12   I showed you some of the confidentiality and disclaimer

13   language?

14   A    Yeah.

15   Q    I want to show you the confidentiality and disclaimer

16   language in this document.

17        MR. MENCHEL:  If you can go to Page 2, please,

18   Andy.

19   Q    See that?

20   A    Yeah.

21   Q    Also, if you go to Page 20, there's some risk language

22   there.

23        Do you recognize that?

24   A    No, I can't even read it.

25        MR. MENCHEL:  Blow it up for the gentleman.  Now,

1  Andy, if you would, please, I want you to do a side-by-side
2  of the disclaimer that was in the GPB Capital Holdings deck
3  which was Defendant's Exhibit DDDD-DX and the language
4  that's in this deck, the Grand Central Automotive Partners.
5  A    Looks like the same.
6  Q    Same exact language, right?
7  A    Yeah.
8  Q    You have any idea how the language that belonged to GPB
9  Capital Holdings wound up in a marketing deck that has your
10 name on it and wound up on GPB's servers?
11 A    It looks like some sort of standard disclaimer
12 language.
13 Q    Well, you say it's standard.  It's word for word GPB's
14 language, is it not?
15 A    I don't know if it's GPB's.  It looks like the same
16 kind of disclaimer language that I see on a lot of these
17 things.
18 Q    So it's just a coincidence that the words are almost
19 identical substituting the different companies' names, is
20 that your testimony?
21 A    I think it's just standard off-the-shelf disclaimer
22 language, yes.
23 Q    And --
24 A    It's innocuous.
25 Q    Let's go to the risk language, please.

W. Jacoby - Cross/Mr. Menchel                    1174

1     And do a side-by-side of GPB's versus Grand Central.

2  A   Again, it's just standard, innocuous risk language.

3  Q   You're saying that if I pulled up any private equity

4  fund, I would find the identical language in there?

5  A   Probably similar yeah.

6  Q   Similar or identical?

7  A   Let's go find one and I bet you it looks exactly the

8  same.

9  Q   So is it your testimony, sir, that you weren't cribbing

10 the work product that belonged to GPB and using it to set up

11 your own fund; is that your testimony?

12 A   That is my I testimony, yes.

13 Q   How did this wind up on GPB's servers, your Grand

14 Central Automotive Partners?

15 A   I don't know.

16 Q   Okay.  Let me show you something you produced as part

17 of the thumb drive.

18         MR. MENCHEL:  I assume there's no objection.

19         MR. MCCONNELL:  No.

20 Q   This is admitted as Defense Exhibit EEEE-EE.

21     Sir, this was in the thumb drive you provided the

22 Government?

23 A   Okay.

24 Q   Let's turn through it.  Publish it.  Start at the first

25 page.  Turn through it.  One second, Andy.  Go to Page 9,

W. Jacoby - Cross/Mr. Menchel                    1175

 1    please.

 2        Once again, that's your name, right, Mr. Jacoby?

 3    A    Yes.

 4    Q    You know who created this document?

 5    A    No, I don't.

 6    Q    Did you create it?

 7    A    I don't think so.

 8    Q    Let me show you?

 9    A    I don't believe this is on my thumb drive but maybe it

10    was.

11    Q    Well, the Government has stipulated that it was, sir?

12    A    Okay.

13    Q    I want to show -- you know you can click on a document

14    and you can see who the creator of the document is, right?

15    A    That just means you saved it.

16    Q    Okay.  So you would have looked at it if you saved it,

17    right?

18    A    I don't think so.

19    Q    Let's pull up a screenshot if we could, please.

20        MR. MENCHEL:  What is this marked as?  This is

21    EEEE-EG.  I offer this document.

22        THE COURT:  Any objection?

23        MR. MCCONNELL:  One moment, it's not on the

24    screen, Judge.

25        Just the square cut-out is fine.  The rest of it I

1    don't think is -- it should be redacted.

2              MR. MENCHEL:  It's what was produced.

3              MR. MCCONNELL:  Right.  But the whole left side

4    has nothing to do with anything you're talking about.  So I

5    would just ask that the additional thing be redacted.

6              THE COURT:  Any objection to redacting the portion

7    other than the properties of the document?

8              MR. MENCHEL:  I'm fine with that except I want to

9    keep in "auto strategy."

10             MR. MCCONNELL:  That's fine.

11             MR. MENCHEL:  I offer it.

12             THE COURT:  Admitted.

13             (Defendant's Exhibit EEEE-EG was marked in

14   evidence.)

15   Q    Sir, I'll represent to you that this is the property of

16   the deck I just showed you that was in the thumb drive that

17   you gave the Government.

18             You see who the author is?

19   A    Yes.

20   Q    You see who saved it?

21   A    Yes.

22   Q    That's you, right?

23   A    Yes.

24   Q    By the way, this was last -- the content was created on

25   May 23, 2016?

W. Jacoby - Cross/Mr. Menchel                1177

1   A    That doesn't mean anything to me.

2   Q    Well, let me tell you what it means, sir.

3        You were the chief financial officer at GPB Automotive

4   while you were working on a document for a different fund

5   while you were under their employ, correct?

6   A    I don't think so.  I don't think that's right.

7   Q    How did this magically show up in a thumb drive you

8   produced to the Government?

9   A    I don't know.  I obviously got one in there and I

10  produced everything.  But I don't think that all those pages

11  and everything that you just showed was created on the date

12  that you say there.

13  Q    What's your basis for that?

14  A    Because I would think I would remember it.

15  Q    So it's still your testimony that you stole these

16  documents even though you didn't file a whistleblower

17  complaint until you were sued to protect yourself; is that

18  your testimony?

19  A    That's right.

20  Q    And not set up a copycat fund, correct?

21  A    That's right.  I would never set up a fund to raise

22  money for retail investors.

23  Q    Let's go back to the document that's Defense Exhibit

24  EEEE-EF and go to Page 9, please.

25            MR. COGAN:  Publish it.

1           MR. MENCHEL:  Yes.  Publish it, please?

2    Q    The preferred return on this document for Grand Central

3    Automotive Partners was eight percent, right?

4    A    Yeah, just like every other private equity fund.

5    Q    The incentive fund fee of 20 percent profits after

6    preferred return, same as GPB; right?

7    A    And every other private equity fund.

8    Q    Every other private equity fund has the exact same

9    structure?

10   A    Pretty much.

11   Q    Okay?

12   A    2 and 20 is the standard.

13   Q    The portfolio allocation was 100 percent automotive

14   retail?

15   A    Yes.

16   Q    Just like GPB Automotive?

17   A    Yes.

18   Q    Okay.  At that looks awfully similar to a GPB deck,

19   does it not?

20   A    That page does.

21   Q    You didn't copy that from GPB either?

22   A    No.

23   Q    By the way, you mentioned that you had sent some

24   materials to a marketing guy.  Who was the marketing guy you

25   were sending materials to?

1    A    There was a couple.

2    Q    These were not marketing guys working for GPB, right?

3    A    No.

4    Q    So while you were employed by GPB, you were sending

5    marking materials to somebody else to set up a separate

6    fund?

7    A    No, I don't think that's true.

8    Q    What is true?

9    A    I think I started to look for a new job.

10   Q    So you think the date that I showed you where that

11   content was created is wrong?

12   A    I don't know if all of this content was in there on the

13   date you say it was created.

14   Q    Okay.  Let's go on and discuss --

15   A    So because on that page --

16   Q    Sir, there's no question pending.

17   A    Okay.

18   Q    I want to go back to a document that you were shown by

19   Mr. McConnell on, I believe it was Thursday, possibly

20   Friday.

21       This is Government Exhibit 6171-C, it's in evidence;

22   I'd ask that it be published.

23       You recall looking at this document with Mr. McConnell?

24   A    Yes.

25   Q    He went over this with you, right?

1  A    Yes.

2  Q    And one of the questions that he asked you about was

3  whether the information in this spreadsheet was from

4  QuickBooks, do you recall that?

5  A    Yes.

6  Q    And the purpose of, I guess, the reason why you're

7  being asked these questions was to show on the left side --

8  could you blow that up, Andy, the left columns on the top,

9  please.

10      This is the transfer detail of the various monies going

11  into the different accounts that we talked about on Friday,

12  right?

13  A    Yes, that's right, yes.

14  Q    And it has a starting date at the very top of August

15  13, 2015, right?

16  A    Right.

17          MR. MENCHEL:  Andy, could you highlight that,

18  please.  Just the top row, Andy.  Thank you.

19  Q    And it has an ending date at the very bottom of June

20  30, 2016?

21  A    Right.

22  Q    So this is showing all of the monies that are being

23  transferred to the various accounts during this time period,

24  right?

25  A    Yes.

*W. Jacoby - Cross/Mr. Menchel*                    1181

1    Q    Okay.  Andy could you blow that out?  Blow up the other

2    half.  I need the whole top, Andy.  Could you just blow up

3    the top row where it says, "GPB Automotive Portfolio and

4    AR."

5         AR is accounts receivables, correct?

6    A    Yes.

7    Q    And this was for the GPB Automotive Portfolio Fund,

8    right?

9    A    Yes.

10   Q    Okay.

11        MR. MENCHEL:  If you will not blow down the bottom

12   portion -- I'm sorry, go to the right, Andy, where it says

13   monthly distributions.

14   Q    This stops in November 30th of 2015, right?

15   A    Yes.

16   Q    So these aren't the same time periods being reflected

17   in this sheet, correct?

18   A    Can I see what you're talking about.

19   Q    Sure.  The transfer detail, which we just looked at.

20        MR. MENCHEL:  Go back to that, please, Andy.

21   Q    Shows a period of time from August 13, 2015?

22   A    Right.

23   Q    To June 30, 2016, correct?

24   A    Yes.

25   Q    Okay.  If you go back to the accounts receivables?

1    A    Right.

2    Q    The last month we're looking at is November 30, 2015?

3    A    What's the top one?  So that goes from March 15th to

4    November 15th.  So I'm not understanding what your point is,

5    is that it only -- the spreadsheet only goes to what.

6    Q    Sir, on the left, the transfer detail goes to June 30,

7    2016, right?

8    A    '16, yes.

9    Q    On the right, the accounts receivables stop at

10   November 30, 2015, correct?

11   A    Yeah.

12   Q    So there's seven months of information, of account

13   receivables, that are not on this spreadsheet; right?

14   A    Yeah.  This is just the way Steve was doing his

15   analysis.  But the part from the QuickBooks is to the left.

16   This is him trying to say, can we collect any of this money?

17   Q    And that you can't tell by looking at the accounts

18   receivable whether you have sufficient funds because it

19   stops seven months before the transfer details being shown,

20   right?

21   A    You're making -- what you're saying doesn't make sense.

22   Q    Sir, I'm asking a very simple question, okay?

23       The transfer detail goes all the way to June 30, 2016,

24   correct?

25   A    Yes.

1   Q    The accounts receivables stop at November 30, 2015?

2   A    For the analysis that Steve was doing here, yes.

3   Q    That's my question.

4   A    Yes.

5   Q    Clear?

6   A    Yeah.

7   Q    You agree with me?

8   A    Yeah, for that part of it, yeah.

9   Q    GPB held something called webinars for investors of the

10  broker-dealers or advisors in each of their funds, correct?

11  A    Yes.

12  Q    And part of the broker-dealers' job and the investment

13  advisors' job was to monitor the funds of their clients,

14  right?

15  A    Yeah.

16  Q    Okay.  And GPB, through these webinars, communicated

17  with the investors and the broker-dealers about various

18  financial metrics of the various funds, right?

19  A    Yes.

20  Q    Okay.  I want to show you for the witness only, please,

21  Defense Exhibit LP.

22       By the way, part of your job was to review these

23  materials for these webinars, correct, as chief financial

24  officer?

25  A    No.

*W. Jacoby - Cross/Mr. Menchel*                1184

1    Q    You never looked at these?

2    A    I didn't say I never looked at them, but it wasn't part

3    of my job.  That was all done by Ascendant.

4    Q    You were familiar with these, correct?

5    A    I was aware of them.

6    Q    Did you look at them?

7    A    Infrequently.

8    Q    Okay.  Let me see if you looked at this one.

9              MR. MENCHEL:  Scroll through for the gentleman,

10   please.

11   Q    Do you recognize this document?

12   A    Not yet.  Keep going.

13   Q    Okay.

14   A    I don't recognize this particular one, but it looks

15   similar to other ones I've seen.

16   Q    Let me ask you this.  Forgetting about the document.

17        Are you aware that in these decks that were created for

18   these webinars, GPB routinely reported the coverage ratio of

19   the various funds?

20             MR. MCCONNELL:  Objection.

21   A    Yes.

22             THE COURT:  I'm sorry, give me one second.

23             Overruled.

24   Q    You said yes, right?

25   A    They reported coverage ratios when they did marketing

1  meetings.

2  Q    Right.  And they literally told the percentage of

3  coverage in these marketing materials hundred percent,

4  80 percent, 50 percent, 30 percent, right, you've seen

5  those?

6  A    I haven't seen that, no.

7  Q    You've never seen a webinar where -- in the ones that

8  you've seen, what were the coverage ratios that were being

9  portrayed?

10 A    The only thing that I recall seeing is a hundred

11 percent from them.

12 Q    You don't recall seeing a single webinar where the

13 investors and the broker-dealers were being told that the

14 funds were under-covered at various points in time?

15 A    No, I don't, no.

16 Q    So I take it if I showed you one it wouldn't refresh

17 your recollection?

18 A    Show it to me.

19 Q    Okay, let me start with this one.

20      Directing the witness, for the witness only, please,

21 Page 11 and see -- if you look at it; when you're done, let

22 me know?

23 A    Can I see the front page first?

24 Q    The front page, sure.

25 A    Okay.  Go ahead.

1  Q    Now, if you would, please, go to Page 11.

2  A    Okay.

3  Q    Having looked at that, does that refresh your

4  recollection that the funds would often report

5  under-coverage through the webinars?

6  A    No.

7  Q    Okay.  Let me show you another one.

8         MR. MENCHEL:  This is for the witness only Defense

9  Exhibit PPR-2.  And I'll direct the witness to the Page 11.

10 Q    Having looked at that, does that refresh your

11 recollection as to whether or not in the webinars -- let me

12 finish my question -- GPB reported under coverage?

13 A    No, I never saw that one.

14 Q    Never that one either?

15 A    No, I didn't.

16 Q    Okay.  Let me show you another one, see if this

17 refreshes your recollection?

18         MR. MENCHEL:  For the witness only Defense Exhibit

19 PPP-2.

20 Q    If you would turn to Page 10.  Having looked at that --

21         MR. MCCONNELL:  Objection.  Is this the same one

22 as before?

23         MR. MENCHEL:  Let me see.

24         THE WITNESS:  I think it was the same one.

25         MR. MENCHEL:  I apologize.  Hold on.  I don't

1  think so but it doesn't matter, I'll move on to the next

2  one.

3            MR. MCCONNELL:  Okay.

4  A     This is I think after I'm CFO.

5  Q     Okay.  I'm just asking if it refreshes your

6  recollection?

7  A     That's why I don't remember.

8  Q     Well, I showed you ones when you were CFO you and you

9  couldn't remember those either, right?

10 A     Can you go back and show me.  I'll have to try to take

11 a look at that.

12 Q     Hold on.

13 A     Because I wasn't involved in putting these together.

14 That was Ascendant.

15 Q     Is it your testimony that nobody from GPB had any

16 involvement in the webinar decks?

17 A     No, of course I provide whatever they wanted.  They

18 produced the things that went out to their customers.

19 Q     What I'm asking you, sir, is whether it was you or

20 somebody else, were there people at GPB that were reviewing

21 the materials for the webinars before they were presented?

22 A     Everybody did -- had a job to provide information to

23 the marketing guys at Ascendant.

24 Q     The audited financial statements themselves often

25 disclosed the shortfalls, did they not?

1    A    Yes.

2    Q    Let's look at a couple.

3            MR. MENCHEL:  This is Government Exhibit 2009, I

4    believe, this is in evidence.  Yes?

5            MR. MCCONNELL:  Yes.

6            MR. MENCHEL:  Can we publish it to the jury,

7    please.

8            (Exhibit published.)

9            MR. MENCHEL:  If you'll go to Page 5, please,

10   Andy.

11   Q    This is for the Automotive Portfolio, correct?

12   A    Yeah.

13   Q    Okay.  And it shows the net investment income.  Again,

14   that's the metric you were using to determine coverage at

15   that time, right?

16       Hold on a second.

17           MR. MENCHEL:  Andy please go back to Page 5.  Blow

18   up "net investment income," please.

19   Q    That's the metric you were using, right, to show

20   whether or not those funds were fully covered?

21   A    Right.

22   Q    Go to the next page, please.

23   A    Hold on, one second.  Can you go back to the balance

24   sheet, please.

25   Q    What page is that?

W. Jacoby - Cross/Mr. Menchel                1189

1   A    It's the assets and liabilities.  You showed it to me

2   first.  Okay.  You can go back to the next page forward,

3   please.  Right.

4        So, 3.3 million, and go back to the balance sheet

5   again, please.  So 3.7 million in accounts receivable is a

6   greater than the amount of net investment income.

7   Q    Okay.

8   A    Go ahead.

9   Q    Is there a point you're trying to make?

10  A    Yes.

11  Q    Okay.  So we talked about accrual accounting before,

12  did we not?

13  A    Yes, and we also talked about the fact that the

14  materials say that distributions will be made from free cash

15  flow.

16  Q    We'll get there, all right.

17       The point is, sir, all of this information including,

18  by the way, the accounts receivable are right there in black

19  and white for the investors to see, right?

20  A    Yes.

21  Q    For the broker-dealers to see?

22  A    Yes.

23  Q    For any financial advisor who was working with these

24  funds to see, right?

25  A    If they had them, yes.

W. Jacoby - Cross/Mr. Menchel                    1190

1   Q    Well, do you know if they were sent these regularly

2   through the portal?

3   A    They were made available.

4   Q    Okay.  And anybody that was concerned about the

5   investment would obviously want to take a look and see how

6   their investment was doing, right?

7   A    They should, yes.

8   Q    Okay.  If you go down to --

9   A    I think most people relied on their statements, though.

10  Q    You know that based on what, nothing?

11  A    Well, when you invest, when anybody invests in

12  anything, don't you check your statement when you get it

13  every month to see how it's doing?

14  Q    So if the audited financials -- is it your testimony

15  that the audited financials are the holy grail for

16  registered investment advisors?

17  A    No, you asked me about people and what they would refer

18  to.

19  Q    Can we agree that the most accurate financial

20  information that a potential investor/advisor could get

21  would be the audited financial statements?

22  A    No, we have to talk about -- no, I disagree with what

23  you're saying.

24  Q    That's fine.  So they're not the holy grail?

25  A    No, I think the most important document that a person

W. Jacoby - Cross/Mr. Menchel                    1191

1  gets when they invest in something is their statement that

2  says what their investment is worth.

3  Q    Okay.

4         MR. MENCHEL:  Anyway, if we can go to the

5  distributions on this and do a side-by-side with the

6  investment, Andy, I appreciate it.

7  Q    So if someone had bothered to look, they would have

8  seen that the distributions well outflanked investment

9  income, correct?

10 A    Yeah, and actually, worse than that.

11 Q    Okay.  Because you're counting the accounts receivable?

12 A    Yes.

13 Q    Okay.  And it's right there for everyone to see.  Not

14 hidden, right?

15 A    That's right.

16 Q    Okay.  Let's go to Defense Exhibit BX for the witness

17 only, please.  Do you recognize document?

18        MR. MENCHEL:  Turn the page for the gentleman.

19 A    No, I haven't seen this one.  Can you go back to the

20 beginning?

21 Q    Okay, sure.

22 A    Which one is this?

23 Q    It's for holdings 2, December 31, 2016?

24 A    December.

25 Q    2016?

W. Jacoby - Cross/Mr. Menchel                    1192

1   A    2016, see, this is after I left.

2   Q    Well, you said after you left.  Weren't you there until

3   April of two thousand and --

4   A    No, I was there for Macrina to consult with me to get

5   financials finished.

6   Q    So, at that point, you weren't looking at the

7   financials?

8   A    I don't remember looking at these ones.  Can you flip

9   forward, I'll take a look for you if you have a question.

10  Q    Sure.

11  A    Stop there, okay.  So what's your question?  I didn't

12  do these ones, but.

13  Q    If you don't know the document, then that's fine, I'll

14  just move on.

15  A    Okay.

16  Q    Okay.  I want to talk about the various deals that were

17  in the pipeline that you testified about with Mr. McConnell.

18       Do you recall that last week?

19  A    No, you have to refresh my memory.

20  Q    Okay.

21       MR. MENCHEL:  Hold on one second.  Can you put up

22  on the screen for the witness Page 791, Line 23, to 792,

23  Line 12.  Actually, you know what, I'll just read it, Andy

24  to save time.

25  Q    Do you recall being asked these questions and giving

*W. Jacoby - Cross/Mr. Menchel*                    1193

1    these answers on direct examination by Mr. McConnell.

2        I'm going to read the question and answer to you.

3    A    Okay.

4    Q    Question, this Page 791, Line 23.

5            "QUESTION:  So in the period covered in this

6    version of the spreadsheet --"

7            MR. MENCHEL:  Andy, you can take it down.

8    Q    "QUESTION:  Roughly from September 2015 to the end of

9    June 2016, what was the total amount of money that was moved

10   from the not Holdings 1 investment account to either

11   operating account or the distributions account?"

12           "ANSWER:  In this case, it's $10,566,843."

13   A    Right.  We were looking at that spreadsheet.

14   Q    Right.

15   A    Okay.

16           "QUESTION:  And did you specifically discuss

17   Holdings 1 with Mr. Gentile?"

18           "ANSWER:  Yes."

19           "QUESTION:  And what did he say about Holdings 1

20   and all of this money being moved out of the investment

21   account?"

22           "ANSWER:  There was a lot of deals and profits in

23   the pipeline that were going to come in to make up the

24   difference."

25   A    Right.

W. Jacoby - Cross/Mr. Menchel                1194

1    Q    "QUESTION:  And did that ever happen?"

2         "ANSWER:  No."

3    A    Right.

4    Q    Do you recall being asked those questions and giving

5    those answers?

6    A    And this is with Holdings 1, right?

7    Q    Yes.

8    A    Yes.

9    Q    Do you recall being asked those questions and giving

10   those answers?

11   A    Yes, sounds familiar, yeah.

12   Q    What deals did you book for Holdings 1 in 2015 that

13   didn't go through?

14   A    Can we look at the financial statement, I'll show you.

15   Q    Okay.  Well, offhand, do you remember a particular

16   automotive company that was going to be acquired and fell

17   through for Holdings 1?

18   A    Holdings 1, yes.  So there was Nissan of

19   North Plainfield and Nissan of Garden City that happened.

20   Then there was Nissan of Richmond, Volkswagen of Huntington

21   and Nissan of Huntington all which the fund never purchased

22   so that had to come out of the financials as --

23   Q    It's your testimony that that was for Holdings 1 and

24   not Automotive?

25   A    That was Holdings 1.

1    Q    You're sure?

2    A    Yeah, let's look at the financial statement, I'll show

3    you.

4         Bring up the Holdings 1 2015 financial statement.

5    There were others deals as well, but apparently that he knew

6    about that I didn't but they never came through.

7    Q    Well, you only booked what you knew about, right?

8    A    No, I booked what I was told.

9    Q    Right.  You only booked what he told you about?

10   A    Right.  Right.

11   Q    Okay.  And by the way, you as the chief financial

12   officer, if he -- we'll get to that in a second, I want to

13   ask you some questions.

14        If Mr. Gentile told you there were certain deals that

15   were going to go through, you had to have a reasonable basis

16   to believe that that was true, right?

17   A    Him telling me?

18   Q    Yeah.

19   A    Yeah.

20   Q    And if you weren't comfortable with it, you wouldn't

21   have booked it, right?

22   A    Well, it gets to a point, yes, you have to make that

23   decision.  You're right.

24   Q    Oak.  So was there or an accrual that you booked for

25   that you felt you shouldn't have but Mr. Gentile asked you

1    to do it and you did it anyway?

2    A    It's tough because I was pretty skeptical about Planet

3    Honda to begin with and it turns out I was right.  But I did

4    it.  I did it because I was told to.  But I was very

5    skeptical about it.

6    Q    Sir, you were a chief financial officer of a company

7    that had hundreds of millions of dollars under management,

8    correct, even billions at some point, right?

9    A    Never when I was there it wasn't that big.

10   Q    Hundreds of millions?

11   A    Yeah, few hundred.

12   Q    Is it your testimony that you just did whatever

13   Mr. Gentile told you to do as the chief financial officer?

14   A    No.

15   Q    Okay.  And if you were not comfortable with booking a

16   particular accrual, I assumed you would not have done it?

17   A    It was -- it has to raise to the level where you get to

18   the point where you say, okay, well this complete crap, I'm

19   not going to do it.

20   Q    Okay.

21   A    It was close at that point.

22   Q    You didn't --

23   A    It didn't rise to that level until I left.

24   Q    And, by the way, when deals fell through, and they did

25   fall through sometimes, right?

1    A    Frequently.

2    Q    And they also went through frequently.  You mentioned a

3    few just now, right?

4    A    Yeah.

5    Q    Okay.  And when they fell through, they got backed out?

6    A    That's right.  And we can actually look at some that

7    needed to and I'll show you.  Because they didn't all get

8    backed out right away when they should have.  Some of them

9    did and then more information came out and more information

10   came out, and then more BS about why we should keep them in

11   and we kept them in and we didn't and we should have taken

12   them out.  And we should have gone back and restated and we

13   didn't.

14   Q    When the auditors -- when transactions were booked as

15   accruals and then backed out, that's something the auditors

16   would test; right?

17   A    I don't know about what you're talking there.

18   Q    Okay.  Auditors would see at year-end financials

19   certain deals that had been booked as accruals and then when

20   the deal fell through, they got backed out.

21        An auditor would see that, right?

22   A    I'm not sure about that.  They're going to see what you

23   give them for the year-end.  So if something transpires

24   during the year, so say, for example, Dave says book

25   $900,000.  Oh, no wait let's book $2 million from

1   Planet Honda and Bruce Rogers.  Oh, those deals didn't go

2   through, take it out.

3        When the final financials get published to the auditor,

4   they probably would not see that.

5   Q    Sir, I'm not interested in probably.  Are you aware?

6   A    So I don't think they would see that.  They may, but I

7   don't think they would.

8   Q    Are you aware, in fact, that not only did the auditors

9   see it, they actually did something called "testing for it"

10  to see if it was an appropriate booking and backing out.

11  Are you aware of that?

12  A    Sometimes.  They may have missed something, though.

13  Q    So it did happen that auditors would see a booking and

14  then they would see it reversed out, correct?

15            MR. MCCONNELL:  Objection.

16  A    Yeah.

17            THE COURT:  Sustained.

18  A    It's possible.

19  Q    Well, you looked at the audited financial statements,

20  right?

21  A    Yeah.  I was going to show you it in a second.

22  Q    Okay.  I'm going to go back to that in a little bit,

23  sir.

24       I want to talk to you about the PPMs, the private

25  placement memorandums?

1    A    Okay.

2    Q    Okay.

3              MR. MENCHEL:  Andy if you would, please, call up

4    transcript Pages 958, Lines 8 to 13 and Page 959, Lines 3 to

5    7.

6              MR. MCCONNELL:  Your Honor, I would object.  I

7    think the question needs to come before the transcript.

8    Q    You recall me asked asking a series of questions as

9    well as Mr. McConnell about how the "no present plans"

10   language wound up in the June 2016 PPM for the Automotive

11   Portfolio?

12   A    No, I don't recall the way -- the way that we were

13   talking about it, we were talking about a specific section.

14   So you were talking about in that huge document the section

15   in the general risks --

16   Q    Okay.

17   A    -- that was updated.

18   Q    Let me read to you your testimony?

19   A    That specifically, though, the way you phrased it was

20   it was as if it never, ever existed ever before.  It had

21   existed but it was added in there.

22   Q    Okay.  We'll get there, sir.

23   A    Okay.

24   Q    All right.  Page 958.  Never mind I'll just read it.

25        I asked you this question on Friday, Page 958, Line 8.

1      "QUESTION:  It's your testimony before this jury

2    that the "no present plans" language came up in the context

3    of discussing this particular PPM, yes?"

4      "ANSWER:  That's my recollection."

5      "QUESTION:  2016?"

6      "ANSWER:  Correct."

7      Were you asked those questions and did you give

8    these answers?

9    A    We're talking --

10   Q    Sir, were you asked those questions and did you give

11   those answers?

12            MR. MCCONNELL:  Your Honor, I'd like to let the

13   witness answer.

14   A    I need to explain exactly.  It's not a yes-or-no

15   answer.

16   Q    It's not yes-or-no answer whether you were asked those

17   questions and gave those answers?

18   A    You're reading it out of context.  We were talking

19   about specifically the risk language in the risk section of

20   the document that you had directed me to.

21   Q    So are you saying that that one portion of the PPM

22   there was a discussion and not in another?

23   A    Yes.

24   Q    That's something you thought about over the weekend?

25   A    No.

1           MR. MCCONNELL:  Objection.

2   Q    Okay.  Let me read you this question.

3   A    I wasn't clear on that, I didn't understand.

4   Q    I also asked you again on Page 959.

5           Question, Line 3:

6           "QUESTION:  Is it your sworn testimony before this

7   jury that in 2016 you had a discussion with Mr. Gentile and

8   Mr. Schneider where the "no present plans language" was

9   discussed and that's how it got inserted into this PPM?"

10          "ANSWER:  That is my recollection."

11  A    Into that section of the risk description?

12  Q    Okay.

13  A    Is correct.

14  Q    So you're saying it never showed up before that date?

15  A    No, I didn't say that.  You keep changing it.  I said

16  in the section where they -- where Roger wanted to add, we

17  might return your money and make Ponzi payments to you.

18  They said, no, we want to say is --

19          (Continued on the next page.)

20

21

22

23

24

25

1   CROSS-EXAMINATION (Continuing)

2   BY MR. MENCHEL:

3   Q    I'm sorry, did you say Ponzi payments?

4   A    Yes.

5   Q    Did somebody tell you to just volunteer things like that?

6   A    Just making it clear, because you don't seem to

7   understand.

8   Q    Okay, sir.  Thank you for my education.  Just answer the

9   questions I'm asking.  Okay.

10          In fact, sir, the "no present plans" language had

11  been in PPMs word for word for well over a year before in

12  multiple PPMs, true?

13  A    Not in that section.

14  Q    We'll take a look and see.

15  A    Yeah, let's.

16  Q    Okay.

17          MR. MENCHEL:  Tab 33, this is Exhibit UUB for the

18  witness only.

19          And you can start at the back of the document and

20  let the witness refresh himself.

21          THE WITNESS:  What's your question?

22  Q    Do you recognize this e-mail exchange?

23  A    No.  This is from February of 2015.

24  Q    Do you recognize it?

25  A    No.

1    Q    Are you on it?

2    A    Yes.

3                MR. MENCHEL:  I offer it.

4                MR. McCONNELL:  Can we be heard at sidebar on this,

5    Judge?

6                THE COURT:  Yes.

7                MR. McCONNELL:  Thank you.

8                (Sidebar held.)

9

10                (Continued on the following page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Sidebar*                                                              1204

1          (Sidebar conference held on the record in the

2   presence of the Court and counsel, out of the hearing of the

3   jury.)

4          MR. AXELROD:  Sorry, guys.

5          Your Honor, this is one of the e-mails with

6   attorneys that we had talked about at length on Friday.  And

7   so before we get into it, and to avoid the need for a curative

8   instruction afterwards, I just thought it made sense to

9   understand the extent of the scope of the question and how

10  we're going to do this to make sure that we don't go further

11  than is --

12         MR. MENCHEL:  Daniel Peterson is the lawyer.  Jacoby

13  is e-mailing him about not letting the comments get gathered

14  and communicated at once.

15         THE COURT:  I think what he is asking is just that

16  he wants to know if you're getting into attorneys.

17         MR. MENCHEL:  Well, I thought you said you weren't

18  going to redact out who he is.

19         THE COURT:  Are you asking what the line of inquiry

20  is going to be?

21         MR. AXELROD:  Yes, your Honor, and whether it's --

22  if it's for the point of this is in the earlier document

23  conveyed from someone else, I understand Your Honor's ruling

24  on that.

25         What I'm asking is that it not go beyond that and

*Sidebar*                                                                    1205

1    become:  Well, the lawyers are inserting it yada, yada, yada.

2            THE COURT:  Are there going to be questions about

3    lawyers?

4            MR. MENCHEL:  I was going to ask him if Mr. Peterson

5    was one of the attorneys working on this document.

6            MR. AXELROD:  So, your Honor, I don't have any

7    problem if he wants to show him, for instance, like an

8    attachment that shows that it's in an earlier PPM.  I get

9    that.  If he wants to show that it came from someone else, I

10   understand all of that.

11           But I think the point, as I understand it, of this

12   line of questioning is to argue that lawyers inserted it and

13   that, I believe, is improper.

14           MR. COLTON:  May I just add because this issue is

15   come up again?

16           Mr. Jacoby testified in no uncertain terms that that

17   PPM was written by Jeffry Schneider.  It's dramatically false

18   and these documents show that.

19           THE COURT:  I am inclined to allow that question.

20           If you all have an instruction clarifying what this

21   is and isn't being offered for, I am amenable it.

22           Did you work on that?

23           MR. AXELROD:  So, it really is going to depend, your

24   Honor, on how it's done.

25           If it's done in the way that we're describing, I

*Sidebar*                                                                1206

1   don't know that we're going to want a curative instruction on

2   it.

3          THE COURT:  But I'm asking if you have one.

4          MS. WEIGEL:  No, we do not.

5          MR. AXELROD:  We do not.

6          THE COURT:  All right, so then maybe we'll take it

7   up at break, but we'll keep going.

8          MR. COLTON:  Thank you, your Honor.

9          (Sidebar concluded; proceedings resumed.)

10

11         (Continued on the following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (In open court; jury present.)

 2                    MR. MENCHEL:  I think I had offered this document.

 3       I don't know if there's an objection.

 4                    MR. AXELROD:  No, it's 's fine.

 5                    THE COURT:  Admitted.

 6                    (Defense Exhibit UUB was received in evidence.)

 7                    MR. MENCHEL:  Publish it, please.

 8                    (Exhibit published.)

 9                    MR. MENCHEL:  You can go to the beginning, please,

10       which is on page 3 of the document.

11       BY MR. MENCHEL:

12       Q    Mr. Jacoby, you see at the top of this e-mail it's from

13       you to a gentleman named Daniel Peterson and Valerie Arroyos.

14                    Do you see that?

15       A    Yes.

16       Q    And this is February 20th, 2015, correct?

17       A    Yes.

18       Q    And it involves the drafting and making comments about

19       PPMs concerning Automotive and Holdings II?

20       A    Yes.

21       Q    Okay.  And Mr. Peterson was an outside attorney that was

22       working on the draftsmanship of this, correct?

23       A    He was -- yeah, he was doing some work on that, yeah.

24       Q    Okay.

25                    And you said -- and who's Valerie Arroyos?
```

1    A    She was working for Mr. Schneider.

2    Q    Hi, Dan and Val, I apologize for not letting comments get

3    gathered and then communicated at once, but I thought it might

4    be than helpful for Dan to see what we (Val and Bill and Steve

5    F.) agreed the performance calculation is doing, as well as

6    the fact we are making it 8 percent distributions and so on

7    forth.

8              Do you see that?

9    A    Yes.

10   Q    You are discussing this in the context of the creation of

11   this PPM, correct?

12   A    That's right, yeah.

13   Q    Okay.

14             MR. MENCHEL:  And if we go to the very first page,

15   Ms. Arroyos e-mails you and Mr. Peterson and Mr. Frangioni,

16   correct, and says:  Dan, I know Auto is moving along.  Want to

17   confirm that Holdings is moving and that you have everything

18   you need.

19             Do you see that?

20   A    Yes.

21   Q    So you understood that she was asking whether or not the

22   lawyer had all the materials he needed to finish crafting this

23   PPM, right?

24   A    I think he was just reviewing it.  I don't think he

25   crafted it.

*Jacoby - cross - Menchel*                                                1209

1   Q    What's that based on?

2   A    Based on the fact that he showed me Polsinelli would not

3   put their name on it as it was currently drafted.

4   Q    Sir, do you know what a redline is?

5   A    Yes.

6   Q    And with a redline you can see whether or not somebody is

7   actually making insertions into a document, correct?

8   A    Yes.

9   Q    Is it your testimony that Mr. Polsinelli did not make

10  draft changes to this document?

11  A    No.  I said that he told me that Polsinelli wouldn't

12  endorse it.

13  Q    And that you have in writing somewhere, as well, or

14  that's just another thing that came out of the air?

15  A    Well, did they put their name in the document?  That just

16  sort of defines it.  Right?

17  Q    No, it doesn't.

18  A    Why?

19  Q    Okay.  I'm not going to argue with you are, sir, just

20  answer the question.

21  A    But every other one that is endorsed by a --

22          THE COURT:  Just a second.

23          What is your question?

24  Q    My question is:  Was Mr. Peterson one of the lawyers

25  working on this document?

1   A     Yes.

2   Q     Do you have anything in writing that says that

3   Mr. Polsinelli would not put his name to it?

4   A     Yes.

5   Q     You have it in writing?

6   A     Just look at the document.  His name is not in it.

7   Q     So the absence of his name is your proof?

8   A     Every other PPM that's drafted in -- in private placement

9   that I've ever seen and in hedge funds is endorsed by a legal

10  firm.

11  Q     Okay.

12  A     It's -- the legal firm puts their name in it, sometimes

13  they put their letterhead on it, when they endorse it.

14  Q     Let's go to Defense Exhibit --

15  A     This is not the case here.

16        MR. MENCHEL:  Let's go to Defense Exhibit UUF.  For

17  the witness only, please, Tab 34.

18  BY MR. MENCHEL:

19  Q     Do you recognize this e-mail?

20  A     Yes -- I don't recognize it.  I see it.

21  Q     Are you on it?

22  A     Yes.

23        MR. MENCHEL:  I offer it.

24        MR. McCONNELL:  Can I just have a moment to....

25        THE COURT:  Sure.

1          MR. McCONNELL:  Your Honor, same objection.  I

2    don't --

3          THE COURT:  Okay.  Admitted.

4          (Defense Exhibit UUF was received in evidence.)

5          MR. MENCHEL:  Please publish it.

6          (Exhibit published.)

7    BY MR. MENCHEL:

8    Q    Sir, this document is from Mr. Peterson at the Polsinelli

9    firm, correct?

10   A    Yeah.

11   Q    To you and Ms. Arroyos?

12   A    Yes.

13   Q    Who is James Wotruba?

14   A    Don't have any idea.

15   Q    Okay.  As far as you know, you're the only person on this

16   document on behalf of GPB, correct?

17   A    Yeah.

18   Q    Mr. Gentile isn't on it?

19   A    No, no.

20   Q    Mr. Schneider is not on it?

21   A    Well, Valerie was working directly with Mr. Schneider and

22   she would --

23   Q    Mr. Schneider is not on it?

24   A    No.  She was doing it for him.

25   Q    Mr. Schneider is not on it?

1    A    Yeah.

2    Q    Thank you.

3         It says:  Val, attached is the updated PPM for

4    Holdings II.  The redline is this current version to Version

5    4.  The last version I sent you was Version 3.  I took Version

6    3 and dropped in the new business section you sent the other

7    day and then made my edits in new Version 5.

8    A    Okay.

9    Q    Is it still your testimony under oath before this jury

10   that Mr. Polsinelli was not making edits to this document?

11   A    I didn't say that.  You're changing my testimony.

12   Q    You know what, we'll have the testimony read back later.

13   A    Well, I can just clarify it for you right now.

14   Q    I don't need your clarity, sir.  Thank you.

15        MR. McCONNELL:  Objection.

16        THE COURT:  Counsel, let's just do questions and

17   answers with the witness and not argument with the witness.

18        MR. MENCHEL:  Well, if the witness would just answer

19   my questions, your Honor, I think we could move this along.

20   He volunteers after every question.  I think the record shows

21   that.

22        THE COURT:  All right.

23   BY MR. MENCHEL:

24   Q    You are on this e-mail because your job is to review this

25   for its accuracy, correct?

1  A    Accuracy and I'm trying to learn it as well at that -- at

2  that stage because it was gonna be a new fund and I wanted to

3  understand it.

4  Q    Sir, is it your testimony that you're not on this e-mail

5  to make sure that what's being put out in this Private

6  Placement Memorandum on behalf of GPB is true and accurate to

7  the best of your ability?

8  A    That was definitely not my job on this, no.

9  Q    That was not your job?

10  A    To make sure that the legal document was actually put

11  together right, no.  That's the legal firm should do that.

12  Q    You're saying that it's not your job to make sure that

13  what's being portrayed in a private placement memorandum as

14  chief financial officer is accurate?

15  A    I didn't -- it wasn't my job to make sure that the PPM

16  was accurate.  That wasn't my job.

17          But what question -- if you ask me a question that I

18  can refer to in the PPM --

19          THE COURT:  All right.  I think you've answered the

20  question, so let's just have the next question.

21  Q    At the bottom he says:  Otherwise, this should pick up --

22  the very last sentence -- all other comments you gave me, a

23  few other notes we've exchanged, as well as the LPH changes I

24  sent you yesterday.

25          Right?

1    A    Right.

2    Q    Okay.  So the sentence from Mr. Polsinelli is:  I'm

3    getting comments from the two of you?

4    A    Yes.

5    Q    Correct?

6    A    Yes.

7    Q    So were you providing comments or not providing comments

8    to the PPM?

9    A    Definitely, and questions.

10    Q    And that was part of your job, was it not?

11    A    Yes.

12           MR. MENCHEL:  Let's go to the PPM that was attached

13    to this e-mail.  This is Defense Exhibit UUF-1.  I offer it.

14           MR. McCONNELL:  Can I just see a few pages?

15           MR. MENCHEL:  Sure.

16           Can you turn a few pages for Mr. McConnell, please.

17    Actually, if you can go to page 12, 13.

18           THE WITNESS:  So, is this before the fund launched,

19    is that what this is?

20           MR. MENCHEL:  Sir, I'm just asking questions.

21           THE COURT:  So any objection?

22           MR. McCONNELL:  I'd like to see the foundation laid

23    with the witness.

24           MR. MENCHEL:  He was included in this e-mail, this

25    is attached.

*Jacoby - cross - Menchel*                                          1215

1           THE COURT:  All right.  Give me one second.

2           (Pause.)

3           THE COURT:  All right.  So I don't think there were

4    any foundation questions asked about this document.

5           So go ahead, if you want to do it.

6    BY MR. MENCHEL:

7    Q    Sir, the document...

8           MR. MENCHEL:  If we go to the first page.

9           No, no, no, the first page has the e-mail, UUF.

10   Q    -- has in the attachment section the attachments of

11   Holdings II, correct?

12   A    Yeah.  It looks like a draft PPM.  So it must be before

13   the fund launched.

14   Q    Okay.  And you were provided this, yes?

15   A    Yeah, it looks like we were working on it and had

16   questions and we worked through it.

17          MR. MENCHEL:  I offer it.

18          MR. McCONNELL:  No objection.

19          THE COURT:  Admitted.

20          (Defense Exhibit UUF-1 was received in evidence.)

21          (Exhibit published.)

22   Q    Now, if you'll go to page 12 of UUF-1, do you see how

23   there is all these underlines in here?

24   A    Yeah.

25   Q    Do you understand that to be redline changes, those are

1    track changes into a document, you're familiar with that

2    process, right?

3    A    Yeah.

4    Q    When somebody is working in a document and they're typing

5    it in, it will show up as a way for other people to read it

6    knowing this is new, this is being inserted, correct?

7    A    Right.

8    Q    And we see a whole bunch of those track changes in here.

9             MR. MENCHEL:  Turn to the next page, please,

10   page 16.

11            (Exhibit published.)

12   Q    Do you see all this?

13   A    Yeah.

14   Q    Now, let's go to page 17, please.

15   A    Okay.

16   Q    This is under Distributions.

17            MR. MENCHEL:  And if you'll blow up the section that

18   says:  We reserve the right to return capital contributions to

19   LPs.

20   A    Right.  That's what I was telling you before.  I think

21   it's in the --

22   Q    Sir, I'm asking you questions.  Please answer my

23   questions.

24   A    Yep.

25   Q    This is in April of 2015, a year, well in advance of the

1    conversation you say you had with Mr. Gentile and

2    Mr. Schneider, correct?

3    A    Right.  And so the conversation was to take the language

4    from here and put it into the Risk section.

5    Q    Is that what you said when you were asked questions by

6    Mr. McConnell?

7    A    Yeah.

8    Q    Your testimony today is that you referenced in your

9    testimony to Mr. McConnell that you were referencing back to

10   earlier PPMs, is that your testimony?

11   A    No, that's not what I said.

12   Q    Okay.

13            This language, sir, as far as we can tell, was

14   inserted by the person who was working on the draft, right?

15   A    At the direction of Mr. Schneider.

16   Q    Says you, right, sir?

17   A    Absolutely.

18   Q    Okay.  You know Mr. Polsinelli was having discussions

19   with Mr. Schneider?

20   A    Yes.

21   Q    Okay.

22   A    I was on the phone with them both actually.

23   Q    Do you know if this language:  We reserve the right to

24   return capital as part of our distributions, though we do not

25   presently plan -- presently have plans to do so, do you know

*Jacoby - cross - Menchel*                                          1218

1   "the presently have plans to do so" is pretty standard

2   language in a lot of these subscription agreements and

3   offering memoranda?

4            MR. McCONNELL:  Objection.

5            THE COURT:  He can answer.  If you know.

6   BY MR. MENCHEL:

7   Q    Do you know?

8   A    I don't draft PPMs.

9   Q    Do you know?

10  A    No.

11  Q    Okay.

12           Do you know who put these words "we do not presently

13  have plans to do so" in this draft?

14  A    My guess is --

15  Q    I'm not asking for a guess.

16  A    Okay.  Then I would -- no.

17  Q    And Mr. Schneider is not on this e-mail chain?

18  A    He was actively working on this document.

19  Q    Mr. Schneider is not on this e-mail chain?

20  A    This isn't an e-mail, it's a PPM.

21  Q    It's attached to an e-mail, yes?

22  A    Yes.

23  Q    Mr. Gentile is not on it, correct?

24  A    Right.

25  Q    The only person that's on it is you from GPB, correct?

*Jacoby - cross - Menchel*                                          1219

1   A    On the 1-E-mail that you showed me, yes.

2   Q    Well, that's what this is attached to?

3   A    Yeah.

4   Q    Did you notice this language when you were reading this?

5   A    Of course.

6   Q    Did you have any concerns about it?

7   A    I hadn't even started yet.

8   Q    Did you have any concerns about it?

9   A    No.  I wouldn't have known that it was true at that

10  point.

11  Q    Well, it wasn't even launched yet, so it couldn't have

12  been true or not true, right?

13  A    Right.

14       MR. MENCHEL:  Let's go to page 40 of this document.

15  Blow up the section that says "no assurance of distributions."

16       (Exhibit published.)

17  Q    Do you see how it's, again, in what they call a redline

18  or underlined version?

19  A    Yes.

20  Q    Okay.  It says:  The process of identifying, screening

21  and successfully acquiring private companies is difficult and

22  risky.  Accordingly, we can provide no assurances that we will

23  be able to make distributions of income at any level.

24  Furthermore, while we have no present plans to do so, we can

25  include LP's invested capital in amounts we distribute to

*Jacoby - cross - Menchel*                                    1220

1   LPs --

2   A    Right.

3   Q    -- Which would reduce an LP's rate of return.  Right?

4   A    Right.

5   Q    By the way, putting aside the "no present plans" --

6   A    Okay.

7   Q    -- for a second --

8   A    Right.

9   Q    -- it's here in black and white --

10  A    Right.

11  Q    -- that investors were told that their own capital could

12  be used to pay distributions back to them, correct?

13  A    Right.

14  Q    No question about that?

15  A    No.

16  Q    Okay.

17        And, again, at the time this was inserted into --

18  into this document, there was not even a fund up and running?

19  A    No, but we were -- the one you were asking me about was

20  the other one that didn't have this language, right?

21  Q    I'm going to get to that one.  If you could just stay

22  with me on the questions I'm asking.

23  A    Right.

24  Q    Did you notice this language when you read it?

25  A    I don't remember.

*Jacoby - cross - Menchel*                                                    1221

1   Q    You know, you're giving me a look as though it's crazy,

2   but you seem to have a very vivid recollection of

3   conversations you had a year later with Mr. Gentile and

4   Mr. Schneider.

5            THE COURT:  Sustained.

6   Q    Do you know how many times that language got propagated

7   into PPMs from this point forward?

8            MR. McCONNELL:  Your Honor, I'm going to object to

9   the question, and a very brief sidebar on this line of

10  questioning.

11           THE COURT:  Okay.

12           (Sidebar held.)

13

14           (Continued on the following page.)

15

16

17

18

19

20

21

22

23

24

25

*Sidebar*                                                                    1222

1           (Sidebar conference held on the record in the

2    presence of the Court and counsel, out of the hearing of the

3    jury.)

4           MR. McCONNELL:  So, I think the questions about

5    personal knowledge that he has or did not have are fair game

6    and that's why I'm not objecting to this.

7           But the problem is that we have no access to the

8    taint side.  So we actually don't know how many iterations of

9    this exist or when they came into --

10          THE COURT:  He's just asked him do you know how many

11   times it got incorporated into the --

12          MR. McCONNELL:  Right, but I think that's a question

13   that he's not capable of answering.  And so the general --

14          THE COURT:  So he'll say he doesn't know.

15          MR. McCONNELL:  Okay.

16          I think that the general questioning on this,

17   though, has gone on enough and we should move on from this

18   because we can't contest this and we can't challenge it or

19   verify it.  So it's --

20          THE COURT:  Well, you can ask questions from the

21   witnesses, who prepped the witness on his knowledge of this

22   issue and he's just going to answer as to his knowledge of

23   this.

24          MS. WEIGEL:  I mean, kind of.  We can't ask about

25   any privileged questions.

*Sidebar*                                                          1223

1          MR. AXELROD:  The problem with the question is that

2     it's implying that there are all sorts of things out there.

3     It's the way the question is being asked.

4          THE COURT:  Is there a privilege issue that you're

5     asserting here or not?

6          MR. COLTON:  So, if I may clear it up.

7          When GPB produced documents pursuant to an SEC

8     subpoena, those documents, the judgment was made pre March of

9     2018, that if Ascendant was on the e-mails, they got produced,

10    which is why we're all looking at privileged documents.

11         So, when we're talking about materials from '14,

12    '15, '16, '17, this taint issue is non-existent.

13         MS. WEIGEL:  That's not true, because if Ascendant

14    is on the e-mail, we have it, but we don't know what e-mails

15    between GPB employees and counsel.  And we cannot inquire

16    about them.

17         THE COURT:  But this is a question that's asking

18    from the witness's knowledge does the witness know if these

19    materials were inserted into other PPMs.

20         Is your objection that that calls for a privileged

21    response or your objection is this has gone on too long or

22    your objection is....

23         I heard it's gone on too long.  Anything else?

24         MR. McCONNELL:  I think the problem is that we

25    haven't been able to test the answer and we just don't know.

*Sidebar*                                                                          1224

1    And I don't know whether or not --

2            THE COURT:  But not that it calls for privileged

3    information, you just don't know the truth of his answer,

4    essentially.

5            MR. McCONNELL:  It may very well call for privileged

6    information because it does sounds like he's on calls, and

7    he's already said a few things.

8            THE COURT:  All right.  Let's take a short break.

9            (Sidebar concluded; proceedings resumed.)

10

11           (Continued on the following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Proceedings* 1225

1           (In open court; jury present.)

2           THE COURT:  Let's take a short break.

3           THE COURTROOM DEPUTY:  All rise.

4           (Jury exits.)

5           THE COURT:  And I think we can have the witness step

6    out, too.

7           (Witness steps down and exits courtroom.)

8           THE COURT:  Okay.

9           So, I admit that I have not immersed myself in the

10   details of what people think might be privileged and what

11   might not be privileged.

12          Is this really a question you're worrying calls for

13   privileged information?

14          MS. WEIGEL:  It could.  If he is on calls with

15   Polsinelli about the PPM and about inserting it in various

16   drafts of the PPM, then asking him about whether he knows that

17   this has gone into various drafts calls for conversations that

18   he's had.

19          THE COURT:  And what is it you think is privileged?

20          Because this is a conversation with lawyers that

21   everybody seems to agree is not privileged, right?

22          We have the e-mail coming in.  And so why is this

23   different?

24          MS. WEIGEL:  So, this e-mail has Ascendant on it.

25   So the specific e-mail is not privileged.  But we do not know

*Proceedings*                                        1226

1   what conversations were had between Mr. Jacoby or other GPB

2   employees and their law firms.

3          Once it's shared with Ascendant, obviously, its

4   privileged -- privilege is broken.

5          THE COURT:  So can I offer a few ideas and then

6   you --

7          MR. MENCHEL:  I can shortcut this.

8          THE COURT:  Yes, yes.

9          MR. MENCHEL:  I'm only asking about the final PPM.

10  That's not privileged.

11         How many times did this get propagated into a final

12  PPM that was given to investors?

13         I don't care about how many draft iterations there

14  are.

15         THE COURT:  That sounds fine, right?

16         MR. AXELROD:  Totally agree, your Honor.

17         THE COURT:  Right.

18         MR. AXELROD:  But there were earlier questions, for

19  instance, about:  You didn't put that in writing to Mr. -- I

20  don't know that his name is Polsinelli.

21         MS. WEIGEL:  That's the firm.

22         MR. MENCHEL:  Peterson.

23         MR. AXELROD:  -- Mr. Peterson and you didn't tell

24  anyone this and all these things.  And truly, those issues, to

25  the extent no one from Ascendant was on it, are privileged and

*Proceedings*                                                         1227

1    he's hamstrung --

2              MR. MENCHEL:  Hold on.  Hold no.

3              He volunteers this stuff, and then I get chastised

4    for crossing him on it.

5              This witness is volunteering stuff way beyond the

6    questions.  He does that at his own risk.

7              THE COURT:  The witness has said a lot of stuff

8    about lawyers and communications with lawyers, so it has put

9    the lawyers into the case much more than I thought you all

10   wanted.

11             But maybe we should just resolve what we've got on

12   the table now.

13             MR. MENCHEL:  Yes.

14             I'm just going to ask him how many -- to his

15   knowledge, how many times did this language get propagated

16   into the final PPMs that were given to investors.

17             THE COURT:  Okay.

18             MS. WEIGEL:  That's fine.

19             MR. MENCHEL:  And I am going to walk him through

20   those in my slow sweet time.

21             THE COURT:  All right.  Sounds fine.  I think we can

22   get the jury if they're ready.

23             (Pause.)

24             THE COURTROOM DEPUTY:  All rise.

25             (Jury enters.)

*Jacoby - cross - Menchel*                                          1228

1          (Witness enters and resumes the stand.)

2          THE COURT:  Thanks for your patience.  I think we're

3  ready to get started.

4          MR. MENCHEL:  May I, your Honor?

5          THE COURT:  Go ahead.

6  BY MR. MENCHEL:

7  Q    Mr. Jacoby, before the break I asked you a question.  I'm

8  going to repeat it now.

9          Do you have any idea how many times the language "no

10  present plans" in those two sections we looked at got

11  re-incorporated into the PPMs that were sent to investors

12  prior to 2016?

13  A    So, can you clarify that question for me?

14          The "no present plans" language from the Holdings II

15  PPM, is that what you're asking about?

16  Q    Yes.

17          MR. MENCHEL:  Let's go back to the document.  Go to

18  page 17.

19          THE COURTROOM DEPUTY:  Is this for the witness?

20          MR. MENCHEL:  This is in, yes.

21          (Exhibit published.)

22  BY MR. MENCHEL:

23  Q    The language "we reserve the right" --

24  A    Yeah.

25  Q    -- how many times did that get carried over into later

*Jacoby - cross - Menchel*                                    1229

1    PPMs that were given to investors?

2    A    Into Holdings II or --

3    Q    Into all of them.

4    A    -- into Holdings I and the others?

5    Q    I'm only asking about the three that are at issue in this

6    trial; Holdings I, Holdings II and Auto.

7              How many times did that get carried over?

8    A    It got -- I don't know.

9    Q    Okay.  If you don't know, you don't know.

10   A    Yeah.

11   Q    And I want to show you also on page 40, this language,

12   how many times did the language "we have no present plans"

13   under the general investment risk get carried over into later

14   PPMs that were given to investors?

15   A    You mean in future versions that were amended?

16   Q    Yes.

17   A    Is that what you're saying?

18   Q    Yes.

19   A    I don't know how many times the PPMs were amended in the

20   future.

21   Q    All right.  So you don't know?

22   A    Yeah, I -- I -- you'd have to refresh my memory.

23   Q    Well, I'm going to go through some of them with you.

24             Now, I asked you before the break about whether or

25   not it was your job to provide input and oversight of the

*Jacoby - cross - Menchel*                                      1230

1    new -- of PPMs.

2             Do you remember I asked you that question?

3    A    You're asking different things.

4    Q    I'm asking you now whether you remember me asking you

5    whether it was your job to review these for accuracy?

6    A    It was not my job to review PPMs for accuracy.

7             It was my job to learn the PPMs and ask questions.

8    I wasn't drafting them.  I wasn't involved in them.  I may

9    make comments, have questions.  The lawyers were the ones who

10   did it and Mr. Schneider was the one who had final say.

11   Q    Okay.  I want to show you a document --

12            MR. MENCHEL:  For the witness only.

13   Q    -- that's been marked as Defense Exhibit EEEEEH.

14            MR. MENCHEL:  Your Honor, I need this on the ELMO,

15   please.

16   BY MR. MENCHEL:

17   Q    Do you see this document?

18   A    Yes.

19   Q    Let's turn to the next page for you.

20            Do you see this?

21   A    Yep.

22   Q    Do you recognize it?

23   A    Yes.

24            MR. MENCHEL:  I'd offer it.

25            MR. McCONNELL:  What is it?

*Jacoby - cross - Menchel*                                    1231

1          MR. MENCHEL:  Got it?  This was produced to us by

2    you.

3          MR. McCONNELL:  I have no objection.

4          THE COURT:  Admitted.

5          (Defense Exhibit EEEEEH was received in evidence.)

6          MR. MENCHEL:  Can we publish it, please?

7          (Exhibit published.)

8    BY MR. MENCHEL:

9    Q    So, Mr. Jacoby, back in January of 25th of 2016, you

10   e-mailed yourself from your GPB Capital account to your

11   personal account a document called Goals, correct?

12   A    Okay.

13   Q    Is that a yes?

14   A    It looks like it.

15         MR. MENCHEL:  Hold on a second, please, your Honor.

16         (Pause.)

17         MR. MENCHEL:  You can help me.  You got it up.  Even

18   better.

19         Switch back over, please.

20         Publish it.

21         (Pause.)

22         MR. MENCHEL:  Publish it.

23         THE COURTROOM DEPUTY:  One moment, please.

24         MR. MENCHEL:  Okay.

25         (Exhibit published.)

*Jacoby - cross - Menchel*                                        1232

1   Q    You e-mailed yourself this document on January 25th,

2   2016, right?

3   A    That's what it looks like.

4   Q    A document called Goals?

5   A    Okay.

6   Q    So these were goals that you e-mailed to yourself about

7   your job, right?

8   A    I'd have to look at the document.

9   Q    All right.  Let's go to the next page.

10          (Exhibit published.)

11          MR. MENCHEL:  Next page, please.

12  A    Okay.

13  Q    Do you see on the bottom where it says under the bullet

14  Product Development?

15  A    Yes.

16  Q    It says:  Establish and drive processes of financial

17  modeling and strategic development of multiple new funds and

18  strategies?

19  A    Yes.

20  Q    The next bullet point:  Provide input and oversight of

21  new fund PPMs.

22  A    Right.

23  Q    And the one we were just looking at was a new fund PPM?

24  A    Right.  So input and oversight, that's not producing the

25  document.

*Jacoby - cross - Menchel*                                    1233

1    Q    Sir, you just testified a moment ago that you weren't

2    there to provide input at all.

3             Wasn't that your testimony?

4    A    No, that wasn't my testimony.

5    Q    Okay.  The jury heard what the jury heard.

6             Was it your job or not your job to provide oversight

7    and input into new PPMs?

8    A    Yes.

9             MR. MENCHEL:  Can we go to Defense Exhibit DDDDDC,

10   that's five Ds.

11   Q    Mr. Jacoby, take a look at this, please.

12            Do you recognize it?

13   A    Yes.

14            MR. MENCHEL:  I offer it.

15            MR. McCONNELL:  No objection.

16            THE COURT:  Admitted.

17            (Defense Exhibit DDDDDC was received in evidence.)

18            MR. MENCHEL:  Okay.

19            (Exhibit published.)

20   Q    Let's start at the bottom of the e-mail, please.

21            By the way, earlier I said Mr. Polsinelli.  The

22   man's name is Mr. Peterson, correct?

23   A    He works at Polsinelli.

24   Q    He works at Polsinelli is the name of the firm?

25   A    Yes, that's true.

*Jacoby - cross - Menchel*                                      1234

1    Q    Okay.

2         It says:  Val -- this is from Mr. Peterson to you

3    and Valerie Arroyos, correct?

4    A    Yes.

5    Q    -- Attached is the updated PPM for Holdings II.  The

6    redline is this current version to Version 4.  The last

7    version I sent you was Version 3.

8         We looked at this before, right?

9    A    Yes.

10   Q    Now let's go to the top.

11        And Valerie Arroyos from Ascendant e-mails you,

12   right?

13   A    Yes.

14   Q    She says:  Bill, I think this is in good shape aside from

15   a few typographical errors and a few charts that are being

16   updated.  Could you please take a look and comment?

17        Do you see that?

18   A    Yes.

19   Q    Did you take a look and comment?

20   A    I would assume I did.

21   Q    And you would have seen the "no present plans" language

22   at that time as well, right?

23   A    I probably wouldn't have been reading it for that

24   comment; no.

25   Q    You were not looking for that?

*Jacoby - cross - Menchel*                                              1235

1    A    No.  I would have been looking at other things, but yes.

2    Q    So your focus wouldn't have been on the "no present

3    plans" language?

4    A    I have no idea what we -- what we were specifically going

5    back and forth.

6    Q    You don't remember?

7    A    (No response.)

8    Q    It's a question.  You don't remember?

9    A    It's a big document.

10         Yes, we were going back and forth, myself,

11   Mr. Schneider, Valerie.  We were all looking at it.

12   Q    Let me show you Defense Exhibit DDDDDF.

13         MR. MENCHEL:  The witness only, please.

14   Q    You're on this e-mail exchange?

15   A    Right, okay.

16   Q    Do you recognize that you're on this exchange?

17   A    November -- yeah, November of '16, yes.

18         MR. MENCHEL:  I offer it.

19         MR. McCONNELL:  Could I just see the rest of it,

20   please, Counsel?

21         All right.  That's the whole thing.

22         MR. MENCHEL:  That's the whole thing.

23         MR. McCONNELL:  Then no objection.

24         THE COURT:  Admitted.

25         (Defense Exhibit DDDDDF was received in evidence.)

*Jacoby - cross - Menchel*                                    1236

1              (Exhibit published.)

2    BY MR. MENCHEL:

3    Q    Now, this document is from you to somebody named Stuart

4    Serpanchy.

5              MR. MENCHEL:  I am probably butchering that.

6    A    Yes.

7    Q    Do you know who that person is?

8    A    I believe he was working at the fund administrator

9    Phoenix.

10   Q    Phoenix American?

11   A    Yes.

12   Q    The reason he's being sent this is because they are the

13   ones that are going to send these PPMs out to investors?

14   A    No.

15   Q    What's the purpose?

16   A    He's doing the fund accounting for the investor.  So,

17   they're going to produce the partnership accounting and the

18   allocations that get populated into every individual's capital

19   account.  So they have to do all the partnership accounting.

20   Q    Okay.  And the subject is Final PPMs and LPAs.

21              Do you see that?

22   A    Yes.

23   Q    So let's take a look at what was attached to this.

24              And this is for GPB Holdings, the Holdings I,

25   correct?

*Jacoby - cross - Menchel*                                    1237

1    A    Yes.

2    Q    In December of 2016?

3    A    Right.  It's an amended version, right.

4    Q    That's what happened, the PPMs would get amended from

5    time to time?

6    A    Well, not -- not usually, but in this case they were,

7    yeah.

8    Q    Okay.  And let me show you, sir, page 11 of the Bates

9    page under Plan of Distribution, the bottom.

10        Do you see that same language, right, "we reserve

11   the right to return capital contributions to LPs as part of

12   the our distributions" --

13   A    Yes.

14   Q    -- "though we do not presently have plans to do so"?

15   A    That's right.

16   Q    Did you notice that was in the document?

17   A    When I forwarded it to Phoenix American?

18   Q    Yes, or at any point?

19   A    Well, no.  Mr. Schneider -- I mean Mr. Schultz, who was

20   on the e-mail that you showed me, said here are the final

21   versions.  He was the lawyer, in-house lawyer, working on it.

22   So he said these are the ones that are going out.

23        I sent it to the accounting guys at Phoenix American

24   because they need it so that they can do the partnership

25   accounting.

*Jacoby - cross - Menchel*                                              1238

1    Q    My question, sir, was did you notice this language was in

2    there or not?

3    A    In November of '16 after I was already gone.

4    Q    You said you were already gone.

5         You were on the e-mail working on this?

6    A    Right, and I forwarded it to the fund accountants.

7    Q    Sir, you weren't already gone, you had been demoted,

8    right?

9    A    Yes.

10   Q    There's a difference, yes?

11   A    Sure.

12   Q    You were director of fund accounting, you still had a

13   title there?

14   A    Right, that's why I was sending it to the fund

15   administrator.

16        MR. MENCHEL:  Let's go to page 34, please.

17   Q    I won't belabor this, but it's the same language under

18   "no assurance of distributions," right?

19   A    Right.

20   Q    Okay.  Now, by the way, at that time, that was true,

21   wasn't it, they weren't -- there were no present plans and

22   they weren't using --

23   A    For which.

24   Q    -- investor capital?

25   A    For which fund is this?

*Jacoby - cross - Menchel*                                    1239

1   Q    This is Holdings I.

2   A    You're saying that in November of '16, that Holdings I

3   had not made distributions --

4   Q    Oh, I'm sorry, I misspoke.

5   A    Because the answer is no.

6   Q    Hold on.

7            (Pause.)

8            MR. MENCHEL:  One second, please.

9   Q    I'm sorry, let me go back.  We're going to get back to

10  that one.

11           I want to show you Defense Exhibit DDDDDD.

12           Do you recognize this document?

13           MR. MENCHEL:  Hold on, this is not the right

14  document.

15           DDDDDD.

16  BY MR. MENCHEL:

17  Q    Do you recognize this?

18  A    No, but it looks like I sent it to some people that I

19  don't remember.

20  Q    You're on the e-mail chain?

21  A    Yes.

22  Q    All right.

23  A    It looks like it's from me to some people that I can't

24  remember who they are.

25           MR. MENCHEL:  I offer it.

*Jacoby - cross - Menchel*                                                1240

1              MR. McCONNELL:  Your Honor, we object to this.

2              THE COURT:  Can I talk to the parties at sidebar?

3              (Sidebar held.)

4

5              (Continued on the following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Sidebar*                                                                    1241

1              (Sidebar conference held on the record in the

2     presence of the Court and counsel, out of the hearing of the

3     jury.)

4              THE COURT:  Is your objection to relevance?

5              MR. McCONNELL:  It's relevance.  It's also hearsay.

6              The cover e-mail is not necessary.  If they want to

7     show the document that's attached there and say:  Is this the

8     PPM on this date and is this the language in there?  I have no

9     problem with that.

10             But they want this in because they say it's coming

11    from Proskauer.

12             MR. MENCHEL:  No.  I want it in because it's coming

13    from him and not --

14             THE COURT:  Right.  I think I'm confused as to the

15    chronology here.

16             So, this language is in a lot of PPMs.

17             MR. MENCHEL:  Sometimes it's accurate and sometimes

18    it's not.

19             MR. COLTON:  Depending on the metric.

20             MR. MENCHEL:  Depending on the metric, depending on

21    the time.

22             MS. WEIGEL:  I don't understand.

23             THE COURT:  And he's forwarding it along.  It

24    seems --

25             MR. AXELROD:  Is there any reason we can't just show

*Sidebar*                                                                          1242

1    him a bunch of these PPMs for these various funds that are in

2    evidence already?

3              THE COURT:  What's the relevance?

4              MR. MENCHEL:  I want to establish that he had this

5    document in his possession and he didn't notice one way or the

6    other at various times and, therefore, why would Mr. Gentile

7    know this.

8              MS. WEIGEL:  I understand that, but I don't

9    understand why we need the sentence.

10             I understand why defense would want to have

11   Mr. Jacoby on this e-mail.

12             THE COURT:  Your issue is just with Proskauer?

13             MS. WEIGEL:  Yes, that's hearsay, that sentence.

14             THE COURT:  Any issue with taking out Proskauer?

15             MR. COGAN:  I do, and I'll explain.

16             When cross-examining, I plan to elicit on

17   cross-examination that Mr. Jacoby said to the FBI and to the

18   prosecutors that lawyers were not involved in the PPMs.  That

19   is what he said to them and that's the 3500 we have.

20             So we have to be able to impeach him with the fact

21   that they were.

22             THE COURT:  So for now, I mean he's said like

23   lawyers, lawyers, lawyers, fifty times, so I'm not really sure

24   that this Proskauer thing is causing you prejudice from the

25   idea that lawyers were involved.

*Sidebar*                                                                    1243

1          MS. WEIGEL:  I think it's the cumulative effect, and

2     I think they certainly have enough to do that.

3          THE COURT:  I hear you.  I'll let it in.

4          (Sidebar concluded; proceedings resumed.)

5

6          (Continued on the following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Jacoby - cross - Menchel*                                        1244

```
 1              (In open court; jury present.)
 2              MR. MENCHEL:  This is in, your Honor?
 3              THE COURT:  Yes.
 4              (Defense Exhibit DDDDDD was received in evidence.)
 5              MR. MENCHEL:  Publish it, please.
 6              (Exhibit published.)
 7    BY MR. MENCHEL:
 8    Q    So, Mr. Jacoby, this is another PPM for Holdings II,
 9    correct?
10    A    The --
11    Q    The March 5th of 2016?
12    A    It looks like a new version that must have been worked on
13    by a new law firm.
14    Q    Okay.  I want to direct you to the attachment again.
15              This is on page 12.
16              MR. MENCHEL:  And if you blow up the section that
17    says "we reserve the right."
18    Q    Same language as before, correct?
19    A    Yes.
20    Q    Were you aware that that was in there when you sent it?
21    A    Can you show me the e-mail?
22    Q    Sure.
23    A    Yeah, I'm sure it was.  It was a version, yeah.  I had
24    suggested that we not say "no present plans," but I was
25    overruled on that.
```

*Jacoby - cross - Menchel*                                      1245

1    Q    You had no problem forwarding it on, correct?

2    A    I had no input whether or not I could do that.

3    Q    Okay.

4            MR. MENCHEL:  If we go to the General Investment

5    Risks, and can we blow up the section that says "no assurance

6    of distributions."

7    BY MR. MENCHEL:

8    Q    And, once again, it says:  Furthermore, while we have no

9    present plans to do so, we could include LP's invested

10   capital; right?

11   A    Which fund is this?  Can you go back to it?

12   Q    Sure.

13           MR. MENCHEL:  Let's go back to the beginning.  It's

14   Holdings II, March 2016.

15   A    2016.  Okay, got it.

16   Q    And at that time, sir, Holdings II was fully covered, was

17   it not?

18   A    You'd have to refresh my memory.

19   Q    Okay, I'll show you something.

20   A    Because I don't think it was, but I can't remember when.

21

22           (Continued on the following page.)

23

24

25

*Jacoby - Cross - Menchel*                                    1246

1    CROSS EXAMINATION (Continued.)

2    BY MR. MENCHEL:

3    Q    I want to show you, for the witness only, Defense Exhibit

4    WL-1.  I'll refer you first --

5              MR. MENCHEL:  Show him the cover page, Andy.

6    Q    This is a report of partnership.  I'll refer you to

7    page 7 and page 8.

8    A    Yes.  So when did this --

9    Q    I'm just asking if you recognize this document.

10   A    No, I kind of recognize.  The numbers look familiar, but

11   I didn't send this document out.

12   Q    I'm not asking if you sent it.  Does this refresh your

13   recollection that during the time that that particular PPM was

14   being sent out that that investment income exceeded

15   distributions?

16   A    Yes, but I'd have to see more detail.  It looks that way.

17   Q    That's fine for now.

18   A    That was March of 2016?

19   Q    Yes.  Now, I skipped ahead.  Now I want to go back to

20   Defense Exhibit DDDDDF-1, and this is what I showed you

21   earlier.  This is in evidence.  Can you publish, please?  This

22   is for Holdings 1, right?

23   A    Holdings 1, okay.

24   Q    We saw the same language that carried over into this PPM

25   as well, right?

*Jacoby - Cross - Menchel*                                              1247

1  A     It got added into this one, in a couple of places, I

2  think.

3  Q     And at that time it turns out that the funds weren't

4  fully covered at that point.  That's what you said, right?

5  A     I don't think it was fully covered.  We have to go back

6  and look but I'm pretty sure it was not.

7  Q     Did you notice, sir -- go back to the first page of the

8  email, please.  When you sent this document out that the

9  language was in there and it was inaccurate?

10 A     And it's going to the fund accountants.

11 Q     I'm just asking if you noticed when you sent it out that

12 there was language in there that was inaccurate.

13 A     That I said we shouldn't do it that way because it wasn't

14 accurate, yes.

15 Q     In this particular PPM?

16 A     Holdings 1.

17 Q     Yes.

18 A     Yeah.  Are we talking about yesterday when you're saying

19 the question to me was, why did we add this no present plans

20 into that risk section?

21 Q     My question is much narrower.  When this document got

22 sent out, did you actually mentally note, wait a minute,

23 there's no present plans language in here and at the time this

24 was being sent out we are no longer fully covered?

25 A     Certainly not.  I would not have mentally noted that.

*Jacoby - Cross - Menchel*                                    1248

1   Q    That's all I wanted to know.  If it got out under you

2   sending it out, it was not an intentional fraud you were

3   trying to commit, you just didn't know the language was in

4   there, correct?

5   A    I don't think I was forwarding it for purposes of that

6   language.  I was forwarding it to the fund accountants who

7   were doing the fund accounting.

8   Q    You didn't notice one way or the other.

9   A    One way or the other, I was just forwarding it to them so

10  they could set up the accounting on their systems.

11  Q    This was the final version that went out, correct?

12  A    From Mr. Shultz.

13  Q    This was the final version that went out, correct?

14  A    I don't know.

15  Q    Now, Mr. Jacoby, we spoke about the whistleblower

16  complaint that you filed with the SEC, correct?

17  A    Yes.

18  Q    And you signed your name to that form I asked you the

19  questions about?

20  A    Yes.

21  Q    Under the penalty of perjury?

22  A    Correct.

23  Q    And the form also required you to detail all the facts in

24  your knowledge that were pertinent to what it was you were

25  blowing the whistle about, right?

*Jacoby - Cross - Menchel*                                        1249

1    A    To the best of my ability.

2    Q    To the best of your ability, right?

3    A    Yeah.

4    Q    Nowhere in the actual complaint that you made did you

5    ever once mention that you had raised concerns to either Mr.

6    Gentile or Mr. Schneider, true?

7    A    I don't think that's true.  I think I did.

8    Q    Let me show it to you.

9    A    You're showing me a subset.

10   Q    I'm going to show you -- the complaint, sir.

11   A    Okay.

12              MR. MENCHEL:  One second, your Honor.  May I

13   approach the witness?

14              THE COURT:  Sure.

15   Q    Mr. Jacoby, I'm showing you what's been marked for

16   identification as Defense Exhibit QQQQG.  Just read that to

17   yourself.

18              My question was, did you in anyplace in your

19   complaint mention to the SEC that you had actually complained

20   to or reported violations of law to either Mr. Schneider or

21   Mr. Gentile.

22   A    I think I did, but let's have a look.

23              MR. MCCONNELL:  We have no objection to moving this

24   in.

25              MR. MENCHEL:  I'm not offering it.

Jacoby - Cross - Menchel                                    1250

1   A    I don't think it specifically says anything about --

2   Q    That was my question.

3   A    -- internal reports.

4   Q    You didn't mention that, right?

5        THE COURT:  The Court reporter mentioned to me

6   earlier, and I should have mentioned it to you, you guys are

7   overlapping.  You're both cutting each other off.  If you

8   would both try not to do that, it would make the transcript

9   cleaner.

10  Q    There's nowhere in your complaint that you reported your

11  concerns to either Mr. Gentile and Mr. Schneider, correct?

12  A    Not in this piece.

13  Q    Well, we also showed question five when you asked

14  specifically whether you reported violations and you answered

15  the question no, correct?

16  A    Yeah, I disagreed with your interpretation of that.  So

17  maybe it's possible that I answered Part B wrong there.

18  Q    Okay.  Nor did you ever mention anything about

19  performance guarantees in that complaint, right?

20  A    I did not get into the detail of performance guarantees

21  in the complaint.  However --

22  Q    Sir, I'm asking you to answer my questions.  Did you ever

23  mention the words performance guaranty at all in that

24  complaint?

25  A    No, I referred to the events around it.

*Jacoby - Cross - Menchel*                                    1251

1  Q    Okay.  Did you mention anything about the supposed

2  conversation that you had with Mr. Gentile and Mr. Schneider

3  about how the no present plans language wound up in that PPM?

4  A    I wouldn't go into that kind of detail.

5  Q    The SEC asked you to provide all the relevant details and

6  facts, right?

7  A    In this many pages?

8  Q    Yes.

9  A    Do you know how many meetings I had with them?

10  Q    When you say this many pages, your lawyer -- you wrote

11  that, right?

12  A    Right.

13  Q    The number of pages is up to you, correct?  That's your

14  document.  It's not a form.

15  A    So I say, I look forward to providing any information I

16  can to the staff and directing them to additional documents --

17  Q    Sir, my question was, anywhere in your complaint that you

18  filed with the SEC you discussed at all the supposed

19  conversation you had with Mr. Gentile and Mr. Schneider about

20  how the no present plans language got into the PPM, yes or no?

21  A    No.

22         MR. MENCHEL:  No further questions.

23         THE COURT:  This is probably a good time to break

24  for lunch.  Let's break for lunch and come back at 1:30.

25  Please remember to not make up your minds and not talk to each

*Jacoby - Cross - Menchel*                                    1252

1    other about the case.

2              (Jury not present.)

3              THE COURT:  The witness and the lawyer should not

4    speak to the Government.  Are you pretty confident that we're

5    going to be on this witness all day?

6              MR. MCCONNELL:  Apparently.

7              THE COURT:  Is there anything you anticipate coming

8    up?

9              MR. MCCONNELL:  Your Honor, we got some of the

10   exhibits from Mr. Colton last night.  We're trying to get

11   through them as quickly as we can.  A lot of the exhibits that

12   end up getting offered are not ones that were on the list.

13   That's fine.  But that's why there may be a need to discuss

14   things at sidebar because some of them -- and I understand

15   some things are initially offered for impeachment and then

16   they want to admit it.  I get that.

17             THE COURT:  Nothing on your agenda right now?

18             MR. MCCONNELL:  No.

19             THE COURT:  Anything else on your agenda right now?

20             MR. MENCHEL:  No, your Honor.

21             THE COURT:  See you all at 1:30.

22             (Lunch recess taken.)

23             (Continued on next page.)

24

25

*Proceedings*                                              1253

1                       AFTERNOON SESSION

2

3            (In open court.)

4            (Parties present.)

5            MR. MCCONNELL:  Your Honor, while we're waiting on

6    a juror, we were going to offer a proposed limiting

7    instruction on the attorney issue.  We're having someone run

8    over a hard copy but I don't know if you want read it into

9    the record.

10           THE COURT:  Sure, let's hear it because then your

11   adversaries can comment.

12           MR. AXELROD:  We're just bringing it up on the

13   phone.

14           MS. MATHEWS:  You saw earlier I admitted these

15   exhibits in connection with the defendants' argument that

16   individuals other than the defendants prepared and

17   disseminated some of the private placement memorandums in

18   this case.

19           I am instructing you that there is no argument in

20   this case that attorneys approved or blessed the private

21   placement memorandums.

22           You also have not heard evidence regarding what

23   these attorneys knew at the time.  You should not infer

24   anything from the facts that the individuals involved in

25   these e-mails happen to be attorneys.

*W. Jacoby - Cross/Mr. Colton*          1254

1           MR. COLTON:  Your Honor, I don't think we can

2    fairly be forced to evaluate that on the fly the minute

3    before cross-examination.

4           I mean, if they would e-mail it to us, we're happy

5    to engage in a meet and confer, and hopefully, we can come

6    up with something we can agree on.  But I can't agree to

7    that, it seems broader than what we thought about.

8           THE COURT:  I think it's fair to say that you need

9    more than a minute to think about it.

10          MS. MATHEWS:  All e-mails.

11          MR. MCCONNELL:  Your Honor, do you want the

12   witness now?

13          THE COURT:  Yes, that would be great.

14          (Witness takes the witness stand.)

15          COURTROOM DEPUTY:  All rise.

16          (Jury enters courtroom at 1:32 p.m.)

17          THE COURT:  Everyone can be seated.  I think we're

18   ready, Mr. Colton.

19          MR. COLTON:  Yes, Judge.

20          May I inquire?

21   CROSS-EXAMINATION

22   BY MR. COLTON:

23   Q    Good afternoon, Mr. Jacoby.

24   A    Good afternoon.

25   Q    You and I have never met, have we?

W. Jacoby - Cross/Mr. Colton                1255

1   A    No.

2   Q    You and I have never spoken?

3   A    I don't recall ever meeting you.

4   Q    Okay.  I'm going to take you back to a couple of basics

5   here to set the stage.

6        You were the CFO, the chief financial officer, of

7   GPB Capital Holdings, correct?

8   A    Yes.

9   Q    And you served in that role for, approximately, two

10  years?

11  A    Year and a half.

12  Q    Okay.  And that was an important role in the company,

13  correct?

14  A    Yes.

15  Q    You had a responsibility to investors, correct?

16  A    Yes.

17  Q    And you had a responsibility to investors in all of the

18  funds overseen by GPB Capital Holdings, correct?

19  A    Yes.

20  Q    And you know a gentleman name Patrick Dibre?

21  A    Yes.

22  Q    You met Mr. Dibre at or through your officer at GPB?

23  A    Yes.

24  Q    You didn't know Mr. Dibre before that?

25  A    No.

W. Jacoby - Cross/Mr. Colton                1256

1   Q    And Mr. Dibre also had an important role at GPB,

2   correct?

3   A    For a short while.

4   Q    He was the actual operator of auto dealerships owned by

5   some of the GPB funds, correct?

6   A    Yes.

7   Q    He was the operator of some of the auto dealerships

8   owned by the funds that were designed to kick cash up to the

9   fund for the benefit of investors, correct?

10  A    Yes.

11  Q    And it's also true, is it not, that you and Mr. Dibre

12  together came up with a brand called Grand Central

13  Automotive, correct?

14  A    I believe that is true.

15  Q    Okay.  And you came up with that brand, Grand Central

16  Automotive, with the intent of buying car dealerships,

17  correct?

18  A    That was his intention.

19  Q    And you were working with him toward that in the brand

20  that you and he came up with together?

21  A    He came up with the brand and I agreed to help him.

22  Q    You both came up with the brand, correct?

23  A    No, it was his idea.  I thought it was a good name.

24  Q    Now, you testified about Grand Central Automotive last

25  week in this trial, correct?

W. Jacoby - Cross/Mr. Colton          1257

1    A    Yes.

2    Q    You were asked the following question and you gave the

3    following answer.

4         Page 943, Line 8, for counsel and the Court:

5             "QUESTION:  What is Grand Central Automotive?"

6             "ANSWER:  That was a brand that I and Mr. Dibre

7    came up with to try and borrow some money to buy some

8    dealerships for him."

9    A    Sounds rights.

10   Q    So you and Mr. Dibre came up with the brand Grand

11   Central Automotive, correct?

12   A    Correct.

13   Q    Okay.  And the reason is to buy dealerships above and

14   beyond the ones he already had or already operated, correct?

15   A    That's right.  He had some in mind.

16   Q    And that was not to buy them for GPB Automotive Fund,

17   correct?

18   A    No.

19   Q    That was not to buy them for GPB Holdings 1, correct?

20   A    No.

21   Q    That was not to by them for GPB Holdings 2, correct?

22   A    Right.

23   Q    These automotive dealerships would have been bought for

24   the benefit of someone other than the GPB investors,

25   correct?

W. Jacoby - Cross/Mr. Colton                1258

1    A    That's right.

2    Q    Now, we looked at a whole bunch of private placement

3    memoranda and, I don't want to go through all of the

4    different parts of that, it's a long document, but I do want

5    to call your attention, if we can bring up 8258-B in

6    evidence, and if we could specifically go to 8258-B

7    Page 34-034.

8             MR. COLTON:  My screen is not working.  Somebody

9    tell me the trick.  Just tap it?  No preview detected.  Now

10   it's detected.

11   Q    You see that on your screen, Mr. Jacoby?

12   A    Yes.

13   Q    Okay.  This states that one of the risks in involved

14   for the GPB investors in GPB Automotive Fund is the risk

15   that GPB Automotive Fund will have a failure to acquire

16   dealerships, correct?

17   A    Yes.

18   Q    In fact, it says, in evidence, "Growth in our revenues

19   and our earnings will depend on our ability to acquire

20   dealerships."

21        Correct?

22   A    Yes.

23   Q    And it also says, "In addition, increased competition

24   for acquisitions may develop which could result in fewer

25   acquisition opportunities available to us and/or higher

*W. Jacoby - Cross/Mr. Colton*                    1259

1    acquisition prices."

2         Correct?

3    A    Yes.

4    Q    You're familiar with this PPM?

5    A    Yes.

6              MR. COLTON:  And if we could go back to the front

7    page, please, Michelle.

8    Q    This PPM was issued on June 30, 2016?

9    A    Okay.

10   Q    You reviewed, or at least had access to, this PPM

11   before it was issued to the investors?

12   A    Yes.

13   Q    But yet, you did not disclose to the investors that not

14   only was there an acquisition risk, but the risk of

15   competition for acquisition of automotive dealerships came

16   from the CFO of GPB and one of its main operating partners.

17   You didn't disclose that, did you?

18   A    No.

19   Q    You think that's funny?  Do you think that's funny?

20   A    No.

21   Q    We agree on that.

22        Now, let's go and take a look, if we can, at what has

23   been admitted into evidence as, I don't know the word for

24   it, six Es.

25        You recall this as the deck that was found on the thumb

W. Jacoby - Cross/Mr. Colton                1260

1  drive of materials that you stole from GPB before you left,

2  correct?

3  A    Yes.

4  Q    Okay.  Now, if we could go to five Es and a G.

5        MR. COLTON:  If we could blow up the box, please,

6  Michelle.

7  Q    You remember this document from this morning, correct,

8  Mr. Jacoby?

9  A    Yes.

10 Q    And you'll agree that the name says, "Author, Bill

11 Jacoby."

12 A    When I saved it to there, it records it as that, yes.

13 Q    And you go by Bill, right, sometimes?

14 A    Sometimes.

15 Q    Okay.  And it says, "Content created May 23, 2016."

16 That's what to says, correct?

17 A    Date last saved.

18 Q    Okay.  So this document was in existence on May 23,

19 2016?

20 A    The version that you're looking at was in existence in

21 February of '17.

22 Q    Okay.  But the document was originally created?

23 A    I don't know what document was originally created --

24 Q    Okay.

25 A    -- in May.  The only one that we can be sure of is that

W. Jacoby - Cross/Mr. Colton                    1261

1   I saved it to this drive not knowing it but I saved it to

2   this drive in February of '17.

3   Q    Okay.  And you were still a consultant for GPB until

4   August 28th of 2017, correct?

5   A    What?

6   Q    You were still a consultant?

7   A    Right.

8   Q    Getting paid by GPB until April 28th of 2017?

9   A    Yeah, that's right.

10  Q    So, at the time you were still working and getting paid

11  by GPB, you had some connection at a minimum to this deck

12  which was designed to buy auto dealerships for somebody's

13  benefit other than the investors of GPB, correct?

14  A    Yes, in February of '17.  Yes, for sure.  I was

15  definitely --

16  Q    You will agree with me, sir, that if you were working

17  toward acquiring dealerships for the benefit of someone

18  other than the investors of GPB in May of 2016, that should

19  have been disclosed by you in the PPM that came out in June

20  of 2016, correct?

21  A    If that was the case, I hadn't been doing it in May.

22  Q    If that were happening, it should have been disclosed;

23  correct?

24  A    If I was actively working for somebody else, I would

25  have disclosed it.

W. Jacoby - Cross/Mr. Colton                    1262

1   Q    So if you were only partially working for someone else

2   to disadvantage the investors of GPB, that would have been

3   okay to hide?

4   A    No, I was planning on leaving.  I was trying to get

5   other work.

6   Q    You were planning on leaving?

7   A    Yes.

8   Q    So it's okay not to tell the investors that the CFO,

9   the person in charge of the financials of their investment,

10  is working against them a little bit?

11            MR. MCCONNELL:  Objection.

12            THE COURT:  Overruled.

13  A    I was planning on leaving.  And so, when you transition

14  to another job you don't say, hey, bye guys, I'm going to

15  quit here soon.

16  Q    People trust you, right?

17  A    Mm-hmm.

18  Q    This CFO.  The documents went out to the public,

19  William Jacoby, CFO?

20  A    Correct.

21  Q    30 years of experience.  You can trust this man with

22  your finances.  That's what that says.

23  A    Yes.

24  Q    And what you're saying is, if you're working just a

25  little bit against those people, you don't have to tell

W. Jacoby - Cross/Mr. Colton                1263

1    them?

2    A    No, I was looking for new work and I had not disclosed

3    that yet.

4    Q    You weren't looking to open a pet store, you were

5    looking partially to buy auto dealerships that could have

6    gone to the benefit of investors, correct?

7    A    Yes.

8    Q    It's a little different than maybe buying a pet store?

9    A    If we had succeeded with that, it would have gone that

10   way.

11   Q    I see.

12        So there's a point at which you can work against your

13   investors, it's just a question of how much?

14   A    Yeah, it's when you're gone, when you're actually

15   officially gone, and you actually actively go out and start

16   to buy the dealerships that would be the point.

17   Q    So if you're planning to compete --

18   A    Yes.

19   Q    Working on competing --

20   A    Right.

21   Q    -- and creating materials designed to compete with the

22   very investors you served, as long as you don't start doing

23   it, it's okay?

24   A    I would say that's true.  You got to get another job,

25   right?

W. Jacoby - Cross/Mr. Colton                1264

1    Q    Whether or not you have to get another job is

2    different.  I don't think the investors would have cared if

3    you were trying to buy pet stores?

4            THE COURT:  Counsel.  Let's just have a question.

5    Q    The question is:  Do you think it's the same thing to

6    try to get another job that competes for value with the

7    investors you served as just get another job that has

8    nothing to do with the investors that you served?

9    A    I think it's a very large market.  There's a lot of car

10   dealerships in the world, so, yes, I don't think that's a

11   problem.

12           MR. COLTON:  Let's take that down.  Thank you,

13   Michelle.

14   Q    Now, I want to turn your attention to an allegation

15   that you made on Thursday right before lunch and your

16   allegation was that Jeffry Schneider wrote the PPMs for the

17   GPB funds.

18           Do you remember that allegation?

19   A    Yes.

20   Q    And when you gave that testimony on Thursday, you left

21   out the fact that other people, other professionals, were

22   involved in drafting those PPMs; correct?

23   A    Okay.

24   Q    Do you agree or would you like me to read the

25   transcript back to you?

*W. Jacoby - Cross/Mr. Colton*                    1265

1   A    That sounds true.

2   Q    You left the jury with the impression that only

3   Mr. Schneider wrote these PPMs?

4   A    He was the final say.

5   Q    You left the jury with the impression that it was only

6   Mr. Schneider involved, didn't you?

7   A    No, I don't think that's true.

8   Q    June 20th, transcript Page 728, Lines 15 to 22 for the

9   Court and counsel.

10       You were asked the following questions and you gave the

11  following answers:

12       "QUESTION:  You mentioned before that you had

13  conversations with Mr. Schneider about the private placement

14  memorandum?"

15       "ANSWER:  Yes."

16       "QUESTION:  And in those conversations, did you

17  come to understand how this PPM got drafted and put

18  together?"

19       "ANSWER:  Yes, I did."

20       "QUESTION:  And tell the members of the jury about

21  that?"

22       "ANSWER:  Mr. Schneider wrote it."

23  A    Right.

24  Q    That's all you said?

25  A    Okay.  So maybe I should have made it more clear.

W. Jacoby - Cross/Mr. Colton                    1266

1  Q    But the reality is that you were involved in writing

2  the PPM we were talking about, correct?

3  A    I certainly was involved, yeah.

4  Q    That PPM we're talking about is in evidence at

5  Government Exhibit 4100.

6       That came out in March of 2015, correct?

7  A    Yes.

8  Q    March 6th of 2015?

9  A    Yeah.

10 Q    I don't want this to be a memory test.

11       MR. COLTON:  Michelle, can you pull up the cover

12 of Government Exhibit 4100 in evidence.

13       (Exhibit published.)

14 Q    So we'll agree that this PPM is dated March 6, 2015?

15 A    That's right.

16       MR. COLTON:  Your Honor, a couple of times where

17 we had prepared exhibits that maybe the same as what

18 Mr. Menchel used and I don't have them loaded so we may end

19 up with a couple of exhibits that are same with different

20 numbers.

21       I would like to show at this point, it's -- we

22 have to marked as Defendant's Jacoby 1.  It is similar or

23 the same as document in evidence.  If we can call that up at

24 this point just for the witness, Counsel, and the Court.

25 Q    Do you remember this document, which is an e-mail from

*W. Jacoby - Cross/Mr. Colton*                    1267

1    you to among others Dan Peterson of the Polsinelli Law Firm,

2    Valerie Arroyos, and Steve Frangioni?

3    A    Yes, we talked about this morning.

4    Q    It contained an attachment which includes something

5    called "Red Line GPB Automotive PPM WJ Comments"?

6    A    Yes.

7    Q    And WJ is you, William Jacoby?

8    A    I had comments or questions, yes.

9          MR. COLTON:  Your Honor, we offer

10    Defense Jacoby 1.

11          MR. MCCONNELL:  I believe it's in already, no

12    objection.

13          THE COURT:  Admitted.

14          (Defendant's Exhibit Defense Jacoby 1 was marked

15    in evidence.)

16    Q    Now, if you look at this e-mail, Mr. Jacoby, Jeffry

17    Schneider is not copied on the e-mail, correct?

18    A    Correct.

19    Q    And this is an e-mail where you are offering comments

20    on the PPM?

21    A    That's right.

22    Q    You're not drafting comments to Jeffry Schneider.  You

23    that's addressed to someone else, correct?

24    A    Yes, in this e-mail.

25    Q    Despite the fact that your claim is he wrote this,

*W. Jacoby - Cross/Mr. Colton*                    1268

1  you're directing your comments to someone else?

2  A    That's right.

3  Q    Okay.  Now, at the bottom, you remember that

4  Mr. Peterson is a lawyer at the Polsinelli Law Firm,

5  correct?

6  A    Yeah, I do recall that.

7  Q    And he is clear involved, at least in some way, in

8  drafting or editing this private placement memorandum?

9  A    Critically, yes.

10  Q    You say critically?

11  A    I think he's important, yes.

12  Q    Now, let's take a look at Defense

13  Exhibit -- Defense Jacoby 2, if you will, again just for

14  counsel and the witness and the Court.

15       I'd like to go to the bottom, Page 4, of this document.

16  If we could blow it up slightly, I apologize, there you go.

17       That is what we are looking at for Defense Jacoby 2 is

18  the same e-mail that we just looked at, it's just at the

19  bottom of a longer chain, correct?

20  A    Okay.

21  Q    And this is an e-mail that you were on, of course?

22  A    Yes.

23  Q    Okay.

24       MR. COLTON:  Your Honor, I offer this longer chain

25  involving Mr. Jacoby in evidence.

*W. Jacoby - Cross/Mr. Colton*                    1269

1          MR. AXELROD:  Can we see the rest of it?

2          MR. COLTON:  Sure.  Michelle, go back to Page 1

3    and go through the pages slowly for the Government team.  Go

4    through all the pages, if you could, Michelle.

5          MR. MCCONNELL:  No objection.

6          THE COURT:  Admitted.

7          (Defense Jacoby 2 was marked in evidence.)

8          MR. COLTON:  Thank you, your Honor.

9    Q    So I'd like to go to Page 3 of 5 in this exhibit and,

10   specifically, to an e-mail from Mr. Peterson to you,

11   Mr. Jacoby, on the 22nd of February, 2015.

12       Do you see that?

13         MR. MCCONNELL:  Judge, we didn't -- I apologize

14   but when we were scrolling through this document, this part

15   of it didn't come up.

16         MR. COLTON:  I don't have a problem with the Court

17   clerk taking it down while Mr. McConnell has a discussion.

18         THE COURT:  Are you looking at it now?

19         MR. MCCONNELL:  Yes.  Okay.

20         Your Honor, I think this portion, without knowing

21   what the intention for offering, we would have an objection.

22         MR. COLTON:  I can maybe save time explain to it

23   Mr. McConnell and maybe we won't have an issue.

24         THE COURT:  Sure.

25         (A brief pause in the proceedings was held.)

*W. Jacoby - Cross/Mr. Colton*                    1270

1            MR. MCCONNELL:  Your Honor, we have an objection

2    to the document, I'm sorry.

3            THE COURT:  Let's have a sidebar.

4            (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Sidebar*                                                        1271

1          (Sidebar held outside the presence of the jury.)

2          THE COURT:  Are you guys producing a list and then

3    you're looking at the list?  Otherwise, it feels like we're

4    just going --

5          MR. MCCONNELL:  We got a list very late and we did

6    our best to look at it last night and this morning and, you

7    know, again --

8          THE COURT:  We're on our third witness in this

9    case.  I'm trying to figure out a way to make this work.

10         What's the issue here?

11         MR. MCCONNELL:  The issue is that this is a

12   hearsay document.  I understand that everything is sort of

13   being rammed through for the limited purpose of showing

14   every, you know, that there are other people involved.  But

15   this is a very long substantive part of an e-mail involving

16   a lawyer and it's got nothing to do with a sensible purpose

17   of admitting this type of evidence.  If every time this

18   comes up, it's simply to show this and it becomes --

19         THE COURT:  So what is it?

20         MR. COLTON:  This is different.

21         The witness got on the stand and said,

22   unequivocally, Jeffry Schneider wrote this.  Unequivocally,

23   trying to put Jeffry Schneider as the only person.  Then he

24   makes the further allegation that it's designed to be

25   misleading by Jeffry Schneider and it's just not so.

*Sidebar*                                                              1272

1          And the next thing I'm going to do is show that he

2    told the FBI lawyers weren't involved at all.  And I have to

3    be able to show not only lawyers were involved but the

4    lawyers were directing, as this document shows, questions

5    directly to Bill, not to Jeffry Schneider to him.  So his

6    credibility about bias saying things are blatantly false, I

7    think have to come before this jury.

8          THE COURT:  He's already said lawyers.  I said

9    five times now that lawyers were involved, they were

10   critically involved, they were so, so important.  So what

11   are we getting out of this exchange?

12         MR. COLTON:  I can ask him the question if I'm

13   allowed, of course, that a lawyer from Polsinelli directed

14   his question to you, not to Mr. Schneider.

15         MS. WEIGEL:  That's fine.

16         MR. COLTON:  I will go on from there.  I would

17   like the opportunity to look at the document to see if there

18   is actually any substance.  But, for now, we won't present

19   it anymore and we can revisited it later.

20         THE COURT:  Okay.

21         (Sidebar discussion concludes.)

22         (Continued on the next page.)

23

24

25

W. Jacoby - Cross/Mr. Colton                    1273

```
 1              (In open court.)

 2    EXAMINATION BY

 3    MR. COLTON:

 4    (Continuing.)

 5    Q    Mr. Jacoby, I just want to make sure that the document

 6    is on your screen.

 7    A    Yes, I see.

 8    Q    Okay.  And you will agree with me that this is an

 9    e-mail between Mr. Peterson, the lawyer from Polsinelli,

10    yourself, Valerie Arroyos, and Steve Frangioni?

11    A    Yes.

12    Q    Mr. Schneider is not copied on this e-mail, correct,

13    yes or no?

14    A    Yes.

15    Q    Okay.  And, in this document, Mr. Peterson specifically

16    directs a question to you, Bill?

17    A    Yes.

18    Q    I'm not going to read the question but he's asking a

19    question to you, right?

20    A    Right, yes.

21    Q    And, to your knowledge, Mr. Schneider, Jeffry

22    Schneider, never went by the nickname Bill.  Did he?

23    A    No, I don't think he did.

24    Q    If we can just keep it displayed as it is and we go to

25    Page 2.
```

*W. Jacoby - Cross/Mr. Colton*                1274

1      After being asked by lawyer Dan Peterson from

2   Polsinelli for something?

3            THE COURT:  Counsel, can we just have a sidebar?

4            (Continued on the next page.)

*Sidebar*                                                      1275

1          (Sidebar held outside the presence of the jury.)

2          THE COURT:  I think we're --

3          MR. MCCONNELL:  Good.

4          (Sidebar discussion concludes.)

5          (Continued on the next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

W. Jacoby - Cross/Mr. Colton                    1276

1          (In open court.)

2   EXAMINATION BY

3   MR. COLTON:

4   (Continuing.)

5   Q    I'll ask the question this way.

6        Mr. Jacoby, after being asked specifically for

7   information from you, you then wrote back and said, "Steve,"

8   which is Steve Frangioni --

9              MR. MCCONNELL:  Objection to the content.  He

10  responded.

11             MR. COLTON:  There's no assertion in the response,

12  it's just a statement of intention and we've been totally

13  doing why Mr. Jacoby did things.

14             THE COURT:  That he answered the question?  There

15  an objection?

16             MR. MCCONNELL:  The document is not in evidence.

17  He shouldn't be reading from a document that's in evidence.

18  We've been doing it.  The witness has answered all of the

19  questions without the need to refer to the content of the

20  exhibit.

21             MR. COLTON:  So, your Honor, I propose to just

22  read ending in the word memo which takes out any substance.

23             THE COURT:  Any objection?

24             MR. MCCONNELL:  Yes.

25             THE COURT:  Okay.  I'll allow it.  I don't think

W. Jacoby - Cross/Mr. Colton                    1277

1    it's for the truth.

2            MR. COLTON:  It is not, your Honor, thank you.

3    EXAMINATION BY

4    MR. COLTON:

5    (Continuing.)

6    Q    You responded, "You and Steve," Frangioni, "will

7    provide a summary memo."

8            Correct?

9    A    Yes.

10   Q    And Steve Frangioni works for GPB, correct?

11   A    Right.

12   Q    And, at that time, he worked for you or was about to

13   work for you when you ascended to the CFO position?

14   A    Yeah, this is February 23, 2015, so I'm trying to

15   educate myself on this entire thing.

16   Q    Frangioni was somebody who worked for you or was about

17   to work for you, right?

18   A    Yeah, he will be needed for me because I'm so now there

19   I would have to get his help, right.

20   Q    Okay.  You can take that down.

21           MR. COLTON:  Thank you, Michelle.

22   Q    I want to say on this subject of who wrote the PPMs.

23           You had a meeting with the Government including members

24   of the prosecution team, Mr. McConnell, Ms. Weigel,

25   Mr. Axelrod on April 2, 2024, correct?

W. Jacoby - Cross/Mr. Colton                    1278

1    A    I may have.

2    Q    You had a lot of meetings?

3    A    Yeah.

4    Q    You had meetings in April?

5    A    That sounds right.

6    Q    You had been advised before this meeting in April that

7    if you didn't tell the truth to the prosecutors and the FBI

8    that's a crime, correct?

9    A    So I did my best to tell the truth.

10   Q    You were informed of that reality, yes?

11   A    For sure.

12   Q    Okay.  And despite being that information, you told the

13   FBI that Schneider took a draft PPM from another firm,

14   repurposed it for GPB, no attorney made the edits to what

15   Schneider put in the PPM.

16        That's what you told the FBI?

17   A    No I don't think I said that.

18        MR. COLTON:  Okay.  If we could take a look at

19   just for counsel and the Court 3500-WJ-23.  And specifically

20   on Page 2?

21   A    I think they got that wrong.  And if I said to --

22   Q    Just a minute.

23        I'm sorry, if we look at the third full paragraph from

24   the bottom.

25        Now, is this visible on the screen Mr. Jacoby?

W. Jacoby - Cross/Mr. Colton                1279

1   A    Yes.

2   Q    If you look at the third full paragraph from the bottom

3   it starts, "When Jacoby started at GPB."

4        Do you see that?

5   A    Yes.

6   Q    Now, isn't it true that when you met with the

7   prosecutors and the FBI, you knew it was a crime not to tell

8   the truth that you told them Schneider took a draft PPM from

9   another firm and repurposed it for GPB.  No attorney made

10  edits to what Schneider put in the PPM.  Gentile said that

11  he and Schneider participated in the creation of the PPM.

12       That's what you told them?

13  A    No, I think they got that wrong or maybe they

14  misunderstood.

15  Q    The FBI got it wrong, that's your testimony?

16            THE COURT:  Counsel.

17  A    On that part of it, yeah.

18            MR. COLTON:  Your Honor, I offer the statement

19  that I read in evidence as a prior inconsistent statement to

20  his testimony here.

21            THE COURT:  That's not a permissible use of this

22  document.

23  Q    As you sit here today, you are saying two months ago

24  when you met with the FBI --

25            THE COURT:  Counsel, sidebar.

W. Jacoby - Cross/Mr. Colton                 1280

1              (Continued on the next page.)

*Sidebar*                                                              1281

1        (Sidebar held outside the presence of the jury.)

2        THE COURT:  So it seems like you're trying to read

3   in the 302 through the witness.  You cannot get in this 302

4   through the witness.

5        You can ask him if it refreshes his recollection.

6   You've asked him if he said that.  He said no to those

7   things.  And now it feels like we're just trying to get

8   before the jury the substance of the 302 which you can't do

9   through this witness so let's move on.

10        MR. COLTON:  Okay.

11        (Sidebar discussion concludes.)

12        (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

W. Jacoby - Cross/Mr. Colton                    1282

1      (In open court.)

2   EXAMINATION BY

3   MR. COLTON:

4   (Continuing.)

5   Q    So just to close the loop.

6   A    Sure.

7   Q    There's no question in your mind that at this point in

8   time that lawyers were fully involved in the drafting of the

9   PPMs?

10  A    Absolutely.  And I've consistently said that throughout

11  the years.

12  Q    Okay.  And just so when you say "throughout the years,"

13  meaning, that lawyers were involved forget about what they

14  said or did or whatever but they were involved throughout

15  the years you were associated with GPB?

16  A     No, I was talking about the fact that throughout the

17  years, the many years that I've been interviewed about this,

18  I've always said that they were involved, that they didn't

19  endorse the document.

20  Q    I'm asking a different question.

21       I'm saying, did you in any way dispute that lawyers

22  were involved in the drafting of the PPMs throughout your

23  tenure as CFO of GPB?

24            MR. MCCONNELL:  Objection.

25            THE COURT:  Overruled.

W. Jacoby - Cross/Mr. Colton                1283

1  A    I would say that's true, they were involved.

2  Q    Great, thank you.

3       I would like to turn your attention now to testimony

4  you gave the other day about Mr. Schneider's AMEX card.

5       Do you remember that?

6  A    Yes.

7  Q    Okay.  Now, you and Mr. Schneider didn't know each

8  other before you interviewed for the job at GPB, correct?

9  A    No.

10 Q    Never worked with him?

11 A    No.

12 Q    Had no personal relationship with him?

13 A    No.

14 Q    Okay.  Now, let me ask you this:  As the CFO of

15 numerous companies, you would agree with me that it is

16 common for people to put business expenses on their personal

17 credit cards and then seek reimbursement that's common,

18 right?

19 A    That would be common, yeah.

20 Q    Happens all the time?

21 A    Sure.

22 Q    But when you said in court some of the expenses we paid

23 Mr. Schneider's AMEX, you left out that they were a lot of

24 business expenses that were being paid on Mr. Schneider's

25 AMEX, didn't you?

W. Jacoby - Cross/Mr. Colton                    1284

1   A    Well, I agree with you that that's true if that makes

2   you...

3   Q    I just -- doesn't matter how I feel.  All I want is

4   truthful testimony?

5   A    Both statements are true.

6   Q    Okay.  And isn't it true that some of the expenses on

7   Mr. Schneider's AMEX that you commented on were to reimburse

8   the payments, were to reimburse for your travel?

9   A    I'm sure that that's true, yeah.

10  Q    And there's nothing wrong with that, correct?

11  A    There are valid business purposes to use your AMEX

12  card.

13  Q    So when you travelled to Austin, and that expense was

14  on Mr. Schneider's card, and then it got charged to either

15  GPB Capital Holdings or the fund, if permissible, no issue

16  with that?

17  A    Yeah, the whole question there is what's permissible

18  and what's not, you're right.

19  Q    But you didn't mention when you testified earlier about

20  paying the AMEX card that there's a lot of legitimate

21  reasons one would do that?

22  A    In general, I didn't -- yeah.

23  Q    Okay.

24         MR. COLTON:  One moment, your Honor.

25  Q    Now, I want to take you to an allegation that you made,

*W. Jacoby - Cross/Mr. Colton*                    1285

1  frankly, over and over again that Mr. Schneider controlled

2  or ran GPB.

3       You remember making that allegation a lot, right?

4  A    I was told to report to him directly, yes.

5  Q    And you allege he was one of the two people running the

6  company.

7       That was your allegation here in court, right?

8  A    Yes.

9  Q    Okay.  Let's take a look at your offer letter which is

10 in evidence as Defense BBS.

11          MR. COLTON:  If I may publish, your Honor.

12          THE COURT:  Sure.

13          (Exhibit published.)

14 Q    Let's take a look.  If we can blow up the very top of

15 the page.

16      This says, "On behalf of GPB Capital, I am pleased to

17 offer you the position of chief financial officer."

18      Correct?

19 A    That's right.

20 Q    Okay.  So you were employed by GPB Capital, not by

21 Ascendant Capital, correct?

22 A    That's right.

23 Q    And then let's take a look.  If we can go to Page 2.

24 It says in the highlighted portion, "No individual other

25 than the chief executive officer of GPB Capital has the

*W. Jacoby - Cross/Mr. Colton*                    1286

1  authority to enter into any agreement for employment for a

2  specified period of time or to make any agreement or

3  representation to the contrary."

4       You see that?

5  A    Yes.

6  Q    And the chief executive officer of GPB Capital was

7  David Gentile, correct?

8  A    That's right.

9  Q    So your own offer letter said only David Gentile had

10 certainly authority, correct?

11 A    That's right, it does.

12 Q    Now, this document, you can look at it if you like, not

13 signed by Jeffry Schneider, correct?

14 A    It's signed by David Gentile.

15 Q    In fact, your offer letter makes no mention of Jeffry

16 Schneider, correct?

17 A    That's correct.

18 Q    Now, let's take a look at your transition agreement

19 from when you were leaving GPB.  That's Exhibit BBT, in

20 evidence.

21      You remember this document as your transition agreement

22 for leaving GPB, right?

23 A    That's right.

24 Q    Okay.  And the top of the first page it says, it's an

25 agreement between you, William Jacoby, and GPB Capital

W. Jacoby - Cross/Mr. Colton          1287

1  Holdings, right?

2  A    Right.

3  Q    Doesn't make any mention of Ascendant Capital?

4  A    No.

5  Q    Doesn't make any mention of Jeffry Schneider?

6  A    It does not.

7  Q    Okay.  Now, if we go to Page 7 at the bottom.

8       This document is signed by Roger Anscher on behalf of

9  GPB Capital Holdings, correct?

10  A    Yes.

11  Q    Not signed by Jeffry Schneider?

12  A    That's correct.

13  Q    Now, let's go to the next document if we could,

14  Defendant's Exhibit MMMMU that's in evidence.

15      You remember this document that was shown to you.  It's

16  the Form ADV for GPB Capital, you remember that?

17  A    Yes.

18  Q    Okay.  So I want to start on Page 21 if we could.

19      You see it's a section that says "signature"?

20  A    Yes.

21  Q    And this document is signed, albeit electronically, by

22  you, William Jacoby; correct?

23  A    That's right.

24  Q    And you did indeed sign this document, correct?

25  A    April 30, 2015, yes.

W. Jacoby - Cross/Mr. Colton                    1288

1   Q    And what it says, "Is that the investment advisor."

2   That's GPB Capital Holdings, correct?

3   A    That's right, yes.

4   Q    "And I both certify under penalty of perjury under the

5   laws of the United States of America that the information

6   and statements made in this ADV, including exhibits and any

7   other information submitted, are true and correct and that I

8   am signing this Form ADV execution page as a free and

9   voluntary act."

10       Do you see that?

11  A    Yes.

12  Q    And you signed as the CFO, chief financial officer, and

13  CCO, chief compliance officer; correct?

14  A    Yes.

15  Q    And you knew this was a document being submitted to the

16  Securities and Exchange Commission, correct?

17  A    Yes.

18  Q    You knew the Securities and Exchange Commission would

19  rely on this document, correct?

20  A    Yes.

21  Q    And you knew it was important that you tell the truth,

22  or actually, you could be prosecuted for perjury, right?

23  A    Yes.

24  Q    Okay.  Now, let's go to Page 19, please.  It's a

25  carryover from Page 19 and 20, we put them together.  If you

W. Jacoby - Cross/Mr. Colton                1289

1   want to see the whole thing, that's not a prompt.

2        You recognize that section of the Form ADV that you

3   signed?

4   A    No.

5   Q    Okay.

6             MR. COLTON:  It's in evidence.  May I read it,

7   your Honor?

8             THE COURT:  Sure.

9   Q    It says, "No. 2.  Direct owners and executive officers

10  list the names below of:  A:  Each chief executive officer,

11  chief financial officer, chief operations officer, chief

12  legal officer, chief compliance officer, director, and any

13  other individuals with similar status or functions."

14       Do you see that?

15  A    Yes.

16  Q    Okay.  And then you filled out the section that's below

17  that, correct?

18  A    That's right.

19  Q    Let's take a look at Page 20 just lower down in that

20  section.

21       You see Question 7-A?

22  A    Yes.

23  Q    This was signed by you under penalty of perjury,

24  correct.

25  A    That's right.

W. Jacoby - Cross/Mr. Colton                1290

1   Q    And it lists David Gentile, managing member; William

2   Jacoby, CFO and CCO; and Brian Marshall, COO, correct?

3   A    Yes.

4   Q    It does not list Jeffry Schneider as someone who is a

5   control person or has a similar function, yes or no, does it

6   say Jeffry Schneider?

7   A    It does not say Jeffry Schneider.

8   Q    Okay.  You did not include Jeffry Schneider in this

9   document of who's a control person knowing that you filled

10  it out under the penalty of perjury, yes or no?

11  A    Yes.

12  Q    Okay.  But Jeffry Schneider does appear, or his company

13  appears, somewhere else in this document.

14       Let's take a look at Page 15.  You see Page 15,

15  question 28?

16  A    Yes.

17  Q    There's a question, "Does the private fund," that's

18  referring to GPB, right?

19  A    Yes.

20  Q    "Use the services of someone other than your employees

21  for marketing purposes?"

22       You see that?

23  A    Yes.

24  Q    And on that question, you answered Ascendant Capital?

25  A    Yes.

W. Jacoby - Cross/Mr. Colton                    1291

1   Q    That was accurate, GPB was using the services of

2   Ascendant Capital, correct?

3   A    Yes.

4   Q    But Ascendant Capital and, excuse me --

5        MR. COLTON:  Withdrawn.

6   Q    Ascendant Capital is owned, to your knowledge, by

7   Jeffry Schneider, right?

8   A    Yes.

9   Q    So despite making the allegation that Jeffry Schneider

10  ran GPB, was a control person of GPB, you swore under the

11  penalty of perjury to the SEC that he is not a control

12  person of GPB, yes or no?

13  A    Yeah, the entity that we were registering here is GPB

14  Capital, right, you're correct.

15  Q    Okay.

16       MR. COLTON:  We can take that down.  Thank you,

17  Michelle.

18  Q    Now, I'm going to go back again, not at length right

19  now, but to a couple of provisions of that PPM that we were

20  looking at from June 30, 2016, on this subject.

21       MR. COLTON:  If we could pull up

22  Government Exhibit 8258-B in evidence.

23  Q    Again, we looked at this a few minutes ago so you

24  remember this document.

25       Correct, Mr. Jacoby?

*W. Jacoby - Cross/Mr. Colton*                1292

1    A    Yes.

2    Q    If we could specifically go to Page 106.  This document

3    in evidence says, "GPB was formed in March 2013 and is owned

4    by David Gentile, its sole member."

5         Correct?

6    A    That's right.

7              (Continued on the next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Jacoby - cross - Colton*                                          1293

1    CROSS-EXAMINATION (Continuing)

2    BY MR. COLTON:

3    Q    And you reviewed this document, the PPM from June 30,

4    2016, before it went out, right?

5    A    Yeah, I think so.

6    Q    And that's a true statement, GPB is owned 100 percent by

7    David Gentile?

8    A    That is a true statement to my knowledge.

9    Q    Thank you.

10        It doesn't make any mention of Jeffry Schneider in

11   this PPM?

12   A    No.

13   Q    And it was important that this PPM being issued to

14   investors be accurate, right?

15   A    Right.

16   Q    And part of your role, you weren't the only one, but part

17   of your role was to ensure the accuracy of information told to

18   investors?

19   A    Right.

20   Q    Now, let's stay with this document, if you will.

21        MR. COLTON:  If we go to pages 21 and 22 of

22   Government Exhibit 8258-B, pages 21 and 22.

23        (Exhibit published.)

24   Q    This lists a number of key executives or managers of GPB,

25   correct?

*Jacoby - cross - Colton*                                                      1294

1   A    Yes.

2   Q    It lists David Gentile, right?

3   A    Yes.

4   Q    It lists Roger Anscher?

5   A    Right.

6   Q    It lists you, Bill Jacoby?

7   A    Yep.

8   Q    It lists Brian Marshall?

9   A    I don't see him in the thing you're showing me, but it

10  probably does.

11  Q    Sorry.  It also lists Jeffrey Lash?

12  A    Yep.

13  Q    And Scott Naugle?

14  A    I see that.

15  Q    And Mr. Naugle is the chief financial officer of the

16  Auto --

17  A    At that time.  At that time --

18  Q    -- strategy, right?

19  A    At that time I think that's right.  I'm not sure when he

20  stopped.

21  Q    So in putting out information designed to be accurate to

22  investors, nowhere here is the name Jeffry Schneider listed as

23  a key manager or member of GPB, right?

24  A    That's right.

25              MR. COLTON:  Let's go to the next page, which talks

*Jacoby - cross - Colton*                                        1295

1    about the acquisition committee.

2    BY MR. COLTON:

3    Q    The acquisition committee was an important committee,

4    correct?

5    A    Yes.

6    Q    And you were on the acquisition committee, right?

7    A    I think I was -- yeah, I think I was.

8    Q    Okay.  And so was Mr. Gentile?

9    A    Yes.

10   Q    And Mr. Anscher?

11   A    I can't remember.

12   Q    But Mr. Schneider was not on the acquisition committee?

13   A    No, he was not.

14        MR. COLTON:  That's good enough, so we don't have to

15   worry about it.  Thank you, though.

16   Q    Now, this wasn't the only PPM that got issued, right, we

17   also were looking at Government Exhibit 4100.

18        MR. COLTON:  If we could pull that up, that's the

19   one from March 6th of 2015, I believe.

20   Q    Of course, you remember that because it's not been that

21   long ago?

22   A    Right.

23        MR. COLTON:  If we could go to page 25.

24        (Exhibit published.)

25   Q    This, again, in an earlier version of the PPM issued to

*Jacoby - cross - Colton*                                          1296

1  investors, lists the key executives and Mr. Gentile is there;

2  you, Mr. Jacoby, are there; Brian Marshall and Jeffrey Lash,

3  right?

4  A    That's right.

5  Q    But Jeffry Schneider is not listed?

6  A    He is not.

7  Q    Okay.

8        MR. COLTON:  Now, let's jump ahead if we could to

9  page 124, if you will.  This is in evidence about the Code of

10 Ethics.

11 BY MR. COLTON:

12 Q    You remember that GPB had a Code of Ethics, don't you?

13 A    No, I don't, but I'm sure they did.

14 Q    So this document actually says in the last sentence:  To

15 receive a copy of the Code, please contact Bill Jacoby.

16 A    That was in March of '15?

17 Q    Yes.

18 A    Yes.

19 Q    And at that time you were the chief compliance officer?

20 A    I had nobody else to do it at that point.

21 Q    You had that role.

22        As the chief compliance officer, you read the Code

23 of Ethics, right?

24 A    The one that they had at that point, yeah, I probably

25 did.

*Jacoby - cross - Colton*                                          1297

1   Q    And you'd previously served as a chief compliance officer

2   before, right?

3   A    I had.

4   Q    So you understood the role and you understood codes of

5   ethics, right?

6   A    Sure.

7   Q    And one of the big things in codes of ethics typically is

8   not to compete with your current employer, correct?

9   A    That's right.

10  Q    And you knew that?

11  A    For sure.

12         MR. COLTON:  One moment, your Honor.

13         THE COURT:  Sure.

14         (Pause.)

15  Q    Now, Mr. Jacoby, I want to talk about some of these

16  metrics and financial concepts we've been talking about to

17  make sure you and I are on -- not talking past each other when

18  we go into some of the numbers and financial issues, if that's

19  okay?

20  A    Okay.

21         MR. COLTON:  If we could just call up, just for

22  counsel and the Court and witness, Government Exhibit 2004.

23         Bear with me one second.

24         (Pause.)

25         MR. COLTON:  Happy to report, no issue.

*Jacoby - cross - Colton*                                                1298

1          The Government will correct me if I'm wrong, but

2    we'd like to offer 2004 without objection.

3          MR. McCONNELL:  That's fine.

4          THE COURT:  It's in.

5          (Government's Exhibit 2004 was received in

6    evidence.)

7          (Exhibit published.)

8    BY MR. COLTON:

9    Q    I know you weren't at the company in 2013, 2014?

10   A    Right.

11   Q    But you recognize generally what an audited financial

12   statement cover looks like, right?

13   A    Sure.

14   Q    Okay.

15         MR. COLTON:  If we could go to page 5.

16   Q    And largely, I'm not going to ask you about the

17   performance of the funds, I'm just going to ask you about the

18   concepts on the page.

19         MR. COLTON:  Sorry, I'm not on the right page.  I

20   apologize.

21         (Pause.)

22   Q    Can you see that on your screen, Consolidated Statements

23   of Operations?

24   A    Yes.

25   Q    Kind of similar to an income statement, right?

*Jacoby - cross - Colton*                                                1299

1    A    Yeah, it is an income statement.

2    Q    Okay.  So let's go line by line here.

3          The first line is called the total is -- is income

4    or total income, do you see that?

5    A    Yeah.

6    Q    So -- and those terms are often used interchangeably,

7    income, total income, total investment income up on the top

8    line, right?

9    A    It's the revenue.

10   Q    Let me just go slower.

11          So, basically, I just want to understand this,

12   revenue is the same as -- as the top line income, investment

13   income, total income, they're raised -- they're used

14   interchangeably as the top line revenue?

15   A    Yes.

16   Q    And that's basically the -- what's coming up, if you

17   will, from the portfolio companies into the fund?

18   A    Yep.

19   Q    And sometimes one does that on a cash basis, meaning just

20   the cash you really get in the bank account, and sometimes you

21   do it on an accrual basis, which we've talked about which is,

22   in essence, likely and predictably going to come.

23   A    Right.

24   Q    Right?

25   A    Yes.

*Jacoby - cross - Colton*                                                                    1300

1   Q     I grant you, and we'll agree that's a simplified

2   explanation, but that's the concept?

3   A     Yes.

4   Q     So that's the top line.

5   A     Okay.

6   Q     Then there's expenses.  And then the next line below that

7   is net investment income.

8   A     Right.

9   Q     And that's generally the revenue minus the fund level

10  expenses, right?

11  A     That's right.

12  Q     The portfolio expenses, portfolio company expenses have

13  already come out before you get to the top line, right?

14  A     What portfolio --

15  Q     In other words, a portfolio company --

16  A     The dealerships.

17  Q     -- a dealership --

18  A     Okay.

19  Q     -- its expenses have been deducted from its cash before

20  it does any transfer to the fund?

21  A     That's right.

22  Q     Right?

23  A     Yes.

24  Q     So the only expenses we're talking about here are fund

25  level expenses?

*Jacoby - cross - Colton*                                              1301

1    A    Yes, right.

2    Q    Running and operating the business, that is GPB Auto, GPB

3    Holdings, whatever it is?

4    A    Yes.

5    Q    And then there is a line, two lines for unrealized gains.

6              And, in essence, what that means is your assets that

7    you bought, whether it be Google stock or a dealership or

8    whatever, have increased in value, but you haven't yet sold

9    them, right?

10   A    That's right.

11   Q    Okay.

12             So, if, just to use a simplified example, GPB

13   Holdings bought a thousand dollars' worth of Google stock and

14   it went up to be a billion dollars, it would all -- and hadn't

15   been sold, it would all be unrealized gain?

16   A    That's right.

17   Q    And then realized gain, which is not on there, but let's

18   just sort of get it out of the way --

19   A    Well, the net investment income, right?

20   Q    No, I'm just in my example.  If you had sold the Google

21   stock?

22   A    If you had, okay.

23   Q    If you had, then it becomes a realized gain?

24   A    That's right, yeah.

25   Q    And then the last line here is net income?

*Jacoby - cross - Colton*                                    1302

1  A    Yes.

2  Q    So net income, in essence, is the net investment income

3  plus the unrealized gains?

4  A    Yes.

5  Q    So that's all of the concepts, if you will?

6  A    Okay.

7  Q    I just want to make sure you and I are talking about the

8  same thing.

9  A    Okay.

10 Q    Okay.

11        Now, let me give you, just to illustrate, a

12 hypothetical, just so we can understand how these financial

13 statements work.

14        In my -- let me take a step back.

15        It's often, you would agree with me, that one of the

16 metrics also used is not -- strike that.  I'm going to start

17 over.

18        All of these different lines of the income statement

19 have valuable information, correct?

20 A    Okay.

21 Q    Do you agree?

22 A    Sure.

23 Q    Okay.

24        And they are all reasonable metrics for different --

25 for performance in some way?

*Jacoby - cross - Colton*                                          1303

1    A    Okay.

2    Q    And another metric that's not on here, just to complete

3    the discussion, two other metrics, one is net investment

4    income plus realized gains, that you've heard of used in the

5    funds, it's not on here, but you've heard that used, right?

6    A    No.  I -- say that again.

7    Q    Net investment income --

8    A    Right.

9    Q    -- plus realized gains.

10   A    I don't recall hearing that somewhere.  You have to

11   refresh my memory.  Maybe I'm not understanding what you're

12   talking about.

13   Q    We'll go back to that.

14   A    Yes.

15   Q    We'll stay with this.

16           I want to understand if in our Google example, buy

17   it for a thousand dollars, it goes up to, you know,

18   whatever --

19   A    Yeah.

20   Q    -- a billion dollars.

21   A    Right.

22   Q    If you sell it --

23   A    Right.

24   Q    -- then you have whatever, a billion dollars' worth of

25   profit?

*Jacoby - cross - Colton*                                                1304

1    A    Yep.

2    Q    That goes on the net investment income line?

3    A    It would be in the revenue.

4    Q    It would be in the revenue line?

5    A    Yeah.

6    Q    And it would flow all the way through?

7    A    Yeah, capital gains.

8    Q    So it would hit in the investment income line?

9    A    Yeah.

10   Q    Now, assuming you sold it for cash, you would be sitting

11   on a lot of cash, right?

12   A    That's right.

13   Q    Now, let me take the next level.

14        You decide, all right, I don't want to own Google

15   anymore, but I want to own Apple.  So you take that billion

16   dollars and you buy Apple stock, right?

17   A    Yep.

18   Q    You still have the same billion dollars in revenue now?

19   A    Uh-him.

20   Q    But you still have no cash?

21   A    Right.

22   Q    Okay.  So just so we're clear, the net investment income,

23   the net income, they're not necessarily measuring cash and,

24   depending on how you do your transactions, the very same

25   transaction status could look very different, right?

*Jacoby - cross - Colton*                                                    1305

1    A    I'm not sure what you're really asking here.

2    Q    So let me put it to you this way:  Your Google stock went

3    up to a billion dollars?

4    A    Yeah.

5    Q    You have a certain value in the fund, right?

6    A    Yeah.

7    Q    A billion dollars' worth of value?

8    A    Right.

9    Q    But you have no cash?

10   A    Right.

11   Q    You sell it and you keep the cash, you have a ton of

12   cash?

13   A    Right.

14   Q    But the fund is still worth a billion dollars, right?

15   A    Yep.

16   Q    You sell the Google stock and then you buy Apple stock,

17   the fund is still, once again, worth a billion dollars, but

18   you have no cash, right?

19   A    Okay.

20              MR. McCONNELL:  Objection.

21              THE COURT:  Are we going to move on soon?

22              MR. COLTON:  Last question, that was it.

23   Q    Okay.  Let me ask you a few question about form K-1-S

24   that we talked about.

25              Do you remember that?

*Jacoby - cross - Colton*                                        1306

1    A    No, I don't.

2    Q    Okay.  So do you know what a form K-1 is?

3    A    Yes.

4    Q    A form K-1, and I'm not going to spend a lot of time on

5    this, is a tax statement issued to limited partners or

6    investors --

7    A    Right.

8    Q    -- in the GPB funds?

9    A    That's right.

10   Q    Whether it be Holdings I or Holdings II or Auto, correct?

11   A    Yeah.

12   Q    And in your view, the K-1-S were prepared properly,

13   correct?

14   A    I didn't review the K-1-S for accuracy.  I wasn't a tax

15   accountant.  They can be complicated.

16        MR. COLTON:  If we could go to 35 -- just for

17   counsel, the Court and witness, 3500-WJ-2.  Specifically at

18   page 2.  I think I'm doing this right.

19   Q    Okay.  Do you see it on the screen?

20        Now you met with the FBI and the prosecutors all the

21   way back in 2018, correct?

22   A    Is that what this is from?

23   Q    I'll represent to you that the document says August 14th,

24   2018.

25   A    Okay.

*Jacoby - cross - Colton*                                      1307

1    Q    But you did have many meetings, even back all the way to

2    2018, with the prosecutors and the FBI, right?

3    A    Yes.

4    Q    Okay.  And at this -- at those meetings, Mr. Crimmins,

5    your lawyer was there?

6    A    Yes.

7    Q    And you told the FBI that the K-1-S were prepared

8    properly, didn't you?

9    A    To my knowledge they were, yeah, that was my belief.

10   Q    Okay.  Thank you.

11   A    I didn't review them, but I believed that Kyle Brengel

12   created them correctly.

13   Q    Okay.

14   A    He seems like a competent tax accountant.

15   Q    So now I want to talk to you about the concept of

16   coverage.

17            You've heard that throughout your couple of days on

18   the witness stand, haven't you?

19   A    Yeah, and we always talk about it in GPB's nomenclature.

20   Q    I'm sorry?

21   A    We're talking about coverage in the GPB sort of Ascendant

22   version of it, right?

23   Q    We'll find out.

24   A    Okay.

25   Q    We've been talking about 8 percent.  A lot of talk about

*Jacoby - cross - Colton*                                    1308

1    8 percent, right?

2    A    Uh-huh.

3    Q    8 percent distributions?

4    A    Right.

5    Q    And there's a difference, just so we're clear, between

6    8 percent targeted monthly distributions and an 8 percent

7    preferred return.

8              These are two very different concepts, correct?

9    A    Yeah, they are.  One is a hurdle, one is your actual

10   return.

11   Q    And when you say "a hurdle," just so we're clear, that

12   means if there is some exit, a sale of the fund, an IPO --

13   A    Right.

14   Q    -- the investors have to get all their money back?

15   A    That's right, that's the waterfall.

16   Q    Plus the 8 percent?

17   A    That's the waterfall.

18   Q    The 8 percent "hurdle" means GPB gets none of the profits

19   from a sale or an IPO unless the investors already have

20   pocketed all their money plus 8 percent, right?

21   A    At the maturity of the fund, yes.

22   Q    Right.  And that's -- it just happens to both be

23   8 percent, but the preferred return is very different than a

24   targeted monthly distribution, that's all I'm really trying to

25   establish?

*Jacoby - cross - Colton*                                                    1309

1   A    Yes, they're two different things.

2   Q    Yes.

3   A    Okay.

4   Q    Now, when it comes to coverage, coverage is not a term

5   that is -- has got a one specific definition, correct?

6   A    Yes, that's right.

7   Q    It's not something that has a legal definition, to your

8   knowledge, right?

9   A    Banks may have some of it.  It's used in a lot of

10  different things in finance, so yeah.

11  Q    You make a good point.

12         In the context of private equity or alternative

13  investments, coverage does not have one definition in the

14  industry to your knowledge?

15  A    Yeah, I don't think it does.

16  Q    But, in general, it's a comparison between inflow and

17  outflow, basically?

18  A    In general, it's used to describe whether you have the

19  amount of money to cover your debts, that's usually how it's

20  talked about.

21  Q    And that's typically in a lending situation or a bank

22  situation, right?

23  A    Typically, yeah.

24  Q    Okay.

25         But in the private equity or alternative investment

*Jacoby - cross - Colton*                                              1310

1   space, it does not have a specific definition --

2   A     It's not common, yeah.

3   Q     And just to be clear, in your interactions with auditors,

4   they never required a particular formula for coverage, right?

5   A     That's right.

6   Q     And you actually never even talked to the auditors about

7   coverage, right?

8   A     No, this was much more of a marketing term.

9             THE COURT:  Counsel, it doesn't have to be now, but

10  I think we should take a stretch break at some point.

11            MR. COLTON:  Now is fine.

12            THE COURT:  Let's take a ten-minute break.

13            THE COURTROOM DEPUTY:  All rise.

14            (Jury exits.)

15            (Witness steps down and exits the courtroom.)

16            THE COURT:  Just had a juror that was looking tired.

17            MR. COLTON:  Oh, no, I appreciate that the Court

18  asked and I am thrilled to give the jury a break if they need

19  one.

20            How long, your Honor?

21            THE COURT:  Ten minutes.

22            (Recess taken.)

23            (In open court; jury not present.)

24            THE COURT:  Do we have everybody?  I think we do.

25            (Witness enters and resumes the stand.)

*Jacoby - cross - Colton*                                          1311

1        THE COURTROOM DEPUTY:  All rise.

2        (Jury enters.)

3        THE COURT:  Okay, everybody can be seated.

4        Go ahead.

5        MR. COLTON:  Thank you, your Honor.

6    BY MR. COLTON:

7    Q    Okay.  Mr. Jacoby, when we broke for the afternoon break

8    we were talking about coverage and some metrics and things of

9    that nature, right?

10   A    Okay.

11   Q    And I think I recall you testifying, but correct me if

12   I'm wrong, that one of the metrics used to measure "coverage"

13   was net investment income, something we discussed previously?

14   A    Right.

15   Q    But it's also true that net income was compared to

16   distributions to calculate coverage at times, correct?

17   A    I don't recall.  We really just tracked the net

18   investment income because we may have -- I don't remember ever

19   using the net income because being the type of fund it was,

20   you couldn't get a mark-to-market easily, right, because none

21   of the funds -- none of the assets were observable, right.

22   You can't just go out and say:  Well, hey, the value of this

23   dealership changed by a million dollars this month.

24   Q    So let's define a couple of those terms.

25        Mark-to-market means change your books to reflect

*Jacoby - cross - Colton*                                    1312

1   the actual market value of your asset instead of what you paid

2   for it?

3   A    That's right.

4   Q    That's what mark-to-market means?

5   A    Correct.

6   Q    So in our classic Google stock example, if it's just what

7   you paid for it, it's on your books at a thousand; and if it's

8   what it's worth, it's on your books for a billion?

9   A    Right.

10  Q    And with respect to valuations of the assets that were in

11  the GPB funds --

12  A    Right.

13  Q    -- GPB often used an independent third-party valuation

14  company to calculate the valuation, right?

15  A    No, once a year.

16  Q    Okay.

17        Once a year in connection with the preparation of

18  the year-end financial statements?

19  A    Yes.

20  Q    So that wasn't -- that was done by an independent party,

21  right?

22  A    Right, yes.

23  Q    That wasn't just GPB's or you sticking your finger in the

24  air?

25  A    Right.

*Jacoby - cross - Colton*                                                            1313

1  Q    Now, let's take a look at Government Exhibit 7682, which

2  I believe is in evidence.

3           MR. COLTON:  Let's put it up just for counsel, the

4  Court and the witness, just in case.

5           Okay.  It is in evidence.

6           Your Honor, may I publish?

7           THE COURT:  Sure.

8           (Exhibit published.)

9  BY MR. COLTON:

10 Q    So, Mr. Jacoby, this is Government Exhibit 7682.  It's an

11 e-mail from you on February 19th, 2016, to a number of people,

12 including Mr. Schneider, and Mr. Gentile.  Right?

13 A    Yes.

14 Q    And what this e-mail is, is you sending a management

15 dashboard or management report --

16 A    Yeah.

17 Q    -- for the end of December of 2015, right?

18 A    Right.

19 Q    And we'll go into the dashboards in some detail later,

20 but the dashboards are management reports where something that

21 were preliminary indications that you would send regarding the

22 performance of funds, right?

23 A    Yes.

24 Q    Okay.

25           And let's take a look at the second page of this

*Jacoby - cross - Colton*                                          1314

1    document.  There is a set of charts.

2            Do you see that?

3    A    Yes.

4    Q    And if you look at the bottom, the second to the bottom,

5    do you see that, it says "Net Income and Distribution," right?

6    A    Yes.

7    Q    Does that refresh your recollection that sometimes net

8    income was used to calculate coverage and compare it to

9    distributions?

10   A    I think that's probably the -- the net investment income.

11   It's just shortened there.

12   Q    So it says "Net Income"?

13   A    Yeah, but I think --

14   Q    It means net investment income?

15   A    Yeah, that's right.

16   Q    That's kind of confusing, right?

17   A    Yeah, that would be confusing.

18   Q    And you would agree if we go to page 3 of this document,

19   Government Exhibit 7682, it also says "Net Income and

20   Distribution," the third -- the second from the bottom where

21   it's blown up on your screen?

22   A    Can you -- I don't see what you're looking at.  Just can

23   you un-blow it up for a second.  Put it down.

24           MR. COLTON:  May I just for a second?

25           THE COURT:  Sure.

*Jacoby - cross - Colton*                                    1315

1   Q    So, Mr. Jacoby, will you agree with me that the third

2   graph down says "Net Income and Distribution"?

3   A    Yeah, but it's the net investment income.

4   Q    So, again, it's confusing?

5   A    A little bit, yeah.

6   Q    And in all the time you worked on these dashboards, you

7   didn't correct that distinction between net income and net

8   investment income?

9   A    No, because we didn't mark-to-market typically, right.

10  Q    But this is a year-end document for the end of December,

11  it's sent in February for the end of December.

12       So it's certainly possible that the valuations were

13  done, correct?

14  A    No, it couldn't have been done that quickly.

15  Q    Okay.

16       The comparison -- since coverage has no definition,

17  using net income is at least a possible way to compare to

18  distributions, right?

19  A    Yes, yeah.

20  Q    And when you previously met with the Government, you told

21  them that net income is compared to distributions to figure

22  out coverage?

23  A    Meaning the net investment income, yes.

24  Q    But you told them net income?

25  A    I think.  I think there was no difference, unless you

*Jacoby - cross - Colton*                                                    1316

1   were looking at a year-end where the once a year when we do

2   that, but...

3   Q    So, again, it's confusing?

4   A    Sure.  Definitely needs clarification.

5        MR. COLTON:  Sorry.  When I shuffle, I'm trying to

6   skip pages.  That's actually a good thing.

7   BY MR. COLTON:

8   Q    Now, again, there are also times during the course of

9   your time at GPB that coverage was calculated by comparing the

10  investment income or the total income to the distributions,

11  correct?

12  A    You confused me.

13  Q    So let's take a look, if you will, at --

14       MR. COLTON:  Just for counsel, the Court and the

15  witness.

16  Q    -- DX-Jacoby 9.

17       Can you just take a look at that and read it to

18  yourself, please?

19  A    (Witness complies.)  All right.

20  Q    All right.  So let me ask a couple of questions.

21       You've been talking about distributions being

22  supposed to come from the cash flow from the operations,

23  right?

24  A    That's right, yes.

25  Q    And does this document refresh your recollection that at

1  times --

2          THE COURT:  Sustained.

3          I think I was looking for the question to which he

4  responded that he didn't remember something or didn't recall

5  something, and all I've got is "You confused me," and then

6  you're showing him the document.

7          MR. COLTON:  Let me try to lay a foundation.

8  BY MR. COLTON:

9  Q    When I asked you was total investment income used as a

10  comparison to distributions in order to measure coverage, and

11  you said "you confused me," was that you saying I don't recall

12  that or you saying you didn't understand my question?

13  A    I don't recall the term total investment income being

14  used ever.

15  Q    Now, in light of that testimony, and looking at the

16  document, does it refresh your recollection that total

17  investment income was used as a measure of operating cash

18  flow?

19  A    I think from reading this, I'd have to talk to Jordan.

20  If I got this e-mail, I would have called him and I would have

21  said --

22          THE COURT:  I think the question is just if it

23  refreshes your recollection as to a fact or not.

24          THE WITNESS:  Yes.

25          THE COURT:  And so it's either yes or no as to that.

*Jacoby - cross - Colton*                                    1318

1       THE WITNESS:  I don't -- I don't recognize this.  I

2   need to have it clarified.

3   Q    Let's take a look at a different document.

4       MR. COLTON:  And just tried to use that to refresh,

5   not offering.

6   BY MR. COLTON:

7   Q    Defense Jacoby 13.

8       Do you see the document Defense Jacoby 13 in front

9   of you?

10  A    Yes.

11  Q    Okay.  Do you recognize the document?

12  A    No.

13  Q    Just looking at number 4, I'm not going to read it, it

14  has a reference to Bill.

15      THE COURT:  Okay.  Let's -- if you want him to read

16  it to himself and ask him if it refreshes his recollection

17  that would be fine, but let's not read any portion of the

18  document.

19      MR. COLTON:  That was the only word I was going to

20  say, just to point him to a section of it.

21      (Pause.)

22      THE WITNESS:  Okay.  You had a question about that

23  section.

24  Q    I have a question about whether you recognize the

25  document or what it is, let's start there?

*Jacoby - cross - Colton*                                                    1319

1   A    I don't recognize the document.  I know what it's talking

2   about.

3   Q    Does the document accurately reflect the process for

4   updating management dashboards?

5   A    Yeah.  It's talking about some process that we were using

6   to get that -- those pictures that you showed me in the

7   previous slide.

8              MR. McCONNELL:  Objection.

9              MR. COLTON:  I'm not done asking questions about it

10  to try to lay the foundation.

11             If I may, your Honor.

12             THE COURT:  Go ahead.

13  BY MR. COLTON:

14  Q    Does the document accurately portray the process that you

15  as CFO at GPB used or oversaw for updating the management

16  dashboards?

17  A    At this point in time, I think that's probably true.

18             MR. COLTON:  On that record, I offer it.

19             MR. McCONNELL:  Can we see the rest of it, please?

20             MR. COLTON:  I don't know that there's more than

21  that, but sure.

22             Is there anymore to it?

23             THE COURT:  Is there an objection or no objection?

24             MR. McCONNELL:  One moment, Judge.

25             MR. COLTON:  The Government asked to see if there

*Jacoby - cross - Colton*                                          1320

1   was more of it, so I'm looking for a hard copy.

2            THE COURT:  Okay.

3            MR. AXELROD:  Do you have a hard copy?

4            MR. COLTON:  I'm looking.  Here it is.

5            (Pause.)

6            MR. COLTON:  So, your Honor, there is no objection

7   to the first page of Jacoby, Defense Jacoby 13.

8            THE COURT:  Is that what you're offering, so you're

9   offering the first page?

10           MR. COLTON:  Correct.

11           THE COURT:  Okay.  Admitted.

12           (Defense Exhibit Jacoby 13 was received in

13   evidence.)

14           MR. COLTON:  And we'll make a note to remove the

15   rest of it.

16           (Exhibit published.)

17   BY MR. COLTON:

18   Q    So now if we look at Defense Jacoby 13 in evidence, at

19   least the first page that we're looking at.

20           If you look at Number 3, do you see that?

21   A    Yes.

22   Q    That references the phrase "investment income," correct?

23   A    He means revenue there.

24   Q    Okay.  And nowhere on this proposed process for updating

25   the management dashboards does the phrase either net income or

*Jacoby - cross - Colton*                                          1321

1  net investment income appear, correct?

2  A    No.

3  Q    Okay.  And it was important to have revenue populate onto

4  the dashboard, right?

5  A    Yes.

6  Q    And it was important, revenue meaning investment income

7  or total investment income, we're using them all

8  interchangeably, right?

9  A    I think we're getting confused.

10 Q    Okay.  I don't want that.  Tell me the distinction.

11 A    There's revenue, there's expenses, there's net investment

12 income.

13 Q    Right.  And we looked at the top of the chart, remember,

14 of the audited financial statement and you said:  Oh, it says

15 total income or investment income and that's revenue; remember

16 that?

17 A    Yes, right.

18 Q    Okay.

19        So, revenue, there's a number of terms being used

20 for revenue basically, right, not on this document, but in the

21 conversations we're having?

22 A    Okay.

23 Q    Am I right about that?

24 A    Say it -- what's your question again?

25 Q    When the phrase investment income is used or total income

*Jacoby - cross - Colton*                                              1322

1    is used, I believe what you said earlier is that's revenue, I

2    think that was your answer?

3    A    Right.  Right.  I recall you saying that, yeah.

4    Q    And my recollection of your answer, that's revenue is

5    correct?

6    A    Right, right, right.

7    Q    Now, let's talk about timing.

8              When we are talking about coverage, you can measure

9    it over different time periods, right?

10   A    Yes.

11   Q    So you could measure it over a month, right?

12   A    Yes.

13   Q    Or a quarter?

14   A    Right.

15   Q    Or a year?

16   A    Yes.

17   Q    Or what they call TTM or trailing twelve months, the last

18   twelve months?

19   A    You could do that if you like.

20   Q    Right.  And these are all things that are time periods

21   that are used in financial reporting, right?

22   A    Sure.

23   Q    And you, of course, can do what they call

24   inception-to-date, right?

25   A    You could.

*Jacoby - cross - Colton*                                           1323

1  Q    And inception-to-date means from the beginning of the

2  fund?

3  A    Right.

4  Q    Okay.

5        And from the beginning of the fund means, in

6  essence, that in a silly example, if you are a million dollars

7  over -- have a million dollars more than you need in the first

8  year and, you know, a hundred dollars less than you need in

9  the second year, the two years together from inception you

10 still have -- you're still way over, right?

11 A    You could be, yeah.  That's possible.

12 Q    So in a business concept, if you have additional earnings

13 in your first year, but you're short the second year, you can

14 use those additional earnings from the first year to pay out

15 because you have them in reserve, right?

16 A    You could.

17 Q    Okay.  There's nothing wrong with that?

18 A    You'd have to give me an example to look at.

19 Q    So, let's use the funds.

20 A    Okay.

21 Q    If the fund was to take in whatever metric we're using,

22 let's not debate the metric, but the metric we're using, the

23 income --

24 A    So this is a hypothetical?

25 Q    Yes.

*Jacoby - cross - Colton*                                          1324

1   A      Okay.

2   Q      Because it's conceptual, and then we can build off of

3   that.

4          The income is a million dollars more than the

5   distributions paid.

6   A      So net investment income.

7   Q      Let's use that, fine.

8   A      Okay.

9   Q      Net investment income is a million dollars more than the

10  distributions paid in the first year.

11  A      Okay.  Got it.

12  Q      In the second year, if you're a hundred-thousand dollars

13  short, you can use some of the overage from the first year to

14  pay the distributions because you're still over all in, right?

15  A      You have extra cash, yes.

16  Q      Right.

17         So you would have extra cash or extra revenue, or

18  whatever the metric is?

19  A      Retained earnings.

20  Q      So, it's completely reasonable in your view as a longtime

21  CFO to look at the life of the fund and the amount of, in your

22  example, net investment income versus the life of the fund's

23  distributions, right?

24  A      You could do that.

25  Q      And that's not unreasonable?

*Jacoby - cross - Colton*                                                     1325

1    A    It doesn't -- yeah, what you're saying is just generic.

2    Q    Okay.

3           So when you take a look at coverage or cash flow

4    from operations, it's not necessary to measure it every day,

5    is it?

6    A    No.

7    Q    Okay.  And it's not necessary to measure it every week,

8    you don't have to create cash or revenue every week to equal

9    your distributions, right?

10   A    No.

11   Q    You would do it over -- you would measure it over a

12   longer period of time?

13   A    Right.

14   Q    And businesses are cyclical, right?

15   A    Yes.

16   Q    And the auto business is a classic cyclical business,

17   right?

18   A    Right.

19   Q    For one reason, people by cars at different times of the

20   year more than others, right?

21   A    Sure.

22   Q    And from a revenue perspective, for an auto dealer,

23   typically there is higher revenue at the end of the year

24   because you get your management -- you get your rebates from

25   the manufacturer, right?

*Jacoby - cross - Colton*                                      1326

1    A    Okay.

2    Q    Meaning sometimes they come in in the first quarter of

3    the next year, right?

4    A    Okay.

5    Q    Am I right?

6    A    Yes.

7    Q    Okay.  So that's why it makes more sense generally to get

8    an accurate measure looking over a longer period of time than

9    just a week or a month, right?

10   A    Well, it makes more sense about what?

11   Q    To measure the performance of the business and how it is

12   doing.

13   A    To measure the performance of -- meaning the

14   profitability of the business?

15   Q    Sure, yes.

16   A    Okay.

17   Q    You agree?

18   A    Yes.

19   Q    Forgive me if I am vague about this, but I am going to

20   try to do this.

21        A business's performance is what it is, right, it

22   doesn't change based on what metric you're measuring, right?

23   A    I don't understand the question.

24   Q    Let me put it this way:  The wall behind you is largely

25   white, correct?

*Jacoby - cross - Colton*                                            1327

1    A    Okay.

2    Q    If I put on red glasses, even though it looks red to me,

3    it's still white?

4    A    Okay.

5    Q    If I put on green glasses, it's still white?

6    A    Okay.

7    Q    So in the case of the performance of a business, whether

8    you look at one metric or another, it doesn't change the

9    reality of what happened, because what happened happened?

10   A    That's right.

11   Q    Okay.

12        Now, let's talk about, you said you didn't have much

13   exposure to the question of coverage before you started at

14   GPB, is that right?

15   A    I had never looked at it this way.

16   Q    Okay.  And you'd been involved in a lot of different

17   kinds of investments, right?

18   A    Yes.

19   Q    Had you been involved in alternative investments?

20   A    Yes.

21   Q    And alternative investments, if I'm right about this, are

22   things that are not classic like a stock or a bond, right?

23   A    Well, I think you're -- so I could try to explain it.

24   Q    I'm going to do it.

25        Ordinarily you don't do this in cross-examination ,

*Jacoby - cross - Colton*                                               1328

1   but in your mind what is an alternative investment?

2   A    So I think you're generally referring to hedge funds,

3   private equity and private lending.

4   Q    What about REITs, alternative?

5   A    You want to call that alternative.  I don't know.  I

6   don't think that's really that much of an alternative.  I

7   guess you could call it an alternative.

8   Q    So it's all alternative, also is typically what you

9   talked about the other day where you need to be, it's not

10  registered with the SEC such that you need to be an accredited

11  investor to participate, right?

12  A    Yes.

13  Q    And you had had substantial experience in the alternative

14  investment area before you joined GPB, right?

15  A    Yes.

16  Q    And coverage was not something you looked at, correct?

17  A    That's right.

18  Q    And, therefore, I guess you would say that you had never

19  had conversations with your investors about coverage?

20  A    That's true.

21  Q    And had never had conversations with your auditors about

22  coverage?

23  A    That's true.

24  Q    And in your time at GPB, you personally didn't deal with

25  any investors who asked questions about coverage, right?

*Jacoby - cross - Colton*                                          1329

1   A     I don't think that's true.  I think I did have probably

2   some passing questions about that.

3   Q     Okay.

4   A     I don't recall specific ones, but I do recall people

5   coming through the office.

6   Q     In one of your meetings with the prosecutors and the FBI,

7   do you recall telling them that you never heard of an investor

8   questioning the origins of distributions?

9   A     Yeah, I don't -- that's probably true.

10           MR. COLTON:  One second, your Honor.

11           (Pause.)

12  BY MR. COLTON:

13  Q     So I'd like to show you, the witness, Counsel and the

14  Court, what's been marked as Defense Jacoby 10-B.

15           Do you recognize that?

16  A     No.

17  Q     We talked earlier about the thumb drive of material that

18  were stolen from GPB.

19           Do you remember that?

20  A     Yes.

21  Q     I'm not going to describe what's on the screen in any

22  way, but does it refresh your recollection --

23  A     No, I must have accidentally got it because I don't

24  recognize it at all.

25  Q     Okay.  I'll move on.  That's one question, I guess.

*Jacoby - cross - Colton*                                              1330

1          It's fair to say that the material that was

2    displayed to you, which I am not going to describe, that you

3    took from GPB was actually not even about GPB?

4    A    I have no recollection of that at all.  So I don't

5    know -- if it got on my material, I don't know how it did.

6    Q    Okay.

7          But you are the one who did all the downloading of

8    the material onto the thumb drive to take it, right?

9    A    Yeah.  Maybe it was in something that I didn't know it

10   was there.  I don't know.  I don't recognize it at all.

11   Q    Because what you took on the thumb drive when you left

12   GPB was voluminous and you couldn't remember everything you

13   took, right?

14   A    Probably.  It certainly wasn't intentional to take

15   something like that, that I don't recognize.

16   Q    But it was a lot of stuff and you couldn't take the time

17   to review everything that you were taking, basically is what

18   you're saying?

19   A    That's probably true.

20          MR. COLTON:  I'm sorry, one second.

21          (Pause.)

22   Q    Okay.  Now, with respect to the concept of coverage and

23   use of investor capital to pay distributions, a lot of

24   discussion about that, right?

25   A    Yes.

*Jacoby - cross - Colton*                                          1331

Q    Okay.

        Is it your position, I just want to understand it,
that if, we'll use the metric net investment income, is less
than distributions, that means that investor capital was used
to pay the distributions?

A    No, because included in the net investment income can be
accruals at the end of not collecting.  So, it can be too
large.

        But for the -- but -- rephrase the your question.
Ask me it again, please.

        MR. COLTON:  I will, but I'd like to hear the answer
read back.

        THE WITNESS:  Yeah, maybe I didn't understand you.
It's getting confusing.  I'm sorry.

        MR. COLTON:  I'm trying not to.

        But if I could have the answer read back, Judge.

        I'm sorry, your Honor, I don't know if I'm allowed
to ask the Court reporter directly, so I'm going through --

        THE COURT:  Okay.  You can go ahead and read back
the last answer.

        MR. COLTON:  Thank you.

        (Record read.)

        MR. COLTON:  Okay, I will rephrase the question.
Thank you.

BY MR. COLTON:

*Jacoby - cross - Colton*                                        1332

1    Q    Coverage is meant to determine the source of the

2    distributions paid to the investors, right?

3    A    No, I don't -- I don't think so.  I think it's just meant

4    to -- for the -- for them -- for the marketers to give comfort

5    that the payments that are being made to them are from

6    profits.  I think that's the -- I think that's the meaning of

7    using it in marketing.

8    Q    Profits of the portfolio companies?

9    A    Profits of the portfolio companies, yes.

10   Q    And the profits of the portfolio companies become the

11   revenue --

12   A    Cash.

13   Q    -- of -- well, hold on -- the profits of the portfolio

14   company that are paid to the fund become the revenue of the

15   fund, right?

16   A    Yes.

17   Q    And you can accrue expected payments from the portfolio

18   companies if they meet the various likelihood requirements and

19   certainty requirements, right?

20   A    Right.

21   Q    So, in other words, if I have no idea when I'm getting

22   paid or how much, you can't accrue it?

23   A    That's right.

24   Q    If you have a good faith basis to figure out how much I'm

25   gonna get and I'm gonna get it within a reasonable period of

*Jacoby - cross - Colton*                                                        1333

1   time, you accrue it?

2   A    Right.

3   Q    And that's the right way to do it?

4   A    That would be okay.

5   Q    And if it turns out you don't get paid, you can always

6   reduce it later?

7   A    That's right.

8   Q    So in your mind, how do you figure out looking at a

9   financial statement that we just looked at, the source of the

10  distributions paid to investors?

11  A    Me?

12  Q    Yes.

13  A    I would look at the income statement and I'd look at the

14  cash flow statement and I'd look at the balance sheet, and I'd

15  try to figure it all out.  So it's not simple.

16  Q    So it's a very complicated process?

17  A    It can be.  I mean some people think it's like, you know,

18  make yours hair hurt because they can't -- you know, they

19  don't enjoy reading those things.  Some people find it

20  interesting.

21  Q    Mine already hurts.

22  A    Right.  So I'm starting to get to that point, too.

23  Q    So, it's hard for you as a thirty-year financial veteran

24  to figure out the source of distributions?

25  A    Yeah.

*Jacoby - cross - Colton*                                              1334

1   Q    Not impossible I'm saying, but hard?

2   A    Yeah.  No, I think it can be difficult and it may need

3   some conversation depending on what you're looking at.

4   Q    And I take it if it's hard for you as a thirty-year

5   financial professional with a Master's in accounting, it would

6   be harder for someone without all of your training?

7   A    Yes.

8          MR. COLTON:  I'm sorry, your Honor.  Can I have one

9   minute?

10          (Pause.)

11  BY MR. COLTON:

12  Q    Mr. Jacoby, when you testified earlier in this trial, you

13  were asked whether investor capital was ever included in

14  distributions, and you said:  It's been happening since I

15  arrived at the company.

16          Do you remember that?

17  A    Yes.

18  Q    That's your testimony?

19  A    That's my recollection.  So if you want to refresh my

20  memory and I can look at something and see what you're talking

21  about.

22  Q    Okay.  So let's take a look at some documents.  In fact,

23  let me step back.

24          You were pretty emphatic about it.

25  A    Yes.

*Jacoby - cross - Colton*                                        1335

1  Q     You were asked:  The distributions paid on a monthly

2  basis to investors are supposed to come from profits?

3            And you said:  Yes.

4            And you were asked:  Did it?

5            And you actually said emphatically:  Nope.

6            Do you remember that?

7  A     Yes, yes.

8

9            (Continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jacoby - cross - Colton                                    1336

1    BY MR. COLTON:   (Continuing.)

2    Q    So it's your testimony that the distributions never came

3    from anything other than investor capital?

4    A    I didn't say never.

5    Q    It just didn't happen in the time that you were there?

6    A    What I'm saying is that they're making dividend payments

7    using new investors' cash.

8    Q    So, let's test that.

9    A    Okay.

10   Q    In my example, now I think probably it's the most tired

11   Google example, I come into your fund, I give you $1,000, you

12   invest it.  And then Mr. X comes in the next month.  You've

13   done great.  The $1,000 is now up to a billion.  You've taken

14   $1,000 from Mr. X in order to pay me $80 -- if you pay me $80,

15   it's from investor capital even though we have a billion

16   dollars worth of stock in the fund?

17   A    Mark to market?  Is that what you're talking about in

18   your hypothetical?

19   Q    Yes.

20   A    So that would never happen, what's you're talking about

21   in your hypothetical.

22   Q    But what I want to know, and correct me if I'm wrong, it

23   can't just be the amount of cash in the bank account to

24   measure the source of distributions?

25   A    If you're advertising to people that you're only going to

Jacoby - cross - Colton                    1337

1   pay them cash that you have, free cash flow.  You're saying I
2   have free cash flow then, yes, it cannot be anything but free
3   cash.
4   Q    So, it's your position and the way you ran the finance
5   operation of GPB, is that even though you were doing accrual
6   accounting, presenting financial statements on an accrual
7   basis, you only tried to figure out the cash by looking at
8   various different financial statements to see whether investor
9   capital was used for distributions?
10             MR. McCONNELL:  Objection.
11             MR. COLTON:  I'll rephrase it if it makes it easier.
12             THE COURT:  Okay, great.
13  BY MR. COLTON:
14  Q    It's your position that the way you ran the company, the
15  finance operation of the company, that it was solely
16  cash-based determination of source of distributions,
17  irrespective of the revenue, net investment income or net
18  income of the fund?
19  A    Can I explain?
20  Q    I'm actually going to say yes.
21  A    Okay.  I believe that the PPMs, the due diligence
22  documents and the slide shows say that they will pay cash
23  dividends from the free cash that is available.  So, if it's
24  not available that's telling me that you're telling the
25  investor you won't pay him unless the cash is available.

Sophie Nolan, RCR, RPR - Official Court Reporter

Jacoby - cross - Colton                    1338

1           So, in your example, if I have a billion dollars in
2    mark to market profit from Google and I know it's that because
3    it trades in the New York Stock Exchange, I could not pay you
4    because I haven't realized it.

5    Q    What about the situation where you sold the Google and
6    you bought the Apple and you did realize it?

7    A    You realized it, but you used it so you don't have free
8    cash.

9    Q    So no matter how successful the fund is, it's purely the
10   cash sitting around is your position?

11   A    It's defined by what you told people.  That's what I'm
12   saying.

13   Q    That's based on your interpretation of the documents?

14   A    Yes, that's what I read.

15   Q    But it is fair to say that for a lot of your tenure, even
16   in net investment income metric exceeded the distributions for
17   the funds you oversaw, isn't it?

18   A    Yes, there was mark to market -- there was receivables in
19   that number.

20   Q    Let's just take a look at a couple of them to figure that
21   out.

22   A    Let's do that.

23   Q    The good news is that I just skipped three documents.  If
24   we could take a look at Government Exhibit 2041 just for
25   counsel, the Court and the witness, please?

Jacoby - cross - Colton                    1339

1        (Exhibit published to witness, Counsel and Court only.)

2   Q    Do you recognize Government Exhibit 2041?

3   A    Can I see more of it?

4   Q    Sure.

5   A    I probably will, but I'll know if I can see it.

6        MR. COLTON:  Scroll just a couple of pages, please,

7   Michelle.

8   A    Stop. (Reviewing.)  Okay, next page.  Keep going.  Okay.

9        It's an unaudited quarterly update.

10  Q    So, this is a quarterly report for Holdings I, the fund

11  that was issued while you were CFO?

12  A    March of '15, yeah, so it looks like it's right when I

13  started.

14       MR. COLTON:  We offer Government Exhibit 2041,

15  Judge.

16       MR. McCONNELL:  No objection.

17       THE COURT:  It is admitted.

18       (Government Exhibit 2041 received in evidence.)

19       (Exhibit published.)

20       MR. COLTON:  If we could take a look at page nine of

21  the document.

22  A    Could you make it bigger for me, please?

23  Q    Yes, we're going to do that.  Can you read that or would

24  you like it bigger?

25  A    No, it's good.

Jacoby - cross - Colton                                    1340

1   Q    You'll agree with me, I think, that the net investment

2   income for the first quarter in Holdings I --

3   A    Yeah.

4   Q    -- was 2.03 million.

5   A    Right.

6        MR. COLTON:  And if we could now go to page ten, if

7   we can blow that up a little bit.

8   Q    And you would agree that as compared to the 2.03 million

9   of net investment income, the distributions were 1.39 million;

10  right?

11  A    Right.

12  Q    So in the first quarter, the first quarter you worked as

13  the CFO of GPB, the distributions were covered and covered

14  substantially by the net investment income?

15  A    Can we look at the balance sheet?

16  Q    I'm asking you a question that's --

17  A    I have to take a look at the balance sheet to answer your

18  question.

19  Q    So I'll ask it a different way.  Net investment income

20  produced by the fund, Holdings I, for the first quarter of

21  2015 when you started was greater than the distributions paid

22  out?

23  A    That's true.

24       MR. COLTON:  And if we could go back to page nine,

25  please.

Jacoby - cross - Colton                          1341

1   Q    And you'd agree that the other metrics we discussed, both

2   total income and net income, are greater than the

3   distributions paid in that quarter?

4   A    You just said the same thing, right?

5   Q    Net income, net investment income and total income, all

6   three different metrics were greater than the distributions?

7   A    Right.

8   Q    Okay.  Now, let's go to the next document --

9   A    You didn't look at the balance sheet.

10  Q    What would you like to see in the balance sheet?  Let's

11  go to the balance sheet.

12  A    Yeah, let's do that.

13            (Exhibit published.)

14  A    Okay, make that bigger, please.  Okay.  Remember

15  2,204,866.  That's income receivables.  Can you go to the

16  distribution page.  It's 2,204,000.

17  Q    I don't know what you're looking at, sir.

18  A    The fourth line down.

19  Q    Got it, okay.

20  A    Okay.  Let's go back to the income statements.

21  Q    I think I see your point.  Your point is, again, it

22  doesn't matter how you measure coverage, it's solely pure

23  green cash that you're talking about?

24  A    Can you make this bigger again?

25  Q    Sure.

Jacoby - cross - Colton                                    1342

1   A    So that's distributions, right?  You also have

2   syndication and offering costs of 8 million.  So, of the 49

3   million that you took in, you paid out 8 million, and you paid

4   out 8.4 million, and you paid out 1.4 million in

5   distributions.  Yet when you go to the first page in the

6   income statement, you made $2 million net investment income,

7   of which you collected none.  So all of that is investors'

8   cash.

9   Q    It's all investors' cash because you accrued revenue that

10  you say is reasonably certain to come in and that's your

11  contention of the problem?

12  A    My contention is that you said you would only distribute

13  it --

14  Q    I'm not asking you that question, sir.

15         I'm asking if you're telling me that the grand

16  problem here is that properly accrued revenue shouldn't count;

17  is that right?

18  A    I didn't say that.

19  Q    It seems to be what you said because what you're saying

20  is only cash matters -- hold on a minute.

21         Forget about what I think the documents say or you

22  think the documents say because they say what they say.  I'm

23  talking about how you conducted your job, and you're telling

24  me that if somebody were to define whether investor cash was

25  used by comparing net investment income to distributions, they

Jacoby - cross - Colton                    1343

1  would be doing it wrong?

2  A    I didn't say that either.  I said if you tell people that

3  you're going to pay them dividends with free cash flow, then

4  you have to do that.

5  Q    And you say free cash flow?

6  A    Available cash.  So, retained earnings from your example

7  before --

8  Q    Hold on a minute.  Hold on a minute.  Hold on a minute.

9  I'm asking a very specific question:  If someone were to say

10 that you determined whether investor cash is used to pay

11 distributions by comparing net investment income to

12 distributions, your position, yes or no, is that's wrong?

13 A    I didn't say it was wrong, no.  There's lots of different

14 ways -- like you said before, there's lots of things you can

15 do lots of different ways, but here investor cash was used to

16 pay the distributions.

17 Q    Even though the fund performed, earned revenue, that was

18 greater than the distributions paid?

19 A    That's right.  And it would be one thing like you were

20 saying, oh, but if you catch it up, every quarter it keeps

21 happening.  Here you go.

22 Q    Just a second.  If you accrue revenue there's a good

23 faith basis to believe there's certain an amount and it will

24 come in, correct, or you as a CFO wouldn't do it; right?

25 A    That's right.

Jacoby - cross - Colton                    1344

1    Q    And if it turns out you make a mistake, it didn't come

2    in.  You take it off.  You minus it out, right?  It happens

3    every single day; right?

4    A    Sure.

5    Q    Okay.  So, as a general matter there's absolutely nothing

6    wrong with I just described?

7    A    As a general matter you can accrue for receivables.

8    Q    And you're saying that even if the fund had real revenue

9    that was reasonably certain to come in and properly accrued by

10   somebody like you with tremendous accounting background, it's

11   still improper to pay distributions until the cash lands,

12   that's your view yes or no?

13   A    Yes, would not pay the dividends until the cash is in the

14   bank.

15   Q    So really it doesn't matter about the health of the

16   business?

17   A    It does, but if I tell people I'm going to pay you with

18   cash, I'm going to do it that way.

19   Q    The business is healthy if it has a substantial revenue

20   stream and substantially certain revenue coming in such that

21   it can be accrued and that's greater than its expenses, right?

22   A    Yeah.  You don't have to make a distribution.

23   Q    Yes, the business is healthy if it has real revenue that

24   is properly accrued and exceeds its expenses, yes or no?

25   A    Yeah.

Jacoby - cross - Colton                    1345

1   Q    Okay.  Thank you.  So I'm going to jump ahead a little

2   bit here.  There's been a lot of finance talk so I want to be

3   sure I got this before I show you the next document.

4            Your position is that -- let's even talk about Auto

5   Fund.

6   A    Okay.

7   Q    That the distributions were not from the operations?

8   A    Yes.

9   Q    Since the time you started?

10  A    I think the distributions were made from new investors'

11  deposits.

12  Q    Let's take a look at Government Exhibit 7827, please.

13           (Exhibit published to witness, Counsel and Court only.)

14  Q    Take a moment to look over the document.

15  A    Can you make it larger?

16  Q    This is an e-mail you authored; correct?

17  A    Yes.

18  Q    And you wrote it to Mr. Sijan; right?

19  A    Right.

20           MR. COLTON:  Your Honor we offer Government Exhibit

21  7827.

22           MR. McCONNELL:  Can I see the whole document,

23  please?

24           MR. COLTON:  Can I give you a paper version so it

25  will be faster?

Jacoby - cross - Colton                              1346

1          MR. McCONNELL:  Sure.

2          No objection.

3          THE COURT:  It is admitted.

4          (Government Exhibit 7827 received in evidence.)

5          MR. COLTON:  Permission to publish.

6          (Exhibit published.)

7   BY MR. COLTON:

8   Q    The top is an e-mail you wrote on November 24, 2015 to

9   Mr. Sijan; right?

10  A    Yes.

11  Q    And it was basically answering a question that he asked;

12  right?

13  A    Yeah.

14  Q    Okay.  Let's -- let's start on page two of this document,

15  if we could.  In the middle of the page there's an e-mail that

16  Mr. Sijan had forwarded to you from Mr. Dattolo, right?

17  A    Yes.

18  Q    And Mr. Dattolo is asking -- relaying a question from a

19  broker named Ghabour; right?

20  A    Yes.

21  Q    Okay.  And, again, this e-mail that's entitled, "How do

22  we want to answer this" the broker's questions are forwarded

23  to you?

24  A    Yes.

25  Q    And you answered the question; correct?

Jacoby - cross - Colton                          1347

1   A    Yes.  And I spoke to them on the phone as well.

2   Q    But your answer just sticking with the exhibit is

3   regarding Auto Fund; right?

4   A    Yes.

5   Q    You write "Through the first quarter, the fund has been

6   able to offer distributions with" --

7   A    "Third quarter."

8   Q    -- "operations for a few reasons."  Right?

9   A    It's through the third quarter.

10  Q    I'll read it again to make sure the record is correct.

11  "Through the third quarter, the fund has been able to cover

12  the distributions with funds from operations for a few

13  reasons."  That's what you wrote?

14  A    Correct.

15  Q    And this is for the first three-quarters of 2015;

16  correct?

17  A    Right.

18  Q    So three-quarters at which you were present at quarter

19  end as CFO of GPB?

20  A    Right.

21  Q    So contrary to your prior testimony that the fund had

22  never had sufficient funds from operations, now you're saying

23  the fund had sufficient operations for three quarters;

24  correct?

25  A    Well, in the discussion here and using the GPB and

Jacoby - cross - Colton                    1348

1    Ascendant description I'm confirming to him that the reason

2    that we had been saying it has coverage, okay, is because we

3    had all of these accruals on the books; specifically money

4    from Planet Honda and money from Bruce Rogers Chrysler in

5    Maryland.

6              So because we had accruals from those profits that

7    was $2 million worth of profits at this point that's why it

8    looks like we had coverage.  That's what I'm saying.

9    Q    And that's how you're telling --

10   A    Jovan.

11   Q    -- Mr. Sijan --

12   A    Right.

13   Q    -- to answer the broker.

14   A    If you go down, I'll show you what the question was.

15   Q    I'll be happy to do that in a moment but I would like you

16   to answer my question, which is, the statement through the

17   first -- strike that.  "Through the third quarter the fund has

18   been able to cover the distributions with funds from

19   operations for a few reasons."

20             That is part of what you basically told Mr. Sijan

21   can be told to the broker asking questions; right?

22   A    Right, if you read the whole thing it says --

23   Q    Let's do that.  The rest of what you read is as follows:

24   "First is the three-month delay from when capital is accepted

25   and when distributions pay out.  We raised a significant

Jacoby - cross - Colton                    1349

1  amount of capital since the end of the second quarter, 55

2  million, which would begin to receive distributions in the

3  fourth quarter.  Additionally, we are closing on a GMC store

4  shortly where the money has been in escrow and will collect

5  accruals of profits back to the date of deposit.

6            "Secondly, we have a manufacturer bonus pending to

7  be paid from GM in three traunches.  We have hit one of those

8  milestones and that bonus money will be paid to us from GM."

9            That's what it says?

10 A    Right.

11 Q    So you are saying to tell a broker we have covered with

12 funds from operations for three-quarters of 2015 because of

13 the money that you're expecting to come in?

14 A    I wasn't saying to tell a broker that.  I had a

15 conversation with Jovan explaining how to calculate.  If you

16 go down to his question I'll clarify it.

17 Q    One more question based on what you just said.  Jovan

18 Sijan sends you an e-mail entitled "How do we want to answer

19 this?"

20 A    Right.

21 Q    And your testimony is that you didn't realize that that's

22 how they were going to answer a broker?

23 A    I was giving him more information so he could respond to

24 the broker.

25 Q    And if he provided the information that you provided to

Jacoby - cross - Colton                          1350

1    him --

2    A    Yes.

3    Q    Let me strike that.  If Mr. Sijan provided the

4    information to a broker that you Mr. Jacoby provided to

5    Mr. Sijan?

6    A    I was explaining it to you.

7    Q    So would Mr. Sijan have been misleading the broker?

8    A    Well, I depends on what he to him.

9    Q    He quoted it.

10   A    Then the broker would know what I'm saying hopefully or

11   ask me.

12   Q    So it was perfectly acceptable to you if the broker was

13   told exactly --

14   A    Yes.

15   Q    -- what you told him?

16   A    Yes, yes.  Can we look at what he asked because I'll

17   explain it.

18   Q    Sure.

19   A    Right, so Mr. Ghabour is talking to Joe Dattolo and he

20   correctly picks up that there's been 132 million dollars in

21   the fund and only 27 million invested so why are you guys

22   paying out dividends that's the question.

23   Q    And you answered?

24   A    And I answered we have a lot of a rules that haven't come

25   in this layman's terms.

Sophie Nolan, RCR, RPR - Official Court Reporter

Jacoby - cross - Colton                                1351

1   Q    That was a perfectly good answer?

2   A    It was an answer.

3   Q    And you approved?

4   A    It was the truth.

5        MR. COLTON:  Let's take a look at Government Exhibit

6   8048, please.  Just for counsel, the Court and the witness,

7   please.

8        (Exhibit published to witness, Counsel and Court only.)

9   Q    Now, you see this as -- I'm not going to describe it, but

10  an e-mail on which you're not copied; right?

11  A    Yeah.

12  Q    But I would like you to look at the answer.  If we can go

13  to the top of page two.  Do you see that section?

14  A    That part.

15  Q    So that part?

16  A    He put in his answer.

17  Q    The information that you provided to Mr. Sijan was

18  communicated back to the broker essentially word-for-word from

19  you?

20  A    That section, but can we look at the rest of his answer.

21  Q    I'm asking you the question.

22  A    Yes that answer is exactly what I sent him.

23       MR. COLTON:  We offer 8408, your Honor.

24       MR. McCONNELL:  The whole thing?

25       MR. COLTON:  It sounds like a trap.  You want to see

Jacoby - cross - Colton                    1352

1  it of course.  I'm sorry, I was trying to be funny but it

2  wasn't funny.  I apologize.  I'll show you the entirety of it.

3          MR. McCONNELL:  No objection.

4          THE COURT:  It is admitted.

5          (Government Exhibit 8048 received in evidence.)

6          (Exhibit published.)

7  BY MR. COLTON:

8  Q    So, just so we are clear it was honest and it was proper

9  to communicate to a broker that GPB Auto Fund has been able to

10 fully cover the distributions with funds from operations

11 during the third quarter of 2015?

12 A    The way that they're describing it.  I wouldn't that's

13 done it but that's how GPB decided to do it.

14 Q    But they used your words?

15 A    I would have.

16 Q    There's no question.  I'm not asking what you might or

17 would have done.  The question is they used you words?

18 A    Yes.

19         THE COURT:  I know it's getting late in the day, so

20 if you would just answer the questions that he asks, that

21 would help.

22 Q    I want to turn your attention to dashboards and

23 management reports.  We talked a lot about them during your

24 testimony, right?

25 A    Yes.

Jacoby - cross - Colton                              1353

1   Q    Are you okay.  I know you've been answering questions a

2   long time.  Do you need some water?

3   A    I have some water, thanks.

4            THE COURT:  It might be a good time for a stretch

5   break.

6            MR. COLTON:  Thank you, Judge.

7            (Jury exits.)

8            (Witness steps down.)

9            MR. COLTON:  Judge, do you have something you wanted

10  to talk about or is it a real stretch break?

11           THE COURT:  It is a break.  There's a juror in the

12  back that's a little tired today.  So let's take breaks more

13  regularly.

14           MR. COLTON:  And I'm happy to do that whenever the

15  Court wants.

16           (Recess taken.)

17           (Jury enters.)

18           THE COURT:  Everyone can be seated and I think we're

19  ready for the witness.

20           (Witness resumes stand.)

21           MR. COLTON:  May I inquire?

22           THE COURT:  Go ahead.

23  BY MR. COLTON:

24  Q    So, Mr. Jacoby, we took a little bit of a break and we

25  were going to get into the question of these management

Jacoby - cross - Colton                                1354

1    dashboards.  And I believe your testimony was the management

2    dashboards were the way in which you believe you communicated

3    alleged problems in the fund to, among others, Mr. Schneider

4    and Mr. Gentile; is that right?

5    A    It was a weekly management report that I communicated to

6    them and other managers.

7    Q    Okay.  And was it your position that those reports were

8    supposed to portray some issue or problem of which they should

9    be aware?

10   A    There were always discussions and footnotes and follow-on

11   discussions, yeah.

12   Q    But sometimes these dashboards proved to be erroneous or

13   inaccurate; right?

14   A    Sometimes we would make changes, yes, of course.

15   Q    And sometimes there were even bugs in the program in the

16   system?

17   A    Life happens.

18   Q    Let's take a look at Government Exhibit Jacoby 12 just

19   for counsel, the Court and the witness, please?

20        (Exhibit published to witness, Counsel and Court only.)

21   Q    I'd like you to please take a look at the e-mail first by

22   yourself without reading it out loud.

23   A    (Reviewing.)

24   Q    Mr. Jacoby, this is an e-mail from Leo Chung to you;

25   correct?

Jacoby - cross - Colton                        1355

1   A    Yeah.

2   Q    Among others?

3   A    Yes.

4   Q    And you received this e-mail, right?

5   A    Yes.

6              MR. COLTON:  Your Honor we offer defense Jacoby 12.

7              MR. McCONNELL:  No objection.

8              THE COURT:  It is admitted.

9              (Jacoby Exhibit 12 received in evidence.)

10             MR. COLTON:  If we can publish it, please.

11             (Exhibit published.)

12  Q    I don't want to spend too much time on this, but it's

13  fair to say that the message that is being communicated in

14  this e-mail string from Mr. Chung is that there were errors in

15  the formula for the management dashboard, right, that he was

16  working on?

17  A    He was developing -- you know how you had those charts

18  that you showed me?  He was the guy that was developing the

19  charts that would be displayed from the information that we

20  had in Excel.

21  Q    Got it.  And there were times including in the beginning

22  of January of 2016?

23  A    Right.

24  Q    When there were errors and bugs in that program yielding

25  data that turned out to be wrong?

Jacoby - cross - Colton                          1356

1   A    Yeah.

2   Q    Let's go on to Defendant's Exhibit MMH which I believe is

3   for identification at this point?

4        (Exhibit published to witness, Counsel and Court only.)

5   Q    Again just for counsel the Court and the witness,

6   Mr. Jacoby, this is an e-mail from you to Steve 3frangioni;

7   correct?

8   A    Yes.

9   Q    And this is an e-mail that you did send on or about

10  September 4, 2015?

11  A    Yes.

12       MR. COLTON:  We offer Defendant MMH, that's

13  Mike-Mike-Hotel.

14       MR. McCONNELL:  No objection.

15       (Defendant's Exhibit MMH received in evidence.)

16       (Exhibit published.)

17  BY MR. COLTON:

18  Q    In this e-mail, Mr. Jacoby, you write at the top, "I

19  updated the dividend thing too.  I think it is okay like it is

20  for this week.  We can do a thorough update of both as we plug

21  in the final July numbers and first cut of August P&L next

22  week."  That's what it says; right?

23  A    Yes.

24  Q    Without delving too far into it, it's fair to say that it

25  wasn't uncommon to continuously update or change the data in

Jacoby - cross - Colton                    1357

1    these management dashboards?

2    A    Welcome to the world of accounting.

3    Q    And sometimes the changes they got better and sometimes

4    they got worse?

5    A    You have to try to get it right.

6    Q    But it was known, certainly by you, and I can't ask what

7    anyone else thought but by you, these management dashboards

8    were works in progress, subject to change?

9    A    Yes.

10   Q    Let's take a look at a couple of these management

11   dashboards if you don't mind.

12         MR. COLTON:  If we can start with Government Exhibit

13   7799, again just for counsel, the Court and the witness.

14       (Exhibit published to witness, Counsel and Court only.)

15   Q    This is an e-mail from Mr. Frangioni to, among others,

16   you; correct?

17   A    Yes.

18   Q    And it's an e-mail sending on the June 2015 management

19   dashboard or management report?

20   A    Yeah.

21   Q    And it was sent to, in addition to you, Mr. Schneider and

22   Mr. Gentile?

23   A    Yes.

24         MR. COLTON:  We offer 779 nine.

25         MR. McCONNELL:  Can I just see the whole e-mail,

Sophie Nolan, RCR, RPR - Official Court Reporter

Jacoby - cross - Colton                    1358

1    please?

2            MR. COLTON:  Yes.

3            MR. McCONNELL:  Is it just the single page?  No

4    objection.

5            MR. COLTON:  I'm going to offer the attachment so

6    I'm bringing both.

7            MR. McCONNELL:  Thank you.

8            No objection.

9            THE COURT:  It is admitted.

10           (Government Exhibit 7799 received in evidence.)

11           MR. COLTON:  Thank you.

12           (Exhibit published.)

13   Q    If we could now display in evidence Government 7799-A.

14   It's a little hard to read but if we could blow up the data in

15   the bot left-hand corner.

16           So, this data is for Holdings I, right, Mr. Jacoby,

17   that we're looking at on the screen?

18   A    Yes.

19   Q    And it is data both for June and has '25 -- 2015

20   year-to-date information; right?

21   A    Yes.

22   Q    And so we're clear, year to date means so far this year;

23   right?

24   A    Correct.

25   Q    And for the year-to-date information it has a net

Jacoby - cross - Colton                    1359

1    investment income of $5.66 million shown there; right?

2    A     That's right.

3    Q     And distributions of $5.2 million; right?

4    A     Right.

5    Q     So if one were calculating coverage by net investment

6    income, the net investment income is greater than the

7    distributions for 2015.

8    A     That's right.

9    Q     And this is what's communicated --

10   A     That was the metric that we were using; correct.

11   Q     And that was communicated to both Mr. Schneider and

12   Mr. Gentile others in June of 2015?

13   A     Yes.

14   Q     Now let's go over to the right side of the document and

15   look at the Auto Portfolio.  And if you look at the Auto

16   Portfolio through the first six months of 2015 what was being

17   communicated by the your finance team to Mr. Gentile,

18   Mr. Schneider and others.

19   A     Yup.

20   Q     We've go the net investment income of 1.33 million was

21   greater than the distributions of 1.30 million; correct?

22   A     Right.

23   Q     Let's keep going.  I'm just going to jump ahead.

24         MR. COLTON:  If we could pull up Government Exhibit

25   7402 for counsel the Court and the witness.

Jacoby - cross - Colton                    1360

1          (Exhibit published to witness, Counsel and Court only.)

2   Q    Mr. Jacoby, this is an e-mail from you on September 18,

3   2015 to a number of people including Mr. Schneider and

4   Mr. Gentile?

5   A    Yes.

6   Q    And this is sending another management report or

7   dashboard full?

8   A    Yes.

9   Q    Okay.

10         MR. COLTON:  We're offering 7402 and 7402-B.

11         MR. McCONNELL:  No objection.  Is A also --

12         MR. COLTON:  I'm not offering it.

13         MR. McCONNELL:  I'd like A in as well because it's

14  the backup the witness may need.

15         MR. COLTON:  That's fine.  We'll offer 7402-A and B.

16         THE COURT:  Okay, admitted.

17         (Defendant's Exhibits 7402 and 7402 received in

18  evidence.)

19  BY MR. COLTON:

20  Q    Let's look at 7402-B, if we can?

21         (Exhibit published.)

22  Q    Taking a look -- I'm going to start to short circuit this

23  a little bit.  Holdings 7.37 million; right?

24  A    Right.

25  Q    And distributions of 734 million, right?

Sophie Nolan, RCR, RPR - Official Court Reporter

Jacoby - cross - Colton                                 1361

1   A    Right.

2   Q    So, again the message being relayed is that net

3   investment income is covered?

4   A    Covered, right.

5   Q    And certainly the revenue is much more than the

6   distributions; right?

7   A    Yes.

8   Q    Let's skip ahead here again.

9        MR. COLTON:  If we can go to Government Exhibit 7682

10  in evidence?

11       (Exhibit published.)

12  Q    Do you recall this?  We looked at it a little while ago,

13  Mr. Jacoby?

14  A    Yes.

15  Q    If we could go to the second page, it says "Net income

16  and distribution" -- we talked about that, but what it says on

17  the right side is Net Inc.; right?

18  A    Right.

19  Q    It says net income is $9.7 million, right?

20       Let's take a look at the final numbers that came out

21  for Holdings I in the audited financial statements.  Remember

22  9.7 million for net income and let's look at the financial

23  statements which are Government Exhibit 2011.

24  A    This is Holdings?

25  Q    Yes.

Jacoby - cross - Colton                          1362

1   A    Okay.

2         (Exhibit published.)

3         MR. McCONNELL:  What was the Exhibit Number?

4         MR. COLTON:  The exhibit that we were just looking

5   at was 7682 and I'm asking for 2011.

6   Q    Do you recognize Government Exhibit 2011?

7   A    Yes.

8   Q    That's the audited financials for Holdings I for the year

9   2015, right?

10  A    Okay.

11  Q    Do you want to take a moment or do you recognize it?

12  A    I'm assuming it's what it is.

13  Q    Let me ask this?

14        MR. COLTON:  Any objection?

15  A    No.

16        MR. McCONNELL:  If the witness is okay with it, I am

17  too.

18        MR. COLTON:  A happy agreement.

19        Judge, we offer 2011.

20        (Government Exhibit 2011 received in evidence.)

21  Q    Remember the last exhibit we had said net income was $9.7

22  million on that dashboard.  If we can go to page seven of this

23  exhibit which is the audited financial statement or the final

24  financial statement for 2015, the net income at the bottom $32

25  million; right?

Jacoby - cross - Colton                                    1363

1    A    Right.

2    Q    And the net investment income is $11.6 million?

3    A    That's right.

4    Q    But the last exhibit didn't say net investment income.

5    It said net income.  Which is -- 9.7 is very different from 32

6    million; right?

7    A    Yeah, the net income on the dashboard is only talking

8    about net investment income.

9    Q    I understand that that's your interpretation and that's

10   fine --

11   A    It's what --

12   Q    The document that you sent around to Mr. Schneider and

13   Mr. Gentile and others, Government Exhibit 7682, says "net

14   income 9.7 million."  That's what it says; right?

15   A    Right, yes.

16   Q    And then the final financial statements, audited

17   financial statements come out and say $32 million; right?

18   A    Right.

19   Q    Okay.  Even if they should have somehow known that net

20   income really means net investment income, even though it

21   doesn't say it, there's 's still a very big gap between what

22   was reported in the preliminary dashboard of 9.7 and the 11.6

23   million that's in the final number, right?

24   A    That's right, yes.

25   Q    Because these dashboards are often preliminary and often

Jacoby - cross - Colton                              1364

1    turn out to not be completely accurate; right?

2    A    Right.

3    Q    In the end?

4    A    Right, you have to wait for the results.  So you're

5    waiting for the portfolio companies to report.

6            MR. COLTON:  I'm skipping a couple of more.  The

7    good news is there's four or five things being crossed out in

8    a one minute break.

9            THE COURT:  Great.

10   BY MR. COLTON:

11   Q    I'd like to call up next Defendant's Exhibit WWF.

12       (Exhibit published to witness, Counsel and Court only.)

13   Q    So, Mr. Jacoby, this is an e-mail from you to a number of

14   people including Mr. Schneider and Mr. Gentile in May of 2016;

15   right?

16   A    Okay.

17   Q    May 12th of 2016?

18   A    Okay.

19   Q    Do you recognize it?

20   A    It looks familiar.

21   Q    And it includes a management dashboard dated May 12,

22   2016, as an attachment?

23   A    Yes.

24           MR. COLTON:  We offer WWF and WWF-1-C which is a

25   color copy which I'll provide to Mr. McConnell.

Sophie Nolan, RCR, RPR - Official Court Reporter

Jacoby - cross - Colton                    1365

1          MR. McCONNELL:  No objection.

2          THE COURT:  It is admitted.

3          (Defendant's Exhibits WWF and WWF-1-C received in

4    evidence.)

5    BY MR. COLTON:

6    Q    So if we could call up -- if we could call up WWF-1-C,

7    please.

8          (Exhibit published.)

9    Q    The dashboards are hard but the color ones are a little

10   easier.  If you could isolate on the automotive section in the

11   middle.  Can you see that, Mr. Jacoby?

12   A    Yes.

13   Q    And this is the sort of newfangled, if you will,

14   dashboard that you had helped create for GPB, right?

15   A    It's a lot easier to read on your iPhone, especially.

16   Q    It's easier to read, yes.  I agree with you.

17          Does the section blow up further, that section, but

18   looking along the bottom where it says "Coverage," do you see

19   that?

20   A    Yeah.

21   Q    This is a May 2016 document, right, that's for results

22   through April?

23   A    Right, right.

24   Q    And on the right-hand side are the projections because

25   there are months that hadn't happened yet.  It says forecast

Jacoby - cross - Colton                    1366

1    in the bottom right-hand corner.  It says "forecast"; right?

2    A    Yes.

3    Q    So the forecast of coverage that you put out for auto

4    portfolio in May of 2016 says that this upcoming month of May

5    of 2016 the forecast is for coverage in blue; right?

6    A    Which month are you looking at?

7    Q    I'm looking at the bottom right corner.  If you go

8    across --

9    A    They're all red though.  You mean December?

10   Q    No, not December.

11            MR. COLTON:  If we can blow that up by any chance at

12   the bottom?

13   Q    Do you see that now?

14   A    Right.

15   Q    And you see it has letters along the bottom for months?

16   A    Yes, yes.

17   Q    So it says A, right, which is April right above forecast?

18   A    Yeah, I got it.

19   Q    And then M.  It's hard to read, but it's M.  So the very

20   next month if we can take away the yellow highlighting, it

21   might be easier.  I'm trying to short circuit this.

22            What is put out is a forecast that coverage is going

23   to go positive in the near future.  That's the forecast;

24   right?

25   A    Yeah.

Jacoby - cross - Colton                          1367

1    Q    Now, let's take a look on the second page of this

2    document.   This is information about the Holdings II fund;

3    right?

4    A    Okay.

5    Q    And then on this if -- I'm sorry.   It's hard to read but

6    it's forecasting that for the "N6M", that stands for next six

7    months; right?

8    A    I see, yes.

9    Q    It stands for next six months?

10   A    Yeah.

11   Q    And you see the forecast for Holdings II for the next six

12   months that you're putting out for Mr. Schneider, Mr. Gentile

13   and others is a net investment income of 5.799 million and

14   distributions of 3.188 million; right?

15   A    Right.

16   Q    So the message being sent in those management dashboards

17   is that Holdings II will cover over the next six months?

18   A    Right.

19   Q    Let's go back if we could to the Auto Fund for a moment.

20   I'm sorry, let's go -- I apologize, to page five of the

21   document.   You know what, I have the wrong page.

22          So it's fair to say, Mr. Jacoby, that some of the

23   dashboards that were put out forecast positive results in the

24   future?

25   A    They did.

Jacoby - cross - Colton                    1368

1   Q    Okay.  So if one were to say, I have no present --

2   there's no present plans to use investor capital, if you were

3   relying on coverage and got forecasts of full coverage you

4   would have no present plans to use investor capital, right?

5            MR. McCONNELL:  Objection.

6            MR. COLTON:  I'll withdraw the question.  Let me do

7   it a different way -- you know what, strike it.

8   BY MR. COLTON:

9   Q    Let's turn our attention to special distributions which

10  is something we discussed; right?

11  A    Yes.

12  Q    Is it fair to say that a vast majority of the special

13  distributions that were paid by GPB funds were paid before you

14  joined the company and became CFO?

15  A    I don't know.

16  Q    Rather than take up a lot of time let's just do it this

17  way:  Any special distribution that was paid in 2013 or 2014

18  was before you were at the company; right?

19  A    Right.

20  Q    So you wouldn't have firsthand knowledge of anything

21  basically surrounding the decision to pay the distributions?

22  A    That's right.

23  Q    Are you aware of any special distributions in Holdings I

24  paid in your tenure as you sit here today?

25  A    I think there was one in April of 2015.

Jacoby - cross - Colton                    1369

1    Q    But you're not sure?

2    A    You'd have to go back and look.  You can look.  It might

3    have been one at the end of the year too, but I'm not sure.

4    Q    Let's take them one at a time then.  Let's jump to MMD,

5    Mike-Mike-Delta.  Actually MMD-1.

6         (Exhibit published to witness, Counsel and Court only.)

7    Q    Do you recognize this as the quarterly report for the

8    second quarter of Holdings 2015?

9    A    It looks like it.

10             MR. COLTON:  Any objection?

11             MR. McCONNELL:  No.

12             MR. COLTON:  We offer MMD-1, Judge.

13             THE COURT:  It is admitted.

14             (Defendant's Exhibit MMD-1 received in evidence.)

15             (Exhibit published.)

16   Q    So let's take a look at page nine first.  These are hard

17   to read and I do apologize to everybody but the net investment

18   income line says 5.25 million; correct?

19   A    Right.

20   Q    Okay.  Now let's go forward to page ten, the

21   distributions were 5.24 million; correct?

22   A    Yes.

23   Q    So net investment income covered the distributions for --

24   through Q2 '15 for Holdings; correct?

25   A    Right.

Jacoby - cross - Colton                          1370

1    Q    So the distribution was paid in April which is also in

2    the second quarter of 2015; right?

3    A    Right.

4    Q    And just so -- maybe not everybody knows this, the first

5    quarter is January to March, the second quarter is April to

6    June --

7    A    Right.

8    Q    -- the third quarter July to September.  The fourth

9    quarter, October through December; right?

10   A    Right.

11

12               (Continued on the following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

W. Jacoby - Cross/Mr. Colton                    1371

1    Q    So any --

2              MR. COLTON:  Withdrawn.

3    Q    Let's take a look at Holdings 2.  There was a special

4    distribution paid in April of 2016.  Do you remember that?

5    A    No, but.

6    Q    Does it sound --

7    A    Sounds familiar.

8    Q    Okay.  Let's take a look at the Report of Partnership

9    the financial statement, Defense Exhibit WR-1.

10             And just so, again, we're clear.  The Reports of

11   Partnership that contain financial statements, those are

12   financial statements that you as the CFO are the --

13   A    Source.

14   Q    -- responsible official, right?

15   A    Yeah.

16             MR. COLTON:  Any objection to WR-1?

17             MR. MCCONNELL:  No.

18             THE COURT:  Okay.

19   Q    So, again, the results of the first quarter of 2016

20   would be through March 31st, right?

21   A    Right.

22   Q    And special distribution paid in April would be right

23   after that?

24   A    Right.

25   Q    Okay.  Let's take a look, if we could, at Page 7 of the

W. Jacoby - Cross/Mr. Colton                1372

1    document.

2         The net investment income is $774 million?

3    A    Okay.

4    Q    But thousand dollars, excuse me?

5    A    Right.

6    Q    Then if we go to the next page, remember 774.  Let's go

7    to the next page, Page 8, please.

8    A    Right.

9    Q    And the distributions are 471,000, right?

10   A    Right.

11   Q    So when the special distribution is paid, the most

12   recent results show that even the net investment income

13   greater than the distributions, right?

14   A    Yes.

15   Q    And the distributions --

16        MR. COLTON:  We could take that down.

17   Q    As a general matter, I want to make everyone is clear

18   on this.

19        When the financial statements that you in your tenure

20   prepared listed distributions, it was all the distributions

21   whether they be monthly or special, all encapsulated in that

22   distribution line; right?

23   A    Yeah, that was the year-to-date.

24   Q    Total, both types, special and monthly?

25   A    Yes.  Yes.  Correct.

W. Jacoby - Cross/Mr. Colton                    1373

1    Q    Another minute to save five, Judge.

2         Now, Mr. Jacoby, you had testified at some length, and

3    correct me if I'm wrong about this, that Mr. Schneider and

4    his organization was pretty aggressive salespeople?

5    A    Yes.

6    Q    It's common, is it not, to have aggressive salespeople?

7    A    Yes.

8    Q    And it's common as the --

9         MR. COLTON:  Strike that.

10   Q    You've been a CFO for a very long time, right?

11   A    Yeah.

12   Q    And you've worked in organizations where you've had to

13   make decisions about what revenue to recognize and not,

14   right?

15   A    Yes.

16   Q    And it is common in your experience in 30 years

17   including as a CFO, that there would be salespeople pushing

18   and CFOs pushing back.

19        It's common, right?

20   A    Yes.

21   Q    And, at the end of the day, no matter what the

22   salespeople say, it's the CFO's decision what revenue gets

23   recognized or not.

24        Not the salespeople, right?

25   A    Yes.

W. Jacoby - Cross/Mr. Colton                    1374

1    Q    Now, you described visiting the Ascendant Capital
2    offices?
3    A    Yes.
4    Q    And I think your description was footballs and dogs,
5    things of that nature?
6    A    Yes.
7    Q    Do you remember that description?
8    A    Yes.
9    Q    Are you aware that some of those dogs were rescue dogs?
10   A    Yes.
11   Q    So you have no problem with rescue dogs being in the
12   office?
13   A    Love them.
14   Q    Okay.  On that we can certainly agree.
15        So you weren't trying to paint a picture of a
16   loosey-goosey organization, you were just describing the
17   fact that they had dogs in the office?
18   A    Entirely different atmosphere than an accounting firm.
19   Q    And it would be common in your experience that a sales
20   room would be a very different atmosphere than an accounting
21   office, wouldn't it?
22   A    Wouldn't it, yes.
23   Q    Nothing wrong with that?
24   A    Right.
25   Q    Okay.  And just to put a fine point on that.

W. Jacoby - Cross/Mr. Colton                    1375

1        At the end of the day, it is --

2              MR. COLTON:  Strike that.

3    Q    To put a fine pint on it, no matter how hard a

4    salesperson or a marketer pushes, you have to put on the

5    financial statements only the revenue and expenses that you

6    think are proper, right?

7    A    Yes.

8    Q    And that's what you did?

9    A    That's right.

10   Q    Now, I'm going to take you to marketing materials and I

11   believe, and correct me if I'm wrong, you testified that

12   Jeff Schneider was the last word on marketing?

13   A    That's right.

14   Q    And you testified you were cut out of the process; is

15   that right?

16   A    Yes.

17   Q    Let's test that a little bit.

18             MR. COLTON:  If we could go to Defense Exhibit

19   NNI, I believe it is.

20   Q    I would just like you to look at this e-mail, don't

21   read it out loud?

22             MR. MCCONNELL:  I don't know if this is being

23   offered or if it's being used to refresh.  If it's the

24   former, we would object.

25             MR. COLTON:  I didn't hear what the former was.

W. Jacoby - Cross/Mr. Colton                    1376

1   Hold on, we'll take --

2            THE COURT:  Sure.

3            (A brief pause in the proceedings was held.)

4   Q    Mr. Jacoby, have you had an opportunity to review what

5   is on the screen marked for identification only as defense

6   NNI?

7   A    Yes.

8   Q    Now, I'm going to ask you again.

9        In or around January of 2016, were you part of the

10  approval process for marketing materials?

11  A    My approval was not required.

12  Q    Let me ask you a different process.

13       Were you one of the people at GPB who served the role

14  as the approver in January of 2016?

15  A    No, I reviewed -- had comments and they would do what

16  they want to do with it.

17  Q    So you did review marketing material and made comments?

18  A    I could possibly, yeah.

19  Q    I'm asking if you did?

20  A    I don't recall doing it.

21  Q    But you now recall seeing marketing material and having

22  to run through your desk?

23  A    Once in a while.

24  Q    Generally, not referencing the e-mail, when people talk

25  about Roger at GPB, that's Roger Anscher?

W. Jacoby - Cross/Mr. Colton                1377

1   A    That's right.

2   Q    And he was the COO?

3   A    Yeah.

4   Q    Okay.  We can take the e-mail down.

5        Is there somebody named at Tang at GPB?

6   A    No.

7   Q    Is there somebody named Tang at Oracle?

8   A    No.

9   Q    Do you know who Tang is?

10  A    Yep.

11  Q    Where was Tang from?

12  A    He's a third-party.

13  Q    From what organization?

14  A    I can't remember.  If I think about it, I might come up

15  with it.

16  Q    Okay, we can move forward.

17       Does it refresh your recollection that he could have

18  been not asking from Phoenix?

19  A    No.

20  Q    Okay.  Let's take a look now, if we could, at Defense

21  Exhibit Jacoby 15.

22       This is a e-mail written by you, correct, to somebody

23  named Vanessa Mander?

24  A    Okay.

25  Q    Do you recognize this e-mail?

W. Jacoby - Cross/Mr. Colton          1378

1   A    No.

2   Q    Do you have any reason to doubt that you wrote the

3   e-mail?

4   A    No.

5          MR. COLTON:  We offer Defense Jacoby 15.

6          MR. MCCONNELL:  I don't know what the purpose is.

7   He says didn't recognize it.  It depends where we're going

8   with this.

9          THE COURT:  Well, so, what's the relevance going

10  to be?

11         MR. COLTON:  I don't want to make the proffer in

12  open court, I'm happy to do it at sidebar.

13         THE COURT:  Sure.

14         (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

*Sidebar*                                                      1379

1           (Sidebar held outside the presence of the jury.)

2           MR. COLTON:  Mr. Jacoby's testimony was that

3    Mr. Schneider was the final word.  What's coming is the

4    first steps of an approval log showing approvals by GPB

5    officials after it was submitted by Ascendant Capital which

6    brings it to doubt his testimony that it was just him.

7           THE COURT:  Okay.  So it's showing they talked

8    about an approval log that's going to be approvals of

9    marketing materials.

10          MR. AXELROD:  Actually, what he wants is the truth

11   of the log.  He wants to show that other people approved it

12   and that is a classic hearsay purpose.

13          MR. COLTON:  We're going to prove that up during

14   the course of the trial.  But for this purpose, if he

15   doesn't know, it's still admissible for the fact that he was

16   aware of an approval log, or at least didn't say to

17   somebody, what are you talking about, an approval log?  That

18   doesn't exist, that didn't happen.

19          MR. MCCONNELL:  It didn't impeach him with the

20   document.

21          MR. AXELROD:  That's the purpose for which I want

22   to -- that's its relevance here he wants it for its truth.

23          MR. COLTON:  Here's the real problem, and this is

24   just inherent in the system.

25          They get to meet with him, they get to show him

*Sidebar*                                                    1380

1   the document.  He remembers every single e-mail they show

2   him.  We don't have that opportunity.  There's no dispute of

3   the authenticity happened and subject to connection if we

4   don't prove up the existence of the approval log.

5          THE COURT:  So let's say you're going to prove up

6   for these an approval log some other way.  I don't doubt it

7   what are you trying to get at by tech that he side e-mail

8   about the approval log.

9          MR. COLTON:  Then he obtained the string is the

10  what's coming next is, oh, Jovan here's the approval log, I

11  found it.

12         MR. AXELROD:  So, your Honor, this is exactly what

13  they can do when they put on their case.  They can't do it

14  through there witness.  They're trying to avoid putting on

15  anal case by drug hearsay through him he adopt want to far

16  if the effect on the listener.

17         MR. COLTON:  It's not hearsay he says we have we

18  had so much evidence of yes took actions this is yes took

19  the next action of apossibilitying the approval log and send

20  it out.

21         MR. AXELROD:  That's correct just not purpose for

22  which you want to.

23         THE COURT:  Right.  Aren't you just trying to

24  prove up that there was an approval log that was created

25  that's what it seems like to me let's just move on.

*Sidebar*                                                        1381

1          (Sidebar discussion concludes.)

2          (Continued on the next page.)

*W. Jacoby - Cross/Mr. Colton*                    1382

1           (In open court.)

2           MR. COLTON:  We can take that down, we'll move on.

3    EXAMINATION BY

4    MR. COLTON:

5    (Continuing.)

6    Q    What's Oracle?

7    A    I think it was a law firm but I don't recall.

8    Q    So I don't want to know about -- I'm not asking you

9    about legal advice.  I don't want to run afoul.  Just a

10   moment.

11          (A brief pause in the proceedings was held.)

12          MR. COLTON:  Judge I'm going to ask -- I'm asking

13   if you stipulate to it -- I want to ask a couple of leading

14   questions to avoid the issue.

15          THE COURT:  Yes, I understand.

16   EXAMINATION BY

17   MR. COLTON:

18   (Continuing.)

19   Q    To the best of your recollection, was Oracle an --

20   Oracle was an organization hired to help in the compliance

21   function for GPB; is that right?

22   A    It sounds familiar.  I think it was a law firm, though.

23   Q    I don't want to know about sort of legal advice.  So

24   I'm just asking if there's a difference in my questions.

25   I'm not teaching you the law but in my questions between

*W. Jacoby - Cross/Mr. Colton*                    1383

1   compliance, like, is this a proper document versus is this a

2   legal document.  That's the distinction I'm drawing for

3   compliance purposes.

4   A    Okay.

5   Q    So if you don't recall Oracle, that's fine, I'll move

6   on.  But if you do recall Oracle's function, I'd like to

7   know.

8   A    I can't recall, you have to give me more to go on.

9   Q    Okay.  Let's just move on here.

10        So I just want to address the statement you made that

11   you were cut out of the marketing process?

12   A    Okay.

13   Q    Let's take a look at Defense Exhibit UE, please.

14        This is a e-mail from Eric Schneider to a lot of people

15   including you Mr. Jacoby?

16   A    Okay.

17   Q    And it's entitled, "Material Update."

18   A    Okay.

19   Q    Do you have any reason to think you didn't receive this

20   e-mail that was addressed to you?

21   A    No.

22             MR. COLTON:  We offer UE, your Honor.

23             MR. MCCONNELL:  Can I voir dire -- that's okay.

24   No objection.

25             THE COURT:  Admitted.

W. Jacoby - Cross/Mr. Colton                    1384

1          (Defendant's Exhibit UE was marked in evidence.)

2    Q    So taking a look at this, it's called, "Subject:

3    Material Update."

4          It's sent to a lot of people, correct?

5    A    Yeah.

6    Q    And a lot of people at GPB and a lot of people at

7    Ascendant?

8    A    Yes.

9    Q    Okay.  And one of those is you.

10         One of the things it says, that you were made aware of,

11   is that the presentation, the marketing presentations have

12   been updated and all prior versions should be disposed of,

13   right?

14   A    Okay.

15   Q    I'm sorry, I have a different section, that's my fault.

16   This is January 18, 2016, right?

17              MR. COLTON:  You can take that down we're just

18   going to keep moving.

19              I would like to next put up Defense Exhibit UN.

20   Q    This, too, is an exhibit, it's a e-mail from Eric

21   Schneider to, among others, you on marketing material

22   update?

23   A    Okay.

24   Q    And this is from February 5, 2016?

25   A    Okay.

W. Jacoby - Cross/Mr. Colton                          1385

1    MR. COLTON:  We offer UN.

2    MR. MCCONNELL:  No objection.

3    THE COURT:  Admitted.

4    (Defendant's Exhibit UN was marked in evidence.)

5  Q    And this document, again, says if we can just blow up

6  the bottom.  "Please dispose of all other versions of these

7  presentations," right?

8  A    Uh-huh.

9  Q    And this is dated in February of 2016, right?

10  A    Yes.

11  Q    Okay.  Try to speed through these.

12    MR. COLTON:  Let's go to Defense Exhibit QQQQB.

13  Q    This is a March e-mail, 2016, from Eric Schneider to,

14  among others, you regarding marketing material, right?

15  A    Right.

16    MR. COLTON:  We offer QQQQB.

17    MR. MCCONNELL:  No objection.  I don't think I'll

18  have any objection to any of these if I can briefly voir

19  dire on this and then I'll -- I'll have no objection to any

20  of these.

21    MR. COLTON:  Sounds like redirect if there is

22  objection.

23    THE COURT:  The voir dire has been a little bit

24  redirecty.

25    MR. MCCONNELL:  Fair enough, Judge, no objection.

*Proceedings*                                                    1386

1          MR. COLTON:  Just for the record QQQQB is

2   admitted.

3          THE COURT:  It is.

4          (Defendant's Exhibits QQQQ-B was marked in

5   evidence.)

6   Q    And, again, this is now in March an e-mail to you

7   talking about the updates that were made and instructing

8   people to dispose of all other version of presentations,

9   right?

10  A    Right.

11  Q    Let's go on to Defense Exhibit UZ.

12       This, again, is an e-mail from Eric Schneider to, among

13  others, you regarding marketing material updates?

14  A    Right.

15         MR. COLTON:  We offer UZ your Honor.

16         (Defendant's Exhibit UZ was marked in evidence.)

17         MR. MCCONNELL:  No objection.

18         THE COURT:  Do you have a group of these you want

19  to all offer?

20         MR. COLTON:  Actually, where I am is sort of a

21  deeper dive into one of them.  I'm not sure we want to start

22  that at 10 to 5:00 but that's the Court's call.

23         THE COURT:  I'm happy to call it a day if this is

24  a logical stopping point.

25         So we're back at 9:30 tomorrow.  So please

*Proceedings*                                                    1387

1  remember not it make up your own mind or do your own

2  research or talk to anybody about the case.

3           COURTROOM DEPUTY:  All rise.

4           (Jury exits courtroom at 4:51 p.m.)

5           THE COURT:  You're welcome to step down, sir.

6           (Witness leaves the witness stand.)

7           THE COURT:  Okay.  So just in terms of where we

8  are, how much do you think?

9           MR. COLTON:  I think I can cut it down to no more

10 than 30 minutes.  That's my hope.

11          THE COURT:  Great.

12          MR. COLTON:  I'm not going to be an hour and I

13 hope to make it 30.

14          THE COURT:  Okay.  And then, so who do we have on

15 tap for tomorrow?

16          MR. MCCONNELL:  So I'll do a redirect of

17 Mr. Jacoby.  I don't believe it'll more than a half hour,

18 45 minutes.

19          And we've told defense counsel this.  We have

20 Joseph Ghabour, who is one of the investment advisors.  We

21 have Matt Crafa who is another investment advisor.

22          I imagine, given the pace, that's going take us

23 through the day.  And then, Wednesday we have an

24 Ascendant Capital witness and we made defense aware of who

25 we think is going to take us through the week.

*Proceedings*                                                    1388

1          If our Wednesday witness goes long, and I know
2    we're not sitting Friday this week, Judge, it may change
3    what who we call after and we'll confer with them.  And
4    we're also happy to tell the Court what's coming next if
5    your Honor wants to know.
6          THE COURT:  No, that's fine.
7          And then in terms of Mr. Ghabour and Mr. Crafa,
8    who are the folks who are on tomorrow, you all have
9    exchanged information about exhibits?
10         MR. MCCONNELL:  Yes.
11         THE COURT:  So if you all want to talk
12   about -- should we come in at 9:00 to talk with issues with
13   exhibits or are you not foreseeing a need to do that?
14         MR. COGAN:  Can we just confer for one second?
15         THE COURT:  Yes.
16         (A brief pause in the proceedings was held.)
17         MR. COGAN:  If there are objections, we think that
18   the Court will probably be able to resolve them on the fly.
19         THE COURT:  Okay.
20         MR. COGAN:  Or we can come in 5 to 10 minutes
21   before to deal with the Crafa objections.
22         MR. AXELROD:  They're straightforward and you've
23   seen them before.
24         THE COURT:  All right.  So let's plan to be here
25   at 9:30, that's fine, and we'll probably have a few minutes

*Proceedings*                                              1389

1   before all the jurors are here.

2            MR. COLTON:  Just so we're clear, the same

3   admonition, the witness is still on cross.

4            THE COURT:  Same admonition to the witness still

5   applies.

6            MR. MENCHEL:  Can I raise one other thing?

7            THE COURT:  Sure.

8            MR. MENCHEL:  So, your Honor, this so far in the

9   trial witnesses have volunteered a lot of improper

10  statements.  And, again, I'm not accusing the Government of

11  any impropriety at all.  I believe Mr. McConnell when he

12  says he instructed the witness.  But we've heard one witness

13  testify that 40 percent of his investment went up in smoke.

14  I believe that's a direct quote.

15           MR. COGAN:  Vaporized.

16           MR. MENCHEL:  Vaporized, excuse me.  And we heard

17  "Wolf of Wall Street" from Mr. Jacoby.  And then during my

18  cross-examination, he volunteered the word Ponzi after we

19  had specifically been told that he was advised not to do

20  that.

21           These are starting to accumulate and I think

22  they're becoming very prejudicial to the defense case.  And

23  so, we're going to construct a curative instruction that we

24  think would be appropriate.  We'll work it out overnight.

25  We'll he give it to the defense but I want to make Court

*Proceedings*                                                      1390

1   aware that we think it's appropriate at this juncture that

2   the jury be advised that there is no allegation of a Ponzi

3   scheme in this case because that's not the Government's

4   theory here that this is a Ponzi scheme.  And there's been

5   no evidence presented, nor will be there in this case that

6   any investor actually lost any money.

7               THE COURT:  Okay.  So will you all talk to each

8   other about that and then I guess the instructional issue is

9   that if you want an instruction about attorneys, can you all

10  talk to each other about that?

11              I'll tell you what, come in at 9:15 and then we

12  can a few minutes to talk about those issues.

13              MR. MCCONNELL:  Will you send a written proposal?

14              MR. MENCHEL:  Yes.

15              THE COURT:  Okay.  You shared your --

16              MR. MCCONNELL:  Yes.

17              THE COURT:  Maybe you can send it to or give it to

18  my law clerk if you have a hard copy, too.

19              You're welcome to leave stuff but I have a

20  criminal conference that's on at 5:00.

21              MR. MCCONNELL:  Judge, can I raise one other

22  scheduling matter?

23              THE COURT:  Yes.

24              MR. MCCONNELL:  You know, trials take as long as

25  they take.  We sort of talked about this off the record.

*Proceedings*                                             1391

1      But I do think to the extent we're sort of falling

2   horribly behind schedule, I would rather front that with the

3   jurors sooner rather than later.  Frankly, I think we're

4   going to be here through July at this rate and I think that,

5   at some point, it's in everyone's interest to let the jurors

6   know that that's a really possibility.

7            THE COURT:  Yes.

8            MR. MENCHEL:  I didn't hear what you said.  End of

9   July?

10           MR. MCCONNELL:  Through July.

11           MR. MENCHEL:  Yes.

12           THE COURT:  That's a fair point.

13           Can I ask, I mean, I just don't even know how many

14  witnesses is the Government thinking it's going to call?

15           MR. MCCONNELL:  We will tell the defense and the

16  Court to the extent we can reasonably say.  We're not

17  calling people, again, we're on the third witness.  If we

18  have, you know, our first Ascendant Capital witness go and

19  they get hurt very badly --

20           THE COURT:  The thing is, I'm just giving the jury

21  estimates that I don't really know much about.

22           MR. MCCONNELL:  It depends and we just haven't

23  made it through enough of the trial to make a kind of

24  reasonable.

25           THE COURT:  So you're confident your case is going

*Proceedings*                                                1392

1   to go through when at this point?

2          MS. WEIGEL:  So I think, your Honor, we're looking

3   at July 15th or 16th.  That's our best estimate.

4          THE COURT:  Right.

5          And then you all, I take it, are not going to tell

6   me as we stand here today whether you anticipate putting on

7   a case or not.  That's fine, I'm just saying I'm not sure

8   what to tell the jury at this point.

9          You told jury in jury selection five weeks, is

10  that what they were told.

11         MS. WEIGEL:  We told them to the end of that week

12  of July 15th.  I think it's the 19th.

13         THE COURT:  Yes.

14         MR. COLTON:  I know we didn't tell them the 19th

15  because that's the day we can't work because of my son's

16  wedding.  So we might have been a little more vague than

17  that.

18         THE COURT:  I'm happy to front this issue to the

19  jury did a little bit.  I can say we're still struggling

20  with the timing and we just want you to know that it's

21  possible the trial won't be done that week of the 15th.  So

22  we may be going to the next week and we're trying to go as

23  fast as we can.  I mean, the thing is the later I say we're

24  going to go the more they're going to start writing notes

25  now.

*Proceedings*                                                    1393

1           MR. MCCONNELL:  I would rather deal with it now

2     than...

3           THE COURT:  Yes.

4           MR. MCCONNELL:  Obviously, we defer to the Court

5     and I'm not saying this is the right answer but...

6           THE COURT:  Yes.

7           MR. MCCONNELL:  We're behind.

8           THE COURT:  Okay.

9           MR. COGAN:  Can I make a suggestion?

10          THE COURT:  Yes.

11          MR. COGAN:  I would suggest why don't we evaluate

12    where we are at the end of this week and we'll have a better

13    sense as to whether the pace has picked up over the next

14    witnesses and then we can make a determination about what,

15    if anything, to tell the jury.

16          MR. MCCONNELL:  That's fine.

17          THE COURT:  That's fine.

18          So you all know more about this case, and frankly,

19    are probably more expert at trying cases and I don't want to

20    interfere with how you're trying your cases.

21          I do think we can pick up this trial, pick up the

22    pace.  I think one thing I'm seeing is the same question

23    asked a bunch of different ways to the witness sometimes and

24    if you all can just think about whether that's something you

25    could economize on, I think that would be great.  Because I

*Proceedings*                                                      1394

1  think, I'm looking at the jurors, and they're getting a

2  little bit bored.  And I know people do that for emphasis

3  sometimes, they ask the question a few different ways to

4  really make the point.  I just feel like it's an area where

5  we could speed things up and I think we would get the jurors

6  paying more attention.

7          MR. COLTON:  Understood.

8          MR. MCCONNELL:  Okay.

9          (WHEREUPON, this matter was adjourned to June 24,

10  2024, at 9:30 a.m.)

11

12                          *    *    *

13

14

15

16

17

18

19

20

21

22

23

24

25

1395

1          INDEX

2

3

4    WITNESS:                                PAGE:

5    WILLIAM JACOBY

6          CROSS-EXAMINATION

7          BY MR. MENCHEL.......................... 1124

8          VOIR DIRE EXAMINATION

9          BY MR. MCCONNELL........................ 1149

10         CROSS-EXAMINATION

11         BY MR. MENCHEL.......................... 1149

12         CROSS-EXAMINATION

13         BY MR. MENCHEL.......................... 1170

14         VOIR DIRE EXAMINATION

15         BY MR. MCCONNELL........................ 1171

16         CROSS-EXAMINATION

17         BY MR. MENCHEL.......................... 1171

18         CROSS-EXAMINATION

19         BY MR. COLTON........................... 1254

20

21                    * * * * *

22

23

24

25

1396

1

2                          <u>INDEX OF EXHIBITS</u>

3

4                                                      <u>PAGE:</u>

5    Defense Exhibit CCCCCT was marked in evidence ...... 1138

6    Defense Exhibit DDDDDR was marked in evidence ...... 1141

7    Defense Exhibit DDDDDQ was marked in evidence ...... 1146

8    Defense Exhibit OOS was marked in evidence ......... 1149

9    Defense Exhibit DDDDDV was marked in evidence ...... 1152

10   Defendant's Exhibit DDDD-DS was marked in evidence.. 1160

11   Defendant's Exhibit EEEE-EF was marked in evidence.. 1171

12   Defendant's Exhibit EEEE-EG was marked in evidence.. 1176

13   Defense Exhibit UUB was marked in evidence ......... 1207

14   Defense Exhibit UUF was marked in evidence ......... 1211

15   Defense Exhibit UUF-1 was marked in evidence ....... 1215

16   Defense Exhibit EEEEEH was marked in evidence ...... 1231

17   Defense Exhibit DDDDDC was marked in evidence ...... 1233

18   Defense Exhibit DDDDDF was marked in evidence ...... 1235

19   Defense Exhibit DDDDDD was marked in evidence ...... 1244

20   Defense Jacoby 1 was marked in evidence............ 1267

21   Defense Jacoby 2 was marked in evidence............ 1269

22   Government's Exhibit 2004 was marked in evidence ... 1298

23   Defense Jacoby 13 was marked in evidence ........... 1320

24   Government Exhibit 2041 was marked in evidence ..... 1339

25   Government Exhibit 7827 was marked in evidence ..... 1346

1397

1   Government Exhibit 8048 was marked in evidence .....   1352

2   Jacoby Exhibit 12 was marked in evidence ..........   1355

3   Defendant's Exhibit MMH was marked in evidence .....   1356

4   Government Exhibit 7799 was marked in evidence .....   1358

5   Defendant's Exhibits 7402 and 7402 was marked in

6   evidence ........................................   1360

7   Government Exhibit 2011 was marked in evidence .....   1362

8   Defendant's Exhibits WWF and WWF-1-C was marked in

9   evidence ........................................   1365

10  Defendant's Exhibit MMD-1 was marked in evidence ...   1369

11  Defendant's Exhibit UE was marked in evidence.......   1384

12  Defendant's Exhibit UN was marked in evidence.......   1385

13  Defendant's Exhibits QQQQ-B was marked in evidence..   1386

14  Defendant's Exhibit UZ was marked in evidence.......   1386

15

16

17

18

19

20

21

22                          ****

23

24

25

**$**

**$1,000** [3] - 1336:11, 1336:13, 1336:14
**$10,566,843** [1] - 1193:12
**$300,000** [1] - 1130:23
**$32** [2] - 1362:24, 1363:17
**$5.66** [1] - 1359:1
**$774** [1] - 1372:2
**$792,000** [1] - 1129:20
**$80** [2] - 1336:14
**$900,000** [1] - 1197:25

**'**

**'14** [2] - 1127:18, 1223:11
**'15** [5] - 1151:19, 1223:12, 1296:16, 1339:12, 1369:24
**'16** [5] - 1182:8, 1223:12, 1235:17, 1238:3, 1239:2
**'17** [4] - 1223:12, 1260:21, 1261:2, 1261:14
**'25** [1] - 1358:19

**1**

**1** [8] - 1121:12, 1129:15, 1154:3, 1266:22, 1267:10, 1267:14, 1269:2, 1396:20
**1,000,050** [2] - 1150:12, 1151:1
**1,000,987** [1] - 1151:14
**1,100,000** [1] - 1132:6
**1,987,132** [1] - 1147:19
**1-E-mail** [1] - 1219:1
**1.1** [16] - 1127:20, 1127:22, 1127:24, 1128:1, 1136:13, 1137:2, 1137:23, 1140:10, 1140:20, 1142:5, 1142:15, 1143:16, 1143:19, 1144:2, 1144:6, 1144:10
**1.30** [1] - 1359:21
**1.33** [1] - 1359:20
**1.39** [1] - 1340:9
**1.4** [1] - 1342:4
**10** [3] - 1186:20, 1386:22, 1388:20
**10-B** [1] - 1329:14
**100** [3] - 1124:25, 1178:13, 1293:6
**10019** [1] - 1121:5
**10022** [1] - 1120:21
**106** [1] - 1292:2
**10:32** [1] - 1166:3
**10:47** [1] - 1170:14
**11** [4] - 1185:21, 1186:1, 1186:9, 1237:8
**11.6** [2] - 1363:2, 1363:22
**11201** [1] - 1120:15
**1124** [1] - 1395:7
**1138** [1] - 1396:5
**1141** [1] - 1396:6
**1146** [1] - 1396:7
**1149** [3] - 1395:9, 1395:11, 1396:8
**1152** [1] - 1396:9
**1160** [1] - 1396:10
**1170** [1] - 1395:13
**1171** [3] - 1395:15, 1395:17, 1396:11
**1176** [1] - 1396:12

**12** [9] - 1192:23, 1214:17, 1215:22, 1244:15, 1354:18, 1355:6, 1355:9, 1364:21, 1397:2
**12014** [1] - 1131:21
**1207** [1] - 1396:13
**1211** [1] - 1396:14
**1215** [1] - 1396:15
**1231** [1] - 1396:16
**1233** [1] - 1396:17
**1235** [1] - 1396:18
**124** [1] - 1296:9
**1244** [1] - 1396:19
**1254** [1] - 1395:19
**1267** [1] - 1396:20
**1269** [1] - 1396:21
**1298** [1] - 1396:22
**12th** [1] - 1364:17
**13** [10] - 1180:15, 1181:21, 1199:4, 1214:17, 1318:7, 1318:8, 1320:7, 1320:12, 1320:18, 1396:23
**1301** [1] - 1121:4
**132** [1] - 1350:20
**1320** [1] - 1396:23
**1339** [1] - 1396:24
**1346** [1] - 1396:25
**1352** [1] - 1397:1
**1355** [1] - 1397:2
**1356** [1] - 1397:3
**1358** [1] - 1397:4
**1360** [1] - 1397:6
**1362** [1] - 1397:7
**1365** [1] - 1397:9
**1369** [1] - 1397:10
**1384** [1] - 1397:11
**1385** [1] - 1397:12
**1386** [2] - 1397:13, 1397:14
**14th** [1] - 1306:23
**15** [6] - 1131:16, 1265:8, 1290:14, 1377:21, 1378:5
**15th** [5] - 1182:3, 1182:4, 1392:3, 1392:12, 1392:21
**16** [1] - 1216:10
**16th** [1] - 1392:3
**17** [2] - 1216:14, 1228:18
**1717** [1] - 1121:8
**18** [1] - 1172:7, 1360:2, 1384:16
**19** [3] - 1145:16, 1288:24, 1288:25
**19th** [3] - 1313:11, 1392:12, 1392:14
**1:30** [2] - 1251:24, 1252:21
**1:32** [1] - 1254:16

**2**

**2** [18] - 1172:17, 1178:12, 1191:23, 1197:25, 1257:21, 1268:13, 1268:17, 1269:7, 1273:25, 1277:25, 1278:20, 1285:23, 1289:9, 1306:18, 1342:6, 1348:7, 1371:3, 1396:21
**2,204,000** [1] - 1341:16
**2,204,866** [1] - 1341:15
**2.03** [2] - 1340:4, 1340:8
**20** [5] - 1172:21, 1178:5, 1178:12, 1288:25, 1289:19
**20006** [1] - 1121:9
**2004** [4] - 1297:22, 1298:2, 1298:5,

1396:22
**2008** [1] - 1131:16
**2009** [1] - 1188:3
**2011** [6] - 1361:23, 1362:5, 1362:6, 1362:19, 1362:20, 1397:7
**2013** [3] - 1292:3, 1298:9, 1368:17
**2014** [22] - 1125:3, 1125:21, 1126:25, 1127:3, 1127:9, 1130:13, 1131:14, 1132:5, 1132:21, 1135:3, 1135:7, 1135:18, 1136:13, 1137:2, 1139:1, 1142:16, 1147:14, 1148:1, 1151:13, 1151:19, 1298:9, 1368:17
**2015** [50] - 1127:22, 1128:1, 1138:18, 1138:25, 1147:23, 1147:25, 1148:4, 1148:12, 1151:22, 1152:17, 1153:1, 1155:14, 1156:8, 1180:15, 1181:14, 1181:21, 1182:2, 1182:10, 1183:1, 1193:8, 1194:12, 1195:4, 1202:23, 1207:16, 1216:25, 1266:6, 1266:8, 1266:14, 1269:11, 1277:14, 1287:25, 1295:19, 1313:17, 1340:21, 1346:8, 1347:15, 1349:12, 1352:11, 1356:10, 1357:18, 1358:19, 1359:7, 1359:12, 1359:16, 1360:3, 1362:9, 1362:24, 1368:25, 1369:8, 1370:2
**2016** [46] - 1155:12, 1155:23, 1156:3, 1176:25, 1180:20, 1181:23, 1182:7, 1182:23, 1191:23, 1191:25, 1192:1, 1193:9, 1199:10, 1200:5, 1201:7, 1228:12, 1231:9, 1232:2, 1237:2, 1244:11, 1245:14, 1245:15, 1246:18, 1259:8, 1260:15, 1260:19, 1261:18, 1261:20, 1291:20, 1293:4, 1313:11, 1355:22, 1364:14, 1364:17, 1364:22, 1365:21, 1366:4, 1366:5, 1371:4, 1371:19, 1376:9, 1376:14, 1384:16, 1384:24, 1385:9, 1385:13
**2017** [2] - 1261:4, 1261:8
**2018** [4] - 1223:9, 1306:21, 1306:24, 1307:2
**2024** [3] - 1120:7, 1277:25, 1394:10
**2041** [5] - 1338:24, 1339:2, 1339:14, 1339:18, 1396:24
**20th** [2] - 1207:16, 1265:8
**21** [3] - 1287:18, 1293:21, 1293:22
**21-CR-0054(RPK** [1] - 1120:3
**22** [3] - 1265:8, 1293:21, 1293:22
**22nd** [1] - 1269:11
**23** [6] - 1176:25, 1192:22, 1193:4, 1260:15, 1260:18, 1277:14
**24** [5] - 1120:7, 1152:10, 1152:24, 1346:8, 1394:9
**25** [1] - 1295:23
**25th** [2] - 1231:9, 1232:1
**26** [2] - 1154:18, 1156:20
**2600** [1] - 1121:13
**27** [2] - 1131:16, 1350:21
**271** [1] - 1120:15
**28** [1] - 1290:15
**28th** [2] - 1261:4, 1261:8

**3**

**3** [15] - 1125:25, 1126:11, 1140:18, 1141:24, 1142:9, 1151:3, 1199:4, 1201:5,

1207:10, 1212:5, 1212:6, 1234:7, 1269:9, 1314:18, 1320:20

**3.188** [1] - 1367:14
**3.3** [1] - 1189:4
**3.7** [1] - 1189:5
**30** [16] - 1180:20, 1181:23, 1182:2, 1182:6, 1182:10, 1182:23, 1183:1, 1185:4, 1259:8, 1262:21, 1287:25, 1291:20, 1293:3, 1373:16, 1387:10, 1387:13
**302** [3] - 1281:3, 1281:8
**30th** [1] - 1181:14
**31** [2] - 1132:5, 1191:23
**31st** [1] - 1371:20
**32** [1] - 1363:5
**33** [1] - 1202:17
**33131** [1] - 1121:13
**34** [2] - 1210:17, 1238:16
**34-034** [1] - 1258:7
**35** [1] - 1306:16
**3500** [1] - 1242:19
**3500-WJ-2** [1] - 1306:17
**3500-WJ-22** [1] - 1168:24
**3500-WJ-23** [1] - 1278:19
**3frangioni** [1] - 1356:6
**3rd** [1] - 1121:12

## 4

**4** [6] - 1136:7, 1212:5, 1234:6, 1268:15, 1318:13, 1356:10
**40** [3] - 1219:14, 1229:11, 1389:13
**4100** [3] - 1266:5, 1266:12, 1295:17
**42nd** [1] - 1121:4
**45** [1] - 1387:18
**471,000** [1] - 1372:9
**48** [1] - 1161:20
**49** [1] - 1342:2
**4:51** [1] - 1387:4

## 5

**5** [9] - 1136:6, 1136:10, 1188:9, 1188:17, 1212:7, 1269:9, 1298:15, 1384:24, 1388:20
**5.2** [1] - 1359:3
**5.24** [1] - 1369:21
**5.25** [1] - 1369:18
**5.799** [1] - 1367:13
**50** [1] - 1185:4
**55** [1] - 1349:1
**5:00** [2] - 1386:22, 1390:20
**5th** [1] - 1244:11

## 6

**6** [1] - 1266:14
**6171-C** [1] - 1179:21
**6th** [2] - 1266:8, 1295:19

## 7

**7** [6] - 1124:20, 1128:5, 1199:5, 1246:7,

1287:7, 1371:25
**7-A** [1] - 1289:21
**7.37** [1] - 1360:23
**728** [1] - 1265:8
**734** [1] - 1360:25
**7392** [1] - 1136:5
**7402** [6] - 1359:25, 1360:10, 1360:17, 1397:5
**7402-A** [1] - 1360:15
**7402-B** [2] - 1360:10, 1360:20
**7682** [6] - 1313:1, 1313:10, 1314:19, 1361:9, 1362:5, 1363:13
**774** [1] - 1372:6
**7781-C** [1] - 1124:12
**779** [1] - 1357:24
**7799** [3] - 1357:13, 1358:10, 1397:4
**7799-A** [1] - 1358:13
**7827** [4] - 1345:12, 1345:21, 1346:4, 1396:25
**791** [2] - 1192:22, 1193:4
**792** [1] - 1192:22

## 8

**8** [19] - 1124:25, 1130:15, 1199:4, 1199:25, 1208:6, 1246:7, 1257:4, 1307:25, 1308:1, 1308:3, 1308:6, 1308:16, 1308:18, 1308:20, 1308:23, 1342:2, 1342:3, 1372:7
**8.4** [1] - 1342:4
**80** [1] - 1185:4
**800** [1] - 1120:20
**8048** [3] - 1351:6, 1352:5, 1397:1
**8258-B** [4] - 1258:5, 1258:6, 1291:22, 1293:22
**8408** [1] - 1351:23

## 9

**9** [4] - 1161:15, 1174:25, 1177:24, 1316:16
**9.7** [6] - 1361:19, 1361:22, 1362:21, 1363:5, 1363:14, 1363:22
**943** [1] - 1257:4
**958** [3] - 1199:4, 1199:24, 1199:25
**959** [2] - 1199:4, 1201:4
**963,000** [1] - 1151:3
**9:00** [1] - 1388:12
**9:15** [1] - 1390:11
**9:30** [4] - 1120:8, 1386:25, 1388:25, 1394:10

## A

**a.m** [4] - 1120:8, 1166:3, 1170:14, 1394:10
**ability** [4] - 1213:7, 1249:1, 1249:2, 1258:19
**able** [9] - 1219:23, 1223:25, 1242:20, 1272:3, 1347:6, 1347:11, 1348:18, 1352:9, 1388:18
**absence** [1] - 1210:7
**absolutely** [4] - 1169:13, 1217:17, 1282:10, 1344:5

**acceptable** [1] - 1350:12
**accepted** [2] - 1153:9, 1348:24
**access** [2] - 1222:7, 1259:10
**accidentally** [1] - 1329:23
**accordance** [2] - 1153:8, 1154:9
**according** [3] - 1129:14, 1129:22, 1151:16
**accordingly** [1] - 1219:22
**account** [10] - 1182:12, 1193:10, 1193:11, 1193:21, 1231:10, 1231:11, 1236:19, 1299:20, 1336:23
**accountant** [2] - 1306:15, 1307:14
**accountants** [3] - 1238:6, 1247:10, 1248:6
**accounting** [23] - 1125:13, 1129:3, 1129:7, 1129:12, 1130:9, 1153:8, 1189:11, 1236:16, 1236:17, 1236:19, 1237:23, 1237:25, 1238:12, 1248:7, 1248:10, 1334:5, 1337:6, 1344:10, 1357:2, 1374:18, 1374:20
**accounts** [10] - 1180:11, 1180:23, 1181:5, 1181:25, 1182:9, 1182:17, 1183:1, 1189:5, 1189:18, 1191:11
**accredited** [1] - 1328:10
**accrual** [11] - 1125:13, 1129:3, 1129:7, 1129:11, 1130:8, 1189:11, 1195:24, 1196:16, 1299:21, 1337:5, 1337:6
**accruals** [6] - 1197:15, 1197:19, 1331:7, 1348:3, 1348:6, 1349:5
**accrue** [5] - 1332:17, 1332:22, 1333:1, 1343:22, 1344:7
**accrued** [6] - 1125:16, 1342:9, 1342:16, 1344:9, 1344:21, 1344:24
**accumulate** [1] - 1389:21
**accumulated** [2] - 1125:20, 1128:24
**accuracy** [6] - 1212:25, 1213:1, 1230:5, 1230:6, 1293:17, 1306:14
**accurate** [17] - 1127:16, 1149:17, 1150:14, 1152:5, 1153:17, 1156:1, 1190:19, 1213:6, 1213:14, 1213:16, 1241:17, 1247:14, 1291:1, 1293:14, 1294:21, 1326:8, 1364:1
**accurately** [2] - 1319:3, 1319:14
**accusing** [1] - 1389:10
**acknowledge** [1] - 1154:12
**acquire** [2] - 1258:15, 1258:19
**acquired** [1] - 1194:16
**acquiring** [2] - 1219:21, 1261:17
**acquisition** [8] - 1258:25, 1259:1, 1259:14, 1259:15, 1295:1, 1295:3, 1295:6, 1295:12
**acquisitions** [1] - 1258:24
**act** [1] - 1288:9
**acted** [1] - 1141:11
**action** [1] - 1380:19
**actions** [2] - 1143:5, 1380:18
**actively** [3] - 1218:18, 1261:24, 1263:15
**actual** [6] - 1167:10, 1167:25, 1249:4, 1256:4, 1308:9, 1312:1
**add** [4] - 1140:9, 1201:16, 1205:14, 1247:19
**added** [2] - 1199:21, 1247:1
**addition** [2] - 1258:23, 1357:21
**additional** [4] - 1176:5, 1251:16, 1323:12, 1323:14
**additionally** [1] - 1349:3

**address** [1] - 1383:10
**addressed** [2] - 1267:23, 1383:20
**adjourned** [1] - 1394:9
**administrator** [2] - 1236:8, 1238:15
**admissible** [4] - 1167:2, 1167:17, 1168:13, 1379:15
**admission** [2] - 1134:8, 1134:10
**admit** [3] - 1146:3, 1225:9, 1252:16
**admitted** [31] - 1138:22, 1141:13, 1149:23, 1152:21, 1160:21, 1167:2, 1171:20, 1174:20, 1176:12, 1207:5, 1211:3, 1215:19, 1231:4, 1233:16, 1235:24, 1253:14, 1259:23, 1267:13, 1269:6, 1320:11, 1339:17, 1346:3, 1352:4, 1355:8, 1358:9, 1360:16, 1365:2, 1369:13, 1383:25, 1385:3, 1386:2
**admitting** [1] - 1271:17
**admonition** [2] - 1389:3, 1389:4
**adopt** [1] - 1380:15
**ADRIANA** [1] - 1120:22
**ADV** [4] - 1287:16, 1288:6, 1288:8, 1289:2
**advance** [1] - 1216:25
**adversaries** [1] - 1253:11
**advertising** [1] - 1336:25
**advice** [2] - 1382:9, 1382:23
**advised** [3] - 1278:6, 1389:19, 1390:2
**advisor** [3] - 1189:23, 1288:1, 1387:21
**advisors** [3] - 1183:10, 1190:16, 1387:20
**advisors'** [1] - 1183:13
**affect** [1] - 1155:2
**affecting** [1] - 1155:5
**affects** [2] - 1154:24, 1156:24
**afoul** [1] - 1382:9
**afternoon** [4] - 1253:1, 1254:23, 1254:24, 1311:7
**afterwards** [1] - 1204:8
**agenda** [2] - 1252:17, 1252:19
**aggressive** [2] - 1373:4, 1373:6
**ago** [6] - 1139:7, 1233:1, 1279:23, 1291:23, 1295:21, 1361:12
**agree** [30] - 1130:11, 1134:9, 1143:24, 1152:8, 1170:5, 1183:7, 1190:19, 1225:21, 1226:16, 1254:6, 1259:21, 1260:10, 1261:16, 1264:24, 1266:14, 1273:8, 1283:15, 1284:1, 1300:1, 1302:15, 1302:21, 1314:18, 1315:1, 1326:17, 1340:1, 1340:8, 1341:1, 1365:16, 1374:14
**agreed** [2] - 1208:5, 1256:21
**agreement** [6] - 1286:1, 1286:2, 1286:18, 1286:21, 1286:25, 1362:18
**agreements** [3] - 1131:24, 1156:23, 1218:2
**ahead** [16] - 1141:11, 1143:8, 1170:17, 1185:25, 1189:8, 1215:5, 1228:5, 1246:19, 1296:8, 1314:4, 1319:12, 1331:19, 1345:1, 1353:22, 1359:23, 1361:8
**aided** [1] - 1121:18
**air** [2] - 1209:14, 1312:24
**AI** [1] - 1150:6
**albeit** [1] - 1287:21
**allegation** [9] - 1264:14, 1264:16, 1264:18, 1271:24, 1284:25, 1285:3,

1285:7, 1291:9, 1390:2
**allegations** [1] - 1155:5
**allege** [1] - 1285:5
**alleged** [1] - 1354:3
**allocation** [1] - 1178:13
**allocations** [1] - 1236:18
**allow** [3] - 1146:1, 1205:19, 1276:25
**allowed** [4] - 1122:6, 1167:5, 1272:13, 1331:17
**almost** [1] - 1173:18
**alternative** [11] - 1309:12, 1309:25, 1327:19, 1327:21, 1328:1, 1328:4, 1328:5, 1328:6, 1328:7, 1328:8, 1328:13
**amenable** [1] - 1205:21
**amended** [4] - 1229:15, 1229:19, 1237:3, 1237:4
**AMERICA** [1] - 1120:3
**America** [1] - 1288:5
**Americas** [1] - 1121:4
**AMEX** [6] - 1283:4, 1283:23, 1283:25, 1284:7, 1284:11, 1284:20
**amount** [11] - 1129:23, 1132:2, 1132:3, 1140:3, 1189:6, 1193:9, 1309:19, 1324:21, 1336:23, 1343:23, 1349:1
**amounts** [3] - 1136:23, 1142:17, 1219:25
**anal** [1] - 1380:15
**analysis** [2] - 1182:15, 1183:2
**analysts** [1] - 1155:7
**AND** [1] - 1120:12
**Andy** [38] - 1124:12, 1126:1, 1128:4, 1128:5, 1129:19, 1131:17, 1139:5, 1140:1, 1140:18, 1142:10, 1145:5, 1145:16, 1145:18, 1146:10, 1151:12, 1154:3, 1155:10, 1155:11, 1161:9, 1161:15, 1172:18, 1173:1, 1174:25, 1180:8, 1180:17, 1180:18, 1181:1, 1181:2, 1181:12, 1181:20, 1188:10, 1188:17, 1191:6, 1192:23, 1193:7, 1199:3, 1246:5
**andy** [2] - 1131:15, 1136:6
**annual** [1] - 1124:25
**Anscher** [4] - 1287:8, 1294:4, 1295:10, 1376:25
**ANSWER** [11] - 1193:12, 1193:18, 1193:22, 1194:2, 1200:4, 1200:6, 1201:10, 1257:6, 1265:15, 1265:19, 1265:22
**answer** [41] - 1122:15, 1129:6, 1135:5, 1143:24, 1153:25, 1158:4, 1193:2, 1200:13, 1200:15, 1200:16, 1202:8, 1209:20, 1212:18, 1216:22, 1218:5, 1222:22, 1223:25, 1224:3, 1239:5, 1250:22, 1257:3, 1322:2, 1322:4, 1331:11, 1331:16, 1331:20, 1340:17, 1346:22, 1347:2, 1348:13, 1348:16, 1349:18, 1349:22, 1351:1, 1351:2, 1351:12, 1351:16, 1351:20, 1351:22, 1352:20, 1393:5
**answered** [9] - 1213:19, 1250:14, 1250:17, 1276:14, 1276:18, 1290:24, 1346:25, 1350:23, 1350:24
**answering** [3] - 1222:13, 1346:11, 1353:1
**answers** [10] - 1131:4, 1131:8, 1193:1, 1194:5, 1194:10, 1200:8, 1200:11,

1200:17, 1212:17, 1265:11
**anticipate** [2] - 1252:7, 1392:6
**anyplace** [1] - 1249:18
**anyway** [3] - 1171:6, 1191:4, 1196:1
**APEKSHA** [1] - 1121:6
**apologize** [6] - 1186:25, 1208:2, 1268:16, 1269:13, 1298:20, 1352:2, 1367:20, 1369:17
**apossibilitying** [1] - 1380:19
**appear** [2] - 1290:12, 1321:1
**Apple** [4] - 1304:15, 1304:16, 1305:16, 1338:6
**applies** [1] - 1389:5
**appreciate** [2] - 1191:6, 1310:17
**approach** [2] - 1168:14, 1249:13
**appropriate** [4] - 1129:10, 1198:10, 1389:24, 1390:1
**approval** [12] - 1376:10, 1376:11, 1379:4, 1379:8, 1379:16, 1379:17, 1380:4, 1380:6, 1380:8, 1380:10, 1380:19, 1380:24
**approvals** [2] - 1379:4, 1379:8
**approved** [3] - 1253:20, 1351:3, 1379:11
**approver** [1] - 1376:14
**April** [19] - 1138:18, 1138:24, 1155:14, 1155:16, 1156:8, 1192:3, 1216:25, 1261:8, 1277:25, 1278:4, 1278:6, 1287:25, 1365:22, 1366:17, 1368:25, 1370:1, 1370:5, 1371:4, 1371:22
**AR** [2] - 1181:4, 1181:5
**area** [2] - 1328:14, 1394:4
**ARENT** [2] - 1121:2, 1121:7
**argue** [2] - 1205:12, 1209:19
**argument** [3] - 1212:17, 1253:15, 1253:19
**arrived** [1] - 1334:15
**Arroyos** [8] - 1207:13, 1207:25, 1208:15, 1211:11, 1234:3, 1234:11, 1267:2, 1273:10
**ARTIE** [1] - 1120:16
**Ascendant** [23] - 1141:17, 1184:3, 1187:14, 1187:23, 1223:9, 1223:13, 1225:24, 1226:3, 1226:25, 1234:11, 1285:21, 1287:3, 1290:24, 1291:2, 1291:4, 1291:6, 1307:21, 1348:1, 1374:1, 1379:5, 1384:7, 1387:24, 1391:18
**ascended** [1] - 1277:13
**aside** [2] - 1220:5, 1234:14
**asserting** [1] - 1223:5
**assertion** [2] - 1143:14, 1276:11
**assessment** [1] - 1154:20
**asset** [1] - 1312:1
**assets** [4] - 1189:1, 1301:6, 1311:21, 1312:10
**Assistant** [1] - 1120:18
**associated** [1] - 1282:15
**assume** [3] - 1150:13, 1174:18, 1234:20
**assumed** [1] - 1196:16
**assuming** [2] - 1304:10, 1362:12
**assurance** [3] - 1219:15, 1238:18, 1245:5
**assurances** [1] - 1219:22
**atmosphere** [2] - 1374:18, 1374:20
**attached** [15] - 1138:17, 1139:6, 1142:16, 1143:16, 1147:2, 1148:21,

1151:9, 1212:3, 1214:12, 1214:25,
1218:21, 1219:2, 1234:5, 1236:23,
1241:7

**attaching** [1] - 1150:14
**attachment** [8] - 1145:18, 1148:15,
1205:8, 1215:10, 1244:14, 1267:4,
1358:5, 1364:22
**attachments** [1] - 1215:10
**attention** [7] - 1166:12, 1258:5,
1264:14, 1283:3, 1352:22, 1368:9,
1394:6
**attestations** [1] - 1156:17
**attested** [1] - 1157:2
**Attorney** [1] - 1121:11
**attorney** [7] - 1157:13, 1157:15,
1157:18, 1207:21, 1253:7, 1278:14,
1279:9
**ATTORNEYS** [1] - 1120:14
**Attorneys** [2] - 1120:18, 1121:7
**attorneys** [9] - 1120:19, 1121:3, 1204:6,
1204:16, 1205:5, 1253:20, 1253:23,
1253:25, 1390:9
**audit** [2] - 1153:4, 1154:8
**audited** [22] - 1125:22, 1127:14,
1127:17, 1128:3, 1129:14, 1129:22,
1136:14, 1137:2, 1142:16, 1151:24,
1152:16, 1187:24, 1190:14, 1190:15,
1190:21, 1198:19, 1298:11, 1321:14,
1361:21, 1362:8, 1362:23, 1363:16
**auditor** [2] - 1197:21, 1198:3
**auditors** [14] - 1148:21, 1150:9,
1150:20, 1152:3, 1152:25, 1156:13,
1197:14, 1197:15, 1197:18, 1198:8,
1198:13, 1310:3, 1310:6, 1328:21
**August** [5] - 1180:14, 1181:21, 1261:4,
1306:23, 1356:21
**Austin** [1] - 1284:13
**authenticity** [1] - 1380:3
**Author** [1] - 1260:10
**author** [1] - 1176:18
**authored** [1] - 1345:16
**authority** [2] - 1286:1, 1286:10
**Auto** [10] - 1127:10, 1148:15, 1166:7,
1208:16, 1229:6, 1294:16, 1301:2,
1306:10, 1359:15
**auto** [8] - 1176:9, 1256:4, 1256:7,
1261:12, 1263:5, 1325:16, 1325:22,
1366:3
**Auto Fund** [4] - 1345:4, 1347:3, 1352:9,
1367:19
**automotive** [5] - 1178:13, 1194:16,
1257:23, 1259:15, 1365:10
**Automotive** [31] - 1124:11, 1124:21,
1125:21, 1127:18, 1130:12, 1152:17,
1153:1, 1153:5, 1158:22, 1158:25,
1162:18, 1173:4, 1174:14, 1177:3,
1178:3, 1178:16, 1181:3, 1181:7,
1188:11, 1194:24, 1199:10, 1207:19,
1256:13, 1256:16, 1256:24, 1257:5,
1257:11, 1257:16, 1258:14, 1258:15,
1267:5
**available** [8] - 1128:25, 1130:8, 1190:3,
1258:25, 1337:23, 1337:24, 1337:25,
1343:6
**Avenue** [2] - 1121:4, 1121:12
**avoid** [3] - 1204:7, 1380:14, 1382:14

**aware** [17] - 1135:2, 1135:6, 1135:17,
1135:21, 1184:5, 1184:17, 1198:5,
1198:8, 1198:11, 1244:20, 1354:9,
1368:23, 1374:9, 1379:16, 1384:10,
1387:24, 1390:1
**awfully** [1] - 1178:18
**AXELROD** [20] - 1120:17, 1204:4,
1204:21, 1205:6, 1205:23, 1206:5,
1207:4, 1223:1, 1226:16, 1226:18,
1226:23, 1241:25, 1253:12, 1269:1,
1320:3, 1379:10, 1379:21, 1380:12,
1380:21, 1388:22
**Axelrod** [1] - 1277:25

# B

**backed** [4] - 1197:5, 1197:8, 1197:15,
1197:20
**background** [1] - 1344:10
**backing** [1] - 1198:10
**backup** [1] - 1360:14
**BADELL** [1] - 1120:22
**badly** [1] - 1391:19
**balance** [8] - 1188:23, 1189:4, 1333:14,
1340:15, 1340:17, 1341:9, 1341:10,
1341:11
**bank** [4] - 1299:20, 1309:21, 1336:23,
1344:14
**banks** [1] - 1309:9
**based** [9] - 1129:11, 1132:24, 1190:10,
1209:1, 1209:2, 1326:22, 1337:16,
1338:13, 1349:17
**basics** [1] - 1255:4
**basis** [8] - 1177:13, 1195:15, 1299:19,
1299:21, 1332:24, 1335:2, 1337:7,
1343:23
**Bates** [5] - 1131:16, 1134:12, 1134:16,
1136:3, 1237:8
**BBS** [1] - 1285:10
**BBT** [1] - 1286:19
**bear** [1] - 1297:23
**bearing** [1] - 1170:15
**became** [1] - 1368:14
**become** [3] - 1205:1, 1332:10, 1332:14
**becomes** [3] - 1128:24, 1271:18,
1301:23
**becoming** [1] - 1389:22
**begin** [3] - 1159:6, 1196:3, 1349:2
**beginning** [6] - 1191:20, 1207:9,
1245:13, 1323:1, 1323:5, 1355:21
**begins** [1] - 1137:1
**behalf** [4] - 1211:16, 1213:6, 1285:16,
1287:8
**behind** [3] - 1326:24, 1391:2, 1393:7
**belabor** [1] - 1238:17
**belief** [1] - 1307:9
**belonged** [2] - 1173:8, 1174:10
**below** [4] - 1125:24, 1289:10, 1289:16,
1300:6
**benefit** [8] - 1130:20, 1131:20, 1136:2,
1256:9, 1257:24, 1261:13, 1261:17,
1263:6
**best** [8] - 1126:6, 1213:7, 1249:1,
1249:2, 1271:6, 1278:9, 1382:19, 1392:3
**bet** [1] - 1174:7

**better** [3] - 1231:18, 1357:3, 1393:12
**between** [11] - 1151:18, 1151:19,
1223:15, 1226:1, 1273:9, 1286:25,
1308:5, 1309:16, 1315:7, 1363:21,
1382:25
**beyond** [3] - 1204:25, 1227:5, 1257:14
**bias** [1] - 1272:6
**big** [4] - 1196:9, 1235:9, 1297:7,
1363:21
**bigger** [4] - 1339:22, 1339:24, 1341:14,
1341:24
**Bill** [10] - 1208:4, 1234:14, 1260:10,
1260:13, 1272:5, 1273:16, 1273:22,
1294:6, 1296:15, 1318:14
**billion** [13] - 1301:14, 1303:20, 1303:24,
1304:15, 1304:18, 1305:3, 1305:7,
1305:14, 1305:17, 1312:8, 1336:13,
1336:15, 1338:1
**billions** [1] - 1196:8
**BINHAK** [2] - 1121:11, 1121:14
**bit** [13] - 1169:23, 1198:22, 1262:10,
1262:25, 1315:5, 1340:7, 1345:2,
1353:24, 1360:23, 1375:17, 1385:23,
1392:19, 1394:2
**black** [2] - 1189:18, 1220:9
**blatantly** [1] - 1272:6
**blessed** [1] - 1253:20
**blow** [33] - 1131:17, 1139:25, 1140:1,
1140:5, 1148:11, 1148:15, 1150:3,
1150:19, 1150:22, 1151:13, 1152:23,
1153:11, 1172:8, 1172:25, 1180:8,
1181:1, 1181:2, 1181:11, 1188:17,
1216:17, 1219:15, 1244:16, 1245:5,
1260:5, 1268:16, 1285:14, 1314:23,
1340:7, 1358:14, 1365:17, 1366:11,
1385:5
**blowing** [1] - 1248:25
**blown** [1] - 1314:21
**blue** [1] - 1366:5
**Bob's Buick** [5] - 1145:8, 1147:10,
1148:3, 1150:25, 1151:13
**bond** [1] - 1327:22
**bonus** [2] - 1349:6, 1349:8
**book** [1] - 1194:12, 1197:24, 1197:25
**booked** [8] - 1151:1, 1195:7, 1195:8,
1195:9, 1195:21, 1195:24, 1197:14,
1197:19
**booking** [3] - 1196:15, 1198:10, 1198:13
**books** [4] - 1311:25, 1312:7, 1312:8,
1348:3
**bored** [1] - 1394:2
**borrow** [1] - 1257:7
**bot** [1] - 1358:15
**bothered** [1] - 1191:7
**bottom** [27] - 1128:6, 1136:7, 1136:22,
1147:9, 1147:16, 1180:19, 1181:11,
1213:21, 1232:13, 1233:20, 1237:9,
1268:3, 1268:15, 1268:19, 1278:24,
1279:2, 1287:7, 1314:4, 1314:20,
1362:24, 1365:18, 1366:1, 1366:7,
1366:12, 1366:15, 1385:6
**bought** [4] - 1257:23, 1301:7, 1301:13,
1338:6
**box** [1] - 1260:5
**brand** [7] - 1256:12, 1256:15, 1256:19,
1256:21, 1256:22, 1257:6, 1257:10

**Break** [1] - 1142:15
**break** [24] - 1126:5, 1136:12, 1140:20, 1164:23, 1165:14, 1166:2, 1168:19, 1170:22, 1206:7, 1224:8, 1225:2, 1228:7, 1229:24, 1251:23, 1251:24, 1310:10, 1310:12, 1310:18, 1311:7, 1353:5, 1353:10, 1353:11, 1353:24, 1364:8
**breakdown** [1] - 1142:5
**breaks** [1] - 1353:12
**Brengel** [1] - 1307:11
**Brian** [3] - 1290:2, 1294:8, 1296:2
**brief** [7] - 1169:9, 1169:15, 1221:9, 1269:25, 1376:3, 1382:11, 1388:16
**briefly** [2] - 1171:7, 1385:18
**bring** [3] - 1122:10, 1195:4, 1258:5
**bringing** [2] - 1253:12, 1358:6
**brings** [1] - 1379:6
**broader** [1] - 1254:7
**broke** [1] - 1311:7
**broken** [1] - 1226:4
**broker** [19] - 1143:1, 1183:10, 1183:12, 1183:17, 1185:13, 1189:21, 1346:19, 1348:13, 1348:21, 1349:11, 1349:14, 1349:22, 1349:24, 1350:4, 1350:7, 1350:10, 1350:12, 1351:18, 1352:9
**broker's** [1] - 1346:22
**broker-dealers** [4] - 1183:10, 1183:17, 1185:13, 1189:21
**broker-dealers'** [1] - 1183:12
**Brooklyn** [2] - 1120:5, 1120:15
**brought** [1] - 1166:12
**Bruce** [2] - 1198:1, 1348:4
**BS** [1] - 1197:10
**BUCKLEY** [1] - 1120:21
**bugs** [2] - 1354:15, 1355:24
**Buick** [2] - 1147:12, 1150:23
**build** [1] - 1324:2
**bulb** [1] - 1156:2
**bullet** [4] - 1136:12, 1137:1, 1232:13, 1232:20
**bunch** [4] - 1216:8, 1242:1, 1258:2, 1393:23
**business** [14] - 1212:6, 1283:16, 1283:24, 1284:11, 1301:2, 1323:12, 1325:16, 1326:11, 1326:14, 1327:7, 1344:16, 1344:19, 1344:23
**business's** [1] - 1326:21
**businesses** [1] - 1325:14
**but..** [4] - 1162:6, 1171:17, 1316:2, 1393:5
**butchering** [1] - 1236:5
**buy** [11] - 1257:7, 1257:13, 1257:16, 1257:19, 1261:12, 1263:5, 1263:16, 1264:3, 1303:16, 1304:16, 1305:16
**buying** [2] - 1256:16, 1263:8
**BX** [1] - 1191:16
**bye** [1] - 1262:14

## C

**Cadman** [1] - 1120:15
**calculate** [4] - 1311:16, 1312:14, 1314:8, 1349:15
**calculated** [1] - 1316:9
**calculating** [1] - 1359:5

**calculation** [1] - 1208:5
**cannot** [3] - 1223:15, 1281:3, 1337:2
**capable** [1] - 1222:13
**Capital** [25] - 1173:2, 1173:9, 1231:10, 1255:7, 1255:18, 1284:15, 1285:16, 1285:20, 1285:21, 1285:25, 1286:6, 1286:25, 1287:3, 1287:9, 1287:16, 1288:2, 1290:24, 1291:2, 1291:4, 1291:6, 1291:14, 1374:1, 1379:5, 1387:24, 1391:18
**capital** [19] - 1216:18, 1217:24, 1219:25, 1220:11, 1236:18, 1237:11, 1238:24, 1245:10, 1304:7, 1330:23, 1331:4, 1334:13, 1336:3, 1336:15, 1337:9, 1348:24, 1349:1, 1368:2, 1368:4
**car** [2] - 1256:16, 1264:9
**card** [4] - 1283:4, 1284:12, 1284:14, 1284:20
**cards** [1] - 1283:17
**care** [1] - 1226:13
**cared** [1] - 1264:2
**careful** [1] - 1150:13
**carefully** [1] - 1153:15
**carried** [4] - 1228:25, 1229:7, 1229:13, 1246:24
**carryover** [1] - 1288:25
**cars** [1] - 1325:19
**Carter** [1] - 1156:4
**case** [24] - 1122:25, 1127:8, 1164:9, 1165:10, 1193:12, 1210:15, 1227:9, 1237:6, 1252:1, 1253:18, 1253:20, 1261:21, 1271:9, 1313:4, 1327:7, 1380:13, 1380:15, 1387:2, 1389:22, 1390:3, 1390:5, 1391:25, 1392:7, 1393:18
**cases** [3] - 1131:23, 1393:19, 1393:20
**cash** [61] - 1126:17, 1126:20, 1128:16, 1128:18, 1128:19, 1128:20, 1128:24, 1129:3, 1129:7, 1129:25, 1130:2, 1130:7, 1130:24, 1137:3, 1189:14, 1256:8, 1299:19, 1299:20, 1300:19, 1304:10, 1304:11, 1304:20, 1304:23, 1305:9, 1305:11, 1305:18, 1316:22, 1317:17, 1324:15, 1324:17, 1325:3, 1325:8, 1332:12, 1333:14, 1336:7, 1336:23, 1337:1, 1337:2, 1337:3, 1337:7, 1337:16, 1337:22, 1337:23, 1337:25, 1338:8, 1338:10, 1341:23, 1342:8, 1342:9, 1342:20, 1342:24, 1343:3, 1343:5, 1343:6, 1343:10, 1343:15, 1344:11, 1344:13, 1344:18
**cash-based** [1] - 1337:16
**catch** [1] - 1343:20
**causing** [1] - 1242:24
**CCCCCT** [3] - 1138:10, 1138:23, 1396:5
**CCO** [2] - 1288:13, 1290:2
**Central** [13] - 1158:21, 1158:25, 1162:18, 1166:7, 1173:4, 1174:1, 1174:14, 1178:2, 1256:12, 1256:15, 1256:24, 1257:5, 1257:11
**certain** [9] - 1132:2, 1152:4, 1195:14, 1197:19, 1305:5, 1342:10, 1343:23, 1344:9, 1344:24
**certainly** [9] - 1243:2, 1247:25, 1266:3, 1286:10, 1315:12, 1330:14, 1357:6, 1361:5, 1374:14

**certainty** [1] - 1332:19
**certify** [1] - 1288:4
**CF** [3] - 1132:13, 1132:16, 1134:15
**CFO** [24] - 1155:20, 1167:10, 1187:4, 1187:8, 1256:16, 1259:16, 1262:8, 1262:18, 1262:19, 1277:13, 1282:23, 1283:14, 1288:12, 1290:2, 1319:15, 1324:21, 1339:11, 1340:13, 1343:24, 1347:19, 1368:14, 1371:12, 1373:10, 1373:17
**CFO's** [1] - 1373:22
**CFOs** [1] - 1373:18
**chain** [12] - 1136:7, 1136:16, 1136:18, 1140:16, 1141:4, 1141:25, 1143:10, 1218:17, 1218:19, 1239:20, 1268:19, 1268:24
**challenge** [1] - 1222:18
**chance** [2] - 1167:15, 1366:11
**change** [7] - 1165:12, 1311:25, 1326:22, 1327:8, 1356:25, 1357:8, 1388:2
**changed** [1] - 1311:23
**changes** [8] - 1166:17, 1209:10, 1213:23, 1215:25, 1216:1, 1216:8, 1354:14, 1357:3
**changing** [2] - 1201:15, 1212:11
**charge** [1] - 1262:9
**charged** [1] - 1284:14
**chart** [7] - 1137:14, 1137:20, 1138:4, 1138:5, 1139:5, 1139:6, 1321:13
**charts** [4] - 1234:15, 1314:1, 1355:17, 1355:19
**chastised** [1] - 1227:3
**check** [2] - 1169:8, 1190:12
**chief** [22] - 1153:12, 1177:3, 1183:23, 1195:11, 1196:6, 1196:13, 1213:14, 1255:6, 1285:17, 1285:25, 1286:6, 1288:12, 1288:13, 1289:10, 1289:11, 1289:12, 1294:15, 1296:19, 1296:22, 1297:1
**chronology** [1] - 1241:15
**Chrysler** [1] - 1348:4
**Chung** [1] - 1354:24, 1355:14
**circuit** [2] - 1360:22, 1366:21
**City** [2] - 1139:17, 1194:19
**claim** [2] - 1166:10, 1267:25
**clarification** [1] - 1316:4
**clarified** [1] - 1170:8, 1318:2
**clarify** [4] - 1137:1, 1212:13, 1228:13, 1349:16
**clarifying** [1] - 1205:20
**clarity** [1] - 1212:14
**classic** [4] - 1312:6, 1325:16, 1327:22, 1379:12
**cleaner** [1] - 1250:9
**clear** [19] - 1130:23, 1131:20, 1153:20, 1170:1, 1183:5, 1201:3, 1202:6, 1223:6, 1265:25, 1268:7, 1304:22, 1308:5, 1308:11, 1310:3, 1352:8, 1358:22, 1371:10, 1372:17, 1389:2
**clerk** [2] - 1269:17, 1390:18
**click** [1] - 1175:13
**clients** [1] - 1183:13
**close** [2] - 1196:21, 1282:5
**closing** [1] - 1349:3
**Code** [4] - 1296:9, 1296:12, 1296:15, 1296:22

**codes** [2] - 1297:4, 1297:7
**COGAN** [10] - 1120:23, 1137:17,
1177:25, 1242:15, 1388:14, 1388:17,
1388:20, 1389:15, 1393:9, 1393:11
**coincidence** [1] - 1173:18
**collateral** [2] - 1165:5, 1166:23
**collect** [3] - 1128:18, 1182:16, 1349:4
**collected** [5] - 1125:20, 1128:20,
1128:24, 1130:7, 1342:7
**collecting** [1] - 1331:7
**color** [2] - 1364:25, 1365:9
**COLTON** [175] - 1121:5, 1168:20,
1168:22, 1169:2, 1205:14, 1206:8,
1223:6, 1241:19, 1254:1, 1254:19,
1254:22, 1258:8, 1259:6, 1260:5,
1264:12, 1266:11, 1266:16, 1267:9,
1268:24, 1269:2, 1269:8, 1269:16,
1269:22, 1271:20, 1272:12, 1272:16,
1273:3, 1276:3, 1276:11, 1276:21,
1277:2, 1277:4, 1277:21, 1278:18,
1279:18, 1281:10, 1282:3, 1284:24,
1285:11, 1289:6, 1291:5, 1291:16,
1291:21, 1293:2, 1293:21, 1294:25,
1295:2, 1295:14, 1295:18, 1295:23,
1296:8, 1296:11, 1297:12, 1297:21,
1297:25, 1298:8, 1298:15, 1298:19,
1305:22, 1306:16, 1310:11, 1310:17,
1311:5, 1311:6, 1313:3, 1313:9, 1314:24,
1316:5, 1316:7, 1316:14, 1317:7, 1317:8,
1318:4, 1318:6, 1318:19, 1319:9,
1319:13, 1319:18, 1319:20, 1319:25,
1320:4, 1320:6, 1320:10, 1320:14,
1320:17, 1329:10, 1329:12, 1330:20,
1331:11, 1331:15, 1331:21, 1331:23,
1331:25, 1334:8, 1334:11, 1336:1,
1337:11, 1337:13, 1339:6, 1339:14,
1339:20, 1340:6, 1340:24, 1345:20,
1345:24, 1346:5, 1346:7, 1351:5,
1351:23, 1351:25, 1352:7, 1353:6,
1353:9, 1353:14, 1353:21, 1353:23,
1355:6, 1355:10, 1356:12, 1356:17,
1357:12, 1357:24, 1358:2, 1358:5,
1358:11, 1359:24, 1360:10, 1360:12,
1360:15, 1360:19, 1361:9, 1362:4,
1362:14, 1362:18, 1364:6, 1364:10,
1364:24, 1365:5, 1366:11, 1368:6,
1368:8, 1369:10, 1369:12, 1371:2,
1371:16, 1372:16, 1373:9, 1375:2,
1375:18, 1375:25, 1378:5, 1378:11,
1379:2, 1379:13, 1379:23, 1380:9,
1380:17, 1382:2, 1382:4, 1382:12,
1382:17, 1383:22, 1384:17, 1385:1,
1385:12, 1385:16, 1385:21, 1386:1,
1386:15, 1386:20, 1387:9, 1387:12,
1389:2, 1392:14, 1394:7
**Colton** [2] - 1252:10, 1254:18
**COLTON...........................** [1] - 1395:19
**columns** [3] - 1139:9, 1140:1, 1180:8
**comfort** [1] - 1332:4
**comfortable** [2] - 1195:20, 1196:15
**coming** [11] - 1124:14, 1225:22,
1241:10, 1241:12, 1252:7, 1299:16,
1329:5, 1344:20, 1379:3, 1380:10,
1388:4
**comment** [4] - 1234:16, 1234:19,
1234:24, 1253:11

**commented** [1] - 1284:7
**Comments** [1] - 1267:5
**comments** [14] - 1204:13, 1207:18,
1208:2, 1213:22, 1214:3, 1214:7, 1230:9,
1267:8, 1267:19, 1267:22, 1268:1,
1376:15, 1376:17
**Commission** [2] - 1288:16, 1288:18
**commit** [1] - 1248:3
**committee** [5] - 1295:1, 1295:3, 1295:6,
1295:12
**common** [9] - 1283:16, 1283:17,
1283:19, 1310:2, 1373:6, 1373:8,
1373:16, 1373:19, 1374:19
**communicate** [1] - 1352:9
**communicated** [11] - 1155:6, 1183:16,
1204:14, 1208:3, 1351:18, 1354:2,
1354:5, 1355:13, 1359:9, 1359:11,
1359:17
**communications** [1] - 1227:8
**companies** [8] - 1219:21, 1283:15,
1299:17, 1332:8, 1332:9, 1332:10,
1332:18, 1364:5
**companies'** [1] - 1173:19
**company** [16] - 1162:18, 1194:16,
1196:6, 1255:12, 1285:6, 1290:12,
1298:9, 1300:12, 1300:15, 1312:14,
1332:14, 1334:15, 1337:14, 1337:15,
1368:14, 1368:18
**compare** [2] - 1314:8, 1315:17
**compared** [3] - 1311:15, 1315:21,
1340:8
**comparing** [3] - 1316:9, 1342:25,
1343:11
**comparison** [3] - 1309:16, 1315:16,
1317:10
**compete** [3] - 1263:17, 1263:21, 1297:8
**competent** [1] - 1307:14
**competes** [1] - 1264:6
**competing** [1] - 1263:19
**competition** [2] - 1258:23, 1259:15
**complained** [1] - 1249:19
**complaint** [10] - 1177:17, 1248:16,
1249:4, 1249:10, 1249:19, 1250:10,
1250:19, 1250:21, 1250:24, 1251:17
**complete** [2] - 1196:18, 1303:2
**completely** [2] - 1324:20, 1364:1
**compliance** [8] - 1288:13, 1289:12,
1296:19, 1296:22, 1297:1, 1382:20,
1383:1, 1383:3
**complicated** [2] - 1306:15, 1333:16
**complies** [1] - 1316:19
**Computer** [1] - 1121:18
**Computer-aided** [1] - 1121:18
**computerized** [1] - 1121:18
**concept** [5] - 1125:12, 1300:2, 1307:15,
1323:12, 1330:22
**concepts** [4] - 1297:16, 1298:18,
1302:5, 1308:8
**conceptual** [1] - 1324:2
**concerned** [2] - 1155:17, 1190:4
**concerning** [1] - 1207:19
**concerns** [8] - 1155:14, 1155:15,
1156:9, 1156:10, 1219:6, 1219:8, 1249:5,
1250:11
**concluded** [4] - 1134:20, 1206:9,
1224:9, 1243:4

**concludes** [5] - 1165:16, 1272:21,
1275:4, 1281:11, 1381:1
**conducted** [1] - 1342:23
**confer** [3] - 1254:5, 1388:3, 1388:14
**conference** [5] - 1134:1, 1204:1,
1222:1, 1241:1, 1390:20
**confident** [2] - 1252:4, 1391:25
**confidentiality** [2] - 1172:12, 1172:15
**confirm** [1] - 1208:17
**confirming** [1] - 1348:1
**confused** [8] - 1128:1, 1144:7, 1144:24,
1241:14, 1316:12, 1317:5, 1317:11,
1321:9
**confusing** [5] - 1314:16, 1314:17,
1315:4, 1316:3, 1331:14
**confusion** [1] - 1169:23
**connection** [7] - 1152:16, 1153:4,
1164:19, 1253:15, 1261:11, 1312:17,
1380:3
**considered** [1] - 1156:24
**consistent** [1] - 1170:10
**consistently** [1] - 1282:10
**Consolidated** [1] - 1298:22
**construct** [1] - 1389:23
**consult** [1] - 1192:4
**consultant** [2] - 1261:3, 1261:6
**contact** [1] - 1296:15
**contain** [1] - 1371:11
**contained** [1] - 1267:4
**contend** [1] - 1134:6
**Content** [1] - 1260:15
**content** [5] - 1176:24, 1179:11, 1179:12,
1276:9, 1276:19
**contention** [2] - 1342:11, 1342:12
**contents** [2] - 1143:7, 1168:23
**contest** [1] - 1222:18
**context** [4] - 1200:2, 1200:18, 1208:10,
1309:12
**Continued** [20] - 1121:1, 1159:23,
1165:17, 1201:19, 1203:10, 1206:11,
1221:14, 1224:11, 1240:5, 1243:6,
1245:22, 1246:1, 1252:23, 1272:22,
1275:5, 1281:12, 1292:7, 1335:9,
1370:12, 1381:2
**continued** [8] - 1123:7, 1133:5,
1134:20, 1163:4, 1270:4, 1274:4, 1280:1,
1378:14
**continuing** [1] - 1161:13
**Continuing** [11] - 1170:21, 1171:24,
1202:1, 1273:4, 1276:4, 1277:5, 1282:4,
1293:1, 1336:1, 1382:5, 1382:18
**continuously** [1] - 1356:25
**contracts** [1] - 1137:25
**contractual** [2] - 1156:22, 1156:23
**contrary** [2] - 1286:3, 1347:21
**contributing** [1] - 1171:13
**contributions** [2] - 1216:18, 1237:11
**control** [6] - 1154:14, 1155:1, 1290:5,
1290:9, 1291:10, 1291:11
**controlled** [1] - 1285:1
**conversation** [7] - 1217:1, 1217:3,
1225:20, 1251:2, 1251:19, 1334:3,
1349:15
**conversations** [8] - 1221:3, 1225:17,
1226:1, 1265:13, 1265:16, 1321:21,
1328:19, 1328:21

Case 1:21-cr-00054-RPK-PK    Document 424-3    Filed 07/12/24    Page 285 of 306
PageID #: 14643

**convertible** [8] - 1132:12, 1135:8, 1135:13, 1135:14, 1135:22, 1137:25, 1143:22, 1145:2

**conveyed** [1] - 1204:23

**COO** [2] - 1290:2, 1377:2

**copied** [5] - 1143:10, 1167:8, 1267:17, 1273:12, 1351:10

**copy** [14] - 1138:25, 1147:7, 1158:2, 1158:3, 1158:5, 1164:21, 1178:21, 1253:8, 1296:15, 1320:1, 1320:3, 1364:25, 1390:18

**copycat** [3] - 1167:5, 1168:1, 1177:20

**corner** [3] - 1358:15, 1366:1, 1366:7

**correct** [178] - 1127:3, 1128:11, 1131:3, 1131:25, 1136:18, 1137:11, 1141:12, 1142:12, 1142:23, 1144:12, 1144:15, 1145:19, 1147:2, 1148:14, 1148:22, 1150:4, 1150:20, 1152:1, 1155:22, 1177:5, 1177:20, 1181:5, 1181:17, 1181:23, 1182:10, 1182:24, 1183:10, 1183:23, 1184:4, 1188:11, 1191:9, 1196:8, 1198:14, 1200:6, 1201:13, 1207:16, 1207:22, 1208:11, 1208:16, 1209:7, 1211:9, 1211:16, 1212:25, 1214:5, 1215:11, 1216:6, 1217:2, 1218:23, 1218:25, 1220:12, 1231:11, 1233:22, 1234:3, 1236:25, 1244:9, 1244:18, 1245:1, 1248:4, 1248:11, 1248:13, 1248:16, 1248:22, 1250:11, 1250:15, 1251:13, 1255:7, 1255:13, 1255:15, 1255:18, 1256:2, 1256:5, 1256:9, 1256:13, 1256:17, 1256:22, 1256:25, 1257:11, 1257:12, 1257:14, 1257:17, 1257:19, 1257:21, 1257:25, 1258:16, 1258:21, 1259:2, 1260:2, 1260:7, 1260:16, 1261:4, 1261:13, 1261:20, 1261:23, 1262:20, 1263:6, 1264:22, 1266:2, 1266:6, 1267:17, 1267:18, 1267:23, 1268:5, 1268:19, 1273:12, 1277:8, 1277:10, 1277:25, 1278:8, 1283:8, 1284:10, 1285:18, 1285:21, 1286:7, 1286:10, 1286:13, 1286:16, 1286:17, 1287:9, 1287:12, 1287:22, 1287:24, 1288:2, 1288:7, 1288:13, 1288:16, 1288:19, 1289:17, 1289:24, 1290:2, 1291:2, 1291:14, 1291:25, 1292:5, 1293:25, 1295:4, 1297:8, 1298:1, 1302:19, 1306:10, 1306:13, 1306:21, 1308:8, 1309:5, 1311:11, 1311:16, 1312:5, 1315:7, 1315:13, 1316:11, 1320:10, 1320:22, 1321:1, 1322:5, 1326:25, 1328:16, 1336:22, 1343:24, 1345:16, 1346:25, 1347:10, 1347:14, 1347:16, 1347:24, 1354:25, 1356:7, 1357:16, 1358:24, 1359:10, 1359:21, 1369:18, 1369:21, 1369:24, 1372:25, 1373:3, 1375:11, 1377:22, 1380:21, 1384:4

**correctly** [2] - 1307:12, 1350:20

**costs** [1] - 1342:2

**counsel** [27] - 1134:2, 1168:8, 1204:2, 1212:16, 1222:2, 1223:15, 1241:2, 1257:4, 1264:4, 1265:9, 1268:14, 1274:3, 1278:19, 1279:16, 1279:25, 1297:22, 1306:17, 1310:9, 1313:3, 1316:14, 1338:25, 1351:6, 1354:19, 1356:5, 1357:13, 1359:25, 1387:19

**Counsel** [13] - 1170:17, 1235:20, 1266:24, 1329:13, 1339:1, 1345:13, 1351:8, 1354:20, 1356:4, 1357:14, 1360:1, 1364:12, 1369:6

**count** [1] - 1342:16

**counting** [1] - 1191:11

**country** [1] - 1139:23

**Country** [2] - 1140:5, 1140:6

**couple** [15] - 1179:1, 1188:2, 1247:1, 1255:4, 1266:16, 1266:19, 1291:19, 1307:17, 1311:24, 1316:20, 1338:20, 1339:6, 1357:10, 1364:6, 1382:13

**course** [10] - 1187:17, 1219:5, 1268:21, 1272:13, 1295:20, 1316:8, 1322:23, 1352:1, 1354:14, 1379:14

**Court** [43] - 1121:15, 1121:15, 1131:10, 1134:2, 1164:20, 1204:2, 1222:2, 1241:2, 1250:5, 1257:4, 1265:9, 1266:24, 1268:14, 1269:16, 1278:19, 1297:22, 1306:17, 1310:17, 1313:4, 1316:14, 1329:14, 1331:18, 1338:25, 1339:1, 1345:13, 1351:6, 1351:8, 1353:15, 1354:19, 1354:20, 1356:4, 1356:5, 1357:13, 1357:14, 1359:25, 1360:1, 1364:12, 1369:6, 1388:4, 1388:18, 1389:25, 1391:16, 1393:4

**court** [19] - 1122:1, 1122:5, 1122:8, 1122:18, 1122:19, 1163:3, 1166:1, 1207:1, 1225:1, 1244:1, 1253:3, 1273:1, 1276:1, 1282:1, 1283:22, 1285:7, 1310:23, 1378:12, 1382:1

**Court's** [1] - 1386:22

**Courthouse** [1] - 1120:5

**Courtroom** [1] - 1124:3

**courtroom** [7] - 1166:3, 1166:5, 1170:14, 1225:7, 1254:16, 1310:15, 1387:4

**cover** [11] - 1129:24, 1130:12, 1241:6, 1246:5, 1266:11, 1298:12, 1309:19, 1347:11, 1348:18, 1352:10, 1367:17

**coverage** [42] - 1126:15, 1128:10, 1184:18, 1184:25, 1185:3, 1185:8, 1186:5, 1186:12, 1188:14, 1307:16, 1307:21, 1309:4, 1309:13, 1310:4, 1310:7, 1311:8, 1311:12, 1311:16, 1314:8, 1315:16, 1315:22, 1316:9, 1317:10, 1322:8, 1325:3, 1327:13, 1328:16, 1328:19, 1328:22, 1328:25, 1330:22, 1332:1, 1341:22, 1348:2, 1348:8, 1359:5, 1366:3, 1366:5, 1366:22, 1368:3

**Coverage** [1] - 1365:18

**covered** [17] - 1125:3, 1125:6, 1128:15, 1134:8, 1185:14, 1188:20, 1193:5, 1245:16, 1247:4, 1247:5, 1247:24, 1340:13, 1349:11, 1361:3, 1361:4, 1369:23

**Crafa** [3] - 1387:21, 1388:7, 1388:21

**crafted** [1] - 1208:25

**crafting** [2] - 1162:17, 1208:22

**crap** [1] - 1196:18

**crazy** [1] - 1221:1

**creat** [1] - 1167:5

**create** [4] - 1167:25, 1175:6, 1325:8, 1365:14

**created** [13] - 1167:9, 1168:10, 1175:4,

1176:24, 1177:11, 1179:11, 1179:13, 1184:17, 1260:15, 1260:22, 1260:23, 1307:12, 1380:24

**creating** [1] - 1263:21

**creation** [2] - 1208:10, 1279:11

**creator** [2] - 1167:11, 1175:14

**credibility** [1] - 1272:6

**credit** [1] - 1283:17

**Cremins** [2] - 1164:8, 1166:4

**cribbing** [1] - 1174:9

**crime** [2] - 1278:8, 1279:7

**criminal** [1] - 1390:20

**Crimmins** [1] - 1307:4

**critically** [3] - 1268:9, 1268:10, 1272:10

**cross** [8] - 1123:4, 1149:12, 1242:16, 1242:17, 1254:3, 1327:25, 1389:3, 1389:18

**CROSS** [12] - 1124:5, 1150:1, 1171:23, 1202:1, 1246:1, 1254:21, 1293:1, 1395:6, 1395:10, 1395:12, 1395:16, 1395:18

**cross-examination** [5] - 1149:12, 1242:17, 1254:3, 1327:25, 1389:18

**CROSS-EXAMINATION** [11] - 1124:5, 1150:1, 1171:23, 1202:1, 1254:21, 1293:1, 1395:6, 1395:10, 1395:12, 1395:16, 1395:18

**cross-examining** [1] - 1242:16

**crossed** [1] - 1264:7

**crossing** [1] - 1227:4

**cumulative** [1] - 1243:1

**curative** [3] - 1204:7, 1206:1, 1389:23

**curious** [1] - 1156:13

**current** [3] - 1212:4, 1234:6, 1297:8

**customers** [1] - 1187:18

**cut** [5] - 1175:25, 1356:21, 1375:14, 1383:11, 1387:9

**cut-out** [1] - 1175:25

**cutting** [1] - 1250:7

**cyclical** [2] - 1325:14, 1325:16

# D

**Dan** [5] - 1208:2, 1208:4, 1208:16, 1267:1, 1274:1

**Daniel** [2] - 1204:12, 1207:13

**dash** [1] - 1138:11

**dashboard** [10] - 1313:15, 1321:4, 1355:15, 1357:19, 1360:7, 1362:22, 1363:7, 1363:22, 1364:21, 1365:14

**dashboards** [17] - 1313:19, 1313:20, 1315:6, 1319:4, 1319:16, 1320:25, 1352:22, 1354:1, 1354:2, 1354:12, 1357:1, 1357:7, 1357:11, 1363:25, 1365:9, 1367:16, 1367:23

**data** [5] - 1355:25, 1356:25, 1358:14, 1358:16, 1358:19

**date** [18] - 1151:3, 1155:11, 1160:13, 1177:11, 1179:10, 1179:13, 1180:14, 1180:19, 1201:14, 1241:8, 1260:17, 1322:24, 1323:1, 1349:5, 1358:20, 1358:22, 1358:25, 1372:23

**dated** [4] - 1132:21, 1266:14, 1364:21, 1385:9

**dattolo** [2] - 1346:16, 1346:18

**Dattolo** [1] - 1350:19

**Dave** [1] - 1197:24
**DAVID** [1] - 1120:8
**David** [9] - 1120:20, 1156:5, 1286:7, 1286:9, 1286:14, 1290:1, 1292:4, 1293:7, 1294:2
**days** [1] - 1307:17
**DC** [1] - 1121:9
**DDDD** [5] - 1160:2, 1160:22, 1162:23, 1173:3, 1396:10
**DDDD-DL** [1] - 1162:23
**DDDD-DS** [3] - 1160:2, 1160:22, 1396:10
**DDDD-DX** [1] - 1173:3
**DDDDDC** [3] - 1233:9, 1233:17, 1396:17
**DDDDDD** [4] - 1239:11, 1239:15, 1244:4, 1396:19
**DDDDDF** [3] - 1235:12, 1235:25, 1396:18
**DDDDDF-1** [1] - 1246:20
**DDDDDK-001** [1] - 1158:12
**DDDDDQ** [3] - 1145:17, 1146:8, 1396:7
**DDDDDR** [3] - 1140:13, 1141:14, 1396:6
**DDDDDV** [3] - 1152:10, 1152:22, 1396:9
**DDDQ** [1] - 1145:17
**deal** [4] - 1197:20, 1328:24, 1388:21, 1393:1
**dealer** [1] - 1325:22
**dealers** [5] - 1143:1, 1183:10, 1183:17, 1185:13, 1189:21
**dealers'** [1] - 1183:12
**dealership** [7] - 1132:3, 1139:11, 1147:10, 1151:19, 1300:17, 1301:7, 1311:23
**dealerships** [23] - 1126:21, 1132:6, 1139:1, 1140:3, 1142:23, 1143:16, 1146:19, 1151:18, 1256:4, 1256:7, 1256:16, 1257:8, 1257:13, 1257:23, 1258:16, 1258:20, 1259:15, 1261:12, 1261:17, 1263:5, 1263:16, 1264:10, 1300:16
**deals** [8] - 1192:16, 1193:22, 1194:12, 1195:5, 1195:14, 1196:24, 1197:19, 1198:1
**DEARINGTON** [1] - 1121:9
**debate** [1] - 1323:22
**debts** [1] - 1309:19
**dec** [4] - 1124:10, 1124:17, 1124:21
**December** [11] - 1132:5, 1147:14, 1191:23, 1191:24, 1237:2, 1313:17, 1315:10, 1315:11, 1366:9, 1366:10, 1370:9
**decide** [1] - 1304:14
**decided** [1] - 1352:13
**decision** [3] - 1195:23, 1368:21, 1373:22
**decisions** [1] - 1373:13
**deck** [8] - 1172:11, 1173:2, 1173:4, 1173:9, 1176:16, 1178:18, 1259:25, 1261:11
**decks** [3] - 1160:7, 1184:17, 1187:16
**deducted** [1] - 1300:19
**deeper** [1] - 1386:21
**Defendant** [1] - 1156:12
**Defendant's** [1] - 1266:22
**Defendant's Exhibit** [21] - 1160:22, 1171:21, 1173:3, 1176:13, 1267:14,

1287:14, 1356:2, 1356:15, 1364:11, 1369:14, 1384:1, 1385:4, 1386:16, 1396:10, 1396:11, 1396:12, 1397:3, 1397:10, 1397:11, 1397:12, 1397:14
**Defendant's Exhibits** [6] - 1360:17, 1365:3, 1386:4, 1397:5, 1397:8, 1397:13
**defendants** [2] - 1120:9, 1253:16
**defendants'** [1] - 1253:15
**Defense** [74] - 1132:13, 1132:15, 1135:10, 1137:10, 1138:10, 1138:23, 1140:13, 1141:14, 1145:17, 1146:8, 1148:7, 1149:24, 1152:9, 1152:22, 1162:3, 1170:23, 1174:20, 1177:23, 1183:21, 1186:8, 1186:18, 1191:16, 1207:6, 1210:14, 1210:16, 1211:4, 1214:13, 1215:20, 1230:13, 1231:5, 1233:9, 1233:17, 1235:12, 1235:25, 1239:11, 1244:4, 1246:3, 1246:20, 1249:16, 1267:10, 1267:14, 1268:12, 1268:13, 1268:17, 1269:7, 1285:10, 1318:8, 1320:7, 1320:12, 1320:18, 1329:14, 1371:9, 1375:18, 1377:20, 1378:5, 1383:13, 1384:19, 1385:12, 1386:11, 1396:5, 1396:6, 1396:7, 1396:8, 1396:9, 1396:13, 1396:14, 1396:15, 1396:16, 1396:17, 1396:18, 1396:19, 1396:20, 1396:21, 1396:23
**defense** [12] - 1124:14, 1166:12, 1168:8, 1242:10, 1318:7, 1355:6, 1376:5, 1387:19, 1387:24, 1389:22, 1389:25, 1391:15
**defer** [1] - 1393:4
**define** [2] - 1311:24, 1342:24
**defined** [1] - 1338:11
**defines** [1] - 1209:16
**definitely** [5] - 1134:7, 1213:8, 1214:9, 1261:15, 1316:4
**definition** [5] - 1309:5, 1309:7, 1309:13, 1310:1, 1315:16
**delay** [1] - 1348:24
**Delta** [1] - 1369:5
**delving** [1] - 1356:24
**demoted** [1] - 1238:7
**deposit** [1] - 1349:5
**deposits** [2] - 1130:24, 1345:11
**DEPUTY** [10] - 1122:2, 1124:14, 1225:3, 1227:24, 1228:19, 1231:23, 1254:15, 1310:13, 1311:1, 1387:3
**Deputy** [1] - 1124:3
**describe** [4] - 1309:18, 1329:21, 1330:2, 1351:9
**described** [2] - 1344:6, 1374:1
**describing** [3] - 1205:25, 1352:12, 1374:16
**description** [4] - 1201:11, 1348:1, 1374:4, 1374:7
**design** [1] - 1154:13
**designed** [5] - 1256:8, 1261:12, 1263:21, 1271:24, 1294:21
**desk** [1] - 1376:22
**despite** [3] - 1267:25, 1278:12, 1291:9
**detail** [9] - 1180:10, 1181:19, 1182:6, 1182:23, 1246:16, 1248:23, 1250:20, 1251:4, 1313:19
**details** [4] - 1136:23, 1182:19, 1225:10, 1251:5

**detect** [1] - 1154:14
**detected** [2] - 1258:9, 1258:10
**determination** [2] - 1337:16, 1393:14
**determine** [4] - 1128:9, 1128:14, 1188:14, 1332:1
**determined** [1] - 1343:10
**determining** [1] - 1129:12
**develop** [1] - 1258:24
**developing** [2] - 1355:17, 1355:18
**Development** [1] - 1232:14
**development** [1] - 1232:17
**Dibre** [24] - 1132:2, 1132:9, 1132:21, 1135:3, 1135:6, 1137:3, 1137:6, 1139:11, 1139:13, 1139:15, 1139:17, 1139:19, 1139:21, 1140:2, 1142:20, 1144:25, 1168:3, 1255:20, 1255:22, 1255:24, 1256:1, 1256:11, 1257:6, 1257:10
**Dibre's** [3] - 1137:24, 1143:21, 1144:20
**difference** [7] - 1125:11, 1151:18, 1193:24, 1238:10, 1308:5, 1315:25, 1382:24
**different** [36] - 1144:8, 1173:19, 1177:4, 1180:11, 1225:23, 1230:3, 1258:4, 1263:8, 1264:2, 1266:19, 1271:20, 1282:20, 1302:18, 1302:24, 1304:25, 1308:8, 1308:23, 1309:1, 1309:10, 1318:3, 1322:9, 1325:19, 1327:16, 1337:8, 1340:19, 1341:6, 1343:13, 1343:15, 1363:5, 1368:7, 1374:18, 1374:20, 1376:12, 1384:15, 1393:23, 1394:3
**difficult** [2] - 1219:21, 1334:2
**diligence** [3] - 1125:17, 1130:4, 1337:21
**dire** [5] - 1149:6, 1171:7, 1383:23, 1385:19, 1385:23
**DIRE** [4] - 1149:9, 1171:9, 1395:8, 1395:14
**direct** [8] - 1122:11, 1124:20, 1126:14, 1152:10, 1186:9, 1193:1, 1244:14, 1389:14
**Direct** [1] - 1289:9
**directed** [2] - 1200:20, 1272:13
**directing** [4] - 1185:20, 1251:16, 1268:1, 1272:4
**direction** [1] - 1217:15
**directly** [5] - 1142:23, 1211:21, 1272:5, 1285:4, 1331:18
**director** [2] - 1238:12, 1289:12
**directs** [1] - 1273:16
**disadvantage** [1] - 1262:2
**disagree** [1] - 1190:22
**disagreed** [1] - 1250:16
**disclaimer** [9] - 1161:8, 1161:13, 1167:7, 1172:12, 1172:15, 1173:2, 1173:11, 1173:16, 1173:21
**disclose** [2] - 1259:13, 1259:17
**disclosed** [8] - 1154:19, 1156:20, 1166:13, 1187:25, 1261:19, 1261:22, 1261:25, 1263:2
**discuss** [3] - 1179:14, 1193:16, 1252:13
**discussed** [5] - 1201:9, 1251:18, 1311:13, 1341:1, 1368:10
**discussing** [2] - 1200:3, 1208:10
**discussion** [12] - 1137:24, 1165:16, 1200:22, 1201:7, 1269:17, 1272:21, 1275:4, 1281:11, 1303:3, 1330:24,

Case 1:21-cr-00054-RPK-PK    Document 424-3    Filed 07/12/24    Page 287 of 306
PageID #: 14645
(discussions - economize)                                                    Page 9

1347:25, 1381:1
**discussions** [3] - 1217:18, 1354:10, 1354:11
**display** [1] - 1358:13
**displayed** [3] - 1273:24, 1330:2, 1355:19
**dispose** [2] - 1385:6, 1386:8
**disposed** [1] - 1384:12
**dispute** [2] - 1282:21, 1380:2
**disseminated** [1] - 1253:17
**distinction** [3] - 1315:7, 1321:10, 1383:2
**distribute** [2] - 1219:25, 1342:12
**distributed** [2] - 1125:19, 1128:18
**Distribution** [4] - 1237:9, 1314:5, 1314:20, 1315:2
**distribution** [18] - 1125:17, 1126:23, 1128:21, 1128:23, 1129:18, 1129:20, 1130:3, 1130:23, 1308:24, 1341:16, 1344:22, 1361:16, 1368:17, 1370:1, 1371:4, 1371:22, 1372:11, 1372:22
**Distributions** [1] - 1216:16
**distributions** [95] - 1124:25, 1125:19, 1125:24, 1126:12, 1126:15, 1126:20, 1128:10, 1128:17, 1129:24, 1130:7, 1130:12, 1130:15, 1130:16, 1142:22, 1181:13, 1189:14, 1191:5, 1191:8, 1193:11, 1208:6, 1217:24, 1219:15, 1219:23, 1220:12, 1237:12, 1238:18, 1239:3, 1245:6, 1246:15, 1308:3, 1308:6, 1311:16, 1314:9, 1315:18, 1315:21, 1316:10, 1316:21, 1317:10, 1324:5, 1324:10, 1324:14, 1324:23, 1325:9, 1329:8, 1330:23, 1331:4, 1331:5, 1332:2, 1333:10, 1333:24, 1334:14, 1335:1, 1336:2, 1336:24, 1337:9, 1337:16, 1338:16, 1340:9, 1340:13, 1340:21, 1341:3, 1341:6, 1342:1, 1342:5, 1342:25, 1343:11, 1343:12, 1343:16, 1343:18, 1344:11, 1345:7, 1345:10, 1347:6, 1347:12, 1348:18, 1348:25, 1349:2, 1352:10, 1359:3, 1359:7, 1359:21, 1360:25, 1361:6, 1367:14, 1368:9, 1368:13, 1368:21, 1368:23, 1369:21, 1369:23, 1372:9, 1372:13, 1372:15, 1372:20
**District** [1] - 1120:14
**dive** [1] - 1386:21
**dividend** [2] - 1336:6, 1356:19
**dividends** [4] - 1337:23, 1343:3, 1344:13, 1350:22
**DL** [1] - 1162:23
**document** [156] - 1134:10, 1134:11, 1135:10, 1136:4, 1138:9, 1138:17, 1140:12, 1141:11, 1145:12, 1147:4, 1148:8, 1152:7, 1152:11, 1152:13, 1153:13, 1154:18, 1158:13, 1159:10, 1166:12, 1167:1, 1167:6, 1167:11, 1168:3, 1168:7, 1170:10, 1170:23, 1171:4, 1171:8, 1171:25, 1172:5, 1172:16, 1175:4, 1175:13, 1175:14, 1175:21, 1176:7, 1177:4, 1177:23, 1178:2, 1179:18, 1179:23, 1184:11, 1184:16, 1190:25, 1191:17, 1192:13, 1199:14, 1200:20, 1202:19, 1204:22, 1205:5, 1207:2, 1207:10, 1209:7,

1209:10, 1209:15, 1209:25, 1210:6, 1211:8, 1211:16, 1212:10, 1213:10, 1215:4, 1216:1, 1216:4, 1218:18, 1219:14, 1220:18, 1228:17, 1230:11, 1230:17, 1231:11, 1232:1, 1232:4, 1232:8, 1232:25, 1235:9, 1236:3, 1237:16, 1239:12, 1239:14, 1241:7, 1242:5, 1246:9, 1246:11, 1247:8, 1247:21, 1251:14, 1258:4, 1260:7, 1260:18, 1260:22, 1260:23, 1266:23, 1266:25, 1268:15, 1269:14, 1270:2, 1271:12, 1272:4, 1272:17, 1273:5, 1273:15, 1276:16, 1276:17, 1279:22, 1282:19, 1286:12, 1286:21, 1287:8, 1287:13, 1287:15, 1287:21, 1287:24, 1288:15, 1288:19, 1290:9, 1290:13, 1291:24, 1292:2, 1293:3, 1293:20, 1296:14, 1306:23, 1314:1, 1314:18, 1315:10, 1316:25, 1317:6, 1317:16, 1318:3, 1318:8, 1318:11, 1318:18, 1318:25, 1319:1, 1319:3, 1319:14, 1321:20, 1339:21, 1341:8, 1345:3, 1345:14, 1345:22, 1346:14, 1359:14, 1363:12, 1365:21, 1367:2, 1367:21, 1372:1, 1379:20, 1380:1, 1383:1, 1383:2, 1385:5
**document.** [1] - 1215:7
**documents** [23] - 1130:5, 1134:4, 1149:11, 1165:8, 1167:4, 1167:5, 1167:25, 1170:4, 1170:5, 1177:16, 1205:18, 1223:7, 1223:8, 1223:10, 1251:16, 1262:18, 1334:22, 1337:22, 1338:13, 1338:23, 1342:21, 1342:22
**dogs** [5] - 1374:4, 1374:9, 1374:11, 1374:17
**DOJ-EDNY-0570763** [1] - 1136:3
**dollars** [21] - 1151:20, 1196:7, 1301:14, 1303:17, 1303:20, 1304:16, 1304:18, 1305:3, 1305:14, 1305:17, 1311:23, 1323:6, 1323:7, 1323:8, 1324:4, 1324:9, 1324:12, 1336:16, 1338:1, 1350:20, 1372:4
**dollars'** [3] - 1301:13, 1303:24, 1305:7
**done** [16] - 1122:13, 1122:21, 1122:22, 1184:3, 1185:21, 1196:16, 1205:24, 1205:25, 1312:20, 1315:13, 1315:14, 1319:9, 1336:13, 1352:13, 1352:17, 1392:21
**Doorenbos** [3] - 1142:10, 1142:11, 1144:10
**double** [1] - 1169:8
**doubt** [4] - 1150:17, 1378:2, 1379:6, 1380:6
**down** [28] - 1130:22, 1136:12, 1140:20, 1142:15, 1145:5, 1147:9, 1181:11, 1190:8, 1193:7, 1225:7, 1264:12, 1269:17, 1277:20, 1289:19, 1291:16, 1310:15, 1314:23, 1315:2, 1341:18, 1348:14, 1349:16, 1353:8, 1372:16, 1377:4, 1382:2, 1384:17, 1387:5, 1387:9
**downloading** [1] - 1330:7
**draft** [8] - 1209:10, 1215:12, 1217:14, 1218:8, 1218:13, 1226:13, 1278:13, 1279:8
**drafted** [3] - 1209:3, 1210:8, 1265:17
**drafting** [7] - 1207:18, 1230:8, 1264:22,

1267:22, 1268:8, 1282:8, 1282:22
**drafts** [2] - 1225:16, 1225:17
**draftsmanship** [1] - 1207:22
**dramatically** [1] - 1205:17
**drawing** [1] - 1383:2
**drive** [42] - 1157:4, 1157:10, 1158:8, 1160:4, 1160:17, 1161:25, 1164:3, 1164:12, 1164:21, 1165:11, 1166:7, 1166:10, 1166:14, 1166:19, 1166:20, 1167:1, 1167:14, 1167:15, 1167:16, 1167:21, 1167:22, 1168:16, 1168:23, 1169:5, 1170:4, 1170:6, 1170:9, 1170:24, 1174:17, 1174:21, 1175:9, 1176:16, 1177:7, 1322:16, 1260:1, 1261:1, 1261:2, 1329:17, 1330:8, 1330:11
**drives** [1] - 1157:23
**dropped** [1] - 1212:6
**drug** [1] - 1380:15
**Ds** [1] - 1233:10
**DS** [3] - 1160:2, 1160:22, 1396:10
**Duarte** [2] - 1135:18, 1139:21
**due** [3] - 1125:17, 1130:4, 1337:21
**duly** [1] - 1124:3
**during** [9] - 1137:3, 1180:23, 1197:24, 1246:13, 1316:8, 1352:11, 1352:23, 1379:13, 1389:17
**Dustin** [1] - 1146:11
**DX** [2] - 1173:3, 1316:16
**DX-Jacoby** [1] - 1316:16

---

**E**

---

**e-mail** [71] - 1202:22, 1207:12, 1210:19, 1212:24, 1213:4, 1214:13, 1214:24, 1215:9, 1218:17, 1218:19, 1218:20, 1218:21, 1223:14, 1225:22, 1225:24, 1225:25, 1233:20, 1235:14, 1237:20, 1238:5, 1239:20, 1241:6, 1242:11, 1244:21, 1254:4, 1266:25, 1267:16, 1267:17, 1267:19, 1267:24, 1268:18, 1268:21, 1269:10, 1271:15, 1273:9, 1273:12, 1313:11, 1313:14, 1317:20, 1345:16, 1346:8, 1346:15, 1346:21, 1349:18, 1351:10, 1354:21, 1354:24, 1355:4, 1355:14, 1356:6, 1356:9, 1356:18, 1357:15, 1357:18, 1357:25, 1360:2, 1364:13, 1375:20, 1376:24, 1377:4, 1377:22, 1377:25, 1378:3, 1380:1, 1380:7, 1383:14, 1383:20, 1384:20, 1385:13, 1386:6, 1386:12
**E-mail** [1] - 1121:17
**e-mailed** [3] - 1231:10, 1232:1, 1232:6
**e-mailing** [1] - 1204:13
**e-mails** [7] - 1204:5, 1208:15, 1223:9, 1223:14, 1234:11, 1253:25, 1254:10
**early** [2] - 1155:14, 1156:8
**earned** [2] - 1151:5, 1343:17
**earnings** [5] - 1258:19, 1323:12, 1323:14, 1324:19, 1343:6
**easier** [3] - 1337:11, 1365:10, 1365:15, 1365:16, 1366:21
**easily** [1] - 1311:20
**East** [1] - 1120:15
**Eastern** [1] - 1120:14
**economize** [1] - 1393:25

Case 1:21-cr-00054-RPK-PK    Document 424-3    Filed 07/12/24    Page 288 of 306
PageID #: 14646
(editing - exhibits)                                            Page 10

**editing** [1] - 1268:8
**edits** [4] - 1212:7, 1212:10, 1278:14, 1279:10
**educate** [1] - 1277:15
**education** [1] - 1202:8
**EE** [1] - 1174:20
**EEEE** [9] - 1162:3, 1170:24, 1171:21, 1174:20, 1175:21, 1176:13, 1177:24, 1396:11, 1396:12
**EEEE-EE** [1] - 1174:20
**EEEE-EF** [5] - 1162:3, 1170:24, 1171:21, 1177:24, 1396:11
**EEEE-EG** [3] - 1175:21, 1176:13, 1396:12
**EEEEEH** [3] - 1230:13, 1231:5, 1396:16
**EF** [5] - 1162:3, 1170:24, 1171:21, 1177:24, 1396:11
**effect** [2] - 1243:1, 1380:16
**EG** [3] - 1175:21, 1176:13, 1396:12
**eight** [1] - 1178:3
**either** [12] - 1166:17, 1178:21, 1186:14, 1187:9, 1193:10, 1249:5, 1249:20, 1250:11, 1284:14, 1317:25, 1320:25, 1343:2
**electronically** [1] - 1287:21
**elicit** [1] - 1242:16
**ELMO** [1] - 1230:14
**email** [15] - 1136:7, 1137:13, 1138:15, 1139:6, 1140:16, 1140:19, 1141:4, 1141:24, 1141:25, 1143:3, 1143:10, 1145:19, 1145:25, 1150:4, 1247:8
**emphasis** [1] - 1394:2
**emphatic** [1] - 1334:24
**emphatically** [1] - 1335:5
**employ** [1] - 1177:5
**employed** [2] - 1179:4, 1285:20
**employee** [1] - 1141:17
**employees** [6] - 1154:25, 1155:6, 1155:7, 1223:15, 1226:2, 1290:20
**employer** [1] - 1297:8
**employment** [1] - 1286:1
**empty** [1] - 1140:6
**encapsulated** [1] - 1372:21
**end** [22] - 1193:8, 1197:18, 1197:23, 1252:12, 1266:18, 1312:18, 1313:17, 1315:10, 1315:11, 1316:1, 1325:23, 1331:7, 1347:19, 1349:1, 1364:3, 1369:3, 1373:21, 1375:1, 1391:8, 1392:11, 1393:12
**ended** [1] - 1132:5
**ending** [3] - 1152:17, 1180:19, 1276:22
**endorse** [3] - 1209:12, 1210:13, 1282:19
**endorsed** [2] - 1209:21, 1210:9
**engage** [1] - 1254:5
**engagement** [1] - 1154:8
**enjoy** [1] - 1333:19
**ensure** [1] - 1293:17
**enter** [1] - 1286:1
**enters** [7] - 1170:14, 1227:25, 1228:1, 1254:16, 1310:25, 1311:2, 1353:17
**entire** [1] - 1277:15
**entirely** [1] - 1374:18
**entirety** [1] - 1352:2
**entitled** [4] - 1131:9, 1346:21, 1349:18, 1383:17
**entity** [2] - 1154:24, 1291:13

**entity's** [1] - 1155:5
**equal** [1] - 1325:8
**equity** [7] - 1174:3, 1178:4, 1178:7, 1178:8, 1309:12, 1309:25, 1328:3
**Eric** [4] - 1383:14, 1384:20, 1385:13, 1386:12
**erroneous** [1] - 1354:12
**errors** [3] - 1234:15, 1355:14, 1355:24
**Es** [2] - 1259:24, 1260:4
**escrow** [1] - 1349:4
**especially** [1] - 1365:15
**ESQ** [13] - 1120:16, 1120:16, 1120:17, 1120:17, 1120:21, 1120:22, 1120:22, 1120:23, 1121:5, 1121:6, 1121:9, 1121:10, 1121:14
**essence** [4] - 1299:22, 1301:6, 1302:2, 1323:6
**essentially** [1] - 1224:4, 1351:18
**establish** [3] - 1232:16, 1242:4, 1308:25
**estimate** [1] - 1392:3
**estimates** [1] - 1391:21
**Ethics** [3] - 1296:10, 1296:12, 1296:23
**ethics** [2] - 1297:5, 1297:7
**evaluate** [2] - 1243:2, 1393:11
**Evens** [1] - 1152:25
**event** [1] - 1144:9
**events** [1] - 1250:25
**evidence** [102] - 1122:25, 1124:13, 1127:1, 1132:14, 1136:5, 1137:19, 1138:9, 1138:23, 1140:13, 1141:14, 1146:6, 1146:8, 1149:24, 1152:22, 1160:23, 1165:5, 1166:23, 1171:22, 1176:14, 1179:21, 1188:4, 1207:6, 1211:4, 1215:20, 1231:5, 1233:17, 1235:25, 1242:2, 1244:4, 1246:21, 1253:22, 1258:6, 1258:18, 1259:23, 1266:4, 1266:12, 1266:23, 1267:15, 1268:25, 1269:7, 1271:17, 1276:16, 1276:17, 1279:19, 1285:10, 1286:20, 1287:14, 1289:6, 1291:22, 1292:3, 1296:9, 1298:6, 1313:2, 1313:5, 1320:13, 1320:18, 1339:18, 1346:4, 1352:5, 1355:9, 1356:15, 1358:10, 1358:13, 1360:18, 1361:10, 1362:20, 1365:4, 1369:14, 1380:18, 1384:1, 1385:4, 1386:5, 1386:16, 1390:5, 1396:5, 1396:6, 1396:7, 1396:8, 1396:9, 1396:10, 1396:11, 1396:12, 1396:14, 1396:15, 1396:16, 1396:17, 1396:18, 1396:19, 1396:22, 1396:23, 1396:24, 1396:25, 1397:1, 1397:2, 1397:3, 1397:4, 1397:6, 1397:7, 1397:9, 1397:10, 1397:13
**evidence.....** [3] - 1397:11, 1397:12, 1397:14
**evidence...........** [2] - 1396:20, 1396:21
**exact** [4] - 1136:22, 1141:25, 1173:6, 1178:8
**exactly** [5] - 1174:7, 1200:14, 1350:13, 1351:22, 1380:12
**examination** [7] - 1126:14, 1149:12, 1193:1, 1242:17, 1254:3, 1327:25, 1389:18
**EXAMINATION** [23] - 1124:5, 1149:9, 1150:1, 1170:19, 1171:9, 1171:23, 1202:1, 1246:1, 1254:21, 1273:2, 1276:2,

1277:3, 1282:2, 1293:1, 1382:3, 1382:16, 1395:6, 1395:8, 1395:10, 1395:12, 1395:14, 1395:16, 1395:18
**examined** [1] - 1124:4
**examining** [1] - 1242:16
**example** [12] - 1197:24, 1301:12, 1301:20, 1303:16, 1312:6, 1323:6, 1323:18, 1324:22, 1336:10, 1336:11, 1338:1, 1343:6
**exceeded** [2] - 1246:14, 1338:16
**exceeds** [1] - 1344:24
**Excel** [3] - 1139:3, 1150:10, 1355:20
**except** [1] - 1176:8
**exchange** [5] - 1144:20, 1202:22, 1235:14, 1235:16, 1272:11
**Exchange** [3] - 1288:16, 1288:18, 1338:3
**exchanged** [2] - 1213:23, 1388:19
**excuse** [3] - 1291:4, 1372:4, 1389:16
**execution** [1] - 1288:8
**executive** [4] - 1285:25, 1286:6, 1289:9, 1289:10
**executives** [2] - 1293:24, 1296:1
**Exhibit** [147] - 1124:12, 1131:16, 1132:13, 1132:16, 1135:10, 1136:5, 1137:10, 1138:10, 1138:23, 1140:13, 1141:14, 1145:17, 1146:8, 1148:7, 1149:24, 1152:9, 1152:22, 1160:25, 1162:3, 1162:22, 1170:23, 1174:20, 1177:23, 1179:21, 1183:21, 1186:9, 1186:18, 1188:3, 1188:8, 1191:16, 1202:17, 1207:6, 1207:8, 1210:14, 1210:16, 1211:4, 1211:6, 1214:13, 1215:20, 1215:21, 1216:11, 1219:16, 1228:21, 1230:13, 1231:5, 1231:7, 1231:25, 1232:10, 1233:9, 1233:17, 1233:19, 1235:12, 1235:25, 1236:1, 1239:11, 1244:4, 1244:6, 1246:3, 1246:20, 1249:16, 1266:5, 1266:12, 1266:13, 1268:13, 1285:13, 1286:19, 1291:22, 1293:22, 1293:23, 1295:17, 1295:24, 1297:22, 1298:5, 1298:7, 1313:1, 1313:8, 1313:10, 1314:19, 1320:12, 1320:16, 1338:24, 1339:1, 1339:2, 1339:14, 1339:18, 1339:19, 1341:13, 1345:12, 1345:13, 1345:20, 1346:4, 1346:6, 1351:5, 1351:8, 1352:5, 1352:6, 1354:18, 1354:20, 1355:9, 1355:11, 1356:4, 1356:16, 1357:12, 1357:14, 1358:10, 1358:12, 1359:24, 1360:1, 1360:21, 1361:9, 1361:11, 1361:23, 1362:2, 1362:3, 1362:6, 1362:20, 1363:13, 1364:12, 1365:8, 1369:6, 1369:15, 1371:9, 1375:18, 1377:21, 1383:13, 1384:19, 1385:12, 1386:11, 1396:5, 1396:6, 1396:7, 1396:8, 1396:9, 1396:13, 1396:14, 1396:15, 1396:16, 1396:17, 1396:18, 1396:19, 1396:22, 1396:24, 1396:25, 1397:1, 1397:2, 1397:4, 1397:7
**exhibit** [14] - 1134:8, 1134:13, 1142:1, 1149:7, 1160:1, 1168:12, 1269:9, 1276:20, 1347:2, 1362:4, 1362:21, 1362:23, 1363:4, 1384:20
**EXHIBITS** [1] - 1396:2
**exhibits** [10] - 1166:13, 1169:4, 1252:10,

1252:15, 1253:15, 1266:17, 1266:19, 1288:6, 1388:9, 1388:13

**exist** [2] - 1222:9, 1379:18

**existed** [2] - 1199:20, 1199:21

**existence** [3] - 1260:18, 1260:20, 1380:4

**existent** [1] - 1223:12

**exit** [1] - 1308:12

**exits** [7] - 1166:3, 1225:4, 1225:7, 1310:14, 1310:15, 1353:7, 1387:4

**expected** [1] - 1332:17

**expecting** [1] - 1349:13

**expense** [1] - 1284:13

**expenses** [15] - 1283:16, 1283:22, 1283:24, 1284:6, 1300:6, 1300:10, 1300:12, 1300:19, 1300:24, 1305:25, 1321:11, 1344:21, 1344:24, 1375:5

**experience** [4] - 1262:21, 1328:13, 1373:16, 1374:19

**expert** [1] - 1393:19

**explain** [10] - 1131:6, 1141:8, 1143:5, 1143:8, 1200:14, 1242:15, 1269:22, 1327:23, 1337:19, 1350:17

**explaining** [2] - 1349:15, 1350:6

**explanation** [4] - 1136:12, 1143:20, 1144:5, 1300:2

**exposure** [1] - 1327:13

**expressing** [1] - 1153:6

**extent** [5] - 1144:9, 1204:9, 1226:25, 1391:1, 1391:16

**extra** [3] - 1324:15, 1324:17

**extrinsic** [3] - 1165:4, 1166:23, 1167:3

## F

**Facsimile** [1] - 1121:16

**fact** [17] - 1126:22, 1129:10, 1189:13, 1198:8, 1202:10, 1208:6, 1209:2, 1242:20, 1258:18, 1264:21, 1267:25, 1282:16, 1286:15, 1317:23, 1334:22, 1374:17, 1379:15

**facts** [3] - 1248:23, 1251:6, 1253:24

**failure** [1] - 1258:15

**fair** [14] - 1122:20, 1123:2, 1154:9, 1162:11, 1222:5, 1254:8, 1330:1, 1338:15, 1355:13, 1356:24, 1367:22, 1368:12, 1385:25, 1391:12

**fairly** [2] - 1153:8, 1254:2

**faith** [2] - 1332:24, 1343:23

**fall** [1] - 1196:25

**falling** [1] - 1391:1

**false** [3] - 1140:3, 1205:17, 1272:6

**familiar** [12] - 1138:13, 1145:7, 1159:11, 1159:12, 1184:4, 1194:11, 1216:1, 1246:10, 1259:4, 1364:20, 1371:7, 1382:22

**familiarize** [1] - 1149:18

**familiarizing** [1] - 1148:19

**far** [8] - 1157:19, 1170:23, 1211:15, 1217:13, 1356:24, 1358:22, 1380:15, 1389:8

**fast** [1] - 1392:23

**faster** [2] - 1129:6, 1345:25

**fault** [2] - 1137:19, 1384:15

**FBI** [13] - 1164:9, 1242:17, 1272:2,

1278:7, 1278:13, 1278:16, 1279:7, 1279:15, 1279:24, 1306:20, 1307:2, 1307:7, 1329:6

**February** [11] - 1202:23, 1207:16, 1260:21, 1261:2, 1261:14, 1269:11, 1277:14, 1313:11, 1315:11, 1384:24, 1385:9

**fee** [2] - 1156:4, 1178:5

**fell** [4] - 1194:16, 1196:24, 1197:5, 1197:20

**felt** [1] - 1195:25

**few** [17] - 1196:11, 1197:3, 1213:23, 1214:14, 1214:16, 1224:7, 1226:5, 1234:15, 1291:23, 1305:23, 1347:8, 1347:12, 1348:19, 1388:25, 1390:12, 1394:3

**fewer** [1] - 1258:24

**FFFFY** [1] - 1137:10

**fifty** [1] - 1242:23

**fighting** [1] - 1167:13

**figure** [8] - 1271:9, 1315:21, 1332:24, 1333:8, 1333:15, 1333:24, 1337:7, 1338:20

**file** [1] - 1177:16

**filed** [2] - 1248:16, 1251:18

**filled** [2] - 1289:16, 1290:9

**final** [15] - 1198:3, 1226:9, 1226:11, 1227:16, 1230:10, 1237:20, 1248:11, 1248:13, 1265:4, 1356:21, 1361:20, 1362:23, 1363:16, 1363:23, 1379:3

**Final** [1] - 1236:20

**finance** [5] - 1309:10, 1337:4, 1337:15, 1345:2, 1359:17

**finances** [1] - 1262:22

**financial** [69] - 1127:17, 1128:3, 1129:22, 1131:21, 1135:23, 1138:3, 1143:17, 1143:22, 1145:3, 1145:8, 1146:18, 1146:24, 1151:25, 1152:16, 1153:4, 1153:6, 1153:7, 1153:12, 1154:4, 1154:9, 1154:20, 1155:2, 1155:6, 1155:25, 1156:24, 1177:3, 1183:18, 1183:23, 1187:24, 1189:23, 1190:19, 1190:21, 1194:14, 1195:2, 1195:4, 1195:11, 1196:6, 1196:13, 1198:19, 1213:14, 1232:16, 1255:6, 1285:17, 1288:12, 1289:11, 1294:15, 1297:16, 1297:18, 1298:11, 1302:12, 1312:18, 1321:14, 1322:21, 1333:9, 1333:23, 1334:5, 1337:6, 1337:8, 1361:21, 1361:22, 1362:23, 1362:24, 1363:16, 1363:17, 1371:9, 1371:11, 1371:12, 1372:19, 1375:5

**financials** [18] - 1125:22, 1127:14, 1127:15, 1127:21, 1129:14, 1136:14, 1137:3, 1142:16, 1147:25, 1190:14, 1190:15, 1192:5, 1192:7, 1194:22, 1197:18, 1198:3, 1262:9, 1362:8

**fine** [28] - 1126:6, 1146:5, 1175:25, 1176:8, 1176:10, 1190:24, 1192:13, 1207:4, 1226:15, 1227:18, 1227:21, 1246:17, 1252:13, 1272:15, 1298:3, 1310:11, 1318:17, 1324:7, 1360:15, 1363:10, 1374:25, 1375:3, 1383:5, 1388:6, 1388:25, 1392:7, 1393:16, 1393:17

**finger** [1] - 1312:23

**finish** [3] - 1126:18, 1186:12, 1208:22

**finished** [1] - 1192:5

**Firm** [2] - 1267:1, 1268:4

**firm** [12] - 1210:10, 1210:12, 1211:9, 1213:11, 1226:21, 1233:24, 1244:13, 1278:13, 1279:9, 1374:18, 1382:7, 1382:22

**firms** [1] - 1226:2

**first** [47] - 1127:8, 1136:17, 1138:14, 1138:24, 1146:10, 1150:3, 1152:23, 1152:24, 1154:3, 1161:7, 1174:24, 1185:23, 1189:2, 1208:14, 1215:8, 1215:9, 1246:4, 1247:7, 1286:24, 1299:3, 1320:7, 1320:9, 1320:19, 1323:7, 1323:13, 1323:14, 1324:10, 1324:13, 1326:2, 1340:2, 1340:12, 1340:20, 1342:5, 1347:5, 1347:15, 1348:17, 1348:24, 1354:21, 1356:21, 1359:16, 1369:16, 1370:4, 1371:19, 1379:4, 1391:18

**firsthand** [1] - 1368:20

**five** [12] - 1155:4, 1166:2, 1169:2, 1169:4, 1233:10, 1250:13, 1260:4, 1272:9, 1364:7, 1367:20, 1373:1, 1392:9

**five-minute** [1] - 1166:2

**flip** [1] - 1192:8

**Floor** [1] - 1121:4

**Florida** [1] - 1121:13

**flow** [10] - 1189:15, 1304:6, 1316:22, 1317:18, 1325:3, 1333:14, 1337:1, 1337:2, 1343:3, 1343:5

**fly** [2] - 1254:2, 1388:18

**focus** [1] - 1235:2

**folks** [2] - 1150:8, 1388:8

**follow** [4] - 1122:17, 1136:11, 1354:10

**follow-on** [1] - 1354:10

**follow-up** [1] - 1136:11

**following** [16] - 1122:14, 1123:7, 1203:10, 1206:11, 1221:14, 1224:11, 1240:5, 1243:6, 1245:22, 1257:2, 1257:3, 1265:10, 1265:11, 1335:9, 1370:12

**follows** [2] - 1124:4, 1348:23

**footballs** [1] - 1374:4

**footnote** [1] - 1130:16

**footnotes** [1] - 1354:10

**forced** [1] - 1254:2

**forecast** [9] - 1365:25, 1366:1, 1366:3, 1366:5, 1366:17, 1366:22, 1366:23, 1367:11, 1367:23

**forecasting** [1] - 1367:6

**forecasts** [1] - 1368:3

**foreseeing** [1] - 1388:13

**forget** [2] - 1282:13, 1342:21

**forgetting** [1] - 1184:16

**forgive** [1] - 1326:19

**Form** [3] - 1287:16, 1288:8, 1289:2

**form** [6] - 1248:18, 1248:23, 1251:14, 1305:23, 1306:2, 1306:4

**formed** [1] - 1292:3

**former** [3] - 1155:6, 1375:24, 1375:25

**formula** [2] - 1310:4, 1355:15

**forth** [4] - 1142:6, 1208:7, 1235:5, 1235:10

**forward** [7] - 1168:19, 1189:2, 1192:9, 1221:7, 1251:15, 1369:20, 1377:16

**forwarded** [4] - 1237:17, 1238:6,

Case 1:21-cr-00054-RPK-PK   Document 424-3   Filed 07/12/24   Page 290 of 306
PageID #: 14648
(forwarding - guess)                                                Page 12

1346:16, 1346:22

**forwarding** [5] - 1241:23, 1245:1, 1248:5, 1248:6, 1248:9

**foundation** [7] - 1134:8, 1148:20, 1159:20, 1214:22, 1215:4, 1317:7, 1319:10

**four** [3] - 1154:12, 1154:23, 1364:7

**fourth** [3] - 1341:18, 1349:3, 1370:8

**FOX** [2] - 1121:2, 1121:7

**Frangioni** [12] - 1136:22, 1138:15, 1138:18, 1138:25, 1208:15, 1267:2, 1273:10, 1276:8, 1277:6, 1277:10, 1277:16, 1357:16

**frankly** [3] - 1285:1, 1391:3, 1393:18

**fraud** [9] - 1154:14, 1154:21, 1154:23, 1154:24, 1155:1, 1155:5, 1156:3, 1248:2

**fraudulent** [4] - 1126:23, 1127:6, 1155:17, 1161:3

**free** [9] - 1189:14, 1288:8, 1337:1, 1337:2, 1337:23, 1338:7, 1343:3, 1343:5

**frequently** [2] - 1197:1, 1197:2

**Friday** [15] - 1124:10, 1127:25, 1129:4, 1129:8, 1131:18, 1136:4, 1143:25, 1146:17, 1147:4, 1157:6, 1179:20, 1180:11, 1199:25, 1204:6, 1388:2

**front** [6] - 1185:23, 1185:24, 1259:6, 1318:8, 1391:2, 1392:18

**fulfilled** [1] - 1154:7

**full** [6] - 1146:20, 1146:22, 1278:23, 1279:2, 1360:7, 1368:3

**fully** [10] - 1125:3, 1125:6, 1128:15, 1188:20, 1245:16, 1247:4, 1247:5, 1247:24, 1282:8, 1352:10

**function** [3] - 1290:5, 1382:21, 1383:6

**functions** [1] - 1289:13

**Fund** [4] - 1181:7, 1257:16, 1258:14, 1258:15

**fund** [70] - 1125:20, 1158:21, 1158:25, 1159:3, 1159:7, 1159:9, 1167:5, 1168:1, 1174:4, 1174:11, 1177:4, 1177:20, 1177:21, 1178:4, 1178:5, 1178:7, 1178:8, 1179:6, 1194:21, 1213:2, 1214:18, 1215:13, 1220:18, 1232:21, 1232:23, 1236:8, 1236:16, 1238:6, 1238:12, 1238:14, 1238:25, 1245:11, 1247:10, 1248:6, 1248:7, 1256:9, 1284:15, 1290:17, 1299:17, 1300:9, 1300:20, 1300:24, 1305:5, 1305:14, 1305:17, 1308:12, 1308:21, 1311:19, 1323:2, 1323:5, 1323:21, 1324:21, 1332:14, 1332:15, 1336:11, 1336:16, 1337:18, 1338:9, 1339:10, 1340:20, 1343:17, 1344:8, 1347:5, 1347:11, 1347:21, 1347:23, 1348:17, 1350:21, 1354:3, 1367:2

**fund's** [1] - 1324:22

**funds** [34] - 1125:1, 1126:19, 1182:18, 1183:10, 1183:13, 1183:18, 1184:19, 1185:14, 1186:4, 1188:20, 1189:24, 1210:9, 1232:17, 1242:1, 1247:3, 1255:18, 1256:5, 1256:8, 1264:17, 1298:17, 1303:5, 1306:8, 1311:21, 1312:11, 1313:22, 1323:19, 1328:2, 1338:17, 1347:12, 1347:22, 1348:18, 1349:12, 1352:10, 1368:13

**funny** [4] - 1259:19, 1352:1, 1352:2

**furthermore** [1] - 1219:24, 1245:8

**future** [4] - 1229:15, 1229:20, 1366:23, 1367:24

## G

**GAAP** [2] - 1153:9, 1154:10

**gain** [3] - 1301:15, 1301:17, 1301:23

**gains** [5] - 1301:5, 1302:3, 1303:4, 1303:9, 1304:7

**game** [1] - 1222:5

**gap** [1] - 1363:21

**Garden** [2] - 1139:17, 1194:19

**gathered** [2] - 1204:13, 1208:3

**general** [10] - 1199:15, 1222:13, 1222:16, 1229:13, 1284:22, 1309:16, 1309:18, 1344:5, 1344:7, 1372:17

**General** [1] - 1245:4

**generally** [9] - 1122:13, 1122:21, 1122:23, 1153:9, 1298:11, 1300:9, 1326:7, 1328:2, 1376:24

**generic** [1] - 1325:1

**GENTILE** [1] - 1120:8

**Gentile** [36] - 1120:20, 1153:13, 1193:17, 1195:14, 1195:25, 1196:13, 1201:7, 1211:18, 1217:1, 1218:23, 1221:3, 1242:6, 1249:6, 1249:21, 1250:11, 1251:2, 1251:19, 1279:10, 1286:7, 1286:9, 1286:14, 1290:1, 1292:4, 1293:7, 1294:2, 1295:8, 1296:1, 1313:12, 1354:4, 1357:22, 1359:12, 1359:17, 1360:4, 1363:13, 1364:14, 1367:12

**gentleman** [7] - 1146:11, 1148:11, 1172:25, 1184:9, 1191:18, 1207:13, 1255:20

**gentlemen** [2] - 1136:11, 1143:6

**Ghabour** [4] - 1346:19, 1350:19, 1387:20, 1388:7

**given** [5] - 1226:12, 1227:16, 1229:1, 1229:14, 1387:22

**glasses** [2] - 1327:2, 1327:5

**GLENN** [1] - 1121:5

**GM** [2] - 1349:7, 1349:8

**GMC** [2] - 1150:23, 1349:3

**Goals** [2] - 1231:11, 1232:4

**goals** [1] - 1232:6

**gonna** [2] - 1123:2, 1332:25

**Google** [11] - 1301:7, 1301:13, 1301:20, 1303:16, 1304:14, 1305:2, 1305:16, 1312:6, 1336:11, 1338:2, 1338:5

**goosey** [1] - 1374:16

**Government** [63] - 1120:14, 1124:2, 1124:12, 1131:16, 1134:5, 1136:3, 1136:5, 1157:15, 1160:5, 1160:17, 1161:25, 1163:2, 1164:3, 1166:21, 1168:22, 1171:1, 1174:22, 1175:11, 1176:17, 1177:8, 1179:21, 1188:3, 1252:4, 1266:5, 1266:12, 1269:3, 1277:23, 1291:22, 1293:22, 1295:17, 1297:22, 1298:1, 1313:1, 1313:10, 1314:19, 1315:20, 1319:25, 1338:24, 1339:2, 1339:14, 1339:18, 1345:12, 1345:20, 1346:4, 1351:5, 1352:5, 1354:18, 1357:12, 1358:10, 1358:13, 1359:24, 1361:9, 1361:19, 1361:23, 1362:6,

1362:20, 1363:13, 1389:10, 1391:14, 1396:24, 1396:25, 1397:1, 1397:4, 1397:7

**Government's** [3] - 1298:5, 1390:3, 1396:22

**GPB** [121] - 1136:13, 1142:16, 1146:16, 1148:15, 1152:16, 1153:4, 1155:17, 1157:5, 1161:2, 1168:4, 1170:7, 1172:11, 1173:2, 1173:8, 1174:10, 1177:3, 1178:6, 1178:16, 1178:18, 1178:21, 1179:2, 1179:4, 1181:3, 1181:7, 1183:9, 1183:16, 1184:18, 1186:12, 1187:15, 1187:20, 1211:16, 1213:6, 1218:25, 1223:7, 1223:15, 1226:1, 1231:10, 1236:24, 1255:7, 1255:18, 1255:22, 1256:1, 1256:5, 1257:16, 1257:19, 1257:21, 1257:24, 1258:14, 1258:15, 1259:16, 1260:1, 1261:3, 1261:8, 1261:11, 1261:13, 1261:18, 1262:2, 1264:17, 1267:5, 1277:10, 1278:14, 1279:3, 1279:9, 1282:15, 1282:23, 1283:8, 1284:15, 1285:2, 1285:16, 1285:20, 1285:25, 1286:6, 1286:19, 1286:22, 1286:25, 1287:9, 1287:16, 1288:2, 1290:18, 1291:1, 1291:10, 1291:12, 1291:13, 1292:3, 1293:6, 1293:24, 1294:23, 1296:12, 1301:2, 1301:12, 1306:8, 1307:21, 1308:18, 1312:11, 1312:13, 1316:9, 1319:15, 1327:14, 1328:14, 1328:24, 1329:18, 1330:3, 1330:12, 1337:5, 1340:13, 1347:19, 1347:25, 1352:9, 1352:13, 1365:14, 1368:13, 1376:13, 1376:25, 1377:5, 1379:4, 1382:21, 1384:6

**GPB's** [9] - 1170:25, 1171:25, 1173:10, 1173:13, 1173:15, 1174:1, 1174:13, 1307:19, 1312:23

**grail** [2] - 1190:15, 1190:24

**grand** [1] - 1342:15

**Grand** [13] - 1158:21, 1158:25, 1162:18, 1166:7, 1173:4, 1174:1, 1174:13, 1178:2, 1256:12, 1256:15, 1256:24, 1257:5, 1257:10

**grant** [1] - 1300:1

**graph** [1] - 1315:2

**great** [7] - 1254:13, 1283:2, 1336:13, 1337:12, 1364:9, 1387:11, 1393:25

**greater** [9] - 1189:6, 1340:21, 1341:2, 1341:6, 1343:18, 1344:21, 1359:6, 1359:21, 1372:13

**green** [1] - 1327:5, 1341:23

**Group** [1] - 1135:18

**group** [1] - 1386:18

**Growth** [1] - 1258:18

**guarantee** [1] - 1132:2

**guaranteed** [2] - 1136:13, 1137:2

**guarantees** [13] - 1128:2, 1131:14, 1132:10, 1135:3, 1135:7, 1143:19, 1143:21, 1144:3, 1144:8, 1144:20, 1144:25, 1250:19, 1250:20

**guaranty** [18] - 1126:18, 1126:24, 1127:3, 1127:5, 1127:9, 1127:12, 1129:19, 1135:12, 1135:15, 1135:18, 1138:1, 1142:5, 1142:15, 1144:11, 1147:24, 1148:13, 1150:12, 1250:23

**guess** [8] - 1168:15, 1180:6, 1218:14,

1218:15, 1328:7, 1328:18, 1329:25, 1390:8

**guesses** [2] - 1171:17, 1171:18

**guy** [4] - 1159:15, 1178:24, 1355:18

**guys** [9] - 1134:16, 1179:2, 1187:23, 1204:4, 1237:23, 1250:6, 1262:14, 1271:2, 1350:21

**GX-2005** [1] - 1127:19

## H

**hair** [1] - 1333:18

**half** [6] - 1125:15, 1126:20, 1128:18, 1181:2, 1255:11, 1387:17

**hamstrung** [1] - 1227:1

**hand** [3] - 1358:15, 1365:24, 1366:1

**happy** [9] - 1254:4, 1297:25, 1348:15, 1353:14, 1362:18, 1378:12, 1386:23, 1388:4, 1392:18

**hard** [14] - 1164:17, 1253:8, 1320:1, 1320:3, 1333:23, 1334:1, 1334:4, 1358:14, 1365:9, 1366:19, 1367:5, 1369:16, 1375:3, 1390:18

**harder** [1] - 1334:6

**health** [1] - 1344:15

**healthy** [2] - 1344:19, 1344:23

**hear** [8] - 1126:9, 1158:4, 1169:23, 1243:3, 1253:10, 1331:11, 1375:25, 1391:8

**heard** [12] - 1167:23, 1203:4, 1223:23, 1233:5, 1253:22, 1303:4, 1303:5, 1307:17, 1329:7, 1389:12, 1389:16

**hearing** [5] - 1134:2, 1204:2, 1222:2, 1241:2, 1303:10

**hearsay** [7] - 1141:6, 1241:5, 1242:13, 1271:12, 1379:12, 1380:15, 1380:17

**hedge** [2] - 1210:9, 1328:2

**held** [19] - 1134:1, 1164:1, 1169:9, 1169:15, 1183:9, 1203:8, 1204:1, 1221:12, 1222:1, 1240:3, 1241:1, 1269:25, 1271:1, 1275:1, 1281:1, 1376:3, 1379:1, 1382:11, 1388:16

**hello** [1] - 1136:11

**help** [5] - 1231:17, 1256:21, 1277:19, 1352:21, 1382:20

**helped** [1] - 1365:14

**helpful** [1] - 1208:4

**hi** [1] - 1208:2

**hidden** [1] - 1191:14

**hide** [1] - 1262:3

**higher** [2] - 1258:25, 1325:23

**highlight** [3] - 1128:5, 1141:15, 1180:17

**highlighted** [1] - 1285:24

**highlighting** [1] - 1366:20

**highlights** [1] - 1161:16

**himself** [3] - 1167:4, 1202:20, 1318:16

**hired** [1] - 1382:20

**hit** [2] - 1304:8, 1349:7

**hmm** [1] - 1262:17

**Hold** [1] - 1227:2

**hold** [18] - 1142:8, 1142:14, 1167:19, 1186:25, 1187:12, 1188:16, 1188:23, 1192:21, 1227:2, 1231:15, 1239:6, 1239:13, 1332:13, 1342:20, 1343:8, 1376:1

**holdings** [2] - 1191:23, 1360:23

**Holdings** [47] - 1131:21, 1136:13, 1142:16, 1173:2, 1173:9, 1207:19, 1208:17, 1212:4, 1215:11, 1228:14, 1229:2, 1229:4, 1229:6, 1234:5, 1236:24, 1239:1, 1239:2, 1244:8, 1245:14, 1245:16, 1255:7, 1255:18, 1257:21, 1284:15, 1287:1, 1287:9, 1288:2, 1301:3, 1301:13, 1306:10, 1339:10, 1340:2, 1340:20, 1358:16, 1361:21, 1361:24, 1362:8, 1367:2, 1367:11, 1367:17, 1368:23, 1369:8, 1369:24, 1371:3

**Holdings 1** [14] - 1193:10, 1193:17, 1193:19, 1194:6, 1194:12, 1194:17, 1194:18, 1194:23, 1194:25, 1195:4, 1246:22, 1246:23, 1247:16, 1257:19

**holy** [2] - 1190:15, 1190:24

**Honda** [3] - 1196:3, 1198:1, 1348:4

**honest** [1] - 1352:8

**honestly** [1] - 1164:12

**Honor** [61] - 1122:4, 1123:5, 1134:4, 1148:17, 1162:7, 1164:2, 1166:4, 1169:16, 1171:6, 1199:6, 1200:12, 1204:5, 1204:21, 1205:6, 1205:24, 1206:8, 1211:1, 1212:19, 1221:8, 1226:16, 1228:4, 1230:14, 1231:15, 1240:1, 1244:2, 1249:12, 1252:9, 1252:20, 1253:5, 1254:1, 1254:11, 1266:16, 1267:9, 1268:24, 1269:8, 1269:20, 1270:1, 1276:21, 1277:2, 1279:18, 1284:24, 1285:11, 1289:7, 1297:12, 1310:20, 1311:5, 1313:6, 1319:11, 1320:6, 1329:10, 1331:17, 1334:8, 1345:20, 1351:23, 1355:6, 1380:12, 1383:22, 1386:15, 1388:5, 1389:8, 1392:2

**Honor's** [1] - 1204:23

**HONORABLE** [1] - 1120:11

**hope** [2] - 1387:10, 1387:13

**hopefully** [2] - 1254:5, 1350:10

**horribly** [1] - 1391:2

**Hotel** [1] - 1356:13

**hour** [2] - 1387:12, 1387:17

**house** [1] - 1237:21

**huge** [1] - 1199:14

**hundred** [5] - 1185:3, 1185:10, 1196:11, 1323:8, 1324:12

**hundred-thousand** [1] - 1324:12

**hundreds** [2] - 1196:7, 1196:10

**Huntington** [5] - 1135:7, 1139:15, 1139:19, 1194:20, 1194:21

**hurdle** [3] - 1308:9, 1308:11, 1308:18

**hurt** [2] - 1333:18, 1391:19

**hurts** [1] - 1333:21

**hypothetical** [4] - 1302:12, 1323:24, 1336:18, 1336:21

## I

**idea** [8] - 1171:25, 1173:8, 1211:14, 1228:9, 1235:4, 1242:25, 1256:23, 1332:21

**ideas** [1] - 1226:5

**identical** [3] - 1173:19, 1174:4, 1174:6

**identification** [2] - 1249:16, 1356:3,

1376:5

**identifying** [1] - 1219:20

**II** [17] - 1139:23, 1140:6, 1140:7, 1207:19, 1212:4, 1215:11, 1228:14, 1229:2, 1229:6, 1234:5, 1244:8, 1245:14, 1245:16, 1306:10, 1367:2, 1367:11, 1367:17

**illustrate** [1] - 1302:11

**imagine** [1] - 1387:22

**immersed** [1] - 1225:9

**impeach** [3] - 1165:6, 1242:20, 1379:19

**impeachment** [1] - 1252:15

**implementation** [1] - 1154:13

**implying** [1] - 1223:2

**important** [11] - 1152:7, 1190:25, 1255:12, 1256:1, 1268:11, 1272:10, 1288:21, 1293:13, 1295:3, 1321:3, 1321:6

**impossible** [1] - 1334:1

**impression** [2] - 1265:2, 1265:5

**improper** [3] - 1205:13, 1344:11, 1389:9

**impropriety** [1] - 1389:11

**in-court** [2] - 1122:5, 1122:8

**in-house** [1] - 1237:21

**inaccurate** [3] - 1247:9, 1247:12, 1354:13

**Inc** [1] - 1361:17

**incentive** [1] - 1178:5

**inception** [3] - 1322:24, 1323:1, 1323:9

**inception-to-date** [2] - 1322:24, 1323:1

**inclined** [2] - 1168:12, 1205:19

**include** [3] - 1219:25, 1245:9, 1290:8

**included** [8] - 1137:13, 1137:20, 1137:25, 1139:3, 1161:24, 1214:24, 1331:6, 1334:13

**includes** [2] - 1267:4, 1364:21

**including** [10] - 1130:5, 1189:17, 1277:23, 1288:6, 1313:12, 1355:21, 1360:3, 1364:14, 1373:17, 1383:15

**income** [117] - 1125:15, 1128:5, 1128:6, 1129:12, 1129:15, 1129:23, 1130:12, 1132:2, 1139:1, 1140:3, 1151:13, 1188:13, 1188:18, 1189:6, 1191:9, 1219:23, 1246:14, 1298:25, 1299:1, 1299:3, 1299:4, 1299:7, 1299:12, 1299:13, 1300:7, 1301:19, 1301:25, 1302:2, 1302:18, 1303:4, 1303:7, 1304:2, 1304:8, 1304:22, 1304:23, 1311:13, 1311:15, 1311:18, 1311:19, 1314:8, 1314:10, 1314:14, 1315:3, 1315:7, 1315:8, 1315:17, 1315:21, 1315:23, 1315:24, 1316:10, 1317:9, 1317:13, 1317:17, 1320:22, 1320:25, 1321:1, 1321:6, 1321:7, 1321:12, 1321:15, 1321:25, 1323:23, 1324:4, 1324:6, 1324:9, 1324:22, 1331:3, 1331:6, 1333:13, 1337:17, 1337:18, 1338:16, 1340:2, 1340:9, 1340:14, 1340:19, 1341:2, 1341:5, 1341:15, 1341:20, 1342:6, 1342:25, 1343:11, 1359:1, 1359:6, 1359:20, 1361:3, 1361:15, 1361:19, 1361:22, 1362:21, 1362:24, 1363:2, 1363:4, 1363:5, 1363:7, 1363:8, 1363:14, 1363:20, 1367:13, 1369:18, 1369:23, 1372:2, 1372:12

**Income** [4] - 1314:5, 1314:12, 1314:19,

1315:2
**inconsistent** [1] - 1279:19
**incorporated** [2] - 1222:11, 1228:11
**incorrect** [1] - 1143:14
**increased** [2] - 1258:23, 1301:8
**indeed** [1] - 1287:24
**independent** [2] - 1312:13, 1312:20
**INDEX** [1] - 1395:1
**iNDEX** [1] - 1396:2
**indicated** [1] - 1132:25
**indications** [1] - 1313:21
**individual** [1] - 1285:24
**individual's** [1] - 1236:18
**individuals** [3] - 1253:16, 1253:24, 1289:13
**industry** [1] - 1309:14
**infer** [1] - 1253:23
**inflow** [1] - 1309:16
**information** [32] - 1155:18, 1157:10, 1158:2, 1158:3, 1158:6, 1180:3, 1182:12, 1187:22, 1189:17, 1190:20, 1197:9, 1224:3, 1224:6, 1225:13, 1251:15, 1276:7, 1278:12, 1288:5, 1288:7, 1293:17, 1294:21, 1302:19, 1349:23, 1349:25, 1350:4, 1351:17, 1355:19, 1358:20, 1358:25, 1367:2, 1388:9
**informed** [1] - 1278:10
**infrequently** [1] - 1184:7
**inherent** [1] - 1379:24
**innocuous** [2] - 1173:24, 1174:2
**input** [6] - 1229:25, 1232:20, 1232:24, 1233:2, 1233:7, 1245:2
**inquire** [3] - 1223:15, 1254:20, 1353:21
**inquiry** [1] - 1204:19
**inserted** [6] - 1201:9, 1205:12, 1216:6, 1217:14, 1220:17, 1223:19
**inserting** [2] - 1205:1, 1225:15
**insertions** [1] - 1209:7
**instance** [2] - 1205:7, 1226:19
**instances** [1] - 1156:21
**instead** [2] - 1159:9, 1312:1
**instructed** [1] - 1389:12
**instructing** [2] - 1253:19, 1386:7
**instruction** [6] - 1204:8, 1205:20, 1206:1, 1253:7, 1389:23, 1390:9
**instructional** [1] - 1390:8
**intend** [1] - 1170:4
**intent** [1] - 1256:16
**intention** [3] - 1256:18, 1269:21, 1276:12
**intentional** [2] - 1248:2, 1330:14
**interactions** [1] - 1310:3
**interchangeably** [3] - 1299:6, 1299:14, 1321:8
**interest** [2] - 1140:25, 1391:5
**interested** [2] - 1125:12, 1198:5
**interesting** [1] - 1333:20
**interfere** [1] - 1393:20
**internal** [3] - 1154:14, 1154:25, 1250:3
**interpretation** [3] - 1250:16, 1338:13, 1363:9
**interviewed** [2] - 1282:17, 1283:8
**intimately** [1] - 1168:4
**invest** [3] - 1190:11, 1191:1, 1336:12
**invested** [3] - 1219:25, 1245:9, 1350:21

**investigators'** [1] - 1125:7
**Investment** [1] - 1245:4
**investment** [85] - 1125:15, 1128:5, 1128:6, 1129:15, 1129:23, 1161:16, 1183:12, 1188:13, 1188:18, 1189:6, 1190:5, 1190:6, 1190:16, 1191:2, 1191:6, 1191:8, 1193:10, 1193:20, 1229:13, 1246:14, 1262:9, 1288:1, 1299:7, 1299:12, 1300:7, 1301:19, 1302:2, 1303:3, 1303:7, 1304:2, 1304:8, 1304:22, 1309:25, 1311:13, 1311:18, 1314:10, 1314:14, 1315:3, 1315:8, 1315:23, 1316:10, 1317:9, 1317:13, 1317:17, 1320:22, 1321:1, 1321:6, 1321:7, 1321:11, 1321:15, 1321:25, 1324:6, 1324:9, 1324:22, 1328:1, 1328:14, 1331:3, 1331:6, 1337:17, 1338:16, 1340:1, 1340:9, 1340:14, 1340:19, 1341:5, 1342:6, 1342:25, 1343:11, 1359:1, 1359:5, 1359:6, 1359:20, 1361:3, 1363:2, 1363:4, 1363:8, 1363:20, 1367:13, 1369:17, 1369:23, 1372:2, 1372:12, 1387:20, 1387:21, 1389:13
**investments** [4] - 1309:13, 1327:17, 1327:19, 1327:21
**investor** [17] - 1236:16, 1238:24, 1328:11, 1329:7, 1330:23, 1331:4, 1334:13, 1336:3, 1336:15, 1337:8, 1337:25, 1342:24, 1343:10, 1343:15, 1368:2, 1368:4, 1390:6
**investor/advisor** [1] - 1190:20
**investors** [41] - 1177:22, 1183:9, 1183:17, 1185:13, 1189:19, 1220:11, 1226:12, 1227:16, 1228:11, 1229:1, 1229:14, 1236:13, 1255:15, 1255:17, 1256:9, 1257:24, 1258:14, 1259:11, 1259:13, 1261:13, 1261:18, 1262:2, 1262:8, 1263:6, 1263:13, 1263:22, 1264:2, 1264:7, 1264:8, 1293:14, 1293:18, 1294:22, 1296:1, 1306:6, 1308:14, 1308:19, 1328:19, 1328:25, 1332:2, 1333:10, 1335:2
**investors'** [5] - 1130:24, 1336:7, 1342:7, 1342:9, 1345:10
**invests** [1] - 1190:11
**involved** [27] - 1158:24, 1162:17, 1168:4, 1187:13, 1230:8, 1242:18, 1242:25, 1253:24, 1258:13, 1264:22, 1265:6, 1266:1, 1266:3, 1268:7, 1271:14, 1272:2, 1272:3, 1272:9, 1272:10, 1282:8, 1282:13, 1282:14, 1282:18, 1282:22, 1283:1, 1327:16, 1327:19
**involvement** [1] - 1187:16
**involves** [2] - 1154:24, 1207:18
**involving** [2] - 1268:25, 1271:15
**iPhone** [1] - 1365:15
**IPO** [2] - 1308:12, 1308:19
**irrespective** [1] - 1337:17
**is...** [1] - 1223:22
**isolate** [1] - 1365:10
**issue** [21] - 1126:7, 1164:24, 1165:12, 1168:14, 1205:14, 1222:22, 1223:4, 1223:12, 1229:5, 1242:12, 1242:14, 1253:7, 1269:23, 1271:10, 1271:11, 1284:15, 1297:25, 1354:8, 1382:14, 1390:8, 1392:14

**issued** [7] - 1259:8, 1259:11, 1293:13, 1295:16, 1295:25, 1306:5, 1339:11
**issues** [4] - 1226:24, 1297:18, 1388:12, 1390:12
**it'll** [1] - 1387:17
**items** [1] - 1136:11
**iterations** [2] - 1222:8, 1226:13

---

# J

**JACOBY** [2] - 1124:1, 1395:5
**jacoby** [1] - 1355:9
**Jacoby** [92] - 1124:7, 1124:9, 1131:2, 1136:22, 1138:10, 1138:14, 1140:15, 1141:4, 1149:11, 1150:4, 1151:15, 1152:11, 1158:11, 1170:22, 1171:11, 1175:2, 1204:12, 1205:16, 1207:12, 1226:1, 1228:7, 1231:9, 1233:11, 1242:11, 1242:17, 1244:8, 1248:15, 1249:15, 1254:23, 1258:11, 1260:8, 1260:11, 1262:19, 1266:22, 1267:7, 1267:10, 1267:14, 1267:16, 1268:13, 1268:17, 1268:25, 1269:7, 1269:11, 1273:5, 1276:6, 1276:13, 1278:25, 1279:3, 1286:25, 1287:22, 1290:2, 1291:25, 1294:6, 1296:2, 1296:15, 1297:15, 1311:7, 1313:10, 1315:1, 1316:16, 1318:7, 1318:8, 1320:7, 1320:12, 1320:18, 1329:14, 1334:12, 1350:4, 1353:24, 1354:18, 1354:24, 1355:6, 1356:6, 1356:18, 1358:16, 1360:2, 1361:13, 1364:13, 1365:11, 1367:22, 1373:2, 1376:4, 1377:21, 1378:5, 1383:15, 1387:17, 1389:17, 1396:20, 1396:21, 1396:23, 1397:2
**Jacoby's** [2] - 1164:2, 1379:2
**JAMES** [1] - 1121:11
**James** [1] - 1211:13
**January** [7] - 1231:9, 1232:1, 1355:22, 1370:5, 1376:9, 1376:14, 1384:16
**Jeff** [2] - 1156:5, 1375:12
**Jeffrey** [1] - 1294:11, 1296:2
**Jeffry** [26] - 1121:3, 1121:8, 1121:12, 1205:17, 1264:16, 1267:16, 1267:22, 1271:22, 1271:23, 1271:25, 1272:5, 1273:21, 1286:13, 1286:15, 1287:5, 1287:11, 1290:4, 1290:6, 1290:7, 1290:8, 1290:12, 1291:7, 1291:9, 1293:10, 1294:22, 1296:5
**JEFFRY** [1] - 1120:8
**JESSICA** [1] - 1120:16
**job** [29] - 1131:7, 1146:17, 1179:9, 1183:12, 1183:13, 1183:22, 1184:3, 1187:22, 1212:24, 1213:8, 1213:9, 1213:12, 1213:15, 1213:16, 1214:10, 1229:25, 1230:5, 1230:6, 1230:7, 1232:7, 1233:6, 1262:14, 1263:24, 1264:1, 1264:6, 1264:7, 1283:8, 1342:23
**Joe** [1] - 1350:19
**joined** [2] - 1328:14, 1368:14
**JONATHAN** [1] - 1120:23
**Jordan** [1] - 1317:19
**Joseph** [1] - 1387:20
**Jovan** [4] - 1348:10, 1349:15, 1349:17, 1380:10

(Judge - Took)

**Judge** [11] - 1175:24, 1203:5, 1254:19, 1319:24, 1331:16, 1339:15, 1353:6, 1369:12, 1373:1, 1385:25, 1388:2

**judge** [5] - 1269:13, 1353:9, 1362:19, 1382:12, 1390:21

**judgment** [1] - 1223:8

**July** [7] - 1356:21, 1370:8, 1391:4, 1391:9, 1391:10, 1392:3, 1392:12

**jump** [4] - 1296:8, 1345:1, 1359:23, 1369:4

**juncture** [1] - 1390:1

**June** [17] - 1120:7, 1180:19, 1181:23, 1182:6, 1182:23, 1193:9, 1199:10, 1259:8, 1261:19, 1265:8, 1291:20, 1293:3, 1357:18, 1358:19, 1359:12, 1370:6, 1394:9

**juror** [3] - 1253:6, 1310:16, 1353:11

**jurors** [8] - 1122:17, 1126:5, 1169:18, 1389:1, 1391:3, 1391:5, 1394:1, 1394:5

**jury** [38] - 1131:20, 1134:3, 1162:16, 1164:1, 1165:13, 1169:11, 1188:6, 1200:1, 1201:7, 1204:3, 1207:1, 1212:9, 1222:3, 1225:1, 1227:22, 1233:5, 1241:3, 1244:1, 1252:2, 1265:2, 1265:5, 1265:20, 1271:1, 1272:7, 1275:1, 1281:1, 1281:8, 1310:18, 1310:23, 1379:1, 1390:2, 1391:20, 1392:8, 1392:9, 1392:19, 1393:15

**Jury** [11] - 1123:3, 1166:3, 1170:14, 1225:4, 1227:25, 1254:16, 1310:14, 1311:2, 1353:7, 1353:17, 1387:4

---

**K**

**K-1** [2] - 1306:2, 1306:4

**K-1-S** [4] - 1305:23, 1306:12, 1306:14, 1307:7

**KATE** [1] - 1120:17

**keep** [18] - 1130:19, 1149:1, 1160:10, 1160:13, 1160:14, 1176:9, 1184:12, 1197:10, 1201:15, 1206:7, 1273:24, 1305:11, 1339:8, 1359:23, 1384:18

**keeps** [1] - 1343:20

**kept** [1] - 1197:11

**key** [3] - 1293:24, 1294:23, 1296:1

**kick** [1] - 1256:8

**KIM** [1] - 1120:19

**kind** [7] - 1173:16, 1222:24, 1246:10, 1251:4, 1298:25, 1314:16, 1391:23

**kinds** [1] - 1327:17

**KN** [1] - 1135:10

**knowing** [4] - 1216:6, 1261:1, 1269:20, 1290:9

**knowledge** [15] - 1154:23, 1155:4, 1222:5, 1222:21, 1222:22, 1223:18, 1227:15, 1248:24, 1273:21, 1291:6, 1293:8, 1307:9, 1309:8, 1309:14, 1368:20

**known** [4] - 1156:21, 1219:9, 1357:6, 1363:19

**knows** [2] - 1225:16, 1370:4

**KOBRE** [1] - 1120:19

**KOVNER** [1] - 1120:11

**Kowalski** [1] - 1150:4

**Kyle** [1] - 1307:11

---

**L**

**ladies** [1] - 1143:6

**laid** [1] - 1214:22

**lands** [1] - 1344:11

**language** [50] - 1167:7, 1172:13, 1172:16, 1172:21, 1173:3, 1173:6, 1173:8, 1173:12, 1173:14, 1173:16, 1173:22, 1173:25, 1174:2, 1174:4, 1199:10, 1200:2, 1200:19, 1201:8, 1202:10, 1217:3, 1217:13, 1217:23, 1218:2, 1219:4, 1220:20, 1220:24, 1221:6, 1227:15, 1228:9, 1228:14, 1228:23, 1229:11, 1229:12, 1234:21, 1235:3, 1237:10, 1238:1, 1238:17, 1241:8, 1241:16, 1244:18, 1246:24, 1247:9, 1247:12, 1247:23, 1248:3, 1248:6, 1251:3, 1251:20

**large** [2] - 1264:9, 1331:8

**largely** [2] - 1298:16, 1326:24

**larger** [1] - 1345:15

**Lash** [11] - 1127:13, 1131:25, 1137:3, 1139:23, 1144:3, 1147:24, 1148:13, 1150:12, 1156:4, 1294:11, 1296:2

**Lash's** [3] - 1144:21, 1147:12

**last** [25] - 1127:20, 1136:12, 1137:1, 1145:7, 1148:14, 1152:11, 1153:11, 1176:24, 1182:2, 1192:18, 1212:5, 1213:22, 1234:6, 1252:10, 1256:24, 1260:17, 1271:6, 1296:14, 1301:25, 1305:22, 1322:17, 1331:20, 1362:21, 1363:4, 1375:12

**late** [2] - 1271:5, 1352:19

**launched** [3] - 1214:18, 1215:13, 1219:11

**LAURA** [1] - 1121:10

**law** [7] - 1226:2, 1244:13, 1249:20, 1382:7, 1382:22, 1382:25, 1390:18

**Law** [2] - 1267:1, 1268:4

**LAW** [1] - 1121:11

**laws** [2] - 1156:22, 1288:5

**lawyer** [12] - 1204:12, 1208:22, 1237:21, 1251:10, 1252:3, 1268:4, 1271:16, 1272:13, 1273:9, 1274:1, 1307:5

**lawyers** [22] - 1205:1, 1205:3, 1205:12, 1209:24, 1225:20, 1227:8, 1227:9, 1230:9, 1242:18, 1242:23, 1242:25, 1272:2, 1272:3, 1272:4, 1272:8, 1272:9, 1282:8, 1282:13, 1282:21

**lay** [2] - 1317:7, 1319:10

**laying** [1] - 1148:20

**layman's** [1] - 1350:25

**leading** [1] - 1382:13

**learn** [3] - 1155:19, 1213:1, 1230:7

**least** [6] - 1142:25, 1259:10, 1268:7, 1315:17, 1320:19, 1379:16

**leave** [1] - 1390:19

**leaves** [1] - 1387:6

**leaving** [5] - 1262:4, 1262:6, 1262:13, 1286:19, 1286:22

**left** [18] - 1150:22, 1157:5, 1161:2, 1176:3, 1180:7, 1180:8, 1182:6, 1182:15, 1192:1, 1192:2, 1196:23, 1260:1, 1264:20, 1265:2, 1265:5, 1283:23, 1330:11, 1358:15

**left-hand** [1] - 1358:15

**legal** [9] - 1210:9, 1210:12, 1213:10, 1213:11, 1289:12, 1309:7, 1382:9, 1382:23, 1383:2

**legitimate** [1] - 1284:20

**lending** [2] - 1309:21, 1328:3

**length** [4] - 1155:16, 1204:6, 1291:18, 1373:2

**Leo** [1] - 1354:24

**less** [2] - 1323:8, 1331:3

**letter** [13] - 1152:1, 1152:3, 1152:15, 1152:24, 1153:3, 1154:8, 1156:13, 1156:16, 1156:18, 1168:22, 1285:9, 1286:9, 1286:15

**letterhead** [1] - 1210:13

**letters** [1] - 1366:15

**letting** [3] - 1133:1, 1204:13, 1208:2

**level** [8] - 1132:3, 1138:1, 1196:17, 1196:23, 1219:23, 1300:9, 1300:25, 1304:13

**liabilities** [1] - 1189:1

**lied** [1] - 1156:12

**life** [3] - 1324:21, 1324:22, 1354:17

**light** [3] - 1155:19, 1156:2, 1317:15

**likelihood** [1] - 1332:18

**likely** [2] - 1169:5, 1299:22

**limited** [2] - 1271:13, 1306:5

**limiting** [1] - 1253:6

**Line** [7] - 1192:22, 1192:23, 1193:4, 1199:25, 1201:5, 1257:4, 1267:5

**line** [21] - 1150:20, 1204:19, 1205:12, 1221:9, 1299:2, 1299:3, 1299:8, 1299:12, 1299:14, 1300:4, 1300:6, 1300:13, 1301:5, 1301:25, 1304:2, 1304:4, 1304:8, 1341:18, 1369:18, 1372:22

**Lines** [1] - 1199:4, 1265:8

**lines** [2] - 1301:5, 1302:18

**list** [7] - 1134:13, 1252:12, 1271:2, 1271:3, 1271:5, 1289:10, 1290:4

**listed** [3] - 1294:22, 1296:5, 1372:20

**listener** [1] - 1380:16

**lists** [8] - 1290:1, 1293:24, 1294:2, 1294:4, 1294:6, 1294:8, 1294:11, 1296:1

**literally** [1] - 1185:2

**LLC** [1] - 1135:7

**LLP** [3] - 1120:19, 1121:2, 1121:7

**loaded** [1] - 1266:18

**loan** [3] - 1159:5, 1159:8, 1159:9

**log** [11] - 1379:4, 1379:8, 1379:11, 1379:16, 1379:17, 1380:4, 1380:6, 1380:8, 1380:10, 1380:19, 1380:24

**logical** [1] - 1386:24

**longtime** [1] - 1324:20

**look** [104] - 1127:14, 1129:1, 1129:18, 1130:10, 1136:1, 1140:5, 1143:17, 1146:17, 1148:9, 1148:23, 1159:12, 1161:7, 1166:14, 1167:15, 1167:20, 1168:15, 1179:9, 1184:6, 1185:21, 1187:11, 1188:2, 1190:5, 1191:7, 1192:9, 1194:14, 1195:2, 1197:6, 1202:14, 1210:6, 1221:1, 1232:8, 1233:11, 1234:16, 1234:19, 1236:23, 1246:10, 1247:6, 1249:22, 1251:15, 1259:22, 1267:16, 1268:12, 1271:6, 1272:17, 1278:18, 1278:23, 1279:2, 1285:9, 1285:14, 1285:23, 1286:12, 1286:18,

1289:19, 1290:14, 1304:25, 1313:1,
1313:25, 1314:4, 1316:13, 1316:17,
1318:3, 1320:18, 1320:20, 1323:18,
1324:21, 1325:3, 1327:8, 1333:13,
1333:14, 1334:20, 1334:22, 1338:20,
1338:24, 1339:20, 1340:15, 1340:17,
1341:9, 1345:12, 1345:14, 1350:16,
1351:5, 1351:12, 1351:20, 1354:18,
1354:21, 1357:10, 1359:15, 1360:20,
1360:22, 1361:20, 1361:22, 1367:1,
1369:2, 1369:16, 1371:3, 1371:8,
1371:25, 1375:20, 1377:20, 1383:13,
1384:2

**looked** [25] - 1124:17, 1124:23, 1131:18,
1139:7, 1140:22, 1142:1, 1175:16,
1181:19, 1184:1, 1184:2, 1184:8, 1186:3,
1186:10, 1186:20, 1198:19, 1228:10,
1234:8, 1258:2, 1268:18, 1291:23,
1321:13, 1327:15, 1328:16, 1333:9,
1361:12

**looking** [43] - 1144:13, 1144:19,
1179:23, 1182:2, 1182:17, 1192:6,
1192:8, 1193:13, 1223:10, 1232:23,
1234:25, 1235:1, 1235:11, 1260:20,
1263:2, 1263:4, 1263:5, 1268:17,
1269:18, 1271:3, 1291:20, 1295:17,
1310:16, 1314:22, 1316:1, 1317:3,
1317:15, 1318:13, 1320:1, 1320:4,
1320:19, 1326:8, 1333:8, 1334:3, 1337:7,
1341:17, 1358:17, 1362:4, 1365:18,
1366:6, 1366:7, 1392:2, 1394:1

**looks** [25] - 1138:13, 1148:9, 1148:12,
1159:11, 1160:7, 1173:5, 1173:11,
1173:15, 1174:7, 1178:18, 1184:14,
1215:12, 1215:15, 1231:14, 1232:3,
1239:18, 1239:23, 1244:12, 1246:16,
1298:12, 1327:2, 1339:12, 1348:8,
1364:20, 1369:9

**loop** [1] - 1282:5
**loosey** [1] - 1374:16
**loosey-goosey** [1] - 1374:16
**loss** [1] - 1147:17
**lost** [1] - 1390:6
**loud** [2] - 1354:22, 1375:21
**loudly** [2] - 1126:4, 1126:8
**love** [1] - 1374:13
**lower** [1] - 1289:19
**LP** [3] - 1136:14, 1142:16, 1183:21
**LP's** [3] - 1219:25, 1220:3, 1245:9
**LPAs** [1] - 1236:20
**LPH** [1] - 1213:23
**LPs** [3] - 1216:19, 1220:1, 1237:11
**lunch** [3] - 1251:24, 1264:15
**Lunch** [1] - 1252:22

---

# M

**Macrina** [1] - 1192:4
**magically** [1] - 1177:7
**mail** [72] - 1121:17, 1202:22, 1207:12,
1210:19, 1212:24, 1213:4, 1214:13,
1214:24, 1215:9, 1218:17, 1218:19,
1218:20, 1218:21, 1223:14, 1225:22,
1225:24, 1225:25, 1233:20, 1235:14,
1237:20, 1238:5, 1239:20, 1241:6,
1242:11, 1244:21, 1254:4, 1266:25,

1267:16, 1267:17, 1267:19, 1267:24,
1268:18, 1268:21, 1269:10, 1271:15,
1273:9, 1273:12, 1313:11, 1313:14,
1317:20, 1345:16, 1346:8, 1346:15,
1346:21, 1349:18, 1351:10, 1354:21,
1354:24, 1355:4, 1355:14, 1356:6,
1356:9, 1356:18, 1357:15, 1357:18,
1357:25, 1360:2, 1364:13, 1375:20,
1376:24, 1377:4, 1377:22, 1377:25,
1378:3, 1380:1, 1380:7, 1383:14,
1383:20, 1384:20, 1385:13, 1386:6,
1386:12

**mailed** [3] - 1231:10, 1232:1, 1232:6
**mailing** [1] - 1204:13
**mails** [7] - 1204:5, 1208:15, 1223:9,
1223:14, 1234:11, 1253:25, 1254:10
**main** [1] - 1259:16
**maintenance** [1] - 1154:13
**majority** [1] - 1368:12
**man** [1] - 1262:21
**man's** [1] - 1233:22
**management** [25] - 1152:1, 1152:15,
1154:25, 1156:17, 1196:7, 1313:14,
1313:15, 1313:20, 1319:4, 1319:15,
1320:25, 1325:24, 1352:23, 1353:25,
1354:1, 1354:5, 1355:15, 1357:1, 1357:7,
1357:10, 1357:18, 1357:19, 1360:6,
1364:21, 1367:16
**Management** [1] - 1172:8
**manager** [1] - 1294:23
**managers** [2] - 1293:24, 1354:6
**managing** [2] - 1153:13, 1290:1
**Mander** [1] - 1377:23
**manufacturer** [1] - 1146:24, 1325:25,
1349:6
**March** [17] - 1132:21, 1182:3, 1223:8,
1244:11, 1245:14, 1246:18, 1266:6,
1266:8, 1266:14, 1292:3, 1295:19,
1296:16, 1339:12, 1370:5, 1371:20,
1385:13, 1386:6
**Margolin** [1] - 1152:24
**mark** [7] - 1311:20, 1311:25, 1312:4,
1315:9, 1316:17, 1338:2, 1338:18
**mark-to-market** [4] - 1311:20, 1311:25,
1312:4, 1315:9
**marked** [51] - 1158:11, 1160:2, 1160:22,
1162:22, 1171:21, 1175:20, 1176:13,
1230:13, 1249:15, 1266:22, 1267:14,
1269:7, 1329:14, 1376:5, 1384:1, 1385:4,
1386:4, 1386:16, 1396:5, 1396:6, 1396:7,
1396:8, 1396:9, 1396:10, 1396:11,
1396:12, 1396:13, 1396:14, 1396:15,
1396:16, 1396:17, 1396:18, 1396:19,
1396:20, 1396:21, 1396:22, 1396:23,
1396:24, 1396:25, 1397:1, 1397:2,
1397:3, 1397:4, 1397:5, 1397:7, 1397:8,
1397:10, 1397:11, 1397:12, 1397:13,
1397:14
**market** [10] - 1168:7, 1264:9, 1311:20,
1311:25, 1312:1, 1312:4, 1315:9,
1336:17, 1338:2, 1338:18
**marketer** [1] - 1375:4
**marketers** [1] - 1332:4
**marketing** [41] - 1124:10, 1124:21,
1125:16, 1128:12, 1128:17, 1128:22,
1129:1, 1130:4, 1130:10, 1159:6,

1159:15, 1160:7, 1162:17, 1162:19,
1164:22, 1165:7, 1166:6, 1167:8, 1168:5,
1173:9, 1178:24, 1179:2, 1184:25,
1185:3, 1187:23, 1290:21, 1310:8,
1332:7, 1375:10, 1375:12, 1376:10,
1376:17, 1376:21, 1379:9, 1383:11,
1384:11, 1384:21, 1385:14, 1386:13
**marking** [1] - 1179:5
**Marshall** [4] - 1136:20, 1290:2, 1294:8,
1296:2
**Marshall's** [1] - 1137:13
**Maryland** [1] - 1348:5
**Master's** [1] - 1334:5
**Matarazzo** [1] - 1150:6
**material** [13] - 1128:17, 1153:8,
1154:21, 1155:1, 1329:17, 1330:1,
1330:5, 1330:8, 1376:17, 1376:21,
1384:21, 1385:14, 1386:13
**Material** [2] - 1383:17, 1384:3
**materials** [36] - 1125:16, 1128:12,
1128:22, 1128:23, 1129:1, 1130:4,
1130:10, 1152:4, 1157:4, 1159:6, 1160:4,
1161:1, 1162:17, 1162:19, 1164:10,
1164:22, 1165:7, 1166:7, 1167:9, 1168:5,
1168:7, 1178:24, 1178:25, 1179:5,
1183:23, 1185:3, 1187:21, 1189:14,
1208:22, 1223:11, 1223:19, 1260:1,
1263:21, 1375:10, 1376:10, 1379:9
**MATHEWS** [3] - 1120:17, 1253:14,
1254:10
**Matt** [1] - 1387:21
**matter** [14] - 1165:5, 1166:23, 1187:1,
1284:3, 1338:9, 1341:22, 1344:5, 1344:7,
1344:15, 1372:17, 1373:21, 1375:3,
1390:22, 1394:9
**matters** [1] - 1342:20
**MATTHEW** [1] - 1120:22
**maturity** [1] - 1308:21
**McConnell** [62] - 1124:18, 1124:24,
1125:5, 1131:8, 1179:19, 1179:23,
1192:17, 1193:1, 1199:9, 1203:4, 1203:7,
1210:24, 1211:1, 1212:15, 1214:14,
1214:16, 1214:22, 1215:18, 1217:6,
1217:9, 1218:4, 1221:8, 1222:4, 1222:12,
1222:15, 1223:24, 1224:5, 1230:25,
1231:3, 1233:15, 1235:19, 1235:23,
1240:1, 1241:5, 1269:17, 1269:23,
1277:24, 1298:3, 1305:20, 1319:8,
1319:19, 1319:24, 1337:10, 1339:16,
1345:22, 1346:1, 1351:24, 1352:3,
1355:7, 1356:14, 1357:25, 1358:3,
1358:7, 1360:11, 1360:13, 1362:3,
1362:16, 1364:25, 1365:1, 1368:5,
1369:11, 1389:11
**MCCONNELL** [93] - 1120:16, 1122:22,
1132:23, 1134:11, 1134:15, 1134:18,
1135:19, 1138:21, 1141:1, 1141:6,
1145:22, 1145:24, 1146:2, 1146:7,
1148:17, 1149:4, 1149:6, 1149:10,
1149:20, 1149:22, 1152:20, 1159:19,
1160:20, 1162:7, 1164:11, 1164:15,
1164:25, 1165:3, 1165:15, 1166:9,
1167:18, 1168:2, 1168:15, 1169:11,
1169:22, 1170:7, 1171:7, 1171:10,
1171:19, 1174:19, 1175:23, 1176:3,
1176:10, 1184:20, 1186:21, 1187:3,

1188:5, 1198:15, 1199:6, 1200:12,
1201:1, 1249:23, 1252:6, 1252:9,
1252:18, 1253:5, 1254:11, 1262:11,
1267:11, 1269:5, 1269:13, 1269:19,
1270:1, 1271:5, 1271:11, 1275:3, 1276:9,
1276:16, 1276:24, 1282:24, 1371:17,
1375:22, 1378:6, 1379:19, 1383:23,
1385:2, 1385:17, 1385:25, 1386:17,
1387:16, 1388:10, 1390:13, 1390:16,
1390:21, 1390:24, 1391:10, 1391:15,
1391:22, 1393:1, 1393:4, 1393:7,
1393:16, 1394:8

**MCCONNELL** ........................ [2] -
1395:9, 1395:15

**mean** [12] - 1122:23, 1135:24, 1177:1,
1222:24, 1229:15, 1237:19, 1242:22,
1254:4, 1333:17, 1366:9, 1391:13,
1392:23

**meaning** [7] - 1282:13, 1299:19,
1315:23, 1321:6, 1326:2, 1326:13,
1332:6

**means** [14] - 1175:15, 1177:2, 1301:6,
1308:12, 1308:18, 1311:25, 1312:4,
1314:14, 1320:23, 1323:1, 1323:5,
1331:4, 1358:22, 1363:20

**meant** [2] - 1332:1, 1332:3

**meantime** [1] - 1126:4

**measure** [13] - 1311:12, 1317:10,
1317:17, 1322:8, 1322:11, 1325:4,
1325:7, 1325:11, 1326:8, 1326:11,
1326:13, 1336:24, 1341:22

**measuring** [2] - 1304:23, 1326:22

**meet** [3] - 1254:5, 1332:18, 1379:25

**meeting** [3] - 1255:3, 1277:23, 1278:6

**meetings** [7] - 1185:1, 1251:9, 1278:2,
1278:4, 1307:1, 1307:4, 1329:6

**member** [4] - 1153:13, 1290:1, 1292:4,
1294:23

**members** [2] - 1265:20, 1277:23

**memo** [2] - 1276:22, 1277:7

**memoranda** [2] - 1218:3, 1258:3

**Memorandum** [1] - 1213:6

**memorandum** [3] - 1213:13, 1265:14,
1268:8

**memorandums** [3] - 1198:25, 1253:17,
1253:21

**memory** [7] - 1148:5, 1192:19, 1229:22,
1245:18, 1266:10, 1303:11, 1334:20

**Menchel** [3] - 1166:16, 1167:24,
1266:18

**MENCHEL** [185] - 1120:22, 1122:4,
1122:10, 1122:16, 1122:19, 1122:25,
1123:5, 1124:6, 1124:16, 1126:1, 1126:6,
1126:10, 1128:4, 1129:18, 1131:15,
1132:22, 1133:3, 1134:4, 1134:9,
1134:14, 1134:16, 1135:1, 1136:2,
1136:6, 1137:18, 1138:20, 1139:25,
1140:24, 1141:4, 1141:7, 1141:12,
1143:4, 1143:9, 1145:5, 1145:16,
1145:21, 1146:6, 1146:9, 1148:19,
1149:3, 1149:21, 1150:2, 1151:12,
1152:19, 1155:10, 1159:18, 1160:1,
1160:19, 1160:24, 1162:2, 1162:4,
1162:11, 1163:1, 1164:2, 1164:5, 1164:8,
1164:18, 1165:2, 1166:4, 1167:3,
1168:10, 1168:18, 1168:21, 1169:7,

1169:13, 1169:20, 1169:25, 1170:13,
1170:18, 1170:20, 1171:6, 1171:24,
1172:17, 1172:25, 1174:18, 1175:20,
1176:2, 1176:8, 1176:11, 1178:1,
1180:17, 1181:11, 1181:20, 1184:9,
1186:8, 1186:18, 1186:23, 1186:25,
1188:3, 1188:6, 1188:9, 1188:17, 1191:4,
1191:18, 1192:21, 1193:7, 1199:3,
1202:2, 1202:17, 1203:3, 1204:12,
1204:17, 1205:4, 1207:2, 1207:7, 1207:9,
1207:11, 1208:14, 1210:16, 1210:18,
1210:23, 1211:5, 1211:7, 1212:18,
1212:23, 1214:12, 1214:15, 1214:20,
1214:24, 1215:6, 1215:8, 1215:17,
1216:9, 1216:17, 1218:6, 1219:14,
1226:7, 1226:9, 1226:22, 1227:2,
1227:13, 1227:19, 1228:4, 1228:6,
1228:17, 1228:20, 1228:22, 1230:12,
1230:14, 1230:16, 1230:24, 1231:1,
1231:6, 1231:8, 1231:15, 1231:17,
1231:22, 1231:24, 1232:11, 1233:9,
1233:14, 1233:18, 1235:13, 1235:18,
1235:22, 1236:2, 1236:5, 1238:16,
1239:8, 1239:13, 1239:16, 1239:25,
1241:12, 1241:17, 1241:20, 1242:4,
1244:2, 1244:5, 1244:7, 1244:16, 1245:4,
1245:7, 1245:13, 1246:2, 1246:5,
1249:12, 1249:25, 1251:22, 1252:20,
1389:6, 1389:8, 1389:16, 1390:14,
1391:8, 1391:11

**MENCHEL** ........................ [4] - 1395:7,
1395:11, 1395:13, 1395:17

**mentally** [2] - 1247:22, 1247:25

**mention** [11] - 1249:5, 1249:19, 1250:4,
1250:18, 1250:23, 1251:1, 1284:19,
1286:15, 1287:3, 1287:5, 1293:10

**mentioned** [6] - 1125:24, 1178:23,
1197:2, 1250:5, 1250:6, 1265:12

**message** [3] - 1355:13, 1361:2, 1367:16

**met** [7] - 1157:20, 1254:25, 1255:22,
1279:6, 1279:24, 1306:20, 1315:20

**metric** [15] - 1128:14, 1188:14, 1188:19,
1241:19, 1241:20, 1303:2, 1323:21,
1323:22, 1324:18, 1326:22, 1327:8,
1331:3, 1338:16, 1359:10

**metrics** [9] - 1183:18, 1297:16, 1302:16,
1302:24, 1303:3, 1311:8, 1311:12,
1341:1, 1341:6

**Miami** [1] - 1121:13

**mic** [2] - 1130:21, 1136:1

**MICHAEL** [1] - 1121:9

**Michelle** [9] - 1259:7, 1260:6, 1264:13,
1266:11, 1269:2, 1269:4, 1277:21,
1291:17, 1339:7

**middle** [3] - 1158:15, 1346:15, 1365:11

**might** [17] - 1141:3, 1169:22, 1201:17,
1208:3, 1225:10, 1225:11, 1352:16,
1353:4, 1366:21, 1369:2, 1377:14,
1392:16

**Mike** [4] - 1356:13, 1369:5

**Mike-Mike-Delta** [1] - 1369:5

**Mike-Mike-Hotel** [1] - 1356:13

**milestones** [1] - 1349:8

**Milford** [1] - 1150:23

**million** [53] - 1129:15, 1136:13, 1137:2,
1140:10, 1140:20, 1142:5, 1142:15,

1143:16, 1143:19, 1144:2, 1144:10,
1151:20, 1189:4, 1189:5, 1197:25,
1311:23, 1323:6, 1323:7, 1324:4, 1324:9,
1340:4, 1340:8, 1340:9, 1342:2, 1342:3,
1342:4, 1342:6, 1348:7, 1349:2, 1350:20,
1350:21, 1359:1, 1359:3, 1359:20,
1359:21, 1360:23, 1360:25, 1361:19,
1361:22, 1362:22, 1362:25, 1363:2,
1363:6, 1363:14, 1363:17, 1363:23,
1367:13, 1367:14, 1369:18, 1369:21,
1372:2

**millions** [2] - 1196:7, 1196:10

**mind** [8] - 1150:17, 1199:24, 1257:15,
1282:7, 1328:1, 1333:8, 1357:11, 1387:1

**minds** [1] - 1251:25

**mine** [1] - 1333:21

**minimum** [1] - 1261:11

**minus** [2] - 1300:9, 1344:2

**minute** [13] - 1166:2, 1247:22, 1254:2,
1254:9, 1278:22, 1310:12, 1334:9,
1342:20, 1343:8, 1364:8, 1373:1

**minutes** [8] - 1169:2, 1291:23, 1310:21,
1387:10, 1387:18, 1388:20, 1388:25,
1390:12

**misimpression** [1] - 1144:12

**misleading** [2] - 1271:25, 1350:7

**misremembering** [1] - 1166:25

**missed** [1] - 1198:12

**misspoke** [2] - 1170:25, 1239:4

**misstated** [1] - 1154:21

**mistake** [1] - 1344:1

**misunderstood** [1] - 1279:14

**MMD** [1] - 1369:4

**MMD-1** [4] - 1369:5, 1369:12, 1369:14,
1397:10

**MMH** [4] - 1356:2, 1356:12, 1356:15,
1397:3

**MMMMU** [1] - 1287:14

**modeling** [1] - 1232:17

**moment** [13] - 1139:7, 1175:23,
1210:24, 1231:23, 1233:1, 1284:24,
1297:12, 1319:24, 1345:14, 1348:15,
1362:11, 1367:19, 1382:10

**Monday** [1] - 1120:7

**money** [17] - 1125:7, 1125:15, 1177:22,
1182:16, 1193:9, 1193:20, 1201:17,
1257:7, 1308:14, 1308:20, 1309:19,
1348:3, 1348:4, 1349:4, 1349:8, 1349:13,
1390:6

**monies** [2] - 1180:10, 1180:22

**monitor** [1] - 1183:13

**month** [10] - 1182:2, 1190:13, 1311:23,
1322:11, 1326:9, 1336:12, 1348:24,
1366:4, 1366:6, 1366:20

**monthly** [6] - 1181:13, 1308:6, 1308:24,
1335:1, 1372:21, 1372:24

**months** [12] - 1182:12, 1182:19,
1279:23, 1322:17, 1322:18, 1359:16,
1365:25, 1366:15, 1367:7, 1367:9,
1367:12, 1367:17

**morning** [5] - 1124:7, 1124:8, 1260:7,
1267:3, 1271:6

**Moscato** [2] - 1145:19, 1146:11

**most** [5] - 1190:9, 1190:19, 1190:25,
1336:10, 1372:11

**Motor** [1] - 1135:18

**Motors** [3] - 1139:23, 1140:6, 1140:7
**mouths** [1] - 1130:6
**move** [15] - 1143:3, 1145:4, 1168:18, 1187:1, 1192:14, 1212:19, 1222:17, 1281:9, 1305:21, 1329:25, 1377:16, 1380:25, 1382:2, 1383:5, 1383:9
**moved** [2] - 1193:9, 1193:20
**moving** [4] - 1208:16, 1208:17, 1249:23, 1384:18
**Mr. Schneider** [38] - 1201:8, 1208:1, 1211:20, 1211:21, 1211:23, 1211:25, 1217:2, 1217:15, 1217:19, 1218:17, 1218:19, 1221:4, 1230:10, 1235:11, 1237:19, 1249:6, 1249:20, 1250:11, 1251:2, 1251:19, 1265:3, 1265:6, 1265:13, 1265:22, 1273:12, 1273:21, 1283:7, 1285:1, 1295:12, 1313:12, 1354:3, 1359:11, 1359:18, 1360:3, 1364:14, 1367:12, 1373:3, 1379:3
**MS** [18] - 1164:14, 1169:16, 1206:4, 1222:24, 1223:13, 1225:14, 1225:24, 1226:21, 1227:18, 1241:22, 1242:8, 1242:13, 1243:1, 1253:14, 1254:10, 1272:15, 1392:2, 1392:11
**multiple** [3] - 1157:21, 1202:12, 1232:17

## N

**N6M** [1] - 1367:6
**name** [20] - 1158:15, 1159:12, 1168:3, 1172:5, 1173:10, 1175:2, 1209:3, 1209:15, 1210:3, 1210:6, 1210:7, 1210:12, 1226:20, 1233:22, 1233:24, 1248:18, 1255:20, 1256:23, 1260:10, 1294:22
**named** [7] - 1146:11, 1207:13, 1236:3, 1346:19, 1377:5, 1377:7, 1377:23
**names** [2] - 1173:19, 1289:10
**narrower** [1] - 1247:21
**nature** [2] - 1311:9, 1374:5
**Naugle** [2] - 1294:13, 1294:15
**near** [1] - 1366:23
**necessarily** [1] - 1304:23
**necessary** [3] - 1241:6, 1325:4, 1325:7
**need** [26] - 1122:24, 1136:24, 1141:3, 1141:8, 1144:15, 1181:2, 1200:14, 1204:7, 1208:18, 1212:14, 1230:14, 1237:24, 1242:9, 1252:13, 1254:8, 1276:19, 1310:18, 1318:2, 1323:7, 1323:8, 1328:9, 1328:10, 1334:2, 1353:2, 1360:14, 1388:13
**needed** [3] - 1197:7, 1208:22, 1277:18
**needs** [2] - 1199:7, 1316:4
**net** [75] - 1125:15, 1128:5, 1128:6, 1129:15, 1129:23, 1188:13, 1188:18, 1189:6, 1300:7, 1301:19, 1301:25, 1302:2, 1303:3, 1303:7, 1304:2, 1304:22, 1304:23, 1311:13, 1311:15, 1311:17, 1311:19, 1314:7, 1314:10, 1314:14, 1315:3, 1315:7, 1315:17, 1315:21, 1315:23, 1315:24, 1320:25, 1321:1, 1321:11, 1324:6, 1324:9, 1324:22, 1331:3, 1331:6, 1337:17, 1338:16, 1340:1, 1340:9, 1340:14, 1340:19, 1341:2, 1341:5, 1342:6, 1342:25, 1343:11, 1358:25, 1359:5, 1359:6,

1359:20, 1361:2, 1361:19, 1361:22, 1362:21, 1362:24, 1363:2, 1363:4, 1363:5, 1363:7, 1363:8, 1363:13, 1363:19, 1363:20, 1367:13, 1369:17, 1369:23, 1372:2, 1372:12
**Net** [6] - 1314:5, 1314:12, 1314:19, 1315:2, 1361:15, 1361:17
**never** [40] - 1122:6, 1122:22, 1126:21, 1131:2, 1138:1, 1138:2, 1145:12, 1147:5, 1158:19, 1162:14, 1164:14, 1164:15, 1164:16, 1171:11, 1177:21, 1184:1, 1184:2, 1185:7, 1186:13, 1186:14, 1194:21, 1195:6, 1196:9, 1199:20, 1199:24, 1201:14, 1254:25, 1255:2, 1273:22, 1283:10, 1310:4, 1310:6, 1327:15, 1328:18, 1328:21, 1329:7, 1336:2, 1336:4, 1336:20, 1347:22
**new** [16] - 1140:12, 1179:9, 1212:6, 1212:7, 1213:2, 1216:6, 1230:1, 1232:17, 1232:21, 1232:23, 1233:7, 1244:12, 1244:13, 1263:2, 1336:7, 1345:10
**New** [8] - 1120:5, 1120:14, 1120:15, 1120:21, 1121:5, 1338:3
**newfangled** [1] - 1365:13
**news** [2] - 1338:23, 1364:7
**next** [60] - 1129:19, 1133:5, 1134:20, 1136:10, 1139:5, 1142:8, 1147:1, 1154:23, 1159:22, 1159:23, 1161:9, 1161:12, 1163:4, 1165:17, 1168:19, 1187:1, 1188:22, 1189:2, 1201:19, 1213:20, 1216:9, 1230:19, 1232:9, 1232:11, 1232:20, 1252:23, 1270:4, 1272:1, 1272:22, 1274:4, 1275:5, 1280:1, 1281:12, 1287:13, 1292:7, 1294:25, 1300:6, 1304:13, 1326:3, 1336:12, 1339:8, 1341:8, 1345:3, 1356:21, 1364:11, 1366:20, 1367:6, 1367:9, 1367:11, 1367:17, 1372:6, 1372:7, 1378:14, 1380:10, 1380:19, 1381:2, 1384:19, 1388:4, 1392:22, 1393:13
**NICHOLAS** [1] - 1120:17
**nickname** [1] - 1273:22
**night** [2] - 1252:10, 1271:6
**nine** [4] - 1339:20, 1340:24, 1357:24, 1369:16
**Nissan** [10] - 1135:18, 1139:10, 1139:13, 1139:15, 1139:17, 1139:21, 1194:18, 1194:19, 1194:20, 1194:21
**NNI** [2] - 1375:19, 1376:6
**nobody** [3] - 1150:8, 1187:15, 1296:20
**nomenclature** [1] - 1307:19
**non** [1] - 1223:12
**non-existent** [1] - 1223:12
**noncompliance** [2] - 1156:21, 1156:22
**none** [4] - 1308:18, 1311:20, 1311:21, 1342:7
**normally** [1] - 1129:11
**North** [1] - 1194:19
**north** [1] - 1139:10
**note** [4] - 1131:23, 1135:9, 1247:22, 1320:14
**noted** [1] - 1247:25
**notes** [11] - 1132:12, 1135:13, 1135:14, 1135:22, 1137:25, 1140:25, 1143:22, 1145:2, 1153:6, 1213:23, 1392:24
**nothing** [11] - 1168:6, 1172:3, 1176:4,

1190:10, 1252:17, 1264:8, 1271:16, 1284:10, 1323:17, 1344:5, 1374:23
**notice** [7] - 1219:4, 1220:24, 1237:16, 1238:1, 1242:5, 1247:7, 1248:8
**noticed** [1] - 1247:11
**November** [10] - 1181:14, 1182:2, 1182:4, 1182:10, 1183:1, 1235:17, 1238:3, 1239:2, 1346:8
**nowhere** [4] - 1249:4, 1250:10, 1294:22, 1320:24
**Number** [2] - 1320:20, 1362:3
**number** [21] - 1128:7, 1128:9, 1128:19, 1134:16, 1146:18, 1147:19, 1149:11, 1154:12, 1154:18, 1155:4, 1156:20, 1160:1, 1251:13, 1293:24, 1313:11, 1318:13, 1321:19, 1338:19, 1360:3, 1363:23, 1364:13
**numbers** [8] - 1140:10, 1149:15, 1149:17, 1246:10, 1266:20, 1297:18, 1356:21, 1361:20
**numerous** [1] - 1283:15
**NW** [1] - 1121:8

## O

**oak** [1] - 1195:24
**oath** [1] - 1212:9
**object** [7] - 1141:1, 1162:7, 1165:4, 1199:6, 1221:8, 1240:1, 1375:24
**objecting** [1] - 1222:6
**objection** [75] - 1132:23, 1135:19, 1138:21, 1141:5, 1145:22, 1145:23, 1146:4, 1146:7, 1149:22, 1152:20, 1159:19, 1160:20, 1169:21, 1170:2, 1170:9, 1170:12, 1171:19, 1174:18, 1175:22, 1176:6, 1184:20, 1186:21, 1198:15, 1201:1, 1207:3, 1211:1, 1212:15, 1214:21, 1215:18, 1218:4, 1223:20, 1223:21, 1223:22, 1231:3, 1233:15, 1235:23, 1241:4, 1249:23, 1262:11, 1267:12, 1269:5, 1269:21, 1270:1, 1276:9, 1276:15, 1276:23, 1282:24, 1298:2, 1305:20, 1319:8, 1319:23, 1320:6, 1337:10, 1339:16, 1346:2, 1352:3, 1355:7, 1356:14, 1358:4, 1358:8, 1360:11, 1362:14, 1365:1, 1368:5, 1369:10, 1371:16, 1383:24, 1385:2, 1385:17, 1385:18, 1385:19, 1385:22, 1385:25, 1386:17
**objections** [2] - 1388:17, 1388:21
**observable** [1] - 1311:21
**obtained** [1] - 1380:9
**obviously** [4] - 1177:9, 1190:5, 1226:3, 1393:4
**October** [1] - 1370:9
**off-the-shelf** [1] - 1173:21
**offer** [52] - 1132:22, 1133:1, 1138:20, 1140:24, 1145:21, 1146:6, 1149:3, 1149:21, 1152:19, 1159:18, 1160:19, 1167:1, 1171:6, 1175:21, 1176:11, 1203:3, 1210:23, 1213:14, 1215:17, 1226:5, 1230:24, 1233:14, 1235:18, 1239:25, 1253:6, 1267:9, 1268:24, 1279:18, 1285:9, 1285:17, 1286:9, 1286:15, 1298:2, 1319:18, 1339:14, 1345:20, 1347:6, 1351:23, 1355:6,

**offered** [8] - 1141:9, 1141:10, 1143:7, 1205:21, 1207:2, 1252:12, 1252:15, 1375:23

**offering** [13] - 1141:7, 1148:18, 1164:18, 1218:3, 1249:25, 1267:19, 1269:21, 1318:5, 1320:8, 1320:9, 1342:2, 1360:10, 1360:12

**offhand** [1] - 1194:15

**OFFICE** [2] - 1120:14, 1121:11

**office** [4] - 1329:5, 1374:12, 1374:17, 1374:21

**officer** [24] - 1153:12, 1164:20, 1177:3, 1183:24, 1195:12, 1196:6, 1196:13, 1213:14, 1255:6, 1255:22, 1285:17, 1285:25, 1286:6, 1288:12, 1288:13, 1289:10, 1289:11, 1289:12, 1294:15, 1296:19, 1296:22, 1297:1

**officers** [1] - 1289:9

**offices** [1] - 1374:2

**Official** [1] - 1121:15

**official** [1] - 1371:14

**officially** [1] - 1263:15

**officials** [1] - 1379:5

**often** [7] - 1186:4, 1187:24, 1299:6, 1302:15, 1312:13, 1363:25

**once** [17] - 1125:19, 1128:18, 1128:23, 1130:7, 1146:21, 1154:16, 1175:2, 1204:14, 1208:3, 1226:3, 1245:8, 1249:5, 1305:17, 1312:15, 1312:17, 1316:1, 1376:23

**One** [1] - 1231:23

**one** [108] - 1126:21, 1126:25, 1132:21, 1138:11, 1139:23, 1140:6, 1140:8, 1146:23, 1159:4, 1159:22, 1160:15, 1167:18, 1168:5, 1170:7, 1170:8, 1174:7, 1174:25, 1175:23, 1177:9, 1180:2, 1182:3, 1184:8, 1184:14, 1184:22, 1185:16, 1185:19, 1186:7, 1186:13, 1186:14, 1186:16, 1186:21, 1186:24, 1187:2, 1188:23, 1191:19, 1191:22, 1192:21, 1200:21, 1204:5, 1205:5, 1206:3, 1209:21, 1209:24, 1215:1, 1220:19, 1220:20, 1220:21, 1226:25, 1230:10, 1232:23, 1239:8, 1239:10, 1242:5, 1247:1, 1248:8, 1248:9, 1249:12, 1258:13, 1259:16, 1260:25, 1284:21, 1284:24, 1285:5, 1293:16, 1295:19, 1296:24, 1297:7, 1297:12, 1297:23, 1299:19, 1302:15, 1303:3, 1308:9, 1309:5, 1309:13, 1310:19, 1311:12, 1319:24, 1325:19, 1327:8, 1329:6, 1329:10, 1329:25, 1330:7, 1330:20, 1334:8, 1343:19, 1349:7, 1349:17, 1359:5, 1364:8, 1368:1, 1368:25, 1369:3, 1369:4, 1376:13, 1384:9, 1384:10, 1386:21, 1387:20, 1388:14, 1389:6, 1389:12, 1390:21, 1393:22

**ones** [12] - 1184:15, 1185:7, 1187:8, 1192:8, 1192:12, 1230:9, 1236:13, 1237:22, 1252:12, 1257:14, 1329:4, 1365:9

**OOS** [3] - 1148:7, 1149:24, 1396:8

**open** [14] - 1122:1, 1163:3, 1166:1, 1207:1, 1225:1, 1244:1, 1253:3, 1263:4, 1273:1, 1276:1, 1282:1, 1310:23, 1378:12, 1382:1

**operated** [1] - 1257:14

**operating** [5] - 1131:24, 1193:11, 1259:16, 1301:2, 1317:17

**operation** [2] - 1337:5, 1337:15

**Operations** [1] - 1298:23

**operations** [14] - 1125:1, 1125:20, 1126:19, 1289:11, 1316:22, 1325:4, 1345:7, 1347:8, 1347:12, 1347:22, 1347:23, 1348:19, 1349:12, 1352:10

**operator** [2] - 1256:4, 1256:7

**opinion** [2] - 1144:5, 1153:7

**opportunities** [1] - 1258:25

**opportunity** [3] - 1272:17, 1376:4, 1380:2

**Oracle** [5] - 1377:7, 1382:6, 1382:19, 1382:20, 1383:5

**Oracle's** [1] - 1383:6

**order** [3] - 1146:3, 1317:10, 1336:14

**ordinarily** [1] - 1327:25

**organization** [4] - 1373:4, 1374:16, 1377:13, 1382:20

**organizations** [1] - 1373:12

**originally** [2] - 1260:22, 1260:23

**origins** [1] - 1329:8

**otherwise** [2] - 1213:21, 1271:3

**outflanked** [1] - 1191:8

**outflow** [1] - 1309:17

**outside** [6] - 1164:1, 1207:21, 1271:1, 1275:1, 1281:1, 1379:1

**overage** [1] - 1324:13

**overlapping** [1] - 1250:7

**overnight** [1] - 1389:24

**overruled** [3] - 1135:20, 1184:23, 1244:25

**Overruled** [2] - 1262:12, 1282:25

**oversaw** [2] - 1319:15, 1338:17

**overseen** [1] - 1255:18

**oversight** [4] - 1229:25, 1232:20, 1232:24, 1233:6

**own** [9] - 1130:24, 1174:11, 1220:11, 1227:6, 1286:9, 1304:14, 1304:15, 1387:1

**owned** [5] - 1256:4, 1256:8, 1291:6, 1292:3, 1293:6

**owners** [1] - 1289:9

## P

**P&L** [1] - 1356:21

**p.m** [2] - 1254:16, 1387:4

**pace** [3] - 1387:22, 1393:13, 1393:22

**packages** [1] - 1125:17

**Page** [38] - 1161:15, 1161:20, 1172:7, 1172:17, 1172:21, 1174:25, 1177:24, 1185:21, 1186:1, 1186:9, 1186:20, 1188:9, 1188:17, 1192:22, 1193:4, 1199:4, 1199:24, 1199:25, 1201:4, 1257:4, 1258:7, 1265:8, 1268:15, 1269:2, 1269:9, 1273:25, 1278:20, 1285:23, 1287:7, 1287:18, 1288:24, 1288:25, 1289:19, 1290:14, 1292:2, 1371:25, 1372:7

**PAGE** [2] - 1395:4, 1396:4

**page** [132] - 1123:7, 1124:20, 1128:5, 1129:19, 1131:16, 1133:5, 1134:20, 1136:6, 1136:7, 1136:10, 1136:17, 1138:11, 1138:14, 1138:24, 1139:5, 1140:18, 1141:24, 1142:8, 1142:9, 1146:10, 1147:1, 1148:14, 1150:3, 1152:10, 1152:11, 1152:23, 1152:24, 1153:11, 1154:3, 1154:12, 1154:18, 1155:10, 1156:20, 1159:23, 1160:9, 1160:15, 1161:7, 1161:9, 1161:12, 1161:16, 1163:4, 1165:17, 1174:25, 1178:20, 1179:15, 1185:23, 1185:24, 1188:22, 1188:25, 1189:2, 1191:18, 1201:19, 1203:10, 1206:11, 1207:10, 1208:14, 1214:17, 1215:8, 1215:9, 1215:22, 1216:9, 1216:10, 1216:14, 1219:14, 1221:14, 1224:11, 1228:18, 1229:11, 1230:19, 1232:9, 1232:11, 1237:8, 1237:9, 1238:16, 1240:5, 1243:6, 1244:15, 1245:22, 1246:5, 1246:7, 1247:7, 1252:23, 1259:7, 1270:4, 1272:22, 1274:4, 1275:5, 1280:1, 1281:12, 1285:15, 1286:24, 1288:8, 1292:7, 1294:25, 1295:23, 1296:9, 1298:15, 1298:18, 1298:19, 1306:18, 1313:25, 1314:18, 1320:7, 1320:9, 1320:19, 1335:9, 1339:8, 1339:20, 1340:6, 1340:24, 1341:16, 1342:5, 1346:14, 1346:15, 1351:13, 1358:3, 1361:15, 1362:22, 1367:1, 1367:20, 1367:21, 1369:16, 1369:20, 1370:12, 1372:6, 1372:7, 1378:14, 1381:2

**Pages** [1] - 1199:4

**pages** [13] - 1138:11, 1177:10, 1214:14, 1214:16, 1251:7, 1251:10, 1251:13, 1269:3, 1269:4, 1293:21, 1293:22, 1316:6, 1339:6

**paid** [39] - 1124:25, 1126:16, 1126:20, 1132:6, 1137:3, 1138:1, 1138:2, 1144:11, 1156:4, 1261:8, 1261:10, 1283:22, 1283:24, 1312:1, 1312:7, 1324:5, 1324:10, 1332:2, 1332:14, 1332:22, 1333:5, 1333:10, 1335:1, 1340:21, 1341:3, 1342:3, 1342:4, 1343:18, 1349:7, 1349:8, 1368:13, 1368:17, 1368:24, 1370:1, 1371:4, 1371:22, 1372:11

**paint** [1] - 1374:15

**paper** [1] - 1345:24

**paragraph** [4] - 1142:15, 1154:3, 1278:23, 1279:2

**paragraphs** [1] - 1153:19

**part** [32] - 1135:8, 1135:13, 1135:14, 1135:22, 1140:19, 1141:25, 1148:23, 1150:20, 1154:4, 1160:3, 1161:1, 1161:13, 1165:10, 1170:25, 1174:16, 1182:15, 1183:8, 1183:12, 1183:22, 1184:2, 1214:10, 1217:24, 1237:11, 1269:14, 1271:15, 1279:17, 1293:16, 1348:20, 1351:14, 1351:15, 1376:9

**Part** [1] - 1250:17

**partially** [2] - 1262:1, 1263:5

**participate** [1] - 1328:11

**participated** [1] - 1279:11

**particular** [7] - 1184:14, 1194:15,

1196:16, 1200:3, 1246:13, 1247:15, 1310:4
**parties** [2] - 1240:2, 1253:4
**partner** [1] - 1131:25
**partners** [2] - 1259:16, 1306:5
**Partners** [6] - 1158:22, 1159:1, 1162:18, 1173:4, 1174:14, 1178:3
**Partnership** [2] - 1371:8, 1371:11
**partnership** [5] - 1131:24, 1236:17, 1236:19, 1237:24, 1246:6
**parts** [1] - 1258:4
**party** [3] - 1312:13, 1312:20, 1377:12
**passed** [1] - 1155:21
**passing** [1] - 1329:2
**past** [1] - 1297:17
**patience** [1] - 1228:2
**Patrick** [7] - 1132:2, 1139:11, 1142:17, 1142:20, 1144:11, 1168:3, 1255:20
**Patrick's** [1] - 1143:16
**Pause** [13] - 1215:2, 1227:23, 1231:16, 1231:21, 1239:7, 1297:14, 1297:24, 1298:21, 1318:21, 1320:5, 1329:11, 1330:21, 1334:10
**pause** [7] - 1126:2, 1169:9, 1169:15, 1269:25, 1376:3, 1382:11, 1388:16
**pay** [25] - 1125:7, 1126:20, 1128:21, 1128:23, 1137:6, 1140:8, 1220:12, 1323:14, 1324:14, 1330:23, 1331:5, 1336:14, 1337:1, 1337:22, 1337:25, 1338:3, 1343:3, 1343:10, 1343:16, 1344:11, 1344:13, 1344:17, 1348:25, 1368:21
**paying** [4] - 1142:22, 1284:20, 1350:22, 1394:6
**payment** [4] - 1136:13, 1137:2, 1142:6, 1142:15
**payments** [8] - 1136:23, 1140:2, 1201:17, 1202:3, 1284:8, 1332:5, 1332:17, 1336:6
**penalty** [5] - 1248:21, 1288:4, 1289:23, 1290:10, 1291:11
**pending** [2] - 1179:16, 1349:6
**people** [36] - 1128:12, 1166:22, 1187:20, 1190:9, 1190:17, 1216:5, 1225:10, 1239:18, 1239:23, 1262:16, 1262:25, 1264:21, 1271:14, 1283:16, 1285:5, 1313:11, 1325:19, 1329:4, 1333:17, 1333:19, 1336:25, 1338:11, 1343:2, 1344:17, 1360:3, 1364:14, 1376:13, 1376:24, 1379:11, 1383:14, 1384:4, 1384:6, 1386:8, 1391:17, 1394:2
**percent** [25] - 1124:25, 1125:25, 1126:11, 1130:15, 1178:3, 1178:5, 1178:13, 1185:3, 1185:4, 1185:11, 1208:6, 1293:6, 1307:25, 1308:1, 1308:3, 1308:6, 1308:16, 1308:18, 1308:20, 1308:23, 1389:13
**percentage** [1] - 1185:2
**perfect** [1] - 1166:10
**perfectly** [3] - 1129:10, 1350:12, 1351:1
**performance** [35] - 1125:18, 1126:18, 1126:24, 1127:2, 1127:5, 1127:9, 1127:12, 1128:2, 1131:14, 1132:9, 1132:19, 1135:3, 1135:6, 1135:11, 1135:15, 1135:17, 1143:19, 1144:2, 1144:6, 1144:10, 1144:25, 1147:24,

1148:12, 1150:12, 1208:5, 1250:19, 1250:20, 1250:23, 1298:17, 1302:25, 1313:22, 1326:11, 1326:13, 1326:21, 1327:7
**performed** [1] - 1343:17
**performing** [1] - 1151:19
**period** [8] - 1155:18, 1180:23, 1181:21, 1193:5, 1286:2, 1325:12, 1326:8, 1332:25
**periods** [3] - 1181:16, 1322:9, 1322:20
**perjury** [6] - 1248:21, 1288:4, 1288:22, 1289:23, 1290:10, 1291:11
**permissible** [2] - 1279:21, 1284:15, 1284:17
**permission** [1] - 1346:5
**person** [12] - 1135:25, 1141:21, 1190:25, 1211:15, 1217:14, 1218:25, 1236:7, 1262:9, 1271:23, 1290:5, 1290:9, 1291:10, 1291:12
**personal** [4] - 1222:5, 1231:11, 1283:12, 1283:16
**personally** [1] - 1328:24
**perspective** [1] - 1325:22
**pertinent** [1] - 1248:24
**pet** [3] - 1263:4, 1263:8, 1264:3
**Peterson** [7] - 1204:12, 1205:4, 1207:13, 1207:21, 1208:15, 1209:24, 1211:8, 1226:22, 1226:24, 1233:22, 1234:2, 1267:1, 1268:4, 1269:10, 1273:9, 1273:15, 1274:1
**Phoenix** [2] - 1236:9, 1377:18
**Phoenix American** [3] - 1236:10, 1237:17, 1237:23
**phone** [3] - 1217:22, 1253:13, 1347:1
**phrase** [3] - 1320:22, 1320:25, 1321:25
**phrased** [1] - 1199:19
**physically** [1] - 1130:2
**pick** [3] - 1213:21, 1393:21
**picked** [1] - 1393:13
**picks** [1] - 1350:20
**picture** [1] - 1374:15
**pictures** [1] - 1319:6
**piece** [1] - 1250:12
**pint** [1] - 1375:3
**pipeline** [2] - 1192:17, 1193:23
**place** [1] - 1131:24
**placement** [8] - 1198:25, 1210:8, 1213:13, 1253:17, 1253:21, 1258:2, 1265:13, 1268:8
**Placement** [1] - 1213:6
**places** [1] - 1247:1
**Plainfield** [2] - 1139:10, 1194:19
**plan** [3] - 1217:25, 1242:16, 1388:24
**Plan** [1] - 1237:9
**Planet** [3] - 1196:2, 1198:1, 1348:4
**planning** [4] - 1262:4, 1262:6, 1262:13, 1263:17
**plans** [24] - 1199:9, 1200:2, 1201:8, 1202:10, 1217:25, 1218:1, 1218:13, 1219:24, 1220:5, 1228:10, 1228:14, 1229:12, 1234:21, 1235:3, 1237:14, 1238:21, 1244:24, 1245:9, 1247:19, 1247:23, 1251:3, 1251:20, 1368:2, 1368:4
**Plaza** [1] - 1120:15
**pleased** [1] - 1285:16

**PLLC** [1] - 1121:11
**plug** [1] - 1356:20
**plus** [6] - 1155:21, 1302:3, 1303:4, 1303:9, 1308:16, 1308:20
**pocket** [1] - 1142:22
**pocketed** [1] - 1308:20
**point** [41] - 1123:2, 1137:2, 1141:22, 1182:4, 1189:9, 1189:17, 1192:6, 1195:22, 1196:8, 1196:18, 1196:21, 1204:22, 1205:11, 1219:10, 1221:7, 1232:20, 1237:18, 1247:4, 1263:12, 1263:16, 1266:21, 1266:24, 1282:7, 1296:20, 1296:24, 1309:11, 1310:10, 1318:20, 1319:17, 1333:22, 1341:21, 1348:7, 1356:3, 1374:25, 1386:24, 1391:5, 1391:12, 1392:1, 1392:8, 1394:4
**points** [1] - 1185:14
**Polsinelli** [18] - 1209:2, 1209:9, 1209:11, 1210:3, 1211:8, 1212:10, 1214:2, 1217:18, 1225:15, 1226:20, 1233:21, 1233:23, 1233:24, 1267:1, 1268:4, 1272:13, 1273:9, 1274:2
**Ponzi** [5] - 1201:17, 1202:3, 1389:18, 1390:2, 1390:4
**populate** [1] - 1321:3
**populated** [1] - 1236:18
**portal** [1] - 1190:2
**portfolio** [13] - 1178:13, 1299:17, 1300:12, 1300:14, 1300:15, 1332:8, 1332:9, 1332:10, 1332:13, 1332:17, 1364:5, 1366:4
**Portfolio** [14] - 1124:11, 1124:21, 1125:21, 1127:18, 1130:12, 1148:15, 1153:1, 1153:5, 1181:3, 1181:7, 1188:11, 1199:11, 1359:15, 1359:16
**portion** [7] - 1141:15, 1176:6, 1181:12, 1200:21, 1269:20, 1285:24, 1318:17
**portray** [2] - 1319:14, 1354:8
**portrayed** [2] - 1185:9, 1213:13
**position** [10] - 1141:19, 1277:13, 1285:17, 1331:2, 1337:4, 1337:14, 1338:10, 1343:12, 1345:4, 1354:7
**positive** [2] - 1366:23, 1367:23
**possession** [1] - 1242:5
**possibility** [1] - 1391:6
**possible** [6] - 1198:18, 1250:17, 1315:12, 1315:17, 1323:11, 1392:21
**possibly** [2] - 1179:19, 1376:18
**potential** [1] - 1190:20
**PPM** [52] - 1130:4, 1199:10, 1200:3, 1200:21, 1201:9, 1205:8, 1205:17, 1208:11, 1208:23, 1210:8, 1212:3, 1213:15, 1213:18, 1214:8, 1214:12, 1215:12, 1218:20, 1225:15, 1225:16, 1226:9, 1226:12, 1228:15, 1232:23, 1234:5, 1241:8, 1244:8, 1246:13, 1246:24, 1247:15, 1251:3, 1251:20, 1259:4, 1259:8, 1259:10, 1261:19, 1265:17, 1266:2, 1266:4, 1266:14, 1267:5, 1267:20, 1278:13, 1278:15, 1279:8, 1279:10, 1279:11, 1291:19, 1293:3, 1293:11, 1293:13, 1295:16, 1295:25
**PPMs** [32] - 1125:18, 1198:24, 1202:11, 1202:12, 1207:19, 1217:10, 1218:8, 1221:7, 1223:19, 1227:16, 1228:11,

1229:1, 1229:14, 1229:19, 1230:1, 1230:6, 1230:7, 1232:21, 1233:7, 1236:13, 1236:20, 1237:4, 1241:16, 1242:1, 1242:18, 1264:16, 1264:22, 1265:3, 1277:22, 1282:9, 1282:22, 1337:21

**PPP-2** [1] - 1186:19

**PPR-2** [1] - 1186:9

**pre** [1] - 1223:8

**predictably** [1] - 1299:22

**preferred** [4] - 1178:2, 1178:6, 1308:7, 1308:23

**prejudice** [1] - 1242:24

**prejudicial** [1] - 1389:22

**preliminary** [3] - 1313:21, 1363:22, 1363:25

**preparation** [3] - 1154:8, 1157:20, 1312:17

**prepared** [5] - 1253:16, 1266:17, 1306:12, 1307:7, 1372:20

**preparing** [2] - 1156:24, 1158:8

**prepped** [1] - 1222:21

**presence** [9] - 1134:2, 1164:1, 1204:2, 1222:2, 1241:2, 1271:1, 1275:1, 1281:1, 1379:1

**present** [30] - 1123:3, 1199:9, 1200:2, 1201:8, 1202:10, 1207:1, 1219:24, 1220:5, 1225:1, 1228:10, 1228:14, 1229:12, 1234:21, 1235:2, 1238:21, 1244:1, 1244:24, 1245:9, 1247:19, 1247:23, 1251:3, 1251:20, 1252:2, 1253:4, 1272:18, 1310:23, 1347:18, 1368:1, 1368:2, 1368:4

**presentation** [2] - 1154:9, 1384:11

**presentations** [3] - 1384:11, 1385:7, 1386:8

**presented** [3] - 1153:7, 1187:21, 1390:5

**presenting** [1] - 1337:6

**presently** [5] - 1217:25, 1218:1, 1218:12, 1237:14

**pretty** [8] - 1139:6, 1178:10, 1196:2, 1218:1, 1247:6, 1252:4, 1334:24, 1373:4

**prevent** [1] - 1154:14

**preview** [1] - 1258:9

**previous** [1] - 1319:7

**previously** [4] - 1124:3, 1297:1, 1311:13, 1315:20

**prices** [1] - 1259:1

**principals** [1] - 1153:9

**private** [19] - 1159:5, 1174:3, 1178:4, 1178:7, 1178:8, 1198:24, 1210:8, 1213:13, 1219:21, 1253:17, 1253:20, 1258:2, 1265:13, 1268:8, 1290:17, 1309:12, 1309:25, 1328:3

**Private** [1] - 1213:5

**privilege** [2] - 1223:4, 1226:4

**privileged** [14] - 1222:25, 1223:10, 1223:20, 1224:2, 1224:5, 1225:10, 1225:11, 1225:13, 1225:19, 1225:21, 1225:25, 1226:4, 1226:10, 1226:25

**problem** [14] - 1167:20, 1205:7, 1222:7, 1223:1, 1223:24, 1241:9, 1245:1, 1264:11, 1269:16, 1342:11, 1342:16, 1354:8, 1374:11, 1379:23

**problems** [1] - 1354:3

**Proceedings** [1] - 1121:18

**proceedings** [9] - 1169:9, 1169:15, 1206:9, 1224:9, 1243:4, 1269:25, 1376:3, 1382:11, 1388:16

**process** [11] - 1216:2, 1219:20, 1319:3, 1319:5, 1319:14, 1320:24, 1333:16, 1375:14, 1376:10, 1376:12, 1383:11

**processes** [1] - 1232:16

**produce** [1] - 1236:17

**produced** [13] - 1121:18, 1168:5, 1168:24, 1171:1, 1174:16, 1176:2, 1177:8, 1177:10, 1187:18, 1223:7, 1223:9, 1231:1, 1340:20

**producing** [2] - 1232:24, 1271:2

**product** [1] - 1174:10

**Product** [1] - 1232:14

**professional** [1] - 1334:5

**professionals** [1] - 1264:21

**proffer** [1] - 1378:11

**profit** [4] - 1147:16, 1151:13, 1303:25, 1338:2

**profitability** [1] - 1326:14

**profits** [15] - 1125:19, 1147:21, 1147:23, 1178:5, 1193:22, 1308:18, 1332:6, 1332:8, 1332:9, 1332:10, 1332:13, 1335:2, 1348:6, 1348:7, 1349:5

**program** [2] - 1354:15, 1355:24

**progress** [1] - 1357:8

**prohibits** [1] - 1122:7

**projections** [1] - 1365:24

**prompt** [1] - 1289:1

**proof** [1] - 1210:7

**propagated** [3] - 1221:6, 1226:11, 1227:15

**proper** [4] - 1166:22, 1352:8, 1375:6, 1383:1

**properly** [5] - 1306:12, 1307:8, 1342:16, 1344:9, 1344:24

**properties** [1] - 1176:7

**property** [1] - 1176:15

**proposal** [1] - 1390:13

**propose** [1] - 1276:21

**proposed** [2] - 1253:6, 1320:24

**prosecuted** [1] - 1288:22

**prosecution** [2] - 1127:9, 1277:24

**prosecutors** [8] - 1157:17, 1157:21, 1242:18, 1278:7, 1279:7, 1306:20, 1307:2, 1329:6

**Proskauer** [4] - 1241:11, 1242:12, 1242:14, 1242:24

**protect** [4] - 1157:8, 1161:4, 1167:4, 1177:17

**prove** [5] - 1164:10, 1379:13, 1380:4, 1380:5, 1380:24

**proved** [1] - 1354:12

**provide** [10] - 1187:17, 1187:22, 1219:22, 1229:25, 1232:20, 1233:2, 1233:6, 1251:5, 1277:7, 1364:25

**provided** [23] - 1134:5, 1134:13, 1150:10, 1152:5, 1153:3, 1157:24, 1157:25, 1158:3, 1158:6, 1160:4, 1160:17, 1161:25, 1164:3, 1164:21, 1166:20, 1174:21, 1215:14, 1349:25, 1350:3, 1350:4, 1351:17

**providing** [3] - 1214:7, 1251:15

**provisions** [1] - 1291:19

**public** [1] - 1262:18

**publish** [17] - 1122:5, 1124:13, 1141:15, 1160:24, 1174:24, 1177:25, 1178:1, 1188:6, 1211:5, 1231:6, 1231:20, 1244:5, 1246:21, 1285:11, 1313:6, 1346:5, 1355:10

**Publish** [2] - 1207:7, 1231:22

**published** [46] - 1137:17, 1137:19, 1160:25, 1179:22, 1188:8, 1198:3, 1207:8, 1211:6, 1215:21, 1216:11, 1219:16, 1228:21, 1231:7, 1231:25, 1232:10, 1233:19, 1236:1, 1244:6, 1266:13, 1285:13, 1293:23, 1295:24, 1298:7, 1313:8, 1320:16, 1339:1, 1339:19, 1341:13, 1345:13, 1346:6, 1351:8, 1352:6, 1354:20, 1355:11, 1356:4, 1356:16, 1357:14, 1358:12, 1360:1, 1360:21, 1361:11, 1362:2, 1364:12, 1365:8, 1369:6, 1369:15

**pull** [6] - 1126:1, 1175:19, 1266:11, 1291:21, 1295:18, 1359:24

**pulled** [2] - 1164:22, 1174:3

**purchased** [2] - 1126:21, 1194:21

**pure** [1] - 1341:22

**purely** [1] - 1338:9

**purpose** [11] - 1146:2, 1153:6, 1180:6, 1236:15, 1271:13, 1271:16, 1378:6, 1379:12, 1379:14, 1379:21, 1380:21

**purposes** [4] - 1248:5, 1284:11, 1290:21, 1383:3

**pursuant** [1] - 1223:7

**pushes** [1] - 1375:4

**pushing** [2] - 1373:17, 1373:18

**put** [36] - 1157:10, 1159:6, 1159:15, 1171:16, 1192:21, 1209:3, 1209:15, 1210:3, 1210:13, 1213:5, 1213:10, 1217:4, 1218:12, 1226:19, 1227:8, 1265:17, 1271:23, 1278:15, 1279:10, 1283:16, 1288:25, 1305:2, 1313:3, 1314:23, 1326:24, 1327:2, 1327:5, 1351:16, 1366:3, 1366:22, 1367:23, 1374:25, 1375:3, 1375:4, 1380:13, 1384:19

**puts** [1] - 1210:12

**putting** [7] - 1171:13, 1187:13, 1220:5, 1294:21, 1367:12, 1380:14, 1392:6

# Q

**Q2** [1] - 1369:24

**QQQQ** [2] - 1386:4, 1397:13

**QQQQ-B** [2] - 1386:4, 1397:13

**QQQQB** [3] - 1385:12, 1385:16, 1386:1

**QQQQG** [1] - 1249:16

**quarter** [24] - 1322:13, 1326:2, 1340:2, 1340:12, 1340:20, 1341:3, 1343:20, 1347:5, 1347:7, 1347:9, 1347:11, 1347:18, 1348:17, 1349:1, 1349:3, 1352:11, 1369:8, 1370:2, 1370:5, 1370:8, 1370:9, 1371:19

**quarterly** [3] - 1339:9, 1339:10, 1369:7

**quarters** [4] - 1347:15, 1347:18, 1347:23, 1349:12

**QUESTION** [12] - 1193:5, 1193:8, 1193:16, 1193:19, 1194:1, 1200:1, 1200:5, 1201:6, 1257:5, 1265:12,

1265:16, 1265:20

**questioning** [6] - 1124:24, 1127:20, 1205:12, 1221:10, 1222:16, 1329:8

**questions** [55] - 1125:5, 1129:6, 1131:4, 1131:8, 1131:9, 1149:20, 1153:25, 1154:1, 1180:2, 1180:7, 1192:25, 1194:4, 1194:9, 1195:13, 1199:8, 1200:7, 1200:10, 1200:17, 1202:9, 1205:2, 1212:16, 1212:19, 1214:9, 1214:20, 1215:4, 1215:16, 1216:22, 1216:23, 1217:5, 1220:22, 1222:4, 1222:20, 1222:25, 1226:18, 1227:6, 1230:7, 1230:9, 1248:19, 1250:22, 1251:22, 1265:10, 1267:8, 1272:4, 1276:19, 1316:20, 1319:9, 1328:25, 1329:2, 1346:22, 1348:21, 1352:20, 1353:1, 1382:14, 1382:24, 1382:25

**QuickBooks** [2] - 1180:4, 1182:15

**quickly** [2] - 1252:11, 1315:14

**quit** [1] - 1262:15

**quote** [1] - 1389:14

**quoted** [1] - 1350:9

## R

**RACHEL** [1] - 1120:11

**raise** [4] - 1177:21, 1196:17, 1389:6, 1390:21

**raised** [3] - 1249:5, 1299:13, 1348:25

**rammed** [1] - 1271:13

**ran** [4] - 1285:2, 1291:10, 1337:4, 1337:14

**rate** [2] - 1220:3, 1391:4

**rather** [5] - 1142:22, 1368:16, 1391:2, 1391:3, 1393:1

**ratio** [1] - 1184:18

**ratios** [2] - 1184:25, 1185:8

**re** [1] - 1228:11

**re-incorporated** [1] - 1228:11

**read** [39] - 1133:1, 1172:24, 1192:23, 1193:2, 1199:18, 1199:24, 1201:2, 1212:12, 1216:5, 1220:24, 1249:16, 1253:8, 1264:24, 1273:18, 1276:22, 1279:19, 1281:2, 1289:6, 1296:22, 1316:17, 1318:13, 1318:15, 1318:17, 1331:12, 1331:16, 1331:19, 1331:22, 1338:14, 1339:23, 1347:10, 1348:22, 1348:23, 1358:14, 1365:15, 1365:16, 1366:19, 1367:5, 1369:17, 1375:21

**reading** [8] - 1122:11, 1200:18, 1219:4, 1234:23, 1276:17, 1317:19, 1333:19, 1354:22

**ready** [5] - 1123:4, 1227:22, 1228:3, 1254:18, 1353:19

**real** [6] - 1127:10, 1134:6, 1344:8, 1344:23, 1353:10, 1379:23

**reality** [3] - 1266:1, 1278:10, 1327:9

**realize** [2] - 1338:6, 1349:21

**realized** [6] - 1301:17, 1301:23, 1303:4, 1303:9, 1338:4, 1338:7

**really** [16] - 1126:4, 1165:12, 1166:17, 1205:23, 1225:12, 1242:23, 1299:20, 1305:1, 1308:24, 1311:17, 1328:6, 1344:15, 1363:20, 1391:6, 1391:21, 1394:4

**realtime** [1] - 1141:2

**reason** [10] - 1122:20, 1167:25, 1180:6, 1236:12, 1241:25, 1257:13, 1325:19, 1348:1, 1378:2, 1383:19

**reasonable** [5] - 1195:15, 1302:24, 1324:20, 1332:25, 1391:24

**reasonably** [3] - 1342:10, 1344:9, 1391:16

**reasons** [4] - 1284:21, 1347:8, 1347:13, 1348:19

**rebates** [1] - 1325:24

**recalled** [1] - 1165:4

**recap** [1] - 1137:20

**receivable** [4] - 1182:18, 1189:5, 1189:18, 1191:11

**receivables** [8] - 1181:5, 1181:25, 1182:9, 1182:13, 1183:1, 1338:18, 1341:15, 1344:7

**receive** [3] - 1296:15, 1349:2, 1383:19

**received** [26] - 1138:23, 1141:10, 1141:14, 1146:8, 1149:24, 1152:22, 1207:6, 1211:4, 1215:20, 1231:5, 1233:17, 1235:25, 1244:4, 1298:5, 1320:12, 1339:18, 1346:4, 1352:5, 1355:4, 1355:9, 1356:15, 1358:10, 1360:17, 1362:20, 1365:3, 1369:14

**recent** [1] - 1372:12

**Recess** [1] - 1353:16

**recess** [2] - 1252:22, 1310:22

**recognize** [52] - 1128:7, 1132:15, 1135:11, 1138:12, 1138:13, 1147:6, 1148:7, 1149:2, 1149:14, 1152:13, 1158:12, 1158:17, 1159:10, 1160:6, 1162:6, 1162:12, 1162:24, 1168:7, 1171:4, 1172:23, 1184:11, 1184:14, 1191:17, 1202:22, 1202:24, 1210:19, 1210:20, 1230:22, 1233:12, 1235:16, 1239:12, 1239:17, 1246:9, 1246:10, 1289:2, 1298:11, 1318:1, 1318:11, 1318:24, 1319:1, 1329:15, 1329:24, 1330:10, 1330:15, 1339:2, 1362:6, 1362:11, 1364:19, 1369:7, 1373:13, 1377:25, 1378:7

**recognized** [1] - 1373:23

**recognizes** [1] - 1149:4

**recollection** [21] - 1185:17, 1186:4, 1186:11, 1186:17, 1187:6, 1200:4, 1201:10, 1221:2, 1246:13, 1281:5, 1314:7, 1316:25, 1317:16, 1317:23, 1318:16, 1322:4, 1329:22, 1330:4, 1334:19, 1377:17, 1382:19

**record** [11] - 1134:1, 1204:1, 1212:20, 1222:1, 1241:1, 1253:9, 1319:18, 1331:22, 1347:10, 1386:1, 1390:25

**recorded** [1] - 1121:18

**records** [1] - 1260:12

**red** [3] - 1327:2, 1366:9

**Red** [1] - 1267:5

**redact** [1] - 1204:18

**redacted** [2] - 1176:1, 1176:5

**redacting** [1] - 1176:6

**redirect** [2] - 1385:21, 1387:16

**redirecty** [1] - 1385:24

**redline** [6] - 1209:4, 1209:6, 1212:4, 1215:25, 1219:17, 1234:6

**reduce** [2] - 1220:3, 1333:6

**refer** [5] - 1190:17, 1213:18, 1246:4, 1246:6, 1276:19

**reference** [1] - 1318:14

**referenced** [1] - 1217:8

**references** [1] - 1320:22

**referencing** [2] - 1217:9, 1376:24

**referred** [1] - 1250:25

**referring** [6] - 1126:24, 1135:4, 1142:20, 1144:14, 1290:18, 1328:2

**reflect** [2] - 1311:25, 1319:3

**reflected** [1] - 1181:16

**refresh** [18] - 1148:5, 1185:16, 1186:3, 1186:10, 1192:19, 1202:20, 1229:22, 1245:18, 1246:12, 1303:11, 1314:7, 1316:25, 1317:16, 1318:4, 1329:22, 1334:19, 1375:23, 1377:17

**refreshes** [5] - 1186:17, 1187:5, 1281:5, 1317:23, 1318:16

**regarding** [6] - 1124:10, 1253:22, 1313:21, 1347:3, 1385:14, 1386:13

**registered** [2] - 1190:16, 1328:10

**registering** [1] - 1291:13

**regularly** [2] - 1190:1, 1353:13

**regulations** [1] - 1156:22

**regulators** [1] - 1155:7

**reimburse** [2] - 1284:7, 1284:8

**reimbursement** [1] - 1283:17

**REITs** [1] - 1328:4

**related** [2] - 1143:21, 1153:5

**relationship** [1] - 1283:12

**relayed** [1] - 1361:2

**relaying** [1] - 1346:18

**relevance** [5] - 1241:4, 1241:5, 1242:3, 1378:9, 1379:22

**relevant** [3] - 1167:24, 1168:13, 1251:5

**relied** [1] - 1190:9

**rely** [1] - 1288:19

**relying** [1] - 1368:3

**remember** [58] - 1122:9, 1125:12, 1127:21, 1137:11, 1138:4, 1145:20, 1145:24, 1147:23, 1157:5, 1165:8, 1166:11, 1166:18, 1171:12, 1171:13, 1177:14, 1187:7, 1187:9, 1192:8, 1194:15, 1220:25, 1230:2, 1230:4, 1235:6, 1235:8, 1239:19, 1239:24, 1245:20, 1251:25, 1260:7, 1264:18, 1266:25, 1268:3, 1283:5, 1285:3, 1286:21, 1287:15, 1287:16, 1291:24, 1295:11, 1295:20, 1296:12, 1305:25, 1311:18, 1317:4, 1321:13, 1321:15, 1329:19, 1330:12, 1334:16, 1335:6, 1341:14, 1361:21, 1362:21, 1371:4, 1372:6, 1374:7, 1377:14, 1387:1

**remembers** [1] - 1380:1

**remove** [1] - 1320:14

**removed** [1] - 1166:5

**repay** [1] - 1156:4

**repeat** [1] - 1228:8

**rephrase** [3] - 1331:9, 1331:23, 1337:11

**report** [11] - 1186:4, 1246:6, 1285:4, 1297:25, 1313:15, 1339:10, 1354:5, 1357:19, 1360:6, 1364:5, 1369:7

**Report** [1] - 1371:8

**reported** [7] - 1184:18, 1184:25, 1186:12, 1249:20, 1250:10, 1250:14, 1363:22

Case 1:21-cr-00054-RPK-PK    Document 424-3    Filed 07/12/24    Page 301 of 306
PageID #: 14659
(reporter - see)                                                          Page 23

reporter [4] - 1126:7, 1130:20, 1250:5, 1331:18
Reporter [2] - 1121:15, 1121:15
reporting [2] - 1142:11, 1322:21
reports [4] - 1250:3, 1313:20, 1352:23, 1354:7
Reports [1] - 1371:10
represent [2] - 1160:3, 1164:19, 1176:15, 1306:23
representation [1] - 1152:1, 1152:15, 1153:3, 1156:18, 1286:3
represented [2] - 1144:10, 1170:24
representing [2] - 1142:25, 1160:16
repurposed [2] - 1278:14, 1279:9
required [3] - 1248:23, 1310:4, 1376:11
requirements [2] - 1332:18, 1332:19
rescue [2] - 1374:9, 1374:11
research [1] - 1387:2
reserve [6] - 1216:18, 1217:23, 1228:23, 1237:10, 1244:17, 1323:15
resolve [4] - 1165:1, 1169:1, 1227:11, 1388:18
resolved [1] - 1170:3
respect [2] - 1312:10, 1330:22
respects [1] - 1153:8
respond [2] - 1137:23, 1349:23
responded [3] - 1276:10, 1277:6, 1317:4
response [5] - 1137:13, 1143:5, 1223:21, 1235:7, 1276:11
responsibilities [1] - 1154:7
responsibility [3] - 1154:13, 1255:15, 1255:17
responsible [1] - 1371:14
rest [7] - 1175:25, 1235:19, 1269:1, 1319:19, 1320:15, 1348:23, 1351:20
restated [1] - 1197:12
result [3] - 1142:17, 1154:21, 1258:24
results [6] - 1154:19, 1364:4, 1365:21, 1367:23, 1371:19, 1372:12
resumed [2] - 1206:9, 1224:9, 1243:4
resumes [3] - 1228:1, 1310:25, 1353:20
retail [2] - 1177:22, 1178:14
retained [2] - 1324:19, 1343:6
return [10] - 1178:2, 1178:6, 1201:17, 1216:18, 1217:24, 1220:3, 1237:11, 1308:7, 1308:10, 1308:23
revenue [35] - 1299:9, 1299:12, 1299:14, 1300:9, 1304:3, 1304:4, 1304:18, 1320:23, 1321:3, 1321:6, 1321:11, 1321:15, 1321:19, 1321:20, 1322:1, 1322:4, 1324:17, 1325:8, 1325:22, 1325:23, 1332:11, 1332:14, 1337:17, 1342:9, 1342:16, 1343:17, 1343:22, 1344:8, 1344:19, 1344:20, 1344:23, 1361:5, 1373:13, 1373:22, 1375:5
revenues [1] - 1258:18
reversed [1] - 1198:14
review [9] - 1183:22, 1212:24, 1230:5, 1230:6, 1306:14, 1307:11, 1330:17, 1376:4, 1376:17
reviewed [5] - 1149:12, 1153:15, 1259:10, 1293:3, 1376:15
reviewing [3] - 1187:20, 1208:24, 1354:23

Reviewing [1] - 1339:8
revisited [1] - 1272:19
Richmond [2] - 1139:13, 1194:20
right-hand [2] - 1365:24, 1366:1
rights [1] - 1257:9
rise [8] - 1122:2, 1196:23, 1225:3, 1227:24, 1254:15, 1310:13, 1311:1, 1387:3
risk [14] - 1154:20, 1161:21, 1172:21, 1173:25, 1174:2, 1200:19, 1201:11, 1227:6, 1229:13, 1247:20, 1258:14, 1259:14
Risk [1] - 1217:4
risks [2] - 1199:15, 1258:13
Risks [1] - 1245:5
risky [1] - 1219:22
RIVIERE [1] - 1120:22
RIVIERE-BADELL [1] - 1120:22
Roger [5] - 1201:16, 1287:8, 1294:4, 1376:25
Rogers [2] - 1198:1, 1348:4
role [9] - 1165:6, 1255:9, 1255:12, 1256:1, 1293:16, 1293:17, 1296:21, 1297:4, 1376:13
roles [1] - 1154:25
room [1] - 1374:20
roughly [1] - 1193:8
routinely [1] - 1184:18
row [3] - 1148:16, 1180:18, 1181:3
rule [1] - 1122:7
rules [2] - 1131:10, 1350:24
ruling [1] - 1204:23
run [3] - 1253:7, 1376:22, 1382:9
running [3] - 1220:18, 1285:5, 1301:2
Ryan [1] - 1156:4

# S

sale [2] - 1308:12, 1308:19
sales [1] - 1374:19
salespeople [5] - 1373:4, 1373:6, 1373:17, 1373:22, 1373:24
salesperson [1] - 1375:4
Sarah [1] - 1150:4
save [3] - 1192:24, 1269:22, 1373:1
saved [7] - 1175:15, 1175:16, 1176:20, 1260:12, 1260:17, 1261:1
saw [9] - 1139:6, 1158:19, 1159:16, 1162:14, 1164:14, 1164:15, 1186:13, 1246:24, 1253:14
schedule [1] - 1391:2
scheduling [1] - 1390:22
scheme [2] - 1390:3, 1390:4
SCHIFF [2] - 1121:2, 1121:7
SCHNEIDER [1] - 1120:8
Schneider [39] - 1121:3, 1121:8, 1121:12, 1205:17, 1264:16, 1267:17, 1267:22, 1271:22, 1271:23, 1271:25, 1272:5, 1272:14, 1273:22, 1278:13, 1278:15, 1279:8, 1279:10, 1279:11, 1286:13, 1286:16, 1287:5, 1287:11, 1290:4, 1290:6, 1290:7, 1290:8, 1290:12, 1291:7, 1291:9, 1293:10, 1294:22, 1296:5, 1357:21, 1363:12, 1375:12, 1383:14, 1384:21, 1385:13, 1386:12

Schneider's [5] - 1283:4, 1283:23, 1283:24, 1284:7, 1284:14
Schneiter [7] - 1136:8, 1136:20, 1141:25, 1142:9, 1142:11, 1142:25, 1144:9
Schultz [1] - 1237:19
scope [1] - 1204:9
Scott [1] - 1294:13
screen [15] - 1122:17, 1126:11, 1132:15, 1175:24, 1192:22, 1258:8, 1258:11, 1273:6, 1278:25, 1298:22, 1306:19, 1314:21, 1329:21, 1358:17, 1376:5
screening [1] - 1219:20
screenshot [1] - 1175:19
scroll [8] - 1141:3, 1147:9, 1162:4, 1171:2, 1184:9, 1339:6
scrolling [1] - 1269:14
SE [1] - 1121:12
SEAN [1] - 1120:21
seated [5] - 1122:3, 1170:16, 1254:17, 1311:3, 1353:18
SEC [10] - 1157:16, 1157:19, 1157:25, 1223:7, 1248:16, 1249:19, 1251:5, 1251:18, 1291:11, 1328:10
second [40] - 1125:23, 1138:11, 1142:9, 1142:14, 1142:15, 1148:10, 1167:18, 1170:8, 1174:25, 1184:22, 1188:16, 1188:23, 1192:21, 1195:12, 1198:21, 1209:22, 1215:1, 1220:7, 1231:15, 1239:8, 1249:12, 1297:23, 1313:25, 1314:4, 1314:20, 1314:23, 1314:24, 1323:9, 1323:13, 1324:12, 1329:10, 1330:20, 1343:22, 1349:1, 1361:15, 1367:1, 1369:8, 1370:2, 1370:5, 1388:14
secondly [1] - 1349:6
section [26] - 1199:13, 1199:14, 1200:19, 1201:11, 1201:16, 1202:13, 1212:6, 1215:10, 1216:17, 1217:4, 1219:15, 1244:16, 1245:5, 1247:20, 1287:19, 1289:2, 1289:16, 1289:20, 1318:20, 1318:23, 1351:13, 1351:20, 1365:10, 1365:17, 1384:15
sections [1] - 1228:10
Securities [2] - 1288:16, 1288:18
see [116] - 1122:21, 1123:1, 1125:25, 1126:11, 1132:6, 1136:8, 1136:14, 1137:4, 1140:15, 1140:19, 1142:18, 1144:24, 1147:9, 1148:16, 1148:23, 1150:23, 1152:12, 1160:10, 1160:13, 1161:10, 1161:22, 1168:15, 1172:19, 1173:16, 1175:14, 1176:18, 1176:20, 1181:18, 1184:8, 1185:21, 1185:23, 1186:16, 1186:23, 1189:19, 1189:21, 1189:24, 1190:5, 1190:13, 1191:13, 1192:1, 1197:18, 1197:21, 1197:22, 1198:4, 1198:6, 1198:9, 1198:10, 1198:13, 1198:14, 1202:14, 1207:12, 1207:14, 1208:4, 1208:8, 1208:19, 1209:6, 1210:20, 1214:14, 1214:22, 1215:22, 1216:8, 1216:12, 1219:17, 1230:17, 1230:20, 1232:13, 1234:17, 1235:19, 1236:21, 1237:10, 1246:16, 1252:21, 1258:11, 1263:11, 1269:1, 1269:12, 1272:17, 1273:7, 1279:4, 1286:4, 1287:19, 1288:10, 1289:1, 1289:14, 1289:21, 1290:14, 1290:22,

Case 1:21-cr-00054-RPK-PK    Document 424-3    Filed 07/12/24    Page 302 of 306
PageID #: 14660
(seeing - special)                                        Page 24

**seeing** [6] - 1166:11, 1171:12, 1185:10, 1185:12, 1376:21, 1393:22
**seek** [1] - 1283:17
**seem** [2] - 1202:6, 1221:2
**selection** [1] - 1392:9
**sell** [3] - 1303:22, 1305:11, 1305:16
**send** [9] - 1156:13, 1156:16, 1236:13, 1246:11, 1313:21, 1356:9, 1380:19, 1390:13, 1390:17
**sending** [8] - 1141:21, 1178:25, 1179:4, 1238:14, 1248:2, 1313:14, 1357:18, 1360:6
**sends** [1] - 1349:18
**sense** [5] - 1182:21, 1204:8, 1326:7, 1326:10, 1393:13
**sensible** [1] - 1271:16
**sent** [28] - 1138:17, 1138:25, 1142:12, 1146:23, 1150:14, 1178:23, 1190:1, 1212:5, 1212:6, 1213:24, 1228:11, 1234:7, 1236:12, 1237:23, 1239:18, 1244:20, 1246:12, 1246:14, 1247:8, 1247:11, 1247:22, 1247:24, 1315:11, 1351:22, 1357:21, 1363:12, 1367:16, 1384:4
**sentence** [5] - 1213:22, 1214:2, 1242:9, 1242:13, 1296:14
**separate** [2] - 1129:5, 1179:5
**September** [4] - 1193:8, 1356:10, 1360:2, 1370:8
**series** [1] - 1199:8
**serious** [2] - 1156:9, 1156:10
**seriously** [1] - 1134:5
**Serpanchy** [1] - 1236:4
**served** [6] - 1255:9, 1263:22, 1264:7, 1264:8, 1297:1, 1376:13
**server** [1] - 1170:8
**servers** [4] - 1170:25, 1172:1, 1173:10, 1174:13
**services** [2] - 1290:20, 1291:1
**SESSION** [1] - 1253:1
**set** [8] - 1154:7, 1174:10, 1177:20, 1177:21, 1179:5, 1248:10, 1255:5, 1314:1
**seven** [3] - 1182:12, 1182:19, 1362:22
**shape** [1] - 1234:14
**shared** [2] - 1226:3, 1390:15
**sheet** [9] - 1181:17, 1188:24, 1189:4, 1333:14, 1340:15, 1340:17, 1341:9, 1341:10, 1341:11
**shelf** [1] - 1173:21
**short** [8] - 1126:4, 1224:8, 1225:2, 1256:3, 1323:13, 1324:13, 1360:22, 1366:21
**shortcut** [1] - 1226:7
**shortened** [1] - 1314:11
**shortfalls** [1] - 1187:25
**shortly** [1] - 1349:4
**show** [82] - 1125:22, 1131:1, 1132:13,

1135:10, 1135:23, 1137:9, 1137:16, 1138:3, 1138:9, 1138:10, 1140:12, 1140:18, 1141:10, 1143:17, 1143:22, 1145:2, 1145:12, 1145:15, 1145:18, 1148:6, 1150:22, 1152:9, 1155:10, 1158:11, 1160:2, 1161:24, 1162:22, 1167:6, 1167:10, 1167:24, 1168:11, 1168:17, 1169:12, 1170:5, 1171:2, 1172:7, 1172:15, 1174:16, 1175:8, 1175:13, 1177:7, 1180:7, 1183:20, 1185:18, 1186:7, 1186:16, 1187:10, 1188:19, 1194:14, 1195:2, 1197:7, 1198:21, 1205:7, 1205:9, 1205:18, 1216:5, 1229:11, 1230:11, 1235:12, 1237:8, 1239:11, 1241:7, 1241:25, 1244:21, 1245:19, 1246:3, 1246:5, 1249:8, 1249:10, 1266:21, 1271:18, 1272:1, 1272:3, 1329:13, 1345:3, 1348:14, 1352:2, 1372:12, 1379:11, 1379:25, 1380:1
**showed** [28] - 1124:18, 1127:23, 1130:17, 1132:25, 1136:4, 1136:16, 1137:10, 1144:4, 1144:21, 1147:4, 1151:14, 1157:23, 1172:11, 1172:12, 1176:16, 1177:11, 1179:10, 1185:16, 1187:8, 1189:1, 1201:14, 1209:2, 1219:1, 1237:20, 1246:20, 1250:13, 1319:6, 1355:18
**showing** [14] - 1122:7, 1144:19, 1148:6, 1158:7, 1165:11, 1170:22, 1180:22, 1249:9, 1249:15, 1271:13, 1294:9, 1317:6, 1379:4, 1379:7
**shown** [7] - 1149:11, 1164:16, 1165:7, 1179:18, 1182:19, 1287:15, 1359:1
**shows** [6] - 1181:21, 1188:13, 1205:8, 1212:20, 1272:4, 1337:22
**shuffle** [1] - 1316:5
**Shultz** [1] - 1248:12
**side** [17] - 1151:12, 1151:14, 1173:1, 1174:1, 1176:3, 1180:7, 1191:5, 1222:8, 1359:14, 1361:17, 1365:24, 1380:7
**side-by-side** [3] - 1173:1, 1174:1, 1191:5
**sidebar** [35] - 1133:3, 1133:5, 1134:1, 1134:20, 1141:8, 1163:1, 1164:1, 1164:17, 1165:16, 1170:2, 1203:4, 1203:8, 1204:1, 1206:9, 1221:9, 1221:12, 1222:1, 1224:9, 1240:2, 1240:3, 1241:1, 1243:4, 1252:14, 1270:3, 1271:1, 1272:21, 1274:3, 1275:1, 1275:4, 1279:25, 1281:1, 1281:11, 1378:12, 1379:1, 1381:1
**sign** [4] - 1127:15, 1151:25, 1153:20, 1287:24
**signature** [1] - 1287:19
**signed** [17] - 1129:15, 1147:24, 1152:12, 1153:13, 1153:15, 1155:9, 1155:12, 1155:25, 1248:18, 1286:13, 1286:14, 1287:8, 1287:11, 1287:21, 1288:12, 1289:3, 1289:23
**significant** [2] - 1154:25, 1348:25
**signing** [3] - 1155:3, 1155:8, 1288:8
**sijan** [2] - 1345:18, 1350:5
**Sijan** [8] - 1346:9, 1346:16, 1348:11, 1348:20, 1349:18, 1350:3, 1350:7, 1351:17

**silly** [1] - 1323:6
**similar** [9] - 1144:8, 1174:5, 1174:6, 1178:18, 1184:15, 1266:22, 1289:13, 1290:5, 1298:25
**simmer** [1] - 1130:22
**simple** [2] - 1182:22, 1333:15
**simplified** [2] - 1300:1, 1301:12
**simply** [1] - 1271:18
**single** [4] - 1185:12, 1344:3, 1358:3, 1380:1
**sit** [3] - 1126:5, 1279:23, 1368:24
**sitting** [3] - 1304:10, 1338:10, 1388:2
**situation** [3] - 1309:21, 1309:22, 1338:5
**six** [7] - 1156:20, 1259:24, 1359:16, 1367:6, 1367:9, 1367:11, 1367:17
**skeptical** [2] - 1196:2, 1196:5
**skip** [2] - 1316:6, 1361:8
**skipped** [2] - 1246:19, 1338:23
**skipping** [1] - 1364:6
**slide** [2] - 1319:7, 1337:22
**slideshows** [2] - 1125:18, 1130:5
**slightly** [1] - 1268:16
**slow** [1] - 1227:20
**slower** [1] - 1299:10
**slowly** [1] - 1269:3
**smoke** [1] - 1389:13
**sold** [5] - 1301:8, 1301:15, 1301:20, 1304:10, 1338:5
**sole** [1] - 1292:4
**solely** [2] - 1337:15, 1341:22
**someone** [3] - 1191:7, 1204:23, 1205:9, 1253:7, 1257:24, 1261:17, 1262:1, 1267:23, 1268:1, 1290:4, 1290:20, 1334:6, 1343:9
**sometimes** [18] - 1196:25, 1198:12, 1210:12, 1241:17, 1260:13, 1260:14, 1299:19, 1299:20, 1314:7, 1326:2, 1354:12, 1354:14, 1354:15, 1357:3, 1393:23, 1394:3
**somewhere** [3] - 1209:13, 1290:13, 1303:10
**son's** [1] - 1392:15
**soon** [2] - 1262:15, 1305:21
**sooner** [1] - 1391:3
**sorry** [25] - 1136:7, 1141:2, 1145:17, 1156:23, 1158:4, 1181:12, 1184:22, 1202:3, 1204:4, 1239:4, 1239:9, 1270:2, 1278:23, 1294:11, 1298:19, 1307:20, 1316:5, 1330:20, 1331:14, 1331:17, 1334:8, 1352:1, 1367:5, 1367:20, 1384:15
**sort** [10] - 1173:11, 1209:16, 1271:12, 1301:18, 1307:21, 1365:13, 1382:23, 1386:20, 1390:25, 1391:1
**sorts** [1] - 1223:2
**sound** [1] - 1371:6
**sounds** [11] - 1194:11, 1224:6, 1226:15, 1227:21, 1257:9, 1265:1, 1278:5, 1351:25, 1371:7, 1382:22, 1385:21
**source** [6] - 1332:1, 1333:9, 1333:24, 1336:24, 1337:16, 1371:13
**space** [1] - 1310:1
**speaking** [1] - 1144:20
**special** [18] - 1125:18, 1125:23, 1126:11, 1126:22, 1128:16, 1128:23, 1130:2, 1130:6, 1130:16, 1368:9,

Case 1:21-cr-00054-RPK-PK    Document 424-3    Filed 07/12/24    Page 303 of 306
PageID #: 14661
*(specific - testifying)*    *Page 25*

1368:12, 1368:17, 1368:23, 1371:3,
1371:22, 1372:11, 1372:21, 1372:24
 **specific** [6] - 1199:13, 1225:25, 1309:5,
1310:1, 1329:4, 1343:9
 **specifically** [17] - 1125:6, 1143:12,
1193:16, 1199:19, 1200:19, 1235:4,
1250:1, 1250:14, 1258:6, 1269:10,
1273:15, 1276:6, 1278:19, 1292:2,
1306:17, 1348:3, 1389:19
 **specified** [2] - 1132:3, 1286:2
 **speed** [2] - 1385:11, 1394:5
 **spend** [2] - 1306:4, 1355:12
 **spoken** [1] - 1255:2
 **spot** [1] - 1164:17
 **spotty** [1] - 1146:20
 **spreadsheet** [11] - 1138:6, 1138:7,
1139:3, 1142:12, 1150:10, 1151:10,
1180:3, 1182:5, 1182:13, 1193:6,
1193:13
 **square** [1] - 1175:25
 **staff** [1] - 1251:16
 **stage** [2] - 1213:2, 1255:5
 **stand** [11] - 1123:6, 1167:13, 1169:19,
1228:1, 1254:14, 1271:21, 1307:18,
1310:25, 1353:20, 1387:6, 1392:6
 **standard** [6] - 1173:11, 1173:13,
1173:21, 1174:2, 1178:12, 1218:1
 **stands** [2] - 1367:6, 1367:9
 **start** [18] - 1152:23, 1159:4, 1169:24,
1169:25, 1174:24, 1185:19, 1202:19,
1233:20, 1263:15, 1263:22, 1287:18,
1302:16, 1318:25, 1346:14, 1357:12,
1360:22, 1386:21, 1392:24
 **started** [9] - 1158:21, 1179:9, 1219:7,
1228:3, 1279:3, 1327:13, 1339:13,
1340:21, 1345:9
 **starting** [3] - 1180:14, 1333:22, 1389:21
 **starts** [2] - 1141:24, 1279:3
 **statement** [28] - 1135:23, 1147:14,
1151:25, 1190:12, 1191:1, 1194:14,
1195:2, 1195:4, 1276:12, 1279:18,
1279:19, 1293:6, 1293:8, 1298:12,
1298:25, 1299:1, 1302:18, 1306:5,
1321:14, 1333:9, 1333:13, 1333:14,
1342:6, 1348:16, 1362:23, 1362:24,
1371:9, 1383:10
 **statements** [45] - 1127:17, 1128:3,
1129:22, 1131:21, 1138:3, 1143:17,
1143:23, 1145:3, 1145:8, 1146:18,
1146:21, 1146:24, 1152:4, 1152:16,
1153:4, 1153:6, 1153:7, 1154:4, 1154:9,
1154:20, 1155:2, 1155:6, 1156:1,
1156:23, 1156:25, 1187:24, 1190:9,
1190:21, 1198:19, 1284:5, 1288:6,
1302:13, 1312:18, 1337:6, 1337:8,
1341:20, 1361:21, 1361:23, 1363:16,
1363:17, 1371:11, 1371:12, 1372:19,
1375:5, 1389:10
 **Statements** [1] - 1298:22
 **states** [1] - 1258:13
 **status** [2] - 1289:13, 1304:25
 **stay** [3] - 1220:21, 1293:20, 1303:15
 **stenography** [1] - 1121:18
 **step** [4] - 1225:5, 1302:14, 1334:23,
1387:5
 **STEPHEN** [2] - 1121:11, 1121:14

 **steps** [4] - 1225:7, 1310:15, 1353:8,
1379:4
 **Steve** [10] - 1182:14, 1183:2, 1208:4,
1267:2, 1273:10, 1276:7, 1276:8, 1277:6,
1277:10, 1356:6
 **sticking** [2] - 1312:23, 1347:2
 **still** [23] - 1137:6, 1158:17, 1177:15,
1212:9, 1238:12, 1261:3, 1261:6,
1261:10, 1304:18, 1304:20, 1305:14,
1305:17, 1323:10, 1324:14, 1327:3,
1327:5, 1344:11, 1363:21, 1379:15,
1389:3, 1389:4, 1392:19
 **stipulate** [8] - 1164:4, 1164:5, 1164:7,
1166:20, 1166:25, 1167:16, 1167:20,
1382:13
 **stipulated** [1] - 1175:11
 **stipulation** [2] - 1134:10, 1166:21
 **Stock** [1] - 1338:3
 **stock** [10] - 1301:7, 1301:13, 1301:21,
1304:16, 1305:2, 1305:16, 1312:6,
1327:22, 1336:16
 **stole** [7] - 1157:5, 1157:8, 1161:1,
1167:4, 1167:5, 1177:15, 1260:1
 **stolen** [1] - 1329:18
 **stop** [4] - 1182:9, 1183:1, 1192:11,
1339:8
 **stopped** [1] - 1294:20
 **stopping** [1] - 1386:24
 **stops** [2] - 1181:14, 1182:19
 **store** [3] - 1263:4, 1263:8, 1349:3
 **stores** [1] - 1264:3
 **straightforward** [1] - 1388:22
 **strategic** [1] - 1232:17
 **strategies** [1] - 1232:18
 **strategy** [2] - 1176:9, 1294:18
 **stream** [1] - 1344:20
 **Street** [2] - 1121:8, 1389:17
 **stretch** [3] - 1310:10, 1353:4, 1353:10
 **strike** [5] - 1302:16, 1348:17, 1350:3,
1368:7, 1373:9, 1375:2
 **string** [2] - 1355:14, 1380:9
 **structure** [1] - 1178:9
 **struggling** [1] - 1392:19
 **Stuart** [1] - 1236:3
 **stuff** [8] - 1159:14, 1166:9, 1169:5,
1227:3, 1227:5, 1227:7, 1330:16,
1390:19
 **subject** [8] - 1138:25, 1146:24, 1164:18,
1236:20, 1277:22, 1291:20, 1357:8,
1380:3
 **Subject** [1] - 1384:2
 **submitted** [3] - 1288:7, 1288:15, 1379:5
 **subpoena** [4] - 1164:8, 1164:9, 1166:22,
1223:8
 **subscription** [1] - 1218:2
 **subsequently** [1] - 1143:8
 **subset** [1] - 1249:9
 **substance** [3] - 1272:18, 1276:22,
1281:8
 **substantial** [2] - 1328:13, 1344:19
 **substantially** [2] - 1340:14, 1344:20
 **substantive** [2] - 1165:10, 1271:15
 **substituting** [1] - 1173:19
 **succeeded** [1] - 1263:9
 **successful** [1] - 1338:9
 **successfully** [1] - 1219:21

 **suddenly** [1] - 1156:2
 **sued** [1] - 1177:17
 **sufficient** [7] - 1126:15, 1128:10,
1129:23, 1130:11, 1182:18, 1347:22,
1347:23
 **suggest** [1] - 1393:11
 **suggested** [1] - 1244:24
 **suggesting** [2] - 1127:5, 1128:20
 **suggestion** [1] - 1393:9
 **suggestions** [1] - 1126:3
 **Suite** [1] - 1121:13
 **summary** [3] - 1147:17, 1161:21, 1277:7
 **support** [1] - 1150:12
 **suppose** [1] - 1251:1, 1251:18,
1316:22, 1335:2, 1354:8
 **surrounding** [1] - 1368:21
 **suspected** [3] - 1154:24, 1155:5,
1156:21
 **Sustained** [3] - 1198:17, 1221:5, 1317:2
 **sustained** [2] - 1135:16, 1143:2
 **sweet** [1] - 1227:20
 **switch** [1] - 1231:19
 **switched** [1] - 1159:8
 **swore** [1] - 1291:10
 **sworn** [2] - 1162:16, 1201:6
 **sworn/affirmed** [1] - 1124:3
 **syndication** [1] - 1342:2
 **system** [2] - 1354:16, 1379:24
 **systems** [1] - 1248:10

## T

 **Tab** [3] - 1145:16, 1202:17, 1210:17
 **tab** [1] - 1131:16
 **table** [3] - 1124:15, 1151:2, 1227:12
 **taint** [2] - 1222:8, 1223:12
 **talks** [1] - 1277:14
 **Tang** [4] - 1377:5, 1377:7, 1377:9,
1377:11
 **tap** [2] - 1258:9, 1387:15
 **targeted** [2] - 1124:25, 1308:6, 1308:24
 **tax** [3] - 1306:5, 1306:14, 1307:14
 **teaching** [1] - 1382:25
 **team** [3] - 1269:3, 1277:24, 1359:17
 **Team** [1] - 1172:8
 **tech** [3] - 1126:3, 1135:25, 1380:7
 **Telephone** [1] - 1121:16
 **ten** [4] - 1310:12, 1310:21, 1340:6,
1369:20
 **ten-minute** [1] - 1310:12
 **tenure** [5] - 1155:20, 1282:23, 1338:15,
1368:24, 1372:19
 **term** [3] - 1309:4, 1310:8, 1317:13
 **terms** [8] - 1154:8, 1205:16, 1299:6,
1311:24, 1321:19, 1350:25, 1387:7,
1388:7
 **test** [5] - 1197:16, 1223:25, 1266:10,
1336:8, 1375:17
 **testified** [17] - 1124:4, 1124:23, 1125:3,
1126:14, 1131:2, 1155:16, 1156:8,
1167:4, 1192:17, 1205:16, 1233:1,
1256:24, 1284:19, 1334:12, 1373:2,
1375:11, 1375:14
 **testify** [2] - 1122:23, 1389:13
 **testifying** [1] - 1311:11

**testimony** [54] - 1122:6, 1122:8, 1122:11, 1122:12, 1125:4, 1126:16, 1127:2, 1132:24, 1135:2, 1135:6, 1137:6, 1137:22, 1145:10, 1155:23, 1157:20, 1158:9, 1162:16, 1173:20, 1174:9, 1174:11, 1174:12, 1177:15, 1177:18, 1187:15, 1190:14, 1194:23, 1196:12, 1199:18, 1200:1, 1201:6, 1209:9, 1212:9, 1212:11, 1212:12, 1213:4, 1217:8, 1217:9, 1217:10, 1233:3, 1233:4, 1264:20, 1279:15, 1279:20, 1283:3, 1284:4, 1317:15, 1334:18, 1336:2, 1347:21, 1349:21, 1352:24, 1354:1, 1379:2, 1379:6

**testing** [1] - 1198:9

**than..** [1] - 1393:2

**the Defendant** [5] - 1120:19, 1120:19, 1121:3, 1121:7, 1121:11

**themselves** [1] - 1187:24

**theory** [3] - 1130:1, 1167:23, 1390:4

**therefore** [2] - 1242:6, 1328:18

**they've** [2] - 1152:5, 1165:7

**thinking** [1] - 1391:14

**third** [14] - 1271:8, 1278:23, 1279:2, 1312:13, 1314:20, 1315:1, 1347:7, 1347:9, 1347:11, 1348:17, 1352:11, 1370:8, 1377:12, 1391:17

**Third Avenue** [1] - 1120:20

**third-party** [2] - 1312:13, 1377:12

**thirty** [2] - 1333:23, 1334:4

**thirty-year** [2] - 1333:23, 1334:4

**thorough** [1] - 1356:20

**thousand** [6] - 1192:3, 1301:13, 1303:17, 1312:7, 1324:12, 1372:4

**thread** [1] - 1140:19

**three** [10] - 1154:18, 1229:5, 1338:23, 1341:6, 1347:15, 1347:18, 1347:23, 1348:24, 1349:7, 1349:12

**three-month** [1] - 1348:24

**three-quarters** [3] - 1347:15, 1347:18, 1349:12

**thrilled** [1] - 1310:18

**throughout** [6] - 1282:10, 1282:12, 1282:14, 1282:16, 1282:22, 1307:17

**thumb** [40] - 1157:4, 1157:10, 1157:23, 1158:8, 1160:4, 1160:17, 1161:25, 1164:3, 1164:12, 1164:20, 1165:11, 1166:7, 1166:10, 1166:13, 1166:19, 1166:20, 1167:1, 1167:14, 1167:15, 1167:16, 1167:21, 1167:22, 1168:16, 1168:23, 1169:5, 1170:4, 1170:5, 1170:9, 1170:24, 1174:17, 1174:21, 1175:9, 1176:16, 1177:7, 1259:25, 1329:17, 1330:8, 1330:11

**Thursday** [4] - 1124:18, 1179:19, 1264:15, 1264:20

**timing** [3] - 1136:23, 1322:7, 1392:20

**tired** [3] - 1310:16, 1336:10, 1353:12

**title** [1] - 1238:13

**to...** [1] - 1210:24

**today** [7] - 1149:12, 1167:14, 1217:8, 1279:23, 1353:12, 1368:24, 1392:6

**together** [11] - 1159:6, 1159:15, 1171:14, 1171:16, 1187:13, 1213:11, 1256:12, 1256:20, 1265:18, 1288:25, 1323:9

**tomorrow** [3] - 1386:25, 1387:15, 1388:8

**ton** [1] - 1305:11

**took** [12] - 1143:5, 1167:25, 1212:5, 1278:13, 1279:8, 1330:3, 1330:11, 1330:13, 1342:3, 1353:24, 1380:18

**top** [30] - 1136:16, 1136:17, 1139:10, 1140:15, 1141:15, 1142:9, 1147:9, 1150:3, 1152:23, 1155:10, 1155:11, 1180:8, 1180:14, 1180:18, 1181:2, 1181:3, 1182:3, 1207:12, 1234:10, 1285:14, 1286:24, 1299:7, 1299:12, 1299:14, 1300:4, 1300:13, 1321:13, 1346:8, 1351:13, 1356:18

**total** [16] - 1193:9, 1299:3, 1299:4, 1299:7, 1299:13, 1316:10, 1317:9, 1317:13, 1317:16, 1321:7, 1321:15, 1321:25, 1341:2, 1341:5, 1372:24

**totally** [2] - 1226:16, 1276:12

**tough** [1] - 1196:2

**toward** [2] - 1256:19, 1261:17

**track** [2] - 1216:1, 1216:8

**tracked** [1] - 1311:17

**trades** [1] - 1338:3

**trailing** [1] - 1322:17

**training** [1] - 1334:6

**transaction** [1] - 1304:25

**transactions** [2] - 1197:14, 1304:24

**TRANSCRIPT** [1] - 1120:11

**Transcript** [1] - 1121:18

**transcript** [7] - 1122:5, 1122:24, 1199:4, 1199:7, 1250:8, 1264:25, 1265:8

**Transcription** [1] - 1121:18

**transfer** [6] - 1180:10, 1181:19, 1182:6, 1182:19, 1182:23, 1300:20

**transferred** [1] - 1180:23

**transition** [3] - 1262:13, 1286:18, 1286:21

**transpires** [1] - 1197:23

**trap** [1] - 1351:25

**traunches** [1] - 1349:7

**travel** [1] - 1284:8

**travelled** [1] - 1284:13

**tremendous** [1] - 1344:10

**Trent** [2] - 1136:8, 1136:20

**trial** [8] - 1229:6, 1256:25, 1334:12, 1379:14, 1389:9, 1391:23, 1392:21, 1393:21

**trials** [1] - 1390:24

**trick** [1] - 1258:9

**tried** [5] - 1145:12, 1159:4, 1159:5, 1318:4, 1337:7

**triggered** [1] - 1156:6

**true** [44] - 1129:24, 1140:1, 1140:2, 1140:3, 1140:4, 1140:6, 1145:11, 1147:8, 1152:5, 1179:7, 1179:8, 1195:16, 1202:12, 1213:6, 1219:9, 1219:12, 1223:13, 1233:25, 1238:20, 1249:6, 1249:7, 1256:11, 1256:14, 1263:24, 1265:1, 1265:7, 1279:6, 1283:1, 1284:1, 1284:5, 1284:6, 1284:9, 1288:7, 1293:6, 1293:8, 1311:15, 1319:17, 1328:20, 1328:23, 1329:1, 1329:9, 1330:19, 1340:23

**truly** [1] - 1226:24

**trust** [2] - 1262:16, 1262:21

**truth** [15] - 1141:7, 1141:9, 1143:3, 1143:4, 1143:7, 1166:24, 1224:3, 1277:1, 1278:7, 1278:9, 1279:8, 1288:21, 1351:4, 1379:10, 1379:22

**truthful** [1] - 1284:4

**try** [12] - 1165:9, 1187:10, 1250:8, 1257:7, 1264:6, 1317:7, 1319:10, 1326:20, 1327:23, 1333:15, 1357:5, 1385:11

**trying** [26] - 1130:19, 1131:6, 1182:16, 1189:9, 1213:1, 1248:3, 1252:10, 1262:4, 1264:3, 1271:9, 1271:23, 1277:14, 1281:2, 1281:7, 1308:24, 1316:5, 1331:15, 1352:1, 1366:21, 1374:15, 1380:7, 1380:14, 1380:23, 1392:22, 1393:19, 1393:20

**TTM** [1] - 1322:17

**turn** [19] - 1136:6, 1140:18, 1141:24, 1147:1, 1148:14, 1152:11, 1160:9, 1174:24, 1174:25, 1186:20, 1191:18, 1214:16, 1216:9, 1230:19, 1264:14, 1283:3, 1352:22, 1364:1, 1368:9

**turned** [1] - 1355:25

**turning** [1] - 1146:10

**turns** [5] - 1147:7, 1196:3, 1247:3, 1333:5, 1344:1

**twelve** [1] - 1322:17, 1322:18

**two** [18] - 1319:9, 1144:2, 1144:8, 1151:18, 1169:12, 1192:3, 1214:3, 1228:10, 1255:9, 1279:23, 1285:5, 1301:5, 1303:3, 1308:8, 1309:1, 1323:9, 1346:14, 1351:13

**type** [2] - 1271:17, 1311:19

**types** [1] - 1372:24

**typically** [6] - 1297:7, 1309:21, 1309:23, 1315:9, 1325:23, 1328:8

**typing** [1] - 1216:4

**typographical** [1] - 1234:15

## U

**UE** [4] - 1383:13, 1383:22, 1384:1, 1397:11

**uh-him** [1] - 1304:19

**UN** [4] - 1384:19, 1385:1, 1385:4, 1397:12

**un-blow** [1] - 1314:23

**unaudited** [1] - 1339:9

**uncertain** [1] - 1205:16

**uncommon** [1] - 1356:25

**under** [19] - 1154:3, 1177:5, 1185:14, 1186:5, 1186:12, 1196:7, 1212:9, 1216:16, 1229:13, 1232:13, 1237:9, 1238:17, 1248:1, 1248:21, 1288:4, 1289:23, 1290:10, 1291:10

**under-coverage** [1] - 1186:5

**under-covered** [1] - 1185:14

**underlined** [1] - 1219:18

**underlines** [1] - 1215:23

**underlying** [1] - 1146:18

**underperformed** [1] - 1151:22

**understood** [4] - 1208:21, 1297:4, 1394:7

**unequivocally** [1] - 1271:22

**United States** [9] - 1120:1, 1120:3,

1120:5, 1120:12, 1120:14, 1120:18,
1129:11, 1153:9, 1288:5
 **unless** [3] - 1308:19, 1315:25, 1337:25
 **unrealized** [3] - 1301:5, 1301:15, 1302:3
 **unreasonable** [1] - 1324:25
 **up** [112] - 1125:21, 1126:1, 1126:3,
1130:19, 1131:17, 1136:11, 1140:1,
1140:2, 1140:9, 1148:15, 1150:3,
1150:19, 1150:22, 1153:12, 1171:25,
1172:8, 1172:25, 1173:9, 1173:10,
1174:3, 1174:10, 1174:13, 1175:19,
1177:7, 1177:20, 1177:21, 1179:5,
1180:8, 1181:1, 1181:2, 1188:18,
1192:21, 1193:23, 1195:4, 1199:3,
1199:10, 1200:2, 1201:14, 1205:15,
1206:7, 1213:21, 1216:5, 1216:17,
1219:15, 1220:18, 1223:6, 1231:17,
1244:16, 1245:5, 1248:10, 1251:3,
1251:13, 1251:25, 1252:8, 1252:12,
1253:12, 1254:6, 1256:8, 1256:12,
1256:15, 1256:20, 1256:21, 1256:22,
1257:7, 1257:10, 1258:5, 1260:5,
1266:11, 1266:19, 1266:23, 1268:16,
1269:15, 1271:18, 1285:14, 1291:21,
1295:18, 1297:21, 1299:7, 1299:16,
1301:14, 1303:17, 1305:3, 1313:3,
1314:21, 1314:23, 1336:13, 1340:7,
1343:20, 1350:20, 1358:14, 1359:24,
1364:11, 1365:6, 1365:17, 1366:11,
1368:16, 1377:14, 1379:13, 1380:4,
1380:5, 1380:24, 1384:19, 1385:5,
1387:1, 1389:13, 1393:13, 1393:21,
1394:5
 **upcoming** [1] - 1366:4
 **update** [4] - 1339:9, 1356:20, 1356:25,
1384:22
 **Update** [2] - 1383:17, 1384:3
 **updated** [6] - 1199:17, 1212:3, 1234:5,
1234:16, 1356:19, 1384:12
 **updates** [2] - 1386:7, 1386:13
 **updating** [3] - 1319:4, 1319:15, 1320:24
 **ups** [1] - 1140:6
 **US** [2] - 1153:9, 1154:10
 **UUB** [3] - 1202:17, 1207:6, 1396:13
 **UUF** [4] - 1210:16, 1211:4, 1215:9,
1396:14
 **UUF-1** [4] - 1214:13, 1215:20, 1215:22,
1396:15
 **UZ** [4] - 1386:11, 1386:15, 1386:16,
1397:14

## V

 **vague** [2] - 1326:19, 1392:16
 **Val** [4] - 1208:2, 1208:4, 1212:3, 1234:2
 **Valerie** [8] - 1207:13, 1207:25, 1211:21,
1234:3, 1234:11, 1235:11, 1267:2,
1273:10
 **valid** [1] - 1284:11
 **valuable** [1] - 1302:19
 **valuation** [2] - 1312:13, 1312:14
 **valuations** [2] - 1312:10, 1315:12
 **value** [6] - 1264:6, 1301:8, 1305:5,
1305:7, 1311:22, 1312:1
 **Vanessa** [1] - 1377:23

 **vaporized** [2] - 1389:15, 1389:16
 **various** [13] - 1180:10, 1180:23,
1183:17, 1183:18, 1184:19, 1185:14,
1192:16, 1225:15, 1225:17, 1242:1,
1242:6, 1332:18, 1337:8
 **vast** [1] - 1368:12
 **verify** [1] - 1222:19
 **version** [16] - 1193:6, 1212:4, 1212:5,
1219:18, 1234:6, 1234:7, 1237:3,
1244:12, 1244:23, 1248:11, 1248:13,
1260:20, 1295:25, 1307:22, 1345:24,
1386:8
 **Version** [6] - 1212:4, 1212:5, 1212:7,
1234:6, 1234:7
 **versions** [4] - 1229:15, 1237:21,
1384:12, 1385:6
 **versus** [6] - 1129:3, 1129:7, 1151:19,
1174:1, 1324:22, 1383:1
 **veteran** [1] - 1333:23
 **view** [4] - 1143:14, 1306:12, 1324:20,
1344:12
 **violations** [2] - 1249:20, 1250:14
 **visibility** [3] - 1146:20, 1146:21,
1146:22
 **visible** [1] - 1278:25
 **visiting** [1] - 1374:1
 **vivid** [1] - 1221:2
 **voice** [2] - 1126:6, 1130:19
 **voir** [5] - 1149:6, 1171:7, 1383:23,
1385:18, 1385:23
 **VOIR** [4] - 1149:9, 1171:9, 1395:8,
1395:14
 **Volkswagen** [3] - 1135:7, 1139:19,
1194:20
 **voluminous** [1] - 1330:12
 **voluntary** [1] - 1288:9
 **volunteer** [2] - 1153:23, 1202:5
 **volunteered** [2] - 1389:9, 1389:18
 **volunteering** [1] - 1227:5
 **volunteers** [2] - 1212:20, 1227:3
 **VORA** [1] - 1121:6

## W

 **wait** [3] - 1197:25, 1247:22, 1364:4
 **waiting** [2] - 1253:5, 1364:5
 **walk** [2] - 1153:19, 1227:19
 **wall** [1] - 1326:24
 **Wall** [1] - 1389:17
 **wants** [10] - 1131:8, 1168:8, 1204:16,
1205:7, 1205:9, 1353:15, 1379:10,
1379:11, 1379:22, 1388:5
 **Washington** [1] - 1121:9
 **water** [2] - 1353:2, 1353:3
 **waterfall** [2] - 1308:15, 1308:17
 **ways** [4] - 1343:14, 1343:15, 1393:23,
1394:3
 **webinar** [3] - 1185:7, 1185:12, 1187:16
 **webinars** [7] - 1183:9, 1183:16,
1183:23, 1184:18, 1186:5, 1186:11,
1187:21
 **wedding** [1] - 1392:16
 **Wednesday** [2] - 1387:23, 1388:1
 **week** [15] - 1127:20, 1145:7, 1192:18,
1256:25, 1325:7, 1325:8, 1326:9,

1356:20, 1356:22, 1387:25, 1388:2,
1392:11, 1392:21, 1392:22, 1393:12
 **weekend** [1] - 1200:24
 **weekly** [1] - 1354:5
 **weeks** [1] - 1392:9
 **Weigel** [1] - 1277:24
 **WEIGEL** [17] - 1120:16, 1164:14,
1169:16, 1206:4, 1222:24, 1223:13,
1225:14, 1225:24, 1226:21, 1227:18,
1241:22, 1242:8, 1242:13, 1243:1,
1272:15, 1392:2, 1392:11
 **Weisenberger** [2] - 1141:16, 1143:12
 **welcome** [3] - 1357:2, 1387:5, 1390:19
 **whistle** [1] - 1248:25
 **whistleblower** [2] - 1177:16, 1248:15
 **white** [5] - 1189:19, 1220:9, 1326:25,
1327:3, 1327:5
 **whole** [12] - 1176:3, 1187:2, 1216:8,
1235:21, 1235:22, 1258:2, 1284:17,
1289:1, 1345:22, 1348:22, 1351:24,
1357:25
 **William** [5] - 1262:19, 1267:7, 1286:25,
1287:22, 1290:1
 **WILLIAM** [1] - 1124:1, 1395:5
 **willing** [2] - 1134:9, 1167:15
 **wind** [1] - 1174:13
 **Winer** [1] - 1152:24
 **withdraw** [3] - 1146:4, 1156:14, 1368:6
 **withdrawing** [1] - 1156:17
 **withdrawn** [2] - 1291:5, 1371:2
 **Witness** [8] - 1169:19, 1225:7, 1228:1,
1254:14, 1310:15, 1310:25, 1316:19,
1387:6
 **witness** [104] - 1123:6, 1124:2, 1132:14,
1133:2, 1135:11, 1140:13, 1141:10,
1143:8, 1145:16, 1145:18, 1145:24,
1146:3, 1148:7, 1149:6, 1152:10,
1158:12, 1162:2, 1162:4, 1164:16,
1166:18, 1166:24, 1167:3, 1168:6,
1169:16, 1169:19, 1170:5, 1170:23,
1171:3, 1171:8, 1183:20, 1185:20,
1186:8, 1186:9, 1186:18, 1191:16,
1192:22, 1200:13, 1202:18, 1202:20,
1210:17, 1212:17, 1212:18, 1214:23,
1222:21, 1223:18, 1225:5, 1227:5,
1227:7, 1228:19, 1230:12, 1235:13,
1246:3, 1249:13, 1252:3, 1252:5,
1254:12, 1254:14, 1266:24, 1268:14,
1271:8, 1271:21, 1276:18, 1281:3,
1281:4, 1281:9, 1297:22, 1306:17,
1307:18, 1313:4, 1316:15, 1329:13,
1338:25, 1339:1, 1345:13, 1351:6,
1351:8, 1353:8, 1353:19, 1353:20,
1354:19, 1354:20, 1356:4, 1356:5,
1357:13, 1357:14, 1359:25, 1360:1,
1360:14, 1362:16, 1364:12, 1369:6,
1380:14, 1387:6, 1387:24, 1388:1,
1389:3, 1389:4, 1389:12, 1391:17,
1391:18, 1393:23
 **witness'** [1] - 1122:5
 **witness's** [1] - 1223:18
 **witnesses** [4] - 1222:21, 1389:9,
1391:14, 1393:14
 **WJ** [2] - 1267:5, 1267:7
 **WL-1** [1] - 1246:4
 **Wolf** [1] - 1389:17

**word** [14] - 1167:8, 1173:13, 1202:11, 1259:23, 1276:22, 1318:19, 1351:18, 1375:12, 1376:13, 1379:3, 1389:18
**word-for-word** [1] - 1351:18
**words** [8] - 1122:10, 1173:18, 1218:12, 1250:23, 1300:15, 1332:21, 1352:14, 1352:17
**works** [6] - 1131:4, 1131:7, 1233:23, 1233:24, 1277:10, 1357:8
**world** [2] - 1264:10, 1357:2
**worry** [1] - 1295:15
**worrying** [1] - 1225:12
**worse** [2] - 1191:10, 1357:4
**worth** [9] - 1191:2, 1301:13, 1303:24, 1305:7, 1305:14, 1305:17, 1312:8, 1336:16, 1348:7
**Wotruba** [1] - 1211:13
**wound** [5] - 1171:25, 1173:9, 1173:10, 1199:10, 1251:3
**WR-1** [2] - 1371:9, 1371:16
**write** [2] - 1347:5, 1356:18
**writing** [6] - 1209:13, 1210:2, 1210:5, 1226:19, 1266:1, 1392:24
**written** [4] - 1166:21, 1205:17, 1377:22, 1390:13
**wrote** [12] - 1251:10, 1264:16, 1265:3, 1265:22, 1267:25, 1271:22, 1276:7, 1277:22, 1345:18, 1346:8, 1347:13, 1378:2
**WWF** [4] - 1364:11, 1364:24, 1365:3, 1397:8
**WWF-1-C** [4] - 1364:24, 1365:3, 1365:6, 1397:8

# Y

**yada** [3] - 1205:1
**year** [49] - 1126:18, 1126:21, 1127:3, 1129:16, 1129:24, 1130:13, 1132:5, 1137:4, 1147:21, 1147:23, 1148:4, 1151:3, 1152:17, 1153:1, 1155:20, 1197:18, 1197:23, 1197:24, 1202:11, 1216:25, 1221:3, 1255:11, 1312:15, 1312:17, 1312:18, 1315:10, 1316:1, 1322:15, 1323:8, 1323:9, 1323:13, 1323:14, 1324:10, 1324:12, 1324:13, 1325:20, 1325:23, 1326:3, 1333:23, 1334:4, 1358:20, 1358:22, 1358:25, 1362:8, 1369:3, 1372:23
**year-end** [5] - 1197:18, 1197:23, 1312:18, 1315:10, 1316:1
**year-to-date** [3] - 1358:20, 1358:25, 1372:23
**years** [9] - 1255:10, 1262:21, 1282:11, 1282:12, 1282:15, 1282:17, 1323:9, 1373:16
**yelling** [2] - 1130:19, 1130:20
**yellow** [1] - 1366:20
**yes-or-no** [2] - 1200:14, 1200:16
**yesterday** [4] - 1164:15, 1164:21, 1213:24, 1247:18
**yielding** [1] - 1355:24
**York** [8] - 1120:5, 1120:14, 1120:15, 1120:21, 1121:5, 1338:3
**you..** [1] - 1284:2

**yourself** [10] - 1157:8, 1161:5, 1177:17, 1231:10, 1232:1, 1232:6, 1249:17, 1273:10, 1316:18, 1354:22
**yourselves** [1] - 1168:25
**yup** [1] - 1359:19

# Z

**ZELL** [1] - 1121:10