UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
UNITED STATES OF AMERICA

       v.

DAVID GENTILE
and JEFFRY SCHNEIDER,

       Defendants.
---------------------------------------------------------------x

**MEMORANDUM AND ORDER**
21-CR-54 (RPK) (PK)

RACHEL P. KOVNER, United States District Judge:

The government has moved *in limine* to preclude defendants' proposed experts or, in the alternative, for a *Daubert* hearing. *See* Gov't's Renewed Mot. in Limine (Dkt. #406). For the reasons set forth below, Mr. Palzer's testimony is precluded, but Mr. Flemmons and Ms. Bramer may testify subject to certain limitations.

## BACKGROUND

I assume the parties' familiarity with the underlying facts, summarized here only as necessary to decide this motion.

On May 20, 2024, defendant David Gentile noticed Keith Palzer and Jason Flemmons as potential expert witnesses, and defendant Jeffry Schneider noticed Erica Bramer. *See* Ex. A to Gov't's Renewed Mot. in Limine. ("Initial Disclosures"). On May 28 and May 29, 2024, defendants provided supplements to their initial disclosures. *See* Ex. B to Gov't's Reply in Supp. of Mot. First Mot. in Limine ("First Suppl. Disclosures") (Dkt. #345-2) (supplemental disclosures for Mr. Flemmons and Ms. Bramer); Ex. C to Gov't's Reply in Supp. of First Mot. in Limine ("Second Suppl. Disclosures") (Dkt. #345-3) (supplemental disclosures for Mr. Palzer).

The government moved *in limine* to preclude defendants' proposed experts or, in the alternative, for an order directing defendants to supplement their disclosures pursuant to Federal

1

Rule of Criminal Procedure 16(b)(1)(C).  *See* Gov't's First Mot. in Limine (Dkt. #324).  The government initially argued that defendants' disclosures for all three experts were inadequate.  *Id.* at 5.  But after receiving defendants' supplemental disclosures, the government stated that "[a]ssuming Erica Bramer's testimony is confined to the demonstrative and summary slides provided in the defendants' supplemented disclosure, her slides are sufficiently clear that the government can at least divine the gist of the proposed testimony."  Gov't's Reply in Supp. of First Mot. in Limine 2 n.4 (Dkt. #345).  The government maintained, however, "that much of Ms. Bramer's testimony [was] likely to be irrelevant, more prejudicial than probative, and not helpful to the jury" but indicated that "these issues" would be "most efficiently addressed at the close of the government's case."  *Ibid.*

I granted the government's motion in part and denied it in part.  I held that Mr. Gentile's expert disclosures for Mr. Palzer and Mr. Flemmons failed to comply with Rule 16(b)(1)(C)(iii) but that preclusion was not required.  *United States v. Gentile*, No. 21-CR-0054 (RPK) (PK), 2024 WL 3251702, at *4 (E.D.N.Y. June 20, 2024).  I ordered Mr. Gentile to provide revised disclosures for Mr. Palzer and Mr. Flemmons and granted the government leave to file a renewed motion to preclude or seek a *Daubert* hearing.  *Ibid.*

After Mr. Gentile provided his revised disclosures, *see* Ex. B to Gov't's Renewed Mot. in Limine ("Third Suppl. Disclosures"), the government filed its renewed motion *in limine*.  The government argues that the revised disclosures still fail to satisfy Rule 16 and that defendants have not established that their experts' proposed testimony is admissible under Federal Rule of Evidence 702.  *See* Gov't's Renewed Mot. in Limine 1–2.

## LEGAL STANDARD

Federal Rule of Criminal Procedure 16 requires parties to make certain disclosures pertaining to expert testimony they will seek to offer at trial. As relevant here, Rule 16(b)(1)(C)(iii) provides that "[t]he disclosure for each expert witness must contain: [1] a complete statement of all opinions that the defendant will elicit from the witness in the defendant's case-in-chief; [2] the bases and reasons for them; [3] the witness's qualifications, including a list of all publications authored in the previous 10 years; and [4] a list of all other cases in which, during the previous 4 years, the witness has testified as an expert at trial or by deposition." Fed. R. Crim. P. 16(b)(1)(C)(iii).

"[A] statement of an opinion's bases and reasons cannot merely be 'the *ipse dixit* of the expert' from experience." *United States v. Mrabet*, No. 23-CR-69 (JSR), 2023 WL 8179685, at *2 (S.D.N.Y. Nov. 27, 2023) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). "An expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion." *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006).

Where a party fails to comply with Rule 16's disclosure requirements, "a district court has broad discretion in fashioning a remedy," *United States v. Lee*, 834 F.3d 145, 158 (2d Cir. 2016) (citation and alterations omitted), including by "prohibit[ing] that party from introducing the undisclosed evidence" or "enter[ing] any other order that is just under the circumstances," Fed. R. Crim. P. 16(d)(2).

Federal Rule of Evidence 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if four conditions are met: "(a) the expert's scientific, technical, or other specialized

3

knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.  A party seeking to admit expert testimony under Rule 702 "must establish admissibility by a preponderance of the evidence." *Kortright Cap. Partners LP v. Investcorp Inv. Advisers Ltd.*, 392 F. Supp. 3d 382, 397 (S.D.N.Y. 2019) (citing *Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987)).  The Rule 702 standard for the admissibility of expert testimony is "liberal." *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005).

Under Rule 702, the court must ensure that the "expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmas., Inc.*, 509 U.S. 579, 597 (1993); *accord United States v. Willis*, 14 F.4th 170, 185 (2d Cir. 2021).  That "gatekeeping role" requires the court to "consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quotation marks and citation omitted) (quoting Fed. R. Evid. 702); *see Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (holding that courts have the same "gatekeeping" role with respect to "technical" and "other specialized" knowledge).  Factors that bear on reliability include whether a theory or technique "can be (and has been) tested," "whether the theory or technique has been subjected to peer review and publication," the technique's "known or potential rate of error," the existence of standards controlling the technique's operation, and "general acceptance" of the technique or theory in the relevant scientific community. *Amorgianos*, 303 F.3d at 266 (quoting *Daubert*, 509 U.S. at 593–94).

4

In short, the court must "undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.* at 267. The court's analysis "must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Id.* at 266. However, "only serious flaws in reasoning or methodology will warrant exclusion." *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) (citing *Amorgianos*, 303 F.3d at 267). For example, expert testimony should be excluded as unreliable if the testimony "is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or [is] in essence an apples and oranges comparison." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp.*, LLC, 571 F.3d 206, 214 (2d Cir. 2009) (citation and quotation marks omitted). Other deficiencies in the expert's assumptions go to the testimony's "weight, not . . . admissibility." *Ibid.* (citation omitted).

## DISCUSSION

Mr. Palzer's testimony is precluded, but Mr. Flemmons and Ms. Bramer may testify subject to limitations set out below.

### 1. Mr. Palzer

The government's motion to preclude Mr. Palzer's proposed testimony is granted in full because (i) Mr. Gentile's Rule 16 disclosure does not provide an adequate description of the bases and reasons for his opinions, and (ii) Mr. Gentile has not established that his proposed testimony is the product of reliable principles and methods under Rule 702.

Mr. Gentile anticipates that Mr. Palzer, a registered broker-dealer and purported expert on fund design, will testify that reasonable investors would apply the following three-step "hierarchy in performing due diligence" before deciding to invest in GPB funds:

- First, reasonable investors would review and "place the most weight" on the funds' limited partnership agreements, private placement memoranda, and subscription agreements.

- Second, reasonable investors would give "substantial" but "less weight" to the funds' audited financial reports and unaudited reports of partnership.

- Third, reasonable investors would "place the least weight on due diligence, marketing, and other documents and statements provided by agents" of the funds.

Third Suppl. Disclosures 9–10.

In setting forth the bases and reasons for Mr. Palzer's three-step hierarchy, Mr. Gentile mostly summarizes and describes the types of documents in the first category, *see id.* at 10–11, and repeats Mr. Palzer's conclusion that a reasonable investor would give those documents more weight than the documents in the latter two categories, *see id.* at 12–13 (stating that "reasonable investors in private equity funds would look to funds' audited financial statements and unaudited quarterly reports" but give them "less weight than the disclosures and statements provided in" the first category); *id.* at 13 (stating that "a reasonable investor in the GPB Funds would place the least weight on" documents in the third category).

Largely absent from Mr. Gentile's description of Mr. Palzer's bases and reasons is an explanation of *why* Mr. Palzer has concluded that a reasonable investor would rely most heavily on the documents in the first category. At most, Mr. Gentile cites the following as evidence substantiating Mr. Palzer's conclusions:

- The Institutional Limited Partners Association's Due Diligence Questionnaire, a "standard checklist in the industry," which places limited partnership agreements and private placement memoranda at the top of its list of documents it recommends that investors review;

6

- The nature of audited financial statements and unaudited reports of partnership—namely, that they are "'point in time' factual statements" for a particular "reporting period" and do not contain "statements of discretion, policy, or track record"; and

- Mr. Palzer's "industry observation" that "it is commonly understood" among "broker dealers, registered investment advisors, and sophisticated investors" that due diligence documents, marketing materials, and related documents from agents of a fund "contain limited statements . . . that may require further research."

*Id.* at 11, 13.

The limited evidence defendants cite is insufficient to explain the bases and reasons for Mr. Palzer's three-step hierarchy. Mr. Gentile does not clarify, for instance, why the placement of certain documents at the top of a due diligence questionnaire indicates that reasonable investors would rely most heavily on those documents. Nor does he explain why reasonable investors are less likely to rely on "'point in time' factual statements" than "statements of discretion, policy, or track record." *Id.* at 13. And while Mr. Gentile offers some limited authority supporting Mr. Palzer's "observation" that the private fund industry distinguishes between documents in the first two categories and documents in the third, *see id.* at 13 n.19, 14 n.20, he fails to link that observation to Mr. Palzer's conclusion regarding how reasonable investors would behave.

Without more explanation as to "what methodologies or evidence substantiate [his] conclusion," *Riegel*, 451 F.3d at 127, the only remaining support for the three-step hierarchy is Mr. Palzer's *ipse dixit*. But "a statement of an opinion's bases and reasons cannot merely be 'the *ipse dixit* of the expert.'" *Mrabet*, 2023 WL 8179685, at *2 (quoting *Joiner*, 522 U.S. at 146); *see, e.g.*, *United States v. Weiner*, No. 22-CR-0019 (PGG), 2024 WL 82729, at *5 (S.D.N.Y. Jan. 8, 2024) (explaining that "conclusions and generalities are not adequate" because "they do not permit the reader" of a Rule 16 disclosure "to understand the 'bases and reasons'" for an expert opinion and determining that a defendant who had "not explained in any systematic way" the "reasons" for an expert's opinion had not satisfied his Rule 16 obligations).

7

For similar reasons, Mr. Gentile has not established that Mr. Palzer's proposed testimony is admissible under Rule 702. That is, because Mr. Gentile offers only Mr. Palzer's *ipse dixit*, the Court does not have "enough information to conduct a 'rigorous examination' of [his] methodology, as required by its gatekeeping function" under Rule 702. *United States v. Kwok*, No. 23-CR-0118 (AT), 2024 WL 1773143, at *3 (S.D.N.Y. Apr. 24, 2024) (quoting *Amorgianos*, 303 F.3d at 267) (concluding that a defendant's failure to adequately explain an expert's bases and reasons "not only doom[ed] [his] notices under Rule 16" but also posed issues under Rule 702); *see Prohaska v. Sofamor, S.N.C.*, 138 F. Supp. 2d 422, 438 (W.D.N.Y. 2001) ("[C]ourts do not have to credit opinion evidence connected to data 'only by the *ipse dixit* of the expert.'" (quoting *Joiner*, 522 U.S. at 146)).

In sum, Mr. Gentile has failed to adequately describe the bases and reasons for Mr. Palzer's proposed testimony or establish that it satisfies Rule 702. Given the late stage of the trial and the fact that Mr. Gentile has already been granted an opportunity to cure deficiencies in his Rule 16 disclosures, Mr. Palzer's testimony is precluded. *See Lee*, 834 F.3d at 159 (explaining that, under Rule 16, "[a] district court has broad discretion in fashioning a remedy . . ., including ordering the exclusion of evidence" (citation omitted)); *Joiner*, 522 U.S. at 146 (explaining that a district court has discretion to exclude expert testimony based on *ipse dixit*).

### 2. Mr. Flemmons

The government's motion to preclude certain aspects of Mr. Flemmons' testimony is granted in part and denied in part.

Mr. Gentile anticipates that Mr. Flemmons, a certified public accountant and fraud examiner, will testify about (i) the 2014 performance guarantees executed by cooperating witness Jeffrey Lash, (ii) defendants' compliance with auditing standards—namely, the Accounting

8

Standards Codification ("ASC") and Generally Accepted Auding Principles ("GAAP"), and (iii) other related topics. Third Suppl. Disclosures 3–7. The government has moved to preclude certain aspects of Mr. Flemmons' testimony. *See* Gov't's Renewed Mot. 7–11. I address the government's arguments in turn.

I decline to preclude Mr. Flemmons' proposed testimony related to the 2014 performance guarantees on the ground that Mr. Gentile failed to timely disclose it. The government characterizes defendants' revised Rule 16 disclosure for Mr. Flemmons as containing "two entirely new subject areas": Mr. Flemmons' conclusion that GPB did not report the 2014 performance guarantees as revenue and his conclusion that a financial statement describing a $1,100,000 guarantee refers to a guarantee executed by someone other than Mr. Lash. Gov't's Renewed Mot. in Limine 7. But those conclusions relate to the same topics included in Mr. Gentile's initial disclosure, which previewed that Mr. Flemmons would testify to "[h]is analysis and tracing related to the 2014 performance guarantees" and "any impact on the financial statements reported by GPB Holdings, LP in 2014." Initial Disclosures 3. After concluding in my previous order that Mr. Gentile had not "me[t] the requirements of Rule 16(b)," *Gentile*, 2024 WL 3251702, at *2, I gave Mr. Gentile an opportunity to supplement his disclosures. In accordance with my order, the revised disclosures specify that Mr. Flemmons' testimony on the 2014 performance guarantees will include his opinion that GPB did not report those guarantees as revenue. The revised disclosures do not, as the government contends, introduce an entirely new subject area. I therefore decline to preclude Mr. Flemmons' testimony on the 2014 performance guarantees on that basis. *See United States v. Dupree*, No. 10-CR-0627 (KAM), 2011 WL 5976006, at *9 (E.D.N.Y. Nov. 29, 2011) (emphasizing that a district court has "broad discretion" under Rule 16 and describing preclusion

9

as an "extreme remedy"); *United States v. Raniere*, 384 F. Supp. 3d 282, 327 (E.D.N.Y. 2019) (same).

Turning to the substance of the testimony, Mr. Flemmons may testify to his opinion that GPB's 2015 financial statements complied with ASC disclosure requirements but not to his opinion that "it is appropriate under GAAP to include accrued but uncollected revenue in the pool of income eligible for distribution to investors." Third Suppl. Disclosures 6. Compliance with accounting standards and principles does not "shield[] guilt," but such compliance may be "relevant . . . as evidence of whether a defendant acted in good faith." *United States v. Rigas*, 490 F.3d 208, 220 (2d Cir. 2007); *see United States v. Ebbers*, 458 F.3d 110, 125 (2d Cir. 2006) ("GAAP may have relevance in that a defendant's good faith attempt to comply with GAAP or reliance upon an accountant's advice regarding GAAP may negate the government's claim of an intent to deceive."). Mr. Gentile indicates that he is offering Mr. Flemmons' opinion that he complied with ASC's disclosure requirements as evidence of his "lack of intent to deceive"—in other words, his good faith. Gentile Opp'n 9 (Dkt. #411-1). The opinion is therefore relevant as offered for that limited purpose.

Though Mr. Flemmons' opinion regarding GAAP may also be relevant, Mr. Gentile has not established that it is admissible under Rule 702. Mr. Gentile anticipates that Mr. Flemmons will opine that, "under GAAP," it is "appropriate . . . to include accrued but uncollected revenue in the pool of income eligible for distribution to investors." Third Suppl. Disclosures 6. But Mr. Gentile does not identify any specific GAAP standard on which he relies, nor does he provide any other basis for his opinion regarding what is appropriate under GAAP. *See ibid*. Instead, the Court is left only with Mr. Flemmons' *ipse dixit*. Mr. Gentile has therefore failed to provide the Court with "enough information to conduct a 'rigorous examination' of [Mr. Flemmons'] methodology,

10

as required by its gatekeeping function" under Rule 702. *Kwok*, 2024 WL 1773143, at *3 (quoting *Amorgianos*, 303 F.3d at 267). Mr. Flemmons' testimony on this point is therefore precluded. *See Joiner*, 522 U.S. at 146.

Next, Mr. Flemmons may briefly testify to his opinion that if GPB had "decided to reduce its management fee in lieu of enforcing Mr. Lash's 2015 performance guarantee, the impact on [its] reported net investment income and net income for 2015 would have been identical." Third Suppl. Disclosures 5. The government contends that such testimony is not relevant because there was no reduction in management fees in 2015. Gov't's Renewed Mot. in Limine 10. But jurors have heard abundant testimony regarding the extent to which payments to investors were covered in particular years. *See, e.g.*, Trial Tr. 2469–70 (testimony of Macrina Kgil). And the government has elicited testimony that defendants had contemplated a management-fee rebate in 2015 and then made a "last-minute" decision to have Mr. Lash execute a performance guarantee instead. *See id.* at 905–06 (testimony of William Jacoby). Mr. Flemmons' testimony provides modestly relevant context in making clear that two courses of action defendants allegedly contemplated in 2015 would have comparable effects on coverage ratios.

In addition, Mr. Flemmons may testify to "different methods" of "calculat[ing] funds from operations." Third Suppl. Disclosures 6. Such testimony is relevant in light of the government's allegation that defendants misrepresented that monthly distributions from GPB funds were fully covered by "funds from operations." *See* Indictment ¶ 21 (Dkt. #1). Testimony indicating that GPB distributions were fully covered by funds from operations using certain metrics is relevant to the veracity of defendants' alleged misrepresentations. And though GPB employees have already testified that there are differing coverage metrics, *see, e.g.*, Tr. 2562 (testimony of Macrina Kgil), Mr. Flemmons' further description of the potential metrics would not be needlessly cumulative.

11

However, Mr. Flemmons may not testify that investors' ownership interest, when measured in "units," remained the same regardless of the source of funds used to pay distributions. Third Suppl. Disclosures 5–6. Mr. Flemmons' testimony regarding ownership interests when measured in "units" lacks clear relevance to the case, and any marginal relevance is outweighed by the risk of confusing the jury.

Finally, Mr. Flemmons' demonstrative slides should not characterize certain bank account transactions as an "Advance from Gentile" or "Repayment of Advance." *See* Gov't's Renewed Mot. in Limine 11. Whether those transactions were advances or repayments is a contested question of fact that is ultimately for the jury to decide. *See SEC v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013) (collecting cases holding that "[i]t is . . . inappropriate for experts to become a vehicle for factual narrative" and warning that "narration of facts of the case may easily invade the province of the jury").

In sum, Mr. Flemmons may testify to the 2014 performance guarantee, ASC disclosure requirements, the financial impact of a reduction in management fees, and different methods of calculating coverage. He may not, however, testify to GPB's compliance with GAAP or the effect of measuring investors' ownership interest in units. Nor may he refer to certain bank account transactions as an advance from or repayment to Mr. Gentile.

### 3. Ms. Bramer

The government's motion to preclude certain aspects of Ms. Bramer's testimony is denied as to her testimony on coverage metrics but granted as to her testimony on asset valuation.

Mr. Schneider anticipates that Ms. Bramer, a Chartered Financial Analyst and purported expert on financial analysis and valuation, will provide testimony:

- "explain[ing] the meaning and import of concepts contained within such financial statements such as 'Total Investment Income,' 'Investment Income, 'Total Income,' 'Net

12

- Investment Income,' 'Realized Gains,' and 'Net Income,' among others, as well as other financial terms used in connection with financial analysis, such as 'EBITDA'";

- "explain[ing] how different financial reporting methods can affect financial analysis, as well as . . . how to understand financial terms such as 'distributions,' 'waterfall,' 'coverage,' and 'return of capital';

- "analy[zing] . . . the income, cash, funds, and/or proceeds that the GPB Funds generated";

- explaining "[h]ow to measure income, cash, funds, and/or proceeds generated by Investments owned by a GPB Fund and where on a financial statement such information is located";

- explaining "how Form K-1s and investor account/distribution statements relate to financial statements";

- explaining "[m]ethods by which assets are valued and how different methods can affect the outcome of the valuation process"; and

- "explain[ing] the figures and metrics listed [in defense exhibits] and opin[ing] on the propriety of the process used to create those exhibits."

Initial Disclosures 8–10. In setting forth Ms. Bramer's bases and reasons, defendants list the various statements and documents which Ms. Bramer purports to explain, namely:

- financial and fund information such as private placement memoranda and limited partnership agreements and amendments thereto issued by the GPB Funds;

- audited and unaudited financial statements, annual reports, and reports of the partnerships for the GPB Funds;

- certain fair market value statements and account/distribution statements sent to investors in the GPB Funds;

- reports filed by the court-appointed monitor for GPB Capital Holdings, LLC ("GPB Capital") and reports filed by the GPB Funds with the SEC; and

- documents and communications involving, among others, GPB Capital and its accountants, auditors and other professionals.

*Id.* at 10.

As an initial matter, Mr. Schneider argues that the government's motion is untimely as it pertains to Ms. Bramer. Def.'s Opp'n 1–2 (Dkt. #409) ("Schneider Opp'n"). Mr. Schneider

13

purports to rely on the government's prior representation that Ms. Bramer's "slides are sufficiently clear that the government can at least divine the gist of the proposed testimony." *Id.* at 1 (quoting Gov't's Reply in Supp. of First Mot. in Limine 2 n.4). But in the same footnote the government noted that it continued to review Ms. Bramer's testimony due to concerns about its admissibility and that the testimony's admissibility "may depend on the evidence at trial." Gov't's Reply in Supp. in Supp. of Renewed Mot. in Limine 7 (Dkt. #423) (quoting the same). The Court therefore considers the government's challenge to be timely.

The government does not challenge Ms. Bramer's testimony *in toto*, but rather relies on *Daubert*'s "require[ment] that expert testimony 'fit' the facts of the case" to argue for preclusion of Ms. Bramer's testimony on two particular matters: "coverage metrics" and "asset valuation principles." Gov't's Renewed Mot. in Limine 12–14. "*Daubert*'s 'fit' requirement is satisfied where the 'expert testimony proffered in the case is sufficiently tied to the facts of the case [such] that it will aid the jury in resolving a factual dispute.'" *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 131 (S.D.N.Y. 2022) (quoting *United States v. Maxwell*, No. 20-CR-330 (AJN), 2021 WL 5283951, at *5 (S.D.N.Y. Nov. 11, 2021)).

Ms. Bramer's testimony regarding coverage metrics satisfies *Daubert*'s fit requirement because it is relevant to the veracity of defendants' alleged misrepresentations that certain distributions were "fully covered" with "funds from operations." *See* Indictment ¶¶ 21, 28–31, 39; *see also id.* ¶ 51 (charging defendants with, *inter alia*, "making one or more untrue statements of material fact"). Ms. Bramer's testimony purports to explain the various coverage metrics that, given her expertise as applied to numerous financial statements and documents related to GPB, might reflect whether a distribution is covered by funds from operations.

14

The government claims that defendants' representation that distributions were fully covered with funds from operations carries a particular meaning—that 'the source of funds used to pay distributions' was 'cash flow generated by the companies the funds owned, and not capital raised from investors.'" Gov't's Reply in Supp. of Renewed Mot. in Limine 9 (quoting Indictment ¶ 21); *see, e.g.*, Indictment ¶ 21 (asserting what "'fully covered' by 'funds from operations'" means "[i]n other words")); Gov't's Renewed Mot. in Limine 12. But that is precisely the factual inference that Ms. Bramer's testimony challenges by explaining other "appropriate measure[s]" for whether a given distribution is covered by funds from operations. Schneider Opp'n 4. Ms. Bramer's testimony regarding coverage metrics is therefore relevant to, and helpful for the jury in determining, the alleged falsity of representations by defendants that are at the core of this case. *Daubert*'s fit element does not require more. *See United States v. Jones*, No. 16-CR-553 (AJN), 2018 WL 1115778, at *9 (S.D.N.Y. Feb. 27, 2018) (finding that proposed expert testimony "satisfie[d] the low bar of relevance"); *see also Daubert*, 509 U.S. at 587 (noting that the "basic standard of relevance [] is a liberal one").

Ms. Bramer's testimony regarding asset valuation, in contrast, is precluded because any modest relevance is substantially outweighed by the likelihood that it would mislead or confuse the jury. Ms. Bramer would testify as to the "[m]ethods by which assets are valued," "certain fair market value statements" regarding GPB funds, and comparing asset value to capital contributions and distributions. *See* Initial Disclosures 9–10. Mr. Schneider argues that this testimony is relevant to the materiality of alleged misrepresentations. Schneider Opp'n 5. "A misrepresentation is material under Section 10(b) of the Securities Exchange Act and Rule 10b–5 where there is 'a substantial likelihood that a reasonable investor would find the . . .

15

misrepresentation important in making an investment decision.'" *United States v. Litvak*, 808 F.3d 160, 175 (2d Cir. 2015) (quoting *United States v. Vilar*, 729 F.3d 62, 89 (2d Cir. 2013)).

The testimony that government seeks to preclude here is of minimal relevance to materiality but highly likely to confuse the jury, and it is not sufficiently tied to the facts of the case [such] that it will aid the jury in resolving a factual dispute.'" *Capri Sun*, 595 F. Supp. 3d at 131. Testimony about Net Asset Valuations, and distributions of capital as compared to Net Asset Valuations, would put before the jury evidence of the appreciation of GPB assets over time. But the fact that GPB assets appreciated in value over time does not negate an element of the government's case or establish that defendants' alleged misrepresentations were not material. See *Litvak*, 808 F.3d at 185–86 (finding district court acted within its discretion in excluding expert testimony on the "fair market value and [] profitability of the trades at issue" after explaining that "[w]hether [an investor] later made a profit or loss . . . has no bearing on whether [the defendant's] misrepresentations were material")..

To be sure, testimony on *whether* reasonable investors would consider Net Asset Valuations and distributions of capital as compared to Net Asset Valuations when making investments of the kind made in GPB could be relevant to materiality, *see Litvak*, 808 F.3d at 181–85, but that is not the testimony at issue here. Moreover, thus far, other testimony has not established the materiality of metrics like these, which foreground the alleged appreciation of GPB assets. Defendants point to an investor's testimony that "if the distribution was from [investor] capital *only*" he would not have invested, Schneider Opp'n 5 (citing Trial Tr. at 261:1-5) (emphasis in defense submission), but defendants can show that distributions were not *only* return of capital without putting before a jury a metric involving the alleged appreciation of GPB assets.

Moreover, the proposed testimony poses a substantial risk of confusing and misleading the jury. Putting before the jury metrics that foreground alleged appreciation in assets would inject into the case the basically irrelevant question of whether investors made money on the investments at issue in this case. Because doing so poses a substantial risk of confusion that outweighs any minimal relevance this testimony has, the testimony is precluded. *See Litvak*, 808 F.3d at 185–86 (similar).

## CONCLUSION

The government's motion is granted in part and denied in part, as set forth in this order.

SO ORDERED.

                                        */s/ Rachel Kovner*
                                        RACHEL P. KOVNER
                                        United States District Judge

Dated: July 17, 2024
       Brooklyn, New York