JAM/JKW/NMA/KM

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – – – – – – – – X

UNITED STATES OF AMERICA

   – against –                                              No. 21-CR-54 (RPK)

DAVID GENTILE and
JEFFRY SCHNEIDER,

              Defendants.

– – – – – – – – – – – – – – – – – – – – – – – – – – – X

## THE GOVERNMENT'S OMNIBUS OPPOSITION
## TO THE DEFENDANTS' POST-TRIAL MOTIONS

BREON PEACE
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

ARTIE MCCONNELL
JESSICA K. WEIGEL
NICK M. AXELROD
KATE MATHEWS
Assistant U.S. Attorneys
(Of Counsel)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................. 1

ARGUMENT ..................................................................................................................... 3

I.    The Defendants Misstate the Applicable Legal Standards........................................ 3

      A.    The Defendants Misstate the Rule 29 Standard ............................................ 3

      B.    The Defendants Also Misstate the Rule 33 Standard .................................... 6

II.   The Proof of the Defendants' Guilt Was Overwhelming.......................................... 9

      A.    The Distributions Scheme........................................................................... 9

      B.    The Performance Guarantee Scheme .......................................................... 23

III.  All of the Defendants' Sufficiency Arguments Were Rejected by the Jury .................. 30

      A.    The Defendants Misled Investors About the Source of Distributions ................ 31

      B.    Evidence of the Performance Guarantee Scheme Was Sufficient to Convict on All Counts ........................................................................................... 57

      C.    Evidence of the Defendants' Intent to Defraud Was Overwhelming ................. 69

IV.   The Court's Evidentiary Rulings Were Correct ...................................................... 85

      A.    Misleading Statements to Investors and Potential Investors Were Admissible for the Effect on the Listener .................................................................... 85

      B.    The Court Correctly Limited Erica Bramer's Prejudicial and Irrelevant Proposed Testimony................................................................................. 90

      C.    The Court Already Rejected the Defendants' Remaining Evidentiary Arguments............................................................................................. 93

      D.    The Government Did Not "Manipulate" the Designation of Co-Conspirators.. 107

V.    The Government Did Not Constructively Amend or Vary From the Indictment ........ 109

      A.    Applicable Law .................................................................................... 109

      B.    The Government Proved the Scheme to Defraud Alleged in the Indictment .... 111

      C.    There Was No Prejudicial Variance ........................................................ 115

VI.   The Court's Jury Instructions Were Correct ........................................................ 118

      A.    *Connolly* and *Harra* Are Inapplicable ...................................................... 119

      B.    The Court's "Willfulness" Instructions Were Correct.................................. 122

      C.    Unanimity as to a Particular Misrepresentation is Not Required .................... 125

      D.    The Conscious Avoidance Charge Was Appropriate ................................... 127

      E.    The Court's Materiality Instruction Correctly Stated the Law ........................ 132

      F.    The Court's "Government Not on Trial" Instruction Was Proper.................... 136

VII.  The Defendants' Accusations of Misconduct Are Frivolous ................................. 139

      A.    No Government Witness Committed Perjury................................................ 140

B.    The Defendants' Accusations of Improper "Witness-Coaching" Are Baseless .................................................................................... 147

C.    The Government's Rebuttal Properly Responded to the Defendants' Improper Arguments ..................................................................... 149

CONCLUSION ......................................................................................... 159

## PRELIMINARY STATEMENT

Following an eight-week trial, the jury convicted David Gentile and Jeffry Schneider on all counts. Both defendants were convicted of conspiracy to commit securities fraud and wire fraud and securities fraud, and Gentile was convicted of wire fraud.

The defendants now move for relief under Federal Rules of Criminal Procedure 29 and 33, asking the Court to grant them a judgment of acquittal or a new trial. In seeking this extraordinary relief, the defendants ask the Court to pick-and-choose from competing inferences from circumstantial evidence and disregard testimony that does not fit with their theories. As we explain below, Rule 29 and Rule 33 do not authorize this sort of re-weighing of the evidence, and the defendants significantly misstate the law.

The jury's conviction on all counts is supported by extensive evidence, including testimony from a cooperating witness, Jeffrey Lash, who testified to creating sham documents with the defendants; from two whistleblowers who testified to warning the defendants their conduct was fraudulent; and from victim-investors who testified to how the defendants personally lied to them. Crediting these witnesses—as the jury did and Rule 29 and Rule 33 require—this was not a close case, as the defendants insist. The witnesses' testimony was mutually-corroborating and supported by an extensive documentary record.

The defendants' motions also recycle a series of evidentiary objections that were litigated in limine and at trial; all of these arguments were considered by the Court and rejected. The Court's evidentiary rulings were sound, and the defendants present few, if any, new arguments—often their papers simply cite back to their prior, unpersuasive filings while ignoring the Court's reasoned decisions.

The defendants' objections to the Court's jury instructions are of a similar nature. The Court has already considered each of these arguments and rejected them. The defendants do

not cite any additional precedent, any intervening change in the law, or any other basis for the Court to reconsider its rulings.

Finally, the defendants resort to allegations of misconduct by the prosecution team where there has been none. The defendants' unsupported attacks on the ethics and character of the prosecution team have been a hallmark of their litigation strategy for years. And these attacks have always been a distraction. There is no evidence the government suborned perjury, coached witnesses, or misstated the evidence in rebuttal. There was no evidence of this when the defendants made these allegations at trial and when they were rejected by the Court, and their motions fail to cite any new evidence today.

The defendants' motions should be denied.

<u>ARGUMENT</u>

I.    <u>The Defendants Misstate the Applicable Legal Standards</u>

The defendants misstate the applicable standards of review and misapply—or outright ignore—nearly all governing Second Circuit precedent.  In doing so, the defendants ask the Court to re-weigh the evidence, particularly with respect to the credibility of witnesses and the interpretation of documentary evidence, to reach a conclusion contrary to that of the jury.  Federal Rules of Criminal Procedure 29 and 33 do not permit this.

A.    <u>The Defendants Misstate the Rule 29 Standard</u>

A defendant "challenging the sufficiency of the evidence to support his conviction 'bears a heavy burden.'"  <u>United States v. Ceballos</u>, 340 F.3d 115, 124 (2d Cir. 2003) (quoting <u>United States v. Best</u>, 219 F.3d 192, 200 (2d Cir. 2000)).  Indeed, to prevail under Rule 29, a defendant must show that no rational trier of fact could find the essential elements of each crime beyond a reasonable doubt.  <u>United States v. Aguiar</u>, 737 F.3d 251, 264 (2d Cir. 2013); <u>see</u> <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979) (noting standard is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"); <u>United States v. Payton</u>, 159 F.3d 49, 56 (2d Cir. 1998) (explaining "ultimate question is not whether we believe the evidence adduced at trial established [the] defendant's guilt beyond a reasonable doubt, but whether any rational trier of fact could so find").  In other words, "[a] court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."  <u>United States v. Temple</u>, 447 F.3d 130, 136 (2d Cir. 2006) (quoting <u>United States v. Guadagna</u>, 183 F.3d 122, 130 (2d Cir. 1999)).

In assessing the evidence, the court must "view the evidence in its totality and in the light most favorable to the prosecution."  <u>United States v. Florez</u>, 447 F.3d 145, 154–55 (2d

Cir. 2006). "Pieces of evidence must be viewed not in isolation but in conjunction," United States v. Reifler, 446 F.3d 65, 94–95 (2d Cir. 2006), and the court should apply the sufficiency standard "to the totality of the government's case and not to each element, as each fact may gain color from others," Guadagna, 183 F.3d at 130. In addition, "courts must be careful to avoid usurping the role of the jury." United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003); see United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000) (noting that where testimony is in direct conflict, "such a conflict on a Rule 29 motion must be resolved in favor of the verdict"). Courts must "defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence." Reifler, 446 F.3d at 94–95; Florez, 447 F.3d at 154–55 (noting that the "task of choosing among permissible competing inferences is for the jury, not a reviewing court"); see also Guadagna, 183 F.3d at 130 ("[Rule 29] does not provide [a court] with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury.").

Therefore, courts must "draw all reasonable inferences in the government's favor," United States v. Gagliardi, 506 F.3d 140, 149 (2d Cir. 2007)—not "weigh . . . competing inferences and explanations" to determine "which explanation is more likely," United States v. Friedman, 998 F.2d 53, 56 (2d Cir. 1993) (citations omitted)—since it "is the task of the jury, not the court, to choose among competing inferences," United States v. Martinez, 54 F.3d 1040, 1043 (2d Cir. 1995). Likewise, the court must "resolve all issues of credibility" in the government's favor, United States v. Khan, 787 F.2d 28, 34 (2d Cir. 1986), and defer to "the jury's resolution of conflicting testimony," United States v. Glenn, 312 F.3d 58, 64 (2d Cir. 2002) (internal quotation marks and citations omitted); see United States v. Rea, 958 F.2d 1206, 1221–22 (2d Cir. 1992) ("Matters of the choice between competing inferences, the credibility of the witnesses, and the

weight of the evidence are within the province of the jury, and [the court is] not entitled to second-guess the jury's assessments.").  Thus, a witness's direct testimony to a particular fact, so long as it is not incredible on its face, is sufficient to establish that fact and sustain a conviction.  See, e.g., United States v. Desena, 287 F.3d 170, 177 (2d Cir. 2002); United States v. Jespersen, 65 F.3d 993, 998 (2d Cir. 1995); United States v. Parker, 903 F.2d 91, 97 (2d Cir. 1990); United States v. Gonzalez, 110 F.3d 936, 941 (2d Cir. 1997).  The Second Circuit has cautioned courts not to usurp the jury's role because "jurors are entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences."  United States v. Huezo, 546 F.3d 174, 182 (2d Cir. 2008).

"[I]f the court 'concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter.'"  Guadagna, 183 F.3d at 129.  Furthermore, "[d]irect evidence is not required; '[i]n fact, the government is entitled to prove its case solely through circumstantial evidence, provided, of course, that the government still demonstrates each element of the charged offense beyond a reasonable doubt.'"  United States v. Lorenzo, 534 F.3d 153, 159 (2d Cir. 2008).  When making a case based on circumstantial evidence, the government need not "exclude every reasonable hypothesis other than that of guilt."  Holland v. United States, 348 U.S. 121, 139 (1954); see also United States v. Rosenthal, 9 F.3d 1016, 1024 (2d Cir. 1993) (noting that "[t]he government need not eliminate every theory of innocence"); United States v. Puzzo, 928 F.2d 1356, 1361 (2d Cir. 1991).

As the Second Circuit recently explained, this "high degree of deference" given to the jury's verdict "is especially important when reviewing a conviction of conspiracy."  United States v. Landesman, 17 F.4th 298, 320 (2d Cir. 2021).  "This is so because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be

laid bare in court with the precision of a surgeon's scalpel." Id. (quoting United States v. Anderson, 747 F.3d 51, 73 (2d Cir. 2014)). "The 'agreement to participate in the conspiracy may be inferred from the facts and circumstances of the case,' and 'both the existence of the conspiracy and the defendant's participation in it with the requisite criminal intent may be established through circumstantial evidence.'" Id. (quoting United States v. Wexler, 522 F.3d 194, 207–08 (2d Cir. 2008)). "Moreover, 'seemingly innocent acts taken individually may indicate complicity when viewed collectively and with reference to the circumstances in general.'" Id. (quoting United States v. Mariani, 725 F.2d 862, 865–66 (2d Cir. 1984)). Given this high standard, Rule 29 motions "rarely carry the day." United States v. Tillem, 906 F.2d 814, 821 (2d Cir. 1990).

### B.     The Defendants Also Misstate the Rule 33 Standard

The standard under Rule 33 is no more permissive. Rule 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The Second Circuit has held that "[g]enerally, a motion for a new trial 'should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'" Smith v. Carpenter, 316 F.3d 178, 183 (2d Cir. 2003) (quoting Atkins v. New York City, 143 F.3d 100, 102 (2d Cir. 1998)). "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33," United States v. McCourty, 562 F.3d 458, 475 (2d Cir. 2009), and the crucial question for the court is whether "it would be a manifest injustice to let the guilty verdict stand," United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992). A "manifest injustice" occurs where a trial court cannot be satisfied that "competent, satisfactory and sufficient evidence" supports the jury's finding of guilt beyond a reasonable doubt, and where a "real concern" exists "that an innocent person may have been convicted." Sanchez, 969 F.2d at 1414. As the Second Circuit recently clarified, "a district court may not grant a Rule 33 motion based on the weight of the

6

evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand."   United States v. Archer, 977 F.3d 181, 188 (2d Cir. 2020) (quoting Sanchez, 969 F.2d at 1414).   Under this standard, a district court "may not 'reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable.'"   Id. (quoting United States v. Robertson, 110 F.3d 1113, 1118 (5th Cir. 1997)).   A district court must "defer to the jury's resolution of conflicting evidence," absent "a situation in which the evidence was 'patently incredible or defie[d] physical realities.'"   Id. (quoting United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001)).   As with a Rule 29 motion, "a district court faced with a Rule 33 motion must be careful to consider any reliable trial evidence as a whole, rather than on a piecemeal basis."   Id. at 189 (citation omitted).

The defendants selectively quote various holdings to minimize or outright avoid the high, exacting standards for Rule 29 and 33 motions.   See ECF Dkt. No. 487-1 at 11–13.[1]   For example, Schneider cites United States v. Finnerty, 474 F. Supp. 2d 530, 545 (S.D.N.Y. 2007), for the proposition that "the court is entitled to weigh the evidence and in so doing evaluate for itself the credibility of the witnesses" when deciding a Rule 33 motion.   Id.   However, Schneider ignores the very next sentence of the opinion: "At the same time, 'the court may not wholly usurp the jury's role.   It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment."   Id. (quoting United States v. Robinson, 430 F.3d 537, 543 (2d Cir. 2005)).   The defendants also misstate United States v. Napout, 332 F. Supp. 3d 533, 548–49 (E.D.N.Y. 2018), which recognized that while the trial court may "weigh the evidence for itself" it must avoid "wholly usurping" the role of the jury, and

---

[1]   Citations to the defendants' post-trial briefs are to the page number printed on the ECF header.

reiterated that a "manifest injustice" is required to warrant ordering a new trial. The defendants further misapply <u>United States v. Landesman</u>, 17 F.4th 298, 330 (2d Cir. 2021), again implying that post-trial, the court must make an "objective evaluation" of the evidence <u>de novo</u>, while overlooking the fact that the "ultimate test for such a motion is whether letting a guilty verdict stand would be a manifest injustice." <u>Id.</u> (quoting <u>United States v. Alston</u>, 899 F.3d 135, 146 (2d Cir. 2018); <u>United States v. Aguiar</u>, 737 F.3d 251, 264 (2d Cir. 2013)).

The defendants fail to cite a single case—and the government has found none—where application of the Rule 29 or 33 standard resulted in dismissal or a new trial on facts even remotely comparable to this case. For example, in <u>Finnerty</u>, the trial court granted the defendant's motion for judgment of acquittal and motion for a new trial if the judgment of acquittal was later vacated or reversed, where the court found that the government had failed to prove an element of the offense. 474 F. Supp. 2d at 540, 547. The court explained that "evidence of consumer expectations was required at trial," yet the government "did not call any customer-buyer or seller or any other witness to testify as to what customers expected." <u>Id.</u> at 540–41. Similarly, in <u>United States v. Olazabal</u>, 610 F. App'x 34, 37 (2d Cir. 2015), a new trial was granted where the evidence was almost entirely predicated on the questionable and largely irrelevant testimony of a single key witness. This is entirely different from this case where the government called investors, advisors, a cooperating defendant, a witness from Ascendant Capital, LLC ("Ascendant Capital" or "Ascendant"), and multiple former employees of GPB Capital Holdings, LLC ("GPB"), all of whom had personal interactions with the defendants and whose testimony—both standing alone and collectively—satisfied the elements of the charged offenses. Of course, as the government argued in its rebuttal, the strength of the documentary evidence and the inculpatory nature of email

and text message communications involving the defendants was independently sufficient to warrant their convictions. See Tr. 6925:2–13, 6935:16–22.

The reason for the defendants' selective and misleading survey of precedent is obvious: they ask the Court to relitigate nearly the entire case anew. The Court should reject this invitation and deny their motions in their entirety.

II.    The Proof of the Defendants' Guilt Was Overwhelming

Over more than six weeks, the jury heard evidence from victims who spoke personally to the defendants, multiple GPB insiders who described how the defendants tightly controlled everything at GPB and Ascendant Capital and how GPB employees warned the defendants they were lying to investors, and the defendants' co-conspirator, Jeffrey Lash, who detailed how he and the defendants executed a scheme to falsely inflate GPB's financial results. This testimony was corroborated by an extensive documentary record including "dashboard" and performance reports showing that the defendants knew GPB was using investor money to pay distributions, marketing materials illustrating the fraud and the defendants' deception, and contemporaneous emails and text messages cataloging the performance guarantee fraud involving Lash. The evidence was overwhelming, and it took the jury just five hours to return a guilty verdict on all counts.

A.    The Distributions Scheme

At trial, the government called six investors and financial advisors to testify to their communications with the defendants and their employees at Ascendant Capital. These witnesses each testified that they were told that GPB's distributions were being paid with income from portfolio companies; none of them were told that, in fact, GPB was using investor capital to pay distributions. In some cases, GPB had been already using investor capital to cover distributions for years by the time the witnesses invested. Victim-investor Marvin Jones, the first witness at

trial, testified that it was made "crystal clear" to him that the distributions were "coming from operations of the automotive business." Tr. 180:3–4. Each of the other victim-investors and investment professionals testified to the same thing. Jay Frederick, Jones's investment adviser, said: "[I]t's the ongoing operations. It's selling cars and changing oil and doing warranty work and repair work. It's the profit that comes from all of this activities . . . ." Tr. 399:23–400:2; see also Tr. 492:4–6 ("It meant that it was coming from the profits of the car dealerships. **They weren't just sending us back our own money**." (emphasis added)). Financial advisor Joseph Ghabour explained his understanding that the distributions were from "funds from operations from the underlying companies they purchased." Tr. 1628:7–8. So did Matthew Crafa, a financial adviser on Long Island. See Tr. 1658:22–24 ("The income that's being produced from cash flow from the portfolio of companies that were in the particular investments."). Anthony Lagiglia, another Long Island-based advisor, testified that he was told that GPB's portfolio companies "were already cash-flowing and producing income. So we were buying the cash flow of that – of that company." Tr. 3659:15–19. Morey Goldberg, an investor, said the same thing: "my understanding was that they were acquiring businesses that were profitable, they were, at a minimum, supposed to be generating a 15 percent return on acquisition so that there should be plenty of cash flow from operations to make payments." Tr. 5005:7–11. Josh Teeters, a longtime Ascendant Capital salesman testified to the same thing. He testified that he told investors that monthly distributions were sourced from "income generated from the portfolio companies" and that this messaging was consistent from 2015 through 2017 and came directly from Schneider. Tr. 1914:15–20.

The investor witnesses testified to hearing this pitch directly from the defendants at due diligence seminars. Frederick testified about a February 2016 due diligence event at which Gentile "emphasized the operating cash flow" of the portfolio companies, which were "such great

10

investments because they generate steady predictable ongoing cash flow far in excess of the target distribution." Tr. 415–25. Jones attended an October 2016 due diligence event at which the defendants described "everything" as "very positive" and omitted the fact that GPB Automotive Portfolio, LP ("Automotive Portfolio") and GPB Holdings, LP ("Holdings I") had been using investor capital to pay distributions for over a year. Tr. 189:1–3, 371:17–372:5. Lagiglia testified to attending a March 2017 due diligence event in New York with the defendants at which he was told that monthly distributions were sourced from income from the portfolio companies. Tr. 3659:13–23. Lagiglia also attended a September 2017 due diligence meeting at which he was told the same thing. See Tr. 3666:1–3667:4. Crafa testified to attending a March 2017 due diligence event at which Gentile, when asked point-blank whether distributions to date had been sourced from income, assured the audience that distributions had been and would be paid with income from portfolio companies. Tr. 1739:22–1741:7.

The multiple investor witnesses who heard directly from the defendants were corroborated by the witnesses from GPB and Ascendant Capital who likewise testified to personally hearing the defendants tell investors and prospective investors over and over that distributions were sourced from income from portfolio companies. Tr. 1912:1–6 (Teeters) ("Q: You just told us that Mr. Schneider presented at 2016 conferences diligence events and 2017 diligence events. On the topic of monthly distributions, did the messaging from Mr. Schneider change at all with respect to the monthly distributions payments? A: No."); Tr. 1896 (Teeters) (describing "day and-a-half" events at which Schneider and Gentile presented to prospective investors); Tr. 4131:17–22 (Anscher) ("What did you hear Mr. Schneider tell investors during those 14 months about the source of the distributions? A: That the income from operations was a

hundred percent enough to cover the funds' distribution requirements.  Q: And how about Mr. Gentile? A: Said the same thing.").

The marketing materials provided to investors also highlighted the monthly distributions sourced from income as what set GPB apart from other private equity funds.  See GX-7781-C at 8; GX-8256-A at 13 ("GPB's focus on 'income producing' private equity makes the Fund a unique opportunity in the alternative investment landscape, unlike the majority of offerings in this asset class that focus solely on capital appreciation at the time of exit."); GX-7846-B (describing the "private equity stage" of GPB's investments as "Income producing operating companies"); see also GX-7846-B (describing distributions as "100% funds from operations" and "based off cash flow from portfolio companies"); GX-5089-E (explaining the deferred timing of monthly distributions as "in place to provide an adequate window for GPB to align capital inflow with timely deployment . . . ensuring all distributions are covered by operating cash flows").  Investors were also sent a "fund level track record" which included a "Fund to Date Annualized Return" of more than 10% for all three of the GPB funds at issue.  GX-1438; see also Tr. 1741:5–7 (Crafa) (testifying that Gentile was asked about the track record document, in evidence at GX-8063-C, at a 2017 due diligence seminar and "reaffirmed that the history was correct and anticipated moving forward that it would continu[e] to be consistent").

Teeters also testified that Schneider exercised "full control" over the pitch for the GPB funds.  Tr. 1904:8–10.  That testimony was confirmed by Roger Anscher, GPB's Chief Operating Officer ("COO") during most of 2016, who described fighting with Schneider over control of the marketing materials for GPB.  Anscher testified that Schneider was "very specifically focused on each word" in the marketing materials, Tr. 4315, and that Gentile was familiar with them as well because Anscher discussed them with him, Tr. 4312–13.  Anscher

described recommending changes to the marketing materials in early 2016. In response he "got a call from Jeff Schneider on video screaming at me . . . telling me that I should never put something in writing like that again." Tr. 4314. Anscher's request that he "and compliance, approve, have final say with respect to the marketing materials . . . was absolutely rejected." Tr. 4314. Anscher testified that he raised these concerns to Gentile, who told him to follow Schneider's instructions. See Tr. 4315–16 ("Q: Did you discuss your concern to Mr. Gentile? A: Yes. Q: What did he tell you? A: In the beginning, because again, I'd only been there a month, he was trying to suggest that we should work together and get through it and that things would happen over time. That was kind of the discussion at that point. Over time, it became very apparent that Jeff had final say; not me.").

The defendants' representations were false, and they knew it. The defendants were sent dozens of reports showing that the GPB funds were not making sufficient returns to pay distributions exclusively from income from the portfolio companies as they claimed. Beginning in approximately April 2015, Gentile and Schneider were sent report after report showing that the GPB funds had insufficient income to pay distributions. See GX-8327-A (Feb. 2015 management dashboard showing distributions exceeded net investment income for both Holdings I and Automotive Portfolio); GX-7355-B (June 2015 management dashboard showing the same); GX-7681 (Jan. 2016 management dashboard showing Automotive Portfolio was not covering distributions); GX-7682 (2015 year-end management dashboard showing $2.6 million coverage deficit for Holdings I and $3.2 million coverage deficit for Automotive Portfolio); GX-7857-A (June 2016 management dashboard showing current and projected coverage deficits for Holdings I and Automotive Portfolio); GX-8008-A (2017 Q1 performance report showing coverage deficits in all three funds); GX-7582-A (2017 Q2 performance report showing the same); GX-8009-B

(2017 Q3 performance report showing the same); GX-7669-A (Mar. 2018 performance report showing the same); GX-8275-A (May 2018 performance report showing the same).

   Anscher described Gentile's reaction to being sent this information in early 2016. He recalled being in an airport with Gentile and overhearing him berate Bill Jacoby, GPB's Chief Financial Officer ("CFO"), about the numbers: "We were waiting for a flight and there was a call to Bill Jacoby made by Dave because there were concerns about coverage and Dave was pacing in the airport screaming at him for a solid five to ten minutes pacing, and I watched it happen; back and forth, back and forth pacing screaming, saying to find another way." Tr. 4165:25–4166:5. Jacoby testified to his own conversations with the defendants about these numbers. He testified that Gentile told him "to create [his] own reality," which he understood to mean Gentile wanted him to make up better numbers. Tr. 892:8–24. Schneider offered Jacoby a "million dollar bonus" if he could "make the financials look better." Tr. 893. Jacoby testified that he regularly suggested to Gentile and Schneider that they reduce the rate of monthly distributions in response to the funds' performance. Tr. 793. Schneider told him "that we couldn't do it because it would slow down the new deposits coming in, so you had to keep it the same in order to continue to raise money." Tr. 793:23–25; see also Tr. 794:7–13 (same). Macrina Kgil, GPB's CFO from approximately September 2016 to April 1, 2018, testified that she also discussed lowering Holdings I's monthly distributions with the defendants, and the defendants expressed concern about the impact that might have on capital raising and on redemption requests. Tr. 2481:22–2482:19.

   The defendants were also aware that GPB was funding the distributions to investors with investor capital. Beginning in August 2015, GPB finance employees began transferring investor capital from the funds' "investment" accounts to the funds' "distribution" accounts to cover distributions. Jacoby and his employees kept an Excel sheet to track the transfers. See GX-

6171-C; <u>see also</u> GX-3072 (email from Steve Frangioni explaining that the "tracking sheet" "shows any dollars transferred from the Investment account to the Distribution and/or Operating account"). This tracker was shared with Gentile, who approved the transfers. <u>See</u> GX-7011 (requesting approval to transfer $1.69 million to the Holdings I distributions account and $1.1 million to the Automotive Portfolio distribution account to cover October 2015 distributions); GX-7332; GX-7810; GX-7405. Jacoby testified that he did not have the authority to approve these transfers himself. Instead, "Mr. Gentile always authorized or confirmed the transfer for Mr. Frangioni." Tr. 785:12–15; <u>see</u> Tr. 786:9–18 (Q: "Why did you decide — well, why did the accounting team decide to keep a separate spreadsheet of these if they were already in the QuickBooks? A: Well, I discussed it with Mr. Gentile and Mr. Frangioni and we wanted to make sure that we kept a running tab on this. Q: Why? A: Because as I was describing before, if you are digging this hole and we're anticipating these profits that were going to come in to catch us up, we needed to know if that was realistic or not."); Tr. 788:21–25 ("Q: When you shared this information with Mr. Gentile, what was his response? A: He said he was aware of it, but that we had a lot of new deals in the pipeline that were going to come in and make up the shortfall."). Jacoby also told Schneider about the transfers: "Q: How often would you meet with Mr. Schneider about this issue? A: I would see Mr. Schneider maybe once a month. Q: And what do you recall his response being or dural a response to being shown this information? A: He said that it was our job to make sure that we kept track of it and made it work out better because he could not handle having a lower distribution rate so we needed to make sure that we got the money to cover the distributions." Tr. 811:10–18. Kgil testified that when she joined the company, Gentile and Jacoby explained to her that when there was a "shortage of funds, it would be coming from the capital account to be able to distribute." Tr. 2626:8–14. Kgil kept her own version of this tracker

after she replaced Jacoby.  See GX-8249-A.  Kgil explained that she kept the tracker because "if you use the investor capital for distributions, you lose out on the opportunity to make further acquisitions and have better performance at the funds."  Tr. 2963.

Michael Petron, an experienced accountant retained by the government testified to the transfers—all of which were hidden from investors—and presented a summary of the cash flows for the jury.  See GX-6200.  For Holdings I and Automotive Portfolio, transfers from the investment account to the distribution account began in December 2014; they started in GPB Holdings II, LP ("Holdings II") in October 2015.  Both the size and frequency of these transfers increased over time, and they account for a significant portion and in one case a majority of distributions to investors.  Between September 2015 and October 2018, Holdings I paid approximately $57.4 million in distributions.  GX-6200.  Approximately $21.22 million or 36% was funded with money from the Holdings I investment account.  Between August 2015 and December 2018, Automotive Portfolio paid approximately $91.3 million in distributions.  Approximately $50.5 million or 55% was funded with money from the Automotive Portfolio investment account.  And between April 2017 and December 2018, Holdings II paid approximately $73.83 million in distributions.  Approximately $26.78 million or 36% was funded with money from the Holdings II investment account.

Each of the victim-investors and advisors also testified that the actual source of the annual distributions was important to them—in other words, that it was "material" to their investment decision.  They would have wanted to know that GPB was funding a large share of the monthly distributions with investor capital instead of income.  When asked if the source of the distribution was important, Marvin Jones said "very much so."  Tr. 182:18–20.  He elaborated: "you expect a return in addition to the money you put to work.  That's a fundamental principle.

16

So it's very important."  Tr. 183:3–8.  The investors were not paying high fees for a return of capital, which would reduce the overall pool of money available for GPB to invest in income-producing businesses: "I don't want to invest in a car dealership group and then send me back my own money instead of sending me back the operating cash flows from the underlying car dealerships.  Tr. 418:13–19 (Frederick); see also Tr. 419:1–2 (Frederick) ("That's the entire purpose of investing in the fund"); Tr. 1503:22–1504:5 (Ghabour) ("Was it important to that the eight percent targeted distribution payment come from income . . . Yes.  It was.  And because if they were using other investor capital that was being raised to pay the distributions, there was less money available to be going out to purchase the targeted companies and dealerships within the portfolio."); Tr. 3663:10–12 (Lagiglia) ("[W]e want to put our capital to work to earn yield and income.  Getting my capital back was not one of the desired outcomes."); Tr. 1682:18–20 (Crafa) ("The distributions, the whole reason why the income that was being produced for my clients was really what attracted me to the actual investment for my clients.").

Other advisors also explained that their clients were especially focused on income or dividends and invested in GPB for that reason.  See Tr. 2661:15–17 (Lagiglia) ("The yield is important.  So we're putting capital to work, we want to receive income on our investment.  And you know, having income produced was important to my clients."); Tr. 1682:18–20 (Crafa) ("The distributions, the whole reason why the income that was being produced for me clients was really what attracted me to the actual investment for my clients."); see also Tr. 5016:6–9 (Goldberg) ("[I]f I knew that the underlying portfolio companies were not capable of producing that eight percent, it would cause me pause to make this investment").  At the time, interest rates and yields were relatively low, making GPB's promised 8% annual distribution especially attractive to these investors.  Tr. 1657:18–22 (Crafa) ("It was very important.  At the time, interest rates were very

low. Traditional vehicles we could have used to get yield, so to speak, like bonds, were yielding very low at that time with interest rates where they were.  So it was important to me to have a yield.").

The witnesses who worked at GPB and Ascendant Capital said the same thing. Anscher testified that the source of distributions was "definitely" an important part of the pitch." Tr. 4131:23–25.  In fact, it was "the whole premise by which we were raising money was to enter into selling agreements with brokers, and those brokers heard consistently that the income from operations was paying the dividend, and that there would never be a return of capital — or that there never was return of capital at that point."  Tr. 4132:2–7.  Teeters testified that the "main focus [of GPB] was income producing private equity . . . the differentiator was the income component."  Tr. 1898:10–13; see also Tr. 1898:24 (describing monthly distributions as the "focal point" of the GPB pitch).  Kgil also testified to the importance of the source of distributions.  She explained that she tracked the investor capital used for distributions (instead of actual investments) because "if you use the investor capital for distributions, you lose out on the opportunity to make further acquisitions and have better performance at the funds."  Tr. 2963:2–5.  The defendants were also well aware of the importance of the source of distributions to investors.  Gentile told Anscher that "it was critical for the funds to be one hundred percent covering distributions from operations in order to continue to raise money and to sign selling agreements with other brokers and grow the funds."  Tr. 4166:10–13.

Anscher and Jacoby both testified to warning the defendants that their representations to investors were false in light of the funds' poor performance and needed to be changed.  Anscher testified that "I had concerns around coverage.  I had concerns around distributions.  I had concerns around how were representing that information because I wasn't

18

comfortable with it.  Q: Did you recommend additional changes?  A: Yes.  Q: To the defendants? A: Yes."  Tr. 4332.  Anscher also corroborated Jacoby's testimony.  He described how he and Jacoby both told the defendants that the marketing materials and due diligence presentations were false.  Tr. 3956:6–18 ("Q: What generally did you tell them about coverage?  A: That we — we were short again in the Holdings I and Auto and Holdings II was close and that it was of grave concern particularly because of the marketing materials and the discussions we were having with investors. Q: Were you the only one who told them that?  A: No.  Q: Were you in meetings with Bill Jacoby and the defendants?  A: Yes.  Q: Related to this topic?  A: Yes.  Q: What did Mr. Jacoby tell the defendants?    A: The same thing."); see also Tr. 4312–13 ("Q: Mr. Anscher, I believe you said you discussed the marketing materials with Mr. Gentile, correct?  A: Yes.  Q: You reviewed the PowerPoint presentations?  A: Yes.  Q: In those conversations, did you discuss the details of the PowerPoint presentations?  A: Yes. . . Q:  Mr. Anscher, did you raise concerns about the marketing materials?  A: Yes.").  Anscher was so concerned that he even sent the defendants a link to a Wall Street Journal article reporting that the principals of another fund had been charged in a very similar fraud.  See GX-8326, GX-6201.  Anscher testified that he sent the defendants this article "because I was concerned we were going down the same path . . . after all the many conversations we'd had about lack of coverage, about not having sufficient capital to make the distributions, and therefore, it being a return of capital, we were in a position where we were doing the same thing as these guys were doing and did."  Tr. 4308.  Anscher and Jacoby were both fired by the defendants.  Tr. 940–41, 4470, 4956.  And Kgil resigned almost immediately after the SEC began an examination of the GPB funds in 2018.  Tr. 2496:10–17.

        Instead of being truthful, the defendants covered up the GPB funds' poor performance.  Ascendant Capital staff were instructed to tell representatives of Madison Securities,

a broker-dealer, that the distributions in Automotive Portfolio in 2015 were fully covered, and that any delay in deploying capital was "intentional and part of an overall, long-term strategic plan." GX-8146.  Teeters testified that Schneider portrayed the coverage shortfall as a "short-term" problem and a "strategic choice" when, in fact, Automotive Portfolio had been using investor capital to pay distributions for more than a year.  Investors were also assured that "distributions would either continue fully covered or be reduced if not fully covered."  Tr. 574:7–10 (Frederick); see also Tr. 574:18–21 ("[Y]ou could have a blip in coverage for a month or two for earnings for the distributions, you would have also, quite likely, something akin to retained earnings to cover the distributions.").  The marketing materials—which Schneider controlled and were also sent to Gentile—were changed in misleading ways to remove the most egregious misrepresentations while still misleading prospective investors into thinking their distributions were funded with income from portfolio companies.  For instance, the words "100% funds from operations" were removed from the Automotive Portfolio PowerPoint presentation in one place, but the PowerPoint continued to tout historical returns as if they were funded with income from operations and continued to describe the distributions as funded from operations.  Compare GX-7838-B (Feb. 2016 Automotive Portfolio PowerPoint), with GX-8170-A (July 2016 Automotive Portfolio PowerPoint).  Nobody told the Ascendant Capital representatives to explain these changes to financial advisors.  Tr. 1942:2–4 (Teeters) ("Q:  Did anyone ever ask you to highlight this change for financial advisors?  A: No.").  In the Holdings II PowerPoint, distributions went from being described as "based off cash flow from portfolio companies" to "primarily based off cash flow from portfolio companies."  Compare GX-7838-E (Feb. 2016 Holdings II PowerPoint), with GX-8147-C (Aug. 2017 Holdings II PowerPoint).

The defendants also made misleading changes to the GPB private placement memoranda or "PPMs." In spring 2016, the Automotive Portfolio PPM was updated to represent that "while we have no present plans to do so, we could include LPs' invested capital in amounts we distribute to LPs, which may reduce the amount of capital available to acquire and operate Dealerships and make other permitted acquisitions." GX-4110-I. This was false. At the time, GPB had been using investor capital to pay Automotive Portfolio distributions for approximately a year. Jacoby explained that he discussed the change with both Schneider and Gentile. See Tr. 953. He explained that the change was designed to obfuscate and mislead investors: "Mr. Gentile and Mr. Schneider felt that making it more clear that we were paying investor money back to them would be alarming." Tr. 953:12–17. Anscher testified to having similar conversations with Schneider: "I think the point was we took it, we got it pasted based on the absolute direction that that language had to be in there. Q: And who gave you that direction? A: Jeff Schneider." Tr. 4939:12–19; see also Tr. 4369 ("Q: Did Mr. Schneider tell you why he wanted that language in the PPM? A: He thought it would be better to write it than to leave it out because it left some wiggle room."). Anscher told Schneider the "no present plans" language was inaccurate: "Q: Did you express concern to him about this language? A: Yes. Q: Why? A: Because we had obviously been returning capital as was indicated in the financials, so I didn't think it was accurate." Tr. 4368. Their testimony was corroborated by dozens of calendar invites showing the defendants were involved in reviewing the PPMs. See GX-8362, GX-8361, GX-8365, GX-8364, GX-7446, GX-8366, GX-8274, GX-8333, GX-8339, GX-8338, GX-8359, GX-8363, GX-8350, GX-8273. Lash corroborated Anscher and Jacoby as well. He testified to overhearing a conversation about the same changes. He testified that he overheard Schneider and Anscher talking about the change: "the gist of the conversation was how to get something into – I believe it was the PPM without

causing too much of a stir; that the investor was getting part of their capital basically back as part of their dollars that they were receiving."  Tr. 3077:21–25; see also Tr. 3077:3–5 ("Q:  What did you understand that to mean?  A:  That it was something that they didn't want the investors to see that it had already started transpiring.").  Later that year, in December 2016, the same misleading language was incorporated into the Holdings I PPM, even though Holdings I already had been using investor capital to fund distributions for nearly two years.  See GX-4099; Tr. 2478:11–14 (Kgil) ("Q: In December 2016 was GPB using investor capital to pay a portion of the monthly distributions to Holdings I's investors?  A: Yes, it was.").

Yet the defendants repeatedly authorized so-called "special distributions" during this same period, ostensibly because the portfolio companies were generating profits above and beyond their expected targets.  These special distributions were described to investors as follows: "[a]s excess cash flow from operations is generated, GPB will pay additional distributions (known as "special distributions" to investors in the Funds."  GX-8256 (2017 due diligence questionnaire listing numerous special distributions for Holdings I, Holdings II, and Automotive Portfolio during the charged period).  The defendants did this despite Anscher and Jacoby warning the defendants they could not afford to pay them in 2016.  Tr. 4284–85.  The use of special distributions was particularly egregious in April 2015, when a 1.5% special distribution was paid to Holdings I investors at the same time the defendants were creating a phony performance guarantee, and when Holdings I was showing a $1.377 million shortfall.  See GX-7682; GX-7008-A (Lash text message in April 2015 relaying that Jacoby informed the defendants that paying a special distribution would be "basically suicide").  Similarly, in December 2015, a .5% special distribution was paid to Automotive Portfolio investors that was funded almost entirely from other investors' capital. Compare GX-7682 (reflecting $1.195 million shortfall in Automotive Portfolio in December

2015); GX 6171-C (denoting $1 million transfer from the investment to distribution account "[t]o cover December 2015, Investor's [sic] Distribut").  Of course, the fact that the defendants continued to market—and pay—special distributions, falsely advertising them as being the result of excess profits, was highly deceptive and helped effectuate the fraud.

### B.    The Performance Guarantee Scheme

The defendants also executed three phony performance guarantees to artificially inflate Holdings I's financial statements for 2014 and Automotive Portfolio's results for 2015.  The evidence of the performance guarantee scheme was overwhelming and independently sufficient to convict the defendants on every count in the indictment.  The jury was presented with detailed testimony from the defendants' co-conspirator, Lash, who testified to committing the fraud with the defendants, text messages giving a blow-by-blow of the creation of the 2014 guarantees, and emails detailing the creation of the 2015 guarantee.  Lash admitted that he committed wire fraud, and he told the jury that he had done so with the defendants.  He testified that "I, with the defendants, made a basically document which was a performance guaranty.  We created it.  We backdated it, predicated it on a conversation that never happened and we gave that to the accounting firm to give to the investor to show performance that the stores had not met."  Tr. 3077:24–3078:3.

#### 1.    The Sham 2014 Performance Guarantees

In 2013 and 2014, Lash sold three dealerships—in White Plains, New York and Oneonta, New York— to Holdings I (the "DJD Dealerships").  The DJD Dealerships did not meet expectations in 2014 and by the end of the year Holdings I did not have sufficient income to cover distributions.  Tr. 3100–01.  Lash explained that Holdings I's poor performance was an existential threat to the fund.  The defendants told him that "performance at the beginning is most critical

. . . bad performance could basically put us out of business or stop capital raising all together." Tr. 3102:11–14.

To cover up the fund's poor performance and continue to raise money, Gentile, Schneider, Lash, and the fund's attorney, James Prestiano, created two backdated "performance guarantees," which provided that Lash would cover the shortfall in profits at the dealership holding companies. Tr. 3105:13–21; GX-6038, GX-6039 (together with GX-6038, the "2014 Performance Guarantees"). The 2014 Performance Guarantees were dated to February 20, 2014 to create the appearance that Lash had been guaranteeing the performance of the DJD Dealerships since they were sold to the fund, when in fact he had never agreed to guarantee the performance of the dealerships. Lash testified that, in March 2015, he was presented with the 2014 Performance Guarantees at a meeting in New York with the defendants and Prestiano and instructed by the defendants to sign them. Tr. 3106. Gentile told him "we're going to produce a performance guaranty for the two stores, and you're going to sign it. We're going to back-date it to the beginning of 2014 so it gives the appearance that we had a discussion there about these two basic documents . . . that we guaranteed them basically over a year ago." Tr. 3105:13–21. Lash was also assured that he would not need to pay the sham guarantees; in Gentile's words, "You're not going to get hurt." Tr. 3113:25–3114:1; see Tr. 3114:9–19 ("Dave said he would, numerous times, kind of take care of the accounting and I wouldn't get hurt financially by it at all. . . He always said that, you know, whether doing my taxes that he could basically make anything look the way you want to make it look, so that financially I wouldn't be on the hook for it.").

Lash's testimony was corroborated by text messages, emails, and transaction documents confirming that the 2014 Performance Guarantees were created after the fact to cover up the shortfall in Holdings I. The guarantees are not mentioned anywhere in the numerous

transaction documents related to the sales.  See GX-6031, GX-6132-D, GX-6032, GX-6034; see also Tr. 3094 (Lash confirms there was no unwritten agreement guaranteeing performance).  On the morning of March 17, 2015, Lash texted Gentile that "Jimmy [Prestiano] is sending me a copy of the document this morning I will sign it and send it over to Will."  GX-8120-A.  Ten minutes later, Lash texted Gentile and Schneider: "I have a call with Will [Fernandez] this morning and Brian Marshall to go over getting White Plains wrapped up with the guarantees . . . Once I receive I will send it to all of you."  GX-7009-B.  An hour-and-a-half later, Lash provided another update to Gentile: "Just spoke with well [Will] we are good Jimmy will finish the document in the next two hours he'll adjust he audits and send a copy over to Kyle later today or tomorrow at the latest so he can do the K 1st[sic]."  GX-8120-C.  Gentile's texts to Schneider and Lash also confirmed that the guarantees had been created after the fact to solve for the shortfall in Holdings I.  On March 18, 2015, the next day, Gentile wrote: "Schneider/Lash please get on a call now with Kyle from Schneider's phone.  Kyle feels based on his convo with Schneider that the guarantee that keeps neutral income and no losses on the tax returns and therefore no negative effect to the capital accounts is 1.1mm.  In the other hand: 800k is needed to cover the 500k in distributions made but has a negative impact on the capital accounts if we use the 800k guarantee. The fund either has to demand the 800k or 1.1mm.  I told Kyle it was prudent to follow Schneider's instructions."  GX-7008-A.

Later that day, March 18, 2015, Lash received two deficiency notices pursuant to the sham 2014 Performance Guarantees demanding he pay approximately $1.13 million within thirty days.  See GX-7962, GX-7962-A, GX-7962-B.  After receiving the deficiency notices, Lash called Gentile who assured him he would not have to actually pay the sham guarantees.  Tr. 3131:12–3132:5.  Two days later, on March 20, 2015, Lash confirmed his agreement to the

auditors for the DJD Dealerships, Scott Derco and Will Fernandez.  Lash testified that he lied to the auditors because "that was the agreement that I had with David [Gentile], to email back Scott that we were in agreement."  Tr. 3134:5–24.  Lash made no payments on the 2014 Performance Guarantees in 2015 and made only partial payments, at Gentile's direction, over the next three years.  See Tr. 3136, 3202–05.

Work papers prepared by Holdings I's auditors confirmed that the 2014 Performance Guarantees were used to inflate the fund's 2014 results.  See GX-8028-J.  The fund booked approximately $538,390 in income from the DJD Dealerships in 2014.  Without the sham guarantees, the DJD Dealerships would have had a "net loss allocated to GPB" of $536,201.  See id.  The $1.13 million demanded in the deficiency notices wiped out the loss attributable to the fund and supported the $538,390 in income recorded by the fund.  See GX-2008 at 5 (recording "Distributions from investments" of $538,390).  To explain the calculation, the auditors wrote: "this workpaper calculates the income of the dealership, including the amount required to be put into the dealership by Jeff Lash under the performance guarantee.  **The income/net cash flow of the dealership then dictates approx.[] how much the fund can pull out as distributions**."  Id. (emphasis added).  The work papers are consistent with Gentile's text message from March 18, 2015.  See GX-7008-A **("In the other hand: 800k is needed to cover the 500k in distributions made . . . .**" (emphasis added)).  The auditors also believed that Lash had actually paid the deficiency notices.  Id. ("Paid by Lash in 2015 per audited financials).  That (false) understanding was reflected in Note 5 to the 2014 Holdings I financial statements, which explains that "[i]n some cases the Partnership [Holdings I] has agreements in place with the Operating Partner [Lash] and Patrick Dibre to guarantee a certain amount of income at the dealership level for a specified amount

of time.  **For the year ended December 31, 2014 approximately $1,100,000 was paid by them into the dealerships**."[2]  GX-2008 at 13.

### 2.    *The Sham 2015 Performance Guarantee*

The next year, the defendants executed another sham guarantee to artificially inflate Automotive Portfolio's results for 2015.  Automotive Portfolio did not earn enough in income to support the monthly distributions to investors in 2015.  See GX-7682 at 3.  To make up the shortfall, in 2016, Gentile, Schneider, Lash, and Prestiano created another sham performance guarantee (the "2015 Performance Guarantee").  The 2015 Performance Guarantee purported to require Lash to cover a $1.05 million in shortfall in net cash flow from operations, i.e., income, at the Country Motors II dealership owned by the fund.  GX-7531-A.  Like the 2014 Performance Guarantees, the 2015 Performance Guarantee was backdated to January 1, 2015 to create the appearance that the agreement had been in place throughout 2015.  Gentile then routed a series of transfers from GPB accounts he controlled, including at another fund, GPB Cold Storage, LP ("Cold Storage"), through Lash's account, and to Automotive Portfolio's accounts to create the appearance that Lash had actually paid the 2015 Performance Guarantee.  See GX-6200.  GPB's auditors counted the $1.05 million purportedly paid by Lash as income from investments for 2015, falsely increasing the fund's Net Investment Income by approximately 50%.  See GX-2125 at -007 (reflecting $3.39 million in Net Investment Income for 2015); id. at -015 ("In some cases the Partnership has agreements in place with the operating partners to guarantee a certain amount of

---

[2]    Note 5 also separately describes payments by Dibre to the fund itself, which were reflected in interest income from investments: "Distributions and interest received by the Partnership resulting from these guarantees are included in interest income from investments on the consolidated statement of operations."  GX-2008 at 13.  As the government explained at trial, Note 5 refers to both Dibre's payments to the fund itself ("Interest income from investments") and Lash's purported payments to the DJD Dealerships ("Distributions from investments").  The note's reference to $1,100,000 in payments to the dealerships refers to the amount Lash purportedly agreed to pay to the DJD Dealerships in the deficiency notices.

income at the dealership level for a specified amount of time.  For the year ended December 31, 2015, $1,050,000 was earned by the Partnership and is included in income receivable from investments on the balance sheet.").

Lash testified that he had never agreed to guarantee the performance of the Country Motors II dealership.  Tr. 3181.  The transaction documents for the sale of the Country Motors II dealership likewise include no guarantee.  See GX-6195, GX-6191, GX-6190, GX-6192, GX-6193, GX-6189, GX-6196, GX-6194.  Lash's testimony was also corroborated by a December 2015 operating agreement between Lash, Patrick Dibre, the other operating partner, and GPB, which likewise does not mention any guarantee related to the Country Motors II dealership.  See GX-6129.  Instead, Lash testified that he first heard about the 2015 Performance Guarantee at a meeting with the defendants and Prestiano in New York in approximately April 2016.  Tr. 3184.  Lash testified that he told Gentile he had not guaranteed Country Motors II's performance and that Gentile had said "we're in crunch time and, you know, I know you really didn't guarantee it, but, you know, this is something we have to do, if not it's going to affect performance . . . you know, capital is coming in and this would have a big impact on GPB if we didn't do this."  Tr. 3184:10–18.  Gentile also assured Lash he would not have to pay the 2015 Performance Guarantee.  Referencing the 2014 Performance Guarantees, which Lash had not paid at that point, Gentile said: "the first one you didn't get hurt on and you're still not going to get hurt.  You have to trust me.  You have to be the team.  You have to be on team GPB."  Tr. 3185:4–8.  Later, Gentile told Lash that he "put money in [his account] and then kind of taken it out the next day and taken part of funds that were in there to make the payment . . . to make it appear that the guarantee was being paid."  Tr. 3197:16–21.

28

Lash's testimony was corroborated by Jacoby and by contemporaneous documents showing that the 2015 Performance Guarantee was created in April 2016. Jacoby testified that the defendants had planned initially to use a management fee rebate to partially cover the shortfall in Automotive Portfolio, which would have been unnecessary if Lash had already agreed to cover the shortfall. Tr. 895–96. The planned management fee rebate was also reflected in emails from March and April 2016. See GX-7852 ("In addition, there will be a capital contribution coming in from Dave Gentile to GPB Capital Holdings for $1,050,000, which will be used to refund that portion of management fee / fund expenses. . . Per my calculations, the attached should get us to . . . 70.4% coverage in GPB Auto Portfolio."); GX-7476 (GPB's auditors request the "business reason" for the management fee rebate); GX-7496 (GPB's auditors request confirmation that the management fee rebate had been properly recorded in the fund's books as of December 31, 2015). Jacoby testified that in late April, Gentile informed him that "he had decided not to refund the management fees but instead he had changed his mind and that Mr. Lash was going to pay a performance guaranty on . . . the [Country Motors II] dealership" in an identical amount. Tr. 905:6–14. Records of the 2015 Performance Guarantee itself also corroborated Lash and Jacoby. The metadata for the document shows it was created by Prestiano on April 28, 2016. See GX-7513-C. Emails from May 1 and May 2. 2016, also show Jacoby waiting on Lash to arrive at GPB's office to sign the 2015 Performance Guarantee so it could be provided to the auditors. GX-7526, GX-7528, GX-7530.

### 3. *The Cover-Up*

Lash also testified to engaging in an effort to cover up the performance guarantee scheme and lie to the government with the defendants. The cover-up was powerful corroborating evidence of the defendants' fraudulent intent and consciousness of guilt. Lash testified that he met with Schneider and Gentile immediately after being approached by the FBI in 2019. Tr. 3218.

Lash told the jury that Gentile wanted to make sure he was "on team GPB" and would "[s]tick to the story." Tr. 3219:10–15. Lash agreed with Gentile and Schneider that, if asked, he would tell law enforcement that the transfer through his account related to the 2015 Performance Guarantee was actually a loan from Gentile. Tr. 3219:22–3220:2. Lash told the jury that he agreed with the defendants to lie. Tr. 3220:9–12 ("Q: Mr. Lash, was that true? A: No. Q: Did you agree to lie? A: Yes."). Lash testified that Prestiano accompanied him to an interview with the fund's attorneys to ensure he stuck with the story. Tr. 3221. He also testified that Gentile and Prestiano threatened him: "Q: Did the defendant or Mr. Prestiano tell you what might happen if you didn't stick to the story? A: In discussions it would be, we could take your basic severance package away and make it very difficult for you going forward." Tr. 3222:17–21.

### III.    All of the Defendants' Sufficiency Arguments Were Rejected by the Jury

The evidence set out above decisively proved the defendants' guilt. Nonetheless, the defendants contend that the government failed to prove most every aspect of the fraud, including that (i) the government failed to prove the defendants' statements to investors about the source of the monthly distributions were false and material; (ii) there was insufficient evidence of the fraudulent performance guarantees to support the defendants' convictions; and (iii) there was insufficient proof of the defendants' fraudulent intent. Each of the arguments presented in the defendants' motions were presented to the jury and rejected. And the record evidence eviscerates all of them. Under either Rule 29 or Rule 33, the jury's verdict should stand.

A.    The Defendants Misled Investors About the Source of Distributions

1.    *The Government Presented Overwhelming Evidence That the Defendants' Statements to Investors About the Source of Monthly Distributions Were False and Misleading*

The government's evidence of the defendants' false and misleading statements to investors was more than sufficient to support the jury's verdict, and the defendants' arguments to the contrary defy common sense and the trial record.

Six victim-investors and financial advisors testified at trial to their direct interactions with the defendants and the defendants' lies about the source of the monthly distributions and the performance of the funds. Some of that evidence is described below.

- In February 2016, the defendants each presented at a due diligence event in Austin. GX-8189-A (Agenda). Frederick attended the event and testified that Gentile "emphasized the operating cash flow and how these businesses were — made such great investments because they generate steady predictable ongoing cash flow far in excess of the target distribution."[3] Tr. 415:6–25. That was a lie. In 2015, Holdings I and Automotive Portfolio had paid out more in distributions than they had made in profits. And the defendants knew it. Automotive Portfolio was short over $1.5 million and had been paying its investor distributions with other investors' money every month for the last six months. GX-7681-A.

- In October 2016, Gentile and Schneider presented at another due diligence event, GX-8185-C (Agenda), attended by Jones and Frederick, Tr. 185:4–189:3 (Jones), 494:9–495:13 (Frederick). Gentile presented on Automotive Portfolio: "Business was healthy, pursuing more acquisitions, wanting to continue to grow. Everything was very positive." Tr. 188:22–189:3 (Jones). Neither defendant said the funds had been returning investor capital or other investors' capital as part of the monthly distributions to investors. Tr. 371:17–372:5 (Jones). No one said the distributions would involve

---

[3]    Gentile argues that Frederick "conceded on cross examination that there was in fact no update about the Automotive Portfolio [fund]—only the Holdings II fund." ECF Dkt. No. 488-1 at 18. This misstates Frederick's testimony. Frederick testified on cross-examination that the Automotive Portfolio was discussed at the due diligence event. Tr. 550–52. He was then asked whether he recalled that Gentile's discussion of car dealerships was in connection with Holdings II, and he testified he was not sure. Tr. 553:2–8 ("Q: You testified on direct examination, nonetheless, that Mr. Gentile spoke specifically during his presentation about the Auto Fund, right? A: About investigating in car dealerships, yes. Q: You're sure though, sir, that was not in connection with Holdings II? A: No, I'm not going to say I'm sure.").

the investors getting their own money back or other people's money back. Tr. 189:1–3 (Jones), 494:20–495:13 (Frederick). In reality, Automotive Portfolio and Holdings I had been using investor capital to pay distributions for well over a year. GX-7405, GX-7409.

- On March 1, 2017, Gentile presented at a due diligence event in New York City. GX-8208-A (Agenda). Lagiglia attended the event and testified that Gentile was there and presented. Tr. 3655:14–3656:3. At the event, Lagiglia learned that monthly distributions came from income from the portfolio companies. Tr. 3659:13–23. At the event, no one said the distributions could include investors getting their own money back or other people's money back. Tr. 3662:20–22. These were lies. Less than a week before this event, Gentile received the year-end 2016 results for Automotive Portfolio and Holdings I, which showed extremely low coverage ratios—far below 100%. For Automotive Portfolio, "inception to date coverage was 48% and 2016 full year coverage was 35%." GX-7915, 7915-A. For Holdings I, "inception to date coverage was 64%, 2016 FY coverage was 30%." GX-8117, 8117-A. Earlier in February, Gentile had received the year-end 2016 results for Holdings II. GX-7910, 7910-A. Holdings II had only been 90% covered for 2016. The coverage ratios confirmed what Gentile already knew: that GPB had been transferring money from the investment accounts to distribution accounts to cover monthly distributions for years. See GX-7011, GX-6171-C.

- Later that same month, in March 2017, Gentile and Schneider both spoke at a due diligence event in Austin. GX-8070-A (Agenda). Crafa testified that he attended the event and that while it was focused on Holdings II, Gentile also discussed other GPB funds. The government introduced Crafa's notes from the event, which reflect that Automotive Portfolio was discussed. GX-8270. Gentile answered questions about Automotive Portfolio's track record and conveyed that the fund had been covering distributions with income. Tr. 1740–41. That was a lie. Gentile had already been informed that inception-to-date coverage for Automotive Portfolio was 48% and 2016 full-year coverage was 35%. GX-7915, 7915-A. And again, he knew GPB had been transferring money from the investment accounts to the distribution accounts to cover the shortfall for years.

- In September 2017, Gentile presented at a due diligence event in New York City. GX-8257-A (Agenda). Lagiglia testified that he was told at this event that monthly distributions were covered by income from the portfolio companies. Tr. 3666–67. Gentile knew that was a lie. Gentile and Schneider were sent the numbers on August 4, 2017, GX-7582, 7582-A, which showed that each fund had an inception-to-date coverage deficit. Holdings I was $18.3 million short, Holdings II was $6.4 million short, and Automotive Portfolio was short $26.8 million. The fund had been making up these shortfalls by transferring money from the investment accounts to the distribution accounts.

   In addition, the government introduced evidence of a lie in writing that came directly from Schneider. On September 22, 2016, Schneider sent an email (from his personal email

account) to a representative at broker-dealer Hightower Advisors, in which he wrote, in relevant part: "**GPB has been able to provide meaningful income (8.7% fully covered distributions)** with minimal to no leverage in addition to the upside potential in fragmented and recession resilient sectors of the private market." GX-7879 (emphasis added). That was a lie. In June 2016, Anscher sent Gentile and Schneider the financials for the funds. GX-8105. Holdings I had a shortfall for 2015 year-to-date and at the end of Q1 2018, was short almost $2 million for the year. Automotive Portfolio was short over $1.3 million for 2015 and another half a million for year-to-date 2016.

The evidence also established that the defendants were personally responsible for adding false information to the Holdings I and Automotive Portfolio PPMs.

- Jacoby testified that he discussed with the defendants and Anscher adding language to the PPM to say GPB may include investor money in the distributions. Tr. 952–54. The defendants "refused to accept that language and they made us change it to, we have no present plans to do so but we could do it if we wanted to." Tr. 953:1–5. Jacoby further testified that Gentile and Schneider felt that making it clear that GPB was using investor capital to cover distributions would be "alarming" to investors. Tr. 953. Schneider told Jacoby he wanted the "no present plans" language in because he felt it could be used as an excuse down the road. Tr. 954.

- Anscher testified that he discussed the "no present plans" language with both Gentile and Schneider. Tr. 4361. Anscher testified that it was Schneider who directed him to copy and paste the "no present plans" language from the Holdings II PPM into the Automotive Portfolio PPM. Tr. 4939:12–19. Anscher testified that Schneider was "adamant" that GPB include the "no present plans to do so" language in the amended PPM. Tr. 4367. Schneider wanted the "no present plans" language in the offering document because it "left some wiggle room." Tr. 4369. Anscher raised concerns to Schneider about the accuracy of the language because GPB had been using investor capital to pay the distributions. Tr. 4368.

- Lash testified that sometime in 2016, he overheard a conversation between Gentile, Schneider, Anscher, and Prestiano about how to get something into the PPM. Tr. 3075–77. He overheard them say they wanted to get something in "without causing too much of a stir that the investor was getting part of their capital basically back as part of their dollars that they were receiving." Tr. 3075.

- The government introduced over one dozen calendar invitations showing the defendants invited, or were invited by others, to meetings to discuss the PPMs. *See,*

e.g., GX-8362, GX-8361, GX-8365, GX-8364, GX-7446, GX-8366, GX-8274, GX-8333, GX-8339, GX-8338, GX-8359, GX-8363, GX-8350, GX-8273.

The government also introduced evidence of the defendants' heavy-handed control over all aspects of GPB's and Ascendant Capital's operations, including representations to investors and potential investors. This evidence included the following:

- Testimony that both CFOs of GPB reported directly to Gentile. Tr. 691:23–24 (Jacoby), 2155:1–3 (Kgil).

- Teeters's testimony that Schneider controlled everything at Ascendant, including the marketing materials, the pitch, and communications with financial advisors. Tr. 1971:18–22.

- Anscher's testimony that Schneider told him that he—Schneider—was in charge of the GPB marketing materials, not the Chief Operating Officer or the compliance employees. Tr. 4313:25–4314:24.

- Documentary evidence that Gentile and Schneider received weekly dashboards with financial results from Jacoby and at least quarterly results from Kgil. See, e.g., GX-8327-A, GX-7355-B, GX-7411, GX-7681, GX-7682, GX-7857, GX-8012-A, GX-8013-A, GX-8013-B, GX-8014-I, GX-8014-J, GX-7910-A, GX-8117-A, GX-7915-A, GX-7568-A, GX-7568-B, GX-7568-C, GX-8008-A, GX-7582-A, GX-8009-B, DX-FFFFM-1, GX-7669-A, GX-8275-A.

- Documentary evidence that Gentile received copies of the marketing materials. See, e.g., GX-8099, GX-8184.

The defendants argue that the government failed to prove that the defendants' statements about coverage were false and misleading. ECF Dkt. No. 487-1 at 15–27; ECF Dkt. No. 488-1 at 18–20. Their arguments, which are addressed in turn below, are both legally and factually erroneous and should be rejected.

To begin with, the defendants' argument proceeds from the legally-flawed premise that the government was required to prove that the defendants' false statements were "false under every reasonable interpretation," and failed to do so. ECF Dkt. No. 487-1 at 15–19 (citing United States v. Connolly, 24 F.4th 821 (2d Cir. 2022)). For the reasons explained supra in Section VI.A., this is an incorrect reading of Connolly. The defendants raised this issue in connection with jury

34

instructions, and the Court rejected their arguments.  See Tr. 6330–34.  The Court properly ruled that the defendants' requested instruction was improper.  There is no basis to revisit that ruling.

Even setting Connolly aside, the defendants' suggestion that their representations were somehow literally correct because "total investment income" exceeded distributions is a red herring and was rejected by the jury.  See, e.g., Tr. 6750 ("You can see that under the total investment income.  Fully covered was simply true.  So if you are measuring the question of whether the statement, income from the portfolio companies is greater than distributions, the answer is, according to many witnesses that defined the answer, is yes.  Yes.  No false statement.").  The defendants promised investors that they would pay monthly distributions with profits from the portfolio companies, and they used investor contributions instead.  The falsity of the defendants' statements about the source of the monthly distributions does not depend on the coverage metric employed.  The government introduced overwhelming unrefuted evidence that GPB used investor contributions to pay its monthly distributions to investors.  This evidence included:

- Testimony from Jacoby that when the GPB funds did not have enough money to make the distribution payments, the accounting team at GPB would, at the direction of and with the approval of Gentile, transfer money from the investment account to the distribution account.  Tr. 766.

- Testimony from Kgil that Gentile explained this to her when she joined the company— that when there was a shortage of funds, they would use money from the investment account to be able to make distributions.  Tr. 2626.

- Tracking spreadsheets, which were updated by GPB's accounting team and sent to Gentile, which tracked the money moved between the investment, operating and distribution accounts.  See, e.g., GX-6171, GX-7405, GX-7405-A, GX-7405-B, GX-7011.

- Testimony from Jacoby that Steve Frangioni (who worked in the accounting department) sent him the tracking spreadsheets for Holdings I and Automotive

Portfolio prior to a meeting with Schneider and another Ascendant employee.  Tr. 806; see also GX-7405, GX-7405-A, GX-7405-B.

- An email dated November 24, 2016 from Kgil to Frangioni and Jacoby asking: "If AP is only at 38% coverage, how do we pay for the distribution?  Which account is the cash coming from?"  Jacoby responded: "Out of principal or 'investment' cash."  Frangioni responded, in relevant part: "These schedules were created from inception to date, essentially the first dollars that left the investment account other than for an 'investment.'"  GX-3072.

- Kgil's testimony that she wanted to track how much was moving from the investment account to the distribution account "because if you use investor capital for distributions, you lose out on opportunities to make further acquisitions and have better performance at the funds."  Tr. 2963.

- Summary charts prepared by Petron that showed, by month, the money transfers from the investment account to the distribution account and the distributions to investors.  GX-6200 at 5, 12, 19.

- Summary charts based on a flow of funds analysis completed by Petron showing that Holdings I, Holdings II, and Automotive Portfolio did not have sufficient "profit distributions" from the portfolio companies to pay the monthly distributions that went out the door to investors.  GX-6200 at 2, 4, 9, 11, 16, 18.

It was reasonable for the jury to conclude from this evidence that the defendants lied when they told investors that they would pay monthly distributions from income or profits from the portfolio companies.

        The defendants make the related argument that GPB never promised investors that its distributions would be covered using the net investment income metric.  ECF Dkt. No. 487-1 at 24–26.  This argument also misconstrues the evidence and the government's argument.  The government did not introduce this evidence to prove that investors were specifically promised distributions would be covered by net investment income—as the defendants insist—but instead because the coverage ratios are circumstantial evidence that distributions were being paid with

investor capital (as they in fact were) and evidence that the defendants were aware of this fact and therefore intended to mislead investors.[4]

Gentile also argues that under the Supreme Court's decision in <u>Janus Capital Group, Inc. v. First Derivative Traders</u>, 564 U.S. 135 (2011), he did not "make" "many of the allegedly fraudulent statements" and therefore cannot be liable for securities fraud.[5]  ECF Dkt. No. 488-1 at 10–16.  This is wrong for multiple reasons.

<u>First</u>, <u>Janus</u> is a civil case involving a private action alleging a Rule 10b-5 violation. It does not address criminal liability under Rule 10b-5, and at least the Fourth Circuit has held <u>Janus</u> does not apply in the criminal context.  <u>See</u> <u>Prousalis v. Moore</u>, 751 F.3d 272, 279 (4th Cir. 2014) (Wilkinson, J.).[6]  As Judge Wilkinson explained: "the <u>Janus</u> opinion itself makes clear the limits of its reach," and its reasoning "indicates that its holding was confined to cases invoking he implied private right of action and does not extend to the criminal convictions at issue here."  <u>Id.</u>

---

[4]    In fact, investors were told that GPB used net investment income to calculate distributions coverage.  The government introduced evidence of a GPB "De-Risking Private Equity" fact sheet sent to financial advisor Lagiglia, which states, in relevant part:

> Distribution Coverage: Since inception, Holdings II has been able to deliver an 8.7% distribution from profits from operations and realized gains from the portfolio's acquired companies and investments*
>
> * Coverage based on net investment income plus realized gain (loss) through September 30, 2016[.]

GX-5093.  There was ample evidence the defendants used net investment income (and realized gain or loss, where applicable) to calculate coverage.  <u>See, e.g.</u>, Tr. 767–97 (Jacoby), 821 (Jacoby), 2945–47 (Kgil); GX-8012-A, GX-8013-A, GX-8013-B, GX-8014-I, GX-8014-J, GX-7910-A, GX-8117-A, GX-7915-A, GX-7568-A, GX-7568-B, GX-7568-C, GX-8008-A, GX-7582-A, GX-8009-B, DX-FFFFM-1, GX-7669-A, GX-8275-A (GPB's internal performance reports).

[5]    Gentile's claim that he did not make any statements concerning the 2014 Performance Guarantees is addressed <u>infra</u> in Section II.B.

[6]    The Second Circuit has not addressed this question.  <u>See</u> <u>United States v. Chartier</u>, No. 22-3125, 2024 WL 3617023, *1, *8 (2d Cir. Aug. 1, 2024).

at 276.  The private right of action under Rule 10b-5 does not apply to aiding and abetting liability, and the concerns animating a restrictive approach to implied private rights of action simply do not apply to criminal liability.  Id. at 277–78; see also id. at 279 ("In sum, to broaden Janus's holding beyond the domain of implied rights would represent a stark assertion of judicial will, the very thing against which Janus itself inveighed.  The majority in Janus gave not the slightest indication that its holding applied beyond the implied civil context: the four dissenters resisted taking the law even that far.").

Second, assuming, arguendo, that Janus applies, the evidence proved that Gentile was in fact the "maker" of the alleged false statements to investors.  Janus holds that, for purposes of liability under Rule 10b-5(b), the "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."  564 U.S. at 142.  The government presented ample evidence, some of which is detailed above, that Gentile personally communicated falsehoods about the GPB funds to investors and caused false statements to be made.  Gentile appears to concede that he made at least some false statements to investors.  ECF Dkt. No. 488-1 at 10 (arguing Gentile did not make "many" or the "vast majority" of the statements the government claims are fraudulent).  Notably, the jury was not required more than one false or misleading statement, and as the evidence described above shows, there was abundant evidence Gentile personally made false and misleading statements.[7]

The jury was also entitled to credit the testimony of the GPB insiders that Gentile not only controlled everything at the fund but participated in the fraud by causing false information

---

[7]    Gentile argues that his "mere presence at due diligence events is insufficient to establish that he was the maker of each and every statement made by one of the presenters at the conferences he attended." ECF Dkt. No. 488-1 at 15.  He cites only one case in support of his claim: In re Smith Barney Transfer Agent Litig., 884 F. Supp. 2d 152 (S.D.N.Y. 2012).  In re Smith Barney cites Janus and refers to a close relationship between the maker and the defendant, not a situation where the defendant was physically proximate to the maker of a statement.

to be disseminated to investors, namely the lies in the PPMs and audited financials, and Schneider

and Gentile essentially operated Ascendant Capital and GPB as one entity. Jacoby testified that

Gentile and Schneider ran GPB and Ascendant as "one firm," together "as partners." Tr. 692–93.

Kgil described the relationship between GPB and Ascendant as a "partnership." Tr. 2159. She

explained: "It's not a typical vendor relationship . . . It's more of a partnership. There was a lot of

conversation. Jeff Schneider would be part of a lot of the meetings at GPB Capital. . . . It was

more of a partnership where discussions were had and agreements were, you know, looked at

together." Tr. 2159:4–23. Teeters, an Ascendant employee, testified that GPB and Ascendant

"essentially r[an] as one organization. There was even a brief period of time where we included

GPB's logo on our email signatures." Tr. 1895:8–12. Documentary evidence corroborated this

testimony. For instance, the government introduced dashboards and performance reports created

by GPB's CFO and accounting staff that were sent to Gentile and Schneider. Both defendants

received updates to GPB's marketing materials. See GX-8099, GX-8184 (Gentile receiving

updates to marketing materials). The jury was entitled to infer from this evidence that Gentile had

oversight of, and controlled with Schneider, the representations made to investors. Gentile's

arguments that he was not involved in the false statements in the marketing materials, account

statements, and PPMs simply reflects a contrary inference that was presented to the jury and

rejected. See ECF Dkt. No. 488-1 at 11–16. Gentile made these same arguments in summation,

and the jury rejected them. See, e.g., Tr. 6510:121–16 ("Mr. Gentile's the CEO. He's the head.

The buck stops with him. But this is a federal case, charging federal crimes. And you don't convict

somebody just because of their position. You have to prove their knowledge, intent, and

participation before you do it."); Tr. 6688:16–15 ("Want to talk about Ascendant, the sales team.

It has nothing to do with Mr. Gentile. He's far away from this. . . He's the CEO over here. He

39

has delegated a lot of responsibility.  He has nothing to do with the marketing arm of Ascendant. Nothing.").  While Gentile might wish the jury had accepted his arguments, under the governing legal standards for this motion, all reasonable inferences must be drawn in favor of the government—not the defendant.

Third, even if Janus applies, its holding is confined to Rule 10b-5(b) and does not extend to liability under Rule 10b-5(a).  The Supreme Court held in Lorenzo v. SEC, 587 U.S. 71, 78 (2019), that dissemination of false or misleading statements with intent to defraud can fall within the scope of Rule 10b-5(a) and (c) even if the disseminator did not "make" the statements. In this case, the government alleged that the defendants employed a scheme or artifice to defraud GPB's investors in violation of Rule 10b-5(a) and made materially false statements to GPB's investors in violation of subsection (b) of the same rule.  Even if Gentile was not the "maker" of every fraudulent statement presented to the jury, the evidence established that he caused these falsehoods to be disseminated to investors through, for example, the offering documents and marketing materials.

Fourth, Gentile's argument ignores the fact that he was charged with conspiracy to commit wire fraud and securities fraud, and false statements made by co-conspirators in furtherance of those conspiracies can be imputed to him.

Fifth, and finally, Gentile was charged pursuant to 18 U.S.C. § 2 with (i) aiding and abetting the securities fraud crime charged in Count Three and the wire fraud crimes charged in Counts Four and Five; and (ii) "willfully causing" those crimes.  Under 18 U.S.C. § 2(a), he can be found guilty even if he did not personally make the false statements, and under subsection (b) of that section, if he willfully caused false statements to be made by another person.  Cf. Prousalis,

751 F.3d at 277 (explaining that aiding and abetting liability applies to criminal liability but not to the civil implied right of action under Section 10b).

> 2.    *The Government Presented Overwhelming Evidence of Materiality*

By any rational measure, the misrepresentations and omissions made by the defendants to prospective and existing investors regarding the source of the monthly distributions were material to a reasonable investor.  The government's evidence on the element of materiality was more than sufficient to support the jury's verdict, and the defendants' arguments to the contrary defy common sense and the trial record.

In reaching its verdict, the jury was required to find beyond a reasonable doubt that the misstatements and omissions made in furtherance of the defendants' scheme to defraud misrepresented material facts.  As the jury was instructed, "a misrepresentation is material when there is a substantial likelihood that it would have been significant to a reasonable investor's investment decision . . . The word 'material' is used to distinguish the kinds of statements that would have been significant to a reasonable investor in making an investment decision from those that would be of no real importance to that investor.  In order for you to find that a misrepresentation was material, the Government must prove beyond a reasonable doubt that there was a substantial likelihood that the misstated fact would have been viewed by a reasonable investor as having significantly altered the total mix of information available."  Tr. 6989:9–23. "Determination of materiality under the securities laws is a mixed question of law and fact that the Supreme Court has identified as especially 'well suited for jury determination.'" United States v. Litvak, 808 F.3d 160, 175 (2d Cir. 2015) ("Litvak I") (quoting United States v. Bilzerian, 926 F.2d 1285, 1298 (2d Cir. 1991) (citing TSC Indus. Inc. v. Northway, Inc., 426 U.S. 438, 450 (1976)). Only "[w]here the misstatements are 'so obviously unimportant to a reasonable investor that

reasonable minds could not differ on the question of their importance,' [courts] may find the misstatements immaterial as a matter of law." Id. (quoting Wilson v. Merrill Lynch & Co., Inc., 671 F.3d 120, 131 (2d Cir. 2011)).

The jury's verdict reflects a reasonable conclusion that the lies told by the defendants about the source of the monthly distributions were material. Six victim investors and financial advisors testified at trial, and each witness explained that it would have mattered to them if they were receiving their own money back or other investors' money back, rather than a return on their investment, as they had been promised by the defendants. Investor and financial advisor Jay Frederick testified that he would have wanted to know if distributions had been paid previously from investor capital rather than profits. Tr. 419:1–6. Investor Marvin Jones testified that the source of the monthly distribution was significant to him as an investor because "[t]he objective is to get a return for the money . . . you expect a return in addition to the money you put to work." Tr. 182:18–183:6. Financial advisor Matthew Crafa similarly testified that the source of the monthly distributions was the "main reason why I decided to invest in the funds. The distributions, the whole reason why the income that was being produced by my clients was really what attracted me to the actual investment for my clients." Tr. 1682:11–20. Financial advisor Joseph Ghabour testified that it was important it to him that the monthly distributions come from income generated by the portfolio companies "because if they were using other investor capital that was being raised to pay the distributions, there was less money available to be going out to purchase the targeted companies and dealerships within the portfolio." Tr. 1503:25–1504:4. Financial advisor Anthony Lagiglia also testified that the source of the monthly distributions was important to him in recommending the GPB investment to his clients: "The yield is important. So we're putting capital to work, we want to receive income on our investment. And, you know, having income produced

was important to my clients." Tr. 2661:12–17. The testimony of six victim-investor witnesses

established this element beyond a reasonable doubt, and the jury was reasonable to credit it.

> 3.    *GPB's Account Statements Contained False and Misleading Statements that Were Material to Investors*

Gentile argues that GPB's account statements were not materially false or

misleading to investors. ECF Dkt. No. 488-1 at 30–31. The jury was reasonable to conclude

otherwise.[8]

The government presented evidence that until August 2018, GPB's account

statements included a "Total Capital Invested" column that remained static, despite the fact that

GPB paid monthly distributions using investor contributions, thereby depleting investors'

principal balance. Jones testified that nothing in the account statements from before August 2018

indicated to him that the monthly distributions he received included a return of his own capital or

included other investors' capital. Tr. 215:5–11. In August 2018, GPB revised its account

statements to add two footnotes. Footnote 1 specified that "Current Cash Distributions have been,

and may in the future continue to be, paid out of available working capital, including, but not

limited to, investor contributions (i.e., distributions have, and may in the future, exceed operating

income, if any, generated by the Partnership)." GX-1390 at 2. Footnote 2 stated: "Total Capital

Invested is the total amount of money an investor has invested in the Partnership. An investor's

Total Capital Invested amount is not indicative of an investor's current capital account balance

and should not be viewed as the current value of an investor's partnership interest. An investor's

---

[8]    Gentile's argument that account statements were not part of the total mix of information made available to prospective investors and therefore were not actionable because existing investors had no investment decision to make post-investment is also wrong and is addressed infra in Section II.A.8. See ECF Dkt. No. 488-1 at 30.

current capital account balance is reduced by Current Cash Distributions." [9]  Id.  Frederick testified that when he received the new account statement with these footnotes in August 2018, it was a "rather shocking revelation that we had been lied to about the source of our distributions."  Tr. 505:20–22.  He explained this was "the first time they indicated to us that the distributions have been paid out of available working capital, which is another way of saying investor capital. . . . So this entire time we're being told that, hey, this is all being paid out of cash flows, profit from the dealerships, you know.  That the portfolio value is not just the portfolio value, we were consistently led to believe that we were building significant capital . . . . this was shocking.  I immediately was on the phone with clients.  No one expected this, no one saw this coming.  This was the exact opposite."  Tr. 507:2–20.  The jury was reasonable to credit Frederick's testimony and find that the defendants' false and misleading statements about the source of the monthly distributions in the account statements mattered to investors.

Contrary to Gentile's claim, Ghabour's testimony does not contradict the government's argument that account statements that pre-dated August 2018 misled investors into thinking their total investment principal remained intact when in fact it was regularly being depleted to allow GPB to pay its monthly distributions.  Gentile cites Ghabour's testimony from page 1622, line 13 to page 1623, line 6.  A portion of this testimony—Tr. 1622:20–1623:2—was struck by the Court and is therefore not proof of any point.  Moreover, Ghabour's testimony that he understood the "Total Invested Capital" column to reflect "the total amount [his client] had invested **at the time**" actually supports the government's argument that the account statements misled investors into thinking their investment principal remained intact.  Tr. 1623:3–6 (emphasis

---

[9]    GPB made further changes were made to the account statements in September 2018.  See, e.g., GX-1389.

added).  Gentile points to no evidence in the record that investors disregarded the account statements or found the information in them about the source of the monthly distributions to be unimportant.

> 4. *Alleged Disclosures in the Limited Partnership Agreement, Private Placement Memoranda, and Quarterly Reports Do Not Make the Defendants' Lies Immaterial*

The defendants argue that the defendants' lies in marketing materials, communications and due diligence events were immaterial because, in their view, GPB's written materials, including the limited partnership agreement ("LPA") and PPMs, "explicitly told investors, before they invested, that investor capital could be used to pay investor distributions" and GPB's quarterly reports "told investors exactly when investor capital <u>was</u> used to pay investor distributions."  ECF Dkt. No. 488-1 at 23–26, 30–31.  This is wrong for a number of reasons.

The LPA does not, as defendants contend, specify that the monthly distributions could include a return of investor capital.  Rather, the LPA provides that the general partnership (GPB) has authority to "care for and distribute funds to the Partners by way of cash, income, return of capital, or otherwise."  GX-4061 at 85, 126.  The evidence does not support the defendants' claim that this provision is specific to monthly distributions.  Indeed, while Frederick, Ghabour, and Goldberg each testified that this provision in the LPA referred to "distributions," no witness confirmed that they understood the provision to refer to the monthly distributions.  Tr. 548:2–8 (Frederick), 1614:2–1615:5 (Ghabour), 5153:2–13 (Goldberg).  But even if the LPA did say that GPB had the ability to use investor capital to fund the monthly distributions, that does not negate the defendants' lies that GPB was in fact not using investor capital to fund the monthly distributions.  Similarly, the fact that the PPMs disclosed the risk that monthly distributions may

45

not be paid does not address defendants' misrepresentations to investors that the monthly distributions that were being paid came from funds from operations, not investor contributions.

Even accepting as true, arguendo, the premise that GPB's investors knew the fund could use investor capital to fund the monthly distributions is of no import because the government presented extensive evidence investors were told that GPB was not funding distributions with investor capital. The documents relied on by the defendants refer to a possibility, but do not address what was actually happening, and what was happening was obviously important to GPB's investors. Each of the investor witnesses testified that they interacted directly with the defendants at due diligence events and/or in meetings and were told that monthly distributions were in fact sourced from income from the operating companies, not investor contributions. See, e.g., Tr. 188–89 (Jones), 371–72 (Jones), 415–25 (Frederick), 494–95 (Frederick), 1496–1502 (Ghabour), 1740–41 (Crafa), 3663 (Lagiglia), 3666–67 (Lagiglia), 5003–05 (Goldberg). Morey Goldberg testified that it was important to him that he spoke directly with the CEO of the fund. He explained that "CEOs run the ship." Tr. 5030.

Likewise, the jury was entitled to conclude that the purported disclosures in the quarterly reports did not render the defendants' misstatements immaterial. Nowhere in the LPA, PPMs, or quarterly reports does it say that GPB is using investor capital to fund the monthly distributions. Indeed, the jury heard testimony from investors and financial advisors that the defendants, the CEOs of GPB and Ascendant Capital, assured them that the monthly distributions were being funded exclusively from income from the portfolio companies. The fact that some of the quarterly reports disclosed monthly distributions in excess of net investment income for a particular period does not tell investors how GPB is making up the shortfall in that period. As the government argued in summation, you could have a shortfall in a particular period but still cover

distributions with excess income from an earlier period.  Tr. 6482; see also Tr. 574 (Frederick) ("So while you could have a blip in coverage for a month or two for earnings for the distributions, you would have also, quite likely, something akin to retained earnings to cover the distribution."). The question of how a reasonable investor would consider the defendants' lies in light of the total mix of information available to them was precisely the question put to the jury, which it answered with its verdict.  That verdict was reasonable and should be left in place.

> The defendants now invite the Court to second guess the jury's assessment of how a reasonable investor would have viewed the total mix of information available to them.  This is improper.  See Rea, 958 F.2d at 1221–22 ("Matters of the choice between competing inferences, the credibility of the witnesses, and the weight of the evidence are within the province of the jury, and [the court is] not entitled to second–guess the jury's assessments."); United States v. Barret, No. 10-CR-809 (KAM), 2012 WL 3229291, at *16 (E.D.N.Y. Aug. 6, 2012).  The Second Circuit has cautioned courts not to usurp the jury's role because "jurors are entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences."  Huezo, 546 F.3d at 182.

> The defendants also attempt to argue that the fact that three of the investor witnesses "made no efforts to exit their GPB investments" after receiving the quarterly reports shows that the source of monthly distributions was immaterial to them.  ECF Dkt. No. 487-1 at 46–49.  It was not unreasonable for the jury to reject this inference.  There was overwhelming evidence that the investors were not provided full information about the use of investor capital to pay distributions. The quarterly reports do not amount to such a disclosure.  As even the defendants concede, at best for the quarterly reports indicate a "**potential** shortfall in coverage" that "**could** have suggested to[investors] that monthly distributions were being paid by something other than operating

profits." ECF Dkt. No. 487-1 at 46 (emphases added). Disclosing a temporary shortfall in coverage does not equate to telling investors that the funds were using investor capital to cover those shortfalls. Victim-investor Jay Frederick explained that excess cash flow from an earlier period—similar to "retained earnings"—could be used to fund the distributions in periods where the portfolio companies did not have sufficient income to pay the full 8%. See Tr. 574, 1323–24. Contrary to the defendants' argument, there was also evidence that the defendants were particularly concerned that disclosing the truth would lead to a run on redemptions. See Tr. 2481:22–2482:19. The connection between a lack of redemptions by three investors and materiality is quintessentially an inference to be drawn from the evidence. The jury was entitled to reject the defendants' inference and the decision to do so was not unreasonable in light of the investors' extensive testimony that the source of distributions was material, much less so unreasonable that it is a ground for Rule 29 relief.[10]

> 5. *The Contractual Disclaimers of Reliance in the Limited Partnership Agreement Do Not Make the Defendants' Lies Immaterial*

The defendants argue that "investors expressly certified that they would not rely on oral representations in examining the GPB Funds (such as the purportedly false statements the Government alleged Mr. Gentile made), such that those alleged oral statements could not be deemed material to an investment decision." ECF Dkt. No. 488-1 at 25. This argument relies on an incorrect reading of the LPA and is inconsistent with Second Circuit case law.

The LPA required investors to certify that in connection with "evaluating the suitability" of the investment, they did not rely on documents and statements other than the PPM

---

[10]    At best, the fact that these three investors did not attempt to redeem goes to their credibility, which was a question for the jury.

and LPA. Frederick explained that "suitability" relates to whether the investor met the qualifications to invest, i.e., whether they were an "accredited" investor. Tr. 537:14–538:1 ("Suitability is determined by other factors, like whether or not we have an accredited investor, whether or not the client has immediate need for liquidity, and this is illiquid. So for suitability, I understand. You can't rely upon marketing materials. But for your investment decision, certainly you can include those marketing materials in your decision making, beyond suitability."). "Suitability" is not shorthand for the merits of the investment, as the defendants claim, and their contrary argument simply disregards the testimony at trial.

Moreover, the Second Circuit and other courts have rejected the argument that disclaimers in investor contracts, whereby investors disclaim any reliance on oral or other extra-contract representations, render a defendant's false statements immaterial as a matter of law for purposes of the criminal fraud statutes. See, e.g., United States v. Weaver, 860 F.3d 90, 95 (2017); United States v. Lucas, 516 F.3d 316, 339 (5th Cir. 2008); United States v. Ghilarducci, 480 F.3d 542, 546 (7th Cir. 2007). As the Second Circuit explained in Weaver, this argument—that "because the fraud's victims signed a contract expressly acknowledging that no earlier representation 'influenced' their decision, the earlier misrepresentations could not be material because no reasonable person would alter his decision based on those statements"—confuses materiality for reliance and is, therefore, "contrary to Supreme Court precedent." 860 F.3d at 96 (internal citation omitted).

Indeed, the parties litigated this exact issue before the trial (see ECF Dkt. Nos. 325, 342, 348), and the Court ruled that while the defendants could offer evidence of contractual disclaimers as they are part of the "total mix of information" for the jury to consider, those disclaimers do not entitle a defendant to a judgment of acquittal. ECF Dkt. No. 370 at 3

49

("Defendants may not argue based on these disclaimers, however, that they cannot be convicted because investors did not reasonably rely on their misrepresentations, as evidenced by the fact that investors signed contractual disclaimers foreswearing reliance.").  And the Court instructed the jury that "a disclaimer in a contract does not, by itself, establish that a misrepresentation to investors was immaterial, meaning of no real importance to a reasonable investor in making his or her investment decision.  You can, however, consider contractual disclaimers (just like any other statement) as part of the information before investors when you make a determination about whether a reasonable investor would have considered a misrepresentation to be significant or important to his or her investment decision."  Tr. 6990.

The jury was presented with evidence of the alleged disclaimers in the LPA and PPMs and was allowed to consider this evidence during its deliberations.  The jury simply did not find persuasive the defendants' argument that the alleged disclaimers rendered the information communicated directly by the defendants to investors unimportant or immaterial.  There is no basis to disturb the jury's verdict.

> 6.    *False and Misleading Statements to Existing Investors Were Actionable*

The defendants argue that the jury's verdict on Counts One through Three "*could rest on an improper theory*" if the jury predicated its verdict on the defendants' lies to existing investors because such a conviction would necessarily be based on the invalid "right to control" theory.[11]  See ECF Dkt. No. 487-1 at 49–57.  This is incorrect for several reasons.

_____

[11]    The defendants also argue that misrepresentations to existing investors after the fund's closing date were not material because "existing investors had no right to redeem their investments" and "there was no investment decision to be made with respect to that fund."  ECF Dkt. No. 488-1 at 27–28.

First, the defendants' argument rests on the erroneous premise that the Court did not properly instruct the jury that, to convict, they must find there was a scheme or artifice to defraud with the purpose of obtaining money or property by materially false and fraudulent pretenses, representations, or promises.  In fact, the Court instructed the jury that in order to find the defendants guilty of wire fraud or wire fraud conspiracy, the government must prove, among other things, that "the scheme to defraud must target money or property. . . [I]n order to find a defendant guilty, you must find that the scheme contemplated depriving another of money or property."  Tr. 7009–10 (emphases added).  The Court's charge was consistent with the Supreme Court's holding in United States v. Ciminelli, 598 U.S. 306 (2023).[12]  There can be no real argument that the jury convicted the defendants on an improper legal theory where, as here, the Court's charge stated multiple times that the jury must find that the defendants' scheme to defraud contemplated a deprivation of money or property.  Cf. United States v. Sabhnani, 599 F.3d 215, 239–40 (2d Cir. 2010) ("This was not a case in which the jury instructions were insufficiently detailed as to an essential element of the crime and were never clarified by other language, such that the jury could have convicted based on a legally erroneous theory.").

Second, the government did not advance an invalid "right to control" theory at trial based on a deprivation of only information, as the defendants contend.  Instead, the government argued and proved that GPB investors (both prospective and existing) were deprived of money when they were solicited to invest in the GPB funds and when they paid continuing and ongoing

_____

[12]    To the extent the defendants are arguing that Ciminelli stands for the proposition that defendants can only be convicted of fraud if the jury finds that the defendants lied to investors at the time of their initial investments, and that Ciminelli therefore bars liability for fraudulent conduct aimed at current investors, they are wrong.  Ciminelli did not hold that current investors cannot be the victims of fraud.  Such a holding would suggest that once investors have handed over their money to an investment adviser, that adviser is now free to engage in any sort of deceptive scheme aimed at keeping their money without fear of federal criminal liability.  This is not true under Ciminelli, and has never been true under the law.

fees to GPB based on the defendants' lies and misrepresentations about the source of the funds' monthly distributions and the funds' performance.[13]  The defendants raise a number of specious arguments in support of their claim that the government argued a "right to control" theory, none of which are persuasive.

The fact that the government elicited testimony from victim-investors about whether they would have wanted to know the truth about the GPB funds' performance and the source of the distribution payments does not, as the defendants argue, mean that the government was arguing a "right to control" theory.  As Judge Matsumoto recently explained, "Ciminelli did not reject the premise that depriving a victim of information in order to induce the victim to part with traditional property can be fraud.  Ciminelli simply rejected the notion that information itself can be property."  United States v. An, 2024 WL 2010017, at *8 (E.D.N.Y. May 7, 2024) (emphasis added).  Consistent with An and Ciminelli itself, the government elicited this testimony to establish the materiality of the defendants' misrepresentations, not because the misrepresentations were themselves the property targeted by the scheme.

Similarly, the government's argument in closing that the jury could convict based on "just one lie the[] [defendants] told about one fund," Tr. 6460, does not equate to arguing an invalid "right to control" theory, as the defendants claim, see ECF Dkt. No. 487-1 at 53.  The government proved that the defendants lied about the performance of Holdings I, Automotive Portfolio, and Holdings II and the source of the monthly distributions for each of those funds.  Each of these lies was designed to swindle GPB's investors out of money—whether it was an

---

[13]      Among other witnesses, Jacoby, Lash, and Anscher testified about the ongoing fees charged to GPB's investors.  See Tr. 734–41 (Jacoby), 3004–06 (Lash), 4378–79 (Anscher).  The fees were also outlined in the PPMs provided to investors.  See, e.g., GX-4100 at 10–11.  GPB collected approximately $64 million in management fees alone during the charged conspiracy period.  GX-6200 at 24.

investor's first investment in a GPB fund, ongoing fees paid by an existing investor to GPB, or an existing investor's second or subsequent contribution in the same or another GPB fund.

The defendants argue that the government "hammered" the importance of lies "to H1 investors about the source of their distributions" in its closing arguments and this was improper because Holdings I had closed and there could therefore be no deprivation of money or property. ECF Dkt. No. 487-1 at 55–56. Lies to existing Holdings I investors were actionable because Holdings I's existing investors continued to pay fees to GPB, including management fees, organizational fees, acquisitions fees, and partnership expenses even after the fund closed to new investors. The defendants' scheme to defraud targeted the existing investors' money, rather than some intangible property interest. Moreover, the evidence at trial proved that existing investors were often resolicited and urged to invest in other GPB funds—another attempt by the defendants to deprive the victims of money. For example, after Holdings I closed to new investments, the defendants solicited Morey Goldberg (an existing investor in Holdings I) to invest in Holdings II. See GX-8213, GX-8219; Tr. 5010–15, 5036–39.

Moreover, this argument conflates lies communicated to existing investors in Holdings I with lies told to prospective investors in other funds about Holdings I's performance and the source of Holdings I's monthly distributions. There is overwhelming evidence in the record that the defendants lied about Holdings I's purported success and performance to convince prospective investors to invest in GPB's other, open funds. For example, several investors testified that they received GPB's "Fund Level Track Record," which purports to show, among other things, Holdings I's "fund to date annualized return" and "cumulative cash on cash return" through June 2016. See GX-1438. Jones, for example, testified that he invested in Automotive Portfolio but received this track record with Holdings I's results included as part of his research on GPB. Tr.

177–78.  Jones testified that where the "fund to date annualized return" is above 8.7% he understood it to mean that the fund was "exceeding their profit projections" and the fund is "sharing part of the additional profitability with the . . . investors."  Tr. 368–69.  He also testified that nothing on the tracker indicated that the distributions were a return of investor capital.  Tr. 368.  Frederick, an investor in Automotive Portfolio, also testified he received GX-1438 with Holdings I's purported results.  Tr. 428–29.  Jacoby testified that the fund's performance as indicated in GX-1438, including Holdings I's performance, was "not the actual performance" of the fund.  Tr. 946–47.  Kgil testified that GX-1438 did not state that GPB had used investor capital to pay a portion of the monthly distributions for Holdings I and Automotive Portfolio in 2016.  Tr. 2479.  The lies about Holdings I's performance were communicated not only to Holdings I's existing investors, but also to prospective investors as a means to induce investors to invest in other GPB funds.

The defendants' argument that the Court's decision not to give a "curative instruction, consistent with Ciminelli, to inform the jury that deprivation of information and impairment of the right to control an asset is not a sufficient basis for fraud" allowed the jury to convict based on a legally inadequate theory, is also wrong.  See ECF Dkt. No. 487-1 at 57.  As explained above, the government did not advance an invalid "right to control" theory.  And even if it had, the Court properly instructed the jury that in order to find the defendants guilty of wire fraud or wire fraud conspiracy, the government must prove, among other things, that "the scheme to defraud must target money or property. . . [I]n order to find a defendant guilty, you must find that the scheme contemplated depriving another of money or property."  Tr. 7009–10 (emphases added).

7. *The Defendants' False and Misleading Statements Were Made "In Connection With the Purchase and Sale" of Securities*

Gentile argues that misstatements to existing investors made after a fund's closing date were not "made 'in connection with the purchase or sale of a security' because investors did not have any right to purchase or sell a security after the funds' respective Closing Dates." See ECF Dkt. No. 488-1 at 32. This argument is foreclosed by on-point Supreme Court case law addressing the "in connection with" requirement and is wrong as a factual matter.

With respect to the "in connection with" requirement, and as the government has previously explained, ECF Dkt. No. 303 at 5–6, the Supreme Court interprets the "in connection with" requirement to include "victims who took, who tried to take, who divested themselves of, who tried to divest themselves of, or who maintained an ownership interest in financial instruments that fall within the relevant statutory definition." Chadbourne & Park v. Troice, 571 U.S. 377, 388 (2014) (emphasis added). The Troice Court expressly held that the "in connection with" requirement encompassed claims that fraudulent statements "induc[ed] the plaintiffs to hold their stocks long beyond the point when, had the truth been known, they would have sold." Id. at 387; see also United States v. Small, No. 16-CR-640 (BMC), ECF. Dkt. No. 984 (E.D.N.Y.) ("With regard to the purchase and sale of securities requirement, I think the Supreme Court cases are clear that a holder is good enough and is included in that definition . . . ."). False statements to existing investors who had the right and ability to make redemption requests of GPB are clearly "in connection with" the purchase or sale of the GPB securities.

Moreover, as Gentile points out in his brief, the Holdings II and Automotive Portfolio funds did not close until the middle of 2018. As explained infra, the evidence proved that the defendants made false statements about closed funds to induce existing and prospective investors to invest in open funds. Even under Gentile's incorrect view of the "in connection with"

55

requirement, false statements made to investors about Holdings I's performance after Holdings I closed but while Holdings II and Automotive Portfolio were still open, were made "in connection with" the purchase or sale of a security.

> 8. *False and Misleading Statements to Existing Investors Were Material*

The defendants advance the closely-related argument that their false and misleading statements to existing investors after the funds closed were not material "because there was no investment decision to be made with respect to that fund." ECF Dkt. No. 488-1 at 27–28, 30. The Court properly rejected this argument in denying the defendants' motion in limine to exclude evidence and arguments regarding any alleged fraudulent statements made to then-existing investors. May 23, 2024 Pre-Trial Conf. Tr. 10:9–12:23. The Court held that fraudulent statements to existing investors "are material to defendants' alleged efforts to defraud existing invest[ors] both of management fees that investors continue to pay and investment capital that investors could have sought to redeem from the GPB funds." Id. at 11:9–12. The Court went on to explain:

> Even though investors didn't have an absolute right to redeem, that doesn't lead me to accept the defendants' arguments that there were no investment decisions to be made. GPB had a process in place for investors to seek to redeem their investments, and the Government indicates its trial evidence will show that GPB frequently did honor investment redemption requests. Indeed, as defendants themselves point out in their reply briefs, the LPAs, or limited partnership agreements, also provided investors with a separate contractual remedy in the event of suspected fraud or breach of fiduciary duties after investment. . . . Finally, it appears that at least some of the statements to existing investors would be relevant because those existing investors could become, and in some cases did become, investors in the new funds. Defendants represent that each of the GPB funds closed to new investments during the indictment period. But there appears to be also no dispute that various GPB funds were open to new investments during part of the indictment period. So at least during the portions of the indictment period where one or more GPB funds were open to new investments, statements to then–existing investors would be relevant as statements to potential investors in those open GPB funds.

56

Id. at 11:13–12:23.

The evidence at trial established that although investors did not have an absolute right to redeem their investments, there was a redemption process in place and GPB honored redemption requests. See GX-8256-A (due diligence questionnaire stating "GPB has a redemption policy in place and intends to redeem Units on a quarterly basis. . . To date, GPB has honored all redemption requests."); Tr. 1851–52 (Crafa), 2482 (Kgil). Defendants point to the fact that investor witnesses who did not know the truth about the funds' performance and the source of monthly distributions never attempted to redeem as evidence that the defendants' lies about these matters were immaterial. See ECF Dkt. No. 488-1 at 28. This is wholly unpersuasive. Contrary to what the defendants claim, the government elicited testimony that a reasonable investor would have attempted to redeem had they known the truth about the source of the monthly distributions and the funds' performance. For example, Ghabour testified that had he known what his clients were receiving in monthly distributions included investor capital, he "likely would have explored the options as to whether or not I would be able to get my clients out of the investment." Tr. 1521–22. And the defendants themselves were worried about precisely this prospect. See Tr. 2481:22–2482:19.

B.    Evidence of the Performance Guarantee Scheme Was Sufficient to Convict on All Counts

The evidence at trial proved that the defendants, together with Lash and GPB's lawyer, James Prestiano, used fraudulent performance guarantees to inflate Holdings I's and Automotive Portfolio's reported income in 2014 and 2015, respectively. The defendants' argument that evidence of the fraudulent performance guarantees cannot sustain the defendants' conviction is belied by the overwhelming proof in the record that the defendants orchestrated the creation and execution of these fraudulent guarantees and incorporated the guarantees into the

funds' respective audited financials to fraudulently inflate the funds' income figures. The defendants marketed the GPB funds using Holdings I and Automotive Portfolio's 2014 and 2015 audited financials and raised over one billion dollars in subsequent years.

                1.      *The 2014 Performance Guarantees Were Fraudulent*

There is overwhelming proof in the record that the 2014 Performance Guarantees were fraudulent.[14] This evidence included the following:

- Lash's testimony that, together with the defendants, he created and signed three backdated performance guarantees that were "predicated . . . on a conversation that never happened and we gave that to the accounting firm to give to the investor to show performance that the stores had not met." Tr. 3077–78.

- Lash's testimony that Gentile, Schneider, and Prestiano were all involved in GPB's purchase of the DJD Dealerships and a personal guarantee was never part of those deals. Tr. 3090–99.

- Lash's testimony that the 2014 Performance Guarantees were drafted in 2015 and backdated to February 2014 to create the appearance that they existed in 2014 and cover up poor performance at the DJD Dealerships. Tr. 3103–25.

- Lash's testimony that Gentile told him that he "wouldn't get hurt financially by [the guarantees] at all" and based on this, Lash knew he would not need to pay the 2014 guarantees. Tr. 3114.

- Lash's testimony that when he signed the 2014 guarantees, he knew what he was doing was wrong. Tr. 3231.

- Lash's testimony that he agreed with Gentile that he (Lash) would tell the auditors that he was in agreement on the deficiency notices, but in reality he knew he was not actually going to need to pay the guarantees. Tr. 3133–34.

- Lash's testimony that he did not tell the auditors that the guarantees had not existed until March 2015, that he had never guaranteed the performance of the dealerships, and that he had been promised by Gentile he would not have to pay, and that he hid these things from the auditors so they would sign off on the audited financials and so

---

[14] The defendants also argue that the 2014 Performance Guarantees are not admissible evidence because the guarantees predate the conspiracy period charged in the indictment. ECF Dkt. No. 487-1 at 28; ECF Dkt. No. 488-1 at 21. The Court already rejected this argument in limine, and the defendants provide no basis for the Court to reconsider that (correct) ruling. *See* May 23, 2024 Pre-Trial Conf. Tr. 27–28 (finding the 2014 performance guarantees are "directly relevant to the charged conspiracy").

investors would not see the real performance of the dealerships and know that GPB "had not hit anywhere close to the objective that [the fund] had stated." Tr. 3135.

- Lash's testimony that he never paid the 2014 guarantees on the terms of the deficiency notices. Tr. 3136.

- Jacoby's testimony that the $1.1 million in guarantee payments referenced in Note 5 of Holdings I's 2014 audited financial statements referred to the 2014 Performance Guarantees and was accounted for in the fund's investment income line. Tr. 887:21–23.

- The purchase and sale agreements for the DJD Dealerships, which do not say anything about a personal guarantee from Lash. GX-6031, GX-6132-D, GX-6032, GX-6034.

- An email dated March 23, 2015 from a member of GPB's accounting team about deficiency notices for DJD and DJD2 that stated the "agreements . . . don't currently exist." GX-8020.

- Text messages between Lash and Gentile from March 17, 2015 wherein they discussed how Lash was getting a copy of the performance guarantee agreement, signing it and then sending it to the auditor for the dealerships. GX-8120-A.

- Text messages between Lash, Gentile, Schneider, and Patrick Dibre from March 17, 2015, wherein they discussed finalizing the numbers in the guarantee and what the "game plan" will be. GX-7009-B. Lash testified that in this exchange, the co-conspirators were trying to figure out what the story would be. Tr. 3119–20.

- Text messages between Lash and Gentile from March 17, 2015 wherein Lash wrote Gentile: "Just spoke with w[i]ll we are good Jimmy will finish the document in the next two hours he'll adjust the audits and send a copy over to Kyle later today or tomorrow at the latest." GX-8120-C. Lash testified that Will was Will Fernandez. He was the senior accountant working for Citrin and Cooperman on the dealerships' audited financials. Tr. 3117–18. In this same text message exchange, Lash updated Gentile that Brian Marshall (an accountant that worked at GPB) was sending a copy of the agreement to Will: "we should be all set." GX-8120-C.

- Text messages between Gentile, Schneider, and Lash from March 18, 2015, in which Gentile proposed that the guarantee amount should be $1.1 million. Gentile wrote, in relevant part: "Kyle feels based on his convo with Schneider that the guarantee that keeps neutral income and no losses on the tax returns and therefore no negative effect to the capital accounts is 1.1mm. In the other hand: 800k is needed to cover the 500k in distributions made but has a negative impact on the capital accounts if we use the 800k guarantee. The fund either has to demand the 800k or 1.1mm. I told Kyle it was prudent to follow Schneider's instructions." GX-7008-A.

- The Holdings I's audited financials that state, in relevant part: "In some cases the Partnership has agreements in place with the Operating Partner and Patrick Dibre to

guarantee a certain amount of income at the dealership level for a specified amount of time. For the year ended December 31, 2014 approximately $1,100,000 was paid by them into the dealerships." GX-2008 at 13.

- An email dated May 8, 2015 between Gentile, Schneider, Lash, Dibre, Brian Marshall, and Jovan Sijan (all using their personal email accounts) in which they discussed a payment plan for the 2014 Lash guarantees. GX-8143.

- A memorandum from October 2015 from GPB's CFO of the Automotive Portfolio to Gentile, which notified Gentile that the guarantee receivable from Lash had not been paid and if the receivable was written off, it could have "fund level issues." GX-8222-A.

- Lash's testimony that he agreed with the defendants and Prestiano to lie to law enforcement about the performance guarantees. Tr. 3216–31.

- Lash's testimony that in 2019 when law enforcement started asking questions, he met with Schneider in Gentile in New York. Gentile wanted to make sure everyone was on "Team GPB" and that they were all going to "stick to the story" that they agreed to relating to the guarantees. Tr. 3217–19.

Unable to reckon with this overwhelming evidence, the defendants argue that the 2014 Performance Guarantees (i) were immaterial; and (ii) were not reflected in the Holdings I 2014 audited financials.[15] See ECF Dkt. No. 488-1 at 16–17, 28. These arguments, which are addressed in turn below, simply reflect disagreements with the jury's interpretation of the evidence at trial, and do not support overturning the jury's verdict.

The defendants argue that Holdings I's inception-to-date distributions were covered by the end of 2015 using net income even without the 2014 Performance Guarantees and so

---

[15]     In one passing sentence, Gentile argues that the government "elicited no evidence at trial that Mr. Gentile reviewed, approved, or made any representations concerning Note 5." ECF Dkt. No. 488-1 at 16. As outlined above, there was overwhelming proof of Gentile's involvement in the creation and execution of the 2014 fraudulent performance guarantees. Lash testified that it was Gentile who directed him to sign the guarantee. The text messages introduced at trial establish that Gentile knew that a copy of the fraudulent agreement had been sent to the auditors. Indeed, the evidence proves the entire purpose of the guarantee was to fabricate Holdings I's audited financials. Moreover, as explained infra in Section II.A.1, it is of no moment whether Gentile himself drafted the language in the fraudulent audited financial statements. Gentile knew that the fraudulent information would be communicated to investors.

therefore the fraudulent guarantees are immaterial.[16]  ECF Dkt. No. 487-1 at 29.  This made-up construct has no connection to the evidence actually introduced at trial.  The evidence established that the guarantees accounted for a 40% increase in Holdings I's net investment income for <u>2014</u>. <u>See</u> GX-2008, GX-6038, GX-6039.  There can be no question that 40% of a fund's net investment income for a year, as reported in audited financial statements, is material.  The defendants do not explain why it is that an investor could not consider the audited financial reports for 2014 to be material or why an investor would consider aggregated results "through" 2015 in evaluating the 2014 audited financial statements.  Essentially, the defendants ask the Court to find that as a matter of law, the audited financial results reported for 2014 could not be material to an investor at any point thereafter.  They cite no support for this premise, and the jury was well within its rights to reject it.

The defendants further argue that Note 5 in the Holdings I 2014 audited financials is "indisputably <u>not</u> about the 2014 Performance Guarantees."  <u>See</u> ECF Dkt. No. 488-1 at 16. Gentile presented this argument to the jury, and the jury rejected it.  <u>See</u> Tr. 6555–59 (arguing defense expert Martin Wilczynski established that the guarantees referenced in the 2014 financials were Patrick Dibre's guarantees, not Lash's); Tr. 6650 ("As we have shown, the money went to a different entity, it never hit the books of Holding's — of Holding I's financials.").  It was reasonable for the jury to do so in light of all of the evidence in the record, detailed below, that proved the 2014 fraudulent performance guarantees were reflected in Holdings I's 2014 audited financials.  Jacoby testified that the $1.1 million in guarantee payments referenced in Note 5 of

---

[16]     Gentile also argues that the 2014 performance guarantees are immaterial because they "did not contribute <u>any</u> revenue at the Holdings I fund level and, thus, were not reported as such in its 2014 audited financial statements."  For the reasons set forth in the following paragraph, this is wrong.  The 2014 fraudulent guarantees are reflected in the Holdings I's audited financial statements.

Holdings I's 2014 audited financial statements referred to the 2014 Performance Guarantees and was accounted for in the fund's investment income line.   Tr. 887:21–23.   The documentary evidence introduced by the government also proved the 2014 Lash guarantees were reflected in the Holdings I financials.   Specifically, the government introduced a text message exchange between Gentile, Schneider, and Lash from March 18, 2015, in which Gentile proposed that the performance guarantee amount should be $1.1 million.   Gentile wrote, in relevant part:

> Kyle feels based on his convo with Schneider that the guarantee that keeps neutral income and no losses on the tax returns and therefore no negative effect to the capital accounts is 1.1mm.  In the other hand: 800k is needed to cover the 500k in distributions made but has a negative impact on the capital accounts if we use the 800k guarantee. The fund either has to demand the 800k or 1.1mm.  I told Kyle it was prudent to follow Schneider's instructions.

GX-7008-A.  The government also introduced audit workpapers prepared by GPB and sent to its auditor.  GX-8028-J.  A comparison of Gentile's text messages, the audit workpapers, and the Holdings I 2014 audited financial statement (GX-2008) demonstrate that the 2014 Lash performance guarantees are reflected in Holdings I's audited financials.  The audit workpaper, which is titled "DJD and DJD2 Guarantee Calculation," lists the total guarantee as $1,136,201 and the "total distribution to GPB" is $538,390.  GX-8028-J.  The "500k" referenced in Gentile's above text message is almost the same number as the $538,390 figure in the audit workpaper.  The audit workpaper explains: "[T]his workpaper calculates the income of the dealership, including the amount required to be put into the dealership by Jeff Lash under the performance guarantee.  The income/net cash flow of the dealership then dictates approx. how much the fund can pull out as distributions."  Id.  The same $538,390 figure appears on page 5 of the Holdings I audited financials as the total amount of "distributions from investments".  GX-2008.  And the performance guarantee figure in the audit workpaper mirrors the number in the notes on page 13

of the audited financials: "For the year ended December 31, 2014 approximately $1,100,000 was paid by them into the dealerships." Id.

In light of this evidence, the jury was entitled to reject defense expert Martin Wilczynski's dubious testimony and Gentile's arguments, and their verdict should not be disturbed.

### 2. The 2015 Performance Guarantee Was Fraudulent

There is overwhelming proof in the record that the 2015 Performance Guarantee was also fraudulent. This evidence included the following testimony:

- Lash's testimony that, together with the defendants, he created and signed three backdated performance guarantees that were "predicated . . . on a conversation that never happened and we gave that to the accounting firm to give to the investor to show performance that the stores had not met." Tr. 3077–78.

- Jacoby's testimony that Gentile said they had a "big problem" to fix in reference to the 2015 Automotive Portfolio financials and told him to "create his own reality." Tr. 892.

- Jacoby's testimony that Schneider offered him a million dollars to make the 2015 Automotive Portfolio financials look better. Tr. 893.

- Jacoby's testimony that the initial plan was for GPB to refund some of the management fees it had charged investors, but then the plan changed to a fraudulent performance guarantee. Tr. 894–903.

- Lash's testimony, consistent with Jacoby's, that the original plan was for Gentile to refund the management fees. Tr. 3161.

- Jacoby's testimony that sometime between April 27, 2016 and April 29, 2016, he had a phone call from Gentile, and Gentile told him that he decided not to give back the management fees but instead Lash would pay a performance guarantee. Jacoby testified that prior to this, he had never heard of a performance guarantee for Bob's Buick and this is something he would have known as the CFO of GPB. Tr. 923–24.

- Lash's testimony that before sometime in late April 2016, there had not been an agreement—written or otherwise—to guarantee the performance of Bob's Buick. Tr. 3180–81.

- Lash's testimony that in late April 2016, he had a meeting with Gentile, Schneider, and Prestiano and Lash told them that he had never agreed to guarantee the performance of

Bob's Buick.  Gentile acknowledged that Lash didn't guarantee it but indicated this was something they had to do.  Tr. 3184.

- Lash's testimony that Gentile told Lash he needed to be on team GPB, that he would not get hurt, and that he had to trust him.  Tr. 3185.

- Lash's testimony that he lied and signed the fraudulent performance guarantee for Bob's Buick.  Tr. 3187.

- Lash's testimony that he did not think he would have to pay the 2015 Performance Guarantee.  Tr. 3195–96.

- Lash's testimony that Gentile set up the EMDYKYCOL account for him (i.e., the account from which the 2015 guarantee was ultimately paid) and Gentile had access to the account.  Tr. 3196–97.

- Lash's testimony that sometime after the 2015 Performance Guarantee was signed, around June or July 2016, Gentile told him that he put money in the EMDYKYCOL account and then made a payment using that money and other funds in the account. Gentile explained to Lash that he did this to make it appear that the guarantee was being paid.  Tr. 3197.

- Lash's testimony that he agreed with the defendants and Prestiano to lie to law enforcement about the performance guarantees.  Tr. 3216–31.

- Lash's testimony that in 2019 when law enforcement started asking questions, he met with Schneider and Gentile in New York.  Gentile wanted to make sure everyone was on "Team GPB" and that they were all going to "stick to the story" that they agreed to relating to the guarantees.  Tr. 3217–19.

- Lash's testimony that in 2019, Gentile told Lash to say the $700k payment into the EMDYCKOL account—that was used to pay the 2015 Performance Guarantee—was a loan from Gentile to Lash.  Lash testified that that was "new" and he "had never had a loan agreement with David."  Tr. 3219–20.

The documentary evidence introduced at trial also established the 2015 Performance Guarantee was fraudulent.  This evidence included:

- Eight agreements related to the purchase of Bob's Buick, none of which refer to a performance guarantee from Lash.  GX-6195, GX-6191, GX-6190, GX-6192, GX-6193, GX-6189, GX-6196, GX-6194.

- Lash's operating agreement for Bob's Buick dated December 9, 2015—less than 5 months before the personal guarantee was signed—which has no mention of a performance guarantee.

- A text message exchange from March 2016 between the defendants and Lash, in which the conspirators discuss needing cash in Automotive Portfolio. GX-7008-C. Gentile wrote: "Lash, Jovan told me we were upside down on Automotive pretty badly. What are your thoughts? . . . Guys to get coverage ratio to 50% on AP we need cash back to the company of approx. 600k. Thoughts?" Schneider responded: "We have to man up and write checks which is simply giving back dollars we already received." There is no mention of a performance guarantee in this text exchange.

- A series of emails from March 2015 through April 27, 2015, in which Jacoby and others at GPB discuss with the auditors the plan for Gentile to rebate the management fees for 2015. See GX-7852, GX-7475, GX-7476, GX-7480, GX-7478, GX-7496. None of these emails mention a performance guarantee from Lash.

- An email from April 29, 2016 from Jacoby to the auditors, which attached an unsigned draft of the performance guarantee. GX-7513. The file name of the attachment included "2015 draft" but metadata for the attachment showed the document was created by Prestiano on April 28, 2016. GX-7513-C.

- Emails from May 2, 2016 between Jacoby and the auditors about Lash still needing to sign the guarantee. GX-7562, GX-7528.

- Summary charts based on bank records, which show that Lash did not personally pay the 2015 guarantee. See GX-6200 at 22.

Gentile argues that the 2015 Performance Guarantee was not a "sham" agreement, "let alone one that Mr. Gentile used for the purpose or effect of deceiving investors." ECF Dkt. No. 488-1 at 22. Gentile presented this argument to the jury, and the jury rejected it. See Tr. 6649 ("Performance guaranties tell investors that performance was down. It's not hidden."); Tr. 6594–95 (arguing the auditors were not deceived by the 2015 guarantees). Lash testified that the purpose of the 2015 guarantee, as agreed to by Lash and the defendants, was to deceive the auditors and ultimately the investors about Automotive Portfolio's true performance. See Tr. 3188 (the purpose was "to . . . give the . . . accounting firm for the audited financial performance from the dealership that it didn't have. So it was showing that this money was increasing the net cash flow of the dealership that wasn't really there"). He further explained during his testimony that Gentile told

65

him they needed to execute a backdated guarantee to avoid reporting poor fund performance to
investors, which would have a "big impact" on GPB and capital raising.  Tr. 3184–85 ("Anything
bad reported is obviously going to hinder new clients coming in and . . . existing clients coming in
to the fund.").  The jury was reasonable to credit this testimony, particularly in light of the
documentary evidence presented and Jacoby's corroborative testimony.

> The defendants further argue that the 2015 Performance Guarantee was not
fraudulent because it was paid to the fund.  ECF Dkt. No. 487-1 at 29–30; ECF Dkt. No. 488-1 at
37–39.  The defendants presented this argument to the jury, and the jury rejected it.  Tr. 6603–04
(arguing the guarantee was paid by Lash); Tr. 6718 ("And Auto, the one guaranty from 2015, there
is no dispute that the million fifty that you have heard so much about was paid to the investors,
period, full stop, undisputed."); see also Tr. 6650 ("The fact in the 2015 performance guaranty that
it changed and switched from a return of management fees to a performance guaranty, as you
heard, made no difference.  It was a wash.  It was the same two investors either way.  It was a
promise to investors, and that promise happened.").  The jury credited the evidence presented by
the government that notwithstanding the fact that the guarantee was paid, the 2015 Automotive
Portfolio audited financial statements misrepresented the true performance of the fund by (i)
purporting that the operator of the dealership (Lash) had paid the guarantee; and (ii) purporting
that Lash had an agreement in 2015 to guarantee the performance of Bob's Buick when no such
agreement existed during the relevant year and was not created until 2016.

> The evidence proved that the guarantee was paid in a fraudulent manner to make it
appear that Lash had paid it because the auditors needed to see payment coming from Lash because
he is the one who signed the agreement.  Lash testified that sometime after the 2015 Performance
Guarantee was signed, around June or July 2016, Gentile told him that he put money in the

EMDYKYCOL account and then made a payment using that money and other funds in the account. Gentile explained to Lash that he did this "to make it appear that the guarantee was being paid." Tr. 3197. The government also introduced summary charts, based on bank records, to show that Gentile used approximately $624,000 from another GPB fund—Cold Storage—and routed it through various accounts to Lash's EMDYKCOL account to make it look like Lash paid the guarantee. See GX-6200 at 22; Tr. 3851–57 (Petron testimony regarding flow of funds).

Even if the guarantee had been paid by Lash personally, the fact that the agreement was backdated to 2015 and purported to memorialize an agreement that had not existed until 2016 rendered it fraudulent. The government introduced evidence that the 2015 Performance Guarantee was backdated to mislead the auditors and ultimately the investors. Lash testified that the agreement was backdated because "because this document would be going to the accounting firm and it was to make it look like it was legitimately signed on that date to show the performance guaranty was for, you know, starting for January 1st and ending at the end of January and December." Tr. 3198:15–19. Lash further testified that the defendants did not want to disclose Automotive Portfolio's poor performance to investors. See Tr. 3155–56, 3160–61. Lash testified that Gentile told him: "hey, listen, you know, we're in crunch time and, you know, I know you really didn't guarantee it but, you know, this is something we have to do, if not it's going to affect performance. Things are starting to – you know, capital is coming in and this would have a big impact on GPB if we didn't do this." Tr. 3184. The jury was reasonable to credit this evidence.

The defendants further argue that even if the 2015 guarantee had not been paid, it would not have been material because Automotive Portfolio was "fully covered" without the 2015 guarantee using the total investment income figure. ECF Dkt. No. 487-1 at 29. This argument proceeds from the false premise that investors could consider the fund's audited financial

statements only in connection with "total investment income" and that they would not have cared about any other metric or even about whether "total investment income" was significantly overstated.  The jury was entitled to reject that argument.  Based on, among other things, evidence that:

- The defendants themselves considered and tracked net investment income instead of total investment income.  Tr. 767–97 (Jacoby), 821 (Jacoby), 2945–47 (Kgil); GX-8012-A, GX-8013-A, GX-8013-B, GX-8014-I, GX-8014-J, GX-7910-A, GX-8117-A, GX-7915-A, GX-7568-A, GX-7568-B, GX-7568-C, GX-8008-A, GX-7582-A, GX-8009-B, DX-FFFFM-1, GX-7669-A, GX-8275-A (GPB's internal performance reports).

- Testimony from Frederick that it would have been important to him to know that the guarantee was paid by someone other than the operator.  Tr. 670.

- Testimony from Fredrick that he would have wanted to know if the performance guarantee had not been in place in 2015.  Tr. 670.

- Testimony from Teeters that performance guarantees were part of the pitch to investors.  Tr. 1902–03 (explaining that "[i]f a particular dealership wasn't generating the supported income on an annual basis, that Jeff Lash would personally come out of pocket to cover any shortfall").

A jury could reasonably infer from this evidence that the defendants' representations regarding the 2015 Performance Guarantee were material.

3.     *A Scheme to Defraud May be Based on the Dissemination of Material Misstatements or Deceptive Conduct*

Gentile argues that the government failed to elicit sufficient evidence of a "scheme to defraud" because a scheme to defraud "cannot be premised solely on a material misstatement or omission," but rather the government must prove "something extra"—i.e., "an inherently deceptive act that was distinct from an alleged misstatement."  ECF Dkt. No. 488-1 at 20–22.

Gentile's argument is based on an erroneous understanding of the law and ignores the evidence in the trial record.

Gentile cites <u>SEC v. Rio Tinto plc</u>, 41 F.4th 47 (2d Cir. 2022), for the proposition that liability under Rule 10b-5 cannot be premised solely on a material misstatement or omission, but he leaves out that a scheme to defraud can be predicated on "dissemination" of those material misstatements or omissions. <u>Id.</u> at 54 ("[D]issemination is one example of something extra that makes a violation a scheme." (citing <u>Lorenzo v. SEC</u>, 587 U.S. 71 (2019)). There was overwhelming evidence presented to the jury that the defendants disseminated false statements about the funds' performance and the source of the monthly distributions to investors, at due diligence conferences and meetings and through GPB's marketing materials, offering documents, and audited financial statements.

Further, the evidence established that the defendants created sham agreements, which Gentile concedes suffice as "something extra." ECF Dkt. No. 488-1 at 22. Gentile argues that the 2014 Performance Guarantees were not sham agreements because they were not reflected in the Holdings I audited financial statements. <u>Id.</u> at 21. This is wrong for the reasons explained <u>supra</u> in Section II.B.1. Gentile further argues that the 2015 agreement was not a sham agreement because the guarantee was paid and "its payment was timely and accurately disclosed to investors in its 2015 audited financials." <u>Id.</u> at 20. This is also wrong for the reasons articulated above in Section II.B.2.

C.    <u>Evidence of the Defendants' Intent to Defraud Was Overwhelming</u>

The government presented extensive evidence demonstrating that Gentile and Schneider acted with intent to defraud when they lied to GPB's prospective investors about the performance of the GPB funds and the source of the monthly distribution payments.

As the Court is aware, "direct proof of [a] defendant's fraudulent intent is not necessary but may be proven through circumstantial evidence, including by showing that defendant made misrepresentations to the victim(s) with knowledge that the statements were false." Guadagna, 183 F.3d at 129–30 (citing United States v. Smith, 133 F.3d 737, 743 (10th Cir. 1997)). The Second Circuit's "sufficiency of the evidence test must consider the Government's case in its totality rather than in its parts, . . . and may be satisfied by circumstantial evidence alone." Wexler, 522 F.3d at 207 (citations omitted). "When the 'necessary result' of the . . . scheme is to injure others, fraudulent intent may be inferred from the scheme itself." Guadagna, 183 F.3d at 129–30 (quoting United States v. D'Amato, 39 F.3d 1249, 1257 (2d Cir. 1997)). As a result, "a jury may bring to its analysis of intent on individual counts all the circumstantial evidence it has received on the scheme and the purpose of the scheme in which the defendant allegedly participated." Id. With this standard in mind, the government's proof of the defendants' intent to defraud was not merely sufficient, it was overwhelming.

The government's evidence of the defendants' intent to defraud largely fell into the following categories: (1) testimony from the defendants' co-conspirator, Jeffrey Lash, who described how he and the defendants intended to mislead investors; (2) evidence proving certain GPB employees raised concerns about coverage and distributions to the defendants and were fired for raising concerns; (3) evidence proving the defendants added inaccurate information to GPB's offering documents, with knowledge it was inaccurate; and (4) evidence the defendants attempted to hide their actions from regulators.[17]

---

[17]    This is not an exhaustive list and is not meant to capture every piece of evidence of the defendants' intent to defraud introduced during the government's six-week case-in-chief.

1.    *Jeffrey Lash*

Lash testified that he agreed with Gentile, Schneider, and Prestiano to create three backdated "performance guarantees" for the purpose of concealing Holdings I and Automotive Portfolio's poor performance from investors and so that they could continue raising money.  Tr. 3077–78, 3105:13–21.  Lash testified that, in explaining the plan for the 2014 Performance Guarantees, Gentle told him: "We're going to back-date it to the beginning of 2014 so it gives the appearance that we had a discussion there about these two basic documents that he had that showed, and they were just our projections, and that we guaranteed them basically over a year ago."  Tr. 3105:13–21.  Lash further testified that the purpose of back-dating the documents was to deceive the auditors about the true nature of the agreement and the fact that it had never existed before 2015: "It was important to make sure it looked legitimate so when we're sending it to the auditor that it is a document that reflects that the time period that it is taken care of.  This is for the performance of 2014."  Tr. 3125:12–16. Lash further explained that he did not tell the auditors (i) the 2014 Performance Guarantees had not existed until 2015; (ii) he had never guaranteed the performance of the DJD Dealerships; and (iii) that Gentile promised him he would not have to pay the guarantees, because if he told the auditors the truth, "the investors would see the proper performance of the dealership that, you know, we had not hit anywhere close to the objective that we had stated."  Tr. 3134:19–3135:10.

Lash testified that the defendants executed another sham guarantee to artificially inflate Automotive Portfolio's results for 2015.  Like the 2014 Performance Guarantees, the 2015 Performance Guarantee was backdated to January 1, 2015 to create the appearance that the agreement had been in place throughout 2015 and deceive the auditors and ultimately investors.  Lash testified on cross-examination:

> Q: Now, you testified, I think, both with respect to the 2014 and 2015 performance guarantys that they were backdated to fool the auditors. Was that your testimony?
> A: It was -- the date was to make it appear that that's the date it was signed on is what I said.
> Q: Right.  Yeah, in other words –
> A: The ultimate result of doing the fraudulent guarantee is to ultimately get it to the accounting firm who is doing the audited financials to put it in.

Tr. 3455:24–3456:1.  Lash explained that the guarantees were back-dated to deceive the auditors into thinking the guarantees had been in place all along: "[The auditors] wouldn't take – if it was darted the actual date it was signed, they wouldn't take it because it wouldn't make any sense.  So there was a reason for backdating it, it shows performance for a previous year."  Tr. 3456:2–11; see also Tr. 3606:25–3607:5 (Lash) ("Q: Mr. Lash, both on direct examination and on cross-examination today you testified that the performance guaranties had to be backdated so as the auditors wouldn't really know the true date of when the document was signed, correct?  A: Correct.").

Lash further testified that in approximately June or July 2016, he learned that Gentile had put money in Lash's account and taken it out he next day to pay the 2015 Performance Guarantee.  Gentile told him he did this "[t]o make it appear that the guarantee was being paid."  Tr. 3197:12–21.  The jury was reasonable to credit Lash's testimony that the purpose of the 2014 Performance Guarantees and the 2015 Performance Guarantee was to deceive GPB's auditors in order to get them to sign off on false audited financial statements.

Lash also testified to engaging in an effort to cover up the performance guarantee scheme and lie to the government with the defendants; the cover-up was evidence the defendants knew they had done something wrongful.  Lash testified that he met with Schneider and Gentile immediately after being approached by the FBI in 2019.  Tr. 3218.  Lash told the jury that Gentile

wanted to make sure he was "on team GPB" and would "stick to the story." Tr. 3219:10–15. Lash agreed with Gentile and Schneider that, if asked, he would tell law enforcement that the transfer through his account related to the 2015 Performance Guarantee was actually a loan from Gentile. Tr. 3219:22–3220:2. Lash told the jury that he agreed with the defendants to lie. Tr. 3220:9–12 ("Q: Mr. Lash, was that true?  A: No.  Q: Did you agree to lie?  A: Yes."). Lash testified that Prestiano accompanied him to an interview with the fund's attorneys to ensure he stuck with the story. Tr. 3221. He also testified that Gentile and Prestiano threatened him: "Q: Did the defendant or Mr. Prestiano tell you what might happen if you didn't stick to the story?  A:  In discussions it would be, we could take your basic severance package away and make it very difficult for you going forward." Tr. 3222:17–21.

Lash testified after the FBI executed a search warrant at GPB's office, Gentile asked a lawyer how much jail time he (Gentile) was facing if he were to go to prison. Tr. 3230–31. Lash testified that he was looking for the answer because he knew he was involved. He was waiting to see what the response from the attorney was.

### 2.  Evidence GPB Employees Raised Concerns to the Defendants, and Then the Employees Were Fired

Multiple GPB insiders testified that they raised concerns about how GPB was communicating information about coverage and the source of the monthly distributions to investors and were fired for it. The jury could infer from this evidence that the defendants knew they were misleading investors and that they intended to do so when they fired the employees who challenged them. For example, Jacoby testified that he saw the discrepancies between what was happening inside GPB—that the funds were using investor money to pay distributions—and what investors were being told—that distributions were fully covered, and he raised these concerns with the defendants:

> Q: What do you remember saying to Mr. Gentile after you reviewed
> the marketing materials?
> A: Well, I told him that the performance numbers weren't accurate
> and he said they were selling at different performance and that's the
> performance that they were going to use.
> Q: And what about Mr. Schneider? Did you have discussions with
> him about these marketing materials?
> A: I did.
> Q: And what was — what was his response when you told him about
> these inaccuracies?
> A: He told me I was being a cock block and that I should stick to
> accounting and he would stick to the marketing.
> . . .
> Q: What did you understand that to mean, sir?
> A: He didn't want me to be difficult because he needed the
> performance numbers to be the way that they looked so he could sell
> the funds.
> Q: Did he tell you this?
> A: Yes.

Tr. 714:8–20.  Jacoby further testified that after he had these conversations with the defendants

about the marketing materials, he "was cut out of that process going forward."  Tr. 733:18–23.

Jacoby also testified that he told Gentile the financials for Holdings I in 2014 and Automative

Portfolio in 2015 had to be restated.  Tr. 937.  Gentile refused and shortly thereafter, Jacoby was

fired.   Tr. 940–41.  Anscher's testimony corroborated Jacoby's account of his firing.  Anscher

testified that the defendants made him fire Jacoby because they wanted someone smart, and they

wanted someone to listen to them.  Jacoby was not doing what the defendants wanted him to do

with respect to coverage and accruals.  Tr. 4955–56.

Anscher also testified that he had concerns about the marketing materials, notably,

what they said about coverage and distributions.  Tr. 4332–33.  He explained: "I had concerns

around how we were representing that information, because I wasn't comfortable with it."  Tr.

4332.  Anscher testified that he raised these concerns and others with the defendants.  Tr. 4333.

On September 9, 2016, Anscher forwarded the defendants a link with an article from the Wall

Street Journal about the CFO of a company being arrested on securities fraud charges. GX-8326.

The article, titled "Former American Realty Capital CFO Arrested on Securities Fraud Charges,"

describes how the CFO allegedly falsified the company's adjusted funds from operations numbers.

Anscher testified that he sent this article to the defendants because he was "concerned we were

going down the same path." Tr. 4308. He testified: "I mean, after all the many conversations

we'd had about lack of coverage, about not having sufficient capital to make the distributions, and

therefore, it being a return of capital, we were in a position where we were doing the same thing

as these guys were doing and did." Tr. 4308. Anscher was fired by the defendants in February

2017. Tr. 4470. The jury could infer from this testimony that the defendants were aware that their

conduct was wrongful. The jury could also reasonably infer from their continued conduct and

decision to fire Anscher that they intended to continue it.

Anscher testified that GPB's Chief Compliance Officer Jeff Schultz also had

concerns about the use of investor capital to pay distributions, and was fired by the defendants.

Tr. 4120–21.

>    3.    *Evidence That the Defendants Amended GPB's
>           Offering Documents and Were Warned About the
>           Accuracy of the Language They Added*

The government introduced evidence that the defendants amended the Holdings I

and Automotive Portfolio PPMs to add lies, despite being warned that the language was inaccurate.

The testimony made clear that these lies were not an accident and that the defendants' purpose was

to mislead investors while providing themselves plausible deniability.

Jacoby testified that he discussed with the defendants and Anscher adding language

to the PPM to say GPB may include investor money in the distributions. Tr. 952–54. The

defendants "refused to accept that language and they made us change it to, we have no present

plans to do so but we could do it if we wanted to." Tr. 953:1–5. Jacoby further testified that

Gentile and Schneider felt that making it clear that GPB was using investor capital to cover distributions would be "alarming" to investors. Tr. 953. Schneider told Jacoby he wanted the no present plans language in because he felt it could be used as an excuse down the road. Tr. 954.

Anscher also testified that he discussed the "no present plans" language with both Gentile and Schneider. Tr. 4361. Anscher testified that it was Schneider who directed him to copy and paste the "no present plans" language from the Holdings II PPM into the Automotive Portfolio PPM. Tr. 4939:12–19. Anscher testified that Schneider was "adamant" that GPB include the "no present plans to do so" language in the amended PPM. Tr. 4367. Schneider wanted the "no present plans" language in the offering document because it "left some wiggle room." Tr. 4369.

Anscher raised concerns to Schneider about the accuracy of the language because GPB had been using investor capital to pay the distributions. Tr. 4368. On June 7, 2016, Anscher sent the Q1 2016 results to the defendants. GX-8105. Holdings I had a shortfall for 2015 year-to-date and at the end of Q1 2018, was short almost $2 million for the year. GX-8105-A. Automotive Portfolio was short over $1.3 million for 2015 and another half a million for year-to-date 2016. Id. Later that same day, Anscher had a call with the defendants. Tr. 4163. The government introduced the calendar invite for the call. GX-8183. Anscher testified that he spoke just with Gentile and Schneider because it was a "sensitive" topic. Tr. 4163. He testified that the coverage shortfalls were evident from the Q1 2016 results, "and we were talking about being one hundred percent covered in our marketing meetings." Tr. 4163–64.

Lash testified that sometime in 2016, he overheard a conversation between Gentile, Schneider, Anscher, and Prestiano about how to get something into the PPM. Tr. 3075–77. He overheard them say they wanted to get something in "without causing too much of a stir that the

investor was getting part of their capital basically back as part of their dollars that they were receiving." Tr. 3075.

In December 2016, the same "no present plans" language was added to the Holdings I PPM. GX-4099. Kgil testified that in December 2016, Automotive Portfolio and Holdings I were using investor money to pay the distribution payments. Tr. 2476–78.

4.    *Evidence the Defendants Attempted to Hide Their Actions From Regulators*

The government also introduced evidence that the defendants attempted to conceal their conduct from regulators. The jury could infer from this effort at concealment that the defendants knew their conduct was wrong. Among other evidence:

- Jacoby testified that Schneider told him to be careful not to use company email because he was "afraid that . . . FINRA may come in and look at his emails, and he wanted that to be clean just in case. He didn't want comments about compliance or anything else that may look like it's a little shady on corporate email." Tr. 1444:14–17.

- Anscher testified about an incident in February 2016 when Anscher emailed Schneider proposed changes to marketing material, and Schneider called Anscher screaming that he should never put something like that in writing again. Tr. 4314.

- Lash testified that Schneider told him that FINRA could monitor or see his company emails, so Lash would call him or use a different email address, not company email, if he had something sensitive to talk to Schneider or Gentile about. Tr. 3144:9–17.

- A text message from Schneider to Lash, in which Schneider wrote: "Wherever possible avoid emails to me as they get reviewed by FINRA. Otherwise use my gmail. (Jeffrey Schneider@gmail.com)." GX-7008-D.

- An email dated May 8, 2015 between Gentile, Schneider, Lash, Dibre, Marshall, and Sijan (all using their personal email accounts) in which they discussed a payment plan for the 2014 Lash guarantees. GX-8143.

In addition, the government introduced evidence establishing that Schneider used his personal email to lie to Kenneth Hoffman, an employee of broker-dealer Hightower Advisors. On September 17, 2016, Schneider personally sent an email inviting Hightower Advisors to an upcoming GPB due diligence event. GX-8259. Hightower responded to Ascendant and said they

would not be moving forward with due diligence on GPB.  GX-8260.  Mano Fanopoulous (an Ascendant employee) forwarded the response to Schneider and responded: "A little lame.   We need to understand the deal and not give up."  Id.  Someone at Ascendant then drafted an email response for Schneider to send to Hightower, and they sent the draft to Schneider's Ascendant email account.  GX-8261.  Schneider then switched to his Gmail account and sent the email dated September 22, 2016 to Hightower.  GX-7879.   He wrote:

> My colleague, Mano, had mentioned that your team, won't be moving forward with any additional due diligence on GPB. . . . I believe GPB is distinct from any other PE strategy currently in the market.  **GPB has been able to provide meaningful income (8.7% fully covered distributions)** with minimal to no leverage in addition to the upside potential in fragmented and recession resilient sectors of the private market.  I certainly appreciate that your team is busy and hope I am not overstepping my bounds, but it would mean a lot to me if you could take a closer look at GPB.

Id. (emphasis added).  The government introduced evidence that Schneider knew that, for over a year, GPB had been using investor money to pay the Automotive Portfolio and Holdings I distributions.  GX-8105.

## 5. The Jury Has Already Rejected the Defendants' Competing Inferences With Respect to Intent

Both defendants assert that the evidence was insufficient to establish that they acted with specific intent to defraud investors or, for aiding and abetting liability, the specific unlawful intent to further the underlying crime and intent that the defendants acted would bring about the underlying crime.  The defendants present several competing inferences that the jury could have drawn from the evidence at trial.  These competing inferences are just that—contrary inferences

that the jury could have but was not required to draw.  They do not establish that no reasonable jury could have found that the defendants acted with fraudulent intent.

Gentile argues that the evidence is insufficient to support a finding that he acted with intent to defraud GPB's investors because when Gentile made representations about coverage, any "shortfalls" that existed were covered by accrued revenue.  ECF Dkt. No. 488-1 at 33.  Gentile argues that Mr. Wilcyznski found that the funds were covered if one were to count accrued revenue.  Id. at 26–27.  Gentile made this argument in summation, and the jury rejected it.  Tr. 6541 ("And suddenly, in this courtroom, it's become a crime when GPB would use accruals, which means money they haven't received yet, but they have a reasonable basis to believe they're going to collect on it to figure out and calculate net investment income.  There's nothing wrong with that and Ms. Kgil told you there's nothing wrong with that."); Tr. 6548 ("There is nothing wrong when you have available cash in one account and move it another account especially when you have accruals you think are coming in.  It happens all the time in business.").  As the government explained in rebuttal, accruals are not cash, and the defendants had promised that cash from the profits of the portfolio companies would be used to fund the distributions.  Tr. 6874, 6880.  Whether or not Gentile thought the funds might eventually receive accrued income to cover distributions, he knew that the funds did not actually have sufficient cash profits to pay monthly distributions.  Jacoby testified that when GPB did not have enough money to make the distribution payments, the accounting team at GPB would, at the direction of and with the approval of Gentile, transfer money from the investment account to the distribution account.  Tr. 766.  Kgil testified that Gentile explained this to her when she joined the company—that when there was a shortage of funds, they would use money from the investment account to be able to make distributions.  Tr. 2626.  The government introduced various iterations of the tracking spreadsheet that was created

to track the money moved between the investment, operating and distribution accounts. GX-6171. Gentile received the tracking spreadsheet. See, e.g., GX-7011. This evidence establishes that Gentile knew GPB was not actually paying distributions from profits, regardless of whether GPB might receive sufficient funds from receivables in the future.

Gentile further claims that evidence of his financial compensation is not enough "without more" to establish his intent. ECF Dkt. No. 488-1 at 34. Evidence of Gentile's compensation was admitted as evidence of motive and motive is relevant to an inference of intent. In support of this argument, Gentile cites only inapposite civil cases addressing Rule 12 motions to dismiss. He cites no criminal case for the proposition that the jury cannot consider motive as evidence of intent. Moreover, evidence of Gentile's motive supports the extensive other evidence of intent described above.

Gentile also argues that any inference by the jury of fraudulent intent is not reasonable in light of the "repeated disclosures of under-coverage during the course of the alleged scheme." ECF Dkt. No. 488-1 at 35. The defendants presented this argument to the jury and the jury rejected it. See Tr. 6516 ("Audited financial statements. Audited financial statements. Once again showing distributions exceeding net invest income. You are under covered. It is there in black and white. No mystery. . . . This is evidence of lack of intent. I have never heard of a fraud case where somebody produces webinars and announces just how poorly we're doing."); Tr. 6715 ("What's hidden? An intent to deceive, an intent to defraud? The numbers are put out there. Most fraud cases, you see it's all sunshine, paved roads, no bumps, no nothing. Nothing can go wrong. You can't lose. None of that is present here. The good and the bad is presented."). It was not unreasonable for the jury to reject this inference. As the government explained, these purported disclosures fell far short of what the defendants claimed. They did not, in fact, present the full

story.  None of the "disclosures" the defendants point to actually informed investors that the monthly distributions the funds had been paying included other people's money.  In fact, these partial "disclosures" tended to show that the defendants knew what they were doing was wrong. Tr. 6483–87, 6895.

With respect to Count Four, Gentile claims that he "could not have the requisite intent to commit wire fraud . . . because that $509,644 transfer occurred at least five, if not seven, days before the alleged scheme to create the 2015 Performance Guarantee was purportedly even created by Mr. Gentile and others."  ECF Dkt. No. 488-1 at 41–42.  The Court instructed the jury that the government must establish beyond a reasonable doubt that the interstate wire communication was "in furtherance of the scheme to defraud."  Tr. 7011.  And although the record does not answer the question of the precise date on which Gentile and his co-conspirators decided to incorporate a fake performance guarantee into Automotive Portfolio's audited financials, it was reasonable for the jury to infer from the evidence that the $509,644 wire transfer from the GPB Realty Capital account at Signature Bank to a Realty Capital account at J.P. Morgan Chase on April 22, 2016 was in furtherance of the conspiracy.

Lash testified that sometime after a text exchange with the defendants dated from March 23, 2016, he went to a meeting in New York City with Gentile, Schneider, and Prestiano and they told him "we're going to do another performance guarantee."  Tr. 3165–68.  The fact that Prestiano did not paper the agreement until April 28, 2016 is not dispositive of when Lash's meeting with Gentile, Schneider, and Prestiano took place.  It was reasonable for the jury to conclude that the April 22, 2016 wire was in furtherance of the conspiracy to defraud investors using the 2015 Performance Guarantee given the defendants had done the very same thing the year prior.  Namely, Lash testified that in 2015, the defendants had contemplated "putting money back

in [Holdings I] to shore up the shortfall" before instead choosing to use a fake performance guarantee to fraudulently inflate Holdings I's revenue.  Tr. 3104:16–3105:21.

In addition, the jury could reasonably conclude that the circuitous April 22, 2016 transaction—from one Realty Capital account to another—would not make sense if Gentile intended to use a legitimate management fee rebate.  Rather, the jury could reasonably find that the transactions were structured to disguise the true source of the funds used to pay the 2015 Performance Guarantee and therefore were in furtherance of the scheme.

Gentile further argues that he always acted "in good faith to put either his own or Mr. Lash's money into Automotive Portfolio—be it through the originally contemplated management fee rebate or the 2015 Lash Performance Guarantee—for the ultimate benefit of investors."  ECF Dkt. No. 488-1 at 42–43.  This argument appears to confuse the requirement that Gentile intend to obtain "money or property" through the scheme with how the scheme was executed.  As the government explained, Gentile contributed approximately $700,000 to the fund by routing payments through Lash under the cover of the 2015 Performance Guarantee.  This fraud inflated Automotive Portfolio's financial results and fueled hundreds of millions of dollars in investments.  Those investments (and the management fees GPB charged on them) are the "money or property" targeted by the scheme.  It is also irrelevant that the management fee rebate would have resulted in a similar bottom-line income number.  The management fee rebate never happened, and Gentile chose to inflate Automotive Portfolio's results with money from another GPB fund—Cold Storage—instead.

Gentile argues that the fact the auditors were aware of and approved of the switch from a management fee rebate to the 2015 Performance Guarantee negates any inference that Gentile had an intent to defraud.  ECF Dkt. No. 488-1 at 43.  Gentile made this argument in his

closing, and, once again, the jury reasonably rejected it. See Tr. 6602 ("Mr. Matarazzo and all the auditors being sent the same document. They knew about the switch. They didn't have a problem with it."). Gentile's argument disregards the other evidence in the record that showed that Gentile intended to deceive the auditors, and, most importantly, GPB's investors. For example, Lash testified that sometime after the 2015 Performance Guarantee was signed, around June or July 2016, Gentile told him that he put money in the EMDYKYCOL account and then made a payment using that money and other funds in the account. Gentile explained to Lash that he did this to make it appear that the guarantee was being paid. Tr. 3197. The jury was reasonable to credit the ample evidence in the record of Gentile's fraudulent intent.

Finally, Gentile argues that since a performance guarantee signals to investors that the fund underperformed, that negates any inference that he acted with intent to conceal Automotive Portfolio's true 2015 financials. ECF Dkt. No. 488-1 at 44. The jury reasonably rejected this argument. As the government explained in rebuttal: "Yes, a performance guaranty tells you that a dealership didn't make the profit it was supposed to. But it's not as they're saying. It's not, oh, we're telling you we're having bad performance. What they're telling you as an investor is, the plan is working, just like we told you it would. If we missed our mark, we've got a performance guaranty to backstop the profits. But there was no backstop. There was no performance guaranty. It's fake." Moreover, the jury could reasonably conclude that the results would have been even worse without the 2015 Performance Guarantee, regardless of whether or not the guarantee might signal to investors that the fund had underperformed. Gentile's argument depends on the false premise that the 2015 Performance Guarantee was legitimate.

Schneider argues that the evidence at trial proved he "sought to prevent misrepresentations" because at some point, Schneider instructed the Ascendant Capital

representatives to take out the fully covered language from the pitch.  ECF Dkt. No. 487-1 at 44.
The jury reasonably rejected this argument because the evidence established that Schneider did
not actually instruct Ascendant Capital's employees to provide truthful information and he
withheld key facts from them.  Teeters testified that sometime in 2016, the words "fully covered"
were taken out of the pitch but the pitch otherwise stayed the same.  Tr. 2102–03.  Teeters testified
that he attended due diligence events at which Schneider presented in 2015, 2016, and 2017 and
the messaging from Schneider on the source of monthly and special distribution payments never
changed: Schneider said the distributions came from income from the portfolio companies.  Tr.
1012.  Teeters further testified that at no point during his time at Ascendant did anyone (including
Schneider) ever instruct him to tell financial advisors that the monthly distributions could be a
return of capital or a return of other investors' capital.  Tr. 2136:9–15.  In light of this evidence
and all of the other evidence presented, the jury was reasonable to infer that Schneider acted with
intent to defraud GPB's investors.

Finally, Schneider argues that he did not have the requisite intent because he
personally invested in the GPB funds.  ECF Dkt. No. 487-1 at 45.  The jury was not required to
draw the inference that Schneider lacked criminal intent from his own investments.  Rather, the
jury could weigh this argument against all the other evidence of Schneider's intent—described
above—and conclude as it did that whatever the purpose of Schneider's investments, it did not
outweigh the other evidence presented.[18]

---

[18]     There are any number of other reasonable inferences from Schneider's decision to invest,
including that he believed things would work out in the end, i.e., that there would be "no ultimate harm," or that he
thought it would be suspicious if he did not invest in his own funds, or that he put his own money in late in the fraud
so that he could point to his own contributions later to argue as he did at trial that he lacked an intent to defraud.

Based on all of the evidence discussed above, it was reasonable for the jury to find that the defendants acted with fraudulent intent. Their verdict should therefore not be disturbed.

IV.    The Court's Evidentiary Rulings Were Correct

The Court has already considered and rejected each of the evidentiary issues raised by the defendants. The defendants present no new arguments and no meaningful basis for the Court to revisit its rulings, which were sound in any event. Moreover, even assuming the defendants could present a basis for the Court to reconsider these rulings, any error was harmless in light of the extensive evidence of the defendants' guilt, including the testimony of a cooperating witness who admitted on the stand to committing crimes with the defendants, insiders who told the jury they warned the defendants they were lying to investors, and victims who described how the defendants lied to them personally.

A.    Misleading Statements to Investors and Potential Investors
Were Admissible for the Effect on the Listener

As in any investment fraud case, the Court admitted at trial evidence of statements made to investors and potential investors because those statements are relevant to the "total mix" of information available to investors and potential investors. Tr. 2144–47. That some of these statements were made by Ascendant Capital employees, instead of the defendants personally, does not make these statements per se irrelevant, as the defendants contend, and the government was not required to establish that these statements were made pursuant to an agency relationship or by a co-conspirator for them to be relevant. The defendants' alternative argument that the Court was required to find expressly that the government had "connected" these statements to the defendants as if they were co-conspirator statements admitted pursuant to Federal Rule of Evidence 801(d) is also meritless. The defendants cite no case for this supposed requirement because none exists.

Relevant evidence is any evidence that "has a tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401(a). "'The definition of relevance under Fed. R. Evid. 401 is very broad,' and as a result, the standard for relevance is 'very low.'" United States v. Jones, No. 16-CR-553 (AJN), 2018 WL 1115778, at *9 (S.D.N.Y. Feb. 27, 2018) (internal citations omitted). "[S]o long as a chain of inferences leads the trier of fact to conclude that the proffered submission affects the mix of material information, the evidence cannot be excluded at the threshold relevance inquiry." United States v. Quattrone, 441 F.3d 153, 179 (2d Cir. 2006) (citing United States v. Ravich, 421 F.2d 1196, 1204 n.10 (2d Cir. 1970)).

As the Court explained, evidence of what investors and prospective investors were told about their GPB investments generally and about the source of their monthly distributions specifically was plainly relevant in this case. The Court clearly stated that "this [information] is part of the total mix of information that is going to investors."[19] Tr. 2144. The Court reiterated this ruling multiple times. See, e.g., Tr. 3643 ("So I am not going to exclude these materials. I think before I have allowed materials like these in on the grounds that what the total mix of information before investors is, is something that is important to this case."). These rulings were correct. The government was required to prove that investors and prospective investors were given false or misleading information about the monthly distributions from the GPB funds. Accordingly,

_____

[19]    Gentile asserts that the government agreed that it was necessary for the government to show an "agency" relationship even if the statements were admitted not for their truth but for the effect on the listener. ECF Dkt. No. 490-1 at 28. That was not the government's position. The government sought to admit these statements on multiple theories. See ECF Dkt. No. 373 (arguing that statements to investors and prospective investors were admissible for a non-hearsay purpose for effect on the listener and/or alternatively as agent statements). The Court did not rely on this theory, and the defendants do not cite any statement that was actually admitted as a statement of an agent as opposed to on the "total mix" theory articulated by the government and accepted by the Court. Nonetheless, to the extent the Court considers the issue, the government notes that there was extensive evidence of such a relationship, as the Court itself recognized at the end of trial. See Tr. 4574 ("I also think, based on what we have heard about Ascendant and how it worked in Mr. Schneider's role, that these are statements of Mr. Schneider's agents.").

the information provided to investors was relevant either to show that investors were provided false and misleading information (as the government argued) or were provided accurate information (as the defense argued unsuccessfully), and so that the jury could determine whether any false and misleading information was "material" in light of the other information presented.

Statements to investors and prospective investors satisfied the exceedingly low threshold for relevance whether the statements were made by the defendants personally or by their employees at Ascendant Capital and GPB. As the Court recognized, whether the defendants were aware of or authorized a particular statement goes to the weight of the statement, not its admissibility, and other elements of the charges, which the government could (and did) prove through other evidence.[20]  As the Court explained, "I take the point that there is still like it has to be relevant to the trial, but the rest of it just seems like argument. You can argue to the jury, look, my client had nothing to do with GPB. My client had nothing to do with Ascendant, and they put on evidence that would suggest the two entities are being run the same, and you all can argue about that. You can say he is not on the email. You can say that this witness said he almost never interacted with Mr. Gentile . . . ." Tr. 2144–47; see also Tr. 234 ("I take it you were going to have different testimony that you are going to adduce, either from these witnesses or from other witnesses that complicates the story of who was directing these communications, but that does seem like it's going to be — feels like it would be a jury question, right? Which of these witnesses do you believe? What's the rational inference to draw from the degree of control that these folks

---

[20]    Schneider contends that the evidence showed that other individuals at Ascendant Capital, including the Product Due Diligence team, were responsible for reviewing and approving these communications. ECF Dkt. No. 487-1 at 61–62. Whether other individuals at Ascendant Capital were also involved in reviewing and approving these communications is irrelevant to whether Schneider was aware of or caused the statements. Schneider does not explain how the involvement of others precludes his own involvement in the same communications. Moreover, his argument that the compliance team at Ascendant Capital was responsible for these communications was presented to and rejected by the jury.

were exercising?"); Tr. 2144 ("I do not think I am going to the agency hearsay bucket").   Because these statements were introduced for a non-hearsay purpose, the government was not required to show anything more.  See Tr. 234 ("I do think the government's probably right that these are statements that are not offered for their truth, so they are not – they don't need to meet a hearsay exception in the way that they would if they were offered for their truth.").   The defendants' attempt to graft onto Rule 401 some other "connection" requirement borrowed from Rule 801(d) has no basis in law.[21]   The statements admitted here were not admitted as non-hearsay pursuant to Rule 801(d) and the defendants do not cite any support for their ipse dixit and apparently novel demand that the Court apply the same approach to a question of weight rather than admissibility.

The Court recognized the difference between a "preliminary question" necessary to determine admissibility pursuant to Rule 801(d) and relevance at trial, and the defendants have not presented any basis for the Court to reconsider that ruling.  The Court explained that, "I guess I agree there has to be some connection to the defendants in this case. I am just not sure as to exactly operate through the hearsay rules or that I have to make the same kinds of factual findings that you have to make for some hearsay exceptions, right, like co–conspirator statement, I think I would have to make some formal findings.  I am not sure I need to make them here."  Tr. 237; see also Tr. 234 ("as I said we are already out of the hearsay bucket so I'm not sure that there is a preliminary determination really for me to make other than, I guess, relevance is sort of subject to

---

[21]    For a statement to be non-hearsay under Rule 801(d) the Court must resolve the "preliminary question" of whether the statement was made by a co-conspirator in furtherance of the conspiracy. United States v. Maldonado-Rivera, 922 F.2d 934, 959 (2d Cir. 1990).  In the Second Circuit, the practice is to conditionally admit alleged co-conspirator statements "subject" to the Court's ultimate finding at the close of evidence that the government has proven the speaker's membership in the conspiracy at least by a preponderance.  See United States v. Geaney, 417 F.2d 1116, 1120 (2d Cir. 1969) (observing that "the practicalities of a conspiracy trial may require that hearsay be admitted 'subject to connection'"); see also United States v. Saneaux, 365 F. Supp. 2d 488, 489–90 (S.D.N.Y. 2005) (explaining the Circuit's traditional practice).

connection from what we will hear later."). The "connection" described by the Court is not the same thing as an "agency" relationship or membership in a conspiracy as Gentile argues. ECF Dkt. No. 490-1 at 28. As the government explained on the first day of trial, such a connection could be established through evidence that the defendants "knew about it, or caused it, or they made statements themselves." Tr. 194:12–15. There was more than sufficient evidence for the jury to conclude the defendants were aware of the representations made to investors and prospective investors. The defendants' insistence that the government establish that connection through an agency relationship specifically, ECF Dkt. No. 490-1 at 28–29; ECF Dkt. No. 487-1 at 70–71, has no basis in law and was rejected by the Court at trial.

For all the reasons explained above, infra in Section III, the Court's ruling on this issue was correct; there was more than sufficient evidence showing the defendants' awareness of the materially false and misleading information provided to investors and prospective investors. Teeters, a longtime Ascendant Capital employee, testified that he learned how to pitch GPB funds from Schneider, that Schneider exercised "total control" over the pitch, attended sales calls, and instructed him and others on how to respond to questions. Tr. 1898, 1900, 1904, 1908, 1971, 1957, 2137, 1955–56. Anscher also testified to Schneider's control of marketing materials and that he raised concerns about the representations made to investors and potential investors to both defendants. Tr. 4313, 4332, 4945. Victim-investors Jay Frederick, Marvin Jones, Anthony Lagiglia, and Matthew Crafa all testified to the defendants' attendance at due diligence events where materially false and misleading information was provided to investors and potential investors. See Tr. 415, 189, 371, 3659, 1740, 3666. Anscher and Teeters also testified to personally attending presentations with the defendants, and Anscher testified to observing the defendants make materially misleading statements to investors. Tr. 1012, 4130–32. Finally, the

defendants were included on many emails circulating marketing materials to be provided to investors.[22] GX-8099, GX-8184. Schneider was also included on emails discussing how to respond to questions from Madison Securities representatives about the source of monthly distributions. GX-8146. This evidence was more than sufficient for the jury to conclude that Schneider and Gentile were aware of the false and misleading information provided to investors and prospective investors.

B.    The Court Correctly Limited Erica Bramer's Prejudicial and Irrelevant Proposed Testimony

Contrary to Schneider's contention, see ECF Dkt. No. 487-1 at 63–69, the Court correctly limited Erica Bramer's prejudicial and irrelevant proposed expert testimony regarding the valuation of the funds' assets. As an initial matter, trial courts have broad discretion in deciding whether to admit or exclude expert testimony, and such a decision "is not an abuse of discretion unless it is 'manifestly erroneous.'" Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 264 (2d Cir. 2002); see United States v. Finazzo, 682 F. App'x 6, 10 (2d Cir. 2017) (same). Here, Schneider sought to introduce confusing and irrelevant expert testimony about the Net Asset Value of the GPB funds, which testimony, Schneider now argues, "would have demonstrated that there had either never been a return of investor capital, or that any such return was immaterial." ECF Dkt. No. 487-1 at 68. Stated differently, Schneider claims that Ms. Bramer's proposed testimony "would have demonstrated that the GPB Funds retained all or almost all of the capital contributed

---

[22]    Schneider contends that the evidence showed that other individuals at Ascendant Capital, including the Product Due Diligence team, were responsible for reviewing and approving these communications. ECF Dkt. No. 487-1 at 70–71. Whether other individuals at Ascendant Capital were also involved in reviewing and approving these communications is irrelevant to whether Schneider was aware of or caused the statements. Schneider does not explain how the involvement of others precludes his own involvement in the same communications. Moreover, his argument that the compliance team at Ascendant Capital was responsible for these communications was presented to and rejected by the jury.

90

by investors *after* making distribution payments." Id. at 69.  But the Court already considered and properly rejected these arguments in ruling on the government's Daubert motion, and Schneider identifies no basis for the Court to revisit that ruling now.  As the government explained in its original motion, see ECF Dkt. No. 406 at 13, the Net Asset Value of the funds after distributions has no bearing on whether GPB in fact used investor contributions to fund distributions in whole or in part, which is a function of cash flow.  And as the Court recognized in its Daubert ruling, the defendants could have attempted to show that distributions did not include a return of capital or were not only a return of capital without presenting testimony regarding a confusing and misleading metric about the value of the funds' assets, which would in effect have introduced into the case the irrelevant question whether investors lost or made money on their GPB investments. See ECF Dkt. No. 435 at 16–17.

    The Court also considered and correctly rejected Schneider's misplaced materiality argument.  In his motion, Schneider erroneously claims, as he did at trial, that Ms. Bramer's proposed testimony about Net Asset Value was relevant to the materiality question before the jury. See ECF Dkt. No. 487-1 at 68.  It was not.  As the Court explained in rejecting this same argument, the question of materiality turned on whether "there is 'a substantial likelihood that a reasonable investor would find the . . . misrepresentation important in making an investment decision." ECF Dkt. No. 435 at 15–16 (quoting Litvak I, 808 F.3d at 175).  Here, as the government proved overwhelmingly at trial, the defendants repeatedly misrepresented to current and prospective investors that distributions were sourced from income from portfolio companies.  Whatever value remained in the funds after distributions were ultimately paid has no bearing on the materiality of this misrepresentation when it was made to investors.  And whatever minimal relevance it had to

materiality was, as the Court reasoned, substantially outweighed by the risk of confusing and misleading the jury.  See id. at 16–17.

In any event, any error in precluding Ms. Bramer's proposed asset valuation testimony would be harmless as Schneider had ample opportunity to present his non-materiality defense.  At trial, and over the government's objection, the defendants introduced testimony on cross-examination regarding the fair market value of the Automotive Portfolio.  See Tr. 659:3–661:11; DX-IIIIM at -173.  In doing so, Schneider's counsel relied on this metric to make the point that, even after five years of distributions had been paid to investors, the fund was still purportedly valued at $415.7 million.  See Tr. 661:4–11.  Moreover, as Schneider points out, the government introduced a summary chart reflecting total assets under management across the GPB funds as of April 2018.  See GX-6200 at 31.  During summations, Schneider repeatedly referenced this chart in arguing to the jury that "[t]here is not a material return of capital here.  The investors' money . . . is still here."  Tr. 6758:17–19; see also Tr. 6758:7–9 ("So I ask you, proof beyond a reasonable doubt that a substantial, material amount of capital was returned?  The government's chart says it didn't happen."); Tr. 6858:3–4 ("Was there a massive return of capital?  Mr. Petron says no.  The government says no.").  Evidence regarding the value of the funds' assets was thus before the jury, and Schneider not only had the opportunity but in fact did make his non-materiality argument at the close of the case.

In short, the Court properly precluded Ms. Bramer's prejudicial and irrelevant proposed expert testimony regarding the Net Asset Value of the GPB funds.  But even assuming error, the exclusion was harmless.  Schneider is not entitled to a new trial on this basis.

C.    The Court Already Rejected the Defendants' Remaining
Evidentiary Arguments

1.    *The Court Properly Excluded Evidence of Third-Party Due Diligence Requirements*

The Court properly excluded evidence and testimony regarding the legal due diligence obligations of third-party broker-dealers and investment advisors. Gentile offers no basis for the Court to revisit that ruling and, instead, reiterates the same arguments the Court already considered and rejected at trial, in particular, his assertion that this evidence was admissible to show he did not act with the requisite fraudulent intent. See ECF Dkt. No. 490-1 at 24. However, neither in his motion nor at trial did Gentile attempt to explain how testimony from "experts, investors, and broker-dealers and [registered investment advisors] themselves," id. at 25, would have any bearing on Gentile's state of mind and thus any relevance to the jury's determination of his intent to defraud. Instead, as the Court reasoned in rejecting the same argument Gentile now advances, whatever minimal relevance the fact of these due diligence obligations had to the defendants' mental state was substantially outweighed by the risk of unfair prejudice and confusing the jury. See ECF Dkt. No. 370 at 4.

And even if it were error for the Court to preclude this evidence, any such error would be harmless. See, e.g., United States v. Gatto, 986 F.3d 104, 117 (2d Cir. 2021) (reiterating standard that, even if exclusion of defense evidence was erroneous, reversal is unwarranted if error was harmless). Notwithstanding the Court's pre-trial ruling, the jury repeatedly heard from defense counsel and from government witnesses on cross-examination about the due diligence obligations of these third parties, including investment advisors. See, e.g., Tr. 92:18–22 ("After the broker-dealers would do their due diligence . . . they would make a recommendation and then the investors would have to review the offering materials, make sure they understood them, and sign them."); Tr. 119:13–23 ("Here is how it worked. Ascendant Capital would send materials to

broker-dealers' main offices for due diligence to be performed. . . . The registered representatives, the salespeople, they were required to understand the business, understand the product."); Tr. 275:20–22 (Jones) ("Q: And you know that you had to conduct your own investigation into the investment, correct? A: I did."); Tr. 1557:13–15 (Ghabour) ("Q: One part of your job as a financial advisor is to conduct due diligence, right? A: Correct."). Not only did the defendants successfully elicit testimony on this point, but they relied on it in their closing arguments to the jury. See, e.g., Tr. 6714:1–3 ("Not only did the Government witnesses not review the information after they invested with due diligence obligations, they didn't read after they invested.").

Both defendants had ample opportunity to advance this defense by urging the jury to infer from the testimony they elicited that the defendants knew these third parties would conduct their own due diligence, so as to undermine any suggestion that the defendants acted with the requisite criminal intent. In short, the Court properly excluded this category of evidence. But even if it erred in doing so, any error was harmless, particularly in light of the testimony on this point that the defendants elicited and relied upon at trial.

> 2.    *The Court Properly Admitted Certain Evidence Regarding the Delay in Audited Financial Statements*

Contrary to Gentile's contention, the Court did not err in permitting certain evidence regarding the delay in or withdrawal of audited financial statements. The admissibility of this evidence was litigated at length before and during trial, and Gentile advances no new argument or other basis for the Court to revisit its prior decision. See ECF Dkt. No. 490-1 at 26 (reiterating same, previously rejected arguments advanced at trial).

As the government argued and the Court agreed, evidence regarding the delay in audited financials was relevant to the unraveling of the defendants' scheme and, in August 2018, led GPB "to temporarily pause the acceptance of new capital from investors" and "to temporarily

suspend redemptions until the audited financial statements have been released."  GX-8089 at -002; see also id. ("Moving forward, we expect to resume the acceptance of new subscriptions once our audited financials and public reporting are completed . . . ."); GX-8205.  And any potential prejudice to the defendants was appropriately and adequately addressed by the Court's curative instructions, which included directing the jury not to speculate regarding the reasons why, for example, audited financials needed to be restated.  See Tr. 518:24–519:8.  Gentile argues only in conclusory fashion, in a footnote, that the Court's various instructions on this topic were insufficient to mitigate any prejudice.  See ECF Dkt. No. 490-1 at 26 n.7.  The Court should reject Gentile's unfounded request for a new trial on this basis.

### 3.  The Court Properly Admitted Evidence of Communications with James Prestiano

After extensive in limine briefing, the Court permitted the government to introduce evidence of five communications between Lash and Prestiano related to Prestiano's involvement in the performance guarantee scheme, the government's investigation, and the defendants' effort to cover up the fraud by convincing Lash to lie to federal investigators and GPB's attorneys. Gentile contends that the Court erred in doing so, but in support of this argument he presents no new arguments or evidence—just theories that have already been rejected by the Court in a written order and a subsequent minute order denying Gentile's motion for reconsideration.  See July 10, 2024 Minute Order, ECF Dkt. No. 419.

During the relevant period, Prestiano was either GPB's in-house counsel or a consultant for GPB.  In that role, he drafted the fraudulent performance guarantees and otherwise facilitated the fraud by conveying messages from Gentile to Lash.  Later, when the government's investigation became known to the defendants, Prestiano and Gentile met with Lash and encouraged him to lie to the government and GPB's other attorneys.  The government moved in

limine to introduce evidence of Prestiano's involvement in the cover-up after the government learned of the details of these incidents in June 2024.[23]  See ECF Dkt. No. 394.  Gentile opposed the motion principally on the grounds that Prestiano was acting as Gentile's personal attorney as well as GPB's attorney at the time.  See ECF Dkt. No. 396.

The Court rejected Gentile's argument, relying on well-established Second Circuit case law.  In United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., the Second Circuit held that "any privilege that attaches to communications on corporate matters between corporate employees and corporate counsel belongs to the corporation, not to the individual employee, and that employees generally may not prevent a corporation from waiving the attorney–client privilege arising from such communications."  119 F.3d 210, 215 (2d Cir. 1997).  As the Court explained, an individual like the defendant may assert a personal privilege over communications with corporate counsel only with respect to "personal matters" based on a showing that "communications implicated her interests alone and were segregable from those involving the company's interests."  ECF Dkt. No. 419 at 5 (quoting United States v. Stein, 463 F. Supp. 2d 459, 465 (S.D.N.Y. 2006)).  As the Court explained, Gentile could not meet this standard with respect to any of the communications to be introduced by the government.  The communications pertained to matters within the scope of Prestiano's corporate retention and work

---

[23]    Gentile contends that the statements should not have been admitted because the filter team "breached its longstanding protocol" of conferring with both counsel for GPB and Gentile before releasing information to the prosecution team.  ECF Dkt. No. 490-1 at 34.  Gentile's argument elides the fact that the filter team shared this information with the government (and the defendants) pursuant to a Court order and waiver from GPB.  Moreover, Gentile does not explain how this supposed procedural breach bears on the Court's evidentiary rulings.  He also does not explain the legal mechanism by which this supposed breach of "protocol" by the filter team could be enforced by the Court, much less why or how preclusion (or a new trial) would be the appropriate remedy.

for GPB and Gentile did not claim he had "made it known that he was seeking Prestiano's legal advice on personal matters."[24]  Id. at 8.

The Court went on to reject both of the arguments Gentile highlights in his brief, and Gentile has not presented any basis for the Court to reconsider those rulings.  Gentile contends that the Court "erroneously ignored Mr. Gentile's belief that he was consulting Mr. Prestiano as his personal lawyer."  ECF Dkt. No. 490-1 at 32.  But as the Court explained, the Second Circuit expressly rejected a "reasonable belief" standard in this context in Teamsters.  ECF Dkt. No. 419 at 10 (citing Teamsters, 119 F.3d at 217).  The fact that Prestiano represented Gentile personally for "decades" elides the difference between matters related to Prestiano's representation of GPB, like the communications introduced by the government, and unrelated matters within the scope of Prestiano's representation of Gentile personally.  Id.  The Court's ruling was also supported by evidence that GPB asserted an exclusive privilege over matters within the scope of Prestiano's representation of GPB,[25] and evidence that Gentile himself signed an agreement retaining Prestiano as GPB's counsel in the government's investigation in July 2019 while retaining other counsel to represent him personally in the same matter.[26]   ECF Dkt. No. 403-2; ECF Dkt. No. 399 at 4 n.2.

---

[24]      Gentile filed a declaration in support of his opposition to the government's motion in limine claiming Prestiano was his long-standing personal attorney but notably did not claim he had made it clear he was seeking advice from Prestiano in a personal capacity during the relevant communications.  Even had he done so, that would have presented yet other legal hurdles for Gentile because all of the communications involved Lash who would have been a third party to the discussions, breaking any otherwise applicable privilege.  While there was evidence of a common-interest arrangement between Lash and GPB, there was no evidence of such an arrangement with Gentile during the relevant period.

[25]      Even this evidence was not in fact admitted pursuant to Rule 801(d)(2)(E).

[26]      The retainer agreement also makes clear that GPB was entitled to a conflict-free representation.  See ECF Dkt. No. 403-2 at 6.

Gentile also relies on the Second Circuit's summary order in <u>Sampedro v. Silver Point Capital, LP</u>, to argue that he was a "joint client" of Prestiano's with GPB. ECF Dkt. No. 490-1 at 25. <u>Sampedro</u>'s description of a director as a "joint client" was not essential to any holding in the case and arose out of litigation between a corporation and its former director concerning advice "furnished to the board during a directors' tenure." <u>Newmarkets Partners, LLC v. Sal. Oppenheim Jr. & Cie. S.C.A.</u>, 258 F.R.D. 95, 104 (S.D.N.Y. 2009). As the Court and other courts have recognized, that factual scenario distinguishes <u>Sampedro</u>, which did not cite much less impliedly overrule <u>Teamsters</u>. ECF Dkt. No. 419 at 7; <u>United States v. Rankin</u>, No. 18-CR-272 (JAM), 2020 WL 3036015, at *2–3 & n.3 (D. Conn. June 5, 2020).

Last, Gentile contends that the Court failed to recognize a common-interest arrangement between himself and Lash that could have conceivably covered one of the communications introduced by the government. The Court did no such thing. As the Court explained, even if Gentile's communication with Prestiano was personal and therefore "segregable" from Prestiano's representation of GPB, there was no evidence that Lash and Gentile were in a common-interest agreement at the time. ECF Dkt. No. 419 at 12. There is a difference between having aligned interests, as Gentile asserts, and having an actual common-interest arrangement in place. <u>Id.</u>; <u>see also</u> <u>United States v. Napout</u>, No. 15-CR-252 (PKC), 2017 WL 980323, at *3 (E.D.N.Y. Mar. 10, 2017) ("For courts to find such a common legal interest, the parties must have come to an agreement, 'though not necessarily in writing, embodying a cooperative and common enterprise towards an identical legal strategy." (quoting <u>Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York</u>, 284 F.R.D. 132, 139 (S.D.N.Y. 2012)). Moreover, the fact that Lash entered into a written common-interest agreement with GPB around the same time in 2019, but did not enter into a similar agreement with Gentile, suggests that no such

agreement existed. And even had such an agreement existed, Gentile did not and still has not explained how his communication with Prestiano furthered their common interest. See Napout, 2017 WL 980323, at * 3 (explaining the parties "must establish that any exchange of privileged information was 'made in the course of formulating a common legal strategy' and that the parties understood that the communication would be in furtherance of the shared interest" (quoting Fireman's Fund Ins. Co., 284 F.R.D. at 140)).

### 4.    The Court Properly Admitted Summary Evidence

Consistent with Rule 1006, the government introduced evidence including a flow-of-funds summary showing various transfers among GPB accounts. The flow-of-funds summary included illustrations of the transfers between GPB accounts used to fund distributions to investors and transfers related to the fraudulent 2015 Performance Guarantee. Gentile contends that the Court erroneously admitted a single slide, slide 22, captioned "Payment to GPB Automotive Portfolio May 20, 2016," which he claims was not a proper summary under Rule 1006. See ECF Dkt. No. 490-1 at 37. The Court previously rejected this argument, see ECF Dkt. No. 387 at 5, and Gentile provides no reasoned explanation for why the Court's ruling was incorrect.

Slide 22 summarizes a series of bank transfers between various accounts between April 14, 2016 and May 20, 2016. This sort of flow-of-funds analysis is routinely admitted pursuant to Rule 1006 because it calls the jury's attention to a limited number of transactions out of voluminous bank records containing numerous other transactions. See ECF Dkt. No. 350 at 2 (citing four examples of recent E.D.N.Y. cases in which highly similar flow-of-funds charts have been admitted pursuant to Rule 1006, including two cases involving charts created by the same witness called by the government in this case). Gentile cites no case law in support of his claim that "this presentation . . . requires an expert to use specific tracing methodologies and assumptions," ECF Dkt. No. 490-1 at 37. Indeed, Slide 22 was not proffered as a tracing analysis

and the government's witness, Michael Petron, made clear that he had <u>not</u> undertaken a tracing analysis.  <u>See</u> Tr. 3939 ("Q:  You did not conduct a tracing analysis for the prosecutors in this case; right?  A: I did not.").  Gentile also contends that this slide contained "opinions and argument," ECF Dkt. No. 490-1 at 37, but he does not actually cite any opinion expressed by Mr. Petron in Slide 22 or in his testimony.  Mr. Petron did not testify to the purpose of any of the transactions on Slide 22 and he did not present any conclusion about the relationship, if any, between the transactions.  Indeed, his direct and cross-examination made clear he was not offering any opinion at all about these transfers.  <u>See generally</u> Tr. 3851–56; <u>see also</u> Tr. 3875 ("Q: You haven't been asked to offer any opinions in this case; correct?  A: I have not . . . I was not asked to offer any opinions").

Gentile's remaining argument, that Mr. Petron "cherry-picked" particular transactions to present to the jury, goes to the weight to be accorded the evidence and not to its admissibility.  <u>See</u> ECF Dkt. No. 387 at 7–8 (explaining that the government had provided sufficient sourcing information for the defendants to adequately cross-examine Petron and were "free to question [Petron] about the summary slides at trial").  Indeed, Gentile's counsel presented exactly this point on cross-examination.  Tr. 3922–33.  Moreover, the Court instructed the jury that it was for the jury "to give no greater consideration to these charts or summaries than you would give to the evidence upon which they are based" and "to decide whether the charts and summaries correctly present information contained in the testimony and in the exhibits on which they are based."  Tr. 6967:12–17.

For essentially the same reasons, any error in admitting this single slide during an eight-week trial would be harmless.  Gentile developed all of the same arguments on cross-

100

examination and the Court properly instructed the jury on the limited purpose for which the charts were introduced.

>    5.    *The Court Properly Admitted Evidence of Fees Earned Through Other Funds*

The Court properly admitted evidence of fees paid or received for funds other than Holdings I, Holdings II, and Automotive Portfolio—i.e., GPB Waste Management, LP ("Waste Management") and Cold Storage.  In arguing otherwise, Gentile recycles the same arguments he made in his pre-trial motion in limine on this topic, see ECF Dkt. No. 490-1 at 35–36, which arguments the Court already considered and rejected.

First, Gentile argues that evidence of these fees was not relevant because it concerned funds that were not at issue in the case.  Id. at 35.  But as the Court correctly reasoned in rejecting Gentile's argument the first time, the fees the defendants earned through Waste Management and Cold Storage were relevant to their motive to commit the charged crimes.  May 23, 2024 Pre-Trial Conf. Tr. 14:9–12.  This was because, as the government argued and the Court agreed, by mispresenting the performance of Holdings I, Holdings II, and Automotive Portfolio to make those funds appear more successful, the defendants were able to induce investors to invest in these other funds.  Id. at 14:4–9.  Second, Gentile claims in conclusory fashion that any probative value this evidence had was substantially outweighed by the risk of creating the "false impression" that he "received more money during the relevant time period from the at-issue GPB Funds than he in fact did."  ECF Dkt. No. 490-1 at 36.  Gentile does even attempt to explain why that is so, or why that would have caused him any unfair prejudice.  In any event, the Court already considered and rejected Gentile's Rule 403 arguments when ruling on his motion in limine at the pre-trial conference.  See May 23, 2024 Pre-Trial Conf. Tr. 14:12–13.  Gentile fails to identify any error, no less any harmless error, in the Court's evidentiary ruling.

6.    *The Court Properly Admitted a Transcript of Gentile's Pre-Recorded Webinar*

After a lengthy argument, the Court permitted the government to introduce a transcript of a pre-recorded webinar featuring Gentile from December 18, 2018.  The pre-recording, GX-8330, was admissible as a statement of the defendant, which Gentile does not meaningfully dispute, and relevant to show the sudden change in the defendants' messaging just two days later when they sent a letter to investors revealing that "all of the Company's [i.e., GPB's] distributions made to date have been a return of capital contributions made to the Company by investors," Tr. 6902:4–15, ostensibly as part of the distribution "waterfall" in the PPM.[27]

The defendants now complain that the government improperly leveraged GX-8330 in its rebuttal, claiming "there was no evidence that the webinar was, in fact, ever played to any investor," and that the Court only admitted the exhibit "solely as Mr. Gentile's statement on a recording, but not that it was a statement to an investor."  ECF Dkt. No. 490-1 at 38–39.  The defendants also lament that they had "[no] opportunity to address the Government's impending misstatement before the jury," and that the Court should have given a limiting instruction that there was "no evidence" that the webinar was ever played to investors.  Id. at 38.  The defendants are wrong on all counts.

First, as the Court recognized, whether or not the webinar transcribed in GX-8330 was ever played for investors does not minimize its significance: the webinar memorializes statements of a defendant at a critical point in the conspiracy, when Gentile continues to obfuscate the fact that monthly distributions were paid using investor capital, something that he knew had

---

[27]    This claim by Gentile was also false.  As multiple witnesses testified and as the government argued in rebuttal, the "monthly distributions have nothing to do with the waterfall . . . [the waterfall] is how they distribute money when the fund closes . . . it has absolutely nothing to do with the monthly distributions."  Tr. 6902:4–6903:3.

been transpiring for years.  The recording was made just two days before the December 20, 2018 letter to investors, see GX-8030, in which Gentile discloses this fact, albeit in a misleading way. The transcript was highly relevant on its own.

Second, the defendants are wrong that there was no evidence the webinar recording was ever shared with investors, and the Court put no limitation on the parties' ability to argue the issue.  Lagiglia testified that "there was a conference call [GX-8330], and then this was released [GX-8030]."  Tr. 3737:23.  As the government argued, given the close timing between the two, it was reasonable to ask the jury to infer that Lagiglia heard the "call" or webinar and then received the letter.  See Tr. 5244:4–22; see also Tr. 5245:24–5246:21 (arguing "there's enough temporal proximity that the jury can make the inference" that the GX-8330 transcript refers to the webinar Lagiglia attended).  The Court did not restrict the admission of GX-8330 or curtail its use during closing argument—in fact, the Court admitted the cover email precisely to "let them [the defendants] make whatever arguments they want to make.  I want to give them the opportunity to set that in context."  Tr. 5249:14–19.[28]

Third, the defendants cannot seriously argue they did not have the opportunity to make their desired summation arguments regarding GX-8330.  All of the colloquy regarding the admissibility and interplay of GX-8330 and GX-8030 took place during the government's case-in-chief.  The defendants, therefore, were provided sufficient notice of what the government's arguments would be vis-à-vis this evidence.  These arguments were proper and supported by the evidence, and the defendants' choice not to address them during a combined six hours of closing

---

[28]      GX-8330-P, the cover email chain, bore sufficient indicia that the webinar had, in fact, been given to investors.  In fact, the bottom-level email of the relevant thread indicates that the attached transcript, GX-8330, "is the transcript from today's call."

arguments was either a tactical decision or an oversight.  Gentile nevertheless objected during the government's summation, gratuitously stating for the jury's benefit that the government's argument "misstates that evidence.  There was no webinar." Tr. 6903: 4–5.  The Court responded, "[a]ll right.  Let's let the attorney do his closing.  Obviously, the evidence is the evidence and these are the attorney points."   The government's interpretation of this evidence and subsequent arguments to the jury—that the webinar was shared with investors, as Lagiglia's testimony indicated—was within the bounds of proper argument, and the Court's jury charge made clear that, in any event, "arguments or statements by lawyers are not evidence."  Tr. 6963:5; see United States v. Rosa, 17 F.3d 1531, 1549 (2d Cir. 1994) ("The AUSA's argument . . . may have been an overstatement . . . it surely was not an egregious one . . . though the trial court did not give a curative instruction directed precisely at this overstatement, it did instruct the jury that the statements of the attorneys did not constitute evidence.").[29]  Regardless, Gentile falls short of his "heavy burden" to show that "the comment, when viewed against the entire argument to the jury, and in the context of the entire trial, was so severe and significant as to have substantially prejudiced him, depriving him of a fair trial."  United States v. Farhane, 634 F.3d 127, 167 (2d Cir. 2011).   The government's comments regarding GX-8330 and GX-8030 consisted of approximately one and a half pages of the trial transcript.  See Tr. 6901:12–6903:3.

---

[29]    Notably, when the jury requested GX-8330 and GX-8030 during its deliberations, Gentile did not ask the Court to give any instruction, despite his objection during the government's rebuttal.  In fact, when Schneider requested that the Court instruct the jury that the exhibits were "admitted as to only one defendant [Gentile]," Gentile flatly objected and stated, "I've never heard of when a jury requests evidence that they're reinstructed . . . I think it's an improper thing to do."  Tr. 7042:25–7043:22.

7.    *The Court Did Not Improperly Limit Evidence of Post-Conspiracy Performance of the Fund*

Contrary to Gentile's contention, see ECF Dkt. No. 490-1 at 39–40, the Court did not improperly limit evidence regarding the performance of the GPB funds after the conspiracy period.  As an initial matter, Gentile wrongly claims that the Court precluded this evidence at the pre-trial conference.  In fact, prior to trial, the government moved in limine to preclude evidence of this nature and, at the pre-trial conference, the Court explained that it would reserve decision on the government's motion and wait to hear the evidence at trial.  May 23, 2024 Pre-Trial Conf. Tr. 56:13–15, 58:11–15.  In doing so, the Court provided its "preliminary views" that, under the theory of the case articulated by the government during the conference, it seemed unlikely that it would be appropriate to admit evidence from outside the conspiracy period "that remaining capital was a successful investment and performed well."  Id. at 56:24–57:2; see also id. at 57:20–22 (explaining "real risk of unfair prejudice from confusing the jury into thinking there wasn't a crime because there was no harm to investors").  If, on the other hand, the government's evidence at trial suggested, for example, that the defendants were not investing in the type of companies they represented to investors, the Court explained this type of evidence might be relevant to counteract the government's arguments.  See id. at 57:23–58:10.

At no point during trial did the government make any such suggestion so as to open the door to the defendants' introduction of evidence of the funds' performance after the conspiracy period, and the Court agreed.  During Kgil's direct testimony, for example, the government introduced a series of charts not to show investor loss, as Gentile contends, but to show the increasingly dire coverage deficit for the GPB funds that was consistently reported to the defendants.  See, e.g., Tr. 2212:11–16 (Kgil) (testifying that chart for "trailing 12 months coverage percentage for the three funds" shows downward trend); Tr. 2238:21–25 (Kgil testifying to

105

"declining trend" in Holdings I coverage ratio).  The Court allowed Kgil's testimony over Schneider's objection that it "feels . . . like an implication of losses." Tr. 2215:13.  The Court did not err in doing so, nor does Gentile attempt to explain why it was error to allow Kgil's testimony and accompanying charts.  The only other record citation Gentile relies on to support his argument is to Jones's testimony regarding his investment having "vaporized," which testimony the government agreed to strike as not responsive to the question asked.  See Tr. 5176:24–5177:15.

In any event, Gentile fails to explain how evidence of the funds' performance after the conspiracy period would prove lack of fraudulent intent at the time he made misrepresentations to investors.  And he misstates the court's decision in United States v. Nordlicht, No. 16-CR-640 (BMC), ECF Dkt. No. 1004 (E.D.N.Y. July 12, 2023), wherein Judge Cogan concluded, citing Ciminelli, that no reasonable jury could find that the defendants in that case "intended to defraud bondholders of anything other than 'potentially valuable economic information,'" and granted the defendants' motion for judgment of acquittal as to their wire fraud conspiracy conviction accordingly.  Id. at 12.  As explained infra in Section II.A.6., the government did not pursue a "right to control" theory in this case.  Nor can Gentile seriously claim he was unable to counter whatever supposedly "misleading impression of loss" was left with the jury.  ECF Dkt. No. 490-1 at 40.  During summations, both he and Schneider pointed the jury to information regarding the fair market value of the funds, which, Gentile argued, demonstrated that "[t]he majority of [investor money] was invested in these businesses, and these businesses became valuable."  Tr. 6507:11–13; see also Tr. 6507:7–8 (Gentile arguing "[t]his was a real company, with real assets, with real value"); Tr. 6858:7–9 (Schneider arguing "[o]ver a billion dollars, 1.6 billion still in the funds, it didn't disappear").  Gentile fails to identify any error in the Court's evidentiary rulings

106

regarding post-conspiracy performance of the funds.  But even if there were error, it would be harmless.

        D.    The Government Did Not "Manipulate" the Designation of Co-Conspirators

Rule 801(d)(2)(E) provides that a statement by a "party's coconspirator during and in furtherance of the conspiracy" is not hearsay when "offered against an opposing party."  Fed. R. Evid. 801(d)(2)(E) (emphasis added).  Schneider contends that the government "manipulated" the co-conspirator hearsay exception by designating and "de-designating" co-conspirators, but he does not cite any evidence that was improperly admitted on account of this claimed misconduct. At trial, the only evidence even arguably admitted pursuant to Rule 801(d)(2)(E) were statements made by Prestiano regarding the performance guarantee scheme and the defendants' subsequent efforts to cover up their fraud and obstruct the government's investigation.[30]  As the Court and the defendants are well aware, the government learned of Prestiano's involvement in the cover-up and several of his other statements on the eve of trial after the Court authorized the filter team to share additional information from Lash with the parties.  See June 12, 2024 Minute Order; ECF Dkt. No. 382.  This was critical evidence of Prestiano's knowing participation in the conspiracy and led the government to seek to introduce Prestiano's statements.  It is hardly surprising then that the government did not identify Prestiano in an expressly non-exhaustive list of co-conspirators provided to the defendants as a courtesy in May 2024, more than a month before the government learned the details of Prestiano's statements.

---

[30]    Even this evidence was not in fact admitted pursuant to Rule 801(d)(2)(E).  As the Court explained in denying Gentile's motion for reconsideration, Prestiano's statements were admitted for the non-hearsay purpose of establishing Prestiano's statement of mind and to establish his membership in the conspiracy.  See July 10, 2024 Minute Order.

There is nothing improper about the government's decision not to argue that a particular individual ("Ascendant Employee 1") was a co-conspirator, as Schneider apparently claims. See ECF Dkt. No. 487-1 at 73. Having identified Ascendant Employee 1 as a potential co-conspirator for purposes of Rule 801(d)(2)(E) in May 2024, the government was free to determine, as it ultimately did, that it was unnecessary to take on the burden of alleging that Ascendant Employee 1 was a co-conspirator. See Tr. 2643 ("The Court: If you're telling me that's not something the government is pursuing at this trial in any way, then I don't think it's . . . Mr. Axelrod: So we haven't and we're not going to."). The government held to this concession. Schneider does not cite any evidence admitted on the basis of Ascendant Employee 1's status as a co-conspirator.[31] The only support for his claim that the government "flip-flopped" on this point is an out-of-context quote from proceedings outside the presence of the jury. See Tr. 3043–44. But Schneider does not actually point to any evidence improperly admitted after this supposed "flip-flop," and the government did not present this individual as a co-conspirator in closing arguments. At most, Schneider contends he should have been able to introduce documents showing that Ascendant Employee 1 was aware of a marketing material approval process. See ECF Dkt. No. 422 at 1. But Ascendant Employee 1's state of mind was irrelevant in light of the government's concession that it would not present him as a co-conspirator, and the defendants otherwise introduced extensive evidence of the marketing material approval process itself, rendering any error harmless.

*    *    *

---

[31] GX-7531, the only evidence Schneider actually cites, was admitted "for effect on [the] listener" because the document included an instruction that the information be shared with the defendants. Tr. 756; see also Tr. 757 (Court: "They're being offered to show, they're being offered as relevant to the effect of the e-mails on the recipient").

In sum, the Court has already ruled on each of the evidentiary issues presented in the defendants' post-trial briefs, in some instances multiple times. The defendants present no meaningfully new arguments, but merely recycle positions the Court has already rejected. These arguments should again be rejected for all the reasons the Court already provided on the record and in written orders.

    V.    <u>The Government Did Not Constructively Amend or Vary From the Indictment</u>

        A.    <u>Applicable Law</u>

A constructive amendment to an indictment arises when "the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify <u>essential elements</u> of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." <u>United States v. Vilar</u>, 729 F.3d 62, 81 (2d Cir. 2013) (quoting <u>United States v. D'Amelio</u>, 683 F.3d 412, 416 (2d Cir. 2012)). "A constructive amendment occurs either where (1) an additional element, sufficient for conviction, is added, or (2) an element essential to the crime charged is altered." <u>United States v. Dove</u>, 884 F.3d. 138, 146 (2d Cir. 2018) (internal citations omitted); <u>see also United States v. Weiss</u>, 752 F.2d 777, 787 (2d Cir. 1985) (observing that an impermissible alteration of the government's proof or the court's charge must affect an essential element of the offense); <u>United States v. LaSpina</u>, 299 F.3d 165, 181 (2d Cir 2002) (same). There is no constructive amendment where "a generally framed indictment encompasses the specific legal theory or evidence used at trial." <u>United States v. Salmonese</u>, 352 F.3d 608, 620 (2d Cir. 2003) (citing <u>United States v. Wallace</u>, 59 F.3d 333, 337 (2d Cir. 1995)).

Because the evidence at trial is not required to be a precise replica of the charges contained in the indictment, courts in this Circuit permit "significant flexibility" in the

government's proof at trial, so long as the defendant was provided notice of the "'core of criminality' to be proven at trial." United States v. Patino, 962 F.2d 263, 266 (2d Cir. 1992) (citing United States v. Heimann, 705 F.2d 662, 666 (2d Cir. 1983)).   "The core of criminality of an offense involves the essence of a crime, in general terms; the particulars of how a defendant effected the crime falls outside that purview." D'Amelio, 683 F.3d at 418.  In the context of fraud, the "core of criminality" is the nature of the scheme.  See, e.g., United States v. Dupre, 462 F.3d 131, 140–41 (2d Cir. 2006) (concluding there was no constructive amendment where evidence "concerned the same elaborate scheme to defraud investors as was described in the indictment"); see also United States v. Stitsky, 536 F. App'x 98, 102–03 (2d Cir. 2013) ("The fraudulent acts described by these witnesses, although not specifically identified in the indictment . . . 'fall[] squarely within the charged scheme,' and thus their testimony did not constructively amend the conspiracy, wire fraud, and mail fraud counts." (quoting Salmonese, 352 F.3d at 621)).   "When the crime charged involves making false statements, the 'core of criminality' is not the substance of the false statements but rather that knowing falsehoods were submitted." United States v. Rigas, 490 F.3d 208, 229 (2d Cir. 2007) (internal quotation marks omitted).  Moreover, as the Second Circuit has recognized in considering a claim of constructive amendment in a false statements case, the court must "read an indictment to include facts which were necessarily implied by the specific allegations made." Id. (internal quotation marks omitted).   "To prove a constructive amendment, a defendant must show that the evidence and jury instructions at trial completely shifted the core of criminality—i.e. proved 'behavior entirely separate from that identified in the indictment.'" United States v. Gross, No. 15-CR-769 (AJN), 2017 WL 4685111, at *23 (S.D.N.Y. Oct. 18, 2017) (citing United States v. Bastian, 770 F.3d 212, 223 (2d Cir. 2014)).

110

"A variance occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." United States v. Frank, 156 F.3d 332, 337 n.5 (2d Cir. 1998).  As with a constructive amendment claim, a court reviewing a claim of variance must ask "whether the defendant was given notice of the 'core of criminality' to be proven at trial." United States v. Benussi, 216 F. Supp. 2d 299, 322 (S.D.N.Y. 2002) (quoting Wallace, 59 F.3d at 338).  In contrast to a constructive amendment claim, however, a defendant must show "substantial prejudice" in order to prevail on a variance claim.  Rigas, 490 F.3d at 230.  "A defendant cannot demonstrate that he has been prejudiced by a variance where the pleading and the proof 'substantially correspond, where the variance is not of a character that could have misled the defendant at trial, and where the variance is not such as to deprive the accused of his right to be protected against another prosecution for the same offense.'" Salmonese, 352 F.3d at 621–22 (quoting United States v. Mucciante, 21 F.3d 1228, 1236 (2d Cir. 1994)).

> B.    The Government Proved the Scheme to Defraud Alleged in the Indictment

The "core of criminality" proved by the government at trial matches the scheme to defraud alleged in the indictment.  Since the beginning of the case, the government's theory was, and continued to be, that the defendants engaged in a scheme to defraud GPB investors and prospective investors through material misrepresentations and omissions relating to, among other things, (i) the source of funds used to pay monthly distributions; and (ii) the revenue generated by Holdings I in 2014 and Automotive Portfolio in 2015.  Indictment ¶ 15.  As detailed in Section II above, the government proved this broadly drawn scheme through testimonial and documentary evidence over more than six weeks of trial.  The arguments the defendants now present do not go to this unchanged "core of criminality," nor to any essential element of the scheme to defraud.

More fundamentally, their arguments fail because none of the defendants' proffered changes in the government's theory are accurate.

Contrary to the defendants' claim, the government did not constructively amend the indictment during rebuttal when it stated that the term "coverage ratio" was not the central issue in the case. See ECF Dkt. No. 487-1 at 59–61; ECF Dkt. No. 490-1 at 41. As the government argued, and consistent with its theory all along, the core issue was whether monthly distributions paid to investors were, as the defendants repeatedly represented, sourced from profits from the funds' portfolio companies, or sourced from investor capital whether in whole or in part. See Tr. 6873:20–23. The government went on to argue, also consistent with its theory from the beginning, that the term "coverage ratio" was relevant insofar as it shed light on how the defendants, internally at GPB, measured and forecasted the success of the funds' portfolio companies and, relatedly, GPB's ability to fund investor distributions from profits. See Tr. 6875:20–6876:3. These rebuttal arguments were also consistent with the indictment, in which the term "coverage ratio" appears only four times—all in the context of explaining how the defendants, internally at GPB, measured the portfolio companies' success and GPB's ability to fund distributions with cash from profits. See Indictment ¶¶ 37, 41, 46. And Schneider's claim of surprise and prejudice on this issue is belied by the record. See ECF Dkt. No. 487-1 at 61. During summations, Schneider's counsel told the jury that "the charge and the allegation is different than coverage," Tr. 6746:18–19, conceding his understanding that the alleged scheme to defraud investors did not turn on the term "coverage ratio" or how that term might be defined.

Nor was the indictment constructively amended for any of the other reasons the defendants claim. Contrary to the defendants' contention, any evidence or argument relating to the fact that GPB used footnotes and small print in marketing materials, did not provide a

112

"coverage ratio" in its financial statements, and did not update marketing materials when, for example, it began using investor capital to fund monthly distributions, did not shift the "core of criminality" in the case. See ECF Dkt. No. 487-1 at 61–62; ECF Dkt. No. 490-1 at 42–45.  At no point did the government suggest nor did the Court instruct the jury that it could convict the defendants on the theory that, for example, they used footnotes or fine print in marketing materials. See Vilar, 804 F.3d at 584 ("To prevail on a constructive amendment claim" the defendant must show "there is a substantial likelihood that [he] may have been convicted of an offense other than that charged in the indictment." (internal quotation marks omitted)).  Rather, any such evidence and argument were proper to rebut the defendants' claim that they could not have acted with the requisite criminal intent because they had purportedly fully disclosed to investors that the source of funds used to pay monthly distributions could include investor capital.  Nor did the government or the Court suggest the jury could convict the defendants for using accrual-based accounting.  On this point, Gentile selectively quotes from the record to suggest the government argued during rebuttal that it was unlawful for GPB to pay distributions based on accrued but uncollected cash. See ECF Dkt. No. 490-1 at 44 (citing Tr. 6874:19–21).  In fact, the government's argument was that "the promise was always profits, cash profits.  Not accruals."  Tr. 6874:17–18.  Again, this was consistent with the indictment and the government's consistently held theory regarding the nature of the defendants' misrepresentations to GPB investors as to the source of funds used to pay monthly distributions.  See Rigas, 490 F.3d at 229 (noting that "core of criminality" in false statements case "is not the substance of the false statements but rather that knowing falsehoods were submitted").  In short, the government's proof and argument at trial were consistent with the broadly drawn scheme to defraud alleged in the indictment.  The "core of criminality" did not shift, and there is no basis on which to find a constructive amendment.

113

In arguing otherwise, Gentile relies heavily on Stirone v. United States, 316 U.S. 212 (1960), which is easily distinguishable from the facts of this case.  See ECF Dkt. No. 490-1 at 45–46.  In Stirone, the Supreme Court concluded the indictment was constructively amended and reversed the defendant's Hobbs Act conviction accordingly, where the government's proof and the jury's instructions supported a theory of interference with interstate commerce that was distinctly different from the one charged in the indictment.  See 316 U.S. at 218.  In doing so, the Court noted that "[t]he charge that interstate commerce [wa]s affected is critical since the Federal Government's jurisdiction of this crime rests only on that interference."  Id.  In analyzing Stirone in subsequent cases, the Second Circuit has explained that, in Stirone, "the differences between the indictment and proof were extreme" to the point that "the conviction was based on a set of facts wholly unrelated to the facts charged" in the indictment.  D'Amelio, 683 F.3d at 420, 421 (internal quotation marks omitted).  That did not happen in this case.  Unlike in Stirone, where the specific means of interstate commerce that served as the basis for federal jurisdiction under the Hobbs Act as charged by the grand jury was wholly unrelated to the means proved at trial, the indictment here broadly alleged a scheme to defraud investors, and the evidence at trial concerned that same scheme or "core of criminality."  See Dupre, 462 F.3d at 140–41; see also D'Amelio, 683 F.3d at 418 (explaining that the "core of criminality" does not include "the particulars of how a defendant effected the crime").  There is no basis to find a constructive amendment to the indictment in this case.

Schneider also erroneously claims the government shifted theories during summation and rebuttal by suggesting that it was "somehow a fraud" for GPB to represent that it was "buying income-producing companies."  ECF Dkt. No. 481-1 at 62.  In fact, in the portions of the transcript to which Schneider cites, the government argued it was false and misleading to

continue to pitch the funds as "income producing private equity," Tr. 6481:13, when, in reality, the income-producing aspect of the investment, i.e., the monthly distribution payments, were funded in whole or in part by investor capital.  This is, again, consistent with the "core of criminality" alleged in the indictment—that the defendants misrepresented the source of funds used to pay monthly distributions to investors.  Moreover, the Second Circuit has made clear that the "specific means used by a defendant to effect his or her crime does not constitute an 'essential element' of the offense and, therefore, proof of specific means apart from those charged in the indictment does not constructively amend the indictment." D'Amelio, 683 F.3d at 422.  Schneider also wrongly claims that, during summations, the government suggested that "representations of 'annualized' return was somehow fraudulent."  ECF Dkt. No. 487-1 at 62.  In fact, in the portion of the transcript to which Schneider cites, the government argued—consistent with the indictment—that, in a document referencing "annualized" returns, GPB misrepresented to investors that the funds were earning in excess of 8.7% when they were not.  See Tr. 6475:6–16. Schneider's characterizations of the government's arguments are wrong, and he otherwise fails to show that an essential element of the charged crime was altered so as to affect a constructive amendment.

### C.    There Was No Prejudicial Variance

For the same reasons discussed above, there was no variance because the arguments and evidence presented at trial did not materially deviate from the allegations in the indictment. See, e.g., Benussi, 216 F. Supp. 2d at 322 (explaining that a variance occurs only where the "evidence offered at trial proves facts materially different from those alleged in the indictment"). But even if there were a variance, the defendants fail to show the requisite substantial prejudice to support their claim.  See Rigas, 490 F.3d at 226 (observing that variance must cause "substantial prejudice" to warrant reversal); United States v. McDermott, 245 F.3d 133, 139 (2d Cir. 2001)

(same).  Contrary to Gentile's argument, ECF Dkt. No. 490-1 at 47, which primarily restates the same points in support of his claim of constructive amendment, "the pleading and the proof" in this case "substantially correspond," and any purported variance "is not of a character that could have misled" him or Schneider or otherwise deprived them of the right to be tried again for the same offense, see Salmonese, 352 F.3d at 621–22 (internal quotation marks omitted).

As explained above, the indictment alleged a broad scheme to defraud GPB investors through, among other things, misrepresentations regarding the source of funds used to pay monthly distributions.  See Indictment ¶ 15.  For example, as alleged in the indictment and proved at trial, the defendants repeatedly mispresented that monthly distributions were sourced only from cash flow generated by the portfolio companies or "funds from operations" when, in reality, the distributions included investor capital.  See, e.g., id. ¶¶ 21, 28.  The proof and the government's arguments during rebuttal substantially correspond to these allegations, and the defendants' contentions to the contrary are unavailing.  In rebuttal, the government explained clearly and simply:  "They promised cash profits, they used investor cash instead. . . . It's always been about using investor cash to pay investor distributions and lying about it."  Tr. 6873:5–9.

Gentile selectively quotes and mischaracterizes much of the government's rebuttal to create the misleading impression that the government shifted theories at the very last second. But the record does not support Gentile's claim of shifting theories.  The government did not, as Gentile contends, "pivot[] to the purported legality" of "accrual-basis accounting."  ECF Dkt. No. 490-1 at 47.  Rather, the government argued—again, consistent with the indictment and the evidence—that the defendants promised monthly distributions would be sourced only from cash from profits, "not receivables, not accruals, not anything else."  Tr. 6879:24.  This was not a change in the government's theory but a response to the defendants' claim that they could not have had

the requisite fraudulent intent because, at least at times, GPB had sufficient accrued by uncollected cash to cover the monthly distributions.  See, e.g., Tr. 6541 ("And suddenly, in this courtroom, it's become a crime when GPB would use accruals, which means money they haven't received yet, but they have a reasonable basis to believe they're going to collect on it to figure out and calculate net investment income. There's nothing wrong with that and Ms. Kgil told you there's nothing wrong with that."); Tr. 6548 ("There is nothing wrong when you have available cash in one account and move it another account especially when you have accruals you think are coming in.  It happens all the time in business.").  Nor was there a shift for any of the other reasons Gentile claims.  Again, the government's arguments during rebuttal regarding fine print and footnotes and the lack of "coverage ratios" in financial statements were in response to the defendants' claims of transparency and disclosure to show lack of intent—not a fundamental change in the essence of the charged scheme.  Nor did, as Gentile contends, the government argue that it was false for GPB to represent that it "had the absolute authority to include investor capital in distributions."  ECF Dkt. No. 490-1 at 48.  As an initial matter, Gentile cites nothing in support of this contention.  See id. at 48–49.  In any event, the government made no such argument.  Even if the defendants disclosed that GPB had this authority, they did not—as the government consistently maintained—disclose that monthly distributions included a return of capital.  Indeed, they represented the opposite.

        The Court should also reject Schneider's baseless claim that the government improperly varied with respect to the time period of the charged conspiracy.  See ECF Dkt. No. 487-1 at 62–63.  As an initial matter, Schneider cites not a single case where the court found a prejudicial variance under the same or even similar circumstances.  In fact, in the sole case he relies upon, the court concluded there was no prejudicial variance at trial from the conspiracy

period charged in the indictment.  See United States v. Ortiz, 666 F. Supp. 2d 399, 405 (S.D.N.Y. 2009), aff'd, 394 F. App'x 722 (2d Cir. 2010); ECF Dkt. No. 487-1 at 62 (citing Ortiz, 666 F. Supp. 2d at 404).   In any event, Schneider's claim is unfounded.   As detailed above, the government's proof and argument at trial regarding the conspiracy period were "substantially similar" to the period charged in the indictment.  See United States v. Teague, 93 F.3d 81, 84 (2d Cir. 1996) (internal quotation marks omitted).  In arguing otherwise, Schneider does not cite any evidence or argument at trial but, instead, to colloquy outside the presence of the jury and a single reference in the government's opening statement to the time period "[b]etween 2014 and 2018." See ECF Dkt. No. 487-1 at 53 (citing Tr. 53).   He does not even attempt to explain, nor could he, how the actual evidence at trial proved a conspiracy period substantially dissimilar from that charged in the indictment.

## VI.    The Court's Jury Instructions Were Correct[32]

The Court's jury instructions are supported by recent caselaw from the Southern and Eastern Districts and are consistent with applicable Second Circuit precedent.  In challenging the jury instructions, the defendants re-raise a series of arguments that the Court has already considered and rejected—as they do throughout their nearly 200 pages of post-trial briefing.

---

[32]    The defendants' claim that Magistrate Judge Bloom prejudiced the venire during jury selection by describing U.S. Attorney Breon Peace as a "great man" is meritless.  See ECF Dkt. No. 490-1 at 21–23 (citing Tr. 38).  The defendants have stretched the import of this remark beyond what Judge Bloom intended, as is evident when the remark is read in its complete context.  Judge Bloom repeatedly emphasized that the purpose of jury selection is to select a panel of "fair and impartial" jurors to try the case.  See, e.g., Tr. 31, 33, 182, 184, 234.  Further, both before and after Judge Bloom made this comment about Mr. Peace, she advised the jury that "all parties, the Government and individuals, are equals before the Court and all are entitled to equal consideration; no party is entitled to sympathy or favor."  Tr. 32:16–23; see also Tr. 184, 202.  Moreover, Judge Bloom individually questioned prospective jurors about whether they could be fair and impartial.  In its jury charge, the Court again reminded the jury that "[t]he parties, the United States government and the defendants, are equal before the Court and entitled to equal consideration."  Tr. 6957:6–19.  The Court expressly stated: "The fact that this prosecution is brought in the name of United States government does not entitle the United States to any greater consideration than the defendants are entitled to."  Tr. 6957:11–14.  Given this context, there is no basis for the defendants' claim that Judge Bloom implanted in the jury a bias in favor of the government.

Nothing has changed since the Court considered these issues in July; the defendants do not cite new cases or intervening decisions. For the same reasons now as then, the Court should reject these arguments.

    A.    <u>*Connolly* and *Harra* Are Inapplicable</u>

Contrary to Schneider's contention, the government was not required to prove the defendants' misrepresentations to investors "were false under every reasonable interpretation of 'coverage.'" ECF Dkt. No. 487-1 at 15. Schneider's argument, which the Court already considered and rejected in connection with jury instructions, <u>see</u> Tr. 6330–34, rests on a fundamental misunderstanding of <u>United States v. Connolly</u>, 24 F.4th 821 (2d Cir. 2022), and similar such cases, which have no relevance here.

In <u>Connolly</u>, two former Deutsche Bank traders were charged and convicted of wire fraud and conspiracy in connection with allegedly false submissions made by Deutsche Bank to the British Bankers' Association ("BBA"). 24 F.4th at 834. Deutsche Bank's submissions were made in response to a specific instruction by the BBA, directing the bank to submit to the BBA "the rate at which it could borrow funds, were it to do so by asking for and then accepting inter-bank offers in reasonable market size just prior to 1100." <u>Id.</u> (emphases omitted). In that circumstance, <u>i.e.</u>, where the allegedly false submission was made in response to a specific and arguably ambiguous reporting instruction, the trial court instructed the jury that the government had the burden "to negate any reasonable interpretation of the instruction" that would make the bank's statement factually correct. <u>Id.</u> Similarly, in <u>United States v. Harra</u>, on which Schneider also relies, the defendants' convictions turned on the falsity of their employer-bank's submissions to the SEC and the Federal Reserve in response to a specific requirement that the bank report to those agencies its "past due" loans. 985 F.3d 196, 204 (3d Cir. 2021). The Third Circuit held that since the SEC's and Federal Reserve's definition of "past due" loan was arguably ambiguous, the

government was required (but failed) to prove that the bank's "interpretation [wa]s the only reasonable one or that the defendant's statement [wa]s false under each reasonable interpretation." Id. at 214.

Neither case is applicable here, where the defendants are not alleged to have made any representations in response to a specific reporting requirement. In other words, this case does not involve GPB having submitted anything to a government agency in response to a requirement that it report, for example, its "coverage ratio," without the agency sufficiently defining what that term meant so that GPB would know how to be accurate in its reporting. See id. at 213 (holding that "where falsity turns on how an agency has communicated its reporting requirements to the entities it regulates and those communications are ambiguous, fair warning demands that the Government prove a defendant's statement false under each objectively reasonable interpretation of the relevant requirements"). Instead, the defendants were alleged and proved to have engaged in a scheme to defraud investors through affirmative misrepresentations and omissions. In such cases, as the Connolly court recognized, "the government need not prove an actual false statement so long as it proves a scheme to engage in some form of deception, such as a half-truth." 24 F.4th at 833. Taken to its (il)logical conclusion, Schneider's reading of the case law would mean a defendant could never be held accountable for materially misleading his victim so long as his statement was not literally false. As Connolly recognized, that is not the law. In short, Schneider's reliance on these cases is misplaced. They do not stand for the proposition Schneider suggests, and he offers no reasoned basis why the Court should revisit its previous rejection of the arguments he now advances.

The only "new" case Schneider cites that did not involve a regulatory-based reporting requirement or similar circumstance, is a non-binding decision from the District of

Oregon in <u>United States v. Buckley</u>, No. 3:10-CR-00328-MO, 2013 WL 5206287 (D. Or. Sept. 12, 2013). <u>See</u> ECF Dkt. No. 487-1 at 17. Schneider's reliance on <u>Buckley</u> is likewise misplaced. In that case, the defendant served as a commodity trading advisor for a small number of clients pursuant to an agreement that the defendant would "take a 35% fee from <u>total profits</u>" of all trading accounts managed by the defendant on a monthly basis. <u>Buckley</u>, 2013 WL 5206287, at *3 (emphasis added). The defendant was indicted on mail and wire fraud charges, on the theory that he "calculated materially false and inflated monthly profits" that did not reflect the "actual profit realized," thereby causing his clients to pay a fee in excess of what was promised. <u>Id.</u> at *2. The defendant's trial and subsequent conviction turned on the meaning of the term "total profits," specifically, whether that term had a particular meaning from which the defendant deviated. <u>See id.</u> at *7–8. In granting the defendant's motion for judgment of acquittal, the court expressed concern that "the jury could have relied on inconsistent meanings of the term 'total profits,'" referencing "irreconcilable" testimony from the defendant's clients and a government expert. <u>Id.</u> at *6, 8.

Unlike in <u>Buckley</u>, where the government's theory relied on there being a "baseline" for the term "total profits," <u>id.</u> at *8, the government's theory here did not turn on there being an agreed-upon definition of the term "coverage ratio." Instead, the scheme to defraud turned on the defendants' representations to investors about the source of the funds used for monthly distributions. At trial, the jury heard repeated and consistent testimony that the defendants represented one thing, <u>i.e.</u>, that monthly distributions would be based on cash flow or funds from operations from portfolio companies, while they did another, <u>i.e.</u>, use investor capital to fund the distributions. The facts of <u>Buckley</u> are therefore easily distinguishable from this case. <u>See id.</u> at

*3 (explaining that what the defendant "told his investors he would do was 'take a 35% fee from total profits' (X)" and "[w]hat he actually did was 'take a 35% fee from total profits' (Y)").

The Court correctly declined to adopt Schneider's proposed jury instruction adapted from cases like Connolly and Harra. And the government was not, as Schneider claims, required to prove the defendants' statements were false under every reasonable interpretation of the term "coverage."

B.    The Court's "Willfulness" Instructions Were Correct

The Court instructed the jury that securities fraud (Counts One and Two) requires proof that the defendants acted willfully, that is to say with a "bad purpose." This instruction follows the willfulness instructions in United States v. Milton, No. 21-CR-478 (ER) (S.D.N.Y.) and United States v. Watson, No. 23-CR-82 (EK) (E.D.N.Y.), and is supported by multiple other district court decisions, see, e.g., United States v. Middendorf, No. 18-CR-36 (JPO), 2019 WL 4254025, at *7 (S.D.N.Y. Sept. 9, 2019); United States v. Wey, No. 15-CR-611 (AJN), 2017 WL 237651, at *12 (S.D.N.Y. Jan. 18, 2017).

The defendants contend that the Court was required to charge the jury that willfulness requires an "intent to do something the law forbids." ECF Dkt. No. 490-1 at 10; see ECF Dkt. No. 487-1 at 80. The defendants' arguments are based on an over-reading of United States v. Kosinski, 976 F.3d 135 (2d Cir. 2020), and a recent summary order, United States v. Petit, No. 21-543, 2022 WL 3581648 (2d Cir. Aug. 22, 2022), which in fact supports the government's position and the Court's instructions. The Second Circuit, like the Ninth Circuit and Eighth Circuit, has held that the term "willfully" as used in 15 U.S.C. § 78ff requires "an awareness of the general wrongfulness of [the defendant's] conduct" and not "awareness of the general unlawfulness of his conduct." United States v. Kaiser, 609 F.2d 556, 570 (2d Cir. 2010); see also United States v. Tarallo, 380 F.3d 1174, 1188 (9th Cir. 2004); United States v. O'Hagan, 139 F.3d

641, 647 (8th Cir. 1998).  This holding is consistent with the text of the statute and with the

traditional rule that ignorance of the law is not a defense.

United States v. Kosinski, the principal case relied on by the defendants, did not

purport to revisit Kaiser's clear holding, nor could a subsequent panel do so.  As Judge Ramos

explained in Milton, the issue presented in Kosinski was whether Section 10(b) requires

knowledge of a specific law, as has been required in connection with violations of highly technical

statutes like the tax law.  See United States v. Milton, No. 21-CR-478 (ER), 2023 WL 5609098,

at *8 n.14 (S.D.N.Y. Aug. 30, 2023); Kosinski, 976 F.3d at 154.  Kosinski cited Kaiser only in

passing and only to reject the defendant's argument that an earlier decision, United States v.

Cassese, 428 F. 3d 92 (2d Cir. 2005), required such specific knowledge when it did not.  Kosinski,

976 F.3d at 154.  If anything in Kosinksi was unclear, the Second Circuit resolved that ambiguity

in Petit, which affirmed instructions defining willfulness as "act[ing] deliberately and with a bad

purpose, rather than innocently," i.e., the instructions given by the Court in this case.  Petit, 2022

WL 3581648, at *4.  The only decision cited by the defendants reaching a different conclusion is

Judge Liman's on-the-record ruling in United States v. Phillips, No. 22-CR-138 (LJL), ECF Dkt.

No. 86 at 1179–80 (S.D.N.Y. Oct. 24, 2023).  Judge Liman recognized there was "admitted

tension" between Kaiser and Kosinski and concluded that the "defense has the better of the

argument . . . on balance" but did not address Petit or ground his decision in the text of the statute

as the Second Circuit did in Kaiser and as the Ninth and Eighth Circuits did in Tarallo and

O'Hagan.  Instead, Judge Liman appears to have concluded that "it is awareness of the general

unlawfulness of his conduct that makes a person a criminal."  No. 22-CR-138 (LJL), ECF Dkt.

No. 86 at 1180.  That of course proves too much, as many provisions of Title 18—including wire

fraud, 18 U.S.C. § 1343—do not require willfulness in any respect.

Next, the defendants re-raise their argument that "willfulness" is an element of wire fraud. When asked for decisional support, Gentile's counsel conceded on the record that he had none, "just the inference" that willfulness must be required because it is included in the Sand treatise. Tr. 6322 (Court: "is it just the inference from the fact that it has been charged, and it is in Sand?" Mr. Buckley: "Just the inference."). The wire fraud statute does not contain a willfulness requirement. See Middendorf, 2019 WL 4254025, at *7. As the Court instructed the jury, the required mens rea is "intent to defraud." See United States v. Blagojevich, 794 F.3d 729, 739 (7th Cir. 2015) ("The wire-fraud statute requires a specific intent to defraud but not wilfulness [sic] or any other proxy for knowledge of the law.").

"Intent to defraud" means "to act knowingly and with intent to deceive." As the Court instructed, in the wire fraud context, the defendant must also have intent to defraud for the specific purpose of "obtaining money or property." See United States v. Gole, 21 F. Supp. 2d 161, 167 (E.D.N.Y. 1997). Thus, the statute prohibits knowing deception with the specific intent of obtaining money or property; no willfulness is required. See United States v. Dockray, 943 F.2d 152, 156 (1st Cir. 1991) (distinguishing "intent to defraud" from willfulness); United States v. DiRoberto, 686 F. App'x 458, 461 (9th Cir. 2017) ("The mail and wire fraud statutes do not require proof of willfulness."); United States v. Newton, 766 F. App'x 742, 747–48 (11th Cir. 2019) (noting "the statutes at issue here do not include willfulness as an element"). There is no basis to

additionally require willfulness in the wire fraud statute and the Court correctly instructed the jury that it was not required.[33]

### C.    Unanimity as to a Particular Misrepresentation is Not Required

The jury was instructed that to convict the defendants of any offense it must find unanimously that all of the elements of that crime were satisfied. This instruction was consistent with the bedrock principle that unanimity as to elements is required but unanimity as to means is not. See United States v. Rice, 699 F.3d 1043, 1048 (8th Cir. 2012) (noting "the general rule is that the jury need not agree on the 'underlying brute facts' of a verdict, such as the means the defendant used to commit an element of the crime"). The applicable statutes require proof of a "scheme to defraud" and not a particular misstatement. For this reason, numerous circuits to consider the issue have concluded that a specific misstatement is a means and not an element. See United States v. Lyons, 472 F.3d 1055, 1068 (9th Cir. 2007); United States v. Daniel, 749 F.3d 608, 613–14 (7th Cir. 2014); United States v. LaPlante, 714 F.3d 641, 647 (1st Cir. 2013); Rice, 699 F.3d at 1048.

The defendants do not contend that a particular false statement is an element, as opposed to a "means" or "brute fact." Rather, Gentile contends that an exception to the basic distinction between "elements" and "means" applies to this case in particular. Gentile cites no Second Circuit (or even local district court) decision applying this exception to the general rule.

---

[33]    Any error in these instructions would also be harmless. The jury found that both defendants acted willfully when it convicted them of securities fraud and securities fraud conspiracy (Counts One and Two). Moreover, the Court's "good faith" instruction specifically equated good faith to the absence of willfulness and instructed the jury that good faith was a complete defense to each of the charges in the indictment: "Because the government must prove that a defendant acted willfully and with intent to defraud to establish a defendant's guilt on any count in the indictment, the 'good faith' of a defendant is a complete defense to each count in the indictment. . . . The burden is on the government to prove beyond a reasonable doubt both that a defendant acted willfully and, consequently, that he lacked good faith." Tr. 6892:2–11.

Gentile relies instead on citations to other crimes with distinct elements, like perjury, and two decisions from the Third and Eleventh Circuits that considered unanimity in connection with other, fundamental errors. ECF Dkt. No. 490-1 at 14. United States v. Adkinson addresses what the Eleventh Circuit described as a "unique set of circumstances" in which a conspiracy count was dismissed before deliberations and the indictment was redacted to remove all allegations of a scheme leaving the jury to parse 227 overt acts to find a scheme to defraud on its own.[34] 135 F.3d 1363, 1377 (11th Cir. 1998). On these facts, the Eleventh Circuit concluded, among other things, that the jury may not have been unanimous as to the scheme to defraud element. Id. at 1377–78. The only other case the defendants cite is United States v. Harra, in which the Third Circuit concluded that the jury was charged on two theories, one of which was legally erroneous. 985 F.3d at 224. In finding that the error was not harmless, the Third Circuit explained that the court's instructions did not distinguish the two theories. See id. at 224–25. The Third Circuit did not require the unanimity instruction Gentile now demands. The defendants have not presented any other error similar to the issues in Adkinson and Harra. On these facts, the Court's general unanimity instruction was sufficient as it generally is, and nothing more was required. See United States v. Ferguson, 676 F.3d 260, 280 (2d Cir. 2011) ("Even assuming that the jury had to agree on the theory of liability, the general unanimity instruction . . . was sufficient to remove any genuine danger that the jury would convict on disparate theories."); see also United States v. Shaoul, 41 F.3d 811, 817–18 (2d Cir. 1994) (concluding there was no plain error even assuming

---

[34] Gentile cites Adkinson, for the proposition that the Eleventh Circuit requires unanimity as to overt acts. ECF Dkt. No. 490-1 at 14. That is not the law in the Second Circuit: "[W]hich overt act among multiple such acts supports proof of a conspiracy conviction is a brute fact and not itself [an] element of the crime. The jury need not reach unanimous agreement on which particular overt act was committed in furtherance of the conspiracy." United States v. Kozeny, 667 F.3d 122, 132 (2d Cir. 2011).

unanimity should have been required as to false statements and overt acts in light of the court's general unanimity charge).

          D.      The Conscious Avoidance Charge Was Appropriate

        The Court correctly instructed the jury that it could consider whether the defendants "consciously avoided" learning of the details of statements to GPB's investors. A "conscious avoidance" instruction is appropriate where (i) the defendant asserts a lack of knowledge or mens rea and (ii) there is an appropriate factual basis for the jury to find that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact. See United States v. Fofanah, 765 F.3d 141, 144 (2d Cir. 2014). As the Second Circuit has explained, while "conscious avoidance is a concept that deals most directly with knowledge," "conscious avoidance is not irrelevant to intent, for knowledge is one component of intent." United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1195 (2d Cir. 1989); see also id. at 1194 ("This Court has repeatedly approved use of a conscious-avoidance charge in a variety of cases in which there was a genuine issue as to the defendant's good-faith ignorance of the illegality of his conduct."); United States v. McMahon, No. 21-CR-265 (PKC), 2024 WL 896838, at *21 (E.D.N.Y. Mar. 1, 2024) (finding conscious avoidance charge "plainly responsive" to arguments that the defendant lacked the "requisite knowledge and mens rea to commit the crimes with which he was charged").

        Throughout the trial, Schneider asserted a lack of knowledge regarding misrepresentations made to investors and a good-faith defense that depended in part on a lack of knowledge. For instance, in cross-examining Crafa, an investment advisor whose clients invested in GPB, Schneider's counsel pointed out that Schneider was not copied on the marketing emails Crafa received from Ascendant Capital employees. See Tr. 1827 ("Q: Jeff Schneider is not on this e-mail, right? A: No."); Tr. 1857 ("Q: Jeff Schneider is not on this e-mail? A: No."). When questioning Lagiglia, another financial advisor, regarding a due diligence event, Schneider's

counsel pointed out that Schneider himself did not present at the due diligence event.  See Tr. 3741 ("Q: Mr. Schneider did not present at that due diligence event, correct? A: I don't recall if he did or he didn't. I know David more than I know Mr. Schneider."); see also Tr. 6845 (arguing in summation, "The government witnesses, many of them didn't recall even speaking with Mr. Schneider.").  The obvious inference from this questioning was that Schneider was not aware of what the witnesses were told by GPB and Ascendant representatives.  In closing, Schneider's counsel argued that Schneider had put in place an elaborate compliance program to ensure communications to investors were accurate and therefore acted in good faith.  See Tr. 6729 ("This was a very formalized process and procedure at GPB. And you know who's not involved? Mr. Schneider, despite the nonsense spun by Mr. Jacoby and Anscher from the witness stand, the formal process, Mr. Schneider is not involved."); Tr. 6737 ("This was a serious compliance program, and it wasn't perfect, and they tried to make it better, but it shows good faith and trying to get the material to the market.  And as we saw, positive and negative materials went to the market.").  This good-faith defense depended on the argument that Schneider was not actually aware of the false and misleading information being provided to investors or the failures in GPB's and Ascendant Capital's compliance programs.  See Tr. 6751 (arguing that misleading statements by Ascendant representatives were "unapproved statements" "what are you going to do.  You told them not to say it . . . Can't hold these men responsible when you made a rule and somebody didn't follow it.").  Schneider's counsel also denied Schneider's knowledge of the performance guarantee scheme, pointing out that Schneider was not on many of the emails related to the scheme: "Mr. Axelrod showed Mr. Lash document after document about the alleged guaranty fraud. And you know what is critical about all of those documents or, at least, a very substantial number? Jeffry Schneider is not on them.  Here's a list of all of these e-mails and documents that the Government

showed Mr. Lash and you do not see Mr. Schneider." Tr. 6789. The Court correctly concluded that these arguments established a basis for a conscious avoidance charge. See Tr. 6866 ("I think the conscious avoidance argument is fair. . . . I think the caselaw is it's responsive when it's responsive to an argument about lack of mens rea or lack of knowledge it's appropriate. . . . I do think mens rea, lack of knowledge, are squarely in play based on the defense summations.").

Schneider appears not to dispute that he put this issue in play, but instead contends that the government's decision to argue conscious avoidance in rebuttal was somehow improper or indicates a lack of a factual predicate for the instruction. There is nothing improper about arguing that the jury can consider conscious avoidance in rebuttal. In McMahon, Judge Chen rejected this exact argument: "As to the first purportedly new argument McMahon identifies, 'conscious avoidance,' it was plainly responsive to the defense summation about McMahon lacking the requisite knowledge and mens rea to commit the crimes with which he was charged." 2024 WL 896838, at *21. And just as in McMahon, the government had "made clear even before trial that it was pursuing a theory of conscious avoidance" in its proposed jury instructions. Id.; see also Tr. 6866 ("It's very clear that the government has wanted that issue in the case."). Having argued that he was unaware of misstatements made to investors and prospective investors, Schneider cannot credibly claim he was "sandbagged" by the government's response.

Moreover, there was ample factual predicate to believe Schneider either actually knew of these misrepresentations or avoided learning about them. As described previously, the evidence at trial established that Schneider received more than a dozen reports from Bill Jacoby and Macrina Kgil describing how the GPB funds did not have sufficient income to pay distributions. Josh Teeters testified that this information was not shared with employees at Ascendant Capital. Instead, Schneider presented it to the Ascendant Capital team as if there was

a "short term" problem and the fund was building up cash to make large acquisitions.  Tr. 1954–56, 2137:14–24.  Schneider was aware that this was not the case and that GPB had been using investor capital to make up the shortfall since at least August 2015.  Jacoby testified that he met with Schneider regularly and discussed the transfers between accounts with him.  See Tr. 811 ("Q: If we can go back to the e-mail, so it says, 'Please review and let me know if you have questions prior to your meeting with Jeff and Jovan.'  Did you meet with Jeff and Jovan about this?  A: Yes.  Q: How often would you meet with Mr. Schneider about this issue?  A: I would see Mr. Schneider maybe once a month.  Q: And what do you recall his response . . . to being shown this information?  A: He said that it was our job to make sure that we kept track of it and made it work out better because he could not handle having a lower distribution rate so we needed to make sure that we got the money to cover the distributions.").  The jury could conclude based on this testimony that Schneider was aware of the full extent of the shortfall at GPB and understood that withholding information about the transfers between accounts from Ascendant Capital employees like Teeters would lead them to provide false and misleading information to investors and potential investors, as it in fact did.[35]

There was also evidence from which the jury could reasonably conclude that Schneider was willfully blind to failures in the compliance program at GPB and Ascendant Capital that contributed to misleading communications to be disseminated to the market.  Jeff Schultz, GPB's Chief Compliance Officer, was not included on 17 performance reports circulated to Schneider and Gentile between the third quarter of 2016 and mid-2018.  See GX-8012-A, GX-8013-A, GX-8013-B, GX-8014-I, GX-8014-J, GX-7910-A, GX-8117-A, GX-7915-A, GX-7568-

---

[35]    The jury could draw a similar inference from the fact that Schneider did not share the details of the performance guarantee scheme with Ascendant Capital employees.

A, GX-7568-B, GX-7568-C, GX-8008-A, GX-7582-A, GX-8009-B, DX-FFFFM-1, GX-7669-A, GX-8275-A.    As the government argued in closing, withholding information about GPB's performance from Schultz made it obvious that he would be unable to check the accuracy of the Ascendant Capital marketing materials.  Tr. 6472.  Roger Anscher also testified that Schneider disregarded Schultz's concerns (as well as his own) and insisted on having final say over marketing materials.  Tr. 4314, 4335, 4353.  Likewise, Kgil testified that the compliance process in place on paper was not followed in practice.  Tr. 2464.

Schneider's argument that the government's evidence went to actual knowledge instead of conscious avoidance is unpersuasive and at odds with established Second Circuit law. As the Second Circuit has explained "the same evidence that will raise an inference that the defendant had actual knowledge of the illegal conduct ordinarily will also raise the inference that the defendant was subjectively aware of a high probability of the existence of illegal conduct." United States v. Svoboda, 347 F.3d 471, 480 (2d Cir. 2003); see also United States v. Kozeny, 667 F.3d 122, 133 (2d Cir. 2011) (rejecting defense argument that "the conscious avoidance charge was given in error because the government argued [the defendant] actually knew of the bribes"). The evidence of Schneider's actual knowledge was overwhelming.[36]  It included testimony from multiple employees who described personally warning Schneider that Ascendant Capital

---

[36]    For this reason, any error in charging the jury on conscious avoidance was also harmless. The Second Circuit has explained that a conscious avoidance charge is harmless where there is overwhelming evidence of actual knowledge.  See Fofanah, 765 F.3d at 144–45 (finding conscious avoidance instruction harmless where there was "overwhelming" evidence of actual knowledge).  Such a charge is also harmless because the jury is presumed to follow the Court's instructions and to disregard a charge that has no basis in the evidence.  See United States v. Adeniji, 31 F.3d 58, 63 (2d Cir. 1994) (concluding that it was "apparent" the jury did not convict on conscious avoidance where there was insufficient evidence of conscious avoidance but sufficient evidence of actual knowledge and "presum[ing] that the jury convicted [the defendant] on the basis of actual knowledge, an alternative theory that was supported by the evidence"); see also United States v. Cartwright, 6 F.3d 294, 301 (5th Cir. 1993) ("Where there is no evidence of conscious ignorance . . . [t]he instruction is surplusage and thus does not create the risk of prejudice.").

employees were providing false and misleading information.  Anscher and Jacoby testified to raising concerns with Schneider about representations to investors.  Teeters testified that Schneider controlled the pitch to investors and attended sales calls at which these topics were discussed. Schneider also attended due diligence seminars at which investors and prospective investors were provided false and misleading information.  And finally, Schneider was copied on the "material update" emails distributing new marketing materials that contained misleading representations to investors.  GX-8099, GX-8184.

E.    The Court's Materiality Instruction Correctly Stated the Law

In accordance with longstanding Second Circuit law, the Court instructed the jury to evaluate materiality from the perspective of an objective, "reasonable investor" and that the fact that a statement was made to a "gullible" investor does not render it immaterial.  See Tr. 6990. The defendants contend the Court erred by refusing to add additional gloss to the definition of a "reasonable investor," ECF Dkt. No. 490-1 at 16, and by cautioning the jury that the sophistication of the person who actually heard the statement is irrelevant, ECF Dkt. No. 487-1 at 76–80.  These instructions correctly stated the law and the defendants' arguments are meritless.

"[T]he materiality standard is an objective one and centers on the views of a hypothetical, reasonable investor in the market at issue."  United States v. Litvak, 889 F.3d 56, 68 (2d Cir. 2018) ("Litvak II").  Consistent with this standard, the Court instructed the jury that the government was required to "prove beyond a reasonable doubt that there was a substantial likelihood that the misstated fact would have been viewed by a reasonable investor as having significantly altered the total mix of information."  Tr. 6989 (emphasis added).  The Court went on to explain that "[t]o significantly alter the total mix of information available means to meaningfully affect a reasonable investor's investment decisions."  Id. (emphasis added).  This instruction is consistent with Litvak II and has been given in a multitude of recent fraud trials in

this district.[37]  Nor was the Court required to provide additional gloss on the "reasonable investor" standard, as Gentile insists.  In fact, the Ninth Circuit has rejected precisely this argument.  In United States v. Sayre, the court concluded that the term "reasonable investor" is "a concept within the jury's ordinary experience and understanding" and therefore does not require additional definition.  434 F. App'x 662, 624 (9th Cir. 2011).  This reasoning is equally applicable here.

The Court's instruction on "gullible" investors did not alter this instruction, and Schneider's argument otherwise misreads the Court's instructions.  After correctly defining materiality in terms of an objective investor, the Court went on to explain that if the jury found a misrepresentation to be material, "it does not matter whether the statement was made to a gullible buyer or sophisticated investor."  Tr. 6990.  Rather than muddying the charge, as the defendants claim, the Court's instructions reinforced the objective nature of the inquiry by making clear that the subjective sophistication of the listener is not relevant.  The charge was also balanced and properly instructed the jury not to consider the subjective attributes of the listener be they "gullible" or "sophisticated."  This instruction on "gullible" investors is well-supported by precedent and has been affirmed by the Second Circuit.  See United States v. Schlisser, 168 F. App'x 483, 486 (2d Cir. 2006); see also United States v. Ellison, 704 F. App'x 616, 620–21 (9th Cir. 2017) ("The instruction correctly stated the law because materiality is determined objectively, so that a victim's negligence is not a defense."); cf. United States v. Isola, 548 F. App'x 723, 725 (2d Cir. 2013) (noting that "evidence of a particular lender's unreasonableness is irrelevant to the materiality of [the defendant's] false statements because materiality is an objective question").

---

[37]     See United States v. Watson, No. 23-CR-82 (EK); United States v. Petrossi, 16-CR-234 (BMC); United States v. Greebel, 15-CR-637 (KAM).

In arguing otherwise, Schneider relies on inapposite case law.  In <u>Litvak II</u>, the Second Circuit concluded that the district court erred by permitting testimony regarding a counterparty's admittedly <u>incorrect</u> belief that the defendant was his agent.  As the court explained, the witness's "indisputably idiosyncratic and unreasonable viewpoint" was not probative of the views of a reasonable, objective investor.  <u>Litvak II</u>, 889 F.3d at 69.  Thus, while it is "permissible in a case like this" to rely on "testimony of counterparty traders—purported victims—that they considered appellant's misstatements to be an important factor, among others," <u>id.</u> at 64, the government erred in <u>Litvak II</u> by relying on a witness who everyone agreed was incorrect.  On the other hand, "views that are not 'erroneous or idiosyncratic' do not implicate <u>Litvak II</u>'s core theory that 'the point of view of an investor who is admitted to be wrong' could not be 'relevant to prove what a reasonable investor, neither confused nor incorrect, would have deemed important.'" <u>United States v. Gramins</u>, 939 F.3d 429, 446 (2d Cir. 2019).  Just as in <u>Gramins</u>, and unlike in <u>Litvak II</u>, the government presented testimony from a cross-section of investors and advisors, none of whom the defense has shown held "erroneous or idiosyncratic" views.[38]

The defendants were free to argue that the government's witnesses did not reflect a "reasonable investor's" views, and the jury was free to reject that argument (as it did).  <u>See</u> <u>id.</u> ("[T]he government had the right to advance its theory of materiality that, based on relevant features of the market for RMBS, a reasonable investor would have relied on the sorts of misrepresentations that [the defendant] and his co-conspirators made in the context of certain

---

[38]    Although Schneider cites <u>Gramins</u>, he fails to note that the Second Circuit <u>reversed</u> the district court's grant of Rule 29 and Rule 33 relief in <u>Gramins</u> because the government's witnesses <u>did not</u> hold admittedly incorrect or obviously idiosyncratic views.  Far from supporting Schneider's arguments, <u>Gramins</u> reiterates that this was a jury question and the defendants' sour grapes are not a basis for Rule 33 relief.  <u>See Gramins</u>, 939 F.3d at 448 ("The debate over whether Gramins's misrepresentations were material should therefore have remained where it nearly always belongs: with the jury selected to determine Gramin's guilt or innocence.").

trades.  Likewise, the defense had the right to advance its theory of materiality that, in a market full of sophisticated investors relying largely on complex models, no reasonable investor would have credited broker-dealers' representations about RMBS prices.  And the jury had the right to accept whichever theory of materiality it found more persuasive in light of the testimony and other evidence before it at trial.  In short, the question of whether [the defendant's] misrepresentations were material under the reasonable investor standard was for the jury to decide in light of the opposing theories advanced by the two sides and the evidence that each side marshalled to support them.").  The Court's jury instructions did not preclude Schneider from making this argument.  In fact, the Court's charge specifically provided for consideration of Schneider's argument that any misrepresentations were immaterial in light of the terms of GPB's transaction documents.  The Court instructed the jury that although "a disclaimer in a contract does not by itself establish that a misrepresentation to investors was immaterial . . . You can, however, consider contractual disclaimers (just like any other statement) as part of the information before investors when you make a determination about whether a reasonable investor would have considered a misrepresentation to be significant or important . . . ."  Tr. 6990.  This instruction correctly stated the law, see Weaver, 860 F.3d at 96, and Schneider does not argue otherwise.

It is not surprising, much less Rule 33 error, that the jury rejected Schneider's argument that the government's witnesses were not "reasonable investors" and credited the government's witnesses.  Schneider's argument relies on the false premise that because the possibility of a return of capital had been disclosed, the fact that it was actually happening could not be material to a reasonable investor.  See ECF Dkt. No. 487-1 at 78–80.  This argument was particularly flawed in light of the evidence of the defendants' affirmative representations that they were not returning capital and had "no present plans" to do so.  See GX-4110-I; infra Section II.A.

Moreover, the defense chose not to call any witness to buttress its arguments regarding materiality. Neither defendant called any investors in GPB, any employees of Ascendant Capital, or any employees from the broker-dealers who they insist were responsible for doing diligence on the GPB investments. Rather, the defendants presented their materiality defense through cross-examination and argument. The jury was entitled to reject this argument—as <u>Gramins</u> makes clear—and credit the government's witnesses. The jury did so in five hours.

> F.    The Court's "Government Not on Trial" Instruction Was Proper

The defendants argue that the Court's "government not on trial" instruction was improper because it "usurped the jury's role to decide if there was evidence of the Government's improper motive in prosecuting this case,[] which in turn was relevant as to whether the Government met its burden to show proof beyond a reasonable doubt of the charges against Mr. Gentile." ECF Dkt. 490-1 at 17–20. They are wrong. The defendants' <u>ad hominem</u> attacks on the prosecution's motives had no basis in the evidence and have long been held to be improper. The Court found as much before instructing the jury that there was no evidence of the government acting with an improper motive, while still emphasizing in its charge that it was "appropriate for [the jury] to consider arguments of counsel going to the credibility of witnesses." Tr. 6977.

The defendants' claims regarding alleged government misconduct were addressed and dismissed by the Court during trial, most pointedly after Gentile's "inflammatory" summation:

> The thing I'm seeing in the closing, and I was surprised by it when it happened, is it went pretty far down the inflammatory road of, and these guys are—it shifted away from the witnesses to the prosecutors and prosecutor violations of their ethical duties. And I'm not really seeing anything in the record that I think makes that fair game. In any kind of trial like this, you are going to have witnesses who say things at one point and then say a different thing. You're going to have statements that are made late, they're not made earlier, that's totally fair game for you to argue. But the closing was of a different—has portions of it that are of a different nature that

136

> the Government had them committing misconduct and I guess I'd
> like the focus the jury on whether the Government has met its burden
> of proof beyond a reasonable doubt in this case . . . once it goes to
> inflammatory language about the Government committing
> misconduct, there is a risk that the jury is not going to decide this
> case based on the evidence or that you are inviting the jury to do
> something different.

Tr. 6818:17–6819:15; see Tr. 6815:9–6815:13 ("I don't think there's anything in the trial to

support the inference that the Government is hellbent on winning and engaged in

misconduct."). Confronted with this stark rebuke, counsel for Gentile intimated he was in

possession of additional information, stating, "I don't think the Court should be weighing in,

without even knowing all the facts that, frankly, I know on whether there is or is not improper

motive." Tr. 6827:7–9. Yet, despite this assertion, neither defendant has offered any new facts

not known at trial for the Court's consideration.

In fact, because the Court found the misconduct allegations in Gentile's summation

baseless—allegations that are now largely repeated in the defendants' instant motions—the Court

amended its jury charge to include a "government not on trial" instruction, explaining:

> I think the jury's job is to decide whether the proof establishes the
> defendant's guilt beyond a reasonable doubt. And there is a risk
> when somebody gets up and raises, basically, a claim of
> prosecutorial misconduct . . . that you're prejudicing or inflaming
> the jury . . . I think the reason [for the curative instruction] is, right,
> that if you say something very inflammatory in front of the jury
> about the Government's conduct, that the Government does not
> really have an opportunity to say here's or backstory about why we
> did this . . . It's just an inflammatory thing that's put before the jury
> sort of inviting the jury to reach a verdict on this case basis.

Tr. 6826:11–16, 6827:14–23.

The Court's "government not on trial" charge is supported by the Supreme Court's

decision in United States v. Young, 470 U.S. 1 (1985) and its progeny. In Young, the Court held

that "[d]efense counsel, like his adversary, must not be permitted to make unfounded and

137

inflammatory attacks on the opposing advocate." Id. at 9. The Court went on to explain that in situations where an attorney goes "out of bounds" in attacking his or her adversary, the prudent course is for the Court to take "prompt action from the bench in the form of corrective instructions to the jury and, when necessary, an admonition to the errant advocate."[39] Id. at 13. That is precisely what the Court did here. Before giving its instruction, the Court explained its grounding in Young:

> So, I do think there's been a bunch of arguments about the prosecutors' motives that are not really proper, and the Young case, Supreme Court case, and its sort of follow-on cases indicate the right way to address is through an instruction by the Court. A lot of these cases are cases where the Government responds by getting up and talking about its motive, which I think would be a natural thing for the Government to do. And there are a lot of cases saying we're not going to say that was a basis for overturning a conviction because it was a response to something that the defense said in its argument. But I think the cases are clear that the more appropriate way to do that is not to have prosecutors get up and do a sort of vouching about their motives, but to have the Court instruct. And I don't think that an instruction that just says this is not for you to think about is enough here because I do think this is inflammatory discussion before the jury, and so I think this is a more appropriate instruction.

Tr. 6865:3–21.

The fact that the Court's "government not on trial" instruction did not include a directive to the jury not to question whether the government failed to use certain investigative techniques is of no significance and does not bear on whether the specific charge the Court gave was appropriate. See ECF Dkt. No. 490-1 at 18. The defendants did not argue that the government

---

[39] The defendants misinterpret Young as considering only the "limited issue of whether a reviewing court could address Government misconduct absent a timely objection." ECF Dkt. No. 490-1 at 19, n.6. In fact, Young's holding addressed the broader issue of how a district judge should handle a situation where one adversary argues improperly, provoking opposing counsel to respond in kind. See 470 U.S. at 11. The Supreme Court made clear that "district judges should "deal with the improper argument of the defense counsel promptly and thus blunt the need for the prosecutor to respond." Id. at 13.

failed to employ certain investigative techniques.  There was no need for this language.  The Court's charge was properly tailored to the facts of the case.

Moreover, contrary to the defendants' suggestion, the Court's charge did not prevent the jury from considering evidence presented during the trial.  Indeed, the Court found there was no evidence in the record of the government operating under an improper motive.  The Court's charge was carefully crafted to "emphasize to the jury that they can consider anything that bears on credibility."  Tr. 6866.  The Court instructed the jury that "[a]rguments about the credibility of the witnesses who have testified are fair game. And it is appropriate for you to consider arguments of counsel going to the credibility of witnesses." Tr. 6977:9–17.  The jury was free to consider evidence, for example, of the number of times witnesses met with the government and arguments that the government's witnesses were coached.  See Tr. 6866 (Court: "And I think that allows you to have your argument that they were coached as going to credibility, but what I don't think is appropriate is arguments about why prosecutors did certain things.  I don't think that's supported by the evidence, but I also don't think it's an appropriate consideration for the jury.").

VII.    The Defendants' Accusations of Misconduct Are Frivolous

The defendants' post-trial motions contain the same type of baseless allegations of prosecutorial misconduct that have characterized their litigation strategy since the inception of the case.  Indeed, before trial commenced, this Court and the Honorable Diane Gujarati (who presided over the case until approximately January 2024) rejected repeated arguments by the defendants that the government had engaged in misconduct.  See, e.g., Feb. 13, 2023 Conf. Tr. 13 (Judge Gujarati noting that "[d]efendants have failed to make a non-conclusory, non-speculative showing of government misconduct"); May 23, 2024 Pre-Trial Conf. Tr. 7–8 (ruling the "defendants have

not identified a widespread or continuous pattern of prosecutorial misconduct . . . I just don't find such a pattern of conduct based on the evidence presented to me").

In yet another attempt to ignore the evidence of their guilt and deflect blame on others, the defendants accuse the government of (i) suborning and countenancing perjury from several witnesses; (ii) coaching witnesses; and (iii) making improper statements in its rebuttal summation. The Court has already considered and rejected counsel's arguments that the government suborned perjury and coached witnesses and should reject these recycled complaints once again. See Tr. 6818 ("The thing I'm seeing in the closing, and I was surprised by it when it happened, is it went pretty far down the inflammatory road of, and these guys are—it shifted away from the witnesses to the prosecutors and prosecutor violations of their ethical duties. And I'm not really seeing anything in the record that I think makes that fair game."). And when asked by the Court for any actual evidence of misconduct, Gentile's counsel made a bizarre allusion to evidence of improper motive somehow known only to him and which still has not been provided to the Court or the government. See Tr. 6827:7–9 ("I don't think the Court should be weighing in, without even knowing all the facts that, frankly, I know on whether there is or is not improper motive."). The defendants' arguments regarding the government's rebuttal are no more persuasive. For all the reasons set forth below, the defendants' unsupported and conclusory allegations do not warrant a new trial or dismissal.

A.    No Government Witness Committed Perjury

The defendants' claims that the government knowingly adduced or relied on perjured testimony are unsubstantiated and categorically false. Having heard all the testimony, including cross-examination of the government's witnesses by both defendants, the jury made the relevant credibility determinations and convicted the defendants on all counts. The claims of perjury in the defendants' motions do not provide a new or compelling reason to depart from that

verdict.  Fundamentally, the defendants fail to bridge the gap between testimony that may be merely inconsistent or the result of confusion, mistake, or faulty memory, and testimony that was given with willful intent to provide false information.

   "Reversal of a conviction based upon allegations of perjured testimony should be granted only with great caution and in the most extraordinary circumstances."  United States v. Zichettello, 208 F.3d 72, 102 (2d Cir. 2000).  In assessing a Rule 33 motion based on allegations of perjury, "the defendant must show that (i) the witness actually committed perjury; (ii) the alleged perjury was material; (iii) the government knew or should have known of the perjury at [the] time of trial; and (iv) the perjured testimony remained undisclosed during trial."  United States v. Josephberg, 562 F.3d 478, 494 (2d Cir. 2009).  None of the defendants' purported instances of perjured testimony satisfy this standard.

   First, no government witnesses committed perjury.  A witness perjures themselves when they "give false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." United States v. Dunnigan, 507 U.S. 87, 94 (1993).  Even "inconsistencies between witness's [prior sworn] statements before grand jury and at trial do not warrant inference that [the] government knowingly used false testimony."  United States v. Bortnovsky, 879 F.2d 30, 33 (2d Cir. 1989) (internal citation omitted).  Moreover, "even a direct conflict in testimony does not in itself constitute perjury."  United States v. Gambino, 59 F.3d 353, 365 (2d Cir. 1995); see also United States v. Balagula, 863 F. Supp. 117 (E.D.N.Y. 1994) (concluding that difference in opinion between laypersons and handwriting expert as to whether defendant authored a document did not render laypersons' testimony perjury, and prosecution's use of laypersons' testimony did not constitute prosecutorial misconduct).

The defendants focus their perjury allegations on various aspects of former CFO and whistleblower Bill Jacoby's testimony concerning the "existence of a fake performance guarantee"; the "exorbitant expenses" incurred by the defendants and charged to GPB; the origin of the "no present plans" language in various PPM iterations; and whether the 2014 Performance Guarantees were accrued as income on the 2014 Holdings I audited financials.  ECF Dkt. No. 489-1 at 12–17.  In doing so, the defendants mischaracterize the relevant evidence and attempt to cast different factual interpretations as proof of false testimony.

The defendants claim that Jacoby testified about a "fake performance guarantee with Mr. Lash to falsely inflate GPB Auto's 2014 financial performance" and claim such a guarantee never existed.  Id. at 14–15.  Counsel for Gentile made the argument in summation that Jacoby had "literally made this up [a Lash performance guarantee for Automotive in 2014] on the spot," claiming that it was "perjury.  Rank perjury.  And it would be funny if this wasn't so serious.  But its terrifying that this is happening in this courtroom . . . a man on the spot can make up a performance guarantee that doesn't exist and they [the government] sat there and did nothing."  Tr. 6552:5–6554:22.  Jacoby's testimony is nothing of the sort.

The relevant testimony was elicited by the defense during its cross-examination of Jacoby.  See Tr. 6808:24–25.  Jacoby testified on direct examination that he did not believe Automotive Portfolio had sufficient funds in 2014 to pay its monthly distributions exclusively from income from the portfolio companies, much less the special distributions it paid.  Tr. 719:3–11.  On cross-examination, he explained GPB "used a performance guarantee in that year as well" and it was "fraudulent."  Tr. 1126–27.  It was the defendants, not the government, that elicited this supposedly perjurious testimony.

142

As the government argued after Gentile's summation, the cross-examination on this point was, to say the least, confusing. See Tr. 6809:17–6810:9 (government explaining "[t]he best read of it . . . was that Mr. Jacoby was confused because the questions were confusing between 2014 Auto and 2015 Auto . . . But it makes no sense that we would intentionally elicit some phantom fourth guaranty, never prove it up, it's not alleged anywhere in the case, and then go forth").[40] The defendants fail to address the plausible explanation that Jacoby was simply confused by counsel's questioning as even the government was. Nor do they present reliable evidence that Jacoby's testimony was false. Considering how the defendants intentionally manipulated internal and audited financials, defense counsel's use of GPB's audited financial reports to prove the falsity of Jacoby's testimony is hardly reliable.[41] See Tr. 6552:12–18 (summation referencing cross-examination of Jacoby with 2014 Automotive Portfolio audited financials showing "more than fully covered"). Moreover, the fact that the government did not charge a 2014 Automotive Portfolio fraudulent performance is not evidence that one did not exist, as the defendants claim. ECF Dkt. No. 489-1 at 10. Finally, assuming, arguendo, that Jacoby did willfully testify falsely, the defendants' claim that the government knew Jacoby's testimony was false because the government had met with Jacoby for numerous prep sessions and had discussed other performance guarantees with him, is unpersuasive. The defendants' other professed instances of perjury are equally unavailing. Regarding the genesis of the "no present plans" language in the Holdings I, Holdings II, and Automotive Portfolio PPMs, while defense counsel is correct that this language

---

[40]    Notably, at no point during the cross-examination of Lash or any other witness did either defendant ask about this performance guarantee.

[41]    As proven at trial, GPB was unable to issue audited financial statements for several consecutive years, and on August 17, 2018, Gentile sent a letter to investors suspending redemptions and stating that "previously issued financial statements as of and for the years ended [2015 and 2016] will need to be restated . . . and the independent accountants' reports thereon should no longer be relied upon." GX-8205.

appeared in the Holdings II PPM in April 2015, this fact misses the import of the testimony on this issue. Specifically, this language was only added to the Automotive Portfolio PPM in June 2016 and the Holdings I PPM in December 2016—as the witnesses described—and long after GPB had begun using investor capital to fund distributions. Accordingly, the timing of this language's inclusion in the Automotive Portfolio and Holdings I PPMs is intentionally deceptive and highly probative of the defendants' criminal intent and consciousness of guilt, as argued by the government. So too with the defendants' claims regarding "private jet travel" and "other exorbitant expenses." ECF Dkt. No. 489-1 at 12–14. The defendants conflate Jacoby's testimony about expenses—which the government dramatically curtailed despite a favorable in limine ruling from the Court—with the "private jet in question," which was a purchase made by the defendants and Lash in 2017.

Similarly, defense counsel's insistence that 2014 Performance Guarantees were not accrued as income in the 2014 Holdings I audited financials, ECF Dkt. No. 489-1 at 12–13, is, at best, a factual dispute that was thoroughly vetted for the jury's consideration. The defendants cross-examined Jacoby extensively on this point, and Gentile called an expert witness to try and buttress the defense assertion. See Tr. 5483:2–5493:8. However, during cross-examination, defense expert Martin Wilczynski made several key concessions about how the Holdings I audited financials did reflect the Lash performance guarantees as income, including, inter alia, "Patrick Dibre paid $1.8 million in 2015 not $1.1 million," Tr. 5662:19–21, and "Mr. Dibre didn't have guarantees in favor of the dealerships and Mr. Lash did," Tr. 5663:19–5664:25; see also Tr. 5618:4–5636:18, 5641:8–5662:24. Both parties presented their competing views of the issue

during summations,[42] and the jury either rejected the defendants' position or found it immaterial to their deliberations in light of all the other evidence proving the defendants' guilt.

In sum, nothing the defendants label as perjury is false or even inconsistent with anything in the trial record. Witness testimony and argument on these points was neither "patently incredible" nor did it "def[y] physical realities." McCourty, 562 F.3d at 476. Under those circumstances, the defendants' challenges involve factual determinations and credibility assessments, which are strictly within the province of the jury. See id.; see also United States v. Payne, 591 F.3d 46, 59–60 (2d Cir. 2010) ("Assessments of witness credibility and choices between competing inferences lie solely within the province of the jury."); Jackson, 335 F.3d at 180 ("[I]t is the task of the jury, not the court, to choose among competing inferences that can be drawn in favor of the government." (citing Martinez, 54 F.3d at 1043)); United States v. Miller, 116 F.3d 641, 676 (2d Cir. 1997) ("[W]here there are conflicts in the testimony, we must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses.").

Second, even if the defendants could demonstrate false testimony and the government's knowledge of and acquiescence in that false testimony, they cannot show the "jury probably would have acquitted in the absence of the false testimony," given the overwhelming evidence of guilt. McCourty, 562 F.3d at 476 (internal quotation marks omitted). Any argument that a new trial or outright dismissal is warranted because "the jury probably would have acquitted in the absence of the false testimony" is flatly disingenuous, especially where, as here, the alleged

---

[42]    Defense counsel for Gentile argued to the Court that this was an example of the government suborning perjured testimony and "operating with an improper motive," ostensibly justifying his inflammatory comments during summation. See Tr. 6807:5–6809:12. The government countered that there was "abundant evidence" that the 2014 guarantee was booked as income as the government alleged. Tr. 6810:10–21 ("I think the audit spreadsheet shows that it did. I think their expert got up there and tried to claim that somehow you can book things as income even when the underlying consolidated dealerships have a loss . . . At best for him, that's a good–faith dispute. It's certainly not evidence that the Government was acting in bad faith.").

perjurious testimony related to largely peripheral topics such as an uncharged performance guarantee and improper company expenses.  See United States v. Truman, 688 F.3d 129, 139 (2d Cir. 2012).

Third, the defendants do not submit any newly discovered evidence of this alleged perjury.  Rather, they argue that various government witnesses committed perjury when compared to other documents and testimony available at trial.  The Second Circuit has held that, "[w]hen the perjury was disclosed during the trial, a new trial should not be granted."  United States v. Cromitie, No. 09-CR-558, 2011 WL 1842219, at *25 (S.D.N.Y. May 10, 2011).  "As long as the jury is alerted to a witness's lies, the jury—the appropriate arbiter of the truth—can sift falsehood from fact and make its own credibility determinations."  Id.  As their own submissions make clear, the defendants had a full opportunity at trial to refute the government's case witness by witness, cross-examining every government witness for hours and sometimes days.  Accordingly, "any possible falsity was fully disclosed to the jury."  Kenner, 272 F. Supp. 3d 342, 430–31 (E.D.N.Y. 2017).  Here, as in Kenner, "counsel extensively cross-examined each government witness at trial—indeed, the time expended on cross-examination often exceeded the length of direct testimony."  Id. at 434.  Counsel also spent inordinate time on summation "attempting to impugn the honesty of government witnesses with much of the same testimony and documents" they cite in their instant motions.  Id.  In short, after a two-month trial, "the jury had ample opportunity to evaluate the credibility of each and every witness and to consider [the defendants'] version of events."  Id.    The Court should not "usurp that function by arrogating the power to resolve conflicting statements and narratives."  Id.

In sum, no perjury occurred during the trial.  Because no witness testified falsely and the defendants fail to prove that any testimony was perjurious, the Court need not consider the

additional prongs of the Second Circuit test. However, even accepting the defendants' characterization of events arguendo, the jury had ample opportunity to consider the same evidence and arguments made in the instant motions, and the defendants cannot credibly claim that the jury would have otherwise acquitted given the overwhelming evidence of the defendants' guilt.

    B.    The Defendants' Accusations of Improper "Witness-Coaching" Are Baseless

The defendants next claim that witnesses—principally cooperating witness Jeffrey Lash—were induced and coached by the government to provide knowingly false testimony. See, e.g., ECF Dkt. No. 489-1 at 14–16 (arguing the government "doubled down" and prepared Lash and Anscher to "clean up" Jacoby's "bad faith" testimony about a "fake conversation" regarding the "no present plans" language in various PPMs). This accusation is largely predicated on the number of times the government met with Lash and Jacoby before they each testified. See id. Indeed, the defendants spent significant time on summation promoting the idea of a highly orchestrated government conspiracy, even employing graphics to detail dates of witness preparations as proof of impropriety. However, as the Court already noted at trial, the government's repeated meetings with such witnesses in a complex fraud case such as this is unremarkable. See Tr. 6820:8–6821:4; see also Tr. 6816:24–6818:6 (government response to defense allegations and noting that privilege issues and lack of waiver prevented inquiry on certain subjects related to James Prestiano). Indeed, this claim of government-manufactured testimony is largely co-extensive with the defendants' accusations of perjury. The claim therefore fails on the same grounds, as it is factually groundless and legally meritless.

The Supreme Court has noted that "opposing counsel . . . is not without weapons to cope with coached witnesses." Geders v. United States, 425 U.S. 80, 89 (1976). Specifically, "[s]killful cross-examination could develop a record which [counsel] in closing argument might

well exploit by raising questions as to the [witness's] credibility, if it developed that [opposing] counsel had in fact coached the witness."[43] United States v. Fearon-Hales, 224 F. App'x 109, 2007 WL 1475630, at *2 (2d Cir. May 21, 2007) (quoting Geders, 425 U.S. at 89–90). In this case, defense counsel had "ample opportunity to cross-examine the witness[es] and did in fact question [their] credibility in closing arguments." Id.; see, e.g., Tr. 6535:7–8, 6546:23–25, 6550:21–22; see Tr. 6554:18 (referring to [Jacoby] as a "pathological liar" and on a "vendetta"); Tr. 6567:1–6571:12 (alleging that Lash and Anscher were "coached" while Jacoby was "on the stand," attributing inconsistencies to perjury and alternative explanations as "ridiculous"); Tr. 6574:7–6576:13 (listing the dates of meetings between Lash and the government to "shape his testimony" and stating "he'll say whatever they want him to say and whenever they want him to say it"). Nor do the defendants "establish any likelihood that additional efforts [on those] lines of inquiry would have altered the result of the trial." Castellano v. United States, 795 F. Supp. 2d 272, 279–80 (S.D.N.Y. 2011).

   The defendants next claim that the government acted in "bad faith by intentionally eliciting highly inflammatory testimony from its witnesses on several occasions and/or failing to properly instruct its witnesses to avoid using inflammatory terms" also fails. ECF Dkt. No. 489-1 at 20–21. The defendants' conjecture that "[g]iven the Government's extensive preparation with these witnesses . . . it is highly improbable that these repeated instances of inflammatory testimony were merely accidental." Id. at 21. This is a change in position from their comments at trial, during which they stated that such comments—to the extent they were objectionable—were clearly

---

[43]   The Court made the same point: "In any kind of trial like this, you are going to have witnesses who say things at one point and then say a different thing. You're going to have statements that are made late, they're not made earlier, that's totally fair game for you to argue." Tr. 6818–19.

inadvertent.  See Tr. 1389:10–12 ("I'm not accusing the Government of any impropriety at all.  I believe [the government] when he says he instructed the witness.").    Regardless, as with their other allegations of misconduct, the defendants offer no support for this claim.

In each instance cited by the defendants, the comment at issue was either responsive to the question and stood without objection (Tr. 714:17–20 (Schneider calling Jacoby a "cock block"); Tr. 1201:4–1202:7 (Jacoby referring to return of investor capital as "Ponzi payments" on day three of cross-examination[44])); or was struck by the Court in response to an objection (Tr. 4314:3–6 (Aston Martin reference); Tr. 701:12–17 ("Wolf of Wall Street" reference); Tr. 257:15–16 ("vaporized" comment elicited on cross-examination[45]).  These comments, to the extent objectionable, are hardly of the quantity or character necessary to infect the trial on a constitutional level.

Thus, the defendants cannot establish or point to any "coached" or perjured testimony because none occurred.  The Court properly allowed the jury to determine how much weight to afford each witness's testimony, and there is no reason to disturb their judgment.

C.    The Government's Rebuttal Properly Responded to the Defendants' Improper Arguments

The government's comments on rebuttal were proper, consistent with the evidence, and responsive to the defendants' summations, particularly considering counsel's incendiary

---

[44]    "Where, as here, the defendant did not object at trial to the statements forming the basis of his [prosecutorial misconduct claim], the plain error standard applies."  United States v. Williams, 690 F.3d 70, 75 (2d Cir. 2012).  On plain error review, a new trial is not warranted absent "flagrant abuse which seriously affects the fairness, integrity, or public reputation of judicial proceedings, and causes substantial prejudice to the defendant." Id.; see United States v. Kidd, No. 22-287, 2023 WL 7290904 (2d Cir. Nov. 6, 2023).

[45]    Though the defense objection to this testimony was untimely, the government "agree[d] that the vaporized answer was not really responsive to the question, was somewhat gratuitous, we have no problem removing it."  Tr. 5176:24–5177:15.

attacks on the government's witnesses and the prosecutors themselves.[46]   The challenged remarks—while entirely appropriate—were suitably contextualized by the Court's jury charge on the burden of proof, witness credibility, and the elements of the charged offenses.   The overwhelming evidence of guilt also mitigates any prejudice caused by the portions of the rebuttal the defendants now challenge.[47]   In sum, none of the issues the defendants raise, even if the Court were to credit them, rise to the level of affecting the fairness or integrity of the trial, and their protests to the contrary are meritless.

A defendant asserting that a prosecutor's remarks warrant a new trial "faces a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of [his] right to a fair trial."   United States v. Locascio, 6 F.3d 924, 945 (2d Cir. 1993).   The Supreme Court has made clear that "[i]nappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding."   Young, 470 U.S. at 11.   Even statements that amount to prosecutorial misconduct during summation do not warrant reversal unless they cause the defendant "substantial prejudice" in that they "so infect the trial with unfairness as to make the resulting conviction a denial of due process."   United States v. Shareef, 190 F.3d 71, 78 (2d Cir. 1999) (quoting Darden v. Wainwright, 477 U.S. 168, 181 (1986)); accord United States v. Elias, 285 F.3d 183, 190 (2d Cir. 2002) (quoting

---

[46]      These included, inter alia, a litany of ad hominem attacks, including that the government was "hiding" things and "hellbent on winning," Tr. 6527:21–6528:4; doing "nothing" during "rank perjury," Tr. 6553:24–6554:13; calling the prosecutors' conduct "abhorrent," "shameful," and "appalling," Tr. 6554:14–17, 6570:9–10, 6541:2; and alleging that the prosecutors had "coached" witnesses "to give you a story," Tr. 6570:11–12.

[47]      "Where, as here, the defendant did not object at trial to the statements forming the basis of his [prosecutorial misconduct claim], the plain error standard applies."   Williams, 690 F.3d at 75.   On plain error review, a new trial is not warranted absent "flagrant abuse which seriously affects the fairness, integrity, or public reputation of judicial proceedings, and causes substantial prejudice to the defendant."   Id.; see Kidd, 2023 WL 7290904.

Shareef, 190 F.3d at 78).  The Second Circuit focuses on three factors to determine whether the statements at issue amount to substantial prejudice: "the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct."  Elias, 285 F.3d at 190.  Even in a case involving serious misconduct, "proper instructions by the trial court may suffice to prevent undue prejudice and make the misconduct harmless."  United States v. Walker, 835 F.2d 983, 988 (2d Cir. 1987).

In evaluating the propriety of a prosecutor's summation, the Second Circuit has recognized that both the prosecution and the defense "are generally entitled to wide latitude during closing arguments, so long as they do not misstate the evidence."  United States v. Tocco, 135 F.3d 116, 130 (2d Cir. 1998).  "A prosecutor is not precluded from vigorous advocacy, or the use of colorful adjectives, in summation."  United States v. Rivera, 971 F.2d 876, 884 (2d Cir. 1992); accord United States v. Jaswal, 47 F.3d 539, 544 (2d Cir. 1995).  In addition, in evaluating a claim of improper argument, a court cannot view the challenged remarks in isolation; rather, it "must consider the objectionable remarks within the context of the entire trial," United States v. Espinal, 981 F.2d 664, 666 (2d Cir. 1992) (citing Young, 470 U.S. at 11–12), granting relief only if the remarks, "viewed against 'the entire argument before the jury,' deprived the defendant of a fair trial," United States v. Pena, 793 F.2d 486, 490 (2d Cir. 1986).

Moreover, under the invited or fair response doctrine, the defense summation may open the door to an otherwise inadmissible prosecution rebuttal.  For this reason, even greater leeway is afforded in rebuttal summations, which are not fully constructed in advance and are often improvised.  See Farhane, 634 F.3d at 167 ("[S]ummations—and particularly rebuttal summations—are not detached exposition[s] . . . with every word carefully constructed . . . before the event."); United States v. Arias-Javier, 392 F. App'x 896, 898–99 (2d Cir. 2010).  "In

151

particular, where the defense summation makes arguments and allegations against the government, the prosecutor may respond to them in rebuttal." Tocco, 135 F.3d at 130; see generally Young, 470 U.S. at 12 (holding that "the reviewing court must not only weigh the impact of the prosecutor's remarks but must also take into account defense counsel's opening salvo"). Disturbing a conviction based on remarks in a prosecutor's summation is a "drastic remedy," warranted only where the challenged remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Wainwright, 477 U.S. at 181.

Viewing the defendants' claims against the backdrop of a two-month trial and considering the defendants' own summations, there was nothing in the government's rebuttal that transgressed the generous boundaries outlined above. The government properly responded to arguments raised by the defendants and referenced evidence to support those replies, and it did so without prejudicial or inflammatory remarks.

While the defendants claim the government improperly argued that the defendants "caused financial losses to investors through a Ponzi scheme," ECF Dkt. No. 487-1 at 82–87, the government did no such thing. The defendants ignore that the government's limited reference to, as they call it, "the magic word—Ponzi," in rebuttal was in direct response to Gentile's counsel's attempt to use the term as both a sword and a shield in his own summation:

> If you have been sitting here listening to this trial, you would have thought that all that was happening was money was being cycled around like some giant Ponzi scheme. And Mr. Jacoby volunteered that from the stand. This is not a Ponzi scheme. It is not alleged to be a Ponzi scheme by the government. You won't see the words 'Ponzi scheme' in their indictment because that's not what this case is. This is not Bernie Madoff. In fact, I don't know why we're here.

Tr. 6508:5–12.

In response, the Court remarked that counsel's use of the term "was a little strange to me because I struck the Ponzi thing." Tr. 6550:16–18. The government noted the defendants'

conduct is clearly "Ponzi-like" but that the government had "gone through great efforts to keep that language out of the case . . . . All of these witnesses wanted to call it a Ponzi scheme and we repeatedly instructed them not to . . . . And for [defense counsel] to take our agreement, not to put in any evidence of that, and then turn around and use it to his advantage in summation after the record is closed is unfair." Tr. 6559:16–6561:11.  In response to counsel for Gentile's comments, the government countered with the following:

> Defense counsel used the term 'Ponzi scheme,' and that's a term that you didn't hear during the Government's opening statement.  It's a term that witnesses were told not to use, and it's a term that I'm not going to use again after I make this point to you.  That term has absolutely no place in this case for two reasons.  Number one, it's inflammatory.  It's one that while they say all we care about is winning, we're not going to use it because we know that it would prejudice you, and that's not what your verdict should be based on . . . it has no legal significance in this case.  What the evidence will prove, you can call it whatever you want, is that this conduct is wire fraud, it's securities fraud, and it's conspiracy.  So we can stick with those terms.

Tr. 6878:5–23.  For the defendants to claim the government is at fault for merely responding to the defendants' comparison of the charged fraud to a "Bernie Madoff"-style "Ponzi scheme" is hypocritical—the government's brief, limited comment was well within the bounds of proper rebuttal argument.

Next, the defendants feign surprise over the government's emphasis on the defendants' use of investor capital to pay distributions that the defendants claimed to be from the portfolio companies' profits, even though this conduct was the core of the charged fraud.  The government referenced this again and again during the case in the same manner as in its rebuttal, beginning with its opening statement, which drew no objections.  See Tr. 53:8–9 ("[The defendants] even paid investors with their own money or money from other investors and told them it was income."); Tr. 59:1–3 ("[I]nstead [the defendants] were paying investors their own

money, money from other investors, and keeping it all a secret while taking a fee."). Witnesses also repeatedly testified to this fact, which also drew no objections from defense counsel throughout the trial. See, e.g., Tr. 183:11–21; Tr. 215:9–11 (Jones testifying he "would not have invested" if "the 8.7 percent distribution could include other investors' capital"; nothing in account statement "indicates that it is other investors' capital that you're receiving [as a distribution]"); Tr. 405:9–14, 494:24–5, 665:6–12 (Frederick testifying he would not have invested or recommended GPB to clients if he had been told monthly distribution "was coming from your own capital or other investors' capital"); Tr. 727:11, 7286–14 (Jacoby noting that PPM and marketing materials say nothing "about paying a distribution with other investor's capital"); Tr. 1503:22–1504:5 (Ghabour opining that "if they [the defendants] were using other investor capital that was being raised to pay distributions, there was less money available [to invest]"); Tr. 2131:4–7, 2136:8–13 (Teeters remarking that marketing material does not "say anything about how distributions could be a return of capital or a return of other investors' capital" and he was never "instruct[ed] to tell financial advisors that the monthly distribution could be a return of capital or return of other investors' capital"); Tr. 3752:20–23, 3754:18–21 (Lagiglia interpreting "no present plans" language in PPM and other marketing materials as clients are not "getting back their capital or other investors' capital"). Similarly, during colloquy about a potential limiting instruction in response to Jacoby's use of the term "Ponzi payments" on cross-examination, described above, the government was clear that the defendants' proposed curative instruction "undermines our theory that there were payments made with the money of investors and other investors, and I worry about jury confusion." Tr. 1405:21–25. So too in the discussion about the admissibility of the "Billion Dollar Party" video, Tr. 2363:15–22 ("[T]hese defendants know the true state of affairs at the company. They have been paying investors back with other investors' capital for years at this

point."), and the Patrick Dibre lawsuit, Tr. 2507:11–17, 5085:9–21 ("I'd ask that the defense not be allowed to sort of backdoor their way into this issue by alleging that, oh, this lawsuit is the reason for our financial problems and that's why we've been paying investors back with other investors' money."; "this is concealment [claiming distributions were reduced due to the Dibre litigation] because investors didn't know that new investor capital and other investor capital that was in the investment account was being used to fund the distributions.").[48]

Nor does this equate to the government arguing loss. In an attempt to bolster their misconduct claims, the defendants erroneously conflate distribution payments using investor capital with improper argument about harm or loss. See ECF Dkt. No. 487-1 at 85–86. The government's argument was factual—that distributions were paid with investor capital rather than with profits. The government did not ask the jury to infer from this that the investors had sustained a loss, and the defendants do not cite any argument in either summation or rebuttal in which the government actually drew this connection. To the extent the jury was inclined to draw this inference, defense counsel responded to it directly by arguing that GPB's assets under management at the end of 2018 were equal to or nearly equal to investor contributions. Tr. 6758:17–19; see also Tr. 6758:7–9. And even if the government had asked the jury to draw this inference, the Court's jury instructions were sufficient to remedy any inappropriate argument. See Tr. 7009:21– 7010:2 (defendants need not have "realized any gain from a scheme, or that the intended investment income actually suffered any loss."); Tr. 6963:5 ("arguments or statements by lawyers are not evidence"); Tr. 6978:24–7014:17 (detailing the elements of the charged offenses).

---

[48]     To the extent the defendants complain about the manner in which the government made this point, the Second Circuit has permitted the use of far more provocative language during rebuttal. See, e.g., United States v. Perry, 643 F.2d 38, 51 (2d Cir. 1981); United States v. Millar, 79 F.3d 338, 343–44 (2d Cir. 1996); Rivera, 971 F.2d at 884.

The defendants next claim that the government "intentionally mischaracterized the evidence" during its summation, including in its portrayal of an incriminating email from Schneider to a broker-dealer; its characterization of GPB and Ascendant Capital compliance programs as ineffectual and dominated by the defendants; and its reference to the number of GPB investors.[49]  ECF Dkt. No. 487-1 at 87–91.  The government's arguments were supported by the evidence, and the fact that Schneider has a different view of the evidence is not a basis to claim government misconduct.

The government argued that Schneider's use of his personal account to email Hightower Advisors was evidence of his consciousness of guilt.  See GX-7879.  The fact that the email was retained by Axiom says nothing about Schneider's intent in sending the email from his personal email account, which was the government's point during rebuttal.  It was well within the bounds of proper argument for the government to argue that the jury could infer Schneider's intent from his decision to use his personal email account, regardless of how the email in fact was retained.  And Schneider was free to argue in response, as he did, that the fact that the email was retained by Axiom negated any inference of Schneider's intent.  See Tr. 6700–01.

The government's presentation of the Ascendant Capital compliance program was likewise supported by testimony elicited from Anscher and Kgil that the program was, in fact, ineffectual because the defendants refused to empower compliance personnel, did not share complete information with Schultz, GPB's compliance officer, and overruled both Jacoby and

---

[49]     The defendants argue that there were not 17,000 investors in Holdings I, Holdings II, and Automotive Portfolio, but rather 17,000 investors total across all of the GPB funds.  This is true.  However, the Court permitted the government to elicit testimony about how the inflated performance metrics in those three funds were used to entice new and existing investors to invest in other GPB products, such as the Waste Management and Cold Storage funds.  That GPB had thousands of investors was noted during the trial, beginning with opening statements.  See Tr. 55:11–12 (government opening statement noting "so as GPB grew . . . thousands of investors gave them their money").

Anscher when they raised concerns. That Schneider's counsel would draw a different inference from evidence that was not actually in the record does not make the government's summation improper.

As to the two single comments about 17,000 GPB investors, even crediting the defendants' interpretation of these brief remarks, they do not rise to the requisite level of "flagrant abuse," Elias, 285 F.3d at 190, or "egregious misconduct," United States v. Rodriguez, 587 F.3d 573, 583 (2d Cir. 2009), either standing alone or collectively. As the Second Circuit concluded in United States v. Rosa, 17 F.3d 1531, 1549 (2d Cir. 1994), reversal was not warranted even where "[t]he AUSA's argument . . . may have been an overstatement . . . it surely was not an egregious one . . . though the trial court did not give a curative instruction directed precisely at this overstatement, it did instruct the jury that the statements of the attorneys did not constitute evidence." So too here.

The instant case is readily distinguishable from cases cited by the defendants where the Second Circuit has found reversible error. For example, the defendants repeatedly and erroneously cite United States v. Friedman, 909 F.2d 705, 708 (2d Cir. 1990), where a conviction was reversed after the prosecutor stated in summation that "some people [defense counsel] would have you pull down the wool over your eyes and forget all that, because while some people . . . go out and investigate drug dealers and prosecute drug dealers and try to see them brought to justice, there are others who defend them, try to get them off, perhaps even for high fees." Similarly, in United States v. Burse, 531 F.2d 1151, 1154–55 (2d Cir. 1976), the government's closing argument featured incorrect statements about a witness serving jail time; references to the "high incidence of bank robberies" as evidence of the defendant's guilt; references to portions of a statement that were not introduced into evidence; incorrect assertions that a key defense witness had admitted to

being drunk on the day of the robbery; and excessive vouching. Such conduct is far more pervasive and severe than anything the defendants complain of here. Even then, the Burse panel lamented that "[p]erhaps if the case against Burse had been stronger, these improper comments would be of less significance." Id. at 1155. United States v. Ballard, 727 F. App'x 6, 9 (2d Cir. 2018), is also inapposite. In Ballard, the court found no error in a prosecutor's repeated graphic characterization of the defendant's treatment of minor victims as "pieces of meat" and of the defendant himself as a "dead beat," as well as a statement that a picture of the defendant would appropriately be included in the dictionary definition of "pimp." Id. Instead, grounds for reversal lay in the government's mischaracterization of the defense as a "government frame-up" and the "insinuat[ion] that it had more evidence incriminating [the defendant] in the charged crimes that it had not been allowed to offer in evidence." Id. at 10–12 (stating "both errors are serious, the first because it undermines a defendant's constitutional right to present a defense, the second because it appears to reduce the government's burden"). The facts of Ballard are hardly analogous to this case.

Finally, though the defendants repeatedly characterize the instant case as "close" in an attempt to amplify the import of the alleged government misconduct, ECF Dkt. No. 487-1 at 86–92, this simply was not a close case. The jury convicted both defendants on all counts after only five hours of deliberations, not because they were swayed by perjured testimony and government malfeasance, but because the proof of the defendants' guilt was devastating and largely incontrovertible, irrespective of the government's summation or rebuttal.

\*   \*   \*

In sum, no witness committed perjury, the government did not rely on false or mischaracterized evidence, and its rebuttal summation was well within the bounds of appropriate, responsive argument. "Although framed as allegations of prosecutorial misconduct, many of [the

defendants'] arguments amount to little more than attempts to dispute witness credibility and relitigate evidentiary rulings." United States v. Feng Ling Liu, No. 12-CR-934-01 (RA), 2015 WL 4460898, at *10 (S.D.N.Y. July 20, 2015). The Court need not entertain these arguments given the high standard for reversal or dismissal outlined above. The defendants' Rule 33 motion on this basis must be denied.

CONCLUSION

For the reasons set forth above, the government respectfully submits that the Court should deny the defendants' post-trial motions in their entirety.

Dated: Brooklyn, New York

October 14, 2024

Respectfully submitted,

BREON PEACE
United States Attorney
Eastern District of New York

_____/s/_____
Artie McConnell
Jessica K. Weigel
Nick M. Axelrod
Kate Mathews
Assistant U.S. Attorneys
(718) 254–7000

cc:  Clerk of the Court (RPK)
     Defense counsel (by ECF)