**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

                        -against-                                             21-CR-54 (RPK) (PK)

DAVID GENTILE and
JEFFRY SCHNEIDER,

                                        Defendants.

**REPLY IN SUPPORT OF**
**DEFENDANT DAVID GENTILE'S MOTION TO DISMISS**
**THE INDICTMENT BASED ON PROSECUTORIAL MISCONDUCT**

<u>**TABLE OF CONTENTS**</u>

**PRELIMINARY STATEMENT** ................................................................................................. 1

**ARGUMENT** ............................................................................................................................ 2

    I.     THE GOVERNMENT'S REPEATED CONSTITUTIONAL VIOLATIONS WARRANT VACATUR OF THE CONVICTION AND DISMISSAL OF THE INDICTMENT .................. 2

        A.    The Opposition Uses an Incorrect Legal Standard ...................................... 2

        B.    The Government Knew or Should Have Known That Its Witnesses Repeatedly Provided False and/or Inflammatory Testimony .................................................. 3

            1.    Bill Jacoby Testified Falsely Regarding GPB Auto's 2014 Financials ........................ 4

            2.    Multiple Witnesses Testified Falsely Regarding GPB's Private Placement Memoranda ...................................................................................................... 8

            3.    Bill Jacoby Further Testified Falsely and the Government Presented Factually Untrue Information Regarding Holdings I's 2014 Audited Financial Statements .......................... 11

            4.    The Government Engaged in a Pattern of Eliciting Inflammatory Testimony from Its Witnesses in Bad Faith .......................................................................... 13

        C.    The False Testimony Elicited by the Government and Identified at Trial Did Alter, or At the Very Least, Might Have Altered the Jury's Verdict .................................... 13

        D.    The Government Repeatedly Violated Mr. Gentile's Right to Due Process and to Confront the Government's Witnesses at Trial.................................................... 15

**CONCLUSION** ...................................................................................................................... 18

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Drake v. Portuondo,*
 553 F.3d 230 (2d Cir. 2009) ................................................................. 2, 8

*Giglio v. United States,*
 405 U.S. 150 (1972) ............................................................................. 15, 17

*Giles v. Lamanna,*
 No. 22 CIV. 5804 (GHW), 2024 WL 3678282 (S.D.N.Y. Apr. 15, 2024) ............................ 3, 14

*Jenkins v. Artuz,*
 294 F.3d 284 (2d Cir. 2002) ................................................................. 5

*Napue v. People of State of Ill.,*
 360 U.S. 264 (1959) ............................................................................. 5, 6, 8

*Rajaratnam v. United States,*
 No. 09 CR. 1184 (LAP), 2017 WL 887027 (S.D.N.Y. Mar. 3, 2017) ...................... 12

*United States v. Brown,*
 602 F.2d 1073 (2d Cir. 1979) ................................................................. 2

*United States v. Certified Env't Servs., Inc.,*
 753 F.3d 72 (2d Cir. 2014) ................................................................. 17

*United States v. Cromitie,*
 No. 09-CR-558 (CM), 2011 WL 1842219 (S.D.N.Y. May 10, 2011) ................... 14, 15

*United States v. Ferguson,*
 676 F.3d 260 (2d Cir. 2011) ................................................................. 2

*United States v. McCourty,*
 562 F.3d 458 (2d Cir. 2009) ................................................................. 13, 14

*United States v. Parker,*
 903 F.2d 91 (2d Cir. 1990) ................................................................. 11

*United States v. Rodriguez,*
 496 F.3d 221 (2d Cir. 2007) ................................................................. 15

*United States v. Scott,*
 No. 17-CR-630 (ER), 2023 WL 6064329 (S.D.N.Y. Sept. 14, 2023) ................... 2

*United States v. Shareef,*

190 F.3d 71 (2d Cir. 1999) ............................................................................................. 2

*United States v. Vozzella,*
   124 F.3d 389 (2d Cir. 1997) ...................................................................................11

*United States v. Wallach,*
   935 F.2d 445 (2d Cir. 1991) ...............................................................................passim

*United States v. Zichettello,*
   208 F.3d 72 (2d Cir. 2000) .......................................................................................... 2

Mr. Gentile respectfully submits this reply memorandum in further support of his motion to vacate the jury's guilty verdict and dismiss the Indictment, ECF No. 489, 489-1 (the "Motion" or "Mot."),[1] on the basis that the Government's extreme misconduct deprived him of his constitutional rights under the Fifth and Sixth Amendments.[2]

## PRELIMINARY STATEMENT

Rather than confront—let alone refute—the clear evidence of the Government's misconduct, the Opposition instead asks the Court to shift its focus away from the Government's demonstrated pattern of bad faith—and its corresponding threat to the proper administration of justice—to the uncontested and irrelevant principle that the Court should not usurp the jury's role in assessing evidence and witness testimony.  The Court should decline the Government's invitation to take this detour.

The Due Process and Confrontation Clause violations detailed in the Motion have nothing to do with the jury's role as the finder of fact.  To the contrary, the gravamen of the Motion—and the injustice it asks this Court to remedy—is that the Government's knowing and repeated elicitation of, and failure to correct, false and misleading testimony from its own witnesses deprived Mr. Gentile of due process.  This constitutional violation was compounded further by the Government's intentional failure to disclose witness statements concerning key allegations of fraud depriving defense counsel of the opportunity to rebut this testimony in violation of Mr. Gentile's right to confront the Government's witnesses.

The Motion therefore lays bare how this prosecutorial misconduct, which is substantively

---

[1] The Government's Omnibus Opposition to the Motion, ECF No. 499, is referred to as the "Opposition" or "Opp." Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

[2] Mr. Gentile also joins and incorporates herein by reference the arguments regarding the Government's misconduct in Mr. Schneider's reply in support of his motion for a judgment of acquittal or new trial to the extent that they apply to Mr. Gentile.

unrebutted by the Opposition, so pervasively infected the record that the jury could not properly fulfill its role as the trier of fact—the very circumstance that precedent makes clear requires judicial intervention in the wake of a guilty verdict. *See United States v. Shareef*, 190 F.3d 71, 78 (2d Cir. 1999) (reversal warranted when the ensuing "substantial prejudice" resulting from prosecutorial misconduct "so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process.") Justice requires dismissal of the Indictment or, at the very least, a new trial based upon a record excised of this improper testimony and argument.[3]

## ARGUMENT

### I. THE GOVERNMENT'S REPEATED CONSTITUTIONAL VIOLATIONS WARRANT VACATUR OF THE CONVICTION AND DISMISSAL OF THE INDICTMENT

#### A. The Opposition Uses an Incorrect Legal Standard

The Opposition relies upon the four-factor test from *United States v. Zichettello*, 208 F.3d 72, 102 (2d Cir. 2000) for assessing a post-trial, due process motion based on allegations of perjury. Opp. at 141. However, the Court should apply the two-part test established by the Second Circuit in *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991), *abrogated on other grounds by Ciminelli v. United States*, 598 U.S. 306 (2023). When evaluating a motion based on allegations of perjury under this standard, the Court must consider *only* (i) "the materiality of the perjury to the jury's verdict" and (ii) "the extent to which the prosecution was aware of the perjury." *Id.* at 456.[4]

---

[3] The Government fails to address Mr. Gentile's argument that the Court may also dismiss the Indictment (as it should here) under its supervisory powers: (i) "to eliminate prejudice to a defendant in a criminal prosecution;" (ii) "to 'help translate the assurances of the United States Attorneys into consistent performance by their assistants;'" and (iii) "when the pattern of misconduct is widespread or continuous." Mot. at 3–4 (citing *United States v. Brown*, 602 F.2d 1073, 1075–77 (2d Cir. 1979)).

[4] *See also United States v. Ferguson*, 676 F.3d 260, 282 (2d Cir. 2011) (noting "[l]ater cases add to the confusion by applying *Wallach* without referencing *Zichettello*"); *see also, e.g., Drake v. Portuondo*, 553 F.3d 230, 241 (2d Cir. 2009) (applying *Wallach*); *United States v. Scott*, No. 17-CR-630 (ER), 2023 WL 6064329, at *6 (S.D.N.Y. Sept. 14, 2023) (same).

Nevertheless, as described in the Motion and set forth in greater detail below, the knowing introduction of false testimony by the Government (and its concomitant failure to correct or otherwise cure such falsity) requires dismissal of the Indictment under either standard.

### B. The Government Knew or Should Have Known That Its Witnesses Repeatedly Provided False and/or Inflammatory Testimony

The Opposition's claim that "no government witnesses committed perjury," Opp. at 141, is false and belied by the record. Mot. at 4–14. Nothing in the Opposition calls into doubt that the Government knew or should have known that its witnesses testified falsely regarding at least three topics that are at the core of the Government's fraud allegations. Nor does the Opposition argue that the Government took any ameliorative measures to correct the false or inflammatory testimony proffered by its witnesses. *See* Opp. at 141–47. Instead, the Opposition advances two points that, in addition to being factually inaccurate, in essence collapse the *Zichettello* factors into the two *Wallach* factors, by arguing that: (i) the perjury (if any) was elicited by Mr. Gentile and not the Government, Opp. at 141–44; and (ii) such perjury was immaterial because it was disclosed at trial, fully corrected by Defendants' cross examination and summation, and the jury nevertheless convicted Mr. Gentile, Opp. at 145–47. However, the critical nature of these witnesses' false testimony necessarily altered the jury's verdict and warrants dismissal of the Indictment. *Wallach*, 935 F.2d at 456 ("Where the prosecution knew or should have known of the perjury, the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." (internal quotations marks omitted)); *see also Giles v. Lamanna*, No. 22 CIV. 5804 (GHW), 2024 WL 3678282, at *21 (S.D.N.Y. Apr. 15, 2024) (emphasis added), *report and recommendation adopted*, No. 1:22-CV-5804-GHW, 2024 WL 3678060 (S.D.N.Y. Aug. 2, 2024) ("The question for the Court is whether the jury's verdict *might* be altered by the false testimony.") (cleaned up).

### 1. Bill Jacoby Testified Falsely Regarding GPB Auto's 2014 Financials

The Government was aware—or should have been aware even prior to cross-examination—of Mr. Jacoby's perjurious testimony (i) on direct examination that GPB Auto did not fully cover investor distributions in 2014 with funds from operations, and (ii) on cross examination, when confronted with clear evidence of full coverage, that GPB Auto used an uncharged fourth fraudulent performance guarantee with Jeffrey Lash to falsely inflate its 2014 financial performance. Mot. at 5–6. Critically, the Government does not dispute that it elicited testimony from Mr. Jacoby that GPB Auto was not fully covered in 2014 that is directly contradicted by evidence produced by the Government to Mr. Gentile. *See Id.* at 5 (citing Tr. 717:22–718:3; 719:3–11). Instead, the Government offers a hodgepodge of reasons to deflect its duty to correct Mr. Jacoby's perjury concerning GPB Auto's 2014 financial condition and purported use of the fourth performance guarantee: that part of his testimony was elicited by the defense during cross-examination, that he was "simply confused," and that his testimony may, in fact, not have been false. Opp. at 142–43. Each of these arguments misses the mark.

*First*, the Opposition's claim that "[i]t was the defendants, not the government, that elicited [Mr. Jacoby's] supposedly perjurious testimony," Opp. at 142, regarding the uncharged fourth fraudulent performance guarantee is disingenuous at best. Indeed, the Opposition acknowledges that it was *the Government on direct examination*—not the defense—that elicited testimony from Mr. Jacoby that GPB Auto was not fully covered when it paid regular and special distributions to investors in 2014. *Id.* (citing Tr. 719:3–11). It was only later, when Mr. Gentile's counsel confronted Mr. Jacoby on cross-examination regarding the falsity of this testimony that Mr. Jacoby, rather than admit that he was wrong, doubled down on his lie and claimed that GPB Auto's 2014 audited financials were inaccurate because they were purportedly supported by an uncharged fourth performance guarantee. *See* Mot. at 5–6 (citing Tr. 1126:14–1127:13). This second lie (*i.e.*,

the existence of a fourth performance guarantee)—which Mr. Jacoby conceded on cross-examination was the very first time in this case that he claimed that there was an additional, uncharged 2014 performance guarantee for GPB Auto and that such guarantee was not real, *see id.* (citing Tr. 1127:2–13)—was manufactured by Mr. Jacoby on the spot to cover his first lie on direct examination regarding GPB Auto's purported under-coverage in 2014. Thus, the Government's claim that "the relevant testimony was elicited by [Mr. Gentile's counsel] during [his] cross-examination of [Mr.] Jacoby," Opp. at 142, is belied by the record.

Regardless of whether or not Mr. Jacoby's testimony came out on direct or cross examination does not alter the Government's fundamental duty to ensure that its witnesses testify truthfully. *See, e.g.*, *Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959) (finding that due process violation occurs "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears."); *Jenkins v. Artuz*, 294 F.3d 284, 296 (2d Cir. 2002) ("Even prosecutorial silence 'harm[s]' defendants, who are unable 'to respond effectively.'") (citation omitted). Such dereliction of the Government's duty to elicit and present only the truth should not be tolerated by the Court. Indeed, the Government investigated this case for more than five years, it met with Mr. Jacoby dozens of times to prepare his testimony—not to mention several hundred interviews with over one hundred other witnesses—and then brought an Indictment alleging that Mr. Gentile caused GPB to fraudulently misstate its financials in various funds between 2014 and 2018. Yet the Government now asks the Court to believe the Government never had any reason or opportunity to assess whether GPB Auto's financials in 2014 were also the product of fraud until Mr. Jacoby happened to mention it for the very first time on the stand in the middle of direct examination. The Government's suggestion is simply not credible. As explained in further detail below, Mr. Jacoby's testimony was false, the Government knew of the falsity of Mr. Jacoby's

testimony, and reversal concerning such a perjurious statement core to the Government's allegations should be "automatic." *Wallach*, 935 F.2d at 456.

*Second*, the Opposition argues that the Motion is deficient because it fails "to address the plausible explanation that [Mr.] Jacoby was simply confused by counsel's questioning," Opp. at 143, regarding the fourth, uncharged performance guarantee. To the contrary, there was (and could be) no confusion regarding the relevant line of cross-examination concerning GPB Auto's 2014 financial performance and purported use of an uncharged performance guarantee, *see* Mot. at 5–6 (citing Tr. 1126:14–1127:13), and quite tellingly and fatal to the Government's argument, Mr. Jacoby never claimed or suggested that he did not understand the questions or otherwise was confused. And, critically, even after counsel for Mr. Gentile specifically put the Government on notice of Mr. Jacoby's false testimony during summation and pleaded for the Government to acknowledge the perjury to the jury in its rebuttal, *see id.* at 7 (Tr. 6553:2–6554:22), the Government still said nothing. The Government's bad faith in failing to fulfill its duty to correct Mr. Jacoby's false testimony concerning a core allegation in this case warrants vacatur of Mr. Gentile's conviction and dismissal of the Indictment. *See, e.g.*, *Napue*, 360 U.S. at 269.

*Finally*, the Government claims that the Motion fails to "present reliable evidence that [Mr.] Jacoby's testimony was false." Opp. at 143. In support, the Opposition questions the reliability "of GPB's audited financial reports to prove the falsity of [Mr.] Jacoby's testimony" given that Mr. Gentile purportedly "manipulated internal and audited financials." *Id.* Yet, the Government relied on these very same internal financial reports (GX-7355-A and GX-7355-B) when it elicited testimony during a different line of direct examination with Mr. Jacoby that GPB Auto was, in fact, fully covered in 2014. *See* Tr. 823:3–9; *see also* Opp. at 13 (relying on GX-7355-A and GX-7355-B to claim Mr. Gentile's awareness of GPB's distribution coverage); *id.* at

6

34 (same).  This "heads I win, tails you lose" formulation, in which the Government is able to submit GPB's financial documents in service of the Government's argument, but disclaim the reliability of those very same documents when offered by Mr. Gentile, cannot be entertained and is even further evidence of the Government's bad faith.

Next, the Opposition's bald assertion that "the fact that the Government did not charge a [fourth fraudulent performance guarantee] is not evidence that one did not exist," Opp. at 143, simply makes no sense.  One of the Government's principal theories in this case was that purportedly fraudulent performance guarantees were manufactured by Mr. Gentile and others and booked to certain of the GPB Funds' audited financial statements to mask shortfalls in those funds' annual performance in order to entice new investors to invest in those funds.  *See, e.g.*, Indictment ¶¶ 43–49; Tr. 6449:22–6450:3, 6454:5–16.  But the Government has made no allegation, offered no evidence, and provided no disclosure in any of its hundreds of interviews with over one hundred individuals that there was a fourth purportedly fraudulent performance guarantee used to inflate GPB Auto's 2014 financials.[5]  Nor could it.  Indeed, the trial record is devoid of any evidence that a performance guarantee was referenced, let alone used to book any increase in revenue, realized gains, or other measure in GPB Auto's 2014 financials.  *See* GX-2005.  By the Government's own logic, without such reference to a performance guarantee in the financials, there would be no reason for Mr. Gentile to have purportedly manufactured a fourth performance guarantee.  Thus, there is no doubt that the Government knew or should have known that Mr. Jacoby testified falsely regarding the existence of a fourth fraudulent performance guarantee and that it abandoned its duty

---

[5] The Government perfunctorily claims that even if "[Mr.] Jacoby did willfully testify falsely, [Mr. Gentile's] claim that the government knew Jacoby's testimony was false because the government had met with Jacoby for numerous prep sessions and had discussed other performance guarantees with him, is unpersuasive," Opp. at 143, but offers no explanation in support of this argument.

to correct such a statement.[6]

### 2. Multiple Witnesses Testified Falsely Regarding GPB's Private Placement Memoranda

The Government next argues, in conclusory fashion, that because the "no present plans" language was added to the GPB Auto PPM in June 2016 and the Holdings I PPM in December 2016, Mr. Jacoby's false testimony regarding the origin of that language in a GPB Fund PPM sometime in 2016 (when, in fact, it was first introduced in April 2015 in the Holdings II PPM) is of no import. Opp. at 143–44. That is wrong. As an initial matter, by acknowledging that "the defense is correct that [this] language first appeared in the Holdings II PPM in April 2015," *id.*, the Government effectively concedes that Mr. Jacoby testified falsely that he overheard a supposed conversation in 2016 between Mr. Gentile, Mr. Schneider and others during which Messrs. Schneider and Gentile purportedly insisted that GPB add the "no present plans" to a GPB Fund PPM for the first time. Tr. 957:19–958:13. Indeed, Mr. Jacoby unequivocally testified that the "no present plans" language was first created for GPB Auto in 2016:

> Q: It's your testimony before this jury that the "No present plans" language came up in the context of discussing this particular PPM, yes?
> A: That's my recollection.
> Q: 2016?
> A: Correct.

Tr. 958:8–13; *see also* Tr. 952:6–8, 952:15–953:5, 959:3–7.

This false testimony goes to the very heart of the Government's allegations—that the "no

---

[6] The Government fails to offer any evidentiary support for its bizarre claim that Mr. Gentile "conflate[d] [Mr.] Jacoby's testimony about expenses . . . with the 'private jet in question,' which was a purchase made by the defendants and [Mr.] Lash in 2017." Opp. at 144. Indeed, the record is clear that Mr. Jacoby's false testimony on direct examination regarding private jet travel expenses, Tr. 771:3–9, 17–20, concerned the same private jet purchased with Mr. Lash that Mr. Jacoby later testified falsely about on cross-examination, Tr. 1050:2–1055:3. Given this patently false testimony and the uncontroverted evidence in the record, *see* Mot. at 8 (citing DX-EEEEET, DX-EEEEET-1), which the Government fails to address in its Opposition, the Government acted in bad faith by eliciting that testimony from Mr. Jacoby. The Government knew or should have known that Mr. Jacoby's testimony was false and abdicated its duty to correct such testimony in violation of Mr. Gentile's constitutional rights. *See* Mot. at 8–9 (citing *Drake* and *Napue*).

present plans" language was first added to the PPMs *after* GPB was no longer covering distributions as a way to defraud investors. This assertion is plainly contradicted by the uncontroverted fact that GPB *was* covering distributions when it first added the language to the Holdings II PPM in April 2015 and, thus, the genesis of this language is highly relevant in disproving the Government's key allegation of fraud in the PPMs. Indeed, the "no present plans" language is a critical piece of the Indictment, *see* ¶ 26, and the Government references this specific language no less than twenty times in its Opposition. Thus, by the Government's own words, Mr. Jacoby's false testimony was key to the jury's verdict and, because it was knowingly permitted to be introduced by the Government at trial, *see* Mot. at 10 (citing evidence), reversal should be "automatic." *Wallach*, 935 F.2d at 456.

Yet, instead of trying to right the course when confronted with each of Mr. Jacoby's lies, the Government not only failed to correct this false testimony but set out through the testimony of Messrs. Lash and Anscher to clean up the factual discrepancy between the false testimony it had already elicited from Mr. Jacoby and the incontrovertible documentary evidence showing that the "no present plans" language originated a year prior to when Mr. Jacoby had testified it had happened.

The Second Circuit's finding of prosecutorial misconduct in *Wallach* is instructive here. There, a government cooperating witness testified falsely on direct examination that he had ceased gambling. 935 F.2d at 455. On cross-examination, when confronted with documentary evidence from a casino showing that the witness had purchased gambling chips at casinos on at least two occasions, the witness maintained his denial. *Id.* Then, on redirect and at the prompting of the government, the witness proffered implausible explanations for the purchases and maintained that he did not gamble. *Id.* at 455–56. In concluding that the convictions must be reversed because

the Court was "convinced that the government should have known that [the witness] was committing perjury," the Second Circuit held:

> In light of [the witness]'s acknowledged history of compulsive gambling, we believe that given the inconsistencies in his statements the government should have been on notice that [the witness] was perjuring himself. Yet, instead of proceeding with great caution, the government set out on its redirect examination to rehabilitate [the witness] and elicited his rather dubious explanation of what had happened. Defendants placed before the government and the court powerful evidence that [the witness] was lying. . . . We fear that given the importance of [the witness]'s testimony to the case, the prosecutors may have consciously avoided recognizing the obvious—that is, that [the witness] was not telling the truth.

*Id.* at 457.

Here, the Government fails entirely to address the highly suspicious timeline leading up to Messrs. Lash and Anscher's testimony regarding the "no present plans" language. Indeed, the Government offers no explanation why, after two years and roughly two dozen pre-trial meetings with Mr. Lash, he miraculously remembered overhearing a conversation between Mr. Gentile and others about inserting disclosure language regarding distributions into the GPB Funds' PPMs "without causing too much of a stir" for the first time just two days after Mr. Gentile's counsel confronted Mr. Jacoby with incontrovertible evidence showing the true origin of the PPM language in question. Tr. 3075:8-3077:5; Tr. 3239:21-3241:13. Nor does the Government offer any reason as to how or why Mr. Anscher, who explicitly told the Government in a pre-testimony interview that he "did not recall any discussions about this ['no present plans'] language," even after being shown that exact language from a PPM, Mot. at 12 (citing Ex. B, GX-3500-RA-2 at 10), suddenly remembered with remarkable clarity conversations about that very topic when he was on the stand. Such suspicious timing of this newly recollected testimony was compounded by the fact that Mr. Gentile's counsel had just confronted Mr. Jacoby with evidence that the "no present plans"

language was not false at the time it was added to the PPMs, [7] thereby requiring the Government to come up with some new "evidence" to support its theory of fraud in the PPMs. Messrs. Lash and Anscher's remarkably timed recollection of very specific, allegedly incriminating conversations strains credulity.

In sum, the Government knew or should have known each of these witnesses' testimony concerning a key feature of the Government's fraud allegation was false and, by repeatedly eliciting such testimony in the face of incontrovertible evidence showing its falsity, the Government acted in bad faith in presenting it to the jury. *See Wallach*, 935 F.2d at 456; *United States v. Vozzella*, 124 F.3d 389, 392 (2d Cir. 1997).

### 3. Bill Jacoby Further Testified Falsely and the Government Presented Factually Untrue Information Regarding Holdings I's 2014 Audited Financial Statements

The Government frames the incontrovertible fact that the 2014 Performance Guarantees were not accrued as income in Holdings I's 2014 audited financials as "a factual dispute that was thoroughly vetted for the jury's consideration." Opp. at 144. In support, the Government points to Mr. Jacoby and defense expert Martin Wilczynski's testimony regarding this issue. Neither man's testimony supports the Government's position.

First, the Government does not dispute that, when Mr. Jacoby was shown his own email communications stating that the 2014 Performance Guarantees were *not* accrued as income in the 2014 Holdings I audited financial statements, he was unable to provide any evidentiary support for his false testimony about those guarantees' purported impact on the financial statements. *See* Mot. at 20–21 (citing Tr. 978:5–8, 978:21–981:25, 1140:13–1141:14; DX-FFFFY; DX-DDDDDR). Such uncorroborated testimony is "incredible on its face" and the jury's

---

[7] In fact, Mr. Jacoby was still on the stand when Mr. Lash purportedly first remembered overhearing this conversation about the PPMs.

assessment of both its weight and sufficiency requires no deference. *See United States v. Parker*, 903 F.2d 91, 97 (2d Cir. 1990); *see also Rajaratnam v. United States*, No. 09 CR. 1184 (LAP), 2017 WL 887027, at *6 (S.D.N.Y. Mar. 3, 2017), *aff'd*, 736 F. App'x 279 (2d Cir. 2018) (stating that "[t]he movant bears the burden to prove perjury by a preponderance of the evidence.").

Second, the Government also contorts Mr. Wilczynski's testimony: the purportedly "key concessions" made by Mr. Wilczynski were nothing of the sort. Opp. at 144 (citing Mr. Wilczynski's testimony). Indeed, Mr. Wilczynski emphatically testified that the 2014 Performance Guarantees were not reported as revenue on Holdings I's 2014 financial statements. *See, e.g.*, Tr. 5457:11–5458:9, 5616:20–5617:11, 5764:9–22, 5767:8–5768:8.

Apparently content to rest on its laurels that the reporting of the 2014 Performance Guarantees in Holdings I's 2014 financial statements was nothing but a "factual dispute," the Government ignores Section I.D of the Motion, which sets forth in considerable detail the Government's brazen misconduct in pursuit of its false theory of criminal fraud. In brief, the Government (i) possessed for several years prior to trial indisputable documentary evidence demonstrating that its theory regarding the 2014 Performance Guarantees was factually untrue; (ii) declined to ask (or failed to disclose) *any* statement from its dozens of relevant witnesses, including its professional summary witness, Michael Petron, about the guarantees' impact on Holdings I's 2014 financial statements; and (iii) fought tooth and nail to preclude Mr. Wilczynski from opining that the 2014 Performance Guarantees did not impact Holding I's 2014 revenue. Mot. at 18–22. At bottom, the Government's continued pursuit of its theory that 2014 Performance Guarantees impacted Holdings I's 2014 revenue even after it knew it was false and directly contradicted by uncontested evidence was done in bad faith, violated Mr. Gentile's due process rights, and alone warrants vacatur and dismissal of the Indictment.

#### 4. The Government Engaged in a Pattern of Eliciting Inflammatory Testimony from Its Witnesses in Bad Faith

The Government argues that Mr. Gentile offers no support for his claim that the Government further acted in bad faith by intentionally eliciting highly inflammatory testimony from its witnesses on multiple occasions and/or failing to properly instruct its witnesses to avoid using inflammatory terms.[8] Opp. at 148–49. That is wrong. Although the Government is correct that Mr. Gentile's counsel did at one point state that he was not accusing the Government of any impropriety regarding certain witnesses' inflammatory statements, Opp. at 148–49, Mr. Gentile's counsel also made clear that these statements were "starting to accumulate" and were "becoming very prejudicial to the defense case." Tr. 1389:8–14, 21–22. Indeed, these were not isolated incidents and continued unabated after Mr. Gentile's counsel made that comment early in the trial after only Mr. Jacoby—the third of thirteen Government witnesses—testified. As set forth in greater detail in the Motion, these repeated instances of inflammatory and prejudicial testimony concerning specific topics and terminology that the Government was either ordered by the Court or had explicitly agreed to instruct its witnesses not to use at trial is further evidence that the Government prosecuted the case in bad faith and in violation of Mr. Gentile's right to a fair trial. Indeed, it strains credulity that this pattern continued to repeat itself by mere accident and their cumulative effect warrants vacatur of Mr. Gentile's conviction and dismissal of the Indictment.

#### C. The False Testimony Elicited by the Government and Identified at Trial Did Alter, or At the Very Least, Might Have Altered the Jury's Verdict

The Government, citing to *United States v. McCourty*, 562 F.3d 458 (2d Cir. 2009), argues

---

[8] The Government does not address any of the arguments made in Section I.A.3 of the Motion, which sets forth additional instances of the Government's bad faith and violation of Mr. Gentile's due process rights by eliciting false testimony from Mr. Lash concerning several highly relevant topics. As detailed in that section, Mot. at 13-14, given the total absence of any corroboration of Mr. Lash's testimony concerning these topics—much of which was raised for the very first time at trial—taken together with the critical nature of that testimony to the Government's allegations and the Government's extensive pre-trial witness preparation with Mr. Lash, the Government knew or should have known that his testimony was false and, at a minimum, acted to correct its falsity at trial.

that even if Mr. Gentile demonstrated false testimony and the Government's knowledge of and acquiescence in that false testimony, Mr. Gentile still "cannot show the 'jury probably would have acquitted in the absence of the false testimony,' given the overwhelming evidence of guilt." Opp. at 145. However, the Government misstates the operative standard for evaluating perjury in the context of prosecutorial misconduct, which requires the Court to evaluate "'whether the jury's verdict '*might*' be altered' by the false testimony," *Giles*, 2024 WL 3678282, at *21 (S.D.N.Y. Apr. 15, 2024) (emphasis added) (citing *Wallach*)—not whether the "jury probably would have acquitted in the absence of the false testimony."[9] Opp. at 145 (citing *McCourty*). As explained above in Section I.B, the Government elicited substantial false testimony regarding at least three topics critical to the Government's fraud allegations, which likely did alter, or at the very least might have altered, the jury's verdict.

The Government next argues that Mr. Gentile does "not submit any newly discovered evidence" of the above instances of alleged perjury and "[w]hen the perjury was disclosed during the trial, a new trial should not be granted." Opp. at 146 (citing *United States v. Cromitie*, No. 09-CR-558 (CM), 2011 WL 1842219, at *25 (S.D.N.Y. May 10, 2011)). As an initial matter, under *Wallach*, this Court need not consider whether the perjury was disclosed during the trial in evaluating the materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury. But even if the Court does consider this factor, vacatur is still required. For the reasons explained below in Section I.D, Mr. Gentile's counsel's ability to refute the Government's case was hamstrung by the Government's repeated failure to disclose pre-testimony witness statements concerning critical testimony. As a prime example of the effect of the Government's bad faith and, as explained above in Section I.A.2, when Mr. Gentile's counsel

---

[9] Moreover, *McCourty* is inapposite. In that case, there was no allegation of suborning perjury and other prosecutorial misconduct resulting in Due Process and Confrontation Clause violations, which is the thrust of the Motion.

confronted Mr. Jacoby about his false testimony regarding the timing of the "no present plans" language in the PPMs, the Government then unearthed newly recollected testimony from two other key witnesses—Messrs. Lash and Anscher—that miraculously fixed the gap in proof created by Mr. Gentile's counsel's cross-examination of Mr. Jacoby. It cannot be that defense counsel can confront one witness with proof of falsity, only to have the Government present new, unsubstantiated, and previously undisclosed "evidence" regarding critical facts within a matter of days. Indeed, this Court would not usurp the jury's function in assessing witnesses' credibility where the Government engaged in a pattern of misconduct by eliciting previously undisclosed statements from witness after witness. *See Cromitie*, 2011 WL 1842219, at *26 (denying prosecutorial misconduct motion where, unlike here, government "gathered hundreds of pages of additional material that addressed (and sometimes undermined) what [a cooperating witness] had said on the witness stand, and disclosed to the defense the results of its investigation—including results that established certain inaccuracies in [that] testimony").

### D. The Government Repeatedly Violated Mr. Gentile's Right to Due Process and to Confront the Government's Witnesses at Trial

The Government argues that Mr. Gentile's claim that Messrs. Jacoby, Lash, and Anscher were "induced and coached" by the Government to provide knowingly false testimony for the first time on the stand (i) "is largely co-extensive with the defendants' accusations of perjury . . . [and] therefore fails on the same grounds;" (ii) Mr. Gentile's counsel had "ample opportunity" to cross-examine these witnesses and question their credibility in closing arguments; and (iii) Mr. Gentile does establish any likelihood that additional efforts would have altered the result of the trial. Opp. at 147–48. These arguments should be rejected.

The Government is constitutionally obligated to disclose information that could be used to impeach government witnesses. *See Giglio v. United States*, 405 U.S. 150, 154 (1972); *United*

*States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007) ("The obligation to disclose information covered by the *Brady* and *Giglio* rules exists without regard to whether that information has been recorded in tangible form."). The Government's repeated failure to do so here for at least Messrs. Jacoby, Lash, and Anscher constitutes a separate and grave violation of Mr. Gentile's constitutional rights to due process and to confront his accusers.

Indeed, Mr. Gentile's counsel's "ample opportunity" to effectively cross-examine witnesses and attack their credibility in summation and whether or not that would have altered the result of the trial depends, in large part, on the Government's pre-testimony disclosure to the defense of the witness statements that the Government later elicited as false testimony from its witnesses. The Opposition offers no explanation why the Government met repeatedly with these three witnesses—in the case of Messrs. Jacoby and Lash, dozens of times—and failed to disclose to Mr. Gentile any statements directly relevant to their eventual testimony concerning topics core to the Government's allegations, including testimony regarding, among other things, the "no present plans" language. *See, e.g.*, Tr. at 4960:21 (Mr. Gentile's counsel noting at sidebar that Mr. Anscher's testimony regarding the "no present plans" language was the first time it was disclosed to counsel and, in fact, contradicted by his prior witness disclosure statements). In fact, the Opposition is entirely silent in response to Mr. Gentile's argument that, regardless of the falsity of these witnesses' testimony, the fact that the Government elicited testimony from three separate witnesses for the first time on the stand demonstrates that the Government anticipated eliciting that testimony, discussed it with those witnesses in advance of their taking the stand, and failed to disclose the substance of those pre-testimony witnesses' statements to Mr. Gentile. Mot. at 13–16.[10] This pattern of repeatedly eliciting testimony from key witnesses *that had not been disclosed*

---

[10] As but one example, the Government elicited testimony during its redirect examination of Mr. Lash that GPB's

*to the defense before trial*—despite the extreme unlikelihood that the Government would elicit such key testimony without knowledge of its witness's anticipated testimony—violated Mr. Gentile's Due Process and Confrontation Clause rights under the Fifth and Sixth Amendments. *See Giglio v. United States*, 405 U.S. 150, 153 (1972).

Likewise, the Opposition's claim that Mr. Gentile's counsel was able to question witnesses' credibility in closing argument, Opp. at 147–48, conveniently omits that when Mr. Gentile's counsel did just that in summation, the Government immediately asked for a curative instruction that there was no evidence of improper motive. To be sure, the Government requested the instruction in response to Mr. Gentile's counsel's summation, in which defense counsel argued (citing Messrs. Jacoby, Lash, and Anscher's testimony) that Government witnesses were coached during dozens of witness preparation sessions, including numerous last-minute witness preparation sessions, and had lied. Dkt. 468 at 1–2; Tr. 6527:21–6528:3; 6570:11–12. As established in Mr. Gentile's Motion for a New Trial, ECF Nos. 490, 490-1, this curative instruction requiring the jury to accept the Government's contention that there was no evidence of improper motive undermined Mr. Gentile's counsel's attack on these witnesses' credibility during summation and invaded the province of the jurors as the sole fact finders in the case. At a minimum, vacatur and a new trial is required. *See United States v. Certified Env't Servs., Inc.*, 753 F.3d 72, 96 (2d Cir. 2014) (holding a new trial is warranted where evidentiary errors combine with various examples of prosecutorial misconduct to render a trial unfair).

---

auditors were purportedly part of the allegedly fraudulent conspiracy to use a fake performance guarantee to inflate fund performance. *See* Mot. at 13 (Tr. 3595:24–3596:5). It defies credulity that the Government would elicit such testimony, which was previously undisclosed to the defense, on redirect examination without knowing in advance the substance of Mr. Lash's testimony.

## CONCLUSION

For the foregoing reasons and those stated in the Motion, the Court should grant Mr. Gentile's motion to vacate his conviction and dismiss the Indictment in its entirety or, in the alternative, the Court should grant Mr. Gentile a new trial.


Dated: October 29, 2024
      New York, New York

Respectfully submitted,

*/s/ Matthew I. Menchel*
Matthew I. Menchel
Adriana Riviere-Badell *(admitted pro hac vice)*
**KOBRE & KIM LLP**
201 South Biscayne Boulevard
Suite 1900
Miami, FL 33131
(305) 967-6100
Matthew.Menchel@kobrekim.com
Adriana.Riviere-Badell@kobrekim.com

Jonathan D. Cogan
Sean S. Buckley
A. Zoe Bunnell
Benjamin F. Cooper
**KOBRE & KIM LLP**
800 Third Avenue
New York, NY 10022
(212) 488-1200
Jonathan.Cogan@kobrekim.com
Sean.Buckley@kobrekim.com
Zoe.Bunnell@kobrekim.com
Benjamin.Cooper@kobrekim.com

*Attorneys for Defendant David Gentile*