**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

-against-

DAVID GENTILE and
JEFFRY SCHNEIDER,

Defendants.

21-CR-54 (RPK) (PK)

ORAL ARGUMENT REQUESTED

**REPLY IN SUPPORT OF DEFENDANT**
**<u>DAVID GENTILE'S MOTION FOR A JUDGMENT OF ACQUITTAL</u>**

## TABLE OF CONTENTS

ARGUMENT .................................................................................................................... 1

I.  THE COURT SHOULD ENTER A JUDGEMENT OF ACQUITTAL ON THE
    SECURITIES FRAUD COUNT AGAINST MR. GENTILE ............................................ 2

    A.  The Evidence Was Insufficient to Support a Finding Beyond a Reasonable Doubt that
        Mr. Gentile Committed Securities Fraud under Rule 10b-5(b) ....................................... 2

        1.  The Overwhelming Majority of the Allegedly False Statements Were Not Made,
            Adopted, or Authorized by Mr. Gentile ...................................................................... 3

        2.  Any Purportedly False Statements Concerning Distributions Being Funded by Cash
            Flow from Operations Are Immaterial as a Matter of Law ......................................... 4

        3.  The Government's Contention that Mr. Gentile Can Be Primarily Liable for
            Statements He Did Not Personally Make Is Contrary to Controlling Law.................. 8

    B.  The Evidence Was Insufficient to Support a Finding Beyond a Reasonable Doubt that
        Mr. Gentile Committed Securities Fraud under Rule 10b-5(a)...................................... 10

        1.  The Evidence Was Insufficient to Support a Finding that Mr. Gentile Disseminated
            Any False Information to Investors ........................................................................... 10

        2.  The Evidence Was Insufficient to Support a Finding that Mr. Gentile Otherwise
            Engaged in a Scheme to Defraud............................................................................... 11

    C.  The Evidence Was Insufficient to Support a Finding Beyond a Reasonable Doubt that
        Mr. Gentile Aided and Abetted and/or Willfully Caused the Commission of Securities
        Fraud ................................................................................................................................ 14

        1.  The Record Does Not Support a Finding that Mr. Gentile Aided and Abetted
            Securities Fraud ......................................................................................................... 15

        2.  The Record Does Not Support a Finding that Mr. Gentile Willfully Caused an Act
            Constituting Securities Fraud..................................................................................... 15

II.  THE COURT SHOULD ENTER A JUDGEMENT OF ACQUITTAL ON THE WIRE
     FRAUD COUNTS.............................................................................................................. 18

    A.  The Evidence Was Insufficient to Support a Finding that Mr. Gentile Engaged in a
        Scheme to Defraud Investors ........................................................................................... 18

    B.  The Evidence Was Insufficient to Support a Finding Beyond a Reasonable Doubt that
        Mr. Gentile Knowingly Acted with the Specific Intent to Defraud Investors ............... 20

III. THE COURT SHOULD ENTER A JUDGEMENT OF ACQUITTAL ON THE
CONSPIRACY COUNTS ................................................................................................ 24

**CONCLUSION** ................................................................................................................ **24**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*BYD Co. v. VICE Media LLC*,
  531 F. Supp. 3d 810 (S.D.N.Y. 2021), *aff'd*, 2022 WL 598973 (2d Cir. Mar. 1, 2022) ........... 15

*Fan v. Stonemor Partners LP*,
  927 F.3d 710 (3d Cir. 2019) ......................................................................................... 5

*Iannelli v. United States*,
  420 U.S. 770 (1975) ...................................................................................................... 24

*In re Carlotz, Inc. Sec. Litig.*,
  No. 21-cv-5906 (AS), 2024 WL 3924708 (S.D.N.Y. Aug. 23, 2024) ....................................... 14

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
  625 F. Supp. 3d 164 (S.D.N.Y. 2022) ..................................................................... 10

*Janus Cap. Grp. v. First Der. Traders*,
  564 U.S. 135 (2011) ........................................................................................ 3, 8, 9

*Lorenzo v. S.E.C.*,
  587 U.S. 71 (2019) ......................................................................................... 8, 10

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
  547 U.S. 71 (2006) ......................................................................................... 9

*Okley v. Hyperion 1999 Term Tr., Inc.*,
  98 F.3d 2 (2d Cir. 1996) ................................................................................ 6

*Prousalis v. Moore*,
  751 F.3d 272 (4th Cir. 2014) ......................................................................... 9

*S.E.C. v. Garber*,
  959 F. Supp. 2d 374 (S.D.N.Y. 2013) ........................................................... 9

*S.E.C. v. Wey*,
  246 F. Supp. 3d 894 (S.D.N.Y. 2017) ......................................................... 11

*SEC v. Sugarman*,
  No. 19-cv-5998 (WHP), 2020 WL 5819848 (S.D.N.Y. Sept. 30, 2020) ................................ 14

*TSC Indus., Inc. v. Northway, Inc.,*
    426 U.S. 438 (1976) ................................................................................... 5, 20

*United States v. Aarons,*
    718 F.2d 188 (6th Cir. 1983) ............................................................................. 17

*United States v. Calderon,*
    944 F.3d 72 (2d Cir. 2019) ................................................................................ 20

*United States v. Chartier,*
    No. 22-3125 (L), 23-6080 (CON), 2024 WL 3617023 (2d Cir. Aug. 1, 2024) ........................ 9

*United States v. Cruz,*
    363 F.3d 187 (2d Cir. 2004) .............................................................................. 17

*United States v. Feola,*
    420 U.S. 671 (1975) ...................................................................................... 23

*United States v. Ferguson,*
    676 F.3d 260 (2d Cir. 2011) .............................................................................. 18

*United States v. Florez,*
    447 F.3d 145 (2d Cir. 2006) ............................................................................ 1, 22

*United States v. Gagliardi,*
    506 F.3d 140 (2d Cir. 2007) ............................................................................... 7

*United States v. Greenberg,*
    835 F.3d 295 (2d Cir. 2016) .............................................................................. 23

*United States v. Gumbs,*
    283 F.3d 128 (3d Cir. 2002) .............................................................................. 16

*United States v. Johnson,*
    513 F.2d 819 (2d Cir. 1975) .............................................................................. 17

*United States v. Napout,*
    332 F. Supp. 3d 533 (E.D.N.Y. 2018) ................................................................... 1, 22

*United States v. Parker,*
    903 F.2d 91 (2d Cir. 1990) ............................................................................. 2, 12

*United States v. Pauling,*
    924 F.3d 649 (2d Cir. 2019) .............................................................................. 12

iv

*United States v. Percoco*,
  317 F. Supp. 3d 822 (S.D.N.Y. 2018) ......................................................... 16

*United States v. Pipola*,
  83 F.3d 556 (2d Cir. 1996) ........................................................................ 15

*United States v. Praddy*,
  725 F.3d 147 (2d Cir. 2013) ...................................................................... 24

*United States v. Temple*,
  447 F.3d 130 (2d Cir. 2006) ........................................................................ 1

*United States v. Torres*,
  604 F.3d 58 (2d Cir. 2010) ........................................................................ 23

*United States v. Triumph Cap. Grp.*,
  544 F.3d 149 (2d Cir. 2008)) ................................................................. 1, 16

*United States v. Valle*,
  807 F.3d 508 (2d Cir. 2015) .................................................................. 1, 16

*United States v. Wallach*,
  935 F.2d 445 (2d Cir. 1991), *abrogated on other grounds by Ciminelli v. United States*, 598
  U.S. 306 (2023) ........................................................................................ 24

**Statutes**

18 U.S.C. § 2 ................................................................................ 2, 9, 14, 17

18 U.S.C. § 2(b) ..................................................................................... 3, 10

**Rules**

17 C.F.R. 240.10b-5(b) ................................................................................. 8

Fed. R. Crim. P. 29 ..................................................................................... 1

Defendant David Gentile ("Mr. Gentile") respectfully submits this reply memorandum in further support of his motion for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure, ECF Nos. 488, 488-1 (the "Motion" or "Mot.").[1]

## ARGUMENT

The crux of the Opposition is that the jury already rejected Defendants' arguments at trial. *See, e.g.*, Opp. at 30 ("Each of the arguments presented in the defendants' motions were presented to the jury and rejected"); *see also id.* at 61, 65, 66 ("[Mr.] Gentile presented this argument to the jury, and the jury rejected it"). To that end, the Opposition all but ignores the elements of the charged offenses and instead argues repeatedly that the jury was free to "infer" Mr. Gentile's guilt based on little more than his role as CEO. But that is not the standard.[2] The very cases cited in the Opposition make clear that courts are obligated to enter a judgment of acquittal where, as here, despite the jury rejecting the defendant's arguments at trial, the verdict was based on unreasonable inferences, incredible witness testimony, or the evidence was otherwise insufficient to support a finding of each as to each element of the offense(s) charged. *See, e.g.*, *United States v. Napout*, 332 F. Supp. 3d 533, 548 (E.D.N.Y. 2018) ("[T]he court 'must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that each element is established beyond a reasonable doubt.'" (cleaned up) (quoting *United States v. Triumph Cap. Grp.*, 544 F.3d 149, 159 (2d Cir. 2008)); *United States v. Florez*, 447 F.3d 145, 154–55 (2d Cir. 2006) (a jury's verdict must be supported by

---

[1] References to the Government's Omnibus Opposition to the Motion, ECF No. 499, are denoted as the "Opposition" or "Opp." Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion. Mr. Gentile also joins in and incorporates the arguments in Defendant Jeffry Schneider's reply memorandum to the extent they apply to Mr. Gentile.

[2] That a jury "rejected" a defendant's arguments is a prerequisite to *every* Rule 29 motion for a judgment of acquittal. Indeed, a judgment of acquittal is needed only if the jury convicts. *See, e.g.*, *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015) (noting that "[i]n any criminal trial there is always some evidence of guilt, otherwise there could not have been a prosecution;" however, "[a]pplying [the Rule 29] standard does not . . . mean that a reviewing court must affirm all jury verdicts"); *United States v. Temple*, 447 F.3d 130, 136 (2d Cir. 2006) ("The very nature of motions for acquittal pursuant to Rule 29 is to question the sufficiency of the evidence to support a conviction." (cleaned up)).

"permissible" inferences); *United States v. Parker*, 903 F.2d 91, 97 (2d Cir. 1990) (conviction

supported by testimony that is "incredible on its face" is grounds for reversal under Rule 29).

Here, the verdict was based on impermissible inferences, facially incredible witness

testimony, and evidence that failed to establish beyond a reasonable doubt the crimes of which

Mr. Gentile was convicted. Specifically:[3]

- As to the securities fraud count, there was insufficient evidence to establish beyond a reasonable doubt that Mr. Gentile personally made a materially false statement or willfully caused someone else to make a materially false statement, engaged in a scheme to defraud, or aided and abetted someone else who committed securities fraud, *see infra* Section I;

- As to the wire fraud count, there was insufficient evidence to establish beyond a reasonable doubt that Mr. Gentile engaged in a scheme to defraud or acted with fraudulent intent, *see infra* Section II; and

- As to the conspiracy counts, there was insufficient evidence to establish beyond a reasonable doubt the existence of an agreement to commit an unlawful act, *see infra* Section III.

Accordingly—even applying the Government's own precedent—the Court should grant

Mr. Gentile's motion for acquittal on all counts.

**I.    THE COURT SHOULD ENTER A JUDGEMENT OF ACQUITTAL ON THE SECURITIES FRAUD COUNT AGAINST MR. GENTILE**

Whether considered under Rule 10b-5(b), Rule 10b-5(a), or 18 U.S.C. § 2, the Opposition

does nothing to alter the indisputable conclusion that there was insufficient evidence to support a

finding that Mr. Gentile committed securities fraud and, for the reasons described below, the Court

should vacate his conviction and enter a judgment of acquittal on Count Three.

**A.    <u>The Evidence Was Insufficient to Support a Finding Beyond a Reasonable Doubt that Mr. Gentile Committed Securities Fraud under Rule 10b-5(b)</u>**

To find Mr. Gentile guilty of securities fraud under Rule 10b-5(b), the jury was required to

find, among other things, that Mr. Gentile made a materially false or misleading statement. *See* Mot.

---

[3] Given space limitations, this brief will not address every point related to Mr. Gentile's Motion raised in the Government's more than 150-page Opposition. Mr. Gentile will rely on both Defendants' opening post-trial briefs as well as his arguments raised during trial to rebut those other points.

at 15–24. The evidence elicited at trial was insufficient to support such a finding.

### 1. The Overwhelming Majority of the Allegedly False Statements Were Not Made, Adopted, or Authorized by Mr. Gentile

The Government does not appear to seriously dispute that the overwhelming majority of the statements it contends were false were not made, adopted, or authorized by Mr. Gentile.[4] This includes all of Ascendant's marketing materials and other communications between Ascendant's sales staff and investors, investor account statements (which were prepared and disseminated by Phoenix American), and the GPB Funds' PPMs and audited financial statements.[5] Rather, the only evidence cited in the Opposition of an allegedly false statement that Mr. Gentile actually made is the testimony of one witness, Matthew Crafa, who alleged that at a single due diligence presentation in March 2017, Mr. Gentile purportedly told those in attendance that the source of distributions for the Automotive Portfolio fund was the cash flow from GPB's operating companies, Opp. at 32; Tr. 1739:13–1741:7, which, as detailed in Section I.A.2 below, is immaterial as a matter of law.

The Government's laundry list of other statements that Mr. Gentile purportedly made at other conferences mischaracterizes the record. For example, the Government contends that, at a due diligence conference in October 2016, Mr. Gentile "lie[d] about the source of the monthly distributions and the performance of the funds" when he presented on the business being "healthy,"

---

[4] The Government in its Opposition conflates "making" a statement with "causing" a statement to be made. Opp. at 38, 60 n.15. The Government cites no authority to support this interpretation of maker-liability under *Janus Capital Group v. First Derivative Traders*, 564 U.S. 135 (2011), because no such authority exists. *Janus* itself explicitly rejected such a definition of "make." *Id.* at 140 (rejecting plaintiff's argument that "caus[ing] mutual fund prospectuses to be issued . . . and ma[king] them available to the public" constituted "making" a statement under Rule 10b-5(b)). Whether the evidence is sufficient to establish that Mr. Gentile "willfully caused" a false or fraudulent statement to be made under 18 U.S.C. § 2(b) is a separate issue discussed in Section I.C.2.

[5] *See, e.g.*, Opp. at 34 (stating that in implementing the de facto arrangement between GPB Funds and Ascendant, Mr. Schneider "controlled" all marketing materials and Mr. Gentile merely "received copies"); Opp. at 43–44 (claiming that account statements were "false" and "material" but not disputing that they were prepared and disseminated by Phoenix American); Opp. at 33 (contending that the "no present plans" language was added at the direction of Mr. Schneider); Opp. at 39 (arguing that Mr. Gentile was "involved" in discussions concerning marketing materials, account statements, and PPMs, not that he prepared them, let alone had ultimate authority over them); Opp. at 60 n.15 (not contesting that Mr. Gentile did not "review[], approve[], or ma[ke] any representations concerning Note 5" in Holdings I's 2014 audited financials, but rather that Mr. Gentile merely "knew" fraudulent information would be included in the audited financials).

claiming that "[n]o one said the distributions would involve the investors getting their own money back or other people's money back." Opp. at 31–32. This is a clear distortion of the record. Both Jay Frederick and Marvin Jones, who attended this event, testified that it indeed was disclosed that there was insufficient cash being generated by the portfolio companies to cover distributions for the year. Tr. 333:2–7 (Mr. Jones), Tr. 572:4–573:23 (Mr. Frederick). Neither testified to Mr. Gentile making any representations about the source of funds for distributions as the Government claims.

The Government's selective memory regarding this event is not new. Despite Mr. Jones explicitly informing the Government and FBI during trial preparations that GPB had disclosed under-coverage at this October 2016 conference, Tr. 288:9–17, 292:3–13—a fact fatal to the Government's criminal fraud allegations—the Government did not elicit this testimony from Mr. Jones and, instead, left the jury with the false impression that the entire due diligence conference was a "cheerleading session." Tr. 189:10–17. It was only on cross examination that both witnesses conceded that their testimony on direct that under-coverage was never disclosed was, in fact, not true.

The Opposition repeatedly (and improperly) characterizes any statements made at these due diligence conferences as made by Mr. Gentile personally. *See, e.g.*, Opp. at 31–32. This is a distortion of the trial record and an overgeneralization designed to suggest that the evidence showed something that it unequivocally did not. The Motion discussed in detail how the record does not support the inference that Mr. Gentile made any false misrepresentations at any other conferences as suggested by the Government at trial and repeated in the Opposition, and Mr. Gentile refers the Court to those arguments again here (rather than repeat them), which were largely ignored in the Opposition. Mot. at 8–9, 11–13.

### 2. Any Purportedly False Statements Concerning Distributions Being Funded by Cash Flow from Operations Are Immaterial as a Matter of Law

The Government's arguments concerning the materiality of any alleged statements made by

Mr. Gentile about distributions being funded by cash flow from operations are unavailing.

As an initial matter, the Government repeatedly misstates the applicable standard, arguing that the jury's materiality finding is supported by investor testimony that they "would have wanted to know" the source of funds for distributions and that it was "important." *See, e.g.*, Opp. at 16, 42. But the Supreme Court has explicitly rejected this definition of materiality. *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 445 (1976) (rejecting a definition of "materiality" that would include any facts "a reasonable shareholder might consider important"). Rather, the standard is whether "there was a substantial likelihood that the misstated fact would have been viewed by a reasonable investor as having significantly altered the total mix of information available." Tr. 6989:18–21. As detailed below, there is insufficient evidence in the record to meet that standard here.

Specifically, courts in this Circuit and elsewhere have held, *as a matter of law*, that false or misleading statements do not substantially alter the total mix of information available—and thus are immaterial—where they are contradicted by affirmative disclosures. This specific point was made in Mr. Gentile's opening brief, Mot. at 16–19, but the Opposition fails to address this body of law, which unequivocally supports a judgment of acquittal. Instead, the Government argues, as it does throughout the Opposition, that the jury was entitled to conclude otherwise. But, while materiality is usually a matter reserved for the trier of fact, it is not if a misstatement is immaterial as a matter of law, as the alleged misstatements are here.

The Third Circuit's decision in *Fan v. Stonemor Partners LP*, 927 F.3d 710 (3d Cir. 2019), is particularly instructive. The defendant in *Fan* was a publicly traded company that had a substantial disparity between its overall sales and its accessible cash from which it could pay distributions to shareholders. Rather than limit distributions to the company's accessible cash, however, the defendant funded distributions in part with the proceeds of new investments (specifically, cash from loans it repaid with new equity sales). In other words, new investor capital was used to pay

distributions to existing investors. At the same time, the defendant was telling investors in press releases and marketing materials that the primary source of cash for distributions was operating cash flow, which was indisputably not true. The Third Circuit nonetheless found that these misstatements as to the source of funds for distributions were immaterial as a matter of law because the truth was "readily and consistently disclosed" to investors. *Id.* at 716, 717. Specifically, the defendant's financial reports "demonstrated the mathematical reality" that the defendant was not able to fund distributions primarily from day-to-day operations, and it "repeatedly disclosed the risks it faced in its business," including the fact that it "may not have sufficient cash from operations to continue paying distributions at their current level, or at all." *Id.* at 716–717 (also describing defendant's 10-Ks, which showed available cash and demonstrated that "a reasonable investor would be informed that [the defendant]'s distributions were funded by more than just its operating revenue").

The facts here are nearly identical: not only did the GPB Funds' audited financial statements demonstrate the "mathematical reality" that distributions could not, at times, be funded solely from operating cash flow, but GPB explicitly and repeatedly disclosed that it had the right to include investor capital in distributions and, more specifically, that distributions were not covered by operating cash flow. *See, e.g.*, GX-8058-A (presentation to investors about Holdings I's performance for the third quarter of 2016, stating that coverage for Holdings I's distributions was "63%" for the last 12 months and "82%" since inception); Tr. 559:4–563:17 (Mr. Frederick testifying that the Automotive Portfolio's 2015 financial statements showed that the fund was "not fully covered" by net investment income), Tr. 1797:24–1798:4 (Mr. Crafa agreeing that under-coverage for Holdings II was "reported to [him] and everyone else who is receiving this document in black and white"). As such, any statement by Mr. Gentile to the contrary would be immaterial as a matter of law. *See also, e.g.*, *Okley v. Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, 9 (2d Cir. 1996) (finding that alleged statements that were immaterial as a matter of law because "they are contradicted by plain and prominently

displayed languages in the prospectuses" (collecting cases)).

Thus, there is no evidence in the record that supports a finding of materiality, and the Opposition does nothing to alter this conclusion. The Government's own witnesses uniformly rejected the Government's interpretation that the GPB Funds' financial statements did not disclose a lack of coverage. *See, e.g.*, Tr. 1609:20–1610:8 (Joseph Ghabour agreeing that he "easily" could have seen that distributions were "not fully covered from funds from operations" and "anyone who reviewed those quarterly or annual reports could have done that math"), Tr. 562:6–8 (Mr. Frederick agreeing that net income, net investment income, and distribution metrics to calculate coverage are "all being reported to [him] in black and white" in the funds' financial statements). Further, the Opposition ignores that many investors, including Mr. Frederick, invested only *after* being told explicitly that the Automotive Portfolio's profits were insufficient to cover distributions and continued to invest money despite knowing that the relevant GPB Fund was under-covered. Mot. at 20; Tr. 573:5–574:1, 590:11–18 (Mr. Frederick agreeing that he invested his and his clients' money after "someone announced to an audience full of people that there had been a shortfall in profitability from operations such that the dividend could not be fully covered from cash from operations," and he invested again in 2018 after receiving financial statements showing under-coverage). As such, the record is devoid of any evidence to support the inferences the Government asks this Court to draw from the financial statements and other disclosures. *See* Opp. at 45–48. The Government's interpretations are therefore unreasonable and entitled to no weight on a Rule 29 motion. *See, e.g.*, *United States v. Gagliardi*, 506 F.3d 140, 149 (2d Cir. 2007) (on a Rule 29 motion the court draws only "*reasonable* inferences in the government's favor" (emphasis added)).

On this basis alone, the Government has failed to establish that any alleged misstatements by Mr. Gentile (or others) concerning the source of funds for distributions were material.

### 3.    The Government's Contention that Mr. Gentile Can Be Primarily Liable for Statements He Did Not Personally Make Is Contrary to Controlling Law

The Opposition cites no authority in this Circuit—indeed, there is none—to support the Government's attempt to extend the reach of primary liability for securities fraud to individuals who do not "make" any false or misleading statements. Rule 10b-5(b) plainly states, in relevant part, that it is unlawful "[t]o *make* any untrue statement of a material fact." 17 C.F.R. § 240.10b-5(b) (emphasis added). The Supreme Court's textual analysis in *Janus* of this language in Rule 10b-5(b)—specifically, what it means to "make" a statement—found that "[f]or the purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." 564 U.S. at 142.

The Government, however, argues that the word "make" has an entirely different definition depending on who commences an action—a private plaintiff in civil litigation or the United States government—and that *Janus*'s definition of "make" only applies to private plaintiffs. Opp. at 37–38. But this strained reading is entirely without support.

*First*, limiting *Janus*'s holding to private actions is belied by *Janus* itself: even the dissenting justices understood that *Janus*'s reach applied outside the context of private actions to government enforcement actions. 564 U.S. at 157–58 (Breyer, J., dissenting) (explaining the impact of the majority opinion on SEC enforcement actions). Indeed, the Supreme Court in subsequent decisions has confirmed the applicability of *Janus*'s "maker" standard outside the context of private actions. *Lorenzo v. S.E.C.*, 587 U.S. 71, 74 (2019) (in the context of an SEC enforcement action, "consider[ing] whether those who do not 'make' statements (as *Janus* defined 'make') . . . can be found to have violated the *other* parts of Rule 10b-5").

In light of this, it is not surprising that the Government is unable to point to a single criminal or SEC action in this Circuit that has refused to apply *Janus*. In fact, the case law suggests just the

opposite: courts, including the Second Circuit itself, have assumed, for argument's sake, that *Janus* does apply to enforcement actions. *See, e.g.*, *United States v. Chartier*, No. 22-3125 (L), 23-6080 (CON), 2024 WL 3617023 (2d Cir. Aug. 1, 2024); *S.E.C. v. Garber*, 959 F. Supp. 2d 374 (S.D.N.Y. 2013). And the one case from outside the Circuit the Government does cite to support its position, *Prousalis v. Moore*, 751 F.3d 272, 279 (4th Cir. 2014), is not only non-precedential, but it predates *Lorenzo* and is thus no longer good law. Opp. at 37.

*Second*, the Government's interpretation of *Janus*—which requires reading one word to have two different meanings—runs headlong into a line of Supreme Court precedent stating that identical words in different parts of the same securities statute are to be interpreted the same. *See, e.g.*, *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 86 (2006).

*Finally*, the Government's strained reading of *Janus* improperly conflates primary liability under Rule 10b-5(b) and aiding and abetting liability, which is in violation of the Supreme Court's stated intent in *Janus* to "draw a clean line between the two—the maker is the person with ultimate authority over a statement and others are not." *Janus*, 564 U.S. at 143 & n.6 ("If persons or entities without ultimate control over the content of a statement could be considered primary violators who 'made' the statement, then aiders and abettors would be almost nonexistent."). Indeed, the Government attempts to circumvent the specific requirements for secondary liability under 18 U.S.C. § 2, likely because, as explained in detail below, it failed to elicit sufficient evidence to support a finding that Mr. Gentile aided and abetted securities fraud.[6]

Accordingly, the record is insufficient to support a finding that Mr. Gentile personally "made"

---

[6] The Government also appears to argue that Mr. Gentile can be guilty of a primary violation of Rule 10b-5(b) based, not on misstatements that Mr. Gentile himself made, but on alleged misstatements that were "made by co-conspirators in furtherance of [the charged wire fraud and securities fraud] conspiracies." Opp. at 40. But the Government cites no authority in support of expanding primary liability in this way (because no such law exists). Whether the evidence was sufficient to support a finding beyond a reasonable doubt that Mr. Gentile is guilty of conspiring to violate Rule 10b-5(b) arising out of any such statements by co-conspirators is addressed in Section III.

any materially false statements under Rule 10b-5(b).

**B.**  **The Evidence Was Insufficient to Support a Finding Beyond a Reasonable Doubt that Mr. Gentile Committed Securities Fraud under Rule 10b-5(a)**

The Government argues that there was sufficient evidence for the jury to find beyond a reasonable doubt that Mr. Gentile employed a device, scheme, or artifice to defraud under Rule 10b-5(a) based on two different theories: (1) dissemination of false information; and (2) creation of "sham" transactions designed to mislead investors. Both are without merit.

**1.**  **The Evidence Was Insufficient to Support a Finding that Mr. Gentile Disseminated Any False Information to Investors**

The Opposition argues that there was sufficient evidence for the jury to find that Mr. Gentile "caus[ed] false information to be disseminated to investors." Opp. at 38–39. Merely causing someone else to disseminate false information to investors, however, is legally insufficient to establish primary liability under Rule 10b-5(a).[7] To be found guilty of disseminating false or misleading information under Rule 10b-5(a), Mr. Gentile *himself* had to disseminate the false or misleading statement. *See Lorenzo*, 587 U.S. at 75–78 (director of investment bank was found liable under Rule 10b-5(a) for "disseminating" a false statement where he personally sent a knowingly false email to investors that was drafted and approved by his superior); *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 251 (S.D.N.Y. 2022) (rejecting a claim under Rule 10b-5(a) where the defendants did not "directly transmit[]" false information, but rather the false information was disseminated by a separate entity). And the record is devoid of any evidence of Mr. Gentile personally sending out marketing materials, account statements, PPMs, or any other disclosures.

---

[7] Whether the evidence cited by the Government is sufficient to establish secondary liability under 18 U.S.C. § 2(b) is discussed in Section I.A.3.

2.    **The Evidence Was Insufficient to Support a Finding that Mr. Gentile Otherwise Engaged in a Scheme to Defraud**

The Government argues that there was sufficient evidence for the jury to find beyond a reasonable doubt that Mr. Gentile entered into "sham" transactions designed to mislead investors about the profitability of the portfolio companies and the source of monthly distribution payments. Opp. at 23–29, 57–60. This is also not supported by the record.

With respect to the 2014 Performance Guarantees, there was insufficient evidence for a rational jury to find beyond a reasonable doubt that those guarantees were part of a scheme to defraud investors regarding the profitability of the GPB Funds and the source of monthly distribution payments. While the Government cites what it believes to be "overwhelming proof" that the 2014 Performance Guarantees were "fraudulent," Opp. at 58, the evidence it cites in support is irrelevant to the actual element requiring that Mr. Gentile "participate[] in an illegitimate, sham or inherently deceptive transaction where [his] conduct or role had *the purpose or effect of creating a false appearance*." *S.E.C. v. Wey*, 246 F. Supp. 3d 894, 918 (S.D.N.Y. 2017) (emphasis added). Here, there is nothing in the record to support the conclusion that the 2014 Performance Guarantees had the purpose or effect of creating a false appearance for investors about the profitability of the portfolio companies or the source of funds for distributions.

As an initial matter, it is undisputed that the triggering of a performance guarantee signals to an investor that the portfolio companies are underperforming. *See, e.g.*, Tr. 339:1–22 (Mr. Jones agreeing that "disclosure that performance guarantees were triggered and paid, means that the underlying dealerships that needed the performance guarantees to be triggered and paid had not performed up to expectation"), Tr. 566:23–567:3 (Mr. Frederick agreeing that "[i]f a personal guaranty gets paid" that means "that a dealership underperformed expectations"), Tr. 3478:7–10 (Mr. Lash agreeing that if "a performance guaranty [is] . . . reported to people [that] basically says

11

performance tanked"). So the existence of the 2014 Performance Guarantees and any statements made to investors that they were triggered cannot "create a false appearance" about the profitability of the portfolio companies—they convey the exact opposite.

Further, as briefed in the Motion, *see* Mot. at 9–10, it is an incontrovertible fact that the proceeds of the 2014 Performance Guarantees were not accrued as income in Holdings I's audited financials, meaning that they in no way impacted the distribution coverage calculation. The Government argues, however, that this was "a factual dispute that was thoroughly vetted for the jury's consideration," *id.* at 144, and which it was "reasonable" for them to reject, *id.* at 61—*i.e.*, that it was reasonable for the jury to infer that the 2014 Performance Guarantees did, in fact, impact Holdings I's revenue and, thus, its distribution coverage ratio. For the reasons that follow, this is not a reasonable inference.

*First*, the Government argues that it was reasonable for the jury to infer that the 2014 Performance Guarantees impacted the investment income reported on Holdings I's audited financial statements simply because Mr. Jacoby said so. Opp. at 62 (stating that Mr. Jacoby testified "that the $1.1 million referenced in Note 5 of Holdings I's 2014 audited financial statements referred to the 2014 Performance Guarantees and was accounted for in the fund's investment income line" (citing Tr. 887:21–23)). Yet, the Government does not dispute that, when Mr. Jacoby was shown his own email communications stating that the 2014 Performance Guarantees were not recorded as income in the 2014 Holdings I audited financial statements, he provided no evidentiary support for his position, which was directly contradicted by the written record. *See* Mot. at 10, n. 2 (citing Tr. 978:5–981:25, 1140:12–1141:14; DX-FFFFY, DX-DDDDDR). Such uncorroborated testimony, which was directly refuted by Mr. Jacoby's own written correspondence, is "incredible on its face" and the jury's assessment of both its weight and sufficiency requires no deference. *See Parker*, 903 F.2d at 97; *see also United States v. Pauling*, 924 F.3d 649, 657 (2d Cir. 2019) ("[W]e may not credit inferences

12

within the realm of possibility [on a Rule 29 motion] when those inferences are unreasonable.").

*Second*, the Government contorts Mr. Wilczynski's testimony: the purportedly "key concessions" he made, Opp. at 144, were nothing of the sort. Indeed, Mr. Wilczynski—an expert tendered by Mr. Gentile who was the only witness qualified to testify about the relationship between the 2014 Performance Guarantees and Holdings I's 2014 financial statements—emphatically testified that the 2014 Performance Guarantees were *not* reported as revenue on Holdings I's 2014 financial statements. *See, e.g.*, Tr. 5457:11–5458:9, 5616:20–5617:11, 5764:9–22, 5767:8–5768:8.

*Finally*, the Government misleadingly claims that "[a] comparison of Gentile's text messages, the audit workpapers, and the Holdings I 2014 audited financial statement (GX-2008) demonstrate that the 2014 Lash performance guarantees are *reflected* in Holdings I's audited financials." Opp. at 62 (emphasis added). That is not the issue: there is no dispute that the 2014 Performance Guarantees were, in fact, *reflected* in Holdings I's 2014 audited financial statement. Indeed, Mr. Wilczynski testified that these Guarantees impacted the fair value of private holding companies, DJD Holdings LLC and DJD 2 Holdings LLC, reported on Holdings I's consolidated schedule of investments. *See, e.g.*, Tr. 5521:16–5524:25. But the book value of Holdings I's portfolio companies says nothing about the source of funds for distribution, the coverage ratio, or, more generally, the profitability of Holdings I. Indeed, the issue is whether the 2014 Guarantees impacted the reported *revenue* (*i.e.*, income) for Holdings I, and the record does not support such a finding.[8]

Rather, the only credible and reliable evidence adduced at trial was that the 2014 Performance Guarantees were in favor of DJD Holdings LLC and DJD 2 Holdings LLC and any monies paid by

---

[8] The various assertions made in the Opposition regarding the documentary evidence are based entirely on the Government's own say-so. For instance, the Government provides no evidentiary support for its unsubstantiated claim that "the guarantees accounted for a 40% increase in Holdings I's net investment income for 2014." Opp. at 61 (citing GX-2008 (Holdings I's 2014 audited financial statements), and GX-6038 and GX-6039 (the 2014 Performance Guarantees), but no testimony or documents arriving at that calculation). Similarly, the Government's interpretation of the audit papers and text messages, Opp. at 62 (citing GX-8028-J, GX-7008-A), are pure conjecture unsupported by any testimonial evidence explaining their import.

Mr. Lash under those guarantees contributed to the revenue of only those entities. Tr. 5458:7–9 (Mr. Wilczynski testifying that, based on his analysis of the document, "the entity affected by [the 2014 Performance Guarantees] was DJD Holdings and DJD Holdings II"). As such, the record was insufficient for a reasonable jury to find beyond a reasonable doubt that the 2014 Performance Guarantees had the purpose or effect of deceiving investors about the profitability of Holdings I or the source of funds for distributions.

With respect to the 2015 Performance Guarantee, for the reasons explained below in Section II, there was insufficient evidence for a rational jury to find beyond a reasonable doubt that this guarantee was part of a scheme to defraud investors regarding the profitability of the GPB Funds and the source of monthly distribution payments. In short, Mr. Lash paid the monies he owed under the guarantee to Automotive Portfolio, and the fact of the guarantee and its payment was timely and accurately disclosed to investors in its 2015 audited financial statement. Thus, there was no "sham" agreement, let alone one that Mr. Gentile used for the purpose or effect of deceiving investors. *See, e.g.*, *SEC v. Sugarman*, No. 19-cv-5998 (WHP), 2020 WL 5819848, at *5 (S.D.N.Y. Sept. 30, 2020); *In re Carlotz, Inc. Sec. Litig.*, No. 21-cv-5906 (AS), 2024 WL 3924708, at *5–6 (S.D.N.Y. Aug. 23, 2024).

### C. The Evidence Was Insufficient to Support a Finding Beyond a Reasonable Doubt that Mr. Gentile Aided and Abetted and/or Willfully Caused the Commission of Securities Fraud

There is also insufficient evidence to support a finding beyond a reasonable doubt that Mr. Gentile is guilty of securities fraud under 18 U.S.C. § 2. This Court charged the jury on two theories of secondary liability under 18 U.S.C. § 2: (a) aiding or abetting the commission of an offense against the United States; and (b) "willfully caus[ing] an act to be done which if directly performed by him or another would be an offense against the United States." The record does not support a conviction under either theory.

1.    **The Record Does Not Support a Finding that Mr. Gentile Aided and Abetted Securities Fraud**

Liability for aiding and abetting securities fraud under Section 2(a) requires that the Government, among other things, "prove the underlying crime was committed by someone other than the defendant." *United States v. Pipola*, 83 F.3d 556, 562 (2d Cir. 1996). As explained in the Motion, the Government failed to present sufficient evidence that any principal of GPB or Ascendant actually committed securities fraud. Mot. at 38–40. The Government did not respond to this argument in any way in its Opposition and, as such, has conceded the issue. *Cf. BYD Co. v. VICE Media LLC*, 531 F. Supp. 3d 810, 821 (S.D.N.Y. 2021) (failure to oppose a specific argument "is deemed waiver of that issue"), *aff'd*, 2022 WL 598973 (2d Cir. Mar. 1, 2022). Regardless, the trial record does not support a finding that anyone committed securities fraud:

- Mr. Lash pled guilty to wire fraud, not securities fraud, and there is no evidence that he made any statements to investors, let alone materially false statements with an intent to defraud;

- The evidence was insufficient to support a finding that Mr. Schneider committed securities fraud for the reasons articulated in his own motion for judgment of acquittal, ECF No. 489-1 at 4–40, which is incorporated herein by reference;

- There is similarly no evidence that any of the Government's other named co-conspirators made any statements to investors, let alone any knowingly false material statements with an intent to defraud; and

- There are no allegations that the individuals who did make and/or disseminate the allegedly false material statements knew those statements were false and/or made those statements with an intent to defraud investors—*i.e.*, Ascendant's sales staff, Phoenix American, and other unidentified presenters at the funds' due diligence conferences. *See, e.g.*, Tr. 2137:4–24 (Joshua Teeters, an Ascendant employee who made representations to investors about the source of funds for distributions, testifying that he never knew that investor capital was used to cover monthly distributions).

Accordingly, there is insufficient evidence to support a finding beyond a reasonable doubt that Mr. Gentile aided and abetted the commission of securities fraud.

2.    **The Record Does Not Support a Finding that Mr. Gentile Willfully Caused an Act Constituting Securities Fraud**

Nor does the record support Mr. Gentile's securities fraud conviction under Section 2(b).

"Under a § 2(b) theory, a defendant who possesses the requisite mental state for an offense, and who willfully causes a third party to commit the act criminalized by that offense, is punishable as if he were a principal." *United States v. Percoco*, 317 F. Supp. 3d 822, 835 (S.D.N.Y. 2018); *see also* Tr. 7017:1–14 (jury charge). Courts have interpreted Section 2(b)'s "willfully causes" standard to require the government to prove that the defendant "intentionally manipulate[d] an innocent intermediary to commit the prohibited *actus reus*." *United States v. Gumbs*, 283 F.3d 128, 134 (3d Cir. 2002). Here, the Government argues that the jury was entitled to infer that Mr. Gentile "caus[ed] false information to be disseminated to investors" from the fact that "Schneider and Gentile essentially operated Ascendant Capital and GPB as one entity." Opp. at 38–39. But this argument is without basis in law or fact.

*First*, the Government misstates the applicable standard under Rule 29. It does not mean, as the Government suggests, that the Court may deny a motion for a judgment of acquittal "if there is any evidence that arguably could support a verdict." *Valle*, 807 F.3d at 515 (noting that "[i]n any criminal trial, there is always some evidence of guilt, otherwise there could not have been a prosecution," and "this standard does not . . . mean that a reviewing court must affirm all jury verdicts"). Indeed, the Second Circuit repeatedly has instructed that "it is not enough that the inferences in the government's favor are permissible. A court must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that [each element of the offense] is established beyond a reasonable doubt." *Triumph*, 544 F.3d at 159; *accord Valle*, 807 F.3d at 522 (noting that "'some' evidence is not the test"). "If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *Valle*, 807 F.3d at 522.

*Second*, the "inference" that the Government contends was necessary for the jury to convict

Mr. Gentile of "willfully causing" false information to be disseminated to investors is not supported by the evidence. The Government relies exclusively on the assertion that "Schneider and Gentile essentially operated Ascendant Capital and GPB as one entity." Opp. at 39. In other words, according to the Government, because Mr. Gentile was the CEO of GPB, Mr. Schneider was the CEO of Ascendant, and GPB and Ascendant were run by Mr. Gentile and Mr. Schneider as a "partnership," the jury was allowed to infer that Mr. Gentile willfully caused every allegedly false statement disseminated by either entity.[9] But this is not a permissible inference under the law. As this Court charged the jury, "a defendant who is an officer, director, or employee of a corporation is not criminally responsible for the alleged acts of other employees merely because he held a senior position within the corporation." Tr. 7019:25–7020:3. Relatedly, courts within this Circuit have uniformly held mere association—even knowledge or presence at the scene of a crime—is insufficient for criminal liability. *See, e.g.*, *United States v. Cruz*, 363 F.3d 187, 198 (2d Cir. 2004) ("mere presence at the scene of a crime, even when coupled with knowledge that at the moment a crime is being committed, is insufficient to prove aiding and abetting"); *United States v. Johnson*, 513 F.2d 819, 824 (2d Cir. 1975) ("Guilt may not be inferred from mere association with a guilty party."). Rather, a conviction under Section 2(b) requires some affirmative act by Mr. Gentile. *See, e.g.*, *United States v. Aarons*, 718 F.2d 188, 190 (6th Cir. 1983) (holding that there can be no liability under 18 U.S.C. § 2 absent some affirmative conduct or overt act by the defendant).

Here, however, the Government is unable to point to any affirmative action by Mr. Gentile that "willfully caused" a false statement to be disseminated. Nor could it; such evidence does not exist. *See, e.g.*, Mot. at 4–6 (summarizing testimony that Mr. Gentile had no involvement in marketing materials or account statements and was merely "aware of" changes to the PPMs but not

---

[9] For the reasons set forth in the Mr. Schneider's motion, ECF No. 489, 489-1, which are incorporated herein, the record does not support a finding beyond a reasonable doubt that any false statements were made, which further supports a judgment of acquittal on the securities fraud count.

involved in drafting); Mot. at 9–10, 29–33 (summarizing testimony that there were no false representations in the GPB Funds' financial statements related to the Performance Guarantees).[10] As such, the evidence is insufficient to support a securities fraud conviction under Section 2(b). Having failed to elicit sufficient evidence at trial to sustain a conviction for securities fraud—as either a principal or aider and abettor—the Court should grant Mr. Gentile's motion and enter a judgment of acquittal on Count Three.

## II.    THE COURT SHOULD ENTER A JUDGEMENT OF ACQUITTAL ON THE WIRE FRAUD COUNTS

There was insufficient evidence to support a finding that Mr. Gentile committed wire fraud and, for the reasons described in the Motion and below, the Court should vacate his conviction and enter a judgment of acquittal on Counts Four and Five.

### A.    <u>The Evidence Was Insufficient to Support a Finding that Mr. Gentile Engaged in a Scheme to Defraud Investors</u>

The Government argues in its Opposition that there is "overwhelming proof" that the 2015 Performance Guarantee was "fraudulent." Opp. at 63. The evidence it cites in support of this argument, however, is irrelevant to the actual elements of a scheme or artifice to defraud. Specifically, the Government was required to prove, among other things, that (i) Mr. Gentile made a false statement or representation; and (ii) the fraudulent representation related to a material fact or matter. *See* Mot. Ex. A at 38. The trial record is insufficient to support either finding.

*First*, the Government fails to point to any false statement made by Mr. Gentile concerning the 2015 Performance Guarantee, instead citing to evidence purporting to show, among other things,

---

[10] The Government also argues in a footnote that Mr. Gentile can be liable for securities fraud arising out of allegedly false statements in the GPB Funds' audited financials because he "knew" that fraudulent information would be communicated to investors. Opp. at 60, n.15. But this is not an accurate statement of the law. Section 2(b) requires that Mr. Gentile "willfully caused" a false statement to be communicated to investors, not merely that he "knew" that a false statement would be communicated to investors. *See, e.g., United States v. Ferguson*, 676 F.3d 260 (2d Cir. 2011) (reversing a conviction where a Section 2(b) jury instruction failed to include a causation instruction and merely instructed on the requisite mental state).

that the 2015 Performance Guarantee was not created until April 2016, Mr. Gentile assured Mr. Lash that he would not have to pay the guarantee, and Mr. Gentile and Mr. Lash conspired to lie to GPB's auditors, investors, and, ultimately, law enforcement about the guarantee. Opp. at 63–67. None of this evidence, however, dispels what is at bottom the core fundamental truth: no rational jury could have found that the Government met its burden to prove beyond a reasonable doubt that Mr. Gentile actually made any fraudulent representation concerning the 2015 Performance Guarantee.

The only representation that was made to investors concerning the 2015 Performance Guarantee appeared in Note 5 of Automotive Portfolio's 2015 audited financial statements, which stated, in relevant part:

> In some cases the Partnership has agreements in place with the operating partners to guarantee a certain amount of income at the dealership level for a specified amount of time. For the year ended December 31, 2015, $1,050,000 was earned by the Partnership and is included in income receivable from investments on the balance sheet. The $1,050,000 was collected in April 2016.

GX-2125-015. Contrary to the claims advanced by the Opposition, Note 5 is accurate. It makes no misrepresentation that the 2015 Performance Guarantee was executed prior to when the agreement was memorialized with Mr. Lash in 2016 and it accurately states that $1,050,000 was collected in April 2016. Indeed, as detailed in the Motion, *see* Mot. at 31–32: (i) bank records show that GPB did, in fact, collect $1,050,000 in April 2016, GX-3005 at 095; (ii) Mr. Lash testified that he immediately paid $350,000—one-third of the guarantee—directly out of his account to cover the guarantee in April 2016, Tr. 3384:16–3385:10; and (iii) Mr. Lash testified that he repaid the remaining $700,000 by the end of the year, Tr. 3386:8–15, which was confirmed by the Government's summary witness, Michael Petron, Tr. 3932:9–25. None of the evidence presented in the Opposition, *see* Opp. at 66–67, alters this uncontroverted fact that the existence of the 2015 Performance Guarantee and collection by GPB of the monies owed were accurately disclosed to investors.

*Second*, there was insufficient evidence at trial for a jury "to reasonably infer . . . that [Mr.

Gentile's] representations regarding the 2015 Performance Guarantee were material" to investors. Opp. at 68. The Opposition points to only one investor witness, Jay Frederick, who testified that he was specifically aware of the 2015 Performance Guarantee and that, in general terms, he would have wanted to know if the performance guarantee had not been in place in 2015 and that someone "other than the operator" paid the guarantee. Tr. 670:3–23. But again, as detailed above, this is not the standard. *See TSC Indus., Inc.*, 426 U.S. at 445 (rejecting a definition of "materiality" that would include any facts "a reasonable shareholder might consider important"). Rather, the Government was required to prove that there was a "substantial likelihood" that the alleged truth about the 2015 Performance Guarantee "would have been viewed by a reasonable investor as having significantly altered the total mix of information available." Tr. 6989:18–21; *see also* Tr. 7009:17–20 (defining materiality under wire fraud the same as materiality under securities fraud). Mr. Frederick did not, however, testify that he relied on, let alone was significantly influenced by, the 2015 Performance Guarantee in making an investment decision; nor did any other investor, broker-dealer, or investment advisor testify that they considered the date of or source of payment of the 2015 Performance Guarantee or that it influenced any of their investment decisions. *See, e.g.*, *United States v. Calderon*, 944 F.3d 72, 85–86 (2d Cir. 2019) ("All of these specifications of the materiality inquiry target the same question: would the misrepresentation actually *matter* in a *meaningful way* to a rational decisionmaker?" (emphasis in original)).

### B. The Evidence Was Insufficient to Support a Finding Beyond a Reasonable Doubt that Mr. Gentile Knowingly Acted with the Specific Intent to Defraud Investors

The Opposition confirms that the Government failed to elicit sufficient evidence to establish beyond a reasonable doubt that Mr. Gentile intended to commit wire fraud.

With respect to Count Four, the Government acknowledges that "the record does not answer the question of the precise date on which Gentile and his co-conspirators decided to incorporate a

fake performance guarantee into Automotive Portfolio's audited financials," but argues that "it was reasonable for the jury to infer from the evidence that the $509,644 [sic] wire transfer from the GPB Realty Capital account at Signature Bank to a Realty Capital account at J.P. Morgan Chase on April 22, 2016 was in furtherance of the conspiracy." Opp. at 81. The uncontroverted evidence and the Government's own summation show the exact opposite.

As detailed in the Motion, the Government repeatedly elicited evidence showing the purported scheme regarding the 2015 Performance Guarantee arose no earlier than April 27, 2016, if not later. Emails between GPB's auditors and Mr. Gentile and Mr. Jacoby show that, as of April 27, 2016, GPB still intended to use a management fee rebate to cover the shortfall in Automotive Portfolio's revenue. *See, e.g.*, GX-7496. Mr. Jacoby testified on direct examination that this email showed that the auditors were working "to confirm with [Mr. Gentile] the existence of this rebate, that he's aware of it and that he has to pay it," Tr. 922:9–13, and that Mr. Jacoby had no knowledge of the 2015 Performance Guarantee as of the date of this email. Tr. 922:18–22. Mr. Jacoby further testified that, on the morning of April 29, 2016, he participated in a phone call during which Mr. Gentile told him that "he decided not to pay the management fees and Mr. Lash is going to instead pay a performance guaranty in that amount." Tr. 923:9–924:3; GX-7156. Mr. Jacoby made clear in his testimony that (i) he had never heard of the 2015 Performance Guarantee prior to that April 29 phone call and (ii) as GPB's Chief Financial Officer, the existence of the 2015 Performance Guarantee is something that he would have been aware of. Tr. 924:4–9; *see also* Tr. 931:1–4 (Mr. Jacoby also testifying that he thought he first learned that Mr. Lash was to pay the Automotive Portfolio shortfall through the 2015 Lash Performance Guarantee on "April 28th"). Likewise, in its own summation, the Government repeatedly and explicitly expressed its view of when the purportedly fraudulent 2015 Performance Guarantee scheme was hatched: "On April 29, 2016, two days after the e-mail we just looked at with the auditors discussing the management fee rebate, the

21

management fee rebate idea is dropped, and the plan changes to a fake performance guaranty. Out of nowhere." Tr. 6446:4–18; *see also* Tr. 6445:17–22 (stating that there was no mention of the 2015 Performance Guarantee as of April 27, 2016). Thus, the only inference to be drawn from the record is that that the $509,643 wire transfer was made in connection with the management fee rebate—not the 2015 Performance Guarantee—if not some other totally unrelated purpose.

Nothing the Government cites in the Opposition supports a contrary inference. That Mr. Lash testified that "sometime" after a text exchange with Mr. Gentile and others, dated March 23, 2016, he went to a meeting in New York City with Mr. Gentile, Mr. Schneider, and Mr. Prestiano where they told him "we're going to do another performance guarantee," Tr. 3165–68, is entirely consistent with and does nothing to suggest that this meeting occurred at a date *prior* to April 22, 2016 as the Government suggests. Opp. at 81. In fact, elsewhere in its Opposition the Government confirms that Lash testified "that before sometime in late April 2016, there had *not* been an agreement—written or otherwise—to guarantee the performance of Bob's Buick," and "that in late April 2016, he had a meeting with Gentile, Schneider, and Prestiano and Lash told them that he had never agreed to guarantee the performance of Bob's Buick." Opp. at 63–64 (citing Tr. 3180–81, 3184).[11]

Based on the Government's own characterization of its evidence, it was not reasonable for the jury to conclude that Mr. Gentile made the $509,643 transfer with the intent to defraud investors. *See, e.g.*, *Napout*, 332 F. Supp. 3d at 548; *Florez*, 447 F.3d at 154–55. Instead, the only reasonable inference was this transfer necessarily was not made in furtherance of the 2015 Performance Guarantee and, instead, was done in connection with Mr. Gentile's original intention to rebate his

---

[11] Furthermore, the Opposition's claim that "that Prestiano did not paper the agreement until April 28, 2016 is not dispositive of when Lash's meeting with Gentile, Schneider, and Prestiano took place" similarly flies in the face of the Government's own characterization of the evidence. Opp. at 81. To be sure, the Government's rebuttal made clear it understood the evidence to show that the 2015 Performance Guarantee was not conceived until April 28, 2016. *See* Tr. 6922:6–14 (rebuttal stating "[t]he metadata on [the 2015 Performance Guarantee] shows it was created April 28th of 2016. Mr. Prestiano's cooking up the performance guaranty in less than twenty-four hours, and they want you to believe that this is legitimate.").

management fees to Automotive Portfolio—if not for some entirely unrelated purposes—which the Government repeatedly characterized as "legitimate." Tr. 6446:2, 6449:23–24. Thus, the Count Four wire transfer was made for a legitimate purpose unrelated to the later creation and execution of the purported guarantee scheme. *See United States v. Greenberg*, 835 F.3d 295, 305–06 (2d Cir. 2016) (requiring "that defendants *contemplated* some actual harm or injury to their victims.").

With respect to Counts Four and Five, the Government misapprehends Mr. Gentile's argument that he always acted in good faith to put either his own or Mr. Lash's money into Automotive Portfolio—be it through the originally contemplated management fee rebate or the 2015 Lash Performance Guarantee—for the ultimate benefit of investors. Mot. at 42–43. Under the Government's reading of the Motion, Mr. Gentile is purportedly "confus[ing] the requirement that Gentile intend to obtain 'money or property' through the scheme with how the scheme was executed." Opp. at 82. Not so. That Mr. Gentile contributed his own money to the 2015 Performance Guarantee, which Mr. Lash repaid within a matter of months, demonstrates that there was no scheme to defraud investors, *see* Section II.A, and is further evidence that Mr. Gentile was acting in good faith. And, far from being "irrelevant that the management fee rebate would have resulted in a similar bottom-line number" as the Government claims, Opp. at 82, Mr. Gentile contributed the same monies he gathered in connection with the management fee rebate, which again the Government characterized as legitimate. Tr. 6445:23–6446:3.

Accordingly, there is insufficient evidence to support a finding that Mr. Gentile acted with specific intent to defraud investors, which requires the entry of a judgment of acquittal on not only the wire fraud counts, but all counts. *See* Tr. 6991:1–20, 7010:20–7011:2 (defining intent to defraud the same for securities and wire fraud); *United States v. Torres*, 604 F.3d 58, 65 (2d Cir. 2010) (for conspiracy, "the Government 'must prove at least the degree of criminal intent necessary for the substantive offense itself.'" (quoting *United States v. Feola*, 420 U.S. 671, 686 (1975))).

### III. THE COURT SHOULD ENTER A JUDGEMENT OF ACQUITTAL ON THE CONSPIRACY COUNTS

The Government does not directly address the sufficiency of the evidence specifically with respect to the conspiracy counts (Counts One and Two) in its Opposition, and each of the arguments outlined above apply with equal force to those counts. The "essence" of the crime of conspiracy is "the agreement . . . to commit one or more *unlawful* acts." *United States v. Praddy*, 725 F.3d 147, 153 (2d Cir. 2013) (emphasis added); *accord Iannelli v. United States*, 420 U.S. 770, 777 (1975) ("[T]he essence of [conspiracy] is an agreement to commit an unlawful act."); *see also* Tr. 6997:3–13, 7014:4–5 (jury charge defining a securities fraud conspiracy to require "an agreement to commit securities fraud" and defining a wire fraud conspiracy to require "an agreement to commit wire fraud"). But here, the Government has established, at most, an agreement to commit totally lawful acts. The evidence at trial did not establish that any of the alleged misstatements or purported schemes were fraudulent. Accordingly, there was insufficient evidence to support a finding beyond a reasonable doubt that Mr. Gentile is guilty of the charged conspiracies, and, accordingly, the Court should enter a judgment of acquittal on Counts One and Two.[12]

### CONCLUSION

For the foregoing reasons and those stated in the Motion, as well as for the reasons articulated in Mr. Schneider's opening and reply brief, the Court should grant Mr. Gentile's Motion and enter a judgment of acquittal on all counts.

---

[12] To be clear, the evidence at trial did not establish (and the Government has never argued) that the charged scheme to defraud was unsuccessful; indeed, this would be irrelevant, as success of the underlying crime is not an element of conspiracy. *See, e.g.*, Tr. 6996:25–6997:1 (charging the jury that a conspiracy can exist "even if it should fail to achieve its purposes"). Rather, the "central question" is "whether the government's proof could establish that the accused planned to commit a substantive offense, which, if attainable, would have violated a federal statute." *United States v. Wallach*, 935 F.2d 445, 470–71 (2d Cir. 1991), *abrogated on other grounds by Ciminelli v. United States*, 598 U.S. 306 (2023). And, here, for the reasons explained in detail above and in Defendants' respective moving briefs, the alleged co-conspirators planned "scheme" did not "violate[] a federal statute." *Id.*

Dated: October 29, 2024
       New York, New York

Respectfully submitted,


 */s/ Matthew I. Menchel*
Matthew I. Menchel
Adriana Riviere-Badell *(admitted pro hac vice)*
**KOBRE & KIM LLP**
201 South Biscayne Boulevard
Suite 1900
Miami, FL 33131
(305) 967-6100
Matthew.Menchel@kobrekim.com
Adriana.Riviere-Badell@kobrekim.com

Jonathan D. Cogan
Sean S. Buckley
A.  Zoe Bunnell
Benjamin F. Cooper
**KOBRE & KIM LLP**
800 Third Avenue
New York, NY 10022
(212) 488-1200
Jonathan.Cogan@kobrekim.com
Sean.Buckley@kobrekim.com
Zoe.Bunnell@kobrekim.com
Benjamin.Cooper@kobrekim.com

*Attorneys for Defendant David Gentile*