**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

                -against-

DAVID GENTILE and
JEFFRY SCHNEIDER,

                  Defendants.

21-CR-54 (RPK) (PK)

## <u>DAVID GENTILE'S SENTENCING MEMORANDUM</u>

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

I.    DAVID GENTILE'S PERSONAL LIFE ........................................................... 2

   A.    David's Early Life and Career ...................................................... 3

   B.    David's Role as a Professional Mentor to His Colleagues and Friends ........................ 4

   C.    David's Role as a Devoted Father to His Four Children ................................ 5

   D.    David's Role as Family Leader and Caretaker to Aging and Ailing Relatives .............. 6

   E.    David's Kindness to Friends and Care for the Community ............................ 7

   F.    David's Generosity and Charitable Work ...................................... 8

   G.    David Is a Thoughtful and Reliable Businessman ............................... 9

II.   THE OFFENSE CONDUCT ......................................................... 10

III.   THE SENTENCING GUIDELINES ................................................... 11

   A.    No Enhancement Under Section 2B1.1(b)(1) Is Appropriate Because the Government Failed to Establish that Any Investor Sustained Losses Caused by the Offense Conduct .....11

     1.    Investor Capital Included in Distribution Payments Does Not Constitute an "Actual Loss" ................................................................ 12

     2.    The Record Does Not Support a Finding that the Offense Conduct Was the But For Cause of the Losses Described in the PSR .......................................... 14

   B.    This Court Should Not Apply Enhancements for Ten or More Victims, Sophisticated Means, Investment Advisor, Abuse of a Position of Public of Private Trust, or Leadership Role ................................................................ 16

   C.    This Court Should Apply the Two-Level Reduction for Being a Zero-Point Offender 16

IV.   IF THE COURT ACCEPTS THE PSR'S GUIDELINES CALCULATION, A DRAMATIC DOWNWARD VARIANCE IS WARRANTED ................................. 17

   A.    The Offense Level Overstates the Seriousness of the Offense Conduct .................... 17

   B.    A PSR Guidelines Sentence Would Represent Cruel and Unusual Punishment .......... 18

V.    A NON-CUSTODIAL SENTENCE IS APPROPRIATE UNDER 18 U.S.C. § 3553(a) . 19

   A.    The Nature and Circumstances of the Offense Conduct Weigh in Favor of Lenience . 19

     1.    David Set Out to Build a Novel Business in the Private Equity Industry ................ 19

       (a)    The Origin of GPB .......................................................... 19

       (b)    GPB's Rapid Growth and Evolution of Internal Controls and Compliance ..... 20

     2.    There is Nothing Inherently Unlawful About GPB's Business Model .................... 21

       (a)     Return of Capital Distributions Are Acceptable in Alternative Investments .... 21

       (b)     GPB's Offering Documents Authorized GPB to Return Capital in Distributions 22

    3.    The Performance Guarantees Were Used to Benefit Investors ................................. 23

    4.    David Genuinely Believed that Investors Would Ultimately Profit from Their Investments in the GPB Funds ........................................................................................ 23

  B.   A Non-Custodial Sentence Provides Just Punishment and Adequate Deterrence ........ 25

  C.   Suitable Alternatives to a Custodial Sentence Are Available ........................................ 27

  D.   A Sentence of Time Served Avoids Unwarranted Sentencing Disparities .................... 28

**CONCLUSION** ........................................................................................................................ **30**

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Balaber-Strauss v. Lawrence*,
  264 B.R. 303 (S.D.N.Y. 2001) ............................................................. 30

*Dean v. United States*,
  581 U.S. 62 (2017) ............................................................................. 19

*Furman v. Georgia*,
  408 U.S. 238 (1972) ........................................................................... 18

*Gall v. United States*,
  552 U.S. 38 (2007) ............................................................................. 17

*In re Bernard L. Madoff Inv. Sec. LLC*,
  12 F.4th 171 (2d Cir. 2021) ............................................................... 30

*In re EPD Inv. Co. LLC*,
  114 F.4th 1148 (9th Cir. 2024) .......................................................... 30

*KDH Consulting Grp. v. Iterative Cap. Mgmt. L.P.*,
  528 F. Supp. 3d 192 (S.D.N.Y. 2021) ............................................... 16

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005) ............................................................... 15

*Pepper v. United States*,
  562 U.S. 476 (2011) ............................................................................ 11

*Taylor v. Fed. Aviation Admin.*,
  351 F. Supp. 3d 97 (D.D.C. 2018) ..................................................... 14

*Tison v. Arizona*,
  481 U.S. 137 (1987) ........................................................................... 23

*United States v. Adelson*,
  441 F. Supp. 2d 506 (S.D.N.Y. 2006) ...................................... 1, 17, 18, 26

*United States v. Algahaim*,
  842 F.3d 796 (2d Cir. 2016) ............................................................... 18

*United States v. Carrozzella*,
  105 F.3d 796 (2d Cir. 1997) ............................................................... 13

*United States v. Cavera*,
   550 F.3d 180 (2d Cir. 2008) .................................................................. 17

*United States v. Constantine*,
   762 F. App'x 16 (2d Cir. 2019) ............................................................. 12

*United States v. Corsey*,
   723 F.3d 366 (2d. Cir. 2013) .................................................................. 17

*United States v. Cull*,
   446 F. Supp. 2d 961 (E.D. Wisc. 2006) ................................................ 26

*United States v. Dauria*,
   2008 WL 5459197 (E.D.N.Y. Nov. 24, 2008).......................................... 28

*United States v. Emmenegger*,
   329 F. Supp. 2d 416 (S.D.N.Y. 2004) .................................................... 17

*United States v. Faibish*,
   2015 WL 4637013 (E.D.N.Y. Aug. 3, 2015)............................................ 17

*United States v. Gayle*,
   2010 WL 2540488 (E.D.N.Y. June 17, 2010) ......................................... 28

*United States v. Gill*,
   523 F.3d 107 (2d Cir. 2008) .................................................................. 28

*United States v. Gravel*,
   323 F. App'x 55 (2d Cir. 2009) ............................................................. 29

*United States v. Gupta*,
   904 F. Supp. 2d 349 (S.D.N.Y. 2012) .................................................... 26

*United States v. Harper*,
   805 F.3d 818 (7th Cir. 2015).................................................................. 28

*United States v. Harris*,
   2013 WL 5739202 (E.D.N.Y. Oct. 22, 2013) ................................... 27, 28

*United States v. Hernandez*,
   2005 WL 1242344 (S.D.N.Y. May 24, 2005) ......................................... 26

*United States v. Hsu*,
   669 F.3d 112 (2d Cir. 2012) .................................................................. 13

*United States v. Johnson*,
   2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018) ......................................... 17

*United States v. MacCallum*,
   2018 WL 2999907 (W.D.N.Y. June 15, 2018) .......................................... 13

*United States v. Marino*,
   654 F.3d 310 (2d Cir. 2011) .......................................................... 15

*United States v. Moran*,
   2024 WL 2577970 (E.D.N.Y. May 24, 2024) ..........................................11

*United States v. Orton*,
   73 F.3d 331 (11th Cir. 1996) ......................................................... 14

*United States v. Parris*,
   573 F. Supp. 2d 744 (E.D.N.Y. 2008) ........................................... 17, 18

*United States v. Reifler*,
   446 F.3d 65 (2d Cir. 2006) ........................................................... 16

*United States v. Rioux*,
   97 F.3d 648 (2d Cir. 1996) ........................................................... 28

*United States v. Romano*,
   825 F.2d 725 (2d Cir. 1987) ..........................................................11

*United States v. Ruiz*,
   2006 WL 1311982 (S.D.N.Y. May 10, 2006) ........................................ 26

*United States v. Schneider*,
   930 F.2d 555 (7th Cir. 1991) .........................................................11

*United States v. Shehee*,
   2020 WL 5229030 (E.D. Wash. Sept. 1, 2020) ...................................... 28

*United States v. Snelling*,
   768 F.3d 509 (6th Cir. 2014) ......................................................... 13

*United States v. Stein*,
   846 F.3d 1135 (11th Cir. 2017) ................................................. 14, 15

*United States v. Stewart*,
   590 F.3d 93 (2d Cir. 2009) ........................................................... 26

*United States v. Sullivan*,
   118 F.4th 170 (2d Cir. 2024) ......................................................... 16

*United States v. Williams*,
   662 F. App'x 366 (6th Cir. 2016) ................................................... 26

*United States v. Zangari*,
   677 F.3d 86 (2d Cir. 2012) ............................................................................ 12

*United States v. Desilva*,
   2010 WL 532987 (E.D.N.Y. Feb. 8, 2010) ..................................................... 28

*United States v. Peppel*,
   707 F.3d 627 (6th Cir. 2013) ......................................................................... 14

*United States v. Coppola*,
   671 F.3d 220 (2d Cir. 2012) ........................................................................... 14

*United States v. Ebbers*,
   458 F.3d 110 (2d Cir. 2006) ........................................................................... 14

*United States v. Evans*,
   744 F.3d 1192 (10th Cir. 2014) ...................................................................... 14

*United States v. Wills*,
   476 F.3d 103 (2d Cir. 2007) ........................................................................... 29

*United States v. Free*,
   839 F.3d 308 (3d Cir. 2016) ...........................................................................11

**Statutes**

18 U.S.C. § 3553(a) .............................................................................. *passim*

**Rules**

Fed. R. Crim. P. 29 ..........................................................................................11

Fed. R. Crim. P. 32(f)(1) ................................................................................ 12

Fed. R. Crim. P. 32(i)(D) ............................................................................... 12

**Other Authorities**

Amended Judgment, *United States v. Petit*, No. 19-CR-850 (S.D.N.Y. June 3, 2021), ECF No.
   206 ................................................................................................................... 30

*Deterrence in the Twenty-First Century*,
   42 Crime & Just. 199 (2013) ......................................................................... 27

*Impact of the Front End on Federal Sentencing and Beyond: Recidivism and More*,
   88 Fed. Probation 3 ....................................................................................... 27

Judgment, *United States v. Ng*, No. 11-CR-161 (S.D.N.Y. May 23, 2012), ECF No. 149 .......... 28

Judgment, *United States v. Nordlicht*, No. 16-CR-640 (E.D.N.Y. July 16, 2024), ECF No. 1020 ......................................................................................... 29

Judgment, *United States v. Nordlicht*, No. 16-CR-640 (E.D.N.Y. July 16, 2024), ECF No. 1052 ......................................................................................... 29

Order Regarding Loss Calculation, *United States v. Nordlicht*, No. 16-CR-640 (E.D.N.Y. July 16, 2024), ECF No. 1005 .......................................................... 29

Sentencing Submission by Gregoire Tournant, *United States v. Tournant*, No. 22-CR-276 (S.D.N.Y. Nov. 8, 2024), ECF No. 156 ........................................ 29

Transcript of Sentencing Proceedings, U*nited States v. Nordlicht*, No. 16-CR-640 (E.D.N.Y. July 16, 2024), ECF No.1057. ..................................................... 27

Transcript of Sentencing Proceedings, *United States v. Schulman*, No. 16-CR-442 (E.D.N.Y. Oct. 6, 2017), ECF No. 155 .................................................... 28

Transcript of Sentencing Proceedings, *United States v. Stewart*, No. 15-CR-287 (S.D.N.Y. May 9, 2016), ECF No. 95 ......................................................... 28

U.S. Sent'g Guidelines Manual § 2B1.1 ................................................... *passim*

U.S. Sent'g Guidelines Manual § 4C1.1(a) ..................................................11

U.S. Sent'g Guidelines Manual § 5D1.3(c)(3)............................................... 28

U.S. Sent'g Guidelines Manual § 5D1.3(c)(7)............................................... 28

U.S. Sent'g Guidelines Manual, App. C, Vol. II at 178, Amend. 617 (U.S. Sentencing Comm'n 2003) ......................................................................... 14

## PRELIMINARY STATEMENT

David Gentile is a loving and devoted father to four children, husband, son, brother, uncle, cousin, colleague, friend, and the quintessential patriarch of his large, extended family. At 58 years old, he is a self-made man who worked hard from a young age and put himself through school. Through his hard work, dedication to others, and integrity, David earned the respect of countless friends, family, and colleagues over a roughly thirty-five-year successful career. He has made it his mission to help those around him—be it his immediate family or total strangers—and his life is a testament to his humble roots and his unshakeable faith in the value of hard work and giving back to his community. This conviction is a total aberration in what has otherwise been a successful and honorable life and career.

David's world was turned upside down when he was charged and the jury returned a guilty verdict on securities fraud, wire fraud, and conspiracy to commit each in connection with the disclosures made by three funds—H1, AP, and H2—under the management of GPB (the "Offense Conduct"), Indictment ¶¶ 50–60, a company that he helped found and build from the ground up. While he vigorously disputes the jury's verdict and plans to appeal his conviction, David recognizes that he must bear the consequences of the conviction, including sentencing. However, a sentence below the truly draconian calculation of a 1,020-month Guidelines range and recommendation of 20 years' incarceration by the U.S. Probation Office ("Probation") in its Presentence Investigation Report ("PSR") is warranted here for at least three reasons.

*First*, while Probation asserts that the correct Guidelines range is 1,020-months—***a staggering 85 years of imprisonment***—its calculations are simply wrong. Indeed, the PSR misapprehends the nature of this case and is riddled with factual inaccuracies, unsupported assertions and legal conclusions untethered from the trial record, and improper enhancements. Most significantly, the PSR's calculations are almost entirely driven by the application of a 24-level loss enhancement under Section 2B1.1 of the Guidelines based on an erroneous loss theory proffered by the Government. That theory is grounded on an erroneous calculation, which the Government provided to Probation, and which is prohibited in this Circuit because it purportedly measures the amount of money *paid* to investors—not the amount of money unlawfully taken from them. This purported loss calculation, which is based entirely on the testimony and slides of the Government's non-expert witness who did not opine on loss and, in fact, offered no expert testimony at all, is not only divorced from fact and law, but represents a complete about-face by the Government; indeed, the Government repeatedly and emphatically asserted at trial that it not only was "not alleging loss," Tr. 34:17–23, but that it could not allege loss because it *did not know* if any investor actually lost money, *see* Tr. 36:9–11. Simply put, the Government, in providing information concerning this case to Probation for the PSR, has failed to carry its burden of proving a reasonable estimate of loss or that any other enhancement is appropriate.

*Second*, even if Probation's Guidelines calculations were correct (they are not), the circumstances here call for a significant downward variance. This is because: (i) the Guidelines dramatically overstate the seriousness of the Offense Conduct and the circumstances here are not adequately reflected in the applicable Guidelines range; and (ii) the Guidelines range would violate the Eighth Amendment's prohibition on cruel and unusual punishment. Indeed, a Guidelines sentence in these circumstances would elevate "the guidelines' fetish with abstract arithmetic" over "common sense" and produce a "travesty of justice." *See United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (decrying "the harm that guideline calculations can visit on human beings if not cabined by common sense.").

*Third*, the Section 3553(a) factors warrant a non-incarceratory sentence. The Offense Conduct dramatically differs from other cases in which incarceration was ordered, in large part because it concerns inaccurate disclosures—a theory of fraud frequently and more appropriately addressed in civil matters. The circumstances here reflect a clear story of a business that grew too quickly for its CEO to personally ensure the accuracy of every investor communication but who genuinely believed in GPB's success for investors and who tried to hire the right people to help him and the company. That he ultimately failed to ensure investors fully understood GPB's performance (despite the issuance of regular financial statements reporting the same) does not warrant incarceration, let alone the 20 years recommended by Probation that would have him leaving prison an elderly man (if at all). David is a generous man and devoted to his family. He is not a danger to society and his prosecution and conviction have already sent a powerful message to others. Indeed, Probation itself recognized that "a downward variance may be appropriate, as the applicable guidelines may overrepresent the seriousness of this offense." PSR ¶ 119.

For these reasons and those set forth below, Probation's recommended sentence is patently unfair. Justice demands (i) a proper analysis of loss and the other enhancements recommended by Probation, in which case David should receive a non-incarceratory sentence within the Guidelines, or, should the Court accept the Government's analysis of loss, (ii) a variant, below-Guidelines sentence accounting for the many factors in this case that warrant leniency. In either case, a non-incarceration sentence is appropriate because it is "sufficient, but not greater than necessary" to provide a just punishment for the Offense Conduct for which David has been convicted.

David also joins and incorporates herein by reference the arguments in the Legal Analysis section of Mr. Schneider's sentencing memorandum to the extent that they apply to David.

## I.    DAVID GENTILE'S PERSONAL LIFE

Scores of friends, family members, colleagues, and employees have submitted letters of support on David's behalf. These letters in Exhibit A[1] written to Your Honor demonstrate the strength of his character and unwavering commitment to his community. They describe a man whose life was shaped by his upbringing in a tight-knit, working-class family in Queens and Long Island and who has made it his mission in life to treat everyone—be it his wife and children or a casual acquaintance—like family.

The stories shared by seventy-five people reveal his kindness: from traveling thousands of miles to support friends overcome with severe illness and grief, providing advice and support to friends struggling with their businesses and finances, to welcoming strangers into his home for Thanksgiving dinner, all without ever asking for anything in return. Friends and family describe David as a "guiding compass," and associate him with his familiar refrains to "never compromise your integrity," to remember that "without your word you have nothing," "family is the centerpiece of everything," "everyone deserves kindness," and "the more you give the better you feel." Ex. A-19. One friend, quoting a former American president, writes "'There are men and women who make the world better just by being the kind of people they are,' David is one of those people." Ex. A-38. These dozens of accounts paint a consistent picture of David's selflessness, generosity, and dependability, which weigh in favor of leniency in his sentencing.

---

[1] Exhibit A, and all other exhibits cited in this memorandum, are attached to the Declaration of Matthew I. Menchel in Support of Defendant David Gentile's Sentencing Memorandum ("Menchel Dec.").

## A. **David's Early Life and Career**

David was born to a family of first- and second- generation Italian immigrants in a blue-collar neighborhood of Brooklyn. PSR ¶ 67. At the time, his father worked as a printer while his mother (who was still learning to speak English) attended school. Around third grade, David's family moved to Jamaica, Queens, where they remained throughout his adolescence. Faith was a core value in David's family, and they enrolled him in Catholic schools with the goal of providing a structured, stable, and safe environment that aligned with the morals they forged at home. Ex. A-7. He grew up playing team sports like baseball, basketball, and rugby. PSR ¶ 79–80.

At home, David's parents instilled values of hard work, generosity, and loyalty. His mother, Josephine Gentile, emphasized that they uplifted one another "physically, morally, emotionally, or financially," which shaped David's outlook on life. Ex. A-6. These virtues run through his large extended family as well; David's cousin describes religion, along with respect and honesty, as the Gentile family's bedrock values. Ex. A-28. His family, which includes nearly two dozen cousins, gathered often for holidays, birthdays, and regular Sunday dinners. David's close family friend characterized the bond between David and his family members as a "constant," always looking out for one another "no matter what." Ex. A-27. Now, David carries on the longstanding tradition of hosting family gatherings and celebrations. Ex. A-26. David's godson, Carmelo Cataudella, recalls how, while hosting a family Christmas celebration, David encouraged the younger family members to carry the torch from him in the future because "family is everything." Ex. A-12.



He made it his mission to help those who were going through difficult times—like he had—ensuring that everyone around him felt supported.

David started college shortly after graduating high school but then took time off to work full-time delivering furniture, and part-time, at a gas station. He then clerked at his father's accounting firm, GP&B, earning minimum wage while attending school in the evenings, and working as a waiter on weekends. Ex. A-8. Balancing his full-time role as a clerk with night classes reinforced his family's values of grit and hard work and David ultimately graduated from Queens College with an accounting degree. His friend, John Aljian, remembers that when he met David thirty years ago, David expressed "how grateful he was to have had the opportunity to go back to school, become a [CPA], and no longer have to drive a truck to support himself." Ex. A-46.

All told, David spent nearly 30 years working as an accountant and later Managing Partner

for GP&B. PSR ¶ 93. David's colleagues report that he was a crucial team member, Ex. A-23, and his father remarked that the firm's "growth is due to his caring approach, conscientious work ethic and commitment to the well-being of his clients." Ex. A-7. By bringing the values that were instilled in him into his profession, GP&B colleague, Wayne Lin, remarked that David "creat[ed] a family-like atmosphere for both our staff and our clients" based on "reliability, loyalty, trustworthiness, generosity, and empathy." Ex. A-23. David prided himself on providing each client with individualized attention. David's wife, Joanne, witnessed how he "completely immersed himself into [his clients'] lives and was always interested in learning about their families, their interests and demonstrated a genuine attentiveness to their well-being." Ex. A-1. In fact, Joanne relates that David's clients "treated him like a cherished friend or family member." *Id.*

To this day, many of David's accounting clients "continue to inquire about David's well-being," Ex. A-23, and stand by his professional judgment, work ethic and dependability. Former client Arnold DiJoseph praised David's "excellent work" at the firm, which developed into a mutual business relationship between them. Ex. A-24. Similarly, Jon Arancio was "struck" by "how well he treated even the smallest [clients]" when his family trusted David with their personal tax returns. Ex. A-25. Former client and now friend, Kosmas Aronis, "distinctly remember[s]" David's "willingness to go beyond what was expected to help" and how he ensured that Kosmas "fully understood each step of the process." Ex. A-60.

## B. <u>David's Role as a Professional Mentor to His Colleagues and Friends</u>

David takes great pride in his former career as an accountant—from his beginnings as an entry-level clerk to his promotion to Managing Partner at GP&B. He has used his knowledge to mentor others and help them succeed. Wayne Lin, admires how David championed the firm's internship and new graduate programs, delivering lessons not only on the "technical aspects of the job, but also the unspoken rules of professionalism." Ex. A-23. David nurtured their professional development beyond the day-to-day tasks required of them, laying "the groundwork for long-term success in their careers and personal lives." *Id.*

David's readiness to share knowledge with others has uplifted friends and family in times of need.



Those close to David trust him to unravel the trickiest of their problems and launch them into success in their own ventures.

From his childhood growing up as one of many in a large Italian family, to his tutelage under his father at his accounting firm, and finally in his entrepreneurship with different business ventures before founding GPB, David has dedicated himself to helping others. he drew from experiences that

4

"show his own character . . . . without any expectation of receiving anything in return." Ex. A-59. [REDACTED] that he imparted to Glenn: "to always be intellectually honest and to make sure [one does] not gain at someone else's expense." Ex. A-45. David's godson, Carmelo Cataudella, similarly describes David as a "sounding board for those around him" who seek his guidance. Carmelo recognizes that David's mentorship shaped his perspective and goals:

> David taught me that the 'long game' is hard work, work ethic, dedication, consistency, honesty. David's mentorship extended into every aspect of my life. He guided me in how to present myself, how to care for family, and how to foster meaningful relationships. He played an instrumental role in helping me navigate critical decisions . . . . As the eldest son in a house without a father, he had the foresight and confidence in me to encourage and assist in my development into the man I am today. As I began to excel and succeed, he taught me humility: that I could be the most important person in the world, just so long as everyone else was just as important. Ex. A-12.

## C. David's Role as a Devoted Father to His Four Children

When it comes to his family, David proudly wears his heart on his sleeve, and his profound love for his wife and children inspires people around him. His wife, Joanne, describes it simply: "To say that he is dedicated to his family is an understatement." David's devotion to providing for his family is "one of his greatest joys." Ex. A-1. Those close to David recount how he not only always emphasizes his commitment to family but encourages them to live according to the same principles, keeping family as "the cornerstone of life." Ex. A-19. One of the key lessons David imparted to his godson, Carmelo, is "how to balance [his] own ambitions with the responsibility of being a man who stands by and supports his family." Ex. A-12.

David has been wholly dedicated to his children throughout their lives, and their support for him reflects the importance he placed on fatherhood. David's daughter, Chiara, cherishes memories of his "advice at nearly every family dinner" and how he raised her and her siblings to "always love, support, guide, and grow with each other." Ex. A-3. David's eldest son, James, recounts that his father "emphasized the importance of taking full responsibility for [his] actions and prioritizing the well-being of others" and "doing the right thing, even when it's not easy." Ex. A-2. David's middle son, Richard, recalls being brought up to value "hard work, honesty, self-discipline, compassion, humility, and lastly, never taking shortcuts." Ex. A-4. And David's youngest child, Joseph, credits his father with encouraging him to stay in school, teaching him the value of hard work and discipline, and cementing respect for others as a "vital part of [his] life." Ex. A-5. The magnitude of David's presence in their lives is clear, and he remains a positive force driving them forward into adulthood.

With his guidance, David's children have embarked on higher education and the beginning of promising young careers. Friends and family remark that David's children embody his devotion to family and caring for others, and "have adopted values that reflect those of their parents." Ex. A-49. David's wife, Joanne, attests that "[w]orking hard and taking responsibility are core tenets that David operates with and has instilled in [their] children." Ex. A-1. As young adults, all in their late teens to early twenties, his children are in the early stages of independence but still rely on their father's direction as some of their most consequential life choices approach.

James has followed in his father's footsteps to pursue a career in accounting and business.

Family friends attest to the impact of "David's guidance" on James' "remarkable growth." Ex. A-35. Chiara graduated from New York University and is currently working part-time, supported by her parents as she prepares to apply to graduate school. She counts on David's "unwavering encouragement, wisdom, and guidance" as she makes this transition from college. Ex. A-3. Richard and Joseph are both currently college students. ████████████████████████████████ ████████████████████████████████████████████████████████████ Joseph has been inspired by his father to pursue a career as an accountant within the automotive industry. Ex. A-5. David has dedicated his life to paving a path to success for them, which they have all begun to achieve.

As young adults, David's children depend on him for advice and support during this crucial transitionary period in their lives, and a long incarceratory sentence is likely to have a devastating impact on the Gentile family. ████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

Those close to the family fear that David's "absence would be devastating and profoundly impact his family." Ex. A-35. Joanne recognizes that their "existence as a family relies on him quite heavily," describing him as the "primary individual that binds all of [them] together." Ex. A-1. ██████ Richard struggles to imagine family dinners without his father "sitting to [his] left at the head of the table." Ex. A-4. ████████████████████ ██████ The Gentile children would be devastated without their father at the head of the family table and as their foundation. One family friend, George Maroulis, puts it simply: "The Gentiles have given to our society the gift of four smart, productive, and caring children, all whom need their dad present during these trying and uncertain times. I, too, need their dad." Ex. A-40.

### D. David's Role as Family Leader and Caretaker to Aging and Ailing Relatives

David's absence will significantly alter the structure of his extended family, as dozens of aunts, uncles, and cousins have come to rely on his leadership and generosity to keep them close. With David at the helm, the Gentile family has both grown in number and closer to one another. The Gentile family's holiday gatherings include everyone David can fit into his home—above and beyond blood relations. ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████ and the Gentiles happily take them in on weekends, school breaks, and for the holidays. Kehinde Adenle, a friend of James, has celebrated four Thanksgivings with the Gentiles. Ex. A-47. Maad AlKadhim, a friend of Chiara's, celebrated the holidays with the Gentiles at David's insistence and describes his "generosity and inclusion" as the "norm and the way he treats all those who become a part of his or his children's circle." Ex. A-48. David truly is the glue "keeping [the] family together." Ex. A-26.

David's leadership within his family also entails a great deal of responsibility. ████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

[REDACTED] She treasures the time she spends with David: "Life without David is impossible for me to comprehend. Not having him during these precious years of mine and my husband's lives would be beyond devastating for us." Ex. A-6.

His commitment to the senior members of his family extends beyond his parents. [REDACTED] David's dedication to his elderly relatives is well-recognized within his family, including by his brother, [REDACTED] Removing David from each of their lives would immeasurably darken their sunset years.

### E. David's Kindness to Friends and Care for the Community

Beyond his dedication to his close-knit family, David shows kindness in all facets of his day-to-day life. His friends and family recognize him as someone to lean on for both emotional and practical support—in ways both big and small. In every community David has touched, he has become the trusted resource, whether it means fixing someone's tire, Ex. A-30, rounding up his sons to help a friend move, Ex. A-18, helping a local priest buy a car, Ex. A-56, [REDACTED]

In fact, since David was a teenager, he has also made it his mission to help family, friends, and colleagues facing serious illness and grief. David's friend, [REDACTED]



Even as David coped with his own imminent trial, he supported loved ones through their grief.

considers David a "true friend—not looking for anything" in return. Ex. A-14. David can always be counted on for his empathy toward others, even when he is facing his own considerable challenges.

David truly has gone above and beyond for friends and family members facing overwhelming hardship.

David is a genuine, decent, caring human being who stepped up and into our lives when he didn't have to and it is a characteristic that is so rare to find these days. I feel so lucky and blessed to call him family and honestly, he may have just saved our lives from utter despair. Ex. A-10.

and despite having just been convicted by a jury in this case less than two months before,

## F. David's Generosity and Charitable Work

Since he was a teenager, David has always prioritized giving back to his family and community. David's charity ranges from the everyday, "guiding an elderly hand across the street," to dedicated charitable sponsorships. Ex. A-4. His good deeds are done with the belief that "the kindness and respect that everyone deserves . . . [are] what he expected in return," and those close to him count generosity as one of David's fundamental principles. Ex. A-59. David encourages his

family and friends to uphold the same commitment; his godson, Carmelo Cataudella, emphasizes that "David always reinforced the idea that service to others is the highest form of self-expression." Ex. A-12. His friend, Lex Heslin, fondly recalls how when he and David "would have lunch at his local diner, you could see the manager and server's eyes light up as he called them by name and asked about their families . . . . he always listened to others' opinions and was never the center of attention." Ex. A-63. David's charity reflects his belief in treating everyone like a member of his own family and looking after them just the same.

David is the person others naturally consult in challenging times.



David's nephew, David Bocchi, reports that "David helped so many businesses and the corresponding employees. . . . Whether it was the local pizzeria that needed to find an interim solution to stay open, or the firefighters at Christmastime that needed a champion to spearhead their children's toy drive, David was a 'go-to' community leader to call upon." Ex. A-19.

David also uses his entrepreneurial background to elevate others and strives to empower everyone in his community to succeed.

His friend, Scott Chichester, recounts that David's "inclination is to find a way to help all those he meets, and [he] ha[s] seen him help numerous people with the expectation of nothing in return." Ex. A-39. He is always ready to take on acts of kindness to improve others' lives and commits to seeing them through.

David also supports wide-reaching causes, including Youth for Human Rights, the Citizen's Commission on Human Rights, Drug Free World, Ex. A-12, and Operation Restore Sight. Ex. A-46. These donations are consistent with David's private acts of kindness.

But David's kindness does not just extend to his family. David's wife, Joanne, fondly recalls how on one of their first dates, David stopped to buy sandwiches and bagels for an elderly homeless individual they had passed on the sidewalk, Ex. A-1, and his cousin, Sabrina Cataudella, remembers a similar, simple act of kindness from David when he "wanted to know if [a homeless] man was hungry or thirsty and offered to buy him a meal." Ex. A-20. David's generosity persists despite the precariousness of his own current financial circumstances. Ex. A-55. At the end of the day, David's charity has never been confined to his level of financial prosperity—generosity is his way of life regardless of his own circumstances.

### G. David Is a Thoughtful and Reliable Businessman

David extends his values and leadership to how he conducts business, maintaining tight-knit friendships with several of his partners. David's friend, Matt Judkin, related that when he met David in 2014 he "found him to be warm, sincere and a straight shooter." Ex. A-9.



Likewise, one of David's accounting clients, [redacted] emphasizes that he "developed a bond of great trust and confidence in David" and that he "noticed at that time, and still know to be true, is that David has never made a decision to solely benefit himself. He unquestionably is always looking out for others and his investors." *Id.*

Likewise, [redacted] that David always advocated for them and performed the best work he could. [redacted] stressed that he never had "cause to be concerned about the degree to which [he] could trust David," and emphasizes that [redacted] Mr. Weber emphasizes David's "integrity" and "earnestness." *Id.*

That is because David has a personal commitment to his businesses' success. Former GPB employee, Evan Myrianthopoulos, recalls that, during his time running the Debt Strategies division for H1 and H2, one portfolio company suffered significant financial stress. To aid in the company's recovery, David personally loaned $2.32 million to the company, preventing what would have been an imminent foreclosure and a 100% loss for H1 investors. Ex. A-17. David extended additional loans to other H1 portfolio companies years after he stopped collecting management fees because he truly believed in their ability to be fruitful investments. *Id.* Indeed, David's sincere belief in GPB's success was apparent to Kenneth Alberstadt, a partner at Akerman LLP who represented GPB Capital in certain mergers and acquisitions. Ex. A-21. Kenneth understood that David "seeks in all of his business ventures to build something valuable and to create a legacy that he and those working for him can be proud of." *Id.* David maintains a philosophy of service both close to his heart and at the core of his career and has been willing to put himself on the line for it.

David's commitment to his employees extended beyond the workplace. After an accounting employee's fatal heart attack, David immediately offered the widow his "reassurance that he would help take care of her and her family" and followed through on his word by providing financial support to her family. Ex. A-1. And this is not an isolated act of kindness by David. His longtime friend, Christos Vasakiris, remembers years ago when he told David that a woman in his building "did not have the money to bury her [very young] son" that "David, upon hearing this without even stating a word reached into his pocket, pulled out all of the money in his money clip and gave it to [Christos] to put toward" the burial collection." Ex. A-38. Christos says that he "never forgot that act of pure kindness, indeed for someone [David] did not even know." *Id.*

## II.   THE OFFENSE CONDUCT

At trial, the Government focused on statements made by certain individuals at GPB and Ascendant Capital LLC ("Ascendant") regarding the performance of the GPB Funds. The Government argued that David, in his role as the CEO at GPB, was responsible for broker dealers and investors not having full and accurate information about the GPB Funds' performance and the source of funds used to pay investor distributions. The Government did not, nor did it even attempt to, prove that investors suffered losses. *See* Section III.A. Instead, at most, the harm to investors

according to the Government was the deprivation of clear disclosures in various offering documents and in marketing materials communicated to investors (through their broker dealers and financial advisors).

## III.    THE SENTENCING GUIDELINES

The Court has wide latitude to vary from the Guidelines based upon the factors enumerated in 18 U.S.C. § 3553(a) to ensure that the punishment "fit[s] the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 488 (2011). This Court should exercise that discretion here.

The PSR calculates an advisory Guidelines Offense Level of 43[2] and recommends a Guidelines sentence of 1,020 months, tempered only by the statutory maximum for securities and wire fraud, which is 20 years' imprisonment. This draconian Guidelines range is largely the result of the 24-point § 2B1.1 loss enhancement. *See* PSR ¶¶ 16, 24. For the reasons explained in detail below, the PSR is incorrect, because the Government has not proven any losses at all, let alone any losses caused by misstatements made by David or others at GPB and Ascendant. *See* Section III.A. The PSR is also incorrect in applying enhancements for an offense involving ten or more victims, sophisticated means, investment advisor, abuse of a position of public or private trust enhancement, and leadership and improperly does not apply a zero-point offender reduction. *See* Sections III.B, C. The PSR further contains numerous errors and omissions, which are detailed in the objections attached as Exhibit H ("Letter Objections"), and are incorporated herein.[3]

### A. <u>No Enhancement Under Section 2B1.1(b)(1) Is Appropriate Because the Government Failed to Establish that Any Investor Sustained Losses Caused by the Offense Conduct</u>

The Government, not the defense, bears the burden of establishing loss under U.S.S.G. § 2B1.1(b)(1). The Government is not entitled to a punitive loss finding, and loss is not required to sentence David. *See, e.g.*, *United States v. Moran*, 2024 WL 2577970, at *3 (E.D.N.Y. May 24, 2024) (finding $0 in loss where the government had "not met its burden"). Indeed, courts have described the Guidelines' enhancement as "bonus punishment points" that the government must "earn." *United States v. Schneider*, 930 F.2d 555, 559 (7th Cir. 1991); *see also, e.g.*, *United States v. Free*, 839 F.3d 308, 323 (3d Cir. 2016) (same).

The PSR, which adopts the Government's position on loss,[4] states that investors in the GPB

---

[2] David does not contest Probation's determination that the base offense level guideline is U.S.S.G. § 2B1.1 and results in a base offense level of 7. The proposed enhancements fail to meet the requirements in the Guidelines or are otherwise incorrectly applied. Assuming the Court declines to apply any aggravating role enhancements, David is eligible for a two-point reduction because he has no criminal history and meets the criteria listed in U.S.S.G. § 4C1.1(a). Thus, the base offense level of 7 should be reduced, resulting in a total adjusted offense level of 5 and a correct Guidelines range of 0–6 months.

[3] David respectfully requests that the Court provide him an opportunity to revise the Letter Objections, if necessary, after the Court issues its rulings on each of his pending motions under FED. R. CRIM. P. 29 and 33.

[4] Although not clear from the PSR, the Government informed David's counsel via email on January 12, 2025 that the loss figure in paragraph 16 of the PSR was provided to Probation by the Government and "[t]he back-up for this number is Mr. Petron's testimony and GX-6200, specifically slides 4, 11 and 18." Despite the Government bearing the burden on loss, David is in this unusual procedural posture of having to dispute an argument that the Government has yet to brief based on nothing more than a sentence in the PSR due to the schedule set by the Court over Defendants' objection. David respectfully reserves the right to seek additional time and/or pages for his reply should the Government's brief contain new facts or arguments in support of the theory of loss articulated in the PSR. *See United States v. Romano*, 825 F.2d 725, 728 (2d Cir. 1987) ("Due process requires that a defendant be given an opportunity to assure the accurate presentation of reliable sentencing information to the district court.").

Funds suffered $97 million in actual losses.[5] This $97 million, according to the Government, is the amount transferred "from the investment capital accounts of [H1, H2, and AP] to their respective distribution accounts to fund the 8% annual distributions to the investors." PSR ¶ 16. Per the Government, this figure is supported entirely by the trial testimony of its non-expert, summary witness, Michael Petron.

At trial, the Government offered Mr. Petron's testimony to establish the falsity of statements about distributions being fully covered by funds from operations and expressly disclaimed that it was offering any evidence of loss at trial. *See, e.g.*, Tr. 34:17–23. The Government stated it was not alleging loss because it *did not know* if any investor actually lost money. *See* Tr. 36:9–11. The Court should take the Government at its word that no evidence of loss was offered at trial and reject the Government's attempt to repurpose Mr. Petron's flawed analysis, which was thoroughly impeached at trial, as a loss calculation. *See* Tr. 6126:25. Given that the Government has failed to come forward with any other evidence of loss—indeed the time for it to object to the PSR has long passed[6]—the Government has failed to meet its burden, and no enhancement under Section 2B1.1(b)(1) is appropriate.

Even if the Court were to accept the Government's recharacterization of Mr. Petron's flawed analysis as a loss calculation, it fails to establish any loss at all. As detailed below: (i) using investor capital to fund distribution payments does not constitute "losses" under Section 2B1.1; and (ii) any purported harm that resulted from GPB paying investors $97 million in distributions, even if those distributions were paid from investor capital (which the Government has not proven), does not constitute loss caused by the Offense Conduct. Accordingly, the Government has completely failed to establish loss.

### 1. Investor Capital Included in Distribution Payments Does Not Constitute an "Actual Loss"

To justify the 24-level enhancement under Section 2B1.1(b)(1), PSR ¶ 29, the Government must prove that GPB's investors sustained actual, monetary losses equal to $97 million. U.S.S.G. § 2B1.1(b)(1)(C)(i), (iii) (defining "actual loss" as the "reasonably foreseeable pecuniary harm that resulted from the offense," and "pecuniary harm" as "harm that is monetary or that is otherwise measurable in money"). The PSR, however, fails to explain how $97 million of investor capital purportedly ***paid back*** to investors in distribution payments constitutes a monetary harm suffered by the GPB Funds' investors. There is no interpretation of this "loss" that supports such a conclusion.

*First*, every dollar of the Government's $97 million purported loss figure represents a dollar that was *paid to* investors, not money that was "unlawfully taken" from investors. U.S.S.G. § 2B1.1, cmt. n.3(B)(i); *see also United States v. Constantine*, 762 F. App'x 16, 19 (2d Cir. 2019) (explaining that any loss estimate should consider the value of property "unlawfully taken"). The Application Notes to Section 2B1.1 explicitly state that "[t]he money returned . . . by the

---

[5] Although the PSR is silent as to whether these are "actual" versus "intended" losses, it is indisputable that Probation is referring to purported actual losses. Probation recommends that restitution be ordered in the same amount, and "a restitution order must be tied to the victim's actual, provable, loss," not intended loss. *United States v. Zangari*, 677 F.3d 86, 91 (2d Cir. 2012). Further, as discussed in Section V.A.4, there is no evidence that David intended that any of GPB's investors lose money to support a finding of any intended loss (let alone $97 million in intended losses).

[6] The Government failed to serve any objection to the PSR and has thus waived the ability to advocate for a different loss amount. *See* FED. R. CRIM. P. 32(f)(1) (stating that the "parties" must serve objections within 14 days of receiving the PSR, *i.e.*, January 16, 2025); *see also* FED. R. CRIM. P. 32(i)(D) (allowing late objections only for "good cause").

defendant . . . to the victim before the offense was detected" must be excluded from the loss calculation. U.S.S.G. § 2B1.1, cmt. n.3(D)(i). There is no authority that supports defining loss as the amount of money paid *to* victims.[7]

*Second*, to the extent the Government tries to argue that this $97 million constitutes a loss because it represents money taken from new investors to pay old investors, there is neither legal nor factual support for this conclusion. The amount and source of funds *paid* to investors via distribution payments is legally irrelevant to the loss calculation. The Application Notes to the Guidelines state that, even under a classic Ponzi scheme in which a defendant uses funds from one investor to pay another without any legitimate business operations (which the Government has not alleged here), money that investors received—regardless of source—must still be subtracted from the total loss amount up to the amount of that investor's principal investment. *See* U.S.S.G. § 2B1.1 cmt. n.3(E)(iv) (explaining that one investor's gains cannot be used to offset *another's* losses). In other words, even where there is an actual Ponzi scheme conviction—which is not the case here—money paid to investors simply does not constitute an "actual loss."

This theory of loss is also unsupported by the facts. There is no evidence in the record that new investor capital was used to pay existing investors. To the contrary, the Government elicited testimony over and over at trial that investors were being repaid their *own* capital, rather than capital from other investors.[8] Repayment of an investor's own capital is specifically required by the GPB Funds' private placement memoranda, which govern the order of priority of "distributions of cash as it's [sic] available" and provide that distributions must first be paid to the GPB Funds' investors until they "have received (when aggregated with all previous distributions to the LPs) all of their respective net capital contributions." *See, e.g.*, GX-8258-B-044; GX-8219-B-014; GX-4065-011. In other words, distributions were in fact a return of each individual investors' own capital, and GPB investors expressly agreed to this treatment when they invested in the GPB Funds. Thus, this is neither a legally nor factually cognizable theory of loss.

*Third*, to the extent the Government attempts to argue that this $97 million constitutes losses because investors "lost" $97 million in illusory profits—*i.e.*, investors believed that this money was a distribution of profits when it was instead a return of capital—there is explicit legal authority to the contrary. The Application Notes to the Guidelines specifically exclude from loss "[i]nterest of any kind . . . [and] amounts based on an agreed-upon return or rate of return," U.S.S.G. § 2B1.1, cmt. n.3(C)(i), and the Second Circuit has interpreted this to mean that any "promised interest or return that was never received" does not constitute either an intended or actual loss under the Guidelines. *United States v. Hsu*, 669 F.3d 112, 120–21 (2d Cir. 2012) (finding that such "invented" losses could not be included in even intended loss calculations unless they

---

[7] While some courts have refused to *credit* losses for money returned to victims when "the return of money as interest or other income [was] necessary for the scheme to continue," *United States v. Carrozzella*, 105 F.3d 796, 805 (2d Cir. 1997), this authority is explicitly rejected by the Sentencing Commission in its 2001 amendments to the Guidelines. *See, e.g.*, *United States v. MacCallum*, 2018 WL 2999907, at *9, n.15 (W.D.N.Y. June 15, 2018) (describing how the 2001 amendment to the Guidelines explicitly stated that it was resolving a circuit split regarding "whether and how to credit payments made to victim" and rejected the Second Circuit's approach as expressed in *Carrozzella*); *see also, e.g.*, *United States v. Snelling*, 768 F.3d 509, 514–15 (6th Cir. 2014). Even if these cases refusing to credit losses were still good law (which they are not), they define loss as "*the amount of property taken*, even if all or part has been returned." *Carrozzella*, 105 F.3d at 805 (emphasis added). The issue is whether amounts returned should be subtracted from money taken from investors. These cases do not support defining losses as solely the amount returned.

[8] *See, e.g.*, Tr. 224:25 (investor Marvin Jones testifying that he was being paid distributions "with his own money"); Tr. 6904:23–25 (Government rebuttal explaining that investor account statements should have reflected that investors were "being paid their own money back").

13

were reinvested into the fund).

*Finally*, to the extent the Government attempts to argue that the $97 million paid to investors constitutes "actual losses" because these payments reduced the value of the GPB Funds by $97 million, there is neither factual nor legal authority to support such a conclusion. At worst, the $97 million paid to investors resulted in a wash for investors—they received as much as the GPB Funds "lost"—and individuals who "break even on their investments are not victims" under the Guidelines. *United States v. Orton*, 73 F.3d 331, 334 (11th Cir. 1996). At best, this was a net positive for investors. As the Government's investor witnesses testified at trial, "paying money back to you actually . . . de-risks your investment." Tr. 347:1–11 (Mr. Jones testifying that there are "less dollars at risk" when capital is paid in distribution payments).

Any finding that this $97 million in value would still have been in the Funds but for the fraud requires the Court to assume that GPB would have invested this money and that such investment would have resulted in profit. But this assumption is nothing more than speculation, and "[i]n determining a loss amount for purposes of Guidelines calculation, a district court's findings must be grounded in the evidence and not derive from mere speculation." *United States v. Coppola*, 671 F.3d 220, 249 (2d Cir. 2012). Like any investment, profit in the GPB Funds was not guaranteed. Indeed, every investor in the GPB Funds certified their understanding that their investment was a "highly speculative investment[] which involve[d] a high degree of risk of loss of the entire investment," Tr. 539:23–540:4. By receiving the distributions on a monthly basis after making their initial investments, investors also benefited from the time value of money. *Taylor v. Fed. Aviation Admin.*, 351 F. Supp. 3d 97, 102 (D.D.C. 2018) ("money available today is worth more than the same amount of money in the future"). Because investors benefited from receiving their capital back and having the ability to use and invest that money, there can be no finding of loss. *See, e.g.*, U.S.S.G. § 2B1.1(b)(1)(C)(i) (requiring a finding of "harm").

For all of these reasons, the Government failed to meet its burden to establish any "actual losses" under the Guidelines and, thus, no enhancement for loss is appropriate.

## 2. The Record Does Not Support a Finding that the Offense Conduct Was the But For Cause of the Losses Described in the PSR

Even if any amount of investor capital paid back to investors qualified as a "loss" under the Guidelines (and, as detailed above, it unequivocally does not), the evidence does not support a finding by a preponderance of the evidence that these losses "resulted from the" Offense Conduct, as required by the Guidelines' definition of "actual loss." *See* U.S.S.G. § 2B1.1(b)(1)(B)(C)(i) (defining "actual loss" as the "reasonably foreseeable pecuniary harm that *resulted from the offense*" (emphasis added)). For harm to have "resulted from the offense," it must have been both the factual (or "but for") cause *and* the legal (or "proximate") cause of the harm.[9] To establish "but for" causation, the Government must establish that, but for the fraud, the investors identified as victims in the PSR would not have invested in the GPB Funds. In other words, the Government must establish that any investors relied on the accuracy of any false statements that distributions were "fully covered" in deciding whether to invest. *See, e.g.*, *United States v. Ebbers*, 458 F.3d

---

[9] *See* U.S.S.G. app. C, Vol. II at 178, Amend. 617 (U.S. Sentencing Comm'n 2003) (the definition of "actual loss" in § 2B1.1 "at a minimum, requires factual causation (often called 'but for' causation) and provides a rule for legal causation (*i.e.*, guidance to courts regarding how to draw the line as to what losses should be included and excluded from the loss determination)."); *see also, e.g.*, *United States v. Stein*, 846 F.3d 1135, 1152 (11th Cir. 2017) (actual loss under Section 2B1.1 requires a showing of both factual and legal causation); *United States v. Evans*, 744 F.3d 1192, 1196 (10th Cir. 2014) (same); *United States v. Peppel*, 707 F.3d 627, 643–44 (6th Cir. 2013) (same).

110, 126–27 (2d Cir. 2006) (recognizing that causation under Section 2B1.1 requires a finding of "express reliance on the accuracy of the [fraudulent] financial statements").[10] Here, the record does not support a finding by a preponderance of the evidence that the Offense Conduct was a "but for" cause of the $97 million in alleged "harm" to investors.

Courts have discussed two different ways the government can establish reliance: (i) "direct evidence that each individual investor read the false information and relied on it when deciding to [invest]" or (ii) "specific circumstantial evidence from which the district court may reasonably conclude that all of the investors relied on the defendant's fraudulent information." *Stein*, 846 F.3d at 1153–54. Neither form of evidence exists here.

There is no direct evidence to support a finding of but for causation for every one of the 15,460 investors identified as victims in the PSR. PSR ¶ 24.[11] Despite outreach to 4,320 of these investors, only *two* submitted affidavits of loss (which David has not seen, despite repeated requests to Probation) and *none* submitted a victim impact statement. *Id.* Individualized proof of reliance for each of the 15,460 investors simply does not now exist and, given the very low response rate, is unlikely to ever exist.

There is also insufficient circumstantial evidence of but for causation for every investor identified as a victim in the PSR. *First*, although the Government elicited testimony from a handful of witnesses that they "would not have invested" had they known "prior to investing" that distributions could include investor capital, *see, e.g.*, Tr. 183:16–21, evidence of but for causation for a few investors is insufficient to support a finding of reliance for "all" investors. *See Stein*, 846 F.3d at 1154 (finding evidence that two victims relied on fraudulent statements insufficient to support a finding of reliance for "all 2,415 investors"). The circumstantial evidence here is particularly weak and unreliable because one of these same witnesses—Jay Frederick—testified that he invested *only after* he was told that distributions had not been fully covered. Tr. 573:5–574:1, 644:24–645:16.

*Second*, several additional investors affirmatively stated that they invested knowing investor capital could be or already had been included in distribution payments. Indeed, two such investors submitted letters on David's behalf urging this Court to order a lenient sentence. ███████

████████████████████████████████████████████████████████████████████████████

███████ Further, financial advisor Matthew Crafa testified that he advised his clients to invest only after he saw "in black and white" that distributions were not covered by net investment income. Tr. 1796:2–8; 1797:24–1798:4.

*Finally*, the Government is counting as "losses" investor capital that was purportedly paid to investors who made the decision to invest *before* any allegedly false statements were even made.

---

[10] *See also, e.g.*, *United States v. Marino*, 654 F.3d 310, 322 (2d Cir. 2011) (finding cause in fact established where "[b]ut for appellant's role in affirmatively concealing [a Ponzi scheme], these investors would certainly not have invested in" the fund and suffered losses); *see also, e.g.*, *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (stating that "but for" or "transaction" causation "is akin to reliance" and requires a finding that "but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction") (internal quotation marks and citation omitted).

[11] The PSR does not provide the support for this number and does not define who constitutes a victim. Indeed, it appears to include more than the total number of investors for the GPB Funds. *See* Ex. B at 6–8.

However, these thousands of investors chose to invest at a time when, even by the Government's version of events, distributions were fully covered by operations and the offering documents stated that investor capital *could* be included in distributions going forward. In fact, all of H1's nearly 2,000 investors invested before the Government even alleged that any of the GPB Funds were under covered.[12] Similarly, both H2 and AP had already been raising capital from investors for two years before the Government alleges each fund stopped covering distributions.[13] An investor cannot base an investment decision on a fraudulent statement that has not yet been made, and courts have found reliance lacking when the decision to invest pre-dated the fraud. *See, e.g.*, *KDH Consulting Grp. v. Iterative Cap. Mgmt. L.P.*, 528 F. Supp. 3d 192, 204 (S.D.N.Y. 2021) (finding that an investor "cannot rely on misrepresentations or omissions that postdate its investment").

Moreover, that these investors may have relied on later misstatements about coverage in deciding not to redeem is irrelevant to sentencing. The Second Circuit has explicitly held that "persons who were neither buyers in reliance on a defendant's material misrepresentation/omission nor sellers at all, but rather were persons who simply held their stock until it became worthless" are not "victims" for purposes of sentencing, and any losses they sustained as a result of their investment were not caused by the fraud. *United States v. Reifler*, 446 F.3d 65, 136–37 (2d Cir. 2006).[14] The trial record is clear that GPB investors did not have the right to redeem or sell their shares. *See, e.g.*, GX-8258-B-011; Tr. 276:24–277:5 (testimony from Mr. Jones confirming that he understood that investors had no right to redeem their investment). Thus, any losses sustained by investors who invested before alleged misstatements were made cannot be considered in calculating loss.

Accordingly, the Government has failed to establish that the Offense Conduct for which David was convicted was a but for cause of the $97 million it alleges in actual losses, and, having failed to meet its burden, no enhancement is appropriate under Section 2B1.1(b)(1).

**B.** **This Court Should Not Apply Enhancements for Ten or More Victims, Sophisticated Means, Investment Advisor, Abuse of a Position of Public of Private Trust, or Leadership Role**

Enhancements for (i) ten or more victims; (ii) sophisticated means; (iii) investment advisor; (iv) abuse of a position of public or private trust; or (v) leadership role would also be inappropriate in this case for the reasons set forth in the Letter Objections at ¶¶ 24, 29–34, 49–54, attached as Exhibit H, which are incorporated herein.

**C.** **This Court Should Apply the Two-Level Reduction for Being a Zero-Point Offender**

The two-level reduction for being a zero-point offender should be applied for the reasons set forth in the Letter Objections at ¶ 58, attached as Exhibit H, which are incorporated herein.

---

[12] *See* Ex. B at 6 (reflecting 1,989 limited partners in H1); GX-5068-B-009 (indicating H1 closed to new investors in July 2015); Indictment ¶ 23 (stating H1 was under covered as of September 2015).

[13] *See* GX-5068-B-009 (indicating that AP and H2 were formed in May 2013 and April 2015, respectively); Indictment ¶ 23 (stating that AP and H2 were under covered as of August 2015 and April 2017, respectively).

[14] Although *Reifler* involved losses under the Mandatory Victims Restitution Act, the Second Circuit has held that where, as here, the Guidelines' loss calculation is limited to actual losses, the restitution and Guidelines' analyses of loss are generally the same. *See, e.g.*, *United States v. Sullivan*, 118 F.4th 170, 228 n.35 (2d Cir. 2024).

## IV.    IF THE COURT ACCEPTS THE PSR'S GUIDELINES CALCULATION, A DRAMATIC DOWNWARD VARIANCE IS WARRANTED

As explained in Section III, the Court may not "presume that a Guidelines sentence is reasonable," *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*) and where, as here, the circumstances of an offenses are not adequately taken into consideration, a variance from the relevant Guidelines is appropriate based on "an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 47 (2007) (holding that "extraordinary" circumstances need not be required to "justify a sentence outside the Guidelines range" and rejecting "the use of a rigid mathematical formula"). If the Court accepts the PSR's Guidelines calculation of offense level 43, *see* PSR ¶ 59, there are at two grounds for variance here.

### A.    The Offense Level Overstates the Seriousness of the Offense Conduct

The Guidelines offense level and, in particular, the impact of the PSR's loss calculation on that offense level, dramatically overstate the seriousness of the Offense Conduct at issue here. Courts, academics, the American Bar Association, and even the Sentencing Commission have recognized that the Guidelines' draconian loss table, which governs David's loss calculation, "was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices" but in response to national media attention on infamous frauds. *United States v. Corsey*, 723 F.3d 366, 379 (2d. Cir. 2013) (Underhill, J, concurring) (citation omitted).

More and more courts within this Circuit are recognizing that the policy (or lack thereof) behind the loss enhancement table is wrong. Judges have criticized the loss enhancement Guidelines as:

- "Patently absurd on their face." *Adelson*, 441 F. Supp. 2d at 515 (Rakoff, J.).

- A "black stain on common sense." *United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008) (Block, J.).

- "Broken," leaving judges "without meaningful guidance in high-loss cases." *Corsey*, 723 F.3d at 378 (Underhill, J.).

- "Mindless acceleration." *United States v. Faibish*, 2015 WL 4637013, at *2 (E.D.N.Y. Aug. 3, 2015) (Vitaliano, J,).

- "[L]ead[ing] to a patently absurd sentence." *United States v. Johnson*, 2018 WL 1997975, at *4 (E.D.N.Y. Apr. 27, 2018) (Garaufis, J.).

Rather, the astronomical Guidelines ranges for high-loss offenses are a symptom of the Guidelines' attempt to reduce complicated offenses into numerical terms. This "fetish with abstract arithmetic," *Adelson*, 441 F. Supp. 2d at 512, uses loss as a proxy for culpability—often leading to unjust outcomes. While the Guidelines place an enormous weight on this single factor, in many cases the amount at issue "is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence." *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (Lynch, J.).

Those concerns are manifest here where, should the Court accept the PSR's guidelines calculations, David faces a total offense level of 43—a level identical to the base offense level for first-degree (premeditated) murder, which would produce a sentence over *four times* the average sentence imposed on a career offender convicted of murder in 2005. *See Adelson*, 441 F. Supp. 2d at 509 ("An offense level of 55 is a level normally only seen in cases involving international narcotics traffickers, Mafia dons, and the like. How could it possibly apply here?"). As Professor

17

Frank Bowman, a leading commentator on sentencing issues, has noted:

> While corporate fraud is certainly a serious offense, it is hard to argue that it is more serious than murder and several orders of magnitude more serious than armed robbery. In 2005, the average sentence actually imposed on a robber with no prior criminal record was 57 months, or less than 5 years. Even robbers who were also Criminal History Category VI career offenders (meaning they had roughly five prior felony convictions) received an average of only 168 months, or 14 years. The average sentence for all murderers regardless of prior criminal record was less than 19 years. And in 2005, the mean sentence imposed on murderers who were also career offenders was 297.5 months, or just shy of 25 years.

Frank O. Bowman, III, *Sentencing High–Loss Corporate Insider Frauds After Booker*, 20 FED. SENT'G REP. 167, 169 (2008). These same concerns warrant a dramatic downward variance if Probation's proposed Guidelines calculations are accepted.

Indeed, David is a first-time offender. He created a novel business model designed to benefit a whole new class of investors, by providing them with access to the private equity industry and deleveraging their investments with monthly distribution payments. Critical to the Court's analysis of the seriousness of this offense is recognizing that the very heart of the fraud alleged by the Government was explicitly disclosed to investors. That is, certain inaccurate disclosures that allegedly ultimately confused investors about what funds were used to pay distributions must be balanced in sentencing by the quarterly and annual reports that reported exactly whether distributions were being covered *and* the core governing documents that forewarned investors about that possibility. *See* Section V.A.2(b). This is a far cry from the scandals that led to the current draconian Guidelines loss table—each of which involved repeated conduct designed to hurt investors, wanton violations of clear industry practice, and vast financial upside for those involved—and certainly does not justify comparable treatment under the Guidelines. *See United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) ("Where the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence.").

## B. A PSR Guidelines Sentence Would Represent Cruel and Unusual Punishment

The Eighth Amendment prohibits as "cruel and unusual punishment" "a severe punishment that is patently unnecessary." *Furman v. Georgia*, 408 U.S. 238, 281 (1972). Here, the proposed Guidelines sentence amounts to a severe punishment that is patently unnecessary and warrants a downward variance. In addition to the loss enhancement, the proposed Guidelines offense level incorporates other enhancements that are similarly divorced from any type of logic. The loss table is accompanied by a host of specific offense characteristics for which "the [Sentencing] Commission has never explained the rationale . . . why it has elected to identify certain characteristics and not others, or the weights it has chosen to assign to each identified characteristic." *Adelson*, 441 F. Supp. 2d at 510. When added together, these enhancements lead to "the kind of piling-on of points for which the guidelines have frequently been criticized." *Parris*, 573 F. Supp. 2d at 745.

*   *   *

At bottom, even if the Court accepts Probation's proposed enhancements (which it should not), the Court should substantially vary from them.

18

## V.    A NON-CUSTODIAL SENTENCE IS APPROPRIATE UNDER 18 U.S.C. § 3553(a)

Section 3553(a) requires that a sentence be "sufficient, but not greater than necessary" to satisfy the four permissible goals of sentencing: "just punishment, deterrence, the protection of the public, and rehabilitation." *Dean v. United States*, 581 U.S. 62, 67 (2017). The Court must consider the Section 3553(a) factors in the aggregate and not in isolation.

As set forth below, the Section 3553(a) factors, both individually and collectively, warrant a downward variance to a non-custodial sentence for David in light of the nature of the offense, the lack of any need for specific deterrence, the availability of other sentences, the relevant Guidelines, *see* Section III, the need to avoid sentencing disparities, and the overwhelmingly positive record detailing David's character and personal history.

### A.    <u>The Nature and Circumstances of the Offense Conduct Weigh in Favor of Lenience</u>

Without minimizing the seriousness of the Offense Conduct for which David was convicted, the circumstances of the offenses, even as characterized by the Government, do not warrant an incarceratory sentence. The nature of the Offense Conduct is quite distinct from scenarios in which courts order incarceration, such as where a defendant created a fraudulent business model and acted from the start to defraud investors with no regard for their interests.[15] David never set out to commit a crime. *See* Section V.A.1. Indeed, GPB operated for years before any of the Offense Conduct is alleged to have occurred and continued to manage several funds with the same model even during the relevant time period that are not part of the Offense Conduct. And, but for the alleged inaccurate statements about the source of investor distributions in certain disclosures, there was nothing illegal about the GPB business model that David created and implemented. Critical to the Court's analysis is understanding that David legitimately believed that GPB's strategy would prove successful for investors. To this day, he continues to advocate in support of those investors, including by encouraging GPB to pay out distributions that have been held at bay by the court-imposed monitor and now receiver.[16]

Far from a Bernie Madoff-esque Ponzi scheme, the nature of David's offenses reflect a well-intentioned man who genuinely believed in the success of the GPB Funds, but who got in over his head with the explosive growth of his business and ultimately failed to ensure that investors had consistent, accurate disclosures over the course of three years.

### 1.    **David Set Out to Build a Novel Business in the Private Equity Industry**

#### (a)    <u>The Origin of GPB</u>

David founded GPB in March 2013 based on the seed idea of expanding access to private equity for individual investors through the acquisition of small privately held businesses, like those he advised as an accountant. To compensate for his lack of experience with private equity or managing an investment fund, David relied heavily on subject-matter experts in the industries GPB targeted for investments (including one of his accounting clients, Jeffrey Lash, who had expertise in automotive dealerships). GPB was unique at the time in the private equity sphere because it

---

[15] The motion recently filed by the court-appointed Receiver over GPB further supports the legitimacy of GPB's model and operations. *See* Ex. B at 22 (confirming the "Books and Records for each [GPB] Partnership . . . are materially accurate"), *id.* at 13 (reporting that "each component of the Receiver's review [of GPB management under David] has led him to conclude that GPB Capital did, in fact, respect the corporate form of each Partnership.").

[16] *See S.E.C. v. Ascendant Cap., LLC*, No. 23-8010 (2d Cir. Dec. 13, 2023), ECF No. 45.1 (citing numerous instances of David expressly supporting a distribution plan).

19

pioneered two transformative strategies: (i) consolidating established middle-market businesses (primarily in the automotive industry) to achieve scale and efficiencies and (ii) broadening access to investment opportunities for a different class of investors. Both strategies have since proven to be enduring and have been widely adopted within the private equity industry.[17] For instance, Morgan Stanley lowered its private equity investment minimums in 2016 to $250,000, and leading firms like Blackstone, Apollo, and KKR have since embraced strategies targeting smaller, accredited investors.[18] These shifts underscore that GPB was ahead of its time and leading the market in this space. As with any innovator, even one with a sound investment thesis like GPB, mistakes can easily be made as the business model was refined over time.

Indeed, the model was not without its hurdles—in the automotive industry in particular—which impacted the GPB Funds' ability to timely deploy capital raised from investors (and thus to generate a profit from that deployed capital, that it could distribute back to investors). See Tr. 3071:16–21 (testimony from Mr. Lash that "getting manufacturer approval . . . [could] take even more than six months."). But GPB and investors understood GPB's model was a long-term strategy that would hopefully pay out on the back end.

(b) GPB's Rapid Growth and Evolution of Internal Controls and Compliance

GPB's novel investment strategy garnered a lot of attention. And from 2015 through 2018, GPB grew much faster than expected, raising about $1.8 billion in investor capital from approximately 17,000 investors across GPB, including the three at issue here. GPB ultimately acquired over 160 businesses with an employee headcount of approximately 6,000 people by the end of this period. As the business expanded in scale and complexity, David encountered challenges typical of a fast-growing, early-stage company: increased competition, intracompany disputes, and an evolving regulatory landscape that required a great deal of learning as they grew.

Historically, private equity funds operated with minimal direct oversight from government agencies, which resulted in inconsistent disclosures and conflicts of interest. Under new guidelines introduced in 2015 and 2016, private equity firms faced heightened reporting and compliance obligations from the SEC.[19] This transformatory period compelled the private equity industry to refine its practices to align more closely with established standards for other investment advisers. Many industry-leading private equity firms, including Blackstone, KKR, and Apollo, faced fines and consent decrees as the SEC began enforcing these stricter standards.[20] These actions, all

---

[17] In subsequent years, the industry adapted, "propelling a wave of consolidation: large dealers are getting larger and smaller ones are exiting." Ed Newman et al., *Four Ways Private Equity Can Accelerate Returns in Automotive*, BOSTON CONSULTING GROUP (Feb. 9, 2020), https://www.bcg.com/publications/2020/four-ways-pe-can-accelerate-returns-in-automotive. *See also Global Private Equity Report* 7, GRANT THORNTON (2013), https://www.grantthornton.global/globalassets/1.-member-firms/global/insights/article-pdfs/2013/global_private_equity_report_2013.pdf (stating "[t]here remains a deep focus on driving value through business performance and finding companies where the growth is not linked just to arbitrage or market developments.").

[18] *Private Equity: An Important Alternative for Your Asset Allocation* 2, MORGAN STANLEY (2016), https://advisor.morganstanley.com/robert.duenner/documents/field/d/du/duenner-iii-robert-h/Private_Equity.pdf.

[19] *See e.g.*, Andrew Ceresney, Director, U.S. Sec. and Exch. Comm'n Div. of Enf't, Securities Enforcement Forum West 2016 Keynote Address: Private Equity Enforcement (May 12, 2016) (transcript available at https://www.sec.gov/newsroom/speeches-statements/private-equity-enforcement).

[20] *Blackstone Charged With Disclosure Failures*, U.S. SEC. AND EXCH. COMM'N (Oct. 7, 2015), https://www.sec.gov/newsroom/press-releases/2015-235; *SEC Charges KKR With Misallocating Broken Deal Expenses*, U.S. SEC. AND EXCH. COMM'N (June 29, 2015), https://www.sec.gov/newsroom/press-releases/2015-131;

handled solely as civil enforcement actions by the SEC, reflect the growing pains of an industry working to adapt to heightened regulatory expectations around investor disclosures.

David was not blind to the need for quality control and oversight over GPB's practices and hired many experienced professionals, both internally and externally, to oversee GPB's operations and improve its internal controls as the firm grew. Although GPB's procedures and resulting disclosures were not always perfect, David's inclusion of experienced professionals in the decision-making and compliance processes should be considered by the Court in assessing the circumstances surrounding the Offense Conduct because they reflect a genuine desire to operate a successful, legitimate business.

Ultimately, GPB's rapid growth made it challenging to ensure that it was always reporting accurate, up-to-date interim financial information to investors. For example, GPB's newly acquired, privately held portfolio companies did not always maintain up-to-date, organized financial records, which could create delays and errors in consolidating financials at the fund level. The growth also impacted GPB's timely revision of disclosures to reflect its current distribution practices, including those disclosures central to the Offense Conduct. But throughout the relevant period, David did act to update disclosures. *See* Tr. 2884:20–2885:5; Ex. C (DX-ZZT-4). And when GPB realized in 2018 that some PPMs and marketing materials were still reporting that GPB was not planning to use investor capital to pay distributions, GPB amended those disclosures to remove the outdated language. *See* GX-4047-030; GX-4015-025. David even returned and waived some of his own compensation when performance dipped, *see* Tr. 2915:7–12, so that investors would not feel the brunt of lagging performance. David's good-faith efforts to consistently improve GPB's processes and disclosures should weigh heavily in favor of a downward variance for sentencing.[21]

### 2. There is Nothing Inherently Unlawful About GPB's Business Model

Key to the Court's consideration of the nature of the Offense Conduct (and its distinction from cases in which incarceration is warranted) is understanding that there was nothing inherently wrong with GPB's use of uncovered distributions (*i.e.*, paying distributions that exceed the GPB Fund's income). The payment of uncovered distributions is both common in other types of alternative investments and was permitted by GPB's own offering documents, of which investors all certified their understanding. Thus, even under the Government's alleged scheme, the only harm alleged is inaccurate disclosure.

(a) <u>Return of Capital Distributions Are Acceptable in Alternative Investments</u>

When designing GPB's distribution model, David and his team specifically looked to comparable investment vehicles, including one called Real Estate Investment Trusts ("REITs")

---

*Apollo Charged With Disclosure and Supervisory Failures*, U.S. SEC. AND EXCH. COMM'N (Aug. 23, 2016), https://www.sec.gov/newsroom/press-releases/2016-165.

[21] After issues were raised about GPB's disclosures about distributions, David cooperated with regulatory investigations and directed internal changes to improve GPB's compliance operations. David instructed his team and outside counsel to fully cooperate with the SEC investigation, including producing over five million documents and delivering multiple presentations to the SEC and state regulators in response to their inquiries. Internally, David hired forensic accounting firms and independent investigators to review issues raised by the SEC. He also transformed GPB's corporate governance system, establishing an independent board of experienced directors (including one director who previously served in the SEC's Division of Investment Management) to increase oversight and decentralize decision-making authority. Ultimately, David voluntarily stepped down from his position as CEO of GPB with the hope that this move would also benefit investors in the near term.

that frequently pay uncovered distributions. A 2017 REIT industry report found that 30 of the 62 nontraded funds included in the report paid distributions that exceeded the funds from operations for 2017.[22] Simply put, even to the extent GPB paid any uncovered distributions, they were not aberrant within the alternative investment space, let alone unlawful.

The payment of monthly distributions was an intentional part of GPB's model. Monthly payments incrementally helped deleverage GPB investors' positions, further safeguarding their financial interests over time. Because GPB's investors received distributions through 2018 regardless of the GPB Funds' performance, investors had already recouped part of their investment and thus had a lower risk exposure than a typical private equity investor (whose entire investment would be retained by the fund unless and until there was a liquidity event). At trial, investors and broker-dealers testified that they understood that this distribution mechanism minimized their risk exposure. *See, e.g.*, Tr. 347:1–11.

Further, GPB Funds' distributions in the relevant period almost exclusively were funded at least in part by profits from the Funds' operations, thereby serving the dual purposes of passing on profits to investors while maintaining a predictable distribution amount regardless of interim performance.

(b) <u>GPB's Offering Documents Authorized GPB to Return Capital in Distributions</u>

The Offense Conduct is not of the nature requiring incarceration given the explicit disclosures GPB made to investors. David and GPB consistently issued financial statements that reported when distributions exceeded net investment income (and/or other income metrics like net income) *and* required investors to certify before investment that they understood that distributions could come from multiple sources. The Government conceded each of these truths at trial. The Offense Conduct, as ultimately argued by the Government at trial, is principally that GPB did not explicitly highlight for investors specific language in its disclosures that reported when distribution sources changed. *See* Tr. 6886:10–24 (Government's rebuttal that accurate disclosures were "intentionally deceptive" because they were in "barely readable fine print and footnotes"). This is far from scenarios in which defendants completely and directly falsified financial statements and other disclosures to obscure fund performance, as described in Section V.D., and thus warrants a downward variance.

Specifically, the trial record established that investors were repeatedly told that GPB could return investor capital to pay distributions through the GPB Funds' core governing documents.[23] And the Funds' financial statements reported the distributions and various metrics of performance to which they can be compared.[24] Investor witnesses testified repeatedly at trial confirming their understanding of the same.[25] The recent motion filed by the receiver overseeing GPB and the GPB

---

[22] *Nontraded REIT Industry Review, Fourth Quarter 2017* 9, Blue Vault Partners (2017), https://bluevaultpartners.com/wp-content/uploads/wp-filebase/subscriber_only_research/nontraded_reit/review/2017/q4/Nontraded-REIT-Review-Q4-2017-Industry-Data.pdf.

[23] *See, e.g.*, GX-4061 at 084-85; GX-4009 at 30; Tr. 1617:17–20 (testimony from financial advisor Joseph Ghabour confirming he "understood that GPB did not have an obligation to update or announce the revision of any of the risk factors set forth in this PPM")

[24] *See, e.g.*, DX-MF-6-007–08 (Q1 2017 report of partnership showing distributions paid to investors exceeding net investment income).

[25] *See, e.g.*, Tr. 548:2–9 (Mr. Frederick confirming that the LPA "allows the general partner to distribute money by way of a return of capital"); Tr. 294:2–297:15 (Mr. Jones testifying that GPB Fund financial statements reported when distributions were not fully covered).

Funds, *S.E.C. v. GPB Cap. Holdings, LLC*, No. 21-CV-583 (MKB) (E.D.N.Y.) (*S.E.C. Case*), ECF. No. 228 (attached as Ex. B), also confirms GPB was empowered by the GPB Funds' governing documents to distribute funds from any available source, including investor capital. *See* Ex. B at 5–6 (detailing the PPM disclosures and GPB's right to distribute investor capital).

Further, David did not make the vast majority of misstatements raised by the Government at trial that were contained in marketing materials and PPMs. *See, e.g.*, Tr. 713:5–17; 1230:4–10; 4361:1–16. While the jury, in its province as factfinder, found that those statements can nonetheless be attributable to David, the Court should consider that David did not review and approve the language in question in those materials in arriving at a sentence.

### 3.  The Performance Guarantees Were Used to Benefit Investors

While the Offense Conduct also included the fabrication of performance guarantee agreements, the nature of that offense also does not warrant incarceration. The Government argued at trial that David, along with Mr. Lash and others, fabricated these agreements to cover up the fact that GPB Funds were not producing enough profit to cover distributions. But, as shown at trial, the amounts guaranteed by the performance guarantees did not even result in full coverage for the relevant period (*i.e.*, the 2015 performance guarantee for Automotive Portfolio only increased the 2015 revenue to 70% of the amounts paid in distributions).[26]

And, critically, the use of those agreements, even if created after the fact, were both disclosed to investors and ultimately *benefitted* investors because they required Mr. Lash to pay the relevant GPB Funds millions of dollars, in the form of direct cash payments or compensation in the form of giving up certain claims he made for compensation,[27] which could then be distributed to investors. Indeed, Probation does not attribute *any* loss to the performance guarantees in the PSR. PSR ¶¶ 16, 24. GPB's transparency in disclosing the performance guarantee agreements, the ultimate purpose of those agreements (to bolster the Funds' income and incentivize dealership managers to meet revenue targets), and the lack of harm to investors distinguishes this case from other fraud cases, in which defendants were acting purely in their own interests.

### 4.  David Genuinely Believed that Investors Would Ultimately Profit from Their Investments in the GPB Funds

While a good faith belief by David that "ultimately everything would work out so that no investors would lose money" is not legally relevant to a finding of guilt at trial, Tr. 6982:16–17, such an honestly held belief is highly relevant to assessing his degree of culpability at the sentencing phase. *Cf. Tison v. Arizona*, 481 U.S. 137, 171 (1987) (Brennan, J., dissenting) (recognizing the difference between criminal liability and moral culpability and stating that "the criminal law must ensure that the punishment an individual receives conforms to the choices that individual has made"). Here, as detailed below, at the time of the Offense Conduct, David honestly believed that investors in the GPB Funds would eventually profit from their investments.

Like most private equity investments at the time, the potential for profit for GPB investors principally came after the GPB Funds' closing and upon the occurrence of a liquidity event (*i.e.*, a direct sale of portfolio companies or an initial public offering). As the Government's witnesses uniformly testified, GPB investors invested in the Funds based on the hope that they would receive not only monthly distribution payments, but a large payment after a liquidity event equal to

---

[26] *See* Tr. 997:24–998:8 (former CFO William Jacoby confirming that "the fund was only going to get to 70 percent coverage even with the inclusion of [the performance guarantee]" and that it was "not going to be fully covered").

[27] *See* Tr. 3445:3–16; Tr. 3502:10–16; Tr. 3384:19–21; GX-3026-189; Tr. 3549:17–19.

"significantly more" than the total amount invested.[28]

Here, as is typical in private equity, the expectation was that a liquidity event would not occur until *years* after the GPB Funds closed,[29] such that any big payday for investors was not contemplated to occur until *years* after the Offense Conduct.[30] And David had good reason to believe that this big payday would indeed come, regardless of dips in the GPB Funds' performance along the way. Of the more than approximately $1.4 billion in investor capital raised by the GPB Funds during the relevant period, more than $1 billion was deployed or invested by the GPB Funds, *see* GX-6200 (Mr. Petron's summary).[31] This resulted in the Funds' collective ownership interests in 160 separate companies[32] that would eventually be monetized through a sale or an IPO for the benefit of investors.

David was actively involved in this aspect of the business and thus had direct insight into the potential for profitable liquidity events. As head of GPB's acquisition committee, he personally oversaw the process of vetting and acquiring new portfolio companies for the GPB Funds, which necessarily required analysis of their ultimate value and sale potential. *See, e.g.*, GX-4065-027 (Dec. 2016 H1 PPM); GX-4047-026 (July 2018 H2 PPM); GX-4015-023 (July 2018 AP PPM).

The Government's GPB witnesses uniformly testified that David was focused on an exit strategy from day one.[33] Indeed, David himself was personally incentivized to achieve these liquidity events because, like investors, GPB's profit potential was also tied to post-closing payouts. Only after investors both recouped their initial investment and received an additional 8% for every year invested did GPB receive a portion of Fund profits. *See, e.g.*, GX-4061-052–053 (May 2014 H1 PPM).

The future profitability of the GPB Funds, and David's confidence in the same, came up repeatedly during the trial.[34] Indeed, David and his wife personally invested over $2 million in H2 in March of 2017, *see* Ex. G (DX-IIIIN), and numerous friends and family members put their own money into the funds because they trusted David and his confidence that investors would see a

---

[28] *See, e.g.*, Tr. 5109:3–13 (investor Morey Goldberg testifying that "the most interesting reason" for investing was "the idea of a big liquidity event."); Tr. 149:19–22 (Mr. Jones testifying that "at the end"—i.e., after the Funds closed and there was a liquidity event—he expected to receive not only a return of his capital, but "significantly more" than an 8.7% return); Tr. 568:4–24 (Mr. Frederick testifying that a successful liquidity event could result in returns that doubled or tripled initial investments); Tr. 1501:18–22 (Mr. Ghabour testifying that "the hope was that they would have a liquidity strategy where it either be a publicly traded syndicate of automotive dealerships or a sale to an already publicly dealership syndicate in the hopes to get a higher multiple [return]").

[29] H1 closed on December 31, 2015, and H2 and AP closed on June 30, 2018, *see* Ex. E (GX-4059-006) (H1); GX-4047-086 (H2); GX-4015-070 (AP).

[30] *See, e.g.*, Tr. 689:15–23 (Mr. Jacoby testifying that typically this occurs 5 to 10 years after closing); *see also, e.g.*, Ex. D (DX-IIK) (Nov. 2017 FactRight due diligence report stating that the goal was to obtain liquidity events for the GPB Funds between 2019 and 2022).

[31] The amount of capital deployed was arrived at by netting the amount of money transferred from the GPB Funds' investments accounts to their investments, as reflected in slides 1, 8, and 15 of Mr. Petron's analysis, *see* Ex. F (GX-6022), with the amount returned from those investments and entities to the investment accounts reflected on those same slides.

[32] *See, e.g.*, *S.E.C. Case*, ECF No. 82 at ¶ 5.

[33] *See, e.g.*, Tr. 1048:14–1049:3 (Mr. Jacoby testifying that he was fired as CFO and replaced with Macrina Kgil because David needed someone who had the experience and skillset necessary to take the company public); Tr. 2539:6–19 (Ms. Kgil similarly testifying that she was hired to prepare the company for an IPO)

[34] *See, e.g.*, Tr. 723:3–9 (Mr. Jacoby testifying that David always thought that GPB would be able to "catch up"); *see also* Tr. 333:2–10 (Mr. Jones testifying that presenters at a due diligence conference stated their hope that profitability shortfalls would receive the following year)

substantial payout. And that confidence was shared by others at GPB. Ms. Kgil testified that the "financials [she was] preparing and reviewing gave [her] a reason to believe that the fund would perform better in 2017." Tr. 2555:22–25. Likewise, several GPB investors have written *on behalf of David* to make clear that, unlike the Government's witnesses, they never felt deceived, lied to, or defrauded; and, if given the opportunity, they would invest with him again.[35]

David's optimism was not unwarranted. A portfolio snapshot from the relevant period shows that, from inception through the end of 2016, GPB's portfolio companies brought in over $3.9 billion in revenue, compared to the $900,000,000 contributed by investors. *See* DX-ZZU-1-003. Further, the sale of only a subset of assets from all the GPB funds, including the three at issue here, between 2021 and 2024 resulted in proceeds of approximately $1.3 ***billion*** dollars—nearly double the December 31, 2020, valuation of those same assets. *See S.E.C. Case*, ECF No. 223. The motion recently filed by the court-appointed Receiver detailing the Receiver's plan for distributing assets to investors further substantiates David's good faith belief in the Funds' likelihood of profitability. For example, if the information the Receiver presented to the court is accurate, for Automotive Portfolio, the Receiver reported that GPB raised approximately $683 million from investors, had already distributed $109.7 million back to investors, and recently sold a substantial portion of the Fund's assets for $923 million. Ex. B at 7. The Receiver's motion proposed distributing profits of that liquidity event to investors, precisely as contemplated by GPB's distribution model. *Id*. Thus, the evidence reflects that GPB's acquisition strategy and management of portfolio companies has in fact resulted in significant liquidity events for the GPB Funds, just as David believed it would during the relevant time period.

*       *       *

In evaluating the nature and circumstances of these offenses for purposes of sentencing, the Court has the benefit of considering all relevant circumstances, including those not presented to the jury, like the ultimate profitability of the GPB Funds. The circumstances present a clear story of a man's good faith attempt to implement a novel business strategy that would ultimately benefit both him and investors, which is entirely distinct from other fraud cases in which incarceration was ordered. The hurdles that David and GPB faced—with GPB's rapid growth, industry-specific challenges impacting interim performance, and changing and complex regulatory requirements that resulted in the alleged inaccurate investor disclosures—do not invalidate David's good faith efforts along the way to produce returns for investors. Given all of the circumstances underlying the offenses, this factor weighs heavily against the Court's imposition of incarceration under Section 3553(a).

### B.  A Non-Custodial Sentence Provides Just Punishment and Adequate Deterrence

As the Court is aware, Section 3553(a) requires that the sentence imposed provides just punishment for the offense, adequately deter future criminal conduct, and protect the public from further crimes by the defendant. 18 U.S.C. § 3553(a)(2). Here, a non-custodial sentence achieves all of these goals.

*First*, a custodial sentence is not necessary for punishment. David has spent the better part of the last nearly seven years defending his name: first in private litigation, then in response to an investigation by the SEC, and finally, and most publicly, in response to the DOJ's indictment and trial. He is now a convicted felon, he lost the company he worked so hard to build from the ground up, his reputation is ruined, and he will never be able to manage funds, or work in private equity

---

[35] *See, e.g.*, Ex. A-15 (letter from H2 investor); Ex. A-16 (letter from H2 investor).

or as an accountant again. And he still faces an enforcement action by the SEC, with the risk of additional monetary penalties and industry, officer and director, and trading bars, plus nearly twenty civil litigations and state regulatory actions alleging similar misconduct to the criminal case. *See* Menchel Dec. ¶ 10.

But the punishment David has faced, and will continue to face, is more than financial and professional: David has suffered immensely in his personal life because of his conviction. ███████

███████ The impending sentencing has caused David immense stress due to the possibility of prolonged separation from his family. ███████

*Second*, a custodial sentence is not required to deter future criminal conduct by David. As courts in this Circuit have routinely held for defendants with similar circumstances, "[a]s to specific deterrence, it seems obvious that, having suffered such a blow to his reputation, [David] is unlikely to repeat his transgressions, and no further punishment is needed to achieve this result." *United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012).[36] David has further demonstrated by his actions that he has respect for authority and the law. *See* Section I. Indeed, in the over four years since his release on bond in January 2021, he has complied with all of the conditions of his bond and returned to court for his trial. No additional punishment is needed to achieve specific deterrence.

*Third*, David is a first-time offender, and courts have observed that first-time offenders like him are statistically less likely to reoffend. *See, e.g., United States v. Williams*, 662 F. App'x 366, 377 (6th Cir. 2016) (affirming a below-Guidelines sentence because the sentencing court "was motivated primarily by [the defendant's] lack of criminal history and her low risk of recidivism"). Moreover, for offenders like David who have never been imprisoned, "even a short term of imprisonment can be "sufficient to impress upon him the seriousness of the offense and to deter others under similar circumstances." *United States v. Cull*, 446 F. Supp. 2d 961, 965 (E.D. Wisc. 2006). And offenders over the age of 40—David is 58—"exhibit markedly lower rates of recidivism in comparison to younger defendants." *United States v. Hernandez*, 2005 WL 1242344, at *5 (S.D.N.Y. May 24, 2005).[37]

*Finally*, a custodial sentence is unnecessary to achieve general deterrence. As an initial matter, the public humiliation and reputational harm David has experienced and will continue to experience, combined with his losing control of his company, and the fact that he will never work in private equity again is more than sufficient to deter private equity fund managers from engaging in similar conduct. *See, e.g., United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (sentencing court properly considered that the "conviction itself already visit[ed] substantial punishment" on the defendant by likely barring him from future work in his profession); *Adelson*, 441 F. Supp. 2d at 514 (finding reputational harm provides general deterrence). Perhaps more importantly, though, general deterrence is not a motivating factor for sentencing because the facts are so specific that copycats are highly unlikely. The Government's allegations boil down to a private equity fund

---

[36] *See also Adelson*, 441 F. Supp. 2d at 514 ("With his reputation ruined by his conviction, it was extremely unlikely that [the defendant] would ever involve himself in future misconduct")

[37] *United States v. Ruiz*, 2006 WL 1311982, at *4 (S.D.N.Y. May 10, 2006) (imposing below Guidelines sentence in part because, defendant was older offender and citing U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal History Computation Of The Federal Sentencing Guidelines,* at 28 (2004)).

returning investor capital earlier and in a different manner than investors expected. Specifically, the Government explained in closing that David and co-defendant Jeffry Schneider were faced with a choice when profits from the portfolio companies were insufficient to cover monthly distribution payments: "Come clean, lower or suspend distributions, or keep the lie going." Tr. 6919:20–21. However, as described in Section III.A.1, the GPB Funds were contractually obligated to return all investor capital before distributing any profits from a liquidity event. *See, e.g.*, GX-8258-B-044; Tr. 570:6–9. In other words, investor capital was going to be paid eventually; according to the Government, GPB just paid investor capital through monthly distribution payments—thereby de-risking those investments—instead of waiting years for a liquidity event. While GPB had an indisputable right to do so under the GPB Funds' offering documents, the jury found that GPB did not accurately disclose when it actually was returning investor capital (if investor capital was returned at all).

As the Honorable Brian M. Cogan said in sentencing another defendant convicted of securities fraud in 2024:

> [W]hile I think in financial crimes . . . that there is a need to make a statement of general deterrence for a lot of these crimes. This crime to me is so atypical, and the consequences are so disputable, that when you look at what's happened to him and his family over the years, this is not the case to use to make an example. It would be—it would require someone to get into the weeds in a way that nobody who reads a newspaper does. You just can't draw a connection between any conduct that someone might be contemplating and the conduct that happened here.

*United States v. Nordlicht*, No. 16-CR-640 (E.D.N.Y. July 16, 2024), ECF No. 1057 at 49. This logic applies with equal force to David.

Indeed, studies have demonstrated that longer prison sentences do not necessarily serve as a general deterrent, further confirming that a sentence with no incarceration is sufficient to meet the goals of § 3553(a).[38] Studies have also shown that a longer prison sentence is unlikely to have a specific deterrent effect.[39] A long prison sentence for David—who, as set forth above, is a first-time offender who has otherwise lived a lawful life in service of others—is thus not necessary to adequately serve the goals of deterrence.

### C.  Suitable Alternatives to a Custodial Sentence Are Available

In accordance with Section 3553(a), the Court must consider the "kinds of sentences available" and, in doing so, must impose a sentence "not greater than necessary" to address the factors set out above. *See* Section V.B; 18 U.S.C. § 3553(a)(3). A sentence of time served is sufficient to satisfy the goals specified under 18 U.S.C. § 3553(a)(2), but to the extent that the Court feels that additional punishment is required, there are several non-custodial options available.

*First*, a term of supervised release is, in and of itself, punishment, and provides a just sentence for David's conduct. *See United States v. Harris*, 2013 WL 5739202, at *3 (E.D.N.Y. Oct. 22, 2013). Supervised release would pose several limits on David's freedoms, and such sentences have been characterized as "impos[ing] severe limitations on a defendant's" liberty.

---

[38] *See, e.g., The Impact of the Front End on Federal Sentencing and Beyond: Recidivism and More*, 88 FED. PROBATION 3, 4 (citing "comprehensive meta-analysis of 116 studies of prison and recidivism [which] found that custodial sanctions have no effect on reoffending or, worse yet, slightly increase reoffending").

[39] *See* Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 CRIME & JUST. 199, 201 (2013).

*United States v. Harper*, 805 F.3d 818, 822 (7th Cir. 2015). For example, David may not be able to move or change his employment without notifying his probation officer, U.S.S.G. § 5D1.3(c)(3), (7). This District has repeatedly found supervised release to be an appropriate punishment for fraud, particularly for defendants like David with no criminal history, strong community and family ties, and a low likelihood of recidivism. *See, e.g.*, *United States v. Gayle*, 2010 WL 2540488 (E.D.N.Y. June 17, 2010) (defendant with a history of community service and strong familial relationships sentenced to 5 years' probation).[40] A term of supervised release is therefore a just punishment in line with similarly situated defendants.

*Second*, the Court has the discretion to impose a range of additional conditions it deems fit, including ordering a period of home confinement. *See United States v. Shehee*, 2020 WL 5229030, at *3 (E.D. Wash. Sept. 1, 2020) ("Home confinement reflects the seriousness of the offense and provides a more just punishment, because it is safer for Defendant yet still restricts Defendant's liberty."). Home confinement is suitable for a non-violent defendant of David's age. *See, e.g.*, *United States v. Rioux*, 97 F.3d 648, 652 (2d Cir. 1996) (sentencing a 62-year-old defendant convicted of mail fraud to 6 months of home confinement, 36 months' probation, and 500 hours of community service). To the extent the Court feels that additional restrictions are required to fulfill the goals specified under 18 U.S.C. § 3553(a)(2), discretionary conditions would be more appropriate than incarceration. *See, e.g.*, *United States v. Gill*, 523 F.3d 107 (2d Cir. 2008).

*Finally*, David is well-suited for a meaningful sentence of community service. As demonstrated by his over seventy-five letters of support and set forth in greater detail in Section I, David has provided mentorship and generosity to numerous individuals, including guidance based on his specialized skillsets and financial acumen.[41] A combination of supervised release, home confinement, and community service would allow David to make a positive societal impact and promote his reform in the most effective manner possible in accordance with Section 3553(a).

### D.  A Sentence of Time Served Avoids Unwarranted Sentencing Disparities

A non-incarceratory sentence is necessary in this case in light of the sentences received by similarly situated offenders both within this Circuit and across the country.

*First*, GPB's former CFO and CCO—Government witnesses who were integral to its investigation and prosecution of David—both testified under oath to engaging in the same conduct for which David was convicted, yet neither will see a single day in jail. Mr. Jacoby described at trial how he knew that investors were being told that distributions were fully covered by funds by operations and how he nonetheless personally signed off on transferring funds from the investment accounts to distribution accounts to cover distributions. *See, e.g.*, Tr. 1089:6–1090:13; 715:17–719:23; 721:10–722:23. He testified that he did this despite believing at the time that it was unlawful. Tr. 961:12–962:12. Mr. Jacoby also described how he worked with GPB's accountants

---

[40] *United States v. Desilva*, 2010 WL 532987, at *2 (E.D.N.Y. Feb. 8, 2010) (5 years' supervised release); *United States v. Dauria*, 2008 WL 5459197, at *1–2 (E.D.N.Y. Nov. 24, 2008) (3 years' probation); *Harris*, 2013 WL 5739202, at *2–3 (2 years' supervised release).

[41] *Cf. United States v. Schulman*, No. 16-CR-442 (E.D.N.Y. Oct. 6, 2017), ECF No. 155, at 37:13–38:14 (imposing below-Guidelines sentence where letters "paint a picture of a man who cares deeply about his family, his friends, his community, and his ideals" and "a man willing to go out of his way to help friends, acquaintances, colleagues, and members of his community."). Similarly situated defendants convicted of conspiracy to commit securities fraud and wire fraud have received community service in conjunction with a term of probation. *See, e.g.*, *United States v. Ng*, No. 11-CR-161 (S.D.N.Y. May 23, 2012), ECF No. 149 (24 months' probation, including 400 hours of community service); *United States v. Stewart*, No. 15-CR-287 (S.D.N.Y. May 18, 2016), ECF No. 95 at 32:8–12 (48 months of probation, including 750 hours of community service).

28

to ensure that the audited financial statements included what he believed was a false and phony performance guarantee. *See, e.g.*, Tr. 812:21–814:18; 1089:19–1090:13; 1094:15–1096:14. Similarly, Roger Anscher, CCO from January 2016 to February 2017, who was interviewed by the Government and SEC at least six times, described at trial how he worked to "sneak" the "no present plans" language into the 2016 Automotive Portfolio PPM without causing a stir, despite believing that this language was false. Tr. 4361:1–4368:20; *see also* Tr. 3239:21–3940:24.

Neither of these men have been charged with a crime, and, as such, their lives have not been destroyed, their reputations are intact, and they will not face any consequences for the same conduct that resulted in David's conviction. The Second Circuit requires this Court to avoid disparate treatment of similarly situated participants in a crime, and, here, this necessitates a non-incarceratory sentence. *United States v. Gravel*, 323 F. App'x 55, 56 (2d Cir. 2009).

*Second*, an analysis of similarly situated defendants nationwide demonstrates that courts frequently impose sentences *significantly* below the applicable Guidelines range and in line with the non-incarceratory sentence David seeks. In 2022, just 21.9% of defendants received Guidelines sentences and less than 1% received above-Guidelines sentences.[42] Roughly 11% of defendants received below-Guidelines sentences on a Government recommendation and roughly 39% of defendants received below-Guidelines sentences without Government recommendation—all told, approximately 50% of defendants received a below Guidelines recommendation. *Id.* Moreover, over the past five years, the average length of sentence in the entire United States for someone like David—a U.S. citizen with no criminal history, convicted of a crime falling under Section 2B1.1 (approximately 14,000 cases)—was 18 months, with the median sentence being 8 months. In this District specifically over the same period, the average sentence for similarly situated defendants was 11 months, with the median sentence being *zero months*.[43]

And these low sentences are not simply the result of low Guidelines ranges; rather, U.S. Sentencing Commission data shows that more than 50% of all sentences in the Second Circuit of similarly situated defendants was the result of a downward variance from the Guidelines range. Section 3553(a)(6) instructs the Court to impose a sentence that "minimize[s] nationwide disparities," and, here, the nationwide treatment of Category I offenders convicted of similar offenses heavily weighs in favor of a substantially below Guidelines sentence. *See United States v. Wills*, 476 F.3d 103, 110 (2d Cir. 2007).

*Third*, if this broad category of first-time offenders sentenced under Section 2B1.1 is narrowed to those individuals, who, like David genuinely believed their investors would not ultimately be harmed or suffer losses, and whose "victims" did not suffer losses attributable to the defendants' behavior, defendants' sentences do not generally include a term of imprisonment. Indeed, a survey of relevant and recent case law in this Circuit makes clear that the sentence sought by Probation is beyond the pale. In *Nordlicht*, the defendants received non-custodial sentences of either time served or probation. *See* ECF Nos. 1020, 1052. As is the case here, the offenses in *Nordlicht* could not be tied to any actual losses by investors. *See* ECF No. 1005 at ¶12–14. Similarly, in *United States v. Tournant*, No. 22-CR-276 (S.D.N.Y. Nov. 8, 2024), the defendant received a sentence of house arrest where he was a first-time offender and the evidence and expert

---

[42] *See Statistical Information Packet, Fiscal Year 2022, Eastern District of New York* 12, U.S. SENT'G COMM'N (2022), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2022/nye22.pdf.

[43] *See Interactive Data Analyzer*, U.S. SENT'G COMM'N (last visited Oct. 3, 2024), https://ida.ussc.gov/analytics/saw.dll?Dashboard (using "Sentence Type" and "Sentence Length").

analyses suggested that actual loss was zero, based in part on the fact that investors, as here, "received legitimate interests in legitimate securities." *See* ECF No. 156 at 55. And in cases where a sentence of imprisonment was imposed, the sentence was dramatically lower than the 20 years recommended by Probation.[44]

*Finally*, as the Government recognized in its closing, this was not a Ponzi scheme. Tr 6878:18–19 (explaining on rebuttal that the term Ponzi scheme has "no legal significance in this case"). "A *Ponzi* scheme is an investment scheme which is not supported by a legitimate underlying business venture." *Balaber-Strauss v. Lawrence*, 264 B.R. 303, 305 (S.D.N.Y. 2001).[45] Here, in contrast, the GPB Funds bought real, legitimate businesses with real assets that were generating real income. *See* Section V.A.4. Further, the hallmark of a Ponzi scheme is "the payment of purported returns to existing investors from funds contributed by new investors," which courts have likened to "money stolen from other customers." *In re Bernard L. Madoff Inv. Sec. LLC*, 12 F.4th 171, 179 (2d Cir. 2021) (citation omitted). But that is not what is alleged to have occurred here. Rather, as explicitly disclosed in the GPB Funds' offering documents, to the extent investor capital was included in distribution payments, it was *investors' own capital* being paid to them per the first step in the funds' waterfall. *See, e.g.*, GX-8258-B-044. There are no allegations of theft, of money from investor B being used to pay investor A. And, unlike in a Ponzi scheme, the GPB Funds explicitly told investors that it had the right to include investor capital in distribution payments—it was not a secret. Indeed, Mr. Jones testified at trial that he not only understood that "a substantial portion of the distributions could be a return of [investor] capital," but that he "hoped [he] got all [his] capital back." Tr. 285:22–25. As such, Ponzi scheme-defendants are not similarly situated to David and their sentences are irrelevant.

\*      \*      \*

The Court's analysis of the Section 3353(a) factors should make clear that neither the public nor David would be served by the Court's imposition of incarceration here. These offenses simply are not the type warranting deprivation of liberty, particularly in David's case and the voluminous record detailing how the jury's conviction based on the Offense Conduct was a mere blip in an otherwise honorable and law-abiding life, *see* Section I, and the lack of any demonstrable loss to investors,[46] *see* Section III.A.

## CONCLUSION

For the foregoing reasons, David respectfully requests that the Court consider alternatives to incarceration and impose a non-incarceratory sentence.

---

[44] *See, e.g.*, *United States v. Petit*, No. 19-CR-850 (S.D.N.Y. June 3, 2021), ECF No. 206 at 2–5 (1 year' imprisonment); *United States v. Tzolov*, No. 08-CR-370 (E.D.N.Y. Jan. 22, 2010), ECF No. 341 at 3–4 (5 years' imprisonment where government requested 15 years).

[45] *See also, e.g.*, *In re EPD Inv. Co. LLC*, 114 F.4th 1148, 1159 (9th Cir. 2024) (finding the lack of a "legitimate profit-making business opportunity" for investors to be an "essential element" of a Ponzi scheme).

[46] No restitution is warranted because no one suffered a loss for the reasons described above in Section III.A. The Court should therefore find this weighs in favor of a probationary sentence, or at least one that varies downward from any Guidelines range. If, however, restitution is awarded, a probationary sentence that allows David to attempt to use his skills to earn a living will help fulfill his restitution obligations.

Dated: January 31, 2025
New York, New York

Respectfully submitted,

*/s/ Matthew I. Menchel*
Matthew I. Menchel
Adriana Riviere-Badell *(admitted pro hac vice)*
**KOBRE & KIM LLP**
201 South Biscayne Boulevard
Suite 1900
Miami, FL 33131
(305) 967-6100
Matthew.Menchel@kobrekim.com
Adriana.Riviere-Badell@kobrekim.com

Sean S. Buckley
Jonathan D. Cogan
Benjamin F. Cooper
A.  Zoe Bunnell
**KOBRE & KIM LLP**
800 Third Avenue
New York, NY 10022
(212) 488-1200
Sean.Buckley@kobrekim.com
Jonathan.Cogan@kobrekim.com
Benjamin.Cooper@kobrekim.com
Zoe.Bunnell@kobrekim.com

*Attorneys for Defendant David Gentile*