UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x

UNITED STATES OF AMERICA,


        v.                      **MEMORANDUM AND ORDER**
                                    21-CR-54 (RPK)

DAVID GENTILE and JEFFRY
SCHNEIDER,

                   Defendants.

------------------------------------------------------x

RACHEL P. KOVNER, United States District Judge:

A jury convicted David Gentile and Jeffry Schneider of securities fraud as well as conspiracy to commit securities fraud and wire fraud. The jury also convicted Mr. Gentile of two counts of wire fraud. Defendants move for judgments of acquittal and for a new trial, and Mr. Gentile moves to dismiss the indictment based on prosecutorial misconduct. Defendants' motions are denied.

## BACKGROUND

### I.    Indictment

Defendants were indicted, along with Jeffrey Lash, on five counts. Defendants and Mr. Lash were charged with conspiracy to commit securities fraud in violation of 18 U.S.C. § 371 (Count One), conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 (Count Two), and securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff (Count Three). Indictment ¶¶ 50–56 (Dkt. #1). Mr. Gentile and Mr. Lash were also charged with wire fraud in violation of 18 U.S.C. § 1343, based on a wire transfer of about $509,643 on or about April 22, 2016 and a wire transfer of about $1,050,000 on or about April 28, 2016 (Counts Four and Five). *Id.* ¶¶ 57–60.

1

The indictment alleged that "[i]n or about and between August 2015 and December 2018," defendants and Mr. Lash "engaged in a scheme to defraud investors and prospective investors" in funds managed by GPB Capital Holdings LLC, of which Mr. Gentile was "the founder, owner and Chief Executive Officer" ("CEO") and Mr. Lash was "a managing partner." *Id.* ¶¶ 1, 7, 9, 15. Mr. Schneider was "the owner and CEO" of Ascendent Capital LLC which "served as the placement agent and marketing firm for" funds managed by GPB. *Id.* ¶¶ 6, 8. The indictment described two aspects of the alleged scheme. Defendants and Mr. Lash were alleged to have made "material misrepresentations and omissions relating to . . . (a) the source of funds used to pay monthly distribution payments to investors" in three GPB funds—GPB Holdings, LP ("Holdings I"), GPB Holdings II, LP ("Holdings II"), GPB Automotive Portfolio, LP ("GPB Auto")—and "(b) the revenue generated by Holdings I in 2014 and [GPB Auto] in 2015." *Id.* ¶¶ 1, 15.

Regarding the source of distributions, the indictment alleged that Mr. Gentile, Mr. Schneider, and "Ascendent employees acting at their direction" represented to investors and prospective investors that Holdings I and II and GPB Auto "would pay to investors a monthly distribution . . . [that] would be 'fully covered' by 'funds from operations'" and "would pay special distribution[s]" when "cash flow from the portfolio companies allowed." *Id.* ¶¶ 21–22. The indictment further alleged that defendants represented "that the source of funds used to pay distributions would be cash flow generated by the companies the funds owned, and not capital raised from investors," when, "[i]n reality, . . . investor capital was used to pay a material portion of the distributions made to investors in each of these funds, including several special distribution payments." *Id.* ¶¶ 16, 21, 23. Those representations were alleged to have been made to investors in "written correspondence and marketing materials," the private placement memoranda ("PPMs")

for the three funds, and "marketing communications . . . made by Ascendant employees" that were "approved by" defendants. *Id.* ¶¶ 21–22, 25–31.

Regarding the revenue of Holdings I and GPB Auto, the indictment alleged that "in approximately 2015 and 2016" respectively, defendants and Mr. Lash "fraudulently inflated the income" that the two funds "received from certain of their assets through the use of backdated performance guarantees" which set a certain level "of guaranteed profits" for dealerships Mr. Lash had sold to the funds. *Id.* ¶¶ 43–44; *see id.* ¶ 47.

## II.    Trial

The case was tried before a jury.

### A.    Government's case

The government sought to establish at trial that defendants told investors they would receive a monthly distribution approximately equal to an eight percent annualized return on invested capital, in addition to possible special distributions, paid only with income generated by companies owned by the GPB funds.  The government aimed to prove that, at certain times for certain funds, there was insufficient income to pay those returns using income generated by the GPB companies and that defendants fraudulently misrepresented that fact while paying distributions with investor capital rather than income and using backdated performance guarantees to increase the income certain funds reported in 2014 and 2015.  The government argued that defendants made those misrepresentations to facilitate further investment in the funds, on which defendants would earn fees.

#### 1.    *Source of distributions*

The government offered testimonial and documentary evidence that investor distributions from Holdings I and II and GPB Auto were not fully sourced from income generated by the funds'

portfolio companies. Bill Jacoby, the Chief Financial Officer ("CFO") of GPB from March 2015 to September 2016, testified that each GPB fund had "an investment account" and "a distribution account," as well as an operations account. Trial Tr. 690:2–6, 761:9–13. The investment account collected money invested in the fund net of "up-front selling fees" in order to "buy portfolio companies or make investments," while the distribution account was used "for distribution[s] out to the investors" in the fund. *Id.* at 763:2–765:7. That testimony was corroborated by Macrina Kgil, GPB's CFO from September 2016 to April 2018. *Id.* at 2152:7–17, 2257:22–2260:9. Ms. Kgil testified that the operating account received "cash coming from the portfolio companies" and paid out necessary expenses, and "the remainder," *i.e.*, "the profits," "would go to the distribution account." *Id.* at 2258:4–18. Both Mr. Jacoby and Ms. Kgil testified that when the distribution account lacked sufficient funds to pay investors, GPB's accounting department, with Mr. Gentile's approval, would transfer money from the investment account to the distribution account. *Id.* at 765:24–766:22, 785:7–15 (testimony of Bill Jacoby); *accord id.* at 2261:12–2262:4, 2626:2–7 (testimony of Macrina Kgil).

Michael Petron, an accountant retained by the government, presented a summary of GPB's financial statements and GPB's banking and accounting records. *Id.* at 3791:14–25, 3798:23–3799:19; *see* Gov't Ex. 6200. Those records and Mr. Petron's testimony showed the amount and frequency of transfers from the "investment accounts" of Holdings I and II and GPB Auto to the "distribution accounts" of those funds. *See* Trial Tr. 3801:10–3807:15, 3819:7–3820:6, 3824:3–3833:25 (Holdings I), 3834:1–3843:13 (Holdings II), 3843:14–3851:13 (GPB Auto); *see generally* Gov't Ex. 6200. The GPB records summarized by Mr. Petron showed that transfers from the investment accounts to the distribution accounts began in approximately January 2015 for Holdings I and GPB Auto and in October 2015 for Holdings II. *See* Gov't Ex. 6200 at 5, 12, 19;

4

Trial Tr. 3913 (cross-examination of Michael Petron). The cumulative amount of such transfers for Holdings I between September 2015 and October 2018 was approximately $30 million, of which approximately $21 million was needed to fund the difference between total investor distributions (approximately $57 million) and the total amount transferred to the distribution account from other sources, including "profit distributions" from portfolio companies, (approximately $36 million). *Id.* at 4; *see* Trial Tr. 3826:2–3827:4. The cumulative amount of such transfers for GPB Auto between August 2015 and December 2018 was approximately $75 million, of which approximately $47 million was needed to fund investor distributions. *See* Gov't Ex. 6200 at 18; *see* Trial Tr. 3846:3–22. The cumulative amount of such transfers for Holdings II between April 2017 and December 2018 was approximately $35 million, of which approximately $27 million was needed to fund investor distributions. *See* Gov't Ex. 6200 at 11; Trial Tr. 3837:19–3839:21.

The government offered documentary evidence of when transfers from investment accounts to distribution accounts were executed to fund distributions from Holdings I and GPB Auto with Mr. Gentile's approval. *See* Gov't Ex. 6171-C; Trial Tr. 783:19–787:23, 790:20–791:20 (testimony of Bill Jacoby); *see also* Gov't Exs. 7405, 7405-A, 7405-B, 7011; Trial Tr. 812:17–813:13 (testimony of Bill Jacoby). Bill Jacoby testified that Mr. Gentile told him, in response to a spreadsheet tracking such transfers, that "he was aware of it, but that [there were] a lot of new deals in the pipeline that were going to come in and make up the shortfall." Trial Tr. 788:13–25; *see* Gov't Ex. 6171-C. Mr. Jacoby testified that Mr. Schneider told him, in response to a similar spreadsheet, that "he could not handle having a lower distribution rate so [Mr. Jacoby and his colleagues] needed to make sure that [they] got the money to cover the distributions." Trial Tr. 810:17–811:18; *see* Gov't Exs. 7405, 7405-A, 7405-B.

Michael Petron also testified about "coverage ratios" calculated using different measures of income as the numerator and the distributions paid as the denominator. Regarding Holdings I, for example, based on the fund's audited financial statements, the ratio was below one hundred percent in 2014 and 2015 using net investment income plus realized gain or loss as the numerator, and in 2014 and 2016, using net income as the numerator. *See* Gov't Ex. 6200 at 6. For GPB Auto, the ratio was below one hundred percent on its audited financial statements in 2015, using net investment income plus realized gain or loss, and in 2013 and 2016 using net income. *See id.* at 20. For Holdings II, the ratio was below one hundred percent on its audited financial statements in 2016, using net income. *See id.* at 13. The annual reports for all three funds showed net investment income plus realized gain or loss that was lower than distributions for 2016 through 2018. *See id.* at 7, 14, 21. The government offered testimonial and documentary evidence showing that defendants used net investment income, or net investment income plus realized gain or loss, to calculate whether distribution payments were covered, *see, e.g.*, Trial Tr. 767:1–768:3 (testimony of Bill Jacoby); *id.* at 2945:15–21 (testimony of Macrina Kgil), and communicated that fact to investors in February 2017, *see id.* at 3668:6–3671:20 (testimony of Anthony Lagiglia); Gov't Ex. 5093.

Other evidence showed that defendants were repeatedly presented throughout the charged conspiracy period with financial reports reflecting distributions that exceeded net investment income. *See* Trial Tr. 835:25–836:9 (discussing Gov't Ex. 7681); Gov't Exs. 7681, 7681-A 1[1] (attachment to a January 2016 email to Mr. Gentile regarding 2015 results for both GPB Auto and Holdings I); *see also* Trial Tr. 5095:17–5096:4, 5099:6–9, 5198:3–5199:10 (discussing Gov't Ex. 8327); Gov't Ex. 8327-A (attachment to email to Mr. Gentile showing February 2015 report of

---

[1] Citations to exhibits use those documents' Bates stamps when provided, unless otherwise noted.

such deficits for both funds); Trial Tr. 818:23–820:12 (discussing Gov't Ex. 7355); Gov't Ex. 7355-B (June 2015 report sent to Mr. Gentile showing same); Trial Tr. 839:9–25 (discussing Gov't Ex. 7682); Gov't Ex. 7682 (2015 "year-end" report sent to defendants showing same); Trial Tr. 2201:8–20 (discussing Gov't Ex. 8008); Gov't Ex. 8008-A (2017 first quarter report sent to defendants showing same); Trial Tr. 4925:13–4926:4 (discussing Gov't Ex. 7857); Gov't Ex. 7857-A (2017 second quarter report sent to defendants showing same); Trial Tr. 2224:11–16 (discussing Gov't Ex. 8009); Gov't Ex. 8009-B (2017 third quarter report sent to defendants showing same).  Bill Jacoby testified that, in response to GPB Auto's 2015 financial results, Mr. Gentile said they "needed to talk about it and see what [they] could do to fix it," and Mr. Schneider said that "one-third net investment to distributions was unacceptable" because "people would stop putting new investments into the fund."  Trial Tr. 891:8–893:8.  In February 2017, defendants received 2016 financial results showing "[i]nception to date coverage [of] 48% and 2016 full year coverage [of] 35%" for GPB Auto, "inception to date coverage [of] 64% and 2016 [full year] coverage [of] 30%" for Holdings I, and a "[c]overage ratio [of] 90% for full year 2016" for Holdings II.  Gov't Exs. 7915, 7915-A 2 (GPB Auto), 8117, 8117-A 2 (Holdings I), 7910, 7910-A (Holdings II); *see also* Gov't Exs. 7582, 7582-A 5 (August 2017 email to defendants with attachment reflecting inception-to-date coverage deficits for all three funds).

2.      *Representations about the source of distributions*

The government offered testimonial and documentary evidence of defendants' sales pitches for the three GPB funds.

Josh Teeters, a salesman at Ascendant Capital from 2013 to 2019, testified that Mr. Schneider had "[f]ull control" over the sales pitch to investors for GPB funds including Holdings I and II and GPB Auto. *Id.* at 1890:8–21, 1901:11–14, 1904:8–10, 1971:18–22; *see id.* at 1908:8–

25. Bill Jacoby testified that marketing materials "were created by Mr. Schneider" or by Ascendant employees "at his direction," with him retaining "the last word" on their contents. *Id.* at 713:5–17. Roger Anscher, GPB's Chief Operating Officer from January 2016 to February 2017, testified that Mr. Schneider reviewed and was "in charge of" marketing presentations provided to prospective investors and had "absolutely rejected" a request that Mr. Anscher and GPB compliance "have final say with respect to the marketing materials." *Id.* at 4115:17–24, 4311, 4314. Mr. Anscher also testified that he "discussed the marketing materials" with Mr. Gentile, who reviewed them and made it "very apparent that [Mr. Schneider] had final say" over "the way things were presented" in "marketing materials" and "PPMs." *Id.* at 4312–16; *see id.* at 4941:23–4942:23, 4945:17–4946:7.

Government witnesses testified that Mr. Schneider and Mr. Gentile operated GPB and Ascendant as "one firm," *id.* at 692:16–693:10 (testimony of Bill Jacoby); *accord id.* at 1895:8–12 (testimony of Josh Teeters), and as a "partnership," *id.* at 2159:4–23 (testimony of Macrina Kgil). The government also offered documentary evidence of emails sharing marketing materials with defendants in 2016, *see* Gov't Exs. 8099, 8184, including one shared with Mr. Schneider specifically discussing how "to address any potential concerns" regarding "distribution coverage" in GPB Auto, Gov't Ex. 8146.

The government submitted evidence that financial advisors and investors were told by Ascendant employees and both defendants that the source of the monthly distribution payments was income generated by the funds' portfolio companies. Josh Teeters testified that at due diligence events in late 2015, Mr. Schneider told investors that special distributions were paid out of "income from the portfolio companies." He also testified that, "us[ing] the pitch that Mr. Schneider taught [him]," he told financial advisors from 2015 through 2017 that "the source of

monthly distribution payments" and "special distributions" was "income generated from the portfolio companies." *Id.* at 1910:5–1912:25, 1914:7–1915:4; *see id.* at 1955:14–1958:5; *see also, e.g.*, Gov't Ex. 7846-B 4, 6–7 (early 2016 GPB Auto marketing presentation sent to investors describing distributions as "[b]ased off cash flow from portfolio companies" and "fully covered – funds from operations"); Gov't Ex. 1434 at 4, 6 n.2, 8 (late 2016 GPB Auto marketing presentation sent to investors describing distributions as "depend[ent] on" and "[b]ased off cash flow from portfolio companies"). Roger Anscher testified that at "about 20" investor meetings he attended with defendants during his tenure from January 2016 to February 2017, he heard each defendant tell investors "[t]hat the income from operations was a hundred percent enough to cover the funds' distribution requirements." *Id.* at 4130:1–4132:23. The government also offered documentary evidence of a September 2016 draft email sent to Mr. Schneider's Ascendant email account, which Mr. Schneider then sent from his Gmail account to a broker dealer at Hightower Advisors, referring to monthly distributions as "fully covered." Gov't Exs. 8261, 7879; *see* Trial Tr. 5258:23–5261:10. An email previously sent to both defendants by Mr. Anscher in June 2016 shared "[c]overage for [Holdings I] and [GPB] Auto" excluding "certain options" and showed measures of net investment income that were less than distributions for both Holdings I and GPB Auto during 2015 and the first quarter of 2016. Gov't Exs. 8105, 8105-A. Mr. Anscher testified to discussing the results in that email with defendants because "the coverage shortfalls were evident and we were talking about being one hundred percent covered in our marketing meetings." Trial Tr. 4162:22–4164:24; *see* Gov't Ex. 8183. Mr. Anscher testified that the meeting involved only himself and defendants because they "didn't want to necessarily discuss [the results] with other people at the firm." Trial Tr. 4164:11–24.

On cross-examination, Roger Anscher acknowledged that the quarterly report for the first quarter of 2016 for both Holdings I and GPB Auto and second quarter for Holdings I and II reflected "full coverage" of distributions whether the numerator was "total investment income, net investment income, [or] net income." Trial Tr. 4861:16–21; *see id.* at 4862:16–4863:16, 4866:22–4867:4. Mr. Anscher further acknowledged that by April 2016, the marketing presentation for GPB Auto had removed a reference to distributions as "100 percent paid from funds from operations." Trial Tr. 4866:8–16; *compare* Gov't Ex. 7846-B 6–7, *with* Gov't Ex. 1434 at 6–8.

The government also offered testimony from investors and financial advisors. Morey Goldberg, who invested in Holdings I in approximately May 2015, testified about attending a meeting in GPB offices in April 2015 at which Mr. Gentile discussed monthly and special distributions. Mr. Goldberg testified that he understood those distributions would be paid with "cash flow from operations" and would be reduced if "there was not sufficient cash flow." Trial Tr. 5002:3–5005:20. Mr. Goldberg also testified about a May 2015 meeting with defendants where Mr. Gentile "told [him] . . . that the portfolio was generating sufficient cash flow from operations to make [monthly distribution] payments." *Id.* at 5006:5–10, 5007:8–9, 5007:24–5008:11. Mr. Goldberg acknowledged that after investing in Holdings I, he did not review audited financial statements or quarterly financial statements. *Id.* at 5031:15–5032:1.

Marvin Jones, who invested in GPB Auto in 2016, testified that marketing materials he reviewed prior to investing presented the historical performance for all three funds and made it "crystal clear" that the monthly and special distributions were "coming from operations" of businesses owned by the funds. *Id.* at 179:25–180:4, 180:16–18; *see id.* at 176:19–178:3; Gov't Ex. 1438 (showing historical "cash distributions paid to investors as a percentage of their gross investment" for all three GPB funds); *see also* Trial Tr. 428:16–429:21 (testimony of Jay Frederick

regarding Gov't Ex. 1438); *id.* at 946:19–947:22 (testimony of Bill Jacoby regarding Gov't Ex. 1438).  Mr. Jones testified that, after he had invested in GPB Auto, he attended an October 2016 due diligence event because he was "open to possibly making more investments with" GPB.  He testified that defendants spoke at the event but did not disclose that investor capital had been used to pay distributions.  Trial Tr. 185:4–23; *see id.* at 188:10–189:3, 371:17–372:5.

Jay Frederick, a financial advisor who invested in GPB Auto along with several clients in 2016, testified about the materials he received prior to making or recommending an investment.  Mr. Frederick testified that those materials represented that distributions would be paid with "the profit that comes from . . . car dealerships" and that "if the profits . . . [did] not support the distribution, the distribution would be reduced or suspended" or covered with excess profits from prior periods.  Trial Tr. 399:12–400:14, 574:7–21; *see id.* 385:11–386:10, 398:2–19, 405:20–406:12, 415:18–25, 423:13–424:1, 491:21–492:6; Gov't Ex. 8192.  Mr. Frederick testified that he attended a February 2016 due diligence event hosted by GPB where Mr. Gentile emphasized that the businesses owned by GPB Auto "generate steady predictable ongoing cash flow far in excess of the target [monthly] distribution."  Trial Tr. 415:6–14; *see* Gov't Ex. 8189-A.  Mr. Frederick also attended the October 2016 event with Mr. Jones to "further engage in due diligence" and consider whether "to invest more money" with GPB; Mr. Frederick testified that defendants presented but did not disclose that investor capital had been used to pay distributions.  *Id.* at 493:10–20; *see id.* at 494:9–495:13.

Other evidence showed defendants' roles in adding language to PPMs in 2016 regarding the source of distributions.  The June 30, 2016 GPB Auto PPM contained new language stating, "[W]hile we have no present plans to do so, we could include [investors'] invested capital in amounts we distribute to [investors], which may reduce the amount of capital available to acquire

and operate Dealerships." Gov't Ex. 8258-B 6, 26; Trial Tr. 951:23–952:20; *see id.* at 4362 (testimony of Roger Anscher); *see also* Gov't Ex. 4110-I 9, 29. Mr. Jacoby testified that, in meetings among Roger Anscher, defendants, himself, and others, "[i]t was proposed that [the GPB Auto PPM] say, we may include investor money in the distributions." Trial Tr. 952:19–953:2. Mr. Jacoby testified, in response, "Mr. Schneider and Mr. Gentile refused to accept that language and . . . made us change it to, we have no present plans to do so," because defendants "felt that making it more clear that we were paying investor money back to them would be alarming." *Id.* at 953:3–17. Roger Anscher testified that "Jeff Schneider was adamant that we include this 'we have no present plans to do' so language," and that when Mr. Anscher expressed "concern" about it because he "didn't think it was accurate," Mr. Schneider's response was "[t]o include it anyway." *Id.* at 4366–68; *see id.* at 4939:12–19. Jeffrey Lash testified that he overheard a conversation in 2016 among defendants, Mr. Anscher, and others about "how to get something into . . . the PPM without causing too much of a stir." *Id.* at 3075:8–3077:5. The government also offered evidence showing that the same language was added to the Holdings I PPM in December 2016. *Id.* at 2477:7–2478:14 (testimony of Macrina Kgil); Gov't Ex. 4099 at 34

The government submitted additional testimony by financial advisors and investors regarding representations made to them in 2017. Matthew Crafa, a financial advisor, testified that he received marketing materials and communications regarding Holdings II and GPB Auto in 2017 which represented that monthly and special distributions would be paid with "cash flow from the portfolio of companies." Trial Tr. 1658:1–24; *see id.* at 1655:3–1656:25, 1658:25–1659:4. Mr. Crafa also testified to attending a March 2017 due diligence event where GPB Auto was discussed and where Mr. Gentile, in response to questioning about "the fund's track record" of "dividend coverage," confirmed that that "history was correct." *Id.* at 1739:13–1741:7; *see id.* at 1672:5–

1676:7; Gov't Ex. 8063-C (table "represent[ing] cash distributions from inception" for each of the three GPB funds).  Anthony Lagiglia, another financial advisor, testified to being told—at due diligence events in March and September 2017 at which Mr. Gentile presented—that the "the source of the monthly distribution payment" would be "cash flow" from "mature businesses" owned by GPB Auto and Holdings II.  Trial Tr. 3655:9–25, 3659:13–23, 3665:3–3667:4; *see id.* at 3662:20–22.  Morey Goldberg testified that in July 2017, having invested in Holdings I, he was contacted by an Ascendant employee who solicited his investment in GPB Auto and Holdings II. *Id.* at 5009:20–5011:25, 5036:14–5039:13; *see* Gov't Ex. 8219.

### 3.    *Performance Guarantees*

The government offered testimony that defendants used backdated performance guarantees by Jeffrey Lash for two dealerships owned by Holdings I in 2014 and a dealership owned by GPB Auto in 2015—dealerships Mr. Lash had sold to those funds—in order to show that the funds had income adequate to support certain distributions.  Mr. Lash testified that in early 2015 Mr. Gentile told him to sign two performance guarantees, which were "back-date[d]" to "the beginning of 2014," to "solve the problem of [a] shortfall" caused by the underperformance of two dealerships owned by Holdings I.  Trial Tr. 3103:16–21.  Mr. Lash testified that he told defendants he never guaranteed the performance of the dealerships but that he was told "this was something that had to be done."  *Id.* at 3106:14–23.  Mr. Lash also testified that Mr. Gentile assured him he would not have to pay the guarantees.  *See id.* at 3113:19–3115:1, 3131:25–3132:5.  The government also offered documentary evidence that Mr. Lash signed the two guarantees after text communications with defendants in March 2015.  In those texts, both defendants suggest that the income guaranteed by the two agreements be such that approximately $1.1 million in deficiency payments were owed by Mr. Lash to both "cover the 500k in distributions made" and avoid "a negative effect on the

13

capital accounts." Gov't Ex. 7008-A; *see* Trial Tr. 31116:1–3134:7; Gov't Exs. 8120-A, 8120-C, 6038, 6039. Mr. Lash testified that he never made the approximately $1.13 million payment as required by two deficiency notices related to the guarantees, that Mr. Gentile told him "not[] to worry about" those notices, and that he only made a partial payment over two years later in July 2017 at Mr. Gentile's direction. *See* Trial Tr. 3130:11–3132:5, 3136:4–11, 3202:9–3205:8; Gov't Exs. 7962, 7962-A, 7962-B.

Other testimonial and documentary evidence showed how these performance guarantees were reflected on the 2014 audited financial statements for Holdings I. Those financial statements reflected "[d]istributions from investments" of $538,390, contributing to a net investment income for Holdings I of $2,498,858. Gov't Ex. 2008 at 7. The number $538,390 is also reflected under "Total distribution to GPB" on an auditor work paper describing the "Guarantee Calculation" for the two dealerships subject to the performance guarantees, Gov't Ex. 8028-J, and it is approximately the same as the "500K" Mr. Gentile referenced in text communications with Mr. Schneider and Mr. Lash discussing the size of the then-contemplated guarantee, Gov't Ex. 7008-A. Similarly, the auditor work paper reflects a total guarantee—"Paid by Lash in 2015 per audited financials"—of $1,136,201 that is the same as the total listed on Mr. Lash's two deficiency notices and is consistent with defendants' suggestion of an approximately $1.1 million deficiency under the guarantees in text communications. Gov't Exs. 8028-J, 7008-A. Note 5 of the 2014 audited financial statements for Holdings I also lists $1,100,000, as the approximate amount "paid by [Mr. Lash and another dealership owner, Patrick Dibre] into the dealerships" during 2014 pursuant to performance guarantees. Gov't Ex. 2008 at 15. Note 5 also reads, "Distributions and interest received by [Holdings I] resulting from these guarantees are included in interest income from investments on the consolidated statement of operations." *Ibid.* Bill Jacoby testified that the two

14

performance guarantees were reflected in the "investment income" listed on the consolidated statement of operations for Holdings I's 2014 audited financial statements.  Trial Tr. 887:21–23; *see id.* 879:23–882:4, 884:18–20.

On cross-examination, Bill Jacoby acknowledged that he did not "have a chart or Excel spreadsheet" that showed, as he had testified, that the two "performance guarant[e]es got on to the [2014] financials" of Holdings I.  *Id.* at 989:14–25.

The government also offered evidence of a third backdated performance guarantee for part of GPB Auto's 2015 income.  Jeffrey Lash testified to receiving a March 23, 2016 email which shared GPB Auto's 2015 financial performance and stated that "there will be [a] capital contribution coming from David Gentile" to be used for a partial "refund . . . of management fees." Sometime after that email, Mr. Lash met with defendants and James Prestiano and was told by Mr. Gentile, "we're gonna do another performance guarant[ee]."  *Id.* at 3165:19–3168:14. Documentary evidence offered by the government shows that in May 2016 Mr. Lash signed a performance guarantee for a dealership owned by GPB Auto.  The document was dated January 1, 2015, and metadata and email communications showed it was created on April 28, 2016.  *See* Gov't Exs. 7513-C, 7526, 7528, 7530, 7531-A.  Bill Jacoby testified that on April 28 or 29, Mr. Gentile told him "that he decided not to pay the management fees and Mr. Lash [was] going to instead pay a performance guarant[ee]" of $1,050,000.  *See* Trial Tr. 922:23–924:9, 931:1–20.  Mr. Jacoby also testified that he later worked with one of GPB's auditors to "update[] the notes to the financial statements to reflect" the performance guarantee.  *Id.* at 926:11–13, 932:6–933:4.

Mr. Lash testified that he never agreed to guarantee the performance of the dealership listed in the document.  *Id.* at 3180:23–3181:18.  Mr. Lash also testified that at a meeting in 2016, Mr. Gentile told him, "the first [performance guarantee] you didn't get hurt on and you're still not

going to get hurt," *id.* at 3185:2–15, and, "I know you really didn't guarantee it, but . . . this would have a big impact on GPB if we didn't do this."  *Id.* at 3184:8–22; *see id.* 3181:19–3182:1.  Mr. Lash testified that both defendants said that reporting GPB Auto's actual performance during 2015 would "definitely hurt capital raising."  *Id.* at 3154:22–3156:3.

Bank records offered by the government showed that Mr. Gentile made the following bank transfers, which Mr. Lash described as intended "[t]o make it appear that the guarantee was being paid":

- $509,644 from a Signature Bank account for GPB Realty Capital to a J.P. Morgan Chase account for GPB Realty Capital LLC, on April 22, 2016;
- $200,000 from a J.P. Morgan Chase savings account for Mr. Gentile and Joanne M. Cardali to the J.P. Morgan Chase account for GPB Realty Capital LLC, on April 28, 2016;
- $700,000 from the J.P. Morgan Chase account for GPB Realty Capital LLC to Mr. Lash's J.P. Morgan Chase "business account," on April 28, 2016;
- $1,050,000 from Mr. Lash's business account to a J.P. Morgan Chase "Dividends" account for GPB Auto, on April 28, 2016; and
- $1,050,000 from the J.P. Morgan Chase "Dividends" account for GPB Auto to a Signature Bank "Distribution" account for GPB Auto, on May 20, 2016.

Gov't Ex. 6200 at 22; Trial Tr. 3196:11–3198:5; *see id.* at 3851:23–3856:7; *see also* Indictment ¶¶ 57–60.  Note 5 to GPB Auto's 2015 financial statements addressed "agreements in place with the operating partners to guarantee a certain amount of income at the dealership level for a specified amount of time," and noted that $1,050,000 was considered "earned" by GPB Auto "[f]or the year ended December 31, 2015," is included "in income receivable from investments on the balance sheet," and "was collected in April 2016."  Gov't Ex. 2125 at 7, 15.

On cross-examination, Jeffrey Lash acknowledged that the $1,050,000 guarantee was "effectively" received by GPB Auto investors, *id.* at 3550:3–6; *see id.* at 3990:23–3991:14 (testimony of Michael Petron), and that he "never protested" $350,000 of the guarantee being paid "directly out of [his] bank account," *id.* at 3384:16–3385:18.  Defendants also elicited testimony

16

on cross-examination showing that the payment of a performance guarantee generally reflects underperformance by the dealership.  *See id.* at 339:1–22 (testimony of Marvin Jones); *id.* at 566:25–567:3 (testimony of Jay Frederick); *id.* at 3478:7–10 (testimony of Jeffrey Lash).

        *4.*    *Other evidence relevant to materiality*

The government elicited testimony about how defendants and those who worked for them understood the impact their representations regarding the source distributions would have on the willingness of investors to invest in GPB funds.  Roger Anscher testified that Mr. Gentile told him "it was critical for the funds to be one hundred percent covering distributions from operations in order to continue to raise money." *Id.* at 4166:6–13.  Josh Teeters testified that the "focal point" of the sales pitch he learned from Mr. Schneider in 2013 and used through 2017 was that "monthly distributions" were funded "[e]xclusively" by "[i]ncome from the portfolio companies." *Id.* at 1898:3–1899:15; *see id.* at 1914:7–1915:4.  Bill Jacoby testified that he discussed "reducing the distribution rate" with defendants "weekly," but that Mr. Schneider told him doing so "would slow down the new deposits coming in" and that they had to "keep it the same in order to continue to raise money" and "because that's what he [(Mr. Schneider)] was marketing." *Id.* at 793:11–794:13.  Macrina Kgil testified that "if you use the investor capital for distributions, you lose out on the opportunity to make further acquisitions and have better performance at the funds." *Id.* at 2962:23–2963:5.  She also testified that, "in the second half of 2017," she discussed "lowering the distribution for Holdings I" with defendants and others but was told that doing so "could potentially impact the other funds" that were still open for investment and that there could be "an increase in redemptions." *Id.* at 2480:19–2482:19.

Other documentary evidence showed that investors were told that "GPB has a redemption policy in place and intends to redeem Units on a quarterly basis" and that as of January 2017,

"GPB ha[d] honored all redemption requests."  Gov't Exs. 8256, 8256-A 11; *see* Trial Tr. 1943:13–
1944:18, 1945:12–18 (testimony of Josh Teeters).

The government also offered testimony describing the degree to which financial advisors
and investors cared about the source of funds used to pay distributions.  Marvin Jones testified that
"[i]t's one of the benchmarks in determining if you're going to put money" in and that he would
not "want to invest in a company that's just taking a share of your money and then giving you a
portion of it back over time."  Trial Tr. 182:18–183:8, 262:13–22.  Jay Frederick testified that the
source of distributions being "from income generated from the portfolio companies" was "the
entire purpose of investing in the fund" and that neither he nor his clients "would have invested"
if he "thought that [the] monthly . . . distribution was coming from your own capital or other
investor[s'] capital."  *Id.* at 405:9–14, 418:23–419:19.  Joseph Ghabour, a financial advisor whose
clients invested in Holdings I and GPB Auto, testified that the source of distributions was
"important" because use of "investor capital . . . to pay the distributions" would mean "there was
less money available to . . . purchase the targeted companies and dealerships within the portfolio."
*Id.* at 1503:22–1505:06.  Mr. Ghabour also testified that "there were some limited redemption
clauses" and that if he had "been told that distributions . . . include[d] investor capital," he "would
have likely explored the options as to whether or not [he] would be able to get [his] clients out of
the investment."  *Id.* 1505:7–11, 1521:24–1522:3.  Mathew Crafa testified that "the source of the
distributions" was "the whole reason why [he] was putting the money in . . . for [his] clients,"
especially since "[t]raditional [investment] vehicles . . . , like bonds, were yielding very low at that
time."  *Id.* at 1657:16–25, 1659:5–13; *see id.* 1682:7–20.  Anthony Lagiglia testified that if he "had
known that the monthly distributions were in part a return of capital," he would not "have
recommended the GPB funds to [his] clients."  *Id.* at 3663:5–12; *see id.* at 3661:12–17, 3662:20–

3663:4.  Finally, Morey Goldberg testified that "if [he] knew that the underlying portfolio companies were not capable of producing" sufficient cash flow to pay the monthly distributions, then he "would be concerned" and "it would cause [him] pause to make th[e] investment." *Id.* at 5015:23–5016:9, 5036:2–13; *see id.* 5039:21–25.

One of those witnesses, Jay Frederick, also testified that "the existence of the[] performance guarantees impact[ed] [his] view about the viability of the . . . targeted distribution." *Id.* at 417:17–20.  Mr. Frederick testified that *bona fide* performance guarantees "reduce[] the risk" of an investment, and that it therefore would be significant for him to know "as an investor and an adviser" whether the 2015 GPB Auto performance guarantee was "backdated" or "paid by someone else, other than the operator." *Id.* at 416:22–417:16, 670:8–20.

On cross-examination, some of these witnesses acknowledged that the PPMs and Limited Partnership Agreements ("LPAs") for each GPB fund disclosed that distributions could be paid with investor capital.  Marvin Jones, for example, acknowledged on cross-examination that the GPB Auto PPM disclosed that "a substantial portion of the distributions [could] be paid from . . . invested capital," *id.* at 285:1–16, and that he "received and carefully read and understood" the PPM.  *Id.* at 268:12–272:22, 275:2–22; *see also, e.g.*, *id.* at 528:18–23, 530:11–533:11, 545:11–547:25 (testimony of Jay Frederick); *id.* at 5153:9–5154:17 (testimony of Morey Goldberg); *id.* at 3718:7–3719:13 (testimony of Anthony Lagiglia); *id.* at 1612:9–1616:1 (testimony of Joseph Ghabour); *id.* at 1784:10–1785:22, 1790:8–1792:3, 1850:25–1851:7 (testimony of Matthew Crafa); Gov't Exs. 8258-B 26, 4061 at 84–85, 126; Def. Exs. QA 5, QI 6.

Defendants also elicited testimony that financial statements given to investors disclosed various measures of income and the total amount of distributions.  Mr. Jones, for example, acknowledged on cross-examination that he "carefully reviewed" the 2015 audited financial

statements for GPB Auto in deciding whether to invest, *id.* at 351:12–21, and that those financial statements reported net investment income lower than distributions, *id.* at 292:23–293:3, 350:2–353:5. *See* Gov't Ex. 2125 at 7–8; *see also, e.g.*, Trial Tr. 559:4–562:14 (testimony of Jay Frederick); *id.* at 3719:14–3726:11 (testimony of Anthony Lagiglia); *id.* at 1591:22–1598:9 (testimony of Joseph Ghabour); Def. Ex. MF-6 at 7–8 (quarterly report for the first quarter of 2017 for GPB Auto, showing distributions exceeding net investment income).

Similarly, Jay Frederick testified that investors had to certify that "[i]n evaluating the suitability of [the] investment," the investor had "not relied upon any representation or other information, whether oral or written, other than as provided" in the PPM and LPA. Trial Tr. 530:24–533:3. Mr. Frederick added that such certification was limited to determining "suitability"—*i.e.*, "whether or not [the investor is] an accredited investor" or "has immediate need for liquidity." *Id.* at 537:12–538:1.

On cross-examination, multiple investors acknowledged their understanding that "there was no absolute right of redemption" for those who invested in the GPB funds. *Id.* at 1851:12–1852:4 (testimony of Matthew Crafa); *see id.* at 276:13–277:5 (testimony of Marvin Jones). Marvin Jones testified on re-direct that GPB "could allow redemption," *id.* at 365:11–16, and Matthew Crafa testified on cross-examination that "a redemption program" existed whereby "an investor could redeem their investment" subject to "GPB's discretion," *id.* at 1851:12–1852:4. Both Joseph Ghabour and Marvin Jones acknowledged that neither sought to redeem his investment after learning some distributions were not fully covered. *See id.* at 1609:14–1610:25, 1619:17–19 (testimony of Joseph Ghabour); *id.* at 291:6–16 (testimony of Marvin Jones). Defendants also elicited testimony from Jay Frederick that, after learning of a coverage "shortfall" for GPB Auto at an October 2016 due diligence event, he personally invested in GPB Auto and

that his clients and him continued to invest in GPB Auto throughout 2017 and again in March 2018.  *See id.* at 572:4–577:25, 581:2–582:24, 644:24–645:16.

5.    *Other evidence relevant to knowledge and intent*

The government elicited testimony that individuals associated with GPB expressed concerns to the defendants regarding the payment of distributions and how distributions were marketed.  For example, GPB Auto paid special distributions in 2015 after Mr. Lash had shared "concerns" about doing so with defendants and conveyed that Bill Jacoby "stated that doing special distributions is basically suicide."  *Id.* at 3156:6–3159:22.  Mr. Jacoby testified that he shared a report on GPB Auto's 2015 financial performance with defendants, showing net investment income amounting to "one-third of the distributions paid," and was told by Mr. Schneider in response, "[I]f I offered you a million dollar bonus, could you make the financials look better[?]" *Id.* at 890:8–22, 893:17–19; *see also id.* at 713:2–715:8 (testifying that both defendants rejected Mr. Jacoby's concerns that marketing materials "weren't showing the actual performance of the investments").  Mr. Jacoby also testified that he told Mr. Gentile that GPB Auto's 2015 audited financial statements needed to be restated to remove the performance guarantee because "the statements were not accurate," but that Mr. Gentile refused to "restate the financial statements." *Id.* at 937:8–15, 940:9–941:18.  Roger Anscher testified that, in 2016, he repeatedly expressed to defendants "concerns around coverage," "concerns around distributions," and concerns about how they "were representing that information because [Mr. Anscher] wasn't comfortable with it."  *Id.* at 4332; *see id.* at 4165:2–20, 4312–13, 4304–08.

Other evidence showed that Mr. Schneider sometimes used his Gmail, instead of his company email, because emails involving the latter email address got "reviewed by [the Financial Industry Regulatory Authority ("FINRA")]."  *Id.* at 1444:10–24 (testimony of Bill Jacoby); *see id.*

at 4314 (testimony of Roger Anscher); *id.* at 3144:9–17, 3145:24–3147:7 (testimony of Jeffrey Lash). There was also testimony that GPB and Ascendant charged investors in each fund fees, which were then, in part, paid to defendants through their compensation. *See id.* at 734:1–738:16 (testimony of Bill Jacoby); *id.* at 3004:11–3006:15 (testimony of Jeffrey Lash); *id.* at 4378–79, 4467:9–4470:6 (testimony of Roger Anscher).

Jeffrey Lash testified that in 2019—after he no longer worked for GPB and had met with agents of the Federal Bureau of Investigation ("FBI")—he and defendants agreed that he would tell the FBI that the transfer into his bank account prior to payment of the GPB Auto performance guarantee "was a loan from" Mr. Gentile. *Id.* at 3216:13–3219:24; *see id.* at 3220:22–3221:4. Mr. Lash further testified that he "never had a loan agreement" with Mr. Gentile and that he "agree[d] to lie." *Id.* 3219:25–3220:12; *see id.* at 3222:3–10. Mr. Lash also testified that an attorney who had been GPB's in-house counsel, James Prestiano, accompanied him to a meeting with the FBI and told Mr. Lash he was doing so to "mak[e] sure that [Mr. Lash] stuck with the story." *Id.* at 3220:3–3221:21; *see id.* at 878:16–19 (testimony of Bill Jacoby). Mr. Lash further testified that Mr. Gentile and Mr. Prestiano told him that "if [he] didn't stick to the story," then they "could take [Mr. Lash's] basic severance package away." *Id.* at 3222:17–21.

On cross-examination, Mr. Schneider elicited testimony showing that he was not copied on certain marketing emails sent from Ascendant employees to investors and financial advisors. *See, e.g.*, *id.* at 1854:14–15, 1857:3–4 (cross-examination of Matthew Crafa). Mr. Schneider sought to elicit testimony regarding efforts at Ascendant to remove certain representations from marketing communications. Josh Teeters, for example, acknowledged that language referring to distributions as "fully covered" was removed from the sales pitch for GPB Auto in March 2016. *Id.* at 2102:3–2103:10. Mr. Teeters further stated that he reviewed "20 binders" of emails sent to

investors in 2017 and 2018 and "none of them said fully covered." *Id.* at 2125:21–2126:15.  Other evidence showed a series of marketing communications which omitted such language.  *See id.* at 6374:22–6376:9; July 28, 2024 Ltr., Ex. A (Dkt. #462).

Mr. Schneider also submitted documentary evidence that he invested in the GPB funds. *See* Def. Exs. Pub 63, Pub 64, Pub 65, Pub 69, Pub 70, Pub 71; Trial Tr. 6263:5–6269:19.

Mr. Gentile elicited testimony regarding the limited extent of his involvement in Ascendant employees' representations to investors.  The government's investor and financial advisor witnesses, for example, acknowledged that the email communications to which they testified were not from and did not copy Mr. Gentile.  *See, e.g.*, Trial Tr. 593:4–14 (cross-examination of Jay Frederick).  Mr. Gentile also elicited testimony from Mr. Frederick regarding the February 2016 due diligence event, at which Mr. Frederick had testified to hearing certain representations made by Mr. Gentile.  Mr. Frederick acknowledged that the event did not involve a session specific to GPB Auto, but did include "an update on the Holdings II fund in particular."  *See id.* at 549:5–553:1.  Mr. Frederick also testified on cross-examination that GPB Auto "was discussed" at the event but that he was not "sure" that Mr. Gentile "spoke specifically during his presentation about" GPB Auto and "not in connection with Holdings II."  *Id.* at 550:22–25, 553:2–8.

## B.    Defendants' case

Defendants sought to establish through cross-examination that they had disclosed the possibility of using investor capital to pay distributions and the periods for which distributions exceeded portfolio-company income.  Defendants also sought to show through expert testimony that alternative metrics of portfolio-company income largely exceeded distributions paid to investors, and that the amount of investor capital used to pay those distributions was immaterial. Mr. Schneider sought to establish that he enforced a compliance process for marketing material in

2016 and invested in the GPB funds himself.  Mr. Gentile sought to show that he did not draft or review the language used in marketing materials for the GPB funds.  He also sought to show, regarding the performance guarantees, that he loaned Mr. Lash the money needed to pay the Holdings I and GPB Auto performance guarantees and that the GPB Auto performance guarantee was in fact paid.

### 1.   Coverage Metrics

Defendants offered expert testimony from Erica Bramer, as an expert in finance and financial analysis.  Ms. Bramer testified that there is no "regulatory requirement" for how a "coverage ratio has to be calculated" and that there is "more than one reasonable way to calculate coverage ratio in the private equity context."  *Id.* at 5873:3–11.  Ms. Bramer also testified to the historical, inception-to-date coverage for Holdings I and II and GPB Auto on a quarterly basis using different coverage metrics, including total investment income, net investment income, net investment income plus realized gain or loss, and net income.  That testimony and accompanying exhibits showed, for example, that distributions were fully covered by total investment income, on an inception-to-date basis, for all three funds through the first quarter of 2018, except for a two percent shortfall in GPB Auto that occurred in that quarter.  *Id.* at 5876:8–5879:18; Def. Ex. BRAMER-A.  Ms. Bramer testified that total investment income "represents the income that . . . comes up from the . . . portfolio companies."  Trial Tr. 5878:15–5879:1.

Ms. Bramer testified that, on an inception-to-date basis, distributions were fully covered by net income until the fourth quarter of 2014 for Holdings I, the third quarter of 2016 for GPB Auto, and the second quarter of 2016 for Holdings II, *see* Def. Ex. BRAMER-B, that distributions were fully covered by net investment income plus realized gain or loss until the third quarter of 2016 for Holdings I, the fourth quarter of 2015 for GPB Auto, and the second quarter of 2016 for

Holdings II, *see* Def. Ex. BRAMER-C; and that distributions were fully covered by net investment income until the fourth quarter of 2015 for Holdings I, the fourth quarter of 2015 for GPB Auto, and the second quarter of 2016 for Holdings II, *see* Def. Ex. BRAMER-D.

Ms. Bramer also testified that Holdings I closed to new investment "[a]t some point in 2015" and that GPB Auto and Holdings II closed to new investment in 2018. Trial Tr. 5889:4–9; *see* Gov't Ex. 5068-B 9 (noting a "Close Date" of July 2015 for Holdings I); Def. Ex. TTS-1 at 34, 88 (noting investors "will be joining" Holdings II "up until June 30, 2018).

On cross-examination of government witnesses, defendants elicited testimony about some of the metrics of income to which Ms. Bramer testified. Bill Jacoby and Macrina Kgil acknowledged that "coverage" lacked "one specific definition." Trial Tr. 1309:4–15 (testimony of Bill Jacoby); *accord id.* at 2561:20–2563:17, 2714:25–2715:7 (testimony of Macrina Kgil). Ms. Kgil testified that she recognized the metrics of total investment income, which measured a given fund's revenue; net investment income, which "subtract[ed] out the expenses of the fund"; net investment income plus realized gains or losses; and net income, which accounted for "unrealized gain or loss." *Id.* at 2802:11–2804:2; *see also id.* at 886:3–887:20 (testimony of Bill Jacoby). Ms. Kgil further stated that she would not use net investment income to "measur[e] the cash flow into the fund." *Id.* at 2818:24–2819:1. Investor Marvin Jones acknowledged that total investment income represents "the cash or revenue from the portfolio companies," *id.* at 301:3–13, and other investor and advisor witnesses acknowledged that distributions were fully covered using total investment income, *see id.* at 296:6–24 (testimony of Marvin Jones); *id.* at 561:6–10 (testimony of Jay Frederick); *id.* at 1599:25–1600:11 (testimony of Joseph Ghabour); *id.* at 1797:3–19 (testimony of Matthew Crafa); *id.* at 5162:2–11 (testimony Morey Goldberg).

25

In addition, defendants offered expert testimony from Martin Wilczynski, as an accounting expert, about the aggregate accrued revenues recorded by each GPB fund since inception relative to the total amount of cash that had been transferred from each fund's investment account to its distribution account. *See* Def. Ex. WILCZYNSKI-F. Aggregate accrued revenues exceeded such transfers until October 2016 for Holdings I, until September 2016 for GPB Auto, and until June 2017 for Holdings II. *See ibid.*

> 2. *Performance guarantees*

Defendants offered expert testimony by Martin Wilczynski that the two performance guarantees signed by Jeffrey Lash did not affect the revenue reported on the 2014 audited financial statements of Holdings I. *See* Trial Tr. 5457:15–5458:9. Mr. Wilczynski testified that the reference in Note 5 of those financial statements to approximately $1.1 million in performance guarantees related to performance guarantees executed by Patrick Dibre, not those executed by Mr. Lash. *See id.* at 5484:8–15. On the government's cross-examination, Mr. Wilczynski acknowledged that Mr. Dibre "paid $1.8 million in 2015 not $1.1 million" in performance guarantees, and that Note 5 referred to "a $1.1 million guarantee in favor of the dealerships," whereas Mr. Dibre "didn't have guarantees in favor of the dealerships" and Mr. Lash did. *Id.* at 5662:19–21, 5663:19–5665:3.

### C. Summations

The government argued in summation that defendants and Ascendant employees told investors that distributions would be paid exclusively with income from the GPB funds' portfolio companies. *See id.* at 6389:17–22, 6390:3–9, 6409:2–6412:15. The government argued that defendants were made aware that "the funds weren't making enough money to pay the monthly distributions with profits"—*i.e.*, that there was "a coverage shortfall" with net investment income

lower than distributions—requiring the use of "investor money to pay . . . distributions." *Id.* at 6396:2–6397:6, 6404:24–6405:2, 6398:1–19. The government urged the jury to find that defendants did in fact use investor capital to pay distributions, rather than relying exclusively on portfolio-company income, and that defendants created the three backdated performance guarantees in order to make it seem that those dealerships had income adequate to support distributions. *See id.* at 6413:24–6414:5, 6396:2–9, 6429–54.

Defendants argued in summation that they disclosed the possibility that investor capital would be used to pay distributions and the periods during which distributions were under-covered relative to portfolio-company income. *See id.* at 6508:21–6509:2, 6713:5–6717:16. They argued that distributions were covered by alternative metrics of income such as accrued revenues, *see id.* at 6675:8–6681:19, 6792:1–6795:11, and total investment income, *see id.* at 6740:6–6754:11. And they argued that the government failed to prove they acted with the requisite intent, emphasizing evidence of a compliance process for the approval of marketing materials and the fact that Mr. Schneider invested in the GPB Funds. *See, e.g.*, *id.* at 6681:20–25, 6697:18–21, 6720:19–6721:13, 6728:10–6734:3, 6698:2–11, 6721:14–6722:16. Regarding the performance guarantees, defendants claimed there was no evidence that the Holdings I performance guarantees affected its 2014 financial statements, *see id.* at 6555:6–6558:10, that auditors were aware of the GPB Auto performance guarantee, *see id.* at 6510:1–3, and that the GPB Auto performance guarantee was paid in full, *see id.* at 6718:3–6.

Defendants also urged the jury to find several government witnesses not credible, *see e.g.*, *id.* at 6509:14–24, 6511:23–25, 6785:7–20, and claimed that perjury had been committed by Bill Jacoby, *see, e.g.*, *id.* at 6532:21–25, Roger Anscher, *see, e.g.*, *id.* at 6569:16–6570:12, and Jeffrey

Lash, *see, e.g.*, *id.* at 6572:14–18.  Defendants further accused the government of having "coached" witnesses during trial.  *Id.* at 6567:1–6570:22.

In rebuttal, the government argued that "the issue in this case" is not the "definition of coverage ratio" but rather whether defendants used "investor cash to pay investor distributions." *Id.* at 6873:4–25.  The government asserted that defendants had misrepresented to investors the fact that that they had used investor capital to pay distributions and that internal reports of coverage were relevant insofar as they showed that defendants either knew, or consciously avoided knowing, that the portfolio companies were not generating enough income to pay distributions without continuing to use investor capital.  *See id.* at 6874:2–6878:4, 6941:4–20.

*       *       *

The jury found defendants guilty on all counts.  Gentile Verdict Sheet (Dkt. #472); Schneider Verdict Sheet (Dkt. #473).

### III.   Post-Trial Motions

Defendants filed motions for judgments of acquittal under Federal Rule of Criminal Procedure 29, *see* Schneider Mot. for Acquittal or New Trial ("Schneider Mot.") 4–40 (Dkt. #487-1); Gentile Mot. For Acquittal (Dkt. #488-1), and for a new trial under Federal Rule of Criminal Procedure 33, *see* Schneider Mot. 40–83; Gentile Mot. for New Trial (Dkt. #490-1).  Mr. Gentile also filed a motion to dismiss the indictment based on prosecutorial misconduct, in which Mr. Schneider joined.  *See* Gentile Mot. to Dismiss (Dkt. #489-1); Schneider Mot. 71–83; Sept. 16, 2024 Schneider Ltr. (Dkt. #491).

Defendants argue that they are entitled to acquittal on all counts.  Regarding securities fraud, defendants assert that there was insufficient evidence that defendants made a false statement or employed a scheme to defraud, or that the alleged misrepresentations were material, made in

28

connection with the purchase or sale of a security, or made with the requisite knowledge and intent. *See* Schneider Mot. 4–40; Gentile Mot. For Acquittal 2–28; Gentile Reply in Supp. of Mot. for Acquittal ("Gentile Acquittal Reply") 2–18 (Dkt. #507); Schneider Reply 11–33 (Dkt. #504). Regarding wire fraud, Mr. Gentile asserts there was insufficient evidence that the GPB Auto performance guarantee was material or made with the requisite intent. *See* Gentile Mot. for Acquittal 28–37; Gentile Acquittal Reply 18–24.

In seeking a new trial, defendants argue that the jury was permitted to convict on a right-to-control theory invalidated by *Ciminelli v. United States*, 598 U.S. 306 (2023), that the government constructively amended and prejudicially varied from the indictment, that the government engaged in misconduct during summation and rebuttal, that there were various errors in the admission and exclusion of evidence and in the jury charge, and that an improper statement was made to the venire during jury selection. *See* Gentile Mot. for New Trial; Schneider Mot. 40–83; Gentile Reply in Supp. of Mot. for New Trial ("Gentile New Trial Reply") (Dkt. #506); Schneider Reply 1–11, 33–45.

Finally, defendants argue that the indictment should be dismissed based on prosecutorial misconduct. Defendants claim the government solicited perjury, relied on false evidence during summation, withheld prior statements made by its witnesses or improperly coached them during trial, elicited inflammatory testimony in bad faith, and engaged in misconduct during summation and rebuttal. *See* Gentile Mot. to Dismiss; Schneider Mot. 71–83; Gentile Reply in Supp. of Mot. to Dismiss ("Gentile MTD Reply"); Schneider Reply 43–45; Sept. 16, 2024 Schneider Ltr.

## DISCUSSION

Defendants' motions for judgments of acquittal and for a new trial are denied, as is Mr. Gentile's motion to dismiss the indictment based on prosecutorial misconduct.

## I.     Defendants Are Not Entitled to Judgments of Acquittal

Defendants' motions for acquittal are denied.  "A defendant bears a heavy burden when he attacks a criminal conviction on the basis of insufficient evidence." *United States v. Delgado*, 972 F.3d 63, 72 (2d Cir. 2020) (quotation marks and citation omitted).  While a court must enter a judgment of acquittal when "the evidence is insufficient to sustain a conviction," Fed. R. Crim. P. 29(a), a conviction will be upheld "if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *United States v. Bramer*, 956 F.3d 91, 96 (2d Cir. 2020).  In making this assessment, a court must "view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *Delgado*, 972 F.3d at 72 (citation omitted).

### A.     A rational jury could have found Mr. Gentile guilty of both counts of wire fraud.

Mr. Gentile fails to establish that no rational jury could have found him guilty of both counts of wire fraud.

#### 1.     *Material fraudulent representation*

There was sufficient evidence for a rational jury to find, beyond a reasonable doubt, that the GPB Auto performance guarantee was fraudulent and material.

As to the fraudulent nature of the guarantee, the government offered evidence from which a rational jury could find that Mr. Lash—the operating partner referenced in Note 5 of GPB Auto's 2015 financial statements, *see* Gov't Ex. 2125 at 15—had not agreed to guarantee the performance of the relevant dealership at any point during 2015.  That evidence also showed that GPB Auto neither "earned" the $1,050,000 underlying the performance guarantee during 2015 nor ended that year with a "receivable" for that amount.  Mr. Lash testified that he never agreed to the

performance guarantee and was told by Mr. Gentile he would not have to pay it, *see* Trial Tr. 3180:23–3181:18, 3185:2–15, other evidence showed that the agreement was not executed until May 2016, *see id.* at 3165:19–3169:15; Gov't Exs. 7513-C, 7526, 7528, 7530, 7531-A, and documentary evidence showed that most of the funds used to pay the guarantee had been transferred from other GPB accounts by Mr. Gentile, *see* Gov't Ex. 6200 at 22; Trial Tr. 3196:11–3198:5, 3851:23–3856:7.

As to materiality, Mr. Gentile is mistaken to argue that because GPB Auto received full payment of the amount guaranteed, the evidence was insufficient to support a finding that the misrepresentations regarding the performance guarantee—*i.e.*, the date of execution and identity of the guarantor—were material. *See* Gentile Mot. for Acquittal 30–32. The "materiality inquiry target[s] the . . . question: would the misrepresentation actually *matter* in a *meaningful* way to a rational decisionmaker?" *United States v. Calderon*, 944 F.3d 72, 86 (2d Cir. 2019). "When considering a securities transaction, a misstatement is material if there is . . . . 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" *United States v. Gramins* (*Gramins II*), No. 21-5, 2022 WL 6853273, at *2 (2d Cir. Oct. 12, 2022) (quoting *United States v. Landesman*, 17 F.4th 298, 341 (2d Cir. 2021)). "Determination of materiality . . . is a mixed question of law and fact that the Supreme Court has identified as especially well suited for jury determination." *Ibid.* (quoting *United States v. Gramins* (*Gramins I*), 939 F.3d 429, 446 (2d Cir. 2019)).

The government offered testimony from which a jury could have found that the misrepresentations surrounding the performance guarantee were material. This evidence included a GPB investor's testimony that whether a purported performance guarantee is "backdated" or

"paid by someone else, other than the operator" "[a]bsolutely" impacts his decision to invest and affects the "risk" and "viability" of the investment.  Trial Tr. 416:22–417:20, 670:8–20 (testimony of Jay Frederick).  Mr. Lash also testified to statements by both defendants showing they expected fewer investors to invest in the GPB funds if GPB Auto's 2015 performance was accurately reported.  *See id.* at 3184:8–22, 3154:22–3156:3.  When viewed in the light most favorable to the government, that testimony "precludes a finding that no reasonable mind could find [the mis]statements material."  *United States v. Litvak* (*Litvak I*), 808 F.3d 160, 175–76 (2d Cir. 2015) (noting testimony from "representatives of [the defendant's] counterparties that his misrepresentations were 'important' to them in the course of the transactions on which the securities fraud charges were predicated").

> ### 2. *Intent*

There was sufficient evidence for a rational jury to find, beyond a reasonable doubt, that Mr. Gentile acted with "specific intent to obtain money or property by means of a fraudulent scheme that contemplated harm to the property interests of the victim."  *United States v. Carlo*, 507 F.3d 799, 801 (2d Cir. 2007).  For example, the inference that Mr. Gentile intended to defraud investors is supported by evidence that he concealed from investors when the performance guarantee was executed and by whom, *see* Trial Tr. 3180:23–3181:18, 3185:2–15, 3165:19–3168:14, 3196:11–3198:5, 3851:23–3856:7; Gov't Exs. 7513-C, 7526, 7528, 7530, 7531-A, 6200 at 22, 2125 at 7, 15, and told Mr. Lash, "I know you really didn't guarantee it, but . . . this would have a big impact on GPB if we didn't do this," Trial Tr. 3184:8–22.  "The jury was entitled to believe that [Mr. Gentile] was telling the truth" when he told Mr. Lash that not using a backdated performance guarantee would negatively impact GPB's efforts to raise and retain funds from investors.  *United States v. Halloran*, 821 F.3d 321, 330 (2d Cir. 2016).

Mr. Gentile points to evidence that he argues suggests a lack of intent.  For example, he emphasizes that GPB's auditors were aware of and approved the performance guarantee and that the need to collect on a performance guarantee generally reflects underperformance by the dealership.  Gentile Mot. for Acquittal 35–37.  But this evidence supports only a "competing inference[]" on the issue of intent, which the jury was permitted, but not required, to adopt. *Gramins II*, 2022 WL 6853273, at *3 (quoting *United States v. Coppola*, 671 F.3d 220, 239 (2d Cir. 2012)).  When the record is viewed in the light most favorable to the government, there was sufficient evidence that Mr. Gentile acted with intent to defraud investors of their money.

Mr. Gentile is similarly mistaken in arguing that the evidence at trial precluded the jury from concluding that he executed the April 22, 2016 wire at issue in Count Four with intent to further the performance guarantee scheme, because he claims the scheme could have existed no earlier than April 27.  *See* Gentile Mot. for Acquittal 34–35.  The jury was entitled to base its finding on when the performance guarantee scheme began "entirely on circumstantial evidence." *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995).  Mr. Lash testified that sometime "[t]hree weeks . . . or less than a couple weeks" after March 23, 2016, he was told by Mr. Gentile, "we're gonna do another performance guarant[ee]," and that Mr. Gentile later told him he had made a series of bank transfers "[t]o make it appear that the guarantee was being paid."  Trial Tr. 3165:19–3168:14, 3185:13–3186:2, 3196:11–3198:5.  A rational jury could infer from Mr. Lash's testimony and their own "common sense and experience" that Mr. Gentile would not have transferred $509,644 from a Signature Bank account for GPB Realty Capital to a J.P. Morgan Chase account for the same entity, except with the intent to further the performance guarantee scheme. *United States v. Huezo*, 546 F.3d 174, 182 (2d Cir. 2008).  A jury could reasonably draw

that inference even though it was not until April 28, 2016 that Mr. Jacoby became aware of the scheme and the physical guarantee document was created. *See* Gentile Mot. for Acquittal 35.

*    *    *

Accordingly, Mr. Gentile's motion for a judgment of acquittal is denied as to the two wire fraud counts.

### B.    A rational jury could have found both defendants guilty of securities fraud.

Defendants fails to establish that no rational jury could have found them guilty of securities fraud beyond a reasonable doubt. Defendants argue that there was insufficient evidence that Mr. Schneider made a false statement, that Mr. Gentile made a false statement or employed a scheme to defraud, that any such statement was material and made in connection with the purchase or sale of a security, or that either defendant acted with the requisite intent. Schneider Mot. 4–32, 32–40, Gentile Mot. for Acquittal 2–28, 38–40.

#### 1.    *Making of a false statement – Mr. Schneider*

There was sufficient evidence for a rational jury to find that Mr. Schneider made or caused to be made several false statements to investors, including: (1) statements made throughout 2016 and 2017 by Ascendant employees at Mr. Schneider's direction that the source of distributions was, "exclusively," "income from the portfolio companies." *Id.* at 1898:3–1899:15, 1910:5–1912:25, 1914:7–1915:4 (testimony of Josh Teeters regarding all three GPB funds); *see id.* at 176:19–178:3, 179:25–180:4, 180:16–18 (testimony of Marvin Jones regarding GPB Auto); *id.* at 385:11–386:10, 398:2–19, 399:12–400:14, 405:20–406:6, 415:18–25, 423:13–424:1, 491:21–492:6, 574:7–21 (testimony of Jay Frederick regarding GPB Auto); *id.* at 1655:8–1656:25, 1658:1–1659:4 (testimony of Matthew Crafa regarding GPB Auto and Holdings II); *id.* at 3655:9–25, 3659:13–23, 3662:20–22, 3665:3–3666:16 (testimony of Anthony Lagiglia regarding GPB

34

Auto and Holdings II); (2) the statements in GPB Auto's June 2016 PPM and Holdings I's December 2016 PPM that GPB had "no present plans" to "include [investors'] invested capital in amounts . . . distribute[d] to" investors, Gov't Exs. 4110-I 29, 8258-B 26, 4099 at 34; *see* Trial Tr. 951:23–953:8 (testimony of Bill Jacoby); *id.* at 4362, 4366–68 (testimony of Roger Anscher); *id.* at 3075:8–3077:5 (testimony of Jeffrey Lash); and (3) statements made throughout 2016 by Mr. Schneider that investor distributions were "fully covered" with "income from operations," Trial Tr. at 4130:24–4132:23 (testimony of Roger Anscher); Gov't Exs. 8261, 7879; *see* Trial Tr. 5258:23–5260:1. While Mr. Schneider focuses his briefing on the last of these three, *see* Schneider Mot. 4–23, there need only have been "sufficient evidence to support one of the theories presented." *United States v. Desnoyers*, 637 F.3d 105, 109 (2d Cir. 2011) (quoting *United States v. Garcia*, 992 F.2d 409, 416 (2d Cir. 1993)).

Contrary to Mr. Schneider's arguments regarding the first category, the jury was entitled to rely on statements made to investors by Ascendant employees to find fraud on the part of Mr. Schneider. *See* Schneider Mot. 60–63. Viewed in the light most favorable to the government, the evidence showed that Mr. Schneider exercised ultimate control over the pitch used by Ascendant employees and thus caused those employees to tell investors throughout 2016 and 2017 that distributions were paid exclusively from portfolio company income, and not investor capital. *See* Trial Tr. at 713:5–17, 1890:8–21, 1901:11–14, 1904:8–10, 1908:8–25, 1971:18–22 (testimony of Bill Jacoby); *id.* at 4115:17–24, 4311–16, 4941:23–4942:23, 4945:17–4946:7 (testimony of Roger Anscher); *see also* Gov't Exs. 8099, 8184, 8146 (marketing materials shared with Mr. Schneider). As discussed above, the government offered sufficient evidence to show that GPB Auto and Holdings I had begun to use investor capital to pay distributions by the end 2015, and thus that the statements were false when made throughout 2016. Moreover, other evidence showed that for the

third and fourth quarters of 2016 and throughout 2017, both GPB Auto and Holdings I had paid more in distributions than they had received in net investment income plus realized gain or loss. *See* Gov't Ex. 6200 at 7, 21; Def. Ex. BRAMER-C. There was also evidence that similar financial results were conveyed to Mr. Schneider throughout 2017. *See* Gov't Exs. 7915, 7915-A 2 (GPB Auto), 8117, 8117-A 2 (Holdings I); Trial Tr. 2201:8–20, Gov't Ex. 8008-A; Trial Tr. 4925:13–4926:4, Gov't Ex. 7857-A; Trial Tr. 2224:11–16, Gov't Ex. 8009-B.

In response to the second category of statements—statements in the PPMs that GPB had "no present plans" to "include [investors'] invested capital in amounts . . . distribute[d] to" investors—Mr. Schneider principally argues that distributions were fully covered at the time the PPMs were issued, using certain measures of income. *See* Schneider Mot. 26–27. But the "no present plans" language speaks to the use of "invested capital" to pay distributions, not any measure of coverage. The government's testimonial and documentary evidence showed that by the end of 2015—before the "no present plans" language was issued to investors in the June 2016 GPB Auto PPM and December 2016 Holdings I PPM—GPB Auto and Holdings I had begun to pay investor distributions at least partially with investor capital rather than income from the operations of the funds' portfolio companies. *See* Gov't Ex. 6200 at 5, 19; Trial Tr. 3791:14–25, 3798:23–3799:19, 3801:10–3807:15, 3819:7–3820:6 (testimony of Michael Petron); *see id.* at 3824:3–3829:1 (Holdings I), 3843:14–3847:14 (GPB Auto). Corroborating that showing were the financial reports and communications with Mr. Schneider that reported distributions exceeding net investment income plus realized gain or loss on an inception-to-date basis by the time each PPM was issued. *See* page 38 *infra*. And when viewed in the light most favorable to the government, the evidence was sufficient to show that Mr. Schneider and Mr. Gentile had ultimate authority over the inclusion of the "no present plans" language in the PPMs. *See* Trial Tr. 951:23–953:17

(testimony of Bill Jacoby); *id.* at 4939:12–19, 4362, 4366–68 (testimony of Roger Anscher); *id.* at 3075:8–3077:5 (testimony of Jeffrey Lash).

While each of those two categories of statements are independently sufficient to support Mr. Schneiders' conviction, so is the third category of statements, that distributions were "fully covered." Mr. Schneider argues that these statements were not false when made because there are multiple ways to measure coverage, the alleged representations did not specify to which measure they referred, and under at least one measure, all three funds' distributions were fully covered during substantially all of the charged conspiracy period. *See* Schneider Mot. 4–23.

To the contrary, though, the government offered evidence that Mr. Schneider knew that, under their objective meaning, the "fully covered" statements were false when made. For instance, Mr. Schneider wrote, in a September 2016 email to a broker-dealer, that "GPB has been able to provide . . . 8.7% fully covered distributions" and repeatedly told investors throughout 2016 that distributions were "fully covered" by "income from operations." Gov't Exs. 8261, 7879; Trial Tr. at 4130:24–4132:23 (testimony of Roger Anscher). The government consistently argued that the objective meaning of the term "fully covered" referred to coverage calculated using net investment income after realized gain or loss—the coverage metric used by GPB, Trial Tr. 767:1–19 (testimony of Bill Jacoby); *id.* at 2945:15–21 (testimony of Macrina Kgil)—and that the term thus implied that no investor capital was used to pay distributions, *see, e.g.*, Trial Tr. 6396:2–6397:6, 6404:24–6405:2, 6398:1–19 (government summation). The government's testimonial and documentary evidence showed that by the end of 2015—and prior to Mr. Schneider's repeated "fully covered" statements in 2016—GPB Auto and Holdings I had begun to pay investor distributions at least partially with investor capital rather than income from the operations of the funds' portfolio companies. *See* Gov't Ex. 6200 at 5, 19; Trial Tr. 3791:14–25, 3798:23–3799:19,

3801:10–3807:15, 3819:7–3820:6 (testimony of Michael Petron); *see id.* at 3824:3–3829:1 (Holdings I), 3843:14–3847:14 (GPB Auto).  That showing was corroborated for GPB Auto by evidence that, by the end of 2015 and continuing through 2016, net investment income plus realized gain or loss was insufficient to cover distributions.  *See* Gov't Ex. 6200 at 20; Def. Ex. BRAMER-C.  Support for the inference that Mr. Schneider was aware that his "fully covered" statements throughout 2016 were false because investor capital had been used to pay distributions included evidence that Ascendant employees were told on a March 2016 sales call to "not say [GPB Auto] is fully covered," Gov't Ex. 8049, financial reports shared with both defendants throughout 2016, Gov't Exs. 7681, 7681-A 1, 8327, 8327-A, 7682, and communications both defendants had with Roger Anscher in June 2016, *see* Trial Tr. 4162:22–4164:24; Gov't Exs. 8183, 8105, 8105-A.

Mr. Schneider is mistaken in relying on a line of cases that include *United States v. Connolly*, 24 F.4th 821 (2d Cir. 2022), and *United States v. Harra*, 985 F.3d 196 (3d Cir. 2021), to argue that the government was required to prove that the "fully covered" statements were false under "any reasonable interpretation" of coverage.  Schneider Mot. 6–8.  To the contrary, the jury had to determine whether the alleged statements were "untrue" when made to investors.  17 C.F.R. § 240.10b–5; Trial Tr. 6985:23–6987:12; *see Connolly*, 24 F.4th at 835; *Harra*, 985 F.3d at 211.  That determination necessarily requires the jury to ascertain the meaning of each statement and find it to be false.  It does not require the government to separately prove that inferior but "reasonable" alternative meanings were also false.

*Harra* is not to the contrary.  *Harra* held that when the defendant's statement was in response to a regulator's request for information, an assessment of whether the defendant's response is false requires consideration whether the regulator's request carried multiple possible

meanings.  *See Harra*, 985 F.3d at 211, 213–15, 218 (Securities and Exchange Commission).  The inquiry into the instruction's ambiguity is required by the principle that the defendant have "fair warning" of what information the regulator requires.  *Harra*, 985 F.3d at 213–15.  That inquiry is inapposite where, as here, the alleged misrepresentation was made to investors and does not turn on the meaning of a regulatory requirement.[2]

*Connolly* is similarly inapposite.  *Connolly* faulted the government in that case for failing to prove that the defendants' rate submissions fell outside the objective meaning of the instruction—not an inferior alternative meaning.  *Connolly* found that certain traders at Deutsche Bank ("DB") had been entitled to an acquittal on charges of wire fraud based on interest rates they submitted to the British Bankers' Associations' ("BBA") in order to benefit their trading positions.  The BBA requested from various banks "the rate at which [the bank] *could* borrow funds, were it to do so by asking for and then accepting inter-bank offers in reasonable market size just prior to 1100."  24 F.4th at 835.  Thus, whether the defendants' rate submissions were untrue turned on "the precise question" posed by that instruction—could DB "have borrowed a typical amount of cash at the rate stated in any of DB's LIBOR submissions."  *Id.* at 835–36.  "If the [defendants'] submissions did reflect rates at which DB could have borrowed, they complied with the BBA . . . Instruction[] and . . . were not false."  *Id.* at 839.  Even though testimony established that the motivation behind such submissions—to benefit trading positions—was "intuitively wrong," the "government failed to show that trader-induced [rate] submissions did not reflect rates at which DB could have borrowed."  *Id.* at 839.  In other words, the government failed to show the

---

[2] A jury charge from *United States v. Connolly*, 16-CR-370, 2019 WL 2125044, at *6 (S.D.N.Y. May 2, 2019) cited with approval by the Second Circuit in *Connolly* is unhelpful to Mr. Schneider for similar reasons.  As *Connolly* made clear, that charge gave the jury instructions on how to construe a government instruction to which a defendant was responding.  *See* 24 F.4th at 834 (emphasizing that where the alleged "scheme to defraud *is premised on an instruction*" that the defendant provide certain information, the government must "*negate any reasonable interpretation of the instruction*").  Schneider's reliance on that jury charge is misplaced because defendants' representations to investors did not turn on the meaning of an instruction from the government.

defendants' submissions were untrue in light of the "precise question" posed by the BBA's instruction. *Id.* at 836. The government here, in contrast, presented sufficient evidence for a rational jury to find the "fully covered" statements untrue under the objective meaning of those statements. *See* page 37–38, *supra*.

Mr. Schneider is similarly mistaken to rely on *United States v. Buckley*, No. 10-CR-328 (MO), 2013 WL 5206287 (D. Or. Sept. 12, 2013). *Buckley* granted a motion for a judgment of acquittal on charges of mail and wire fraud based on the defendant's alleged misrepresentation to investors that he would take "a 35% fee from total profits." *Id.* at *3. The defendant was entitled to an acquittal because the "government put forward various definitions of the terms 'profit' and 'total profits,' and those definitions were irreconcilable." *Ibid.* "To show that what [the defendant] did was wrong, the government had to explain what would have been right. And there was no consistent theory of what was right—there was no baseline from which [the defendant] deviated." *Ibid.* Here, the government did not assert various, "irreconcilable" definitions of coverage, but rather, alleged and proved that "fully covered" statements were false because they implied that no investor capital was used to pay distributions. The government thus presented to the jury a single, "consistent theory" of what would have been truthful to represent to investors—that investor capital *was* used to pay distributions. *Cf. Buckley*, 2013 WL 5206287, at *3.

  2.  *Making a false statement or engaging in a scheme to defraud – Mr. Gentile*

There was sufficient evidence for a rational jury to find, beyond a reasonable doubt, that Mr. Gentile made false statements or employed a scheme to defraud.

Mr. Gentile seeks to distance himself from representations made by employees of Ascendant or by Mr. Schneider, *see* Gentile Mot. for Acquittal 2–10, but even setting aside those statements, the evidence introduced at trial remains sufficient for a rational jury to find that Mr.

Gentile made false statements to investors.  For example, Roger Anscher testified that at several investor meetings he attended with Mr. Gentile from January 2016 to February 2017, he heard Mr. Gentile tell investors that income from operations was sufficient to cover the funds' distributions. Trial Tr. 4130:24–4132:23.  Matthew Crafa also testified to attending a March 2017 due diligence event where GPB Auto was discussed and where Mr. Gentile, in response to questioning about "the fund's track record" of "dividend coverage," confirmed that that "history was correct."  *Id.* at 1739:13–1741:7; *see id.* at 1672:5–1676:7; Gov't Ex. 8063-C.  And the evidence discussed above was sufficient to show that Mr. Gentile had ultimate authority over false statements made to investors regarding the GPB Auto performance guarantee and the GPB Auto and Holdings I PPMs. *See* pages 30–32, 36–37, *supra*; *see also* Gentile Mot. for Acquittal 11, 13 (acknowledging that "statements . . . regarding the 2015 Performance Guarantee" were "attributed specifically to Mr. Gentile").  Accordingly, there was sufficient evidence for a rational jury to find that Mr. Gentile made false statements to investors.

There was also sufficient evidence that Mr. Gentile employed a scheme to defraud investors by using fraudulent performance guarantees to artificially inflate the revenue reported on Holdings I's 2014 audited financial statements.  As Mr. Gentile concedes, he need not have ultimate authority over a false statement made to investors in order to sustain a securities fraud conviction for employing a "device, scheme, or artifice to defraud."  *See* Gentile Mot. for Acquittal 13–14.  Mr. Gentile's principal argument is that the fraudulent nature of the Holdings I guarantees was immaterial because the evidence showed that the guarantees did not impact Holdings I's 2014 audited financial statements.  *See ibid.*; *see also* Trial Tr. 5457:15–5458:9, 5484:8–15, 5767:8–5768:8, 5776:1–5777:23 (testimony of Martin Wilczynski).  The government supplied sufficient evidence, however, for the jury to make the contrary finding—principally the testimony of Bill

Jacoby.  *See* Trial Tr. 887:21–23, 879:23–882:4, 884:18–20; *see also* Gov't Exs. 2008 at 7, 15, 8028-J, 7008-A.  While Mr. Gentile argues that Mr. Jacoby's testimony regarding the impact of the Holdings I guarantees was not corroborated, *see* Gentile Mot. for Acquittal 9–10 & n.2, this argument goes to the weight that the testimony deserved, and "is a matter for argument to the jury, not a ground for reversal on appeal," *United States v. Reid*, No. 20-CR-626 (PMH), 2024 WL 2159848, at *4 (S.D.N.Y. May 14, 2024) (quoting *United States v. Roman*, 870 F.2d 65, 71 (2d Cir. 1989)).  A rational jury could thus have found Mr. Gentile guilty of employing a scheme to defraud investors by way of the Holdings I performance guarantees.

Accordingly, there was sufficient evidence for a rational jury to find Mr. Gentile made false statements or employed a scheme to defraud.

### 3. Material and in connection with the purchase or sale of a security

There was sufficient evidence for a rational jury to find that that the false statements made or caused to be made by defendants were material and made in connection with the purchase or sale of a security.  Defendants first argue that there was insufficient evidence of materiality due to affirmative disclosures made to investors that distributions could include investor capital and that, at times, net investment income plus realized gain or loss exceeded distributions.  *See* Schneider Mot. 23–25, 28–32; Gentile Mot. for Acquittal 15–20, 24.  Second, defendants argue that statements made to existing investors in a fund that had closed to new investment—Holdings I— could not be material or made in connection with the purchase or sale of a security.  Gentile Mot. for Acquittal 20–22, 25.

As to the first argument, viewed in the light most favorable to the government, the evidence of affirmative disclosures does not preclude a rational jury from finding, based on other evidence, that the alleged misrepresentations were material.  "A misstatement in a securities transaction is

material so long as there is a substantial likelihood . . . . that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *United States v. Litvak* (*Litvak II*), 889 F.3d 56, 64 (2d Cir. 2018) (quotation marks and citation omitted).  The Second Circuit has repeatedly noted that "the testimony of various counterparty representatives [is] sufficient to sustain a finding of materiality." *Id.* at 66 (citing *Litvak I*, 808 F.3d at 175–76).  The government provided that here in the form of testimony by several investors and financial advisors that they would not have invested, or recommended that their clients invest, had they known that investor capital was used to pay distributions.  *See* Trial Tr. 182:18–183:8, 262:13–22 (testimony of Marvin Jones); *id.* at 405:9–14, 418:23–419:19 (testimony of Jay Frederick); *id.* at 1503:22–1505:11, 1521:24–1522:3 (testimony of Joseph Ghabour); *id.* at 1657:16–25, 1659:5–13, 1682:7–20 (testimony of Matthew Crafa); *id.* at 3661:12–17, 3662:20–3663:12, (testimony of Anthony Lagiglia); *id.* at 5015:23–5016:9, 5036:2–13, 5039:21–25 (testimony of Morey Goldberg).  That evidence was corroborated with testimony from Josh Teeters that the "focal point" of the sales pitch was that distributions were paid "exclusively" by "income from the portfolio companies," *id.* at 1898:3–1899:15, 1914:7–1915:20, as well as with testimony from Macrina Kgil, *id.* at 2962:23–2963:5.

Defendants cite no authority that supports setting aside the jury's verdict in light of that evidence.  The cases cited by Mr. Gentile, *see* Gentile Mot. for Acquittal 19, stand for the proposition that disclosures which directly contradict the alleged misrepresentations can render them immaterial as a matter of law.  But the disclosures here—that distributions could be paid with investor capital and that distributions were in excess of net investment income plus realized gain or loss for particular reporting periods—do not contradict the alleged misrepresentations regarding the source of funds used to pay distributions.  That distributions *could be* paid with investor capital

does not disclose that they *were in fact* paid, in part, with investor capital.  And the fact that a coverage shortfall was reported for a given reporting period does not necessarily disclose that investor capital was used to pay distributions, rather than a different source of funds from the portfolio companies such as retained earnings from prior reporting periods.  *See* Trial Tr. 574:7–21 (testimony of Jay Frederick).  These disclosures accordingly do not reflect the type of direct contradiction that is required to supplant a jury finding on materiality—"a mixed question of law and fact that the Supreme Court has identified as especially well suited for jury determination," *Gramins II*, 2022 WL 6853273, at *2 (quoting *Gramins I*, 939 F.3d at 434)).  Defendants' related argument—relying on evidence that, after learning of those disclosures, investor and advisor witnesses did not seek to redeem their investment, and even invested more, *see* Schneider Mot. 36–39; Gentile Mot. for Acquittal 20—is similarly unpersuasive.  These investors' responses to those disclosures provides fodder for defendants to dispute materiality before the jury, but it does not preclude a rational materiality finding based on the other evidence submitted by the government.

As to defendant's second argument, defendants fail to establish that statements made to existing investors in funds closed to new investment—specifically, Holdings I—were immaterial as a matter of law or not made in connection with the purchase or sale of a security.  Under the in-connection-with requirement, material fraudulent representations regarding a security are actionable not only when made to prospective investors contemplating whether to buy that security, but also when made to existing investors contemplating whether to sell or hold that security.  *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 388 (2014) (citing case law where the victim-investor was one "who maintained an ownership interest" in the security at issue (emphasis omitted)).  Defendants rely on the fact that investors had "no absolute right of

redemption"—that is, no absolute right to sell their security—and that they were told as much before investing. Trial Tr. 1851:21–1852:4 (testimony of Matthew Crafa); *see id.* at 276:13–277:5 (testimony of Marvin Jones). But there was sufficient evidence for jurors to find the communications were in connection with the sale of a security and material all the same, because existing investors in Holdings I were aware that GPB had honored prior redemption requests, understood they could request redemption at the discretion of GPB, and would have done so had they known that investor capital was used to pay distributions. *See* Gov't Ex. 8256-A 11 ("To date, GPB has honored all redemption requests."); Trial Tr. 1505:7–11, 1521:24–1522:3 (testimony of Joseph Ghabour); *see also id.* at 1851:12–1852:4 (cross-examination of Matthew Crafa); *id.* at 2480:19–2482:19 (testimony of Macrina Kgil).

Moreover, irrespective of whether investors could have redeemed existing investments in Holdings I, there was evidence that defendants used misrepresentations regarding Holdings I to attract new investment in GPB Auto after Holdings I's closing date. *See* Gov't Ex. 1438 (showing historical "cash distributions paid to investors as a percentage of their gross investment" for all three GPB funds); Trial Tr. 176:6–178:3, 368:8–369:1 (testimony of Marvin Jones that he reviewed Gov't Ex. 1438 "prior to investing"); *id.* at 428:16–429:21 (testimony of Jay Frederick); *see also id.* at 946:15–947:22 (testimony of Bill Jacoby that Gov't Ex. 1438 did "[n]ot accurately" represent the performance of Holdings I or GPB Auto); *see also id.* at 5036:14–5039:13 (testimony of Morey Goldberg that, having already invested in Holdings I, Ascendant employee solicited his investment in GPB Auto and Holdings II in 2017); Gov't Ex. 8219 (Ascendant employee email to Mr. Goldberg describing Holdings II as "[s]imilar to" Holdings I).

Accordingly, a rational jury could have found that the false statements made or caused to be made by defendants were material and made in connection with the purchase or sale of a security.

### 4. Intent – Mr. Schneider

There was sufficient evidence for a rational jury to find, beyond a reasonable doubt, that Mr. Schneider acted with the requisite intent. "To establish intent for purposes of the substantive securities fraud charge," the government was required to prove Mr. Schneider "acted willfully and knowingly and with the intent to defraud." *Landesman*, 17 F.4th at 321 (citation omitted). "Criminal intent may be proven entirely through circumstantial evidence." *Ibid.* (quotation marks and citation omitted). "When the necessary result of the defendant's scheme is to injure others, fraudulent intent may be inferred from the scheme itself." *Ibid.* (brackets and citation omitted). Mr. Schneider principally argues that there was insufficient evidence that he acted with the requisite intent because he personally invested in the GPB funds and Mr. Schneider "directed" Ascendant employees to remove "fully covered" language from the sales pitch in March 2016. *See* Schneider Mot. 32–36.

Viewed in the light most favorable to the government, the evidence was sufficient for a rational jury to infer that Mr. Schneider made or caused to be made the aforementioned false statements with the intent to defraud investors. For example, Bill Jacoby and Roger Anscher testified that they expressed concerns about how distributions were represented to investors and that Mr. Schneider rejected those concerns. *See* Trial Tr. 4165:2–20, 4304–08, 4312–13, 4332 (testimony of Roger Anscher); *id.* at 713:2–715:8 (testimony of Bill Jacoby). Mr. Anscher testified that he told Mr. Schneider that he "didn't think it was accurate" to include the "no present plans" language in the GPB Auto PPM, but that Mr. Schneider said "[t]o include it anyway." *Id.* at 4366–

46

68. And Mr. Jacoby testified that, after showing Mr. Schneider GPB Auto's 2015 financial results, Mr. Schneider responded, "[I]f I offered you a million dollar bonus, could you make the financials look better[?]" *Id.* at 890:8–22, 893:17–19. Witnesses also testified that Mr. Schneider sometimes used his Gmail, instead of his company email, to communicate with Mr. Gentile, Mr. Lash, and others about compliance matters, as well as once to pitch the GPB funds to a broker dealer, and the jury could rationally infer that he did so to avoid those communications being discovered by FINRA, which could review his company account. *See id.* at 1444:10–24 (testimony of Bill Jacoby); *id.* at 4314 (testimony of Roger Anscher); *id.* at 3144:9–17, 3145:24–3147:7 (testimony of Jeffrey Lash). Finally, witness testimony showed that Mr. Schneider profited, by way of fees, based on the amount of money invested in the three GPB funds, thereby supplying a motive for the allegedly fraudulent conduct. *See id.* at 734:1–738:16 (testimony of Bill Jacoby); *id.* at 3004:11–3006:15 (testimony of Jeffrey Lash).

Accordingly, a rational jury could have found that Mr. Schneider acted with the requisite intent.

### 5.    *Intent – Mr. Gentile*

Viewed in the light most favorable to the government, the evidence was sufficient for a rational jury to infer that Mr. Gentile acted with the intent to defraud investors in making false statements and engaging in a scheme to defraud. For example, Roger Anscher testified that he expressed concerns about how distributions were represented to investors and that Mr. Gentile brushed them aside. *See id.* at 4332, 4165:2–20, 4312–13, 4304–08. Bill Jacoby testified that he told Mr. Gentile that GPB Auto's 2015 audited financial statements needed to be restated to remove the performance guarantee because "the statements were not accurate," but Mr. Gentile refused to do so. *Id.* at 937:8–15, 940:9–941:18. And Jeffrey Lash testified that Mr. Gentile used

Mr. Lash's severance package as leverage to induce Mr. Lash to lie to the FBI about the nature of the GPB Auto performance guarantee. *See id.* at 3216:13–3219:24, 3219:25–3220:2, 3220:22–3221:4, 3222:3–10, 3222:17–21. Moreover, witness testimony also showed that Mr. Gentile profited, by way of fees, based on the amount of money invested in the three GPB funds, thereby supplying a motive for the allegedly fraudulent conduct. *See id.* at 734:1–738:16 (testimony of Bill Jacoby); *id.* at 3004:11–3006:15 (testimony of Jeffrey Lash); *id.* at 4378–79, 4467:9–4470:6 (testimony of Roger Anscher).

Mr. Gentile principally argues that some trial evidence undercut an inference of intent. For example, he points to evidence that he was aware of accrued revenues which assertedly covered distributions for certain periods of time and that certain instances of "under-coverage" were disclosed to investors in GPB's financial statements. Gentile Mot. for Acquittal 25–28. But this evidence does not preclude a rational jury from determining based on the other evidence set forth above that Mr. Gentile acted with the requisite intent.

*       *       *

Accordingly, defendants' motions for judgments of acquittal are denied as to the securities fraud count.

### C.    Defendants fail to establish that they are entitled to acquittal on the counts of conspiracy to commit securities fraud and conspiracy to commit wire fraud.

Mr. Gentile and Mr. Schneider argue that their convictions for conspiracy to commit securities fraud and conspiracy to commit wire fraud are deficient for the same reasons they invoke in seeking judgments of acquittal on the underlying substantive counts. *See* Gentile Mot. for Acquittal 37–38 (relying on the same reasons as asserted regarding Counts Three through Five for securities fraud and wire fraud); *see generally* Schneider Mot. Because those arguments do not

justify disturbing the jury's verdict for reasons already explained, defendants' challenges to the conspiracy convictions also fail.

*     *     *

Defendants' motions for judgments of acquittal are denied.

## II.    Defendants Are Not Entitled to a New Trial

Defendants' motion for a new trial is denied.  Federal Rule of Criminal Procedure 33 authorizes a court to "vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  But this discretion should be exercised only "sparingly" and "in the most extraordinary circumstances."  *Gramins I*, 939 F.3d at 444 (citation omitted).  The "ultimate test is whether letting a guilty verdict stand would be a manifest injustice."  *United States v. Walker*, 974 F.3d 193, 208 (2d Cir. 2020) (citation omitted).  This typically means that a court must have "a real concern that an innocent person may have been convicted" on the evidence presented.  *Ibid.* (citation omitted).

Defendants argue they are entitled to a new trial because the jury was permitted to convict on a right-to-control theory invalidated by *Ciminelli v. United States*, 598 U.S. 306 (2023), the government constructively amended and prejudicially varied from the indictment, the verdict was against the weight of the evidence, the government engaged in misconduct during summation and rebuttal, there were various errors in the admission and exclusion of evidence and in the instructions to the jury, and an improper statement was made to the venire during jury selection. *See* Gentile Mot. for New Trial; Schneider Mot. 40–83; Gentile New Trial Reply; Schneider Reply 1–11, 33–45.  These arguments lack merit.

**A.    The jury was not permitted to convict on an invalid right-to-control theory.**

The jury was not permitted to convict on an invalid right-to-control theory.  A new trial is required "when disjunctive theories are submitted to the jury . . . . [and] if the challenge is legal and any of the theories was legally insufficient."  *Garcia*, 992 F.2d at 416.  Such a "legal defect arises when a court instructs jurors using an incorrect explanation of the law"—in other words, when the jury is "instructed to apply incorrect legal principles or definitions."  *Desnoyers*, 637 F.3d at 111–12.

Defendants fail to establish that the government submitted a right-to-control theory to the jury or that the jury was instructed that they could convict on such a theory.  Under a right-to-control theory, the government seeks to "establish wire fraud by showing that the defendant schemed to deprive a victim of potentially valuable economic information necessary to make discretionary economic decisions."  *Ciminelli*, 598 U.S. at 310.  That theory is legally deficient because establishing wire fraud requires a showing "that money or property was 'an object of the[] fraud'" and "property" as used in "the wire fraud statute reaches only traditional property interests," not "intangible interests such as the right to control the use of one's assets."  *Id.* at 311–12, 316 (quoting *Kelly v. United States*, 590 U.S. 391, 398 (2020)).

Contrary to defendants' suggestions, the government did not advance a right-to-control theory in this trial.  Defendants argue that the government did so through its argument that defendants "deprived *existing* investors of information that they would have wanted" in deciding "whether to keep their funds invested with GPB or request redemption."  Schneider Mot. 44–45; *see id.* 45–48.  Consistent with *Ciminelli*, the government premised its theory of fraud on "depriving [investors] of information in order to induce [them] to part with" their money, and not on depriving investors of any intangible property interest in "that *information itself*."  *United States*

*v. An*, 733 F. Supp. 3d 77, 93 (E.D.N.Y. 2024).  *See, e.g.*, Trial Tr. 6386:3–9, 6388:20–6389:8, 6390:10–13.

Even if the record could be read to suggest that the government's argument to the jury encompassed a right-to-control theory of fraud, the jury "was not instructed to apply" that theory. *Desnoyers*, 637 F.3d at 112.  The Court's jury charge was consistent with *Ciminelli*.  Unlike the district court in *Ciminelli*, the Court did not "instruct[] the jury that the term 'property' in § 1343 'includes intangible interests such as the right to control the use of one's assets.'"  *See* 598 U.S. at 311 (citation omitted).  The jury charge specified that a guilty verdict required finding "that money or property was 'an object of the[] fraud,'" and omitted any reference to intangible property interests "such as the right to control the use of one's assets" or any right to "potentially valuable economic information."  *Id.* at 311–12 (quoting *Kelly*, 590 U.S. at 398); *see* Trial Tr. 7009:21–7010:2.  Contrary to Mr. Schneider's argument, an explicit instruction that "property" excludes "economically valuable information concerning existing investors' investments" was not required.  *See* Schneider Reply 3–4.  The repeated emphasis in the jury charge on the statutory money-or-property requirement, *see* Trial Tr. 7007:20–7008:2, 7008:12–21, 7009:21–7010:2, 7011:6–7, was "sufficient to ameliorate any possible confusion" by the jury about which theories of fraud could sustain a conviction.  *United States v. Sabhnani*, 599 F.3d 215, 239–40 (2d Cir. 2010).

### B.    The government did not constructively amend, or prejudicially vary from, the indictment.

The government did not constructively amend, or prejudicially vary from, the indictment.

#### 1.    Constructive amendment

Defendants fail to establish that the government constructively amended the indictment. The Fifth Amendment requires that the indictment "contain the elements of the offense charged and fairly inform the defendant of the charge against which he must defend."  *United States v.*

*Khalupsky*, 5 F.4th 279, 293 (2d Cir. 2021) (quoting *United States v. Dove*, 884 F.3d 138, 146 (2d Cir. 2018)).  An improper constructive amendment "occurs when the charge upon which the defendant is tried differs significantly from the charge upon which the grand jury voted," such as where "the proof at trial or the trial court' jury instructions" add "an additional element, sufficient for conviction" or alter "an element essential to the crime charged." *Ibid.* (citations omitted).  In contrast, "courts have constantly permitted significant flexibility in proof, provided that the defendant was given notice of the core of criminality to be proven at trial." *Ibid.* (citation omitted). "The 'core of criminality' of an offense involves the essence of a crime, in general terms; the particulars of how a defendant effected the crime falls outside that purview." *United States v. D'Amelio*, 683 F.3d 412, 418 (2d Cir. 2012).

Defendants fail to establish that the government's evidence and argument at trial differed significantly from what the indictment alleged.  Defendants principally take issue with the government's rebuttal summation.  Defendants argue that—after much testimony and argument during trial over whether distributions were represented as, and in fact were, "fully covered"—the government's rebuttal improperly claimed that "[t]he issue in this case" is not the "definition of coverage ratio" but rather whether defendants used "investor cash to pay investor distributions." Trial Tr. 6873:4–25; *see* Schneider Mot. 50–52; Gentile Mot. for New Trial 33–34.  Even if that rebuttal argument reflected a "shift in approach," it does not "amount[] to a constructive amendment of the indictment" because "[t]he indictment's core theory of deceit," *United States v. Leonard*, 350 F. App'x 480, 482 (2d Cir. 2009), revolved around "the source of funds used to pay" distributions, Indictment ¶ 15.

To be sure, the indictment contains allegations of representations to investors that distributions were "fully covered by funds from operations." *E.g.*, Indictment ¶¶ 21, 29.  But

because the core of criminality "involves the essence of a crime" and not "the particulars of how a defendant effected" it, *D'Amelio*, 683 F.3d at 418, it is defined here by the nature of the "knowing falsehoods . . . submitted" by defendants, not by the precise "substance of the false statements" alleged, *United States v. Rigas*, 490 F.3d 208, 229 (2d Cir. 2007) (citation omitted).   As the indictment itself specifies, representing distributions as "'fully covered' by 'funds from operations'" is just one way to falsely convey that the "source of funds used to pay distributions would be cash flow generated by the companies the funds owned, and not capital raised from investors."   Indictment ¶ 21; *see id.* ¶ 29; *see also id.* ¶ 37 ("'Coverage ratio' was a term used by GPB Capital employees that referred to the ratio of portfolio company cash flow to distribution payments, *i.e.*, the extent to which the distributions were paid from cash flow.").   The indictment thus gave defendants clear notice that the core of criminality with which they were charged was misrepresenting the source of funds used to pay distributions.   The government's rebuttal did not depart significantly from that theory of fraud.

Accordingly, defendants fail to establish that the government constructively amended the indictment.

### 2.    *Prejudicial variance*

The government likewise did not prejudicially vary from the indictment.   A prejudicial variance "occurs when the charging terms of the indictment are left unaltered, but the evidence at trial proves facts materially different from those alleged in the indictment" and "substantial prejudice occurred at trial as a result."   *Dove*, 884 F.3d at 149 (quotation marks and citations omitted).

"For the reasons discussed in the context of constructive amendment," defendants fail to establish that the government's evidence at trial "materially differed from what was alleged in the

superseding indictment." *Khalupsky*, 5 F.4th at 294 (brackets, quotation marks, and citation omitted). Moreover, defendants' argument that the government's evidence improperly varied from the charged conspiracy period is without merit. *See* Schneider Mot. 53–54. The evidence on which defendants rely dates to around April 2015 and relates to the two Holdings I performance guarantees. *See ibid.* (citing Trial Tr. 2938–40, 3016–42); Trial Tr. at 2939:11–21, 3020:20–25. The indictment alleges that those guarantees were executed sometime before July 2015 and impacted the 2014 revenue reported by Holdings I. *See* Indictment ¶ 44. The indictment further alleges that defendants made misrepresentations regarding Holdings I's 2014 revenue during the charged conspiracy period of around August 2015 to December 2018. *See id.* ¶ 15; *see also* May 23, 2024 Tr. 27:11–28:5 (finding evidence of the Holdings I performance guarantees relevant to misrepresentations made during the charged conspiracy opinion). The evidence defendants cite thus does not differ, let alone materially so, from the indictment's allegations.

### C.    Alleged prosecutorial misconduct during summations does not warrant a new trial.

Defendants have not established that they are entitled to a new trial due to alleged prosecutorial misconduct during closing arguments. To warrant reversal of a criminal conviction based on prosecutorial misconduct, a defendant must establish that the misconduct "cause[d] [him] substantial prejudice, by so infecting the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Hilts*, 757 F. App'x 56, 59 (2d Cir. 2018) (quoting *United States v. Shareef*, 190 F.3d 71, 78 (2d Cir. 1999)). The Court must consider "the objectionable remarks within the context of the entire trial" and assess (1) "the seriousness of the misconduct," (2) "the measures adopted by the trial court to cure the misconduct," and (3) "the certainty of conviction absent the improper statements." *United States v. Banki*, 685 F.3d 99, 120 (2d Cir. 2012) (citations omitted). "[A] defendant who seeks to overturn his conviction based on alleged

prosecutorial misconduct in summation bears a heavy burden." *United States v. Farhane*, 634 F.3d 127, 167 (2d Cir. 2011) (quotation marks and citation omitted). Because "summations—and particularly rebuttal summations"—often "require improvisation, courts will not lightly infer that every remark is intended to carry its most dangerous meaning." *Ibid.* (quotation marks and citations omitted).

The remarks highlighted by defendants do not meet the high bar for ordering a new trial. Defendants claim it was improper for the government to argue during rebuttal that the transcript admitted as Government Exhibit 8330 reflected the "prepared comments in a webinar" that "Mr. Gentile recorded on December 18th of 2018." Trial Tr. 6901:15–6902:3; *see* Gentile Mot. for New Trial 30–31. But while defendants are correct that the exhibit in question was admitted as a statement by Mr. Gentile and not as a statement made to investors for its effect on the listener, *see* Gentile Mot. for New Trial 30, both parties were free to argue whether the evidence showed that the transcript reflected what Mr. Gentile conveyed to investors during the webinar, *see* Trial Tr. 5247:23–5248:15 (colloquy where the Court noted that the asserted uncertainty over whether the transcript was a complete and accurate one "would enable [defendants] to make arguments along those lines"). Defendants therefore fail to establish that the government's claim falls outside the "broad latitude" the parties have "in the inferences [they] may reasonably suggest to the jury during summation." *United States v. Edwards*, 342 F.3d 168, 181 (2d Cir. 2003) (citation omitted).

Defendants also take issue with the government's repeated argument that defendants paid distributions using "other investors' money," *e.g.*, Trial Tr. 6871:10–14, which defendants claim falsely suggested that they caused investors financial loss through a Ponzi scheme, *see* Schneider Mot. 73–78. The government's factual allegation that defendants paid distributions using "other investors' money" was at the core of its case—repeatedly alleged in the indictment, *see, e.g.*,

Indictment ¶ 16, foregrounded in the government's opening, *see* Trial Tr. 53:8–9, and referenced in witness testimony, *see, e.g.*, *id.* at 183:11–15 (testimony of Marvin Jones). That allegation speaks directly to the government's central theory that defendants misrepresented the source of funds used to pay distributions, *see* Indictment ¶¶ 15–16, not to losses by investors.

Moreover, the government's sole mention of the term "Ponzi scheme" in rebuttal was invited by Mr. Gentile's summation. "Under the 'invited response' doctrine, 'defense argument may . . . "open the door" to otherwise inadmissible prosecution rebuttal.'" *United States v. Ozsusamlar*, 349 F. App'x 610, 611 (2d Cir. 2009) (quoting *United States v. Rivera*, 971 F.2d 876, 883 (2d Cir. 1992)). Mr. Gentile's counsel injected that term—and the government's omission of it—into the case during his summation by asserting that "[t]his is not a Ponzi scheme" and noting to the jury that "[y]ou won't see the words 'Ponzi Scheme' in their indictment." Trial Tr. 6508:5–15. The government, in rebuttal, responded by noting that the term "has no legal significance in this case" and explained that "witnesses were told not to use" it because "it's inflammatory." *Id.* at 6878:5–19. The government's rebuttal was a "legitimate response" in light of Mr. Gentile's "attempt to focus the jury's attention" on the omission of the term "Ponzi scheme" from the case before it. *Rivera*, 971 F.2d at 883.

Defendants are also mistaken in arguing that the government's assertion that "witnesses were told not to use" the term "Ponzi scheme" improperly suggested to the jury that the government had evidence of such a scheme. *See* Schneider Reply 44. The "jury would have reasonably understood" the government's remark as explaining an instruction given to witnesses, but not speaking to what their testimony would have been absent such an instruction. *United States v. Reynoso-Hiciano*, No. 22-1044-CR, 2024 WL 461706, at *2 (2d Cir. Feb. 7, 2024) (noting that "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most

damaging meaning or that a jury . . . will draw that meaning" (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974))).

Defendants have thus failed to show that the government engaged in misconduct during summation and rebuttal that warrants a new trial.  And even if the government erred in making the statements highlighted by defendants, defendants have not established that those statements, in the context of their whole trial, "cause[d] [them] substantial prejudice, by so infecting the trial with unfairness as to make the resulting conviction a denial of due process." *Hilts*, 757 F. App'x at 59 (quoting *Shareef*, 190 F.3d at 78).

### D.    Defendants are not entitled to a new trial based on a weight-of-the-evidence rationale.

Defendants' request for a new trial based on the weight of the evidence lacks merit.  A Court may not grant a new trial "based on the weight of the evidence alone unless," considering all "reliable trial evidence as a whole," the evidence "preponderates heavily against the verdict to such an extent that it would be manifest injustice to let the verdict stand." *Landesman*, 17 F.4th at 330–31 (citation omitted).  The Court, however, "may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." *Id.* at 331 (citation omitted).  The Court must instead "defer to the jury's resolution of conflicting evidence," absent situations such as where "the evidence was patently incredible or defied physical realities, where an evidentiary or instructional error compromised the reliability of the verdict, or where the government's case depends upon strained inferences drawn from uncorroborated testimony." *Ibid.* (brackets, ellipsis, quotation marks, and citation omitted).

Here, in arguing for a new trial based on the weight of the evidence, defendants rely exclusively on their arguments for a judgment of acquittal.  Gentile Mot. for New Trial 15.  Having considered all "reliable trial evidence as a whole," the Court finds that the evidence does not

"preponderate[] heavily against the verdict" for substantially similar reasons as explained above. *See* pages 30–49, *supra*; *see, e.g.*, *United States v. Phillips*, No. 22-CR-138 (LJL), 2024 WL 1300269, at *29 (S.D.N.Y. Mar. 27, 2024); *United States v. Napout*, 332 F. Supp. 3d 533, 575 (E.D.N.Y. 2018), *aff'd*, 963 F.3d 163 (2d Cir. 2020).

### E.    None of defendants' challenges to evidentiary rulings justify a new trial.

Defendants' challenges to evidentiary rulings do not justify a new trial.   Defendants principally argue (1) that the Court's prior ruling excluding certain testimony by Mr. Schneider's expert, Erica Bramer, "missed the point" of the excluded testimony; (2) that the Court admitted "statements of Ascendant Capital sales representatives to various broker-dealers and investors" subject to the government showing that such representatives "acted on Mr. Schneider's direction and as his agent"; and (3) that the government "manipulated its co-conspirator designations" to impact "which evidence could be admitted."   Schneider Mot. 54–65; Gentile Mot. for New Trial 18–22.

### 1.    Expert testimony by Erica Bramer

The expert testimony of Erica Bramer was properly limited.   Ms. Bramer was permitted to testify "on coverage metrics."   July 17, 2024 Order 12, 14–15 (Dkt. #435).   She testified, for example, about there being "more than one reasonable way to calculate coverage ratio in the private equity context" and about different coverage metrics for the GPB funds, including total investment income, net investment income, net investment income plus realized gain or loss, and net income.   Trial Tr. 5873:3–11.   But her testimony "about Net Asset Valuations, and distributions of capital as compared to Net Asset Valuations," was precluded because "any modest relevance" to the "materiality of alleged misrepresentations" was "substantially outweighed by the likelihood

that it would mislead or confuse the jury." July 17, 2024 Order 15–17.[3]  Defendants argue that the

limitation placed on Ms. Bramer's testimony was inconsistent with the admission of testimony by

Michael Petron regarding summary exhibits displaying net income.  Schneider Mot. 55–59.  But

Ms. Bramer, like Mr. Petron, was permitted to testify—and did testify—to calculations of coverage

ratio comparing net income to investor distributions.  *See* July 17, 2024 Order 14–15; Def. Ex.

BRAMER-B; Trial Tr. 5882:11–5884:2.

Even if the Court erred in limiting Ms. Bramer's testimony, that error was harmless.  To

determine whether the exclusion of evidence was harmless, the Court considers

> (1) the importance of the unrebutted assertions to the government's case;
> (2) whether the excluded material was cumulative; (3) the presence or absence of
> evidence corroborating or contradicting the government's case on the factual
> questions at issue; (4) the extent to which the defendant was otherwise permitted to
> advance the defense; and (5) the overall strength of the prosecution's case.

*United States v. Carter*, No. 21-1005, 2022 WL 16909404, at *2 (2d Cir. Nov. 14, 2022) (quoting

*United States v. Stewart*, 907 F.3d 677, 688 (2d Cir. 2018)).  Defendants put forward extensive

evidence to support the point that there are multiple metrics for coverage and that any coverage

shortfalls were too modest to be material.  Ms. Bramer's asset-valuation testimony would have

been cumulative on that point.

### 2.  *Statements by Ascendant employees*

Statements made by Ascendant employees to investors and their advisors were properly

admitted for the non-hearsay purpose of their effect on the listener.  *See* Trial Tr. 198:10–11,

2144:21–2145:1.  To be admissible on this non-hearsay basis, the government had the burden of

---

[3] Defendants also argue that the Court failed to appreciate that Ms. Bramer's testimony was not only relevant to
materiality but also to falsity—whether "investor capital was used to pay distributions" at all.  Schneider Mot. 55.  But
both defendants' post-trial briefing and Ms. Bramer's excluded exhibits speak not to whether investor capital was used
to pay distributions "at all," but rather to how "material" the amount of investor capital used was relative to "the value
of the GPB Funds."  Schneider Mot. 55, 57 (emphasis omitted); *see, e.g.*, *id.* at 55 ("This evidence would have proven
that *hardly* any investor capital was used to pay those distributions." (emphasis added) (citing Def. Exs. BRAMER-
G–O)); Def. Exs. BRAMER-G–O.

establishing that the statements of Ascendent employees were relevant, but it did not need to establish a formal agency or co-conspirator relationship of the sort that could justify admitting these statements for their truth, as hearsay. *See id.* at 193:1–24, 234:8–235:9, 237:6–238:17, 2143:25–2147:24, 3643:6–19. In assessing relevance, a judge performs a limited gatekeeping function, determining whether, considering the entire trial record, a jury could find preliminary facts that make the additional evidence relevant. *See Palin v. N.Y. Times Co.*, 113 F.4th 245, 272 (2d Cir. 2024).

There was ample evidence at trial from which the jury could find preliminary facts that would make the statements of Ascendant employees relevant to whether one or more of the defendants made false statements, whether those statements were material, and whether defendants acted with intent to defraud investors. As explained above, several witnesses testified that Mr. Schneider controlled the statements made by Ascendant employees to investors and their advisors in their sales pitches. *See* pages 35–36, *supra*. As a result, a jury could reasonably find that Mr. Schneider caused those statements to be made—a predicate for securities fraud liability. *See ibid.* Moreover, a jury could have found that Mr. Gentile was aware of Ascendant's marketing pitches, *see* Trial Tr. 4312–16, 4941:23–4942:23, 4945:17–4946:7 (testimony of Roger Anscher); Gov't Exs. 8099, 8184; *see also, e.g.*, Trial Tr. 692–93 (testimony of Bill Jacoby) (stating that defendants operated GPB and Ascendant as "one firm"); *id.* at 1739:13–1741:7 (testimony of Matthew Crafa) (stating that, at a March 2017 due diligence event, Mr. Gentile discussed marketing materials reflecting "the fund's track record" of "dividend coverage"). Under these circumstances, a jury could have considered the Ascendant statements as important context for how Mr. Gentile's statements would have been understood by investors and as relevant to Mr. Gentile's intent in making his own related statements to investors. While defendants were free to—and did—elicit

evidence to challenge the defendants' connection to the Ascendant statements, *see* Schneider Mot. 61–63, such evidence was insufficient to "take that issue [away from] the jury," Trial Tr. 2146:13–22; *see Palin*, 113 F.4th at 272 (noting that the Court plays "only a limited gatekeeping" role under Rule 104(b)).

### 3.    Designation of alleged co-conspirators

Defendants fail to establish that any evidence was erroneously admitted due to alleged "flip-flopping" by the government as to whom it alleged were co-conspirators.  Schneider Mot. 65.  Defendants argue that the non-hearsay relevance of a particular exhibit—Government Exhibit 7351—depended on the status of the recipient (an Ascendant employee) as an alleged co-conspirator.  *Id.* at 64.  Defendants claim that the government later "*de-designated*" that employee as an alleged co-conspirator to preclude admission of certain communications between Macrina Kgil and that employee.  *Id.* at 64–65.  But Government Exhibit 7351 was not admitted on the ground that the recipient was a co-conspirator.  Its non-hearsay relevance for effect on the listener instead depended on a showing that the email "went to somebody . . . [who] relayed it to the defendants," Trial Tr. 756:24–757:10, 758:16–23—a showing the government made with Mr. Jacoby's testimony that the Ascendant employee was, at the time, his "communication point for [defendants] while they were traveling," *id.* at 760:11–16.  Defendants do not cite any other evidence admitted on the basis of that Ascendant employee being a co-conspirator.  Nor do defendants provide any authority for requiring the government to have maintained, throughout trial, its initial position that the employee was a co-conspirator when none of its evidence depended on making that showing.

*       *       *

Defendants remaining evidentiary arguments are rejected for the reasons explained in the Court's rulings before and during trial.  *See United States v. Menendez*, — F. Supp. 3d —, No. 23-CR-490 (SHS), 2024 WL 5103452, at *46 (S.D.N.Y. Dec. 13, 2024) (collecting cases "deny[ing] attempts to relitigate already resolved matters under the guise of a Rule 33 motion").

### F.    None of defendants' challenges to the jury instructions justify a new trial.

Defendants' challenges to the jury instructions do not justify a new trial.  "An erroneous instruction requires a new trial unless the error is harmless[,] and an error is harmless only if the court is convinced that the error did not influence the jury's verdict."  *United States v. Moses*, 109 F.4th 107, 114 (2d Cir. 2024) (citation omitted).  "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law."  *United States v. Roy*, 783 F.3d 418, 420 (2d Cir. 2015) (citation omitted).  A new trial is not warranted based on the omission of a requested instruction unless that "instruction is legally correct, represents a theory of defense with basis in the record that would lead to acquittal, and the theory is not effectively presented elsewhere in the charge."  *United States v. Holland*, 381 F.3d 80, 84 (2d Cir. 2004) (brackets and citation omitted).

Defendants principally argue that (1) the conscious avoidance instruction lacked a factual basis; (2) the materiality instruction was erroneous; (3) the securities fraud instruction erroneously defined willfulness and the wire fraud instruction erroneously omitted a willfulness charge; (4) the jury charge erroneously omitted a requirement that the jury find an intent to deprive investors of the benefit of the bargain; and (5) the jury charge erroneously omitted a requirement that the jury unanimously find a false statement beyond a reasonable doubt in order to find that defendants devised a scheme to defraud.  *See* Schneider Mot. 65–71; Gentile Mot. for New Trial 1–13; Schneider Reply 7–11; Gentile New Trial Reply 1–7.  These arguments lack merit.

### 1.  Conscious avoidance

A conscious avoidance instruction was proper.  *See* Schneider Mot. 65–66; Schneider Reply 7–11.  The Second Circuit has instructed that a conscious avoidance instruction may be given only if

> (1) the defendant asserts the lack of some specific aspect of knowledge required for conviction and (2) the appropriate factual predicate for the charge exists, i.e. the evidence is such that a rational juror may reach the conclusion beyond a reasonable doubt that the defendant was (a) aware of a high probability of the fact in dispute and (b) consciously avoided confirming that fact.

*United States v. Wedd*, 993 F.3d 104, 118–19 (2d Cir. 2021) (brackets, quotation marks, and citation omitted).  "A challenge to the factual predicate of a conscious avoidance instruction" effectively amounts to "'a challenge to the sufficiency of the evidence,' on which the defendant 'bears a heavy burden' to demonstrate that based on all the evidence, viewed 'in the light most favorable to the government,' no 'rational trier of fact could have found'" conscious avoidance beyond a reasonable doubt.  *United States v. Gata-Aura*, No. 22-283-CR, 2024 WL 389422, at *3 (2d Cir. Feb. 2, 2024) (quoting *United States v. Aina-Marshall*, 336 F.3d 167, 171 (2d Cir. 2003)).  The fact that a rational jury could "find actual knowledge does not mean that it can also find conscious avoidance."  *United States v. Ferrarini*, 219 F.3d 145, 157 (2d Cir. 2000).  But certain evidence may support jury findings of "both actual knowledge and conscious avoidance."  *United States v. Goffer*, 721 F.3d 113, 127 (2d Cir. 2013); *accord United States v. Svoboda*, 347 F.3d 471, 480 (2d Cir. 2003).

The first requirement for a conscious avoidance instruction was satisfied here.  Both defendants "denied knowledge" of numerous marketing communications made by Ascendant employees and, relying on the asserted existence of a compliance program, disputed that they understood the false or misleading nature of the communications of which they were aware.

*Svoboda*, 347 F.3d at 480; *see, e.g.*, Trial Tr. 127:10–15, 129:11–131:4 (opening for Mr. Schneider); *id.* at 593:4–14 (cross-examination of Jay Frederick); *id.* at 1854:14–15, 1857:3–4 (cross-examination of Matthew Crafa); *id.* at 2102:3–2103:10, 2125:21–2126:11 (cross-examination of Josh Teeters); *id.* at 6681:20–25, 6697:18–21, 6720:19–6721:13, 6728:10–6734:3 (closing for each defendant).

 The second requirement was also met as to both defendants. Viewed in the light most favorable to the government, there was sufficient evidence for the jury to find that both defendants were aware of a high probability that statements made to investors were false and deliberately avoided confirming that fact. For example, Roger Anscher testified that he warned Mr. Schneider that he "didn't think it was accurate" to include the "no present plans" language in the June 2016 GPB Auto PPM and that Mr. Schneider's response was to "include it anyway." Trial Tr. 4366–68; *see id.* 4939:12–19. Mr. Anscher further testified to sharing concerns with both defendants about how coverage and distributions were represented to investors, *see id.* at 4332, 4165:2–20, 4312–13, 4304–08. And Bill Jacoby testified that Mr. Gentile disregarded his concerns about the veracity of references to the Lash performance guarantee in GPB Auto's 2015 audited financial statements. *See id.* 937:8–15, 940:9–941:18. That evidence of two high-level employees "expressing alarm" to defendants and defendants disregarding those concerns provides "ample basis for the . . . conscious-avoidance instruction." *United States v. Graham*, 51 F.4th 67, 84 (2d Cir. 2022); *see United States v. Kozeny*, 667 F.3d 122, 134 (2d Cir. 2011) ("It is not uncommon for a finding of conscious avoidance to be supported primarily by circumstantial evidence."); *Svoboda*, 347 F.3d at 480–81 (noting that evidence that the defendant was aware his co-defendant's trading activity "was suspicious" supported a finding on both prongs of conscious avoidance).

2.    *Materiality*

The Court's materiality instruction was also proper.  Tracking statements of the Second Circuit, the charge instructed jurors that materiality turned on the significance of an alleged misrepresentation to "a reasonable investor's investment decision."  Trial Tr. 6989:9–11; *see Litvak II*, 889 F.3d at 64; *Gramins I*, 939 F.3d at 445.  Jurors were directed to assess materiality based on "the total mix of information available" to investors, noting that "the Government must prove beyond a reasonable doubt that there was a substantial likelihood that the misstated fact would have been viewed by a reasonable investor as having significantly altered the total mix of information available."  Trial Tr. 6989:16–23; *see Litvak II*, 889 F.3d at 64; *Gramins I*, 939 F.3d at 445.  If the jurors found "that the defendant [they were] considering made a material misrepresentation or omitted a material fact" under these standards, the instructions added, "it does not matter whether the statement was made to a gullible buyer or a sophisticated investor."  Trial Tr. 6989:24–6990:4.  The instruction further noted that jurors had "heard evidence that GPB investors were required to sign subscription agreements in connection with their investments and that those agreements contained certain disclaimers."  *Id.* at 6990:6–9.  The jury was instructed that while "a disclaimer in a contract does not, by itself, establish that a misrepresentation to investors was immaterial," jurors could "consider contractual disclaimers (just like any other statement) as part of the information before investors" when deciding "whether a reasonable investor would have considered a misrepresentation to be significant or important to his or her investment decision."  *Id.* at 6990:15–23.

Mr. Schneider takes issue with the portion of the materiality charge stating that if the jury found "that the defendant [they were] considering made a material misrepresentation or omitted a material fact, . . . it does not matter whether the statement was made to a gullible buyer or

sophisticated investor." Trial Tr. 6989:24–6990:5. But that statement accurately reflects the law. Materiality is assessed based on "[t]he standard of a 'reasonable investor,'" which is "an objective one." *Litvak II*, 889 F.3d at 64. The language to which Mr. Schneider objects accurately conveyed that if jurors found a misrepresentation material under the "reasonable investor" standard, they need not conduct a subjective inquiry analyzing the characteristics of the individual to whom the statement was made. *See United States v. Schlisser*, 168 F. App'x 483, 486 (2d Cir. 2006) (holding that defendant's challenge to similar jury instruction "plainly fails").

For his part, Mr. Gentile objects that the charge did not include additional proposed language directing that jurors "must consider the sophistication of investors in the particular fund" in assessing materiality. Gentile Mot. for New Trial 8–9. But Mr. Gentile has failed to demonstrate that this additional language "represents a theory of defense with basis in the record that would lead to acquittal[], and . . . is not effectively presented elsewhere in the charge. *Holland*, 381 F.3d at 84. The charge already instructed that materiality should be assessed in light of the "total mix of information" before GPB investors. It therefore gave defendants ample opportunity to argue, as they did, that GPB investors were sophisticated individuals with access to abundant information that rendered the challenged statements immaterial—such as audited financial reports, subscription agreements, and advice from broker-dealers or registered investment advisers, the only individuals through whom one could invest in the GPB funds. *See, e.g.*, Trial Tr. 6705–6715. Indeed, as defendants elicited and emphasized, the mix of information before investors included a contract which specifically provided that GPB investments were only available to sophisticated investors with knowledge and experience in investment matters and which required investors to affirm that point. *See, e.g.*, *id.* at 275, 531, 6512–26, 5144–45, 6512–13. Simply put, the existing reasonable-investor instruction left defendants free to argue "that, in

a market full of sophisticated investors" who had received certain disclosures, "no reasonable investor would have credited" defendants' representations regarding the source of funds used to pay distributions, *Gramins I*, 939 F.3d at 446. But the jury was entitled to reject that theory of the evidence in light of the extensive investor and advisor testimony on the materiality issue. *See* pages 42–46, *supra*.

### 3. Willfulness

Neither the securities fraud instruction on willfulness nor the omission of a willfulness charge for wire fraud were erroneous. *See* Schneider Mot. 71; Gentile Mot. for New Trial 2–5; Gentile New Trial Reply 1–3. The jury charge on securities fraud accurately instructed that conviction required a finding that the defendant "acted willfully" and that to "act 'willfully' means to act with a wrongful purpose; that is, with awareness that the individual defendant was doing a wrongful act." Trial Tr. 6981:22–24, 6984:22–6985:16. While defendants claim that willfulness requires an awareness that conduct is unlawful, *see* Gentile Mot. for New Trial 3–4, a securities fraud conviction does "not require a showing that a defendant had awareness of the general unlawfulness of his conduct, but rather, that he had an awareness of the general wrongfulness of his conduct." *United States v. Kaiser*, 609 F.3d 556, 569 (2d Cir. 2010). The Second Circuit recently upheld a willfulness charge substantially similar to the one presented here, explaining that its recent decision in *United States v. Kosinski*, 976 F.3d 135 (2d Cir. 2020), on which defendants rely, merely "reaffirmed [*Kaiser*'s] holding on 'willfulness.'" *United States v. Petit*, No. 21-543, 2022 WL 3581648, at *4 (2d Cir. Aug. 22, 2022) ("[T]he district court correctly instructed the jury that it could find that Taylor and Petit acted willfully if they 'act[ed] deliberately and with a bad purpose, rather than innocently.'").

The jury charge on wire fraud properly omitted a willfulness requirement. Willfulness "is not included in the wire fraud statute itself," the "vast weight of authority" holds that willfulness is not required for a wire fraud conviction, and the omission of a willfulness requirement comports with the Second Circuit's insistence that a mistake of law provides no defense to conviction. *United States v. Middendorf*, No. 18-CR-36 (JPO), 2019 WL 4254025, at *7 (S.D.N.Y. Sept. 9, 2019) (citing *United States v. Blagojevich*, 794 F.3d 729, 739 (7th Cir. 2015), and *United States v. Porcelli*, 865 F.2d 1352, 1358 (2d Cir. 1989)); *see also, e.g.*, *United States v. Dockray*, 943 F.2d 152, 155–56 (1st Cir. 1991).

### 4.    Intent to deprive investors of the benefit of the bargain

The omission of an instruction that a wire fraud conviction required the jury to find "an intent to deprive investors of the benefit of the bargain," Schneider Mot. 71, was not error. To prove wire fraud, the government must show the defendant acted with a "knowing intent to defraud" and contemplated "some harm or injury to the property rights of the victim." *United States v. McGinn*, 787 F.3d 116, 123 (2d Cir. 2015) (citation omitted); *see United States v. Shellef*, 507 F.3d 82, 107 (2d Cir. 2007) (noting that "the 'scheme to defraud' prong" requires that "the defendant [have] contemplated actual harm that would befall victims due to his deception"). But defendants have not established that the jury charge "misle[d] the jury" or failed to "adequately inform the jury" of that wire fraud element. *Roy*, 783 F.3d at 420. The jury charge noted that a wire fraud conviction required proof, beyond a reasonable doubt, of the defendant's knowing participation in a "scheme or artifice to defraud with the purpose of obtaining money or property with knowledge of its fraudulent nature and with specific intent to defraud." Trial Tr. 7007:24–7008:2. The charge further specified that a "scheme to defraud" requires, *inter alia*, "that the scheme contemplated depriving another of money or property," and that "intent to defraud"

68

requires that the defendant have "act[ed] knowingly with the intent to deceive" and a "lack of good faith." *Id.* at 6991:5–20, 7009:21–7010:2. The charge was adequate in its presentation of the requisite *mens rea* for a wire fraud conviction. *See McGinn*, 787 F.3d at 122–23.

Mr. Schneider was not entitled to his requested instruction stating that wire fraud requires proof not only that the defendant contemplated harm to the victim but also that he intended to inflict economic harm on the victim, because that instruction is not "legally correct." *Holland*, 381 F.3d at 84 (citation omitted). Because "defendants must *either* intend to harm their victim *or* contemplate that their victim may be harmed," *United States v. Gatto*, 986 F.3d 104, 113 (2d Cir. 2021) (emphasis added) (citing *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987)), "a showing of intent to cause financial loss" is not required, *United States v. Pasternak*, No. 23-6316-CR, 2024 WL 4763986, at *3 (2d Cir. Nov. 13, 2024) (quoting *Shaw v. United States*, 580 U.S. 63, 67 (2016)).

### 5. *Unanimity as to a false statement underlying a scheme to defraud*

Defendants have not established that their requested wire fraud instruction—that unanimity is required as to a particular false statement in order to prove a scheme to defraud, *see* Gentile Mot. for New Trial 5–8—is "legally correct," *Holland*, 381 F.3d at 84 (citation omitted). A jury can convict notwithstanding its "disagreement about . . . 'which of several possible means the defendant used to commit an element of the crime[,] . . . as long as all 12 jurors unanimously conclude that the Government has proved the necessary related element." *United States v. Requena*, 980 F.3d 30, 48–49 (2d Cir. 2020) (brackets omitted) (quoting *Richardson v. United States*, 526 U.S. 813, 817 (1999)). "Elements are . . . 'ordinarily listed in the statute that defines the crime,'" *id.* at 49 (quoting *Richardson*, 526 U.S. at 817), as distinct from items within an

69

"illustrative list . . . 'specif[ying] diverse means of satisfying [an] element,'" *ibid.* (quoting *Mathis v. United States*, 579 U.S. 500, 506 (2016)).

A false statement underlying a scheme to defraud is properly classified as a means, rather than an element, of wire fraud.  The wire fraud statute prohibits "devis[ing] any scheme or artifice to defraud . . . by means of false or fraudulent pretenses, representations, or promises."  18 U.S.C. § 1343.  Like the statute discussed in *Mathis*, *see* 579 U.S. at 506, the only reference to "false or fraudulent . . . representations" is contained in an illustrative list of "means"—along with false "pretenses" and "promises"—by which a scheme to defraud may be "devised," 18 U.S.C. § 1343. The Second Circuit has thus stated that "[t]he elements of wire fraud are: (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the wires to further the scheme"— conspicuously omitting defendants' asserted false-statement element.  *E.g.*, *United States v. Cooper*, No. 22-2709-CR, 2024 WL 4533335, at *1 (2d Cir. Oct. 21, 2024) (quoting *United States v. Jabar*, 19 F.4th 66, 76 (2d Cir. 2021))).  And the four circuits to have specifically addressed the issue have rejected the argument that jurors must be unanimous as to a particular false statement underlying their verdict.  *United States v. Daniel*, 749 F.3d 608, 613–14 (7th Cir. 2014) (citing *United States v. LaPlante*, 714 F.3d 641, 647 (1st Cir. 2013), *United States v. Rice*, 699 F.3d 1043, 1048 (8th Cir. 2012), and *United States v. Lyons*, 472 F.3d 1055, 1068 (9th Cir. 2007)).

Accordingly, it was not error for the jury charge to omit an unanimity requirement as to a false statement underlying the scheme to defraud.

### G.    A remark made during jury selection does not warrant a new trial.

An isolated remark about the U.S. Attorney by the magistrate judge overseeing jury selection does not warrant a new trial.  A new trial due to judicial conduct "is appropriate only where an examination of the entire record demonstrates that the jurors have been impressed with

the trial judge's partiality to one side to the point that this became a factor in the determination of the jury." *United States v. Mulder*, 273 F.3d 91, 109 (2d Cir. 2001) (citation omitted). A new trial is not required even if "some comments would have been better left unsaid." *United States v. Pisani*, 773 F.2d 397, 402 (2d Cir. 1985). Defendants fail to clear that high bar. They rely on a single comment to the venire when "introduc[ing] the participants in the case," in which the judge conducting jury selection referred to Breon Peace, the then-United States Attorney, as a "great man." June 10, 2024 Tr. 38:12–15. That isolated, "relatively mild" comment does not justify a new trial, especially in the context of the judge's repeated cautioning that defendants and the government are equals before the Court. *United States v. Robinson*, 635 F.2d 981, 984–85 (2d Cir. 1980); *see* June 10, 2024 Tr. 32:16–23, 184:4–7; *see also* Trial Tr. 6957:6–19.

*    *    *

Defendants' remaining challenges to the jury charge do not support reversal for the reasons explained on the record during trial. The motions for a new trial are therefore denied.

### III.    Defendants Are Not Entitled to Dismissal Based on Prosecutorial Misconduct

Mr. Gentile's motion to dismiss the indictment based on prosecutorial misconduct, in which Mr. Schneider joins, is denied. "Dismissal of the indictment is an extreme sanction and a drastic remedy, appropriate only when it is otherwise impossible to restore a criminal defendant to the position that he would have occupied vis-a-vis the prosecutor, or when there is a widespread or continuous pattern of prosecutorial misconduct." *Halloran*, 821 F.3d at 342 n.14 (quotation marks and citation omitted).

Defendants argue that the government committed prosecutorial misconduct by eliciting perjury, withholding prior statements made by its witnesses or improperly coaching them during trial, eliciting inflammatory testimony in bad faith, and engaging in misconduct during summation

71

and rebuttal.  *See* Gentile Mot. to Dismiss; Schneider Mot. 71–83; Gentile MTD Reply; Schneider Reply 43–45; Sept. 16, 2024 Schneider Ltr.  Those arguments which were asserted in Mr. Schneider's motion for a new trial, and incorporated by reference by Mr. Gentile, do not support dismissal for the reasons explained above.  *See* pages 54–57, *supra*; Gentile Mot. to Dismiss 6; Schneider Mot. 71–83; Schneider Reply 43–45.  Mr. Gentile's remaining arguments lack merit.

Mr. Gentile has not established that the government elicited perjury.  "Reversal of a conviction based upon allegations of perjured testimony should be granted only with great caution and in the most extraordinary circumstances." *United States v. Zichettello*, 208 F.3d 72, 102 (2d Cir. 2000) (quotation marks and citation omitted)).  "To establish his entitlement to a new trial on the ground that a witness committed perjury, a defendant must show that (i) the witness actually committed perjury; (ii) the alleged perjury was material; (iii) the government knew or should have known of the perjury at the time of trial; and (iv) the perjured testimony remained undisclosed during trial." *United States v. Kirk Tang Yuk*, 885 F.3d 57, 89 (2d Cir. 2018) (quotation marks and citation omitted).  "Where the alleged perjury came to light during the trial and the defendant had ample opportunity to undermine the witness's credibility, '[the court] will not supplant the jury as the appropriate arbiter of the truth and sift falsehoods from facts.'" *Ibid.* (quoting *Zichettello*, 208 F.3d at 102).  "[A] witness commits perjury if he gives false testimony concerning a material matter with the willful intent to provide false testimony." *United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001).  "Simple inaccuracies or inconsistencies in testimony" arising from "confusion, mistake, or faulty memory . . . do not rise to the level of perjury." *Ibid.*

Mr. Gentile has not established that the government knowingly elicited perjury.  First, he has not shown that Bill Jacoby's testimony regarding a 2014 GPB Auto performance guarantee was more than an inaccuracy resulting from confusion.  *See* Gentile Mot. to Dismiss 5–7; Trial Tr.

1127:18–1128:2 (cross-examination of Bill Jacoby) ("I must have been confused."). And Mr. Gentile has not established that any of the other testimony cited in his motion was false. *See* Gentile Mot. to Dismiss 5, 8–14; *see, e.g.*, Trial Tr. 717:21–718:3, 823:6–9, 1128:4–19 (testimony and cross-examination of Bill Jacoby) (explaining that GPB Auto's 2014 distributions were "covered" by net investment income but were not "paid 100 percent from profits from . . . car dealerships"); *id.* at 770:10–772:3 (testimony of Bill Jacoby) (referring to "other expenses" beyond private jet travel); *id.* at 952:19–20 (testimony of Bill Jacoby) (testifying to how the "no present plans" language "got into" GPB Auto's PPM in 2016); Gentile Mot. to Dismiss 13–14 (arguing only that certain testimony by Jeffrey Lash was "uncorroborated by any other evidence").

Second, Mr. Gentile has failed to show that the government knowingly elicited perjury through Bill Jacoby's testimony that the Holdings I performance guarantees were reflected as income on the 2014 audited financial statements, or that the government presented false evidence in summation when it relied on that testimony. *See* Gentile Mot. to Dismiss 12–13, 18–22. While Mr. Gentile points to testimony from defense expert Martin Wilczynski, certain documentary evidence, and Mr. Jacoby's lack of corroboration for his testimony, *see id.* at 18–19; Gentile MTD Reply 11–12., the jury could permissibly credit Mr. Jacoby's testimony over the evidence submitted by Mr. Gentile, *see* pages 41–42, *supra*. As a result, Mr. Gentile has failed to "demonstrate[] that [Mr. Jacoby] in fact committed perjury," or that the government was foreclosed from arguing in summation that the jury should credit Mr. Jacoby's testimony. *United States v. Diaz*, 176 F.3d 52, 106 (2d Cir. 1999). Moreover, Mr. Gentile extensively questioned Mr. Jacoby using the documentary evidence that allegedly contradicts Mr. Jacoby's testimony regarding Holdings I's 2014 audited financial statements. *See* Trial Tr. 970:4–989:25, 1140:12–1145:3. Any supposed inaccuracies exposed by Mr. Gentile merely entitled the jury "to weigh the

evidence and decide the credibility issues for itself." *United States v. Josephberg*, 562 F.3d 478, 494 (2d Cir. 2009); *cf.* Trial Tr. 981:24 (statement by counsel for Mr. Gentile during cross-examination of Bill Jacoby) ("Okay. The jury will decide.").

Third, Mr. Gentile has not established that dismissal is warranted based on a *Giglio* violation or his allegation that the government coached certain witnesses. *See* Gentile Mot. to Dismiss 14–16. To demonstrate a *Giglio* violation, a defendant must show that the government "either willfully or inadvertently, suppressed evidence"—including "evidence that could be used to impeach a key government witness"—and that "the failure to disclose this evidence resulted in prejudice." *United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001) (citing *Giglio v. United States*, 405 U.S. 150, 151 (1972)). Mr. Gentile points to several instances of "testimony from key witnesses that had not been disclosed to the defense before trial." Gentile Mot. to Dismiss 14. But without evidence "indicating or even suggesting that the Government possessed this information before trial," Mr. Gentile cannot establish that the government "willfully or inadvertently suppressed [that] information." *United States v. Full Play Group, S.A.*, No. 15-CR-252 (PKC), 2023 WL 1994196, at *7 (E.D.N.Y. Feb. 13, 2023). Beyond this, defendants cannot show prejudice. They "had ample opportunity to cross-examine" the relevant witnesses, "develop[] that opposing counsel had in fact coached the witness[es]," and "question the witness[es'] credibility in closing arguments." *United States v. Fearon-Hales*, 224 F. App'x 109, 112 (2d Cir. 2007) (brackets omitted) (quoting *Geders v. United States*, 425 U.S. 80, 89–90 (1976)); *see, e.g.*, Trial Tr. 6567:1–6570:22 (summation for Mr. Gentile) ("They are literally prepping [Jeffrey Lash] in the middle of the cross-examination I'm doing of Mr. Jacoby . . . . Witnesses in this case have been coached to give you a story.").

74

Finally, Mr. Gentile has not shown that the government elicited inflammatory testimony in bad faith. *See* Gentile Mot. to Dismiss 16–17. As the government notes, the testimony cited by Mr. Gentile was either struck, *see* Opp'n 149 & n.45 (Dkt. #499), or was not objected to by defendants, *see* Trial Tr. 714:17–715:8 (testimony of Bill Jacoby) (testifying Mr. Schneider "told" Mr. Jacoby he "was being a cock block and that [he] should stick to accounting and [Mr. Schneider] would stick to the marketing"); *id.* at 1201:4–1202:7 (cross-examination of Bill Jacoby) (referencing "Ponzi payments" during discussion of risk language in fund PPM). "Where, as here, the defendant did not object at trial to the statements . . . , the plain error standard applies, requiring" the Court "to reject any assignment of error that does not amount to flagrant abuse which seriously affects the fairness, integrity, or public reputation of judicial proceedings, and causes substantial prejudice to the defendant." *United States v. Williams*, 690 F.3d 70, 75 (2d Cir. 2012) (quotation marks and citation omitted). "Given the context in which" Mr. Jacoby made the two unstricken statements "and the evidence used to convict" Mr. Gentile, Mr. Gentile has failed to show that either statement meets the high bar required for relief on plain error review. *United States v. Strauss*, 999 F.2d 692, 699 (2d Cir. 1993).

Accordingly, Mr. Gentile's motion to dismiss the indictment based on prosecutorial misconduct is denied.

**CONCLUSION**

Defendants' motions for judgments of acquittal and for a new trial are denied, as is Mr.

Gentile's motion to dismiss the indictment based on prosecutorial misconduct.

SO ORDERED.

_/s/ Rachel Kovner_
RACHEL P. KOVNER
United States District Judge

Dated: March 11, 2025
        Brooklyn, New York